# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. *16-cr-00301-WJM*

UNITED STATES OF AMERICA

        Plaintiff,

v.

1.   WILLIAM J. SEARS, and
2.   SCOTT M. DITTMAN,

        Defendants.

---

## INFORMATION
18 U.S.C. §371
26 U.S.C. §7206(1)

---

The Acting United States Attorney charges that:

## COUNT 1

1.     Beginning as early as in or about March 25, 2011 and continuing at least through in or about May 15, 2014, the exact dates being unknown, in the State and District of Colorado, and elsewhere, the defendants,

### WILLIAM J. SEARS, and
### SCOTT M. DITTMAN,

did knowingly and willfully conspire, combine and agree with each other, and with other persons both known and unknown,

    (a) to defraud the United States and one of its agencies, the United States Securities and Exchange Commission ("SEC"), by impeding, impairing, defeating and obstructing the lawful

1

governmental functions of the SEC; and

      (b) to commit the following offenses against the United States:

          (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5];

          (ii) willful violations of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a);

          (iii) mail fraud, in violation of Title 18, United States Code, Section 1341; and

          (iv) wire fraud, in violation of Title 18, United States Code, Section 1343.

## **Background**

At all times material to this Information:

2.      Defendant WILLIAM J. SEARS was a resident of Thornton, Colorado whose principal occupation over the years was providing public relations and promotional services to companies with low or minimal capitalization (hereinafter, "microcap companies") that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets.   In 2007, defendant Sears was convicted in the Southern District of New York of one count of conspiring to commit federal securities fraud and commercial bribery and one count of federal securities fraud (Case No. 04-cr-556-swk).

3.      Microcap Management LLC ("Microcap") was a Nevada limited liability company formed by defendant SEARS, with its primary business address in Colorado. Defendant SEARS was, among other things, the beneficial owner and manager of Microcap and controlled Microcap. SEARS primarily conducted his stock public relations and promotional business through Microcap over the years.

2

4.      Bayside Realty Holdings, LLC ("Bayside") was another Nevada limited liability company formed, controlled and operated by defendant SEARS, in fact, but which was held out to be managed and owned by a blood relative family member (hereinafter, "Family Member A") residing in North Carolina.

5.      Defendant SCOTT M. DITTMAN was a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania.   From October 1991 until April 1995, DITTMAN practiced as an accountant and for two years, from 1995 to 1997, had been a certified public accountant licensed in the State of California. Thereafter, defendant DITTMAN was principally self-employed in various businesses, including real estate development, construction and, beginning in or about 2010, medical marijuana. Defendants DITTMAN and SEARS were brothers-in-law, SEARS being married to DITTMAN's sister.

6.      FusionPharm, Inc. ("FusionPharm") was a Nevada corporation with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado. FusionPharm's principal business was the development, manufacture and sale of steel shipping containers retrofitted and refurbished for use as hydroponic growing pods, branded as "PharmPods," for indoor plant cultivation, primarily cannabis. Defendant DITTMAN was the founder, chief executive officer and sole director of FusionPharm but, in fact, operated FusionPharm, and pursued and developed its business, together and in concert with defendant SEARS, and the two defendants together beneficially held and controlled the majority of the shares of FusionPharm's common and preferred stock, which was convertible into the company's common stock.   FusionPharm's common stock was publicly traded in the over-the-counter markets, primarily through transactions involving networks of securities broker-dealers.

3

7.     Meadpoint Venture Partners, LLC ("Meadpoint") was a Nevada limited liability company formed by defendant SEARS and was held out to be FusionPharm's exclusive distributor of PharmPods, marketing, in particular, to customers interested in using the pods for cannabis cultivation.   Meadpoint shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm. Defendant SEARS was identified as Meadpoint's managing member, and Meadpoint was operated by both defendants together in conjunction with the operations of FusionPharm.

8.     VertiFresh, LLC ("VertiFresh") was a Delaware limited liability company jointly owned and controlled together by defendants SEARS and DITTMAN.   Vertifresh was held out to be a licensee of FusionPharm's technology and growing methods whose principal business purportedly involved using FusionPharm PharmPods to grow non-cannabis produce (primarily, lettuce) for sale to restaurants and retail food outlets. Vertifresh shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm.

9.     OTC Link was an electronic inter-dealer stock quotation system that published stock quotes and other stock transaction information posted by securities broker-dealers and was typically used by broker-dealers to display quotes and make markets in securities of publicly traded microcap companies whose securities were traded in the over-the-counter markets.   Such companies did not have to meet any requirements in order to have their stocks quoted on the OTC Link system, and any reporting or disclosure by companies whose stocks were quoted on the system was voluntary.   However, the OTC Link system organized and classified the securities of the companies quoted on its system into several distinct marketplaces or "market

4

tiers," depending, in large part, on the nature, quality and extensiveness of the corporate and financial disclosures a company provided to OTC Link. The "market tiers" were designed to provide investors some indication as to the quality and level of information about the companies on the OTC Link system, and companies that provided limited or no information were placed in market tiers reserved for stock issuers that prospective investors were advised to consider with caution. The type of information that participating companies were encouraged to provide to OTC Link typically included quarterly and annual financial statements and quarterly and annual reports, in a prescribed format, providing disclosure, among other things, about the officers, directors, control persons and significant beneficial owners of the company's stock. These quarterly and annual submissions were uploaded to OTC Link's website, where they were readily accessible to the investing public and subject to wide dissemination through financial media outlets.

10.     FusionPharm's common stock was quoted on the OTC Link under the stock symbol "FSPM" and, using this system, securities broker-dealers made a market in and facilitated public, over-the-counter trading in its stock.   FusionPharm undertook to, and regularly did, upload to the OTC Link's website, and thereby made available to the investing public, quarterly and annual financial statements and reports providing information about its performance, its financial condition and the identities of its officers, control persons and significant stockholders.

11.     The SEC was an independent agency of the executive branch of the United States Government whose duties included regulating and monitoring the trading of securities and the

reporting of financial and other information by publicly-held corporations within the United States.

12.     Under the federal securities laws, the securities of companies traded in United States could not be bought and sold in public transactions unless first registered with the SEC or considered exempt from registration pursuant to one of several defined statutory or regulatory provisions.   Such registration typically involved providing to the SEC and making available to the investing public certain specified information about the company, its financial situation, its operations and its principals and officers, in a prescribed form filed with the SEC which typically included a prospectus made available to potential investors.   Securities that were unregistered, and not otherwise exempt from registration, were considered restricted securities that were not eligible for lawful public re-sale, and the certificates evidencing these securities typically bore a legend providing notice of this status.

13.     One of the exemptions from registration recognized under the federal securities laws generally allowed holders of unregistered securities, not already unrestricted at the time of receipt, to resell them in public transactions, without limitation, after having held the securities for a specified period.   This holding period, in the case of companies such as FusionPharm, was one year.   Holders of unregistered, restricted securities who were deemed to be "affiliates" could resell these securities in public transactions after meeting the specified holding period, but only if they met certain additional regulatory requirements, and only then in limited numbers of shares over specified periods of time (*i.e.*, in public sales subject to "volume restrictions").   An "affiliate," for the purpose of this regulatory exemption from registration, was considered to be someone who directly, or indirectly through one or more intermediaries, controlled, or was

6

controlled by, or was under common control with the issuing company.   Such "control" was defined to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

14.     Both non-affiliate and affiliate holders of unregistered securities, upon satisfying their respective requirements for the regulatory exemption from registration, would typically have had to have the stock transfer agent for the issuing company remove the restrictive legends on the certificates of their securities, before the securities could be eligible for resale in a public transaction.   To accomplish this, the holders would have had to have secured the consent of the issuing company and would have had to have provided documentation to the stock transfer agent demonstrating that the requirements for exemption from registration had been met.

15.     None of FusionPharm's securities were registered with the SEC, and the only way that its securities could be traded over-the-counter or in other public transactions were through transactions involving securities that qualified for exemption from registration with the SEC.

## Manner and Means of the Conspiracy

16.     It was part of the manner and means of carrying out the conspiracy that:

A.     Defendant SEARS would cause shares of preferred stock of FusionPharm held in the name of Microcap to be converted into shares of FusionPharm common stock and deposited into brokerage accounts established in the name of Microcap. Defendant SEARS would induce brokers overseeing these accounts to consider and treat these common shares as unrestricted securities that could be immediately sold in the public securities markets by falsely representing to them that neither he nor Microcap was an affiliate of FusionPharm or a control

person of the company.   Defendant DITTMAN facilitated the deposit of these shares, and their treatment as unrestricted securities, by executing FusionPharm officer certificates and other documentation affirming that Microcap was not an affiliate of FusionPharm.

B.      Defendant SEARS would then cause the remainder of these preferred shares to be transferred from Microcap's name into the names of family members or entities held in the name of family members, in order to make it appear that neither he nor Microcap had shareholdings in FusionPharm in such amounts as to deem either SEARS or Microcap to be affiliates or control persons under the federal securities laws or to trigger their disclosure as significant shareholders under the reporting guidelines established by OTC Link. Defendant SEARS would thereafter cause portions of the FusionPharm preferred shares that had been transferred into the names of these family members and entities, in turn, to be converted into additional common shares of FusionPharm that could be publicly sold later on or that he and DITTMAN could later use to raise funds for the company in private sales to select FusionPharm investors.

C.      Defendant SEARS, working in coordination with another individual, would thereafter cause the FusionPharm common shares that had been deposited into the Microcap brokerage accounts to be sold in the public securities markets and, in consultation with defendant DITTMAN, would deposit significant portions of the proceeds of these FusionPharm stock sales into operating bank accounts of FusionPharm – both directly and through a series of transactions involving Bayside, Meadpoint or Vertifresh – so that the money could then be used to capitalize and operate the company, as well as be used for the defendants' own financial support.

8

17.     As a further part of the manner and means of carrying out the conspiracy, in order to generate and make available for themselves additional FusionPharm common stock that could immediately be sold, without limitation, into the public securities markets, the defendants did and caused the following to be done:

A.     Over the course of June 2012 through in or about December 2012, the defendants, working together with another individual (identified hereinafter as, "Co-Conspirator A"), fabricated promissory notes and incorporated credit line agreements, in order to falsely portray some of the money that had previously been deposited into FusionPharm's bank accounts from the Microcap FusionPharm stock sales as loans from Bayside and Meadpoint that had been extended to FusionPharm over a year before.

B.     The defendants and Co-Conspirator A further fabricated documentation making it appear that FusionPharm had drawn down on the supposed credit lines established with Bayside and Meadpoint by specified amounts, and they assembled bank records to offer substantiation for these supposed earlier credit line draw downs.

C.     The defendants and Co-Conspirator A, in the final iterations of these fabricated promissory notes and supporting documents, made it appear that the supposed debt evidenced by these notes could be converted in whole or in pieces, at the election of the noteholders, into shares of FusionPharm common stock at a specified conversion rate of one FusionPharm share for every penny of debt supposedly still owed on the notes by FusionPharm.

D.     Defendant DITTMAN, on behalf of FusionPharm, and defendant SEARS, on behalf of Meadpoint and acting for Family Member A on behalf of Bayside, executed the back-dated promissory notes and documents.

E.      Defendants SEARS and DITTMAN then generated packets of documents that SEARS caused to be presented to FusionPharm's stock transfer agent, over a series of months, in order to effectuate the conversion of portions of the supposed debt held by Bayside and Meadpoint into shares of FusionPharm common stock. The packets typically included the following:

- convertible promissory notes that he and defendant DITTMAN had backdated;

- the backdated draw down requests that DITTMAN had signed on behalf of FusionPharm;

- copies of bank account statements showing deposits to FusionPharm's accounts corresponding to the draw down requests;

- letters from Bayside and Meadpoint (depending on the entity exercising the conversion), for signature by Family Member A for Bayside and SEARS for Meadpoint, falsely representing that the entities were not affiliates of FusionPharm;

- additional statements of non-affiliation for Bayside and Meadpoint (again depending on the entity exercising the conversion), reiterating that neither entity was a FusionPharm affiliate and additionally representing that neither Family Member A, in the case of Bayside, and SEARS, in the case of Meadpoint, was an officer, director, control person or holder of more than ten percent of the securities of FusionPharm;

- a FusionPharm officer's certificate, signed by DITTMAN, representing that neither Bayside nor Meadpoint (depending on the entity making the conversion) were affiliates of FusionPharm and were outsiders to the company and management, with no other method of control over the company, and that the convertible promissory notes that were the vehicles for the conversion were valid obligations of the company;

- additional letters signed by DITTTMAN reiterating that Bayside and Meadpoint were not affiliates of the company; and

- attorney opinion letters opining that the common shares to be issued to Bayside and Meadpoint met the federal securities exemption from registration and could be issued as unrestricted shares without the need for a restrictive legend.

18.      It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS thereafter caused a substantial portion of the common shares issued to

Bayside and Meadpoint as a result of these supposed debt conversions to be deposited into brokerage accounts set up in the names of Bayside and Meadpoint and then caused these shares to be sold in the public securities markets.

19.     It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS, in consultation with defendant DITTMAN, would arrange for a substantial portion of the proceeds realized from the stock and debt sales resulting from the supposed FusionPharm debt to Bayside and Meadpoint to be deposited either directly or indirectly into FusionPharm's operating bank accounts so that these funds could also be used to further capitalize and support the operations of the company and to provide for both defendants' financial support.

20.     As a part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, caused FusionPharm to treat and account for some of the funds received back to FusionPharm from the Microcap, Meadpoint and Bayside sales of FusionPharm stock as payments to FusionPharm for or relating to sales of its PharmPods, which sales DITTMAN then caused FusionPharm to book in its accounting records as licensing revenues realized by the company.   The stock proceed deposits were claimed, in particular, to be payments by Meadpoint, acting in its supposed capacity as FusionPharm's purported exclusive PharmPod distributor, for PharmPods that were being manufactured for and sold to FusionPharm customers in arms-length transactions but that had not yet been delivered to those customers or purported Meadpoint payments in anticipation of sales of PharmPods that DITTMAN and SEARS were still negotiating with prospective FusionPharm customers.

11

21.     As a further part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, also sought to use purported dealings with Vertifresh as a basis to claim and book additional revenues for FusionPharm.   DITTMAN and SEARS caused contracts and related documentation to be drafted that purportedly depicted a licensing agreement between FusionPharm and Vertifresh, pursuant to which Vertifresh agreed to pay $750,000 to FusionPharm over the course of three years in exchange for the purchase of a series of PharmPods and the right to use FusionPharm's growing methods and technology to cultivate and sell non-cannabis produce in three distinct geographic regions.   Based on this purported agreement, DITTMAN then caused FusionPharm to book the entire licensing agreement amount as FusionPharm revenues in a single year, 2012.

22.     It was part of the manner and means of carrying out the conspiracy that defendant DITTMAN, with defendant SEARS' assistance, would then cause these purported transactions with Meadpoint and Vertifresh and the purported revenues associated with them to be publicly disseminated, among other ways, through press releases disseminated in the financial media and through interviews by DITTMAN made available to the public.

23.     It was a further part of the manner and means of carrying out the conspiracy that defendants DITTMAN and SEARS would cause these transactions and revenue figures to be reported in quarterly and annual financial statements uploaded to, and made available to the investing public on, OTC Link's website. DITTMAN, working in concert with SEARS, would cause the financial statements notes and the quarterly and annual reports to omit facts revealing that Meadpoint, Vertifresh and FusionPharm were all under the common control of the

defendants and the revenues generated as a result of these transactions were between related

parties.   DITTMAN, in concert with SEARS, would further cause FusionPharm to affirmatively

represent in these reports that there were, in fact, no related party transactions with immediate

family members and significant beneficial owners of FusionPharm stock and would cause these

reports to conceal completely SEARS' involvement in the company and his beneficial ownership

of its stock.

### Overt Acts

24.     In furtherance of the conspiracy and to effect the objects thereof, one or more

overt acts were carried out by at least one co-conspirator in the State and District of Colorado

and elsewhere, which overt acts included the following:

A.     On or about March 25, 2011, defendants SEARS and DITTMAN caused an Issuer

Company-Related Action Notification form to be filed with the Financial Industry Regulatory

Authority ("FINRA") providing notice of a name change to, and stock symbol change with

respect to, FusionPharm, identifying himself and Family Member A as the sole officers and

directors of the company, and representing, among other things, that none of the company's

officers, directors or parties related to the company were the subjects of pending, adjudicated or

settled civil or criminal action related to fraud or securities violations.

B.     On or about April 11, 2011, defendant SEARS sent a letter to a representative of

FusionPharm's stock transfer agent in Las Vegas, Nevada surrendering a stock certificate

evidencing the ownership of 185,0000 FusionPharm preferred shares and requesting that a

portion of the shares evidenced by this certificate be converted into 80,000 shares of

FusionPharm common stock in the name of a limited liability company in Orlando, Florida and

13

65,000 shares of FusionPharm common stock in the name of Microcap and that the balance of the remaining preferred shares, 183,550, be transferred to a company in Thornton, Colorado.

C.     On or about April 21, 2011, defendant DITTMAN sent an email to a number of people, bearing the subject "Fusion Pharm," announcing that he had recently "partnered with [his] brother-in-law William Sears" and that "we have acquired and moved our operations into a publicly traded company: Fusion Pharm, Inc."

D.     On or about May 2, 2011, defendant SEARS sent a letter to an employee at Oppenheimer, & Co., Inc., directing that 65,000 shares of FusionPharm common stock be deposited into the brokerage account of Microcap Management and representing that Microcap Management was neither a control person nor an affiliate of FusionPharm.

E.     On or about June 20, 2011, defendant SEARS sent an email to defendant DITTMAN, bearing the subject "Stock," advising, in part, that the "cert [was] for 182,050," that "the deal will be structured whereas we can have some free anyway," and that it was "just something we need."

F.     On or about June 23, 2011, defendant DITTMAN sent an email to defendant SEARS asking whether "$3k from this weeks [sic] take" could be wired to a family member's account.

G.     On or about September 6, 2011, defendant DITTMAN sent defendant SEARS an email asking, "What do we have in microcap now?"

H.     On or about September 13, 2011, defendant SEARS forwarded defendant DITTMAN an exchange of emails between SEARS and a representative of a brokerage firm addressing SEARS' inquiry about the net amount in Microcap's brokerage account.

I.      On or about October 6, 2011, defendant DITTMAN had a telephone conversation with a FINRA investigator during which he described defendant SEARS as a part-time salesman for FusionPharm and stated that he was unaware that SEARS owned or was selling FusionPharm stock.

J.      On or about November 3, 2011, defendant DITTMAN had another telephone conversation with the same FINRA investigator during which he stated that defendant SEARS no longer owned Microcap or any FusionPharm stock.

K.      On or about March 31, 2012, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2011, was uploaded to a public website maintained by OTC Link.

L.      On or about June 4, 2012, defendant SEARS forwarded an email from Co-Conspirator A transmitting as an attachment a draft promissory note and credit line agreement for Bayside and stating that Co-Conspirator A would draft "the drawdown requests to match the dates and amounts of the deposits."

M.      On or about June 6, 2012, Co-Conspirator A sent defendant SEARS an email, bearing the subject "Bayside Loan Documents, transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements, and stating, "Bill, Let's get these signed up. Meadpoint's to follow in a separate email."

N.      On or about June 6, 2012, Co-Conspirator A sent defendant SEARS a subsequent email, bearing the subject "MeadPoint Loan Documents," transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements.

15

O.      On or about July 12, 2012, defendant SEARS sent defendant DITTMAN an email, bearing the subject "Cash," stating, in part, "This week will be a gross total of $25,118," and setting forth a "net to FP" of $12,558, after certain enumerated dollar amount offsets to identified individuals.

P.      On or about November 26, 2012, a press release entitled, "FusionPharm Signs Licensing Agreement for Flowering Containers," was disseminated via PR Newswire, announcing the signing of a licensing agreement with Meadpoint to market PharmPods and relating that an initial order of 9 PharmPods had already been received from Meadpoint "with minimum purchase quantities of 50 containers in both 2013 and 2014."

Q.      On or about November 26, 2012, Co-Conspirator A sent an email to defendant SEARS attaching drafts of convertible promissory notes for Bayside and Meadpoint and advising that the "Notes work with the existing draw down requests."

R.      On or about December 12, 2012, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent transmitting a convertible promissory note in favor of Bayside, notifying the transfer agent that "Bayside has chosen to exercise its option to convert into shares [sic]," and that "Bayside [was] a family members [sic] company and I am assisting them [sic] as I am familiar with all parties."

S.      On or about December 27, 2012, Co-Conspirator A sent defendant DITTMAN an email stating, "We are in need of a letter which confirms the end of the drawdowns under the Bayside promissory note," and advising that Co-Conspirator A had drafted such a letter for DITTMAN's signature.

16

T.      On or about January 7, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Bayside Note FSPM," transmitting an attorney's opinion letter, FusionPharm bank account statements "which reflect funding" and a "[c]losing letter that closed the note."

U.      On or about January 30, 2013, defendant SEARS sent an email to Co-Conspirator A and defendant DITTMAN attaching drafts of a licensing agreement between Vertifresh and FusionPharm and advising, "This is the one we should work thru [sic]."

V.      On or about March 6, 2013, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2012, was uploaded to a public website maintained by OTC Link.

W.      On or about March 27, 2013, defendant DITTMAN conducted a recorded interview with a representative of an internet-based financial public relations service for Small Cap Voice.Com, Inc., as self-styled financial communications and investor relations service for "small cap" companies, during which he stated that FusionPharm did "a little over $800,000 in revenue" for 2012 and that he expected FusionPharm to double its results for 2013.

X.      On or about April 11, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Meadpoint Venture Partners FSPM," stating that he was attaching a series of documents, including "a notice to convert," the "[o]riginal note," a "letter of opinion," and a "Non Affiliate declaration," and transmitting scanned versions of the described documents.

Y.      On or about August 5, 2013, defendant DITTMAN set an email to an individual considering making an investment in FusionPharm proposing, in part, that some of the funds for

the contemplated investment involve the individual's purchase of "part of the existing note payable from FusionPharm to Meadpoint Venture Partners."

Z.     On or about February 18, 2014, defendant DITTMAN sent the following email message to a representative of FusionPharm's stock transfer agent, in reply to that representative's observation that defendant SEARS had been listed as an "Administrative Officer" of FusionPharm "which would make him an affiliate:"

> ... Not sure why you would have Mr. Sears as an administrative officer of the Company, he has never been employed by the Company and is not an affiliate. ...

AA.     On or about April 15, 2014, a document identified as FusionPharm's "Financial Statements for the Periods Ended December 31, 3013 [sic] and December 31, 2012 (Restated)", consisting of financial statements and financial statement notes for the periods ended December 31, 2012 and December 31, 2013, was uploaded to a public website maintained by OTC Link.

BB.     On or about May 15, 2014, defendant SEARS forwarded to defendant DITTMAN an email from a representative of an investment firm, bearing the subject "RE: Todays Wires," acknowledging receipt of requests to send three wire transfers from a trust account established in the name of Family Member A.

In violation of Title 18, United States Code, Section 371.

## COUNT 2

25.     On or about January 7, 2013, in the State and District of Colorado, the defendant,

### WILLIAM J. SEARS,

then a resident of Thornton, Colorado, did willfully make and subscribe a U.S Income Tax Return for Single and Joint Filers With No Dependents, Form 1040EZ, for the year 2011, which

was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said return he did not believe to be true and correct as to every material matter, in that the said return reported for the year total adjusted gross income of $7,500 (Form 1040EZ, line 4), whereas, as the defendant then and there well knew and believed, his adjusted gross income was significantly higher than what was actually reported.

In violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE ALLEGATION

26.     The allegations contained in Count One of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

27.     Upon conviction of the violation alleged in Count One of this Information involving the conspiracy to commit of violations of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1341, Title 15, United States Code, Sections 78j(b) and 78ff(a), all in violation of Title 18, United States Code, Section 371, the defendants,

**WILLIAM J. SEARS, and**
**SCOTT M. DITTMAN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to:

19

a.  $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name of Meadpoint Venture Partners;

b.  $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name of Sandra L. Sears;

c.  $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee;

d.  $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name of FusionPharm, Inc.;

e.   $212,273.92 Seized From Wells Fargo Bank Account No 8141061286, Held In The Name of FusionPharm, Inc.;

f.  $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The purchase of 4200 Monaco Street, Denver, Colorado;

g.  194 BASKET ROAD, OLEY, PENNSYLVANIA; and

h.  A money judgment in the amount of proceeds obtained by the conspiracy and by the defendants, for which the defendants are joint and severally liable, less the amount recovered from directly forfeitable assets.

i.  If any of the property described above, as a result of any act or omission of the defendant:

   a) cannot be located upon the exercise of due diligence;
   b) has been transferred or sold to, or deposited with, a third party;
   c) has been placed beyond the jurisdiction of the Court;
   d) has been substantially diminished in value; or
   e) has been commingled with other property which
      cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

20

incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

ROBERT C. TROYER
ACTING UNITED STATES ATTORNEY


By: s/Tonya S. Andrews
Tonya S. Andrews
Assistant United States Attorney


s/Scott Mascianica
Scott Mascianica
Special Assistant U.S. Attorney


s/Kenneth M. Harmon
Kenneth M. Harmon
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, CO 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
Kenneth.Harmon@usdoj.gov