# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. _16 – CC – 321 – WJM_

UNITED STATES OF AMERICA,

                Plaintiff,

v.

1.      WILLIAM J. SEARS,

                Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Kenneth M. Harmon and Tonya S. Andrews, Assistant United States Attorneys for the District of Colorado, and Scott M. Mascianica, Special Assistant United States Attorney for the District of Colorado, and the defendant, William J. Sears, personally and by his counsel, Marci Gilligan LaBranche, Esq., and Frederic M. Winocur, Esq., submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to D.C.COLO.LCrR 11.1.

## I.   PLEA AGREEMENT

      A.      The defendant agrees to plead guilty to a two-count information in this case, in the form annexed hereto as Exhibit A (hereinafter, the "Contemplated Information"), charging him, in Count 1, with conspiring with Scott M. Dittman, named as a co-defendant, and with others to defraud the United States and one of its agencies, the U.S. Securities and Exchange Commission ("SEC"), and to commit specified offenses against the United States, in violation of Title 18, United States Code, Section 371, and, in Count 2, with filing a false income tax return, in violation of Title 26, United States Code, Section 7206(1) .

**EXHIBIT A**

Court
Exhibit
I

B.1.    The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), including, but not limited to: forfeiture of his interest in all property that may constitute or is derived from proceeds of his commission of or involvement or participation in the charged conspiracy and its object offenses, including, but not limited to, the following:

(a)    A money judgment not exceeding approximately $12,204,172, corresponding to the total amount obtained as a result of the Count One;

(b)    The following particular assets, derived from the sale of Fusion Pharm common stock, and constituting direct and indirect proceeds of the Count One:

(1)    $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name Of Meadpoint Venture Partners;

(2)    $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name Of Sandra L. Sears;

(3)    $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name Of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee, less approximately $2,472,945 to be applied to Mr. Sears' restitution;

(4)    $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name Of Fusionpharm, Inc.;

(5)    $212,273.92 Seized From Wells Fargo Bank Account No. 8141061286, Held In The Name Of Fusionpharm, Inc.,

(6)    $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The Purchase Of 4200 Monaco Street, Denver, Colorado; And

(7)    The Real Property Located At 194 Basket Road, Oley, Pennsylvania.

B.2.    The defendant further agrees to forfeit, as substitute assets, (1) $147,724.38 from the sale proceeds of 13442 Jackson Drive, Thornton, Colorado, in the custody of the United States; and (2) any monetary value he realizes in the future from his interest in FusionPharm, Inc. ("FusionPharm").

B.3.     The United States agrees the funds obtained from the forfeiture of any assets, direct or substitute, shall be applied to the forfeiture money judgment identified in subparagraph (a).   In addition, the seized funds applied to any restitution obligation would also be credited to the forfeiture money judgment.

B.4.     The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.   The forfeiture money judgment entered against the defendant would be joint and several with co-defendant Dittman's forfeiture money judgment.   The parties further agree that the forfeiture money judgment shall remain in full force and effect for 5 years from the date of sentencing.

B.5.     The defendant further agrees, at the government's election, to divest whatever beneficial ownership interest he has in shares of common and preferred stock of FusionPharm.

C.1.     The parties agree that, although restitution would otherwise be mandatory with respect to Count 1 of the Contemplated Information, they will take the position that restitution should not be ordered by the Court, pursuant to 18 U.S.C. § 3663A(c)(3), because the number of identifiable victims is so large as to make restitution impracticable and, alternatively, restitution would involve determination of complex issues of fact that would complicate or prolong the sentencing process to a degree that the need for restitution would be outweighed by the burden on the sentencing process.   The parties acknowledge and agree, however, that, while court ordered restitution will not be sought with respect to Count 1 of the Contemplated Information, the assets and funds which are to be forfeited pursuant to the terms of this plea agreement may be made available to eligible victims pursuant to administrative proceeding before the U.S. Department of Justice.

C.2.     The defendant agrees, pursuant to 18 U.S.C. § 3663(a)(3), to make restitution to the Internal Revenue Service in the total amount of $2,433,818, corresponding to the federal tax loss

associated with the sale of FusionPharm securities and other securities for the years 2011 through 2014, a figure comprising unpaid and owed taxes for these years, plus any interest on this amount determined to be due and owing at the time of sentencing (the combined principal and interest due hereinafter referred to as the "criminal tax restitution amount").   The defendant acknowledges and agrees that neither his agreement to pay this restitution nor the restitution payments themselves limit the Internal Revenue Service ("IRS") in its lawful examination, determination, assessment or collection of any taxes, penalties or interest due from him for these years. The defendant further acknowledges and agrees that any disputes regarding such assessments or collection actions will be resolved with the IRS through the administrative and/or judicial process applicable to the resolution of federal civil tax controversies. The parties agree that the criminal tax restitution amount will be paid from funds seized and subject to forfeiture under this plea agreement.

D.1.



    D.2.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

    D.3.    The defendant ■■■■■ agrees to cooperate fully with the Law Enforcement

Agencies in the identification, recovery and repatriation of assets that are subject to, or are

otherwise available for, forfeiture pursuant to his plea obligations with respect to forfeiture, as set

forth in paragraph B above.   Such cooperation shall include, but not necessarily be limited to, (a)

submitting to debriefings concerning the identification, recovery and repatriation of potentially

forfeitable assets; (b) producing documents, records and other evidence, as requested by the Law

Enforcement Agencies, relevant to these subjects; (c) executing documents required by financial

institutions and custodians who may have custody or control of potentially forfeitable assets in order to permit access to records concerning such assets and in order to facilitate the recovery and repatriation of such assets; (d) providing truthful testimony concerning these subjects, whether in the form of testimony or through affidavit or declaration; and (e) appearing at judicial or administrative hearings and proceedings as may be necessary for these purposes.

D.4.    The defendant also agrees to cooperate fully with the IRS in the ascertainment and payment of his correct tax liabilities for the calendar years 2011 through 2014 inclusive, among other ways, by preparing and filing returns or amended returns, as necessary, for those years for himself individually as well as for entities through which he conducted business during those years and on whose behalf he should have filed tax returns.   The defendant further agrees to file truthful and accurate income tax returns which are or may become due by law during any period of supervised release or probation imposed by the Court.

E.    The Office of the United States Attorney for the District of Colorado agrees that – contingent upon the defendant's entry of a guilty plea and sentencing on the Contemplated Information and the defendant's fulfillment of his other plea obligations -- it will not further prosecute the defendant for the conduct set forth in the Contemplated Information or any other criminal conduct known to Office of the United States Attorney for the District of Colorado as of the date of this plea agreement.

F.1.    The parties acknowledge that, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court, while not bound by them, is required to consider the United States Sentencing Guidelines and determine the defendant's applicable sentencing guideline range, in deciding the sentence in this case.

F.2.    The parties agree to take the respective positions ascribed to them regarding the sentencing factors set forth in Part VI herein (the parties' Advisory Guideline Computation and

6

3553 Advisement), which positions, the parties agree, would result in an advisory sentencing guideline range that would exceed the total combined statutory maximum imprisonment term of eight years for both offenses of conviction set forth in the Contemplated Information, were the sentences on such convictions imposed to run consecutively to one another. The parties agree that, as a consequence, under these circumstances, should these positions be accepted by the Court, the effective advisory sentencing guideline range applicable to the defendant would be eight years imprisonment or 96 months. *See* U.S.S.G. §§ 5G1.1-5G1.2 & comments.

F.3.



F.4.

F.5.



F.6. 

The defendant further acknowledges that the government will not be advocating, at the time of sentencing, a sentence on his behalf lower than 60 months imprisonment.

F.7.    The defendant is free, at the time of sentencing, to advocate for any lawful sentence in this case and to make to the Court any arguments in support of thereof, provided, however, that that sentence *include a term of imprisonment not less than 60 months in duration* and any supporting arguments are consistent with the positions he is obligated to take under the plea agreement with respect to the calculation of his advisory sentencing guideline range and are not factually inconsistent with his entry of a guilty plea and admission of guilt or with the body of body of stipulated facts set forth in Part V herein (the parties' Stipulation of Facts).

G.1.    The defendant agrees that, as a condition of supervised release or probation, he will not be involved in any capacity in the securities industry on behalf of another individual or an entity not solely owned and controlled by him.   The defendant further agrees that, as a condition of supervised release or probation, he will not act as an officer or director of a company whose

securities are publicly traded or otherwise act as a control person of such a company and that he will not directly or indirectly participate in the issuance, purchase, offer, or sale of any security in an unregistered offering by any issuer of securities.

G.2.    The defendant further agrees that, as a condition of supervised release or probation, he will not act as a fiduciary or be employed in a fiduciary position and that he will not otherwise be engaged in any other employment or occupation involving his solicitation of funds for investment or his custody or control of investor funds.

G.3.    The defendant further agrees that any conditions of supervised release or probation should include the special conditions that (a) his employment be approved in advance by his supervising probation officer; (b) that he provide his supervising probation officer access to any financial records requested by such officer and otherwise be subject to financial monitoring by such officer; (c) that he shall not register any business entities without prior disclosure to his supervising probation officer; and (d) that he shall not conduct any financial transactions through accounts of any business entities or individuals not made known to and approved by his supervising probation officer.

H.    The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless the sentence exceeds 96 months, that is, the combined the statutory maximum penalties for imprisonment for the offenses of conviction, with the sentences run consecutive to one another.  The defendant also agrees to waive his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255, except that such waiver provision will not prevent him from seeking relief

9

otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that he was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from these waiver provisions.

I.     The parties agree and acknowledge that the government's obligations under this plea agreement are expressly contingent on the defendant's performance of his obligations under the plea agreement. The parties further agree and acknowledge, in particular, that should the defendant breach this agreement ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████ the government is entitled, at its election, to be relieved of its obligations under this plea agreement and may elect to abrogate the agreement and prosecute the defendant to the full extent permitted under law.

J.     The parties understand, acknowledge, and agree that the sentencing recommendations of the parties under this plea agreement are made pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure and are not binding on the Court.

## II.  THE ELEMENTS OF THE OFFENSE

The defendant understands that, in order to be convicted of the offense of conspiracy to defraud the United States and one of its agencies, and to commit offenses against the United States, as charged in Count 1 of the Contemplated Information, the government, at trial, would have to prove the following essential elements beyond a reasonable doubt:

1. The defendant agreed with at least one other person to violate the law;

2. One of the conspirators engaged in at least one overt act furthering the conspiracy's objective;

3. The defendant knew the essential objective of the conspiracy;

4. The defendant knowingly and voluntarily participated; and

5. There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[1]

The defendant understands that, in order to be convicted of the offense of filing a false income tax return, as charged in Count 2 of the Contemplated Information, the government, at trial, would have to prove the following essential elements beyond a reasonable doubt:

1. That the defendant signed or subscribed to an income tax return that contained a written declaration that it was made under the penalties of perjury;

2. That the return contained a false statement as alleged in the Contemplated Information;

3. That the defendant knew that statement was false;

4. That the defendant acted willfully, that is, with the voluntary intent to violate a known legal duty; and

5. That the statement was material.[2]

## III. **STATUTORY PENALTIES**

The maximum statutory penalty for the offenses set in Count 1 of the Contemplated Information is: not more than five (5) years imprisonment; not more than a $250,000 fine, or both; not more than three (3) years supervised release; a $100 special assessment fee; plus restitution.

The maximum statutory penalty for Count 2 of the Information is: not more than three (3)

---

[1]    Tenth Circuit Pattern Jury Instruction 2.19 (2011).

[2]    Tenth Circuit Pattern Jury Instruction 2.93 (2011).

years imprisonment; not more than a $250,000 fine, or both; the costs of prosecution; a supervised release term of not more than three (3) years; a $100 special assessment fee.

A violation of the conditions of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. §3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. §3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is in or about November 2010 and continued until on or about July 18, 2014 (the "Relevant Period").

The parties agree that the government's evidence would establish the following:

**Dittman and Sears Partner to Start FusionPharm**

1.      The defendant ("Sears"), a resident of Thornton, Colorado, had previously been primarily involved in the business of providing public relations and promotional services to microcap companies that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets.   In 2007, the defendant was convicted in the Southern District of New York of one count of conspiring to commit securities fraud and commercial bribery and one count of securities fraud (Case No. 04-cr-556-swk).   Thereafter, the defendant primarily conducted his stock public relations and promotional business through Microcap Management, LLC ("Microcap"), a Nevada limited liability company that he formed.   He also conducted some of his business affairs through a second Nevada limited liability company, Bayside Realty Holdings, LLC ("Bayside"), which he formed and operated in the name of a blood relative family member (hereinafter, "Family Member A").

2.      Co-defendant Scott M. Dittman ("Dittman"), a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania, had been trained and practiced as an accountant from 1991 until 1995, when he quit working as an accountant and went into real estate development and construction.   He became a Certified Public Accountant in 1991.   His license with the State of California expired in April 1997. Co-defendant Dittman and Sears are brothers-in-law; Mr. Sears is married to Mr. Dittman's sister.

3.      In or about 2010, co-defendant Dittman conceived of a business to develop, manufacture and sell steel shipping containers refurbished for use as use as hydroponic growing pods ("PharmPods,") for indoor plant cultivation, primarily cannabis. He undertook to collaborate with the defendant to develop this business and, in particular, enlisted Sears to assist in promoting the business, marketing its products and finding investment capital for it.      The business was conducted through FusionPharm, Inc. ("FusionPharm"), a company organized in the State of

Nevada with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado.

4.    Shortly after the formation of FusionPharm, the defendant undertook efforts to make it a company whose stock was publicly traded.  In November 2010, in furtherance of these efforts, the defendant and the CEO for a company named Baby Bee Bright Corporation ("Baby Bee Bright") began discussions about Sears and co-Defendant Scott Dittman ("Dittman") taking over Baby Bee Bright.  The purpose of the takeover was for Dittman and Sears to transform Baby Bee Bright, a company whose stock was already quoted on OTC Link, operated by OTC Markets Group, Inc. ("OTC Link"), into FusionPharm.[3]  On November 8, 2010, Baby Bee Bright's CEO and Sears exchanged emails about the Baby Bee Bright CEO transferring his convertible preferred shares in Baby Bee Bright to Sears and Dittman.    The owner of the preferred shares could convert the shares to common stock at a rate of 100 common stock shares for every preferred share.  Sears and the Baby Bee Bright CEO ultimately agreed that Dittman and Sears would receive 99% of the company's convertible preferred shares at no cost while the Baby Bee Bright CEO retained 1% as his compensation for the transaction.  On November 15, 2010, Baby Bee Bright's shareholders executed a written consent acknowledging, among other things: (a) the resignation of Baby Bee Bright's CEO; and (b) the appointment of Dittman and, at the defendant's direction, Family Member A as directors.    Family Member A was appointed to act as director, in part to avoid disclosure of Sears' involvement and his prior conviction for securities fraud.[4]

---

[3]    At the time, the common stock of Baby Bee Bright, like the common stock of many publicly traded microcap companies, was not traded on a registered national securities exchange but rather directly between two parties, typically securities broker-dealers, using inter-dealer quotation services offered through internet platforms such as OTC Link.

[4]    The parties acknowledge that Dittman and Sears' acquisition of these pre-existing shares through the reverse merger with Baby Bee Bright was not the product of wrongdoing.

5.      Prior to November, 2010, Dittman had been aware that Sears had a prior felony conviction and had at various times used Family Member A's name on various accounts and for various entities in which Sears was involved.   Sears and Dittman discussed Sears' prior felony conviction with a transactional and securities lawyer (hereinafter "Counsel A") and were advised by that lawyer that Sears' felony conviction would have to be disclosed to the market if Sears was given an officer or director title in the company and, over the course of time, they were further advised by Counsel A that Sears' formal involvement with FusionPharm would need to be circumscribed in various ways to avoid running afoul of the federal securities laws or triggering disclosure obligations under the federal securities laws.[5]

6.      On January 25, 2011, as part of the plan to turnover control of Baby Bee Bright to Sears and Dittman, the Baby Bee Bright CEO transferred 1.3 million of the existing 1.5 million Baby Bee Bright preferred shares to a single person LLC owned and controlled by Dittman.   On March 16, 2011, the Baby Bee Bright CEO then transferred 185,000 Baby Bee Bright preferred shares to Microcap, an entity controlled by Sears.    As arranged with Sears, the Baby Bee Bright CEO retained 15,000 preferred shares as his compensation for the transaction.

7.      On March 25, 2011, Dittman and Sears filed a notification of name change with the Financial Industry Regulatory Authority ("FINRA") to change Baby Bee Bright's name and stock symbol to FusionPharm's name and stock symbol.   After FINRA approved this form, all Baby Bee Bright shares were converted to FusionPharm shares.   The FINRA notification form was signed by Dittman in his capacity as President of FusionPharm and identified Sears the

---

[5]      Co-defendant Dittman would also offer evidence that he and Sears also consulted with a cannabis licensing lawyer (hereinafter "Counsel B") who advised that Sears' felony conviction made Sears being an officer or director in FusionPharm problematic from a state cannabis licensure standpoint because FusionPharm's business model contemplated selling its product to, among others, legal marijuana cultivators.

Administrative Officer."  Family Member A was listed as treasurer and secretary of former Baby Bee Bright and the newly formed FusionPharm.

8.      Around this time, Sears and Dittman enlisted the services of an erstwhile associate of Sears ("Co-Conspirator A"[6]) to assist in preparing materials for FusionPharm.  Dittman and Sears requested that Co-Conspirator A prepare, among other things, FusionPharm business plans including financial projections for the company.   For example, on March 10, 2011, Sears emailed Co-Conspirator A and cc'd Dittman, asking Co-Conspirator A to "please start communicating with regard to putting a business/plan/powerpoint/offering documents together."   About a month later, on April 5, 2011, Dittman emailed Co-Conspirator A with specific financial projections to assist in the preparation of FusionPharm's business plan. The projections included PharmPod sales estimates for the company for the upcoming fiscal years that forecasted the number of pods that were expected to be sold in each these years, as follows with the translated corresponding sales revenue figures at an average price of $32,500 per pod: (a) Fiscal Year ("FY") 2011: 30 pods ($975,000); (b) FY 2012: 60 pods ($1,950,000); and (c) FY   2013: 100 pods ($3,250,000).

9.      Dittman and Sears operated FusionPharm as business partners, and held themselves out as such to numerous individuals and investors.   On April 21, 2011, Dittman sent an email to numerous individuals notifying them that he "recently partnered with [Sears] and [we] have acquired and moved [our] operations into a publicly traded company: FusionPharm."   Dittman would identify Sears as his "partner" in FusionPharm to numerous individuals through in-person communications and emails.   In short, during the Relevant Period, Sears and Dittman worked in tandem regarding the critical decisions concerning FusionPharm's management and operations, and Sears was primarily responsible for FusionPharm's capital formation and investor relations.

---

[6]      Use of the term "Co-Conspirator A" herein and below to refer this individual does not necessarily signify Dittman's agreement that he had entered the conspiracy as of the date of the documents referenced here.

10.     Following the conversion of shares and name change to FusionPharm, Dittman and Sears, initially with the assistance of Co-Conspirator A, undertook thereafter regularly to post certain prescribed written disclosure for FusionPharm on the OTC Link internet platform.   These submissions typically included financial statements, together with financial statement notes, and quarterly and annual reports, which reports included information, among other things, about the officers, directors, and control persons and significant beneficial owners of the company's stock.[7] Throughout the Relevant Period, no mention was made in any of FusionPharm's financial statements, notes, or quarterly and annual reports, that the defendant or any of the entities through which he conducted business was an affiliate of, or related party to FusionPharm.[8]

**Sears Served as *de facto* Officer for FusionPharm**

11.     Even though Sears was never identified in FusionPharm's financial and other disclosures as having a formal role with the company, he was integral to the company's operations. As FusionPharm began its actual operations in the Spring of 2011, Sears was identified in some of FusionPharm's documents as being an officer of the company; he was alternatively classified as the company's "Vice President" "Director of Financial Operations" and/or "Investor Relations Director" in other documents.[9]

---

[7]     Reporting on the OTC Link platform was voluntary on the part of the companies whose stock was listed for trading but the degree and nature of the disclosures provided by the companies determined the "market tier" in which the company would be classified by the internet platform. Higher level tiers required more comprehensive disclosures. Companies that provided limited or no information were placed in market tiers that OTC Link reserved for stock issuers that prospective investors were advised to approach with caution.   OTC Link provided written guidelines for the type of information contemplated in these quarterly and annual reports.

The disclosures made by companies whose securities were listed on the OTC Link platform were readily accessible to the investing public and were widely disseminated through financial media outlets.

[8]     The defendants would offer evidence that their determinations regarding OTC Link disclosures concerning Sears and his entities were influenced and shaped by advice received by Counsel A and by subsequent attorneys engaged by Dittman and Sears on behalf of FusionPharm.

[9]     Defendant Sears and co-defendant Dittman acknowledge that, during the early stages of FusionPharm's operations, Sears was recited in various documents as has having certain formal positions in the company.   Sears

17

12.     In addition to being identified on initial company documents as an officer, from the time of FusionPharm's organization as a company in Spring 2011 until late 2013 (when FusionPharm hired a contractor to serve as part-time Chief Financial Officer), Sears handled many day-to-day responsibilities typically reserved in other companies for a chief financial officer.   For example, Sears: (a) managed incoming investor checks and paperwork; (b) served as FusionPharm's primary contact with the company's transfer agent in connection with FusionPharm common stock transactions; (c) provided company funds to FusionPharm employees; (d) signed payroll checks for FusionPharm employees from FusionPharm account(s) for six months when Dittman did not have access to FusionPharm's bank accounts; (e) made pitches to a number of investors on FusionPharm's behalf; (f) at times drafted, revised, and posted FusionPharm press releases; and (g) drafted certain FusionPharm corporate documents, such as written board of director consent for Sears and others to convert their preferred FusionPharm shares for sale.   Sears also had and used a FusionPharm email address and, from at least November 2011 to January 2012 and received a salary during that same time from FusionPharm.

---

contends that these documents were "unofficial" documents.   The Government contends that several of the documents were not informal documents including Corporate Meeting Minutes and a version of FusionPharm's business plan that was sent to a FusionPharm investor.   For example, on May 9, 2011, Sears, Dittman and a third individual assisting them with the start of the company ("Employee A") exchanged emails regarding FusionPharm's May 9, 2011 Corporate Meeting Minutes.   The corporate minutes listed Dittman as FusionPharm's President and Sears and Employee A as its Vice Presidents.   They maintain, however, based on advice from counsel, as the company began to operate, Sears ceased to have these formal positions and that Dittman sought to avoid giving Sears a formal role in FusionPharm, Inc. as the business moved forward.

Notwithstanding, defendant Sears and Dittman do not contest that, over the course of time, as detailed herein, Sears ultimately played an integral and important role in the company's operations, functioning, in particular, as its *de facto* investor relations manager and coordinating substantially all of FusionPharm's common stock sales with its stock transfer agent.

They maintain, however, that whatever degree of involvement Sears came to have in the company, Dittman alone had the final decision-making authority for FusionPharm.

**Sears Sold FusionPharm Stock Through Microcap**

**for the Benefit of Sears, Dittman and FusionPharm**

13.     Federal securities laws require that every offer or sale of a security by a company such as FusionPharm needs to be registered with the Securities and Exchange Commission ("SEC") or exempt from registration. FusionPharm was not registered with the SEC. Accordingly, throughout the Relevant Period, any lawful issuance of securities, including convertible notes, preferred and common stock, would have needed to be exempt from registration. Further, any of these exempt offerings would have required that the shares associated with the issuance be "restricted," or limited in the manner and amount in which they could be sold after issuance.   For example, restricted securities would have needed to be held by the owner for a certain amount of time (the "holding period") before they could be freely transferrable to a third party.   Additionally, shares held by individuals or entities that could direct or control the direction of a company's management or policies - classified as "affiliates" - were subject to additional regulations under federal securities laws, such as limitations on how many shares they can sell during a given time period.[10]

14.     Dittman and Sears knew that unrestricted or "free trading" shares of FusionPharm shares could be sold into the market or to be used as negotiating tools.   Unrestricted shares would be more marketable to investors as they could immediately sell the shares without having to satisfy any holding period.   As such, Sears used the preferred shares acquired by Microcap to fund Fusion Pharm's operations and to financially support themselves.[11]   Because Sears was a *de facto* affiliate

---

[10]     A transfer agent is assigned by a publically traded company to keep track of the individuals and entities that own the companies' stocks and bonds.

[11]     Dittman benefited from some of the sales of Sears' preferred shares in that (1) his FusionPharm salary was sometimes traceable to proceeds of these sales, (2) some capital loans by Dittman to FusionPharm were repaid by

throughout the Relevant Period, sales of his preferred shares were accomplished while avoiding registration with the SEC and in violation of the otherwise applicable restriction requirement on newly issued shares.

15.    The unlawful securities transactions were realized in stages. Sears initially converted 1,450 preferred shares to 145,000 free-trading shares of FusionPharm common stock on April 15, 2011.  He then caused Microcap to transfer the remaining preferred shares (183,550 preferred shares) to a company owned by an immediate family member (identified herein as "Family Member B"), although Sears continued to beneficially own the stock.   Thus, Sears was able to avoid being disclosed in FusionPharm's financial disclosure documents as a 10% shareholder of the company's preferred stock, and an affiliate of FusionPharm based on his stock ownership.   After using Family Member B's company to convert small tranches of FusionPharm preferred shares to common stock, Sears caused the remaining 178,760 preferred shares to be transferred to another family member (hereinafter, "Family Member C") on July 29, 2011.[12] Similarly, Sears then used Family Member C as a proxy for his stock ownership, instructing him to transfer as needed small tranches of preferred shares to Microcap (or other entities controlled by Sears), which Sears, in turn,  caused to be converted into common stock and sold into the market.   Dittman knew about this arrangement.   Sears did this in order to conceal his true share ownership, as he continued to beneficially own these shares throughout the Relevant Period.[13]

---

FusionPharm with proceeds traceable to these sales, (3) FusionPharm's operations were financed by round-tripped proceeds from many of these sales; and (4) he received compensation from Meadpoint traceable to proceeds of these sales.

[12]      Both Family Members B and C were also relatives of co-defendant Dittman.

[13]      Sears contends that this family member, Family Member C, was the true owner of these shares but acknowledges he had substantial influence with this family member as to the use and disposition of these share holdings.

16.    All told, between April 28, 2011 and December 10, 2012, Sears, in consultation with Dittman, converted 14,270 of the 185,000 preferred shares into 1,427,000 shares of FusionPharm common stock.   Sears sold 675,000 shares of these shares into the secondary market through Microcap, netting approximately $1.6 million in proceeds.   Sears and Dittman agreed that Sears would use some of the remaining 752,000 FusionPharm common stock shares as part of their efforts to raise funds for the company's operations and to finance construction of pods.   Some investors were told that such shares would be unrestricted and thus could be immediately traded. [14]

17.    Since FusionPharm's transfer agent was the gatekeeper responsible for determining whether shares would be restricted, Microcap's sale of these unregistered shares was based on false statements by Dittman and Sears about Sears's affiliate status with FusionPharm.   For example, Dittman signed and submitted an FusionPharm Officer's Certificate attesting to, among other things, that Sears and, derivatively, Microcap, were not affiliates of FusionPharm. Similarly, Sears submitted documents on Microcap's behalf to the transfer agent that claimed he had no power to direct or cause the direction of FusionPharm's operations, even though Sears handled many responsibilities typically reserved in other companies for an officer or director. (*See* ¶¶ 8-10 above).   Sears and Dittman did not accurately describe Sears's role with

---

[14]    For example, on May 12, 2011, Dittman emailed Sears with various proposals to a prospective investor, including "[w]e will throw you 1 million shares of free trading paper, in 100,000 share tranches (so they are immediately liquid) while we draw down the line ($100k for 100,000 shares)."   Eight days later, on May 20, 2011, Sears emailed a potential financier and cc'd Dittman.   In the email, Sears claimed that "instead of doing the whole wait for a registration statement thing, we have gone to some shareholders and have been able to put together enough stock to do a transaction with free trading paper."

The "shareholders" referenced in Sears's email referred to his own company, Microcap.

FusionPharm in their efforts to have the transfer agent remove the restricted legend on the stock certificates in order to be able to sell the shares as free trading.[15]

18.     Dittman also misrepresented facts about Sears's stock ownership and transactions to FINRA.   In October 2011, FINRA investigated Microcap's significant sales of FusionPharm stock.   During that investigation, Dittman represented to FINRA that Sears was only a "part time salesman" at FusionPharm and that Dittman was unaware that Sears owned any FusionPharm stock and, therefore, was unaware he was selling FusionPharm stock.[16]   In a later interview, on November 3, 2011, Dittman indicated to FINRA staff that Sears "no longer owns Microcap Management" and that Sears owned no "FusionPharm stock."   But only weeks earlier, on September 6, 2011 and September 13, 2011, Dittman and Sears emailed each other details about Microcap's trading.   On one occasion, Dittman even requested that Sears transfer $3,000 from "this week's take" (in reference to Microcap's trading) to another family member's account.

**Sears and Dittman Use Affiliated Entities to Increase Access to Free-Trading Shares**

19.     Dittman and Sears used a series of entities owned by Sears to increase their access to FusionPharm stock.   Two of these entities, Microcap and Bayside, were, as discussed above, entities that Sears had previously used in connection with earlier business affairs. Two additional entities, VertiFresh, LLC ("VertiFresh") and Meadpoint Venture Partners ("Meadpoint"), formed in connection with efforts to sell FusionPharm's PharmPod's and license its business methods and technology, were employed as well, in part to secure additional FusionPharm stock. (The four entities are hereafter collectively referred to as the "Facilitating Entities".)

---

[15]     Sears would contend that these disclosures to the transfer agent were pursuant to advice received from Counsel A.

[16]     Dittman contends that he believed that Sears was not selling his own FusionPharm stock on the market; rather he believed that a third party was selling Sears' stock to willing buyers, and that he misunderstood the question posed by the FINRA investigator. Sears contends that he had no knowledge or awareness of Dittman's statements to FINRA.

20.     In addition to Sears's control over these entities, the Facilitating Entities shared other connections to FusionPharm.   Among other things, Meadpoint's and VertiFresh's principal places of business were 4360 Vine Street in Denver, CO – the same address as FusionPharm for most of the Relevant Period.   VertiFresh and Meadpoint also shared the same workspace and employees with FusionPharm.   And the Facilitating Entities paid over $40,000 for shipping containers (the raw materials for PharmPods) that went to FusionPharm.

21.     Dittman was also affiliated with, and acted on behalf of, VertiFresh and Meadpoint. Regarding VertiFresh, materials sent to potential VertiFresh investors identified Dittman as a Director of the company.   Dittman edited and reviewed these materials before they were sent to potential investors.   Dittman also made a presentation on VertiFresh's behalf with Sears to the Denver Office of Economic Development JumpStart BizPlan Awards contest in 2012.   The PowerPoint presentation Dittman and Sears used at the presentation identified Dittman as VertiFresh's Director.   Moreover, some company organization documents reflected that Dittman was the CEO and Chairman of Board for VF Management, Inc., VertiFresh's sole managing member.

22.     Regarding Meadpoint, an unsigned version of the company's shareholder agreement identified Dittman as a 50% owner of the company.[17]   Dittman also received tens of thousands of dollars in purported compensation as a 1099 employee of the company, and drafted and issued investor materials on Meadpoint's behalf.   Dittman later identified himself on an application to the Colorado Medical Marijuana Enforcement Division as a "consultant" to Meadpoint.   At no point did FusionPharm disclose to investors that Dittman had any affiliations with VertiFresh or Meadpoint.

---

[17]     The unsigned Meadpoint Shareholder Agreement was sent in an email from Sears to Dittman on November 14, 2011.   Sears contends that Dittman was not a 50% owner of Meadpoint as illustrated in the document.

23.     As a named officer of FusionPharm, Dittman's ownership share and transactions in FusionPharm stock were disclosed on FusionPharm's financial disclosures filed on, and made available to investors via, OTC Link.   However, by selling FusionPharm shares through Microcap, Bayside, Vertifresh, and Meadpoint, Dittman's, along with Sears's, involvement and interest in those stock transactions remained undisclosed to investors.

24.     Co-Conspirator A prepared two separate notes in June 2012 (one for Bayside and one for Meadpoint) for *non-convertible* lines of credit.   On June 4, 2012, Co-Conspirator A emailed Sears a draft Bayside non-convertible promissory note and credit line agreement, writing that he (Co-Conspirator A) would also draft drawdown requests to match the dates and amounts of previously made deposits into FusionPharm's accounts.   Between June 5, 2012 and June 6, 2012, Co-Conspirator A drafted six drawdown requests totaling $177,000 and sent the requests to Sears.   The final non-convertible note and credit line agreement ("Bayside Non-Convertible Note") was then signed on June 6, 2012 with a purported $275,000 line of credit.   However, the Bayside Non-Convertible Note signatures (Dittman on behalf of FusionPharm and Family Member A on behalf of Bayside, acting as Sears's surrogate) were backdated to May 2, 2011.[18]

25.     To justify the "drawdowns," Sears attached deposit slips for nine previous bank deposits totaling approximately $171,000.   In reality, all but one of the various deposits listed as purported drawdowns actually came from Microcap, and the funds are traceable to Microcap sales of FusionPharm stock.   Dittman signed these drawdown requests on June 6, 2012; the dates on the requests, however, were earlier in time and matched when funds actually had been disbursed to FusionPharm.

---

[18]     Sears contends that Counsel A advised that the date of the notes should evidence the first traunch of money that was drawn down by the company.

26.     Following a similar pattern, on June 19, 2012, Co-Conspirator A emailed Sears a draft of the Meadpoint non-convertible promissory note and credit line agreement for signature, with a credit limit of $200,000 ("Meadpoint Non-Convertible Note").   As with the Bayside Non-Convertible Note, Dittman signed the Meadpoint Non-Convertible Note on or about June 19, 2012, when the Note bore a date of June 15, 2011.   Sears signed on Meadpoint's behalf and also backdated his signature.   FusionPharm attached deposit slips for $88,000 of deposits, although again the money actually came from Microcap stock sales.   Once again, Dittman signed drawdown requests that bore earlier dates to match the dates on which funds actually had been disbursed to FusionPharm.

27.     Five months later, on November 26, 2012, Co-Conspirator A emailed Sears new drafts of the Bayside and Meadpoint notes now documented as *convertible* notes, writing "[t]he Notes work with the existing drawdown requests." (hereinafter referred to as the "Meadpoint Convertible Note" and "Bayside Convertible Note" respectively).   The Bayside Convertible Note, signed by Dittman on FusionPharm's behalf on or about November 26, 2012 but bearing a date of May 2, 2011, was a 10% Convertible Promissory Note and Line of Credit Agreement in the amount of $275,000 with a conversion rate of $0.01/share.   Similarly, the Meadpoint Convertible Note was also signed by Dittman on FusionPharm's behalf  on or about November 26, 2012 but bore a date of  June 15, 2011, and was a 10% Convertible Promissory Note in the amount of $275,000 with a conversion rate of $0.01/share.[19]

28.     The notes were changed because Sears wanted to sell the notes to potential buyers whom he had identified.   By changing the non-convertible notes to convertible ones, Sears and Dittman could present the notes to FusionPharm's transfer agent for conversion of the debt into

---

[19]     The date (changed to December 8, 2011) and amount ($275,000 to $88,000) of the Meadpoint Convertible Note would be further revised at later dates.

FusionPharm common stock. Additionally, by fraudulently backdating the notes, Dittman and Sears were able to mislead the transfer agent into believing that: (1) all debt obligations reflected in the backdated notes were intended to be convertible at the time that FusionPharm incurred the debts; (2) the debt obligations always had been convertible; (3) the backdated notes constituted contemporaneously created written evidence of the debt obligations reflected therein; and (4) consequently that the holding period required by the federal securities laws had been satisfied.[20]

**Sears and Dittman Convert Notes into Free Trading**

**FusionPharm Shares and Raise Millions**

29.    After Dittman signed the backdated Bayside Convertible Note, Sears immediately converted debt into FusionPharm shares. On December 6, 2012, Bayside submitted a Notice of Conversion to FusionPharm to convert $1,400 of the debt into 140,000 FusionPharm common shares. The package that Sears submitted to the transfer agent contained several false documents, including: (1) the backdated Bayside convertible note and drawdown requests/deposit detailed above; (2) a letter from Bayside attesting that Bayside was not an affiliate (signed by Family Member A); (3) a separate Statement of Non-Affiliate from Bayside (signed again by Family Member A); and (4) a FusionPharm Officer's Certificate, Written Consent, and letter signed by Dittman stating that Bayside (and derivatively Sears) were not affiliates and that Bayside

---

[20]    Counsel A was copied on and involved in the creation of both the convertible and non-convertible backdated sets of promissory notes described in paragraphs 26 through 28, above.

Convertible Note was a valid obligation of the company as opposed to round-tripped[21] stock sale proceeds (*see* ¶¶ 25-26 above).[22]

      30.    Contrary to these representations, Bayside was an affiliate of FusionPharm. (*See* ¶¶ 8-10; 19 above).  In addition to the impact the Bayside Convertible Note had on Sears's ability to receive unrestricted shares, Sears's affiliate status also meant that Bayside needed to abide by the volume restrictions mandated by federal securities laws. (*See* ¶ 11 above).  Specifically, Bayside could not sell more than 1% of the FusionPharm's common stock shares during a three-month period.  Between February and April 2013, FusionPharm had, at most, 5,201,650 common stock shares outstanding, meaning Bayside could only sell 52,016 shares during this period and still comply with the federal securities laws.[23]  However, Sears sold all 140,000 of Bayside's shares during this period, thus violating the volume restrictions.

      31.    On February 5, 2013, Sears sold the remainder of the Bayside Convertible Note to an investment group.  Sears received $250,000 from the investment group in consideration for the remaining debt that FusionPharm purportedly owed Bayside under the backdated note.  In order to ensure that the five investors in the investment group immediately received unrestricted shares,

---

[21]     "Round tripping" occurs when a company provides an individual or entity with access to the company's stock with the understanding that a portion of the proceeds derived from the sale of such stock will be returned to the company. The practice is not unlawful *per se*.  However, such "round tripping" may run afoul of the federal securities laws if the stock proceeds that are generated from securities transactions that involve unregistered securities that are not deemed lawfully exempt from registration.  The "round tripping" may, under certain circumstances, also be required to be disclosed under the federal securities law or accounting principles.

[22]     Dittman and Sears also created the misimpression that Sears had no affiliation with Bayside.  On December 17, 2012, Sears emailed the FusionPharm transfer agent claiming that Bayside was a "family member['s] company" and that he would be the "point person" for the transaction.  Dittman was cc'd on the email and followed up by writing the transfer agent to "[p]roceed with haste as directed" by "Mr. Sears."

[23]     Notably, for most of this period, FusionPharm had approximately 3 million shares of common stock outstanding, meaning that for most of the period Bayside could not have sold more than 30,016 shares of FusionPharm common stock.  Given that the three month window can be calculated using different dates, the actual figure that Bayside could have sold during the February-April 2013 window is almost assuredly less than 52,016 for most of the period.  Either way, Bayside violated the volume restrictions.

Dittman and Sears again made false representations to the transfer agent as to Bayside's affiliate status.

32.     Once Sears sold the remainder of the Bayside debt, Sears and Dittman turned to utilizing the Meadpoint Convertible Note.   Between March 2013 and April 2014, Sears, though Meadpoint, converted $42,450 of purported debt into 4.245 million FusionPharm common shares. Sears, with Dittman's knowledge, sold approximately 3.2 million of those shares in the market. Meadpoint still holds the remainder of those shares.

33.     The Meadpoint conversions were documented similarly to the Bayside conversion. The packages that Sears submitted to the transfer agent included similar false documents, including: (1) the backdated Meadpoint Convertible Note and deposit details listed above; (2) a letter from Meadpoint attesting that it was not an affiliate (signed by Sears); (3) a separate Statement of Non-Affiliate from Meadpoint (signed by Sears); (4) a FusionPharm Officer's Certificate, Written Consent, and letter (all signed by Dittman) stating that Meadpoint (and derivatively Sears) were not affiliates and that the Meadpoint Convertible Note was a valid obligation of the company.   As with the Bayside converted shares, the backdated nature of the Meadpoint Convertible Note misled the transfer agent into believing the holding period had been satisfied as to all debt obligations reflected in the Note.

34.     FusionPharm's transfer agent emailed Dittman in February 2014 in response to one of the Meadpoint conversion requests.   The transfer agent employee wrote that he had concerns about the conversion because Sears requested the conversion on Meadpoint's behalf, and the transfer agent had Sears listed as an Administrative Officer of FusionPharm (*see* ¶ 5 above). Dittman falsely responded to the transfer agent that Sears had never been employed by FusionPharm (when, in truth and in fact, he had been employed directly by FusionPharm) and was not an affiliate.   (*See* ¶¶ 5, 8-10 above).   Meadpoint was, however, an affiliate of FusionPharm.

28

35.     As with the Bayside Convertible Note, Sears and Dittman also used the Meadpoint Convertible Note to obtain cash from outside investors.   Rather than selling debt, however, Sears converted $15,000 of debt under the Meadpoint Convertible Note into 1.5 million shares of FusionPharm common stock.   Sears, with some assistance from Dittman, then sold the 1.5 million shares to three investors in August 2013 for $184,831.   These three investors received unrestricted shares based on Dittman's and Sears' false representations to FusionPharm's transfer agent (*see* ¶¶ 31-36 above).

36.     Meadpoint received $273,210 in proceeds from the sale of stock derived from the Meadpoint Convertible Note, and an additional $184,831 from the three investors detailed in ¶ 36 above, for a total of $458,041.   This amount constituted the primary source of the funds that Meadpoint transferred to FusionPharm that year—again reflecting that stock sale proceeds were used by Meadpoint finance the construction of pods in 2013.   *See also* ¶ 54 below for other proceeds that passed through the Meadpoint account.

37.     In 2014, after the passage of Amendment 64 in Colorado, legalizing recreational usage of marijuana, FusionPharm's share price and trading volume spiked.[24]   From January through May, 2014, Meadpoint received $9.9 million in proceeds from the sale of stock derived from the Meadpoint Convertible Note.   While some of this amount was transferred to FusionPharm in 2014, the majority – approximately $8.7 million - was seized by the government in May 2014.

38.     In total, from approximately April 28, 2011 through May 8, 2014, Sears, in consultation with Dittman, sold more than 4 million shares of FusionPharm stock through the

---

[24]     The average price of FusionPharm shares from May 2011 through December 2013 was $1.46; the average share price from January 2014 until the SEC suspended trading on May 16, 1014 was $4.28.   Average trading volume during the two periods was 20,773, and 781,800 respectively.

Facilitating Entities and acquired more than $12.2 million in stock sale proceeds: $2.2 million prior to the passage of Amendment 64; $9.9 million in the months immediately following the passage of Amendment 64.  Sears transferred the overwhelming majority of these funds (more than $8.4 million) to a brokerage account he controlled in the name of Family Member A. Although the proceeds were held in an account controlled by Sears, Dittman and Sears treated these proceeds as theirs collectively.  For example, on September 6, 2011, Dittman asked Sears in an email, "what do *we* have in microcap now?"  In addition, on May 15, 2014, Dittman sent an email to a contact in the real estate industry specifically referencing the funds held in the brokerage account, writing "*We* have proof of funds for upward approx. $8 million today (liquid) and have access to more.  *We* would like to write contracts on as many properties as is possible/feasible/reasonable…"

39.     Sears and Dittman also used significant portions of the stock sale proceeds for their own personal benefit.  For example: (a) $688,000 was used to purchase Dittman's home in Pennsylvania; (b) Sears paid off his home in Denver and a condo in Westminster, CO; (c) Sears purchased expensive watches; and (d) Dittman and Sears used $250,000 as a down payment on a Denver warehouse as part of another planned business venture.

### FusionPharm Falsely Reports Proceeds from Stock Sales as Revenue, and Fails to Disclose Sears and Facilitating Entities as Affiliated and Related Parties

40.     In addition to the funds Dittman and Sears used for their own personal benefit, they also round-tripped over a million dollars of stock sale proceeds back to FusionPharm, most of which was booked as company revenue, and the rest as loans.  In this manner, Dittman and Sears consistently transferred a portion of a given week's trading proceeds to FusionPharm.  On certain occasions, they even used a formulaic breakdown for the proceeds.  For example, on July 2, 2012, Sears emailed Dittman with specific figures from the prior week's trading whereby after

30

deducting certain funds for commissions to stock promoters and Sears's cut, the net was to be sent to FusionPharm.

41.     Dittman and Sears used the stock sale proceeds transferred to FusionPharm to sustain FusionPharm's business.   Much of the funds were portrayed as involving transactions with Meadpoint and VertiFresh.   As their business operations got underway, Dittman and Sears had agreed to form entities to act as intermediaries with respect to FusionPharm's ultimate customers, one entity devoted to customers whose intended use of the PharmPods was in connection with the cannabis cultivation and the other with respect to a business devoted to using the PharmPods for growing non-cannabis produce (primarily, lettuce).   Meadpoint was formed for the former purpose and as FusionPharm's 'exclusive distributor' of PharmPods.   VertiFresh was formed for the latter purpose and, as Dittman and Sears started growing lettuce in PharmPods that they kept at FusionPharm's business premises, they began to market sale of this produce to local restaurants and retailers under the name "VertiFresh." As indicated above, the affairs and operation of all three entities – FusionPharm, Meadpoint and VertiFresh – were comingled and all three entities were jointly operated, as a matter of fact, by Sears and Dittman in concert.[25]

42.     As they sought to develop their business and find and sell PharmPods to cannabis growers and lettuce to ultimate customers, Sears and Dittman undertook to use the FusionPharm stock sales proceeds being generated by Sears through the various Facilitating Entities as a basis to claim revenues for FusionPharm.   Dittman booked money being received by FusionPharm from

---

[25]     Both defendant Sears and co-defendant Dittman maintain, and would adduce evidence to establish, that they formed these entities to act as intermediaries on the advice of counsel, including Counsels A and B, prompted, in substantial part, out of a desire to insulate FusionPharm and its customers from regulatory risk related to cannabis cultivation and to avoid potential federal civil and criminal liability relating to the cannabis industry.

The defendants would acknowledge and concede that the corporate form was disregarded in conducting the operations of these entities and that they failed to disclose facts to the investing public and securities regulators that would have revealed that the entities were interrelated operationally and in other ways not visible to the investing public.

the stock sales proceeds as FusionPharm revenue and the two, together, used Meadpoint and/or VertiFresh to construct revenue generating transactions prior to the actual sale and distribution of the PharmPods to the end-users.[26]

FusionPharm's Overstated 2011 Revenues

43.    FusionPharm's financial disclosures were made available to investors via OTC Link.  FusionPharm's Annual Information and Disclosure Statement, financial statements, and notes to the financial statements for the period ended December 31, 2011, signed by Dittman ("FusionPharm's 2011 Annual Report"), was posted on OTC Link on March 31, 2012.  Dittman was primarily responsible for preparing FusionPharm's 2011 Annual Report, although he consulted with other individuals regarding the content, including Sears[27].

44.    In the FusionPharm 2011 Annual Report, FusionPharm claimed $256,895 in revenue for the fiscal year.  FusionPharm's accounting records reflected $226,895 in "licensing revenue" from Meadpoint in 2011, purportedly related to Meadpoint's role as FusionPharm's exclusive distributor of cannabis PharmPods.   However, FusionPharm's accounting records, bank accounts and general ledger reveal that the overwhelming majority of funds that went into FusionPharm's bank accounts in 2011 came from Microcap stock sales.    Dittman caused FusionPharm to book the majority of the stock sale proceeds from Microcap as revenue months in advance of securing signed contracts from actual PharmPod customers by Meadpoint.[28]   The

---

[26]      Sears contends that he was not ultimately responsible for deciding how revenue should be booked and the contents of Financial statements and disclosures.

[27]      Sears contends that he did not provide substantive comments or feedback on FusionPharm's financial statements.   The Government contends that there are numerous emails where Dittman requested that Sears review the company's financial statements.

[28]      Records reflect that in 2011, several PharmPods were intended to be leased to a Denver medical marijuana grower via Meadpoint.   However, the actual transaction between Meadpoint and the grower, which ended up being a sale and not a leasing agreement, between Meadpoint and the marijuana grower did not occur until early 2012.

remainder of the these transfers served as the purported basis for the Meadpoint and Bayside Convertible Notes (*see* ¶¶ 23-27 above).

45.     At no point in FusionPharm's 2011 Annual Report did FusionPharm disclose Sears's role with both Meadpoint and FusionPharm, or Dittman's affiliation with Meadpoint. (*See* ¶¶ 8-10, 21 above).   Additionally, contrary to its representations, FusionPharm failed to identify its transactions with Meadpoint or Sears as: (a) material transactions with any director or executive officer (even though Sears satisfied this by his *de facto* role as an officer of FusionPharm); (b) transactions by any person beneficially owning shares carrying more than 5% of voting rights (which Sears did via his preferred share ownership); or (c) transactions with any member of the immediate family (including in-laws) of any director or executive officer (which Sears satisfied as Dittman's brother-in-law).[29]

FusionPharm's Overstated & Fictitious 2012 Revenues

46.     FusionPharm's Annual Information and Disclosure Statement, financial statements, and notes to the financial statements for the period ended December 31, 2012, signed by Dittman ("FusionPharm's 2012 Annual Report"), were posted on OTC Link on March 6, 2013.

---

Likewise, the payment and delivery of these PharmPods did not occur until 2012.   According to FusionPharm's 2011 Annual Report, FusionPharm "records revenue when all of the following have occurred: (1) persuasive evidence of an arrangement exists, (2) product delivery has occurred, (3) the sales price to the customer is fixed or determinable, and (4) collectability is reasonably assured." Dittman contends that the sale on which revenue was recognized for 2011 was to Meadpoint.   In 2011, the Government contends that none of these requirements were met with respect to the transaction at issue. Dittman contends that as the sale on which revenue was recognized in 2011 was to Meadpoint, all of these requirements were met, while conceding that disclosures concerning related party transactions that may have been required as to this transaction under GAAP given Meadpoint's *de facto* status may not have been met.

[29]     As discussed above (FN 5), OTC Link published guidelines for its issuers to use in connection with its voluntary disclosures.   These guidelines included disclosures of the identities of officers, directors and control persons (defined to be beneficial owners of more than 5% of any class of the issuer's equity securities); and the identities of beneficial owners of more than 10% of any class of the issuer's equity securities.   The OTC Link published guidelines also called for the provision of financial statements prepared in accordance with GAAP, which would have required disclosure of related party transactions.

Dittman was primarily responsible for preparing FusionPharm's 2012 Annual Report, although he consulted with other individuals regarding the content, including Sears.

47.    In its 2012 Annual Report, FusionPharm claimed $808,398 in revenue. FusionPharm stated that $750,000 of this revenue resulted from a license agreement with VertiFresh.[30]    As detailed above, Sears and Dittman[31] owned and/or controlled both entities (a fact never disclosed to investors),   meaning the transaction was essentially one party transacting with itself.  (*See* ¶¶ 8-10, 20 above).[32]   During the Relevant Period, VertiFresh only generated nominal revenue from lettuce sales.

48.    More than a year after the filing, FusionPharm voluntarily restated its 2012 financial statements and represented that $500,000 of the $750,000 revenue related to the VertiFresh license agreement should not have been recognized.    FusionPharm maintained, however, that the other $250,000 was legitimate revenue.   This was also materially overstated. Even if VertiFresh was a separate entity and even if it received anything of value in connection with the agreement, VertiFresh transferred only $147,475 into FusionPharm's bank account in 2012, not $250,000.00 as it agreed to do in 2012.   As in 2011, *all* of these funds can be traced

---

[30]      A comparison of FusionPharm's quarterly financial disclosures demonstrates similar misrepresentations. FusionPharm's first quarter financial disclosures (filed on June 12, 2012) claimed $71,800 in revenue.   Yet, FusionPharm's second quarter financial disclosures (filed on August 14, 2012) claimed $750,000 in revenue, all from the purported VertiFresh agreement meaning FusionPharm's claimed Q1 revenue disappeared without any disclosure to investors.   In fact, FusionPharm's non-VertiFresh revenue for all of 2012 was $58,398, more than $10,000 less than purported Q1 revenue.

[31]      Sears contends that Dittman did not own or control Meadpoint or Vertifresh.

[32]      Consistent with FusionPharm's 2011 Annual Report, FusionPharm's 2012 Annual Report failed to disclose Sears's role with FusionPharm or Dittman's affiliation with and/or control of VertiFresh.

directly back to Microcap's stock sale proceeds.[33]   Once again, FusionPharm booked proceeds from FusionPharm stock sales by Facilitating Entities as FusionPharm revenue.

49.     The 2012 Annual Report went on to claim that Meadpoint and VertiFresh had committed to placing orders for more than $3 million worth of PharmPods over the next three years.[34]

FusionPharm's Overstated 2013 Revenue

50.     FusionPharm's Annual Information and Disclosure Statement, financial statements, and notes to the financial statements for the period ended December 31, 2013, signed by Dittman ("FusionPharm's 2013 Annual Report"), were posted on OTC Link on April 15, 2014. Dittman was primarily responsible for preparing FusionPharm's 2013 Annual Report, although he consulted with other individuals regarding the content, including Sears.

51.     FusionPharm claimed $594,397 in revenue for 2013.  As they did in 2011 and 2012, Sears and Dittman used significant portions of stock sale proceeds back to funds revenue transactions between FusionPharm and Facilitating Entities.[35]   For example, between February 6, 2013 and February 8, 2013, Sears transferred $235,000 from Bayside bank accounts to Meadpoint, all of which were provided by investors in connection with the sale of the Bayside note.  (*See* ¶ 30 above*)*.   During the same time period, Meadpoint transferred at least $170,000

---

[33]     The other amounts that flowed into FusionPharm's bank account in 2012 were actually from Bayside, Microcap, and Meadpoint. Once again, all of these transfers are traceable to FusionPharm stock sales.

[34]     Dittman asserts he terminated the agreement in 2014 for failure to meet performance goals.

[35]     Although Meadpoint did transfer over $728,000 into FusionPharm's bank account in 2013, over $550,000 of that were proceeds traceable to stock sales.  As in 2011, Dittman and Sears had third party customers in mind when they built these pods.   However, most of these pods were not transferred to third-parties until after 2013.   Based upon the government's bank record analysis, FusionPharm received a maximum of $194,000 from third-party customers in 2013.

of these funds to FusionPharm.   According to FusionPharm's general ledger, these transfers were booked as revenues.   Sears and Dittman did something similar with stock sale proceeds funneled through a company they both owned.   According to FusionPharm's general ledger, at least $50,000 in March 2013 checks from this company were also booked as revenues.[36]

52.     Dittman and Sears also transformed investments from direct investors directly into purported FusionPharm revenue by passing the money through accounts in the name of the Facilitating Entities.   For example, on August 5, 2013, Dittman sent a potential investor an email with a proposed investment deal.   Dittman offered the investor an opportunity to purchase $50,000 worth of preferred shares in FusionPharm and purchase $50,000 of Meadpoint's Convertible Note.   With regard to the proposed purchase of the Meadpoint Convertible Note, Dittman claimed that "Meadpoint would use its $50,000 to purchase the 2 containers referenced above…" meaning that investor's funds would flow through Meadpoint to be booked as revenues by FusionPharm.   Dittman summarized the proposed $100,000 investment by claiming "[t]hus, all funds would end up in FusionPharm, $50,000 as an investment and $50,000 as sales revenue for the 2 containers."   The investor ultimately invested $100,000 and, as proposed, $50,000 of this investment was used for two PharmPods that were placed in FusionPharm's sales center and booked as part of FusionPharm's revenue for 2013.

53.     Furthermore, Dittman reiterated the misrepresentation set forth in the 2012 Annual Report that Meadpoint and VertiFresh were independent entities that promised to purchase dozens of PharmPods in the future.   For example, on February 18, 2013, Dittman drafted an email for Co-Conspirator A to send to prospective investors that stated, among other things: (a) Meadpoint is   FusionPharm's   exclusive   distributor   with   minimum   purchase   requirements   of   50

---

[36]     Notably, the notations on these checks were for "Convertible Promissory Note."

PharmPods/year; and (b) VertiFresh is a Denver licensee that paid $250,000 in 2012 for a license and 4 PharmPods, and was expected to purchase another 6 PharmPods in 2013.[37]  However, Dittman did not disclose the relationships that he and Sears had with and in Meadpoint and VertiFresh in that email.   Co-Conspirator A ultimately sent the email to prospective investors.

**The Origins of the Criminal Investigation**

54.     The foregoing matters became the focus of a federal criminal investigation in the District of Colorado that, in turn, arose from a referral in December 2013 from the SEC's Regional Office in Denver, Colorado, after the agency received a complaint from a former FusionPharm worker, alleging that FusionPharm was engaged in fraud. The agency commenced its own parallel civil investigation.

55.     Following the referral, from on or about March 28, 2014 through on or about July 18, 2014, the FBI conducted an undercover operation as part of the investigation into FusionPharm. During this time, Dittman met with an undercover FBI agent posing as a potential FusionPharm investor on four separate occasions.   Sears also met with the undercover agent on one occasion. Over the course of these undercover encounters, Sears and Dittman variously acknowledged Sears' control of Meadpoint and VertiFresh.   Sears also candidly discussed his involvement in FusionPharm, at one point remarking to the FBI undercover agent that, when it came to FusionPharm, he was the "hand up Mona Lisa's skirt." In a final meeting with the FBI undercover agent, Dittman at one point acknowledged that Sears could not be in the company (FusionPharm) because of his prior felony conviction in New York.

56.     As a result of its preliminary investigative findings, the SEC suspended trading in FusionPharm's stock on May 16, 2014.   The same day, the FBI and IRS-CID executed a federal

---

[37]     Sears was not on the email exchanges between Dittman and the investor, and Dittman and co-conspirator A, which are referenced in ¶¶ 53 and 54.

search warrant on FusionPharm's principal place of business. The FBI seized 24 items of evidence including six computers and one tablet. The FBI also executed seizure warrants on four bank accounts and one brokerage account containing proceeds from the sale of FusionPharm stock.

### IRS Tax Investigation

57.     The government's investigation was expanded to include criminal violations of the Internal Revenue Code. The government analyzed bank and brokerage accounts held by the Defendants, Family Member A, and Facilitating Entities, interviewed several witnesses and reviewed the other evidence obtained through the investigation. This information was then compared to records maintained by the Internal Revenue Service.

58.     Even though Sears and Dittman treated the proceeds of the FusionPharm stock sales as theirs collectively (*see* ¶ 40 above), the government's investigation for tax violations focused on Sears individually because Sears controlled the accounts of the Facilitating Entities where the FusionPharm stock sales occurred. Sears' ownership and control of the entities included brokerage accounts and bank accounts in the name of the entities. Accordingly, for tax purposes, such proceeds were considered income to Sears. However, neither Sears nor anyone else for that matter ever claimed the FusionPharm stock sale proceeds as income on their tax returns.

59.     Based on the information set forth herein, Sears willfully failed to report federal capital gains generated from the sale of stock through the Facilitating Entities as well as capital gains generated from sales occurring in his personal E*TRADE account. Sears also failed to pay taxes on capital gains generated at the brokerage account level.

60.     As set forth below, the criminal tax loss associated with Sears for tax years 2011 through 2014 is $2,433,818.00.

**2011 Tax Year**

61.     For tax year 2011, Sears subscribed to and filed with the Internal Revenue Service, a 2011 Federal Form 1040EZ, *Income Tax Return for Single and Joint Filers with No Dependents,* where he claims to have earned $7,500 in wages from FusionPharm, Inc.

62.     During 2011, Sears sold shares of stock through accounts held in the name of Microcap and his personal E*TRADE account for a total of $1,245,631.50[38] which resulted in a tax due and owing to the government in the amount of $315,843.00.

**2012, 2013 and 2014 Tax Years**

63.     For tax years 2012, 2013, and 2014, Sears failed to file individual income tax returns with the Internal Revenue Service.[39] Microcap, Bayside, and Meadpoint also failed to file tax returns from 2011 through 2014.

64.     For tax year 2012, Sears sold shares of FusionPharm stock through brokerage accounts held in the name of Microcap and his personal E*TRADE account for a total of $484,871.43 which resulted in a tax due and owing to the government in the amount of $89,867.00.

65.     During 2013, Sears caused the sale of FusionPharm shares in the amount of $350,328.95 through brokerage accounts held in the name of Bayside, Meadpoint, and his personal E*TRADE account. The tax due and owing to the government for tax year 2013 is $55,698.00.

66.     For tax year 2014, Sears caused the sale of FusionPharm shares in the amount of $9,915,715.26 through brokerage accounts in the name of Meadpoint.   The tax due and owing to the government for tax year 2014 is $1,972,410.00.

---

[39]     Over $1.1 million of 2011 stock sales were derived from shares of FusionPharm. The remainder of the 2011 stock sales was generated by shares of other entities.

[40]     For tax years 2012, 2013 and 2014, the FusionPharm stock sales by Facilitating Entities triggered an individual filing requirement for Sears.

**Government's Financial Analysis and Ill-Gotten Gain Calculations**

67.    The government analyzed bank and brokerage accounts in the name of the Defendants, FusionPharm, Family Member and the Facilitating Entities, along with various documents provided by FusionPharm's transfer agent to determine the amount of funds obtained by the Defendants.   The ill-gotten gains by the Defendants total approximately $12.2 million based on the proceeds of the unregistered sales of FusionPharm common stock.   The parties recognize, however, that as much as $9.9 million was generated immediately following the effective date of Amendment 64.   The government also identified the following:

a.   The government seized approximately $269,616 from various bank accounts, all traceable to FusionPharm stock sales.   Additionally, the government seized approximately $8,462,621 in a brokerage account in the name of Family Member A.

b.   Since the original execution of the search and seizure warrants, on November 30, 2015, the government received $311,865.38 in relation to the sale of Sears's home. Additionally, on January 13, 2016, the government received an additional $85,859.00 in relation to the sale of a warehouse located at 4360 Vine Street in Denver, Colorado.   The government received these funds pursuant to a consent agreement signed by Sears on November 25, 2015.

c.   Proceeds from the sales of FusionPharm stock were transferred to FusionPharm, and reported as revenue, in an amount of approximately $1.3 million.

d.   Meadpoint still holds 1,072,270 FusionPharm common shares.

     e.    Between 2011 and 2014, Dittman received approximately $330,000 in salary and other payments from FusionPharm and the Facilitating Entities.  In addition, on May 15, 2014, Sears transferred to Dittman $688,000, which he used to purchase a house in Pennsylvania; these funds are traced back to FusionPharm stock sales.

## VI.    ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

**Advisory Guideline Computations.**

**Count 1 (Conspiracy).**

A.    The base guideline is U.S.S.G. Section 2X1.1(a), which adopts the base offense level from the guideline for the substantive offenses which are the objects of the conspiracy, plus any adjustments from such guideline for intended offense conduct that can be established with reasonable certainty.   The base guideline for the substantive offenses which are the objects of the conspiracy set forth in Count 1 of the Contemplated Information is U.S.S.G. Section 2B1.1

B.    The Base Offense Level for these object offenses under Section 2B1.1 is offense level **6**, because 18 U.S.C. § 371 carries a maximum term of imprisonment that is less than twenty years.

C.      Specific Offense Characteristic 2B1.1(b)(1), applies in this case because there was a loss resulting from the offense conduct.   The parties agree, however, that such loss reasonably cannot be determined and that the gain that resulted from the offense conduct should instead be used as an alternative measure of loss for the purpose of determining this offense characteristic. *See* U.S.S.G. Section 2B1.1, comment. (n.3(B)).   The parties further agree that the gain that resulted from the offense conduct corresponds to the total in proceeds realized from the sale of FusionPharm common stock and debt securities convertible into common stock through Microcap, Bayside, and Meadpoint, which is approximately $12,204,172, greater than $9,500,000 but not more than $25,000,000, which would increase the offense score **20 levels**, pursuant to U.S.S.G. Section 2B1.1(b)(1)(K).

D.      Specific Offense Characteristic 2B1.1(b)(2)(A) applies because the offense conduct involved 10 or more victims, and was committed through mass marketing, increasing the Offense Level by **2 Levels**.

E.      Specific Offense Characteristic 2B1.1(b)(10)(C) applies because the offense conduct involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting the sophisticated means, warranting an additional **2 Level** increase in the defendant's Offense Level score, pursuant to this provision.

F.      The government's position is that the defendant's Offense Level score should be increased **4 additional levels**, pursuant to U.S.S.G. § 3B1.1(a), because the defendant acted as an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

G.      The parties believe that there are no other victim-related, role-in-offense, obstruction adjustments which apply with respect to the offense conduct associated with this count of conviction. U.S.S.G. Parts 3A-3C.

H.     The Total Offense Level for the conspiracy offense of conviction would accordingly be Level **34**.

**Count 2 (Filing False Tax Return).**

I.     The base guideline for the tax offense set forth in Count 2 of the Contemplated Information is U.S.S.G. Section 2T1.1, which adopts, for its base offense level, the offense level from the tax table set forth in U.S.S.G. § 2T4.1 for cases involving tax losses.  The government has calculated the tax loss associated with the defendant's offense of conviction and relevant conduct to be approximately $2,433,818 for the years 2011 through 2014. Accordingly, the base offense level is **Level 22,** based on the government's tax loss calculations (U.S.S.G. § 2T4.1(I)(tax loss more than $1,500,000 but not more than $3,500,000)).

J.     Specific Offense Characteristic Section 2T1.1(b)(1) applies, increasing the defendant's offense score by **2 levels**, because he failed to report or to correctly identify as a source of income on his federal income tax returns or other return with the IRS, in excess of $10,000 he received from the criminal activity which is the subject of the conspiracy offense of conviction set forth in Count 1 of the Contemplated Information.

K.     Specific Offense Characteristic Section 2T1.1(b)(2) applies, increasing the defendant's offense score by **2 additional levels**, because the offense conduct involved sophisticated means.

L.     The parties agree that there are no victim-related, role-in-offense, obstruction adjustments related to this offense of conviction which apply in this case. U.S.S.G. Parts 3A-3C. Therefore, the Total Offense Level for the tax offense of conviction would be **Level 26**.

**Multiple Counts Adjustment**.

M.     The parties agree that the conspiracy offense of conviction and the tax offense of conviction and their associated relevant offense conduct constitute two distinct sentencing groups

subject to a Multiple Count Adjustment, pursuant to U.S.S.G. Part 3D.

N.    The conspiracy offense of conviction and its relevant conduct constitute 1 unit, pursuant to U.S.S.G. Section 3D1.4(a), as this group carries the highest offense level.   The tax offense of conviction and its relevant conduct would constitute ½ unit, pursuant to Section 3D1.4(b), as that group carries an offense level that is 8 levels lower than the offense level for the conspiracy offense of conviction.   There being a total of 1-1/2 units, **1 additional offense level** would be added to the offense level score for the conspiracy offense of conviction, giving the defendant an overall Total Offense Level of **35**.

**Final Total Offense Level**.

O.    The defendant is eligible to receive a **3-level** offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1 based on his timely notification of his intention to resolve this case by guilty plea.   The resulting offense level, based on the government's current calculations, would therefore be **Level 32**.

**Criminal History**.

P.    The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court.   The defendant has a prior conviction and one month sentence for conspiracy to commit securities fraud and commercial bribery and for securities fraud, which the parties believe is includable in his criminal history score. The parties believe that this prior sentence carries one criminal history point, with no other includable criminal history, classifying the defendant in Criminal History **Category I**, if no other information were discovered.

Q.    Assuming the (tentative) criminal history facts of (P) above, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

**Resulting Guideline Range**.

R.     The guideline range resulting from the estimated offense level of (O) above, and the (tentative) criminal history category of (P) above, would be **121-151** months without regard to the statutory maximum imprisonment terms for Counts 1 and 2 of the Contemplated Information. With the criminal history category undetermined at this time, an estimated offense level 32 above could conceivably result in a range from 121 months (bottom of Category I), to 262 months (top of Category VI).   Because the statutory maximum sentence is deemed to be the guideline sentence as well where the otherwise applicable sentencing guideline range would exceed the statutory maximum sentence, U.S.S.G. § 5G1.1(a), the guideline sentence in this case effectively would be **96 months**, the maximum statutorily authorized imprisonment term assuming the statutory maximum terms of imprisonment for each of the counts of the Contemplated Information were imposed consecutive to one another.

**Additional Matters**.

S.     Pursuant to guideline § 5E1.2, assuming the government's estimated offense level of (O) above, the fine range for the offenses of conviction would be $35,000 to $350,000, plus applicable interest and penalties.

T.     Pursuant to guideline § 5D1.2, if the Court imposes the term of supervised release, that term shall be at least three years but not more than five years.

U.     Restitution is either mandatory under U.S.S.G. § 5E1.1(a)(1) or otherwise contemplated under U.S.S.G. § 5E1.1(a)(2).   The Court may determine not to order restitution or to limit restitution   where, *inter alia*, the Court determines that complication and prolongation of the sentencing process resulting from the fashioning of a restitution requirement outweighs the need to provide restitution to any victims through the criminal process (U.S.S.G. § 5E1.1(b)).   The parties agree that restitution should not be imposed with respect to the conspiracy count of

conviction and offense conduct but should be imposed with respect to the tax offense count of conviction and offense conduct.

**3553 Advisement**.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

Except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.[40]

Date: _9-15-16_                                _____
                                                                 William J. Sears
                                                                 Defendant

Date: _____                    _____
                                                                 Marci Gilligan LeBranche, Esq.
                                                                 Attorney for Defendant Sears

Date: _9/15/16_                             _____
                                                                 Frederic M. Winocur, Esq.
                                                                 Attorney for Defendant Sears

Date: _9/5/16_                               _____
                                                                 Kenneth M. Harmon
                                                                 Assistant U.S. Attorney

Date: _____                    _____
                                                                 Tonya S. Andrews
                                                                 Assistant U.S. Attorney

Date: _____                    _____
                                                                 Scott M. Mascianica
                                                                 Special Assistant U.S. Attorney

---

[40]    This plea agreement expressly supersedes, and renders inoperative, the plea terms letter agreement letter, dated May 25, 2016, previously executed by counsel for the parties, a copy of which letter is annexed hereto as Exhibit B.

47

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.[40]

Date: _9-15-16_                    _____
                                   William J. Sears
                                   Defendant

Date: _____              _____
                                   Marci Gilligan LeBranche, Esq.
                                   Attorney for Defendant Sears

Date: _9/15/16_                    _____
                                   Frederic M. Winocur, Esq.
                                   Attorney for Defendant Sears

Date: _9/8/16_                     _____
                                   Kenneth M. Harmon
                                   Assistant U.S. Attorney

Date: _9/18/2016_                  _____
                                   Tonya S. Andrews
                                   Assistant U.S. Attorney

Date: _____              _____
                                   Scott M. Mascianica
                                   Special Assistant U.S. Attorney

---

[40]   This plea agreement expressly supersedes, and renders inoperative, the plea terms letter agreement letter, dated May 25, 2016, previously executed by counsel for the parties, a copy of which letter is annexed hereto as Exhibit B.



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.

UNITED STATES OF AMERICA

Plaintiff,

v.

1.    WILLIAM J. SEARS, and
2.    SCOTT M. DITTMAN,

Defendants.

---

**INFORMATION**
18 U.S.C. §371
26 U.S.C. §7206(1)

---

The Acting United States Attorney charges that:

## COUNT 1

1.      Beginning as early as in or about March 25, 2011 and continuing at least through

in or about May 15, 2014, the exact dates being unknown, in the State and District of Colorado,

and elsewhere, the defendants,

**WILLIAM J. SEARS, and
SCOTT M. DITTMAN,**

did knowingly and willfully conspire, combine and agree with each other, and with other persons

both known and unknown,

(a) to defraud the United States and one of its agencies, the United States Securities and

Exchange Commission ("SEC"), by impeding, impairing, defeating and obstructing the lawful

1

**EXHIBIT A**

governmental functions of the SEC; and

      (b) to commit the following offenses against the United States:

            (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5];

            (ii) willful violations of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a);

            (iii) mail fraud, in violation of Title 18, United States Code, Section 1341; and

            (iv) wire fraud, in violation of Title 18, United States Code, Section 1343.

## Background

      At all times material to this Information:

      2.     Defendant WILLIAM J. SEARS was a resident of Thornton, Colorado whose principal occupation over the years was providing public relations and promotional services to companies with low or minimal capitalization (hereinafter, "microcap companies") that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets.   In 2007, defendant Sears was convicted in the Southern District of New York of one count of conspiring to commit federal securities fraud and commercial bribery and one count of federal securities fraud (Case No. 04-cr-556-swk).

      3.     Microcap Management LLC ("Microcap") was a Nevada limited liability company formed by defendant SEARS, with its primary business address in Colorado. Defendant SEARS was, among other things, the beneficial owner and manager of Microcap and controlled Microcap. SEARS primarily conducted his stock public relations and promotional business through Microcap over the years.

2

4.      Bayside Realty Holdings, LLC ("Bayside") was another Nevada limited liability company formed, controlled and operated by defendant SEARS, in fact, but which was held out to be managed and owned by a blood relative family member (hereinafter, "Family Member A") residing in North Carolina.

5.      Defendant SCOTT M. DITTMAN was a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania.   From October 1991 until April 1995, DITTMAN practiced as an accountant and for two years, from 1995 to 1997, had been a certified public accountant licensed in the State of California. Thereafter, defendant DITTMAN was principally self-employed in various businesses, including real estate development, construction and, beginning in or about 2010, medical marijuana. Defendants DITTMAN and SEARS were brothers-in-law, SEARS being married to DITTMAN's sister.

6.      FusionPharm, Inc. ("FusionPharm") was a Nevada corporation with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado. FusionPharm's principal business was the development, manufacture and sale of steel shipping containers retrofitted and refurbished for use as hydroponic growing pods, branded as "PharmPods," for indoor plant cultivation, primarily cannabis. Defendant DITTMAN was the founder, chief executive officer and sole director of FusionPharm but, in fact, operated FusionPharm, and pursued and developed its business, together and in concert with defendant SEARS, and the two defendants together beneficially held and controlled the majority of the shares of FusionPharm's common and preferred stock, which was convertible into the company's common stock.   FusionPharm's common stock was publicly traded in the over-the-counter markets, primarily through transactions involving networks of securities broker-dealers.

3

7.      Meadpoint Venture Partners, LLC ("Meadpoint") was a Nevada limited liability company formed by defendant SEARS and was held out to be FusionPharm's exclusive distributor of PharmPods, marketing, in particular, to customers interested in using the pods for cannabis cultivation.   Meadpoint shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm. Defendant SEARS was identified as Meadpoint's managing member, and Meadpoint was operated by both defendants together in conjunction with the operations of FusionPharm.

8.      VertiFresh, LLC ("VertiFresh") was a Delaware limited liability company jointly owned and controlled together by defendants SEARS and DITTMAN.   Vertifresh was held out to be a licensee of FusionPharm's technology and growing methods whose principal business purportedly involved using FusionPharm PharmPods to grow non-cannabis produce (primarily, lettuce) for sale to restaurants and retail food outlets. Vertifresh shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm.

9.      OTC Link was an electronic inter-dealer stock quotation system that published stock quotes and other stock transaction information posted by securities broker-dealers and was typically used by broker-dealers to display quotes and make markets in securities of publicly traded microcap companies whose securities were traded in the over-the-counter markets.   Such companies did not have to meet any requirements in order to have their stocks quoted on the OTC Link system, and any reporting or disclosure by companies whose stocks were quoted on the system was voluntary.   However, the OTC Link system organized and classified the securities of the companies quoted on its system into several distinct marketplaces or "market

4

tiers," depending, in large part, on the nature, quality and extensiveness of the corporate and financial disclosures a company provided to OTC Link. The "market tiers" were designed to provide investors some indication as to the quality and level of information about the companies on the OTC Link system, and companies that provided limited or no information were placed in market tiers reserved for stock issuers that prospective investors were advised to consider with caution. The type of information that participating companies were encouraged to provide to OTC Link typically included quarterly and annual financial statements and quarterly and annual reports, in a prescribed format, providing disclosure, among other things, about the officers, directors, control persons and significant beneficial owners of the company's stock. These quarterly and annual submissions were uploaded to OTC Link's website, where they were readily accessible to the investing public and subject to wide dissemination through financial media outlets.

10.     FusionPharm's common stock was quoted on the OTC Link under the stock symbol "FSPM" and, using this system, securities broker-dealers made a market in and facilitated public, over-the-counter trading in its stock.   FusionPharm undertook to, and regularly did, upload to the OTC Link's website, and thereby made available to the investing public, quarterly and annual financial statements and reports providing information about its performance, its financial condition and the identities of its officers, control persons and significant stockholders.

11.     The SEC was an independent agency of the executive branch of the United States Government whose duties included regulating and monitoring the trading of securities and the

reporting of financial and other information by publicly-held corporations within the United States.

12.     Under the federal securities laws, the securities of companies traded in United States could not be bought and sold in public transactions unless first registered with the SEC or considered exempt from registration pursuant to one of several defined statutory or regulatory provisions.   Such registration typically involved providing to the SEC and making available to the investing public certain specified information about the company, its financial situation, its operations and its principals and officers, in a prescribed form filed with the SEC which typically included a prospectus made available to potential investors.   Securities that were unregistered, and not otherwise exempt from registration, were considered restricted securities that were not eligible for lawful public re-sale, and the certificates evidencing these securities typically bore a legend providing notice of this status.

13.     One of the exemptions from registration recognized under the federal securities laws generally allowed holders of unregistered securities, not already unrestricted at the time of receipt, to resell them in public transactions, without limitation, after having held the securities for a specified period.   This holding period, in the case of companies such as FusionPharm, was one year.   Holders of unregistered, restricted securities who were deemed to be "affiliates" could resell these securities in public transactions after meeting the specified holding period, but only if they met certain additional regulatory requirements, and only then in limited numbers of shares over specified periods of time (*i.e.*, in public sales subject to "volume restrictions").   An "affiliate," for the purpose of this regulatory exemption from registration, was considered to be someone who directly, or indirectly through one or more intermediaries, controlled, or was

6

controlled by, or was under common control with the issuing company.  Such "control" was

defined to mean "the possession, direct or indirect, of the power to direct or cause the direction

of the management and policies of a person, whether through ownership of voting securities, by

contract, or otherwise."

14.     Both non-affiliate and affiliate holders of unregistered securities, upon satisfying

their respective requirements for the regulatory exemption from registration, would typically

have had to have the stock transfer agent for the issuing company remove the restrictive legends

on the certificates of their securities, before the securities could be eligible for resale in a public

transaction.   To accomplish this, the holders would have had to have secured the consent of the

issuing company and would have had to have provided documentation to the stock transfer agent

demonstrating that the requirements for exemption from registration had been met.

15.     None of FusionPharm's securities were registered with the SEC, and the only way

that its securities could be traded over-the-counter or in other public transactions were through

transactions involving securities that qualified for exemption from registration with the SEC.

### Manner and Means of the Conspiracy

16.     It was part of the manner and means of carrying out the conspiracy that:

A.     Defendant SEARS would cause shares of preferred stock of FusionPharm

held in the name of Microcap to be converted into shares of FusionPharm common stock and

deposited into brokerage accounts established in the name of Microcap. Defendant SEARS

would induce brokers overseeing these accounts to consider and treat these common shares as

unrestricted securities that could be immediately sold in the public securities markets by falsely

representing to them that neither he nor Microcap was an affiliate of FusionPharm or a control

person of the company. Defendant DITTMAN facilitated the deposit of these shares, and their treatment as unrestricted securities, by executing FusionPharm officer certificates and other documentation affirming that Microcap was not an affiliate of FusionPharm.

B. Defendant SEARS would then cause the remainder of these preferred shares to be transferred from Microcap's name into the names of family members or entities held in the name of family members, in order to make it appear that neither he nor Microcap had shareholdings in FusionPharm in such amounts as to deem either SEARS or Microcap to be affiliates or control persons under the federal securities laws or to trigger their disclosure as significant shareholders under the reporting guidelines established by OTC Link. Defendant SEARS would thereafter cause portions of the FusionPharm preferred shares that had been transferred into the names of these family members and entities, in turn, to be converted into additional common shares of FusionPharm that could be publicly sold later on or that he and DITTMAN could later use to raise funds for the company in private sales to select FusionPharm investors.

C. Defendant SEARS, working in coordination with another individual, would thereafter cause the FusionPharm common shares that had been deposited into the Microcap brokerage accounts to be sold in the public securities markets and, in consultation with defendant DITTMAN, would deposit significant portions of the proceeds of these FusionPharm stock sales into operating bank accounts of FusionPharm – both directly and through a series of transactions involving Bayside, Meadpoint or Vertifresh – so that the money could then be used to capitalize and operate the company, as well as be used for the defendants' own financial support.

8

17.     As a further part of the manner and means of carrying out the conspiracy, in order to generate and make available for themselves additional FusionPharm common stock that could immediately be sold, without limitation, into the public securities markets, the defendants did and caused the following to be done:

A.     Over the course of June 2012 through in or about December 2012, the defendants, working together with another individual (identified hereinafter as, "Co-Conspirator A"), fabricated promissory notes and incorporated credit line agreements, in order to falsely portray some of the money that had previously been deposited into FusionPharm's bank accounts from the Microcap FusionPharm stock sales as loans from Bayside and Meadpoint that had been extended to FusionPharm over a year before.

B.     The defendants and Co-Conspirator A further fabricated documentation making it appear that FusionPharm had drawn down on the supposed credit lines established with Bayside and Meadpoint by specified amounts, and they assembled bank records to offer substantiation for these supposed earlier credit line draw downs.

C.     The defendants and Co-Conspirator A, in the final iterations of these fabricated promissory notes and supporting documents, made it appear that the supposed debt evidenced by these notes could be converted in whole or in pieces, at the election of the noteholders, into shares of FusionPharm common stock at a specified conversion rate of one FusionPharm share for every penny of debt supposedly still owed on the notes by FusionPharm.

D.     Defendant DITTMAN, on behalf of FusionPharm, and defendant SEARS, on behalf of Meadpoint and acting for Family Member A on behalf of Bayside, executed the back-dated promissory notes and documents.

9

E.     Defendants SEARS and DITTMAN then generated packets of documents that SEARS caused to be presented to FusionPharm's stock transfer agent, over a series of months, in order to effectuate the conversion of portions of the supposed debt held by Bayside and Meadpoint into shares of FusionPharm common stock. The packets typically included the following:

- convertible promissory notes that he and defendant DITTMAN had backdated;

- the backdated draw down requests that DITTMAN had signed on behalf of FusionPharm;

- copies of bank account statements showing deposits to FusionPharm's accounts corresponding to the draw down requests;

- letters from Bayside and Meadpoint (depending on the entity exercising the conversion), for signature by Family Member A for Bayside and SEARS for Meadpoint, falsely representing that the entities were not affiliates of FusionPharm;

- additional statements of non-affiliation for Bayside and Meadpoint (again depending on the entity exercising the conversion), reiterating that neither entity was a FusionPharm affiliate and additionally representing that neither Family Member A, in the case of Bayside, and SEARS, in the case of Meadpoint, was an officer, director, control person or holder of more than ten percent of the securities of FusionPharm;

- a FusionPharm officer's certificate, signed by DITTMAN, representing that neither Bayside nor Meadpoint (depending on the entity making the conversion) were affiliates of FusionPharm and were outsiders to the company and management, with no other method of control over the company, and that the convertible promissory notes that were the vehicles for the conversion were valid obligations of the company;

- additional letters signed by DITTTMAN reiterating that Bayside and Meadpoint were not affiliates of the company; and

- attorney opinion letters opining that the common shares to be issued to Bayside and Meadpoint met the federal securities exemption from registration and could be issued as unrestricted shares without the need for a restrictive legend.

18.     It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS thereafter caused a substantial portion of the common shares issued to

10

Bayside and Meadpoint as a result of these supposed debt conversions to be deposited into brokerage accounts set up in the names of Bayside and Meadpoint and then caused these shares to be sold in the public securities markets.

19.     It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS, in consultation with defendant DITTMAN, would arrange for a substantial portion of the proceeds realized from the stock and debt sales resulting from the supposed FusionPharm debt to Bayside and Meadpoint to be deposited either directly or indirectly into FusionPharm's operating bank accounts so that these funds could also be used to further capitalize and support the operations of the company and to provide for both defendants' financial support.

20.     As a part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, caused FusionPharm to treat and account for some of the funds received back to FusionPharm from the Microcap, Meadpoint and Bayside sales of FusionPharm stock as payments to FusionPharm for or relating to sales of its PharmPods, which sales DITTMAN then caused FusionPharm to book in its accounting records as licensing revenues realized by the company.   The stock proceed deposits were claimed, in particular, to be payments by Meadpoint, acting in its supposed capacity as FusionPharm's purported exclusive PharmPod distributor, for PharmPods that were being manufactured for and sold to FusionPharm customers in arms-length transactions but that had not yet been delivered to those customers or purported Meadpoint payments in anticipation of sales of PharmPods that DITTMAN and SEARS were still negotiating with prospective FusionPharm customers.

11

21.     As a further part of the manner and means for carrying out the conspiracy,

defendant DITTMAN, in consultation and in coordination with defendant SEARS and others,

also sought to use purported dealings with Vertifresh as a basis to claim and book additional

revenues for FusionPharm.   DITTMAN and SEARS caused contracts and related documentation

to be drafted that purportedly depicted a licensing agreement between FusionPharm and

Vertifresh, pursuant to which Vertifresh agreed to pay $750,000 to FusionPharm over the course

of three years in exchange for the purchase of a series of PharmPods and the right to use

FusionPharm's growing methods and technology to cultivate and sell non-cannabis produce in

three distinct geographic regions.   Based on this purported agreement, DITTMAN then caused

FusionPharm to book the entire licensing agreement amount as FusionPharm revenues in a single

year, 2012.

22.     It was part of the manner and means of carrying out the conspiracy that defendant

DITTMAN, with defendant SEARS' assistance, would then cause these purported transactions

with Meadpoint and Vertifresh and the purported revenues associated with them to be publicly

disseminated, among other ways, through press releases disseminated in the financial media and

through interviews by DITTMAN made available to the public.

23.     It was a further part of the manner and means of carrying out the conspiracy that

defendants DITTMAN and SEARS would cause these transactions and revenue figures to be

reported in quarterly and annual financial statements uploaded to, and made available to the

investing public on, OTC Link's website. DITTMAN, working in concert with SEARS, would

cause the financial statements notes and the quarterly and annual reports to omit facts revealing

that Meadpoint, Vertifresh and FusionPharm were all under the common control of the

defendants and the revenues generated as a result of these transactions were between related parties. DITTMAN, in concert with SEARS, would further cause FusionPharm to affirmatively represent in these reports that there were, in fact, no related party transactions with immediate family members and significant beneficial owners of FusionPharm stock and would cause these reports to conceal completely SEARS' involvement in the company and his beneficial ownership of its stock.

## Overt Acts

24. In furtherance of the conspiracy and to effect the objects thereof, one or more overt acts were carried out by at least one co-conspirator in the State and District of Colorado and elsewhere, which overt acts included the following:

A. On or about March 25, 2011, defendants SEARS and DITTMAN caused an Issuer Company-Related Action Notification form to be filed with the Financial Industry Regulatory Authority ("FINRA") providing notice of a name change to, and stock symbol change with respect to, FusionPharm, identifying himself and Family Member A as the sole officers and directors of the company, and representing, among other things, that none of the company's officers, directors or parties related to the company were the subjects of pending, adjudicated or settled civil or criminal action related to fraud or securities violations.

B. On or about April 11, 2011, defendant SEARS sent a letter to a representative of FusionPharm's stock transfer agent in Las Vegas, Nevada surrendering a stock certificate evidencing the ownership of 185,0000 FusionPharm preferred shares and requesting that a portion of the shares evidenced by this certificate be converted into 80,000 shares of FusionPharm common stock in the name of a limited liability company in Orlando, Florida and

13

65,000 shares of FusionPharm common stock in the name of Microcap and that the balance of the remaining preferred shares, 183,550, be transferred to a company in Thornton, Colorado.

C.      On or about April 21, 2011, defendant DITTMAN sent an email to a number of people, bearing the subject "Fusion Pharm," announcing that he had recently "partnered with [his] brother-in-law William Sears" and that "we have acquired and moved our operations into a publicly traded company: Fusion Pharm, Inc."

D.      On or about May 2, 2011, defendant SEARS sent a letter to an employee at Oppenheimer, & Co., Inc., directing that 65,000 shares of FusionPharm common stock be deposited into the brokerage account of Microcap Management and representing that Microcap Management was neither a control person nor an affiliate of FusionPharm.

E.      On or about June 20, 2011, defendant SEARS sent an email to defendant DITTMAN, bearing the subject "Stock," advising, in part, that the "cert [was] for 182,050," that "the deal will be structured whereas we can have some free anyway," and that it was "just something we need."

F.      On or about June 23, 2011, defendant DITTMAN sent an email to defendant SEARS asking whether "$3k from this weeks [sic] take" could be wired to a family member's account.

G.      On or about September 6, 2011, defendant DITTMAN sent defendant SEARS an email asking, "What do we have in microcap now?"

H.      On or about September 13, 2011, defendant SEARS forwarded defendant DITTMAN an exchange of emails between SEARS and a representative of a brokerage firm addressing SEARS' inquiry about the net amount in Microcap's brokerage account.

14

I.       On or about October 6, 2011, defendant DITTMAN had a telephone conversation with a FINRA investigator during which he described defendant SEARS as a part-time salesman for FusionPharm and stated that he was unaware that SEARS owned or was selling FusionPharm stock.

J.       On or about November 3, 2011, defendant DITTMAN had another telephone conversation with the same FINRA investigator during which he stated that defendant SEARS no longer owned Microcap or any FusionPharm stock.

K.       On or about March 31, 2012, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2011, was uploaded to a public website maintained by OTC Link.

L.       On or about June 4, 2012, defendant SEARS forwarded an email from Co-Conspirator A transmitting as an attachment a draft promissory note and credit line agreement for Bayside and stating that Co-Conspirator A would draft "the drawdown requests to match the dates and amounts of the deposits."

M.       On or about June 6, 2012, Co-Conspirator A sent defendant SEARS an email, bearing the subject "Bayside Loan Documents, transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements, and stating, "Bill, Let's get these signed up. Meadpoint's to follow in a separate email."

N.       On or about June 6, 2012, Co-Conspirator A sent defendant SEARS a subsequent email, bearing the subject "MeadPoint Loan Documents," transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements.

O.  On or about July 12, 2012, defendant SEARS sent defendant DITTMAN an email, bearing the subject "Cash," stating, in part, "This week will be a gross total of $25,118," and setting forth a "net to FP" of $12,558, after certain enumerated dollar amount offsets to identified individuals.

P.  On or about November 26, 2012, a press release entitled, "FusionPharm Signs Licensing Agreement for Flowering Containers," was disseminated via PR Newswire, announcing the signing of a licensing agreement with Meadpoint to market PharmPods and relating that an initial order of 9 PharmPods had already been received from Meadpoint "with minimum purchase quantities of 50 containers in both 2013 and 2014."

Q.  On or about November 26, 2012, Co-Conspirator A sent an email to defendant SEARS attaching drafts of convertible promissory notes for Bayside and Meadpoint and advising that the "Notes work with the existing draw down requests."

R.  On or about December 12, 2012, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent transmitting a convertible promissory note in favor of Bayside, notifying the transfer agent that "Bayside has chosen to exercise its option to convert into shares [sic]," and that "Bayside [was] a family members [sic] company and I am assisting them [sic] as I am familiar with all parties."

S.  On or about December 27, 2012, Co-Conspirator A sent defendant DITTMAN an email stating, "We are in need of a letter which confirms the end of the drawdowns under the Bayside promissory note," and advising that Co-Conspirator A had drafted such a letter for DITTMAN's signature.

16

T.     On or about January 7, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Bayside Note FSPM," transmitting an attorney's opinion letter, FusionPharm bank account statements "which reflect funding" and a "[c]losing letter that closed the note."

U.     On or about January 30, 2013, defendant SEARS sent an email to Co-Conspirator A and defendant DITTMAN attaching drafts of a licensing agreement between Vertifresh and FusionPharm and advising, "This is the one we should work thru [sic]."

V.     On or about March 6, 2013, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2012, was uploaded to a public website maintained by OTC Link.

W.     On or about March 27, 2013, defendant DITTMAN conducted a recorded interview with a representative of an internet-based financial public relations service for Small Cap Voice.Com, Inc., as self-styled financial communications and investor relations service for "small cap" companies, during which he stated that FusionPharm did "a little over $800,000 in revenue" for 2012 and that he expected FusionPharm to double its results for 2013.

X.     On or about April 11, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Meadpoint Venture Partners FSPM," stating that he was attaching a series of documents, including "a notice to convert," the "[o]riginal note," a "letter of opinion," and a "Non Affiliate declaration," and transmitting scanned versions of the described documents.

Y.     On or about August 5, 2013, defendant DITTMAN set an email to an individual considering making an investment in FusionPharm proposing, in part, that some of the funds for

the contemplated investment involve the individual's purchase of "part of the existing note payable from FusionPharm to Meadpoint Venture Partners."

    Z.      On or about February 18, 2014, defendant DITTMAN sent the following email message to a representative of FusionPharm's stock transfer agent, in reply to that representative's observation that defendant SEARS had been listed as an "Administrative Officer" of FusionPharm "which would make him an affiliate:"

> … Not sure why you would have Mr. Sears as an administrative officer of the Company, he has never been employed by the Company and is not an affiliate. …

    AA.     On or about April 15, 2014, a document identified as FusionPharm's "Financial Statements for the Periods Ended December 31, 3013 [sic] and December 31, 2012 (Restated)", consisting of financial statements and financial statement notes for the periods ended December 31, 2012 and December 31, 2013, was uploaded to a public website maintained by OTC Link.

    BB.     On or about May 15, 2014, defendant SEARS forwarded to defendant DITTMAN an email from a representative of an investment firm, bearing the subject "RE: Todays Wires," acknowledging receipt of requests to send three wire transfers from a trust account established in the name of Family Member A.

In violation of Title 18, United States Code, Section 371.

## COUNT 2

    25.     On or about January 7, 2013, in the State and District of Colorado, the defendant,

### WILLIAM J. SEARS,

then a resident of Thornton, Colorado, did willfully make and subscribe a U.S Income Tax Return for Single and Joint Filers With No Dependents, Form 1040EZ, for the year 2011, which

was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said return he did not believe to be true and correct as to every material matter, in that the said return reported for the year total adjusted gross income of $7,500 (Form 1040EZ, line 4), whereas, as the defendant then and there well knew and believed, his adjusted gross income was significantly higher than what was actually reported.

In violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE ALLEGATION

26.     The allegations contained in Count One of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

27.     Upon conviction of the violation alleged in Count One of this Information involving the conspiracy to commit violations of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1341, Title 15, United States Code, Sections 78j(b) and 78ff(a), all in violation of Title 18, United States Code, Section 371, the defendants,

**WILLIAM J. SEARS, and**
**SCOTT M. DITTMAN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to:

19

a. $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name of Meadpoint Venture Partners;

b. $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name of Sandra L. Sears;

c. $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee;

d. $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name of FusionPharm, Inc.;

e. $212,273.92 Seized From Wells Fargo Bank Account No 8141061286, Held In The Name of FusionPharm, Inc.;

f. $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The purchase of 4200 Monaco Street, Denver, Colorado;

g. 194 BASKET ROAD, OLEY, PENNSYLVANIA; and

h. A money judgment in the amount of proceeds obtained by the conspiracy and by the defendants, for which the defendants are joint and severally liable, less the amount recovered from directly forfeitable assets.

i. If any of the property described above, as a result of any act or omission of the defendant:

   a) cannot be located upon the exercise of due diligence;
   b) has been transferred or sold to, or deposited with, a third party;
   c) has been placed beyond the jurisdiction of the Court;
   d) has been substantially diminished in value; or
   e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

ROBERT C. TROYER
ACTING UNITED STATES ATTORNEY


By: s/Tonya S. Andrews
Tonya S. Andrews
Assistant United States Attorney


s/Scott Mascianica
Scott Mascianica
Special Assistant U.S. Attorney


s/Kenneth M. Harmon
Kenneth M. Harmon
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, CO 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
Kenneth.Harmon@usdoj.gov



U.S. DEPARTMENT OF JUSTICE

**John F. Walsh**
*United States Attorney*
*District of Colorado*

*Kenneth M. Harmon*                                   *1225 Seventeenth Street, Suite 700    (303) 454-0100*
*Assistant U.S. Attorney*                              *Seventeenth Street Plaza          FAX (303) 454-0402*
                                                       *Denver, Colorado 80202*



May 25, 2016

**VIA E-MAIL TRANSMISSION**

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, CO 80202

           Re:     William J. Sears

Dear Counsel:

       I write to set forth the essential terms by which we propose to address through
negotiated guilty pleas the criminal liability of you client, William J. Sears, in relation to
matters currently under a federal criminal investigation being conducted under the
auspices of a federal grand jury in the District of Colorado, which matters arise from and
relate to the operations of Fusion Pharm, Inc., a public company whose common stock
has been traded on the OTC Markets Group under the ticker symbol "FSPM." The
particular matters under investigation and the federal criminal offenses under
consideration with respect to your client are described and outlined in my February 16,
2016 letter to you setting forth terms under which this office was prepared to take a
proffer of information from your client, by way of interview, which letter is incorporated
by reference herein and a copy of which is attached hereto as Attachment A (hereinafter,
the "February 16, 2016 proffer letter").

       This document does not itself constitute a plea agreement and is being provided in
furtherance of plea discussion and pursuant to Rule 11(f) of the Federal Rules of Criminal
Procedure. This pre-indictment resolution is subject to any formal approval deemed
required by the Tax Division of the United States Department of Justice with respect to
federal criminal tax offenses that have been referred to this office for investigation and
prosecution. This proposed resolution is also subject to, and contingent upon, a pre-
indictment resolution of the matters concerning this federal criminal investigation being
reached with Scott M. Dittman, and his counsel.

       Upon acceptance of this proposed pre-indictment resolution, as signified through
your and your client's execution of this letter in the signature blocks below; upon Mr.

**EXHIBIT B**

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 2

Dittman's acceptance of the terms of his proposed pre-indictment resolution, as signified in the same manner with respect to him; and upon securing any necessary approvals of the Tax Division, these essential terms will be embodied in a formal proposed plea agreement conforming, in form, to the Court's requirements for plea agreements in this District.

      1.      <u>The Offenses of Conviction & Asset Forfeiture</u>.

Mr. Sears would agree to waive prosecution by indictment and would agree to plead guilty to a two-count information charging him with the following offenses:

> *One*, conspiring with Mr. Dittman and others (a) to defraud the U.S. Securities and Exchange Commission ("SEC") and (b) to commit various offenses against the United States, including wire fraud, in violation of Title 18, United States Code, Section 1343; mail fraud, in violation of Title 18, United States Code, Section 1341; securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17 Code of Federal Regulations, Section 240.10b-5; and willful violation of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a); said conspiracy being in violation of Title 18, United States Code, Section 371; and

> *Two*, filing a false federal individual income tax return for calendar year 2011, in violation of Title 26, United States Code, Section 7206(1).

The contemplated information would also contain an asset forfeiture notice provision setting forth the government's intent to seek forfeiture of any and all of Mr. Sears' right, title and interest in all property constituting and derived from any proceeds obtained directly and indirectly by Mr. Sears' as a result of the commission of the charged conspiracy and its object offenses, or substitute assets for such property.

As part of our negotiated resolution, Mr. Sears would agree that he will agree to forfeiture of his interest in all property that may constitute or is derived from proceeds of his commission of or involvement or participation in the charged conspiracy and its objet offenses, including, but not limited to, the following:

      (a)      A money judgment not exceeding approximately $12,204,172, corresponding to the total amount currently believed to have been obtained as a result of the charged conduct from the sale of Fusion Pharm common stock or debt securities convertible into Fusion Pharm common stock;

      (b)      The following particular assets, derived from the sale of Fusion Pharm common stock, and constituting direct and indirect proceeds of the charged conduct:

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 3

     (1)    $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name Of Meadpoint Venture Partners;

     (2)    $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name Of Sandra L. Sears;

     (3)    $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name Of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee, less approximately $2,472,945 to be applied to Mr. Sears' restitution;

     (4)    $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name Of Fusionpharm, Inc.;

     (5)    $212,273.92 Seized From Wells Fargo Bank Account No. 8141061286, Held In The Name Of Fusionpharm, Inc.,

     (6)    $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The Purchase Of 4200 Monaco Street, Denver, Colorado; And

     (7)    The Real Property Located At 194 Basket Road, Oley, Pennsylvania.

The funds obtained from the forfeiture of the assets identified in subparagraph (b) would be applied to the forfeiture money judgment identified in subparagraph (a). In addition, the seized funds applied to any restitution obligation would also be credited to the forfeiture money judgment.

Mr. Sears would further agree to divest whatever beneficial ownership interest he has in shares of common and preferred stock of Fusion Pharm.

Mr. Sears would further agree to forfeit, as substitute asset, any monetary value he realizes in the future from his interest in Fusion Pharm.

The parties would agree that Mr. Sears' liability for forfeiture would be joint and several with Mr. Dittman's forfeiture liability in connection with the pre-indictment resolution of his case. The parties further agree that the forfeiture money judgment shall remain in full force and effect as to Mr. Sears for 5 years from the date of sentencing.

     2.    <u>Restitution</u>.

The parties would agree that, although restitution would otherwise be mandatory with respect to the conspiracy offense of conviction, they will take the position that

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 4

restitution should not be ordered by the Court, pursuant to 18 U.S.C. § 3663A(c)(3),
because either the number of identifiable victims is so large as to make restitution
impracticable or, alternatively, restitution would involve determination of complex issues
of fact that would complicate or prolong the sentencing process to a degree that the need
for restitution would be outweighed by the burden on the sentencing process.
Accordingly, while forfeited funds may be administratively available to eligible victims
by the Department of Justice, no court ordered restitution entered would be sought with
respect to Mr. Sears.

Mr. Sears would agree, pursuant to 18 U.S.C. § 3663(a)(3), to make restitution to
the Internal Revenue Service in the total amount of $2,472,945 corresponding to the
federal tax loss associated with the sale of Fusion Pharm securities for the years 2011
through 2014. Mr. Sears would acknowledge and agree that neither his agreement to pay
this restitution nor the restitution payments themselves will limit the Internal Revenue
Service in its lawful examination, determination, assessment or collection of any taxes,
penalties or interest due from Mr. Sears for these years. The parties agree that
$2,472,945 of the seized funds identified above will be paid toward the restitution.

3.



Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 5

Mr. Sears would ▓▓▓▓ agree to cooperate fully with the Office of the United States
Attorney for the District of Colorado and law enforcement and regulatory authorities designated
by it, in the identification, recovery and repatriation of assets that are subject to, or are otherwise
available for, forfeiture pursuant to his plea obligations with respect to forfeiture, as outlined
above. Such cooperation would include, but not necessarily be limited to, (a) submitting to
debriefings concerning the identification, recovery and repatriation of potentially forfeitable
assets; (b) producing documents, records and other evidence, as requested by this office or its
designees, relevant to these subjects; (c) executing documents required by financial institutions
and custodians who may have custody or control of potentially forfeitable assets in order to
permit access to records concerning such assets and in order to facilitate the recovery and
repatriation of such assets; (d) providing truthful testimony concerning these subjects, whether in
the form of testimony or through affidavit or declaration; (e) preparing and executing sworn
financial statements; and (f) appearing at judicial or administrative hearings and proceedings as
may be necessary for these purposes.

Mr. Sears would also agree to cooperate fully with the Internal Revenue Service in the
ascertainment and payment of his correct tax liabilities for the calendar years 2011 through 2014
inclusive, among other ways, by preparing and filing returns or amended returns, as necessary,
for those years for himself individually as well as for entities through which he conducted
business during those years and on whose behalf he should have filed tax returns. Mr. Sears
would further agree to file truthful and accurate income tax returns which are or may become due
by law during any period of supervised release or probation imposed by the Court.

4.     No Further Prosecution.

The Office of the United States Attorney for the District of Colorado would further agree
that – contingent upon the fulfillment of Mr. Sears' plea obligations and Mr. Sears' entry of
guilty pleas and sentencing on the counts of conviction – it will not further prosecute Mr. Sears
for the conduct set forth in the contemplated information or any other criminal conduct known to
this office as of the date of this letter, which conduct concerns the matters currently under federal

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 6

criminal investigation in this district, as described above and in the February 16, 2016 proffer
letter.

> 5.  Mr. Sears' Advisory Sentencing Guideline Range, Contemplated Sentence And
>     the Parties' Obligations and Rights at Sentencing.
>
>     A. The Advisory Sentencing Guideline Range.

The parties would agree to take the sentencing guideline positions ascribed
to them in Attachment B accompanying this letter. Based on these positions, the parties
would agree that the advisory sentencing guideline range that would otherwise be
applicable to Mr. Sears would exceed the total combined statutory maximum
imprisonment term of eight years for both offenses of conviction, were the sentences on
such convictions imposed to run consecutively to one another. The parties would further
agree that, as a consequence, under these circumstances, the effective advisory sentencing
guideline range applicable to Mr. Sears would be eight years imprisonment or 96 months.
*See* U.S.S.G. §§ 5G1.1-5G1.2 & comments.

B.



Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 7



Mr. Sears would ███████ acknowledge that the government would not be advocating a sentence on his behalf lower than 60 months imprisonment.

### C. Mr. Sears' Right to Advocate for a Variant Sentence.

At the time of sentencing, Mr. Sears would free to advocate for any lawful sentence, and make any arguments in support thereof, provided, however, that that sentence *include a term of imprisonment not less than 60 months in duration* and any supporting arguments are consistent with the positions he is obligated to take under the plea agreement with respect to the calculation of his advisory sentencing guideline range and are not factually inconsistent with his entry of a guilty plea and admission of guilt or with the body of stipulated facts set forth in the parties' plea agreement in this case.

### D. Mr. Sears' Recommended Special Supervised Release Conditions.

Mr. Sears' would agree that, as a condition of supervised release or probation, he will not be involved in any capacity in the securities industry on behalf of another individual or an entity not solely owned and controlled by him. Nor may Mr. Sears act as an officer or director of company whose securities are publicly traded or otherwise act as a control person of such a company. Nor may he directly or indirectly participate in the issuance, purchase, offer, or sale of any security in an unregistered offering by any issuer of securities.

Further, Mr. Sears would agree that, as a condition of such supervision, he will not act as a fiduciary or be employed in a fiduciary position and that he will not otherwise be engaged in any other employment or occupation involving his solicitation of funds for investment or his custody or control of investor funds.

Mr. Sears would further agree that any conditions of supervised release or probation should include the special conditions that (a) his employment be approved in advance by his supervising probation officer; (b) that he provide his supervising

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 8

probation officer access to any financial records requested by such officer and otherwise
be subject to financial monitoring by such officer; (c) that he shall not register any
business entities without prior disclosure to his supervising probation officer; and (d) that
he shall not conduct any financial transactions through accounts of any business entities
or individuals not made known to and approved by his supervising probation officer.

       E.   Parties' Sentencing Recommendations Not Binding on the Court.

       The parties would acknowledge and agree that any sentence to be
recommended or proposed to the Court in this case will be made pursuant to and is
subject to the provisions of Fed.R.Crim.P. 11(c)(1)(B) and as such is not binding on the
Court and so not grounds for Mr. Sears to withdraw his guilty pleas.

      6.   Appellate and Collateral Challenge Waivers.

       Mr. Sears would agree to waive the right to appeal any matter in connection with
this prosecution, conviction, or sentence unless the sentence exceeds 96 months, that is,
the combined the statutory maximum penalties for imprisonment for the offenses of
conviction, with the sentences run consecutive to one another. Mr. Sears would also
agree to waive his right to challenge this prosecution, conviction, or sentence and/or the
manner in which it was determined in any collateral attack, including but not limited to a
motion brought under 28 U.S.C. § 2255, except that such waiver provision will not
prevent him from seeking relief otherwise available if: (1) there is an explicitly
retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim
that he was denied the effective assistance of counsel, or (3) there is a claim of
prosecutorial misconduct. Additionally, if the government appeals the sentence imposed
by the Court, Mr. Sears would be released from these waiver provisions.

      7.   Consequences of Mr. Sears' Plea Agreement Breach or Misconduct.

       The parties would agree that the government's obligations under the contemplated
plea agreement would be expressly contingent on Mr. Sears' performance of his
obligations under the plea agreement. The parties would further agree, in particular, that
should Mr. Sears breach this agreement

                                   the government would be entitled,
at its election, to be relieved of its obligations under the plea agreement and could elect to

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 9

abrogate the agreement and prosecute the defendant to the full extent permitted under law.

Sincerely,

*s/Kenneth M. Harmon*
Kenneth M. Harmon
Assistant United States Attorney

ACKNOWLEDGED AND AGREED TO BY:

Marci Gilligan LaBranche, Esq.
Attorney for William J. Sears

Fred M. Winocur, Esq.
Attorney for William J. Sears

William J. Sears