UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  WILLIAM SEARS,

      Defendant

_____

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**

_____

      The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully submits this response regarding defendant Sears' objections to the PSR.

      1.  Defendant Sears objects to paragraph 16 regarding the language that Baby Bee Bright (BBB) shares would go to both Sears and Dittman.   Emails between defendant Sears and Fredrick Dalhman in November, 2010 show Sears instructing Dalhman to transfer a certain number of BBB preferred shares to Salt Investments, LLC (Dittman), Microcap Management, LLC (Sears), and to Mr. Dalhman himself.  See Attachment One, Two, and Three.  In March of 2011, Defendant Sears sent an email to Mr. Dalhman with an attached letter for Mr. and Mrs. Dalhman to sign and deliver to the transfer agent.   The letter requested that 185,000 Series A Preferred shares of BBB be transferred to Microcap Management and the remaining 15,000 shares left in the name of the Dalhmans.  See Attachment Four.  In addition, the transaction journal for PacificStockTransfer (PST) on January 25, 2011, shows 1.3 million preferred shares

of BBB were issued to Salt Investments (Dittman) and 200,000 shares remained with Mr.

Dahlman.  See Attachment Five.  Defendant Sears was contact person on the credit card payment

Authorization sheet for that transfer of shares.   On March 16, 2011, PST's transaction journal

shows 185,000 preferred shares of BBB were issued to Microcap Management, LLC (Sears) and

15,000 shares remained with Mr. Dahlman.  See Attachment Six.  In addition, under oath,

Defendant Sears testified that Microcap was his corporation.  See Attachment Seven, page 172

Line 20.  The evidence shows that 185,000 preferred A shares of BBB were transferred to Sears'

corporation Microcap and 1.3 million preferred A shares of BBB to Dittman.   In addition, on

page 14 of Sears' Plea Agreement, Sears agreed that Sears and Dittman would receive 99% of

BBB convertible preferred shares.  See Attachment 8.  The common shares that were

fraudulently sold by Microcap came from the 185,000 preferred A shares that Sears received

from BBB.

Defendant Sears next objects to the language that Family Member A was appointed to act

as a director in part to avoid disclosure of Sears' involvement and his prior conviction for

securities fraud.  On February 18, 2016, in Sears' debrief with the government, Sears stated his

mother was listed as the Corporate Secretary of FusionPharm (FUSIONPHARM) and she was

only on the paperwork as a name only.  Sears' mother never acted as an officer or director for

FUSIONPHARM and eventually Jean-Pierre took over as Corporate Secretary.  Sears stated that

originally it was going to be himself and his mother listed as the officers because Sears did not

believe FUSIONPHARM would be around for a long time.  Sears did not want to be listed as an

officer or director because he would have to disclose his prior criminal history.  See Attachment

9, page 10.  See Also Attachment 10, page 4, paragraph 24, 25, 28 (Another debrief with Sears

where he states that Jean-Pierre listed Sears' mother as secretary because Jean-Pierre knew Sears

could not be on the paperwork.)  Furthermore, Sears in his plea agreement agreed that family member A was appointed to act as director in order to avoid disclosure of Sears' involvement and his prior conviction for securities fraud.  See Attachment 8, page 14-15.

2.  Defendant Sears objects to paragraph 17 and the government does not contest that objection.

3.  Defendant Sears objects to paragraph 18 regarding to the language that control of BBB went to both Sears and Dittman inasmuch as Dittman controlled 86.6% of the outstanding stock.   As stated above and shown through PST transaction journal, Sears received at least 185,000 preferred shares of the 1.5 million.  Sears' ownership percentage of shares equals 12.33 percent.  In the industry of securities, the SEC, and other regulatory organizations, 10% is considered a controlling ownership.  Further, as stated in Sears' plea agreement, Dittman and he owned 99.9% of BBB convertible shares.  Finally, the undercover video of Sears and the agents shows Sears speaking about how much time he has placed into FUSIONPHARM.  When the agents ask who is really the person running the show for FUSIONPHARM and Sears stated that he was the "hand up Mona Lisa's skirt" after denying a 50-50 ownership with Dittman.  See Attachment 11, Undercover Video.

4.  Sears objects to paragraph 19 and states that once BBB's name was changed to FUSIONPHARM, Sears removed himself as the "Administrative Officer" since the company was now Dittman's.  As of this date, there is no evidence with FINRA that Sears was ever removed as the "Administrative Officer."  All the paperwork that FINRA has regarding FUSIONPHARM still list Sears as the Administrative Officer.  Sears and Dittman held themselves out as business partners that moved their operations into a publicly traded company.

See Attachment 8, page 16.  In addition, Sears identified himself as FUSIONPHARM's Vice President, Director of Financial Operations, and Investor Relations Director.  *Id*. at 17.

5.  Sears objects to paragraph 20 designating individual "A" as a co-conspirator and denies that his email to "A" regarding a business plan and financial projections was based on conspiratorial activity.  In *United States v. Martinez–Martinez*, 156 F.3d 936, 939, n. 5 (9th Cir.1998) the Court stated that Section 2X1.1(b)(2) does not refer to the acts of each individual defendant.  ("In evaluating whether all the acts necessary for completion of the offense have occurred or are about to have occurred, the court must look at the actions of all the conspirators collectively, rather than at those of a particular defendant individually.")  Individual "A" was a co-conspirator within the entire scheme to include his discussions and work regarding non-convertible notes and convertible notes, back dating notes, falsifying deposits into FUSIONPHARM from Sears' shell entities, and participating in meetings with Sears and Jean-Pierre regarding funding FUSIONPHARM by selling unrestricted shares of FUSIONPHARM, among other activities.  The fact that Sears did not want to be part of writing a business plan is irrelevant to the overall fraudulent scheme and purposes of sentencing in this case.  However, the evidence in the investigation proves otherwise.  On March 10, 2011, Sears sends an email to Bodden asking him to communicate with him regarding the FUSIONPHARM business plan. See Attachment 30.

6.  Next, Sears objects to paragraph 21 that implicates that he and Dittman were business partners in FUSIONPHARM.  First, in Sears plea agreement he admitted that held themselves out as business partners.  See Attachment 8, page 16, paragraph 9.   Second, in Sears debrief with the government, Sears stated that he and Dittman were "partners" that he viewed as two guys building a business.  Further, Sears admitted that "We screwed up royally.  It was two guys

trying to start a business."  See Attachment 9, page 11 and 27.  Sears stated several times on the

undercover video "we" and Scott when referring to the buisness.  See Attachment 11.  In

addition, Dittman on April 21, 2011 in a group email stated that he had just partnered with his

brother-in-law William Sears, and that they had just acquired FUSIONPHARM.  See Attachment

31.

   7. Defendant Sears objects to paragraph 22 description that he or any of the entities

through which he conducted business was an affiliate or related party to FUSIONPHARM.

Rule 144(a) (1) defines an "affiliate" to mean "a person that directly, or indirectly through one or

more intermediaries, controls, or is controlled by, or is under common control with the issuer."

Rule 405 of the Securities Act defines "control" to mean "the possession, direct or indirect, of

the power to direct or cause the direction of the management and policies of a person, whether

through ownership of voting securities, by contract, or otherwise."   Sears stated in his debriefs

with the government that he was an affiliate of FUSIONPHARM, and that his affiliate status was

not disclosed to investors.  Further, Sears stated that Jean-Pierre knew of his affiliation status

with FUSIONPHARM.  See Attachment 12, page 1 and 5 and Attachment 9, page 25.  Further,

Sears admitted to controlling Bayside.  See Attachment 12, page 5.   In Sears' plea agreement,

Sears admitted that Meadpoint, FUSIONPHARM, and Vertifresh were entities operated by him.

See Attachment 8, page 31.  In direct examination in defendant Jean-Pierre's trial, Sears

admitted to owing Microcap and Meadpoint.  See Attachment 7 and 14.  Scott Dittman admitted

in an undercover video that Sears was always Meadpoint.  See Attachment 15.  Under oath at

Sears' change of plea, Sears stated to this Honorable Court the he failed to properly disclose his

affiliation status with FUSIONPHARM to enable him to have access to free trading

FUSIONPHARM shares.  See Attachment 13, page 14.

Based on Sears' own statements and evidence, Sears was the owner/controller of Microcap, Meadpoint, Bayside, and Vertifresh, in addition to controlling FUSIONPHARM as an affiliate.  Essentially, the entities were shell companies that held FUSIONPHARM stock for Sears and Dittman that eventually became unrestricted and sold.   Investors did not know about William Sears and his affiliation with all these entities.

Sears argues that any reports that were uploaded to the OTC Link internet platform by him, were done purely as a ministerial act.   This Honorable Court heard and permitted several emails, with attachments, in the Jean-Pierre trial into evidence that showed Sears, Dittman, and Jean-Pierre reviewing, commenting on, making changes, and uploading onto the OTC Markets portal for the public's view.  For example, on August 20, 2013, Sears sends Scott Dittman an email regarding the quarterly report for June 30, 2013 where Sears clearly reviewed the report for mistakes since he informs Dittman that he missed updating all the dates from last year. Reviewing reports in that much detail is more than a ministerial act.  See Attachment 32.

8.  Defendant Sears denies that he had a role in FUSIONPHARM and that his company worked together with FUSIONPHARM in his objection to paragraph 23.   First, the government is unsure of which one of Sears' company his is objecting as having conducted business with FUSIONPHARM.  The government argues that Sears' entities (Bayside, Meadpoint, Microcap, and Vertifresh) were nothing more than shell companies used by Dittman and Sears to hold FUSIONPHARM stock through fraudulent agreements.  Second, Sears played a major role with FUSIONPHARM based on all the statements he made in his debriefs and the undercover video. In his change of plea, Sears admitted to being an undisclosed affiliate of FUSIONPHARM. Further the facts in his plea agreement clearly lay out his various roles and titles regarding FUSIONPHARM.  See Attachments 8, 9, 10, 11, 12, and 13.

9.  Defendant Sears objects to paragraph 24 as being categorized as acting as a Chief Financial Officer.  The government does not contest the exact wording of "Chief Financial Officer" but Sears did admit in his plea agreement to being Director of Financial Operations.  See Attachment 8, page 17.  Sears in his debrief admitted to the title of Investment Relations Director for FUSIONPHARM.  See Attachment 9, page 11.   Sears did open FUSIONPHARM bank account on March 24, 2011.   Sears and his mother were the only two individuals that had access to FUSIONPHARM bank account up to October 7, 2011.  See Attachment 16 (Changes to Authorized Signers on Business Deposit Accounts).   From April 2011 through October 3, 2011, Sears signed approximately 153 checks for FUSIONPHARM.  On October 5, 2011, FINRA contacted FUSIONPHARM regarding Microcap and William Sears affiliation with FUSIONPHARM.  After that date, Dittman took over the signing of the majority of FUSIONPHARM checks.  See Attachment 19.  In addition, in the undercover video, Sears presents a lot of knowledge regarding international hedge funds, the costs associated to labor, and FUSIONPHARM's capital situation from the start of the company to the date of the video.  See Attachment 11.  Sears' knowledge about such subjects puts doubt into his claims regarding his lack of knowledge with finance.

Sears claims that a receipt of a salary was a mistake mated by a new employee who should have treated him through an IRS Form 1099 and not on the payroll.  However in tax year 2011, a W-2 was filed by FUSIONPHARM for William Sears that reported $8,750 in wages.  In tax year 2012 and 2013 there was no wage W-2 or income 1099 filed by FUSIONPHARM for William Sears.  An email from Scott Dittman shows that he instructed an employee at paychex to process "our" payroll, which included Dittman's and Sears' normal salary amounts.  See Attachment 17.  However, the officer manager for FUSIONPHARM stated in a letter that Sears

was a 1099 employee with a gross pay of $5,000 per month since January 2011.  In that same

letter, Sears was supposed to be a W-2 employee with the same monthly salary as of March 1,

2012.  This letter was written on January 2012, and had attached checks for three months to

Sears for $5,000 signed by Dittman.  See Attachment 22.

Sears admitted to doing work for FUSIONPHARM and using a FUSIONPHARM email

address.  Further, he stated that co-defendant Jean-Pierre advised him not to use a

FUSIONPHARM email account because he could be construed as an affiliate.  When Jean-Pierre

informed him of this information he was upset at Jean-Pierre because he believed that Jean-

Pierre gave him the tools to avoid the perception that he was an affiliate of FUSIONPHARM.

See Attachment 9, page 25.

10.  In Sears' objection to paragraph 26, he objects to being labeled as de facto affiliate

and that sales of preferred shares in Microcap were in violation of securities law.  As this

Honorable Court heard in the trial of Jean-Pierre, Sears did not have the legal knowledge to

understand if he qualified as an affiliate.  However, the government's security expert testified

that Sears had a controlling role in FUSIONPHARM, thus making him an affiliate.  In addition,

under oath at his change of plea, Sears admitted to being an undisclosed affiliate, along with

admitting being an affiliate in his debriefs to the government.  See Attachment 13, page 14 and

Attachment 12 page 1.  Because Sears was an affiliate to FUSIONPHARM, he had to disclose

his true status to the transfer agent when selling shares of FUSIONPHARM.  The law restricts

the amount of shares an affiliate of an issuer can sell, otherwise known as a volume limitation for

affiliates.  As part of the scheme, Sears never disclosed to the transfer agents or brokers that he

was an affiliate to FUSIONPHARM and Jean-Pierre falsely mislead the transfer agents and

brokers by stating Microcap was in no way an affiliate to FUSIONPHARM.  As a result, Sears

was able to obtain free trading shares of FUSIONPHARM and sell more than the volume limitation for an affiliate, which is against the securities laws.  See Attachment 18 (Rule 144 Affiliate Volume Calculations, displays that during the entire time of the conspiracy, Sears as an undisclosed affiliate, was always over the allowed percentage.  In 2011, when Sears was selling FUSIONPHARM through microcap he was at one time 2000% over the limit.)

11.  Sears objects to paragraph 27 that implicates the transactions of issuing FUSIONPHARM shares to his wife and brother-in-law "RD" were merely proxies for his stock ownership.   Both, Sears' wife and "RD" were called to the stand in the trial of Jean-Pierre and had little or no knowledge to ever owning or understanding the stock transactions that were in their names.  Further, witness Bodden testified that "RD" was known as the "beard" because he was essentially a placeholder for Sears' FUSIONPHARM stock.  Sears admitted that he was controlling the stock that was in "RD's" name and that "RD" did not know anything about the paperwork required for stock transactions.  Sears stated he drew down his FUSIONPHARM shares from "RD's" account in order to avoid being a control person by holding over 10% of FUSIONPHARM shares in his name.  See Attachment 9, pages 9-10.

12.  Regarding Sears' objection to paragraph 28, the government is unclear about what Sears means by the "characterization of these transactions" and what "free" shares he is referring to regarding Dittman.   The objection is just not clear to the government.  The government will file a motion to clarify or provide more details to the objection.

13.  As to Sears' objection to paragraph 29, the government does not contest that the transactions regarding FUSIONPHARM shares held by Microcap were approved by the transfer agent and the restricted legends were removed.   The crux of the securities fraud scheme was that Sears never disclosed his true affiliation with FUSIONPHARM to the transfer agents and

brokers.  Jean-Pierre being an expert in securities law, assisted Sears and Dittman with concealing Sears' true affiliation with FUSIONPHARM.  Several of attachments already discussed in this response address these points.

14.  Defendant Sears objects to paragraph 30 denying that the money was made in the market at part of the conspiracy and argues that he owed Dittman for the manufacturing of pods. However, the email recovered in the FBI search warrants shows Scott Dittman asking if $3k can be transferred into his wife's account from "this weeks take."  Sears responds back "Done???you want the full five?"  See Attachment 20.  The "full five" is consistent with what Dittman would make a month based on testifying that his salary was $60,000.   See Attachment 21. Furthermore, Sears should be paying FusionPharm for the manufacturing of PharmPods, not Scott Dittman's wife.

15.  Defendant Sears objects to paragraph 31 and indicates that his mother owned Bayside.  The government has addressed this issue in previous paragraphs.  Also, Sears' mother took the stand at Jean-Pierre's trial and could not speak or remember anything about "her alleged company" Bayside.

16.  Defendant Sears objects to paragraph 33 stating that Dittman was identified as a director of Vertifresh.  Sears claims that Vertifresh was a LLC without any directors and was owned by him.  However, the email the Sears sent to "PG" on October 5, 2012 had attached to it the business plan for Vertifresh.  In the business plan, Scott Dittman is listed as "Director."  See Attachment 23.

17.  Defendant Sears objects to paragraph 34 that Dittman owned 50 percent of Meadpoint.  However, in Sears' email on November 14, 2011 with the Meadpoint Shareholder Agreement attached, the agreement states on the first page that Dittman and Sears own 50% each

of the issued shares and outstanding stock for Meadpoint.  See Attachment 24.  It should also be

noted that Sears is asking the CEO of FUSIONPHARM to forward the agreement.

18.  The government does not contest defendant Sears' objection to paragraph 35.

19.  Regarding Defendant's objections to Paragraph 36, as already stated in this response,

Sears' mother was not the legitimate owner of Bayside.  Further, the documents filed with OTC

show that there was never a convertible feature on any note until the annual report of 2012.  As

co-defendant Jean-Pierre stated in the undercover video, the convertible feature of a note must be

negotiated and agreed upon at the time the note is created, not at a later date.  In addition,

Bodden testified that the notes were created in 2012/2013 and back dated to 2011 timeframe.

20. Defendant Sears objects to paragraph 37 as being nonsensical and wrong.  The source

of 97% of funds for the Bayside convertible note came from the sale of FUSIONPHARM stock

through Microcap.  See Attachment 25 (Table indicating the source of funds for the Bayside and

Meadpoint convertible notes based on documentation provided by transfer agent.)

21.  Defendant Sears objects to paragraphs 38 and 40 stating that the notes were non-

convertible at some time.  In an email from Bodden to Sears on June 6, 2012, Bodden attaches

Promissory Note and Credit Line Agreement for Bayside.  In that agreement there is no

convertible option.  See Attachment 26.  On that same date, Bodden sends another email to Sears

with the Meadpoint Promissory Note and Credit Line Agreement attached.   Again, in that

agreement there is no convertible option.  See Attachment 27.  On June 20, 2012, Bodden sends

"NM" the signed notes for Bayside and Meadpoint.  At this time, FUSIONPHARM via Sears, is

trying to sell these notes to "NM."   There is no convertible feature an either of the notes.  See

Attachment 28 (email from Bodden with the attached notes).  Finally, defendant objects to the

fraudulent scheme, but he has plead guilty to Conspiracy to Defraud the United States and Filing False Income Tax Return in a two-count information.

22.  Regarding Defendant Sears' objection to paragraph 42 regarding his affiliation status with FUSIONPHARM, the government has addressed this objection in previous paragraphs and attachments.  Sears informed this Court that he was an undisclosed affiliate.

23.  Defendant Sears objects to paragraphs 43 and 45 arguing that counsel advised him that all representations were in compliance with securities laws regarding the Bayside and Meadpoint convertible notes.  First, Sears signed approximately 109 of the 110 checks issues by Bayside.  Further as stated in previous paragraphs, Sears was the controller of Bayside and Meadpoint and had a controlling interest in FUSIONPHARM making him an affiliate.  Sears, Dittman, and Jean-Pierre all conspired to hide Sears affiliation status with FUSIONPHARM in order to obtain free trading shares of FUSIONPHARM.

24.  Defendant Sears objects to paragraph 46 as being labeled an employee.  As stated, in 2011, FUSIONPHARM filed a W-2 for William Sears that reported $8,750 in wages.   In addition, checks were signed by Dittman paying Sears $5000 as part of payroll for FUSIONPHARM.  In addition, the officer manager for FUSIONPHARM stated in a letter that Sears was a 1099 employee with a gross pay of $5,000 per month since January 2011.  In that same letter, Sears was supposed to be a W-2 employee with the same monthly salary as of March 1, 2012.  See Attachment 22.

25.  Defendant Sears' objection to paragraph 47 is unclear to the government.  The government will file a motion to clarify or provide more details to the objection.

26.  Defendant Sears objects to paragraph 49 stating that he had no stock to sell for the month of January, which was the month that FUSIONPHARM stock sold for the highest price

and claims he did not get any stock until the middle of February 2014.  Sears held 800,000 shares as of FUSIONPHARM stock on January 16, 2014, that he began selling on 2/7/2014.  This is shown in the transfer agent's transaction journal.  As of January 9, 2014 there were 800,000 that were mailed to Sears' broker and received on January 27, 2014.  See Attachment

27.  Defendant objects to paragraph 50 regarding that the funds were treated as owned collectively with Dittman.  Dittman used funds from Sears' sale of FUSIONPHARM stock to purchase his home in May, 2014.  Attachment 34 shows the wiring of the funds.

28.  As to defendant Sears' objections regarding paragraphs 52-65, Cliff Bodden emailed Sears asking him how to book several deposits.  Bodden clearly does not know if the deposits are supposed to be booked as revenue, debt, or/and loans into quickbooks, so he is asking Sears.  If Sears did not understand the finances regarding FUSIONPHARM, Bodden would not have asked him how to book certain deposits.  See Attachment 29.

29.  Defendant Sears objects to paragraphs 71-78 denying his failure to pay taxes.  Sears plead guilty to a tax charge and told this Honorable Court that during his change of plea while under oath.  Second, his plea agreement discusses his tax violations on pages 38-39.  See Attachment 8.  Sears agreed to this plea agreement and told this Honorable Court that the facts in the agreement were true.

30.  Defendant Sears objects to paragraphs 84-114 regarding information about Jean-Pierre since he was not provided that information in discovery.  As shown in this response, Sears debriefed with the government, which included discussions about Jean-Pierre.  Further, Sears worked with Jean-Pierre in this conspiracy.  Jean-Pierre was found guilty to have conspired with Sears.   Finally, it was Sears who reached out to the FBI to assist in an undercover operation to lure Jean-Pierre.  The entire undercover operation showed Sears close relationship that he had

with Jean-Pierre and discussed various events that occurred in the FUSIONPHARM case/conspiracy.

31.  Regarding Defendant Sears' objects to paragraphs 108-111, the government would argue that the FBI oversaw the undercover operation and Sears' involvement.  However, as this Court heard in Jean-Pierre's trial, much of the conversations that Sears had with Jean-Pierre was unscripted.  Law enforcement concentrated on topics of discussion, not direct word for word written scripts.  In fact in the hotel video of the undercover, Sears had no written script and was speaking freely.

32.  Defendant Sears objects to paragraph 130.  The government argues that the information used by the USPO to compute the offense level were correct and summarized a very complex and long term fraudulent conspiracy.

33.  In response to defendant Sears' objection to paragraph 133 as being an organizer or leader of criminal activity, the government agrees with the USPO.  Sears was no doubt a leader or organizer of the criminal activity in which he plead guilty.  Sears was an undisclosed owner/controller of FUSIONPHARM and several other entities.  Sears organized a fraudulent scheme to hold FUSIONPHARM shares in his entities in which he sold in order to fund FUSIONPHARM.  Sears is now denying any criminal activity, much like him denying his affiliation status with FUSIONPHARM.

34.  Defendant Sears objects to receiving a two level increase for failure to report income from criminal activity in paragraph 137.  Again, defendant Sears is denying criminal activity even though he plead guilty to a tax charge and agreed to the facts of a plea agreement that details his failure to report this income.

35.   Defendant Sears objects to paragraph 138 because his failure to report tax returns was not conducted in sophisticated means.  "The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010); *see also United States v. Jenkins–Watts*, 574 F.3d 950, 962 (8th Cir.2009)

In *United States v. McKye*, 638 Fed. Appx. 680 (10th Cir. 2015), cert. denied, 2016 WL 2840457 (U.S. 2016), the Tenth Circuit upheld the District Court applying two-level sentencing enhancement for use of sophisticated means to defendant's sentence for securities fraud, where defendant ran his scheme undetected for five years, used multiple entities to coordinate the fraud, and used newspaper and television ads to attract more investors, and induced individuals to invest in his scheme by deceiving them into believing their investments were collateralized by real property.  The crime and means of committing the crime in *McKye* are similar to the means used in this case.  Like in *McKye*, Sears, along with co-conspirators Jean-Pierre and Dittman, used multiple entities to coordinate the securities fraud, assisted in drafting fraudulent press releases, and disclosed fraudulent information, specifically pertaining to their revenue, to OTC Markets, the forum for the public to receive information about microcap companies.  They also used a licensed lawyer, not banned to write opinion letters, review fraudulent documents without his knowledge and pay him to place his letterhead and signature on the opinion letters.  In addition, this securities fraud went undetected for approximately four years and the undercover operation displayed that defendant Jean-Pierre was willing to continue engaging in securities fraud.  Many other circuits have upheld the two-level sentencing enhancement when securities

fraud was committed and various layers of fraud was involved.  *See United States v. Regensberg*, 381 Fed.Appx. 60 (2nd Cir. 2010), 210 WL 2501042; *United States v. Bollin*, 73 Fed.Appx. 316, (9th Cir. 2003), 2003 WL 21995421; *United States v. Brennan*, 562 Fed.Appx. 914 (11th Cir. 2014), 2014 WL 1394654; and *United States v. Altomare*, 673 Fed.Appx. 956 (11th Cir. 2016), 2016 WL 7404668.

36.  Defendant Sears objects to paragraphs 160, 161, and 173.   The government does not contest to these objections.

Dated this 2nd day of August 2019.

<div style="margin-left:40%">

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:     s/Jeremy Sibert
        JEREMY SIBERT
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado  80202
        Telephone: (303) 454-0100
        FAX: (303) 454-0403
        E-mail: Jeremy.Sibert@usdoj.gov
        Attorney for the United States

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2019, I electronically filed the foregoing **Government's Response to Defendant's Objections to PSR**
with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Peter Bornstein**

<div style="margin-left:40%">s/Jeremy Sibert</div>

JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov