FD-302 (Rev. 5-8-10)

- 1 of 28 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry _____07/11/2016_____

William Joseph Sears, date of birth May 13, 1966, was interviewed at the Denver United States Attorney's Office located at 1225 17th Street, Suite 700, Denver, Colorado 80202. In attendance were Assistant United States Attorney (AUSA) Kenneth Harmon, Special Assistant United States Attorney (SAUSA) Scott Mascianica (via telephone), Federal Bureau of Investigation (FBI) Special Agent Kate E. Funk, Internal Revenue Service (IRS) Special Agent Michael Godson, United States Postal Inspector Service (USPIS) Kenneth Haithcoat, Securities and Exchange Commission (SEC) Attorney Kimberly Greer and SEC Attorney Lincoln "James" Lyman. Also in attendance were Sears' attorneys Fredric Winocur and Marci Gilligan (via telephone). The proffer letters were reviewed and signed by Harmon, Winocur and Sears. After being advised of the identity of the interviewers and the nature of the interview, Sears provided the following information:

Sears was born in Rockaway Beach, New York and grew up in Queens and Long Island. In 1984, he graduated from General Douglas McArthur High School in New York. He attended Nassau Community College for one year. From 1984 through 1992, he held several jobs to include personal trainer, iron worker, salesman, and driver. Sears also worked for Coca-Cola. He does not have any professional licenses. He studied for the Series 7 in 1991 but did not take the test.

His main employment in adulthood has been as a "financial intermediary" or "stock jock". He has been involved in securities since 1992. When he was 22 years old, he met Marilyn Redman, an older woman who worked at a brokerage firm named Dunhill Securities. Redman held several securities licenses. She taught him the securities business and introduced him to people in Boca Raton, Florida. Sears became involved in Regulation S Securities, which are offers and sales of securities that occur outside of the United States and discounted stocks. The stock would have to spend a minimum of 41 days overseas. Investors would put money into an offshore fund which was used to purchase the discounted stock with the assistance of Sears. He was able to "jockey" blocks of stock.

| | | |
|---|---|---|
| Investigation on | 02/18/2016 at | Denver, Colorado, United States (In Person) |
| File # | 318B-DN-3938165 | Date drafted 02/29/2016 |
| by | Kate E. Funk, GODSON MICHAEL ANTHONY | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GJP_00006226

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 2 of 28

He met and became friends with Cliffe Bodden in approximately 1991 or
1992 in Atlanta, Georgia. Bodden was a stock broker from the Cayman Islands
that worked for an "OSJ" and satellite office of Bear Stearns as well as
Camelot Securities. Sears also worked for Camelot Securities making cold
calls. Sears moved to the Cayman Islands in 1993 or 1994 through 1999. He
set up a hedge fund related to Regulation S securities. He did sales and
marketing and sent out a free newsletter called "Projections". He worked
with Peter Jeffries from Canada and Ari Leo Fromm. Sears also worked for
the business Peachtree with Bodden and Mitch Borcherding.    Bodden was good
at putting together business plans and contracts and was an intermediary in
Cayman. Bodden and Fromm were doing things with the business that he did
not like and Sears left the business in 1997 and began working under his
own name. In 1999, Sears received a call from someone from Australia
telling him that Bodden and Fromm had absconded with $2.5 million of a
friend's money. Sears said that he will go "up to the line", "dance around
the line" and "cross the line" but he would not steal from somebody. Sears
worked with the companies Astro Fund and Growth Planning Limited.


From 1992 through 1999, Sears had good contacts in Australia and did
several other deals related to 144 stock including with symbols ONST, HIVC
or HIVV. Sears moved to Australia in the late 1990s and came back to the
U.S. (and Cayman) in 2004 or 2005. While in Australia, he helped his friend
sell and market a high-rise building, he was an extra in movies and did
some modeling. When he returned to the United States, the industry had
changed: 144 stocks had a one year holding period and were different than
Regulation S securities.


When Sears returned to the United States, Bodden told Sears that he
had the Atlantis, the vessel that found the Titanic, in Lake Pontchartrain,
Louisiana. They wanted to use the vessel for high-end dive operations.
Vencap Holdings, a shell company, was going to be used to run these
operations. Atlantis needed too much work and the deal fell through because
they needed $2.5 million to refurbish the vessel. Vencap was also the
entity that Bodden used in the investment fraud case where he was charged
federally. Sears also worked on an Australian securities deal with the
company Omni-Net related to kiosk advertising. Bodden was not involved with
this deal.

GJP_00006227

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears          , On  02/18/2016 , Page  3 of 28

Sears met Richard Scholz in 2000 in New York. Scholz was working the floor of an Investment Relations company. Scholz was living in Florida at the time, but was from New York. They met at 100 Wall on the 26th floor. Sears was at the meeting on a separate Omni deal. Scholz was a stock promoter. Sears and Scholz did not work together until FusionPharm in 2011. They did not work any other deals together.  Sears sold Microcap Management to Scholz in 2012.

Sears had been involved with bribing brokers. The last time he bribed a broker was in 2004 or 2005 when he was charged in a New York federal case.

Scott Dittman and Robert Dittman are Sears' brother-in-laws. Sears met his wife, Sandra Dittman Sears, in February of 2004. From 2004 through 2007, Sears started the company International Solubles with Robert Dittman and owner Henry Sarmiento. Sears put the company in his wife, Sandra Dittman Sears', name because he was the subject of the New York Federal securities fraud case. Their product was Ultra Grip, a non-slip product that started through Rosual, a private Florida Limited Liability Company (LLC). Rosual and International Solubles had a licensing agreement. It was a clear substance that was applied to floors to make the floor non-slippery. They sold the product to hotels and hospitals in Rhode Island and Florida. International Solubles also had a janitorial company. They had shareholders but did not have a ticker symbol. In November of 2009, the company lost business and was unsustainable. The shareholder list for International Solubles was transferred to Silver Star. Silver Star's business was the Green Street Report which did advertising and marketing for publicly traded "green" businesses. Sears said that the same shareholders were "churned and burned" from one entity to another. The following people were involved with International Solubles: Jack Owens, Bodden, Sears, Richard Buffington, Fred Nelson, Ben Last Name Unknown (LNU), and Robert Dittman. Nelson did Investor Relations/Public Relations (IR/PR) work. Sears was not involved with the company Green Street Capital or Green Street Ventures and did not know why it was started. Owens had owned the shell company, Poker Book. Sears left Silver Star in 2008.

In 2007, Sears met Alan Siegel, owner of Microcap Management. Siegel had an algorithm related to his business which was to pitch microcap companies to registered representatives.   In 2008 or 2009, Sears started

GJP_00006228

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 4 of 28

promoting stocks under the company name Microcap Management. David Heredia,
Also Known As (AKA) David Scott, was supposed to get the Microcap
Management website running. Sears and Heredia worked together at Microcap
for about six or seven months. Heredia was involved with narcotics and had
OxyContin sent to the Microcap office at the end of 2009. Sears discovered
that Heredia was bribing brokers and Sears kicked Heredia out of the
Microcap office. Microcap's IR/PR work terminated around the end of 2009.


Sears met Buffington in 2007 or 2008. He worked to raise money for
Buffington's publicly traded company Silver Star. Silver Star was looking
to put together the Green Street Report. Sears described Buffington as an
alcoholic who was regimented.  Buffington served in the military and had
been a broker in the past. In 2014, Buffington contacted Sears to purchase
Vertifresh. Sears flew to Florida and met with Buffington.


Before 2010, Sears had been doing IR/PR for Jaguar Mining through his
company Microcap Management in order to raise investor awareness. Sears'
contract with Jaguar for this work was similar to the agreement that he
entered into with Baby Bee Bright for IR/PR work. The boiler plate IR/PR
consulting agreement that Sears used for multiple IR/PR clients was
provided by Guy Jean-Pierre. Sears was sending e-mails to 2,000 brokers
that he had set up in Constant Contact. He inherited his list of contacts
from Heredia. Sears would disseminate press releases to his contacts. He
did not draft the press releases.  He did not follow up with brokers
because it was a gray area and he did not want any problems. Sears'
consulting agreement with Jaguar reflected payment of $770,000 in stock. He
said that stock was totally different than getting paid in cash. He charged
three to four times for payment in stock instead of cash because of the
inherent risk associated with stock prices. Sears could not recall who he
received his Jaguar shares from but said that it could have been from
King's family. He was paid in free-trading, unaffiliated and unencumbered
stock for his work doing IR/PR as documented in his contracts. The stock
came from a third party, usually a large shareholder. He did not care who
provided the free-trading stock and did not pay any third-parties for the
stock. He deposited the stock into his brokerage accounts at "RM Stark" or
Oppenheimer. He worked with broker Scott Eisler, who Sears had met years
earlier in Boca Raton, Florida. Eisler is a legitimate broker with a large
book of business. Jean-Pierre completed the Attorney Opinion Letters, to
include those for Sears' Jaguar stock, stating that the third party
shareholders were not affiliates. Sears also had a brokerage account out of
Salt Lake City.

GJP_00006229

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears , On 02/18/2016 , Page 5 of 28

In 2010, Bodden was looking for a shell to acquire for Green Street and Sears helped him by brokering a deal with Billy King and Jaguar. Sears was the "intermediary" in the deal. Bodden never paid King for the shell. Jaguar had been a shell before it became Jaguar Mining. Dale Williams of Jaguar had walked away from the company by moving to Mexico. Sears required that he get paid as a condition of the acquisition of the shell since he had not yet received his stock for the IR/PR work. He filed a "friendly lawsuit" with his attorney Charles Kleeland in Florida court to get his free-trading Jaguar stock. Sears did not have any role with Green Street. He did not want to do any IR/PR work for Green Street (formerly Jaguar) because he was did not want to be involved in Bodden and Buffington's business. He sold all of his Jaguar stock within several months of receiving the stock. Scholz worked for a few weeks with Buffington and Bodden. Bodden had numerous emails addresses to include a Meadpoint, Hotmail, Star City and Green Street email account.

Sears said that the shell companies evolved over several years with different names. The names, in order, were Rosual, International Solubles, PokerBook, SilverStar, and then Green Street. Green Street became publicly traded through the acquisition of the Jaguar Mining shell company. The founder shares came from Sears, Robert Dittman and Henry Sarmiento that started Rosual. Sears received his shares through his wife's name, who was still Sandra Dittman at the time.

Sears met Jean-Pierre through King in 2009. Jean-Pierre was the attorney for the Monogram Energy Deal and was King's Securities Attorney. King was also an attorney. Jean-Pierre was born in Haiti but moved to the United States. He went to Rutgers University and practiced law in Deerfield Beach with several other lawyers. Jean-Pierre helped King get stock. Jean-Pierre was involved with the following companies: Jaguar Mining, FusionPharm, Baby Bee Bright, and Cotton Western. Sears paid Jean-Pierre to write Attorney Opinion Letters. He also had him look at disclaimers, to include safe harbor disclaimers, on Microcap Management's website.

Sears formed Bayside Realty Holdings in North Carolina in 1997 which is now defunct. He then formed Bayside Realty Holdings in Nevada. It was created as a holding company to protect Sears' assets. Sears could not recall using his Mother's name, Sandra Sears, for any business transactions

GJP_00006230

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  6 of 28

other than Baby Bee Bright and FusionPharm although the entity Bayside may
have been used in several other deals. Although his Mother's name was on
some of the Bayside paperwork, Sears was making all the decisions.


Sears met Doug Sailors over the telephone in 2009, likely through
Billy King, when Sears was hired to do stock promotion work for Baby Bee
Bright. Sailors was a major shareholder of Baby Bee Bright and owned the
company FUM Management. Sailors put his Baby Bee Bright stock in his wife's
name, Jamie O'Bryan. Sailors was also a "stock jock" that was involved in
putting deals together. Sears met Frederick Dahlman through Billy King.
Dahlman, Baby Bee Bright's Chief Executive Officer (CEO) hired Sears to do
the IR/PR work for Baby Bee Bright. Sears and Dahlman agreed to Sears'
standard consulting agreement which included a fee of $70,000 worth of free
trading stock per month. Sears always received the first month worth of
fees in free-trading stock. Sears received his shares from FUM Management.
Sears said that the cash equivalent for this agreement was about $10,000 to
$20,000. The $70,000 figure was used in the agreement because of the
inherent risks associated with penny stocks. Sears modified the name in his
template IR/PR agreement for each client. Baby Bee Bright had a
communication device for unborn babies. Sears received a due diligence
package regarding Baby Bee Bright. They originally marketed it as a
learning device but had some issues with the Federal Trade Commission
(FTC). Dahlman had about $140,000 worth of inventory.


When Sears started working for Baby Bee Bright, the company had no
money and was dead. Baby Bee Bright wanted to get the news out that the FTC
investigation was clear. Sears was shown a copy of the consulting agreement
between Baby Bee Bright and Microcap Management. He said that he may have
received two months worth of free trading stock up front. He did IR/PR work
for Baby Bee Bright from April through October or November of 2009. His
work involved sending out press release emails to brokers and directing
investors and brokers to Dahlman. Because of Sears' criminal history
including securities fraud, he did not want to talk directly with brokers
and registered representatives. Baby Bee Bright owed him a lot of money.
During the first half of 2010, Sears explained to Dahlman that Baby Bee
Bright was not worth anything. Sears continued to work under his contract
because it was not cancelled, thus, the associated fees were still
accumulating. Sears planned to use the accumulated fees to allow him to
take over the Baby Bee Bright shell company in lieu of payment. In 2010,
Sears was thinking of starting a business that bought and sold shell
companies. He would clean up the shell by paying the bills, consolidating

GJP_00006231

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  7 of 28

the debt and reversing the stock. Baby Bee Bright was the first shell that
he acquired. Sears met with Dahlman in August of 2010 in Tennessee to
discuss the acquisition of Baby Bee Bright to be used for FusionPharm.
Dittman was out of the home building business at this time and in the
marijuana industry.


Sears hired Jean-Pierre to do the Attorney Opinion Letter's (AOL) for
Sears' Baby Bee Bright stock. The letters were actually signed by someone
other than Jean-Pierre. Sears never thought about why he would receive an
AOL from Jean-Pierre with a different attorneys name on it. Sears always
paid Jean-Pierre for the AOLs. Jean-Pierre also did other attorney work for
Baby Bee Bright on behalf of Sears.


While Sears was promoting Baby Bee Bright, he was also doing IR/PR
work for other companies likely including Cotton and Western Mining,
Diverse Media Group/DMVT, Polaris International Holding, and Actionview
International. These deals originated from broker David Adams. He used the
same type of consulting agreements with these companies. Sears said that if
he received stock from a company, than he did IR/PR work for the company.
He also put together company profiles for his Microcap Management website.


Sears was shown a copy of the 2010 Annual Report for Green Street
Capital which showed Robert Dittman as a beneficial owner of the stock.
Sears was not aware that Robert Dittman ever owned shares of Green Street.
He said Robert Dittman's stock may have originated from International
Solubles or the company Rosual. Robert Dittman was not holding shares that
Sears' controlled. He indicated that Robert Dittman may not even know that
he owned those shares. He noticed the name Rhett Wertzbaugher was also in
the list of beneficial owners. Sears said that Wertzbaugher was part of the
2004/2005 New York federal case against Sears. He said that any newly
issued shares for Green Street Capital would be to new "victims".


Sears wanted to start a business where he purchased shell companies
and then used Pacific Stock Transfer Company (PSTC) as the transfer agent.
This business did not materialize. FusionPharm was the first and only
business deal that Dittman and Sears did together.

GJP_00006232

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 8 of 28


Sears became an Administrative Officer of Baby Bee Bright and/or FusionPharm in order to take over the shell company and clean it up. Jean-Pierre was instrumental to Sears because Sears had not taken over a shell company before. Jean-Pierre worked with Maria Samson and Joanna Dibella at PSTC and put together all the paperwork required to transfer Baby Bee Bright to FusionPharm. Jean-Pierre kept Sears and Dittman in the loop regarding everything he was doing to transition the companies. Jean-Pierre was hired to do legal work for FusionPharm because he had knowledge of Baby Bee Bright and was inexpensive. Jean-Pierre created corporate documents, reviewed financial statements, created business plans with Bodden, and wrote AOLs.


As part of the transition from Baby Bee Bright to FusionPharm, Dahlman transferred a control stock certificate to Dittman. Sears could not recall the number of shares. Before the transition, Dahlman owned 1.5 million preferred shares of Baby Bee Bright. Sears had a verbal agreement with Dahlman regarding the distribution of Dahlman's shares. Dahlman was supposed to transfer all of his shares to Dittman with the exception of the 15,000 preferred shares that Dahlman would retain as payment for the shell and the shares for Sears' IR/PR work. Dahlman transferred 1.3 million preferred shares to Dittman, giving him shareholder control, and held onto 200,000 preferred shares. Sears was owed approximately 500,000 to 700,000 common stock shares as part of his consulting agreement. Sears wanted to get his shares in tranches so that he did not own more than 10% of the outstanding shares.  If he owned 10% or more of the outstanding shares, he would be deemed a control person of FusionPharm. Dahlman ended up retaining 200,000 preferred shares for a period of time as a way to attempt to get Sears to pay him $50,000 to release the stock. Sears was shown an email dated March 1, 2011, from him to Dahlman regarding the share distribution.  Sears said that Dittman wanted Dahlman to transfer 185,000 preferred shares from his 200,000 preferred shares to Robert Dittman. Dahlman had some issues with putting the stock in Robert Dittman's name. Sears wanted control of the 185,000 preferred shares so he had Dahlman transfer the shares to Microcap Management. Sears did not want to keep the shares in his name because it made him an affiliate. He discussed the fact that he was over the threshold with Jean-Pierre. Jean-Pierre was telling Sears what he wanted to hear in order to get his stock as free-trading. Sears also spoke with Joanna DiBella at PSTC on a daily basis. Jean-Pierre also worked with DiBella and Maria Sampson at PSTC on working to clean up Baby Bee Bright. Jean-Pierre helped to facilitate the process with the transfer agent. DiBella was aware that Sears wanted free-trading stock. Sears came up with the idea to transfer the majority of the shares to La Dee Da, a business name set up by his wife, which Robert Dittman was

GJP_00006233

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  9 of 28

supposed to take over. Robert Dittman did not want the stock in his name
and was supposed to set up an entity to hold the FusionPharm stock. Dittman
wanted Robert Dittman to have the shares in case Dittman sold a portion of
FusionPharm in the future. Dittman wanted to have voting rights. The shares
in Robert Dittman's name would allow Dittman to still have an ownership
interest in FusionPharm. Robert Dittman had no involvement with FusionPharm
at the time. At some point, Sears then transferred the shares from La Dee
Da directly to Robert Dittman. He was using Robert Dittman to hold the
stock. Jean-Pierre knew that a portion of the 185,000 preferred shares
included compensation for Sears' work for Baby Bee Bright.


        Sears reviewed the email dated June 20, 2011. Sears did not
specifically recall the email but believed the "we" in the email likely
referred to Sears and Dittman. Sears stated that at the time of this email,
Sears and Dittman were in other ancillary business including marijuana
infused products and another business run by Kelly Blume. Sears said that
Robert Dittman did not know anything about the paperwork required for stock
transactions and that Sears drafted any paperwork and directed the
transfers related to the FusionPharm stock in Robert Dittman's name.
Dittman did not direct Robert Dittman's stock transactions. Todd Abbott,
Paul VanStekelenburg, and Kuntal Vora received FusionPharm free-trading
shares from Sears. They were older investors from prior businesses that
were Scott Dittman's friends. There may have been one or two other
investors that also transferred their restricted stock for unrestricted
stock. VanStekelenburg may have also bought FusionPharm stock. The stock
that went to Roger Pawson, Stephanie Pawson, OTC Markets and For Your
Information was related to a private placement for free trading stock. The
funds were going to be used to start Vertifresh. They never paid for the
stock and should not have received the stock. Buck Adams received 5,000
shares for consulting work and technology provided to Vertifresh.
Vertifresh was run by Sears and Robert Dittman. Steve Falconer, Frank's
father, purchased 144 restricted stock. Jean-Pierre was involved in every
step of the FusionPharm stock transactions related to the 185,000 preferred
shares. At some point after the transfer of shares occurred for Abbott and
Vora, Jean-Pierre said that it could be considered a "gypsy swap". Sears
told Jean-Pierre that he was controlling the stock that was in Robert
Dittman's name. Jean-Pierre also knew that the shares due to Sears from his
debt settlement agreement with Baby Bee Bright were being held by Robert
Dittman. Jean-Pierre was working out of Florida. Bodden, Dittman and Robert
Dittman might be able to corroborate that Jean-Pierre was aware that Sears
was controlling the preferred shared in Robert Dittman's name. Robert
Dittman's incentive to keep the preferred shares in his name was that if he
got his act together, he may have been able to use the shares in the

GJP_00006234

Attachment 9
Page 9 of 28

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  10 of 28

future. Robert Dittman did not receive any compensation for holding the
shares from 2011 through 2014.


The 185,000 preferred shares consisted of shares owed to Sears from
his debt settlement agreement and Robert Dittman's stock. Sears drew down
his shares from Robert Dittman's in order to avoid being a control person.
If he owned more than 10% of the outstanding shares, he would have problems
depositing the shares in his brokerage account.


Sears' Mother, Sandra Sears, was listed as the Corporate Secretary of
FusionPharm although she never had any role with FusionPharm. They needed
two signatures and Sears was already the Administrative Officer on
documents submitted to the OTC, so they had his Mother sign although she
was there in name only. Sandra Sears was listed on the stock certificates
because she was Corporate Secretary. She was never an officer or director
of FusionPharm. Sandra Sears resigned from her position with FusionPharm
when Sears' Grandmother became ill. Jean-Pierre took over as Corporate
Secretary. Originally, it was going to just be Sears and his Mother listed
as the officers of the shell company. In the beginning, Sears did not think
FusionPharm would be around for a long time. He did not want to be a listed
officer or director because he would have to disclose his prior criminal
history.


Jean-Pierre introduced Sears to attorney Tod DiTommaso in 2011 after
telling Sears that he was working with DiTommaso. DiTommaso was working
from California. DiTommaso told Sears to run everything through
Jean-Pierre, but Sears never asked why. He only talked to DiTommaso on the
phone once. Dittman also spoke to DiTommaso. Sears was not sure why
DiTommaso was involved, but thought that DiTommaso and Jean-Pierre were
partners. Jean-Pierre wrote every AOL signed by DiTommaso. Sears was
friendly with Jean-Pierre and attorney Fred Lehrer. Sears met Frederick
Lehrer in August of 2013. Jean Pierre had an issue with Lehrer's ex-wife,
Linda Hamilton, relating to the company Big Apple, an Investor Relations
firm. Sears learned of Jean-Pierre's OTC ban around the same time in early
2013 that he learned about the SEC default judgment from a text message he
received from Scholz. He maintained contact with Jean-Pierre after finding
out about his legal trouble but Sears' never hired him to do work after
that date.

GJP_00006235

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  11 of 28


        Sears initial role with FusionPharm was to get everything set up with
the Over-the-Counter (OTC) market. He worked with Baby Bee Bright's
accountant, Mike Kocinski, and with Jean-Pierre. The financial statements
from Baby Bee Bright had not been audited. In order to file a Form 10 or
S-1 with the SEC, they would need two years of audited financial
statements. In early 2011, FusionPharm was going to be a cannabis support
and consulting business. Shane Bohlender had accounting software that they
thought could be used for cannabis business. The PharmPod idea started in
summer of 2011. Bill Farley from Commerce City had the initial idea but had
his containers outdoors. In 2011 and 2012, FusionPharm began procuring
PharmPods. Sears had administrative responsibilities at FusionPharm to
include uploading reports to the OTC website after they had been reviewed
by the accountants and the attorneys.  Sears did not take part in
preparing the content included in the documents posted to the OTC website.
This was handled by Dittman, Kocinski, Bodden, and then Craig Dudley in
2014. Sears, Dittman and Bodden all worked on the content of press
releases.  Sears posted the press releases on the news websites, PR
Newswire and Globe Newswire. Sears was responsible for FusionPharm stock to
include being present for pitches to investors and being the main contact
for the transfer agent from 2011 through sometime in 2013. Sears said that
he should not have been assigned the title of Investment Relations Director
in any of the FusionPharm documents. Sears and Dittman were "partners" that
he viewed as two guys building a business.  There were numerous times that
the company could have gone out of business due to lack of funding.


        Scholz was involved from the beginning of FusionPharm in 2011. Sears
visited Scholz's office in Florida. Through Scholz's company Prestige
Media, Scholz, and his approximately six employees, were making phone calls
to registered representatives at Oppenheimer, Merrill Lynch and Prudential
to market FusionPharm and generate interest in FusionPharm's stock. Scholz
sent investors copies of FusionPharm press releases and directed them to
the OTC website. Scholz tried to have brokers and dealers contact Sears
with any questions. Sears spoke to one or two of these brokers and dealers.
Sears requested that Scholz instead send him a list of the brokers and
dealers wanting more information. Sears and Scholz had an agreement where
Sears paid Scholz 25% or 30% of the proceeds from Sears' sale of
FusionPharm stock. Sears transferred Microcap Management to Scholz for $1
to shield Sears from Scholz's failure to disclose the commission he was
being paid by Sears. Scholz set up a new Employer Identification Number for
Microcap Management. Sears did not know if Scholz ever paid bribes to the
brokers.

GJP_00006236

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 12 of 28

Sears reviewed an email dated July 2, 2012. Sears did not recall the email. He said he had to pay Jimmy Harris $900 for damage to his house as a result of a Pharmpod install in Arizona.


Jean-Pierre was aware of everything that Sears was doing at FusionPharm. Jean-Pierre told him not to be an officer, director or on FusionPharm's payroll. He told Sears not to get paid a commission for bringing in investors and not to make management decisions.


Dittman wanted to speak with Baby Bee Bright's attorney and accountant. He first met Jean-Pierre in October or November of 2011 via a telephone call. This was around the same time that Dittman spoke with Kocinski. Jean-Pierre wanted to be paid quarterly or receive stock options for his duties as Corporate Secretary. Sears paid Jean-Pierre by deposit into a Jean-Pierre and Jean-Pierre Citibank bank account. The checks came from Microcap or Sears' personal bank account. Jean-Pierre was never paid in stock.


Sears was loaning money to FusionPharm in 2011 to clean up the shell and start up FusionPharm although they had not discussed the terms of the loan or documented the loan agreement. They were all handshake deals between Dittman and Sears that were not documented. They operated the business loose and fast. Dittman was always trying to raise money. The funds came from Sears' sale of FusionPharm stock in his Microcap brokerage account. Jean-Pierre advised that the loan be documented in a financial instrument. At the end of 2011 or early 2012, Jean-Pierre traveled to Denver and they discussed the terms of the convertible note. Jean-Pierre was aware of the fact that Sears was lending proceeds of FusionPharm stock sales back to FusionPharm and did not have an issue with it. Bodden suggested that the loans made by Sears to FusionPharm be split into two notes, one from Meadpoint and one from Bayside, so Sears could keep one note and sell the other note. Bodden had contacts that would buy the debt including Nick Malino at Capitoline. Malino was only interested in purchasing a convertible note and wanted his attorneys to do the paperwork to purchase the convertible note. Malino wanted to purchase the note in drawdowns of 50,000 shares. In March of 2012, Sears and Bodden flew to Florida and met with Jean-Pierre to discuss the notes. Sears was only interested in selling Malino a non-convertible note. Around the time of the discussions with Malino, the note agreements between FusionPharm and

GJP_00006237

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 13 of 28

Meadpoint and Bayside were documented as non-convertible notes. The convertible notes sent to Malino did not accurately reflect the terms of the loan because the convertible feature was concealed. There were multiple unsigned versions of the notes, both convertible and non-convertible, all documented after the loan was funded. The conversion rate was $0.01 per share. Conversion rates were always at a discount. Sears did not know if any other investors received FusionPharm stock at $0.01 per share. After the Florida meeting in March of 2012, Jean-Pierre and Bodden drafted the notes and they were executed at the same time. The note amounts were determined after Bodden went through the FusionPharm bank statements to identify all of the deposits from Sears. There were several companies interested in purchasing FusionPharm's convertible debt. Sears did not want to enter into any of these agreements because he was afraid it would tank FusionPharm's stock. He also wanted to be in a position to take back FusionPharm's stock in the event that FusionPharm failed.

Sears reviewed an email dated November 26, 2012 from Bodden. Sears believed that this was related to the later version of the notes. Sears believed that Bodden may have recreated the convertible loan paperwork in order to clean up FusionPharm's paperwork. Sears could not recall the amount of the loans. The earlier version of the notes was drafted sometime around the summer of 2012. Sears had the notes changed to include the convertible option in order to sell the Bayside note to Wayne Coleson. Sears set the price to $0.40 per share for Coleson.

Sears had his concerns about drafting the notes and backdating them to 2011, but Jean-Pierre was willing to put them together. Jean-Pierre said that the "144 tack back date" would start from when the first money was loaned from Sears to FusionPharm. When the convertible notes were sent to DiBella at PSTC, Sears did not tell her that the notes were backdated. Dittman and Bodden were aware that the notes were backdated. Lehrer was not aware that the notes were backdated. Sears believed that Jean-Pierre was not aware that he was giving bad legal advice. Sears also believed that Lehrer was manipulative.

Sears' Mother did not have any role with Meadpoint. His Mother did not have a job. Sears' Mother signed most of the documents that required her signature, but Sears also signed her name to documents. Sears never signed a stock certificate.

GJP_00006238

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  14 of 28


Sears said that FusionPharm only sold two Pharmpods in 2012. One was sold to Jimmy Harris and the other one was to Boone Smith.   Sears was not certain of Smith's first name.


Scholz told Sears about Jean-Pierre's case being charged by the SEC in 2013. It was around the time that Sears was selling portions of the Meadpoint note to Myron Thaden and Scholz and while he was focused on the Bayside note. Sears had to find someone else to do the Attorney Opinion Letters. Jean-Pierre was living in the Dominican Republic at the time. Dittman and Sears were shocked to find out about Jean-Pierre's legal trouble. Sears did not think that Jean-Pierre did any legal work for FusionPharm after they found out about his legal issues. Sears said that he did not know why Jean-Pierre was not listed in FusionPharm's 2012 Annual Report as the Corporate Secretary. He said the financial statements changed over time depending on who was creating the report.


Sears was transitioning out of his role at FusionPharm around the time that Paul and Dustin Budden invested in FusionPharm restricted stock. At Dittman's request, Sears sent the Buddens their stock purchase agreements.


Sears, Lehrer, Scholz and James Painter were going to do a turn-key grown business together with plans for Lehrer to be the Chief Executive Officer. Lehrer and Painter were discussing doing a registration or acquiring a shell for the company. This was progressing until law enforcement executed the search warrant on FusionPharm's warehouse in May of 2014.


Sears said that if he asked Jean-Pierre to do the same work that he did for FusionPharm today, that he would do it. Sears said that Jean-Pierre was still in the securities legal business and had called Sears on February 17, 2016, looking for work. Jean-Pierre and Sears also communicated via e-mail. Jean-Pierre used an e-mail with Florida Advisors within the e-mail address. They used Skype to communicate over the phone. Sears said that he

GJP_00006239

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  15 of 28

continued to communicate with Jean-Pierre in the event that the Department
of Justice was interested in having Jean-Pierre travel back to the United
States.

Buffington is currently raising money for the company Vast through an
S-1 offering that cleared in November of 2015. This is the final iteration
of Green Street. Buffington is taking money from "old ladies".   Sometime
around February 4, 2016, Sears mentioned Vast to Jean-Pierre on a phone
call saying that he will need documents and convertible notes drafted for
the S-1 filing. Jean-Pierre was interested in doing the work and indicated
that he would travel to Florida to start doing the work. Buffington is
aware that Sears is being investigated for his activity related to
FusionPharm.

Sears assisted the FBI with his previous case when he was charged
with Securities Fraud in 2004 or 2005. He worked with FBI Special Agent
Richard Jacobs and the prosecutors. He was proactive in cooperating and
made consensual recordings of targets. He helped the Department of Justice
apprehend a subject in Canada. He received a 5K-1 letter for his
cooperation. He was on probation for three years. He was supervised in
Colorado and his last probation officer was Elizabeth Oppenheimer. One of
his probation officers visited his office. He wanted to provide similar
assistance in this investigation with regard to Jean-Pierre.

Sears worked with Tim Scarpino, a broker at Scottsdale. Scarpino was
an administrative person, substitute trader, and took stock orders from
Sears. Sears met Joe Meuse from PSTC through Billy King. Sears was going to
start a transfer agent with King names Patriot. King is currently deceased.
Mark Habegger was Sears' wife's cousin.

In 2009, Sears received a letter in the mail from the state of Nevada
relating to child support. Through this letter, Sears learned that he had a
child, Nick Terry, who is now 16 years old. Sears was not aware that his
previous attorney had been served with the paperwork related to Nick Terry.
Nick Terry lived in Illinois with his mother, Pamela Terry. Sears met Nick
Terry for the first time in December of 2013. Sears had an ex-wife who
lived in Australia.

GJP_00006240

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  16 of 28


Robert Dittman has substance abuse issues including alcohol and cocaine. He also suffers from seizures.


Bodden was very good at putting together paperwork. Bodden pitched FusionPharm to three different investors.


*Administrative Note: The proffer on February 18, 2016 ended at approximately 4:45 pm. The proffer reconvened on February 22, 2016 with the following parties: AUSA Harmon, SA Funk, SA Godson, United States Postal Inspection Service Investigative Analyst George Allen, Inspector Haithcoat, SEC Attorneys Greer and Lyman, Sears and his attorneys Winocur and Gilligan.*


Sears and Dittman attended a marijuana conference at the Expo Center located at 26th and Walnut. Around the time of this conference, they met with attorney Robert Corry because Dittman had concerns with selling PharmPods direct to the marijuana industry. The FusionPharm public documents started to reference High Intensity Lighting which correlated to the marijuana industry. Corry recommended setting up a third party to sell the PharmPods. Corry used the word "disconnect" to refer to the use of a third party to sell the PharmPods. Sears set up Meadpoint to fill this role and incorporated it in Nevada. Sears was the only employee of Meadpoint. Corry was aware that Sears was running Meadpoint but may not have been aware that Sears was also doing work for FusionPharm. Sears and Dittman's conversation with Corry was focused on marijuana and did not focus on SEC requirements. The agreement was that Sears was supposed to receive a 15% discount off the order price but it did not always work out that way. Sears said he might have discussed the concept of setting up and running Meadpoint with Bodden and Jean-Pierre. Sears could not recall which PharmPods he actually marked up in order to make any money on the sale. The intent was for Sears to pay for the PharmPods upfront for FusionPharm to sell. Jean-Pierre and Sears discussed Meadpoint and whether or not Meadpoint or Sears were affiliates to FusionPharm. Jean-Pierre told Sears not to be on FusionPharm's payroll, not to participate in board members' meetings and not to take a commission for bringing in investors. Corry represented FusionPharm at times but never represented Meadpoint.

GJP_00006241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 17 of 28

FusionPharm only sold PharmPods to Mile High Green Cross (MHGC) in 2011. The deal was brokered by Dittman although Frank Falconer established the initial contact with MHGC. The original plan was for MHGC to rent the warehouse space and the PharmPods at FusionPharm's warehouse at 4360 Vine Street in Denver, but MHGC was unable to transfer their marijuana license to Vine Street. Sears purchased these PharmPods and then leased them to MHGC in order to get a higher return on this investment. He made a commission on the sale and then leased at a 14.99% interest rate resulting in Sears either breaking even or making a little bit of money. MHGC did not have the money to pay for the PharmPods upfront, so it was always the plan to finance the PharmPods. Originally MHGC was going to lease directly from FusionPharm. The deal was essentially complete but then Dittman switched the lease to Meadpoint because Sears wanted to help FusionPharm by providing the financing and because of the advice provided by Corry. Sears used proceeds from the sale of FusionPharm stock to pay FusionPharm for the MHGC PharmPods. MHGC wrote their initial check to FusionPharm because of a mistake made by Falconer. Sears could not recall who drafted the lease agreement between Meadpoint and MHGC but said that it could have been Dittman and an attorney. Sears then said that he did not really make any money on the MHGC PharmPods because they were prototypes and expensive. They were using window air conditioners in the PharmPods. Sears said that he guessed that Dittman discussed the accounting rules with Jean-Pierre regarding the structure of the MHGC deal. Sears did not take part in accounting discussions regarding the MHGC deal because he was the sales guy.

Sears picked up the lease payment from MHGC every month. They usually paid in cash. Sears said that he loaned Dittman money that came from MHGC monthly payments and FusionPharm stock sales to help keep FusionPharm going.   Sears never documented the loans. Per Lehrer and Jean-Pierre, it was not a problem for Sears to loan Dittman money. Lehrer was going to prepare paperwork for the loans that Sears made to Dittman, including the loan for Dittman to purchase his home, prior to the Federal search warrant executed in May, 2014.

Sears lost money on two PharmPod sales related to FusionPharm promotions. Sears and FusionPharm employees helped them to build the PharmPods and put them on a flatbed trailer to promote them at an event. Mark Anderson, an independent contractor for FusionPharm, and his crew were

GJP_00006242

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  18 of 28

responsible for building the PharmPods and were always involved in the
construction of PharmPods. Falconer and First Name Unknown (FNU) Cook were
hired to help Sears. Dittman paid Anderson for his contract work.


Sears and Dittman were involved in negotiating the purchase of the
storage containers that were used to construct the PharmPods, to include
the vendor Complete Containers. Sears purchased containers in order to
avoid losing a negotiated container.


Sears purchased the PharmPods in advance for all the PharmPods sales
up until 2013. Sears and Dittman did not document any of these purchases
between FusionPharm and Meadpoint. Sears said that he was horrendous with
paperwork. Starting sometime in 2013, FusionPharm's business had grown and
Sears no longer had to pay for the PharmPods in advance of the sale. Sears
did not make any money from his business dealings with FusionPharm. He got
paid through what he believed to be legitimate FusionPharm stock sales.


In 2012, FusionPharm almost abandoned marijuana and moved into
lettuce. In the spring of 2012, FusionPharm was experimenting with growing
lettuce in one test PharmPod. They did a lot of testing to include testing
lights in different containers. Buck Adams had a growing medium that did
not work very well. The Vertifresh deal was similar to the Meadpoint deal.
Sears was now running Vertifresh. Sears took over the FusionPharm test
PharmPod. Sears role was to grow the lettuce and then market and sell that
lettuce. He delivered lettuce to local Denver restaurant Mad Greens. Sears
said that the terms of the Vertifresh licensing agreement included four
PharmPods and the exclusive rights to the Denver area. He believed he paid
about $200,000 for the Vertifresh licensing agreement: $32,000 for each
PharmPod and then approximately $90,000 to $100,000 for the exclusivity to
the Denver territory. Dittman had completed the analysis to come up with
the price and felt it was a fair price. Sears did not see any paperwork
regarding the justification for the price. Vertifresh was necessary because
it was an area that Sears was interested in pursuing and he had the
proceeds from the FusionPharm stock sales for research and development.
Steve Reinhardt, who used to work for eBay motors, was going to the same
deal with Dittman but the deal fell through because Reinhardt could not get
a tax break to build out a "pharmplex". Sears was not sure if Sears and
Dittman discussed the specific terms of the Vertifresh deal or documented
the agreement. The agreement was drawn up sometime after the fact when they
figured out what it was worth but it was never signed. Sears wrote an

GJP_00006243

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  19 of 28

initial draft that Leudan said was too draconian so Leudan may have
rewritten it. Leudan, Sears, Dittman, Bodden and Jean-Pierre would have all
been copied on emails with the draft Vertifresh Licensing Agreements.
Jean-Pierre needed to know the terms of the agreement in order to opine for
the financials and draft information for the financial statements. Sears
said that he paid the total amount due for the Vertifresh licensing
agreement but could not recall the agreed upon price or when he had
completed payments. He said that there was still lettuce growing in the
Vertifresh PharmPods in 2013. He made the payments to FusionPharm when he
sold FusionPharm stock just as he did for the deals between Meadpoint and
FusionPharm. He also used FusionPharm stock proceeds to pay for Vertifresh
equipment and staffing.  All the PharmPods located at the FusionPharm
warehouse belonged to Vertifresh. FSPM was using these PharmPods to do
testing.  FusionPharm did not sell any lettuce after the Vertifresh
licensing agreement was effective.


Dittman was an advisor to Vertifresh and was not an officer or
director. Vertifresh was Sears' company.  Sears and Dittman had an
atypical business relationship where they talked about everything all the
time. Sears said that Vertifresh did not have a Board of Directors. Sears
came up with the Vertifresh name, logo and website content. He worked with
Nelson, an Information Technology professional from Florida, who helped
Sears build the Vertifresh website. The name was derived from vertical
farming and fresh produce. Vertifresh was the name that Dittman liked the
most of the three to four names proposed.  Vertifresh's management company
was VF Management, which was initially owned by Sears. VF Management was a
cultivation and employment company that was incorporated by Stuart Leudan
in Delaware. Dittman may have been listed as a controller of VF Management
in a later use of VF Management. Vertifresh was also incorporated in
Delaware. Leudan was possibly paid by FusionPharm and from one of Sears'
accounts by check. Sears reincorporated Vertifresh in Colorado as a Limited
Liability Corporation.


Chris Haddad and Kelly Blume worked on the Vertifresh lettuce
operations. Each company paid the employees that worked for FusionPharm,
Vertifresh or Meadpoint separately. Sears estimated that Haddad was paid
about $2,500 in cash for the work that he did for Vertifresh. Haddad also
had a Vertifresh credit card and was at Home Depot regularly. Blume had
been working for FusionPharm since 2011 and was likely paid by check. She
did Quickbooks for Dittman and was growing lettuce for Vertifresh. Her time
for Vertifresh was tracked via a time clock. Sears just sold the last

GJP_00006244

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  20 of 28

Vertifresh PharmPod to an individual in Seattle for $25,000. The Seattle
buyer did not have to pay a licensing fee.


Falconer brokered a deal between Mad Greens and Vertifresh.
Vertifresh did not make money on the deal with Mad Greens because
Vertifresh was still in a testing phase and needed to scale. Vertifresh
received exposure by being in 11 Mad Greens stores. Sears was not sure if
Falconer knew about the licensing agreement between FusionPharm and
Vertifresh. Vertifresh tried to work a deal with the Mayor's Office to
provide lettuce to prisons. They also had a deal with the restaurant Lola
in the Highlands neighborhood in Denver. Vertifresh gave away more lettuce
than was sold in the beginning. Sears did the business plan presentation
for Denver Jumpstart.  Sears lost money through the Vertifresh business.
He did not even get close to their goal of 50 PharmPods. The Vertifresh
business was put on hold when FusionPharm decided to focus again on the
marijuana industry. At some point later, Robert Dittman took over
Vertifresh. In 2013, Bodden expressed interested in pursuing Vertifresh. In
mid-2014, Richard Buffington gave Sears a check for $100,000 to purchase
Vertifresh to include the website, consulting services from Sears and one
PharmPod. Buffington wanted the Vertifresh name because it was more
established. Sears did not cash the check and the deal did not happen
although Buffington is in the process of a new offering that includes the
name Vertifarm. Sears said that Vertifarm was just another one of
Buffington's Ponzi schemes. Sears had not had any contact with Buffington
for the last 18 months with the exception of receiving a few voicemails
from Buffington where it sounded like Buffington was drunk.


Dittman and Bodden would have completed the 2012 annual report that
reflected 100 percent of FusionPharm's revenue came from Sears' companies,
Meadpoint and Vertifresh. Sears was copied on the e-mails regarding this
report. Mike Kocinski and Jean-Pierre were also involved. Jean-Pierre and
Lehrer told Sears that if Sears had a customer, it was not a problem for
Sears to purchase PharmPods from FusionPharm. Jean-Pierre also advised that
if Sears sold stock that originated from a convertible note, he could use
those funds to purchase a tangible asset from FusionPharm. Lehrer often
said that with regard to the SEC, it's all about the "optics".   Sears and
Jean-Pierre spoke primarily by themselves and by telephone via Sears'
Verizon cellular telephone and Jean-Pierre's Skype account. Jean-Pierre
often called Sears twice a day. Sears said that he changed his telephone

GJP_00006245

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  21 of 28

number in 2012, but stayed with Verizon. Dittman had trouble understanding
Jean-Pierre on the phone and preferred to speak via Skype. Jean-Pierre used
audio and video on Skype. They rarely exchanged text messages.


At the end of 2012, FusionPharm business was grim and they almost
went out of business. They were almost shut down three separate times.
Sears was working with Tim Scarpino, Debra Friednash and Craig Summers at
Scottsdale Capital Advisors. Summers was a trader at Scottsdale and
Friednash worked in the back office. Friednash knew of New York investors
that purchased debt from companies. Friednash set up an introductory phone
call with Sears, Wayne Coleson, Sam Levin and maybe Levin's son. They
discussed marijuana, lettuce, and the debt for at least 90 minutes. The
investors were only interested in purchasing debt that was convertible to
free-trading stock where the holding period had been met. Sears sent
Coleson an email with the Bayside convertible note. Coleson and his group
of investors purchased the remainder of the Bayside note for approximately
$240,000 after Sears converted a portion of the note. Sears raised the
strike price to $0.40 per share from the $0.01 share. There were no terms
for when they could sell their stock from the note, although Sears
requested that they not sell the stock all at once because it would crush
the market.


In 2013, marijuana became hot again because of the legalization of
recreational marijuana in Denver. FusionPharm transitioned out of lettuce
and went back to the marijuana industry. In early 2013, Sears used a
portion of the note proceeds to purchase seven or nine PharmPods from
FusionPharm. Sears paid approximately $30,000 per Pharmpod through
Meadpoint before the Pharmpods were constructed. Sears believed that the
approximately $277,000 booked in Quickbooks for this transaction was likely
accurate. He did not recall any documentation being generated to support
the purchase. The PharmPods were not constructed from the standard PharmPod
shipping containers. Sears paid upfront and over a period of time for the
PharmPods because he planned to lease them to Don Novak of Groundswell. He
transferred the PharmPods from Meadpoint to VF Management's name without
any related compensation. Sears and Novak began discussing the leasing of
the PharmPods at the end of 2012. It was a joint venture/operating
agreement where Novak would provide the licensing and distribution and
Sears and Dittman would provide the equipment and expertise to bring the
cannabis to market. FusionPharm, Mark Anderson and Sears worked on
constructing the PharmPods purchased by Sears. Haddad and VF Management
were growing cannabis in the seven or nine PharmPods for Groundswell using

GJP_00006246

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                              , On  02/18/2016 , Page 22 of 28

Groundswell's off-premise license. Groundswell was supposed to pay VF
Management based on the amount of cannabis harvested. Dittman became owner
of VF Management. Haddad was a 1099 contractor for VF Management. VF
Management had the agreement with Groundswell.   The lease agreement with
Novak was reviewed by attorneys at Vincente Sederberg. Haddad failed at
growing cannabis and only had one good harvest.


     The seven or nine VF Management PharmPods were eventually sold to
Groundswell through the entity 10MM Holdings, an entity controlled by
Sears, Dittman and John Scott. 10MM Holdings was the entity that purchased
FusionPharm's warehouse space located at 4360 Vine. Dittman, Sears and
Scott originally wanted Novak to rent 4360 Vine and the seven or nine
PharmPods for $20,000 per month, but that was too expensive for Novak.
Instead, he purchased the PharmPods. When Sears was asked about the
complexity of this transaction, Sears then said, "We fucked up royally, it
was not premeditated, the circumstances dictated the setting up of
entities. It's the way it worked out."


     Sears sold a portion of the Meadpoint note to Scholz, Myron Thaden
and Thaden's wife. Scholz wanted to buy a portion of the note because he
knew about the Thaden's note purchase. Scholz was going to purchase 500,000
shares of the note for $50,000. Scholz never came up with the money to pay
for the note, but the stock was already in his name. Sears let him pay it
off over time. Sears could not recall the terms that he negotiated with
Scholz. Sears provided false records to the transfer agent showing that
Scholz paid him $50,000 before transferring the stock. Scholz paid Sears as
he sold the stock. Sears believed that he may have modified the terms of
the note purchase from a $50,000 payment to a split based on the stock
proceeds. The stock proceeds split may have been 75% of the proceeds going
to Sears and 25% going to Scholz. Sears believed that Scholz was actively
promoting FusionPharm stock at this time.   Sears was not aware that it was
an issue to promote stock and sell stock at the same time, although he was
aware that there were rules related to promoting and selling. Tyler Floor
was Scholz's contact at Alpine Securities.


     Scholz set up the meeting in Orlando to introduce Sears and Lehrer.
Scholz had given Lehrer due diligence on Sears and FusionPharm. Lehrer was
interested in representing FusionPharm and working as General Counsel.
Lehrer wanted Sears to discuss this with Dittman. Lehrer wanted to be paid
two million shares of FusionPharm stock in additional to monetary

GJP_00006247

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  23 of 28

compensation. Sears told Lehrer that he needed to lower his fees. Dittman
and Lehrer came to an arrangement but Sears could not recall the details.
Once Lehrer started working for FusionPharm, he did all the legal work that
was previously done by Jean-Pierre.


Sears discussed the Bayside note with Lehrer. Lehrer told Sears that
Jean-Pierre had been involved in a lawsuit with Lehrer's ex-wife and Lehrer
did not think Jean-Pierre was a good person. Sears and Lehrer discussed
doing an S-1 registration for FusionPharm. Lehrer began drafting the
document and had a copy on his computer. When discussing the necessary
disclosures for the S-1, Sears told Lehrer about Bayside and Meadpoint and
the related notes. Lehrer knew that Sears' Mother was on the Bayside
paperwork, but because the note was already sold when Lehrer starting doing
work for Sears and FusionPharm, it was not an issue they discussed in
detail. Lehrer advised Sears to transfer the Meadpoint entity to his
Mother. They did not discuss Vertifresh because the transaction was
complete. Lehrer wrote the AOLs saying that Sears was not an affiliate of
FusionPharm. Lehrer did not have a problem with Sears providing money to
FusionPharm as long as Sears was purchasing a real product. Lehrer had some
concerns about disclosing the Bayside and Meadpoint notes in the S-1. Sears
flew down to Altamont Springs, Florida and met with Lehrer at a conference
room in Lehrer's apartment building.


Sears explained the Sears/Dittman relationship to Lehrer as "two guys
building a bunch of businesses". Lehrer knew that Dittman and Sears were
brother-in-laws and knew about Sears' criminal history.  Sears said that
he was friends with Lehrer. Lehrer advised that it is not what they are,
but rather how they look with the object being not to get noticed by the
SEC. Lehrer used to work for the SEC. After a conversation with Lehrer,
Sears was nervous because he knew that he had broken the law regarding his
activities with FusionPharm and the entities controlled by Sears. In
approximately October of 2013, Sears requested that Lehrer send him an
email documenting what he could and could not do regarding FusionPharm.
Sears' attorney, Winocur, provided a copy of the email sent by Lehrer for
the interviewers to review. The email copy was retained by Winocur. After
providing Sears with specific instructions regarding what Sears could and
could not do for FusionPharm, Lehrer continued to copy Sears on emails
regarding FusionPharm financial statements. Lehrer was aware that Sears was
performing activities that were listed as prohibited activities in Lehrer's
email. Sears was still involved with FusionPharm investors including the
purchase of restricted stock in 2014 by Thaden and the Buddens. Lehrer knew

GJP_00006248

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page 24 of 28

Thaden personally. Sears gave tours of the 5850 warehouse to multiple
people including investors. When Sears needed an AOL to provide to his
broker at Scottsdale for his Meadpoint stock, Lehrer was provided all the
paperwork necessary to write the letter. Lehrer asked Sears why Sears was
signing off a director of Meadpoint when he had transferred Meadpoint to
his Mother. Sears told Lehrer that he signed off as director because he
still had a brokerage account and that response was sufficient for Lehrer
to write the AOL. On one occasion, Lehrer asked Sears to cut and paste
Lehrer's signature from one AOL to a new AOL. Lehrer had been having issues
with his scanner. Sears was able to highlight Lehrer's signature and cut
and paste it into the new AOL. Lehrer was able to highlight text in
documents and then copy and paste the text into other documents. According
to Gilligan, this AOL may have been related to a January 2014 transaction.
In the AOL, Lehrer opined that Sears was not an affiliate or control person
of FusionPharm.

Lehrer and Sears discussed the necessary disclosures related to
FusionPharm.  Lehrer, Dudley and Dittman had a call to discuss the
disclosure of Sears in the 2013 annual report. Sears talked with Lehrer by
telephone prior to this call. Dittman was upset that Lehrer had a prior
call with Sears before the call with Dittman. Dudley had been reviewing
some of FusionPharm's records and was getting things in order to include
the Vertifresh agreement. Sears was not participating in the Vertifresh
restatement conversation.

Sears and Lehrer also discussed setting up another company with a
separate S-1 filing. They were in the very early stages of this company and
had not yet come up with a name. The people involved included James
Painter, Lehrer, Scholz and Sears. Dittman was not involved in this
business. They discussed the concept of affiliates. Sears did not want to
make a long term commitment to company and was only going to do consulting
work related to locating real estate. Sears was not going to be on the S-1
paperwork. Lehrer agreed with the approach of having Sears involved with
the new company but not be listed on the company paperwork. The business
was going to be a real estate PharmPod business with Lehrer being the Chief
Executive Officer. Lehrer did not like the idea of using a shell company.
They were getting ready to file paperwork and locate shareholders. Scholz
introduced Sears to Painter. Painter knew Lehrer's Father.

Sears paid Lehrer by check for all legal services. He also loaned

GJP_00006249

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____, On  02/18/2016 , Page  25 of 28

Lehrer money to include a loan for $2,500 in cash. Buffington and Bodden both coordinated purchases of FusionPharm stock for their investors through Sears. Sears was never paid for the stock.

Peter Miller from Organigram contacted Sears in August of 2013. He came to Denver, Colorado in October of 2013. Miller wanted to build his own building for PharmPods so Sears put Miller in touch with Dittman. Meadpoint became profitable toward the end of 2013 when FusionPharm was starting to get business. MHGC won the "cannabis cup" and they were talking to other customers. The free MHGC advertising was worth at least $100,000.

Up until when Meadpoint was set up at the end of 2011, Sears was doing work for FusionPharm.  In the beginning, Sears used a FusionPharm email address. Jean-Pierre told Sears not to use the FusionPharm email account because he could be construed as an affiliate of FusionPharm. Sears then began using his william@williamjsears.com account. Sears was upset with Jean-Pierre for not telling him early on that he should not be using a FusionPharm email account. Sears said that in hindsight, he thought that Jean-Pierre gave him the tools to avoid the perception that he was an affiliate of FusionPharm. Jean-Pierre was FusionPharm's attorney and Sears' personal attorney.

Sears did not think he would have asked Jean-Pierre to backdate a document. He could not recall an email where he asked Jean-Pierre to backdate the contract for Scholz to purchase Microcap from Sears. The transfer of Microcap from Sears to Scholz took place around the time that Scholz started promoting FusionPharm stock. Scholz did not disclose on his website that he was being paid by a third party to promote FusionPharm stock. Sears was concerned about this so he suggested that Scholz purchase Microcap to include the website and the broker list. The purchase price was $1 which was never paid. Sears maintained control of the Microcap brokerage accounts at Oppenheimer. At some point, Oppenheimer stopped dealing with penny stocks. Sears was aware of the Financial Industry Regulatory Authority (FINRA) investigation and knew that Microcap was a part of the investigation but he did not know the details. He believed that Jean-Pierre handled the FINRA investigation.

Sears communicated with Jean-Pierre over the telephone. When FusionPharm provided the due diligence to Capitoline via email, Jean-Pierre

GJP_00006250

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  26 of 28

was aware that the paperwork provided regarding the Meadpoint and Bayside
notes showed the notes were not convertible into stock. Jean-Pierre opined
on the notes, through DiTommaso, at a later date with the notes now
including a convertible option.


        Corry represented Dittman in various different matters. Sears and
Dittman also met with attorney Warren Edson.


        Sears spoke with Andrew Rolle once and exchanged a couple of emails
regarding setting up offshore trust, brokerage and bank accounts. Sears was
looking to set up offshore accounts to limit his tax liability and to keep
his accounts anonymous. Scholz and Sears were still vetting Rolle, but
Sears did not trust Rolle. Sears did not think he set up any offshore
accounts for himself. He set up offshore accounts for others back in 2002
or 2003 while he was in Australia.


        When the search warrant was executed at FusionPharm in May, 2014,
Sears was working out at the gym. He found out about the search warrant
from SA Funk on that morning at his home. He was phasing out of FusionPharm
at that time with his responsibilities begin transitioned to John Scott.
Sears and Lehrer spoke three or four times after the Federal Search
Warrant. Lehrer said that he had no idea what was going on and would refer
Sears to another attorney. Lehrer advised Sears to say nothing to the
Federal investigators. Two nights after the Federal Search Warrant, Lehrer
contacted Sears and asked him if Sears provided Meadpoint funds directly to
FusionPharm. Lehrer sounded like he was drunk. Sears also spoke with
Jean-Pierre after the Federal Search Warrant. Jean-Pierre advised not to
give anything to law enforcement without a court order. Jean-Pierre gave
Sears some advice on what to tell the Federal Government but Sears could
not recall the specific details. Sears heard that Lehrer had a drinking
problem. Ted Mahoney, Kermit Silva and Scholz also knew about Lehrer's
alcohol abuse. Lehrer is well known in Orlando and it's a small community.


        FusionPharm's attorney hired a forensic accountant to review
FusionPharm's revenue figures. Sears said that there were not any books or
records in existence that were not already produced to the Department of
Justice.


GJP_00006251

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  27 of 28

Nelson contacted Sears regarding helping to raise money for Green
Street Equities. Nelson did website work for Green Street Equities. Green
Street Equities is made up of the following companies: Vast, Vertifarm,
Affordable Bio and Bee Homes. Buffington is currently trying to raise $25
million for these portfolio companies and had a couple hundred thousand
dollars in the pipeline. Buffington has raised some money for Green Street
Equities. Nelson was listed as the VP of Marketing for Green Street
Equities. Vast is the newest company and has legitimate technology and a
patent for storing 26 terabytes of data on a thumb drive. The other
companies have never had any products and are one big Ponzi scheme. Sears
did not want to be involved in Green Street Equities because of the current
Federal investigation. Bodden told Sears about Green Street Equities.
Bodden and Buffington used to work together before Bodden went to prison.
Borcherding and Bodden lived together in Cayman. Borcherding is the "front
man" for Bodden.  Buffington is renting a $900,000 home in Florida. Sears
said that Nelson has put himself in a bad spot. Sears no longer has a good
relationship with Buffington. Buffington's contract with Vast to assist
with raising money is getting ready to expire.


Sears spoke to Jean-Pierre a little over a week ago. Jean-Pierre was
interested in finding work through Sears. Jean-Pierre is still acting as an
attorney and recently traveled to Haiti to meet with a client. Jean-Pierre
asked about the status of the FusionPharm investigation. Sears told him
that it was turning into a tax investigation. Sears told Jean-Pierre that
Vast was looking to register with the SEC.   Jean-Pierre was interested in
doing the securities work for Vast and wanted to be paid in cash and stock.
Sears and Jean-Pierre discussed setting up a meeting. Jean-Pierre wanted to
meet in the Dominican Republic but Sears told him that they needed to meet
in the United States. They discussed setting up some offshore accounts.
Sears did not mention Vast's deal with Buffington and did not think that
Jean-Pierre knew Buffington. Jean-Pierre is also known as Marcelo
Dominguez. Sears did not know if Jean-Pierre had another attorney in the
United States that he was using to sign AOLs. Sears spoke with Jean-Pierre
every few days.


Sears said, "We screwed up royally. It was two guys trying to start a
business. A lot of stuff was on the fly." They discussed disclosing Sears
as a part of FusionPharm in the early stages of FusionPharm. They decided

GJP_00006252

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of ___(U) Interview of William Sears___ , On __02/18/2016__ , Page __28 of 28__

to keep Sears name out of FusionPharm but wanted to do it legally.   Sears
said that he knew he what he was doing regarding FusionPharm and is
culpable for his activity.

GJP_00006253