

## Memorandum of Interview

| | |
|---|---|
| CASE NUMBER: | 2042900-MF |
| PERSON INTERVIEWED: | William Sears |
| PLACE OF INTERVIEW: | US Attorney's Office<br>1801 California<br>Denver, CO |
| DATE OF INTERVIEW: | June 26 and 27, 2017 |
| TIME OF INTERVIEW: | 9:30 AM |
| INTERVIEWED BY: | FBI SA Kate Funk, IRS-CID SA Jared Erwin, Postal Inspector Rob Barnett |
| ALSO PRESENT: | AUSA Ken Harmon, Attorney Fred Winocur, and FBI Intern Elizabeth Smedley |

1. At the above time, date, and location, William (Billy) Sears was interviewed concerning his involvement with Guy Jean-Pierre and FusionPharm. Also present during the interview was AUSA Ken Harmon and Sears' attorney, Fred Winocur.

2. At the beginning of the session, Sears reviewed his plea agreement, with emphasis on paragraphs 5, 10 (note 8), 12, 18, 22 (note 17), and 28 (note 20). After review, Sears stated that Guy Jean-Pierre knew everything going on with the running of FusionPharm, Microcap, Meadpoint, Bayside, Vertifresh and other entities Sears was a part of. Sears stated he felt he was too close to the company and that made him an affiliate.

3. Sears first heard of Jean-Pierre in Richmond, TX, possibly around 2009 or 2010. Sears recalls being in the office of Billy King, who Sears knew as a lawyer that would acquire shell companies for the purpose of forming new companies. Sears recalls hearing Jean-Pierre's name associated with Monogram Energy but does not know how Jean-Pierre was involved. Sears was being used by King and another lawyer, David Adams, to promote and market deals of the companies the lawyers were working on. Sears was paid with shares of stock in the companies he was promoting.

4. Sears was under the impression that Jean-Pierre did attorney opinion letters for Billy King and David Adams. Jean-Pierre was Adams' go-to attorney. A deal involving Billie King's Monogram Energy was the first deal with Jean-Pierre that Sears was involved with. The Polaris Diversified Media deal through Adams was the first deal done with Jean-Pierre where Sears was a part of the company.

5. Sears said Jean-Pierre wrote attorney opinion letters for him dealing with stock shares being changed from Restricted to Unrestricted. Although he knew the name Jean-Pierre through dealings with King and Adams, Sears first talked with Jean-Pierre around the 2009-2010 timeframe. Sears said he first met Jean-Pierre face-to-face when Jean-Pierre flew into Denver for his son's graduation from the Air Force Academy and they ate at a local diner.

6. Sears left Green Street Capital in approximately 2008 and met Jean-Pierre after that point. Sears recalls doing public relations work for JAGR Mining through Microcap. Jean-Pierre was doing attorney opinion letters for JAGR. JAGR merged with Green Street Capital.

7. Jean-Pierre did most of the opinion letters in which Microcap was involved and worked with Joe Muse who did a lot of shell company deals. Sears paid Jean-Pierre $500 per opinion letter and never paid him in shares of the companies. The letters were used to clear stock through transfer agents. Sears always had less than 10% holdings in stock at any one time in the company.

8. In 2005, Sears became involved with a product called Ultra Grip. Sears researched this product and formed a private company, Rosual, with Robert Dittman and the founder of Ultra Grip, Henry Sarmiento. Rosual did well and had hospitals and hotels as clients. Shareholders in the company included Dittman, Sarmiento, and Sears' wife. Sears did not have any personal ownership stake in the company because he was under federal investigation at the time. Jean-Pierre did not have any affiliation with this company. However, Cliff Bodden came from Ohio to Florida to help with the administration of Rosual. Bodden and Sears had a business relationship stretching back to 1991.

9. Sarmiento claimed ownership of Rosual and, as a result, sold it to International Solubles to continue distributing Ultra Grip. Bodden and Sears continued to work for the company and the company continued to do well until around 2008. At one point, Sears uncovered Bodden trading undocumented stocks and claiming 17% monthly returns. Bodden told Sears he was just putting in what "George" told him to but did not have any reports to back up the return percentage. Sears asked Bodden to leave the company.

10. During the recession in 2008, International Solubles lost customers and shut down. It was changed into the company Poker Book. Bodden and Richard Buffington then turned Poker Book into Silver Star and eventually into Green Street Capital. Shareholders that held Rosual stock were rolled over into Green Street.

11. Sears did Investor Relations and Public Relations work for JAGR through Microcap and helped Bodden with the merger into Green Street. Sears did not have any shares of Green Street/JAGR but received 7.7 million shares through a friendly lawsuit. Sears reviewed a copy of the lawsuit during the interview. Sears said these shares were owed to him from prior work he had done. These shares were eventually broken down into various entities controlled by Sears. Charles Cleland represented Sears during this lawsuit while Jean-Pierre represented Green Street. Sears had no knowledge of Jean-Pierre involvement in the JAGR to Green Street conversion.

12. Sears was shown a list of Green Street/JAGR beneficial owners from September 2010 showing Robert Dittman holding approximately 7% shares in the company. According to Sears, Robert Dittman was not involved with this company and that the shares had been rolled over from Rosual.

13. Sears was told that there were Skype messages from January 2012 where Jean-Pierre asked Sears for a Robert Dittman non-affiliate letter. In the Skype message, Jean-Pierre tells Sears he hadn't received "the non-affiliation form for Rob Dittman for Green Street Capital corporation." Sears told Jean-Pierre he had it and would get it to Jean-Pierre.

Robert Dittman was holding shares of FusionPharm for Sears. Jean-Pierre knew this and did not have a problem with it.

14. Sears was not aware that Robert Dittman had 6.1 million shares of JAGR stock in 2011. Sears and Dittman were broke and if Sears had known those shares existed he would have sold them. The shares were rolled forward from Rosual.

15. 185,000 preferred shares of FusionPharm stock in Robert Dittman's name were actually shares belonging to Sears. Sears had somewhere between 300,000 to 700,000 common shares of Baby Bee Bright (BBYB) that were the result of the debt settlement agreement for Sears' prior services to the company. The shares were held in Robert Dittman's name to be given to Sears later.

16. From 2009-2010 Sears used Jean-Pierre as his sole attorney for writing opinion letters. Jean-Pierre also did work for Dahlman with Baby Bee Bright. Sears said he put Dahlman and Jean-Pierre in contact with each other.

17. Sears was shown an April 2011 letter to the Florida Bar on behalf of Jean-Pierre. Sears said he had no memory of seeing this letter and was not sure he knew at the time that Jean-Pierre was banned by the OTC from writing opinion letters. Sears was shown a March 2011 email string where Jean-Pierre sent drafts of the letter to Sears to forward to Bodden because Jean-Pierre did not have a good email address for Bodden. Sears did not open or review the letter prior to forwarding it to Bodden. Sears said he knew there was a Florida Bar complaint but was not aware of the OTC ban.

18. Sears knew that Jean-Pierre was writing opinion letters but that Leslie Dinwoodie from Complete Legal Solutions in Texas and DiTommaso were signing them. Jean Pierre originally told Sears that Dinwoodie and DiTommaso were his partners he worked with for opinion letters. Jean-Pierre also told Sears that since he was an officer of FusionPharm, he needed a third party to write the letters.

19. Sears knew that Jean-Pierre was ghost writing opinion letters and DiTommaso was signing them. Sears said he was indifferent in knowing that Jean-Pierre was doing this because the letters Sears needed for stock were getting signed. Sears did not have a conversation with Jean-Pierre about anything outlined in the Bodden affidavit.

20. Sears was shown a Dinwoodie opinion letter from June 17, 2010 concerning Baby Be Bright and Microcap stock. Jean-Pierre provided this letter to Sears and also additional letters after this one. Sears never spoke with or met Dinwoodie. Sears said Dinwoodie signed Jean-Pierre drafted letters for other companies such as Polaris and Diversified Media. Jean –Pierre would have known that the letters were used by stock transfer agents and brokerage firms to issue, deposit, sell, etc. stock associated with the companies listed in the letters. Sears knew this letter would be used to clear stock through compliance requirements at the transfer agents and others.

21. Jean-Pierre knew it was industry standard to give opinion letters to transfer agents and other compliance entities. Jean-Pierre knew the Dinwoodie letter would have been used to remove the restricted label from the 185,000 shares of preferred stock. Sears said Jean-Pierre drafted all letters to include opinion letters, safe harbor letters and others in due diligence packages for companies.

22. Jean-Pierre knew Dinwoodie's letter was used by Oppenheimer for depositing stock shares. Oppenheimer would have relied on this letter to be true and Sears would have sent it to them. Jean-Pierre knew the same Dinwoodie letter was used on multiple occasions to clear stock. The letter was sent by Oppenheimer to DTC Scottsdale.

23. Sears spoke with Jean-Pierre on a daily basis concerning the transition from Baby Bee Bright to FusionPharm. Jean-Pierre helped negotiate stock prices and was on phone calls with Sears and the stock transfer agents. It was Sears' idea to use Baby bee Bright as a shell corporation.

24. Jean-Pierre drafted paperwork with Sandra Sears as an officer of FusionPharm, knowing she would have no involvement with the company. Jean-Pierre told Sears a second officer was needed which caused Sears to propose using Sandra as an officer. Jean-Pierre listed Sandra as the secretary on the paperwork and never questioned the practice. Jean-Pierre knew Sears could not be listed on the company paperwork.

25. Sears and Jean-Pierre had a discussion about and knew that Sandra Sears was simply a placeholder as an officer in the company and would have no affiliation with the running of the company. It was known by both Sears and Jean-Pierre that Sandra was to be a placeholder until a new officer was found.

26. Jean-Pierre worked with Maria Sampson who was working with FINRA for the name change from Baby Bee Bright to FusionPharm. Jean-Pierre knew that preferred stock in the company would be going to different places once the company was set up.

27. At the end of 2011, Jean-Pierre recommended to Sears to put FusionPharm shares into one convertible note that would consolidate short term loans Sears gave to the company. Bayside was a holding company that only held FusionPharm stock and Sandra Sears set up the bank accounts for Bayside.

28. Sears ran the brokerage accounts and had Sandra Sears sign the paperwork as needed for those accounts. Sears said he occasionally signed for Sandra. Jean-Pierre knew Sears signed for Sandra on occasion because Sears told him.

29. In the beginning of FusionPharm, Jean-Pierre would have seen Sears's role as a "transition guy" to get the company going. However, Jean-Pierre knew Sears was pitching the company and working for the company with Dittman. Jean-Pierre told Sears this was not a problem as long as Sears didn't take a commission on the sale of stock. Jean-Pierre and Sears had discussions about affiliate status. Jean-Pierre told Sears he would be considered an affiliate if he was an officer, controlled management decisions, or took commissions. Sears was using a FusionPharm email address and Jean-Pierre advised Sears not to use it in order to avoid Sears' appearing to be involved with FusionPharm. Jean-Pierre knew how much Sears was involved with the company and did not raise any concerns as far as Sears being an affiliate.

30. Jean-Pierre was the corporate secretary of FusionPharm at the same time he was writing opinion letters.

31. Sears was shown a series of checks made out to Jean-Pierre: #1064, #1141, #1172. Sears said he wrote each of the three checks to Jean-Pierre and deposited them into Jean-Pierre's JP Morgan Chase account. This was Jean-Pierre's payment for services. If

Jean-Pierre was late getting paid, he would have talked with Dittman about it first and then called Sears if he still could not get paid by Dittman.

32. Sears was shown a series of Bayside checks: #5014, #5047, #5057, #5063. Sears stated he signed these checks to pay Jean-Pierre for opinion letters and legal services from the Bayside account. Jean-Pierre never asked why the checks were coming from Bayside. Checks #5014 and #5047 were for Jean-Pierre's legal services to FusionPharm. Check #5057 could have been a letter of opinion for Adams, but may not have been for FusionPharm. Check #5063 was most likely to pay for work done on creating a note or for Jean-Pierre's retainer fee. Sears indicated he paid Jean-Pierre numerous times on behalf of FusionPharm after discussions with Dittman and Jean-Pierre. However, Sears said the Bayside checks for $2500 would have been for Jean-Pierre's FusionPharm retainer. Sears paid Jean-Pierre out of whatever account had money.

33. Sears was shown Bayside checks #5069 and #5082. Sears stated #5069 was for Jean-Pierre doing normal FusionPharm work, but that #5082 was likely for a 144 letter on a "gypsy swap" deal for Todd Abbott. As the company legal counsel, Jean-Pierre gave the OK for this transaction to occur but then told Sears they should not do it because it was a "gypsy swap."

34. Sears was shown Wells Fargo checks #2002 and #6000. Sears said he signed both of these checks. Sears did not recall what #2002 was for, but said #6000 was most likely one of the $2500 retainer checks for FusionPharm work.

35. Sears was shown an email dated 5/31/2011 from Sears to Jean-Pierre with a copy to Dittman. The email concerned trademark issues with registering the pods produced by FusionPharm. Jean-Pierre never questioned why Sears was making management type decisions and doing affiliate type work with issues such as trademarking. Sears said he may have contracted with Don Hemmer to look into trademarks, but doesn't recall FusionPharm ever getting anything trademarked.

36. Sears was shown an email dated 7/17/2011 from Sears to Jean-Pierre with a copy to Dittman. The subject of the email was 504/506 asking Jean-Pierre to review paperwork created by Bodden. Sears said he did not create the paperwork and that Jean-Pierre never questioned Sears' management type role in creating the documents. Sears said Jean-Pierre recommended 506 because of the accredited investor requirements. Sears recalls the conversation dealing with the 506 recommendation being only between him and Jean-Pierre.

37. Sears was shown an email dated 8/8/2011 from Sears to Jean-Pierre dealing with 15c-211a documents. Sears was not sure why the documents were needed. However, a Form D was needed in order to disclose large blocks of stock for a 504 company. Sears does not know for sure if the Form D was completed, but was assured Jean-Pierre filed the Form D because that was his job.

38. Sears was shown an email dated 12/17/2012 from Sears to Bodden and Jean-Pierre dealing with Kodiak Capital. Sears met with Kodiak by himself in California as Kodiak was pitching to feed money to FusionPharm as part of a Reg A filing. Sears sent the term sheets to Bodden and Jean-Pierre for an opinion. Sears recalled having a conversation with Jean-Pierre about Kodiak getting newly issued FusionPharm stock as well as the term sheets and corporate financing opportunity. Jean-Pierre ended up talking about Kodiak

with Dittman who "went down the road with them" for a period of time. However, a deal was never done. Kodiak was supposed to be a "block" buyer.

39. Jean-Pierre would sometimes pass financing leads to Sears but would never mention where they were coming from. Jean Pierre would keep the sources of the financing leads to himself. Jean-Pierre would say the investors wanted a 40%-50% discount on the stock, which Sears would refuse.

40. Jean-Pierre would call Sears with people wanting to buy free-trading stock or wanting to "uplist" the company onto higher exchanges. Sears said he would pass Jean-Pierre and the information onto Dittman, but it never went anywhere.

BREAK – approximately 1:50PM to 2:25 PM

41. Sears said he had always intended that funds given by him to FusionPharm were to be loans. Notes were drafted to reflect that.

42. Jean-Pierre's role in disclosure statements included reviewing what Bodden drafted as Bodden was more eloquent with his writing. Bodden would draft the documents and send them to Jean-Pierre for review. Notes to the financial statements were drafted by Dittman or Kocinski while the 2011 annual report was drafted by Bodden.

43. Sears was shown a FusionPharm disclosure statement dated June 30, 2011. Sears indicated Bodden drafted the product and it was reviewed by Jean-Pierre before being sent to Dittman for signature. Sears would then upload the documents to the OTC website from a computer in Colorado. Jean-Pierre would then complete the current information letter after the disclosure statement was uploaded and get DiTommaso's signature. Sears would receive the information letter from Jean-Pierre and would then upload it to the OTC website from a computer in Colorado.

44. Sears was shown FusionPharm's 2011 annual report. On the officers and directors page, Jean-Pierre is listed as the corporate secretary with other positions being held by Dittman and Andy Duke. Sears did not have any conversation with Jean-Pierre about Sears not being included as an officer of the company. Sears said he did not want to be listed as an officer because he would not be able to sell his stock if he was. According to Sears, there was never any discussion about removing Jean-Pierre from the list of officers.

45. Sandra Sears was listed as FusionPharm's corporate secretary at one point, but Jean-Pierre never raised any issue about it even though Sandra had no official duties and responsibilities outside of signing a few documents. Sandra would sign stock certificates sent to transfer agents for stock transfers.

46. Jean-Pierre never asked or raised an issue about Sandra resigning in June 2011 as secretary but continuing to be listed on documents as the secretary. Sears found out about Sandra's resignation as part of a due diligence during the Malino deal when he saw a letter from June 2011 to Dittman concerning the resignation.

47. In the legal section of the 2011 annual report, there was no discussion between Sears and Jean-Pierre about listing Sears' criminal history. It was not listed on the filing, even

though Jean-Pierre knew about Sears' criminal history. Additionally, Sears never had a discussion with Jean-Pierre about Jean-Pierre's Florida bar or SEC troubles. Sears was not sure why Jean-Pierre dropped off the reports but said it would have been Dittman making those decisions. Bodden and Dittman would have drafted the reports.

48. In the 2011 annual report section dealing with disclosure of family relationships, Sears is not listed. Sears recalls numerous discussions with Jean-Pierre concerning whether or not Sears should be listed as a family member. Jean-Pierre told Sears he did not have to be disclosed. Dittman and Jean-Pierre had an initial discussion about disclosing Sears as family before Sears and Jean-Pierre talked about it. Sears said he thought he should be disclosed, but Jean-Pierre said that since he was not a blood relative and only a brother-in-law he did not need to be disclosed. Sears thought Jean-Pierre said it was section or rule 404 that he used to make the non-disclosure opinion.

49. In the section of the 2011 annual report dealing with related parties, Sears had discussions with Jean-Pierre concerning Sears needing to be disclosed. Again, Jean-Pierre stated since Sears was not a blood relative and was only an in-law, he did not need to be disclosed as a related party.

50. There was no discussion between Sears and Jean-Pierre about Bayside being a related party or a beneficial owner even though Bayside owned 9.74% of FusionPharm stock at the end of 2011. Sandra took all direction concerning Bayside shares from Sears. Jean-Pierre knew the Bayside shares held by Sandra were Sears' shares. Jean-Pierre knew Bayside loaned money to FusionPharm that was from the sale of stock via Microcap. Jean-Pierre knew this was Sears' stock. The issue of Bayside holding more that 5% shares was never discussed as an issue with Jean-Pierre.

51. Shares due to Sears from his debt settlement agreement with Baby Bee Bright were transferred to Robert Dittman from Dahlman. Jean-Pierre put the debt settlement agreement together in 2010. If Sears had taken possession of the 185,000 preferred shares of stock then he would have possibly had to be disclosed on the company documents as an affiliate. Jean-Pierre had no issues with putting Sears' shares into Robert Dittman's name in order to keep Sears under a 10% shareholder in FusionPharm. Jean-Pierre knew that the stock in Robert Dittman's name was for the funds owed to him from Baby Bee Bright and told Sears there was no problem putting it in Robert Dittman's name. Jean-Pierre knew the shares transferred into Robert Dittman's name were to avoid Sears being an affiliate and to allow him to draw down those shares over time. Jean-Pierre was also aware that Robert Dittman held FusionPharm shares controlled by Scott Dittman.

52. Sears received stock certificates for Microcap with a "Control" stamp on it and said he had an "Oh Shit" moment. Sears called Jean-Pierre to ask what to do about the control stamp and Jean-Pierre asked why the certificates were in Sears' name. Sears explained he was waiting for Robert Dittman to create a holding company so the stock could be placed into it. Jean-Pierre told Sears to transfer the shares to Robert Dittman's name. Sears said he just wanted the stock out of Dahlman's name as soon as possible.

53. Sears was shown a skype message dated 5/18/2011 from Jean-Pierre to Sears stating "Sounds Good! I should still be here. We can go over everything else regarding FusionPlarm's [sic] disclosure statement." Sears did not recall the message.

54. Sears was shown an email dated 10/17/2011 from Sears to Jean-Pierre with the subject of trustee agreement. Sears said the template in the email was from Redchip lawyers from Australia which was obtained as a possible way to put various entities under one umbrella trust account. Sears said Jean-Pierre made no attempt to customize this template but asked for details on how to do the business deals concerning the trust accounts. The text of the email refers to Sears future interests in FusionPharm and Scott Dittman's potential interest in Meadpoint.

55. Sears indicated the trustee agreement email dated 10/17/2011 was around the time he fronted money for a deal in Mile High Green Cross. Sears thinks Jean-Pierre knew about the Mile High Green Cross deal because Jean-Pierre wanted to know everything about all deals. Jean-Pierre was aware Sears bought pods because Sears told him. Jean-Pierre told Sears it was OK to lease the pods for less money that was needed to pay for the pods. However, even though he may have known about the Mile High Green Cross deal, Jean-Pierre may not have known about the personal loans Sears provided to Dittman from the monthly payments made by Mile High Green Cross.

56. Sears was shown the Meadpoint Shareholder Agreement. Sears said Jean-Pierre knew about this agreement. Meadpoint was formed to keep the marijuana part of the business out of FusionPharm since it was a public company. The agreement would have passed from Jean-Pierre, to Sears, to Dittman, and to Stuart Leudan. The agreement was never executed because of the marijuana aspect and Jean-Pierre never followed up with it.

57. Sears recalls Jean-Pierre traveling to Denver in the latter part of 2011, maybe around September 2011. Sears recalls having lunch with Jean-Pierre and Andy Duke, but does not recall discussing FINRA issues with Jean-Pierre.

58. Sears was shown the Vertifresh agreement. Sears said he retrieved an old licensing agreement from Bodden, made some changes, and sent to Leudan and Jean-Pierre for review. Jean-Pierre and Bodden worked on the Vertifresh deal and Jean-Pierre knew about the $750,000 licensing fee for Vertifresh. Sears could not recall which lawyer represented which specific company but that both lawyers were involved with both companies. Both Jean-Pierre and Leudan provided input and comments on the first draft of the Vertifresh agreement. Jean-Pierre knew that revenue was being booked based on an agreement that was not finalized.

59. Sears was shown the Vertifresh-VF Management Shareholder Agreement (Colorado). According to Sears, Leudan drafted the agreement but it was never finalized. This company (known as VF Management, Inc.) was to be the mother company of Vertifresh with Scott Dittman as the CEO. Sears said Jean-Pierre may have seen the agreement or maybe heard about it, but did not have involvement with it. The attorney for this company was Stu Leudan. For reference, Sears said there was also a Vertifresh-VF Management company in Delaware.

60. In preparation for the end of quarter, emails would be sent around among "everyone" to put together financials. Sears said he would skim over these emails and attachments but would not review them in depth. Emails would at least be sent among Bodden, Sears, Dittman, and Jean-Pierre. Jean-Pierre would review the drafts of the financials sent to him by Dittman or Sears. Jean-Pierre would then start drafting attorney opinion letters (AOLs) based on the financials. According to Sears, Jean-Pierre would get documentation from Bodden or Dittman concerning the transfer agents and then check with the transfer

agents to make sure the numbers were right.  Sears cannot recall what specific documents, if any, Jean-Pierre received to backup AOLs.  Sears would pass on requests for documents from Jean-Pierre to Dittman and others.  Sears is not sure what the other people provided back to Jean-Pierre.  Sears does not recall Jean-Pierre ever asking him for support documents for the OTC filings.

61. Sears talked to Tod DiTommaso one time on the phone and never actually met him in person.  Jean-Pierre wrote the AOLs that were signed by DiTommaso.  Sears had the impression that Jean-Pierre and DiTommaso were lawyers in the same firm.

62. Sears knew that Dittman traveled to California one time to meet DiTommaso in person at the Los Angeles Airport.  Dittman told Sears that the meeting lasted for 15 minutes and that DiTommaso seemed like a dumpy guy.  Dittman routinely complained to Sears that DiTommaso would not return his calls.  Sears does not know if Dittman ever talked to DiTommaso outside of the 15 minute meeting at Los Angeles Airport and does not know if DiTommaso contacted Dittman prior to signing the AOLs.  Sears does not know if DiTommaso met with anyone from FusionPharm Management outside Scott Dittman for 15 minutes at the Los Angeles Airport.

63. Sears waived any possible attorney client privilege and provided information from Brenda Hamilton containing a copy of a DiTomaso Opinion letter.  Additionally, Sears provided information about www.promotionstocksecrets.com and other printed material he had obtained from an internet search.

64. Sears was never subpoenaed by the SEC for any records.  Jean-Pierre never told Sears that Dinwoodie was his niece.

65. Sears had less than 10% of FusionPharm holdings in Microcap.


The first day of the interview (6/26/2017) ended at approximately 5:05 PM.

The second day of the interview (6/27/2017) began at approximately 10:41 AM.


66. Documents shown to Sears at the beginning of the interview included:  10/5/2011 email from Todd Kramer (FINRA), 10/5/2011 memo from Kramer concerning a phone call to FusionPharm, 10/5/2011 Skype message between Sears and Jean-Pierre stating that Kramer was part of "a new division of FINRA only enacted post Madoff", 10/6/2011 memo from Todd Kramer concerning an interview with Scott Dittman, various emails from within FusionPharm concerning the FINRA investigation, and a letter from Jean-Pierre to FINRA dated 11/30/2011.  Other documents included Baby Bee Bright Corporate Consent Form (March 2011), Baby Bee Bright Corporate registration (11/15/2010), Baby Bee Bright Consent of Stockholder Agreement (11/15/2010), email string between Sears and Jean-Pierre about Microcap transfers to Scholz (Oct 2011), and 11/25/2011 email from Kramer to Jean-Pierre.

67. Sears said he sometimes signed Sandra Sears name to documents associated with the company and sometimes the documents were sent to Sandra for her signature.  On the

Baby Bee Bright Corporate Consent form, Sears identified the signature as coming from Sandra and not him. Jean-Pierre prepared the Baby Bee Bright Stockholder Agreement and spoke with Sandra on the phone to confirm she was a real person.

68. According to Sears, Jean-Pierre created and forwarded the Baby Bee Bright documents to Dittman and Sears in March 2011. The documents eventually ended up with Todd Kramer later that year. Don Harmer, from Carson, NV, runs a corporate services/registered agent business and also assisted getting documents to Jean-Pierre when organizing the company.

69. Sears remembers hearing about the 10/5/2011 FINRA call from Duke or Dittman and it having something to do with an internet crime division or something similar. Sears searched FINRA and Todd Kramer on the internet to find out what the "post Madoff" division was all about. Sears talked to Jean-Pierre about FINRA inquiring about FusionPharm. Sears said he probably Skyped Jean-Pierre first which led to a phone call. Sears talked to Jean-Pierre about why FINRA would be looking into FusionPharm. Sears recalls asking Jean-Pierre if the FINRA call was about issues with Robert Taylor. Sears talked to Dittman about his conversations with Jean-Pierre about what FINRA might be inquiring about.

70. Sears does not remember Dittman talking to Kramer on the phone on 10/6/2011, but he would have been in the building on Wynkoop. Sears did not prep Dittman for the call with Kramer. After the call, Dittman told Sears that FINRA was asking about him. Dittman told Sears about the call and Sears told Jean-Pierre. Jean-Pierre would have been told that FINRA was asking about Sears.

71. Jean-Pierre was aware of Sears selling FusionPharm stock through Microcap around the time of the FINRA call because Jean-Pierre was writing the AOLs. Jean-Pierre was the only lawyer Sears used to write any type of paper for FusionPharm and Microcap. According to Sears, Jean-Pierre knew everything because Sears told him everything through documents, emails, and phone conversations. Jean-Pierre knew Sears owned a block of FusionPharm stock that was held in the name of Microcap and that Sears was selling the this stock.

72. In October 2011, Jean-Pierre visited Denver. Sears recalls a meeting that occurred at the Rialto Café on the 16th Street Mall with Sears, Jean-Pierre, Scott Dittman, and Andy Duke in attendance. Sears said Duke left early in the meeting. Sears recalls discussions about raising capital, notes, and SB1 vs Form 10. Sears said they could have talked about the FINRA investigation but does not specifically recall it happening.

73. Sears was shown an email string (with attachments) between Sears and Jean-Pierre concerning the Scholz Microcap transfer. As part of the Assignment of Ownership Interest, Scholz would get the database, software, and online publications but did not get the stock in the brokerage accounts, even though the signed agreement states the brokerage accounts were included. Sears identified the signature on the document as being from him. The FINRA inquiry led Jean-Pierre to write the agreement this way. Sears said he did discuss the transfer with Scholz prior to the FINRA agreement but Kramer's inquiry pushed it to the top of the to-do list. Jean-Pierre wrote the agreement, sent it to Sears who then sent it to Scholz for both to sign. Jean-Pierre was aware that Sears was keeping the stock despite what the agreement said. Sears remembers Scholz

telling him that FusionPharm stock got "blue slipped" but that may have been up to a year later.

74. Jean-Pierre knew, during the time of the FINRA inquiry, that Sears was trading Microcap shares. Jean-Pierre also knew this was going on both before and after the FINRA inquiry.

75. Sears was shown an 11/27/2011 email from Dittman to Jean-Pierre concerning Kramer saying they would talk tomorrow. Sears did not recall being on the phone conversation with Dittman and Jean-Pierre but that Jean-Pierre was the lawyer for both he and Dittman.

76. Dittman told Kramer that Sears was divested from Microcap, but he does not know why Dittman would say that. Sears did not collaborate with Dittman on that statement.

77. During the FINRA investigation, Dittman began with an attitude of cooperation with the investigators. However, Jean-Pierre changed the direction and refused to cooperate. Sears said Jean-Pierre put up road blocks to the investigation and it was not at Sears' direction.

78. Sears was shown an email dated 2/28/2012 from Robert Dittman to Leslie at Pacific Stock Transfer Company regarding a transfer of shares from Robert Dittman to Scholz. Sears said he would have assisted Robert Dittman with the language sent to the transfer agent. As a result, Scholz would receive FusionPharm shares from the transfer agent in the name of Microcap at a Florida address. This gave the appearance that Scholz was receiving FusionPharm shares. However, Sears stated that any FusionPharm stock certificate issued to Microcap meant that he was the beneficial owner. Jean-Pierre knew the FusionPharm stock was owned by Sears while in the Microcap name.

79. Another email from May 2012 outlining a Bayside transfer to Scholz was shown to Sears. Sears was not sure of Jean-Pierre's involvement with this transfer. Sears always controlled the Microcap brokerage accounts and Jean-Pierre was aware of this.

BREAK - approximately 1:05 PM to approximately 1:40 PM.

80. Sears gave short term loans to FusionPharm that were derived from previous sales of FusionPharm stock via Microcap. Both Sears and Jean-Pierre knew the loans were from the sale of FusionPharm stock held by Microcap and had conversations on how to convert the loans. The FusionPharm stock that was sold originated from the Dahlman block of shares. According to Sears, Jean-Pierre knew the stock sold was held by Microcap and was owned by Sears, that the preferred shares were given to a third party and released in tranches to Sears, and the proceeds from the sale were placed back into FusionPharm. Jean-Pierre also knew the shares were transferred to the LaDeeDa company before going to Robert Dittman.

81. The debt consisting of Sears' loans to FusionPharm were not initially documented by promissory notes. However, Jean-Pierre knew that if FusionPharm was to be up-listed then the financials would be audited and the loans would have to be documented. Sears recalls this topic being brought up by Jean-Pierre and discussed at the meeting at the Rialto Café when Jean-Pierre was in Denver. The two entity split idea came up after the meeting and was proposed by Bodden.

82. Sears was shown an email dated 9/15/2011 concerning templates for note conversions. Sears recalls Jean-Pierre sending sample notes to him through email, but is not sure if it was this specific email. Sears was interested in the convertible feature of the notes. Sears had no explanation for the amount of time between the proposed templates in September 2011 and the notes being drafted and signed in June 2012.

83. During the dinner meeting at the Rialto Café, Jean-Pierre, Sears, and Dittman discussed up-listing FusionPharm, the associated financial audit, and how to document the loans. During a discussion of the stock strike price, Jean-Pierre proposed listing it at "par" but both Sears and Dittman said no. Jean-Pierre knew money had been previously given to the company and a promissory note was a way to document that. The notes were to be for a finite obligation and not an open line of credit. Sears said Jean-Pierre never prepared a promissory note that Sears signed for the loans.

84. Sears knew Nick Malino as a person who would purchase company debt, specifically notes convertible into stock. Sears was introduced to Malino by Bodden. Bodden put together a FusionPharm due diligence package for Malino to look at. During a conference call between Malino, Bodden and Sears, Malino asked a lot of questions concerning FusionPharm's OTC filings. After the one conference call and exchanging a few emails, Sears and Bodden met with Malino in New York to talk about the sale. Malino wanted the debt to be a convertible note but Sears and Bodden did not. The sale never went through. Jean-Pierre was aware that Sears and Bodden were attempting to sell the debt and knew it was split into two notes. From conversations with Bodden, Sears knew that Bodden was communicating with Jean-Pierre on drafting the notes. Sears said he had not been looking for anyone to purchase the debt prior to discussions with Malino. Sears said he talked to Jean-Pierre at some point about the note sale but did not recall a specific conversation.

85. Sears was shown a certificate of designation. Sears said that prior to the Malino deal, he did not know what a certificate of designation was until Bodden told him. Sears was not aware if one had been received from Dahlman so he asked the transfer agent, who said they did not have one. Sears then told Bodden and Jean-Pierre that the transfer agent did not have one and Jean–Pierre said one will need to be created. Bodden and Jean-Pierre then started the process of creating one with a 9.9% limit on the conversion of preferred stock.

BREAK - approximately 3:25 PM to approximately 3:45 PM.

86. Sears indicated the documents for the Malino deal were put together by Bodden and Jean-Pierre. Sears said he did not review the documents in detail at the time and is shocked reviewing them in detail during this interview. Sears was not aware all this documentation existed to the extent that was shown to him.

87. Sears was not able to recall why a Current Information Letter was not submitted in November 2012 for the reporting period ending September 30, 2012.

88. Sears was shown an email dated November 26, 2012 from Bodden to Sears concerning convertible notes. Sears indicated this was an attempt to bring the notes to market and get money for the company. Sears was could not recall the specific conversations leading up to Bodden sending the email with the notes.

89. Sears was shown documents for #12986 concerning 140,000 free trading shares. Sears said he signed these documents for Sandra Sears as Bayside. Jean-Pierre provided documents related to the backdated note that went to the transfer agent. Jean-Pierre knew the documents were going to the transfer agent.

90. Sears was shown an email dated 12/13/2012 from Jean-Pierre to DiTommaso. Sears identified the attachments on the email and said he traded emails with the transfer agent. Jean-Pierre was OK with the documents being sent to the transfer agent. Jean-Pierre told Sears that the 144 period started when the first money goes in.

91. In an email dated 12/26/2012 from Sears to Joanna DiBella, Sears used the term "righteous" in referencing the notes. The term was provided to him by Jean-Pierre.

92. Sears said he composed and sent emails to the transfer agents using Sandra Sears' emails. Sears said emails would have been sent from Sandra Sears' email address to the transfer agent with documents for by the transfer agent.

93. Sears did an initial conversion on the Bayside note due to Coleson's interest in the note. Sears knew that Coleson's interest in the note would garner interest from the market for stock. Jean-Pierre and DiTommaso did all the attorney letters for the Coleson deal as well as all other deals.

94. Sears forwarded emails from DiBella to Jean-Pierre regarding the initial conversion of the Bayside note. Sears would then have phone calls with Jean-Pierre who would provide lengthy explanations on why the transfer agent was incorrect. However, Jean-Pierre eventually modified the letter with DiTommaso to satisfy the transfer agent.

95. Sears looked at Jean-Pierre as the lawyer and Bodden as the bookkeeper. Bodden put together drawdown requests and worked with Jean-Pierre to draft documents. Sears relied on Jean-Pierre and Bodden for proper documents to give to the transfer agents.

96. Jean-Pierre never pointed out that the notes were prepared in two different ways. Sears would have stopped if he had been advised by Jean-Pierre that the documents were wrong. According to Sears, Jean-Pierre never pushed back or raised any issue with the notes or the changing of documents to meet transfer agent needs.

97. Coleson drove the paperwork changes concerning the purchase of the Bayside notes. Coleson would send them to Sears who would then send to Jean-Pierre to make the changes.

98. Sears said he drafted the email dated 1/17/2013 from Sandra Sears to DiBella with the subject of "Convertable [sic] Note" using Sandra Sears' email address. .

99. Sears was shown a series of documents that were sent through FedEx to and from the transfer agent. Sears noted that the transfer agent would have relied on an attorney letter drafted by Jean-Pierre and signed by DiTommaso as truthful in issuing the stock certificates. Sears said he sent and received the documents by FedEx.

100.      Sears was shown the FedEx receipt showing a record of him sending a packet to the transfer agent in Nevada on 7/25/2012 and another FedEx record showing him receiving a mailing from the transfer agent on 8/01/2012. Sears said he mailed a packet

of information to Pacific Stock Transfer Company by FedEx from Colorado to Las Vegas, NV for the conversion of 40,000 shares from Todd Abbott to Microcap. Sears indicated the packet contained, among many other things, an attorney letter drafted by Jean-Pierre and signed by DiTommaso used by the transfer agent to convert the certificate. Sears said he received the new certificate through FedEx at the Vine Street address in Denver, CO from the transfer agent in Nevada.

101.    Sears was shown a FedEx mailing record showing a packet addressed to him being mailed from the transfer agent on 1/18/2013 to Thornton, CO. Sears said he received the certificate for 140,000 shares in the name of Bayside Realty Holdings at his Jackson Drive address in Thornton, CO. Sears said he knows he received the certificate because he would have remembered if it had not arrived. Sears said this certificate would not have been issued had an attorney letter not been presented at some point to the transfer agent. According to Sears, Jean-Pierre would have drafted the letter and DiTommaso would have signed the letter.

102.    Sears was shown a FedEx mailing record showing a packet addressed to him being mailed from the transfer agent on 8/15/2013 to Brighton, CO. Sears said he received a certificate for 500,000 shares in the name of Meadpoint Ventures Partners at his UPS store box in Brighton, CO. Sears said he knows he received the certificate because he would have remembered if he hadn't. Sears said this certificate would also not have been issued had an attorney letter not been presented at some point to the transfer agent. According to Sears, Jean-Pierre would have drafted the letter and DiTommaso would have signed the letter.

103.    The interview concluded at approximately 5:00 PM.

Rob Barnett

U.S. Postal Inspector