FD-302 (Rev. 5-8-10)

318C-DN-2098327 Serial 78
-1 of 9-

FEDERAL BUREAU OF INVESTIGATION



Date of entry    11/07/2017

    William Sears, date of birth (DOB) May 13, 1966, was interviewed at the United States Attorney's Office (USAO) in Denver, Colorado.  In attendance were Assistant United States Attorney (AUSA) Kenneth Harmon, Assistant United States Attorney(AUSA) Jeremy Sibert, Federal Bureau of Investigation(FBI) Special Agent Kate Funk, United States Postal Inspector Services(USPIS) Robert Barnett,and defense attorney Fredric Winocur.  After being advised of the identity of the interviewers and the nature of the interview, Sears provided the following information:

    Sears stated that Guy Jean-Pierre knew that Sears was an affiliate of FusionPharm and that his affiliate status was not disclosed to investors.  Jean-Pierre wrote opinion letters stating that Sears was not an affiliate of FusionPharm.  Sears stated that there was an email exchange involving Jean-Pierre where Jean-Pierre requested to be paid approximately $2,000 per month along with FusionPharm stock.  This email was part of the emails related to Scott Dittman.  Jean-Pierre was constantly asking Sears for equity in FusionPharm because he wanted to be a part of the company.  Sears said that he had not spoken with Brenda Hamilton since his last disclosed contact with her.  He also had not spoken with Dittman recently.  Sears said that he had not been contacted by anyone else about the FusionPharm or Jean-Pierre cases.

    Sears reviewed the recording of a skype conversation created approximately October 1, 2015, between Sears and Jean-Pierre.  On the same day prior to the recording, Sears sent Jean-Pierre documentation from the transfer agent related to the transaction discussed in the video via e-mail.  Sears said that he produced this documentation to the Securities and Exchange Commission (SEC) as part of his subpoena return.  Sears believed that the documents provided both to the SEC and Jean-Pierre via email included an attorney opinion letter.  Sears believed that the attorney opinion letter referenced Fred Dahlman's lost stock certificate and did not include the signature of Leslie Dinwoodie.  He recalled speaking to Leslie Eldridge at Pacific Stock Transfer about this opinion

| | | |
|---|---|---|
| Investigation on | 10/16/2017 at | Denver, Colorado, United States (In Person) |
| File # | 318C-DN-2098327 | Date drafted  10/18/2017 |
| by | Kate E. Funk | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)   318C-DN-2098327 Serial 78

318C-DN-2098327
Continuation of FD-302 of  (U) Interview of William Sears  , On 10/16/2017 , Page 2 of 9

letter.  Sears said that every time there was a conversion for the same shares, the same opinion letter that was on file would be used.  He said this might explain the Dinwoodie opinion letter being used by Oppenheimer for multiple deposits of the FusionPharm shares in his Microcap brokerage account.  Sears said that Jean-Pierre wrote an opinion letter for Microcap's deposit of FusionPharm shares that were transferred from the original 185,000 preferred shares from Dahlman.  Sears believed all the opinion letters that he received from Jean-Pierre either had Dinwoodie or Tod DiTommaso's signature.  Sears reviewed a packet from Pacific Stock Transfer Company (PSTC) relating to certificate 1015 with bates numbers PST_00001515 through PST_00001526. Sears believed that the packet should have an attorney opinion letter because the transfer required a letter.


   Sears said that he paid Jean-Pierre occasionally after May 16, 2014, to keep him "on the hook" to include returning Sears' phone calls and providing Sears with any information requested even though Jean-Pierre had been fired.  Sears kept Jean-Pierre "on the hook" through their discussions about the company Vast.  Sears said the payments were not for any other deals that Sears and Jean-Pierre were working together.  Sears deposited checks directly into Jean-Pierre's bank account in the name "Jean-Pierre and Jean-Pierre" at Chase.  Sears wrote the checks from one of Sears company accounts to include Bayside, Microcap, and Meadpoint.  Sears estimated that each check was a few hundred dollars.  Sears said that he did not pay Jean-Pierre after meeting at the USAO in February, 2016.  Sears reviewed a number of checks from entities he controlled to Jean-Pierre with bates numbers GJP_00007591, GJP_00007529, GJP_00007537, and GJP_00007541.  Sears said that he paid Jean-Pierre via a check from S&W Solutions on approximately July 3, 2014, for $500.  Sears believed this had something to do with a deal for PharmPods and real estate that did not happen.  Sears paid Jean-Pierre from an account in the name Sandra L Sears on October 1, 2015 for $600 and from an account in the name Meadpoint on August 21, 2014 for $1,000.  He also paid him from a VF Management account on August 25, 2014 for $1,000.


   Sears would not have done anything that Jean-Pierre said was illegal.  Jean-Pierre never advised Sears not to do any business with Dittman due to Sears' affiliate status.

INV_00008227

FD-302a (Rev. 05-08-10)

318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of (U) Interview of William Sears ,On 10/16/2017 ,Page 3 of 9

   Sears said that Jean-Pierre had another client, believed to be female, in Texas or Florida that Jean-Pierre would visit in the United States. Sears reviewed an email dated September 16, 2014 from Jean-Pierre to Sears with bates number SWFBI_00000624. He believed this communication was linked to some sort of cannabis related company. Jean-Pierre was aware of the Federal search warrant on FusionPharm but was still trying to do deals with Sears and would occasionally present deals to Sears.

   When Sears was doing corporate communications for penny stock companies, he would send the company's press releases via e-mail to a proprietary database including brokers. The recipients of the email paid a subscription fee to Sears.

   Charles Cleland represented Sears in the friendly lawsuit executed to transfer JAGR shares to Sears. Sears was introduced to Cleland through broker David Adams. Sears did not know that Jean-Pierre was involved in the friendly lawsuit. Dale Williams was the other party to the friendly lawsuit. At the time of the lawsuit, Sears had used Jean-Pierre to write Attorney opinion letters to clear stock. He did not recall why he did not use Jean-Pierre to assist him with the friendly lawsuit. Sears brokered the deal for Green Street to acquire JAGR. He introduced Billy King to Cliffe Bodden.

   Sears reviewed the March 16, 2009, Consulting Agreement between Microcap Management and Baby Bee Bright with bates number SEC-DOJ-EPROD-000802791. Sears and Dahlman both signed the Consulting Agreement. The document was a standard consulting agreement used previously on other Microcap deals where Jean-Pierre was the attorney. Jean-Pierre provided Sears with standard templates for Sears' consulting agreements. Sometimes, Jean-Pierre would adjust and finalize these agreements for Sears. Neither Sears nor Dahlman created this document. Jean-Pierre talked to Dahlman on several occasions during the transition of Baby Bee Bright(BBYB) to FusionPharm to include one phone conversation between Sears, Dahlman and Jean-Pierre. Sears was not aware of Dahlman having his own attorney. Jean-Pierre liked to speak with people on the other end of deals to confirm they were real people. Per the agreement, Sears would be paid $140,000 in unrestricted stock, which was what he typically received in other deals, and $70,000 per month in unrestricted stock. Sears received his stock from Doug Sailors and Jamie

INV_00008228

FD-302a (Rev. 05-08-10)                     318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of  (U) Interview of William Sears          ,On  10/16/2017 ,Page  4 of 9

O'Bryan or through their company, FUM Management. Sailors worked for Dahlman. Jean-Pierre prepared the Attorney opinion letters related to Sears' BBYB stock, but Sears could not recall whose signature appeared on the letter. Sears paid Jean-Pierre for the opinion letters. Sears received 14 million shares of free trading BBYB stock pursuant to his consulting agreement and the debt settlement agreement. He deposited these shares into his Oppenheimer brokerage account with his broker, Scott Eisler. BBYB stock was very thinly traded. Issuers often hired Sears when their stock was thinly traded to help increase the volume through his public relations work. Sears' fees were structured to have a large upfront payment because of the low volume. Sears would sometimes outsource the public relations work to stock promoters that were paid in stock. He used the company, OTC Picks, to help with BBYB. Sears was able to sell 10 million of his BBYB shares using opinion letters he received from Jean-Pierre. Sears was not sure if Jean-Pierre actually signed these letters or just provided them to Sears.

   Sears communicated with Jean-Pierre via telephone, email and Skype. Their communication via Skype was mostly via a Skype call but they also used the instant message feature. Sears used the names trader5280, billysears66, and wjsears66. Jean-Pierre used several names to include elcommandante1, marcelodominguez, guyjeanpierre, donmarcusi and eldiablo.

   Sears reviewed the skype messages on September 1, 2010. Sears recognized them as messages between Sears and Jean-Pierre. Sears said that messages 32021 and 32024 were discussing Dahlman's resignation. They are referencing the BBYB shell company. Sears only took an interest in two shell companies: JAGR and BBYB. The Shareholder Termination agreement was for Andrew Cafferkey. Sears reviewed a copy of a Termination Agreement for Cafferkey with bates number FD_00000171 and stated that Jean-Pierre would have drafted the agreement because Sears did not have any templates for this type of document. It was part of the due diligence for BBYB shell. Sears met with Cafferkey in person to discuss the options Cafferkey had on the BBYB stock. Sears reviewed a document granting Sears Power of Attorney for BBYB with bates number PST_00004101 with Dahlman's resignation and said that Jean-Pierre would have prepared the letter.

   Sears reviewed bates range FD_00000172 through FD_00000177 relating to a Debt Settlement Agreement between Microcap and BBYB. The information in this agreement was shared with Jean-Pierre. This document was necessary

INV_00008229

Attachment 12
Page 4 of 9

FD-302a (Rev. 05-08-10)                     318C-DN-2098327 Serial 78

318C-DN-2098327
Continuation of FD-302 of  (U) Interview of William Sears                    , On  10/16/2017  , Page  5  of  9

to take over the shell company.  The number of shares reflected post
reverse split of the common stock which came out to $1 per share (350,000
shares and $350,000).  Sears said that there was a second agreement for
approximately $550,000.  The second agreement was created after Sears
became aware of outstanding BBYB bills that Dahlman had not disclosed to
Sears to include money owed to the transfer agent, the accountant, OTC
markets and to attorneys.  Sears said he paid less than $200,000 in bills
that Dahlman had not disclosed to him.  Sears reviewed bates number
FD_00000050.  Robert Taylor had an option or warrant for BBYB
stock.  Sears could not recall the background for the text "I have to give
you two hundred of mine to make the numbers work."  Sears said that he was
going to be involved in another company.


   Jean-Pierre prepared the BBYB Shareholder Written Consent Appointing
Dittman and Sandra Sears as Officers of FusionPharm with bates number
PST_00004102 for Sears and Sears sent to Dahlman.  Originally there was
only one person on the paperwork, but Jean-Pierre told Sears that they
needed two people, so Sears told Jean-Pierre to put his Mother's name,
Sandra Sears, on the paperwork.  Sears said that Bayside was in his
Mother's name, but Sears controlled Bayside.  Sandra Sears spoke with Jean-
Pierre in 2009 in order to get an opinion letter from him.  Sears
transferred some of his Microcap shares to Bayside but retained control of
the shares.  Sears would have told Jean-Pierre that he was going to be
involved in FusionPharm and that FusionPharm was going to be operating in
the marijuana industry.


   Sears reviewed bates number FD_00000136.  These financials were
prepared by Michael Kocinski with Dittman.  Sears forwarded them to
Dahlman.  Sears did not create this document.  Jean-Pierre would have
received this document.  The Other Assets on the financials included
BBYB's inventory of fetal monitors.  The Accounts Payable of $98,579.86
was not for money owed to Sears.


   The emails back and forth between Sears and Dahlman regarding the
preferred share distribution were negotiations between Sears and
Dahlman.  Jean-Pierre was blind copied on these emails.  Sears and Jean-
Pierre decided on the number of BBYB shares that went to Microcap.  Sears
did not want to go over 10% of the outstanding stock because that would
restrict the stock which would subject Sears to volume limits (trickle
rule).  Jean-Pierre advised Sears on this rule.  Jean-Pierre was aware

INV_00008230

FD-302a (Rev. 05-08-10)   318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of (U) Interview of William Sears , On 10/16/2017 , Page 6 of 9

that the preferred stock could be converted to common stock at a ratio of one hundred shares of common stock for each share of preferred stock. Dittman and Robert Dittman decided where they wanted their stock. Jean-Pierre was aware that if Dahlman transferred the 350,000 shares to Microcap immediately after the split, it would take Sears over 10% of the outstanding common stock. Jean-Pierre worked closely with the transfer agent throughout the process of transferring the preferred shares. Jean-Pierre knew there was going to be a 200-1 reverse split of the common shares. He also knew that Sears was going to be getting 185,000 preferred shares of FusionPharm. Sears could have control of these shares while they were in his possession. Sears was owed 350,000 shares of common stock from the 185,000 preferred shares that he received. Sears planned to draw down these shares over time keeping him under the 10% rule. Sears reviewed an email dated February 15, 2011 with bates number PST_00007071 stating the Jean-Pierre was handling the reverse. He said that at the time the letter went out for Dahlman to send to the transfer agent, Jean-Pierre and Sears both knew that the stock was going to do a 200-1 reverse split. Sears reviewed bates number PST_00007111, an email from Joanna DiBella advising Sears and Dahlman to wait 90 days before transferring the preferred shares to Microcap. Sears recalled receiving the email and followed the advice of DiBella. He would have confirmed this 90 day period with Jean-Pierre.

Sears reviewed an email dated February 16, 2011, where a PSTC representative said that Sears was taking over Baby Bee Bright with bates number PST_00007098. Sears said that Belmont was owned by Joe Meuse, the same owner as Pacific Stock Transfer Company. They were concerned about the viability of the company going forward. Sears did not recall talking about taking over BBYB. Sears was cleaning up BBYB. Sears did not come up with the name FusionPharm. Sears reviewed an email where Jean-Pierre was requesting incorporation dates of Baby Bee Bright with bates number FD_00000143. Sears forwarded this email to Dahlman from his iPhone. Sears discovered that Jean-Pierre worked with Sequoia, a previous business name for BBBYB, from Billy King. This came up when dealing with a Green Street capital issue. Sears reviewed an email date March 14, 2011 from Sears to Bodden attaching a draft letter to the Florida Bar Association with bates number SWIRS_00011887 and SWIRS_00011888. Sears sent this email to Bodden. The attachment to the email came from Jean-Pierre and was drafted by Jean-Pierre. Jean-Pierre told Sears that it was a recommendation that he needed Bodden to sign, but they did not discuss the contents of the letter. Sears knew that it was in connection to a bar complaint filed in Florida on Jean-Pierre. Sears reviewed Dittman's letter to the Florida Bar with bates number GJP_00001956 through

INV_00008231

FD-302a (Rev. 05-08-10)

318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of (U) Interview of William Sears, On 10/16/2017, Page 7 of 9

GJP_00002843. Sears did not recall ever seeing this letter before the interview. Sears said that it was Jean-Pierre's idea to have DiTommaso signing the opinion letters. Sears did not know why he no longer used Dinwoodie.

Sears did not recall ever discussing with anyone that the preferred shares should also be split along with the common.

*ADMINISTRATIVE NOTE: We concluded our interview at 5:10 pm on Monday, October 16, 2017, and reconvened on Tuesday, October 17, 2017.*

Sears reviewed the Skype messages between Sears and Jean-Pierre in September, 2010. Sears was going to give Jean-Pierre JAGR shares as payment for work that Jean-Pierre did for Sears because Sears did not have any cash. Sears needed the name for the stock certificates. Sears did not end up providing the discussed shares.

Sears said that he was entitled to $350,000 worth of FusionPharm stock as a result of the Debt Settlement Agreement. He said that the actual number of shares may have fluctuated based on the stock price. Sears said that there were one or two later versions of the Debt Settlement Agreement that was sent to brokers. Dahlman signed three different versions of the Debt Settlement Agreement. The remainder of the 185,000 shares, after the Debt Settlement Agreement was paid, was to be transferred to Robert Dittman. Sears shared the terms of every version of the Debt Settlement Agreement with Jean-Pierre. Sears reviewed the Debt Settlement Agreement between Microcap and LaDeDaa for 700,000 shares with bates number SEC_DOJ-EPROD-000802785 through SEC_DOJ-EPROD_000802788. Sears said that this document was created by Jean-Pierre and Sears and was a newer version of the Debt Settlement Agreement although it was backdated to 2010. The newer version was necessary because the preferred shares had been transferred to LaDeeDa, a limited liability corporation in Sears' wife's name. The preferred shares were eventually going to be held by Robert Dittman when he took over LaDeeDa. Robert Dittman did not want the preferred shares in his name. Around this time, Robert Dittman had some substance abuse and drinking problems. He was also having some health issues including seizures. The new version was created so that the debt owed to Sears would follow the stock. Jean-Pierre added language to the revised agreement to allow Sears to draw down on the debt in tranches in

INV_00008232

FD-302a (Rev. 05-08-10)         318C-DN-2098327 Serial 78

318C-DN-2098327
Continuation of FD-302 of (U) Interview of William Sears , On 10/16/2017 , Page 8 of 9

order to keep him under 10% of the outstanding common stock. The new document was created for the transfer agent and brokers. Sears main contact at Pacific Stock Transfer Company for this transaction was Joanna DiBella and Mikki McGee. Sears had discussed why he received free-trading stock with Jean-Pierre. Sears and Jean-Pierre discussed the problem with the original Debt Settlement Agreement because Sears did not want all the stock in his name because it would have made him an affiliate. When Sears reviewed the preferred stock certificate for 185,000 shares assigned to Microcap, he discussed with Jean-Pierre the fact that the stock certificate was stamped control stock. Jean-Pierre suggested transferring the stock to LaDeeDa since it was going to eventually be taken over by Robert Dittman. Jean-Pierre modified the original Debt Settlement Agreement and then e-mailed the new version to Sears. Jean-Pierre knew that LaDeeDa was Sears' wife's old skincare company. Jean-Pierre added language into the second agreement reflecting that the debt followed the stock. The date on the second agreement was not updated to reflect the actual date the agreement was modified because Jean-Pierre said that letter needed to reflect the original agreement. The number of shares changed from 350,000 to 700,000 because of the change in the stock price. Sears said that the market conditions went from $1 per share to $0.50 per share. Sears signed this second agreement. He did not know who signed the name Sandra Sears. He said that it did not look like his wife's signature.

   Sears reviewed bates number RS_00000411 through RS_00000423 including a third version of the debt settlement agreement now for 875,000 shares. The goal of this third agreement was for Sears to get more stock and capital. It was not related to the $350,000 of debt owed to him from Dahlman. Jean-Pierre created this third version in 2012 after speaking with Sears. It was Jean-Pierre's idea to increase the number of shares. Jean-Pierre changed the number of shares from 700,000 to 875,000. This version still had Dahlman's signature and did not include the language to draw down the stock in tranches. Sears thought that was likely because Jean-Pierre modified the first version, rather than the second version, to create the third version. Sears drafted the letter to Tina Marini at Moors & Cabot. Sears said that the Debt Settlement Agreement should have included Robert Dittman's signature and not Dahlman's. Sears said that Jean-Pierre drafted a debt settlement agreement with Robert Dittman's name. Dahlman and Robert Dittman did not owe Sears any money. Jean-Pierre was aware that the revised agreement was not based on any existing debt. Sears controlled the shares in Robert

FD-302a (Rev. 05-08-10)

318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of (U) Interview of William Sears , On 10/16/2017 , Page 9 of 9

Dittman's name for a period of time.  Sears could ask Robert Dittman at any point in time for shares and Robert Dittman would give him the shares with no questions asked.

INV_00008234