*#'16-CR-00301 WJM*

**UNITED STATES OF AMERICA**

v

**WILLIAM J SEARS**

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2020 JAN 30  PM 1: 17

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

## MOTION FOR DISMISSAL OF CHARGES WITH PREJUDICE
## FOR LACK OF JURISDICTION

**HERE COMES TO**

The defendant, William J. Sears comes before the court on his own behalf after he realized that any and all of the legal counsel and legal advice he has trusted since before this case started has provided less than adequate representation for him. As such this has made it necessary for him to present this motion pro se in order so that justice might finally be served in this case filed against him. No agency of the United States should be allowed to operate outside the laws and regulations that grant them their power. Just as no government employee should be allowed to violate the laws they have been hired to enforce under the guise of enforcement. This is unless the government expects the citizens in the country to resort to the behavior that exists in a lawless society. The rules of law must apply equally to everyone including those who work within the government. There are only minor exceptions and this cannot be negotiable as it seems to be the situation in this case. When the federal prosecutors entered into a plea agreement which was based on an investigation that violated federal regulations whereby rendering the investigation the product of perjury. Thus the failure by the prosecution to disclose this fact makes the plea agreement made in this case the product of government misconduct. Ultimately rendering it invalid and making the charges in this case invalid which then requires this case be dismissed with prejudice.

## BACKGROUND

On May 16, 2014 the federal government exercised a search warrant on the FusionPharm warehouse. On that same day Kate Funk of the FBI exercised a search warrant to Mr. Sears bank account, brokerage account and family trusts. Then approximately 6 months later on November 28, 2014, a warrant was exercised on the email and web hosting companies for FusionPharm and Mr. Sears' personal email accounts. Please note just like Fred Lehrer's FBI 302 the warrant for Mr. Sears bank records, brokerage accounts and family trust have never been seen by the defendants!

Then on September 16, 2016 nearly 3 years after this investigation started, the prosecution filed charges against the defendant by information.

## I. ELEMENTS TO WITHDRAW PLEA

The Defendant essentially will argue his plea is constitutionally infirm for two distinct reasons: (1) The prosecution's Funk's underlying pre-plea misconduct rendered his plea involuntary under Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); and (2) the government failed to meet its evidentiary disclosure obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In Brady it was argued that:

> "[A] guilty plea is a grave and solemn act to be accepted only with care and discernment[.]" Brady v. United States, 397 U.S. at 748, 90 S.Ct. 1463.

> When a defendant pleads guilty, he forgoes not only a fair trial, but also other accompanying constitutional guarantees. 628, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002).

> Thus, a guilty plea "not only must be voluntary but must be a knowing, intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. at 748, 90 S.Ct. 1463.

It is axiomatic that, "to be constitutionally valid, a plea of guilty must be knowingly and voluntarily made." United States v. Brown, 117 F.3d 471, 473 (11th Cir.1997). And " a guilty plea is not knowingly and voluntarily made when the defendant has been misinformed" as to a crucial aspect of his case.

While AUSA attempts to equate the discovery by the defendant with regards to the United States v. Ruiz, 536 U.S. At 630 122 S.Ct. 2450 where it states, "Nevertheless the Constitution "permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." And" Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted." Brady v. United States, 397 U.S. at 756, 90 S.Ct. 1463. Ruiz, 536 U.S. at 630, 122 S.Ct. 2450

However, this is not where the defendant is seeking to withdraw his plea "merely because he discovers[ed] long after the plea had been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action." Brady v. United States, 397 U.S. at 757, 90 S.Ct. 1463.

Rather, Defendant's misapprehension stems from an affirmative government misrepresentation that strikes at the integrity of the prosecution as a whole. Only when the defendant's misapprehension of the strength of the government's case results from some particularly pernicious form of impermissible conduct that due process concerns are implicated, should a plea be vacated. To have a plea vacated, in addition to showing impermissible government conduct, Defendant must show that the misconduct induced him to plead guilty. Brady v. United States, 397 U.S. at 755, 90 S.Ct. 1463. In other words, Defendant must show a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial.

## II. SECURITIES FRAUD FINANCIAL INVESTIGATION

The SEC press releases regarding the halted trading of FusionPharm stock states, "The Commission temporarily suspended trading in the securities of FusionPharm due to a lack of current and accurate information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition. This order was entered pursuant to Section 12(k) of the Exchange Act." See Exhibit A and B

The defendant now asserts and will show that the DOJ and FBI were aware or should have been aware of the fact that Special Agent Funk provided false information regarding her qualifications. For instance the year she graduated, the fact her degree was in business not accounting and the year she received her Kansas State certificate. Instead she was using the title Certified Public Accountant to misrepresent her professional licensing status required under federal regulations required for the forensic financial investigations that are required in securities fraud cases.

## III. QUALIFICATIONS TO PERFORM A SECURITIES FRAUD FINANCIAL INVESTIGATION

This investigation requires that the regulations of the Commission apply as this was a referral and a parallel investigation. It fully relied on the financial investigation by Special Agent Kate Funk who failed to meet the requirements of practice to transact business with the Commission. As such the Commission failed to insure the qualifications of the person they provided confidential financial information to regarding

Mr. Sears including his personal, business and trading accounts which is in violation of the Commissions own regulatory requirements. The defendant calls the courts attention to the following;

17 CFR § 201.102 - Appearance and practice before the Commission

(f) Practice defined. For the purposes of these Rules of Practice, practicing before the Commission shall include, but shall not be limited to:

(1)    Transacting any business with the Commission; and

(2)    The preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert.

17 CFR § 210.2-01 Qualifications of accountants.

(a) The Commission will not recognize any person as a certified public accountant who is not duly registered and in good standing as such under the laws of the place of his residence or principal office. The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.

Under the definitions section this shows that the definitions of this section apply to licensing requirements under the following;

17 CFR § 201.101 - Definitions.

(4) Enforcement proceeding means an action, initiated by an order instituting proceedings, held for the purpose of determining whether or not a person is about to violate, has violated, has caused a violation of, or has aided or abetted a violation of any statute or rule administered by the Commission, or whether to impose a sanction as defined in Section 551(10) of the Administrative Procedure Act, 5 U.S.C. 551(10);

Under the Administrative Procedure Act 5 U.S. Code § 551. Definitions as it relates to this investigation and licensing it applies by definition to

For the purpose of this subchapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;
(B) the courts of the United States;
(C) the governments of the territories or possessions of the United States;
(D) the government of the District of Columbia;

And it applies to any agency that holds the power over a person's freedom which is shown in the Administrative Procedure Act 5 U.S. Code § 551(10)

(10) "sanction" includes the whole or a part of an agency—
(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;
(B) withholding of relief;
(C) imposition of penalty or fine;
(D) destruction, taking, seizure, or withholding of property;
(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;
(F) requirement, revocation, or suspension of a license; or
(G) taking other compulsory or restrictive action;

Under the code of federal regulations contained in 17 CFR Part 210 which is used to define an accountant's report

§ 210.1-02(a)(1) Accountant's report. The term accountant's report is "used in regard to financial statements, means a document in which an independent public or certified public accountant indicates the scope of the audit (or examination) which he has made and sets forth his opinion regarding the financial statements taken as a whole, or an assertion to the effect that an overall opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor shall be stated."

## V. IMPERMISSIBLE GOVERNMENT CONDUCTING UNQUALIFIED INVESTIGATOR

The defendant has discovered impermissible misconduct on the part of Special Agent Kate Funk, who is the sole source of evidence relied on by the courts in rendering its probable cause determinations in this case. This investigation was the basis for the asset forfeiture that Funk claimed FusionPharm to be a Ponzi scheme, which was proven not

to be the case in Funk's own investigation. The government never disclosed the fact that Special Agent Funk provided perjured testimony when she attested to the information contained in her sworn affidavits.

In Special Agent Kate Funk's sworn affidavit in support of search warrant dated May 15, 2014, whereby in Paragraph 1 on Page 1, Special Agent Funk stated under oath,

"I became a Certified Public Accountant in 1996 through the state of Kansas." See Exhibit C

She then repeats this claim again in the second sworn affidavit in support of search warrant dated November 28, 2014, in Paragraph 1 on Page 1, Special Agent Funk whereby again, she states under oath,

"I became a Certified Public Accountant in 1996 through the state of Kansas." See Exhibit D

It is important to note that nowhere in the either of these two documents does Special Agent Funk use the initials CPA behind or after her last name, as was claimed by AUSA Sibert in his response to the defendant's motion to withdraw his plea previously

filed on April 19, 2019.

After reviewing the Kansas Board of Accountancy website, it was discovered that Kansas does not comply with the requirements of the Uniform Accountancy Act (UAA), as it requires a two-tiered regulatory standard for the licensing of Certified Public Accountants, which was basically abolished under the UAA. Prior to the passage of the UAA, most states had the two tiered (Exhibit) regulatory requirements for the licensing of Certified Public Accountants. This required being issued a certificate and a license in order to meet the regulatory licensing requirements. However, after it was discovered that many holding only a certificate but did not complete the requirements to be legally licensed were falsely claiming to be Certified Public Accountants. All the while providing services to individuals, businesses, academia and government and falsely claiming to be licensed when they were not. It was these violations that led to the passage of the UAA in order to be established. See Exhibit

A Kansas issued certificate is not a license, as it is issued prior to meeting the regulatory standards for licensing. Because it is not a license and the reason, the Kansas issued certificate is not valid without also obtaining a valid permit (license). This is plainly stated on the Kansas Board of Accountancy [3] website. See Exhibit

A search of the Kansas Board of Accountancy website found no listing for Kate Funk being issued license as a Certified Public Accountant in Kansas. A wild card

attempt was made using the first name Kate and there was a single name that was returned, Kate Egan. While the information did not match what Funk stated in her sworn affidavit, a public record check verified Egan was in fact Special Agent Funk's maiden name. It was then learned that Egan aka Funk did not hold the permit required under Kansas law to claim to be a Certified Public Accountant, as she only held the certificate but not the required license (or permit) required by regulation to use the professional credentials of Certified Public Accountant. The Kansas issued certificate is not a standalone license as it is under the standards for the UAA. Exhibit E

The NASBA website Verify PA, is an excellent source of information which explains the Kansas issued certificate is not a license under the regulatory requirements established for the licensing of Certified Public Accountants. It also addresses the legal limitations imposed on those who hold only a Kansas issued certificate, a review of the information regarding Kate Egan is included here. Exhibit F

On April 19, 2019, the same day the defendant's counsel filed the motion to withdraw his plea for various reasons that were not addressed properly and the reason why it is necessary for Mr. Sears to represent himself here now. It was noticed the same day of that filing Special Agent Funk changed her name on her Kansas issued certificate. While Funk had not changed her name legally after she was married in 2009, it seems a bit odd that she would choose that specific day to make that change. However her name has nothing to do with the legal reason why she is not a Certified Public Accountant, although it does confirm the fact that Special Agent Funk and Kate Egan were the same person who holds the Kansas issued certificate #8757. Exhibit G

[1]   AICPA (https://www.aicpa.org)
[2]   NASBA (https://www.nasba.org)
(3)   Kansas Board of Accountancy (http://www.ksboa.org/applyCertificate.htm)

## VI. OTHER INACCURATE INFORMATION

It was also discovered that Special Agent Funk provided inaccurate information regarding several items contained in Paragraph 1 on Page 1 of her sworn affidavits. This includes the year she was issued a certificate which according to the Kansas Board of Accountancy website[4] Egan was not issued a certificate in 1996 instead Egan was issued a certificate in August 1999. According to the Kansas University Alumni Association website [5] it indicates Egan did not graduate from Kansas University in 1995 but instead it indicates Egan graduated from Kansas University in 1996. The Alumni Association also shows Kansas University did not offer a bachelor's degree in Accounting, therefor Egan cannot have a degree in Accounting as she states. It does however show that she earned a degree in Business. While accounting does include business, that does not mean business is accounting, so the difference can be substantial. This also means that she is not eligible for any exempts for licensing that occurred in

Kansas in 1996, as there are no 'grandfathered' exceptions applicable in 1999. However, this does however indicate a very disturbing pattern of deceptive pattern of behavior on the part of Special Agent Funk and calls into question the hiring practices of the FBI and the DOJ which is responsible for supervising the hiring of the FBI. See Exhibits H and I

The defendant wishes to call attention to the Kansas Laws of Accountancy requires Certified Public Accountants must possess both the Kansas issued certificate and permit to practice prior to holding out to be a Certified Public Accountant or to practice as such before the courts, this fact is clearly addressed under the laws governing the licensing of Certified Public Accountants in Kansas. (KS Stat § 1-316(a) (2012)) See Exhibit J

Special Agent Funk has violated the statues and regulations governing the licensing and practice of Certified Public Accountancy in Colorado and every State in the United States, including Kansas by claiming to be a Certified Public Accountant, which she is not because she does not hold the required permit which is a license in Kansas. See Exhibit K

As the Kansas issued certificate is provided prior to the license (permit) is issued, this means the Kansas issued certificate holds absolutely no meaning outside of Kansas nor does it provide the holder the ability to use the professional designation in legal proceedings. Doing such provides the false status of being a financial expert which comes with the commitment required to be a licensed and practicing Certified Public Accountant. This case was handed to the FBI by the SEC. Now let us keep in mind the SEC's requirements to be recognized as a Certified Public Accountant.

**The Securities and Exchange Commission Federal Regulations under: 17 CFR § 210.2-01 - Qualifications of accountants**

*(a) The Commission will not recognize any person as a certified public accountant who is not duly registered and in good standing as such under the laws of the place of his residence or principal office. The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.*

*(b) The Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement. In determining whether an accountant is independent, the Commission will consider all relevant circumstances, including all relationships between the accountant and the audit client, and not just those relating to reports filed.*

[4]  Kansas Board of Accountancy (http://www.ksboa.org/applyCertificate.htm)
[5]  Kansas University Alumni Association

https://securelb.imodules.com/s/1312/alumni/index.aspx?sid=1312&gid=2&pgid=8&cid=46

A person is a "statutory" resident of Colorado if the person maintains a permanent place of abode in Colorado and spends, in aggregate, more than six months in Colorado. For a more complete discussion of domicile and statutory residency. See Department Regulation 39-22-103(8)(A).

As such the laws of Colorado require residents who are licensed by a regulatory agency in another state must apply for licensing in Colorado after becoming a resident. As such Special Agent Funk was required to apply for licensing as a Certified Public Accountant in 2011 after she became a resident. This is regulated by the Colorado Code of Regulations governing the licensing and practice of Certified Public Accountants under 3 CCR 705-1 – 1.5 Requirements for Certification – (E.) Reciprocity Requirements states, "An applicant who holds a certificate or license issued by another state based upon passage of the examination but who does not hold a certificate or license to practice is not eligible for reciprocity through that certificate or license." As such this means Special Agent Funk does not meet the requirements to obtain a license by reciprocity in Colorado and as such she cannot legally hold out as being a Certified Public Accountant in proceedings conducted in the State of Colorado and there is nothing that excludes a federal agent who resides in Colorado from meeting these legal requirements for licensing and practice within the state.

## VII.  FORENSIC ACCOUNTING EXPLANATION

The defendant wishes to introduce the definition and explanation regarding forensic accounting as was found on the Investopedia website which is operated with permission by the SEC, the explanation of meaning of forensic accounting investigation [6] is explained it detail below:

What is Forensic Accounting?
Forensic accounting utilizes accounting, auditing and investigative skills to conduct an examination into the finances of an individual or business. Forensic accounting provides an accounting analysis suitable to be used in legal proceedings. Forensic accountants are trained to look beyond the numbers and deal with the business reality of a situation. Forensic accounting is frequently used in fraud and embezzlement cases to explain the nature of a financial crime in court.

---

[6] Investopedia

(https://www.investopedia.com/terms/f/forensicaccounting.asp)
Understanding Forensic Accounting

Forensic accountants analyze, interpret and summarize complex financial and business matters. They may be employed by insurance companies, banks, police forces, government agencies or public accounting firms. Forensic accountants compile financial evidence, develop computer applications to manage the information collected and communicate their findings in the form of reports or presentations.

Forensic Accounting for Criminal Investigation

Forensic accounting is also used to discover whether a crime occurred and assess the likelihood of criminal intent. Such crimes may include employee theft, securities fraud, falsification of financial statement information, identify theft or insurance fraud. Forensic accounting is often brought to bear in complex and high-profile financial crimes. The reason we understand the nature of Bernie Madoff's Ponzi scheme today is because forensic accountants dissected the scheme and made it understandable for the court case.

Defining Financial Forensics

Financial forensics is a field that combines criminal investigation skills with financial auditing skills to identify criminal financial activity coming from within or outside of an organization. Financial forensics may be used in prevention, detection, and recovery activities to investigate terrorism and other criminal activity, provide oversight to private-sector and government organizations, and assess organizations' vulnerability to fraudulent activities. In the world of investments, financial forensics experts look for companies to short or try to win whistleblower awards.

This fact that this was a forensic financial investigation was even admitted to by Special Agent Funk in her sworn affidavits on Page 5 in Paragraph 12, whereby Funk says:

"*Your affiant thereafter reviewed and has been reviewing the SEC Produced Records on an ongoing basis. Additionally, your affiant was made privy to SEC analyses of the Bank Records, Brokerage Records and Transfer Agent Records*

*(collectively "SEC Analyses") and has reviewed the same on an ongoing basis.*"

According to the FBI's own website under the position of Forensic Accountant [8] it states the following:

"FOLLOW THE MONEY TRAILS OF CRIMINAL ACTIVITY AND NATIONAL SECURITY MATTERS"

Because in the Affidavit in Support of Search Warrant prepared by Special Agent Kate Funk she referenced auditing standards accepted by the SEC and the United States of American with her references to violations of GAAP. This means she created a report and as such this requires she must be a Certified Public Accountant, as she not only claimed a violation of GAAP but she then attempted to track financial transactions between accounts in order to determine actual company earnings. This requires the services of a Certified Public Accountant in order to legally attest to those sworn opinions before the court.  Under the laws in Kansas,

*"It is unlawful for any person, except the holder of a Kansas permit to practice, to issue a report with regard to any attest or compilation service under standards adopted by the board. A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board."* Keeping in mind she's not in Kansas Anymore. (KS Stat § 1-316(e) (2012)) Exhibit Highlighted Pages

Additionally, under KS Stat § 1-321. Definitions – it defines "Report" as follows:

*"When used with reference to any attest or compilation service, means an opinion, report or other form of language that states or implies assurance as to the reliability of the attested information or compiled financial statements and that also includes or is accompanied by any statement or implication that the person or firm issuing it has special knowledge or competence in accounting or auditing. Such a statement or implication of special knowledge or competence may arise from use, by the issuer of the report, of names or titles indicating that the person or firm is an accountant or auditor or from the language of the report itself. The term report includes any form of language which disclaims an opinion when such form of language is conventionally understood to imply any positive assurance as to the reliability of the attested information or compiled financial statements referred to or special competence on the part of the person or firm issuing such language; and it includes any other form of language that is*

*conventionally understood to imply such assurance or such special knowledge or competence."*

8)  FBI Forensic Accountant
https://www.fbijobs.gov/career-paths/forensic-accountant

## VIII.  RELIVANCE TO THIS CASE

As the affidavits in support of search warrants prepared by Special Agent Funk were provided to the court through the use of telephonic equipment the requirements under the federal rules of criminal procedure apply.  Under section 4.1(b)(2)(A) requires the affiant must attest to information contained in the written affidavit. Which has occurred in this case, as such the requirements under the rules of public accountancy that requires only a certified public accountant can attest to information contained in a financial report.  As such this means the information attested to before the judge magistrates in this case was perjury as Special Agent Funk knowingly provided false testimony under oath.

In law, an attestation is a declaration by a witness that a legal document was properly signed in the presence of the witness. Essentially, it confirms that a document is valid. In finance, an attestation service is a Certified Public Accountants declaration that the numbers are accurate and reliable. As the service is completed by an independent party, it validates or invalidates in this case the financial information prepared by internal accountants.

Title 41 Search and Seizure d.  Obtaining a warrant (2) The applicant must orally state facts sufficient to satisfy the probable cause requirement for the issuance of the search warrant. (See subdivision (c)(1).) This information may come from either the applicant federal law enforcement officer or the attorney for the government or a witness willing to make an oral statement. The oral testimony must be recorded at this time so that the transcribed affidavit will provide an adequate basis for determining the sufficiency of the evidence if that issue should later arise. See Kipperman. Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Avalere. 825 (1971).

Testimony provided in the form of opinion must be grounded in an accepted body of learning or experience in that particular field, and the witness must explain how the conclusion is so grounded.  See, e.g., American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after Daubert, 157 F.R.D. 571, 579 (1994) ("[W]hither the testimony concerns economic principles, accounting standards, property valuation or other non-scientific subjects, it should be

evaluated by reference to the 'knowledge and experience' of that particular field.").

As Special Agent Funk attested before the courts in three sworn affidavits (keeping in mind Mr. Sears nor his lawyers have ever seen the warrant for the bank accounts and brokerage accounts of his family's trust.) which she testified under oath were truthful. That means she represented herself as a Certified Public Accountant. This means she was an expert capable of performing the services of the financial investigation of the publicly traded company and the transactions regarding money involved with that company.   This she confirmed with the implied insurances of her knowledge, training and experience a total of 47 times in these affidavits.  As the courts relied on this information as evidence to support probable cause of her claims, the fact that this was perjury means it was material to this case and required disclosure to the defendant prior to entering into the plea agreement.

## IX. SHOWING PATTERN OF MISCONDUCT

This is not the only incidence of misconduct by Special Agent Funk that could be construed as unlawful, as on October 13, 2009, Special Agent Funk aka Kate Egan married then United States Assistant Lead Prosecutor for the United States Department of Justice, AUSA T Markus Funk.  As such when Special Agent Kate Funk, decided to accept a position of employment with the FBI while her husband the esteemed Mr. Funk was still employed by the DOJ (while still using her maiden name). As such by Special Agent Funk accepting the position with the FBI, she violated federal regulations and code in doing such. Exhibit

After which Special Agent Kate Funk accepted employment within the FBI, in violation of the following federal regulations:

(a) 5 U.S. Code (USC), § 3110, Employment of Relatives;
    Restrictions
(b) 5 Code of Federal Regulations (CFR) § 310, Employment of
    Relatives
(c) 5 CFR § 2635, Standards of Ethical Conduct for Employees of
    the Executive Branch; Subparts D, E, G,
(d) 5 USC § 2302, Prohibited Personnel Practices
(e) Executive Order 11222, Prescribing Standards of Ethical
    Conduct for Government Officers and Employees, May 8, 1965
(f) 5 CFR § 735, Employee Responsibilities and Conduct

This situation extends beyond just a minor violation of federal regulation by an employee holding a position of trust within the government.  This matter involves numerous violations of federal regulation by two executive level employees within the

Department of Justice who swore to uphold and defend the Constitution of the United States and are responsible for national security. As such this makes the fact that they were willing to violate the laws in order for one of them to obtain a position enforcing the law, suspect. Clearly this relates to the credibility of this government agent and the integrity of this investigation and the fact that Special Agent Kate Funk was the sole source of evidence provided to the court makes this discovery material in this case.

## X. GOVERNMENT AWARE OF MISCONDUCT

Special Agent Kate Funk was required to obtain and pass a mandatory 10 year background investigation[7] in order to obtain the top secret security clearance required of all FBI Special Agents. This information was readily available to the Department of Justice, FBI and SEC, all of which were actively involved in the investigation and prosecution of this case, as such this information regarding the violations of federal regulation that were involved in the hiring of Special Agent Kate Funk. Exhibit

The fact Special Agent Funk had no law enforcement experience prior to working for the FBI and she had never been involved in a white collar securities fraud investigation prior her assignment as the lead investigator in this case, as such there is nothing to support the fact that Special Agent Funk is an expert in these proceedings. As is shown in the court decision in the 5th circuit where the decision of that court was, *"The government used an FDIC investigator as an expert in the area of mortgage fraud. Though the agent had some training in fraud investigation, he had no specialized training in the area of mortgage fraud and had never previously testified as an expert in this field."* United States v. Cooks, 589 F.3d 173 (5th Cir. 2009) AUSA Jeremy Siebert also attests to the fact that Special Agent Funk is not an expert in his response to Mr. Sears' motion to withdraw his plea.

As this entire case rested on the misrepresentations provided by Special Agent Funk as to the inadmissible hearsay statements provided by the confidential witness which she knew was not only unreliable but were false to form the legal basis for her investigation and the fact that she based the opinions she provided to the courts as evidence in this case, makes this information exculpatory in nature and as such it should have been disclosed to the defense. The facts upon which a witness relies for her opinion is discoverable and must be disclosed to the other party. See Dickinson-Tidewater, Inc. v. Supervisor of Assessments, 273 Md. 245 (Md. 1974). The trier of fact should be disregarded if it is found to be unreasonable or not adequately supported by the facts upon which the opinion is based. Clark v. State ex rel. Wyoming Workers' Safety & Compensation Div. (In re Clark), 934 P.2d 1269 (Wyo. 1997).

As the court relied on evidence in the form of inadmissible hearsay and the opinions held by Special Agent Funk which were derived from such this qualifies as

expert testimony in this case and as Special Agent Funk is not an expert this violates the federal rules of evidence 701 and 702-705. As Special Agent Funk was allowed to testify before the court supplying opinions that were not based on first hand observation into the matters claimed by Special Agent Funk, the court must take into consideration any Sixth Amendment Confrontation Clause concerns whenever the prosecution intends to call an expert to offer his or her opinion. *"Though an expert may generally rely on inadmissible evidence in reaching a conclusion, including hearsay, that rule assumes that an expert will carefully analyze the basis of his opinion..."* Howard v. Walker, 406 F.3d 114 (2d Cir. 2005)

## XI. WHISTLEBLOWER PROVEN UNRELIABLE

So, the fact that Special Agent Funk's entire investigation was based on the securities fraud investigation which was based on the false statements provided by the confidential witness, where he claims that FusionPharm was a Ponzi scheme, as is shown in Special Agent Funk's affidavit, in paragraph 8 pages 2 and 3, Funk states:

*"The genesis of the SEC's investigation involved a complaint filed by Cooperating Witness 1 (hereinafter referred to as "CW-1"), a former FusionPharm employee. In the complaint, CW-1 suspected that FusionPharm was operating as a "Ponzi" investment fraud. Although FusionPharm publicly claimed via press releases and quarterly and annual disclosures to develop, produce and sell refurbished shipping containers called "Pharm Pods" to cannabis and organic produce grow operations, CW-1 stated that the company had not made any legitimate product sales during his time with the company."*

Then in Special Agent Funk's own investigation, it was proven this information was false, in footnote 8 on page 28, whereby Funk states:

*"As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company. CW-1 has revised that statement to match the sales highlighted in ¶58. "*

To further support this claim the following is provided from Special Agent Funks affidavit whereby in paragraph 58 on page 28, Funk states:

*"CW-1 identified, at most, two possible sales between January – October 2013: (a) FusionPharm sold two Pharm Pods to a customer in California"; and*

*"(b) FusionPharm sold five Pharm Pods to Local Products, a Denver company." and*

*"CW-1 said there might have been an additional, single Pharm Pod sale to Mile High Green Cross in 2013, but he could not be sure.*

And again where the confidential witness is allowed to provided information and claims that are material to the investigation without there being any way that information which he has provided can be verified given the discrepancies he has provided here or possibly could it be Special Agent Funk simply altering evidence herself to fit within the answers she is looking to discover in order to fit within her investigation. However, it might be a good thing if Special Agent Funk learns to perform basic math as 2+5+1=8 not 7 as she states the confidential witness has said, in paragraph 59 on page 28, Funk states:

*"(b) as noted above, CW-1 could recall, at most, 7 Pharm Pod sales total in 2013."*

## XIII. PROBLEMS WITH WARRANTS

The problems with this investigation are reflected in the Search and Seizure Warrants as well. In the Search and Seizure Warrants executed in this case both affidavits contain the following charges on its face instead the violations being alleged are contained in Attachment B, however the violations are not the same as those alleged in the affidavits. The charges not on the face but on the Attachment B and government exceeded the scope of the warrant as Attachment B. Exhibit L – May 15, 2014 and Exhibit M – November 28, 2014

The affidavit in support of search warrant dated May 15, 2014 and the affidavit dated November 28, 2014 do not allege a chargeable violation of law has been committed. Both of these documents cite the following violations were committed:

In the Affidavit dated May 15, 2014, violations cited on Page 2 in Paragraph 4 which states:

*"William Sears ("Sears"), Dittman's brother-in-law, and a founder and control person of FusionPharm, for various suspected federal criminal offenses, including wire fraud, in violation of 18 U.S.C. §1343, and securities fraud, in violation of 15 U.S.C. §§78(b) and 78ff(a), and 17 C.F.R. §240.10b-5."*

In the Affidavit dated November 28, 2014, violations cited on Page 1 in Paragraph 4 which states:

*"William Sears ("Sears"), Dittman's brother-in-law, and a founder and control person of FusionPharm, for various suspected federal criminal offenses, including wire fraud, in violation of 18 U.S.C. §1343, and securities fraud, in violation of 15 U.S.C. §§78(b) and 78ff(a), and 17 C.F.R. §240.10b-5."*

The following is a breakdown of the violations cited in the Affidavit in Support of Search Warrant, dated May 15, 2014;

15 U.S.C. §§78(b) is a regulatory statement, it contains no essential elements required to support a violation of law having been committed under this section.

15 U.S.C. §§78ff(a) is a penalty assessment which discusses the penalties for violations of the various sections under 15 U.S.C. §§78, however it does not actually address the actual violation and the legal elements required to show a violation under this section instead it requires a valid violation be included one of the numerous violations contained in Section §78 for there to be a penalty assessed under this section.

18 U.S.C. §1343 as there was no legally chargeable fraud violation cited there is nothing to establish a fraud violation has been committed and without which there is nothing to invoke the protections of the mail fraud statutes  and it is well established the protections of the mail fraud statutes do not extend to government regulatory interests.   See F.J. Vollmer & Co., 1 F.3d 1511, 1521 (7th Cir. 1993) ("It is well established that the government's regulatory interests are not protected by the mail fraud statute.)

17 C.F.R. §240.10b-5 is not addressed in the search warrant as such there is no reason to address this here. The Code of Federal Regulation must be named separately on the Search and Seizure Warrant to be considered a part of the items that are being Searched and Seized it is not a standalone charge where it can be included automatically and there was nothing discussed in the affidavit that showed that the company was a Ponzi scheme as was claimed by the CW#1

The Search and Seizure Warrant executed on the FusionPharm warehouse on May 16, 2014 contained the violations in Attachment B however those were not the same violations cited in the supporting affidavit. Attachment B to the Search and Seizure Warrant dated May 16, 2014, states the following:

*"Title 18, United States Code, Section 1343 (wire fraud) and Title 15 United States Codes, Section 78j(b) and 78ff(a)"*

While the prosecution is likely to claim this was merely a clerical error, this was shown not to be the case, as the search warrant dated November 28, 2014 contains the same errors as the Attachment B which states the following

> *"Title 18, United States Code, Section 1343 (wire fraud) and Title 15 United States Codes, Section 78j(b) and 78ff(a), excluding, however, any items constituting privileged attorney-client communications"*

The affidavits were not attached to the Search and Seizure Warrants despite being referenced. This normally invalidates the Search and Seizure Warrants and the evidence discovered as the result of these type of warrants is illegally obtained.

It is well established under the Colorado Constitution, the facts supporting probable cause must be reduced to a writing, and probable cause must be established within the four corners of the warrant or its supporting affidavit. See the Colorado Constitution Article II, § 7; United States Constitution IV Amendment and People v. Padilla, 182 Colo. 101, 105, 511 P.2d 480, 482 (1973).

> *"In this Circuit, both attachment and incorporation are required for an affidavit to remedy a warrant's lack of particularity." See United States v. Leary, 846 F.2d 592 (10th Cir. 1988) at 603 and United States v. Williamson, 1 F.3d 1134, 1136 n.1 (10th Cir. 1993).*

The Fourth Amendment requires a search warrant to *"describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings."* United States v. Carey, 172 F.3d 1268, 1272 (10th Cir. 1999).

A warrant runs afoul of the Fourth Amendment when it is broader in scope than justified by the *"probable cause established by the affidavit upon which the warrant issued."* United States v. Christine, 687 F.2d 749, 753 (3rd Cir.1982)

Because the Search and Seizure Warrant authorized the seizure of a very broad array of items in the FusionPharm offices, for which there was no probable cause and whereby making the search warrant overly broad and as such violated the Fourth Amendment. The Fourth Amendment prohibits general warrants authorizing *"a general, exploratory rummaging in a person's belongings."* Coolidge v. New Hampshire, 403 U.S. at 467. Evidence seized pursuant to a general warrant must be suppressed. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979).

A search warrant that provides law enforcement agents free reign to rummage through a defendant's papers at will renders the warrant overly broad and vague. United States v.

Beckett, 321 F.3d 26, 33 (1st Cir. 2003).

The Search and Seizure Warrant and supporting documentation presented to Magistrate Judge Craig B. Shaffer on May 15, 2014 was attested to telephonically by Special Agent Funk which requires a recording of that and the Search and Seizure Warrant and all supporting documentation be filed with clerk of the court in accordance with the Federal Rules of Criminal Procedure Rule 41 and Rule 4.1.

As this document was not filed in an emergency situation which is shown by the time and date of the Magistrate Judges signature being on May 15, 2014 and the time which it was executed on the following day on May 16, 2014, as such this was not an anticipatory warrant, as such there was no reason why this search warrant was never properly filed. See Exhibit A and Exhibit B

After reviewing this Search and Seizure Warrant it was discovered it was not properly filed as it does not contain the appropriate seal nor the stamp of the clerk across the top. See Exhibit C – copy of Search and Seizure Warrant signed by Robert Dittman.

Nor was this document ever sealed as was claimed by AUSA Harmon on numerous occasions. There is no court order on the dockets sealing the Search and Seizure Warrant which was in fact exercised on the FusionPharm warehouses. Due to the invalid Search and Seizure Warrant which was exercised on the May 16, 2014 raid on FusionPharm which included Special Agent Funk, IRS-CID Agent Loecker and AUSA Harmon and others from the prosecutors office who all have many years' experience dealing with Search and Seizure Warrants. They all knew that this warrant was not valid because it was never properly filed. See Exhibit D – Showing the proper filing and sealing stamps required on a Search and Seizure Warrant as is shown from co-defendant Jean-Pierre's case. There was a **third Warrant served** on the bank, trust and trading accounts of Mr. Sears and his family on May 16, 2014 By Special agent Funk. Much like Fred Lehrer's 302 interview, no one but no one has ever seen it. Mr Sears has called the clerk of the court and confirmed that the Warrant is not in their possession and could not furnish a certified copy. How can the integrity of the warrant be guaranteed if it was not registered with the court as per Federal Rules of Criminal Procedure which state:

*(f) Executing and Returning the Warrant.*

*(1) Warrant to Search for and Seize a Person or Property.*

(A) *Noting the Time. The officer executing the warrant must enter on it the exact date and time it was executed.*

(B) *Inventory. An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person. In a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied. The officer may retain a copy of the electronically stored information that was seized or copied.*

(C) *Receipt. The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property. For a warrant to use remote access to search electronic storage media and seize or copy electronically stored information, the officer must make reasonable efforts to serve a copy of the warrant and receipt on the person whose property was searched or who possessed the information that was seized or copied. Service may be accomplished by any means, including electronic means, reasonably calculated to reach that person.*

**(D) Return. The officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.**

## XIV. DISCLOSURE REQUIREMENTS

## & FAILURE TO DISCLOSE

Based on the previous responses supplied by the federal prosecutor in this case, which has ignored the fact that the Supreme Court ruled, *"the prosecution has an affirmative duty to learn of and disclose, any favorable evidence known to "others acting on the government's behalf in the case, including the police."* Kyles v. Whitley, 514 U.S. 419, 437 (1995).   Thus, the prosecution was required not only to disclose what was already known to prosecutors, but also to learn of any such information that was known to law enforcement, including matters related to witness credibility even that of law enforcement.

Additionally, the Supreme Court decision in Giglio v. United States, 405 U.S. 150 (1972), were the disclosure rule was extended to include not only evidence directly related to the crime involved, but also to information that would affect the credibility of a prosecution witness in the case. The fact, Special Agent Funk was the sole source of the evidence discovered in this investigation and she was the sole source of opinions relied on by the court as evidence including that which was relied on by the courts in rendering it's probable cause determination, this means her credibility relates directly to the evidence.

Additionally, in that case the Supreme Court honed in on the ultimate goal of the Confrontation Clause — that the reliability of evidence introduced against a criminal defendant be assessed through the particular mechanism of cross-examination. In Crawford, it was *decided "[The [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Its commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."* The applicability of the Confrontation Clause, according to Crawford, is limited to witnesses providing testimonial statements. While Justice Scalia did not provide an absolute definition of "testimonial," but articulated that testimonial statements *are "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."*

Furthermore, the Supreme Court provided useful examples of testimonial statements: statements taken by police officers in the course of interrogations and prior testimony given at a court proceeding. The Court held that where a testimonial hearsay statement is offered against a criminal defendant, it is not admissible unless either (1) the prosecution makes the witness who made the statement available, or (2) if the witness is unavailable, the defendant had a prior opportunity to cross-examine him or her.

In United States v. Bagley, 473 U.S. 667 (1985), the Supreme Court defines "material" evidence as information that, had it been disclosed to the defense, would have a *"reasonable probability of providing a different result in the trial or sentencing"* in the case. The national law enforcement model policy defines in the disclosure requirements under Brady, as exculpatory evidence is "material" if there is a reasonable probability that disclosing it will change the outcome of a criminal proceeding. Further, it notes, that a "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial or sentencing of a criminal case. So, the requirements of Brady relate not only to the finding of the case but to the sentencing phase as well.

As the term "exculpatory" is generally understood to refer to virtually any kind of

information that would cast doubt on the guilt of the defendant. As such exculpatory information is that which would bear directly upon the issue of the defendant's guilt or innocence and, therefore must be disclosed to the defense. Like the discussion of material evidence however, material that is exculpatory can also be germane to sentencing. The model policy states that "Brady violations are, by definition, violations of an individual's 14th Amendment right to due process of law. Exculpatory evidence is evidence that is favorable to the accused; is material to the guilt, innocence, or punishment of the accused; and that may impact the credibility of a government witness, including a police officer. Impeachment material is included in the Brady disclosure requirements." With the help of a Florida Forensic Securities Lawyer and specialist who was a whistle-blower to the Securities & Exchange Commission in the case entitled Securities and Exchange Commission v. Guy M. Jean-Pierre, a/k/a Marcelo Dominguez de Guerra, Civil Action No. 12-cv-8886, I uncovered many disturbing things that can only be deemed as Corruption on the part of Mr. Lehrer. The case can be found at the links below:

www.sec.gov/litigation/litreleases/2015/lr23217.htm
https://www.sec.gov/litigation/complaints/2012/comp-pr2012-257.pdf

In that case Jean-Pierre forged more than 100 legal opinions that were used to remove the restrictive legend from millions of shares of penny stock companies. Through discovery in a related case, The specialists firm obtained the forged opinions. The referral to the Florida Bar of that matter resulted in the Florida Supreme court disbarring Mr. Jean-Pierre. (Please note Jean Pierre was never criminally charged. What?) In connection with that case Jean Pierre provided a letter from Scott Dittman, in his capacity as the Chief Executive Officer of Fusion Pharm Inc. ("FSPM") in defense of the allegations. At that time, Jean Pierre was a corporate officer of FSPM. The Specialist involvement in that matter resulted in a civil suit and bar complaint against the securities specialist by Jean-Pierre and his client, Marc Jablon. The securities specialist spent more than two years and thousands of unpaid hours because they were retaliated against for stating that the conduct of Jean-Pierre and his associates was illegal. During that period, the specialist was represented by **Frederick M. Lehrer**. Lehrer assisted them in drafting the documents in all aspects referring the matter to the Florida Bar, SEC and FBI vs Mr. Jeanne Pierre. As a result of the retaliation the securities specialist endured, they became a witness for the Securities & Exchange Commission (the "SEC") in the penalty phase of that proceeding against Marc Jablon. They have not had meaningful communications with Lehrer since 2013.

The Forensic securities specialist then became aware of what they believed to be egregious misconduct by the Colorado Office of the SEC. In approximately 2014, the Colorado SEC commenced an investigation of FSPM. The SEC's news release about FSPM is below:

https://www.sec.gov/litigation/admin/2016/33-10210.pdf

In connection with FSPM, Sears and Dittman were indicted by the US Attorney's Office in Colorado. This, taken from the SEC's press release was then and remained forever

untrue, neither myself or Mr. Dittman were ever in this case.

When The specialist met William Sears and Scott Dittman and learned of Lehrer's involvement in FSPM, they were shocked to learn of Lehrer's conflicts of interest in connection with FSPM. The specialist then contacted Sears and Mr. Dittman to make them aware of Mr. Lehrer's familiarity with Mr. Jeanne Pierre and his conflicts of interest with Mr. Jeanne Pierre in this case. They also made Sears and Mr. Dittman aware of Mr. Lehrers conflicts of interest with AUSA Harmon, who was in charge of the investigation/prosecution. Per the specialist, Mr. Lehrer and Mr. Harmon were 2 of 4 attorneys who constituted the special task force for securities fraud in South Florida in the 1990s (referred to above). In fact, Mr. Harmon and Mr. Lehrer worked side by side for 4 years and remained close friends to this day. This conflict of interest was never disclosed in this case by Mr. Harmon, who should have recused himself from the case as soon as Mr. Lehrers involvement was known. Unfortunately, he did not.

Despite the conflict of interest and without disclosing his conflict, Lehrer commenced representing FSPM, Dittman and Sears within a few months after representing the specialist in the Guy Jeanne Pierre matter. Lehrer continued to represent FSPM until the middle of 2014, approximately two months after the SEC investigation commenced. Pursuant to a Formal Order of Investigation dated January 29, 2015, Lehrer was asked to submit to a deposition concerning FSPM, Dittman and Sears. Prior to his testimony, Lehrer requested that Dittman and Sears waived the attorney client privilege, which they did without any knowledge of Mr. Lehrer's prior involvement with Guy Jeanne Pierre or Kenneth Harmon.

Lehrer provided sworn testimony on January 29, 2015 and May 29, 2015. In that testimony, Lehrer lied repeatedly. Among other things, Lehrer falsely stated that he learned about Jean Pierres OTC Markets ban, a ban he himself brought about, from 'Google searches' after the SEC investigation of FusionPharm began. He was largely responsible for the OTC Markets ban as a result of his representation of specialist in connection with referrals to the SEC, FBI and Florida Bar!

Secondly, Lehrer lied in stating that he had no knowledge of Sears relationship with Dittman or Sears family involvement in FusionPharm. Even more troubling is that Lehrer' conduct makes the waiver of the privilege given by Dittman and Sears ineffective because they were not provided with disclosure of Lehrers egregious conflict of interest and role in reporting a corporate officer of FSPM. ***Because of this non-disclosure, Sears and Dittman could not have made an informed decision of whether to waive the attorney client privilege allowing Lehrer to testify against them.***

Despite this, Denver SEC enforcement attorneys, Ian Karpel and Kim Greer allowed Lehrer to testify as to matters that were subject to the attorney client privilege. Dittman and Sears would never have waived the attorney client privilege if they knew that (i) Lehrer had participated in reporting Jean-Pierre, a corporate officer of FSPM to the FBI and SEC, and (ii) Kenneth Harmon had worked with Lehrer for years and was his supervisor. Greer and Karpel were aware of these conflicts and took no steps to ensure the integrity of Lehrers testimony to the SEC.

Karpel and Greers questioning of Lehrer during his testimony reflects they were aware of the specialists relationship with Lehrer – that he worked with the specialists law firm. The NY SEC action also references the bar complaints the specialist filed. Despite this, Karpel and Greer never contacted the specialist for information about Guy Jean-Pierre, Lehrer or their investigation. Greer and Carpels knowledge of many of the conflicts is demonstrated by Lehrers own SEC testimony.

Further, the DOJ who would interview countless witnesses in the FusionPharm case and would ultimately bring charges against both Jeanne Pierre and Tod DiTomasso (another lawyer who worked with Jeanne Pierre and advised FusionPharm),
**NEVER INTERVIEWED LEHRER!!**…
Ken Harmons friend and previous co-worker.   The SEC only interviewed one witness in this case, twice interviewing Fred Lehrer. **The SEC never interviewed another witness, attorney or otherwise.**

Upon the specialists review of this matter, they found that Lehrer had provided multiple baseless legal opinions for Sears in regarding the trading of his FSPM stock. The only thing more shocking was they learned that Lehrer had even instructed Sears (in writing) to sign his name to legal opinions to remove the legend from restricted securities. This was due to his printer not working, as he explained in his email to Sears. Sears trusting Lehrer, as who better to protect him then an EX SEC enforcement attorney? He did as instruct. If FSPM is a fraud as the SEC states then Lehrer was the gatekeeper allowing Sears to cut and paste legal opinions on his law firm.  Fact is Fred Lehrer cut and pasted Guy Jean Pierres legal opinions as they are almost exactly the same. Kim Greer of the SEC commented on this in Lehrers interview. According to the SEC's press release based on Agent Funks Investigation, FSPM was a pump and dump (not that she would know what that really means) that resulted in investor losses of more than $12 million because of baseless legal opinions. The vast majority (more than $10million of the $12 million at issue with the SEC) of the sales of FSPM stock were only possible because of **Lehrer's opinions**.  In the most recent filing to Scott Dittm,ans lawyers Mr Jeremy Siebert say:"Still no investigation or even mention of Lehrer from the DOJ while all other attorneys in the case were prosecuted? Additionally, "Pump and dump" is when multiple (1-2 a week) press releases are made through a given period to stimulate volume in the stock price. Once volume and a target price are met shareholders will sell into the new volume. FSPM did 10 press releases in 4 years. This was in no way a pump and dump. During the investigation, no press release was ever questioned or at issue. FusionPharms stock price followed the same exact trajectory as all the other marijuana index companies when amendment 64 passed in 2014. If anything, FusionPharm was critiqued by many investors for not putting out any PR/News. Exhibit 19

In 2017 the specialist, provided Mr. Karpel and Ms. Greer with evidence demonstrating that Lehrer lied multiple times under oath in connection with their investigation. they advised them that the specialist had declarations and other evidence of Lehrer that contradict his SEC testimony. Along with emails from Sears that directly refuted much of his SEC testimony. One example was an email communication whereas Lehrer

advised Scott Dittman and Craig Dudley (FusionPharms CFO) that disclosing William Sears was not necessary. Craig Dudley confirms this in his FBI 302 interview.     The specialist also advised them that Lehrer had told William Sears to sign his name to a legal opinion. After receipt of this information, Ms. Greer and Mr. Karpel did not investigate. *EXHIBIT 20 EXHIBIT 21.  Exhibit 22*

Instead Greer contacted Jeff Thomas an attorney of Scott Dittman

*"Kim called to let me know that they received a call from XXXXXXXXXXXX, who detailed some of her knowledge about Fred Lehrer. I pressed Kim as to what this meant in terms of their case, and she made it clear that it didn't mean anything. Because their case is technically still open, she just believed that she had an obligation to inform me of the call."*

Greer violated SEC policy by disclosing confidential SEC information to a private attorney. Her motive is clear and she did this to silence the specialist as a whistle-blower against Lehrer. Greer indicated that their refusal to investigate Lehrer was because of Mr. Harmon.

Further, when Harmon learned the specialist had provided exonerating information about Lehrer to Sears and Dittman and to the FBI as a whistle- blower, Harmon retaliated against Sears and the specialist. Instead of encouraging whistle-blowers to come forward when they learn of information relevant to investigations, Harmon, Karpel and Greer retaliated against the specialist and Sears and sought to discourage them from providing information and him from speaking to the specialist. While the SECs revolving door ignored Lehrer, the SEC charged another attorney, Todd D Tommaso for his legal opinions. The action against him can be found at this link: www.sec.gov/litigation/admin/2016/33-10215.pdf

Sears had put together a chart whereas it could be shown as Mr. D Tomasso also committed perjury in his interview with the SEC.
 Exhibit 24
The Conviction of Mr. Jeanne Pierre in the Fusionpharm case can be found at this link: www.justice.gov/usao-co/pr/denver-jury-convicts-attorney-securities-fraud-0

The specialist even went to the extent to send a letter to Matt Kirsch at the Denver DOJ' office. At that time Matt Kirsch, the First Assistant United States Attorney was the second in command below US Attorney Bob Troyer. This too was ignored and swept under the rug. Despite that Lehrer opinions were baseless and merely cut and pasted from previous Tod D Tomasso opinions and caused greater investor losses and his conduct was more egregious, the Denver SEC/DOJ would never charge Lehrer. For the reasons above, Karpel and Greer of the SEC should be investigated by the Inspector General. Along with Kate Funk of the FBI and & former AUSA Ken Harmon of the Denver US Attorney office.

## XV.  MISCONDUCT BY FEDERAL PROSECUTOR

Furthermore, as AUSA  Jeremy Sibert failed to adequately investigate these credible claims alleged by Mr. Sears, amounts to misconduct, as it is well established the duty of prosecutors is "to seek justice within the bounds of the law, not merely to convict." ABA Criminal Justice Standards for the Prosecution Function, Standard 3-1.2(b) (4th ed.2015); see also Berger v. United States, 295 U.S. 78, 88(1935) (a prosecutor's interest is not to "win a case, but that justice shall be done"); United States v. Kojayan,8 F.3d 1315, 1323 (9th Cir. 1993) ("Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. ... The prosecutor's job isn't just to win, but to win fairly, staying well within the rules."). And should view these obligations as applying in both civil and criminal enforcement actions. See Freeport-McMoRan Oil & Gas Co. v. FERC, 962 F. 2 d 45, 47 (D.C. Cir. 1992) (duty to do justice applies "with equal force to the government's civil lawyers").

## XII. CASE SUMMARY

As such, Special Agent Funks use of the term Certified Public Accountant was not just being used to show she held a Kansas issued certificate but instead was done to mislead the magistrate judges into believing she was qualified to perform the services required in this investigation as the evidence discovered as the result of her unqualified forensic accounting opinions were the basis of fact relied on by the court in this investigation and by the courts in rendering their probable cause determinations and as such violates federal regulations tainting this entire investigation and rendering these search warrants as being illegal.

Without the investigation, search warrants and everything else discovered subsequent to this investigation renders the prosecution with no winnable case and the reasons why the prosecutors kept coming after the company and Mr. Sears.  The last thing that the government thought they would find, is exactly what they found. A legitimate business.  Instead of the Ponzi scheme or illegal marijuana grow they were assured they would discover.

The defendant humbly requests consideration in this matter that relates to the fact that the governmental abuse of power and corruption undermines the courts at its very

foundation.

However should this court choose not to grant this motion the defendant humbly requests a stay in proceedings so a proper evidentiary hearing may be conducted

The defendant wishes to thank the court for its assistance, fairness and patience as this is a pro se filing of which I have never had the experience to encounter till this day. As shown above he has not received effective counsel in this matter as he was advised to accept a pre-charging plea agreement without his attorney ever reviewing in detail any of the evidence provided in this document. All of the above claims were discovered after the fact by non-legal professionals and myself.

Thank you again your Honor and I do pray you will honor my request here by granting this motion.

Respectfully submitted this 29th day of January 2020.

William J. Sears - Defendant

1-30-2020

13670 Via Varra #114
Broomfield Co 80020

**EXHIBIT A**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

May 16, 2014

IN THE MATTER OF
Fusion Pharm, Inc.

File No. 500-1

ORDER OF SUSPENSION OF
TRADING

It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of FusionPharm, Inc. ("FusionPharm") because of questions regarding the accuracy of assertions by FusionPharm and by others, in filings and disclosures made by FusionPharm on OTC Link (previously "Pink Sheets") operated by OTC Markets Group, Inc. and press releases to investors concerning, among other things:  (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition.

The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

THEREFORE, IT IS ORDERED, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the above-listed company is suspended from the period 9:30 a.m. EDT, on May 16, 2014, through 11:59 p.m. EDT, on May 30, 2014.

By the Commission.

Jill M. Peterson
Assistant Secretary

**EXHIBIT B**

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following records and other items, however maintained, related to (a) the formation, ownership, control and/or operations of FusionPharm, Inc., MeadPoint Venture Partners, LLC, VertiFresh, LLC, Bayside Realty Holdings, LLC, and Microcap Management, LLC (hereinafter, collectively, the "Enumerated Entities"); and (b) the scheme and activities which are described and are the subject of the affidavit in support of this warrant (which affidavit is incorporated by reference herein), which records and items are further described below, and which constitute evidence and/or instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud) and Title 15 United States Codes, Section 78j(b) and 78ff(a):

*(As used herein, the terms "records" and "information" include all of the items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory, calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).)*

A. Accounting records and supporting workpapers (in any iteration, including drafts) concerning any and all of the Enumerated Entities, including general journals, general ledgers, accounts receivable and payable ledgers, sales journals, purchase journals, accounts reconciliations, and all data entered in Quickbooks or any other computer digital accounting system.

B. All financial statements and supporting workpapers (in any iteration, including drafts) concerning any and all of the Enumerated Entities.

C. All records concerning sales or any other revenue generating activities of any and all of the Enumerated Entities, including, by way of example, purchase and sales contracts or agreements, memoranda of understanding, term sheets, licensing or distributor agreements and contracts, invoices and purchase orders.

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 72177 / May 16, 2014

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of FusionPharm, Inc. ("FusionPharm") of Denver, Colorado, at 9:30 a.m. EDT on May 16, 2014, and terminating at 11:59 p.m. EDT on May 30, 2014.

The Commission temporarily suspended trading in the securities of FusionPharm due to a lack of current and accurate information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition.  This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777.  If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to FusionPharm's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met.  If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker-dealer or other person has any information which may relate to this matter, they should contact Jay Scoggins at (303) 844-1105, Kimberly S. Greer at (303) 844-1042, or Ian S. Karpel at (303) 844-1017, of the Division of Enforcement.

**EXHIBIT C**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud.   Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995.   I became a Certified Public Accountant in 1996 through the state of Kansas.

2.      At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.      I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

        a.  Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.      The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"),  is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

**EXHIBIT D**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2.      At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.      I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

> a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.      The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"),  is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

President and CEO of FusionPharm, Inc. ("FusionPharm") and William Sears ("Sears"), Dittman's brother-in-law, and a founder and control person of FusionPharm, for various suspected federal criminal offenses, including wire fraud, in violation of 18 U.S.C. §1343, and securities fraud, in violation of 15 U.S.C. §§78(b) and 78ff(a), and 17 C.F.R. §240.10b-5.

5.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, written reports, information from witnesses, and information and analyses obtained from other law enforcement agencies, including the United States Securities and Exchange Commission (" SEC"). This affidavit is intended to show that there is probable cause for the requested search warrants and does not purport to set forth all of my knowledge of, or investigation into, this matter.

6.     Based on the evidence developed, described and detailed herein, your affiant submits that there is probable cause to believe that: (a) Dittman and Sears have committed the criminal offenses as listed in paragraph 4 above, and (b) evidence of these crimes is located at the Subject Premises.

## ORIGINS OF SEC'S INVESTIGATION

7.     The matter which is currently the subject of a criminal investigation arose from a referral on or about December 9, 2013, by the SEC's Regional Office in Denver, Colorado. The referral involved allegations the SEC had been investigating relating to a possible offering fraud and pump-and-dump scheme being orchestrated by Dittman and Sears through FusionPharm, a publicly traded small cap company.

8.     The genesis of the SEC's investigation involved a complaint filed by Cooperating Witness 1 (hereinafter referred to as "CW-1"), a former FusionPharm

2

- You have all the legal rights of a CPA including signing tax returns and audit reports
- You are allowed to own a CPA firm
- You can use the title in any public or official setting
- Requires a significant fee to renew each year

# CPA Certificate vs CPA License

Remember that each state board of accountancy has different rules and regulations to become a CPA. Most have common requirements, but all of them are different in some way, shape, or form.

That being said, most states back in the day had a two-tiered certification process. This meant that once you fulfilled the requirements to sit for the uniform CPA exam and you passed it, you were issued a certificate. This simply meant that you completed the first step to becoming a CPA, but you weren't all the way there yet.

Often candidates still had to complete a lengthy work experience program, additional education requirements, or an ethics exam in order to fulfill the licensure requirements of the state, but they were able to call themselves a CPA in the meantime because they had a certificate. Thus, on resumes and job applications, they could indicate that they had passed the exam and were on their way to becoming licensed.

Keep in mind that this certificate is not a license to practice. Candidates who only have a certificate are not allowed to practice publicly because they are not licensed. Only after you complete the rest of the requirements are you able to obtain your license and truly become a practicing CPA with all of the designations rights intact.

Most states have gotten rid of this two-tiered system and now don't issue you a certificate upon completing the exam. Instead, they

**Top 5 CPA Prep Courses**

**#1**

have switched to using this terminology to define different levels of licenses.

# Different Levels of CPA Licensure:

# Non-reporting and Inactive

This title is a little misleading because it implies that you can be licensed but not be fully licensed. That isn't really true. You are either licensed or you are not. There is no in between. Some states do offer non-reporting or inactive licenses though.

What a lot of states that have gotten rid of the two-tier system have started doing is allowing non-practicing CPAs to switch their full-blown license into a certificate. This way they don't have to pay a huge renewal fee and maintain 40 hours of continuing education each year, but they can still call themselves a CPA for informal purposes.

A good example of this is a college accounting professor. He or she may want to maintain their credential as it gives them more authority in their field, but there is no reason why they should be licensed. They will never perform audit or tax functions that practicing CPAs must perform, so there is no need for them to be licensed.

Most states that allow this type of "downgraded" license also allow certificate holders to renew their license at any time just by filing the proper paperwork and paying the licensure fees. This is also a plus for the accounting professor. If he or she ever wanted to get licensed again, he or she could simply sign up and pay the fee. There is no extra testing or qualifications required.

#2

#3

#4

#5

# CPA Certification vs CPA License for International Candidates

A lot of international candidates think that they can simply obtain a certificate and use it as a license. This is not the case. Just become you are practicing outside of the US doesn't mean that you don't have to be completely licensed.

In order to call yourself a CPA and perform the functions of a certified public accountant, you must be a licensed CPA (whether that be active or inactive).

If you are having a difficult time meeting the requirements to become a CPA because you are an international candidate, check out this post. I walk you through the international process.

# Become a Licensed CPA

The best thing that you can do for your career is to become a full-blown licensed CPA. You will have all of the opportunities and respect afforded to you by people within and outside your profession.

I would highly recommend pursuing this rather than just getting your certificate.

The first place to start pursuing this career goal is to ace the CPA exam. If you haven't already started studying for it, you will need to pick out a CPA review course that fits your learning style and will work for you. Here's a list of the top review course publishers out there. Take a look at my reviews and see which one will work the best for you.

Compare Courses!

**SAVE BIG!**

**Get Up to $1,000 Off Your Review Course!**

Get a FREE Crush the CPA Exam Study Guide

| Your first name |

| Your email addres |

| Where you at in ▼ |



## See the Top CPA Review Courses

### **Kenneth W. Boyd**

Website

**in**

**G**

**W**

 **a**

Kenneth W. Boyd is a former Certified Public Accountant (CPA) and the author of several of the popular "For Dummies" books published by John Wiley & Sons including 'CPA Exam for Dummies' and 'Cost Accounting for Dummies'.

Ken has gained a wealth of business experience through his previous employment as a CPA, Auditor, Tax Preparer and College Professor. Today, Ken continues to use those finely tuned skills to educate students as a professional writer and teacher.

# Related Posts

←                                          →

What Are the
Requirements to Take
the CP...

CPA Exam Score
Release Dates | 2020
Test...

Best CPA Ex
Plan for a Bu

**Get a FREE Crush the CPA Exam Study Guide**

Your first name

Your email address

Where you at in your CPA journey?   ▼

SUBSCRIBE TODAY!

# CPA EXAM

Exam Costs

Exam Schedule & Dates

Application Process

Exam Sections

Pass Rates

Score Release Dates

International Candidates

Glossary

CPA Videos

CPA Exam Books

# TOP CPA REVIEW COURSES

Best CPA Courses

Wiley CPAexcel

Roger CPA

Yaeger CPA

Gleim CPA

Fast Forward Academy
Surgent CPA
Becker CPA
CPAexcel vs Becker
Roger vs CPAexcel
Wiley CPA vs Gleim
Yaeger vs Roger

---

# Categories

CPA Careers
CPA Exam
CPA Exam Study Tips

---

Copyright© 2020 - All Rights Reserved | Accounting Institute for Success

Home          Articles          Videos          Academic Scholarships

Ask your question here                    **Search**      **Show Related Q&As**

Education and Career FAQs / Business FAQs / Accounting FAQs / What is CPE Accounting?

# What Is CPE Accounting?

**Choose your subject:**

Business Management

Bookkeeping and Accounting

Select a Very Specific Subject

**Choose your degree level:**

Select a Degree Level

**Choose your location:**

Online schools only

Campus near me

zip        Or

State

**SEARCH**

No preference

CPE accounting is continued professional education for accountants. Accounting is a highly specialized field. Since tax laws and regulations can change rapidly, accountants participate in continuing education programs to keep abreast of developments in laws and accounting practices. They need to be aware of the CPE requirements of the jurisdictions in which they work. Schools offering Accounting degrees can also be found in these popular choices.

## CPE Requirements

According to the American Institute of Certified Public Accountants, each state has



specific continuing education requirements accountants must follow in order to maintain their licenses. The CPA Journal states that accountants should be concerned about licensing requirements if they maintain such credentials in more than one jurisdiction.

## Important Facts About CPE Accounting

| Work Environment | Office or classroom setting |
|---|---|
| Key Skills | Accounting, Math, Reading Comprehension, Communication |
| Training | There are no mandatory subjects or lessons for CPE, so accountants are free to choose the program that best fits their needs. Acceptable programs include courses offered by the accountant's own firm, accounting-focused conferences or conventions, and any university courses that offer CEUs (Continuing Education Units). |
| Common Courses | Accounting and Finance for Business Operations, Fair Value Accounting, IFRS in the USA: An Implementation Guide |
| Median Salary (2018) | $70,500 (Accountants and Auditors) |
| Job Outlook (2016-2026) | 10% (Accountants and Auditors) |

*Source: U.S. Bureau of Labor Statistics (BLS)*

## Comparing CPE Requirements

Almost every jurisdiction requires an average of 40 hours of CPE per year for Certified Public Accountants (CPA). Other variations are period are 80 hours required each 2-year period or 120 hours each 3-year period. Many jurisdictions do not allow carryover of surplus CPE credits from one period to the next.

In some jurisdictions, required CPE hours depend on either specific duties or job classifications. For example, New York reduces the amount of required hours of CPE credits if an accountant takes continuing education courses in a specialized area. Kentucky reduces the number of required hours if an accountant works less than 3,000 hours every two years.

Each state has different CPE accounting requirements. A CPA must take the required numbers of CPE credits for the jurisdiction where her or she works, and must be aware of the requirements of other jurisdictions if or she wishes to maintain a license in that jurisdiction.

To continue researching, browse degree options below for course curriculum, prerequisites and financial aid information. Or, learn more about the subject by reading the related articles below:

**1. Southern New Hampshire University**
- MBA - Accounting
- BS in Accounting
- AS in Business Administration

**What is your highest level of education completed?**

Select One...

**2. Purdue University Global**
- Master of Science in Accounting
- Bachelor of Science in Accounting
- Associate of Applied Science in Accounting

**Which subject are you interested in?**

Select One...

**3. Florida Tech**
- Master's in Business Administration/Accounting & Finance
- Master's in Business Administration/Finance
- Master's in Business Administration/Management

**What is your highest level of education completed?**

Select One...

**4. Grand Canyon University**
- DBA in Management
- MBA in Accounting
- BS in Accounting

**What is your highest level of education?**

Select One...

| 1. Degree Options: | 2. More Articles |
|---|---|
| Accounting | What Schools Offer Accounting Degrees in Phoenix, Arizona? |
| Accounting & Management | What Schools Have Accounting Degrees in Philadelphia, PA? |
| Bookkeeping | Where in Vermont Can I Take Courses in Accounting? |
| View All Degree Options | |

BUSINESS

VIDEOS

# Agency clarifies uses of CPA designation

BY JERRY SIEBENMARK

JANUARY 21, 2010 12:00 AM

The state agency that regulates certified public accountants and CPA firms noticed a trend it wanted to stop.

Some Kansas CPAs have been using their professional designation in advertising, letters or other public documents in a way that would require them to have a separate practice license.

"We see that more now because information is more available to us," said Susan Somers, executive director of the Kansas Board of Accountancy. "We've got the Internet."

The trend prompted the board to post a notice on its Internet home page — www.ksboa.org — clarifying the use of CPA.

## Subscribe and Save

Act now to get a full year of unlimited digital access – just $49.99!

**VIEW OFFER**

The designation can be used after the CPA's name and in connection with his or her employer as long as the company is not providing services that fall under a separate definition of practice.

So a CPA who is a controller of a company that does not provide CPA services — or any financial or consulting services — can use the designation if it includes the name of the company for whom they work and their job title.

Where things get fuzzy, Somers said, is advertising, phone book listings, letterheads and signatures as a CPA on documents that are available to the public.

In those instances, she said, the CPA can't use the designation unless they also have a practice license.

The board's clarification of the use of CPA has been well received, Somers said.

"I've had a lot of thank yous from people," she said.

So you think you have the flu? Here's what you should do

See the impressive gumball machine collection at Nifty Nut House

**VIEW MORE VIDEO →**

**TRENDING STORIES**

Riverfront Legacy group moves forward with a plan that tears down Century II

DECEMBER 16, 2019 10:01 PM

Wichita is mourning the death of a popular bartender, 'one of the all-time good guys'

DECEMBER 17, 2019 12:54 PM

Impact on Spirit AeroSystems unclear as Boeing plans to halt production of 737 Max

DECEMBER 16, 2019 6:07 PM

State may have to help with Spirit salaries if 737 Max stays grounded, governor says

DECEMBER 17, 2019 7:32 PM

Pie and home cooking are on the menu in the Spaghetti Works District as of Tuesday

DECEMBER 16, 2019 2:36 PM

**FROM OUR ADVERTISING PARTNERS**


Shep Smith's First Public Remarks Since Leaving Fox News


The Main Reason Behind Sarah Palin's Divorce is Pretty Clear Now


This May Have Been Trump's Biggest Flaw


Anna Kendrick Refuses To Do Nude Scenes & We Now Understand Why


No Wonder Aldi's Meat Is So Cheap


Controversial Movies That Were Box Office Hits


There Were Athletes Who Skipped Visiting Obama's White House Too


Celebs Who Died Tragically in 2018

COMMENTS

**EXHIBIT E**



| Apply for Certificate | Apply for Permit | Change of Address | Contact Us |
| CPA Exam Info. | CE | FAQ's | Firm Registration |
| Forms | Laws & Regs | Online Firm Renewal | Newsletter |
| Online Permit Renewal | Peer Review | Search -- Firm | Search -- Individual |

**Home**
**Board of Directors**
**Board Meeting Dates, Agendas & Minutes**
**Complaint Form**
**CPA Exam Pass List**
**CE requirements**
**Disciplinary Actions**
**FAQ's**
**Fees**
**Firm Search**
**Forms**
**Helpful Links**
**Individual Search**
**Laws & Regulations**
**Peer Review**
**Proposed Regulation Amendments**
**Site Map**
**Site Tools Download Center**
**Contact Us**

## Apply for a Certificate

**PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU THAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.**

**NOTE:  KANSAS IS A TWO-TIERED STATE.  YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE.  THE CERTIFICATE <u>DOES NOT</u> ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.**

Below are the forms required to be submitted to obtain a Kansas CPA Certificate:

**CPA Certificate by passing the exam in Kansas--Fee: $50.00**

- http://www.ksboa.org/pdf/app_exam.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf

**CPA Certificate by reciprocity, or for transfer of grades—Fee: $250.00**

- http://www.ksboa.org/pdf/app_recip.pdf
- http://www.ksboa.org/pdf/app_transfer.pdf
- http://www.ksboa.org/pdf/auth_exch.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--this is the order information)



Page Last Updated: 04/30/2018 21:44:52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

**EXHIBIT F**

12/24/17 11:16:00

**CPAVerify Individual Report Results**

---

NAME: **KATE EGAN**
STATE OF LICENSE: **KS**
LAST UPDATED: **2017-12-24**

**Mail**

**Address:**
**License/Permit/Certificate Number:**
**Registration Number:**
**License/Permit/Certificate Status:**
**License/Certificate Status Details:**
**License Type:**

**License Type Details:**

CHICAGO, IL,
8757

ACTIVE CERTIFICATE
The certificate is in good standing.
CPA.
CPA Certificate. In Kansas, a certificate is not a license so therefore, a certificate holder who does not also have an active permit may not hold out, perform or offer to perform services as a CPA. The person may use the title CPA in connection with their employment in industry.

**Basis for License:**
**Issue Date:**
**Expiration Date:**
**Enforcement, Non-Compliance or Disciplinary Actions:**
**Other Information:**

1999-08-04

None Reported To This Site By The Board
IN KANSAS, A CERTIFICATE IS NOT A LICENSE. ONLY THOSE WHO HAVE PERMITS (ALSO KNOWN AS LICENSES) ARE ALLOWED TO HOLD OUT AND PROVIDE OR OFFER TO PROVIDE SERVICES TO THE PUBLIC AS A CPA. IF THE PERMIT STATUS DOES NOT REFLECT "ACTIVE", THAT INDIVIDUAL IS NOT LICENSED TO PRACTICE.

CPAVERIFY INCLUDES ALL CERTIFICATE HOLDERS AND PERMIT HOLDERS. If an individual has a permit, their permit record and their certificate record will show. Only a certificate record will show for non-licensed certificate holders.

If Permit Number shows N/A that means this person had a permit to practice at one point, but let it lapse. When the permit lapses in that case, so does the permit number. If permit shows Lapsed it means that this person once had a permit (license) to practice, but has since let them lapse. This individual is not licensed to practice as a CPA in Kansas.

Contact the Board for official verification of information.

**State Board Contact Information:**

KANSAS BOARD OF ACCOUNTANCY
LANDON STATE OFFICE BUILDING
900 SW JACKSON, SUITE 556
TOPEKA, KS 66612-1239

Phone: 785-296-2162
Fax: 785-291-3501
Email: INFO@KSBOA.KS.GOV
Licensee Lookup: http://www.da.ks.gov/boa/searchforindividual.aspx

---

Details of Enforcement, Non-Compliance or Disciplinary Actions:

1. If "Contact State Board For Details" is displayed then the State Board has reported some type of enforcement, non-compliance or disciplinary action to this site and the State Board should be contacted for full details about the action reported.
2. If "None Reported To This Site By The Board" is displayed then the State Board provides enforcement, non-compliance and disciplinary action data to this site and none was indicated for this record.
3. If "State Does Not Provide This Type of Data At This Site" is displayed then CPAverify is not currently receiving enforcement, non-compliance or disciplinary action data for licensees in this state. Some states are limited to sharing this type of data with third party websites due to privacy laws or policies, but most State Boards offer this information on their official State Board websites.
4. Contact the State Board for official verification of all enforcement, non-compliance and disciplinary activity.

**The results shown here include all data made available by participating states. Additional data about the individual or firm may exist and is not shown here for other states that are not yet participating in the CPAverify website. Please refer to the Participating States tab for more information about which states are currently sharing their licensing data for use with this website and for clarification about which states these results do not include. If**

12/24/17 11:16:00

the Board of interest is not participating, you may refer to the "Contact Boards" tab where a link to every Boards' website and therefore individual license lookup tool is available.

**EXHIBIT G**



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home    >> Search for Firms

## Individual Information   [ Back to Search Results  |  Search Again ]

| | | |
|---|---|---|
| **Name:** | Kate Elizabeth Egan | **Certificate Status:** Active |
| **Address:** | 22 N Morgan Unit 210 Chicago, IL 60607-0000 | **Permit Status:** |
| **Firm/Employer:** | Sprint | **Discipline and/or Board Action:** NO |
| **Certificate Issue Date:** | 08/04/1999 | |
| **Certificate Number:** | 8757 | |
| **Permit Number:** | | |
| **Permit Issue/Renew Date:** | / / | |
| **Permit Expiration Date:** | / / | |



Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

**EXHIBIT H**



## KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home    >> Search for Firms

**Individual Information**    [ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Funk | **Certificate Status:** | Active |
| **Address:** | 8000 E. 36th Ave. Denver, CO 80238-0000 | **Permit Status:** | |
| **Firm/Employer:** | Federal Bureau of Investigation | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |



Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

*Exhibit J*

| Join or Give | News | Events & Programs | Networks | About | Resources | Info for: | Adams Alumni C |
|---|---|---|---|---|---|---|---|

Search…

Home » Resources » Manage My Profile » First-time Registration

**Resources**

Community Home
My Profile
Online Directory
Career Center
Kansas Alumni magazine
Shop for KU Merchandise
KU Websites
Just for Fun
Kansas Alumni Magazine

**Step 2:**

Find your name in the list below and click the radio button beside it, then click "Next."

If your record is marked as "Already Registered," please click here to log in. Tools are available to recover your password if you don't remember it.

In the KU Degree column, the first letter indicates the school that granted your degree, followed by the year of the degree. Below is a key to determining school codes.

**Manage My Profile**

Login/Logout
First-time Registration
Change Password
Class Notes
Email Subscriptions
Contact Support

| | |
|---|---|
| A | School of Architecture, Design & Planning |
| B | School of Business |
| C | College of Liberal Arts & Sciences |
| D | School of Education |
| E | School of Engineering |
| F | School of Fine Arts |
| G | Master's Degree |
| H | School of Health Professions |
| J | School of Journalism |
| L | School of Law |
| M | School of Medicine |
| N | School of Nursing |
| P | School of Pharmacy |
| PharmD | School of Pharmacy |
| S | School of Social Welfare |
| U | School of Music |
| AUD | Doctor of Audiology |
| DE | Doctor of Engineering |
| DMA | Doctor of Musical Arts |
| DNP | Doctor of Nursing Practice |
| DPT | Doctor of Physical Therapy |
| EdD | Doctor of Education |
| OTD | Doctor of Occupational Therapy |
| PhD | Doctor of Philosophy |
| SJD | Doctor of Juridical Science |

*If you don't see your name on the list, please use your browser's Back button to try searing again using alternate values, such as your legal name or a previous name. If you still do not see your name or have other questions about the account lookup*

Join or Give        News        Events & Programs        Networks        About        Resources        Info for:        Adams Alumni C

| | First Name: | Last Name: | Birth or Former Last Name: | KU Degrees : |
|---|---|---|---|---|
| ○ | Aidan | Egan | | |
| ○ | Ann | Egan | | g'89 |
| ○ | Anne | Cory | Egan | d'78 g'82 |
| ○ | Brenda | Egan | | PharmD'10 |
| ○ | Brian | Egan | | F05 |
| ○ | Cassidy | Egan | | c'10 |
| ○ | Catherine | Fennelly | Egan | c'13 |
| ○ | Chet | Egan | | c'06 g'15 |
| ○ | Drew | Egan | | b'16 g'17 |
| ○ | Elaine | Wilson | Egan | '72 |
| ○ | F. | Egan | | PhD'11 |
| ○ | Georgine | Egan | Neuner | g'87 |
| ○ | Gregory | Egan | | C95 |
| ○ | James | Egan | | b'82 |
| ○ | James | Egan | | G85 |
| ○ | Jaxon | Egan | | |
| ○ | Jeanne | Binder | Egan | g'92 |
| ○ | Jennifer | Egan | | g'97 |
| ○ | Jennifer | Egan | Clapper | s'13 |
| Already registered | John | Egan | | j'86 |
| ○ | John | Egan | | C99 |
| ○ | Kate | Egan | | B96 |
| ○ | Katie | Egan | | |
| ○ | Kristian | Eganhouse | Hamilton | l'96 |
| ○ | Lawrence | Egan | | C86 |
| ○ | Lisa | Egan | Hardy | c'12 |
| ○ | Lori | Egan | Wehr | d'83 |
| ○ | Margaret | Egan | | g'77 |
| ○ | Mary | Egan | Hardman | c'42 g'44 |
| ○ | Mary | Egan | | '20 |
| ○ | Michael | Egan | | |
| ○ | Michael | Egan | | g'93 |
| ○ | Misti | Jones | Egan | '84 |
| ○ | Mitchell | Egan | | c'15 |
| ○ | Patricia | Egan | | g'86 PhD'94 |
| Already registered | Philip | Egan | | G72 G74 G81 |
| ○ | Rebecca | Egan | Foster | f87 |
| ○ | Robert | Egan | | e'86 |
| ○ | Spencer | Egan | | |
| ○ | Susan | Egan | | |
| Already registered | Thomas | Egan | | j'77 |

**Contact Us**                    **Current Issue**                    **Shop**                    **Featured Partner**

**KU Alumni Association**
Adams Alumni Center
1266 Oread Ave., Lawrence, KS 66045
Email: kualumni@kualumni.org
Phone: 800-584-2957

     













© 2019 KU Alumni Association. All Right

**EXHIBIT J**



CPA Courses    Reviews ↓    (104) Discounts
Blog    Other Exams ↓

# CPA Certificate vs CPA License: What's the Difference?

📅 **Updated:** Dec. 30, 2019    ✏️ Kenneth W. Boyd    🏷️ Best CPA Review Courses    📰 Advertiser Disclosure

Contents ▤

☰ CPA Exam, Careers



Search …



There always tends to be a lot of confusion between a **CPA certificate vs license**. They both mean completely different things. Furthermore, they give you different amounts of legal authority and responsibility although they seem like the same thing.

A CPA certificate, in most cases, is simply an acknowledgment. It means that you passed the CPA examination and fulfilled the minimum requirements to take it. A CPA license, on the other hand, is issued when you complete all the requirements from a board of accountancy to become a CPA. Consequently, you are granted

Kenneth W. Boyd is a former Certified Public Accountant (CPA) and the author of several popular accounting books including 'CPA Exam for Dummies' and 'Cost Accounting for Dummies'.

permission by the state to practice public accounting.

Let's take a look at some of the differences between these two designations and why you would want one over the other.

# CPA Certificate vs CPA License

# What's the Different between a CPA Certificate vs CPA License?

Let's look at a few key differences between a license and certificate.

## What's a CPA Certificate?

- No work experience requirements
- No continuing education requirements
- Cannot sign tax returns, audit reports, or use the title CPA on any official or legal report
- Cannot be an owner or partner of a public accounting firm
- Some states allow you to use the designation CPA after your name on unofficial documents, like resumes, while others expressly forbid using the acronym altogether
- Requires a small fee to renew each year

## What's a CPA License?

- Most states require at least 1-2 years of relevant accounting experience under a CPA
- Most states require at least 40 hours of continuing education each year

Learn More

CPA Exam
CMA Exam
CFA Exam
EA Exam
CIA Exam
PMP Exam
Six Sigma Exam
Bar Exam
LSAT Exam

**Popular Posts**

**EXHIBIT K**

**1-316.  Unlawful acts; penalty.**  (a) It is unlawful for any person to practice certified public accountancy unless the person holds a Kansas certificate and a valid permit to practice issued by the board pursuant to K.S.A. 1-310 and amendments thereto, or is entitled to practice pursuant to K.S.A. 1-322 and amendments thereto.

(b) It is unlawful for any firm to practice certified public accountancy as a certified public accounting firm or CPA firm unless the firm is registered with the board pursuant to K.S.A. 1-308 and amendments thereto, or meets the requirements to be exempt from such registration.

(c) It is unlawful for any person, except the holder of a valid certificate or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, to use or assume the title "certified public accountant" or to use the abbreviation "CPA" or any other title, designation, words, letters, abbreviation, sign, card or device likely to be confused with "certified public accountant."  The use of the term "public accountant" without the word "certified" shall not be interpreted as implying that one is a certified public accountant.

(d) Except as provided by this subsection, no person holding a permit or practice privilege or a firm holding a registration under this act or meeting the requirements to be exempt from such registration shall use a professional or firm name or designation that is misleading as to:  (1) The legal form of the firm; (2) the persons who are partners, officers, members, managers or shareholders of the firm; or (3) any other matter.  The names of one or more former partners, members or shareholders may be included in the name of a firm or its successor unless the firm becomes a sole proprietorship because of the death or withdrawal of all other partners, officers, members or shareholders.  The use of a fictitious name by a firm is permissible if the fictitious name is registered with the board and is not otherwise misleading.  The name of a firm may not include the name of an individual who is neither a present nor a past partner, member or shareholder of the firm or its predecessor.  The name of the firm may not include the name of an individual who is not a certified public accountant.

(e) It is unlawful for any person, except the holder of a Kansas permit to practice or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, or a valid Kansas firm registration, to issue a report with regard to any attest or compilation service under standards adopted by the board.  A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board.  The practice of public accountancy by persons not required to hold a permit to practice, including public accountants, is not prohibited or regulated by the provisions of this act, except for the provisions of this section, K.S.A. 1-308, 1-318 and 1-319, and amendments thereto and K.S.A. 1-319, and amendments thereto.  The title "enrolled agent" may only be used by individuals so designated by the federal internal revenue service.

(f) Any person who violates any provision of this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $5,000, or to imprisonment for not more than one year, or by both such fine and imprisonment.

**From:** Professional Ethics - Submissions <ProfessionalEthicsSubmissions@aicpa.org>
**Date:** Friday, November 8, 2019 at 9:46 AM
**To:** Bill S <bill@bmails.biz>, Professional Ethics - Submissions
<ProfessionalEthicsSubmissions@aicpa.org>
**Cc:** Peter Bornstein <pbornstein@prblegal.com>, Jeannette Wolf <jwolf@prblegal.com>
**Subject:** RE: Attention Unlicensed Individual Practicing

Hello William,

This individual is neither an AICPA member nor a member of the Kansas State Society of CPAs so we
don't have jurisdiction to perform any investigation.  You may want to contact the State Board of
Accountancy to see if they have any provisions.

Thank you.
Aradhana

## Aradhana Aggarwal, CPA
Manager - Professional Ethics
Professional Ethics Hotline: 888.777.7077 or ethics@aicpa.org
AICPA Member Service: 888.777.7077 or service@aicpa.org
CIMA: cimaglobal.com/Contact-us/

This message, including any attachments, may contain confidential information intended for a specific individual and purpose and is
protected by law. If you are not the intended recipient, please delete it. Any disclosure; copying or distribution of this message is
strictly prohibited.

The position expressed above represents the opinion of the staff of the AICPA Professional Ethics Division as to the application of the
*Code of Professional Conduct* to the facts presented in your e-mail. The opinions reflected in this response do not reflect an official
position of the Professional Ethics Executive Committee or of the AICPA.

Views expressed by AICPA employees are expressed for purposes of deliberation, providing member services and other purposes
exclusive of practicing public accounting. Views expressed by AICPA staff do not necessarily represent the official views of the
AICPA unless otherwise noted. Official AICPA positions are determined through certain specific committee procedures, due process
and deliberation.



**Department of**
**Regulatory Agencies**
Division of Professions and Occupations

Program Branch
Colorado Accountancy Board

William Sears
wjsears@gmail.com

November 8, 2019

Re: Kate Elizabeth Funk

Dear Mr. Sears,

The Colorado Accountancy Board is a state agency that licenses CPAs and CPA Firms, and when appropriate, takes disciplinary action against licensed CPAs. The jurisdiction of the Accountancy Board is confined to issues of customer care and issues of a CPA's ability to practice within State Guidelines. The Board lacks jurisdiction over fee disputes and any aspect of general business practice including matters relating to the personal manner of a CPA Firm's staff.

However the Board wants you to know that its lack of authority to act upon these matters should in no way be construed as an endorsement of rude conduct by a licensed CPAs or of excessive fees for services.

Sincerely,

FOR THE COLORADO ACCOUNTANCY BOARD

Amanda Sarrazin
Program Support Specialist

cc: file



1560 Broadway, Suite 1350, Denver, CO 80202   P 303.894.2988   F 303.894.7764 www.dora.colorado.gov/professions

**From:** Professional Ethics - Submissions <ProfessionalEthicsSubmissions@aicpa.org>
**Date:** Friday, November 8, 2019 at 9:46 AM
**To:** Bill S <bill@bmails.biz>, Professional Ethics - Submissions
<ProfessionalEthicsSubmissions@aicpa.org>
**Cc:** Peter Bornstein <pbornstein@prblegal.com>, Jeannette Wolf <jwolf@prblegal.com>
**Subject:** RE: Attention Unlicensed Individual Practicing

Hello William,

This individual is neither an AICPA member nor a member of the Kansas State Society of CPAs so we don't have jurisdiction to perform any investigation. You may want to contact the State Board of Accountancy to see if they have any provisions.

Thank you.
Aradhana

## Aradhana Aggarwal, CPA
Manager - Professional Ethics
Professional Ethics Hotline: 888.777.7077 or ethics@aicpa.org
AICPA Member Service: 888.777.7077 or service@aicpa.org
CIMA: cimaglobal.com/Contact-us/

This message, including any attachments, may contain confidential information intended for a specific individual and purpose and is protected by law. If you are not the intended recipient, please delete it. Any disclosure, copying or distribution of this message is strictly prohibited.

The position expressed above represents the opinion of the staff of the AICPA Professional Ethics Division as to the application of the *Code of Professional Conduct* to the facts presented in your e-mail. The opinions reflected in this response do not reflect an official position of the Professional Ethics Executive Committee or of the AICPA.

Views expressed by AICPA employees are expressed for purposes of deliberation, providing member services and other purposes exclusive of practicing public accounting. Views expressed by AICPA staff do not necessarily represent the official views of the AICPA unless otherwise noted. Official AICPA positions are determined through certain specific committee procedures, due process and deliberation.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

     Plaintiff,

v.

**1. WILLIAM J. SEARS,**

     Defendant.

---

### AFFIDAVIT OF STEVEN R. ANDERSON, CPA, JD

Steven R. Anderson, being of lawful age and upon his oath, deposes and states:

1.    I am an attorney licensed to practice law in the State of Colorado since 1987, and co-founder and managing partner of Anderson & Jahde, PC, 5800 South Nevada Street, Littleton, Colorado 80120.

2.    I also hold an inactive certified public accountant license in Colorado, having received my certification and license to practice public accounting in the State of Colorado in 1984.

3.    My practice focuses on Federal & State, civil and criminal tax controversies and trials; and, on representing accountants, tax return preparers and CPAs in all professional facets, to include CPA malpractice defense, representing CPAs before the Colorado State Board of Accountancy (and other state licensing boards), representing CPAs before the American Institute of Certified Public Accountants, and representing accountants before the IRS' Office of Professional Responsibility. I have represented and



EXHIBIT
B

consulted between 150 and 200 CPAs in cases before the Colorado State Board of Accountancy.

    4.    I do not have an exact number on how many, but a portion of the Board of Accountancy cases I have worked on involved CPAs who had relocated from other states to Colorado and were defending complaints before Colorado's Board of Accountancy (the "Board") because they did not understand Colorado's rules pertaining to holding out as a CPA in Colorado. I frequently work with Colorado's statutes governing CPAs and with the Rules of the Board. I have reviewed the CPA rules and statutes in Kansas.

    5.    I was asked to review the propriety of Special Agent Kate Funk's use of a CPA designation on search warrant applications related to cases involving William Sears, Scott Dittman, and Fusion Pharm, LLC, which were filed in the United States District Court for the District of Colorado.

    6.    Colorado's rules deem this a holding out as a CPA in Colorado that requires qualifications Ms. Funk does not have. She is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado.

    7.    Ms. Funk passed the CPA exam in Kansas, but never completed the Kansas requirement of having one year of qualified work experience to earn a Kansas "permit" to practice as a CPA. Kansas and Colorado have different legal structures for becoming a CPA authorized to practice as a CPA. In Kansas you obtain a CPA "certificate" (which Ms. Funk has) by meeting educational requirements and passing the CPA exam. Then, you must have the year of qualified work experience after which you may obtain a Kansas "permit" to practice as a CPA. Ms. Funk does not have a "permit" to practice as a CPA in Kansas.

2

8.     Colorado combines education, passing the CPA exam and one year of qualified work experience before you can obtain a CPA "certificate." Colorado does not issue "permits" for individual CPAs See, *C.R.S. §§ 12-2-108 and 12-2-109, and Rule 4.1 Colorado Board of Accountancy*. This difference between the states is key. Colorado does not allow someone from another state without one year of qualified work experience to hold themselves out as a Certified Public Accountant or use "CPA." *C.R.S. § 12-2-115(3).*

9.     Within the last year, I represented *a* Kansas CPA before the Board who was fully licensed in Kansas, with a Kansas permit, who used "CPA" on a business card handed to one client. The Board held this individual in violation of Colorado's statutes for improperly holding herself out as a CPA in Colorado. She did not first get reciprocity from Colorado. Ms. Funk's holding out was more egregious because she has no Kansas permit.

10.     On the Affidavit for Search Warrant, Special Agent for the Federal Bureau of Investigation, Kate E. Funk, wrote, "[p]rior to my employment with the FBI, I received an accounting degree from the University of Kansas in 1995. I became a certified public accountant in 1996 through the State of Kansas." Again, Ms. Funk has a Kansas certificate, not a permit to practice as a CPA. Clearly, Ms. Funk wanted the Court and others to rely on her statements in her affidavit as if they were provided by a CPA who had met Colorado's requirements to be a CPA. She is not recognized as a CPA in Colorado. I also checked the Kansas Board of Accountancy website and found an FAQ that addresses whether Ms. Funk could provide litigation support services (which is what

she did by submitting the affidavit) without having a permit in Kansas.  She cannot.  Here

is the Q&A from the Kansas Board of Accountancy website:

**6. I don't provide any attest services.  Am I required to hold a permit to practice to provide non-attest services as a CPA?**
Yes.  Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, all fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, requires a person to hold a valid Kansas permit to practice.  For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf  The definition is broken out into two categories: atttest and non-attest.

Ms. Funk violated the laws of Colorado by claiming she is a Certified Public Accountant,

intending for the Court and others to rely on her statements with the full level of trust,

training and competence those statements would have had they been made by a CPA.

Even under Kansas law she could not provide the litigation support services she provided

here in Colorado.

      11.     She made the same statement in an affidavit to support an application for

search warrant to search email accounts for William Sears, Scott Dittman, and others.

      12.     According to the records of the University of Kansas, Kate Egan graduated

in 1996, not 1995.

      13.     According to the records of the State Board of Accountancy for the State of

Kansas dated December 24, 2017, Kate Egan was issued a CPA certificate on August 4,

1999, not in 1996 as she claimed in Affidavits filed.

      14.     I am informed, and therefore do believe, that Kate Egan is the same person

as Kate Funk.  I also have been informed and do believe that Kate Funk has moved to

and does reside in Denver, Colorado and not in Chicago, Illinois, and has done so for

many years.

15.    Once one becomes a resident of the State of Colorado, and desires to hold themselves out as a CPA in Colorado, they must obtain reciprocity and a license from the Board to hold themselves out as a CPA in Colorado. Ms. Funk could not have accomplished this because she had no Kansas permit. According to the Board's website: "To apply for a license in Colorado one must satisfy the following:

*    Holds an active license from a substantially equivalent jurisdiction and/or possesses the requirements necessary for issuance of a license in Colorado.

*    Attests to having completed all CPE required by the other state as of the application receipt date"

Kate Funk formerly known as Kate Egan could not obtain reciprocity because her Kansas certificate is not the equivalent to being a CPA in the State of Colorado.

16.    Kate Funk has no professional CPA credential in Colorado. Therefore, she is not qualified as a CPA to offer opinion testimony on the appropriateness of revenue recognition or other applications of Generally Accepted Accounting Principles (GAAP) and Generally Accepting Auditing Standards (GAAS). I have reviewed an Affidavit drafted containing opinions by Kate Funk regarding revenue recognition and disclosure requirements for FusionPharm, and it is my opinion as a licensed lawyer and licensed inactive CPA in the State of Colorado, that Kate Funk was not qualified to render said opinions in her Affidavit as a CPA and violated Colorado's laws by doing so.

17.    Colorado Revised Statute § 12-2-129 makes it a Class 2 Misdemeanor to use the CPA designation in Colorado when one is not authorized to do so; and a class 6

5

felony for any subsequent offense. Kate Funk appears to have violated this criminal statute.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Steven R. Anderson

$6 - 18 - 19$
Date

STATE OF COLORADO )
                     ) ss.
COUNTY OF Arapahoe )

Subscribed and sworn to before me by Steven R. Anderson this _18th_ day of June, 2019.

Witness my official hand and seal.

Notary Public

My commission expires: $8·26·2019$

MARCIE J MORTON
NOTARY PUBLIC
STATE OF COLORADO
Notary ID 20034028692
My Commission Expires 08/26/2019

6

**EXHIBIT L**

and IRS-CID has acquired additional bank records as additional accounts and transactions have been uncovered. Your affiant has been reviewing these records as part of an ongoing effort to follow the flow of money from the scheme detailed herein.

13.     In addition to my review of the records set forth in ¶ 12, your affiant interviewed two former FusionPharm employees.   On February 17, 2014, CW-1 voluntarily sat for a joint proffer session with your affiant, and representatives from the SEC, IRS-CID, and United States Attorney's Office ("USAO") at the USAO offices in Denver, CO.   CW-1 sat for a second voluntary joint proffer session on February 28, 2014 with your affiant and representatives from the SEC, IRS-CID, and USAO at the USAO offices.   On March 12, 2014, your affiant and IRS-CID Special Agent Ronald Loecker had a follow up meeting with CW-1, at which time CW-1 voluntarily provided your affiant and IRS-CID Special Agent Loecker with e-mail and phone text message communications between CW-1, and Dittman and Sears.   Your affiant reviewed these e-mail and phone text message communications after receipt from CW-1.

14.     As part of your affiant's discussions with CW-1, CW-1 identified a former FusionPharm employee, Cooperating Witness 2 (hereinafter referred to as "CW-2"), who was familiar with various aspects of FusionPharm's business operations from the company's inception, including the accounting and bookkeeping aspects of the business.   On March 5, 2014, your affiant and IRS-CID Special Agent Loecker interviewed CW-2.

15.     As part of his assistance, on or about March 28, 2014, CW-1 introduced Dittman to an FBI undercover agent (hereinafter referred to as "UC-1").   CW-1 introduced UC-1 as a prospective FusionPharm investor.   From March 28, 2014 to May

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.     I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2.     At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.     I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

> a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.     The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

38. In 2011, FusionPharm purportedly focused on two aspects of the organic produce and agriculture market: (1) growing and selling produce (almost always lettuce); and (2) selling PharmPods in the organic produce industry. According to FusionPharm's 2011 Annual Report, FusionPharm claimed to have made $256,895 in revenues during the 2011 fiscal year. Notably, your affiant's review of FusionPharm's 2011 Annual Report reveals $0 in Accounts Receivable, suggesting that any revenue generated by FusionPharm during the 2011 fiscal year (January 1, 2011 through December 31, 2011) should be supported by incoming deposits in FusionPharm's bank accounts.

39. In the same report, FusionPharm represented to investors that it derived its revenue from organic food sales. FusionPharm touted its relationship with Circle Fresh Farms as its main partner and revenue driver in 2011. Based on your affiant's review of the SEC Produced Records, SEC Analyses, statements by CW-2 and your affiant's independent investigation, FusionPharm did not generate any significant revenue from: (a) Circle Fresh Farms directly; or (b) agriculture-related business. Moreover, it did not generate anywhere close to $256,895 in revenues during the 2011 fiscal year.

40. FusionPharm reported its "successful harvest and sale of its initial crop through its collaboration agreement with Circle Fresh Farms." Your affiant's review of the SEC's Analyses and the Bank Records reveals only one check from Circle Fresh Farms at any time between 2011 and 2013 across the bank accounts of FusionPharm and the Sears Controlled Entities – for $30.60 in 2012. Accordingly, Circle Fresh Farms did not generate any revenue for FusionPharm in 2011.

20

41. Moreover, CW-2 estimated that FusionPharm only made $3,000 - $5,000 in organic produce sales from 2011 through 2013. Your affiant's review of the Bank Records along with the SEC Analyses of the same corroborates the statements made by CW-2. Your affiant found, and the SEC Analyses confirmed, that there was less than $4,000 worth of organic produce sales across the bank accounts of FusionPharm and the Sears Controlled Entities – and those sales were all in 2012 and 2013. Once again, these sales could not be a basis for claimed 2011 revenue.

42. Furthermore, your affiant's review of the Bank Records and the SEC's Analyses regarding the same provide no evidence of any FusionPharm sales of PharmPods to third parties in 2011. Of the almost $600,000 of incoming funds into FusionPharm's bank account in 2011, nearly 100% of the funds can be traced to: (a) the Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. I have reviewed the SEC Analyses of the Bank Records, wherein the SEC was able to trace the majority of cash deposits and cashier's checks directly back to a corresponding withdrawal from one of the accounts for the Sears Controlled Entities for the same dollar amount on the same day. Your affiant's review of the Bank Records confirms these findings.

43. To ensure that payments from third party customers were not made to one of the Sears Controlled Entities, your affiant reviewed the SEC Analyses concerning the incoming wires and deposits into the Sears Controlled Entities' accounts for 2011. Your affiant found no evidence of any FusionPharm PharmPods sales to third parties in 2011 based upon the following: (a) Sears did not open VertiFresh's bank account until 2012; (b) The Meadpoint account only had a single $100 deposit into the account during 2011

21

from another Sears Controlled Entity; and (c) Bayside's account was almost wholly funded from incoming wires and deposits from Microcap.

44. Microcap, meanwhile, received over $1.2 million in incoming wires and deposits in 2011. Of that amount, approximately 99% came from wire transfers. Based on my review of the Bank Records and Brokerage Records, these wire transfers originated from Microcap's brokerage account. The Brokerage Records confirm that nearly all of the money coming into Microcap's brokerage account in 2011 came from sales of FusionPharm common stock. The remaining 1% that came into Microcap's bank account is 2011 was comprised almost entirely of a single deposit from Bayside.

45. As a result, there is no evidence that the money coming into FusionPharm's accounts or the accounts in the name of the Sears Controlled Entities was the result of legitimate sales of produce or PharmPods. Rather, the source of the money appears to the sale of FusionPharm stock, which was then funneled between and among the Sears Controlled Entities.

## MISREPRESENTING SALES REVENUE IN 2012

46. In its 2012 Annual Report, FusionPharm represented that its net revenues for the year ended December 31, 2012 were $808,398 an increase of 250+% compared to 2011. When asked if these figures seemed accurate, CW-2 said this revenue figure was "impossible" as the most revenue that could have come into FusionPharm from PharmPod sales in 2012 was $160,000. CW-2 was aware of only one deal in 2012 to a customer in Arizona for eight PharmPods. CW-2 helped load the PharmPods for delivery. CW-1 said these figures were "bullshit" and "crazy." Based on your affiant's

22

review of the Bank Records and SEC Analyses regarding the same, FusionPharm did make anywhere close to $825,594 – or even $160,000 – in revenue in 2012.

47. In comparison to 2011, the 2012 Annual Report did disclose significant accounts receivable – over $500,000. Accordingly, your affiant and the SEC analyzed the Bank Records to determine if there was evidence to support approximately $300,000 in incoming revenues in 2012.

48. Based on your affiant's review of the Bank Records and the SEC's Analyses regarding the same, FusionPharm had approximately $400,000 in incoming wires and deposits into its accounts in 2012. As in 2011, nearly 100% of the funds can be traced to: (a) Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. As with 2011, the SEC was able to trace most of the cash deposits back to corresponding cash withdrawals at other Sears Controlled Entities. Your affiant reviewed the Bank Records and the SEC's Analysis on this point and corroborated this conclusion.

49. The SEC and your affiant also reviewed the Bank Records for the Sears Controlled Entities in 2012. The Meadpoint and VertiFresh accounts in 2012 had a very similar pattern – significant deposits and wires coming in to the accounts from other Sears Controlled Entities with little-to-no evidence of any incoming deposits or wires coming into the account from unaffiliated third parties. Consistent with 2011, the majority of the funds coming in to the VertiFresh and Meadpoint accounts were from Bayside and Microcap. More importantly, your affiant's review of the Bank Records reveals evidence of only one possible third-party sale of a PharmPod, with

23

51.    Based on my review, investigation and analysis above, the money coming into FusionPharm's and the Sear Controlled Entities' bank accounts was ultimately the result of Microcap, selling FusionPharm stock on the open market, and re-circulating portions of those proceeds to the other Sears Controlled Entities.

## RESTATEMENT TO 2012 SALES REVENUE STILL INCLUDES MISREPRESENTATIONS

52.    On April 15, 2014, FusionPharm issued its 2013 Annual Report, which included a restatement of 2012 annual revenue, reversing $500,000 of 2012 revenue. The newly stated revenue with the reversal was $308,398. The restatement clarified that $750,000 of initial claimed revenue was purportedly attributable to an "exclusive licensing arrangement with [VertiFresh] for the use of PharmPods growing technologies for agricultural products."

53.    The restatement claimed that VertiFresh paid $250,000 in 2012 in connection with the purported licensing agreement mentioned above, but that the remaining $500,000 was reflected as revenue in error under GAAP. With the restatement, FusionPharm claimed that it only made an additional $58,398 ($308,398 - $250,000) outside of the licensing revenue from VertiFresh – a figure far more consistent with actual 2012 PharmPod sales based on your affiant's review of the Bank Records, statements made by CW-2 and CW-1 and the SEC's Analyses.

54.    However, based on my review of the SEC Produced Records, the SEC Analyses and your affiant's experience and background in accounting, the reported revenue remains inaccurate for at least three reasons:

a. First, as detailed herein ¶¶68-72, nowhere in the Restatement does FusionPharm disclose that VertiFresh is an affiliate owned, operated and controlled by Sears, a FusionPharm control person.

b. Second, even if the revised $250,000 figure could be a legitimate third party transaction, and even if the revenue could be properly recognized under GAAP, FusionPharm misrepresented the basis for possibly recognizing this amount as revenue. In Note 4 to FusionPharm's 2013 Annual Report, FusionPharm claims that "The restatement was based on reevaluating the arrangement with VertiFresh which required $250,000 be paid during 2012 for the licensing of the Colorado territory (on a nonrefundable basis), and the remaining $500,000 to be due in equal installments of $250,000 during 2013 and 2014 for the rights to two additional territories. The initial $250,000 was paid during 2012 and was reflected as earned revenue. Yet, according to the SEC analyses of the Bank Records, and my review of the same, VertiFresh only contributed approximately $128,000 in deposits and wires to FusionPharm in 2012.

c. Third, CW-2 said that FusionPharm did not sell any licenses or receive any licensing income while she worked at FusionPharm, which includes 2012.

## MISREPRESENTING 2013 SALES REVENUE
## AND BUSINESS DEALS

55.) In its 2013 Annual Report, FusionPharm claimed that it made $594,397 in revenue in 2013. Based on your affiant's review of FusionPharm's 2013 Annual Report, FusionPharm did (not) have any accounts receivable at the end of 2013.) (In an (email

26

conversation with UC-1 on April 30, 2014, Dittman confirmed the 2013 revenue was all from the sale of PharmPods. In a subsequent meeting on May 1, 2014, Dittman stated that FusionPharm delivered 34 PharmPods in 2013.

56. CW-1 said that it was "impossible" that the company could have earned these revenues in 2013. Although CW-1 only worked at FusionPharm until October 2013, your affiant's comparison of FusionPharm's September 2013 quarterly financial disclosure comparison, which claimed a cumulative revenue figures of $549,725 through the company's third quarter, with the year-end revenue claimed in FusionPharm's 2013 Annual Report, $594,397, reveals that FusionPharm only claimed to make $44,672 in revenue in the last quarter of 2013. Accordingly, the bulk of the revenue purportedly came during the time that CW-1 worked at FusionPharm.

57. Furthermore, there were only three PharmPods at the warehouse when CW-1 arrived in January 2013: (a) two were used to grow lettuce; and (b) one was not functioning. Additionally, according to CW-1, there were not any deals in place to sell any PharmPods in 2013 when he started. Throughout 2013, CW-1 was responsible for: (a) preparing PharmPods for sales to customers; and (b) constructing the PharmPods kept at the warehouse where FusionPharm would grow cannabis. This meant that any FusionPharm PharmPod 2013 sales required CW-1 to be involved in the refurbishing and retrofitting of the shipping containers prior to delivery. CW-1 did not believe it was possible for FusionPharm to have sold anywhere close to 34 PharmPods while he was employed without his knowledge.

58. According to CW-1, there were two possible revenue sources in 2013: (a) sales of PharmPods; and (b) sales of marijuana. CW-1 said that the most revenue that

could be derived from PharmPod sales in 2013 was $200,000-$250,000 – and CW-1 stated that those figures were a high estimates. CW-1 identified, at most, two possible sales between January – October 2013: (a) FusionPharm sold two PharmPods to a customer in California; and (b) FusionPharm sold five PharmPods to Local Products, a Denver company.[8]

    a. CW-1 said there might have been an additional, single PharmPod sale to Mile High Green Cross in 2013, but he could not be sure. Dittman told CW-1 that FusionPharm "gave away" a PharmPod to Mile High Green Cross so CW-1 was not sure that this could be classified as a "sale." Based on your affiant's review of the Bank Records, Mile High Green Cross did provide funds to Meadpoint – but this was in 2012. There is no evidence that Mile High Green Cross made any payments to FusionPharm or the Sears Controlled Entities in 2013.

59. Based on the statements from CW-1, FusionPharm did not sell more than 7 PharmPods between January – October 2013. Yet FusionPharm continued to make representations to the contrary to the public. For example, on February 6, 2013 the company issued a press release claiming it "completed the sale of 8 PharmPod High Intensity containers under its licensing agreement with Meadpoint Venture Partners." CW-1 said there were multiple problems with this: (a) since Dittman and Sears operated the Sears Controlled Entities and FusionPharm as one entity, this release was basically claiming a sale to itself; and (b) as noted above, CW-1 could recall, at most, 7 PharmPod sales *total* in 2013.

---

[8] As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company. CW-1 has revised that statement to match the sales highlighted in ¶58.

60.     Additionally, Sears's company, Meadpoint directly participated in the misrepresentations. For example, on July 29, 2013, Meadpoint issued a press release that appears on the FusionPharm web page announcing that it "reached the $200,000 mark for sales in the past 30 days, including its first ever sale into the California medical cannabis marketplace." The press release also claimed that Meadpoint was "optimistic that we will reach our annual sales goal of 100 PharmPods by the end of the year." CW-1 said that delivering 100 PharmPods to customers in 2013 was "ridiculous" and not even close to actual figures. Moreover, CW-1 said that the $200,000 figure may have been an annual amount, but certainly not in the last 30 days. Furthermore, based on affiant's review of the Bank Records, there is no evidence of $200,000 coming in to FusionPharm's or Meadpoint's bank accounts between June 2013 and July 2013 from companies that are not affiliated with Sears or Dittman.

61.     For the second possible revenue stream, FusionPharm grew cannabis and sold it to Groundswell, a licensed marijuana retailer on record with the Medical Marijuana Enforcement Division in Colorado, in the latter part of 2013.

62.     Based on your affiant's review of the Bank Records, SEC's Analyses of the same, and CW-1's statements, there is little evidence that Groundswell made up the remainder of the claimed 2013 revenue. In fact, there is only one check or incoming wire from Groundswell in 2013: a $50,000 check to FusionPharm on August 15, 2013.

63.     While your affiant observed some significant transactions in the fourth quarter of 2013, Dittman told UC-1 a portion of the December orders were not recognized as revenue because they were not yet delivered. FusionPharm's 2013

29

Annual Report confirms this statement. Importantly, as noted above in ¶56, FusionPharm made, at most, $44,672 in revenue in the last quarter of 2013.

64. For the first three quarters of 2013 when CW-1 worked at FusionPharm, based on your affiant's review of the Bank Records and SEC's Analyses regarding the same, as well as statements from CW-1, there is no evidence that FusionPharm made $549,725 or sold 34 PharmPods.

## ADDRESSING CONCERNS OF CASH PAYMENTS

65. Dittman told UC-1 on May 1, 2014 that one of FusionPharm's vendors made cash payments between 2011 and 2013. In an effort to ensure that cash payments were not dismissed as a potential legitimate revenue source, the SEC conducted an analysis of FusionPharm's bank accounts and the accounts in the name of the Sears Controlled Entities to determine if a conservative analysis of the cash transactions could provide sufficient revenue to match the numbers claimed by FusionPharm in its financial disclosures.

66. Even after including all cash deposits that could not be directly traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account, based on a review of the Bank Records and SEC Analyses regarding the same, your affiant was unable to get anywhere near the revenues that FusionPharm included in the Financial Statements for 2011, 2012 or 2013.

  a. 2011: Your affiant found less than $25,000 worth of incoming deposits and wires that could be considered from unaffiliated third parties.

  b. 2012: Your affiant uncovered approximately $200,000 in incoming wires and deposits. Of that amount, approximately $128,000 came from

30

VertiFresh (discussed above in ¶¶ 52-54), approximately $35,000 in cash and approximately $47,000 from Bayside, MeadPoint and a missing check with the notation "container deposit."

c. 2013: Your affiant uncovered approximately $425,000 in incoming wires and deposits in 2013. More than 50% of this amount was cash deposits, with many of these traceable back to Meadpoint. The majority of the remaining checks were from Sears Controlled Entities.

67.     Accordingly, even if it were to be assumed that every cash deposit which could not be traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account was the byproduct of a legitimate, arms-length transaction, the maximum possible revenue under my conservative approach was still more than $100,000 short every year of the revenue claimed by FusionPharm.

## OTHER MISREPRESENTATIONS TO INVESTORS

68.     As noted in ¶¶19-20 above, Sears handled numerous responsibilities at FusionPharm that are often reserved for a company officer. Yet, based on statements from CW-1 and CW-2, Sears refused to put his name on any FusionPharm documents or accounts. Rather, Sears attempted to get FusionPharm employees (including CW-1 and CW-2) to open up bank accounts and businesses in their names.

69.     Based on affiant's review of the FINRA Records, Dittman authored FusionPharm's press releases and reviewed its financial statements. Yet, based on affiant's review of the same, Dittman never made any disclosures about Sears's involvement with FusionPharm or the connection between Sears, the Sears Controlled Entities and FusionPharm.

31

EXHIBIT

A

Page 93

1 letters or whether they were denoted for a retainer for
2 FusionPharm, I don't recall. But I -- but the import of
3 the statements -- of the statement was that, you know,
4 you're hired, and in my mind it was FusionPharm.
5   Q  Okay.
6     MR. KARPEL: Kim, let's go off the record for a
7 moment.
8     (Short recess from 10:22 a.m. to 10:28 a.m.)
9     MS. GREER: Let's go back on the record,
10 please, at 10:28 a.m.
11   BY MS. GREER:
12   Q  Mr. Lehrer, during the break, did we have any
13 substantive conversations about the case?
14   A  No.
15   Q  Going back to the meeting that was held in
16 Orlando between yourself, Mr. Sears, and Mr. Scholz, how
17 long was the meeting?
18   A  Maybe an hour.
19   Q  And was there any legal advice sought during
20 the meeting?
21   A  No. It was very general about the company,
22 what my experience is.
23   Q  And what did -- what did -- what did Mr. Sears
24 say about FusionPharm?
25   A  I really don't recollect. I mean, it was just

Page 94

1 very general stuff about what the business is.
2   Q  What did he tell you their business was?
3   A  Selling these pharmpods for cultivation.
4   Q  Did Mr. Scholz tell you anything about
5 FusionPharm?
6   A  I don't really recall him saying anything about
7 FusionPharm. He was really there as an introduction to
8 Mr. Sears.
9     MR. KARPEL: What else do you recall about the
10 meeting? Can you just sort of describe what was said
11 generally?
12     THE WITNESS: I can't really recall. I mean,
13 it was just very general about what the company did,
14 what its prospects were. That was about it.
15     MR. KARPEL: Did he talk about the future? Did
16 he talk about what -- you know, what FusionPharm's plans
17 were for expansion or growth, those kinds of things?
18     THE WITNESS: Well, I think they talked about
19 the opportunity -- he talked about the opportunity in
20 other states where marijuana was medically approved
21 and/or would be recreationally permitted. Again, very
22 general kind of information.
23     MR. KARPEL: Did he speak about Mr. Dittman at
24 all, the CEO?
25     THE WITNESS: I believe so, just that he was a

Page 95

1 very competent CEO.
2     MR. KARPEL: Any more that you recall?
3     THE WITNESS: No.
4     MR. KARPEL: Anything about the facilities or
5 what customers? Anything --
6     THE WITNESS: No.
7     MR. KARPEL: -- along those lines?
8     THE WITNESS: Nothing about that. Generally
9 about what these pharmpods were.
10     MR. KARPEL: That's what you remember? So
11 talking through this, it's not jogging your memory as to
12 any other parts of the conversation?
13     THE WITNESS: No.
14     MR. KARPEL: Okay.
15   BY MS. GREER:
16   Q  Did Mr. Sears indicate that he, through his
17 company, was a shareholder of FusionPharm?
18   A  I don't recall.
19     MR. KARPEL: And was it at this meeting you
20 talked about a registration statement?
21     THE WITNESS: Yes.
22     MR. KARPEL: Can you tell us about that?
23     THE WITNESS: Yeah. The information was that
24 the company wanted to do an S-1 registration statement.
25     MR. KARPEL: It was Mr. Sears who was telling

Page 96

1 you that?
2     THE WITNESS: Yes.
3   BY MS. GREER:
4   Q  Did you have an understanding as to why
5 FusionPharm wanted to do an S-1?
6   A  Well, yes. They wanted to become an
7 SEC-reporting company.
8   Q  Do you know an individual by the name of Guy
9 Jean-Pierre?
10   A  Yes.
11   Q  And how do you know Mr. Jean-Pierre?
12   A  I knew him in connection with my ex-wife's
13 practice.
14   Q  Was he a member of your ex-wife's firm?
15   A  No, absolutely not.
16   Q  Can you explain what you mean when you say you
17 knew him in connection with your ex-wife's practice?
18   A  Well, I believe I only met him once; but prior
19 to that, there was -- I believe it had something to do
20 with my ex-wife contesting something about his opinion
21 letters.
22   Q  Do you recall when that happened?
23   A  I think it was around 2007 or 2008.
24   Q  And you said you met him once?
25   A  Yeah. I can't even recall why I met him, but,

Page 97

1  you know, I found out -- I was with my son, and I found
2  out his office was right there, and I walked in and
3  introduced myself. And I just don't recall what it was,
4  an introduction or I was inquiring about something in
5  particular that my ex-wife had told me to inquire about.
6  This was quite a while ago. I don't recall. And it was
7  an extremely brief, no more than one minute, situation.
8      Q  Did you ever speak with Mr. Jean-Pierre about
9  FusionPharm?
10     A  No, absolutely not.
11     Q  Did you ever become aware at any point that Mr.
12  Jean-Pierre was involved with FusionPharm?
13     A  I don't recall.
14     Q  You don't recall ever knowing that, or you
15  don't recall either way?
16     A  I really don't recall either way. I mean, it's
17  conceivable, but it's certainly not at the forefront of
18  my mind that he was involved in any way.
19     MR. SALLAH:  Is that something you would have
20  remembered, having this prior incident with him, met
21  him, had this, you know, brief incident if his name
22  would have come up in the context of FusionPharm? You
23  would have --
24     THE WITNESS:  Yeah, I would have, because at
25  some point I had learned that he had been banned from

Page 98

1  issuing opinion letters.
2      BY MS. GREER:
3      Q  When did you learn that?
4      A  I don't recall. It was probably, you know,
5  just through a computer search, not necessarily in
6  reference to him in particular, you know, but banned
7  opinion writers.
8      Q  Is there a reason that you were doing that
9  search?
10     A  I really don't recall.
11     MR. KARPEL:  Did -- did you do that search
12  during the time period that you still represented
13  FusionPharm?
14     THE WITNESS:  No.
15     MR. KARPEL:  After?
16     THE WITNESS:  No, this is way before.
17     MR. KARPEL:  Before?
18     THE WITNESS:  Yes.
19     MR. KARPEL:  Okay. So you know before --
20     THE WITNESS:  I believe so.
21     MR. KARPEL:  You knew before you began
22  representing FusionPharm that Guy Jean-Pierre had been
23  banned?
24     THE WITNESS:  Yes.
25     MR. KARPEL:  And ...

Page 99

1      BY MS. GREER:
2      Q  Do you know an individual by the name of Tod
3  DiTommaso?
4      A  Tod DiTommaso? What -- I'm not sure. I think
5  he may have been involved as an officer or one of these
6  shareholders. I'm not sure. I don't recall his name in
7  particular other than perhaps in connection with his
8  opinion letters.
9      Q  I'm sorry. I don't understand that. So you
10  recognize his name or you don't recognize his name?
11     A  I'm thinking perhaps that one of these slices
12  of debt that was sold, that that particular person was
13  representing one of the entities that was trying to free
14  up shares.
15     Q  Okay.
16     A  But I don't -- other than that, I never met the
17  guy, never -- you know, I don't even know --
18     Q  Okay. So I'll represent to you -- we'll get to
19  those -- your attorney opinion letters.
20     A  Yeah.
21     Q  Right. None of those relate -- none of the
22  entities who purchased Bayside debt related to Tod
23  DiTommaso at all. So --
24     A  You're telling me this?
25     Q  I'm telling you this.

Page 100

1      A  Okay. All right.
2      Q  So knowing that, I mean, does --
3      A  No, I --
4      Q  -- do you know his name?
5      A  I don't know his name.
6      Q  And I'll represent to you he's an attorney
7  practicing in California. Does that refresh your
8  recollection or ring any bells?
9      A  Oh, I'm sorry. You mean the gentleman that had
10  issued opinion letters for me?
11     Q  So you do know --
12     A  No, I do.
13     Q  Okay.
14     A  Yeah, because I remember -- I apologize. I
15  didn't get the name right in my mind. I had reviewed an
16  opinion letter that he issued. It was provided to me.
17     Q  Who provided that to you?
18     A  Bill Sears.
19     Q  And when did Mr. Sears provide Mr. DiTommaso's
20  opinion letter to you?
21     A  I don't recall exactly, but it was early on in
22  the engagement.
23     Q  Was it before you drafted and issued your first
24  FusionPharm --
25     A  I believe so --

EXHIBIT

B

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 502011CA007165XXXXMB-AE

BIG APPLE CONSULTING USA, INC.,
a Delaware corporation; BIG APPLE
EQUITIES, LLC., a New York Limited
Liability Corporation, MANAGEMENT
SOLUTIONS INTERNATIONAL, INC.,
a Florida corporation, and MARC JABLON,
an individual,

       Plaintiffs,

vs.

BRENDA LEE HAMILTON, an individual;
HAMILTON & ASSOCIATES LAW GROUP,
P.A., and HAMILTON & LEHRER, P.A.

       Defendants.

_____/

## Declaration

My name is Frederick M. Lehrer. I am a Florida licensed attorney. On or about July 15, 2011, I was assisting Hamilton & Associates Law Group, P.A. in various matters and accepted a telephone call from Leslie Jean Pierre ("L Pierre"), who identified herself as an attorney licensed to practice law in Texas and the niece of Guy Jean-Pierre ("GJP"). L. Pierre informed me that she wished to discuss matters pertaining to a June 15, 2011 letter to the Texas Bar in matter number S00411125140 (hereafter referred to as the "Texas Bar Matter"), a copy of which letter is attached hereto as Exhibit A. L. Pierre told me the following:

1. In or about March or April of 2010, her uncle, Guy Jean-Pierre ("GJP"), asked her for a copy of my driver's license and signature, which he said was required to form a corporation, Complete Legal Solutions, Inc. ("CLS'). GJP also asked L Pierre to assist him with his law firm because he had more legal work than he could do. This work included drafting legal opinions in securities-related matters.

2. L. Pierre advised GJP that she knew nothing about such legal opinions, the SEC, or the OTC Markets. GJP responded, "Don't worry about it". At the conclusion of this conversation, L. Pierre made it clear to GJP that she did not have any experience in securities or corporate law.

3. In compliance with GJP's request, L. Pierre provided GJP with a copy of her driver's license and signature for the purpose of forming CLS. In hindsight, after realizing that her signature has been forged on legal opinions, L. Pierre realized that this was an ill-

advised action on her part. However, at the time she trusted her uncle completely, and never imagined he would violate this trust.

4. L. Pierre had had no further contact with GJP until approximately one year later, when she received notification of the Texas Bar Matter, relating to Brenda Hamilton's concerns about legal opinions that purport to have been authored and signed by L. Pierre under the CLS letterhead. L. Pierre identified those letters as forgeries and L. Pierre did not author or sign them, or authorize GJP or anyone else to sign her name to these letters.

5. L. Pierre called GJP to discuss these circumstances. GHP told L. Pierre said that Ms. Hamilton filed the Texas Bar Matter against him in retaliation against him, which made no sense to L. Pierre. Ms. Hamilton provided L. Pierre   with the legal opinions in question and there is no doubt they are forgeries of her signature.

6. L. Pierre confronted GJP about the forged letters, and advised him that she never authorized him to sign her name to the legal opinion letters. In response, GJP told L. Pierre that he thought that she had understood "how things would work." L. Pierre interpreted this remark to be an admission that he her uncle had forged her name to these letters, but explained that he believed she had somehow been complicit in his plan to do so.

7. L. Pierre immediately responded to GJP that he never gave her any idea of "how things would work," and specifically never told her that he would be signing her name to opinion letters. L. Pierre also told him that she never would have agreed to allow him or anyone else to use her signature or name in such a manner.

8. Based on this conversation with GJP, L. Pierre has come to the conclusion that GJP forged her signature to, or used a copy of her signature on the legal opinions that are the subject of the Texas Bar Matter. .

9. Before learning of the Texas Bar Matter, L. Pierre was unaware that OTC Markets had banned GJP from providing any opinion letters to OTC Markets. In hindsight, she has concluded that GJP used her to form CLS because the OTC Markets would not accept any opinion letters authored by his firm, or any new firm he might create, since he had been banned. Instead, he used CLS and L. Pierre's name -- without her knowledge or permission -- to continue sending opinion letters to OTC Markets and evade the ban, by not using his own name.

10. L. Pierre has never had any contact with Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on her behalf. L. Pierre has never provided a copy of her driver's license or signature to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone on his or her behalf.  L. Pierre has never provided a legal opinion, or legal opinion bearing her signature, to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf. L. Pierre has never authorized Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf to provide her driver's license or any legal opinion bearing her signature to anyone, including the OTC Markets.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed on August  2  2011:

EXHIBIT

**C**

## DECLARATION OF FREDERICK M. LEHRER

The undersigned, Frederick M. Lehrer, hereby declares that:

1. I am an attorney licensed to practice law in the state of Florida.

2. I am a former attorney with the Division of Enforcement of the US Securities and Exchange Commission and a Special Assistant US Attorney with the United States Attorney's Office for the Southern District of Florida.

3. I have a son, Brandon Lehrer, with my ex-wife, Brenda Hamilton.

4. Since he was born, Brandon has suffered various illnesses, which last for weeks and sometimes more than a month. During May of 2010, Brenda and I were told that our son, Brandon's immune system was not functioning properly, which was particularly traumatic for Brenda because her sister's first son died of a rare immune disorder when he was 3 years of age and her sister's second son recently was diagnosed with Stage 4 nasopharyngeal cancer.

5. Because we were advised by our physician at Miami Children's Hospital that Brandon could literally die from a cold, whenever Brandon was ill, Brenda missed work to care for our son, instead of arranging for a babysitter or other childcare.

6. Shortly after learning of our son's illness, in July of 2010, Brenda learned her mother (now deceased) was diagnosed with cancer of an unknown primary region, a terminal form of cancer with a 100% mortality rate. Brenda also assisted in the care of her mother regarding her illness.

7. Because it was impossible for Brenda to maintain a normal work schedule for almost a year, until her mother's death in late April 2011, as summarized above in 4-6, I provided her with assistance in her work with multiple client matters during such time including her representation of Cloud Centric, Inc. ("Cloud Centric") and David Lovatt ("Lovatt"). At times I provided representation to Cloud Centric and Lovatt including the appropriate steps Cloud Centric should take to correct its prior illegal public disclosures, which are available on the OTCMarkets.com website, which Guy Jean Pierre ("Jean Pierre") and Kimberly Graus ("Graus") opined upon.

8. I substantially assisted in drafting the Cloud Centric remedial disclosures (the "Remedial Disclosures") posted on the OTC Markets website pertaining to Big Apple Consulting and its related corporate egos and control persons (collectively "Big Apple"), including Marc Jablon ("Jablon") which are the subject of the Florida Bar grievance (the "Grievance") filed by Jablon against Brenda.

9. When assisting with the drafting of the Remedial Disclosures, I confirmed ALL of the factual disclosures concerning Big Apple by reviewing executed contracts, publicly available information, filings on www.sunbiz.org & OTC Markets website and Cloud Centric's corporate documents and did not rely upon any factual representations made by Lovatt, Brenda or any other person. I also conducted a legal analysis of the securities law issues related to the matters involving Big Apple and assisted with the drafting of the legal analysis contained within the

Remedial Disclosures.

10.   It is my opinion that the Remedial Disclosures are factually and  legally accurate and are disclosures required by the securities laws.

11.  In December of 2010, I assisted David Lovatt in drafting the bar grievance against Carl N. Duncan for the theft of shares held in escrow by Duncan after Duncan provided me with what I believe are false accountings of Cloud Centric's common shares he purportedly held in Escrow. I also assisted substantially with drafting the grievances filed against Jean Pierre and Graus as well as the UPL grievance concerning Connectyx Technologies, Inc. during the time when Brenda's mother was in the final stages of her cancer.

12.  It is my firm belief that there are no confidential communications of any type (including between Jablon and Brenda), which were disclosed in the Remedial Disclosures because I independently verified the information concerning Big Apple contained within the Remedial Disclosures from publicly available documents from the internet, transfer agent documents,  or contracts and corporate documents provided by Lovatt.

13.  I have never spoken with Marc Jablon or anyone at Big Apple about any portion of the information contained within the Remedial Disclosures.

14.  It is my opinion that Brenda's only objective and role in drafting the Remedial Disclosure was to protect the interests of her clients, Cloud Centric and Lovatt and provide truthful disclosure of the public to protect her clients' interests and prevent them from being the subject of an SEC enforcement action based upon improper and illegal disclosures drafted by Big Apple and opined upon by Graus and Jean Pierre, neither understood or undertaken by Cloud Centric and Lovatt.

15. It is a travesty of just that  Brenda has spent more than a year and dedicated literally hundreds of hours defending herself against fabricated allegations made by Jablon during a period of her life when she had devastating personal matters requiring her attention.

I declare under the penalty of perjury that the foregoing is true and correct.


Frederick M. Lehrer

Executed this  16th[h]  day of October 2011



EXHIBIT

D

Private Email <william@williamjsears.com>
To: William Sears
FW: Introduction

September 8, 2015  8:08 AM

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:04 AM
**To:** William Sears
**Subject:** Re: Introduction

OK
Thanks

On Wed, Aug 28, 2013 at 1:02 PM, William Sears <william@williamjsears.com> wrote:
No he has not been secretary since the beginning of 2012 when this came to light

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:02 AM
**To:** William Sears
**Subject:** Re: Introduction

Bill

I have reviewed some of the otcmarkets' flings for Fusion Pharm, Inc.

Can you please inform me whether the link below is the same person appointed to Secretary and whether he still is the Secretary?.

http://www.sec.gov/litigation/litreleases/2012/lr22562.htm

Thank you

On Wed, Aug 28, 2013 at 10:58 AM, William Sears <william@williamjsears.com> wrote:
Fred,
We will be in town next week. I would love to have lunch to discuss. We are looking to do a form 10 and S1. I assume you have reasonable auditors you work with along with a BD that will do the 2-11 for the BB? The symbol is FSPM. I look forward to meeting next week and have a great holiday.

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 8:40 AM
**To:** William Sears
**Subject:** Introduction

Bill:

I understand that Rich Scholz has provided you with an introduction to my services. In further explanation, I have some of the lowest rates in the business for registration statements, opinion letters, periodic reports, securities disclosure matters and other securities related matters.

I charge $350 for opinion letters. Because Rich referred you I would lower that amount for you to $250 (most opinion letters are from $500 to $1,250). My hourly rate is $300/hour. I accept low retainers of $2,500. On registration statements, I charge $10,000 to $15,000 plus a block of stock from 200,000 shares to 400,000 shares. All registration statement quotes are open to negotiation. I have a deep regulatory background with 15 years at the SEC and 3 1/2 years as a Special Assistant United States Attorney. My legal practice since 2000 has been predominately in the area of corporate finance. My ultimate goal in any engagement is to provide full and accurate disclosure to the public and the SEC to protect the shareholders and to provide liability protection to the issuer and its officers and directors. Kindly review my website below or my linked in page for further information pertaining to my background and services.

I look forward to discussing these matters with you further and working with you in the future.

Thank you.

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:   flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:   flehrer@securitiesattorney1.com

EXHIBIT

E

## Page 315

1    Dudley came to you or called you --

2    A   Correct.

3    Q   -- and said I've seen Sears in the office

4    every day for the past two months.

5    A   Correct.

6    Q   And at a later point in time, Mr. Dittman

7    told you Sears has nothing to do with FusionPharm and

8    I'd never let him have anything to do with FusionPharm?

9    A   Correct.

10   Q   Do I have the timeline right so far?

11   A   Correct. And then Mr. Dudley informed me

12   that pursuant to discussions with Mr. Dittman, that

13   there would not be any disclosure because -- regarding

14   Mr. Sears or Meadpoint being an affiliate because based

15   upon Mr. Dittman's representations, he was not.

16   Q   Did Mr. Dudley express to you any indication

17   that he might not agree with Mr. Dittman's

18   characterization of Mr. Sears' involvement with

19   FusionPharm?

20   A   Only from the standpoint that he saw him

21   there every day. I really apologize I had too much

22   coffee this morning.

23   Q   Do you need to take a break?

24   A   Yes.

25   MR. LYMAN: Let's go off the record.

## Page 316

1    (A break was had from 11:04 to 11:10 a.m.)

2    MR. LYMAN: All right. Let's go back on the

3    record.

4    BY MR. LYMAN:

5    Q   Mr. Lehrer, while we were on the break, did

6    we have any substantive conversations about the case?

7    A   No.

8    Q   Okay. In your previous day's testimony we

9    had asked you whether you had an understanding that

10   Meadpoint was one of Bill Sears' companies and you had

11   refused to answer that question on privilege grounds.

12   In light of the agreement we now have with Mr. Sears'

13   counsel, will you now answer whether you were aware

14   that Meadpoint was one of Bill Sears' companies during

15   the time you were issuing Rule 144 letters?

16   A   Yes.

17   Q   And how did you come to be aware of that

18   information?

19   A   In a meeting with Mr. Sears, he told me that

20   he was in control of Meadpoint, but that he was

21   transferring it to a third party unrelated to him or in

22   any family context, including his mother.

23   Q   So when you first had the conversation about

24   Sears' ownership in Meadpoint, he mentioned

25   specifically that he wasn't going to transfer Meadpoint

## Page 317

1    to his mother?

2    A   Very specifically.

3    Q   And was that on your prompting, did you ask

4    him whether he was going to transfer it to his mother

5    or did he just volunteer that particular family member?

6    A   I did ask him.

7    Q   And why his mother? Why did that come up?

8    A   I don't remember why it came up, you know,

9    were having a conversation back and forth. And, you

10   know, through questioning or otherwise about whether it

11   was going to be transferred to a family member. He

12   said, no, it's not going to be transferred to a family

13   member. And I may have asked him, you know, is it

14   going to be transferred to your wife, to your mother,

15   you know, you're saying it's not going to be

16   transferred to a family member. Does that include "X"

17   and "Y"? I don't remember specifically if I asked

18   that, but certainly in the conversation it was

19   communicated to me that it would not be transferred to

20   his mother specifically.

21   Q   Did you ever have an understanding of whether

22   any of the other entities for which you wrote Rule 144

23   opinion letters or which were involved in any of the

24   opinion letters were owned by Mr. Sears' mother?

25   A   Yes.

## Page 318

1    Q   Okay. And which entities were those?

2    A   When I had that conversation with Mr. Sears

3    in or about April, 2014, when he said he transferred it

4    to his mother.

5    Q   But prior to that, when you had the

6    conversation with Mr. Sears, which I believe you

7    thought was in October, 2013, about him transferring

8    Meadpoint, at that point in time were you aware of any

9    other entities that were owned by, managed by or

10   included as an officer, Mr. Sears' mother?

11   A   No.

12   Q   Okay. And other than Meadpoint, did you ever

13   become aware of any other entities that were owned by

14   or directed by or had as an officer Mr. Sears' mother?

15   A   No. Again, apart from that conversation in

16   April, 2014, with Mr. Sears.

17   Q   Okay. So what about Bayside Realty Holdings,

18   did you ever come to understand that Mr. Sears's mother

19   was involved with that company?

20   A   No.

21   Q   Okay. But you knew that there was a Sandra

22   Sears who was involved with Bayside?

23   A   My understanding, it was the Sandra Sears

24   that was Bill Sears' wife.

25   Q   Okay. And what did you understand the person

Page 279

1    A   Correct.

2    Q   2013. So the date of the e-mail is October

3  10, 2013. Thank you for that. And at your prior day

4  of testimony we had asked you if you had an engagement

5  letter with Mr. Sears and you said that you did, but we

6  didn't yet have it. So is this document that begins on

7  page Bates number FLWS00291 the engagement letter

8  between you and Mr. Sears?

9    A   Yes, however, I do recall that Mr. Sears

10  signed that document and if in fact, we did not produce

11  that, we produced a copy with the signature of Mr.

12  Sears

13            (SEC Exhibit No. 122 was marked for

14            identification.)

15  BY MR. LYMAN:

16    Q   Let's mark this 122. Exhibit 122, Bates

17  number FLWS00298. And if you take a look at the third

18  page of this document, unfortunately, this doesn't

19  include every page of the agreement, but the third page

20  of this document appears to be the signature page of

21  Mr. Sears.

22    A   That's correct.

23    Q   Okay. And as this was produced it's missing

24  every other page. Any reason to think that this

25  agreement, this signed agreement, is any different from

Page 280

1  the agreement that's attached to Exhibit 121?

2    A   No.

3    Q   The letter is dated October 10, 2013 and it

4  states in the first paragraph, I'm happy that we could

5  agree on mutually acceptable fee agreement. Do you

6  recall what date you reached a mutually acceptable fee

7  agreement with Mr. Sears?

8    A   Presumably, I really don't know. Presumably,

9  it would have been within a couple weeks prior to

10  October 10, 2013.

11    Q   Okay. Did you recall when you first

12  started -- and we looked at some documents in your

13  previous day's testimony, but when you first started

14  performing work at Mr. Sears's request relating to

15  opinion letters touching on FusionPharm stock --

16    A   I apologize. I didn't catch your question.

17    Q   So this is dated October 10, 2013, and I'm

18  wondering if -- you said that you came to a fee

19  agreement maybe a couple weeks before this.

20    A   Right.

21    Q   But your first letter relating to FusionPharm

22  stock was in August of 2013 and my question is: Did

23  you have a fee agreement with him at that point in

24  time?

25    A   No

Page 281

1    Q   And what was the sort of payment arrangement

2  that you had for those first initial opinion letters?

3    A   Well, the payment arrangement was $250 an

4  opinion.

5    Q   And was that ever sort of memorialized in an

6  engagement letter similar to this?

7    A   No. The first meeting with Mr. Sears wa[...]

8  and I think I already testified to this that it was [...]

9  about preparing a registration statement. As a r[...]

10  of the first testimony refreshed my recollection t[...]

11  you know, there were matters prior to that meeting

12  involving those August 28, 2013, opinions. I don't

13  specifically recall the conversations, but it's

14  apparent to me that I did have conversations with him,

15  you know, as a result of my looking at transmittal

16  information regarding those opinion letters.

17    Q   Okay. If we take a look at Exhibit 121, on

18  this second page, it says engagement and scope of legal

19  work. The client hereby retains FML, which is you, to

20  research various issues pertaining to certain

21  disclosure issues and other related matters under the

22  federal securities laws. And then the next sentence

23  says that the scope of the representation shall be

24  limited to that set forth in this agreement. Would

25  writing attorney opinion letters fall under the scope

Page 282

1  of what's described here as your engagement with Mr.

2  Sears?

3    A   Indirectly.

4    Q   And how is that?

5    A   Can I consult with my counsel? I don't know

6  whether I'm getting into any attorney-client privilege.

7    Q   You can consult with your counsel.

8        THE WITNESS: What was the question again?

9        MR. LYMAN: Could you repeat the last

10  question, please

11        (The reporter read back the record.)

12        THE WITNESS: As I said, indirectly.

13  BY MR. LYMAN:

14    Q   And how is that?

15    A   There was an issue involving Meadpoint -- and

16  Mr. Sears affiliation with FusionPharm. He informed me

17  that he was in control of Meadpoint, but that Meadpoint

18  was going to be transferred to an unrelated third

19  party, not a family relationship, not his mother.

20    Q   Who did he say Meadpoint was going to be

21  transferred to?

22    A   He did not. He said it was going to be

23  transferred to an unrelated third party.

24    Q   And -- go ahead?

25    A   There was also discussions about Mr. Sears's

EXHIBIT

F

Page 283

1 affiliation with FusionPharm and my questioning him in
2 a very detailed fashion, whether he had any kind of
3 control or affiliate relationship with FusionPharm,
4 whether he engaged in any management decisions, whether
5 he had any participation in any shape, form or manner
6 in management decisions. To which he responded,
7 absolutely not. I have nothing to do with management.
8 Those are the issues that were discussed.
9      Q   And did he tell you that he had never had
10 anything to do with management issues at FusionPharm?
11      A   Yes.
12      Q   Did he mention whether his mother, Sandra
13 Sears, had anything to do with FusionPharm?
14      A   Not at that meeting, no.
15      Q   At a subsequent meeting?
16      A   In a telephone conversation.
17      Q   And what did he say to you about that topic?
18      A   I believe that was either in March or April
19 2014, he had informed me that Meadpoint was transferred
20 to his mother. I was shocked to learn that. And I
21 said you informed me that Meadpoint was being
22 transferred to an unrelated third party; not a
23 relative. And that was the substance of that
24 conversation.
25      Q   Why were you shocked to hear that Meadpoint

Page 284

1 was being transferred to his mother?
2      A   It wasn't -- the statement wasn't that
3 Meadpoint was being transferred to his mother. He said
4 it had been transferred.
5      Q   And why was that shocking?
6      A   It was shocking because during the meeting
7 with him in October, 2013, he said that he was
8 transferring to an unrelated third party, not a
9 relative, including his mother.
10      Q   Did he respond to your expression that that
11 seemed inconsistent with what he had told you in
12 October?
13      A   He may very well have. I can't recall.
14      Q   So when you spoke with him in October, 2013
15 about Meadpoint, he expressed to you or left you with
16 the understanding that Meadpoint was his company at
17 that point?
18      A   Correct.
19      Q   And did he leave you with the impression in
20 March or April of 2014 that Meadpoint was now his
21 mother's company and no longer his company?
22      A   Correct.
23      Q   Did he give you any indication of whether he
24 had any dealings on behalf of Meadpoint after he
25 transferred it to his mother?

Page 285

1      A   Well, he didn't give me any indication as
2 such, but again, he was acting as a facilitator for
3 these opinions.
4      Q   Do you have an understanding of when he
5 transferred -- when he told you he transferred
6 Meadpoint to his mother?
7      A   As I said, it was in March or April of 2014.
8      Q   Well, I understand that that's when he told
9 you, but do you have a sense of when the transfer
10 actually occurred?
11      A   No, I don't. And if he did, I don't recall,
12 you know, if he gave me a specific date or an
13 approximate time period.
14      MS. GREER: Going back to the engagement
15 letter that we were just looking at that's part of
16 Exhibit 121, I just want to clarify. This is an
17 engagement letter between yourself and Mr. Sears; is
18 that correct?
19      THE WITNESS: Yes.
20      MS. GREER: Does it in any way reflect an
21 engagement between yourself and FusionPharm?
22      THE WITNESS: No.
23      MS. GREER: So the reference in this
24 engagement letter to the scope being -- pertaining to
25 certain disclosure issues and other related matters

Page 286

1 under the federal securities laws, that was solely as
2 it related to your engagement with Mr. Sears?
3      THE WITNESS: Correct. However, obviously,
4 indirectly, as I testified previously, it would have
5 something to do with my opinion letters.
6      BY MR. LYMAN:
7      Q   What disclosure issues just generally was Mr.
8 Sears interested in you assisting him with, if not
9 related to FusionPharm?
10      A   Having to do with Meadpoint.
11      Q   So Meadpoint disclosures under the federal
12 securities laws?
13      A   As referenced in the FusionPharm obligations.
14      Q   Could you explain that a little bit more? I
15 didn't follow you.
16      A   Sure. I'm sorry. That was very ambiguous.
17 Okay. The subject of our discussions was Meadpoint.
18 He informed me that he controlled Meadpoint, but he was
19 transferring it to an unrelated party, not his mother,
20 not a family relationship. Coupled with that, what I
21 had raised with him was -- were discussions about
22 whether he had any participation in management of the
23 company.
24      Q   Of FusionPharm or Meadpoint?
25      A   I'm sorry. Of FusionPharm. That although

EXHIBIT

G

Page 317

1  Dudley came to you or [...]
2      A  Correct.
3      Q  – and said I've seen Sears in the office,
4  every day for the past two months.
5      A  Correct.
6      Q  And at a later point in time, Mr. Dittman
7  told you Sears has nothing to do with FusionPharm and
8  I'd never let him have anything to do with FusionPharm?
9      A  Correct.
10     Q  Do I have the timeline right so far?
11     A  Correct.  And then Mr. Dudley informed me
12  that pursuant to discussions with Mr. Dittman, that
13  there would not be any disclosure because -- regarding
14  Mr. Sears or Meadpoint being an affiliate because based
15  upon Mr. Dittman's representations, he was not.
16     Q  Did Mr. Dudley express to you any indication
17  that he might not agree with Mr. Dittman's
18  characterization of Mr. Sears' involvement with
19  FusionPharm?
20     A  Only from the standpoint that he saw him
21  there every day.  I really apologize I had too much
22  coffee this morning
23     Q  Do you need to take a break?
24     A  Yes.
25        MR. LYMAN:  Let's go off the record.

Page 316

1        (A break was had from 11:04 to 11:10 a.m.)
2        MR. LYMAN:  All right.  Let's go back on the
3  record.
4  BY MR. LYMAN:
5      Q  Mr. Lehrer, while we were on the break, did
6  we have any substantive conversations about the case?
7      A  No.
8      Q  Okay.  In your previous day's testimony we
9  had asked you whether you had an understanding that
10  Meadpoint was one of Bill Sears' companies and you had
11  refused to answer that question on privilege grounds.
12  In light of the agreement we now have with Mr. Sears'
13  counsel, will you now answer whether you were aware
14  that Meadpoint was one of Bill Sears' companies during
15  the time you were issuing Rule 144 letters?
16     A  Yes
17     Q  And how did you come to be aware of that
18  information?
19     A  In a meeting with Mr. Sears, he told me that
20  he was in control of Meadpoint, but that he was,
21  transferring it to a third party unrelated to him or in
22  any family context, including his mother.
23     Q  So when you first had the conversation about
24  Sears' ownership in Meadpoint, he mentioned
25  specifically that he wasn't going to transfer Meadpoint,

Page 317

1  to his mother?
2      A  Very specifically.
3      Q  And was that on your prompting, did you ask
4  him whether he was going to transfer it to his mother
5  or did he just volunteer that particular family member?
6      A  I did ask him.
7      Q  And why his mother?  Why did that come up?
8      A  I don't remember why it came up, you know, we
9  were having a conversation back and forth.  And, you
10  know, through questioning or otherwise about whether it
11  was going to be transferred to a family member.  He
12  said, no, it's not going to be transferred to a family
13  member.  And, I may have asked him, you know, is it
14  going to be transferred to your wife, to your mother,
15  you know, you're saying it's not going to be
16  transferred to a family member.  Does that include "X"
17  and "Y"?,  I don't remember, specifically if I asked
18  that, but certainly in the conversation it was
19  communicated to me that it would not be transferred to
20  his mother specifically.
21     Q  Did you ever have an understanding of whether
22  any of the other entities for which you wrote Rule 144
23  opinion letters or which were involved in any of the
24  opinion letters were owned by Mr. Sears' mother?
25     A  Yes.

Page 318

1      Q  Okay.  And which entities were those?
2      A  When I had that conversation with Mr. Sears
3  in or about April, 2014, when he said he transferred it
4  to his mother.
5      Q  But prior to that, when you had the
6  conversation with Mr. Sears, which I believe you
7  thought was in October, 2013, about him transferring
8  Meadpoint, at that point in time were you aware of any
9  other entities that were owned by, managed by or
10  included as an officer, Mr. Sears' mother?
11     A  No.
12     Q  Okay.  And other than Meadpoint, did you ever
13  become aware of any other entities that were owned by
14  or directed by or had as an officer Mr. Sears' mother?
15     A  No.  Again, apart from that conversation in
16  April, 2014, with Mr. Sears.
17     Q  Okay.  So what about Bayside Realty Holdings,
18  did you ever come to understand that Mr. Sears's mother
19  was involved with that company?
20     A  No.
21     Q  Okay.  But you knew that there was a Sandra
22  Sears who was involved with Bayside?
23     A  My understanding, it was the Sandra Sears
24  that was Bill Sears' wife.
25     Q  Okay.  And what did you understand the person

17  (Pages 315 to 318)



**Private Email**

**To:**              wjsears66@icloud.com
**Subject:**       FW: Meeting tomorrow


**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Tuesday, October 22, 2013 6:30 AM
**To:** William Sears
**Subject:** Re: Meeting tomorrow

No worries
We will discuss at length during our meeting


On Tue, Oct 22, 2013 at 8:28 AM, William Sears <william@williamjsears.com> wrote:
~~No I do not own Meadpoint any more~~ I do understand however we need to implement practices to ensure not having a conflict regardless

Regards,
Bill Sears


On Oct 22, 2013, at 6:15 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

> This will require more drilling down on this subject. That the company is out of state and you own the company only represents a small part of the relevant factors that we need to analyze. The crucial aspects of this will depend on your participation in Fusion Pharm. No worries - we will cover the subject adequately during our meeting.


> On Tue, Oct 22, 2013 at 8:06 AM, William Sears <william@williamjsears.com> wrote:
> FYI no conflict with Meadpoint as a ~~family member out of state~~ owns the company and it's asserts now
> Nevada registration should reflect the change any day now
>
> Regards,
> Bill Sears


> On Oct 22, 2013, at 6:04 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:
>
> > I mean Wed...correct?
> >
> > Do I need to change the conference room reservation for Thursday???
> >
> >
> > On Tue, Oct 22, 2013 at 8:02 AM, William Sears
> > <william@williamjsears.com> wrote:
> > Fred

Meeting for Thursday. I only land at four pm

Regards,
Bill Sears


On Oct 22, 2013, at 6:00 AM, "Lehrer, Fred"
<flehrer@securitiesattorney1.com> wrote:

Plan for tomorrow:

~~Discuss Meadpoint agreement, historical background of your
relationship with Fusion Pharm, nature of related party
transaction and appropriate disclosure, plan going forward to
ensure that you have no participation with management.~~

Review draft registration statement with emphasis on:
(a) Business section, plan of operations, marketing,
distribution, patent information, product information and any
other matters pertaining to the business and operations.
(b) Information and documents needed



Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com;
www.secdefenselaw.com

<fps1@10-22-13.docx>


--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

# MEADPOINT VENTURE PARTNERS

EXHIBIT

I

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Default | File Date: | 10/24/2011 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0580232011-5 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2015 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20111669192 | Business License Exp: | 10/31/2015 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | INCORP SERVICES, INC. | Address 1: | 3773 HOWARD HUGHES PKWY STE 500S |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89169-6014 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |
| No stock records found for this company | | | |

## Officers     ☑ Include Inactive Officers

### Manager - SANDRA L SEARS

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Historical | Email: | |

### Manager - SANDRA L SEARS

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Active | Email: | |

Entity Details - Secretary of State, Nevada                    https://nvsos.gov/SOSEntitySearch/PrintCorp.aspx?lx8nvq=%2bH...

## − | Actions\Amendments

| | |
|---|---|
| **Action Type:** | Articles of Organization |

| | | | |
|---|---|---|---|
| **Document Number:** | 20110759943-21 | **# of Pages:** | 2 |
| **File Date:** | 10/24/2011 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Initial List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20110846367-98 | **# of Pages:** | 1 |
| **File Date:** | 11/30/2011 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20130084907-14 | **# of Pages:** | 1 |
| **File Date:** | 2/7/2013 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20130708196-47 | **# of Pages:** | 1 |
| **File Date:** | 10/30/2013 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20140824744-66 | **# of Pages:** | 1 |
| **File Date:** | 12/26/2014 | **Effective Date:** | |

(No notes for this action)

Page 233

1 something like that. But by saying --
2     MS. GREER: Yeah. I'm just trying to figure
3 out if we have a date or an approximate date.
4     THE WITNESS: I understand that, but by --
5     MR. SALLAH: By doing that, we are -- you
6 know -- because you said at some point you Googled it.
7     THE WITNESS: Correct.
8     MR. SALLAH: Right. And that is not privileged
9 because you're not waiving --
10     THE WITNESS: Right.
11     MR. SALLAH: -- any work product. You're
12 waiving all work product --
13     THE WITNESS: But the characterization of your
14 question is such that it almost implies that you're
15 going to learn the actual communication.
16     MR. SALLAH: Yeah, and the date of the actual
17 communication.
18     MS. GREER: But I --
19     THE WITNESS: The date is not privileged.
20     MS. GREER: But I'm allowed to ask the date.
21     THE WITNESS: I understand that, but you're
22 asking when did I learn about this or something.
23     MR. SALLAH: If you're saying -- I guess -- I
24 guess -- I guess he would be -- it presupposes that a
25 communication took place between the two where one

Page 234

1 conveyed to the other that they had some kind of a
2 criminal background or one asked the other one if they
3 had some kind of criminal background. And by asking
4 that, it -- it invades that communication. That's my --
5 that's my --
6     MS. GREER: Okay.
7     MR. SALLAH: Do you see what I'm saying?
8     MR. LYMAN: Yeah, but we're not asking about
9 the communication or the context or what else was in the
10 meeting. All we're asking is --
11     MR. SALLAH: Well, I don't know.
12     MR. LYMAN: We know that you have told us that
13 you are aware that Mr. Sears had a criminal conviction
14 for a securities-related matter. And our question is,
15 when did you become aware of that, and there's nothing
16 privileged in that --
17     MR. SALLAH: I think he said --
18     MR. LYMAN: -- information.
19     MR. SALLAH: -- he Googled it. He Googled it
20 and became aware he had a conviction.
21     THE WITNESS: No.
22     MR. SALLAH: He clicked on it, and there was no
23 information.
24     THE WITNESS: That's not what I'm saying.
25     MR. SALLAH: You guys asked if he was aware it

Page 235

1 was for securities fraud. He didn't say that.
2     THE WITNESS: This is what I'm saying. I'm
3 saying that --
4     MR. SALLAH: See, that's why these privilege
5 issues get -- because it creates is
6     THE WITNESS: If I can start

EXHIBIT

K

7 circle back here. I already provide
8 this Google search. Now, you're a
9 learned, you know, that he had a criminal conviction for
10 securities fraud. I can't answer that question because
11 that's a -- you know --
12     MR. SALLAH: If he says no, it implies that no
13 such communication took place. If he says he can't
14 answer because it's privileged, then it presupposes a
15 communication --
16     THE WITNESS: Exactly.
17     MR. SALLAH: -- took place.
18     MS. GREER: Wait. I think you've already -- I
19 think you've already testified that at some point you
20 knew that.
21     MR. SALLAH: No, not that, that he had a
22 conviction. He found on the Internet and then clicked
23 on it, and he couldn't -- it was like some nonsense.
24 Fred, you testify. I don't want to mischaracterize.
25     THE WITNESS: Okay.

Page 236

1     MR. SALLAH: What did you find when you Googled
2 it?
3     THE WITNESS: I did the Google search, as I
4 testified before. It went to -- the link, you know -- I
5 mean the facing page said William Sears. Then I went to
6 the link, and it didn't correspond anything about
7 William Sears.
8     Anything else that I may have had about what
9 you're talking about, you know, may have been privileged
10 communications. I'm not going to, you know, tell you
11 what the -- you know, what the substance of that
12 conversation was or --
13 Q    Certainly.
14 A    -- or --
15 Q    I mean, do you know now at this point -- and
16 I'm not asking you how you learned it -- that Mr. Sears
17 had a prior conviction --
18 A    Yes.
19 Q    -- for securities fraud?
20     MR. SALLAH: Now it could invade on our
21 privilege.
22 A    Yes. No. I learned from a newspaper article,
23 you know, after the search warrant.
24     BY MS. GREER:
25 Q    I believe you said this morning, however, you

Page 69

1 FusionPharm?
2    A   Well, I don't specifically remember, so I don't
3 generally remember.
4    Q   And do you recall Mr. Scholz telling you
5 anything about Mr. Sears' connection to any other
6 company?
7    A   No.
8             (SEC Exhibit 88 was marked for
9             identification.)
10   BY MS. GREER:
11   Q   Mr. Lehrer, I'm handing you what's been marked
12 as Exhibit 88. It's a document with the Bates number
13 FLPA 373 through 374. Do you recognize Exhibit 88?
14        And if you need time to read through it, feel
15 free to take as much time as you need.
16   A   Yes, I recognize this.
17   Q   And what is Exhibit 88?
18   A   It's a communication by e-mail from me to
19 Richard Scholz.
20   Q   And are you --
21   A   And then --
22   Q   Sorry. Go ahead.
23   A   And then an e-mail from me to William Sears.
24   Q   And the bottom e-mail in the chain that begins
25 on the first page of Exhibit 88 and continues on to the

Page 70

1 second page of Exhibit 88, was that an e-mail you sent
2 to Mr. Sears first reaching out to him about your legal
3 services?
4    A   Yes.
5    Q   In your August 28, 2013, e-mail to Mr. Sears,
6 at the -- it starts at the bottom, the first page of
7 Exhibit 88. In the second paragraph, you say: I charge
8 $350 for attorney letters -- sorry -- for opinion
9 letters.
10   A   Right.
11   Q   Do you see that?
12   A   Right.
13   Q   And was that, at this time in August of 2013,
14 your normal price for doing opinion letters?
15   A   Yes, but there were some that were 250.
16   Q   And for those that were 250, how did they --
17 how did they differ from those that were 350?
18   A   Negotiation. Negotiation.
19   Q   Was there some difference in negotiation or
20 difference in clients between those clients who you
21 charged 250 versus those who you charged 350?
22   A   Yeah. I mean, there may have been a couple of
23 clients that I got, you know, several opinions that I
24 charged a deal. It would be 250.
25   Q   So based more on volume, you would give people

Page 71

1 a discount?
2    A   Well, yeah. No, it was not per se volume. It
3 was negotiation.
4    Q   The next sentence of your e-mail to Mr. Sears
5 says: Because Rich referred you, I would lower that
6 amount for you to $250.
7        Do you see that?
8    A   Yes.
9    Q   And so why were you -- why were you offering to
10 lower Mr. Sears' amount to 250?
11   A   It was just a selling point.
12   Q   What do you mean by "it was just a selling
13 point"?
14   A   Yeah. Well, I had not been retained as of yet
15 and went ahead and, you know, said I'll lower it to 250.
16   Q   Prior to sending this e-mail to Mr. Sears about
17 your services, did you do any research about Mr. Sears?
18   A   At what point?
19   Q   Prior to sending this e-mail --
20   A   No.
21   Q   -- to Mr. Sears.
22   A   No.
23   Q   After sending this e-mail to Mr. Sears, did you
24 do any research about Mr. Sears and his background?
25   A   On one occasion, yes.

Page 72

1    Q   And when was that?
2    A   I honestly do not recall.
3    Q   Was it shortly after this time period or --
4    A   I don't recall.
5    Q   -- 2014?
6    A   I don't recall.
7    Q   Okay. And what further research did you do
8 about Mr. Sears?
9    A   I Googled his name.
10   Q   And upon Googling his name, what results did
11 you get?
12   A   I had a -- there was a link to some kind of
13 it was a criminal indictment or a conviction or
14 something like that. And when I pressed on the link, it
15 went to information or a document that had nothing to do
16 with William Sears, but it did list it in the link.
17   Q   Did you do any further investigation then to
18 try to find what that reference was to a criminal
19 conviction?
20   A   No.
21        (Discussion off the record.)
22   A   Other than attorney-client privilege.
23        BY MS. GREER:
24   Q   Did you become aware at any point that Mr.
25 Sears has a prior conviction for securities fraud?

Page 73

1    MR. SALLAH: Again, to the extent you learned
2 it through a privileged communication with Mr. Sears,
3 that would be privileged. At least that's our position
4 at this point.
5    A   That's correct.
6    MR. KARPEL: Are you willing to tell us the
7 timing of that privileged communication?
8    MR. SALLAH: Yeah. I think we have to tell you
9 the timing of the privileged communication.
10    If you remember. Do you remember when the
11 conversation was, the client that --
12    THE WITNESS: Yeah. I believe in the
13 production there -- well, I'm not sure if there's some
14 communication about -- I don't know the date, but it was
15 the day that I met Mr. Sears in my conference room.
16    MR. KARPEL: So it was before issuing any
17 FusionPharm attorney opinion letters?
18    THE WITNESS: I'm pretty sure it was after.
19    MR. SALLAH: It was the day he met him. He --
20 they had the conversation personally, he remembers.
21    THE WITNESS: No, no, it wasn't the day I met
22 him.
23    MR. SALLAH: No. That's what I'm saying. It
24 was the day you met him.
25    THE WITNESS: Correct.

Page 74

1    MS. GREER: In person.
2    MR. SALLAH: -- a personal conversation --
3    THE WITNESS: Correct.
4    MR. SALLAH: -- he remembers. He just
5 doesn't remember what day. It was after.
6    THE WITNESS: I may be able to determine that
7 by looking at documents. I don't know.
8    MR. SALLAH: Your notepad for DayTimer or
9 something like that?
10    THE WITNESS: No.
11    MR. SALLAH: But you're confident it was after
12 the opinion?
13    THE WITNESS: It was after at least the August
14 opinions. I don't know when it was.
15    BY MS. GREER:
16    Q   Can you be any more specific? Was it 2014?
17 Was it --
18    A   Again --
19    Q   -- the end of 2013?
20    A   -- I do not remember. I would be happy to
21 research the matter to make a determination.
22    MR. KARPEL: Okay. We would appreciate that.
23 But just generally, did -- were -- do you recall, were
24 there any opinion letters relating to FusionPharm that
25 you issued after that conversation that we've been

Page 75

1 talking about?
2    THE WITNESS: Yes.
3    BY MS. GREER:
4    Q   Looking back again at Exhibit 88, the next
5 e-mail up in the chain, sort of in the middle of the
6 first page from yourself. It appears to be back again
7 to Mr. Sears. You say: Bill, did you say you were
8 paying for the opinion letters?
9    Do you see that?
10    A   Yes.
11    Q   And what opinion letters were you referring to
12 there?
13    A   The opinion letters that are in your
14 possession.
15    Q   Okay. And so --
16    A   I mean, there was no -- I didn't note what
17 opinion letters they were but just generally speaking.
18    Q   So at least as of this point, August 28, 2013,
19 you understood that the work that you were discussing
20 with Mr. Sears was to issue attorney opinion letters?
21    A   Yes.
22    Q   And did you understand at this point what
23 company those attorney opinion letters would relate to?
24    A   Yeah, FusionPharm.
25    Q   Okay. And how did you come to learn that those

Page 76

1 attorney opinion letters related to FusionPharm
2 shareholders?
3    A   Through the documents that I was provided.
4    Q   Okay. Prior to that, I mean, did Mr. Scholz
5 say to you -- and, actually, one of the first attorney
6 opinion letters we'll look at when we get to it --
7    A   Yeah.
8    Q   -- is from Mr. Scholz himself.
9    A   Yeah.
10    Q   So did Mr. Scholz say to you, hey, I'm a
11 shareholder of FusionPharm. You know, I have an
12 attorney opinion letter, and there are others that --
13 other FusionPharm shareholders that will need attorney
14 opinion letters?
15    A   No. No. He may very well have talked about an
16 opinion for him individually, but I don't recall a
17 statement to the effect that there will be a bunch of
18 others or any others.
19    Q   And what was your understanding at this point
20 when you -- on August 28, 2013, when you sent the e-mail
21 to Mr. Sears? I mean, what was your understanding as to
22 why Mr. Sears was going to be involved at all in the
23 FusionPharm shareholder attorney opinion letters?
24    A   What was my understanding of the involvement?
25    Q   Why was -- why was Mr. Sears involved, yes.

Page 229

```
 1    Q   There -- so you're saying there may have been
 2  communications with Mr. Dittman that you relied upon in
 3  determining for this opinion letter, February 14, 2014,
 4  Meadpoint's nonaffiliate status?
 5    A   No.  What I'm saying is that I don't have any
 6  specific recollection of having a privileged
 7  communication in the form of a telephone conversation
 8  with Mr. Dittman, but in general it's conceivable that I
 9  did, not necessarily with respect to this particular
10  opinion letter as reflected in Exhibit 115 but perhaps
11  some other --
12        MR. SALLAH:  Just --
13    A   -- opinion letters.
14        MR. SALLAH:  Just show you.
15    A   There was one on March 17, 2014, in written
16  form with Mr. Dittman.
17        BY MS. GREER:
18    Q   That you're asserting privilege over?
19    A   Correct.  And March 24, 2014.
20    Q   And that you're also asserting privilege over?
21    A   Correct.  And --
22        MR. SALLAH:  There's a lot.
23        THE WITNESS:  I'm sorry?
24        MR. SALLAH:  There's a lot.
25        THE WITNESS:  Okay.
```

Page 230

```
 1        MR. SALLAH:  Relative to -- not relative to --
 2        THE WITNESS:  Yeah.  I'm saying generally,
 3  yeah.
 4        MR. SALLAH:  But some of these are just general
 5  questions.
 6        (Discussion off the record.)
 7    A   Another one on April 15, 2014.
 8        BY MS. GREER:
 9    Q   Okay.  And are --
10    A   Another one -- I'm sorry.  Go ahead.
11    Q   Go ahead.
12    A   Another one on the same date.
13    Q   And are those attorney-client privileged
14  communications you had with Mr. Dittman communications
15  that you relied upon in determining that Meadpoint was
16  not an affiliate?
17    A   Let me go back, if I could, please.
18        Yes, but not ...
19        (Discussion off the record.)
20    A   Let me just go back and review this, please.
21        (Discussion off the record.)
22    A   There was a communication on March 24, 2014,
23  with Mr. Dittman having to do with Meadpoint, which is,
24  you know -- had no reference to any particular opinion
25  letter.  There was an April 15, 2014, communication.
```

Page 231

```
 1  That one had to do with the OTC Markets opinion.  There
 2  was another one on April 15, 2014, having to do with the
 3  OTC Markets opinion; April 15th, the same OTC Markets
 4  opinion.
 5        MR. SALLAH:  But they generally
 6  the Meadpoint and relationships with ce
 7  Meadpoint?
 8        THE WITNESS:  Well, no, not all of them.
 9        MR. SALLAH:  Not all of them.
10        THE WITNESS:  No.  The March 24th one does, the
11  first April 15, 2014, one does not; the next April 15th
12  one does not; and the next April 15th one does have to
13  do with Meadpoint.
14        BY MS. GREER:
15    Q   And these are all -- these communications are
16  all e-mails over which you're asserting FusionPharm's
17  privilege?
18    A   Yes.
19    Q   Mr. Lehrer, earlier this morning during your
20  testimony, you testified at some point you became aware
21  of Mr. Sears' prior securities fraud conviction,
22  correct?
23    A   Yes.
24    Q   And I think you were struggling to recall
25  exactly when that happened.  Seeing a number of these
```

Page 232

```
 1  opinion letters -- you had the three in the August 2013
 2  timeframe, and then, you know, we've seen a few in early
 3  January and February of 2014.  Having those sort of data
 4  points for time, does that refresh your recollection as
 5  to when you learned that?
 6    A   I'm not sure when I learned that.  It was a
 7  privileged communication.  But it may have been in a
 8  meeting that I had with him in my conference room
 9  downstairs where I live.
10    Q   And do you recall when that meeting took place?
11    A   I believe in preparation for this testimony I
12  had determined an approximate date, but --
13    Q   What's --
14    A   -- I don't recall what it is.  I would
15  certainly --
16    Q   What's that approximate date?
17    A   I don't recall, but can we provide....
18        (Discussion off the record.)
19        MR. SALLAH:  Yeah.  What I'm concerned about
20  is -- what I'm concerned about is, in essence, reverse
21  engineering -- and I know it's not your intention.  I
22  don't think it's your intention -- to try to kind of
23  circumvent the privilege.  Because, again, you're
24  allowed to learn about when privileged communications
25  are, the general -- you know, was it legal advice or
```

EXHIBIT

M

Page 233

1  something like that. But by saying --
2      MS. GREER: Yeah. I'm just trying to figure
3  out if we have a date or an approximate date.
4      THE WITNESS: I understand that, but by --
5      MR. SALLAH: By doing that, we are -- you
6  know -- because you said at some point you Googled it.
7      THE WITNESS: Correct.
8      MR. SALLAH: Right. And that is not privileged
9  because you're not waiving --
10     THE WITNESS: Right.
11     MR. SALLAH: -- any work product. You're
12 waiving all work product --
13     THE WITNESS: But the characterization of your
14 question is such that it almost implies that you're
15 going to learn the actual communication.
16     MR. SALLAH: Yeah, and the date of the actual
17 communication.
18     MS. GREER: But I --
19     THE WITNESS: The date is not privileged.
20     MS. GREER: But I'm allowed to ask the date.
21     THE WITNESS: I understand that, but you're
22 asking when did I learn about this or something.
23     MR. SALLAH: If you're saying -- I guess -- I
24 guess -- I guess it would be -- it presupposes that a
25 communication took place between the two where one

Page 234

1  conveyed to the other that they had some kind of a
2  criminal background or one asked the other one if they
3  had some kind of criminal background. And by asking
4  that, it -- it invades that communication. That's my --
5  that's my --
6      MS. GREER: Okay.
7      MR. SALLAH: Do you see what I'm saying?
8      MR. LYMAN: Yeah, but we're not asking about
9  the communication or the context or what else was in the
10 meeting. All we're asking is --
11     MR. SALLAH: Well, I don't know.
12     MR. LYMAN: We know that you have told us that
13 you are aware that Mr. Sears had a criminal conviction
14 in a securities-related matter. And our question is,
15 when did you become aware of that, and there's nothing
16 privileged in that --
17     MR. SALLAH: I think he said --
18     MR. LYMAN: -- information.
19     MR. SALLAH: -- he Googled it. He Googled it
20 and became aware he had a conviction.
21     THE WITNESS: No.
22     MR. SALLAH: He clicked on it, and there was no
23 information.
24     THE WITNESS: That's not what I'm saying.
25     MR. SALLAH: You guys asked if he was aware it

Page 235

1  was for securities fraud. He didn't say that.
2      THE WITNESS: This is what I'm saying. I'm
3  saying that --
4      MR. SALLAH: See, that's why these privilege
5  issues get -- because it creates issues like this.
6      THE WITNESS: If I can state -- you know,
7  circle back here. I already provided testimony about
8  this Google search. Now, you're asking about whether I
9  learned, you know, that he had a criminal conviction for
10 securities fraud. I can't answer that question because
11 that's a -- you know --
12     MR. SALLAH: If he says no, it implies that no
13 such communication took place. If he says he can't
14 answer because it's privileged, then it presupposes a
15 communication --
16     THE WITNESS: Exactly.
17     MR. SALLAH: -- took place.
18     MS. GREER: Wait. I think you've already -- I
19 think you've already testified that at some point you
20 knew that.
21     MR. SALLAH: No, not that, that he had a
22 conviction. He found on the Internet and then clicked
23 on it, and he couldn't -- it was like some nonsense.
24 Fred, you testify. I don't want to mischaracterize.
25     THE WITNESS: Okay.

Page 236

1      MR. SALLAH: What did you find when you Googled
2  it?
3      THE WITNESS: I did the Google search, as I
4  testified before. It went to -- the link, you know, I
5  mean the facing page said William Sears. Then I went to
6  the link, and it didn't correspond anything about
7  William Sears.
8      Anything else that I may have had about what
9  you're talking about, you know, may have been privileged
10 communications. I'm not going to, you know, tell you
11 what the -- you know, what the substance of that
12 conversation was or --
13  Q  Certainly.
14  A  -- or --
15  Q  I mean, do you know now at this point -- and
16 I'm not asking you how you learned it -- that Mr. Sears
17 had a prior conviction --
18  A  Yes.
19  Q  -- for securities fraud?
20     MR. SALLAH: Now it could invade on our
21 privilege.
22  A  Yes. No. I learned from a newspaper article,
23 you know, after the search warrant.
24     BY MS. GREER:
25  Q  I believe you said this morning, however, you

From: **William Sears** william@williamjsears.com.
Subject: FW:
Date: Today at 8:10 AM
To: William Sears wjsears66@icloud.com



**From:** William Sears
**Sent:** Thursday, October 10, 2013 11:04 AM
**To:** Lehrer, Fred
**Subject:** Re:

Hmmmm  One says no one says yes  I think we stay clear till ten years

Regards,
Bill Sears

On Oct 10, 2013, at 10:58 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

http://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm 

http://www.corporatecrimereporter.com/news/200/secexemptsbadactors09192013/

**Item 404 -- Transactions with Related Persons, Promoters and Certain Control Persons**

1. **Transactions with related persons.** Describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transac
   any related person had or will have a direct or indirect material interest. Disclose the following information regarding the transaction:

   1. The name of the related person and the basis on which the person is a related person.
   2. The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership
   3. The approximate dollar value of the amount involved in the transaction.
   4. The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the am
   5. In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstand
      date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which di
   6. Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the

2.

   **Instructions to Item 404(a):**

   1. For the purposes of paragraph (a) of this Item, the term related person means:

      1. Any person who was in any of the following categories at any time during the specified period for which disclosure under paragraph (a) o

         1. Any director or executive officer of the registrant;
         2. Any nominee for director, when the information called for by paragraph (a) of this Item is being presented in a proxy or informatior
         3. Any immediate family member of a director or executive officer of the registrant, or of any nominee for director when the informat
            election of that nominee for director, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-
            director, and any person (other than a tenant or employee) sharing the household of such director, executive officer or nominee for

      2.
      3. Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest

         1. A security holder covered by Item 403(a); or
         2. Any immediate family member of any such security holder, which means any child, stepchild, parent, stepparent, spouse, sibling, m
            any person (other than a tenant or employee) sharing the household of such security holder.

2. For purposes of paragraph (a) of this Item, a transaction includes, but is not limited to, any financial transaction, arrangement or relationship (in
relationships

3. The amount involved in the transaction shall be computed by determining the dollar value of the amount involved in the transaction in question,

   1. In the case of any lease or other transaction providing for periodic payments or installments, the aggregate amount of all periodic payment
   payments due during or at the conclusion of the lease or other transaction providing for periodic payments or installments; and

   2. In the case of indebtedness, the largest aggregate amount of all indebtedness outstanding at any time since the beginning of the registrant's

4.

5. In the case of a transaction involving indebtedness:

   1. The following items of indebtedness may be excluded from the calculation of the amount of indebtedness and need not be disclosed: Amc
   business travel and expense payments and for other transactions in the ordinary course of business;

   2. Disclosure need not be provided of any indebtedness transaction for the related persons specified in Instruction 1.b. to paragraph (a) of thi

   3. If the lender is a bank, savings and loan association, or broker-dealer extending credit under Federal Reserve Regulation T (12 CFR part 2
   2. of Industry Guide 3, Statistical Disclosure by Bank Holding Companies (17 CFR 229.802(c))), disclosure under paragraph (a) of this It

      1. Were made in the ordinary course of business;

      2. Were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loa

      3. Did not involve more than the normal risk of collectibility or present other unfavorable features.

6.

   1. Disclosure of an employment relationship or transaction involving an executive officer and any related compensation solely resulting from

      1. The compensation arising from the relationship or transaction is reported pursuant to Item 402; or

      2. The executive officer is not an immediate family member (as specified in Instruction 1 to paragraph (a) of this Item) and such comp
      executive officer was a named executive officer as that term is defined in Item 402(a)(3), and such compensation had been approved
      board of directors (or group of independent directors performing a similar function) of the registrant.

   2. Disclosure of compensation to a director need not be provided pursuant to paragraph (a) of this Item if the compensation is reported pursu

7. A person who has a position or relationship with a firm, corporation, or other entity that engages in a transaction with the registrant shall not be

   1. The interest arises only:

      1. From such person's position as a director of another corporation or organization that is a party to the transaction; or

      2. From the direct or indirect ownership by such person and all other persons specified in Instruction 1 to paragraph (a) of this Item, in
      to the transaction; or

      3. From both such position and ownership; or

   2. The interest arises only from such person's position as a limited partner in a partnership in which the person and all other persons specifie
   general partner of and does not hold another position in the partnership.

8. Disclosure need not be provided pursuant to paragraph (a) of this Item if:

   1. The transaction is one where the rates or charges involved in the transaction are determined by competitive bids, or the transaction involve
   with law or governmental authority;

   2. The transaction involves services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar services

   3. The interest of the related person arises solely from the ownership of a class of equity securities of the registrant and all holders of that cla

3.

4. **Review, approval or ratification of transactions with related persons.**

   1. Describe the registrant's policies and procedures for the review, approval, or ratification of any transaction required to be reported under paragra
   particular circumstances, examples of such features may include, in given cases, among other things:

      1. The types of transactions that are covered by such policies and procedures;

      2. The standards to be applied pursuant to such policies and procedures;

      3. The persons or groups of persons on the board of directors or otherwise who are responsible for applying such policies and procedures; an

      4. A statement of whether such policies and procedures are in writing and, if not, how such policies and procedures are evidenced.

   2. Identify any transaction required to be reported under paragraph (a) of this Item since the beginning of the registrant's last fiscal year where such

not followed

5

**Instruction to Item 404 (b):**

Disclosure need not be provided pursuant to this paragraph regarding any transaction that occurred at a time before the related person became one of tl related person became one of the enumerated persons in Instruction 1.a.i., ii., or iii. to Item 404(a)

6. **Promoters and certain control persons.**

1. Registrants that are filing a registration statement on Form S-1 under the Securities Act (Rule 239.11 of this chapter) or on Form 10 under the E: shall:

1. State the names of the promoter(s), the nature and amount of anything of value (including money, property, contracts, options or rights of amount of any assets, services or other consideration therefore received or to be received by the registrant; and

2. As to any assets acquired or to be acquired by the registrant from a promoter, state the amount at which the assets were acquired or are to making the determination and their relationship, if any, with the registrant or any promoter. If the assets were acquired by the promoter wi

2. Registrants shall provide the disclosure required by paragraphs (c)(1)(i) and (c)(1)(ii) of this Item as to any person who acquired control of a reg act together for the purpose of acquiring, holding, voting or disposing of equity securities of a registrant, that acquired control of a registrant tha Securities Act and Rule 12b-2 under the Exchange Act.

7. Smaller reporting companies. A registrant that qualifies as a "smaller reporting company," as defined by Rule 229.10(f)(1), must provide the following

1. The information required by paragraph (a) of this Item for the period specified there for a transaction in which the amount involved exceeds the last two completed fiscal years;

2. The information required by paragraph (c) of this Item; and

3. A list of all parents of the smaller reporting company showing the basis of control and as to each parent, the percentage of voting securities own

**Instruction to Item 404(d)**

1. Include information for any material underwriting discounts and commissions upon the sale of securities by the smaller reporting compan controlling person or member of a firm that was or is to be a principal underwriter.

2. For smaller reporting companies information shall be given for the period specified in paragraph (a) of this Item and, in addition, for the f

8.

**Instructions to Item 404:**

1. If the information called for by this Item is being presented in a registration statement filed pursuant to the Securities Act or the Exchange Act, i the registrant's last fiscal year, unless the information is being incorporated by reference into a registration statement on Form S-4, in which case

2 A foreign private issuer will be deemed to comply with this Item if it provides the information required by Item 7.B. of Form 20-F with more de jurisdiction or a market in which its securities are listed or traded.

WE SHOULD AVOID ANY SITUATION THAT IS INTERPRETED AS YOU EXERCISING ANY MANAGEMENT CONTROL WHATSOEVER
**Item 401 – Directors, Executive Officers, Promoters and Control Persons**

1. *Identification of directors.* List the names and ages of all directors of the registrant and all persons nominated or chosen to become directors; indicate ε period(s) during which he has served as such; describe briefly any arrangement or understanding between him and any other person(s) (naming such p

*Instructions to Paragraph (a) of Item 401:*

1 Do not include arrangements or understandings with directors or officers of the registrant acting solely in their capacities as such.

2 No nominee or person chosen to become a director who has not consented to act as such shall be named in response to this Item  In this regard, ·

3. If the information called for by this paragraph (a) is being presented in a proxy or information statement, no information need be given respectin

4. With regard to proxy statements in connection with action to be taken concerning the election of directors, if fewer nominees are named than the cannot be voted for a greater number of persons than the number of nominees named.

5. With regard to proxy statements in connection with action to be taken concerning the election of directors, if the solicitation is made by persons

other instances, information shall be given as to directors and persons nominated for election or chosen by management to become directors.

2.

3. *Identification of executive officers.* List the names and ages of all executive officers of the registrant and all persons chosen to become executive office and the period during which he has served as such and describe briefly any arrangement or understanding between him and any other person(s) (namir

Instructions to Paragraph (b) of Item 401

1. Do not include arrangements or understandings with directors or officers of the registrant acting solely in their capacities as such.
2. No person chosen to become an executive officer who has not consented to act as such shall be named in response to this Item.
3. The information regarding executive officers called for by this Item need not be furnished in proxy or information statements prepared in accord General Instruction G of Form 10-K under the Exchange Act (Rule 249.310 of this chapter); Provided, that such information is furnished in a se Form 10-K.

4.

5. *Identification of certain significant employees.* Where the registrant employs persons such as production managers, sales managers, or research scienti the registrant, such persons shall be identified and their background disclosed to the same extent as in the case of executive officers. Such disclosure n section 13(a) by section 12(g)(2)(G) of such Act immediately prior to the filing of the registration statement, report, or statement to which this Item is

6. *Family relationships.* State the nature of any family relationship between any director, executive officer, or person nominated or chosen by the registra

Instruction to Paragraph 401(d): The term "family relationship" means any relationship by blood, marriage, or adoption, not more remote than first co

7. *Business experience--*

1. *Background.*Background. Briefly describe the business experience during the past five years of each director, executive officer, person nominate 401, including: each person's principal occupations and employment during the past five years; the name and principal business of any corporati or organization is a parent, subsidiary or other affiliate of the registrant. In addition, for each director or person nominated or chosen to become : the person should serve as a director for the registrant at the time that the disclosure is made, in light of the registrant's business and structure. If particular areas of expertise or other relevant qualifications. When an executive officer or person named in response to paragraph (c) of Item 40: shall be included as to the nature of the responsibility undertaken by the individual in prior positions to provide adequate disclosure of his or her competence, which may include, depending upon the circumstances, such specific information as the size of the operation supervised.
2. *Directorships.*Indicate any other directorships held, including any other directorships held during the past five years, held by each director or pen section 12 of the Exchange Act or subject to the requirements of section 15(d) of such Act or any company registered as an investment company

8.

Instruction to Paragraph (e) of Item 401.

For the purposes of paragraph (e)(2), where the other directorships of each director or person nominated or chosen to become a director include directo Item 22(a) of Schedule 14A under the Exchange Act, the registrant may, rather than listing each such investment company, identify the fund complex :

9. *Involvement in certain legal proceedings.* Describe any of the following events that occurred during the past ten years and that are material to an evalu registrant:

1. A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer wa: partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at o
2. Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and oth
3. Such person was the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent juris

1. Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverag associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person engaging in or continuing any conduct or practice in connection with such activity;
2. Engaging in any type of business practice; or
3. Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of Fede

4. Such person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority described in paragraph (f)(3)(i) of this section, or to be associated with persons engaged in any such activity;

5. Such person was found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities suspended, or vacated;

6. Such person was found by a court of competent jurisdiction in a civil action or by the Commodity Futures Trading Commission to have violated Commission has not been subsequently reversed, suspended or vacated;

7. Such person was the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently

   1. Any Federal or State securities or commodities law or regulation; or
   2. Any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent inju or removal or prohibition order; or
   3. Any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

8. Such person was the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory orga defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization

10.

*Instructions to Paragraph (f) of Item 401:*

1. For purposes of computing the ten-year period referred to in this paragraph, the date of a reportable event shall be deemed the date on which the judgments, or decrees have lapsed. With respect to bankruptcy petitions, the computation date shall be the date of filing for uncontested petition

2. If any event specified in this paragraph (f) has occurred and information in regard thereto is omitted on the grounds that it is not material, the reg before definitive materials are filed in preliminary filing is not required, pursuant to Rule 14a-6 or 14c-5 under the Exchange Act), as supplemen which the omission relates, a description of the event and a statement of the reasons for the omission of information in regard thereto.

3. The registrant is permitted to explain any mitigating circumstances associated with events reported pursuant to this paragraph.

4. If the information called for by this paragraph (f) is being presented in a proxy or information statement, no information need be given respectin

5. This paragraph (f)(7) shall not apply to any settlement of a civil proceeding among private litigants.

11.

12. *Promoters and control persons.*

   1. Registrants, which have not been subject to the reporting requirements of section 13(a) or 15(d) of the Exchange Act for the twelve months imm which had a promoter at any time during the past five fiscal years, shall describe with respect to any promoter, any of the events enumerated in p or investment decision.

   2. Registrants, which have not been subject to the reporting requirements of section 13(a) or 15(d) of the Exchange Act for the twelve months imm describe with respect to any control person, any of the events enumerated in paragraphs (f)(1) through (f)(6) of this section that occurred during

13

*Instructions to Paragraph (g) of Item 401:*

1. Instructions 1. through 3. to paragraph (f) shall apply to this paragraph (g).

2. Paragraph (g) shall not apply to any subsidiary of a registrant which has been reporting pursuant to section 13(a) or 15(d) of the Exchange Act f

14.

**Regulatory History**

47 FR 11401, Mar. 16, 1982, as amended at 47 FR 55665, Dec. 13, 1982; 48 FR 19874, May 3, 1983; 49 FR 32763, Aug. 16, 1984; 52 FR 48982, Dec. 29, 1 18788, 18817, Apr. 16, 2003; 68 FR 36636, 36663, June 18, 2003, 68 FR 66992, Nov. 28, 2003; 70 FR 1506, 1594, Jan. 7, 2005; 71 FR 53158, 53241, Sept.

Return to top

**Previous • Contents • Next**

1.

--

Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email: flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com