IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-301-WJM-1

UNITED STATES OF AMERICA,

Plaintiff,

vs.

WILLIAM J. SEARS,

Defendant.

---------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Sentencing)

---------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
Judge, United States District Court for the District of
Colorado, commencing at 1:33 p.m., on the 30th day of
January, 2020, in Courtroom A801, United States Courthouse,
Denver, Colorado.


APPEARANCES

    JEREMY S. SIBERT and TONYA S. ANDREWS, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

    PETER R. BORNSTEIN, Law Offices of Peter R. Bornstein,
6060 Greenwood Plaza Boulevard, Suit 500, Greenwood Village,
Colorado 80111, appearing for the defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1          P R O C E E D I N G S

2          (Call to order of the court at 1:33 p.m.)

3              THE COURT:  All right, we are on the record in

4     criminal case No. 16-cr-301, defendant No. 1, United States

5     of America versus William Sears.  I'll take appearances of

6     counsel.

7              MR. SIBERT:  Good afternoon, Your Honor, again.

8     Jeremy Sibert on behalf of the United States.  Along with

9     the two agents from this morning's session.

10             THE COURT:  Good afternoon to the three of you

11    again.  For the defendant.

12             MR. BORNSTEIN:  For the -- good afternoon, Your

13    Honor.  Peter Bornstein appearing on behalf of Mr. Sears.

14    Mr. Sears is seated at counsel table with me.

15             THE COURT:  You've looked better.  I don't want to

16    insult you, but what happened?

17             MR. BORNSTEIN:  Well, I -- I suffered a fall, Your

18    Honor --

19             THE COURT:  Oh.

20             MR. BORNSTEIN:  -- while I was in Mexico on

21    vacation and I've got two broken ribs and some stitches.

22    And so if I need to sit down during part of this proceeding,

23    I will ask the Court's leave to -- if I can sit down

24    occasionally.

25             THE COURT:  Sure.  That would be fine.

1          Probation officer, please identify himself for the
2     record.
3          PROBATION OFFICER:  Good afternoon.  Gary Kruck,
4     Senior United States Probation Office.
5          THE COURT:  Mr. Kruck, welcome.
6          Mr. Sears, will you please rise at this time.  My
7     courtroom deputy is going to administer the oath to you.
8          (Defendant sworn in)
9          THE COURT:  The record reflects on the 14th of
10    November, way back in 2016 -- I don't think I've ever had a
11    case with so much time between the change of plea and
12    sentencing -- but in any event, on November 14th, 2016, Mr.
13    Sears entered a plea of guilty to and he was convicted of
14    Counts 1 and 2 of an information charging, respectively,
15    conspiracy to defraud the United States and commit offenses
16    in violation of 18 United States Code Section 371, as well
17    as filing a false income tax return in violation of 26
18    United States Code Section 7206.  In addition, at his change
19    of plea hearing, the defendant also admitted the forfeiture
20    allegations in the information.
21         We are here for the sentencing of the defendant.
22    Counsel, can you briefly summarize your respective
23    sentencing recommendations.  Mr. Sibert.
24         MR. SIBERT:  Good afternoon, again, Your Honor.
25    The Government's going to recommend eight years of

1   imprisonment for Mr. Sears, followed by three years of

2   supervised release, along with the $200 for special

3   assessment based upon the two guilty charges.

4        Now there is a little bit of a difference with Mr.

5   Sears' plea agreement as to Mr. Dittman's plea agreement

6   when it comes to restitution and the loss amount or the

7   gains in this case that the Government has seized, and we're

8   going to use the remission process.

9        In this case, the Government's going to ask the

10  Court to order restitution in the amount of $2 million.

11  This is part of the plea agreement.  The $2 million will

12  come out of those gains that we have seized, but the

13  restitution was part of the agreement where those funds will

14  be -- based upon my understanding with our asset

15  forfeiture -- my colleagues, basically will be made out and

16  sent over to Mr. Bornstein's office, and then Mr. Bornstein

17  will forward that to the clerk's office, and then the

18  clerk's office will go ahead, based upon your order, to send

19  that to the IRS.  And that's part of the plea agreement.

20       THE COURT:  Why would that be different than --

21  what I've normally done in the past in tax fraud cases is

22  just order restitution to the IRS in a certain amount.  Why

23  are we doing that differently?

24       MR. SIBERT:  Because of the remission process.  It

25  has to come out of the funds that we're not designating as

1    restitution because of the victim issue.  And so my

2    understanding is that's the procedure that is required under

3    the agreement, and also the asset forfeiture personnel that

4    will be briefing the motion that will be filed on Tuesday as

5    well.

6              THE COURT:  One second.

7              MR. SIBERT:  I'm going to have --

8              THE COURT:  According to the probation officer's

9    sentencing recommendation, the amount of restitution to the

10   Internal Revenue Service is $2,433,818.

11             MR. SIBERT:  That was 2,472,945?

12             THE COURT:  2,433,818.

13             MR. SIBERT:  We'll agree with that, Your Honor.

14             THE COURT:  Okay.  So --

15             MR. SIBERT:  And if I can, can I have an entry of

16   appearance from Tonya Andrews, who's an Assistant United

17   States Attorney for the forfeiture asset section of the U.S.

18   Attorney's Office.

19             THE COURT:  All right.  Good afternoon, Ms.

20   Andrews.

21             MS. ANDREWS:  Good afternoon, Your Honor.  I do

22   have an appearance in this case.

23             THE COURT:  Yes, you do.

24             MS. ANDREWS:  And I just figured one less attorney

25   at the table might be good.  But I'm -- to the extent I can

1    assist the Court in this particular case, the -- we sought a

2    preliminary order of forfeiture and the Court has already

3    entered that.

4            THE COURT:  Right.

5            MS. ANDREWS:  We seek no change to that because, as

6    it stands, we are forfeiting those specific assets from the

7    defendant in this case.  What's going to happen in between

8    today's sentencing and going forward is we're going to take

9    a portion of those funds and not obtain a final order, but,

10   rather, reroute them back to the defendant per the plea

11   agreement, so that he can then pay, what will be entered

12   today, his outstanding restitution order.

13           THE COURT:  Wow, I don't think I've ever done that.

14           MS. ANDREWS:  I haven't, Your Honor --

15           THE COURT:  Send the money back to the defendant --

16   to his counsel?  And then trust that he's going to then pay

17   the IRS?

18           MS. ANDREWS:  That's correct.

19           THE COURT:  That's in the plea agreement?

20           THE DEFENDANT:  No, it's not.

21           MS. ANDREWS:  The specific mechanism is not in the

22   plea agreement.  It was contemplated when we drafted the

23   plea agreement.  I was actually one of the original

24   attorneys on the case during the drafting of these plea

25   agreements.

1          THE COURT:  So you've been around since -- but I

2     don't -- what I'm not grasping is why am I not just doing a

3     straight restitution order that's going to be part of the

4     judgment that orders the defendant to make restitution in

5     the amount I referenced a couple of minutes ago directly to

6     the IRS?

7          MS. ANDREWS:  You absolutely should, Your Honor.

8          THE COURT:  What is that?

9          MS. ANDREWS:  That is what we're requesting to have

10    happen in this case.

11         THE COURT:  No, you're not.  You're asking me to

12    order that proceeds of forfeited assets be paid to Mr.

13    Bornstein, who will then pay the IRS.

14         MS. ANDREWS:  So we need the restitution order to

15    be ordered to the IRS as per normal in tax cases.

16         THE COURT:  Right.

17         MS. ANDREWS:  But per the plea agreement, we seized

18    $10 million.

19         THE COURT:  Correct.

20         MS. ANDREWS:  And we didn't want to return that to

21    Defendant Sears or his counsel prior to today.  But we did

22    agree that we could take some of those funds and allow him

23    to pay off what would be his restitution --

24         THE COURT:  Why can't I just enter an order,

25    that you would make easier for me by drafting, that includes

1    as a provision that of the X amount seized, that 2,400 and

2    change would be paid to the IRS?  Why can't we do it that

3    way?

4               MS. ANDREWS:  That is what we are suggesting, that

5    between -- after today, once the preliminary order of

6    forfeiture becomes final as to the defendant's sentencing,

7    once the restitution order is part of the judgment, I will

8    file a motion for a final order that will specify where the

9    money's going, that looks different than the preliminary

10   order because we didn't have the restitution order in place

11   until today.

12              THE COURT:  Okay.  So what you're seeking from me

13   today is a -- an order that's going to be included in the

14   judgment of restitution in the amounts of -- that I stated,

15   2.4 million, and then you propose submitting to me a

16   final -- a final proposed order of forfeiture which includes

17   a payment from the assets obtained of that 2.4 million to

18   the IRS?

19              MS. ANDREWS:  That's correct, Your Honor.

20              THE COURT:  So that, like we did with Mr. Dittman,

21   we won't use the subsection of Rule 32 that would allow for

22   the preliminary order by operation of law to become the

23   final order, we're going to not do that, but, in fact, I

24   will allow you to submit a proposed final order that's

25   different than the preliminary order --

1          MS. ANDREWS:  Yes.

2          THE COURT:  -- and enter that, and we'll wait for

3    the entry of that to enter this judgment?

4          MS. ANDREWS:  That is correct, Your Honor.  With

5    the one caveat:  Essentially what we are asking for are --

6    really notifying the Court is we will be filing a subsequent

7    motion for final order that reflects where the money's going

8    more appropriately that looks different than the

9    preliminary.

10         But I don't think it needs to hold up the judgment.

11   And, in fact, we need the judgment to be entered so that the

12   restitution order exists for the Clerk of the Court so that

13   they can receive the funds.

14         So in the forfeiture section of the judgment, we

15   can reflect defendant's agreement to forfeit all of the

16   assets, because he is agreeing to that.

17         THE COURT:  Okay.  So unlike you heard me order

18   with Mr. Dittman, we won't -- we won't hold up the judgment

19   in this case, we'll enter the judgment.  The judgment will

20   have a reference to the forfeiture of the monies and

21   properties set forth in the preliminary order, right?

22         MS. ANDREWS:  Correct, Your Honor.

23         THE COURT:  The preliminary order that I entered in

24   the fall reflected what was in the plea agreement in terms

25   of what would be forfeited?

1        MS. ANDREWS:  That's correct, Your Honor.

2        THE COURT:  And you will be submitting

3   post-judgment a final proposed order of forfeiture that

4   allocates the seized property and funds differently than how

5   it was allocated in the preliminary order?

6        MS. ANDREWS:  Yes.  The preliminary order didn't

7   contemplate an allocation to restitution because it was

8   undetermined at that time.

9        THE COURT:  Okay.  But in this order, you need me

10  to specifically order restitution to the Internal Revenue

11  Service of $2,433,018 -- 818?

12       MS. ANDREWS:  Correct, Your Honor.

13       THE COURT:  First, let me ask Mr. Kruck:  Does that

14  make sense to you?  Have you done -- ever done it that way?

15       PROBATION OFFICER:  Never done it that way, but I

16  spoke with Ms. Andrews after the last sentencing and I

17  understand where she's coming from.

18       THE COURT:  Okay, so you're --

19       PROBATION OFFICER:  Yes, Your Honor.

20       THE COURT:  Okay.  Let me hear from Mr. Bornstein.

21  Is there some issue with proceeding in that fashion?

22       MR. BORNSTEIN:  If I could have one moment, Your

23  Honor.

24       THE COURT:  Yeah.

25       MR. SIBERT:  And, Your Honor, just so the Court

1    knows, this agreement was on page 3 of the plea agreement,

2    paragraph C-2.

3              MR. BORNSTEIN:  Paragraph C-2?

4              MR. SIBERT:  Page 3, Mr. Bornstein.

5              THE COURT:  Was this your doing, Ms. Andrews, or

6    Mr. Harmon's?

7              MS. ANDREWS:  I thought this portion, Your Honor,

8    candidly, because it was so unusual.

9              THE COURT:  I think I understand now what you're

10   proposing.  I still don't understand why we can't do it just

11   like we've -- I do it in all tax -- or fraud cases in terms

12   of restitution.  But I don't want to give myself a blazing

13   headache and think about it more.  I'll just accept what

14   you're saying.

15             Let's see what the defendant has to say on it.

16             MR. BORNSTEIN:  Your Honor, I have -- as you know,

17   I am appointed in this case, and normally at the conclusion

18   of the sentencing, plus some final other post-judgment

19   material, my appointment is finished.

20             THE COURT:  Right.

21             MR. BORNSTEIN:  And so I don't quite understand if

22   my appointment is not going to be finished and if there's

23   something else that I'm supposed to be doing.  I am not

24   aware of it as I sit here today that there was going to be

25   any role for me to play post-judgment with respect to

1    restitution.

2            THE COURT:  And I thought that's what Mr. Sibert

3    was saying, but then I hear Ms. Andrews saying that that's

4    not going to happen.

5            MS. ANDREWS:  Your Honor, I will endeavor to try

6    not to -- to basically move money from one fund -- one

7    government fund to another government fund without involving

8    Mr. Bornstein.  I -- it just may be such that when the --

9    what we are essentially doing is returning these funds to

10   the defendant so that he can pay his restitution --

11           THE COURT:  But why can't --

12           MS. ANDREWS:  -- instead of the Government paying

13   it for him.

14           THE COURT:  I can't understand that.  Why can't I

15   just enter an order that directs the funds that have been

16   seized in part to be used to pay the restitution to the IRS?

17   Because if I'm Mr. Bornstein, I'm thinking, amongst other

18   things, I don't know that I want $2.4 million flowing

19   through my operating account and my law practice and then

20   showing it paying out, and how am I going to explain that to

21   the Internal Revenue Service?

22           MS. ANDREWS:  Yeah.  Your Honor, we can -- we'll

23   try.  I think an order from your Court will help me get the

24   bureaucratic --

25           THE COURT:  Okay.  So why don't we agree to do it

1    this way:  I will enter the order -- I will state on the

2    record that restitution in the $2.4 million amount is being

3    ordered.  Mr. Kruck will include it in the judgment.  We'll

4    enter the judgment.  And then you submit to me -- run it by

5    Mr. Bornstein, the two of you try as best as you can to come

6    to an agreement on the technical terms, submit it to me, and

7    then I'll consider it at that point.

8              MS. ANDREWS:  Okay.  Thank you, Your Honor.

9              THE COURT:  All right.  We haven't even really

10   started with the -- anything else you wanted to say in terms

11   of a recommendation, Mr. Sibert?

12             MR. SIBERT:  Except I think the Court, in the last

13   hearings, was asking about the loss amounts.  And, again,

14   this will be based upon the gains in this case, which is

15   12.2 million.

16             THE COURT:  Yeah, and what's the basis for me to

17   use that number in -- for this defendant?

18             MR. SIBERT:  Page 40 of the plea agreement.

19             THE COURT:  I'm sorry, what?

20             MR. SIBERT:  Page 40 of the plea agreement.

21             THE COURT:  What paragraph?

22             MR. SIBERT:  It's paragraph 67 which falls under

23   the facts that were stipulated to at the change of plea.

24             THE COURT:  You mean paragraph 67?

25             MR. SIBERT:  67.

1          THE COURT:  All right.  You said 47.  Oh, no, you

2     didn't, I'm sorry.  I take it back.

3          MR. SIBERT:  It's the second sentence.

4          THE COURT:  All right.  Okay.  I find, based on the

5     stipulated agreement in the plea agreement, that the loss

6     amount that would be used for determining the offense level

7     calculation under the guidelines is 12.2 million as it

8     pertains to this defendant.

9          All right.  Let me get a sentencing recommendation

10    from the defendant.

11         MR. BORNSTEIN:  Your Honor, I believe in regard to

12    the plea agreement that my hands are somewhat tied with

13    respect to what I can recommend as a sentencing arrangement,

14    but based on the plea agreement, I am going to recommend

15    that the sentence be 60 months, the lower end of the amount

16    potentially required by the plea agreement.  But I know that

17    the Court is not bound by that, but apparently I am bound by

18    what was in the plea agreement in terms of what I could

19    recommend or not recommend.

20         THE COURT:  Yeah, it seems like all the attorneys

21    that came in after the original -- so much time has passed

22    that the original attorneys, the original AUSA and defense

23    attorneys that negotiated all these plea agreements are no

24    longer with -- well, not no longer with us -- no longer in

25    this case.  And so we're all, including myself, having to

1    deal after the fact with trying to figure out what was

2    intended by the plea agreements.

3          But just so I understand what you're saying is you

4    want a total aggregate sentence of 60 months, so that would

5    be ordering the two sentences on Counts 1 and 2 to run

6    concurrently.

7          MR. BORNSTEIN:  Yes, Your Honor.  And I believe

8    that Mr. Sears was told, at some point before I became

9    counsel of record in the case, that if he testified against

10   Mr. Guy Jean-Pierre, that the Government would, in fact,

11   recommend a 60-month sentence, and at one point in the

12   presentence report, the Government was going to recommend a

13   60-month sentence.

14         Now they are not recommending the 60-month

15   sentence, but Mr. Sears was told that if he testified, as he

16   has against Mr. Jean-Pierre, Mr. Jean-Pierre was convicted,

17   that he would look at the lower end of the sentence

18   recommended by the Government.

19         THE COURT:  Right, but I -- the agreement, as I

20   understand it, was not just that he would testify at Mr.

21   Jean-Pierre's trial, but that he would testify truthfully,

22   and there's some dispute about that.

23         But in any event, going back to your initial point,

24   unless it's in this plea agreement, as far as I'm concerned

25   there's no such agreement or understanding.  The plea

1    agreements state in the -- in their body that they

2    constitute the totality of the agreement between the

3    parties, otherwise, my God, then in every case I'd have to

4    be taking testimony on parol evidence of -- "Oh, but, Judge,

5    we know what we said in the plea agreement, but there was

6    this side -- this side agreement.  Let us tell you about

7    this side agreement."

8         You made your point, I'm not going to accept any

9    evidence of any oral modification or oral side agreement to

10    the plea agreement.  Now the plea agreement is -- has --

11    which I am considering for purposes of acceptance, as I've

12    taken the plea but I've not accepted the plea agreement --

13    I'm going to take as it's written, and I'm not going to

14    allow any oral modification of its provisions.  If you can

15    point me to a provision in writing in the plea agreement

16    that said what you just said, then that's a different

17    matter.

18         Mr. Bornstein, I'm not going to hold up matters

19    while you --

20         MR. BORNSTEIN:  Okay.

21         THE COURT:  -- read a 50-page document.  I'm going

22    to go -- we're going to start going forward.  If you --

23         MR. BORNSTEIN:  That's fine, Your Honor.

24         THE COURT:  Don't interrupt me.  Please, don't make

25    this anymore difficult than it's already been for me.  The

first sentencing yesterday, I had one that went three and a half hours this morning, and this is the third one in these two cases.

If you or your client locate such a provision in the plea agreement while we're going through the hearing, you know, just raise your hand, stand up, tell me, and we'll deal with it at that point, but I'm not going to sit here and watch you read a 50-page document to figure out if you could find any such provision.  We're going to move forward.  All right.

I'm going to deal with the objections to the presentence report.  The first ruling I'm going to make is as follows:

Federal Rule of Criminal Procedure 32(f)(1) requires parties to submit any objections to the presentence report in writing.  The defendant has submitted 40 written objections.  However, 11 of these objections consist of a single perfunctory sentence, barely even raising, in my view, a skeletal outline of the nature of the argument in that objection.

The Tenth Circuit has stated repeatedly that purporting to raise an argument in this manner and then failing to develop it constitutes forfeiture of that agreement.  For that, see *Bronson v. Swenson*, a 2007 opinion from our circuit, 500 F.3d 1099, and *United States v.*

1    *Callwood*, a 1995 decision from our circuit, 66 F.3d 1110.

2    Therefore, I am overruling as forfeited defendant's

3    objections to paragraphs 26, 27, 37, 38, 40, 47, 52 through

4    65, 130, 133, 137, and 138.

5            With respect to a second set of objections that

6    were made to several paragraphs of the report, those

7    objections were based on the argument that in these

8    paragraphs, which I'll list in a moment, the probation

9    officer referenced information that Mr. Sears is alleging he

10   either undertook or that he failed to undertake based on the

11   advice of counsel.  Those are objections to paragraphs 16

12   and 17, 22 through 24, 28 and 29, 31, 36, and paragraphs 42

13   through 45 of the report.

14           Mr. Bornstein, if you have any further argument on

15   these objections, I'll hear it at this time.

16           MR. BORNSTEIN:  I have no further argument on the

17   objections.  They -- Mr. Sears believes that he had advice

18   of counsel, he has said so repeatedly, and I have tried to

19   reference that by making the objection on that basis.

20           THE COURT:  Okay.  Mr. Sibert, do you wish to be

21   heard further on these objections?

22           MR. SIBERT:  Your Honor, as the Court knows in

23   document 175, we responded to each and every one of these,

24   so the one's left standing.  If the Court doesn't have any

25   specific concerns about the objections and regarding our

1     response, I would rest on our document that we filed, along

2     with the attachments to that document that in our view we

3     proved beyond a preponderance of the evidence that the

4     objections should be overruled.

5           THE COURT:  All right.  Thank you.

6           All right, I'm prepared to rule on these

7     objections.  The defendant seeks to insulate himself from

8     any adverse legal consequences as a result of the acts or

9     omissions referenced in the paragraphs I just mentioned in

10    the report because, he asserts, he took or failed to take

11    such actions based on the -- based on his reliance on the

12    advice of counsel.

13          This is a similar argument to the one Mr. Dittman

14    made earlier today, and as I stated then, it's true that,

15    taken out of context, it would appear that on certain

16    matters Attorney Lehrer gave questionable legal advice to

17    both of the codefendants, but as I also stated this morning,

18    the force of that argument is hugely undercut by the fact

19    that the defendants in this case withheld, in my view, vital

20    critical information from Mr. Lehrer causing him to give

21    legal advice that in some cases was off the mark.

22          A few examples are as follows:  Attorney Lehrer was

23    never told the truth about the control of these two

24    codefendants that they exercised over the shell entities of

25    MeadPoint or VertiFresh.  Mr. Lehrer was never told about

1    Mr. Sears' controlling role of FusionPharm.  It was never

2    disclosed to Attorney Lehrer that the three co-conspirators

3    had backdated Bayside and MeadPoint convertible notes, or

4    that those notes were funded with proceeds from the sale of

5    FusionPharm stock.

6         And, lastly, this defendant, Mr. Sears, never

7    disclosed to Mr. Lehrer that Mr. Dittman had worked for Mr.

8    MeadPoint -- for Mr. MeadPoint -- for MeadPoint, and that he

9    had received, in fact, 1099 income from that entity.

10        I find that because this defendant and his

11   codefendant withheld material inculpatory information from

12   his counsel, he cannot now rely on any legal advice that he

13   may have received from such counsel as a basis to object to

14   related matters in aggravation contained in the report.

15        For these reasons, the defendant's objections to

16   paragraph 16 and 17, 22 through 24, 28 and 29, 31, 36, and

17   42 through 45 are overruled.

18        Yes, sir.

19        MR. BORNSTEIN:  Yes, Your Honor.  Could I ask for

20   the sake of the record for the Court to spread on the record

21   where the source of the information is that the Court is

22   using with respect to these findings of fact with regard to

23   Mr. Lehrer?

24        THE COURT:  I have no -- there's no obligation on

25   me to do that and I'm not going to.  All I'm saying is I'm

1    not making this up out of thin air.  This is not my opinion;

2    these are facts that are in the record and also, I would

3    say, referenced well in the Government's response at ECF

4    175.

5            There were objections to paragraphs 85 through 114

6    of the record, which were labeled, by the probation officer,

7    Additional Information.  These paragraphs contain

8    information that are beyond the facts stipulated in the plea

9    agreement.  I think that's conceded and no one contests

10   that.  And also he argues that these paragraphs 85 through

11   114 pertain primarily to coconspirator, Guy Jean-Pierre.

12           Under Section 3661, I am permitted to consider

13   essentially all available information bearing on the

14   appropriate sentence to impose on the defendant.  For that

15   reason, I'm going to overrule this objection.  But I will

16   state for the record, as I did with Mr. Dittman, that it is

17   my practice to not give matters in the Additional

18   Information section of the report the same weight that I

19   give to the facts set forth in the report that have been

20   stipulated to by the defendant.

21           The first group, of course -- or the latter group

22   in this case, the facts stipulated, have been stipulated

23   and, in my mind, are entitled to great weight.  The

24   additional information I may consider and I give it less

25   weight than the stipulated facts.

1          There are about a half dozen paragraphs that were

2      objected to that, unfortunately, I think we need to take one

3      by one.  And, you know, if either -- if the defendant wishes

4      to withdraw it, or the Government concedes it, so we can get

5      through those quicker, that's -- I'm all ears for that.  But

6      otherwise, I don't see any way that I can deal with these

7      objections other than to plow through them one by one.

8          There's an objection to paragraph 19 of the report.

9      The defendant objects to paragraph 19 and states, once the

10     transaction of turning Baby Bee Bright stock to

11     FusionPharm's name was completed, Sears removed himself as

12     the administrative officer as the company was now that of

13     Scott Dittman.  So I will listen to both sides and see --

14     and then make a ruling based on what you can develop beyond

15     that one sentence.  Mr. Bornstein.

16         MR. BORNSTEIN:  Your Honor, we believe that's a

17     correct statement of the fact.  It comes from my client who

18     states that that is a correct statement of fact.  That's all

19     I can say is that -- and that's all I can say is that he

20     says that that's a correct statement of fact and it should

21     be accepted by the Court as such.

22         THE COURT:  All right.  Mr. Sibert, what's the

23     Government's position on paragraph 19 and the objection to

24     that paragraph?

25         MR. SIBERT:  Your Honor, we believe that objection

1    should be overruled.  All the records that were submitted to

2    FINRA, the investigating agency with microcap companies such

3    as FusionPharm, their paperwork still indicates

4    administrative officer.  In addition, as we put in our

5    brief, document 175, Sears and Dittman held themselves out

6    as business partners.  That moved their operation into a

7    publicly traded company.  That's in attachment 8, page 16,

8    which is the plea agreement in this case.

9           And, in addition, Mr. Sears himself identified

10   himself as FusionPharm's vice president, director of

11   financial operations, and investor relations director, and

12   that's also in the plea agreement, page -- or attachment 8,

13   page 17.

14           THE COURT:  All right.

15           MR. BORNSTEIN:  Your Honor, those relate to

16   FusionPharm, and we're relating this specifically to Baby

17   Bee Bright stock.

18           THE COURT:  No, that's not what I understand -- the

19   objection is that Mr. Sears removed himself as the

20   administrative officer of FusionPharm and that the company

21   was now Scott Dittman because Baby Bee Bright ceased to

22   exist.

23           I'm going to overrule the objection for the reasons

24   stated by Mr. Sibert, but also specifically because of the

25   evidence we discussed earlier this morning of the emails

1   between Mr. Dittman and the transfer agent in February of
2   2014 where the transfer agent raised a red flag and asked
3   Mr. Dittman, "Why is Mr. Sears still listed as an
4   administrative officer of FusionPharms?  Wouldn't that make
5   him an affiliate of the company?"
6           And then Mr. Dittman denied that Mr. Sears was an
7   affiliate of FusionPharms.  But clearly the materials
8   presented to the transfer agent as late as early 2014 still
9   had in them a reference to this defendant being the
10   administrative officer of the company.  So for that
11   reason -- or those reasons, including Mr. Sibert's reasons,
12   the objection to 19 -- paragraph 19 is overruled.
13           There's an objection to paragraph 20 --
14           MR. BORNSTEIN:  One -- if I might, Your Honor, Mr.
15   Sears would like to address paragraph 19.
16           THE COURT:  I've made my ruling.
17           Objection 20, the defendant objects to the
18   designation of the individual denominated "A" as a
19   co-conspirator, and denies the implication that his email to
20   "A" regarding a business plan and financial projections was
21   based on conspiratorial activity.  It was based on the fact
22   that Sears had no training on financial projections nor does
23   he have the ability to write a business plan, and he did not
24   want to be involved in this part of the creation of a new
25   business.

1          Anything further you wish to say on your

2     objections, Mr. Bornstein?

3          MR. BORNSTEIN:  Nothing additional, Your Honor.

4     That's Mr. Sears' contention and that comes directly from

5     Mr. Sears and that's why it's in the objection.

6          THE COURT:  All right.  Mr. Sibert.

7          MR. SIBERT:  Again, Your Honor, briefly.  On March

8     10th, 2011, defendant Sears sends an email to a Mr. Bodden

9     asking him to communicate with him regarding FusionPharm's

10    business plan.  That's attachment 30 of our response.

11         Above that argument, I gave the Court a Ninth

12    Circuit case regarding the acts of coconspirators in *United*

13    *States v. Martinez.*  *Martinez* at 156 F.3d 936.

14         We would rest with those arguments.

15         THE COURT:  All right.  Who are we talking about in

16    terms of -- is this Mr. --

17         MR. SIBERT:  It will be Mr. Bodden, Your Honor.

18         THE COURT:  As -- okay.  All right.  Based on that,

19    I am overruling the objection to paragraph 20.

20         Paragraph -- the objection to paragraph 21, the

21    defendant objects to the implication that Dittman and Sears

22    operated FusionPharm as business partners and that Sears was

23    primarily responsible for FusionPharm's capital formation

24    and investor relations.  Defendant admits that there was

25    communication and consultation that fell far short of a

1    partnership.  I'm not in need of any additional argument on
2    this point.
3            I find that the Government has proven to me by a
4    preponderance of the evidence that that is a true and
5    factual statement and on that basis, the objection to
6    paragraph 21 is overruled.
7            Turning to the objection to paragraph 46, the
8    defendant objects to being labeled as an employee, claiming
9    that he was never employed directly with FusionPharm.  So
10   what did you mean by that objection, Mr. Bornstein?
11   "Employed directly"?
12           MR. BORNSTEIN:  With the Court's permission, I'll
13   have Mr. Sears --
14           THE COURT:  No, I -- I don't allow hybrid
15   representation.  You're the attorney, you have to give me
16   the explanation.
17           MR. BORNSTEIN:  It's my client's contention that
18   the facts are that he was never put on the books as an
19   employee, that he was supposed to be put on the books as a
20   1099 consultant, independent contractor.  And that if
21   there's any evidence -- that is the true and correct way in
22   which he was involved with the entity of FusionPharm.  Not
23   as an employee, but as a 1099 independent contractor.
24           THE COURT:  All right.  Mr. Sibert, you can respond
25   there from the table, you don't have to take the lectern.

1           MR. SIBERT:  Thank you, Your Honor.

2           Again, in our paragraph 24 of our response, there

3   was a W-2 from 2011 that reported a salary of $8,750 from

4   FusionPharm.  In addition, as this Court heard earlier this

5   morning, and also at the trial of Guy Jean-Pierre, that

6   defendant Dittman did testify at one point Mr. Sears was

7   declared a salesperson for FusionPharm.

8           THE DEFENDANT:  Outside.

9           THE COURT:  All right, Mr. Sears, I'll --

10           THE DEFENDANT:  I'm sorry.

11           THE COURT:  I'll thank you not to make any

12   statements unless you're being recognized by the Court.

13           THE DEFENDANT:  I apologize.

14           MR. SIBERT:  And, in addition, codefendant Dittman

15   was paying Sears $5,000 as part of the payroll for

16   FusionPharm.  And then, finally, in attachment 22 to our

17   response, the office manager for FusionPharm stated in the

18   letter that Sears was a 1099 employee with a gross pay of

19   $5,000 a month since January 11th, but in that same letter,

20   Sears was going to be a W-2 employee with that same monthly

21   salary as of March 2012.

22           So at one point we have a W-2 in 2011 saying

23   $8,750, but then we have the office manager saying it was a

24   1099 2011.  But we do know that in 2012, it was indicated

25   that he would be a W-2 employee of $5,000 a month.

1          THE COURT:  All right.  I find that the Government

2     has proven by a preponderance of the evidence that the

3     defendant was at least at some point in time an employee of

4     FusionPharm making that statement in the report, an accurate

5     statement and, therefore, I'm overruling that objection.

6          The next objection we need to address is to

7     paragraph 49.  The defendant objects because he had no stock

8     to sell for the month of January 2014, which was the month

9     when FusionPharm stock sold for the highest price ever.

10    Defendant did not get any stock until the middle of February

11    of 2014.

12         Anything more you wish to say on that, Mr.

13    Bornstein?

14         MR. BORNSTEIN:  No, Your Honor.  Once again, that

15    comes from Mr. Sears' statements as to what the facts are.

16         THE COURT:  Okay.  Mr. Sibert.

17         MR. SIBERT:  Your Honor, actually, it might be an

18    amendment here.  The records that we have show that Sears

19    held 800,000 shares of FusionPharm stock in January 16,

20    2014, but did not begin selling those stocks until

21    February 7th, 2014.  So instead of selling them in January,

22    the selling actually took place in February of 2014.

23         THE COURT:  All right.  So you concede that that

24    revision is necessary to the report?

25         MR. SIBERT:  Yes, I do.

1          THE COURT:  All right.  So I'm going to sustain the

2     objection.  And Mr. Kruck will prepare a -- an amended final

3     report that reflects that revision.

4          Finally, I want to address the objections -- the

5     objection made to paragraphs 71 through 78.  In that

6     objection, the defendant asserts that he denies that his

7     failure to file or pay taxes in the years in question was

8     done willfully, and asserts that he was in the process of

9     catching up on his taxes when the Government conducted its

10    search warrants and raiding of the business.

11         Anything further you want to state on that, Mr.

12    Bornstein?

13         MR. BORNSTEIN:  One second, Your Honor.

14         THE COURT:  All right.

15         MR. BORNSTEIN:  Nothing additional, Your Honor.

16         THE COURT:  All right.  Mr. Sibert.

17         MR. SIBERT:  Your Honor, this defendant took the

18    oath before you in his change of plea and stated that he --

19    in pleading guilty, that he did not pay his taxes.  In

20    addition his plea agreement, pages 38, 39, and attachment 8

21    of our response outlines those facts as well.

22         THE COURT:  But I think the objection's going to

23    the word "willfully."

24         MR. SIBERT:  Can I have a minute, Your Honor?

25         THE COURT:  Let me ask this, Mr. Sibert.  By

1   pleading guilty to Count 2, doesn't it require, as an

2   element of Count 2 --

3            MR. SIBERT:  That's what I was checking.  If I can

4   refer the Court to page 38 of the plea agreement.

5            THE COURT:  All right.

6            MR. SIBERT:  Paragraph 59.

7            THE COURT:  All right.

8            MR. SIBERT:  Based on the information set forth

9   herein, Sears willfully failed to report federal capital

10  gains generated from the sale of stock through facilitating

11  entities as well as capital gains.

12           So I would argue that that fact shows that it was

13  willful conduct not to report gains to the IRS.

14           THE COURT:  One second.  And you're reading

15  paragraph 59 in terms of failing to report federal capital

16  gains as another way of saying failure to file -- let's see,

17  how is it -- the failure to file or pay taxes?

18           MR. SIBERT:  Right.  It says Sears willfully failed

19  to report federal capital gains generated from the sale of

20  stock.

21           THE COURT:  Right.

22           MR. SIBERT:  So essentially the proceeds, as well

23  as the capital gains, generated from the sales occurring in

24  the personal Etrade account.

25           MR. BORNSTEIN:  Capital gains, Your Honor, is just

1    a subset of what might be done with the taxes.  It's not the

2    willful failure to file the entire tax return.

3              THE COURT:  Well, the -- I think the paragraphs are

4    referencing in the report the -- let's look --

5              MR. SIBERT:  And, Judge, if I can refer you to page

6    19 of the transcript for the change of plea, when Mr.

7    Harmon, with respect to the second count, "Mr. Sears, you

8    are charged -- you're charged with filing a -- willfully

9    making and" -- I'm sorry, I'm talking too fast.

10              "You are charged with filing a -- willfully making

11    and subscribing to -- eventually filing a U.S. income tax

12    return on 1040 EZ for the year 2011."

13              THE COURT:  And that's from the transcript of the

14    change of plea?

15              MR. SIBERT:  That's correct, Your Honor.

16              THE COURT:  All right.  That's sufficient for me.

17    I find that -- based on the defendant's statement under oath

18    at his change of plea hearing, that the Government has

19    proved by a preponderance of the evidence the matters set

20    forth in those paragraphs and, therefore, the objection to

21    paragraphs 71 through 78 is overruled.

22              With respect to all remaining objections by the

23    defendant, to the extent that they are not moot as a result

24    of revisions made to the final report by the probation

25    officer, I find that the subject matter of these objections

do not impact the sentence I intend to impose nor will I consider these matters in sentencing.  And as a consequence, no ruling on these objections is necessary pursuant to Rule 32(i).

Neither the Government nor the defendant challenge any other aspect of the presentence report.  I therefore find that the remaining factual statements and guideline applications of the report are adopted without objection as the Court's findings of fact concerning sentencing.

Is there an oral motion from the Government pursuant to the plea agreement for an additional one-level reduction in the offense level for acceptance of responsibility?

MR. SIBERT:  At this time, Your Honor, yes.

THE COURT:  All right.  There being no objection, the motion's granted.

Given my rulings on the defendant's objections, as well as on the Government's oral motion, I find that the total offense level in this case is 35.  The probation officer's determined the defendant's Criminal History Category to be II, yielding an advisory guideline sentencing range of 168 to 210 months.  This guideline sentencing range is capped, however, by a statutory maximum of 60 months on Count 1, and by a statutory maximum of 36 months on Count 2, which, in turn, become the applicable guideline sentences on

1    the two counts.

2           The guidelines also provide for a period of

3    supervised release of one to three years on Count 1 and zero

4    to one year on Count 2, a fine range of 20,000 to $200,000,

5    and a special assessment of $200.

6           Subject to any objection to my ruling on the

7    defendant's objections, do counsel agree the Court has

8    correctly calculated the guideline range in this case?

9           MR. SIBERT:  Yes, Your Honor.

10          THE COURT:  Mr. Bornstein.

11          MR. BORNSTEIN:  Yeah, subject to the Court's

12   rulings, yes.

13          THE COURT:  Yeah.  You've --

14          MR. BORNSTEIN:  I'm not waiving the objections --

15          THE COURT:  Correct.

16          MR. BORNSTEIN:  -- because the Court ruled against

17   me.

18          THE COURT:  Right.  You've preserved your

19   objections.

20          All right.  At this time, since no motion for a

21   variant sentence was filed, what I -- what is my practice is

22   to hear from counsel in -- give them an opportunity to give

23   me any additional argument they wish to make or commentary

24   they wish to make in support of their respective sentencing

25   recommendations.

1          So, Mr. Sibert, I'm going to begin with you, again

2     because there's no motion pending.  If you'll take the

3     lectern, please.

4          MR. SIBERT:  And, Your Honor, while the Court was

5     doing the housekeeping on the guidelines, I also found that

6     it was stated on page 20 of the transcript that --

7          THE COURT:  Which transcript -- what transcript?

8          MR. SIBERT:  The transcript of the change of plea,

9     Your Honor.

10          THE COURT:  Okay.

11          MR. SIBERT:  "That you're alleged to have done this

12     willfully regarding Count 2."  So --

13          THE COURT:  Who said -- I mean, give me some

14     context.

15          MR. SIBERT:  That's when you asked Mr. Harmon to

16     read the elements of Count 2.

17          THE COURT:  Oh, I see.  All right.

18          MR. SIBERT:  Your Honor --

19          THE COURT:  So basically what I want to hear from

20     you, Mr. Sibert, is the Government's asking for the maximum

21     sentence in this case, so the statutory maximum on Count 1,

22     which is 60 years [sic]; the statutory maximum of three

23     years, or 36 months, on Count 2; and asking that those

24     sentences be imposed consecutively for the maximum possible

25     sentence I can impose today of 96 months, or eight years.

1   And so this is your opportunity to tell me why I should do
2   that.
3               MR. SIBERT:  Okay.  Just to make sure the record is
4   correct, I anticipate more filings after this hearing, but
5   the Court stated for Count 1 60 years.  It's --
6               THE COURT:  I'm sorry.
7               MR. SIBERT:  -- 60 months.  That's okay, I'm going
8   to mess up as well, so . . .
9               Judge, I think one of the most important things the
10  Court has to do -- and I think this Court does it well -- is
11  you have to look at the true nature and character of the
12  defendant in every criminal case.  And that goes from the
13  person growing up all the way to the time that they're
14  facing this Court for sentencing.  And in this case, I think
15  defendant Sears did a very good job of showing his true
16  character about his acceptance of responsibility regarding
17  what he believes is the truth versus what the Government put
18  in the plea agreement, what Mr. Sears agreed to and signed
19  to in his plea agreement, and then over the course of
20  several debriefs and proffers with the Government, I would
21  say the story continues to evolve and change.
22              Now I'm talking about the press releases that was
23  put on the part of Mr. Sears' PSR amended statement, where
24  he opened up a blog, himself, and went after the prosecution
25  about how wrong that he was and how the Government was not

1    doing a professional job in prosecuting.

2         On top of that, he went as far as to look into the

3    federal agent's family and posted pictures on line of her

4    personal family to say, "This is the person that was not

5    honest with this Court about her qualifications in an

6    agreement -- in a search warrant affidavit in this case."

7         THE COURT:  You're referring to Agent Funk?

8         MR. SIBERT:  That is correct, Your Honor.

9         THE COURT:  All right.

10        MR. SIBERT:  I was trying to avoid as much personal

11   recognition saying --

12        THE COURT:  I don't know that we need to beat

13   around that -- I mean, we should just say it directly, and

14   also for clarification, you're referencing the addendum

15   filed by Mr. Kruck last week at ECF 193, the addendum to the

16   report.

17        MR. SIBERT:  That's correct, Your Honor.

18        THE COURT:  Okay.  Go ahead.

19        MR. SIBERT:  In addition, I provided the Court a

20   copy -- and this was actually brought to my attention by Mr.

21   Dittman's counsel, along with, I think, someone else

22   forwarded me this morning as I was preparing, but there was

23   another article out there by Cannabis Law Report basically

24   describing, again, the inconsistent statements of Agent

25   Funk's qualifications as a certified public accountant.

1              And that would be on page -- well, it would be on

2        page 4 of the copy I gave the Court.  It states page 1 at

3        the bottom of the affidavit.

4              THE COURT:  And what -- point me -- oh, is that the

5        part that you've highlighted?

6              MR. SIBERT:  That's the -- I didn't highlight that.

7        That's actually highlighted by either Cannabis Law Report or

8        their --

9              THE COURT:  Oh, I see.

10             MR. SIBERT:  -- source of information.

11             THE COURT:  Oh, I see, electronically highlighted.

12       And that's how it appeared on whatever website this was on?

13             MR. SIBERT:  That's correct, Your Honor.

14             THE COURT:  All right.

15             MR. SIBERT:  All right.  So this was last night.

16       And obviously a lot of the information in this report is

17       false.  I would even argue that picture of Mr. Harmon is too

18       good for him.

19             But, you know, if -- I know the Court probably

20       didn't have time to read this, but it's in --

21             THE COURT:  I didn't see it until I got up to the

22       bench, so how would I have had time to read it?

23             MR. SIBERT:  I've read it over lunch when I was

24       able to print it off.

25             THE COURT:  All right.  I have not read it, so you

1      need to summarize for me --

2              MR. SIBERT:  Sure.  It's consistent -- it's pretty

3      much consistent with what was posted on Mr. Sears' blog

4      about the inconsistencies and how the Government and the

5      federal agencies and the leaders of the Department of

6      Justice at the U.S. Attorney's Office in Denver have not

7      done a professional job and there's been some, lack of

8      better word, sketchy work done in this investigation.

9              THE COURT:  And how does -- how do you tie this to

10     the defendant?

11             MR. SIBERT:  The affidavit.

12             THE COURT:  What affidavit?

13             MR. SIBERT:  The search warrant affidavit that's

14     highlighted.  Again, arguing about Agent Funk's

15     qualifications as a CPA --

16             THE COURT:  No, no, maybe I didn't ask a good

17     question.  You've given me a printout of an article from a

18     website.  How do I have any basis to -- to tie this to this

19     defendant?

20             MR. SIBERT:  Well, I might call the reporter up as

21     a witness and maybe we'll have her testify about where she

22     got some of her information.

23             THE COURT:  Give me an offer of proof first.

24             MR. SIBERT:  The offer of proof is the affidavit

25     with the highlighted section regarding Agent Funk's

1      qualifications as a CPA, which was one of the major basises

2      that was brought to this Court for defendant Sears to be --

3      to be able to withdraw from his plea agreement in this

4      case.

5                THE COURT:  Right.  That was a huge part of the

6      motion to withdraw the guilty plea.

7                MR. SIBERT:  That's correct.

8                THE COURT:  You're representing to me in an

9      offer -- in a proffer that the information in this article,

10     the author of this article, Terry Buell, obtained this

11     information from, what, an interview of the defendant?

12               MR. SIBERT:  I don't know the answer to that

13     question.

14               THE COURT:  But received it from the defendant, is

15     that what you're telling me?

16               MR. SIBERT:  I don't know if that's the case

17     either.  I'm --

18               THE COURT:  Well, if you can't pin this to the

19     defendant, I can't use this against him.

20               MR. SIBERT:  Well, I'm not saying that.  I'm not

21     saying -- I'm just asking you to take it into consideration

22     versus what he's already blogged in the last two weeks that

23     we've had to amend this presentence report.  And if you look

24     at the similarities, if you take a break in this afternoon

25     session of the sentencing, I think you'll see that they're

1     very similar in nature.  That's all.

2               THE COURT:  But similar -- Mr. Sibert, similarity

3     is not sufficient for me.  It's one thing if you were to

4     show me something that was posted, for example, on a

5     Facebook account owned by the defendant.  That's something

6     that clearly ties whatever commentary or text is in that

7     posting to the defendant.  I can't just take some pieces of

8     paper and read what's on here and say -- and hold the

9     defendant accountable for this without some kind of evidence

10    that the information in here can be tied directly back to

11    this defendant.

12              MR. SIBERT:  And the only way I can do that is call

13    the reporter as a witness.

14              THE COURT:  Do you think that's necessary based

15    on --

16              MR. SIBERT:  No, I think we can move on.

17              THE COURT:  All right.  Yes, I would prefer that

18    you just move on.

19              MR. SIBERT:  So then the defendant is under

20    conditions of this Court in his pretrial release and,

21    according to his plea agreement that he won't open up any

22    more companies.

23              THE COURT:  Right.

24              MR. SIBERT:  We've provided evidence now under the

25    Secretary of State regarding the businesses that there's

1       been filings by Mr. Sears at least opening one business.

2                   THE COURT:  Right.

3                   MR. SIBERT:  Which is against the terms of his plea

4       agreement.  So right there I can ask this Court to go ahead

5       and ask the -- allow the Government out of the terms of the

6       plea agreement.  What does that get us?  Had it probably --

7                   THE COURT:  Because it will be the Government's

8       argument -- contention that the defendant has materially

9       breached the plea agreement.  And I'm assuming -- I mean,

10      it's one thing to violate your conditions of pretrial

11      release; it's another thing to breach the plea agreement.

12      So what you're saying is that both the pretrial release

13      conditions and the plea agreement prohibited the defendant

14      from taking any steps to open -- or create any new business

15      entity?

16                  MR. SIBERT:  That's correct.

17                  THE COURT:  All right.

18                  MR. SIBERT:  And this is conduct knowing that he's

19      coming before this Court for sentencing, that he does.

20                  THE COURT:  Right.

21                  MR. SIBERT:  Obviously that goes directly to, I

22      would argue, defendant Sears' mental state of willing to

23      understand the seriousness and the firmness of the Court's

24      orders, directions, and essentially what he has pled guilty

25      to the crime of this case.

1          This isn't -- this isn't about blaming everyone

2     else.  He stood before this Court under oath and pled guilty

3     to being a unaffiliated -- a affiliated, undisclosed owner

4     of FusionPharm.

5          And then as the Court knows, I put this defendant

6     up on the stand as my first witness in Guy Jean-Pierre's

7     case.  And --

8          THE COURT:  I well remember.

9          MR. SIBERT:  And -- and let me tell you, I know it

10    was painful for most parties in the courtroom.  And it was a

11    tragic call made by myself because it introduced the jury to

12    exactly who Mr. Sears was, and that's the person that cannot

13    tell the truth.  And the fact is even in his own testimony

14    under oath, he wasn't truthful.

15         I didn't put him up there as a witness.  I put him

16    up there to get emails in and also to give the jury a little

17    bit of flavor about who this undisclosed affiliate was in

18    FusionPharm.  Sears had issues stating that he was an

19    affiliate with FusionPharm, even though he had already come

20    in this courtroom and pled guilty.  That's page 67 of his

21    transcript.

22         Sears stated that he did not recall if Guy

23    Jean-Pierre knew about the FINRA inquiry.  Well, it was his

24    brother-in-law and him that had the conversation, the

25    emails, asking, "Should we get Guy involved at this point?"

1           And as you remember, it wasn't like I was doing

2     this out of the memory of his head, I was showing him an

3     email that he just went over two days prior.  I made him

4     initial every email to make sure we didn't have any

5     disagreements that it was his email.  And then we couldn't

6     even get through that process on the stand, let alone the

7     fact of the basis of the email between he and his

8     brother-in-law indicated exactly what I was asking him.

9           And I think at one point I said, you know, it's

10    like going to the dentist, this direct testimony.  It's very

11    painful.

12          And obviously this isn't his first time in trouble

13    with the law when it comes to securities.  And I agree with

14    the Court that the district court -- the Southern District

15    of New York, did not do a fair and just sentence by giving

16    him one month in his prior three convictions.  And he didn't

17    learn anything from it either because he went right back to

18    it.

19          THE COURT:  He got probation in his -- for his

20    first conviction and one month for the second two -- the

21    second two -- the second and third.

22          MR. SIBERT:  And so, I mean, Judge, I can belay a

23    lot, but I think the key point here is that, as I did in Mr.

24    Dittman's statement, I suspect that Mr. Sears is going to

25    come up here and give some type of allocution or mitigation

1    on his behalf.  And, again, I'm going to ask the Court if we

2    believe that's untruthful to this Court, that we be asked to

3    be pulled out of the plea agreement and that we set this

4    matter for trial.  Because, again, at some point there needs

5    to be the truth.  And if Mr. Sears doesn't want to take a

6    pretty generous -- generous plea agreement with the range of

7    five to eight years, which I told the Court this morning I

8    would never have offered Mr. Sears --

9            THE COURT:  I understand.  This is, you believe,

10   a -- an agreement that was a windfall for this defendant and

11   one that you would not have offered yourself.

12           MR. SIBERT:  Right.  And so we look at it.  And,

13   again, Mr. Sears wants to blame the lawyers in this case,

14   just like Mr. Dittman wanted to.  But remember, in April

15   7th, 2011, it was his codefendant, Scott Dittman, that wrote

16   a letter to the bar explaining they knew Mr. Guy Jean-Pierre

17   couldn't write the attorney opinion letters because he was

18   banned.  Mr. Sears had a prior relationship with Guy

19   Jean-Pierre.  In fact, it was Mr. Sears that introduced his

20   brother-in-law to Guy Jean-Pierre.

21           And as you saw in the Guy Jean-Pierre, we had over

22   500 exhibits, I would say probably 300 of those exhibits Mr.

23   Sears, Mr. Guy Jean-Pierre, and Scott Dittman were all

24   communicating about how to proceed with these transactions

25   and hiding his true affiliation with FusionPharm.

1            And then I think the biggest point is, as this

2     Court knows, there was the entities of MeadPoint, Bayside,

3     and VertiFresh.  And I asked Mr. Sears on the stand, "Was

4     Bayside -- Bayside was your company?"

5            And Mr. Sears could not admit it.  He said, "No, it

6     was my -- it's my mother's."

7            THE COURT:  Yup.

8            MR. SIBERT:  And then, unfortunately, I had to call

9     his mother into this court in front of the jury to show the

10    jury William Sears' mother had zero knowledge about

11    anything.  Didn't know -- couldn't remember anything, didn't

12    have knowledge, didn't even understand what Bayside was.

13    And so I think that's probably the key point.

14           As I argued with Guy Jean-Pierre's case yesterday,

15    these are the defendants that will put their family members

16    essentially in harm's way when it comes to potential

17    criminal violations for their own personal gain.  So if they

18    don't care about the family members, or willing to use the

19    family members for their own personal gain, the risks to the

20    public is very high.  And Mr. Sears' history shows that

21    because he didn't learn anything from the first time.

22           And I think the Court will agree, all Mr. Sears

23    was, with these entities, was a placeholder.  There was no

24    value, there was no company.  It was just all FusionPharm.

25    It was just placeholding names.

1          And, I mean, I'm not going to go into the fraud of

2     the case because I think this Court has now heard it, at

3     least six hours for the last two days.

4          THE COURT:  And I understand the sentiment behind

5     what you just said and, believe me, if I could, I would just

6     rush through all this, but we can't do that.

7          MR. SIBERT:  I know, we have to make that record --

8          THE COURT:  I have to sentence every defendant

9     individually based on the evidence against him or her and

10    make an independent assessment of his or her culpability.

11    So what I need to ask you to focus on for a few moments, at

12    least, is the following:

13         Two hours ago I just sentenced Mr. Dittman to 60

14    months custodial sentence.  You're seeking 96 months, which

15    is a 60 percent greater sentence.  So highlight for me the

16    reasons why you believe this defendant is worthy of a

17    sentence that's 60 percent longer than his codefendant.

18         MR. SIBERT:  Prior history of the same conduct.  So

19    he wasn't deterred at all by the Court or the light

20    punishment.  The fact that he continues -- I was hesitant

21    today about giving him that level of responsibility based

22    upon his own filings and his blog; the fact that he believes

23    that there's been an injustice on his side.  He's not

24    showing acceptance of responsibility by what appears to be

25    something he's posted on a blog, the fact that he's not

1     obeying the Court orders in his pretrial agreement with

2     opening these entities.

3              As for the case, itself, besides the fact that I

4     would argue that he had the relationship with Guy

5     Jean-Pierre, he knew the lawyer that could do the legal

6     matters to be able to do the transfer agent paperwork and

7     the brokerage paperwork that was required by the brokerage

8     firms to be able to get the free-trading shares.  And so he

9     was in control of the shares:  MicroCap, MeadPoint, Bayside,

10    and then the FusionPharm shares on VertiFresh.  Not only

11    that, he knew Mr. Schultz -- I think that was his last

12    name -- Mr. Schultz, who was the broker that took a 25

13    percent cut, that also testified in Mr. Guy Jean-Pierre's.

14    He brought him into it to be able to unload these shares.

15             Also when it came to the FINRA inquiry, and FINRA

16    was asking about MicroCap, obviously MicroCap was owned by

17    Mr. Sears.  But then he asked Guy Jean-Pierre to go ahead

18    and create document paperwork, backdate that paperwork, just

19    like the notes, to be able to show that he allegedly sold

20    that to Mr. Schultz.  As Mr. Schultz testified, he never

21    owned that.  He did it because Mr. Sears had to hide his

22    affiliation because, in 2011, the bulk of the revenue was

23    from the sale of FusionPharm shares through MicroCap.

24    That's what was causing this at that time.

25             I would further argue that his involvement was

1    probably more in the way of creativity when it came to

2    raising the funds to sell the shares of FusionPharm.  And

3    when I say that, I'm going back to 2012 and 2013 when it

4    wasn't Scott Dittman that went down to Florida to meet Guy

5    Jean-Pierre in person, it was Mr. Sears and Cliffe Bodden

6    that went down to Florida to discuss the raising of capital

7    and the notes and the backdating of those notes that allowed

8    MeadPoint and Bayside, where all the FusionPharm stock was

9    hid, to be able to be sold as unrestricted shares because,

10   based upon the note, the time frame had passed, and his --

11   the fact that he wasn't disclosing his affiliation as the

12   owner of MeadPoint and Bayside.

13          And also I think the video does a good job -- I do

14   think Mr. Dittman -- and we've had lots of discussions about

15   this -- I do think Mr. Dittman had -- he wanted to have a

16   business for these pods, but he didn't -- he was willing to

17   keep the business alive regardless of what it took by

18   selling the shares of FusionPharm.  So I think if there was

19   any good intent by Mr. Dittman, it was that he actually did,

20   as he testified, believe in these pods, in the business,

21   itself, where I think it was Mr. Sears' plans to be the

22   stock guy, as he was.

23          And I think the best character of that is in the

24   video that we submitted to this Court, when Mr. Dittman is

25   introducing defendant Sears to the two undercover agents

1    acting as investors.  And he just goes on a laundry list of

2    Panama, overseas accounts, and the stocks.  And we submitted

3    to the pretrial -- well, I'm going to hold off.  But the --

4    that shows his -- his involvement with the stock side.  But

5    also that interview that happens in the warehouse afterwards

6    and how he was so sure of himself about being the person

7    that created this, that he quoted, when they asked, "So

8    you're the guy that runs this whole thing?"  He goes, "I'm

9    the hand up Mona Lisa's skirt."

10            So if you just watch that video and the character

11   and nature, I would never -- I'm very thankful I never had

12   to work with defendant Sears because just the way he spoke

13   about how he would treat employees and give them these quick

14   smoke breaks and bathroom breaks --

15            THE COURT:  Hold on, hold on.  Where are we getting

16   that?

17            MR. SIBERT:  That's my Government phone.  I'm

18   sorry.  I had it on vibrate because I'm on call, so it was

19   just next to the microphone.

20            THE COURT:  You didn't get someone else to take

21   your call while you're here with me all day?

22            MR. SIBERT:  Judge, I had it on vibrate.  I

23   apologize.  I thought --

24            THE COURT:  All right.  Don't do that again.

25            MR. SIBERT:  You have it, Your Honor.

1          But, yeah, I mean, it goes to the point where he

2    was about -- he doesn't care about anyone else but Mr.

3    Sears.  He doesn't care about anyone else.  And he cares

4    about the money and the proceeds of the illegal activity.

5    And what comes through, even before he's facing this Court,

6    he can't accept that responsibility of saying he was guilty

7    in all this.  And he was hiding his affiliation.

8          And that's what I hope he says to you in court and

9    I hope he has a good allocution about why he should get a

10   lesser sentence, but I haven't seen anything that warrants

11   anything less than eight years.  And I think it's the right

12   sentence based upon how the Court has sentenced the other

13   two defendants that are related in this case, one being the

14   codefendant, one being Guy Jean-Pierre in the related case.

15         THE COURT:  Let me ask you, Mr. Sibert, the 12.2

16   million, as you've mentioned in your filings, that figure

17   was arrived at through the -- I think you called it the gain

18   method under the guidelines.  I don't have the --

19         MR. SIBERT:  The 12.2 million?

20         THE COURT:  The 12.2 million, right.

21         MR. SIBERT:  The 12 point --

22         THE COURT:  You haven't heard my question.

23         MR. SIBERT:  Okay.

24         THE COURT:  My question is:  That's a number that

25   you, or your team, calculated based on using this gain

1          method that's provided for in the guidelines.  Has all 12.2

2          million been accounted for in terms of seized assets?

3                    MR. SIBERT:  I believe what we seized was somewhere

4          around --

5                    THE COURT:  Maybe you want to check with Ms.

6          Andrews.

7                    MR. SIBERT:  -- 10 million, but let me check with

8          that.

9                    THE COURT:  Right.

10                   MR. SIBERT:  So, Your Honor, what we seized was $10

11         million -- a little bit over $10 million.  The rest of the

12         proceeds, based upon what we can figure out with gains, for

13         example, Mr. Dittman, Mr. Dittman's house bought with

14         $750,000 cash, that was from the proceeds of the sale from

15         the FusionPharm stock from MeadPoint.

16                   THE COURT:  Okay.

17                   MR. SIBERT:  So that takes us up to 11 million.

18         Mr. Sears also had a residence here.  He -- and my

19         understanding was is that there were things being, you know,

20         obviously, I guess the cost of living and buying items, we

21         didn't have a -- did we seize anything else besides cash?

22                   We didn't seize any property besides the house.

23         So --

24                   THE COURT:  So let me -- I think one of the things

25         I'm getting at is does the Government have any reason to

1    believe that any of these funds are -- have been put

2    somewhere where they will be available to the defendants

3    when they're released from custody?

4              MR. SIBERT:  Not that I know of, Your Honor.

5              THE COURT:  All right.

6              MR. SIBERT:  And I think that says for the agents,

7    as well.  We don't know of any other funds out there that we

8    could potentially seize based upon the unlawful conduct in

9    this case.

10             THE COURT:  If I looked at the method employed by

11   the FINRA -- the attorney that -- I forget -- Mr. Scofield,

12   who assists in the state and criminal prosecutions, his

13   estimate was that it was effectively double that, and that

14   the ill-gotten gains were closer to 25 million.

15             Does -- and I know you -- the Government selected

16   the gain method, but does -- do you have any basis on which

17   to argue that maybe the Scofield number's closer to the

18   actual number?

19             MR. SIBERT:  All right.  First, let me just make

20   clear to the Court, that wasn't disclosed with Mr.

21   Bornstein, that affidavit wasn't turned over to Mr.

22   Bornstein based upon the plea agreement in this case.

23             THE COURT:  Oh, okay.

24             MR. SIBERT:  That I felt that I was still obligated

25   to comply by because of the agreement that the Government

1    entered in with defendant Sears, and that now Mr. Bornstein

2    is representing.  So I didn't turn that over.

3         The $25 million in the affidavit that was given to

4    you and regarding with Guy Jean-Pierre, that was provided

5    because, as I told the Court, the Tenth Circuit requires at

6    least two ways to be -- to calculate loss before a Court can

7    articulate a loss amount.  But, yeah, I do think it's more

8    appropriate.

9         Again, it's probably a number I would have been

10   more aggressively using in the plea agreement.  The reason

11   why I think it's more appropriate is because the $12.2

12   million that we have in the plea agreement is just what Mr.

13   Sears and Dittman took home from the illegal activity of

14   FusionPharm.  The additional $12 million, essentially,

15   that's the -- that's the amount that all the victims, all

16   the outside purchasers of FusionPharm lost when the stock

17   went down to nothing.  And I think we're going to have

18   another statement to you regarding Mr. Sears in this

19   sentencing.  So if the Court's looking for a totality of

20   loss, yes, but I am bound by the plea agreement.  I just

21   want to make that clear on the record.

22        THE COURT:  I understand.  Anything else you wish

23   to put on the record, Mr. Sibert, in support of your

24   sentencing recommendation?

25        MR. SIBERT:  If the Court doesn't have any more

1   concerns or questions regarding why I'm asking for eight
2   years, no.
3           THE COURT:  Okay.  I don't have any more.  Thank
4   you.
5           MR. SIBERT:  Thank you.
6           THE COURT:  All right, Mr. Bornstein, I'll hear
7   from you in support for your sentencing recommendation.
8           MR. BORNSTEIN:  Your Honor, let me begin by saying
9   that I want to deal a little bit with what Mr. Sibert said
10  with respect to Mr. Sears and the testimony he gave at the
11  Guy Jean-Pierre trial.
12          The Sunday --
13          THE COURT:  Which I think you sat through some of
14  that.  I recall you being in the gallery.
15          MR. BORNSTEIN:  That's true.  I did sit through
16  much of it.  I think I sat through the whole first day, part
17  of the second day.
18          The Sunday before the trial began, we went to the
19  U.S. Attorney's Office and met with Mr. Sibert.  At that
20  time, Mr. Sibert told me and Mr. Sears that he was just
21  going to go through the emails and some of the other
22  documents, identify them as being authentic and having been
23  sent, have Mr. Sears initial them, and that that was how he
24  was going to proceed in court.
25          I was flatly astounded that that's not the way he

1    proceeded in court while I was sitting there.  Instead of

2    just going through the emails and instead of just going

3    through the documents and authenticating them with Mr.

4    Sears, he was asking questions about each of the documents

5    and going into their history and into their purpose and into

6    their reasoning and how they came about.  None of which was

7    previewed and, in fact, was contrary to what I thought was

8    the way that the examination was going to go.

9         I thought Mr. Sears attempted, under those

10   circumstances, to provide truthful information.  And the

11   information he was providing was not the information that

12   Mr. Sibert wanted to hear him say, and so it was like

13   pulling teeth, or however he wanted to characterize it --

14        THE COURT:  Going back to the dental metaphor.

15        MR. BORNSTEIN:  Going back to the dental metaphor.

16        But I just want to go on the record as saying that

17   I was surprised and that it was contrary to what I

18   understood was the way Mr. Sibert was going to use Mr. Sears

19   based on our meeting the Sunday before the trial.

20        THE COURT:  Even if I accept your characterization

21   of that -- and I'm sure Mr. Sibert would have a different

22   version of how that meeting went -- what does it matter in

23   terms of why we're here today?

24        MR. BORNSTEIN:  The only reason it matters is

25   because Mr. Sibert raised that issue when he was addressing

1    you.  If Mr. Sibert had not raised that issue when he was

2    addressing you as to how he was characterizing Mr. Sears'

3    testimony at the Jean-Pierre trial and how he's

4    characterizing it as not being truthful, I would never have

5    raised it.  But I'm raising it because that was raised in

6    front of you.

7            THE COURT:  Well, but I think in fairness to Mr.

8    Sibert's arguments, I think he was arguing in good part that

9    regardless or however much of a heads-up he gave you and

10   your client in terms of how exactly he was going to comport

11   his examination, that a matter that I should take into

12   account under Section 3553(a) is, from the Government's

13   perspective, that your client -- let's put it this way --

14   told less than the whole truth on certain matters.

15           Now, are you saying that your client has to be

16   advised ahead of time that he may get questions and that he

17   needs to know that he needs to answer truthfully because

18   he's under oath and testifying at a jury trial?

19           MR. BORNSTEIN:  No.  Of course not.

20           THE COURT:  All right.  Well, so then I'm not

21   understanding the import of your argument.  You know, I

22   think a similar argument was made and then quickly withdrawn

23   by some of the lawyers for one of the folks that was --

24   were -- that have been indicted in Washington.  I don't know

25   if it was Manafort or the general that basically were

1    arguing, "Well, we didn't know -- no one advised us that we

2    had to tell the truth under oath."  And that's a losing

3    argument with me.

4              MR. BORNSTEIN:  Well -- I --

5              THE COURT:  So I hope that's not what you -- the

6    argument you're making.

7              MR. BORNSTEIN:  No, no.  I'm -- that's not the

8    argument I'm making.

9              THE COURT:  Okay.  The --

10             MR. BORNSTEIN:  I guess the --

11             THE COURT:  Please don't talk over me.  Then all I

12   really hear you saying is that in the examination of Mr. --

13   by Mr. Sibert of your client that he went beyond the scope,

14   as you understood it, of what the examination was going to

15   be.  And so that leads me back to my question of:  So what?

16             MR. BORNSTEIN:  Well, I -- let me phrase it this

17   way:  I think there is a large room for argument on my part

18   that his testimony in the Guy Jean-Pierre trial was truthful

19   and that the argument that his testimony was not truthful is

20   something that I would like to be on the record as saying

21   that I am not agreeing with.  I'm not conceding.  And Mr.

22   Sears is not conceding that his true -- testimony at that

23   trial was not truthful.

24             THE COURT:  Okay.  Well, that's a different point.

25   That's a legitimate point.  And that's one that I will

1       consider.

2               MR. BORNSTEIN:  And the only reason that I raised

3       the pre- -- the issue beforehand is that had we previewed

4       that testimony beforehand and the Sunday before when we met,

5       then we could have hashed out with Mr. Sibert, you know, why

6       Mr. Sears was -- would go along with statement A, but might

7       not go along with statement B.  Go along with statement C,

8       but not necessarily go along with statement D.

9               And -- but we didn't hash that out because it

10      wasn't raised at that pre-testimony meeting.

11              THE COURT:  Okay.  All right.  Why don't you move

12      on with your next point.

13              MR. BORNSTEIN:  All right.  Mr. Sears, No. 1,

14      entered into an agreement with the SEC, which has never been

15      really developed in this courthouse -- in this courtroom,

16      and with the Department of Justice so that in this case

17      there was never an indictment handed down in this case.

18      This was a pre-indictment arrangement and plea that was

19      worked out between prior counsel for the Government and

20      prior counsel for Mr. Sears.

21              THE COURT:  Right.

22              MR. BORNSTEIN:  So he did not ask the Government to

23      bring an indictment, go to the grand jury, bring a case.

24      This was all a negotiated transaction that occurred

25      pre-indictment.

1              No. 2, he did --

2              THE COURT:  It -- and that's an argument in

3      mitigation?

4              MR. BORNSTEIN:  Yes, that's an argument for

5      cooperation with the Government.

6              THE COURT:  Oh, for purposes of cooperation.  Got

7      it.  Okay.

8              MR. BORNSTEIN:  He also negotiated an agreement

9      with the SEC, which is also cooperation with the Government.

10     And he put his life at risk and had personal death threats

11     to himself that he reported to Mr. Harmon during the course

12     of those negotiations because he became a confidential

13     informant and was going to be working for the Government.

14     Excuse me a minute.

15             THE COURT:  You can take the water to the lectern.

16     That's fine.

17             MR. BORNSTEIN:  He --

18             THE COURT:  Under death threats from whom?

19             MR. BORNSTEIN:  He -- he did not -- they were not

20     identified as particular people, but he reported them to

21     the -- to Mr. Harmon at the time back then in 2016 --

22             THE COURT:  During the -- because he was in this --

23     the FBI sting operation and lured back Mr. Jean-Pierre from

24     the Dominican Republic?

25             MR. BORNSTEIN:  Yes.

1          THE COURT:  So these were folks from the Dominican

2     Republic that were threatening him?

3          MR. BORNSTEIN:  He -- there were some people who

4     came up to Mr. Sears, I believe in a car.  There was some

5     additional phone calls that he received saying -- you know,

6     threatening him physically with his life.  Those were all

7     reported.  And that's part of what he did in cooperation for

8     the Government, for which he is getting no particular credit

9     at this point, and certainly not the credit that he thought

10    he would get, which was that they would recommend 60 months.

11         He engaged in the ruse to bring Jean-Pierre to the

12    United States, which was something that the Government

13    should have considered to be a -- a huge benefit to the

14    Government, which he's not getting any credit for anymore.

15         He testified and was partially responsible for the

16    conviction of Mr. Jean-Pierre, for which he's not getting

17    any credit by the Government.  All of these things that he's

18    done to cooperate with the Government and to participate and

19    especially bringing somebody from a -- from a island in the

20    Caribbean, that does not have extradition with the United

21    States, back to the United States so that he could be

22    arrested and prosecuted are all things that he should have

23    been given some credit for and he wasn't given that credit.

24         So for those reasons, I am asking this Court to not

25    sentence him to the maximum 96 months that the Government is

1    asking, but to sentence him to something substantially
2    lower.
3            THE COURT:  All right.  Thank you.  We're going to
4    take a 10-minute recess.
5        (Recess taken 3:02 p.m. to 3:16 p.m.)
6            THE COURT:  You both are standing.  That's not a
7    sign.  What's up.
8            MR. SIBERT:  Your Honor, if the Court has any
9    concerns, essentially about why no further cooperation and
10   why we're recommending eight years, I'm happy to address
11   those reasons, but --
12           THE COURT:  I'm not concerned about that.
13           MR. SIBERT:  All right.  Thank you, Your Honor.
14           THE COURT:  All right.  Mr. Bornstein.
15           MR. BORNSTEIN:  I would ask leave if I -- I have
16   two points that I failed to make before the Court took its
17   recess and I would ask if the Court would allow me to make
18   those two points.
19           THE COURT:  Go ahead.  Briefly, please.
20           MR. BORNSTEIN:  The first point that I want to make
21   is that the information that was put on the website that the
22   probation officer attached to the addendum to the
23   presentence report is basically the same information in a
24   different format than what we filed with our motion to
25   withdraw the plea and then our supplemental -- or additional

1    information that we tried to add to the motion to withdraw

2    the plea.  So there's nothing in that -- those documents

3    that are particularly new or different than was Mr. Sears'

4    position and documents filed with the Court.

5             And, No. 2, I understand that you -- some mention

6    about Mr. Dittman's farm being seized, but Mr. Sears also

7    had a house in Thornton that had some equity and a condo in

8    Westminster that had some equity, both of which were seized

9    by the Government.  But what's more important is there was

10   no evidence of a lavish lifestyle.  The reason that there

11   was 10 or so million dollars recovered was that this money

12   was -- that was taken in terms of stock sales did not go to

13   lavish lifestyle, did not go to houses, cars, boats, places

14   overseas, things that we have seen in other white-collar

15   cases.  So I wanted to add those two --

16             THE COURT:  All right.  Thank you.

17             I'm going to next consider some of the 3553(a)

18   factors regarding the history and characteristics of the

19   defendant.  And I'm going to do that briefly.

20             The record in this case indicates that Mr. Sears is

21   53 years old.  He's a citizen of the United States.  He was

22   born in 1966 in Queens, New York, where he lived with his

23   parents and two sisters until he was seven years old.  It

24   was then that the family left a reportedly bad area of

25   Queens for a middle-class neighborhood in Levittown,

New York.

Growing up, the defendant and his mother were subjected to frequent physical abuse by his alcoholic father and, as a child, Mr. Sears says that he was sexually abused on two occasions.  He enjoys a close relationship with his mother to this day.

In 1948, the defendant graduated from General Douglas McArthur High School in Levittown.  In January of 1985, he enrolled in evening classes at Nassau Community College in Garden City, New York, and withdrew four months later without earning a degree from that institution.

In 2005 the defendant married Sandra Dittman, who is the sister of the codefendant.  As of the date of the report -- as of the date of the report, the defendant was living with his wife on Jackson Drive in Thornton, Colorado.  No children have been born to this marriage and, according to the defendant, their marriage is, for all intents and purposes, over.  According to Mr. Sears, it is unlikely that he will be residing with his wife after he serves his term of imprisonment.

In 1996, the defendant married Sandy Abbas, who he -- whom he met in the Cayman Islands.  According to Mr. Sears, Ms. Abbas began to have issues with her visa, so they decided to get married.  The couple divorced in the year 2000 and no children were born from that marriage.

1       Soon thereafter, the defendant was involved in a
2   short-term relationship with Pamela Terry.  A son, Nicholas
3   Terry, age 18, was born from that relationship.  Ms. Terry
4   and Nicholas live in Monee, Illinois.  The defendant did not
5   know he had a son in 2010 when he received the paperwork
6   regarding child support.  The defendant first had contact
7   with his son in 2014 after an Illinois court allowed him to
8   have only once monthly visitation rights.

9       The defendant first consumed alcohol at age 10 and
10  continues to abuse alcohol to this day.  According to the
11  report, for about a year and a half prior to his initial
12  appearance in this case, he was blacking out on account of
13  drinking beer along with bourbon and tequila.  It's not
14  clear from the report how frequently this was occurring at
15  the time.  Mr. Sears did admit to the probation officer that
16  he's drinking -- currently drinking one pint of rum nightly
17  to cope with stress and anxiety.

18      On top of that, for various periods of time in his
19  life the defendant used or abused controlled substances,
20  most notably cocaine and marijuana.

21      As for Mr. Sears' criminal history, according to
22  the presentence report, he has no juvenile criminal
23  adjudications, he's been assessed three criminal history
24  points by the probation officer and he's before me on his
25  fourth felony conviction.

His first felony conviction was in 1994 out of the United States District Court for the Southern District of Florida where he was convicted of an organized scheme to defraud.  According to the presentence report filed in that case, the defendant and others operated a fraudulent business which purported to place prospective victims in high-paying construction jobs overseas.  He was sentenced to 10 years probation for that crime, which he completed successfully and from which he was terminated early.

His second and third felony convictions were in 2007 out of the United States District Court for the Southern District of New York for conspiracy to commit securities fraud and commercial bribery, as well as securities fraud.  According to the presentence report in that case, the defendant and others engaged in a complex security fraud scheme remarkably similar to the one for which he is being sentenced in this case.

That New York prosecution was the result of an extensive FBI investigation, the result of which Mr. Sears and his codefendants were convicted of, among other things, engaging in a scheme to artificially manipulate the price of the common stock of a microcap company whose stock was publicly traded on the OTC Pink Sheets Market.

I was stunned, I have to say, to read in the report that for those two felony convictions, the defendant

1   received a whopping one-month custodial sentence.  It's

2   abundantly clear to me that the sentences Mr. Sears received

3   for his prior three felony convictions were woefully

4   inadequate to the task of specifically deterring this

5   defendant from engaging in this type of criminal activity

6   again.

7          Turning to the nature and circumstances of the

8   report, I am incorporating herein by reference the factual

9   statements contained in paragraphs 12 through 84 of the

10  report to the extent that any objection to these factual

11  statements has not been sustained.  Because of the parties'

12  and the Court's considerable familiarity with these facts, I

13  will not restate them again at this time.

14         As of today, the defendant has served one day in

15  pretrial detention.

16         Mr. Kruck, do you wish to make any statement at

17  this time on behalf of the probation office?

18         PROBATION OFFICER:  I have nothing to add, Your

19  Honor.

20         THE COURT:  Thank you.  All right.  Thank you, Mr.

21  Kruck.

22         Mr. Sibert, are there any victims present who wish

23  to make a statement to the Court?

24         MR. SIBERT:  Yes, Your Honor.

25         THE COURT:  All right, sir, once again, I need you

1    to state your name for the record and tell me how you're

2    involved with this particular defendant in this case.

3              MR. SHAWN GARRETT:  My name is Shawn Garrett.  I'm

4    one of the victims in the case.  I was an investor in the

5    stock.

6              I would like to thank everybody involved in this

7    case -- sorry.  If I miss anybody, I apologize.  I would

8    like to thank Your Honor; Agent Kate Funk, FBI; ASUA Harmon;

9    Mr. Kruck, probation office; Donna Summers, Crime Victims

10   Advocate; AUSA Sibert; and I know I'll mess up your last

11   name, Debbie Della- -- Debbie, Crime Victim's Advocate.

12   Thank you, guys.

13             Honorable Judge William J. Martinez, as mentioned

14   before in my previous crime victim's impact statement, it is

15   my belief that a longer sentence is deserved for William

16   Sears.  William Sears was not made known to investors as

17   part of this company because he was prohibited from

18   participating in this line of work from a previous

19   securities fraud and bribery conviction in 2007.

20             William Sears didn't learn anything from that light

21   sentence except it made him more determined to get it right

22   the next time.  William Sears with Scott Dittman hid their

23   relationship from investors in order to set up additional

24   companies to sell fake products in order to make FusionPharm

25   look profitable to investors.  Sears set up four companies:

1   MicroCap, Bayside, MeadPoint, VertiFresh; bought bogus

2   orders from PharmPods from FusionPharm, and William Sears

3   and Scott Dittman would release fake press releases and the

4   stock price will rise and William Sears would sell stock --

5   sell stocks into the market and make profits.  All this was

6   fake and insidious.

7        I'm aware that William Sears helped the Government

8   apprehend -- apprehend Guy Jean-Pierre, but it is my firm

9   position that this was only done in order to save his own

10  neck.

11       Just as Scott Dittman was charged -- wasn't charged

12  with the full range and scope of his crimes that they

13  committed, so, too, William Sears was not charged

14  accordingly to the range and scope of his crimes.  William

15  Sears is a recidivist and obviously didn't learn a thing

16  when he's -- when he was convicted the first time.

17       William Sears and Scott Dittman used their family

18  members as part of this scheme in opening up -- and opened

19  them up to possible criminal and civil liabilities.  At this

20  late date, I still don't know their level of culpability,

21  but they are identified in the indictment playing a role.

22       There's an attachment to this recommendation

23  labeled:  Guy Jean-Pierre found guilty on 28 counts.  In

24  this attachment there are highlighted portions to William

25  Sears.  I didn't do the research in this document, but I am

1    including it in the sentencing packages as more evidence.

2            I entered into this with no malice or scorn against

3    this man.  I just want to see justice done.  The attempt by

4    William Sears to push the responsibility onto Guy

5    Jean-Pierre as if he were the main culprit is disingenuous.

6    Sears and Dittman planned this alone and went shopping for a

7    lawyer to help them where they needed help.

8            Guy Jean-Pierre was the path of least resistance.

9    He had a checkered past, and if it went -- if it wasn't for

10   him, they would have moved on to find the next person to

11   fill that role.

12           William Sears should spend a prison sentence of 12

13   to 15 years in prison.  10 years of that equates to --

14   equals what I recommend for Scott Dittman and two extra

15   years because he's the recidivist.  12 years should be the

16   minimum because he's a danger to society.  The sheer volume,

17   forethought, complexity, and lack of empathy that he had for

18   those he must have known that he was hurting, is deserving

19   of this correction.

20           As far as the IRS restitution, I found it odd that

21   all of the money that he stole by sitting down at a -- some

22   computer somewhere, he took from the victims is being taken

23   back out of that money.  He didn't earn a cent of it.  He

24   just stole it.  He could have just walked into a bank and

25   stole it.  Now the IRS wants, like, their portion of it.  I

```
 1   don't see in what universe that's fair.  I think some
 2   portion, 5, 10 percent, 13, whatever the Court can come up
 3   with, that he should have to pay back from his hard work of
 4   going to a 9:00 to 5:00 job, over some period of time, that
 5   he has to pay back from the money that he earns should go
 6   back to paying the IRS back.  All that money shouldn't go
 7   back to the IRS from the funds that he stole from victims.
 8            I had a whole section on this, but that -- it just
 9   boils down to that.  That just seems like what should be
10   fair.  I have no further remarks.
11            THE COURT:  All right.  Thank you, sir.  Appreciate
12   your comments.
13            Any other victims that wish to address the Court?
14            MR. SIBERT:  No, Your Honor.
15            THE COURT:  All right.  Okay, Mr. Bornstein, will
16   you and the defendant please approach the lectern.
17            Mr. Sears, do you wish to make any statement to the
18   Court on your own behalf before I announce your sentence?
19            THE DEFENDANT:  Yes, I do, Your Honor.
20            THE COURT:  Go ahead, please.
21            THE DEFENDANT:  Firstly, I'd like to say to Mr.
22   Garrett, I'm sorry for your losses.  Unfortunately, how it
23   happened isn't exactly how you're saying it is.  I -- I'm
24   sorry for your losses.  It's a terrible thing that happened.
25            Your Honor, you know, just going back to Mr. Sibert
```

1    talking about me, he doesn't know me.  Saying that I'm going

2    to throw my mother in front of the bus to take a hit for me.

3    The only reason I signed that is because they were going to

4    take the IRS money that was -- the money was in her trust

5    and they were going to take the house and everything else

6    that they have, and my parents don't have much.  Otherwise I

7    would have gone to trial and I would have never signed that

8    deal.

9         So for you to say that I'm going to put my family

10    in front:  No, not even close.  You don't know me.  If you

11    knew me, it's not the money.  Money -- money is -- money's a

12    byproduct to me.  I don't care about money, really.  I need

13    it to live, but I really don't.  For me, personally, it's

14    doing the deals, it's the excitement of creating something.

15    Taking an idea and rolling it out and I've been an

16    entrepreneur my entire life.

17         With regard to the last conviction of mine in 2007,

18    for the record it was a $4,000 undisclosed commission that

19    wasn't mine.  I was on the phone and that was my conspiracy.

20    It was between a broker and an FBI agent.  I had little to

21    nothing to do with it.  My sentence was so light because I

22    went ahead and I worked with the FBI and I brought them in

23    just marketing that business, which is what we called it,

24    like another business.  And I brought them five, six other

25    cases that dwarfed me in comparison.  Once again, the total

1    dollar amount of that thing was $4,000.  So that's the

2    big -- there was no pump and dump, there was nothing.

3         Regarding the pump and dump, and inflating the

4    price of the stock to enhance people to buy, anybody that

5    could do any research would know that company only did maybe

6    10 to 12 press releases in four years.  Pump and dump is

7    equated with, you know, three to four a month, and then

8    there's a lot of selling behind it and such and so forth.

9    So that's -- that's just fluff.

10         Am I sorry that this whole thing happened?  Am I

11   sorry that Mr. Garrett lost his money?  Yeah, I am.

12   Absolutely.  I think it's tragic what happened here.  It's

13   disgusting.

14         As far as false companies and -- and funneling -- I

15   built that business; I was the marketing arm.  That was my

16   job.  I had the exclusive rights.  So when they say that I

17   didn't do anything but sit back and collect money, I was out

18   at trade shows, I was there.  So, you know, I pushed that

19   product because that was my thing.  That was my -- my role

20   in there.  So for that, it is not -- it's just unequivocally

21   not true.

22         You know, where I have regret:  I should have got

23   another opinion.  I should have looked at another lawyer.

24   Absolutely.  You know, I did get Fred Lehrer.  I figured who

25   better but an ex-SEC federal prosecutor.  Who better than

1    that to represent me?  Unfortunately, Mr. Lehrer gets on the

2    stand -- well he didn't get on the stand, he interviewed

3    with the SEC.  The only guy that interviewed with the SEC,

4    and the only guy that didn't interview with the FBI says

5    that we lied to him.  Mr. Sibert even says that we lied to

6    him.  If I was allowed to, I mean, phone records and email

7    traffic would show that that's absolute rubbish.  This guy

8    knew everything I was doing at all times, at all times.

9         So what am I guilty of?  Not getting another

10   opinion.  No question about it.  No question.  Maybe being a

11   little too reckless.  Really, if I think about it in

12   hindsight, I probably should have had nothing to do with

13   this thing.  It was a cannabis company, it was going to be

14   high profile, and I have a previous record, and I was going

15   to be easy pickings.  And that's pretty much the way it went

16   down.  There were a couple of names there and that was that.

17        We proved, I thought, that all the revenue was what

18   it was.  It was revenue, PharmPods were sold, money came in.

19   Yes, was it from the sale -- yes, some of it was from the

20   sale of proceeds from securities.  Fred Lehrer told me that

21   I could put the money back in the company, as long as I was

22   buying a product.  It could not be -- not fund operations or

23   anything to that effect.

24        So every bit of money that did go in was tagged to

25   a unit that was sold, that was put out on the street.  Their

initial press releases and everything that they said was
that it was a Ponzi scheme and we never sold a pod in
general.  So, you know -- am I sorry this whole thing
happened?  Yeah.  Should I have been smarter to even put my
name on a company or anywhere near it that was a cannabis
company?  Yeah.

Did Fred Lehrer tell Craig Dudley, the CFO, and
everybody that I did need to be disclosed?  This is
something that Dittman went on and on about, I mean, it was
ad nauseam, you know.  Went to many different lawyers asking
if I needed to be disclosed.  And -- because he would have
done it.  He would have done it.  I mean, it's not like the
entire public didn't know who I was.

I had posts from Investor Hub for -- I mean,
there's tens of thousands of people on Investor's Hub to
where they're saying, "William Sears owns this.  William
Sears owns that.  This is who Robert Dittman is."

This is -- I mean, it was out there, but it wasn't
official in the company's, you know, releases -- or filings.
But I don't do the company's filings.  So, you know -- I had
one more point here.

I -- I had one more point.  I got lost in thought.
But, otherwise, with regard to my cooperation here, I was
the one that pretty much put the whole plan in order.  My
main objective really wasn't to get Guy Jean-Pierre, you

1    know, back to the U.S.  He was already a wanted fugitive out

2    of New York, which they failed to tell you.  They had no

3    idea what to do, so I figured I could pull him in.  I showed

4    them emails that I had with Guy, just keeping him on the

5    hook, because I knew at the end of the day, this is the guy

6    that said at the beginning of what I was doing was okay.

7    Fred Lehrer was the end guy.

8         So I had him on the hook, so I could put my hands

9    on him at any given time to bring him in because that's who

10   I had to point the finger at.  He's the one who gave me the

11   legal letters of opinion that said I could do it.  It wasn't

12   like I could go out and see a dirty lawyer as Mr. Garrett --

13   oh, he's left -- tried to say.  I mean, if we wanted that,

14   we would have got Greg Jaclin.  I met with Greg Jaclin

15   before Fred Lehrer, which, of course, the Government won't

16   tell you.  You know, I didn't like the guy at all.  He

17   was -- I put my paperwork out to him.  He said, "Yeah, well,

18   okay I guess you don't need to be reported."

19        Government won't tell you that, but I picked up my

20   papers and I walked away.  I didn't want any lawyer that was

21   just going to look and say, "Oh, okay, whatever you say."

22        Subsequently, Mr. Jaclin's been, you know,

23   prosecuted -- how long ago?  Three months -- nobody knows.

24   He's serving time for doing exactly that.

25        So then what do I do is I go to the next best guy I

1    can find.  Well, not the next, but Mr. Fred Lehrer, once

2    again.  And for him to say that we weren't close or he

3    didn't know everything I was doing was just an absolute lie,

4    absolute lie.  I knew everything about his son, his son's

5    ailments.  When he needed money to go take his son fishing

6    because that's his thing.  We were pretty close.  And it's

7    just not right, you know.

8         But once again where I have culpability, probably

9    should have checked into Lehrer and his associates a little

10   bit more.  You know, I really should have.  I should have

11   done my due diligence on him because if I would have noticed

12   some of the people that are flying around him a little bit

13   more I probably would have backed up and done something

14   else.

15        So, yeah, that's what I'm guilty of.  I'm guilty of

16   listening to my lawyer, not -- I should have done more.  I

17   should have done more.  And that's all I really have to say.

18        THE COURT:  Do you have any remorse for any of the

19   actions that you undertook that are the basis for your

20   felony convictions in this case?

21        THE DEFENDANT:  I have a tremendous amount of

22   remorse.  I should have done a lot of my own work.  I should

23   have done a lot more homework here.  But I'm -- as I said

24   many, many times, and countless times, I in no way intended

25   to set out and plan and defraud the United States Government

1  or commit any -- or break any kind of laws whatsoever and

2  there are countless emails that will say that. Countless.

3  There's no way this was any kind of plan.

4         Just -- it's not. For them to say that the other

5  companies were just a fraud is absolute rubbish. Meadpoint

6  sold all those pods, I did all that work. I was at trade

7  shows. VertiFresh, I was the one growing lettuce. I

8  delivered lettuce to all of the MADgreens, and a couple

9  other restaurants. So it wasn't like these were frauds, you

10  know. I mean, I put a lot of time and effort into the work

11  I did, so, yeah, I have -- I have remorse for a lot of

12  decisions that I made just without thinking through them to

13  learn how to protect myself a little better. But at no time

14  did I intend to ever break any laws of this country.

15         THE COURT: Well, you've pled guilty to two counts,

16  one of which is conspiracy to defraud the United States.

17  Are you remorseful for doing that?

18         THE DEFENDANT: As that plea agreement was

19  explained to me, as I said, too, in my testimony at Guy

20  Jean-Pierre's trial, was: Fred Winocur explained to me that

21  these are the facts that the Government believes that they

22  can prove to get an indictment. That's what you tell them.

23  Because that's what it is because you know you don't agree

24  with it.

25         And I said that at Mr. Guy Jean-Pierre's trial when

1   he was very upset about the plea agreement, "You signed
2   this, you signed this?"

3            And I believe I'm on record saying, "I signed that
4   knowing then that those are the facts that you believed you
5   could bring a conviction in at trial."

6            THE COURT:  Well, but you understood that you're
7   signing a plea agreement and you are admitting the
8   stipulated facts in that agreement.

9            THE DEFENDANT:  That was the fifth generation of
10   that agreement and it looks nothing like the agreement we
11   were going to sign not but a couple of days before.  And
12   then a new one comes up and, you know, it was either sign it
13   or the IRS was going to come in and take what little bit my
14   parents had because my mother was the trust account in
15   Bayside.  That's where the lion's share of the money went,
16   over there.  And technically she would be the one that had
17   the tax lien.

18            So to him saying that I'm not going to protect my
19   family, if it wasn't for my mother, I would have never
20   signed that document, sir.  I would have rolled the dice and
21   take -- I would have taken my chances at trial.

22            THE COURT:  You understand --

23            THE DEFENDANT:  I was very upset that I didn't --
24   you know, about Guy's trial, you know, I'm sorry to say the
25   man wanted me to lie, and I wasn't going to do it.  And

1     that's why it was such a problem, and painful like going to

2     the dentist.  He wanted me to say that stock was mine that

3     clearly wasn't.  He wanted me to say that Guy did things

4     that he didn't do.  I mean, Guy did a lot of things, you

5     know, but I wasn't going to sit there and put more weight on

6     the guy that's already has the weight that he rightfully

7     earned.

8              THE COURT:  Do you accept responsibility for your

9     actions?

10             THE DEFENDANT:  Oh, I -- yes, sir, I accept

11     responsibility for my actions.

12             THE COURT:  All right.  And you understand that

13     those actions were the basis of the criminal convictions

14     that you have in this case?

15             THE DEFENDANT:  Yeah.  The basis for their criminal

16     conviction.  I'm not saying that's -- yeah.

17             THE COURT:  I'm concerned, sir, about what the

18     probation officer provided me in this addendum, particularly

19     concerned -- and I'll tell you, quite frankly, upset to the

20     extent this -- any of this is accurate in terms of -- we'll

21     start with the posting by you on this website -- what is it,

22     coloradocorruption.com, The Real Story and Investors Hub.

23     You tell me from your view what role you had in posting the

24     information that's referenced in the probation officer's

25     addendum.  And, more specifically, what role did you have in

1    posting the photos of Agent Funk and her family on --

2                THE DEFENDANT:  May I get some water, sir?

3                THE COURT:  Go ahead.

4                THE DEFENDANT:  Thank you.  Firstly, Ms. Funk's

5    photos are public knowledge on a public website from her

6    photographer.  That was an easy Google search.  That's

7    nothing anything -- that's nothing that she didn't

8    obviously --

9                THE COURT:  You admit that you posted photos of her

10   and her family on this website?

11               THE DEFENDANT:  No.  I just -- it was just of the

12   wedding, supposed to be just of the wedding, and the date of

13   it, which was being referenced in a paragraph.  But --

14               THE COURT:  But you admit that you posted those

15   photos.

16               THE DEFENDANT:  No, I did not post those photos.  I

17   sent information that was only two pages, so whoever the web

18   guy did -- not whomever, the web guy must have put the whole

19   packet up there.  It wasn't supposed to be the whole thing.

20   I'm not the type of guy to put somebody's family up there.

21   I mean, I apologize about that.  It was only supposed to be

22   of her and Markus, her wedding photo, just one.  It wasn't

23   supposed to be all pages.  I wouldn't put those little kids

24   in there and everything.  I wouldn't do that.

25               THE COURT:  All right.  But you -- you were the

1    agent -- you were the cause of the -- that photo, even if
2    it's just one --
3              THE DEFENDANT:  Yes, sir.
4              THE COURT:  -- being posted.  Why did you do that?
5              THE DEFENDANT:  I was -- I mean, you would have to
6    read the entire article and how --
7              THE COURT:  Just give me your --
8              THE DEFENDANT:  Summary was talking about when
9    the -- when her wedding was in 2009, and she was still using
10   her Kate Egan number and when she became Funk, and how I
11   drew a direct line to that to her CPA verified reports and
12   when she changed her name after and when she went into the
13   FBI in 2010, I believe it was.
14             She would have been married, but she was still
15   under the -- still using the name Egan for her CPA, so it
16   was mainly for just to show the deception in the names.
17             THE COURT:  What possible legitimate purpose would
18   that have to post something like that?
19             THE DEFENDANT:  If you read the entire -- if you
20   read the entire site, sir, which you can pull up -- I don't
21   know if it's up or not.  He was told to take it down
22   supposedly.  So if you read it, you could put it all into
23   context.
24             It wasn't -- it wasn't really anything -- I know
25   what I want to say, but I want to say it -- I want to be --

1    I don't want my words to be weighed on.

2              If you want to go through the site, page by page, I

3    can do that and I can --

4              THE COURT:  No, I don't --

5              THE DEFENDANT:  For me to pull --

6              THE COURT:  Don't talk over me.  I don't want to go

7    through that word by word of what you posted.  I want to get

8    from you a explanation of why you posted one or more photos

9    of Agent Funk and her family on this coloradocorruption.com

10   website.

11             THE DEFENDANT:  Okay.  Once again, it was not

12   supposed to be the full amount of photos.  I was showing at

13   the time that she was still married to her current

14   husband --

15             THE COURT:  What the hell does that have to do with

16   anything?

17             THE DEFENDANT:  Sir, it draws a direct line into

18   how -- when she got hired with the FBI and the credentials

19   that she got hired with the FBI, that she clearly doesn't

20   have, in my opinion.  And in --

21             THE COURT:  In your opinion, she does not have the

22   degrees and professional certifications that --

23             THE DEFENDANT:  No, she --

24             THE COURT:  -- that she testified to --

25             THE DEFENDANT:  No, she's got a business degree

1    that comes out of KU, which we pulled down from the KU
2    website.  She said she became a certified public accountant.
3    She's only allowed to use the term "CPA" and that's a name
4    designation only.  She's not allowed to opine, she's not
5    allowed to analyze, none of it.

6         I have letters up there from the AICPA.  She's
7    never been a member of the AICPA, not recognized as.  And it
8    is clearly in the Kansas charter that she is not allowed to
9    create a report, which basically what she did was create a
10   report where she's talking about things like GAAP and
11   opining on it, and revenue recognition.  That would be
12   acting as a CPA.  And that is clearly what she's not
13   supposed to do.

14        In the state of Colorado, she's not even recognized
15   as anything, so that was only if she was in Kansas.

16        THE COURT:  So how is any of this -- and this is
17   just your opinion, in my view -- how is any of this somehow
18   corruption?  Because I'm assuming you're posting a story
19   about corruption on a site that's called Colorado
20   Corruption.  You're not posting a story about the Nuggets or
21   the weather.

22        THE DEFENDANT:  Oh, the site just went up.  It's to
23   be about all corruption.  This is just the first one.  You
24   know, there's going to be more stories --

25        THE COURT:  How is any of what you just said -- how

1    is anything of what you just described corruption?

2                THE DEFENDANT:  Well, she -- she's married to T.

3    Markus Funk, gets into the FBI, doesn't have the credentials

4    to get into the FBI at that designation.

5                Now, when you are a certified public accountant and

6    you go into the FBI, what it is, is they only go back 10

7    years in a background check.  Now she got her certificate in

8    1999, but yet she said she got it in '95, '96.  That's an

9    easy math equation to do.

10                Also once you graduate with the FBI with that

11    certification, you get to designate where you want to be.  I

12    mean, there's certain other perks that go along with it.  So

13    I don't think she would have gotten the position that she's

14    in or be where she was if it wasn't for her affiliations,

15    quite frankly.

16                THE COURT:  Well, I'll tell you, sir, I'm quite

17    upset that you did this.  I don't think there's any

18    legitimate purpose for you having done it.  You had, by that

19    time, entered a plea of guilty to these two charges.  So

20    unless you were able to make out a story that everything you

21    just said was a cause, through corruption, that you entered

22    into this plea agreement and admitted guilt to those two

23    charges, I find that there's nothing at all relevant or

24    material to what you are just saying.  And it was an

25    incredible invasion of someone's privacy and the family's

1    privacy.  And I see no legitimate purpose for that.  And you
2    certainly didn't gain any brownie points with me by doing
3    that.  Let me move on.

4         You were prohibited under the plea agreement of
5    registering or starting any new business entities during the
6    time that you were in pretrial supervision.  Did you
7    register BJ Rocks, LLC, with the Colorado Secretary of
8    State?

9         THE DEFENDANT:  No, I did not.  That was Joanna
10   Cox --

11        THE COURT:  Who is she?

12        THE DEFENDANT:  She was working with a company,
13   Elemental Distribution, that I was trying to rep products
14   for at that time.  Joanna had a -- got divorced, was going
15   through a really hard time and she just wanted to walk away
16   from the company, so I took it over because -- I believe she
17   added me to the paperwork sometime after.  And that was the
18   genesis of that.  But I didn't -- I was not the author to
19   create a new company, sir.

20        THE COURT:  So you let her register BJ Rocks, but
21   then she's going through a rough time so she just hands you
22   the ownership of the company?  Isn't that using someone else
23   to do what you can't directly do yourself?

24        THE DEFENDANT:  No, it was her distribution company
25   through Elemental Distribution.  I was the main sales guy.

1    I could have opened an -- I could have used my personal

2    account, sir.  I didn't have to use a name, you know.  I

3    could have used my personal account and, you know, I didn't

4    because a lot of the contracts that they had already had was

5    in the company.

6              THE COURT:  Well, let me just give you a warning

7    because, just like your -- the magistrate judge's order that

8    set the conditions of your pretrial release had certain

9    conditions.  After today, after I sentence you, I'm going to

10   include in the judgment that we're going to prepare in this

11   case a series of conditions on your supervised release when

12   you're released from incarceration.  And you need to

13   understand that that's not a wish list or some kind of goals

14   that you could -- you should aspire to.  Those are orders of

15   this Court, from me, and if you violate them, you will be

16   back in front of me, and I assure you I will not be very

17   happy with that.  And what that will cause, if it's proven

18   up that you violate any of those conditions, you'll go right

19   back to jail.  Do you understand me?

20             THE DEFENDANT:  Yes, I do, sir.

21             THE COURT:  I would advise that when you receive

22   those supervised release conditions that if you have any

23   question about what they prohibit you from doing, that you

24   speak with your lawyer and through your lawyer speak with

25   your supervising probation officer so that there's no

1    ambiguity and it's crystal clear what you can or cannot do.

2    Because I don't want you coming in here on a supervised

3    release revocation hearing and arguing with me, "Well, I

4    really didn't understand that I couldn't do this or I

5    couldn't do that."

6              All right?  Is that clear?

7              THE DEFENDANT:  Crystal.

8              THE COURT:  All right.  Mr. Bornstein, you still

9    want to be sitting?

10             MR. BORNSTEIN:  No, I can stand again.

11             THE COURT:  You can stand, but, you know, we're

12   going to be going into the sentencing so I think this is an

13   important time for you to be with your client there.

14             Anything else you want to say as part of your

15   allocution?

16             THE DEFENDANT:  I believe I've said enough.  Thank

17   you, Your Honor.

18             THE COURT:  All right.  All right, I'm going to, at

19   this point, summarize some of the factors that, in my view,

20   justify the custodial sentence that I intend to impose on

21   this defendant.

22             It is true that Mr. Sears employed no violence or

23   threat of violence in carrying out his criminal scheme.

24   It's also true that he cooperated with the Government with

25   respect to the investigation and prosecution of this case,

1    as well as the investigation and prosecution of his

2    co-conspirator, Mr. Jean-Pierre.  And I consider these

3    matters as significant mitigating factors.

4           With respect to aggravating factors, however, the

5    most serious matter in aggravation I find in this case is

6    the nature of the crime, which was a sprawling scheme of

7    deceit and fraud which resulted in very substantial

8    financial losses, as motivated by nothing more complicated

9    than greed.

10          As I said with Mr. Dittman, another thing that, in

11   my mind, is very aggravating about this is that these crimes

12   are not the result of some single impetuous or spontaneous

13   act.  To undertake and carry forward a conspiracy or scheme

14   or fraud of this type, it requires a lot of substantial

15   planning.  It is the result of a continual reflective

16   process.  And I find that the nature and duration of the

17   defendant's planning, as well as the large number of

18   individual discrete actions that were necessary to

19   accomplish this scheme and keep the scheme going, are also

20   matters in aggravation.

21          A further aggravation is the evidence in the record

22   established that, in my view, the defendant's significant

23   role in furtherance of the security frauds -- securities

24   fraud scheme in this case.  Much of the evidence for these

25   actions come from the stipulated facts in the defendant's

1    own plea agreement, and some came in via testimony or

2    exhibits during the trial of the co-conspirator, Mr.

3    Jean-Pierre.

4         Even though this defendant was never identified in

5    FusionPharm's financial disclosures as having a formal role

6    with the company, he was an integral part of the company's

7    operations.  When FusionPharm began operations in the spring

8    of 2011, Mr. Sears was identified in some of the documents

9    of the company as the company's vice president or investor

10   relations director.  In addition to performing several tasks

11   of the company, Mr. Sears also used a FusionPharm email

12   address and, from at least November 2011 through January of

13   2012, received a salary from FusionPharm.

14        Over the course of time, this defendant played a

15   central role in the company's operations, functioning, in

16   particular, as its de facto investor relations manager and

17   coordinating substantially all of FusionPharm's common stock

18   sales with its stock transfer agent.

19        For fuller context, I note here for the record that

20   federal securities laws require that every offer or sale of

21   a security by a company such as FusionPharm be registered

22   with the SEC or be exempt from such registration.

23   FusionPharm was not registered with the SEC and, therefore,

24   any lawful issuance of its securities would have been --

25   would have required it to be exempt from registration.

1    Exempt offerings would have required that the shares be

2    restricted, limiting the manner and amount in which they

3    could be sold.  Restricted shares of these securities would

4    have needed to be held by the owner for a holding period

5    before they could be freely transferable to a third party.

6    Additionally, shares held by persons who could control the

7    direction of a company's management are classified as

8    affiliates and were subject to additional regulations under

9    federal securities laws such as how many shares could be

10   sold in a given period of time.

11       Because Mr. Sears was at least a de facto

12   affiliate, sales of his preferred shares of FusionPharm were

13   accomplished while avoiding registration with the SEC and in

14   violation of the restriction on the newly issued shares.

15   For example, between April of 2011 and December of 2012,

16   this defendant converted 14,270 of the 185,000 preferred

17   FusionPharm shares acquired by MicroCap, an entity he

18   controlled, into 1,427,000 shares of FusionPharm common

19   stock.  Sears sold approximately 675,000 shares of these --

20   of the -- shares of this stock into the secondary market

21   through MicroCap, and he netted approximately $1.6 million

22   in the process.

23       Since FusionPharm's transfer agent was the

24   gatekeeper responsible for determining whether shares would

25   be restricted, MicroCap's sale of these unregistered shares

1    was based on false statements by Mr. Dittman and Mr. Sears

2    about Mr. Sears' affiliate status with FusionPharm.

3         For example, this defendant submitted documents on

4    MicroCap's behalf to the transfer agent that claim that he

5    had no power to direct FusionPharm's operations, even though

6    he had handled many responsibilities typically reserved in

7    other companies for an officer or director.  In doing so,

8    this defendant did not accurately describe his role with

9    FusionPharm in the course of his efforts to have the

10   transfer agent remove the restricted legend on the stock

11   certificates in order to be able to sell these shares as

12   free trading.

13        In December of 2012, Bayside Realty Holdings, an

14   entity controlled by this defendant, submitted a notice of

15   conversion to FusionPharms to convert $1,400 of debt into

16   140 shares of FusionPharm common stock.  The package that

17   Sears submitted to the transfer agent to accomplish this

18   conversion contained several false documents including, one,

19   a backdated Bayside convertible note and drawdown request; a

20   letter from Bayside attesting that Bayside was not an

21   affiliate of FusionPharm, which was false; a FusionPharm's

22   officer certificate signed by the codefendant, Mr. Dittman,

23   stating that Bayside and, thus, derivatively Sears, was not

24   an affiliate of FusionPharm, when, in fact, it was.

25        Once this defendant sold the remainder of the

Bayside debt, he and his codefendant turned to utilizing the
MeadPoint convertible note.  MeadPoint Venture Partners was
another entry controlled by Mr. Sears.  Between March of
2013 and April of 2014, Mr. Sears, through MeadPoint,
converted $42,450 of the purported debt of MeadPoint into
4.245 million shares of FusionPharm common stock.  This
defendant then freely sold approximately 3.2 million of
those shares in the open market.  The MeadPoint conversions
were documented similarly to the Bayside conversion.  The
packages that Mr. Sears submitted to the transfer agent
included many of the same fraudulent documents containing
many of the same false statements, including a backdated
MeadPoint convertible note and drawdown request; a letter
from MeadPoint signed by Mr. Sears attesting that it was not
an affiliate of FusionPharm, when, in fact, it was; a
FusionPharm officer certificate signed by Mr. Dittman
stating that MeadPoint and, thus, derivatively Mr. Sears,
were not affiliates of FusionPharm and that the MeadPoint
convertible note was a valid obligation of that company.

As with the Bayside convertible shares, the
backdated nature of the MeadPoint convertible note misled
the transfer agent into believing that the holding period
had been satisfied as to all debt obligations reflected by
the note.

Most importantly, the documents in this transfer

1    agent package provided further corroboration to the already

2    overwhelming evidence, in my view, that MeadPoint and

3    Bayside and, thus, this defendant, were affiliates of

4    FusionPharm.

5          In their plea agreement, the parties stipulate that

6    from about April of 2011 through May of 2014, this defendant

7    sold more than 4 million shares of FusionPharm stocks

8    through the affiliate entities that he controlled, and

9    acquired more than $12.2 million in stock sale proceeds.

10   2.2 million was received prior to the passage of Amendment

11   64, which legalized recreational marijuana under Colorado

12   law, and 9.9 million was acquired in the months immediately

13   following the passage of Amendment 64.

14         Mr. Sears transferred more than $8.4 million of

15   these funds directly into a brokerage account he controlled

16   but that was nominally in the name of his mother.

17         Also, according to the stipulated facts in the

18   parties' plea agreement, with respect to Count 2 of the

19   information, Mr. Sears failed to report federal capital

20   gains generated from the sale of FusionPharm stock through

21   the affiliate entities that he controlled, as well as the

22   capital gains generated from sales of FusionPharm stock in

23   his personal brokerage account.

24         The parties stipulate in their plea agreement that

25   the criminal tax loss for the tax years 2011 through 2014,

1    and for which this defendant is responsible, is $2,433,818.

2         For all these reasons, I intend to sentence the

3    defendant to the statutory maximum term of 60 months on

4    Count 1, and the statutory maximum sentence of 36 months on

5    Count 2.  I also intend to order that the sentence on Count

6    2 run consecutive to the sentence imposed on Count 1, for a

7    total custodial sentence of 96 months.

8         I want the record to reflect, however, that in my

9    judgment, the defendant's actions in this case warrant an

10   aggregate sentence closer to 120 months, similar to what Mr.

11   Garrett was saying.  And that, but for the maximum limits

12   imposed upon me by the applicable statutes, I would have

13   imposed a sentence of that length on this defendant.

14        I also intend to order that Mr. Sears pay the money

15   judgment forfeiture agreed to by the parties as well as

16   ordering forfeiture of the assets specified in the plea

17   agreement.  I also intend to order that the defendant pay

18   restitution to the Internal Revenue Service as set forth in

19   the information -- in the plea agreement and information.

20   And, finally, I intend to order this defendant to pay a

21   special assessment of $200.

22        Imposing a fine in this case would, in my view,

23   impair the defendant's ability to simultaneously pay the

24   forfeiture and restitution amounts.  For this reason, I

25   intend to waive payment of any fine, apart from the special

1    assessment.  And for the same reason, I intend to waive any
2    interest on the restitution or forfeiture amounts.
3           Before I actually impose sentence, I'll give
4    counsel a final opportunity to make any record they believe
5    appropriate.  Mr. Sibert.
6           MR. SIBERT:  Your Honor, the only thing I would
7    request is I know that the Court's going to impose
8    conditions on supervised release.  I would ask for a special
9    condition that Mr. Sears be prevented from any further
10   postings of Agent Funk's family, her personal account, her
11   husband, along with any further posting essentially about
12   the Government's actions in this case.
13          We brought this case and the Court's found that
14   throughout all these proceedings it's been done according to
15   the law.  And so I would ask that that be submitted, along
16   with taking down the corruption site that was posted, at
17   least for a few days.  I don't know where it is right now, I
18   don't know what the status is, but I don't think that should
19   be posted either.  So I would ask that be part of the
20   condition.
21          THE COURT:  Mr. Bornstein, your response.
22          MR. BORNSTEIN:  I certainly have no problem with
23   anything personal with respect to Agent Funk, but I believe
24   the defendant does have a First Amendment right to complain
25   about how the Government treated him.  And so since he has a

1    First Amendment right to complain, I have some question

2    about how far the Court could go with respect to gagging

3    him.

4         THE COURT:   That's a fair point.  I understand, Mr.

5    Sibert, what motivates your request, but I do think that

6    ordering him to say or not to say something about the

7    Government would violate his First Amendment rights, so I'm

8    not going to go that far.  But I will grant the Government's

9    request and, to the extent it's objected to, will overrule

10   that objection.  As to the other part -- and so, Mr. Kruck,

11   we'll add an additional special condition that prohibits the

12   defendant from making any postings which include the

13   photographs or references to Agent Funk and her family.

14        Beyond that, Mr. Sibert, anything you wish to say

15   before I impose sentence?

16        MR. SIBERT:   I would just say:  I don't know Mr.

17   Sears' intent, but I would ask for any of the agents -- any

18   of the agents that investigated this, no personal content

19   for anyone that was part of this investigation.

20        THE COURT:   I don't know that I have enough

21   evidence in front of me to warrant that special condition.

22   Of course if there's any development after his release from

23   custody during his supervised release that either the

24   supervising probation officer or the Government comes into

25   knowledge of anything along those lines, you're free to

1      petition me to amend the conditions of supervised release to

2      include that.

3                  MR. SIBERT:  All right.  Thank you, Your Honor.  I

4      appreciate it.  Nothing further.

5                  THE COURT:  All right.  Mr. Bornstein.

6                  MR. BORNSTEIN:  The only other thing I would add is

7      I would ask if the Court would allow Mr. Sears to

8      self-surrender himself.  I know that I received a

9      communication from the Court saying that the Court had some

10     questions with regard to that, but I want to make a formal

11     request on the record that he be allowed to self-surrender.

12                 THE COURT:  All right.  We'll get to that in a few

13     moments.

14                 All right.  The plea agreement of the parties is

15     accepted.  I find no reason to depart from the guideline

16     sentences in this case.  In addition, I find that the

17     sentences I will impose in this case reflect the seriousness

18     of the offense, affords adequate deterrence to future

19     criminal conduct, and will protect the public from further

20     crimes of this defendant.

21                 Accordingly, pursuant to the Sentencing Reform Act

22     of 1984, it is the judgment of this Court that the

23     defendant, William J. Sears, be committed to the custody of

24     the Bureau of Prisons to be imprisoned for a term of 60

25     months on Count 1, and 36 months on Count 2 to run

1   consecutive to the sentence imposed on Count 1, for a total
2   custodial sentence of 96 months.
3           In serving this term of incarceration, the Court
4   recommends that the director of the Bureau of Prisons give
5   the defendant full credit for his time served in pretrial
6   detention.
7           Is there any request, Mr. Bornstein, that I make a
8   recommendation as to designation to a facility in a
9   particular district?
10          MR. BORNSTEIN:  Could I have a moment?
11          THE COURT:  Yes.
12          MR. BORNSTEIN:  Mr. Sears would request that the
13  Court recommend to the Bureau of Prisons that he be
14  incarcerated within the District of Colorado.
15          THE COURT:  All right.  Any objection?
16          MR. SIBERT:  No, Your Honor.
17          THE COURT:  All right.  All right.  There being no
18  objection, I will also recommend to the director that the
19  defendant be incarcerated at a facility appropriate to his
20  security designation located within the District of
21  Colorado.
22          Upon release from imprisonment, the defendant shall
23  be placed on supervised release for a term of three years on
24  Count 1 and one year on Count 2, with both such terms to be
25  served concurrently.  While on supervised release, the

1    defendant shall not commit another federal, state, or local

2    crime, shall not possess a firearm as defined in 18 United

3    States Code Section 921, and shall comply with the standard

4    conditions that have been adopted by this Court in District

5    of Colorado General Order 2019-6.

6        The defendant shall not unlawfully possess and he

7    shall refrain from unlawfully using a controlled substance.

8    The defendant shall submit to one drug test within 15 days

9    of release on supervised release and two periodic tests

10   thereafter.  The defendant shall cooperate in the collection

11   of DNA as directed by the probation officer.

12       The Court finds that the following special

13   conditions of supervision are reasonably related to the

14   factors enumerated in Sections 3553(a) and 3583(d), they do

15   not constitute a greater deprivation of liberty than

16   reasonably necessary to accomplish the goals of sentencing,

17   and they will be included in the Court's judgment.  And

18   those are special conditions 1 through 16.  And to those we

19   will be adding special condition No. 17 as requested by Mr.

20   Sibert that I've already put on the record with respect to

21   the limitation by this defendant on making any public

22   postings with respect to or show any depiction or image of

23   Agent Funk or her family.

24       The defendant shall pay a special assessment of

25   $200.  With respect to restitution, I'm ordering that the

1    defendant pay restitution to the Internal Revenue Service in
2    the amount of $2,433,818.

3           With respect to the other victims of the crimes in
4    this case, I find that in this case, restitution pursuant to
5    the mandatory victim restitution provisions cannot -- should
6    not be ordered because determining the complex issues of
7    fact related to the cause or amount of those individual
8    victims' losses would complicate or prolong the sentencing
9    process to such a degree that the need to provide
10   restitution to any individual victim is outweighed by the
11   burden of the sentencing -- of the burden on the sentencing
12   process.

13          As noted in the presentence report, the Government
14   has indicated, and counsel has represented to me today on
15   the record, that the Government intends to use the remission
16   process to make the remaining victims in this case whole.

17          With respect to forfeiture, I previously entered an
18   order at ECF 132 wherein I granted the Government's motion
19   for a preliminary order of forfeiture of property, which was
20   filed at ECF 129.  In that order, I ordered that a personal
21   money judgment entered against -- enter against the
22   defendant in the amount of $1,914,049.49, and I also ordered
23   the forfeiture to the United States of certain assets and
24   property itemized in that order.  Based on my colloquy and
25   discussion with AUSA Andrews earlier in the hearing, I

1    decided that -- I will not have a final order of forfeiture

2    enter by operation of law via Rule 32.2(b)(4), but, instead,

3    I will accept up to Tuesday a proposed final order of

4    forfeiture that encompasses the issues that I spoke with

5    AUSA Andrews earlier in the hearing.

6         The Court finds that the defendant does not have

7    the ability to pay any interest on the forfeiture or

8    restitution amounts, so the Court will waive payment of any

9    interest on the forfeiture or restitution amount.  And for

10   that reason, I will also waive the payment of any fine by

11   the defendant other than the special assessment.

12        The forfeiture, restitution, and special assessment

13   obligations are due and payable immediately.  Any unpaid

14   forfeiture or restitution balance upon release from

15   incarceration shall be paid in monthly installment payments

16   during the term of supervised release of not less than 10

17   percent of the defendant's gross household monthly income.

18        Within 15 days of release from custody, the

19   defendant shall meet with the probation officer to develop a

20   plan for payment of the unpaid portion of his financial

21   obligations under the Court's judgment.

22        Previously, Mr. Bornstein requested that the

23   defendant be allowed to voluntarily surrender.  At this time

24   I'll get the Government's position.

25        MR. SIBERT:  Your Honor, we oppose voluntary

1    surrender.  We would like Mr. Dittman -- or, excuse me, Mr.

2    Sears be taken into custody today.  There are some concerns

3    based upon defendant Sears' actions in the past few weeks,

4    and particularly regarding the postings and the statements

5    that were made in those postings, and the fact that he

6    hasn't followed the orders of the pretrial under his

7    pretrial conditions made by the magistrate judge in this

8    case, and his conduct.  There is concern and he's now been

9    sentenced to a lengthy sentence by this Court, and we don't

10   want any further issues or problems by defendant Sears.

11          So at this time, we're asking that the Court issue

12   an order to put Mr. Sears in detention today.

13          THE COURT:  Mr. Bornstein, I'll give you an

14   opportunity to reply to those arguments.

15          MR. BORNSTEIN:  Mr. Sears has been out on bond for,

16   as the Court knows, for -- since 2016 -- '14.  I mean,

17   that's almost five, six years.  He has appeared when he was

18   requested to appear at the U.S. Attorney's Office.  He's

19   appeared when he was asked to appear in court.  He's

20   appeared for all proceedings.  He's here for today.  He has

21   shown by his behavior and his actions over the course of the

22   last six years that he's a person who will abide and appear

23   at whatever designated facility the Bureau of Prisons

24   designates.

25          Those are -- for those reasons, I would ask that

1     the Court allow him to self-surrender.

2              THE COURT:  All right.  For the statements -- for

3     the reasons argued by the Government, I find that the

4     defendant has failed to meet his burden of establishing to

5     me by clear and convincing evidence that he will not flee

6     nor pose a danger to the safety of the community, so I'm

7     going to order the immediate remand of this defendant.

8              My staff is contacting the U.S. Marshals right now.

9     I'm ordering Mr. Bornstein and Mr. Sears to remain in the

10    courtroom until the marshals come up into the courtroom to

11    take him into custody.

12             Finally, Mr. Sears, I'm advising you that pursuant

13    to the plea agreement you entered into in this case, you

14    waive the right to appeal your conviction, as well as the

15    sentence I've just imposed, except in very limited

16    circumstances.  To the extent you retained a right to file

17    an appeal, I'm advising you that should you wish to file

18    such an appeal, a notice of appeal must be filed with the

19    Clerk of the Court within 14 days after entry of judgment or

20    the right to appeal will be lost.

21             If you're unable to afford an attorney for an

22    appeal, the Court will appoint one to represent you.  If

23    you're unable to afford the fees for filing an appeal, you

24    may file a request with the Court that such fees be waived.

25             All right.  Is there anything further from the

1    Government at this time?

2             MR. SIBERT:  No, Your Honor.  The Government would

3    like to thank you for your patience during this long process

4    of all three cases, as well as the agencies that

5    participated in this investigation of the case.

6             THE COURT:  Thank you.  And I thank you and your

7    office and the agents in this case for your work on these

8    three prosecutions.

9             Anything further from the defendant?

10            MR. BORNSTEIN:  Nothing, sir.

11            THE COURT:  All right.  Anything further from the

12   probation officer?

13            PROBATION OFFICER:  Nothing, Your Honor.

14            THE COURT:  All right.  Thank you, that will be

15   all.

16        (Proceedings concluded at 4:21 p.m.)

17                *      *      *      *      *

18                   REPORTER'S CERTIFICATE

19        I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21        Dated at Denver, Colorado, this 2d day of April, 2020.

22

23

24   _                                                      _

25                   MARY J. GEORGE, FCRR, CRR, RMR