APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:16–cr–00301–WJM</u>–1

Case title: USA v. Sears et al

Date Filed: 09/15/2016
Date Terminated: 02/10/2020

---

Assigned to: Judge William J. Martinez

Appeals court case number: 20–1042 Tenth Circuit

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **William J. Sears**<br>*TERMINATED: 02/10/2020* | represented by | **Fredric Michael Winocur**<br>Ridley McGreevy & Winocur, P.C.<br>303 16th Street<br>Suite 200<br>Denver, CO 80202<br>303–629–9700<br>Fax: 303–629–9702<br>Email: winocur@ridleylaw.com<br>*TERMINATED: 02/14/2018*<br>*Designation: Retained* |
| | | **Marci Gilligan LaBranche**<br>Stimson Stancil LaBranche Hubbard LLC<br>1652 North Downing Street<br>Denver, CO 80218<br>720–689–8909<br>Email: labranche@sslhlaw.com<br>*TERMINATED: 02/14/2018*<br>*Designation: Retained* |
| | | **Peter R. Bornstein**<br>Peter R. Bornstein, Law Offices of<br>6060 Greenwood Plaza Boulevard<br>Suite 500<br>Greenwood Village, CO 80111<br>720–354–4440<br>Fax: 720–287–5674<br>Email: pbornstein@prblegal.com<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment* |

**<u>Pending Counts</u>**

**<u>Disposition</u>**

| | |
|---|---|
| 18:371.F Conspiracy to Defraud the United States and Commit Offenses (1) | Imprisonment: 60 months as to Count 1 and 36 months as to Count 2, for a total term of 96 months incarceration. Supervised Release: 3 years as to Count 1 and 1 year as to Count 2, to run concurrent. Special Assessment Fee: $200. Restitution: $2,433,818.00. |
| 26:7206B.F Filing False Income Tax Return (2) | Imprisonment: 60 months as to Count 1 and 36 months as to Count 2, for a total term of 96 months incarceration. Supervised Release: 3 years as to Count 1 and 1 year as to Count 2, to run concurrent. Special Assessment Fee: $200. Restitution: $2,433,818.00. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **Kenneth (Former AUSA) Harmon** U.S. Attorney's Office–Denver 1801 California Street Suite 1600 Denver, CO 80202 303–454–0100 Fax: 454–0402 Email: USACO.ECFCriminal@usdoj.gov *TERMINATED: 12/27/2017* *LEAD ATTORNEY* *Designation: Federal Agency Attorney* **Tonya Shotwell Andrews** U.S. Attorney's Office–Denver 1801 California Street Suite 1600 Denver, CO 80202 303–454–0100 |
|---|---|---|

Fax: 303–454–0402
Email: Tonya.Andrews@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Jeremy S. Sibert**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0100
Fax: 303–454–0461
Email: Jeremy.Sibert@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Federal Agency Attorney*

**Robert M. Brown**
U.S. Attorney's Office–Denver
1801 California Street
Suite 1600
Denver, CO 80202
303–454–0355
Fax: 303–454–0403
Email: Robert.Brown5@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/15/2016 | 1 | 17 | INFORMATION as to William J. Sears (1) count(s) 1, 2, Scott M. Dittman (2) count(s) 1. (Attachments: # 1 Criminal Information Sheet, # 2 Criminal Information Sheet) (cthom, ) (Entered: 09/16/2016) |
| 09/15/2016 | 6 | 43 | MINUTE ENTRY for Initial Appearance, Arraignment, Discovery and Detention Hearing as to William J. Sears and Scott M. Dittman held before Magistrate Judge Kathleen M. Tafoya on 9/15/2016. Parties tender an information to the Court. The Court accepts the information as tendered. Defendants advised. Plea of NOT GUILTY entered by defendants. Discovery memorandum executed. Bond set as to William J. Sears (1) Personal Recognizance and Scott M. Dittman (2) Personal Recognizance. Defendants advised of conditions of bond and remanded for processing and release. Counsel is directed to chambers. (Total time: 34 minutes, Hearing time: 1:46–2:20)<br><br>**APPEARANCES**: Kenneth Harmon on behalf of the Government, William Taylor for Defendant Scott Dittman, Frederick Winocur on behalf of William Sears on behalf of the defendant. FTR: KMT Courtroom C201. (lgale, ) Text Only Entry (Entered: 09/16/2016) |
| 09/15/2016 | 7 | 45 | Discovery Conference Memorandum and ORDER: as to William J. Sears by Magistrate Judge Kathleen M. Tafoya on 9/15/16. (lgale, ) (Entered: 09/16/2016) |

3

| | | | |
|---|---|---|---|
| 09/15/2016 | 9 | 55 | Personal Recognizance Bond Entered as to William J. Sears (lgale, ) (Entered: 09/16/2016) |
| 09/15/2016 | 10 | 57 | ORDER Setting Conditions of Release as to William J. Sears (1) Personal Recognizance by Magistrate Judge Kathleen M. Tafoya on 9/15/16. (lgale, ) (Entered: 09/16/2016) |
| 09/15/2016 | 17 | 62 | WAIVER OF INDICTMENT by William J. Sears by Magistrate Judge Kathleen M. Tafoya on 9/15/16. (sgrim) (Entered: 09/19/2016) |
| 09/16/2016 | 4 | | NOTICE OF ATTORNEY APPEARANCE: Fredric Michael Winocur appearing for William J. SearsAttorney Fredric Michael Winocur added to party William J. Sears(pty:dft) (Winocur, Fredric) (Entered: 09/16/2016) |
| 09/16/2016 | 5 | 41 | NOTICE of Disposition by William J. Sears (Winocur, Fredric) (Entered: 09/16/2016) |
| 09/16/2016 | 14 | 60 | ORDER Setting Change of Plea Hearing as to **William J. Sears (1)**: Pursuant to the Notice of Disposition 5 filed by the Defendant, a Change of Plea Hearing is hereby set for November 14, 2016 at 10:00 a.m. in Courtroom A801. Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than **12:00 p.m. on November 7, 2016**. If these documents are not timely submitted, the hearing may be vacated. The signed original and one copy of these documents must also be given to the courtroom deputy at the time of the hearing, pursuant to D.C.COLO.LCrR 11.1E. It is FURTHER ORDERED that defense counsel who reviewed and advised Defendant regarding the plea agreement must attend this Change of Plea Hearing. Pursuant to WJM Revised Practice Standard IX.1.1.c the AUSA assigned to this matter must also be present at the hearing. If that AUSA cannot attend in person, s/he must be present by phone and a fully–briefed substitute AUSA must be physically present in the courtroom at the time of the hearing. SO ORDERED by Judge William J. Martinez on 09/16/2016. Text Only Entry (wjmsec, ) (Entered: 09/16/2016) |
| 09/16/2016 | 15 | | NOTICE OF ATTORNEY APPEARANCE: Marci Gilligan LaBranche appearing for William J. SearsAttorney Marci Gilligan LaBranche added to party William J. Sears(pty:dft) (LaBranche, Marci) (Entered: 09/16/2016) |
| 09/16/2016 | 18 | | Passport Receipt as to William J. Sears.Surrender of passport re Bond Conditions; Passport Number 498719491 (cthom, ) (Entered: 09/19/2016) |
| 10/17/2016 | 21 | 63 | MOTION to Disclose Grand Jury Material to Defendant by USA as to William J. Sears, Scott M. Dittman. (Attachments: # 1 Proposed Order (PDF Only))(Harmon, Kenneth) (Entered: 10/17/2016) |
| 10/17/2016 | 22 | 68 | ORDER granting 21 Motion to Disclose Grand Jury Material as to William J. Sears (1), Scott M. Dittman (2) by Judge William J. Martinez on 10/17/2016. (cthom, ) (Entered: 10/17/2016) |
| 11/08/2016 | 37 | 70 | ORDER as to **William J. Sears (1)**: At the Change of Plea Hearing set for November 14, 2016, the parties should be prepared to discuss whether, pursuant to 18 U.S.C. § 3143, Defendant Sears should remain on pretrial release pending imposition of his sentence, or whether his bond should be revoked and he should be remanded at the conclusion of the Change of Plea |

| | | | |
|---|---|---|---|
| | | | Hearing. SO ORDERED by Judge William J. Martinez on 11/08/2016. Text Only Entry (wjmsec, ) (Entered: 11/08/2016) |
| 11/14/2016 | 40 | 72 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Change of Plea Hearing as to Defendant 1. William J. Sears held on 11/14/2016. Defendant pleads guilty to Counts One and Two of the Information and admits to the forfeiture allegation. ORDERED:Defendant Sears' Plea Agreement will be filed restricted – Level 2.The parties have up to and including Monday, November 28, 2016 to file motions for leave to file redacted Plea Agreements for Defendant Sears and Defendant Dittman assuming Defendant Dittman goes ahead with his Plea Agreement. Sentencing for Defendant Sears is set for 4/24/2017 at 10:30 AM in Courtroom A801 before Judge William J. Martinez. IT IS ORDERED that the defendant is permitted to remain free on bond subject to the conditions of release as set forth in the Order Setting Conditions of Release entered by the Magistrate Judge, with the following ADDITIONAL CONDITIONS: The defendant will not discuss the facts of this case, the evidence, witnesses, or any of the issues raised by this prosecution, either with his co–defendant, Mr. Dittman, or any other potential witness in this case.Court Reporter: Mary George. (dhans, ) (Entered: 11/14/2016) |
| 11/14/2016 | 41 | | RESTRICTED DOCUMENT – Level 2: Plea Agreement, pages 1 thru 25, as to William J. Sears. (dhans, ) (Entered: 11/14/2016) |
| 11/14/2016 | 42 | | RESTRICTED DOCUMENT – Level 2: Plea Agreement, pages 26 thru 47 as to William J. Sears. (dhans, ) (Entered: 11/14/2016) |
| 11/14/2016 | 43 | | RESTRICTED DOCUMENT – Level 2: Plea Agreement, Attachments A and B, as to William J. Sears. (dhans, ) (Entered: 11/14/2016) |
| 11/14/2016 | 44 | 75 | STATEMENT IN ADVANCE OF PLEA OF GUILTY by Defendant William J. Sears (dhans, ) (Entered: 11/14/2016) |
| 11/14/2016 | 48 | | AMENDED MINUTE ENTRY for Change of Plea Hearing as to Defendant 1. William J. Sears 40 held before Judge William J. Martinez: Amended to reflect the corrected sentencing hearing date of Tuesday, April 25, 2017 at 10:30 a.m. Court Reporter: Mary George. (dhans, ) (Entered: 11/15/2016) |
| 11/14/2016 | 50 | | Public Utility Resetting Hearing as to William J. Sears: Text Only Entry. Sentencing set for 4/25/2017 at 10:30 AM in Courtroom A801 before Judge William J. Martinez. (dhans, ) (Entered: 11/16/2016) |
| 11/28/2016 | 51 | 84 | Unopposed MOTION for Leave to File *Redacted Plea Agreement* by USA as to William J. Sears. (Attachments: # 1 Exhibit A)(Harmon, Kenneth) (Entered: 11/28/2016) |
| 11/28/2016 | 52 | | RESTRICTED DOCUMENT – Level 2: as to William J. Sears. (Harmon, Kenneth) (Entered: 11/28/2016) |
| 11/28/2016 | 53 | 165 | MOTION for Leave to Restrict by USA as to William J. Sears. (Harmon, Kenneth) (Entered: 11/28/2016) |
| 11/29/2016 | 54 | 167 | ORDER as to **William J. Sears (1)** granting the Government's Unopposed Motion for Leave to File Redacted Plea Agreement as to Defendant Sears 51 . The Government's Motion is hereby GRANTED for good cause shown. The redacted version of the Plea Agreement attached as Exhibit A to the Motion |

| | | | |
|---|---|---|---|
| | | | [51–1] is ACCEPTED as filed. The Clerk shall file the redacted version of the Plea Agreement as a separate docket entry on CM/ECF. SO ORDERED by Judge William J. Martinez on 11/29/2016. Text Only Entry (wjmsec, ) (Entered: 11/29/2016) |
| 11/29/2016 | 55 | 169 | ORDER as to **William J. Sears (1)** granting <u>53</u> Government's Motion to Restrict Docket Number 52. The Government's Motion is GRANTED for good cause shown. The document filed at ECF No. 52 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 11/29/2016. Text Only Entry (wjmsec, ) (Entered: 11/29/2016) |
| 11/29/2016 | <u>56</u> | | PLEA AGREEMENT as to William J. Sears filed pursuant to 54 Order. (cthom, ) (Entered: 11/29/2016) |
| 12/02/2016 | <u>59</u> | | TRANSCRIPT of Motions Hearing as to William J. Sears, Scott M. Dittman held on September 15, 2016 before Magistrate Judge Tafoya. Pages: 1–22. **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Stevens–Koenig Reporting, ) (Entered: 12/02/2016) |
| 12/05/2016 | <u>60</u> | | MOTION for Hearing , *Phone Appearance* by Scott M. Dittman as to William J. Sears, Scott M. Dittman. (Dubois, Philip) (Entered: 12/05/2016) |
| 12/29/2016 | | | ***Set Deadlines as to William J. Sears: Joint Status Report due by 3/15/2017. re: 62 (dhans, ) (Entered: 12/29/2016) |
| 02/07/2017 | <u>70</u> | | NOTICE of Change of Address/Contact Information (Andrews, Tonya) (Entered: 02/07/2017) |
| 03/15/2017 | <u>71</u> | 171 | Joint MOTION for Order *to Restrict Document* by William J. Sears, Scott M. Dittman. (Attachments: # <u>1</u> Proposed Order (PDF Only))(Winocur, Fredric) (Entered: 03/15/2017) |
| 03/15/2017 | <u>72</u> | | RESTRICTED DOCUMENT – Level 2: as to William J. Sears, Scott M. Dittman. (Winocur, Fredric) (Entered: 03/15/2017) |
| 03/15/2017 | <u>73</u> | | RESTRICTED DOCUMENT – Level 2: as to William J. Sears, Scott M. Dittman. (Winocur, Fredric) (Entered: 03/15/2017) |
| 03/16/2017 | 74 | 175 | ORDER as to **William J. Sears (1), Scott M. Dittman (2)** granting Defendants William Sears' and Scott Dittman's Motion to Restrict Document <u>71</u> . The Defendants' Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 72 and 73 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by the Selected Parties and the |

| | | | |
|---|---|---|---|
| | | | Court). SO ORDERED by Judge William J. Martinez on 3/16/2017. Text Only Entry (wjmsec, ) (Entered: 03/16/2017) |
| 03/16/2017 | 75 | 177 | ORDER as to **William J. Sears (1), Scott M. Dittman (2)**: This matter is before the Court on the Parties' Joint Status Report 73 . A Status Conference is hereby **SET for March 29, 2017 at 11:00 a.m.** in Courtroom A801, at which time the Court will consider the matters raised in said Report. SO ORDERED by Judge William J. Martinez on 3/16/2017. Text Only Entry (wjmsec, ) (Entered: 03/16/2017) |
| 03/16/2017 | 76 | | Utility Setting/Resetting Deadlines/Hearings as to William J. Sears and Scott M. Dittman: Status Conference set for 3/29/2017 11:00 AM in Courtroom A 801 before Judge William J. Martinez pursuant to 75 Order. (cthom, ) (Entered: 03/23/2017) |
| 03/24/2017 | 77 | 179 | Joint MOTION to Vacate *March 29, 2017 Status Hearing, Reset the Status Hearing as a Telephonic Hearing and Defendants' Motion to Waive Their Appearances* by William J. Sears, Scott M. Dittman. (LaBranche, Marci) (Entered: 03/24/2017) |
| 03/24/2017 | 78 | 182 | ORDER as to **William J. Sears (1) and Scott M. Dittman (2)** granting in part the Parties' Joint Motion to Vacate March 29, 2017 Status Hearing, Reset the Status Hearing as a Telephonic Hearing and Defendants' Motion to Waive their Appearances 77 . The Parties' Motion is GRANTED IN PART for good cause shown. The Status Conference currently set for March 29, 2017 is hereby **VACATED and RESET to March 31, 2017 at 10:30 a.m.** in Courtroom A801. Counsel for Defendant Dittman, Philip Dubois, is granted leave to appear at the Status Conference by telephone. Mr. Dubois shall contact chambers at (303) 335–2805 at least 5 minutes prior to the start of the Status Conference. Counsel for the Government and Defendant Sears must appear in person. It is FURTHER ORDERED that Defendant Sears's and Defendant Dittman's presence is WAIVED for the Status Conference. SO ORDERED by Judge William J. Martinez on 3/24/2017. Text Only Entry (wjmsec, ) (Entered: 03/24/2017) |
| 03/31/2017 | 79 | 184 | MINUTE ENTRY for proceedings held before Judge William J. Martinez: Status Conference as to Defendant 1. William J. Sears and Defendant 2. Scott M. Dittman held on 3/31/2017. ORDERED: The Court provisionally grants the Defendants' motion for a single sentencing hearing, subject to a reassessment of this ruling by the Court should future developments in this case so warrant. The parties shall file a Further Joint Status Report no later than Friday, June 30th. The Report shall include, at a minimum, (1) whether a further status conference is appropriate or necessary; (2) whether the parties continue to believe a pre–sentencing evidentiary hearing is required, and (3) whether there is any reason the Court cannot proceed to re–setting the sentencing hearing(s) and the evidentiary hearing on contested sentencing facts, should the parties continue to believe that such a hearing is necessary. To the extent there is a need for a pre–sentencing evidentiary hearing, that hearing will be consolidated as to both defendants.Court Reporter: Mary George. (dhans, ) (Entered: 03/31/2017) |
| 04/20/2017 | 80 | | NOTICE *of Lis Pendens* by USA as to William J. Sears, Scott M. Dittman (Andrews, Tonya) (Entered: 04/20/2017) |

| 05/02/2017 | 84 |  | TRANSCRIPT of Change of Plea as to William J. Sears held on November 14, 2016 before Judge Martinez. Pages: 1–40. <br><br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br><br>Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 05/02/2017) |
| --- | --- | --- | --- |
| 05/09/2017 | 87 | 186 | MOTION for Order *to Restrict Document* by William J. Sears. (Attachments: # 1 Proposed Order (PDF Only) Order to Restrict)(Winocur, Fredric) (Entered: 05/09/2017) |
| 05/09/2017 | 88 |  | RESTRICTED DOCUMENT – Level 2: as to William J. Sears. (Winocur, Fredric) (Entered: 05/09/2017) |
| 05/09/2017 | 89 |  | RESTRICTED DOCUMENT – Level 2: as to William J. Sears. (Attachments: # 1 Exhibit A)(Winocur, Fredric) (Entered: 05/09/2017) |
| 05/10/2017 | 90 | 190 | ORDER as to **William J. Sears (1)** granting 87 Defendant William Sears' Motion to Restrict Document. The Defendant's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 88 and 89, shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by the Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 5/10/2017. Text Only Entry (wjmsec, ) (Entered: 05/10/2017) |
| 05/10/2017 | 91 | 192 | ORDER as to William J. Sears (1) granting 89 Defendant William Sears' Unopposed Motion for Leave to Redact Transcript of Change of Plea Hearing. The Defendant's Motion is GRANTED for good cause shown. Counsel for Defendant Sears are directed to contact my Court Reporter, Mary George, at 303–335–2109, to discuss the necessary arrangements and procedures by which Ms. George may comply with this Order. SO ORDERED by Judge William J. Martinez on 05/10/2017. Text Only Entry (angar, ) (Entered: 05/10/2017) |
| 05/30/2017 | 92 |  | REDACTED TRANSCRIPT as to William J. Sears. Redaction re: 84 Transcript,,,. (mgeor, ) (Entered: 05/30/2017) |
| 06/30/2017 | 104 | 194 | Joint MOTION for Leave to Restrict by William J. Sears, Scott M. Dittman. (Attachments: # 1 Proposed Order (PDF Only))(Winocur, Fredric) (Entered: 06/30/2017) |
| 06/30/2017 | 105 |  | RESTRICTED DOCUMENT – Level 2: as to William J. Sears, Scott M. Dittman. (Winocur, Fredric) (Entered: 06/30/2017) |
| 06/30/2017 | 106 |  | RESTRICTED DOCUMENT – Level 2: as to William J. Sears, Scott M. Dittman. (Winocur, Fredric) (Entered: 06/30/2017) |
| 06/30/2017 | 107 | 197 | ORDER as to **William J. Sears (1) and Scott M. Dittman (2)** granting Defendant William Sears' and Scott Dittman's Motion to Restrict Document 104 . The Defendants' Motion is GRANTED for good cause shown. The |

8

|  |  |  |  |
|---|---|---|---|
|  |  |  | documents filed at ECF Nos. 105 and 106 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by the Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 6/30/2017. Text Only Entry (wjmsec, ) (Entered: 06/30/2017) |
| 12/26/2017 | 113 | 199 | MOTION to Withdraw as Attorney by Kenneth M. Harmon by USA as to William J. Sears, Scott M. Dittman. (Harmon, Kenneth) (Entered: 12/26/2017) |
| 12/27/2017 | 114 | 201 | NOTICE OF ATTORNEY APPEARANCE Jeremy S. Sibert appearing for USA. Attorney Jeremy S. Sibert added to party USA(pty:pla) (Sibert, Jeremy) (Entered: 12/27/2017) |
| 12/27/2017 | 115 |  | ORDER as to **William J. Sears (1) and Scott M. Dittman (2)** granting the Government's Motion to Withdraw 113 . The Motion is GRANTED for good cause shown. Kenneth M. Harmon is hereby granted leave to withdraw from this case. The Clerk shall terminate all further CM/ECF notifications to Mr. Harmon in this case. SO ORDERED. by Judge William J. Martinez on 12/27/2017. Text Only Entry (wjmsec, ) (Entered: 12/27/2017) |
| 02/13/2018 | 117 | 203 | MOTION to Withdraw as Attorney *for William J. Sears and for Appointment of New Counsel from the Criminal Justice Act Panel* by Fredric Winocur & Marci LaBranche by William J. Sears. (Winocur, Fredric) (Entered: 02/13/2018) |
| 02/13/2018 | 118 |  | CJA 23 Financial Affidavit by William J. Sears. (Winocur, Fredric) (Entered: 02/13/2018) |
| 02/14/2018 | 119 | 207 | MEMORANDUM regarding 117 MOTION to Withdraw as Attorney *for William J. Sears and for Appointment of New Counsel from the Criminal Justice Act Panel* by Fredric Winocur & Marci LaBranche filed by William J. Sears. Motion(s) referred to Magistrate Judge Kristen L. Mix. by Judge William J. Martinez on 2/14/2018. Text Only Entry (wjmsec, ) (Entered: 02/14/2018) |
| 02/14/2018 | 120 | 209 | ORDER granting 117 Motion to Withdraw as Attorney. Fredric Michael Winocur and Marci Gilligan LaBranche withdrawn from case as to William J. Sears (1). On review of Defendant Sears' financial affidavit [#118], the Court finds that he is entitled and qualified for the appointment of counsel under Fed.R.Crim.P. 44(a) and 18 U.S.C. section 3006A(b). Accordingly, IT IS HEREBY ORDERED that counsel shall be appointed to represent Defendant William J. Sears. By Magistrate Judge Kristen L. Mix on February 14, 2018. Text Only Entry (klm) (Entered: 02/14/2018) |
| 03/06/2018 | 121 | 211 | NOTICE OF ATTORNEY APPEARANCE: Peter R. Bornstein appearing for William J. SearsAttorney Peter R. Bornstein added to party William J. Sears(pty:dft) (Bornstein, Peter) (Entered: 03/06/2018) |
| 03/06/2018 | 122 | 213 | ORDER as to **William J. Sears (1) and Scott M. Dittman (2)**: This matter is before the Court on the Parties' First Supplemental Joint Status Report 106 . The Parties are DIRECTED to file an updated Joint Status Report on or before **March 23, 2018**, which should include, without limitation, the items the Court required counsel to address in its 79 Minute Entry of March 31, 2017. SO ORDERED by Judge William J. Martinez on 3/6/2018. Text Only Entry (wjmsec, ) (Entered: 03/06/2018) |

| | | | |
|---|---|---|---|
| 03/21/2018 | 123 | 215 | STATUS REPORT *regarding defendants' sentencings* by USA as to William J. Sears, Scott M. Dittman (Sibert, Jeremy) (Entered: 03/21/2018) |
| 07/03/2018 | 124 | | MOTION to Withdraw as Attorney by Philip L. Dubois by Scott M. Dittman as to William J. Sears, Scott M. Dittman. (Dubois, Philip) Modified on 7/5/2018 to terminate motion pursuant to 26 Order (angar, ). (Entered: 07/03/2018) |
| 02/06/2019 | 127 | | MOTION for Hearing *Sentencing Date* by USA as to William J. Sears, Scott M. Dittman. (Sibert, Jeremy) (Entered: 02/06/2019) |
| 02/08/2019 | 128 | 220 | ORDER as to **William J. Sears (1) and Scott M. Dittman (2)** granting the Government's Motion for Sentencing Date 127 . The Government's Motion is GRANTED for good cause shown. Defendant Sears' Sentencing Hearing is hereby **SET for July 11, 2019 at 1:30 p.m.** in Courtroom A801. Defendant Dittman's Sentencing Hearing is hereby **SET for July 11, 2019 at 9:30 a.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards (as revised effective December 1, 2018) with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 2/8/2019. Text Only Entry (wjmsec, ) (Entered: 02/08/2019) |
| 02/12/2019 | 129 | 222 | MOTION for Forfeiture of Property *PRELIMINARY ORDER OF FORFEITURE* by USA as to William J. Sears. (Attachments: # 1 Attachment A, # 2 Proposed Order (PDF Only))(Andrews, Tonya) (Entered: 02/12/2019) |
| 02/12/2019 | 131 | 246 | ORDER as to **William J. Sears (1) and Scott M. Dittman (2)**: This matter is before the Court *sua sponte*. The Parties are DIRECTED to file an updated joint status report, no later than **March 5, 2019**, which address all issues, if any, that need to be resolved prior to the sentencing hearings set for July 11, 2019, including without limitation any remaining disputes regarding amount of loss or restitution for either Defendant. SO ORDERED by Judge William J. Martinez on 2/12/2019. Text Only Entry (wjmsec, ) (Entered: 02/12/2019) |
| 02/13/2019 | 132 | 248 | Preliminary ORDER of Forfeiture as to William J. Sears (1), by Judge William J. Martinez on 2/13/2019. (angar, ) (Entered: 02/13/2019) |
| 03/06/2019 | 135 | 253 | ORDER as to **William Sears (1) and Scott M. Dittman (2)** granting Defendant Dittman's Unopposed Motion to Request Fourteen Days to File a Joint Status Report 134 . The Motion is GRANTED for good cause shown. The deadline for the Parties to file an updated joint status report pursuant to this Court's Order at ECF No. 131, is extended up to and including **March 19, 2019**. SO ORDERED by Judge William J. Martinez on 3/6/2019. Text Only Entry (wjmsec, ) (Entered: 03/06/2019) |
| 03/19/2019 | 136 | 255 | MOTION to Continue *Joint Status Report* by USA as to William J. Sears, Scott M. Dittman. (Sibert, Jeremy) (Entered: 03/19/2019) |
| 03/21/2019 | 137 | 258 | ORDER as to **William Sears (1) and Scott M. Dittman (2)** granting the Government's Motion to Continue Joint Status Report 136 . The Motion is GRANTED for good cause shown. The deadline for the Parties to file an updated joint status report pursuant to this Court's Order at ECF No. 131, is extended up to and including **April 19, 2019**. SO ORDERED by Judge William J. Martinez on 3/21/2019. Text Only Entry (wjmsec, ) (Entered: 03/21/2019) |

| 03/25/2019 | 138 | | Utility Setting Deadline as to William J. Sears, and Scott M. Dittman: Status Report due by April 19, 2019, pursuant to 137 Order. Text Only Entry. (agarc, ) (Entered: 03/25/2019) |
|---|---|---|---|
| 04/04/2019 | 139 | 260 | MOTION to Withdraw Plea of Guilty by William J. Sears. (Bornstein, Peter) (Entered: 04/04/2019) |
| 04/08/2019 | 140 | 270 | MOTION for Victim Rights *Notification Alternative Means* by USA as to William J. Sears, Scott M. Dittman. (Sibert, Jeremy) (Entered: 04/08/2019) |
| 04/09/2019 | 141 | 275 | ORDER as to **William J. Sears (1)**: This matter is before the Court on Defendant's Motion to Withdraw Plea of Guilty 139 . The Government is DIRECTED to file a Response to Defendant's Motion on or before **April 19, 2019**. No Reply will be accepted without prior leave or order of Court. SO ORDERED by Judge William J. Martinez on 4/9/2019. Text Only Entry (wjmsec, ) (Entered: 04/09/2019) |
| 04/10/2019 | 142 | 277 | ORDER as to **William Sears (1) and Scott Dittman (2)** granting the Government's Motion for Alternative Victim Notification Under 18 U.S.C. § 3771(d)(2) 140 . The Government's Motion is GRANTED for good cause shown. Pursuant to 18 U.S.C. § 3771(d)(2), the Government is authorized to employ its requested alternative victim notification procedures. SO ORDERED by Judge William J. Martinez on 4/10/2019. Text Only Entry (wjmsec, ) (Entered: 04/10/2019) |
| 04/19/2019 | 143 | 279 | STATUS REPORT *Joint* by USA as to William J. Sears, Scott M. Dittman (Sibert, Jeremy) (Entered: 04/19/2019) |
| 04/19/2019 | 144 | 283 | RESPONSE in Opposition by USA as to William J. Sears re 139 MOTION to Withdraw Plea of Guilty (Sibert, Jeremy) (Entered: 04/19/2019) |
| 04/22/2019 | 145 | | ORDER as to **William J. Sears (1)**: This matter is before the Court on Defendant's Motion to Withdraw Plea of Guilty 139 and the Government's response 144 . Defendant is DIRECTED to file a reply on or before **May 3, 2019**. SO ORDERED by Judge William J. Martinez on 04/22/2019. Text Only Entry (wjmlc1) (Entered: 04/22/2019) |
| 04/23/2019 | 146 | | ORDER: This matter is before the Court on the Joint Status Report 143 . To the extent that Defendant Dittman takes exception with anything stated in the Joint Status Report, he is DIRECTED to file a Response on or before **Thursday, April 25, 2019**. If Defendant Dittman fails to file a response, the Court will assume that he joins in everything set forth in the Joint Status Report. No Reply will be accepted without prior leave or order of Court. SO ORDERED by Judge William J. Martinez on 4/23/2019. Text Only Entry (wjmsec, ) (Entered: 04/23/2019) |
| 05/03/2019 | 147 | | Unopposed MOTION for Extension of Time to File Response/Reply *Re: Motion to Withdraw Plea of Guilty* by William J. Sears. (Bornstein, Peter) (Entered: 05/03/2019) |
| 05/06/2019 | 148 | | ORDER as to **William J. Sears (1)** granting Defendant's Unopposed Motion for Extension of Time to File a Reply Re: Motion to Withdraw Guilty Plea 147 . Defendant's Motion is GRANTED for good cause shown. Defendant's deadline to file a reply in support of his motion to withdraw guilty plea is extended up to and including **May 9, 2019**. SO ORDERED by Judge William |

| | | | |
|---|---|---|---|
| | | | J. Martinez on 5/6/2019. Text Only Entry (wjmsec, ) (Entered: 05/06/2019) |
| 05/09/2019 | 149 | 298 | REPLY TO RESPONSE to Motion by William J. Sears re 139 MOTION to Withdraw Plea of Guilty (Attachments: # 1 Exhibit A)(Bornstein, Peter) (Entered: 05/09/2019) |
| 05/22/2019 | 150 | 310 | ORDER denying 139 Motion to Withdraw Plea of Guilty as to **William J. Sears (1)**, by Judge William J. Martinez on 05/22/2019. (wjmlc1) (Entered: 05/22/2019) |
| 06/04/2019 | 151 | | RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to William J. Sears (Attachments: # 1 Exhibit A)(doden, ) (Entered: 06/04/2019) |
| 06/04/2019 | 152 | | EXHIBIT B TO RESTRICTED PRESENTENCE REPORT first disclosure for attorney review as to William J. Sears (doden, ) (Entered: 06/04/2019) |
| 06/18/2019 | 159 | 328 | RESPONSE in Opposition by USA as to William J. Sears, Scott M. Dittman re 154 MOTION to Continue *Sentencing Hearing and Request for Specific Discovery* (Sibert, Jeremy) (Entered: 06/18/2019) |
| 06/18/2019 | 160 | 333 | OBJECTION/RESPONSE to Presentence Report 151 by William J. Sears (Bornstein, Peter) (Entered: 06/18/2019) |
| 06/19/2019 | 163 | | ORDER as to **William Sears (1)**: This matter is before the Court on Defendant Sears' Objection to Presentence Investigation Report 160 . The Government is DIRECTED to file a Response to Defendant's Objections on or before **July 1, 2019**. No Reply will be permitted. SO ORDERED by Judge William J. Martinez on 6/19/2019. Text Only Entry (wjmsec, ) (Entered: 06/19/2019) |
| 06/24/2019 | 168 | | MOTION for Clarification *sentencing dates* by USA as to William J. Sears, Scott M. Dittman. (Sibert, Jeremy) Modified on 7/3/2019 to term motion pursuant to 170 (angar, ). (Entered: 06/24/2019) |
| 06/28/2019 | 170 | 341 | ORDER as to **William J. Sears (1)**: This matter is before the Court *sua sponte*. Due to a conflict with a criminal jury trial the week of July 8, 2019, the Sentencing Hearing set for July 11, 2019 at 1:30 p.m. is hereby **VACATED and RESET to October 31, 2019 at 1:15 p.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards with regard to the deadlines for filing sentencing–related motions. It is FURTHER ORDERED that the Government's Motion for Clarification 168 is DENIED as MOOT, given this Court's Orders in *United States of America v. Dittman*, Case No. 16–cr–301–WJM–2 (ECF No. 169) and *United States of America v. Jean–Pierre*, Case No. 17–cr–008–WJM (ECF No. 232), which set the sentencing hearings for these two defendants at or near the same time as Defendant Sears' sentencing hearing. SO ORDERED by Judge William J. Martinez on 6/28/2019. Text Only Entry (wjmsec, ) (Entered: 06/28/2019) |
| 07/01/2019 | 171 | 343 | ORDER as to **William J. Sears (1)**: This matter is before the Court upon the entry of the Court's Order resetting Defendant Sears' Sentencing Hearing for October 31, 2019 (ECF No. 170). The deadline for the Government to file its Response to Defendant Sears' Objection to Presentence Investigation Report (ECF No. 160 ) is extended up to and including **August 7, 2019**. No reply will be permitted. SO ORDERED by Judge William J. Martinez on 7/1/2019. Text |

| | | | |
|---|---|---|---|
| | | | Only Entry (wjmsec, ) (Entered: 07/01/2019) |
| 08/01/2019 | 173 | 345 | MOTION for Reconsideration re 150 Order on Motion to Withdraw Plea of Guilty by William J. Sears. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Bornstein, Peter) (Entered: 08/01/2019) |
| 08/02/2019 | 175 | | RESPONSE by USA as to William J. Sears *TO DEFENDANT'S OBJECTIONS TO PSR* (Attachments: # 1 A1, # 2 A2, # 3 A3, # 4 A4, # 5 A5, # 6 A6, # 7 A7, # 8 A8, # 9 A9, # 10 A10, # 11 A12, # 12 A13, # 13 A14, # 14 A16, # 15 A17, # 16 A18, # 17 A19, # 18 A20, # 19 A21, # 20 A22, # 21 A23, # 22 A24, # 23 A25, # 24 A26, # 25 A27, # 26 A28, # 27 A29, # 28 A30, # 29 A31, # 30 A32, # 31 A33, # 32 A34)(Sibert, Jeremy) (Entered: 08/02/2019) |
| 08/02/2019 | 177 | | Conventionally Submitted Material : CD re: Response, 175 by Plaintiff USA Text Only Entry (angar, ) (Entered: 08/05/2019) |
| 08/05/2019 | 176 | | ORDER as to **William J. Sears (1)**: Before the Court is Defendant's Motion for Reconsideration 173 . The Government shall respond on or before **August 12, 2019**. No reply from Defendant will be accepted. SO ORDERED by Judge William J. Martinez on 08/05/2019. Text Only Entry (wjmlc1) (Entered: 08/05/2019) |
| 08/06/2019 | 178 | | Unopposed MOTION for Extension of Time to File Response/Reply *TO MOTION TO RECONSIDER COURTS DENIAL OF MOTION TO WITHDRAW CHANGE OF PLEA [ ECF 173]* Attorney Robert M. Brown added to party USA(pty:pla) by USA as to William J. Sears, Scott M. Dittman. (Brown, Robert) Modified on 8/7/2019 to terminate motion pursuant to 179 Order (angar, ). (Entered: 08/06/2019) |
| 08/06/2019 | 179 | | ORDER as to **William Sears (1)** granting the 178 Government's Unopposed Motion for Extension of Time to Respond to Motion to Reconsider Court's Denial of Motion to Withdraw Change of Plea [ECF 173]. The Government's Motion is GRANTED for good cause shown. The Government's deadline to file its Response to Defendant's Motion for Reconsideration is extended up to and including **August 26, 2019**. SO ORDERED by Judge William J. Martinez on 8/6/2019. Text Only Entry (wjmsec, ) (Entered: 08/06/2019) |
| 08/23/2019 | 180 | 370 | RESPONSE in Opposition by USA as to William J. Sears re 173 MOTION for Reconsideration re 150 Order on Motion to Withdraw Plea of Guilty (Sibert, Jeremy) (Entered: 08/23/2019) |
| 09/30/2019 | 181 | 376 | ORDER denying 173 Motion for Reconsideration as to **William J. Sears (1)**, by Judge William J. Martinez on 09/30/2019. (wjmlc1) (Entered: 09/30/2019) |
| 10/01/2019 | 183 | 381 | ORDER as to **William J. Sears (1)**: This matter comes before the Court *sua sponte*. The undersigned will be out of the office the week of October 28, 2019, and as a result the Sentencing Hearing currently set for October 31, 2019 at 1:15 p.m. is hereby **VACATED and RESET to January 23, 2020 at 1:30 p.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 10/1/2019. Text Only Entry (wjmsec, ) (Entered: 10/01/2019) |
| 10/02/2019 | 184 | 383 | Unopposed MOTION for Order *Resetting Sentencing Hearing* by William J. Sears. (Bornstein, Peter) (Entered: 10/02/2019) |

| 10/09/2019 | 185 | 385 | ORDER as to **William J. Sears (1)** granting the Defendant's Unopposed Motion to Reset Sentencing Hearing 184 . The Defendant's Motion is GRANTED for good cause shown. The Sentencing Hearing set for January 23, 2020 at 1:30 p.m. is hereby **VACATED and RESET to January 30, 2020 at 1:30 p.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 10/9/2019. Text Only Entry (wjmsec, ) (Entered: 10/09/2019) |
|---|---|---|---|
| 01/21/2020 | 192 |  | RESTRICTED PRESENTENCE REPORT as to William J. Sears (Attachments: # 1 Exhibit A, # 2 Exhibit B)(doden, ) (Entered: 01/21/2020) |
| 01/21/2020 | 193 |  | RESTRICTED ADDENDUM to Presentence Report 192 as to William J. Sears (Attachments: # 1 Exhibit A, # 2 Exhibit B)(doden, ) (Entered: 01/21/2020) |
| 01/30/2020 | 204 | 387 | COURTROOM MINUTES for Sentencing Hearing as to defendant William J. Sears (1) held before Judge William J. Martinez held on 1/30/2020. Granting the Government's oral motion for an additional one–level reduction in the offense level for acceptance of responsibility. Defendant sentenced as reflected on the record. Defendant remanded. Court Reporter: Mary George. (afran, ) (Entered: 01/31/2020) |
| 01/30/2020 | 206 | 390 | **STRICKEN** MOTION for Dismissal of Charges with Prejudice for Lack of Jurisdiction, by William J. Sears. (angar, ) Modified on 2/3/2020 to strike pursuant to 207 Order (angar, ). (Entered: 02/03/2020) |
| 02/03/2020 | 207 | 503 | ORDER as to **William J. Sears (1)** striking Defendant's Motion for Dismissal of Charges with Prejudice for Lack of Jurisdiction 206 As the Defendant, Mr. Sears has the right to have counsel appointed to represent him or he has the right to represent himself, but he does not have the right to hybrid representation. *United States v. Hill*, 526 F.2d 1019, 1025 (10th Cir. 1975). Because Defendant continues to be represented by counsel, he cannot be represented and still continue to file motions on his own behalf. Accordingly, ECF No. 206 is STRICKEN. SO ORDERED by Judge William J. Martinez on 2/3/2020. Text Only Entry (wjmsec, ) (Entered: 02/03/2020) |
| 02/04/2020 | 209 | 505 | MOTION to Amend/Correct *the Preliminary Order of Forfeiture* by USA as to William J. Sears. (Attachments: # 1 Proposed Order (PDF Only))(Andrews, Tonya) (Entered: 02/04/2020) |
| 02/05/2020 | 210 |  | RESTRICTED AMENDED PRESENTENCE REPORT as to William J. Sears (Attachments: # 1 Exhibit A, # 2 Exhibit B)(doden, ) (Entered: 02/05/2020) |
| 02/10/2020 | 211 | 515 | Amended Preliminary ORDER of Forfeiture, as to William J. Sears (1). ORDERED by Judge William J. Martinez on 2/10/2020. (angar, ) (Entered: 02/10/2020) |
| 02/10/2020 | 215 | 520 | JUDGMENT as to defendant William J. Sears (1). Counts 1 and 2 of the Information: Defendant sentence to imprisonment for a term of 60 months as to Count 1 and 36 months as to Count 2, for a total term of 96 months of incarceration. 3 years of supervised release as to Count 1 and 1 year of supervised release as to Count 2, to run concurrent. $200 special assessment fee. $2,433,818.00 in restitution. Entered by Judge William J. Martinez on 2/10/2020. (afran, ) (Entered: 02/10/2020) |

| 02/10/2020 | 216 | | STATEMENT OF REASONS as to William J. Sears (1). (afran) (Entered: 02/10/2020) |
|---|---|---|---|
| 02/12/2020 | 217 | 527 | NOTICE OF APPEAL as to 215 Judgment, by William J. Sears. (Bornstein, Peter) (Entered: 02/12/2020) |
| 02/13/2020 | 218 | | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 217 Notice of Appeal as to William J. Sears to the U.S. Court of Appeals. ( CJA,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 02/13/2020) |
| 02/13/2020 | 220 | | USCA Case Number as to William J. Sears 20–1042 for 217 Notice of Appeal filed by William J. Sears. (angar, ) (Entered: 02/19/2020) |
| 02/20/2020 | 221 | | MOTION for Bond *While on Appeal* by William J. Sears. (Bornstein, Peter) (Entered: 02/20/2020) |
| 02/20/2020 | 222 | | ORDER as to **William Sears (1)**: This matter is before the Court on Defendant's Motion for Bond while on Appeal 221 . The Government is DIRECTED to file a Response to Defendant's Motion on or before **March 2, 2020**. No Reply will be accepted without prior leave or order of Court. SO ORDERED by Judge William J. Martinez on 2/20/2020. Text Only Entry (wjmsec, ) (Entered: 02/20/2020) |
| 02/25/2020 | 223 | | RESPONSE to Motion by USA as to William J. Sears re 221 MOTION for Bond *While on Appeal* (Brown, Robert) (Entered: 02/25/2020) |
| 02/25/2020 | 224 | | MOTION to Proceed in Forma Pauperis by William J. Sears. (Bornstein, Peter) (Entered: 02/25/2020) |
| 02/25/2020 | 225 | | DESIGNATION OF RECORD ON APPEAL re 217 Notice of Appeal by William J. Sears. (Attachments: # 1 Docket Sheet)(Bornstein, Peter) (Entered: 02/25/2020) |
| 02/25/2020 | 226 | | TRANSCRIPT ORDER FORM re 217 Notice of Appeal by William J. Sears. (Bornstein, Peter) (Entered: 02/25/2020) |
| 02/25/2020 | 227 | | ORDER of USCA as to William J. Sears re 217 Notice of Appeal. (USCA Case No. 20–1042) (angar, ) (Entered: 02/26/2020) |
| 02/28/2020 | 228 | | ORDER Granting 224 Motion to Proceed in Forma Pauperis as to William J. Sears (1). ORDERED by Judge William J. Martinez on 2/28/2020. (angar, ) (Entered: 02/28/2020) |
| 03/05/2020 | 230 | | Passport Receipt as to William J. Sears (1). Forwarding passport to Dept. of State pursuant to 215 Judgment. Passport Number 498719491 issued by United States of America. (Attachments: # 1 Certified Mail Receipt) (afran) (Entered: 03/05/2020) |
| 03/12/2020 | 231 | | REPORTER TRANSCRIPT ORDER FORM filed by Mary George re 217 Notice of Appeal. Transcript due by 4/9/2020. (nrich) (Entered: 03/12/2020) |
| 03/25/2020 | 233 | | Passport return Receipt as to William J. Sears (1) (angar, ) (Entered: 03/26/2020) |
| 04/02/2020 | 234 | | TRANSCRIPT of Sentencing Hearing as to William J. Sears held on January 30, 2020 before Judge Martinez. Pages: 1–104. <br><br> **NOTICE –** |

| | | | |
|---|---|---|---|
| | | | **REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>**<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mgeor, ) (Entered: 04/02/2020) |
| 04/23/2020 | 235 | | MOTION for Forfeiture of Property *for Final Order of Forfeiture for Direct Assets, Substitute Assets, and a Personal Forfeiture Money Judgment* by USA as to William J. Sears. (Attachments: # 1 Proposed Order (PDF Only))(Andrews, Tonya) (Entered: 04/23/2020) |
| 04/24/2020 | 236 | | Final ORDER of Forfeiture as to William J. Sears (1), by Judge William J. Martinez on 4/24/2020`. (angar, ) (Entered: 04/24/2020) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. *16-cr-00301-WJM*

UNITED STATES OF AMERICA

        Plaintiff,

v.

1.    WILLIAM J. SEARS, and
2.    SCOTT M. DITTMAN,

        Defendants.

---

## INFORMATION
18 U.S.C. §371
26 U.S.C. §7206(1)

---

The Acting United States Attorney charges that:

### COUNT 1

1.    Beginning as early as in or about March 25, 2011 and continuing at least through in or about May 15, 2014, the exact dates being unknown, in the State and District of Colorado, and elsewhere, the defendants,

**WILLIAM J. SEARS, and**
**SCOTT M. DITTMAN,**

did knowingly and willfully conspire, combine and agree with each other, and with other persons both known and unknown,

    (a) to defraud the United States and one of its agencies, the United States Securities and Exchange Commission ("SEC"), by impeding, impairing, defeating and obstructing the lawful

1

governmental functions of the SEC; and

      (b) to commit the following offenses against the United States:

          (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5];

          (ii) willful violations of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a);

          (iii) mail fraud, in violation of Title 18, United States Code, Section 1341; and

          (iv) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Background

At all times material to this Information:

2.     Defendant WILLIAM J. SEARS was a resident of Thornton, Colorado whose principal occupation over the years was providing public relations and promotional services to companies with low or minimal capitalization (hereinafter, "microcap companies") that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets. In 2007, defendant Sears was convicted in the Southern District of New York of one count of conspiring to commit federal securities fraud and commercial bribery and one count of federal securities fraud (Case No. 04-cr-556-swk).

3.     Microcap Management LLC ("Microcap") was a Nevada limited liability company formed by defendant SEARS, with its primary business address in Colorado. Defendant SEARS was, among other things, the beneficial owner and manager of Microcap and controlled Microcap. SEARS primarily conducted his stock public relations and promotional business through Microcap over the years.

2

4.      Bayside Realty Holdings, LLC ("Bayside") was another Nevada limited liability company formed, controlled and operated by defendant SEARS, in fact, but which was held out to be managed and owned by a blood relative family member (hereinafter, "Family Member A") residing in North Carolina.

5.      Defendant SCOTT M. DITTMAN was a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania.   From October 1991 until April 1995, DITTMAN practiced as an accountant and for two years, from 1995 to 1997, had been a certified public accountant licensed in the State of California. Thereafter, defendant DITTMAN was principally self-employed in various businesses, including real estate development, construction and, beginning in or about 2010, medical marijuana. Defendants DITTMAN and SEARS were brothers-in-law, SEARS being married to DITTMAN's sister.

6.      FusionPharm, Inc. ("FusionPharm") was a Nevada corporation with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado. FusionPharm's principal business was the development, manufacture and sale of steel shipping containers retrofitted and refurbished for use as hydroponic growing pods, branded as "PharmPods," for indoor plant cultivation, primarily cannabis. Defendant DITTMAN was the founder, chief executive officer and sole director of FusionPharm but, in fact, operated FusionPharm, and pursued and developed its business, together and in concert with defendant SEARS, and the two defendants together beneficially held and controlled the majority of the shares of FusionPharm's common and preferred stock, which was convertible into the company's common stock.   FusionPharm's common stock was publicly traded in the over-the-counter markets, primarily through transactions involving networks of securities broker-dealers.

3

7.    Meadpoint Venture Partners, LLC ("Meadpoint") was a Nevada limited liability company formed by defendant SEARS and was held out to be FusionPharm's exclusive distributor of PharmPods, marketing, in particular, to customers interested in using the pods for cannabis cultivation.   Meadpoint shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm. Defendant SEARS was identified as Meadpoint's managing member, and Meadpoint was operated by both defendants together in conjunction with the operations of FusionPharm.

8.    VertiFresh, LLC ("VertiFresh") was a Delaware limited liability company jointly owned and controlled together by defendants SEARS and DITTMAN.   Vertifresh was held out to be a licensee of FusionPharm's technology and growing methods whose principal business purportedly involved using FusionPharm PharmPods to grow non-cannabis produce (primarily, lettuce) for sale to restaurants and retail food outlets. Vertifresh shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm.

9.    OTC Link was an electronic inter-dealer stock quotation system that published stock quotes and other stock transaction information posted by securities broker-dealers and was typically used by broker-dealers to display quotes and make markets in securities of publicly traded microcap companies whose securities were traded in the over-the-counter markets.   Such companies did not have to meet any requirements in order to have their stocks quoted on the OTC Link system, and any reporting or disclosure by companies whose stocks were quoted on the system was voluntary.   However, the OTC Link system organized and classified the securities of the companies quoted on its system into several distinct marketplaces or "market

4

tiers," depending, in large part, on the nature, quality and extensiveness of the corporate and financial disclosures a company provided to OTC Link. The "market tiers" were designed to provide investors some indication as to the quality and level of information about the companies on the OTC Link system, and companies that provided limited or no information were placed in market tiers reserved for stock issuers that prospective investors were advised to consider with caution. The type of information that participating companies were encouraged to provide to OTC Link typically included quarterly and annual financial statements and quarterly and annual reports, in a prescribed format, providing disclosure, among other things, about the officers, directors, control persons and significant beneficial owners of the company's stock. These quarterly and annual submissions were uploaded to OTC Link's website, where they were readily accessible to the investing public and subject to wide dissemination through financial media outlets.

10.     FusionPharm's common stock was quoted on the OTC Link under the stock symbol "FSPM" and, using this system, securities broker-dealers made a market in and facilitated public, over-the-counter trading in its stock.   FusionPharm undertook to, and regularly did, upload to the OTC Link's website, and thereby made available to the investing public, quarterly and annual financial statements and reports providing information about its performance, its financial condition and the identities of its officers, control persons and significant stockholders.

11.     The SEC was an independent agency of the executive branch of the United States Government whose duties included regulating and monitoring the trading of securities and the

reporting of financial and other information by publicly-held corporations within the United States.

12.     Under the federal securities laws, the securities of companies traded in United States could not be bought and sold in public transactions unless first registered with the SEC or considered exempt from registration pursuant to one of several defined statutory or regulatory provisions.   Such registration typically involved providing to the SEC and making available to the investing public certain specified information about the company, its financial situation, its operations and its principals and officers, in a prescribed form filed with the SEC which typically included a prospectus made available to potential investors.   Securities that were unregistered, and not otherwise exempt from registration, were considered restricted securities that were not eligible for lawful public re-sale, and the certificates evidencing these securities typically bore a legend providing notice of this status.

13.     One of the exemptions from registration recognized under the federal securities laws generally allowed holders of unregistered securities, not already unrestricted at the time of receipt, to resell them in public transactions, without limitation, after having held the securities for a specified period.   This holding period, in the case of companies such as FusionPharm, was one year.   Holders of unregistered, restricted securities who were deemed to be "affiliates" could resell these securities in public transactions after meeting the specified holding period, but only if they met certain additional regulatory requirements, and only then in limited numbers of shares over specified periods of time (*i.e.*, in public sales subject to "volume restrictions").   An "affiliate," for the purpose of this regulatory exemption from registration, was considered to be someone who directly, or indirectly through one or more intermediaries, controlled, or was

6

controlled by, or was under common control with the issuing company. Such "control" was defined to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

14.     Both non-affiliate and affiliate holders of unregistered securities, upon satisfying their respective requirements for the regulatory exemption from registration, would typically have had to have the stock transfer agent for the issuing company remove the restrictive legends on the certificates of their securities, before the securities could be eligible for resale in a public transaction. To accomplish this, the holders would have had to have secured the consent of the issuing company and would have had to have provided documentation to the stock transfer agent demonstrating that the requirements for exemption from registration had been met.

15.     None of FusionPharm's securities were registered with the SEC, and the only way that its securities could be traded over-the-counter or in other public transactions were through transactions involving securities that qualified for exemption from registration with the SEC.

## Manner and Means of the Conspiracy

16.     It was part of the manner and means of carrying out the conspiracy that:

A.      Defendant SEARS would cause shares of preferred stock of FusionPharm held in the name of Microcap to be converted into shares of FusionPharm common stock and deposited into brokerage accounts established in the name of Microcap. Defendant SEARS would induce brokers overseeing these accounts to consider and treat these common shares as unrestricted securities that could be immediately sold in the public securities markets by falsely representing to them that neither he nor Microcap was an affiliate of FusionPharm or a control

7

person of the company.   Defendant DITTMAN facilitated the deposit of these shares, and their treatment as unrestricted securities, by executing FusionPharm officer certificates and other documentation affirming that Microcap was not an affiliate of FusionPharm.

B.     Defendant SEARS would then cause the remainder of these preferred shares to be transferred from Microcap's name into the names of family members or entities held in the name of family members, in order to make it appear that neither he nor Microcap had shareholdings in FusionPharm in such amounts as to deem either SEARS or Microcap to be affiliates or control persons under the federal securities laws or to trigger their disclosure as significant shareholders under the reporting guidelines established by OTC Link. Defendant SEARS would thereafter cause portions of the FusionPharm preferred shares that had been transferred into the names of these family members and entities, in turn, to be converted into additional common shares of FusionPharm that could be publicly sold later on or that he and DITTMAN could later use to raise funds for the company in private sales to select FusionPharm investors.

C.     Defendant SEARS, working in coordination with another individual, would thereafter cause the FusionPharm common shares that had been deposited into the Microcap brokerage accounts to be sold in the public securities markets and, in consultation with defendant DITTMAN, would deposit significant portions of the proceeds of these FusionPharm stock sales into operating bank accounts of FusionPharm – both directly and through a series of transactions involving Bayside, Meadpoint or Vertifresh – so that the money could then be used to capitalize and operate the company, as well as be used for the defendants' own financial support.

8

17.     As a further part of the manner and means of carrying out the conspiracy, in order to generate and make available for themselves additional FusionPharm common stock that could immediately be sold, without limitation, into the public securities markets, the defendants did and caused the following to be done:

A.     Over the course of June 2012 through in or about December 2012, the defendants, working together with another individual (identified hereinafter as, "Co-Conspirator A"), fabricated promissory notes and incorporated credit line agreements, in order to falsely portray some of the money that had previously been deposited into FusionPharm's bank accounts from the Microcap FusionPharm stock sales as loans from Bayside and Meadpoint that had been extended to FusionPharm over a year before.

B.     The defendants and Co-Conspirator A further fabricated documentation making it appear that FusionPharm had drawn down on the supposed credit lines established with Bayside and Meadpoint by specified amounts, and they assembled bank records to offer substantiation for these supposed earlier credit line draw downs.

C.     The defendants and Co-Conspirator A, in the final iterations of these fabricated promissory notes and supporting documents, made it appear that the supposed debt evidenced by these notes could be converted in whole or in pieces, at the election of the noteholders, into shares of FusionPharm common stock at a specified conversion rate of one FusionPharm share for every penny of debt supposedly still owed on the notes by FusionPharm.

D.     Defendant DITTMAN, on behalf of FusionPharm, and defendant SEARS, on behalf of Meadpoint and acting for Family Member A on behalf of Bayside, executed the back-dated promissory notes and documents.

9

E. Defendants SEARS and DITTMAN then generated packets of documents that SEARS caused to be presented to FusionPharm's stock transfer agent, over a series of months, in order to effectuate the conversion of portions of the supposed debt held by Bayside and Meadpoint into shares of FusionPharm common stock. The packets typically included the following:

- convertible promissory notes that he and defendant DITTMAN had backdated;

- the backdated draw down requests that DITTMAN had signed on behalf of FusionPharm;

- copies of bank account statements showing deposits to FusionPharm's accounts corresponding to the draw down requests;

- letters from Bayside and Meadpoint (depending on the entity exercising the conversion), for signature by Family Member A for Bayside and SEARS for Meadpoint, falsely representing that the entities were not affiliates of FusionPharm;

- additional statements of non-affiliation for Bayside and Meadpoint (again depending on the entity exercising the conversion), reiterating that neither entity was a FusionPharm affiliate and additionally representing that neither Family Member A, in the case of Bayside, and SEARS, in the case of Meadpoint, was an officer, director, control person or holder of more than ten percent of the securities of FusionPharm;

- a FusionPharm officer's certificate, signed by DITTMAN, representing that neither Bayside nor Meadpoint (depending on the entity making the conversion) were affiliates of FusionPharm and were outsiders to the company and management, with no other method of control over the company, and that the convertible promissory notes that were the vehicles for the conversion were valid obligations of the company;

- additional letters signed by DITTTMAN reiterating that Bayside and Meadpoint were not affiliates of the company; and

- attorney opinion letters opining that the common shares to be issued to Bayside and Meadpoint met the federal securities exemption from registration and could be issued as unrestricted shares without the need for a restrictive legend.

18. It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS thereafter caused a substantial portion of the common shares issued to

10

Bayside and Meadpoint as a result of these supposed debt conversions to be deposited into brokerage accounts set up in the names of Bayside and Meadpoint and then caused these shares to be sold in the public securities markets.

19.     It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS, in consultation with defendant DITTMAN, would arrange for a substantial portion of the proceeds realized from the stock and debt sales resulting from the supposed FusionPharm debt to Bayside and Meadpoint to be deposited either directly or indirectly into FusionPharm's operating bank accounts so that these funds could also be used to further capitalize and support the operations of the company and to provide for both defendants' financial support.

20.     As a part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, caused FusionPharm to treat and account for some of the funds received back to FusionPharm from the Microcap, Meadpoint and Bayside sales of FusionPharm stock as payments to FusionPharm for or relating to sales of its PharmPods, which sales DITTMAN then caused FusionPharm to book in its accounting records as licensing revenues realized by the company.   The stock proceed deposits were claimed, in particular, to be payments by Meadpoint, acting in its supposed capacity as FusionPharm's purported exclusive PharmPod distributor, for PharmPods that were being manufactured for and sold to FusionPharm customers in arms-length transactions but that had not yet been delivered to those customers or purported Meadpoint payments in anticipation of sales of PharmPods that DITTMAN and SEARS were still negotiating with prospective FusionPharm customers.

11

21.     As a further part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, also sought to use purported dealings with Vertifresh as a basis to claim and book additional revenues for FusionPharm.   DITTMAN and SEARS caused contracts and related documentation to be drafted that purportedly depicted a licensing agreement between FusionPharm and Vertifresh, pursuant to which Vertifresh agreed to pay $750,000 to FusionPharm over the course of three years in exchange for the purchase of a series of PharmPods and the right to use FusionPharm's growing methods and technology to cultivate and sell non-cannabis produce in three distinct geographic regions.   Based on this purported agreement, DITTMAN then caused FusionPharm to book the entire licensing agreement amount as FusionPharm revenues in a single year, 2012.

22.     It was part of the manner and means of carrying out the conspiracy that defendant DITTMAN, with defendant SEARS' assistance, would then cause these purported transactions with Meadpoint and Vertifresh and the purported revenues associated with them to be publicly disseminated, among other ways, through press releases disseminated in the financial media and through interviews by DITTMAN made available to the public.

23.     It was a further part of the manner and means of carrying out the conspiracy that defendants DITTMAN and SEARS would cause these transactions and revenue figures to be reported in quarterly and annual financial statements uploaded to, and made available to the investing public on, OTC Link's website. DITTMAN, working in concert with SEARS, would cause the financial statements notes and the quarterly and annual reports to omit facts revealing that Meadpoint, Vertifresh and FusionPharm were all under the common control of the

12

defendants and the revenues generated as a result of these transactions were between related parties. DITTMAN, in concert with SEARS, would further cause FusionPharm to affirmatively represent in these reports that there were, in fact, no related party transactions with immediate family members and significant beneficial owners of FusionPharm stock and would cause these reports to conceal completely SEARS' involvement in the company and his beneficial ownership of its stock.

### Overt Acts

24. In furtherance of the conspiracy and to effect the objects thereof, one or more overt acts were carried out by at least one co-conspirator in the State and District of Colorado and elsewhere, which overt acts included the following:

A. On or about March 25, 2011, defendants SEARS and DITTMAN caused an Issuer Company-Related Action Notification form to be filed with the Financial Industry Regulatory Authority ("FINRA") providing notice of a name change to, and stock symbol change with respect to, FusionPharm, identifying himself and Family Member A as the sole officers and directors of the company, and representing, among other things, that none of the company's officers, directors or parties related to the company were the subjects of pending, adjudicated or settled civil or criminal action related to fraud or securities violations.

B. On or about April 11, 2011, defendant SEARS sent a letter to a representative of FusionPharm's stock transfer agent in Las Vegas, Nevada surrendering a stock certificate evidencing the ownership of 185,0000 FusionPharm preferred shares and requesting that a portion of the shares evidenced by this certificate be converted into 80,000 shares of FusionPharm common stock in the name of a limited liability company in Orlando, Florida and

13

65,000 shares of FusionPharm common stock in the name of Microcap and that the balance of the remaining preferred shares, 183,550, be transferred to a company in Thornton, Colorado.

C.      On or about April 21, 2011, defendant DITTMAN sent an email to a number of people, bearing the subject "Fusion Pharm," announcing that he had recently "partnered with [his] brother-in-law William Sears" and that "we have acquired and moved our operations into a publicly traded company: Fusion Pharm, Inc."

D.      On or about May 2, 2011, defendant SEARS sent a letter to an employee at Oppenheimer, & Co., Inc., directing that 65,000 shares of FusionPharm common stock be deposited into the brokerage account of Microcap Management and representing that Microcap Management was neither a control person nor an affiliate of FusionPharm.

E.      On or about June 20, 2011, defendant SEARS sent an email to defendant DITTMAN, bearing the subject "Stock," advising, in part, that the "cert [was] for 182,050," that "the deal will be structured whereas we can have some free anyway," and that it was "just something we need."

F.      On or about June 23, 2011, defendant DITTMAN sent an email to defendant SEARS asking whether "$3k from this weeks [sic] take" could be wired to a family member's account.

G.      On or about September 6, 2011, defendant DITTMAN sent defendant SEARS an email asking, "What do we have in microcap now?"

H.      On or about September 13, 2011, defendant SEARS forwarded defendant DITTMAN an exchange of emails between SEARS and a representative of a brokerage firm addressing SEARS' inquiry about the net amount in Microcap's brokerage account.

14

I. On or about October 6, 2011, defendant DITTMAN had a telephone conversation with a FINRA investigator during which he described defendant SEARS as a part-time salesman for FusionPharm and stated that he was unaware that SEARS owned or was selling FusionPharm stock.

J. On or about November 3, 2011, defendant DITTMAN had another telephone conversation with the same FINRA investigator during which he stated that defendant SEARS no longer owned Microcap or any FusionPharm stock.

K. On or about March 31, 2012, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2011, was uploaded to a public website maintained by OTC Link.

L. On or about June 4, 2012, defendant SEARS forwarded an email from Co-Conspirator A transmitting as an attachment a draft promissory note and credit line agreement for Bayside and stating that Co-Conspirator A would draft "the drawdown requests to match the dates and amounts of the deposits."

M. On or about June 6, 2012, Co-Conspirator A sent defendant SEARS an email, bearing the subject "Bayside Loan Documents, transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements, and stating, "Bill, Let's get these signed up. Meadpoint's to follow in a separate email."

N. On or about June 6, 2012, Co-Conspirator A sent defendant SEARS a subsequent email, bearing the subject "MeadPoint Loan Documents," transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements.

15

O.     On or about July 12, 2012, defendant SEARS sent defendant DITTMAN an email, bearing the subject "Cash," stating, in part, "This week will be a gross total of $25,118," and setting forth a "net to FP" of $12,558, after certain enumerated dollar amount offsets to identified individuals.

P.     On or about November 26, 2012, a press release entitled, "FusionPharm Signs Licensing Agreement for Flowering Containers," was disseminated via PR Newswire, announcing the signing of a licensing agreement with Meadpoint to market PharmPods and relating that an initial order of 9 PharmPods had already been received from Meadpoint "with minimum purchase quantities of 50 containers in both 2013 and 2014."

Q.     On or about November 26, 2012, Co-Conspirator A sent an email to defendant SEARS attaching drafts of convertible promissory notes for Bayside and Meadpoint and advising that the "Notes work with the existing draw down requests."

R.     On or about December 12, 2012, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent transmitting a convertible promissory note in favor of Bayside, notifying the transfer agent that "Bayside has chosen to exercise its option to convert into shares [sic]," and that "Bayside [was] a family members [sic] company and I am assisting them [sic] as I am familiar with all parties."

S.     On or about December 27, 2012, Co-Conspirator A sent defendant DITTMAN an email stating, "We are in need of a letter which confirms the end of the drawdowns under the Bayside promissory note," and advising that Co-Conspirator A had drafted such a letter for DITTMAN's signature.

16

T.      On or about January 7, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Bayside Note FSPM," transmitting an attorney's opinion letter, FusionPharm bank account statements "which reflect funding" and a "[c]losing letter that closed the note."

U.      On or about January 30, 2013, defendant SEARS sent an email to Co-Conspirator A and defendant DITTMAN attaching drafts of a licensing agreement between Vertifresh and FusionPharm and advising, "This is the one we should work thru [sic]."

V.      On or about March 6, 2013, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2012, was uploaded to a public website maintained by OTC Link.

W.      On or about March 27, 2013, defendant DITTMAN conducted a recorded interview with a representative of an internet-based financial public relations service for Small Cap Voice.Com, Inc., as self-styled financial communications and investor relations service for "small cap" companies, during which he stated that FusionPharm did "a little over $800,000 in revenue" for 2012 and that he expected FusionPharm to double its results for 2013.

X.      On or about April 11, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Meadpoint Venture Partners FSPM," stating that he was attaching a series of documents, including "a notice to convert," the "[o]riginal note," a "letter of opinion," and a "Non Affiliate declaration," and transmitting scanned versions of the described documents.

Y.      On or about August 5, 2013, defendant DITTMAN set an email to an individual considering making an investment in FusionPharm proposing, in part, that some of the funds for

17

the contemplated investment involve the individual's purchase of "part of the existing note payable from FusionPharm to Meadpoint Venture Partners."

Z.     On or about February 18, 2014, defendant DITTMAN sent the following email message to a representative of FusionPharm's stock transfer agent, in reply to that representative's observation that defendant SEARS had been listed as an "Administrative Officer" of FusionPharm "which would make him an affiliate:"

> ... Not sure why you would have Mr. Sears as an administrative officer of the Company, he has never been employed by the Company and is not an affiliate. ...

AA.     On or about April 15, 2014, a document identified as FusionPharm's "Financial Statements for the Periods Ended December 31, 3013 [sic] and December 31, 2012 (Restated)", consisting of financial statements and financial statement notes for the periods ended December 31, 2012 and December 31, 2013, was uploaded to a public website maintained by OTC Link.

BB.     On or about May 15, 2014, defendant SEARS forwarded to defendant DITTMAN an email from a representative of an investment firm, bearing the subject "RE: Todays Wires," acknowledging receipt of requests to send three wire transfers from a trust account established in the name of Family Member A.

In violation of Title 18, United States Code, Section 371.


## COUNT 2

25.     On or about January 7, 2013, in the State and District of Colorado, the defendant,

### WILLIAM J. SEARS,

then a resident of Thornton, Colorado, did willfully make and subscribe a U.S Income Tax Return for Single and Joint Filers With No Dependents, Form 1040EZ, for the year 2011, which

was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said return he did not believe to be true and correct as to every material matter, in that the said return reported for the year total adjusted gross income of $7,500 (Form 1040EZ, line 4), whereas, as the defendant then and there well knew and believed, his adjusted gross income was significantly higher than what was actually reported.

In violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE ALLEGATION

26. The allegations contained in Count One of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

27. Upon conviction of the violation alleged in Count One of this Information involving the conspiracy to commit of violations of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1341, Title 15, United States Code, Sections 78j(b) and 78ff(a), all in violation of Title 18, United States Code, Section 371, the defendants,

<div align="center">

**WILLIAM J. SEARS, and
SCOTT M. DITTMAN,**

</div>

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to:

<div align="center">19</div>

    a. $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name of Meadpoint Venture Partners;

    b. $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name of Sandra L. Sears;

    c. $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee;

    d. $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name of FusionPharm, Inc.;

    e. $212,273.92 Seized From Wells Fargo Bank Account No 8141061286, Held In The Name of FusionPharm, Inc.;

    f. $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The purchase of 4200 Monaco Street, Denver, Colorado;

    g. 194 BASKET ROAD, OLEY, PENNSYLVANIA; and

    h. A money judgment in the amount of proceeds obtained by the conspiracy and by the defendants, for which the defendants are joint and severally liable, less the amount recovered from directly forfeitable assets.

    i. If any of the property described above, as a result of any act or omission of the defendant:

        a) cannot be located upon the exercise of due diligence;
        b) has been transferred or sold to, or deposited with, a third party;
        c) has been placed beyond the jurisdiction of the Court;
        d) has been substantially diminished in value; or
        e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

ROBERT C. TROYER
ACTING UNITED STATES ATTORNEY


By: s/Tonya S. Andrews
Tonya S. Andrews
Assistant United States Attorney


s/Scott Mascianica
Scott Mascianica
Special Assistant U.S. Attorney


s/Kenneth M. Harmon
Kenneth M. Harmon
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, CO 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
Kenneth.Harmon@usdoj.gov

21

DEFENDANT          WILLIAM J. SEARS

YOB:              1966

ADDRESS:          Thornton, Colorado

OFFENSE:          Count 1
                  Conspiracy to Defraud the U.S. and Commit Offenses
                  18 U.S.C. § 371

                  Count 2
                  Filing False Income Tax Return
                  26 U.S.C. § 7206(1)

LOCATION OF OFFENSE:      Adams and Denver County, Colorado, and elsewhere

PENALTY:          Count 1
                  NMT 5 years imprisonment, a $250,000 fine, or both; and a $100
                  Special Assessment Fee; Restitution

                  Count 2
                  NMT 3 years imprisonment; NMT $250,000 fine, or both, together
                  with the costs of prosecution; $100.00 Special Assessment

AGENT:            Kate Funk
                  Special Agent, Federal Bureau of Investigation
                  Denver, CO

                  Michael Godson
                  Special Agent, Internal Revenue Service, Criminal Investigation
                  Division, Denver, CO

                  Kenneth Haithcoat
                  Inspector, United States Postal Inspection Service
                  Denver, CO

AUTHORIZED BY:    Kenneth M. Harmon
                  Assistant United States Attorney

ESTIMATED TIME OF TRIAL:

___ five days or less      _____ over five days     __X__ other

THE GOVERNMENT:

___ will seek detention in this case    **X** will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

OCDEF CASE:    _____Yes    __X__    No

DEFENDANT          SCOTT M. DITTMAN

YOB:               1969

ADDRESS:           Boyertown, PA

OFFENSE:           Count 1
                   Conspiracy to Defraud the U.S. and Commit Offenses
                   18 U.S.C. § 371

LOCATION OF OFFENSE:    Adams and Denver, Counties, Colorado, and elsewhwere

PENALTY:           Count 1
                   NMT 5 years imprisonment, a $250,000 fine, or both; and a $100
                   Special Assessment Fee; Restitution

AGENT:             Kate Funk
                   Special Agent, Federal Bureau of Investigation
                   Denver, CO

                   Michael Godson
                   Special Agent, Internal Revenue Service, Criminal Investigation
                   Division, Denver, CO

                   Kenneth Haithcoat
                   Inspector, United States Postal Inspection Service
                   Denver, CO

AUTHORIZED BY:     Kenneth M. Harmon
                   Assistant United States Attorney

ESTIMATED TIME OF TRIAL:

___ five days or less    _____ over five days    _____ other

THE GOVERNMENT:

___ will seek detention in this case    __X__ will not seek detention in this case

The statutory presumption of detention **is not** applicable to this defendant.

OCDEF CASE:              _____Yes    __X__  No

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.   **WILLIAM J. SEARS,** and
2.   SCOTT M. DITTMAN,

        Defendants.

---

## NOTICE OF DISPOSITION

---

      William J. Sears, through undersigned counsel, hereby notifies this Honorable

Court that the Defendant and the Government have reached a disposition in this case.

      Respectfully submitted this 16th day of September, 2016.


                         *s/ Fredric M. Winocur*
                         Fredric M. Winocur, No. 22112
                         Ridley, McGreevy & Winocur, P.C.
                         303 16th Street, Suite 200
                         Denver, Colorado  80202
                         Telephone: (303) 629-9700
                         Fax:  (303) 629-8702
                         Email:   winocur@ridleylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of September, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*s/ Heather Cratty*
Heather Cratty
Paralegal
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Tonya Shotwell Andrews (charisha.cruz@usdoj.gov,
eileen.oconnor-barnes@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), William Lewis Taylor (hbaker@sideman.com, wtaylor@sideman.com),
Kenneth Mark Harmon (andrea.hough@usdoj.gov, kenneth.harmon@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: AUSA General Mail (usaco.ecfcriminal2@usdoj.gov),
Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal Division
(gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5674044@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Initial Appearance
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 9/16/2016 at 1:25 PM MDT and filed on 9/15/2016

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 6(No document attached) |

**Docket Text:**
 **MINUTE ENTRY for Initial Appearance, Arraignment, Discovery and Detention Hearing as to William J. Sears and Scott M. Dittman held before Magistrate Judge Kathleen M. Tafoya on 9/15/2016. Parties tender an information to the Court. The Court accepts the information as tendered. Defendants advised. Plea of NOT GUILTY entered by defendants. Discovery memorandum executed. Bond set as to William J. Sears (1) Personal Recognizance and Scott M. Dittman (2) Personal Recognizance. Defendants advised of conditions of bond and remanded for processing and release. Counsel is directed to chambers. (Total time: 34 minutes, Hearing time: 1:46–2:20)**

**APPEARANCES: Kenneth Harmon on behalf of the Government, William Taylor for Defendant Scott Dittman, Frederick Winocur on behalf of William Sears on behalf of the defendant. FTR: KMT Courtroom C201. (lgale, ) Text Only Entry**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov

Fredric Michael Winocur      winocur@ridleylaw.com, cratty@ridleylaw.com

William Lewis Taylor      wtaylor@sideman.com, hbaker@sideman.com

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov,
charisha.cruz@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Kenneth Mark Harmon      kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov,
USACO.ECFCriminal@usdoj.gov

Fredric Michael Winocur      winocur@ridleylaw.com, cratty@ridleylaw.com

William Lewis Taylor      wtaylor@sideman.com, hbaker@sideman.com

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov,
charisha.cruz@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

~ ENTRY OF APPEARANCE
~ NOTICE OF DISPOSITION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| Criminal Action No. | ) | JUDGE ASSIGNED: _____ |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | ESTIMATED TRIAL |
| Plaintiff, | ) | TIME: _____ |
| | ) | |
| v. | ) | NUMBER OF |
| | ) | DEFENDANTS:  2 |
| 1.   WILLIAM J. SEARS | ) | |
| | ) | DOCUMENT DISCLOSURE EXTENSIVE |
| Defendant. | ) | ◉ Yes     ○ No |
| | ) | (Please select one) |
| | ) | |

## DISCOVERY CONFERENCE
## MEMORANDUM AND ORDER

### INTRODUCTION

Rule 16, Federal Rules of Criminal Procedure, is entitled Discovery and Inspection and

provides for discovery by both defendant and the government. D.C.COLO.LCrR 17.1.1 requires a

discovery hearing to be held by a magistrate judge.

A defendant may discover certain material as a matter of right without any obligation to permit

discovery by the government. However, if a defendant requests certain materials by discovery, namely,

documents and tangible objects, as well as reports of examinations and tests, then the defendant is

obligated to permit similar discovery by the government.

In addition to discovery we will take up the matter of notice, as required by Rules 12.1 and

12.2, Fed.R.Crim.P., if the defense of alibi or mental capacity is contemplated. Further, a date will be

set for the filing of all motions.

Revised January 13, 2016 – Page 1

At the conclusion of this hearing the report will be signed by defendant and/or his counsel, and government counsel, as well as the magistrate judge. The discovery hearing proceedings will be recorded.

## I. **DEFENDANT'S REQUEST FOR DISCOVERY AND NOTICE**

(A)    Request for Rule 16 Material

1.    The defendant requests disclosure of the substance of any relevant oral statements made by the defendant, before or after arrest, in response to interrogation by any person the defendant knew to be a government agent if the government intends to use that statement at trial. Rule 16(a)(1)(A). The government states that it will disclose to the defendant and make available for inspection, copying, or photographing such statements in accordance with Rule 16(a)(1)(A).

2.    The defendant requests disclosure of any relevant written or recorded statement made by the defendant within the government's possession, custody, or control, which the attorney for the government knows – or through due diligence could know – that the statement exists; the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by any person the defendant knew to be a government agent. Rule 16(a)(1)(B)(i) and (ii).

3.    The defendant requests disclosure of any recorded testimony of the defendant before a grand jury which relates to the offense charged pursuant to Rule 16(a)(1)(B)(iii). The government states it will permit the defendant to inspect and copy such statements.

4.    If government counsel knows of such statements he will so indicate by initialing here.

_____

Revised January 13, 2016 – Page 2

5. The defendant requests, if the defendant is an organization, the government's disclosure to the defendant of any statement described in Rule 16(a)(1)(A) and (B), if the government contends that the person making the statement; (i) was legally able to bind the defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or (ii) was personally involved in the alleged conduct constituting the offense and was legally able to bind the defendant regarding that conduct because of that person's position as the defendant's director, officer, employee or agent. Rule 16(a)(1)(C).

6. The defendant requests a copy of his prior criminal record. The government states it will furnish to the defendant a copy of his prior criminal record, if any, in accordance with Rule 16(a)(1)(D).

7. The defendant, understanding his burden of reciprocal discovery as set forth in Rule 16(b)(1)(A), (requests) (does not request) disclosure of books, papers, documents, data, photographs, tangible objects, buildings or places, and copies or portions thereof, which are within the possession, custody, or control of the government, and which are material to the preparation of his defense, or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

8. The defendant, understanding his burden of reciprocal discovery as set forth in Rule 16(b)(1)(B), (requests) (does not request) disclosure of any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the

government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

9.      The defendant, understanding his burden of reciprocal discovery as set forth in Rule 16(b)(1)(C), (requests) (does not request) disclosure of a written summary of testimony the government intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence, relating to expert testimony and opinions of experts, during its case in chief at trial, as set forth in Rule 16(a)(1)(G).

10.     The government acknowledges its continuing duty to disclose under Rule 16(c).

(B)     Request for Exculpatory Evidence

The defendant requests disclosure of evidence favorable to the defendant on the issue of guilt and/or sentencing. The government states it will disclose material evidence which is favorable to the defendant as required by Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and United States v. Bagley, 473 U.S. 667 (1985). The government acknowledges its continuing duty to make these disclosures. This request does not foreclose the defendant from filing a more specific motion requesting exculpatory evidence.

(C)     Request for Evidence of Other Crimes, Wrongs, or Acts

The defendant requests notice of other crimes, wrongs or acts under Rule 404(b) of the Federal Rules of Evidence. The government states that if it intends to introduce such evidence at trial it will provide written notice to the defendant no later than 21 days before trial unless, for good cause shown, the court permits less notice in accordance with Rule 404(b).

Revised January 13, 2016 – Page 4

(D)   Request for Disclosure of the Identity of Confidential Informants

1.   The government states there (was) (was not) a confidential informant who was a
participant in or a witness to the crime charged and that the informant (may) (will) (will
not) be called as a witness at trial. The government further states it (has supplied) (will
claim privilege of non-disclosure of) the identity of the confidential informant. Rovario
v. United States, 353 U.S. 53 (1957).

(E)   The Government States There Have Been in this Case:

(Circle those which are applicable)

1.   Telephone tape recordings;

2.   Electronic surveillance of the defendant or his premises;

3.   Leads obtained by electronic surveillance of defendant's person or premises; and

4.   Photographic surveillance.

The government (may) (will) (will not) permit discovery of the foregoing items.

## II. **GOVERNMENT'S REQUEST FOR DISCLOSURE AND NOTICE**

(A)   Request for Rule 16 Material

1.   The government requests disclosure of books, papers, documents, data, photographs,
tangible objects, or copies or portions thereof, which are within the possession, custody
or control of the defendant and which the defendant intends to introduce as evidence in
chief at the trial. If the defendant made a similar request under Rule 16(a)(1)(E), the
defendant states that upon compliance by the government with the defendant's request
he will permit the government to inspect and copy or photograph such items in
accordance with Rule 16(b)(1)(A).

2. The government requests disclosure of any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, within the possession or control of the defendant as described in Rule 16(b)(1)(B). If the defendant made a similar request under Rule 16(a)(1)(F), the defendant states that upon compliance by the government with the defendant's request he will permit the government to inspect and copy or photograph such items in accordance with Rule 16(b)(1)(B).

3. The government requests disclosure of a written summary of testimony the defendant intends to use under Rules 702, 703 and 705, F.R.E. as evidence at trial. If the defendant made a similar request under Rule 16(a)(1)(G), the defendant states that upon compliance by the government with the defendant's request he will disclose such summaries in accordance with Rule 16(b)(1)(C).

4. The defendant acknowledges his continuing duty to disclose under Rule 16(c).

(B) <u>Request for Notice of Alibi</u>

1. The government hereby requests notice of the defendant's intent to rely on an alibi defense pursuant to Rule 12.1(a) of the Federal Rules of Criminal Procedure. The parties agree that the indictment/information and the discovery provided by the government give the defendant sufficient notice of the time, date, and place at which the alleged offense was committed and triggers the defendant's obligation under Rule 12(a) to serve upon the attorney for the government a written notice of alibi within 20 days from the date of this request, or at such different time as the court may direct. Should the defendant require additional information concerning the time, date, or place at which the alleged offense was committed, it is the defendant's obligation to file a request for additional information in the time provided for filing motions.

Revised January 13, 2016 – Page 6

2.       The government states that if the defendant files a notice of intent to rely upon alibi, the attorney for the government shall serve upon the defendant or the defendant's attorney a written notice stating the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut the testimony of any of the defendant's alibi witnesses. The government's written notice shall be filed within 10 days of its receipt of the defendant's Rule 12.1(a) notice, but in no event less than 10 days before trial, unless the court otherwise directs.

3.       The parties acknowledge their continuing duty to disclose under Rule 12.1(c).

(C)  Request for Notice of Insanity Defense and Expert Testimony Regarding Defendant's Mental Condition

The government hereby requests notice of the defendant's intent to rely on a defense based on insanity or to introduce expert testimony relating to mental condition. If the defendant intends to rely on the defense of insanity or introduce expert testimony relating to mental disease or defect or any other mental condition bearing on the issue of guilt, he agrees to file a written notice and disclosure of the same within 20 days from the date of this request, or at such different time as the court may direct.

### III. LIKELIHOOD OF DISPOSITION OR TRIAL

(A)     There is a (good) (fair) (poor) chance of a Rule 11 disposition of this case.

(B)     The parties understand that the court must be given notice of any proposed disposition no less than 10 days before the scheduled trial date. Unless otherwise ordered, notice of disposition shall be filed no later than 14 days before the date set forth for trial. (D.C.COLO LCrR 11.1A)

Revised January 13, 2016 – Page 7

(C)     The defendant will receive a jury trial in accordance with F.R.Crim.P. 23(a). Waiver of jury can only be accomplished by filing a motion with the trial court.

### IV. **SPEEDY TRIAL**

(A)     The speedy trial time limits of 18 U.S.C. § 3161 are as follows:

30 days     *10-15-16*

70 days     *11-24-16*

90 days     _____

*9-15-16*
Date Signed

William J. Sears
Defendant

_____
Date Signed

Marci Gilligan LaBranche
Attorney for Defendant

*9/16/16*
Date Signed

Frederic M. Winocur
Attorney for Defendant

Attorney for Defendant will use the following for viewing discovery received from the Government:

___✓___  PC/Windows

_____  Mac/OS

*9/15/16*
Date Signed

Kenneth M. Harmon
Assistant United States Attorney

Revised January 13, 2016 – Page 8

## V. <u>DISCOVERY ORDER</u>

(A)    <u>Effect of Report</u>

The responses by the parties set forth in this Report shall have the effect of a binding discovery

order. All requests for discovery will be considered continuing requests, and any discoverable

information and/or material coming into the possession or knowledge of either party prior to or during

the trial shall be made available to the opposing party promptly, consistent with the law and on an

ongoing basis.

(B)    <u>U.S. Probation Office</u>

Unless otherwise specified in this Discovery Order, at the time of the detention hearing or by

_____[date], the U.S. Probation Office will disclose any criminal history information

compiled on the defendant to both parties.

(C)    <u>Disclosure by the Government</u>

Unless otherwise specified in this Discovery Order, the government on or before

_10 - 17 - 16_   , shall disclose those materials that are on that date within the possession of the

attorney for the government and are subject to disclosure under the provisions of Rule 16. If additional

material subject to the disclosure obligations of Rule 16 come into the possession of the attorney for

the government, the attorney for the government shall promptly disclose the material to the defendant.

The attorney for the government shall exercise due diligence as expressly required by provisions of

Rule 16 to fulfill his or her discovery obligations under the provisions of Rule 16.

Written summaries of any testimony that the government intends to use under Rules 702, 703,

or 705, <u>Fed. R.Crim P. 16</u>(a)(1)(G) shall be provided on such schedule as the District Court shall

determine upon motion by either party.

(D)    <u>Disclosure by the Defendant</u>

Unless otherwise specified in this Discovery Hearing Report, the defendant shall disclose its Rule

Revised January 13, 2016 – Page 9

16 discovery material to counsel for the government on or before ___*10 - 28 -16*___.

Written summaries of any testimony that the defendant intends to use under Rules 702, 703, or 705,

Fed.R.Crim P. 16(b)(1)(C) shall be provided on such schedule as the District Court shall determine

upon motion by either party.

(E)    Any motion alleging a failure to comply with the time limits set forth in this report and order

      must be filed promptly.

(F)    Any pretrial motions shall be filed on or before_____.


      IT IS SO ORDERED.


             BY THE COURT:

             U.S. Magistrate Judge

             *9 - 15 - 16*
             Date

AO 98 (Rev. 12/11) Appearance Bond

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| *William Sears* | ) Case No. 16-Cr-301-001 WJM- |
| Defendant | ) |

## APPEARANCE BOND

### Defendant's Agreement

I, _William Sears_ *(defendant)*, agree to follow every order of this court, or any court that considers this case, and I further agree that this bond may be forfeited if I fail:

( X ) to appear for court proceedings;
( X ) if convicted, to surrender to serve a sentence that the court may impose; or
( ) to comply with all conditions set forth in the Order Setting Conditions of Release.

### Type of Bond

( X ) (1) This is a personal recognizance bond.

( ) (2) This is an unsecured bond of $ _____ .

( ) (3) This is a secured bond of $ _____ , secured by:

( ) (a) $ _____ , in cash deposited with the court.

( ) (b) the agreement of the defendant and each surety to forfeit the following cash or other property *(describe the cash or other property, including claims on it — such as a lien, mortgage, or loan — and attach proof of ownership and value):*

If this bond is secured by real property, documents to protect the secured interest may be filed of record.

( ) (c) a bail bond with a solvent surety *(attach a copy of the bail bond, or describe it and identify the surety):*

### Forfeiture or Release of the Bond

*Forfeiture of the Bond.* This appearance bond may be forfeited if the defendant does not comply with the above agreement. The court may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if the defendant does not comply with the agreement. At the request of the United States, the court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

AO 98 (Rev. 12/11) Appearance Bond

*Release of the Bond.*  The court may order this appearance bond ended at any time.  This bond will be satisfied and the security will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

## Declarations

*Ownership of the Property.*  I, the defendant – and each surety – declare under penalty of perjury that:

(1)  all owners of the property securing this appearance bond are included on the bond;

(2)  the property is not subject to claims, except as described above; and

(3)  I will not sell the property, allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect.

*Acceptance.*  I, the defendant – and each surety – have read this appearance bond and have either read all the conditions of release set by the court or had them explained to me.  I agree to this Appearance Bond.

I, the defendant – and each surety – declare under penalty of perjury that this information is true.  (See 28 U.S.C. § 1746.)

Date:  9-16-16

_____
*Defendant's signature*

_____
*Surety/property owner – printed name*

_____
*Surety/property owner – signature and date*

_____
*Surety/property owner – printed name*

_____
*Surety/property owner – signature and date*

_____
*Surety/property owner – printed name*

_____
*Surety/property owner – signature and date*

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Approved.

Date:  9-15-16

_____
*Judge's signature*

**KATHLEEN M. TAFOYA**
**United States Magistrate Judge**

AO 199A (Rev. 12/11) Order Setting Conditions of Release | Page 1 of __3__ Pages

# UNITED STATES DISTRICT COURT
### for the
District of Colorado

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. *16-cr-301.WJM-001* |
| *William Sears* | ) | |
| Defendant | ) | |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1) The defendant must not violate federal, state, or local law while on release.

(2) The defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.

(3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4) The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: _____

<div align="center"><em>Place</em></div>

on _____

<div align="center"><em>Date and Time</em></div>

If blank, defendant will be notified of next appearance.

(5) The defendant must sign an Appearance Bond, if ordered.

AO 199B  (Rev. 08/14 D/CO)  Additional Conditions of Release                                  Page  2  of  3  Pages

## ADDITIONAL CONDITIONS OF RELEASE

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( )  (6)   The defendant is placed in the custody of:
            Person or organization _____
            Address *(only if above is an organization)* _____
            City and state _____   Tel. No. _____
who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately
if the defendant violates a condition of release or is no longer in the custodian's custody.

                                    Signed: _____   _____
                                                        *Custodian*                          *Date*

( )  (7)   The defendant must:
      ( )  (a)  submit to supervision by and report for supervision to the _____

      ( )  (b)  continue or actively seek employment.
      ( )  (c)  continue or start an education program.
      (X)  (d)  surrender any passport to:  *Clerk's office within 24 hours*
      (X)  (e)  not obtain a passport or other international travel document.  *Continental U.S*
      (X)  (f)  abide by the following restrictions on personal association, residence, or travel:   Travel restricted to the State of Colorado unless prior
                permission is granted by the Court
      ( )  (g)  avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution,
                including: _____
                          _____
      ( )  (h)  get medical or psychiatric treatment: _____
                          _____
      ( )  (i)  return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling,
                or the following purposes: _____
                          _____
      ( )  (j)  maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers
                necessary.
      ( )  (k)  not possess a firearm, destructive device, or other weapon.
      ( )  (l)  not use alcohol ( ) at all ( ) excessively.
      ( )  (m)  Except as authorized by court order, the defendant shall not  use or unlawfully possess a narcotic drug or other controlled substances
                defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.  Except as authorized by court order, the defendant
                shall not possess, use or sell marijuana or any marijuana derivative (including THC) in any form (including edibles) or for any purpose
                (including medical purposes).  Without the prior permission of the probation officer, the defendant shall not enter any marijuana
                dispensary or grow facility.
      ( )  (n)  submit to testing for a prohibited substance if required by the pretrial services office or supervising officer.  Testing may be used with random
                frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited
                substance screening or testing.  The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited
                substance screening or testing.
      ( )  (o)  participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or
                supervising officer.
      ( )  (p)  participate in one of the following location restriction programs and comply with its requirements as directed.
                ( )  (i)  **Curfew.**  You are restricted to your residence every day ( ) from _____ to _____ , or ( ) as
                          directed by the pretrial services office or supervising officer; or
                ( )  (ii)  **Home Detention.**  You are restricted to your residence at all times except for employment; education; religious services; medical,
                          substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities
                          approved in advance by the pretrial services office or supervising officer; or
                ( )  (iii)  **Home Incarceration.**  You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and
                          court appearances or other activities specifically approved by the court.
      ( )  (q)  submit to location monitoring      , as directed by the supervising officer, and comply with all program requirements and instructions
                provided.
                ( )  You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services office or
                      supervising officer.
      ( )  (r)  report as soon as possible, to the pretrial services office or supervising officer, every contact with law enforcement personnel, including
                arrests, questioning, or traffic stops.
      ( )  (s)  The defendant shall not act as an informant for any law enforcement agency without prior permission of the Court.
      ( )  (t)  _____
      ( )  (u)  _____
      ( )  (v)  _____

AO 199C  (Rev. 09/08)  Advice of Penalties

Page ____ of ____ Pages

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
*Defendant's Signature*

_____
*City and State*

### Directions to the United States Marshal

( ✓ ) The defendant is ORDERED released after processing.

( ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: ___9-15-16___

_____
*Judicial Officer's Signature*

**KATHLEEN M. TAFOYA**
**United States Magistrate Judge**
*Printed name and title*

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL SERVICE   U.S. ATTORNEY   U.S. MARSHAL

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Tonya Shotwell Andrews (charisha.cruz@usdoj.gov,
eileen.oconnor-barnes@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Kenneth Mark Harmon (andrea.hough@usdoj.gov,
kenneth.harmon@usdoj.gov, usaco.ecfcriminal@usdoj.gov), William Lewis Taylor
(hbaker@sideman.com, wtaylor@sideman.com), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5674405@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

<div align="center">

**U.S. District Court**

**District of Colorado**

</div>

**Notice of Electronic Filing**


The following transaction was entered on 9/16/2016 at 3:15 PM MDT and filed on 9/16/2016

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | <u>1:16–cr–00301–WJM</u> |
| **Filer:** | |
| **Document Number:** | 14(No document attached) |

**Docket Text:**
 **ORDER Setting Change of Plea Hearing as to William J. Sears (1): Pursuant to the Notice of Disposition [5] filed by the Defendant, a Change of Plea Hearing is hereby set for November 14, 2016 at 10:00 a.m. in Courtroom A801. Counsel for the parties shall e–mail to Chambers courtesy copies of the "Statement by Defendant In Advance of Change of Plea" and the "Plea Agreement and Statement of Facts" no later than <u>12:00 p.m. on November 7, 2016</u>. If these documents are not timely submitted, the hearing may be vacated. The signed original and one copy of these documents must also be given to the courtroom deputy at the time of the hearing, pursuant to D.C.COLO.LCrR 11.1E. It is FURTHER ORDERED that defense counsel who reviewed and advised Defendant regarding the plea agreement must attend this Change of Plea Hearing. Pursuant to WJM Revised Practice Standard IX.1.1.c the AUSA assigned to this matter must also be present at the hearing. If that AUSA cannot attend in person, s/he must be present by phone and a fully–briefed substitute AUSA must be physically present in the courtroom at the time of the hearing. SO ORDERED by Judge William J. Martinez on 09/16/2016. Text Only Entry (wjmsec, )**


**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov,
USACO.ECFCriminal@usdoj.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

William Lewis Taylor     wtaylor@sideman.com, hbaker@sideman.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov,
charisha.cruz@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

AO 455 (Rev 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
### for the
District of Colorado

| | | |
|---|---|---|
| United States of America | ) | Case No. 16 - CR - 00301 - WJM |
| v. | ) | |
| WILLIAM J. SEARS | ) | |
| | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: 9/15/16

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Marci Gilligan LeBranche, Frederic M. Winocur
*Printed name of defendant's attorney*

_____
*Judge's signature*

, Magistrate Judge
*Judge's printed name and title*
## KATHLEEN M. TAFOYA
### United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    WILLIAM J. SEARS and
2.    SCOTT M. DITTMAN

     Defendants.

_____

## GOVERNMENT'S MOTION FOR AN ORDER PERMITTING DISCLOSURE OF GRAND JURY MATERIALS

_____

The UNITED STATES OF AMERICA, by and through its undersigned counsel, respectfully moves the Court, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i), for an order authorizing the Government to disclose grand jury testimony and exhibits, as well as other materials obtained through the grand jury, to the defendants and their attorneys, as part of discovery in this case, on the terms and conditions outlined below.

AS GROUNDS for this motion, the Government states as follows:

1.    Fed. R. Crim. P. 6(e), with various exceptions, prohibits the disclosure of "matters occurring before the grand jury."

2.    The Government wishes to provide discovery to the defendants, but some of the documents are grand jury transcripts and exhibits or may be materials reflecting matters occurring before the grand jury.

3.      Fed. Fed. R. Crim. P. 6(e)(3)(E)(i) allows for Court-authorized disclosure of matters occurring before a grand jury, when such disclosure is "preliminarily to or in connection with a judicial proceeding."

4.      The pending case against the defendants is a "judicial proceeding" and the requested disclosure is "in connection with" such proceeding.  The Government wishes to provide this discovery, but can only do so with the Court's approval.

5.      Since these proceedings (and the related transcripts and exhibits) remain secret, see Fed. R. Crim. P. 6(e), the Government moves that disclosure only be allowed for purposes of defending this case, and that such disclosure only be made to the defendants and their attorneys; that such transcripts, exhibits and other grand jury material be maintained in the defense attorneys' custody; that such materials shall not be reproduced or disseminated; and that such materials be returned to the United States at the end of this case.

WHEREFORE, the Government prays that the Court authorize the disclosure of grand jury testimony, exhibits and other materials to defendants and their attorneys, in the course of providing discovery in this case, on the terms and conditions outlined above.

Respectfully submitted this 17th day of October, 2016.

Respectfully submitted,

ROBERT C. TROYER
Acting United States Attorney

by: s/ Kenneth M. Harmon
KENNETH M. HARMON
Assistant United States Attorney
U.S. Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Tel. No. (303) 454-0100
Fax No. (303) 454-0402
E-mail: kenneth.harmon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of October, 2016, I electronically filed the foregoing **GOVERNMENT'S MOTION TO DISCLOSE GRAND JURY MATERIAL TO DEFENDANT** with the Clerk of the Court using the CM/ECF which will send notification of such filing to counsel at the following e-mail addresses:

Frederic Winocur
winocur@ridleylaw.com

Marci Gilligan LaBranche
labranche@ridleylaw.com

William Taylor
wtaylor@sideman.com

s/ Andrea K. Hough
ANDREA K. HOUGH
Office of the United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    WILLIAM J. SEARS and
2.    SCOTT M. DITTMAN

     Defendants.

_____

## ORDER

_____

THIS MATTER comes before the Court on the Government's Motion to Disclose Grand

Jury Material, pursuant to Fed. R. Crim. P. 6(e) (3)(E)(i).

HAVING REVIEWED the motion and being otherwise advised in the premises, the

Court finds that good and sufficient cause supports the same, and it is therefore

ORDERED that the Government's motion is granted, and that grand jury testimony and

grand jury exhibits and other materials may be disclosed to the defendants and their attorneys in

the course of discovery in this case.  It is further

ORDERED that such materials shall only be used in defending this case; that such

materials are disclosed only to the defendants and their attorneys; that the defendants' attorneys

shall maintain custody of such materials, and shall not reproduce or disseminate the same; and

that such materials shall be returned to the United States at the end of the case.

DATED this _____ day of October, 2016

BY THE COURT:

_____

HON. WILLIAM J. MARTINEZ
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 16-cr-301-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.     WILLIAM J. SEARS, and
2.     SCOTT M. DITTMAN,

     Defendants.

---

**ORDER TO DISCLOSE GRAND JURY MATERIAL**

---

THIS MATTER comes before the Court on the Government's Motion to Disclose Grand Jury Material, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i).

HAVING REVIEWED the Motion and being otherwise advised in the premises, the Court finds that good and sufficient cause supports the same, and it is therefore

ORDERED that the Government's Motion is granted, and that Grand Jury testimony and Grand Jury exhibits and other materials may be disclosed to the Defendants and their attorneys in the course of discovery in this case.  It is further

ORDERED that such materials shall only be used in defending this case; that such materials are disclosed only to the Defendants and their attorneys; that the Defendants' attorneys shall maintain custody of such materials, and shall not reproduce or disseminate the same; and that such materials shall be returned to the United States at the end of the case.

Dated this day of 17th day of October, 2016.

BY THE COURT:

_____

William J. Martínez
United States District Judge

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Tonya Shotwell Andrews (charisha.cruz@usdoj.gov,
eileen.oconnor-barnes@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Matthew Kyle Belcher (cox_ecf@fd.org,
matthew_belcher@fd.org), Kenneth Mark Harmon (andrea.hough@usdoj.gov,
kenneth.harmon@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Marci Gilligan LaBranche
(ashley@ridleylaw.com, labranche@ridleylaw.com), Fredric Michael Winocur
(cratty@ridleylaw.com, winocur@ridleylaw.com), Judge William J. Martinez
(deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5745409@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 11/8/2016 at 1:54 PM MST and filed on 11/8/2016

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | <u>1:16–cr–00301–WJM</u> |
| **Filer:** | |
| **Document Number:** | 37(No document attached) |

**Docket Text:**
**ORDER as to William J. Sears (1): At the Change of Plea Hearing set for November 14, 2016, the parties should be prepared to discuss whether, pursuant to 18 U.S.C. § 3143, Defendant Sears should remain on pretrial release pending imposition of his sentence, or whether his bond should be revoked and he should be remanded at the conclusion of the Change of Plea Hearing. SO ORDERED by Judge William J. Martinez on 11/08/2016. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, ashley@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov,

charisha.cruz@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16−cr−00301−WJM−1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

| | |
|---|---|
| Courtroom Deputy: Deborah Hansen | Date: November 14, 2016 |
| Court Reporter: Mary George | Time: 46 minutes |

_____

Criminal Action No. 16-cr-00301-WJM          <u>Counsel:</u>

UNITED STATES OF AMERICA,                    Kenneth Harmon

      Plaintiff,                                   Tonya Andrews

v.

1.  WILLIAM J. SEARS,                        Frederic Winocur

      Defendant.

_____

## COURTROOM MINUTES
_____

CHANGE OF PLEA HEARING

10:04 a.m.    Court in Session

Appearances

Also present are Agents Kate Funk and Michael Godson

Defendant is present and on bond.

Oath administered to the defendant.

Defendant advised of maximum penalties.

Defendant's right to trial to jury and other constitutional rights explained.

Mr. Winocur states for the record the extent and scope of the limited waiver of the defendant's appeal and collateral challenge rights contained in the Plea Agreement.

Colloquy between the Court and the defendant

The defendant confirms that he understands and agrees to the limitations contained in the Plea Agreement and his right to appeal the sentence the Court will impose.

Two-Count Information read to the defendant.

Defendant pleads guilty to Counts One and Two of the Information and admits to the forfeiture allegation.

**ORDERED:** **Court Exhibit 1 - Plea Agreement; Court Exhibit 2 - Statement by Defendant in Advance of Plea of Guilty are RECEIVED into evidence.**

**ORDERED:** **Defendant's plea of guilty to Counts One and Two of the Information and admission to the forfeiture allegation are accepted.**

**ORDERED:** **The U.S. Probation Office shall prepare a Presentence Investigation Report and Sentencing Statement. In accordance with this Court's Revised Practice Standards, all motions for a sentencing departure, for a statutory variant sentence outside the advisory guideline range, for a change in offense level, to dismiss counts or the indictment, or for acceptance of responsibility, MUST be filed no later than 14 days prior to the date of the sentencing hearing. Proposed orders on such motions must be provided to the Chambers e-mail address at the same time. Responses to such motions must be filed at least 7 days prior to the date of the sentencing hearing. Sentencing-related filings not in compliance with these deadlines may result in a continuance of the sentencing hearing.**

**ORDERED:** **Sentencing is set for Tuesday, April 24, 2017 at 10:30 a.m.**

**ORDERED:** **All hearings and settings in this case other than the Sentencing date are hereby VACATED. Any pending motions are hereby DENIED as moot.**

Discussion

Mr. Harmon states that the Government will propose redacted Plea Agreements for both Defendant Sears and Defendant Dittman.

**ORDERED:** **Defendant Sears' Plea Agreement will be filed restricted - Level 2.**

**The parties have up to and including Monday, November 28, 2016 to file motions for leave to file redacted Plea Agreements for Defendant Sears and Defendant Dittman – assuming Defendant Dittman goes ahead with his Plea Agreement.**

The Court addresses the application of § 3143 with regard to immediate remand.

Statement by Mr. Harmon

Statement by Mr. Winocur

Discussion

The Court enters findings on the record.

**The Court finds by clear and convincing evidence that the defendant's conditions of release reasonably assure that he will not flee or pose a danger to the safety of the community, and that conditions within the meaning of 18 U.S.C. § 3143 have been met. Therefore,**

**IT IS ORDERED that the defendant is permitted to remain free on bond subject to the conditions of release as set forth in the Order Setting Conditions of Release entered by the Magistrate Judge, with the following ADDITIONAL CONDITIONS:**

**The defendant will not discuss the facts of this case, the evidence, witnesses, or any of the issues raised by this prosecution, either with his co-defendant, Mr. Dittman, or any other potential witness in this case.**

10:50 a.m.     Court in Recess
               Hearing Concluded

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA

        Plaintiff(s),

v.

1.    **WILLIAM J. SEARS**, and
2.    SCOTT M. DITTMAN,

        Defendant(s).

---

## STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY

---

I acknowledge and certify that I have been advised of and understand the following facts and rights, that all representations contained in this document are true and correct, and that my attorney has assisted me as I have reviewed and completed this document.

1.    The nature of the charge(s) against me has/have been explained to me by my attorney.   I have had an opportunity to discuss with my attorney both the nature of the charge(s) and the elements which the government is required to prove.

2.    I know that when the Court sentences me, the Court will consider many factors.   These factors are listed in 18 U.S.C. § 3553 and include (a) the nature and circumstances of the offense and my personal history and characteristics, (b) the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and provide me with needed training, care or correctional treatment in the most effective manner, (c) the kinds of sentences available to the court, (d) the advisory sentencing guidelines established by



Court Exhibit 2
75

the U.S. Sentencing Commission,   (e) the pertinent policy statements of the U.S.

Sentencing Commission,   (f) the need to avoid unwarranted sentence disparity among

defendants with similar records who have been found guilty of similar conduct, and (g) the

need to provide restitution.   No single factor is controlling or determinative. I recognize

that it is possible that the Court could, after considering these factors, impose any

sentence in my case, including one which is as severe as the maximum term of

imprisonment, the maximum fine, full restitution (if applicable), the maximum term of

supervised release, and a special assessment, all as set out in paragraph 3 below.

3.       I know that the following penalties may be imposed as a result of my guilty

plea(s):

Count 1 – 18 U.S.C. § 371

a.       Imprisonment for a term of not more than 5 years;

b.       A term of supervised release of not more than 3 years, pursuant to 18

U.S.C. § 3583;

c.       A fine of not more than $250,000, pursuant to the statute that I admit I

violated and/or the alternative fine schedule set out at 18 U.S.C. § 3571;

d.       Restitution to the victim(s) of my crime(s) of not more than $ <u>0.00</u>

pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664;

e.       A special assessment of $100, pursuant to 18 U.S.C. § 3013;

Count 2 – 26 U.S.C. § 7206 (1).

a.       Imprisonment for a term of not more than 3 years;

b.       A term of supervised release of not more than 3 years, pursuant to 18

2

U.S.C. § 3583;

     c.     A fine of not more than $250,000, the costs of prosecution pursuant to the statute that I admit I violated and/or the alternative fine schedule set out at 18 U.S.C. § 3571;

     d.     Restitution to the victim(s) of my crime(s) of not more than $ <u>2,433,818.00</u> pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664;

     e.     A special assessment of $100, pursuant to 18 U.S.C. § 3013;

     4.     I know that if I am convicted of more than one count, the sentences imposed may be either concurrent (served at the same time) or consecutive (served separately or back-to-back) unless the statutory penalty for an offense of conviction expressly requires that a sentence be imposed to run consecutively.

     5.     I know that in addition to any punishment that the Court may impose, there are collateral consequences to pleading guilty to a crime. These consequences are neither imposed nor controlled by the Court. For example, pleading guilty may result in a loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.   And, if I am not a citizen of the United States, these consequences may include deportation from the United States or indefinite confinement if there is no country to which I may be deported, denial of the right to enter the United States in the future, and denial of citizenship.

     6.     I know that if I am given a term of supervised release as a part of my sentence, that supervised release will only begin to run upon my release from custody on all terms of imprisonment imposed by this and any other courts. I understand that any

3

violation of the conditions of that supervised release during its term may lead to an additional prison sentence and additional supervised release being imposed.

7.     I know that there is no parole in the federal system and that I will be required to serve the entire sentence of imprisonment which may be imposed in my case, reduced only by such good time and/or program allowances as may be set by Congress and applied by the Bureau of Prisons.

8.     I know that if a fine or restitution is imposed as a part of my sentence, I will be required to pay interest on any amount in excess of $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment or unless interest is waived by the Court.

9.     I know that if a fine or restitution is imposed as a part of my sentence, I will be required to pay it in a timely manner.   Failure to do so may trigger monetary penalties, collection efforts by the government, potential revocation of any probation or supervised release, and/or exposure to prosecution for "Criminal Default" under 18 U.S.C. § 3615.

10.     I know that I can be represented by an attorney at every stage of the proceedings in this matter, and I know that, if I cannot afford an attorney, one will be appointed to represent me at no cost or expense to me.

11.     I know that I have a right to plead "not guilty;" and I know that if I do plead "not guilty," I can persist in that plea and demand a trial.

12.     I know that I have a right to and can demand a trial by jury, and I know that if I choose to stand trial:

4

a.      I have a right to the assistance of an attorney at every stage of the proceeding;

b.      I have a right to see and observe the witnesses who testify against me;

c.      My attorney can cross-examine all witnesses who testify against me;

d.      I can call and present such relevant witnesses and evidence as I desire, and I can obtain subpoenas to require the attendance and testimony of those witnesses;

e.      If I cannot afford to pay witness fees and expenses, the government will pay those fees and expenses, including mileage and travel expenses, and including reasonable fees charged by expert witnesses;

f.      I cannot be forced to incriminate myself and I do not have to testify at any trial;

g.      However, I can testify at my trial if I choose to, and I do not have to decide whether or not to testify until after I have heard the government's evidence against me;

h.      If I decide that I do not want to testify at trial, the jury will be told that no guilt or inference adverse to me may be drawn from my decision not to testify;

i.      In order for me to be convicted, the government must prove each and every element of the offense(s) with which I am charged, beyond a reasonable doubt;

j.      In order for me to be convicted, the jury must reach a unanimous verdict of guilty, meaning all jurors must agree that I am guilty; and

k.      If I were to be convicted, I could appeal both my conviction and whatever sentence the Court later imposed, and if I could not afford an appeal, the government would pay the cost of the appeal, including the cost of an appointed attorney.

5

13.     I know that if I plead guilty, there will not be a trial of any kind.

14.     I know that if I plead guilty, there will be no appellate review of the question of whether or not I am guilty of the offense(s) to which I have pled guilty.

15.     I know that the terms of my plea agreement with the government contain a waiver of my right to appeal or to collaterally attack the sentence. Specifically, I have agreed to waive the right to appeal any matter in connection with this prosecution, conviction, or sentence unless the sentence exceeds 96 months, that is, the combined statutory maximum penalties for imprisonment for the offenses of conviction, with the sentences to run consecutive to one another.   The defendant also agrees to waive his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255, except that such waiver provision will not prevent him from seeking relief otherwise available if:   (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that he was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from these waiver provision.   Because of this, I know that I cannot seek appellate review of the sentence imposed by the Court in this case, except in the limited circumstances, if any, permitted by my plea agreement.

16.     No agreements have been reached and no representations have been made to me as to what the sentence in this case will be, except those which are explicitly detailed in the document entitled "Plea Agreement" which I and the government have

6

signed.    I further understand that any sentencing agreements and stipulations in the document entitled   "Plea Agreement" are binding on the Court only if the parties ask the Court in that document to be so bound pursuant to Rule 11(c)(1)(C) and only if the Court agrees to be so bound when it accepts my guilty plea(s).

17.    The only plea agreement which has been entered into with the government is that which is set out in the document entitled "Plea Agreement" which has been signed by the government and me and which I incorporate herein by reference.

18.    I understand that the Court will make no decision as to what my sentence will be until a Presentence Report has been prepared by the Probation Department and received and reviewed by the Court.

19.    I know that when I enter my plea(s) of guilty, the Court may ask me questions under oath about the offense(s) to which I have pled guilty.    Such questions, if asked of me on the record and in the presence of my attorney, must be answered by me, and if I give false answers, I can be prosecuted for perjury.

20.    I know that I have the right to ask the Court any questions that I have concerning my rights, these proceedings, and my plea(s) to the charge(s).

21.    1 am 50 years of age.    My education consists of completion of the 12th grade. I can understand the English language.   (Circle either "can" or "cannot.")   I am not taking any medications which interfere with my ability to understand the proceedings in this matter or which impact or affect my ability to choose whether to plead guilty.

22.    Other than the promises of the government set out in the document entitled "Plea Agreement," no promises and no threats of any sort have been made to me by

7

anyone to induce me or to persuade me to enter my plea(s) in this case.

23.     No one has promised me that I will receive probation, home confinement or any other specific sentence desired by me because of my plea(s) of guilty.

24.     I have had sufficient opportunity to discuss this case and my intended plea(s) of guilty with my attorney.   I do not wish to consult with my attorney any further before I enter my plea(s) of guilty.

25.     I am satisfied with my attorney.   I believe that I have been represented effectively and competently in this case.

26.     My decision to enter the plea(s) of guilty is made after full and careful thought, with the advice of my attorney, and with full understanding of my rights, the facts and circumstances of the case, and the potential consequences of my plea(s) of guilty.   I was not under the influence of any drugs, medication, or intoxicants which affect my decision-making ability when I made the decision to enter my guilty plea(s). am not now under the influence of any such drugs, medication or intoxicants.

27.     I want to plead guilty and have no mental reservations about my decision.

28.     Insofar as it shows my conduct, the summary of facts set out in the document entitled "Plea Agreement" is true and correct, except as I have indicated in that document.

29.     I know that I am free to change or delete anything contained in this document and that I am free to list my objections and my disagreements with anything contained in the document entitled "Plea Agreement."   I accept both documents as they are currently drafted.

8

30.     I wish to plead guilty to the following charge(s):

Count 1 – 18 U.S.C. § 371 - Conspiracy to defraud the United States and One of Its

Agencies

Count 2 – 26 U.S.C. § 7206 (1) – Filing a false income tax return


Dated this _____14th_____, day of _____Nov   2016_____.


_____

William Sears, Defendant

I certify that I have discussed this statement and the document entitled "Plea Agreement" with the defendant.   I certify that I have fully explained the defendant's rights to him or her and have assisted him or her in completing this form.   I believe that the defendant understands her rights and these statements.

Dated this _14TH____, day of _Nov_____ 2016


_____
Fredric M. Winocur
Ridley, McGreevy & Winocur
303 16th Street, Ste. 200
Denver, CO 80202
303-629-9700
303-629-9702 (fax)
winocur@ridleylaw.com
Attorney for Defendant

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     WILLIAM J. SEARS

      Defendant.

_____

**GOVERNMENT'S UNOPPOSED MOTION FOR LEAVE TO FILE
REDACTED PLEA AGREEMENT AS TO DEFENDANT SEARS**

_____

The UNITED STATES OF AMERICA, by and through its undersigned counsel, respectfully moves without opposition, to file as an unrestricted document, a redacted version of the Plea Agreement for Defendant William J. Sears, in the form annexed hereto as Exhibit A.

As grounds for the motion, the government states as follows:

1.     On November 14, 2016, this Court conducted a change of plea hearing with respect to defendant Sears, at which time defendant Sears tendered guilty pleas to both counts of the Information filed in this case pursuant to a written plea agreement between Sears and the government. This Court accepted defendant Sears' guilty pleas, adjudged him guilty of the offenses set forth in the Information and set sentencing with respect to his case for April 25, 2017. Based on a colloquy with counsel for the parties, the Court agreed to have defendant Sears' plea agreement with the government filed under restriction at Level 2. (DE 48).[1] The

_____

[1]     "DE" refers to the docket entries in this case.

Court permitted the parties leave to submit to the Court a proposed redacted plea agreement that would be available to the public through viewing on the Court's PACER system.

2.      Thereafter, counsel for the government and defendant Sears consulted and agreed upon the redactions to be made to the version of the Sears plea agreement to be submitted for filing as an unrestricted document.  Exhibit A to this motion is the product of these consultations and bears the proposed redactions to both the plea agreement and its exhibit, a plea terms letter.

3.      The government is filing, in further support of this motion and the proposed redactions, a memorandum identifying for the Court the passages of the Sears plea agreement which the parties propose to be redacted from the publicly filed version of the plea agreement and the current grounds which support keeping these passages restricted from public view.

WHEREFORE, the Government prays that the Court authorize the filing of a redacted version of the Plea Agreement of Defendant Sears in the form annexed hereto as Exhibit A.

Respectfully submitted this  28th   day of November, 2016.

Respectfully submitted,

ROBERT C. TROYER
Acting United States Attorney

by: s/ Kenneth M. Harmon
KENNETH M. HARMON
Assistant United States Attorney
U.S. Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Tel. No. (303) 454-0100
Fax No. (303) 454-0402
E-mail: kenneth.harmon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>28th</u> day of November, 2016, I electronically filed the foregoing **GOVERNMENT'S UNOPPOSED MOTION FOR LEAVE TO FILE REDACTED PLEA AGREEMENT AS TO DEFENDANT SEARS** with the Clerk of the Court using the CM/ECF which will send notification of such filing to counsel at the following e-mail addresses:

Frederic Winocur
winocur@ridleylaw.com

Marci Gilligan LaBranche
labranche@ridleylaw.com

Philip L. Dubois
dubois@dubois.com


<div style="text-align: right;">

<u>s/ Andrea K. Hough</u>
ANDREA K. HOUGH
U.S. Attorney's Office

</div>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. *16 - cr - 321 - WJM*

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    WILLIAM J. SEARS,

    Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Kenneth M. Harmon and Tonya S. Andrews, Assistant United States Attorneys for the District of Colorado, and Scott M. Mascianica, Special Assistant United States Attorney for the District of Colorado, and the defendant, William J. Sears, personally and by his counsel, Marci Gilligan LaBranche, Esq., and Frederic M. Winocur, Esq., submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to D.C.COLO.LCrR 11.1.

### I.    PLEA AGREEMENT

A.    The defendant agrees to plead guilty to a two-count information in this case, in the form annexed hereto as Exhibit A (hereinafter, the "Contemplated Information"), charging him, in Count 1, with conspiring with Scott M. Dittman, named as a co-defendant, and with others to defraud the United States and one of its agencies, the U.S. Securities and Exchange Commission ("SEC"), and to commit specified offenses against the United States, in violation of Title 18, United States Code, Section 371, and, in Count 2, with filing a false income tax return, in violation of Title 26, United States Code, Section 7206(1) .

**EXHIBIT A**

Court Exhibit I    87

B.1.    The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), including, but not limited to: forfeiture of his interest in all property that may constitute or is derived from proceeds of his commission of or involvement or participation in the charged conspiracy and its object offenses, including, but not limited to, the following:

(a)    A money judgment not exceeding approximately $12,204,172, corresponding to the total amount obtained as a result of the Count One;

(b)    The following particular assets, derived from the sale of Fusion Pharm common stock, and constituting direct and indirect proceeds of the Count One:

(1)    $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name Of Meadpoint Venture Partners;

(2)    $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name Of Sandra L. Sears;

(3)    $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name Of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee, less approximately $2,472,945 to be applied to Mr. Sears' restitution;

(4)    $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name Of Fusionpharm, Inc.;

(5)    $212,273.92 Seized From Wells Fargo Bank Account No. 8141061286, Held In The Name Of Fusionpharm, Inc.,

(6)    $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The Purchase Of 4200 Monaco Street, Denver, Colorado; And

(7)    The Real Property Located At 194 Basket Road, Oley, Pennsylvania.

B.2.    The defendant further agrees to forfeit, as substitute assets, (1) $147,724.38 from the sale proceeds of 13442 Jackson Drive, Thornton, Colorado, in the custody of the United States; and (2) any monetary value he realizes in the future from his interest in FusionPharm, Inc. ("FusionPharm").

B.3.     The United States agrees the funds obtained from the forfeiture of any assets, direct or substitute, shall be applied to the forfeiture money judgment identified in subparagraph (a).   In addition, the seized funds applied to any restitution obligation would also be credited to the forfeiture money judgment.

B.4.     The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.   The forfeiture money judgment entered against the defendant would be joint and several with co-defendant Dittman's forfeiture money judgment.   The parties further agree that the forfeiture money judgment shall remain in full force and effect for 5 years from the date of sentencing.

B.5.     The defendant further agrees, at the government's election, to divest whatever beneficial ownership interest he has in shares of common and preferred stock of FusionPharm.

C.1.     The parties agree that, although restitution would otherwise be mandatory with respect to Count 1 of the Contemplated Information, they will take the position that restitution should not be ordered by the Court, pursuant to 18 U.S.C. § 3663A(c)(3), because the number of identifiable victims is so large as to make restitution impracticable and, alternatively, restitution would involve determination of complex issues of fact that would complicate or prolong the sentencing process to a degree that the need for restitution would be outweighed by the burden on the sentencing process.   The parties acknowledge and agree, however, that, while court ordered restitution will not be sought with respect to Count 1 of the Contemplated Information, the assets and funds which are to be forfeited pursuant to the terms of this plea agreement may be made available to eligible victims pursuant to administrative proceeding before the U.S. Department of Justice.

C.2.     The defendant agrees, pursuant to 18 U.S.C. § 3663(a)(3), to make restitution to the Internal Revenue Service in the total amount of $2,433,818, corresponding to the federal tax loss

associated with the sale of FusionPharm securities and other securities for the years 2011 through 2014, a figure comprising unpaid and owed taxes for these years, plus any interest on this amount determined to be due and owing at the time of sentencing (the combined principal and interest due hereinafter referred to as the "criminal tax restitution amount").   The defendant acknowledges and agrees that neither his agreement to pay this restitution nor the restitution payments themselves limit the Internal Revenue Service ("IRS") in its lawful examination, determination, assessment or collection of any taxes, penalties or interest due from him for these years. The defendant further acknowledges and agrees that any disputes regarding such assessments or collection actions will be resolved with the IRS through the administrative and/or judicial process applicable to the resolution of federal civil tax controversies. The parties agree that the criminal tax restitution amount will be paid from funds seized and subject to forfeiture under this plea agreement.

D.1.





D.2.

D.3.  The defendant ■■■■ agrees to cooperate fully with the Law Enforcement

Agencies in the identification, recovery and repatriation of assets that are subject to, or are

otherwise available for, forfeiture pursuant to his plea obligations with respect to forfeiture, as set

forth in paragraph B above.   Such cooperation shall include, but not necessarily be limited to, (a)

submitting to debriefings concerning the identification, recovery and repatriation of potentially

forfeitable assets; (b) producing documents, records and other evidence, as requested by the Law

Enforcement Agencies, relevant to these subjects; (c) executing documents required by financial

institutions and custodians who may have custody or control of potentially forfeitable assets in order to permit access to records concerning such assets and in order to facilitate the recovery and repatriation of such assets; (d) providing truthful testimony concerning these subjects, whether in the form of testimony or through affidavit or declaration; and (e) appearing at judicial or administrative hearings and proceedings as may be necessary for these purposes.

D.4.    The defendant also agrees to cooperate fully with the IRS in the ascertainment and payment of his correct tax liabilities for the calendar years 2011 through 2014 inclusive, among other ways, by preparing and filing returns or amended returns, as necessary, for those years for himself individually as well as for entities through which he conducted business during those years and on whose behalf he should have filed tax returns.   The defendant further agrees to file truthful and accurate income tax returns which are or may become due by law during any period of supervised release or probation imposed by the Court.

E.      The Office of the United States Attorney for the District of Colorado agrees that – contingent upon the defendant's entry of a guilty plea and sentencing on the Contemplated Information and the defendant's fulfillment of his other plea obligations -- it will not further prosecute the defendant for the conduct set forth in the Contemplated Information or any other criminal conduct known to Office of the United States Attorney for the District of Colorado as of the date of this plea agreement.

F.1.    The parties acknowledge that, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court, while not bound by them, is required to consider the United States Sentencing Guidelines and determine the defendant's applicable sentencing guideline range, in deciding the sentence in this case.

F.2.    The parties agree to take the respective positions ascribed to them regarding the sentencing factors set forth in Part VI herein (the parties' Advisory Guideline Computation and

3553 Advisement), which positions, the parties agree, would result in an advisory sentencing guideline range that would exceed the total combined statutory maximum imprisonment term of eight years for both offenses of conviction set forth in the Contemplated Information, were the sentences on such convictions imposed to run consecutively to one another. The parties agree that, as a consequence, under these circumstances, should these positions be accepted by the Court, the effective advisory sentencing guideline range applicable to the defendant would be eight years imprisonment or 96 months. *See* U.S.S.G. §§ 5G1.1-5G1.2 & comments.



7



F.6. [redacted]

[redacted] The defendant further acknowledges that the government will not be advocating, at the time of sentencing, a sentence on his behalf lower than 60 months imprisonment.

F.7.     The defendant is free, at the time of sentencing, to advocate for any lawful sentence in this case and to make to the Court any arguments in support of thereof, provided, however, that that sentence *include a term of imprisonment not less than 60 months in duration* and any supporting arguments are consistent with the positions he is obligated to take under the plea agreement with respect to the calculation of his advisory sentencing guideline range and are not factually inconsistent with his entry of a guilty plea and admission of guilt or with the body of body of stipulated facts set forth in Part V herein (the parties' Stipulation of Facts).

G.1.     The defendant agrees that, as a condition of supervised release or probation, he will not be involved in any capacity in the securities industry on behalf of another individual or an entity not solely owned and controlled by him.   The defendant further agrees that, as a condition of supervised release or probation, he will not act as an officer or director of a company whose

8

securities are publicly traded or otherwise act as a control person of such a company and that he will not directly or indirectly participate in the issuance, purchase, offer, or sale of any security in an unregistered offering by any issuer of securities.

G.2. The defendant further agrees that, as a condition of supervised release or probation, he will not act as a fiduciary or be employed in a fiduciary position and that he will not otherwise be engaged in any other employment or occupation involving his solicitation of funds for investment or his custody or control of investor funds.

G.3. The defendant further agrees that any conditions of supervised release or probation should include the special conditions that (a) his employment be approved in advance by his supervising probation officer; (b) that he provide his supervising probation officer access to any financial records requested by such officer and otherwise be subject to financial monitoring by such officer; (c) that he shall not register any business entities without prior disclosure to his supervising probation officer; and (d) that he shall not conduct any financial transactions through accounts of any business entities or individuals not made known to and approved by his supervising probation officer.

H. The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless the sentence exceeds 96 months, that is, the combined the statutory maximum penalties for imprisonment for the offenses of conviction, with the sentences run consecutive to one another. The defendant also agrees to waive his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255, except that such waiver provision will not prevent him from seeking relief

9

otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that he was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from these waiver provisions.

    I.    The parties agree and acknowledge that the government's obligations under this plea agreement are expressly contingent on the defendant's performance of his obligations under the plea agreement. The parties further agree and acknowledge, in particular, that should the defendant breach this agreement ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████ the government is entitled, at its election, to be relieved of its obligations under this plea agreement and may elect to abrogate the agreement and prosecute the defendant to the full extent permitted under law.

    J.    The parties understand, acknowledge, and agree that the sentencing recommendations of the parties under this plea agreement are made pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure and are not binding on the Court.

## II.   <u>THE ELEMENTS OF THE OFFENSE</u>

The defendant understands that, in order to be convicted of the offense of conspiracy to defraud the United States and one of its agencies, and to commit offenses against the United States, as charged in Count 1 of the Contemplated Information, the government, at trial, would have to prove the following essential elements beyond a reasonable doubt:

1.   The defendant agreed with at least one other person to violate the law;

2.   One of the conspirators engaged in at least one overt act furthering the conspiracy's objective;

3.   The defendant knew the essential objective of the conspiracy;

4.   The defendant knowingly and voluntarily participated; and

5.   There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[1]

The defendant understands that, in order to be convicted of the offense of filing a false income tax return, as charged in Count 2 of the Contemplated Information, the government, at trial, would have to prove the following essential elements beyond a reasonable doubt:

1.   That the defendant signed or subscribed to an income tax return that contained a written declaration that it was made under the penalties of perjury;

2.   That the return contained a false statement as alleged in the Contemplated Information;

3.   That the defendant knew that statement was false;

4.   That the defendant acted willfully, that is, with the voluntary intent to violate a known legal duty; and

5.   That the statement was material.[2]

### III.  STATUTORY PENALTIES

The maximum statutory penalty for the offenses set in Count 1 of the Contemplated Information is: not more than five (5) years imprisonment; not more than a $250,000 fine, or both; not more than three (3) years supervised release; a $100 special assessment fee; plus restitution.

The maximum statutory penalty for Count 2 of the Information is: not more than three (3)

---

[1]   Tenth Circuit Pattern Jury Instruction 2.19 (2011).

[2]   Tenth Circuit Pattern Jury Instruction 2.93 (2011).

years imprisonment; not more than a $250,000 fine, or both; the costs of prosecution; a supervised release term of not more than three (3) years; a $100 special assessment fee.

A violation of the conditions of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV.  COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.  STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. §3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. §3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is in or about November 2010 and continued until on or about July 18, 2014 (the "Relevant Period").

The parties agree that the government's evidence would establish the following:

12

**Dittman and Sears Partner to Start FusionPharm**

1.     The defendant ("Sears"), a resident of Thornton, Colorado, had previously been primarily involved in the business of providing public relations and promotional services to microcap companies that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets.   In 2007, the defendant was convicted in the Southern District of New York of one count of conspiring to commit securities fraud and commercial bribery and one count of securities fraud (Case No. 04-cr-556-swk).   Thereafter, the defendant primarily conducted his stock public relations and promotional business through Microcap Management, LLC ("Microcap"), a Nevada limited liability company that he formed.   He also conducted some of his business affairs through a second Nevada limited liability company, Bayside Realty Holdings, LLC ("Bayside"), which he formed and operated in the name of a blood relative family member (hereinafter, "Family Member A").

2.     Co-defendant Scott M. Dittman ("Dittman"), a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania, had been trained and practiced as an accountant from 1991 until 1995, when he quit working as an accountant and went into real estate development and construction.   He became a Certified Public Accountant in 1991.   His license with the State of California expired in April 1997. Co-defendant Dittman and Sears are brothers-in-law; Mr. Sears is married to Mr. Dittman's sister.

3.     In or about 2010, co-defendant Dittman conceived of a business to develop, manufacture and sell steel shipping containers refurbished for use as use as hydroponic growing pods ("PharmPods,") for indoor plant cultivation, primarily cannabis. He undertook to collaborate with the defendant to develop this business and, in particular, enlisted Sears to assist in promoting the business, marketing its products and finding investment capital for it.     The business was conducted through FusionPharm, Inc. ("FusionPharm"), a company organized in the State of

13

Nevada with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado.

4.     Shortly after the formation of FusionPharm, the defendant undertook efforts to make it a company whose stock was publicly traded.   In November 2010, in furtherance of these efforts, the defendant and the CEO for a company named Baby Bee Bright Corporation ("Baby Bee Bright") began discussions about Sears and co-Defendant Scott Dittman ("Dittman") taking over Baby Bee Bright.   The purpose of the takeover was for Dittman and Sears to transform Baby Bee Bright, a company whose stock was already quoted on OTC Link, operated by OTC Markets Group, Inc. ("OTC Link"), into FusionPharm.[3]   On November 8, 2010, Baby Bee Bright's CEO and Sears exchanged emails about the Baby Bee Bright CEO transferring his convertible preferred shares in Baby Bee Bright to Sears and Dittman.     The owner of the preferred shares could convert the shares to common stock at a rate of 100 common stock shares for every preferred share.   Sears and the Baby Bee Bright CEO ultimately agreed that Dittman and Sears would receive 99% of the company's convertible preferred shares at no cost while the Baby Bee Bright CEO retained 1% as his compensation for the transaction.   On November 15, 2010, Baby Bee Bright's shareholders executed a written consent acknowledging, among other things: (a) the resignation of Baby Bee Bright's CEO; and (b) the appointment of Dittman and, at the defendant's direction, Family Member A as directors.     Family Member A was appointed to act as director, in part to avoid disclosure of Sears' involvement and his prior conviction for securities fraud.[4]

---

[3]     At the time, the common stock of Baby Bee Bright, like the common stock of many publicly traded microcap companies, was not traded on a registered national securities exchange but rather directly between two parties, typically securities broker-dealers, using inter-dealer quotation services offered through internet platforms such as OTC Link.

[4]     The parties acknowledge that Dittman and Sears' acquisition of these pre-existing shares through the reverse merger with Baby Bee Bright was not the product of wrongdoing.

5.      Prior to November, 2010, Dittman had been aware that Sears had a prior felony conviction and had at various times used Family Member A's name on various accounts and for various entities in which Sears was involved.   Sears and Dittman discussed Sears' prior felony conviction with a transactional and securities lawyer (hereinafter "Counsel A") and were advised by that lawyer that Sears' felony conviction would have to be disclosed to the market if Sears was given an officer or director title in the company and, over the course of time, they were further advised by Counsel A that Sears' formal involvement with FusionPharm would need to be circumscribed in various ways to avoid running afoul of the federal securities laws or triggering disclosure obligations under the federal securities laws.[5]

6.      On January 25, 2011, as part of the plan to turnover control of Baby Bee Bright to Sears and Dittman, the Baby Bee Bright CEO transferred 1.3 million of the existing 1.5 million Baby Bee Bright preferred shares to a single person LLC owned and controlled by Dittman.   On March 16, 2011, the Baby Bee Bright CEO then transferred 185,000 Baby Bee Bright preferred shares to Microcap, an entity controlled by Sears.    As arranged with Sears, the Baby Bee Bright CEO retained 15,000 preferred shares as his compensation for the transaction.

7.      On March 25, 2011, Dittman and Sears filed a notification of name change with the Financial Industry Regulatory Authority ("FINRA") to change Baby Bee Bright's name and stock symbol to FusionPharm's name and stock symbol.   After FINRA approved this form, all Baby Bee Bright shares were converted to FusionPharm shares.   The FINRA notification form was signed by Dittman in his capacity as President of FusionPharm and identified Sears the

---

[5]      Co-defendant Dittman would also offer evidence that he and Sears also consulted with a cannabis licensing lawyer (hereinafter "Counsel B") who advised that Sears' felony conviction made Sears being an officer or director in FusionPharm problematic from a state cannabis licensure standpoint because FusionPharm's business model contemplated selling its product to, among others, legal marijuana cultivators.

Administrative Officer."   Family Member A was listed as treasurer and secretary of former Baby Bee Bright and the newly formed FusionPharm.

8.    Around this time, Sears and Dittman enlisted the services of an erstwhile associate of Sears ("Co-Conspirator A"[6]) to assist in preparing materials for FusionPharm.   Dittman and Sears requested that Co-Conspirator A prepare, among other things, FusionPharm business plans including financial projections for the company.   For example, on March 10, 2011, Sears emailed Co-Conspirator A and cc'd Dittman, asking Co-Conspirator A to "please start communicating with regard to putting a business/plan/powerpoint/offering documents together."   About a month later, on April 5, 2011, Dittman emailed Co-Conspirator A with specific financial projections to assist in the preparation of FusionPharm's business plan. The projections included PharmPod sales estimates for the company for the upcoming fiscal years that forecasted the number of pods that were expected to be sold in each these years, as follows with the translated corresponding sales revenue figures at an average price of $32,500 per pod: (a) Fiscal Year ("FY") 2011: 30 pods ($975,000); (b) FY 2012: 60 pods ($1,950,000); and (c) FY   2013: 100 pods ($3,250,000).

9.    Dittman and Sears operated FusionPharm as business partners, and held themselves out as such to numerous individuals and investors.   On April 21, 2011, Dittman sent an email to numerous individuals notifying them that he "recently partnered with [Sears] and [we] have acquired and moved [our] operations into a publicly traded company: FusionPharm."   Dittman would identify Sears as his "partner" in FusionPharm to numerous individuals through in-person communications and emails.   In short, during the Relevant Period, Sears and Dittman worked in tandem regarding the critical decisions concerning FusionPharm's management and operations, and Sears was primarily responsible for FusionPharm's capital formation and investor relations.

---

[6]    Use of the term "Co-Conspirator A" herein and below to refer this individual does not necessarily signify Dittman's agreement that he had entered the conspiracy as of the date of the documents referenced here.

10.     Following the conversion of shares and name change to FusionPharm, Dittman and Sears, initially with the assistance of Co-Conspirator A, undertook thereafter regularly to post certain prescribed written disclosure for FusionPharm on the OTC Link internet platform.   These submissions typically included financial statements, together with financial statement notes, and quarterly and annual reports, which reports included information, among other things, about the officers, directors, and control persons and significant beneficial owners of the company's stock.[7] Throughout the Relevant Period, no mention was made in any of FusionPharm's financial statements, notes, or quarterly and annual reports, that the defendant or any of the entities through which he conducted business was an affiliate of, or related party to FusionPharm.[8]

**Sears Served as _de facto_ Officer for FusionPharm**

11.     Even though Sears was never identified in FusionPharm's financial and other disclosures as having a formal role with the company, he was integral to the company's operations. As FusionPharm began its actual operations in the Spring of 2011, Sears was identified in some of FusionPharm's documents as being an officer of the company; he was alternatively classified as the company's "Vice President" "Director of Financial Operations" and/or "Investor Relations Director" in other documents.[9]

---

[7]     Reporting on the OTC Link platform was voluntary on the part of the companies whose stock was listed for trading but the degree and nature of the disclosures provided by the companies determined the "market tier" in which the company would be classified by the internet platform. Higher level tiers required more comprehensive disclosures. Companies that provided limited or no information were placed in market tiers that OTC Link reserved for stock issuers that prospective investors were advised to approach with caution.   OTC Link provided written guidelines for the type of information contemplated in these quarterly and annual reports.

The disclosures made by companies whose securities were listed on the OTC Link platform were readily accessible to the investing public and were widely disseminated through financial media outlets.

[8]     The defendants would offer evidence that their determinations regarding OTC Link disclosures concerning Sears and his entities were influenced and shaped by advice received by Counsel A and by subsequent attorneys engaged by Dittman and Sears on behalf of FusionPharm.

[9]     Defendant Sears and co-defendant Dittman acknowledge that, during the early stages of FusionPharm's operations, Sears was recited in various documents as has having certain formal positions in the company.   Sears

17

12.     In addition to being identified on initial company documents as an officer, from the time of FusionPharm's organization as a company in Spring 2011 until late 2013 (when FusionPharm hired a contractor to serve as part-time Chief Financial Officer), Sears handled many day-to-day responsibilities typically reserved in other companies for a chief financial officer.   For example, Sears: (a) managed incoming investor checks and paperwork; (b) served as FusionPharm's primary contact with the company's transfer agent in connection with FusionPharm common stock transactions; (c) provided company funds to FusionPharm employees; (d) signed payroll checks for FusionPharm employees from FusionPharm account(s) for six months when Dittman did not have access to FusionPharm's bank accounts; (e) made pitches to a number of investors on FusionPharm's behalf; (f) at times drafted, revised, and posted FusionPharm press releases; and (g) drafted certain FusionPharm corporate documents, such as written board of director consent for Sears and others to convert their preferred FusionPharm shares for sale.   Sears also had and used a FusionPharm email address and, from at least November 2011 to January 2012 and received a salary during that same time from FusionPharm.

---

contends that these documents were "unofficial" documents.  The Government contends that several of the documents were not informal documents including Corporate Meeting Minutes and a version of FusionPharm's business plan that was sent to a FusionPharm investor.  For example, on May 9, 2011, Sears, Dittman and a third individual assisting them with the start of the company ("Employee A") exchanged emails regarding FusionPharm's May 9, 2011 Corporate Meeting Minutes.  The corporate minutes listed Dittman as FusionPharm's President and Sears and Employee A as its Vice Presidents.  They maintain, however, based on advice from counsel, as the company began to operate, Sears ceased to have these formal positions and that Dittman sought to avoid giving Sears a formal role in FusionPharm, Inc. as the business moved forward.

Notwithstanding, defendant Sears and Dittman do not contest that, over the course of time, as detailed herein, Sears ultimately played an integral and important role in the company's operations, functioning, in particular, as its *de facto* investor relations manager and coordinating substantially all of FusionPharm's common stock sales with its stock transfer agent.

They maintain, however, that whatever degree of involvement Sears came to have in the company, Dittman alone had the final decision-making authority for FusionPharm.

**Sears Sold FusionPharm Stock Through Microcap**

**for the Benefit of Sears, Dittman and FusionPharm**

13.    Federal securities laws require that every offer or sale of a security by a company such as FusionPharm needs to be registered with the Securities and Exchange Commission ("SEC") or exempt from registration. FusionPharm was not registered with the SEC. Accordingly, throughout the Relevant Period, any lawful issuance of securities, including convertible notes, preferred and common stock, would have needed to be exempt from registration. Further, any of these exempt offerings would have required that the shares associated with the issuance be "restricted," or limited in the manner and amount in which they could be sold after issuance.    For example, restricted securities would have needed to be held by the owner for a certain amount of time (the "holding period") before they could be freely transferrable to a third party.    Additionally, shares held by individuals or entities that could direct or control the direction of a company's management or policies - classified as "affiliates" - were subject to additional regulations under federal securities laws, such as limitations on how many shares they can sell during a given time period.[10]

14.    Dittman and Sears knew that unrestricted or "free trading" shares of FusionPharm shares could be sold into the market or to be used as negotiating tools.    Unrestricted shares would be more marketable to investors as they could immediately sell the shares without having to satisfy any holding period.    As such, Sears used the preferred shares acquired by Microcap to fund Fusion Pharm's operations and to financially support themselves.[11]    Because Sears was a *de facto* affiliate

---

[10]    A transfer agent is assigned by a publically traded company to keep track of the individuals and entities that own the companies' stocks and bonds.

[11]    Dittman benefited from some of the sales of Sears' preferred shares in that (1) his FusionPharm salary was sometimes traceable to proceeds of these sales, (2) some capital loans by Dittman to FusionPharm were repaid by

throughout the Relevant Period, sales of his preferred shares were accomplished while avoiding registration with the SEC and in violation of the otherwise applicable restriction requirement on newly issued shares.

15.     The unlawful securities transactions were realized in stages. Sears initially converted 1,450 preferred shares to 145,000 free-trading shares of FusionPharm common stock on April 15, 2011.  He then caused Microcap to transfer the remaining preferred shares (183,550 preferred shares) to a company owned by an immediate family member (identified herein as "Family Member B"), although Sears continued to beneficially own the stock.   Thus, Sears was able to avoid being disclosed in FusionPharm's financial disclosure documents as a 10% shareholder of the company's preferred stock, and an affiliate of FusionPharm based on his stock ownership.    After using Family Member B's company to convert small tranches of FusionPharm preferred shares to common stock, Sears caused the remaining 178,760 preferred shares to be transferred to another family member (hereinafter, "Family Member C") on July 29, 2011.[12] Similarly, Sears then used Family Member C as a proxy for his stock ownership, instructing him to transfer as needed small tranches of preferred shares to Microcap (or other entities controlled by Sears), which Sears, in turn,  caused to be converted into common stock and sold into the market.   Dittman knew about this arrangement.   Sears did this in order to conceal his true share ownership, as he continued to beneficially own these shares throughout the Relevant Period.[13]

---

FusionPharm with proceeds traceable to these sales, (3) FusionPharm's operations were financed by round-tripped proceeds from many of these sales; and (4) he received compensation from Meadpoint traceable to proceeds of these sales.

[12]     Both Family Members B and C were also relatives of co-defendant Dittman.

[13]     Sears contends that this family member, Family Member C, was the true owner of these shares but acknowledges he had substantial influence with this family member as to the use and disposition of these share holdings.

20

16.     All told, between April 28, 2011 and December 10, 2012, Sears, in consultation with Dittman, converted 14,270 of the 185,000 preferred shares into 1,427,000 shares of FusionPharm common stock.   Sears sold 675,000 shares of these shares into the secondary market through Microcap, netting approximately $1.6 million in proceeds.   Sears and Dittman agreed that Sears would use some of the remaining 752,000 FusionPharm common stock shares as part of their efforts to raise funds for the company's operations and to finance construction of pods.   Some investors were told that such shares would be unrestricted and thus could be immediately traded. [14]

17.     Since FusionPharm's transfer agent was the gatekeeper responsible for determining whether shares would be restricted, Microcap's sale of these unregistered shares was based on false statements by Dittman and Sears about Sears's affiliate status with FusionPharm.   For example, Dittman signed and submitted an FusionPharm Officer's Certificate attesting to, among other things, that Sears and, derivatively, Microcap, were not affiliates of FusionPharm. Similarly, Sears submitted documents on Microcap's behalf to the transfer agent that claimed he had no power to direct or cause the direction of FusionPharm's operations, even though Sears handled many responsibilities typically reserved in other companies for an officer or director. (*See* ¶¶ 8-10 above).   Sears and Dittman did not accurately describe Sears's role with

---

[14]     For example, on May 12, 2011, Dittman emailed Sears with various proposals to a prospective investor, including "[w]e will throw you 1 million shares of free trading paper, in 100,000 share tranches (so they are immediately liquid) while we draw down the line ($100k for 100,000 shares)."   Eight days later, on May 20, 2011, Sears emailed a potential financier and cc'd Dittman.   In the email, Sears claimed that "instead of doing the whole wait for a registration statement thing, we have gone to some shareholders and have been able to put together enough stock to do a transaction with free trading paper."

The "shareholders" referenced in Sears's email referred to his own company, Microcap.

21

FusionPharm in their efforts to have the transfer agent remove the restricted legend on the stock certificates in order to be able to sell the shares as free trading.[15]

18.    Dittman also misrepresented facts about Sears's stock ownership and transactions to FINRA.   In October 2011, FINRA investigated Microcap's significant sales of FusionPharm stock.   During that investigation, Dittman represented to FINRA that Sears was only a "part time salesman" at FusionPharm and that Dittman was unaware that Sears owned any FusionPharm stock and, therefore, was unaware he was selling FusionPharm stock.[16]   In a later interview, on November 3, 2011, Dittman indicated to FINRA staff that Sears "no longer owns Microcap Management" and that Sears owned no "FusionPharm stock."   But only weeks earlier, on September 6, 2011 and September 13, 2011, Dittman and Sears emailed each other details about Microcap's trading.    On one occasion, Dittman even requested that Sears transfer $3,000 from "this week's take" (in reference to Microcap's trading) to another family member's account.

**Sears and Dittman Use Affiliated Entities to Increase Access to Free-Trading Shares**

19.    Dittman and Sears used a series of entities owned by Sears to increase their access to FusionPharm stock.   Two of these entities, Microcap and Bayside, were, as discussed above, entities that Sears had previously used in connection with earlier business affairs. Two additional entities, VertiFresh, LLC ("VertiFresh") and Meadpoint Venture Partners ("Meadpoint"), formed in connection with efforts to sell FusionPharm's PharmPod's and license its business methods and technology, were employed as well, in part to secure additional FusionPharm stock. (The four entities are hereafter collectively referred to as the "Facilitating Entities".)

---

[15]    Sears would contend that these disclosures to the transfer agent were pursuant to advice received from Counsel A.

[16]    Dittman contends that he believed that Sears was not selling his own FusionPharm stock on the market; rather he believed that a third party was selling Sears' stock to willing buyers, and that he misunderstood the question posed by the FINRA investigator. Sears contends that he had no knowledge or awareness of Dittman's statements to FINRA.

20.    In addition to Sears's control over these entities, the Facilitating Entities shared other connections to FusionPharm.   Among other things, Meadpoint's and VertiFresh's principal places of business were 4360 Vine Street in Denver, CO – the same address as FusionPharm for most of the Relevant Period.   VertiFresh and Meadpoint also shared the same workspace and employees with FusionPharm.   And the Facilitating Entities paid over $40,000 for shipping containers (the raw materials for PharmPods) that went to FusionPharm.

21.    Dittman was also affiliated with, and acted on behalf of, VertiFresh and Meadpoint. Regarding VertiFresh, materials sent to potential VertiFresh investors identified Dittman as a Director of the company.   Dittman edited and reviewed these materials before they were sent to potential investors.   Dittman also made a presentation on VertiFresh's behalf with Sears to the Denver Office of Economic Development JumpStart BizPlan Awards contest in 2012.   The PowerPoint presentation Dittman and Sears used at the presentation identified Dittman as VertiFresh's Director.   Moreover, some company organization documents reflected that Dittman was the CEO and Chairman of Board for VF Management, Inc., VertiFresh's sole managing member.

22.    Regarding Meadpoint, an unsigned version of the company's shareholder agreement identified Dittman as a 50% owner of the company.[17]   Dittman also received tens of thousands of dollars in purported compensation as a 1099 employee of the company, and drafted and issued investor materials on Meadpoint's behalf.   Dittman later identified himself on an application to the Colorado Medical Marijuana Enforcement Division as a "consultant" to Meadpoint.   At no point did FusionPharm disclose to investors that Dittman had any affiliations with VertiFresh or Meadpoint.

---

[17]    The unsigned Meadpoint Shareholder Agreement was sent in an email from Sears to Dittman on November 14, 2011.   Sears contends that Dittman was not a 50% owner of Meadpoint as illustrated in the document.

23.     As a named officer of FusionPharm, Dittman's ownership share and transactions in FusionPharm stock were disclosed on FusionPharm's financial disclosures filed on, and made available to investors via, OTC Link.   However, by selling FusionPharm shares through Microcap, Bayside, Vertifresh, and Meadpoint, Dittman's, along with Sears's, involvement and interest in those stock transactions remained undisclosed to investors.

24.     Co-Conspirator A prepared two separate notes in June 2012 (one for Bayside and one for Meadpoint) for *non-convertible* lines of credit.   On June 4, 2012, Co-Conspirator A emailed Sears a draft Bayside non-convertible promissory note and credit line agreement, writing that he (Co-Conspirator A) would also draft drawdown requests to match the dates and amounts of previously made deposits into FusionPharm's accounts.   Between June 5, 2012 and June 6, 2012, Co-Conspirator A drafted six drawdown requests totaling $177,000 and sent the requests to Sears.   The final non-convertible note and credit line agreement ("Bayside Non-Convertible Note") was then signed on June 6, 2012 with a purported $275,000 line of credit.   However, the Bayside Non-Convertible Note signatures (Dittman on behalf of FusionPharm and Family Member A on behalf of Bayside, acting as Sears's surrogate) were backdated to May 2, 2011.[18]

25.     To justify the "drawdowns," Sears attached deposit slips for nine previous bank deposits totaling approximately $171,000.   In reality, all but one of the various deposits listed as purported drawdowns actually came from Microcap, and the funds are traceable to Microcap sales of FusionPharm stock.   Dittman signed these drawdown requests on June 6, 2012; the dates on the requests, however, were earlier in time and matched when funds actually had been disbursed to FusionPharm.

---

[18]     Sears contends that Counsel A advised that the date of the notes should evidence the first traunch of money that was drawn down by the company.

110

26.     Following a similar pattern, on June 19, 2012, Co-Conspirator A emailed Sears a draft of the Meadpoint non-convertible promissory note and credit line agreement for signature, with a credit limit of $200,000 ("Meadpoint Non-Convertible Note").   As with the Bayside Non-Convertible Note, Dittman signed the Meadpoint Non-Convertible Note on or about June 19, 2012, when the Note bore a date of June 15, 2011.   Sears signed on Meadpoint's behalf and also backdated his signature.   FusionPharm attached deposit slips for $88,000 of deposits, although again the money actually came from Microcap stock sales.   Once again, Dittman signed drawdown requests that bore earlier dates to match the dates on which funds actually had been disbursed to FusionPharm.

27.     Five months later, on November 26, 2012, Co-Conspirator A emailed Sears new drafts of the Bayside and Meadpoint notes now documented as *convertible* notes, writing "[t]he Notes work with the existing drawdown requests." (hereinafter referred to as the "Meadpoint Convertible Note" and "Bayside Convertible Note" respectively).   The Bayside Convertible Note, signed by Dittman on FusionPharm's behalf on or about November 26, 2012 but bearing a date of May 2, 2011, was a 10% Convertible Promissory Note and Line of Credit Agreement in the amount of $275,000 with a conversion rate of $0.01/share.   Similarly, the Meadpoint Convertible Note was also signed by Dittman on FusionPharm's behalf  on or about November 26, 2012 but bore a date of  June 15, 2011, and was a 10% Convertible Promissory Note in the amount of $275,000 with a conversion rate of $0.01/share.[19]

28.     The notes were changed because Sears wanted to sell the notes to potential buyers whom he had identified.   By changing the non-convertible notes to convertible ones, Sears and Dittman could present the notes to FusionPharm's transfer agent for conversion of the debt into

---

[19]     The date (changed to December 8, 2011) and amount ($275,000 to $88,000) of the Meadpoint Convertible Note would be further revised at later dates.

FusionPharm common stock. Additionally, by fraudulently backdating the notes, Dittman and Sears were able to mislead the transfer agent into believing that: (1) all debt obligations reflected in the backdated notes were intended to be convertible at the time that FusionPharm incurred the debts; (2) the debt obligations always had been convertible; (3) the backdated notes constituted contemporaneously created written evidence of the debt obligations reflected therein; and (4) consequently that the holding period required by the federal securities laws had been satisfied.[20]

**Sears and Dittman Convert Notes into Free Trading**

**FusionPharm Shares and Raise Millions**

29. After Dittman signed the backdated Bayside Convertible Note, Sears immediately converted debt into FusionPharm shares. On December 6, 2012, Bayside submitted a Notice of Conversion to FusionPharm to convert $1,400 of the debt into 140,000 FusionPharm common shares. The package that Sears submitted to the transfer agent contained several false documents, including: (1) the backdated Bayside convertible note and drawdown requests/deposit detailed above; (2) a letter from Bayside attesting that Bayside was not an affiliate (signed by Family Member A); (3) a separate Statement of Non-Affiliate from Bayside (signed again by Family Member A); and (4) a FusionPharm Officer's Certificate, Written Consent, and letter signed by Dittman stating that Bayside (and derivatively Sears) were not affiliates and that Bayside

---

[20] Counsel A was copied on and involved in the creation of both the convertible and non-convertible backdated sets of promissory notes described in paragraphs 26 through 28, above.

Convertible Note was a valid obligation of the company as opposed to round-tripped[21] stock sale proceeds (*see* ¶¶ 25-26 above).[22]

30.    Contrary to these representations, Bayside was an affiliate of FusionPharm. (*See* ¶¶ 8-10; 19 above).   In addition to the impact the Bayside Convertible Note had on Sears's ability to receive unrestricted shares, Sears's affiliate status also meant that Bayside needed to abide by the volume restrictions mandated by federal securities laws.  (*See* ¶ 11 above).    Specifically, Bayside could not sell more than 1% of the FusionPharm's common stock shares during a three-month period.   Between February and April 2013, FusionPharm had, at most, 5,201,650 common stock shares outstanding, meaning Bayside could only sell 52,016 shares during this period and still comply with the federal securities laws.[23]   However, Sears sold all 140,000 of Bayside's shares during this period, thus violating the volume restrictions.

31.    On February 5, 2013, Sears sold the remainder of the Bayside Convertible Note to an investment group.   Sears received $250,000 from the investment group in consideration for the remaining debt that FusionPharm purportedly owed Bayside under the backdated note.   In order to ensure that the five investors in the investment group immediately received unrestricted shares,

---

[21]    "Round tripping" occurs when a company provides an individual or entity with access to the company's stock with the understanding that a portion of the proceeds derived from the sale of such stock will be returned to the company. The practice is not unlawful *per se*.   However, such "round tripping" may run afoul of the federal securities laws if the stock proceeds that are generated from securities transactions that involve unregistered securities that are not deemed lawfully exempt from registration.   The "round tripping" may, under certain circumstances, also be required to be disclosed under the federal securities law or accounting principles.

[22]    Dittman and Sears also created the misimpression that Sears had no affiliation with Bayside.   On December 17, 2012, Sears emailed the FusionPharm transfer agent claiming that Bayside was a "family member['s] company" and that he would be the "point person" for the transaction.   Dittman was cc'd on the email and followed up by writing the transfer agent to "[p]roceed with haste as directed" by "Mr. Sears."

[23]    Notably, for most of this period, FusionPharm had approximately 3 million shares of common stock outstanding, meaning that for most of the period Bayside could not have sold more than 30,016 shares of FusionPharm common stock.   Given that the three month window can be calculated using different dates, the actual figure that Bayside could have sold during the February-April 2013 window is almost assuredly less than 52,016 for most of the period.   Either way, Bayside violated the volume restrictions.

Dittman and Sears again made false representations to the transfer agent as to Bayside's affiliate status.

32.     Once Sears sold the remainder of the Bayside debt, Sears and Dittman turned to utilizing the Meadpoint Convertible Note.   Between March 2013 and April 2014, Sears, though Meadpoint, converted $42,450 of purported debt into 4.245 million FusionPharm common shares. Sears, with Dittman's knowledge, sold approximately 3.2 million of those shares in the market. Meadpoint still holds the remainder of those shares.

33.     The Meadpoint conversions were documented similarly to the Bayside conversion. The packages that Sears submitted to the transfer agent included similar false documents, including: (1) the backdated Meadpoint Convertible Note and deposit details listed above; (2) a letter from Meadpoint attesting that it was not an affiliate (signed by Sears); (3) a separate Statement of Non-Affiliate from Meadpoint (signed by Sears); (4) a FusionPharm Officer's Certificate, Written Consent, and letter (all signed by Dittman) stating that Meadpoint (and derivatively Sears) were not affiliates and that the Meadpoint Convertible Note was a valid obligation of the company.   As with the Bayside converted shares, the backdated nature of the Meadpoint Convertible Note misled the transfer agent into believing the holding period had been satisfied as to all debt obligations reflected in the Note.

34.     FusionPharm's transfer agent emailed Dittman in February 2014 in response to one of the Meadpoint conversion requests.   The transfer agent employee wrote that he had concerns about the conversion because Sears requested the conversion on Meadpoint's behalf, and the transfer agent had Sears listed as an Administrative Officer of FusionPharm (*see* ¶ 5 above). Dittman falsely responded to the transfer agent that Sears had never been employed by FusionPharm (when, in truth and in fact, he had been employed directly by FusionPharm) and was not an affiliate.   (*See* ¶¶ 5, 8-10 above).   Meadpoint was, however, an affiliate of FusionPharm.

35.     As with the Bayside Convertible Note, Sears and Dittman also used the Meadpoint Convertible Note to obtain cash from outside investors.   Rather than selling debt, however, Sears converted $15,000 of debt under the Meadpoint Convertible Note into 1.5 million shares of FusionPharm common stock.   Sears, with some assistance from Dittman, then sold the 1.5 million shares to three investors in August 2013 for $184,831.   These three investors received unrestricted shares based on Dittman's and Sears' false representations to FusionPharm's transfer agent (*see* ¶¶ 31-36 above).

36.     Meadpoint received $273,210 in proceeds from the sale of stock derived from the Meadpoint Convertible Note, and an additional $184,831 from the three investors detailed in ¶ 36 above, for a total of $458,041.   This amount constituted the primary source of the funds that Meadpoint transferred to FusionPharm that year—again reflecting that stock sale proceeds were used by Meadpoint finance the construction of pods in 2013.   *See also* ¶ 54 below for other proceeds that passed through the Meadpoint account.

37.     In 2014, after the passage of Amendment 64 in Colorado, legalizing recreational usage of marijuana, FusionPharm's share price and trading volume spiked.[24]   From January through May, 2014, Meadpoint received $9.9 million in proceeds from the sale of stock derived from the Meadpoint Convertible Note.   While some of this amount was transferred to FusionPharm in 2014, the majority – approximately $8.7 million - was seized by the government in May 2014.

38.     In total, from approximately April 28, 2011 through May 8, 2014, Sears, in consultation with Dittman, sold more than 4 million shares of FusionPharm stock through the

---

[24]     The average price of FusionPharm shares from May 2011 through December 2013 was $1.46; the average share price from January 2014 until the SEC suspended trading on May 16, 1014 was $4.28.   Average trading volume during the two periods was 20,773, and 781,800 respectively.

Facilitating Entities and acquired more than $12.2 million in stock sale proceeds: $2.2 million prior to the passage of Amendment 64; $9.9 million in the months immediately following the passage of Amendment 64.    Sears transferred the overwhelming majority of these funds (more than $8.4 million) to a brokerage account he controlled in the name of Family Member A. Although the proceeds were held in an account controlled by Sears, Dittman and Sears treated these proceeds as theirs collectively.    For example, on September 6, 2011, Dittman asked Sears in an email, "what do *we* have in microcap now?"   In addition, on May 15, 2014, Dittman sent an email to a contact in the real estate industry specifically referencing the funds held in the brokerage account, writing "*We* have proof of funds for upward approx. $8 million today (liquid) and have access to more.    *We* would like to write contracts on as many properties as is possible/feasible/reasonable…"

39.    Sears and Dittman also used significant portions of the stock sale proceeds for their own personal benefit.   For example: (a) $688,000 was used to purchase Dittman's home in Pennsylvania; (b) Sears paid off his home in Denver and a condo in Westminster, CO; (c) Sears purchased expensive watches; and (d) Dittman and Sears used $250,000 as a down payment on a Denver warehouse as part of another planned business venture.

**FusionPharm Falsely Reports Proceeds from Stock Sales as Revenue, and Fails to Disclose Sears and Facilitating Entities as Affiliated and Related Parties**

40.    In addition to the funds Dittman and Sears used for their own personal benefit, they also round-tripped over a million dollars of stock sale proceeds back to FusionPharm, most of which was booked as company revenue, and the rest as loans.   In this manner, Dittman and Sears consistently transferred a portion of a given week's trading proceeds to FusionPharm.   On certain occasions, they even used a formulaic breakdown for the proceeds.   For example, on July 2, 2012, Sears emailed Dittman with specific figures from the prior week's trading whereby after

30

deducting certain funds for commissions to stock promoters and Sears's cut, the net was to be sent to FusionPharm.

41.     Dittman and Sears used the stock sale proceeds transferred to FusionPharm to sustain FusionPharm's business.   Much of the funds were portrayed as involving transactions with Meadpoint and VertiFresh.   As their business operations got underway, Dittman and Sears had agreed to form entities to act as intermediaries with respect to FusionPharm's ultimate customers, one entity devoted to customers whose intended use of the PharmPods was in connection with the cannabis cultivation and the other with respect to a business devoted to using the PharmPods for growing non-cannabis produce (primarily, lettuce).   Meadpoint was formed for the former purpose and as FusionPharm's 'exclusive distributor' of PharmPods.   VertiFresh was formed for the latter purpose and, as Dittman and Sears started growing lettuce in PharmPods that they kept at FusionPharm's business premises, they began to market sale of this produce to local restaurants and retailers under the name "VertiFresh." As indicated above, the affairs and operation of all three entities – FusionPharm, Meadpoint and VertiFresh – were comingled and all three entities were jointly operated, as a matter of fact, by Sears and Dittman in concert.[25]

42.     As they sought to develop their business and find and sell PharmPods to cannabis growers and lettuce to ultimate customers, Sears and Dittman undertook to use the FusionPharm stock sales proceeds being generated by Sears through the various Facilitating Entities as a basis to claim revenues for FusionPharm.   Dittman booked money being received by FusionPharm from

---

[25]     Both defendant Sears and co-defendant Dittman maintain, and would adduce evidence to establish, that they formed these entities to act as intermediaries on the advice of counsel, including Counsels A and B, prompted, in substantial part, out of a desire to insulate FusionPharm and its customers from regulatory risk related to cannabis cultivation and to avoid potential federal civil and criminal liability relating to the cannabis industry.

The defendants would acknowledge and concede that the corporate form was disregarded in conducting the operations of these entities and that they failed to disclose facts to the investing public and securities regulators that would have revealed that the entities were interrelated operationally and in other ways not visible to the investing public.

the stock sales proceeds as FusionPharm revenue and the two, together, used Meadpoint and/or VertiFresh to construct revenue generating transactions prior to the actual sale and distribution of the PharmPods to the end-users.[26]

FusionPharm's Overstated 2011 Revenues

43.    FusionPharm's financial disclosures were made available to investors via OTC Link.  FusionPharm's Annual Information and Disclosure Statement, financial statements, and notes to the financial statements for the period ended December 31, 2011, signed by Dittman ("FusionPharm's 2011 Annual Report"), was posted on OTC Link on March 31, 2012.  Dittman was primarily responsible for preparing FusionPharm's 2011 Annual Report, although he consulted with other individuals regarding the content, including Sears[27].

44.    In the FusionPharm 2011 Annual Report, FusionPharm claimed $256,895 in revenue for the fiscal year.  FusionPharm's accounting records reflected $226,895 in "licensing revenue" from Meadpoint in 2011, purportedly related to Meadpoint's role as FusionPharm's exclusive distributor of cannabis PharmPods.   However, FusionPharm's accounting records, bank accounts and general ledger reveal that the overwhelming majority of funds that went into FusionPharm's bank accounts in 2011 came from Microcap stock sales.    Dittman caused FusionPharm to book the majority of the stock sale proceeds from Microcap as revenue months in advance of securing signed contracts from actual PharmPod customers by Meadpoint.[28]   The

---

[26]    Sears contends that he was not ultimately responsible for deciding how revenue should be booked and the contents of Financial statements and disclosures.

[27]    Sears contends that he did not provide substantive comments or feedback on FusionPharm's financial statements.   The Government contends that there are numerous emails where Dittman requested that Sears review the company's financial statements.

[28]    Records reflect that in 2011, several PharmPods were intended to be leased to a Denver medical marijuana grower via Meadpoint.   However, the actual transaction between Meadpoint and the grower, which ended up being a sale and not a leasing agreement, between Meadpoint and the marijuana grower did not occur until early 2012.

remainder of the these transfers served as the purported basis for the Meadpoint and Bayside Convertible Notes (*see* ¶¶ 23-27 above).

45.     At no point in FusionPharm's 2011 Annual Report did FusionPharm disclose Sears's role with both Meadpoint and FusionPharm, or Dittman's affiliation with Meadpoint. (*See* ¶¶ 8-10, 21 above).   Additionally, contrary to its representations, FusionPharm failed to identify its transactions with Meadpoint or Sears as: (a) material transactions with any director or executive officer (even though Sears satisfied this by his *de facto* role as an officer of FusionPharm); (b) transactions by any person beneficially owning shares carrying more than 5% of voting rights (which Sears did via his preferred share ownership); or (c) transactions with any member of the immediate family (including in-laws) of any director or executive officer (which Sears satisfied as Dittman's brother-in-law).[29]

## FusionPharm's Overstated & Fictitious 2012 Revenues

46.     FusionPharm's Annual Information and Disclosure Statement, financial statements, and notes to the financial statements for the period ended December 31, 2012, signed by Dittman ("FusionPharm's 2012 Annual Report"), were posted on OTC Link on March 6, 2013.

---

Likewise, the payment and delivery of these PharmPods did not occur until 2012.   According to FusionPharm's 2011 Annual Report, FusionPharm "records revenue when all of the following have occurred: (1) persuasive evidence of an arrangement exists, (2) product delivery has occurred, (3) the sales price to the customer is fixed or determinable, and (4) collectability is reasonably assured." Dittman contends that the sale on which revenue was recognized for 2011 was to Meadpoint.   In 2011, the Government contends that none of these requirements were met with respect to the transaction at issue. Dittman contends that as the sale on which revenue was recognized in 2011 was to Meadpoint, all of these requirements were met, while conceding that disclosures concerning related party transactions that may have been required as to this transaction under GAAP given Meadpoint's *de facto* status may not have been met.

[29]     As discussed above (FN 5), OTC Link published guidelines for its issuers to use in connection with its voluntary disclosures.   These guidelines included disclosures of the identities of officers, directors and control persons (defined to be beneficial owners of more than 5% of any class of the issuer's equity securities); and the identities of beneficial owners of more than 10% of any class of the issuer's equity securities.   The OTC Link published guidelines also called for the provision of financial statements prepared in accordance with GAAP, which would have required disclosure of related party transactions.

Dittman was primarily responsible for preparing FusionPharm's 2012 Annual Report, although he consulted with other individuals regarding the content, including Sears.

47.     In its 2012 Annual Report, FusionPharm claimed $808,398 in revenue. FusionPharm stated that $750,000 of this revenue resulted from a license agreement with VertiFresh.[30]   As detailed above, Sears and Dittman[31] owned and/or controlled both entities (a fact never disclosed to investors),   meaning the transaction was essentially one party transacting with itself.  (*See* ¶¶ 8-10, 20 above).[32]   During the Relevant Period, VertiFresh only generated nominal revenue from lettuce sales.

48.     More than a year after the filing, FusionPharm voluntarily restated its 2012 financial statements and represented that $500,000 of the $750,000 revenue related to the VertiFresh license agreement should not have been recognized.   FusionPharm maintained, however, that the other $250,000 was legitimate revenue.   This was also materially overstated. Even if VertiFresh was a separate entity and even if it received anything of value in connection with the agreement, VertiFresh transferred only $147,475 into FusionPharm's bank account in 2012, not $250,000.00 as it agreed to do in 2012.  As in 2011, *all* of these funds can be traced

---

[30]     A comparison of FusionPharm's quarterly financial disclosures demonstrates similar misrepresentations. FusionPharm's first quarter financial disclosures (filed on June 12, 2012) claimed $71,800 in revenue.   Yet, FusionPharm's second quarter financial disclosures (filed on August 14, 2012) claimed $750,000 in revenue, all from the purported VertiFresh agreement meaning FusionPharm's claimed Q1 revenue disappeared without any disclosure to investors.   In fact, FusionPharm's non-VertiFresh revenue for all of 2012 was $58,398, more than $10,000 less than purported Q1 revenue.

[31]     Sears contends that Dittman did not own or control Meadpoint or Vertifresh.

[32]     Consistent with FusionPharm's 2011 Annual Report, FusionPharm's 2012 Annual Report failed to disclose Sears's role with FusionPharm or Dittman's affiliation with and/or control of VertiFresh.

directly back to Microcap's stock sale proceeds.[33]   Once again, FusionPharm booked proceeds from FusionPharm stock sales by Facilitating Entities as FusionPharm revenue.

49.    The 2012 Annual Report went on to claim that Meadpoint and VertiFresh had committed to placing orders for more than $3 million worth of PharmPods over the next three years.[34]

FusionPharm's Overstated 2013 Revenue

50.    FusionPharm's Annual Information and Disclosure Statement, financial statements, and notes to the financial statements for the period ended December 31, 2013, signed by Dittman ("FusionPharm's 2013 Annual Report"), were posted on OTC Link on April 15, 2014. Dittman was primarily responsible for preparing FusionPharm's 2013 Annual Report, although he consulted with other individuals regarding the content, including Sears.

51.    FusionPharm claimed $594,397 in revenue for 2013.  As they did in 2011 and 2012, Sears and Dittman used significant portions of stock sale proceeds back to funds revenue transactions between FusionPharm and Facilitating Entities.[35]   For example, between February 6, 2013 and February 8, 2013, Sears transferred $235,000 from Bayside bank accounts to Meadpoint, all of which were provided by investors in connection with the sale of the Bayside note.  (*See* ¶ 30 above).   During the same time period, Meadpoint transferred at least $170,000

---

[33]    The other amounts that flowed into FusionPharm's bank account in 2012 were actually from Bayside, Microcap, and Meadpoint. Once again, all of these transfers are traceable to FusionPharm stock sales.

[34]    Dittman asserts he terminated the agreement in 2014 for failure to meet performance goals.

[35]    Although Meadpoint did transfer over $728,000 into FusionPharm's bank account in 2013, over $550,000 of that were proceeds traceable to stock sales.  As in 2011, Dittman and Sears had third party customers in mind when they built these pods.   However, most of these pods were not transferred to third-parties until after 2013.   Based upon the government's bank record analysis, FusionPharm received a maximum of $194,000 from third-party customers in 2013.

of these funds to FusionPharm. According to FusionPharm's general ledger, these transfers were booked as revenues. Sears and Dittman did something similar with stock sale proceeds funneled through a company they both owned. According to FusionPharm's general ledger, at least $50,000 in March 2013 checks from this company were also booked as revenues.[36]

52.     Dittman and Sears also transformed investments from direct investors directly into purported FusionPharm revenue by passing the money through accounts in the name of the Facilitating Entities. For example, on August 5, 2013, Dittman sent a potential investor an email with a proposed investment deal. Dittman offered the investor an opportunity to purchase $50,000 worth of preferred shares in FusionPharm and purchase $50,000 of Meadpoint's Convertible Note. With regard to the proposed purchase of the Meadpoint Convertible Note, Dittman claimed that "Meadpoint would use its $50,000 to purchase the 2 containers referenced above…" meaning that investor's funds would flow through Meadpoint to be booked as revenues by FusionPharm. Dittman summarized the proposed $100,000 investment by claiming "[t]hus, all funds would end up in FusionPharm, $50,000 as an investment and $50,000 as sales revenue for the 2 containers." The investor ultimately invested $100,000 and, as proposed, $50,000 of this investment was used for two PharmPods that were placed in FusionPharm's sales center and booked as part of FusionPharm's revenue for 2013.

53.     Furthermore, Dittman reiterated the misrepresentation set forth in the 2012 Annual Report that Meadpoint and VertiFresh were independent entities that promised to purchase dozens of PharmPods in the future. For example, on February 18, 2013, Dittman drafted an email for Co-Conspirator A to send to prospective investors that stated, among other things: (a) Meadpoint is FusionPharm's exclusive distributor with minimum purchase requirements of 50

---

[36]     Notably, the notations on these checks were for "Convertible Promissory Note."

PharmPods/year; and (b) VertiFresh is a Denver licensee that paid $250,000 in 2012 for a license and 4 PharmPods, and was expected to purchase another 6 PharmPods in 2013.[37] However, Dittman did not disclose the relationships that he and Sears had with and in Meadpoint and VertiFresh in that email. Co-Conspirator A ultimately sent the email to prospective investors.

**The Origins of the Criminal Investigation**

54. The foregoing matters became the focus of a federal criminal investigation in the District of Colorado that, in turn, arose from a referral in December 2013 from the SEC's Regional Office in Denver, Colorado, after the agency received a complaint from a former FusionPharm worker, alleging that FusionPharm was engaged in fraud. The agency commenced its own parallel civil investigation.

55. Following the referral, from on or about March 28, 2014 through on or about July 18, 2014, the FBI conducted an undercover operation as part of the investigation into FusionPharm. During this time, Dittman met with an undercover FBI agent posing as a potential FusionPharm investor on four separate occasions. Sears also met with the undercover agent on one occasion. Over the course of these undercover encounters, Sears and Dittman variously acknowledged Sears' control of Meadpoint and VertiFresh. Sears also candidly discussed his involvement in FusionPharm, at one point remarking to the FBI undercover agent that, when it came to FusionPharm, he was the "hand up Mona Lisa's skirt." In a final meeting with the FBI undercover agent, Dittman at one point acknowledged that Sears could not be in the company (FusionPharm) because of his prior felony conviction in New York.

56. As a result of its preliminary investigative findings, the SEC suspended trading in FusionPharm's stock on May 16, 2014. The same day, the FBI and IRS-CID executed a federal

---

[37] Sears was not on the email exchanges between Dittman and the investor, and Dittman and co-conspirator A, which are referenced in ¶¶ 53 and 54.

search warrant on FusionPharm's principal place of business. The FBI seized 24 items of evidence including six computers and one tablet. The FBI also executed seizure warrants on four bank accounts and one brokerage account containing proceeds from the sale of FusionPharm stock.

### IRS Tax Investigation

57.     The government's investigation was expanded to include criminal violations of the Internal Revenue Code. The government analyzed bank and brokerage accounts held by the Defendants, Family Member A, and Facilitating Entities, interviewed several witnesses and reviewed the other evidence obtained through the investigation. This information was then compared to records maintained by the Internal Revenue Service.

58.     Even though Sears and Dittman treated the proceeds of the FusionPharm stock sales as theirs collectively (*see* ¶ 40 above), the government's investigation for tax violations focused on Sears individually because Sears controlled the accounts of the Facilitating Entities where the FusionPharm stock sales occurred. Sears' ownership and control of the entities included brokerage accounts and bank accounts in the name of the entities. Accordingly, for tax purposes, such proceeds were considered income to Sears. However, neither Sears nor anyone else for that matter ever claimed the FusionPharm stock sale proceeds as income on their tax returns.

59.     Based on the information set forth herein, Sears willfully failed to report federal capital gains generated from the sale of stock through the Facilitating Entities as well as capital gains generated from sales occurring in his personal E*TRADE account. Sears also failed to pay taxes on capital gains generated at the brokerage account level.

60.     As set forth below, the criminal tax loss associated with Sears for tax years 2011 through 2014 is $2,433,818.00.

**2011 Tax Year**

61.     For tax year 2011, Sears subscribed to and filed with the Internal Revenue Service, a 2011 Federal Form 1040EZ, *Income Tax Return for Single and Joint Filers with No Dependents,* where he claims to have earned $7,500 in wages from FusionPharm, Inc.

62.     During 2011, Sears sold shares of stock through accounts held in the name of Microcap and his personal E*TRADE account for a total of $1,245,631.50[38] which resulted in a tax due and owing to the government in the amount of $315,843.00.

**2012, 2013 and 2014 Tax Years**

63.     For tax years 2012, 2013, and 2014, Sears failed to file individual income tax returns with the Internal Revenue Service.[39] Microcap, Bayside, and Meadpoint also failed to file tax returns from 2011 through 2014.

64.     For tax year 2012, Sears sold shares of FusionPharm stock through brokerage accounts held in the name of Microcap and his personal E*TRADE account for a total of $484,871.43 which resulted in a tax due and owing to the government in the amount of $89,867.00.

65.     During 2013, Sears caused the sale of FusionPharm shares in the amount of $350,328.95 through brokerage accounts held in the name of Bayside, Meadpoint, and his personal E*TRADE account. The tax due and owing to the government for tax year 2013 is $55,698.00.

66.     For tax year 2014, Sears caused the sale of FusionPharm shares in the amount of $9,915,715.26 through brokerage accounts in the name of Meadpoint.   The tax due and owing to the government for tax year 2014 is $1,972,410.00.

---

[39]     Over $1.1 million of 2011 stock sales were derived from shares of FusionPharm. The remainder of the 2011 stock sales was generated by shares of other entities.

[40]     For tax years 2012, 2013 and 2014, the FusionPharm stock sales by Facilitating Entities triggered an individual filing requirement for Sears.

## Government's Financial Analysis and Ill-Gotten Gain Calculations

67.     The government analyzed bank and brokerage accounts in the name of the Defendants, FusionPharm, Family Member and the Facilitating Entities, along with various documents provided by FusionPharm's transfer agent to determine the amount of funds obtained by the Defendants.  The ill-gotten gains by the Defendants total approximately $12.2 million based on the proceeds of the unregistered sales of FusionPharm common stock.  The parties recognize, however, that as much as $9.9 million was generated immediately following the effective date of Amendment 64.   The government also identified the following:

    a.   The government seized approximately $269,616 from various bank accounts, all traceable to FusionPharm stock sales.   Additionally, the government seized approximately $8,462,621 in a brokerage account in the name of Family Member A.

    b.   Since the original execution of the search and seizure warrants, on November 30, 2015, the government received $311,865.38 in relation to the sale of Sears's home. Additionally, on January 13, 2016, the government received an additional $85,859.00 in relation to the sale of a warehouse located at 4360 Vine Street in Denver, Colorado.   The government received these funds pursuant to a consent agreement signed by Sears on November 25, 2015.

    c.   Proceeds from the sales of FusionPharm stock were transferred to FusionPharm, and reported as revenue, in an amount of approximately $1.3 million.

    d.   Meadpoint still holds 1,072,270 FusionPharm common shares.

e.   Between 2011 and 2014, Dittman received approximately $330,000 in salary and other payments from FusionPharm and the Facilitating Entities.  In addition, on May 15, 2014, Sears transferred to Dittman $688,000, which he used to purchase a house in Pennsylvania; these funds are traced back to FusionPharm stock sales.

## VI.   ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

**Advisory Guideline Computations.**

### Count 1 (Conspiracy).

A.   The base guideline is U.S.S.G. Section 2X1.1(a), which adopts the base offense level from the guideline for the substantive offenses which are the objects of the conspiracy, plus any adjustments from such guideline for intended offense conduct that can be established with reasonable certainty.   The base guideline for the substantive offenses which are the objects of the conspiracy set forth in Count 1 of the Contemplated Information is U.S.S.G. Section 2B1.1

B.   The Base Offense Level for these object offenses under Section 2B1.1 is offense level **6**, because 18 U.S.C. § 371 carries a maximum term of imprisonment that is less than twenty years.

C.     Specific Offense Characteristic 2B1.1(b)(1), applies in this case because there was a loss resulting from the offense conduct.   The parties agree, however, that such loss reasonably cannot be determined and that the gain that resulted from the offense conduct should instead be used as an alternative measure of loss for the purpose of determining this offense characteristic. *See* U.S.S.G. Section 2B1.1, comment. (n.3(B)).   The parties further agree that the gain that resulted from the offense conduct corresponds to the total in proceeds realized from the sale of FusionPharm common stock and debt securities convertible into common stock through Microcap, Bayside, and Meadpoint, which is approximately $12,204,172, greater than $9,500,000 but not more than $25,000,000, which would increase the offense score **20 levels**, pursuant to U.S.S.G. Section 2B1.1(b)(1)(K).

D.     Specific Offense Characteristic 2B1.1(b)(2)(A) applies because the offense conduct involved 10 or more victims, and was committed through mass marketing, increasing the Offense Level by **2 Levels**.

E.     Specific Offense Characteristic 2B1.1(b)(10)(C) applies because the offense conduct involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting the sophisticated means, warranting an additional **2 Level** increase in the defendant's Offense Level score, pursuant to this provision.

F.     The government's position is that the defendant's Offense Level score should be increased **4 additional levels**, pursuant to U.S.S.G. § 3B1.1(a), because the defendant acted as an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

G.     The parties believe that there are no other victim-related, role-in-offense, obstruction adjustments which apply with respect to the offense conduct associated with this count of conviction. U.S.S.G. Parts 3A-3C.

H.   The Total Offense Level for the conspiracy offense of conviction would accordingly be Level **34**.

**Count 2 (Filing False Tax Return).**

I.   The base guideline for the tax offense set forth in Count 2 of the Contemplated Information is U.S.S.G. Section 2T1.1, which adopts, for its base offense level, the offense level from the tax table set forth in U.S.S.G. § 2T4.1 for cases involving tax losses.  The government has calculated the tax loss associated with the defendant's offense of conviction and relevant conduct to be approximately $2,433,818 for the years 2011 through 2014. Accordingly, the base offense level is **Level 22,** based on the government's tax loss calculations (U.S.S.G. § 2T4.1(I)(tax loss more than $1,500,000 but not more than $3,500,000)).

J.   Specific Offense Characteristic Section 2T1.1(b)(1) applies, increasing the defendant's offense score by **2 levels**, because he failed to report or to correctly identify as a source of income on his federal income tax returns or other return with the IRS, in excess of $10,000 he received from the criminal activity which is the subject of the conspiracy offense of conviction set forth in Count 1 of the Contemplated Information.

K.   Specific Offense Characteristic Section 2T1.1(b)(2) applies, increasing the defendant's offense score by **2 additional levels**, because the offense conduct involved sophisticated means.

L.   The parties agree that there are no victim-related, role-in-offense, obstruction adjustments related to this offense of conviction which apply in this case. U.S.S.G. Parts 3A-3C. Therefore, the Total Offense Level for the tax offense of conviction would be **Level 26**.

**Multiple Counts Adjustment.**

M.   The parties agree that the conspiracy offense of conviction and the tax offense of conviction and their associated relevant offense conduct constitute two distinct sentencing groups

43

subject to a Multiple Count Adjustment, pursuant to U.S.S.G. Part 3D.

     N.     The conspiracy offense of conviction and its relevant conduct constitute 1 unit, pursuant to U.S.S.G. Section 3D1.4(a), as this group carries the highest offense level. The tax offense of conviction and its relevant conduct would constitute ½ unit, pursuant to Section 3D1.4(b), as that group carries an offense level that is 8 levels lower than the offense level for the conspiracy offense of conviction. There being a total of 1-1/2 units, **1 additional offense level** would be added to the offense level score for the conspiracy offense of conviction, giving the defendant an overall Total Offense Level of **35**.

     **Final Total Offense Level**.

     O.     The defendant is eligible to receive a **3-level** offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1 based on his timely notification of his intention to resolve this case by guilty plea. The resulting offense level, based on the government's current calculations, would therefore be **Level 32**.

     **Criminal History**.

     P.     The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court. The defendant has a prior conviction and one month sentence for conspiracy to commit securities fraud and commercial bribery and for securities fraud, which the parties believe is includable in his criminal history score. The parties believe that this prior sentence carries one criminal history point, with no other includable criminal history, classifying the defendant in Criminal History **Category I**, if no other information were discovered.

     Q.     Assuming the (tentative) criminal history facts of (P) above, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

**Resulting Guideline Range**.

R.       The guideline range resulting from the estimated offense level of (O) above, and the (tentative) criminal history category of (P) above, would be **121-151** months without regard to the statutory maximum imprisonment terms for Counts 1 and 2 of the Contemplated Information. With the criminal history category undetermined at this time, an estimated offense level 32 above could conceivably result in a range from 121 months (bottom of Category I), to 262 months (top of Category VI).   Because the statutory maximum sentence is deemed to be the guideline sentence as well where the otherwise applicable sentencing guideline range would exceed the statutory maximum sentence, U.S.S.G. § 5G1.1(a), the guideline sentence in this case effectively would be **96 months**, the maximum statutorily authorized imprisonment term assuming the statutory maximum terms of imprisonment for each of the counts of the Contemplated Information were imposed consecutive to one another.

**Additional Matters**.

S.       Pursuant to guideline § 5E1.2, assuming the government's estimated offense level of (O) above, the fine range for the offenses of conviction would be $35,000 to $350,000, plus applicable interest and penalties.

T.       Pursuant to guideline § 5D1.2, if the Court imposes the term of supervised release, that term shall be at least three years but not more than five years.

U.       Restitution is either mandatory under U.S.S.G. § 5E1.1(a)(1) or otherwise contemplated under U.S.S.G. § 5E1.1(a)(2).   The Court may determine not to order restitution or to limit restitution   where, *inter alia*, the Court determines that complication and prolongation of the sentencing process resulting from the fashioning of a restitution requirement outweighs the need to provide restitution to any victims through the criminal process (U.S.S.G. § 5E1.1(b)).   The parties agree that restitution should not be imposed with respect to the conspiracy count of

conviction and offense conduct but should be imposed with respect to the tax offense count of conviction and offense conduct.

**3553 Advisement**.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

Except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, except as otherwise provided for by the parties in their plea agreement (Part I herein), no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.[40]

Date: _9-15-16_        _____

William J. Sears
Defendant

Date: _____        _____

Marci Gilligan LeBranche, Esq.
Attorney for Defendant Sears

Date: _9/15/16_        _____

Frederic M. Winocur, Esq.
Attorney for Defendant Sears

Date: _9/15/16_        _____

Kenneth M. Harmon
Assistant U.S. Attorney

Date: _____        _____

Tonya S. Andrews
Assistant U.S. Attorney

Date: _____        _____

Scott M. Mascianica
Special Assistant U.S. Attorney

---

[40]   This plea agreement expressly supersedes, and renders inoperative, the plea terms letter agreement letter, dated May 25, 2016, previously executed by counsel for the parties, a copy of which letter is annexed hereto as Exhibit B.

## VII.   **ENTIRE AGREEMENT**

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.[40]

Date: _9-15-16_

_____
William J. Sears
Defendant

Date: _____

_____
Marci Gilligan LeBranche, Esq.
Attorney for Defendant Sears

Date: _9/15/16_

_____
Frederic M. Winocur, Esq.
Attorney for Defendant Sears

Date: _9/15/16_

_____
Kenneth M. Harmon
Assistant U.S. Attorney

Date: _9/18/2016_

_____
Tonya S. Andrews
Assistant U.S. Attorney

Date: _____

_____
Scott M. Mascianica
Special Assistant U.S. Attorney

---

[40]      This plea agreement expressly supersedes, and renders inoperative, the plea terms letter agreement letter, dated May 25, 2016, previously executed by counsel for the parties, a copy of which letter is annexed hereto as Exhibit B.



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No.

UNITED STATES OF AMERICA

       Plaintiff,

v.

1.    WILLIAM J. SEARS, and
2.    SCOTT M. DITTMAN,

       Defendants.

---

## INFORMATION
### 18 U.S.C. §371
### 26 U.S.C. §7206(1)

---

The Acting United States Attorney charges that:

### COUNT 1

1.     Beginning as early as in or about March 25, 2011 and continuing at least through in or about May 15, 2014, the exact dates being unknown, in the State and District of Colorado, and elsewhere, the defendants,

**WILLIAM J. SEARS, and**
**SCOTT M. DITTMAN,**

did knowingly and willfully conspire, combine and agree with each other, and with other persons both known and unknown,

    (a) to defraud the United States and one of its agencies, the United States Securities and Exchange Commission ("SEC"), by impeding, impairing, defeating and obstructing the lawful

1

**EXHIBIT A**

governmental functions of the SEC; and

(b) to commit the following offenses against the United States:

(i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5];

(ii) willful violations of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a);

(iii) mail fraud, in violation of Title 18, United States Code, Section 1341; and

(iv) wire fraud, in violation of Title 18, United States Code, Section 1343.

## Background

At all times material to this Information:

2. Defendant WILLIAM J. SEARS was a resident of Thornton, Colorado whose principal occupation over the years was providing public relations and promotional services to companies with low or minimal capitalization (hereinafter, "microcap companies") that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets. In 2007, defendant Sears was convicted in the Southern District of New York of one count of conspiring to commit federal securities fraud and commercial bribery and one count of federal securities fraud (Case No. 04-cr-556-swk).

3. Microcap Management LLC ("Microcap") was a Nevada limited liability company formed by defendant SEARS, with its primary business address in Colorado. Defendant SEARS was, among other things, the beneficial owner and manager of Microcap and controlled Microcap. SEARS primarily conducted his stock public relations and promotional business through Microcap over the years.

2

4.     Bayside Realty Holdings, LLC ("Bayside") was another Nevada limited liability company formed, controlled and operated by defendant SEARS, in fact, but which was held out to be managed and owned by a blood relative family member (hereinafter, "Family Member A") residing in North Carolina.

5.     Defendant SCOTT M. DITTMAN was a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania.   From October 1991 until April 1995, DITTMAN practiced as an accountant and for two years, from 1995 to 1997, had been a certified public accountant licensed in the State of California. Thereafter, defendant DITTMAN was principally self-employed in various businesses, including real estate development, construction and, beginning in or about 2010, medical marijuana. Defendants DITTMAN and SEARS were brothers-in-law, SEARS being married to DITTMAN's sister.

6.     FusionPharm, Inc. ("FusionPharm") was a Nevada corporation with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado. FusionPharm's principal business was the development, manufacture and sale of steel shipping containers retrofitted and refurbished for use as hydroponic growing pods, branded as "PharmPods," for indoor plant cultivation, primarily cannabis. Defendant DITTMAN was the founder, chief executive officer and sole director of FusionPharm but, in fact, operated FusionPharm, and pursued and developed its business, together and in concert with defendant SEARS, and the two defendants together beneficially held and controlled the majority of the shares of FusionPharm's common and preferred stock, which was convertible into the company's common stock.   FusionPharm's common stock was publicly traded in the over-the-counter markets, primarily through transactions involving networks of securities broker-dealers.

3

7.     Meadpoint Venture Partners, LLC ("Meadpoint") was a Nevada limited liability company formed by defendant SEARS and was held out to be FusionPharm's exclusive distributor of PharmPods, marketing, in particular, to customers interested in using the pods for cannabis cultivation.   Meadpoint shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm. Defendant SEARS was identified as Meadpoint's managing member, and Meadpoint was operated by both defendants together in conjunction with the operations of FusionPharm.

8.     VertiFresh, LLC ("VertiFresh") was a Delaware limited liability company jointly owned and controlled together by defendants SEARS and DITTMAN.   Vertifresh was held out to be a licensee of FusionPharm's technology and growing methods whose principal business purportedly involved using FusionPharm PharmPods to grow non-cannabis produce (primarily, lettuce) for sale to restaurants and retail food outlets. Vertifresh shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm.

9.     OTC Link was an electronic inter-dealer stock quotation system that published stock quotes and other stock transaction information posted by securities broker-dealers and was typically used by broker-dealers to display quotes and make markets in securities of publicly traded microcap companies whose securities were traded in the over-the-counter markets.   Such companies did not have to meet any requirements in order to have their stocks quoted on the OTC Link system, and any reporting or disclosure by companies whose stocks were quoted on the system was voluntary.   However, the OTC Link system organized and classified the securities of the companies quoted on its system into several distinct marketplaces or "market

4

tiers," depending, in large part, on the nature, quality and extensiveness of the corporate and financial disclosures a company provided to OTC Link. The "market tiers" were designed to provide investors some indication as to the quality and level of information about the companies on the OTC Link system, and companies that provided limited or no information were placed in market tiers reserved for stock issuers that prospective investors were advised to consider with caution. The type of information that participating companies were encouraged to provide to OTC Link typically included quarterly and annual financial statements and quarterly and annual reports, in a prescribed format, providing disclosure, among other things, about the officers, directors, control persons and significant beneficial owners of the company's stock. These quarterly and annual submissions were uploaded to OTC Link's website, where they were readily accessible to the investing public and subject to wide dissemination through financial media outlets.

10.     FusionPharm's common stock was quoted on the OTC Link under the stock symbol "FSPM" and, using this system, securities broker-dealers made a market in and facilitated public, over-the-counter trading in its stock.   FusionPharm undertook to, and regularly did, upload to the OTC Link's website, and thereby made available to the investing public, quarterly and annual financial statements and reports providing information about its performance, its financial condition and the identities of its officers, control persons and significant stockholders.

11.     The SEC was an independent agency of the executive branch of the United States Government whose duties included regulating and monitoring the trading of securities and the

reporting of financial and other information by publicly-held corporations within the United States.

12.     Under the federal securities laws, the securities of companies traded in United States could not be bought and sold in public transactions unless first registered with the SEC or considered exempt from registration pursuant to one of several defined statutory or regulatory provisions.   Such registration typically involved providing to the SEC and making available to the investing public certain specified information about the company, its financial situation, its operations and its principals and officers, in a prescribed form filed with the SEC which typically included a prospectus made available to potential investors.   Securities that were unregistered, and not otherwise exempt from registration, were considered restricted securities that were not eligible for lawful public re-sale, and the certificates evidencing these securities typically bore a legend providing notice of this status.

13.     One of the exemptions from registration recognized under the federal securities laws generally allowed holders of unregistered securities, not already unrestricted at the time of receipt, to resell them in public transactions, without limitation, after having held the securities for a specified period.   This holding period, in the case of companies such as FusionPharm, was one year.   Holders of unregistered, restricted securities who were deemed to be "affiliates" could resell these securities in public transactions after meeting the specified holding period, but only if they met certain additional regulatory requirements, and only then in limited numbers of shares over specified periods of time (*i.e.*, in public sales subject to "volume restrictions").   An "affiliate," for the purpose of this regulatory exemption from registration, was considered to be someone who directly, or indirectly through one or more intermediaries, controlled, or was

6

controlled by, or was under common control with the issuing company.   Such "control" was defined to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

14.     Both non-affiliate and affiliate holders of unregistered securities, upon satisfying their respective requirements for the regulatory exemption from registration, would typically have had to have the stock transfer agent for the issuing company remove the restrictive legends on the certificates of their securities, before the securities could be eligible for resale in a public transaction.   To accomplish this, the holders would have had to have secured the consent of the issuing company and would have had to have provided documentation to the stock transfer agent demonstrating that the requirements for exemption from registration had been met.

15.     None of FusionPharm's securities were registered with the SEC, and the only way that its securities could be traded over-the-counter or in other public transactions were through transactions involving securities that qualified for exemption from registration with the SEC.

**Manner and Means of the Conspiracy**

16.     It was part of the manner and means of carrying out the conspiracy that:

A.     Defendant SEARS would cause shares of preferred stock of FusionPharm held in the name of Microcap to be converted into shares of FusionPharm common stock and deposited into brokerage accounts established in the name of Microcap. Defendant SEARS would induce brokers overseeing these accounts to consider and treat these common shares as unrestricted securities that could be immediately sold in the public securities markets by falsely representing to them that neither he nor Microcap was an affiliate of FusionPharm or a control

7

person of the company. Defendant DITTMAN facilitated the deposit of these shares, and their treatment as unrestricted securities, by executing FusionPharm officer certificates and other documentation affirming that Microcap was not an affiliate of FusionPharm.

B. Defendant SEARS would then cause the remainder of these preferred shares to be transferred from Microcap's name into the names of family members or entities held in the name of family members, in order to make it appear that neither he nor Microcap had shareholdings in FusionPharm in such amounts as to deem either SEARS or Microcap to be affiliates or control persons under the federal securities laws or to trigger their disclosure as significant shareholders under the reporting guidelines established by OTC Link. Defendant SEARS would thereafter cause portions of the FusionPharm preferred shares that had been transferred into the names of these family members and entities, in turn, to be converted into additional common shares of FusionPharm that could be publicly sold later on or that he and DITTMAN could later use to raise funds for the company in private sales to select FusionPharm investors.

C. Defendant SEARS, working in coordination with another individual, would thereafter cause the FusionPharm common shares that had been deposited into the Microcap brokerage accounts to be sold in the public securities markets and, in consultation with defendant DITTMAN, would deposit significant portions of the proceeds of these FusionPharm stock sales into operating bank accounts of FusionPharm – both directly and through a series of transactions involving Bayside, Meadpoint or Vertifresh – so that the money could then be used to capitalize and operate the company, as well as be used for the defendants' own financial support.

8

17.     As a further part of the manner and means of carrying out the conspiracy, in order to generate and make available for themselves additional FusionPharm common stock that could immediately be sold, without limitation, into the public securities markets, the defendants did and caused the following to be done:

A.     Over the course of June 2012 through in or about December 2012, the defendants, working together with another individual (identified hereinafter as, "Co-Conspirator A"), fabricated promissory notes and incorporated credit line agreements, in order to falsely portray some of the money that had previously been deposited into FusionPharm's bank accounts from the Microcap FusionPharm stock sales as loans from Bayside and Meadpoint that had been extended to FusionPharm over a year before.

B.     The defendants and Co-Conspirator A further fabricated documentation making it appear that FusionPharm had drawn down on the supposed credit lines established with Bayside and Meadpoint by specified amounts, and they assembled bank records to offer substantiation for these supposed earlier credit line draw downs.

C.     The defendants and Co-Conspirator A, in the final iterations of these fabricated promissory notes and supporting documents, made it appear that the supposed debt evidenced by these notes could be converted in whole or in pieces, at the election of the noteholders, into shares of FusionPharm common stock at a specified conversion rate of one FusionPharm share for every penny of debt supposedly still owed on the notes by FusionPharm.

D.     Defendant DITTMAN, on behalf of FusionPharm, and defendant SEARS, on behalf of Meadpoint and acting for Family Member A on behalf of Bayside, executed the back-dated promissory notes and documents.

9

E. Defendants SEARS and DITTMAN then generated packets of documents that SEARS caused to be presented to FusionPharm's stock transfer agent, over a series of months, in order to effectuate the conversion of portions of the supposed debt held by Bayside and Meadpoint into shares of FusionPharm common stock. The packets typically included the following:

- convertible promissory notes that he and defendant DITTMAN had backdated;

- the backdated draw down requests that DITTMAN had signed on behalf of FusionPharm;

- copies of bank account statements showing deposits to FusionPharm's accounts corresponding to the draw down requests;

- letters from Bayside and Meadpoint (depending on the entity exercising the conversion), for signature by Family Member A for Bayside and SEARS for Meadpoint, falsely representing that the entities were not affiliates of FusionPharm;

- additional statements of non-affiliation for Bayside and Meadpoint (again depending on the entity exercising the conversion), reiterating that neither entity was a FusionPharm affiliate and additionally representing that neither Family Member A, in the case of Bayside, and SEARS, in the case of Meadpoint, was an officer, director, control person or holder of more than ten percent of the securities of FusionPharm;

- a FusionPharm officer's certificate, signed by DITTMAN, representing that neither Bayside nor Meadpoint (depending on the entity making the conversion) were affiliates of FusionPharm and were outsiders to the company and management, with no other method of control over the company, and that the convertible promissory notes that were the vehicles for the conversion were valid obligations of the company;

- additional letters signed by DITTTMAN reiterating that Bayside and Meadpoint were not affiliates of the company; and

- attorney opinion letters opining that the common shares to be issued to Bayside and Meadpoint met the federal securities exemption from registration and could be issued as unrestricted shares without the need for a restrictive legend.

18. It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS thereafter caused a substantial portion of the common shares issued to

10

Bayside and Meadpoint as a result of these supposed debt conversions to be deposited into brokerage accounts set up in the names of Bayside and Meadpoint and then caused these shares to be sold in the public securities markets.

19.     It was a further part of the manner and means of carrying out the conspiracy that defendant SEARS, in consultation with defendant DITTMAN, would arrange for a substantial portion of the proceeds realized from the stock and debt sales resulting from the supposed FusionPharm debt to Bayside and Meadpoint to be deposited either directly or indirectly into FusionPharm's operating bank accounts so that these funds could also be used to further capitalize and support the operations of the company and to provide for both defendants' financial support.

20.     As a part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, caused FusionPharm to treat and account for some of the funds received back to FusionPharm from the Microcap, Meadpoint and Bayside sales of FusionPharm stock as payments to FusionPharm for or relating to sales of its PharmPods, which sales DITTMAN then caused FusionPharm to book in its accounting records as licensing revenues realized by the company.   The stock proceed deposits were claimed, in particular, to be payments by Meadpoint, acting in its supposed capacity as FusionPharm's purported exclusive PharmPod distributor, for PharmPods that were being manufactured for and sold to FusionPharm customers in arms-length transactions but that had not yet been delivered to those customers or purported Meadpoint payments in anticipation of sales of PharmPods that DITTMAN and SEARS were still negotiating with prospective FusionPharm customers.

11

21.     As a further part of the manner and means for carrying out the conspiracy, defendant DITTMAN, in consultation and in coordination with defendant SEARS and others, also sought to use purported dealings with Vertifresh as a basis to claim and book additional revenues for FusionPharm.   DITTMAN and SEARS caused contracts and related documentation to be drafted that purportedly depicted a licensing agreement between FusionPharm and Vertifresh, pursuant to which Vertifresh agreed to pay $750,000 to FusionPharm over the course of three years in exchange for the purchase of a series of PharmPods and the right to use FusionPharm's growing methods and technology to cultivate and sell non-cannabis produce in three distinct geographic regions.   Based on this purported agreement, DITTMAN then caused FusionPharm to book the entire licensing agreement amount as FusionPharm revenues in a single year, 2012.

22.     It was part of the manner and means of carrying out the conspiracy that defendant DITTMAN, with defendant SEARS' assistance, would then cause these purported transactions with Meadpoint and Vertifresh and the purported revenues associated with them to be publicly disseminated, among other ways, through press releases disseminated in the financial media and through interviews by DITTMAN made available to the public.

23.     It was a further part of the manner and means of carrying out the conspiracy that defendants DITTMAN and SEARS would cause these transactions and revenue figures to be reported in quarterly and annual financial statements uploaded to, and made available to the investing public on, OTC Link's website. DITTMAN, working in concert with SEARS, would cause the financial statements notes and the quarterly and annual reports to omit facts revealing that Meadpoint, Vertifresh and FusionPharm were all under the common control of the

12

defendants and the revenues generated as a result of these transactions were between related parties. DITTMAN, in concert with SEARS, would further cause FusionPharm to affirmatively represent in these reports that there were, in fact, no related party transactions with immediate family members and significant beneficial owners of FusionPharm stock and would cause these reports to conceal completely SEARS' involvement in the company and his beneficial ownership of its stock.

### Overt Acts

24.     In furtherance of the conspiracy and to effect the objects thereof, one or more overt acts were carried out by at least one co-conspirator in the State and District of Colorado and elsewhere, which overt acts included the following:

A.     On or about March 25, 2011, defendants SEARS and DITTMAN caused an Issuer Company-Related Action Notification form to be filed with the Financial Industry Regulatory Authority ("FINRA") providing notice of a name change to, and stock symbol change with respect to, FusionPharm, identifying himself and Family Member A as the sole officers and directors of the company, and representing, among other things, that none of the company's officers, directors or parties related to the company were the subjects of pending, adjudicated or settled civil or criminal action related to fraud or securities violations.

B.     On or about April 11, 2011, defendant SEARS sent a letter to a representative of FusionPharm's stock transfer agent in Las Vegas, Nevada surrendering a stock certificate evidencing the ownership of 185,0000 FusionPharm preferred shares and requesting that a portion of the shares evidenced by this certificate be converted into 80,000 shares of FusionPharm common stock in the name of a limited liability company in Orlando, Florida and

13

65,000 shares of FusionPharm common stock in the name of Microcap and that the balance of the remaining preferred shares, 183,550, be transferred to a company in Thornton, Colorado.

     C.     On or about April 21, 2011, defendant DITTMAN sent an email to a number of people, bearing the subject "Fusion Pharm," announcing that he had recently "partnered with [his] brother-in-law William Sears" and that "we have acquired and moved our operations into a publicly traded company: Fusion Pharm, Inc."

     D.     On or about May 2, 2011, defendant SEARS sent a letter to an employee at Oppenheimer, & Co., Inc., directing that 65,000 shares of FusionPharm common stock be deposited into the brokerage account of Microcap Management and representing that Microcap Management was neither a control person nor an affiliate of FusionPharm.

     E.     On or about June 20, 2011, defendant SEARS sent an email to defendant DITTMAN, bearing the subject "Stock," advising, in part, that the "cert [was] for 182,050," that "the deal will be structured whereas we can have some free anyway," and that it was "just something we need."

     F.     On or about June 23, 2011, defendant DITTMAN sent an email to defendant SEARS asking whether "$3k from this weeks [sic] take" could be wired to a family member's account.

     G.     On or about September 6, 2011, defendant DITTMAN sent defendant SEARS an email asking, "What do we have in microcap now?"

     H.     On or about September 13, 2011, defendant SEARS forwarded defendant DITTMAN an exchange of emails between SEARS and a representative of a brokerage firm addressing SEARS' inquiry about the net amount in Microcap's brokerage account.

14

I.      On or about October 6, 2011, defendant DITTMAN had a telephone conversation with a FINRA investigator during which he described defendant SEARS as a part-time salesman for FusionPharm and stated that he was unaware that SEARS owned or was selling FusionPharm stock.

J.      On or about November 3, 2011, defendant DITTMAN had another telephone conversation with the same FINRA investigator during which he stated that defendant SEARS no longer owned Microcap or any FusionPharm stock.

K.      On or about March 31, 2012, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2011, was uploaded to a public website maintained by OTC Link.

L.      On or about June 4, 2012, defendant SEARS forwarded an email from Co-Conspirator A transmitting as an attachment a draft promissory note and credit line agreement for Bayside and stating that Co-Conspirator A would draft "the drawdown requests to match the dates and amounts of the deposits."

M.      On or about June 6, 2012, Co-Conspirator A sent defendant SEARS an email, bearing the subject "Bayside Loan Documents, transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements, and stating, "Bill, Let's get these signed up. Meadpoint's to follow in a separate email."

N.      On or about June 6, 2012, Co-Conspirator A sent defendant SEARS a subsequent email, bearing the subject "MeadPoint Loan Documents," transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements.

15

O.      On or about July 12, 2012, defendant SEARS sent defendant DITTMAN an email, bearing the subject "Cash," stating, in part, "This week will be a gross total of $25,118," and setting forth a "net to FP" of $12,558, after certain enumerated dollar amount offsets to identified individuals.

P.      On or about November 26, 2012, a press release entitled, "FusionPharm Signs Licensing Agreement for Flowering Containers," was disseminated via PR Newswire, announcing the signing of a licensing agreement with Meadpoint to market PharmPods and relating that an initial order of 9 PharmPods had already been received from Meadpoint "with minimum purchase quantities of 50 containers in both 2013 and 2014."

Q.      On or about November 26, 2012, Co-Conspirator A sent an email to defendant SEARS attaching drafts of convertible promissory notes for Bayside and Meadpoint and advising that the "Notes work with the existing draw down requests."

R.      On or about December 12, 2012, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent transmitting a convertible promissory note in favor of Bayside, notifying the transfer agent that "Bayside has chosen to exercise its option to convert into shares [sic]," and that "Bayside [was] a family members [sic] company and I am assisting them [sic] as I am familiar with all parties."

S.      On or about December 27, 2012, Co-Conspirator A sent defendant DITTMAN an email stating, "We are in need of a letter which confirms the end of the drawdowns under the Bayside promissory note," and advising that Co-Conspirator A had drafted such a letter for DITTMAN's signature.

16

T.      On or about January 7, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Bayside Note FSPM," transmitting an attorney's opinion letter, FusionPharm bank account statements "which reflect funding" and a "[c]losing letter that closed the note."

U.      On or about January 30, 2013, defendant SEARS sent an email to Co-Conspirator A and defendant DITTMAN attaching drafts of a licensing agreement between Vertifresh and FusionPharm and advising, "This is the one we should work thru [sic]."

V.      On or about March 6, 2013, a document entitled "FusionPharm, Inc. Annual Information and Disclosure Statement," for the period ended December 31, 2012, was uploaded to a public website maintained by OTC Link.

W.      On or about March 27, 2013, defendant DITTMAN conducted a recorded interview with a representative of an internet-based financial public relations service for Small Cap Voice.Com, Inc., as self-styled financial communications and investor relations service for "small cap" companies, during which he stated that FusionPharm did "a little over $800,000 in revenue" for 2012 and that he expected FusionPharm to double its results for 2013.

X.      On or about April 11, 2013, defendant SEARS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Meadpoint Venture Partners FSPM," stating that he was attaching a series of documents, including "a notice to convert," the "[o]riginal note," a "letter of opinion," and a "Non Affiliate declaration," and transmitting scanned versions of the described documents.

Y.      On or about August 5, 2013, defendant DITTMAN set an email to an individual considering making an investment in FusionPharm proposing, in part, that some of the funds for

17

the contemplated investment involve the individual's purchase of "part of the existing note payable from FusionPharm to Meadpoint Venture Partners."

Z.    On or about February 18, 2014, defendant DITTMAN sent the following email message to a representative of FusionPharm's stock transfer agent, in reply to that representative's observation that defendant SEARS had been listed as an "Administrative Officer" of FusionPharm "which would make him an affiliate:"

> … Not sure why you would have Mr. Sears as an administrative officer of the Company, he has never been employed by the Company and is not an affiliate. …

AA.    On or about April 15, 2014, a document identified as FusionPharm's "Financial Statements for the Periods Ended December 31, 3013 [sic] and December 31, 2012 (Restated)", consisting of financial statements and financial statement notes for the periods ended December 31, 2012 and December 31, 2013, was uploaded to a public website maintained by OTC Link.

BB.    On or about May 15, 2014, defendant SEARS forwarded to defendant DITTMAN an email from a representative of an investment firm, bearing the subject "RE: Todays Wires," acknowledging receipt of requests to send three wire transfers from a trust account established in the name of Family Member A.

In violation of Title 18, United States Code, Section 371.


## COUNT 2

25.    On or about January 7, 2013, in the State and District of Colorado, the defendant,

### WILLIAM J. SEARS,

then a resident of Thornton, Colorado, did willfully make and subscribe a U.S Income Tax Return for Single and Joint Filers With No Dependents, Form 1040EZ, for the year 2011, which

18

was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said return he did not believe to be true and correct as to every material matter, in that the said return reported for the year total adjusted gross income of $7,500 (Form 1040EZ, line 4), whereas, as the defendant then and there well knew and believed, his adjusted gross income was significantly higher than what was actually reported.

In violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE ALLEGATION

26.     The allegations contained in Count One of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

27.     Upon conviction of the violation alleged in Count One of this Information involving the conspiracy to commit violations of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1341, Title 15, United States Code, Sections 78j(b) and 78ff(a), all in violation of Title 18, United States Code, Section 371, the defendants,

**WILLIAM J. SEARS, and**
**SCOTT M. DITTMAN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense, including, but not limited to:

19

a. $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name of Meadpoint Venture Partners;

b. $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name of Sandra L. Sears;

c. $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee;

d. $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name of FusionPharm, Inc.;

e. $212,273.92 Seized From Wells Fargo Bank Account No 8141061286, Held In The Name of FusionPharm, Inc.;

f. $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The purchase of 4200 Monaco Street, Denver, Colorado;

g. 194 BASKET ROAD, OLEY, PENNSYLVANIA; and

h. A money judgment in the amount of proceeds obtained by the conspiracy and by the defendants, for which the defendants are joint and severally liable, less the amount recovered from directly forfeitable assets.

i. If any of the property described above, as a result of any act or omission of the defendant:

    a) cannot be located upon the exercise of due diligence;
    b) has been transferred or sold to, or deposited with, a third party;
    c) has been placed beyond the jurisdiction of the Court;
    d) has been substantially diminished in value; or
    e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

20

incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

ROBERT C. TROYER
ACTING UNITED STATES ATTORNEY

By: s/Tonya S. Andrews
Tonya S. Andrews
Assistant United States Attorney

s/Scott Mascianica
Scott Mascianica
Special Assistant U.S. Attorney

s/Kenneth M. Harmon
Kenneth M. Harmon
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, CO 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
Kenneth.Harmon@usdoj.gov

21



**U.S. DEPARTMENT OF JUSTICE**

**John F. Walsh**
*United States Attorney*
*District of Colorado*

| | |
|---|---|
| *Kenneth M. Harmon* | *1225 Seventeenth Street, Suite 700    (303) 454-0100* |
| *Assistant U.S. Attorney* | *Seventeenth Street Plaza         FAX (303) 454-0402* |
| | *Denver, Colorado 80202* |

May 25, 2016



**VIA E-MAIL TRANSMISSION**

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, CO 80202

                    Re:    **William J. Sears**

Dear Counsel:

        I write to set forth the essential terms by which we propose to address through negotiated guilty pleas the criminal liability of you client, William J. Sears, in relation to matters currently under a federal criminal investigation being conducted under the auspices of a federal grand jury in the District of Colorado, which matters arise from and relate to the operations of Fusion Pharm, Inc., a public company whose common stock has been traded on the OTC Markets Group under the ticker symbol "FSPM." The particular matters under investigation and the federal criminal offenses under consideration with respect to your client are described and outlined in my February 16, 2016 letter to you setting forth terms under which this office was prepared to take a proffer of information from your client, by way of interview, which letter is incorporated by reference herein and a copy of which is attached hereto as Attachment A (hereinafter, the "February 16, 2016 proffer letter").

        This document does not itself constitute a plea agreement and is being provided in furtherance of plea discussion and pursuant to Rule 11(f) of the Federal Rules of Criminal Procedure. This pre-indictment resolution is subject to any formal approval deemed required by the Tax Division of the United States Department of Justice with respect to federal criminal tax offenses that have been referred to this office for investigation and prosecution. This proposed resolution is also subject to, and contingent upon, a pre-indictment resolution of the matters concerning this federal criminal investigation being reached with Scott M. Dittman, and his counsel.

        Upon acceptance of this proposed pre-indictment resolution, as signified through your and your client's execution of this letter in the signature blocks below; upon Mr.

**EXHIBIT B**

156

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 2

Dittman's acceptance of the terms of his proposed pre-indictment resolution, as signified in the same manner with respect to him; and upon securing any necessary approvals of the Tax Division, these essential terms will be embodied in a formal proposed plea agreement conforming, in form, to the Court's requirements for plea agreements in this District.

      1.      <u>The Offenses of Conviction & Asset Forfeiture</u>.

Mr. Sears would agree to waive prosecution by indictment and would agree to plead guilty to a two-count information charging him with the following offenses:

*One*, conspiring with Mr. Dittman and others (a) to defraud the U.S. Securities and Exchange Commission ("SEC") and (b) to commit various offenses against the United States, including wire fraud, in violation of Title 18, United States Code, Section 1343; mail fraud, in violation of Title 18, United States Code, Section 1341; securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17 Code of Federal Regulations, Section 240.10b-5; and willful violation of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a); said conspiracy being in violation of Title 18, United States Code, Section 371; and

*Two*, filing a false federal individual income tax return for calendar year 2011, in violation of Title 26, United States Code, Section 7206(1).

The contemplated information would also contain an asset forfeiture notice provision setting forth the government's intent to seek forfeiture of any and all of Mr. Sears' right, title and interest in all property constituting and derived from any proceeds obtained directly and indirectly by Mr. Sears' as a result of the commission of the charged conspiracy and its object offenses, or substitute assets for such property.

As part of our negotiated resolution, Mr. Sears would agree that he will agree to forfeiture of his interest in all property that may constitute or is derived from proceeds of his commission of or involvement or participation in the charged conspiracy and its objet offenses, including, but not limited to, the following:

      (a)      A money judgment not exceeding approximately $12,204,172, corresponding to the total amount currently believed to have been obtained as a result of the charged conduct from the sale of Fusion Pharm common stock or debt securities convertible into Fusion Pharm common stock;

      (b)      The following particular assets, derived from the sale of Fusion Pharm common stock, and constituting direct and indirect proceeds of the charged conduct:

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 3

      (1)    $27,066.23 Seized From Wells Fargo Bank Account No. 6020559917, Held In The Name Of Meadpoint Venture Partners;

      (2)    $9,455.56 Seized From Wells Fargo Bank Account No. 7784731577, Held In The Name Of Sandra L. Sears;

      (3)    $8,462,621.25 Seized From Moors And Cabot Trust Account No. 4597-6546, Held In The Name Of Sandra Lee Sears, Tr, Sandra Lee Sears Ttee, less approximately $2,472,945 to be applied to Mr. Sears' restitution;

      (4)    $20,820.37 Seized From Wells Fargo Bank Account No. 5181260307, Held In The Name Of Fusionpharm, Inc.;

      (5)    $212,273.92 Seized From Wells Fargo Bank Account No. 8141061286, Held In The Name Of Fusionpharm, Inc.,

      (6)    $250,000.00 Held In Lieu Of Earnest Money Held On Deposit For The Purchase Of 4200 Monaco Street, Denver, Colorado; And

      (7)    The Real Property Located At 194 Basket Road, Oley, Pennsylvania.

The funds obtained from the forfeiture of the assets identified in subparagraph (b) would be applied to the forfeiture money judgment identified in subparagraph (a). In addition, the seized funds applied to any restitution obligation would also be credited to the forfeiture money judgment.

Mr. Sears would further agree to divest whatever beneficial ownership interest he has in shares of common and preferred stock of Fusion Pharm.

Mr. Sears would further agree to forfeit, as substitute asset, any monetary value he realizes in the future from his interest in Fusion Pharm.

The parties would agree that Mr. Sears' liability for forfeiture would be joint and several with Mr. Dittman's forfeiture liability in connection with the pre-indictment resolution of his case. The parties further agree that the forfeiture money judgment shall remain in full force and effect as to Mr. Sears for 5 years from the date of sentencing.

      2.    <u>Restitution</u>.

The parties would agree that, although restitution would otherwise be mandatory with respect to the conspiracy offense of conviction, they will take the position that

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 4

restitution should not be ordered by the Court, pursuant to 18 U.S.C. § 3663A(c)(3), because either the number of identifiable victims is so large as to make restitution impracticable or, alternatively, restitution would involve determination of complex issues of fact that would complicate or prolong the sentencing process to a degree that the need for restitution would be outweighed by the burden on the sentencing process. Accordingly, while forfeited funds may be administratively available to eligible victims by the Department of Justice, no court ordered restitution entered would be sought with respect to Mr. Sears.

Mr. Sears would agree, pursuant to 18 U.S.C. § 3663(a)(3), to make restitution to the Internal Revenue Service in the total amount of $2,472,945 corresponding to the federal tax loss associated with the sale of Fusion Pharm securities for the years 2011 through 2014. Mr. Sears would acknowledge and agree that neither his agreement to pay this restitution nor the restitution payments themselves will limit the Internal Revenue Service in its lawful examination, determination, assessment or collection of any taxes, penalties or interest due from Mr. Sears for these years. The parties agree that $2,472,945 of the seized funds identified above will be paid toward the restitution.

3.



Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 5



Mr. Sears would ███ agree to cooperate fully with the Office of the United States
Attorney for the District of Colorado and law enforcement and regulatory authorities designated
by it, in the identification, recovery and repatriation of assets that are subject to, or are otherwise
available for, forfeiture pursuant to his plea obligations with respect to forfeiture, as outlined
above. Such cooperation would include, but not necessarily be limited to, (a) submitting to
debriefings concerning the identification, recovery and repatriation of potentially forfeitable
assets; (b) producing documents, records and other evidence, as requested by this office or its
designees, relevant to these subjects; (c) executing documents required by financial institutions
and custodians who may have custody or control of potentially forfeitable assets in order to
permit access to records concerning such assets and in order to facilitate the recovery and
repatriation of such assets; (d) providing truthful testimony concerning these subjects, whether in
the form of testimony or through affidavit or declaration; (e) preparing and executing sworn
financial statements; and (f) appearing at judicial or administrative hearings and proceedings as
may be necessary for these purposes.

Mr. Sears would also agree to cooperate fully with the Internal Revenue Service in the
ascertainment and payment of his correct tax liabilities for the calendar years 2011 through 2014
inclusive, among other ways, by preparing and filing returns or amended returns, as necessary,
for those years for himself individually as well as for entities through which he conducted
business during those years and on whose behalf he should have filed tax returns. Mr. Sears
would further agree to file truthful and accurate income tax returns which are or may become due
by law during any period of supervised release or probation imposed by the Court.

4.      No Further Prosecution.

The Office of the United States Attorney for the District of Colorado would further agree
that – contingent upon the fulfillment of Mr. Sears' plea obligations and Mr. Sears' entry of
guilty pleas and sentencing on the counts of conviction – it will not further prosecute Mr. Sears
for the conduct set forth in the contemplated information or any other criminal conduct known to
this office as of the date of this letter, which conduct concerns the matters currently under federal

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 6

criminal investigation in this district, as described above and in the February 16, 2016 proffer letter.

    5.    **Mr. Sears' Advisory Sentencing Guideline Range, Contemplated Sentence And the Parties' Obligations and Rights at Sentencing.**

    A.  The Advisory Sentencing Guideline Range.

        The parties would agree to take the sentencing guideline positions ascribed to them in Attachment B accompanying this letter. Based on these positions, the parties would agree that the advisory sentencing guideline range that would otherwise be applicable to Mr. Sears would exceed the total combined statutory maximum imprisonment term of eight years for both offenses of conviction, were the sentences on such convictions imposed to run consecutively to one another. The parties would further agree that, as a consequence, under these circumstances, the effective advisory sentencing guideline range applicable to Mr. Sears would be eight years imprisonment or 96 months. *See* U.S.S.G. §§ 5G1.1-5G1.2 & comments.

    B.



Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 7



Mr. Sears would ▇▇▇ acknowledge that the government would not be advocating a sentence on his behalf lower than 60 months imprisonment.

### C. Mr. Sears' Right to Advocate for a Variant Sentence.

At the time of sentencing, Mr. Sears would free to advocate for any lawful sentence, and make any arguments in support thereof, provided, however, that that sentence *include a term of imprisonment not less than 60 months in duration* and any supporting arguments are consistent with the positions he is obligated to take under the plea agreement with respect to the calculation of his advisory sentencing guideline range and are not factually inconsistent with his entry of a guilty plea and admission of guilt or with the body of stipulated facts set forth in the parties' plea agreement in this case.

### D. Mr. Sears' Recommended Special Supervised Release Conditions.

Mr. Sears' would agree that, as a condition of supervised release or probation, he will not be involved in any capacity in the securities industry on behalf of another individual or an entity not solely owned and controlled by him. Nor may Mr. Sears act as an officer or director of company whose securities are publicly traded or otherwise act as a control person of such a company. Nor may he directly or indirectly participate in the issuance, purchase, offer, or sale of any security in an unregistered offering by any issuer of securities.

Further, Mr. Sears would agree that, as a condition of such supervision, he will not act as a fiduciary or be employed in a fiduciary position and that he will not otherwise be engaged in any other employment or occupation involving his solicitation of funds for investment or his custody or control of investor funds.

Mr. Sears would further agree that any conditions of supervised release or probation should include the special conditions that (a) his employment be approved in advance by his supervising probation officer; (b) that he provide his supervising

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 8

probation officer access to any financial records requested by such officer and otherwise
be subject to financial monitoring by such officer; (c) that he shall not register any
business entities without prior disclosure to his supervising probation officer; and (d) that
he shall not conduct any financial transactions through accounts of any business entities
or individuals not made known to and approved by his supervising probation officer.

### E. Parties' Sentencing Recommendations Not Binding on the Court.

The parties would acknowledge and agree that any sentence to be
recommended or proposed to the Court in this case will be made pursuant to and is
subject to the provisions of Fed.R.Crim.P. 11(c)(1)(B) and as such is not binding on the
Court and so not grounds for Mr. Sears to withdraw his guilty pleas.

### 6. Appellate and Collateral Challenge Waivers.

Mr. Sears would agree to waive the right to appeal any matter in connection with
this prosecution, conviction, or sentence unless the sentence exceeds 96 months, that is,
the combined the statutory maximum penalties for imprisonment for the offenses of
conviction, with the sentences run consecutive to one another. Mr. Sears would also
agree to waive his right to challenge this prosecution, conviction, or sentence and/or the
manner in which it was determined in any collateral attack, including but not limited to a
motion brought under 28 U.S.C. § 2255, except that such waiver provision will not
prevent him from seeking relief otherwise available if: (1) there is an explicitly
retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim
that he was denied the effective assistance of counsel, or (3) there is a claim of
prosecutorial misconduct. Additionally, if the government appeals the sentence imposed
by the Court, Mr. Sears would be released from these waiver provisions.

### 7. Consequences of Mr. Sears' Plea Agreement Breach or Misconduct.

The parties would agree that the government's obligations under the contemplated
plea agreement would be expressly contingent on Mr. Sears' performance of his
obligations under the plea agreement. The parties would further agree, in particular, that
should Mr. Sears breach this agreement ███████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████ the government would be entitled,
at its election, to be relieved of its obligations under the plea agreement and could elect to

Marci Gilligan LaBranche, Esq.
labranche@ridleylaw.com
Fredric M. Winocur, Esq.
winocur@ridleylaw.com
May 25, 2016
Page 9

abrogate the agreement and prosecute the defendant to the full extent permitted under
law.

Sincerely,

s/Kenneth M. Harmon
Kenneth M. Harmon
Assistant United States Attorney

ACKNOWLEDGED AND AGREED TO BY:

Marci Gilligan LaBranche, Esq.
Attorney for William J. Sears

Fred M. Winocur, Esq.
Attorney for William J. Sears

William J. Sears

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     WILLIAM J. SEARS

      Defendant.

---

### GOVERNMENT'S MOTION TO RESTRICT DOCKET NUMBER 52

---

The UNITED STATES OF AMERICA, by and through its undersigned counsel, files this Motion to Restrict and states as follows:

1.     The Government asks that docket number 52 be restricted at Level 2.

2.     The basis for filing docket number 52 under restriction is evident from the matters addressed in that document, which matters are confidential in nature and involve ongoing activities.

WHEREFORE, the Government asks this Honorable Court to issue an Order restricting docket number 52.

Respectfully submitted this 28th day of November, 2016.

                        Respectfully submitted,

                        ROBERT C. TROYER
                        Acting United States Attorney

                        by: s/ Kenneth M. Harmon
                        KENNETH M. HARMON
                        Assistant United States Attorney
                        U.S. Attorney's Office
                        1225 Seventeenth Street, Suite 700
                        Denver, Colorado 80202
                        Tel. No. (303) 454-0100
                        Fax No. (303) 454-0402
                        E-mail: kenneth.harmon@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this <u>28th</u> day of November, 2016, I electronically filed the foregoing **GOVERNMENT'S MOTION TO RESTRICT DOCKET NUMBER 52** with the Clerk of the Court using the CM/ECF which will send notification of such filing to counsel at the following e-mail addresses:

Frederic Winocur
winocur@ridleylaw.com

Marci Gilligan LaBranche
labranche@ridleylaw.com

Philip L. Dubois
dubois@dubois.com

<div align="center">
s/ Andrea K. Hough<br>
ANDREA K. HOUGH<br>
U.S. Attorney's Office
</div>

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Tonya Shotwell Andrews (charisha.cruz@usdoj.gov,
eileen.oconnor-barnes@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Matthew Kyle Belcher (cox_ecf@fd.org,
matthew_belcher@fd.org), Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com),
Kenneth Mark Harmon (andrea.hough@usdoj.gov, kenneth.harmon@usdoj.gov,
mascianicas@sec.gov, usaco.ecfcriminal@usdoj.gov), Marci Gilligan LaBranche
(feldman@ridleylaw.com, labranche@ridleylaw.com), Alaurice Marie Tafoya-Modi
(alauricetafoya@yahoo.com), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:5769373@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Leave to
File
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 11/29/2016 at 3:46 PM MST and filed on 11/29/2016

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16-cr-00301-WJM |
| **Filer:** | |
| **Document Number:** | 54(No document attached) |

**Docket Text:**
 **ORDER as to William J. Sears (1) granting the Government's Unopposed Motion for Leave to File Redacted Plea Agreement as to Defendant Sears [51]. The Government's Motion is hereby GRANTED for good cause shown. The redacted version of the Plea Agreement attached as Exhibit A to the Motion [51-1] is ACCEPTED as filed. The Clerk shall file the redacted version of the Plea Agreement as a separate docket entry on CM/ECF. SO ORDERED by Judge William J. Martinez on 11/29/2016. Text Only Entry (wjmsec, )**

**1:16-cr-00301-WJM-1 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov, charisha.cruz@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com), Alaurice
Marie Tafoya-Modi (alauricetafoya@yahoo.com), Marci Gilligan LaBranche
(feldman@ridleylaw.com, labranche@ridleylaw.com), Tonya Shotwell Andrews
(charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Matthew Kyle Belcher
(cox_ecf@fd.org, matthew_belcher@fd.org), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), Kenneth Mark Harmon (andrea.hough@usdoj.gov,
kenneth.harmon@usdoj.gov, mascianicas@sec.gov, usaco.ecfcriminal@usdoj.gov), Judge William
J. Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:5769450@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Leave to
Restrict
Content-Type: text/html
```

<div align="center">

**U.S. District Court**

**District of Colorado**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 11/29/2016 at 4:01 PM MST and filed on 11/29/2016

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16-cr-00301-WJM |
| **Filer:** | |
| **Document Number:** | 55(No document attached) |

**Docket Text:**
 ORDER as to William J. Sears (1) granting [53] Government's Motion to Restrict Docket Number 52. The Government's Motion is GRANTED for good cause shown. The document filed at ECF No. 52 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 11/29/2016. Text Only Entry (wjmsec, )

**1:16-cr-00301-WJM-1 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya-Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, Eileen.OConnor−Barnes@usdoj.gov, charisha.cruz@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov

Matthew Kyle Belcher (Terminated)    Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16−cr−00301−WJM−1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.    **WILLIAM J. SEARS, and**
2.    **SCOTT M. DITTMAN,**

       Defendants.

---

**DEFENDANTS WILLIAM SEARS' AND SCOTT DITTMAN'S
MOTION TO RESTRICT DOCUMENT**

---

COMES NOW; William J. Sears, by and through Fredric M. Winocur and Marci

G. LaBranche; and Scott M. Dittman, by and through Philip L. Dubois, and respectfully

move to restrict access to the Parties' Joint Status Report and Defendants' Unopposed

Motion to Vacate, Consolidate, and Continue Sentencing Hearings, any order revealing

the contents of that document, and the brief filed in support of this motion. Defendant's

request a "Level 2 Restriction" which would make the document, any order revealing the

contents of that document, and brief filed in support of this motion, "viewable by the

Court, the government and the affected defendants."

Respectfully submitted this 15th day of March, 2017.

s/ Fredric M. Winocur
Fredric M. Winocur
Marci G. LaBranche
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 629-9700
Fax: (303) 629-8702
Email: winocur@ridleylaw.com
Email: labranche@ridleylaw.com
Lawyers for William Sears

s/ Philip L. Dubois
Philip L. Dubois
411 S. Cascade Ave. F12
Colorado Springs, CO 80903-3809
Telephone: (719) 635-4848
Email: dubois@dubois.com
Lawyer for Scott Dittman

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record on this case including the following:

Kenneth Harmon
Assistant United States Attorney
U.S. Attorney's Office
1225 Seventeenth Street Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0402
Email: kenneth.harmon@usdoj.gov

s/ Heather Grant
Legal Secretary
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 629-9700
Email: grant@ridleylaw.com

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. **WILLIAM J. SEARS, and**
2. **SCOTT M. DITTMAN,**

      Defendants.

---

## ORDER TO RESTRICT DOCUMENT

---

    This matter is before the Court on the Defendants' Motion to Restrict Document

No. _____.  Upon consideration and for good cause shown,

    IT IS ORDERED that Document No. ___, the Defendants' Brief in Support of

Motion to Restrict Document No. ___, as well as any order revealing the contents of that

document, are hereby restricted until further order of the Court.

    IT IS ORDERED that Document No. ___ shall be restricted to a "Level 2" and will

be "viewable by the Court, the government and the affected defendants" only.

    IT IS SO ORDERED on this _____day of March 2017

                              BY THE COURT:

                              _____

                              JUDGE WILLIAM J. MARTINEZ
                              UNITED STATES DISTRICT COURT
                              DISTRICT OF COLORADO

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com), Alaurice
Marie Tafoya-Modi (alauricetafoya@yahoo.com), Marci Gilligan LaBranche
(feldman@ridleylaw.com, labranche@ridleylaw.com), Tonya Shotwell Andrews
(charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov, jody.gladura@usdoj.gov,
laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov), Matthew Kyle Belcher (cox_ecf@fd.org,
matthew_belcher@fd.org), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), Kenneth Mark Harmon (andrea.hough@usdoj.gov,
kenneth.harmon@usdoj.gov, mascianicas@sec.gov, usaco.ecfcriminal@usdoj.gov), Judge William
J. Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5915160@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Order
```
Content—Type: text/html

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 3/16/2017 at 12:32 PM MDT and filed on 3/16/2017

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 74(No document attached) |

**Docket Text:**
 **ORDER as to William J. Sears (1), Scott M. Dittman (2) granting Defendants William Sears'
and Scott Dittman's Motion to Restrict Document [71]. The Defendants' Motion is GRANTED
for good cause shown. The documents filed at ECF Nos. 72 and 73 shall remain
RESTRICTED at RESTRICTION LEVEL 2 (viewable only by the Selected Parties and the
Court). SO ORDERED by Judge William J. Martinez on 3/16/2017. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Philip L. Dubois    dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon    kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur    winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)    alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor−Barnes@usdoj.gov, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16−cr−00301−WJM−1 Notice has been mailed by the filer to:**

**1:16−cr−00301−WJM−2 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya−Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor−Barnes@usdoj.gov, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16−cr−00301−WJM−2 Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com), Alaurice
Marie Tafoya-Modi (alauricetafoya@yahoo.com), Marci Gilligan LaBranche
(feldman@ridleylaw.com, labranche@ridleylaw.com), Tonya Shotwell Andrews
(charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov, jody.gladura@usdoj.gov,
laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov), Matthew Kyle Belcher (cox_ecf@fd.org,
matthew_belcher@fd.org), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), Kenneth Mark Harmon (andrea.hough@usdoj.gov,
kenneth.harmon@usdoj.gov, mascianicas@sec.gov, usaco.ecfcriminal@usdoj.gov), Judge William
J. Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5915162@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

<div align="center">

**U.S. District Court**

**District of Colorado**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 3/16/2017 at 12:33 PM MDT and filed on 3/16/2017

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 75(No document attached) |

**Docket Text:**
 ORDER as to William J. Sears (1), Scott M. Dittman (2): This matter is before the Court on the Parties' Joint Status Report [73]. A Status Conference is hereby SET for March 29, 2017 at 11:00 a.m. in Courtroom A801, at which time the Court will consider the matters raised in said Report. SO ORDERED by Judge William J. Martinez on 3/16/2017. Text Only Entry (wjmsec, )

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche   labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews   Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)   Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Philip L. Dubois   dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon   kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur   winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)   alauricetafoya@yahoo.com

Marci Gilligan LaBranche   labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews   Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)   Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

Case 1:16-cr-00301-WJM Document 237-1 Filed 05/14/20 USDC Colorado Page 179 of 699

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    **WILLIAM J. SEARS, and**
2.    **SCOTT M. DITTMAN,**

      Defendants.

---

**PARTIES' JOINT MOTION TO VACATE MARCH 29, 2017 STATUS HEARING,
RESET THE STATUS HEARING AS A TELEPHONIC HEARING AND
DEFENDANTS' MOTION TO WAIVE THEIR APPEARANCES**

---

The United States of America, by and through Kenneth M. Harmon, William J.

Sears, by and through Fredric M. Winocur and Marci G. LaBranche, and Scott M.

Dittman, by and through Philip L. Dubois, respectfully move to vacate the status hearing

set for March 29, 2017, reset that hearing as a telephonic hearing and waive the

defendants' appearances. As grounds, the Parties state as follows:

    1.    On March 15, 2017, at the Court's request, the Parties submitted the

Parties' Joint Status Report and Defendants' Unopposed Motion to Vacate, Consolidate,

and Continue Sentencing Hearings.  (Doc.73).

    2.    The Court has set a hearing on the issue for March 29, 2017, at 11:00

a.m.  (Doc. 75).

    3.    Counsel for Mr. Dittman is in trial for three weeks beginning on

March 27, 2017, and will, therefore, not be available to appear in Denver on March 29,

2017.

4.     Counsel for the Parties would be available to reset the hearing to the following dates if they are able to appear by telephone:

a.     March 24, 2017

b.     March 30 or 31, 2017

c.     April 3, 4 or 5, 2017

5.     Although Mr. Dubois will still be in trial on from March 30 to April 5, he believes the trial court will permit him to take a recess for a brief hearing on those dates.

6.     Additionally, as the Defendants presence is not required at a status hearing under F.R.E. 43, they request that their presence be waived.

Respectfully submitted this 24th day of March, 2017.

s/ Marci G. LaBranche
Fredric M. Winocur
Marci G. LaBranche
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado  80202
Telephone: (303) 629-9700
Fax:  (303) 629-8702
Email:   winocur@ridleylaw.com
Email:  labranche@ridleylaw.com
Lawyers for William Sears

s/ Philip L. Dubois
Philip L. Dubois
411 S. Cascade Ave. F12
Colorado Springs, CO 80903-3809
Telephone: (719) 635-4848
Email:   dubois@dubois.com
Lawyer for Scott Dittman

s/ Kenneth M. Harmon
KENNETH M. HARMON
Assistant United States Attorney
U.S. Attorney's Office

2

1225 Seventeenth Street Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0402
Email: kenneth.harmon@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*s/ Jennifer J. Feldman*
Paralegal
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 629-9700
Email: feldman@ridleylaw.com

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Tonya Shotwell Andrews (charisha.cruz@usdoj.gov,
eileen.oconnor-barnes@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov), Matthew Kyle Belcher (cox_ecf@fd.org, matthew_belcher@fd.org),
Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com), Kenneth Mark Harmon
(andrea.hough@usdoj.gov, kenneth.harmon@usdoj.gov, mascianicas@sec.gov,
usaco.ecfcriminal@usdoj.gov), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Alaurice Marie Tafoya-Modi (alauricetafoya@yahoo.com), Fredric
Michael Winocur (cratty@ridleylaw.com, winocur@ridleylaw.com), Judge William J. Martinez
(deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5926341@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion to Vacate
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 3/24/2017 at 2:52 PM MDT and filed on 3/24/2017

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 78(No document attached) |

**Docket Text:**
 ORDER as to William J. Sears (1) and Scott M. Dittman (2) granting in part the Parties' Joint Motion to Vacate March 29, 2017 Status Hearing, Reset the Status Hearing as a Telephonic Hearing and Defendants' Motion to Waive their Appearances [77]. The Parties' Motion is GRANTED IN PART for good cause shown. The Status Conference currently set for March 29, 2017 is hereby VACATED and RESET to March 31, 2017 at 10:30 a.m. in Courtroom A801. Counsel for Defendant Dittman, Philip Dubois, is granted leave to appear at the Status Conference by telephone. Mr. Dubois shall contact chambers at (303) 335–2805 at least 5 minutes prior to the start of the Status Conference. Counsel for the Government and Defendant Sears must appear in person. It is FURTHER ORDERED that Defendant Sears's and Defendant Dittman's presence is WAIVED for the Status Conference. SO ORDERED by Judge William J. Martinez on 3/24/2017. Text Only Entry (wjmsec, )

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon    kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur    winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)    alauricetafoya@yahoo.com

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)    Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Philip L. Dubois    dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon    kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur    winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)    alauricetafoya@yahoo.com

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)    Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

_____

Courtroom Deputy:  Deborah Hansen          Date:  March 31, 2017
Court Reporter:      Mary George            Time:   twenty-two minutes

_____

Criminal Action No.  16-cr-00301-WJM          _Counsel:_

UNITED STATES OF AMERICA,                    Kenneth Harmon

     Plaintiff,

v.

                            Frederic Winocur
1. WILLIAM J. SEARS,                          Philip Dubois (by telephone)
2. SCOTT DITTMAN,

     Defendants.

_____

### COURTROOM MINUTES

_____

STATUS CONFERENCE

10:30 a.m.     Court in Session

Appearances

The defendants' appearances were waived for this hearing.

Court's comments

Discussion

**ORDERED:   The May 24, 2017 Sentencing Hearing for Scott Dittman is VACATED,
and the April 25, 2017 Sentencing Hearing for William J. Sears is
VACATED.**

The Court enters ruling on the record as to Restricted (ECF No. 73).

ORDERED:    **The Court provisionally grants the Defendants' motion for a single sentencing hearing, subject to a reassessment of this ruling by the Court should future developments in this case so warrant.**

              **The parties shall file a Further Joint Status Report no later than Friday, June 30th. The Report shall include, at a minimum, (1) whether a further status conference is appropriate or necessary; (2) whether the parties continue to believe a pre-sentencing evidentiary hearing is required, and (3) whether there is any reason the Court cannot proceed to re-setting the sentencing hearing(s) and the evidentiary hearing on contested sentencing facts, should the parties continue to believe that such a hearing is necessary. To the extent there is a need for a pre-sentencing evidentiary hearing, that hearing will be consolidated as to both defendants.**

10:52  a.m.    Court in Recess
                  Conference concluded

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. **WILLIAM J. SEARS,**
2.   SCOTT M. DITTMAN,

      Defendants.

---

### DEFENDANT WILLIAM SEARS MOTION TO RESTRICT DOCUMENT

---

COMES NOW; William J. Sears, by and through Fredric M. Winocur and Marci G. LaBranche, and respectfully moves to restrict access to Defendant William Sears' Unopposed Motion for Leave to Redact Transcript of Change of Plea Hearing, any order revealing the content of that document, and the brief filed in support of this motion. Mr. Sears requests a "Level 2 Restriction" which would make the document, any order revealing the contents of that document, and brief filed in support of this motion, "viewable by the Court, the government and the affected defendants."

Respectfully submitted this 9th day of May, 2017.

*s/ Fredric M. Winocur*
Fredric M. Winocur
Marci G. LaBranche
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado  80202
Telephone: (303) 629-9700
Fax:  (303) 629-8702
Email: winocur@ridleylaw.com
Email: labranche@ridleylaw.com
*Lawyers for William Sears*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

s/ Heather Grant
Legal Secretary
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 629-9700
Email: grant@ridleylaw.com

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.**   **WILLIAM J. SEARS,** and
2.   SCOTT M. DITTMAN,

      Defendants.

---

## ORDER TO RESTRICT DOCUMENT

---

This matter is before the Court on the Defendants' Motion to Restrict Document No. _____. Upon consideration and for good cause shown,

IT IS ORDERED that Document No. ___, the Defendants' Brief in Support of Motion to Restrict Document No. ___, as well as any order revealing the contents of those documents, are hereby restricted until further order of the Court.

IT IS ORDERED that Document No. ___and Document No. ___ shall be restricted to a "Level 2" and will be "viewable by the Court, the government and the affected defendants" only.

IT IS SO ORDERED on this _____day of May 2017

BY THE COURT:

_____
JUDGE WILLIAM J. MARTINEZ
UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com), Alaurice
Marie Tafoya-Modi (alauricetafoya@yahoo.com), Marci Gilligan LaBranche
(feldman@ridleylaw.com, labranche@ridleylaw.com), Tonya Shotwell Andrews
(charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov, jody.gladura@usdoj.gov,
laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Matthew
Kyle Belcher (cox_ecf@fd.org, matthew_belcher@fd.org), Fredric Michael Winocur
(cratty@ridleylaw.com, winocur@ridleylaw.com), Kenneth Mark Harmon
(andrea.hough@usdoj.gov, kenneth.harmon@usdoj.gov, mascianicas@sec.gov,
usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5991657@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Order
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 5/10/2017 at 12:16 PM MDT and filed on 5/10/2017

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | <u>1:16-cr-00301-WJM</u> |
| **Filer:** | |
| **Document Number:** | 90(No document attached) |

**Docket Text:**
 **ORDER as to William J. Sears (1) granting [87] Defendant William Sears' Motion to Restrict Document. The Defendant's Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 88 and 89, shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by the Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 5/10/2017. Text Only Entry (wjmsec, )**

**1:16-cr-00301-WJM-1 Notice has been electronically mailed to:**

Philip L. Dubois    dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon    kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur    winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya-Modi (Terminated)    alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov,
USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov,
laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov,
usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Tonya Shotwell Andrews (charisha.cruz@usdoj.gov,
eileen.oconnor-barnes@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Matthew Kyle Belcher
(cox_ecf@fd.org, matthew_belcher@fd.org), Philip L. Dubois (dubois@dubois.com,
pldubois@gmail.com), Kenneth Mark Harmon (andrea.hough@usdoj.gov,
kenneth.harmon@usdoj.gov, mascianicas@sec.gov, usaco.ecfcriminal@usdoj.gov), Marci
Gilligan LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Alaurice Marie
Tafoya-Modi (alauricetafoya@yahoo.com), Fredric Michael Winocur (cratty@ridleylaw.com,
winocur@ridleylaw.com), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Probation-General (cod_efiling@cod.uscourts.gov), USM-Criminal
Division (gillian.fleck@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:5991791@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 5/10/2017 at 1:37 PM MDT and filed on 5/10/2017

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 91(No document attached) |

**Docket Text:**
 ORDER as to William J. Sears (1) granting [89] Defendant William Sears' Unopposed Motion for Leave to Redact Transcript of Change of Plea Hearing. The Defendant's Motion is GRANTED for good cause shown. Counsel for Defendant Sears are directed to contact my Court Reporter, Mary George, at 303–335–2109, to discuss the necessary arrangements and procedures by which Ms. George may comply with this Order. SO ORDERED by Judge William J. Martinez on 05/10/2017. Text Only Entry (angar, )

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Philip L. Dubois    dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon    kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur    winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, Eileen.OConnor–Barnes@usdoj.gov,
USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jody.gladura@usdoj.gov,
laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov, pamela.thompson3@usdoj.gov,
usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.   **WILLIAM J. SEARS,**
2.   **SCOTT M. DITTMAN,**

        Defendants.

---

### DEFENDANT WILLIAM SEARS' AND SCOTT DITTMAN'S MOTION TO RESTRICT DOCUMENT

---

      COMES NOW; William J. Sears, by and through Fredric M. Winocur and Marci G. LaBranche, and Scott M. Dittman, by and through Philip L. Dubois, and respectfully move to restrict access to the Parties' First Supplemental Joint Status Report, any order revealing the content of that document, and the brief filed in support of this motion. Defendants request a "Level 2 Restriction" which would make the document, any order revealing the contents of that document, and brief filed in support of this motion, "viewable by the Court, the government and the affected defendants."

      Respectfully submitted this 30th day of June, 2017.

                           *s/ Fredric M. Winocur*
                           Fredric M. Winocur
                           Marci G. LaBranche
                           Ridley, McGreevy & Winocur, P.C.
                           303 16th Street, Suite 200
                           Denver, Colorado  80202
                           Telephone: (303) 629-9700
                           Fax:  (303) 629-8702

Email: winocur@ridleylaw.com
Email: labranche@ridleylaw.com
*Lawyers for William Sears*

*s/ Philip L. Dubois*
Philip L. Dubois
411 S. Cascade Ave. F12
Colorado Springs, CO 80903-3809
Telephone: (719) 635-4848
Email:      dubois@dubois.com
*Lawyer for Scott Dittman*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*s/  Heather Grant*
Legal Secretary
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 629-9700
Email:  grant@ridleylaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    **WILLIAM J. SEARS, and**
2.    **SCOTT M. DITTMAN,**

      Defendants.

---

## ORDER TO RESTRICT DOCUMENT

---

    This matter is before the Court on the Defendants' Motion to Restrict Document No. ____ and No. ____.  Upon consideration and for good cause shown,

    IT IS ORDERED that Document No. ____, the Defendants' Brief in Support of Motion to Restrict Document No. ____, as well as any order revealing the contents of those documents, are hereby restricted until further order of the Court.

    IT IS ORDERED that Document No. ____ and Document No. ____ shall be restricted to a "Level 2" and will be "viewable by the Court, the government and the affected defendants" only.

    IT IS SO ORDERED on this _____day of July 2017

                    BY THE COURT:


                    _____
                    JUDGE WILLIAM J. MARTINEZ
                    UNITED STATES DISTRICT COURT
                    DISTRICT OF COLORADO

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Bcc:
--Case Participants: Philip L. Dubois (dubois@dubois.com, pldubois3@gmail.com), Matthew
Kyle Belcher (cox_ecf@fd.org, matthew_belcher@fd.org), Tonya Shotwell Andrews
(caseview.ecf@usdoj.gov, charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov,
jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Alaurice Marie Tafoya-Modi (alauricetafoya@yahoo.com),
Fredric Michael Winocur (cratty@ridleylaw.com, winocur@ridleylaw.com), Kenneth Mark Harmon
(andrea.hough@usdoj.gov, caseview.ecf@usdoj.gov, kenneth.harmon@usdoj.gov,
mascianicas@sec.gov, usaco.ecfcriminal@usdoj.gov), Marci Gilligan LaBranche
(feldman@ridleylaw.com, labranche@ridleylaw.com), Judge William J. Martinez
(deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:6061539@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Leave to
Restrict
Content-Type: text/html
```

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 6/30/2017 at 4:55 PM MDT and filed on 6/30/2017

**Case Name:**      USA v. Sears et al

**Case Number:**      1:16–cr–00301–WJM

**Filer:**

**Document Number:** 107(No document attached)

**Docket Text:**
**ORDER as to William J. Sears (1) and Scott M. Dittman (2) granting Defendant William Sears' and Scott Dittman's Motion to Restrict Document [104]. The Defendants' Motion is GRANTED for good cause shown. The documents filed at ECF Nos. 105 and 106 shall remain RESTRICTED at RESTRICTION LEVEL 2 (viewable only by the Selected Parties and the Court). SO ORDERED by Judge William J. Martinez on 6/30/2017. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Philip L. Dubois    dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon    kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov,
CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur    winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Eileen.OConnor–Barnes@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth Mark Harmon     kenneth.harmon@usdoj.gov, Andrea.Hough@usdoj.gov,
CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Eileen.OConnor–Barnes@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
pamela.thompson3@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, COX_ECF@fd.org

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    WILLIAM J. SEARS, and
2.    SCOTT M. DITTMAN,

     Defendants.

_____

### MOTION TO WITHDRAW
_____

The United States of America, by and through its undersigned counsel, respectfully moves to permit Kenneth M. Harmon to withdraw as counsel of record for the government in this case, effective December 28, 2017, and to terminate electronic service to him as of that date as well.

As grounds for the motion, the government states that Kenneth M. Harmon is resigning his position as an Assistant U.S. Attorney for the District of Colorado and so will no longer be employed in that capacity. The government will file a notice appearance for substitute counsel by the effective date.

Respectfully submitted this 26th day of December, 2017.

Respectfully submitted,

ROBERT C. TROYER
United States Attorney

by: s/ Kenneth M. Harmon
KENNETH M. HARMON
Assistant United States Attorney

U.S. Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Tel. No. (303) 454-0100
Fax No. (303) 454-0402
E-mail: kenneth.harmon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of December, 2016, I electronically filed the foregoing
**MOTION TO WITHDRAW** with the Clerk of the Court using the CM/ECF system, which will
send notification of such filing to any and all counsel of record.


s/ Kenneth M. Harmon
KENNETH M. HARMON
Office of the United States Attorney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. WILLIAM J. SEARS, and
2. SCOTT M. DITTMAN

    Defendants.

---

## ENTRY OF APPEARANCE OF COUNSEL

---

To:    The clerk of court and all parties of record

    I hereby certify that I am a member in good standing of the bar of this court, and I appear in this case as counsel for:

    the Government

    DATED at Denver, Colorado this 27th day of December, 2017.

    Jeremy Sibert
Name of Attorney

United States Attorney's Office
Firm Name

1801 California Street, Suite 1600
Office Address

Denver, CO, 80202
City, State, ZIP Code

303-454-0100
Telephone Number

Jeremy.Sibert@usdoj.gov
Primary CM/ECF E-mail Address

Respectfully submitted this 27th day of December, 2017.

ROBERT C. TROYER
United States Attorney

By:  *s/ Jeremy Sibert*
JEREMY SIBERT
Assistant U.S. Attorney
United States Attorney's Office
1801 California Street
Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
Fax: (303) 454-0401
E-mail: Jeremy.Sibert@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.    **WILLIAM J. SEARS,** and
2.    SCOTT M. DITTMAN,

        Defendants.

---

## MOTION TO WITHDRAW AS COUNSEL FOR WILLIAM J. SEARS AND FOR APPOINTMENT OF NEW COUNSEL FROM THE CRIMINAL JUSTICE ACT PANEL

---

William J. Sears, through undersigned counsel, moves this Court for an Order granting undersigned counsel's motion to withdraw, and for the appointment of a member of the Criminal Justice Act Panel to represent him going forward. As grounds, Mr. Sears states as follows:

1. Undersigned counsel seek leave to withdraw from further representation of Mr. Sears, pursuant to Colorado Rule of Professional Conduct 1.16(a)(3), as Mr. Sears has requested undersigned counsel's disengagement, has requested the return of his file, and has instructed counsel to take no further action on his behalf. Mr. Sears seeks the appointment of new counsel under the Criminal Justice Act.

2. Colorado Rule of Professional Conduct 1.16 further authorizes withdrawal for good cause. *See* Colo. RPC 1.16(b)(7) (2017); *see also* 1.16(a)(1). Undersigned counsel believes there is good cause for withdrawal, as an ethical conflict has developed between counsel and Mr. Sears. Undersigned counsel is precluded from disclosing the

nature of the underlying conflict with more particularity, as such information would be protected by the attorney-client privilege. *See* Colo. RPC 1.6.

3.      As additional grounds for withdrawal, pursuant to Colo. RPC 1.16(b)(4) & (b)(7), there has been a breakdown of the attorney-client relationship between undersigned counsel and Mr. Sears, further requiring counsel's withdrawal to avoid prejudice to Mr. Sears.  Mr. Sears desires the benefit of new counsel.

4.      As alternative grounds for this motion, Mr. Sears is unable to fulfill his financial obligations to undersigned counsel, which would result in significant financial hardship moving forward.  Withdrawal is further appropriate under these added grounds, pursuant to Colo. RPC 1.16(b)(5) & (6).

5.      Although not required under D.C.COLO.LCivR 7.1(b)(4), undersigned counsel has reached out to counsel for the Government, Assistant U.S. Attorney Jeremy Seibert, to apprise him of this development.  The Government understands that the source of the conflict, including Mr. Sears' reasons for terminating undersigned counsel at this time, cannot be made known to the Government. Accordingly, without having the ability to more fully evaluate its position, the Government therefore intends to oppose this motion.

6.      Mr. Sears has been informed that he is personally responsible for complying with all court orders and time limitations established by applicable rules and that there are no court dates currently set in this matter.

7.      Pursuant to D.C.Colo.LAttyR 5(b), a copy of this motion has been mailed to Mr. Sears.

8.      This motion for withdrawal is filed as soon as practicable upon counsel's becoming aware of its grounds.

9.      As the Court is aware, Federal Rule of Criminal Procedure 44(a) states in pertinent part that, "A defendant who is unable to obtain counsel is entitled to have counsel appointed to represent the defendant at every stage of the proceeding from initial appearance through appeal, unless the defendant waives this right."

10.     As Mr. Sears is not financially able to obtain counsel, he requests the appointment of CJA counsel.  Mr. Sears' CJA 23 Financial Affidavit will be filed under seal contemporaneous with the filing of this motion.

WHEREFORE, undersigned counsel respectfully requests that this Court issue an Order granting undersigned counsel's withdrawal from further representation of Mr. Sears, and to appoint a member of the Criminal Justice Act Panel to represent Mr. Sears.

Respectfully submitted this 8th day of February, 2018.

<div style="text-align:right">

*s/ Fredric M. Winocur*
Fredric M. Winocur
Marci G. LaBranche
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado  80202
Telephone: (303) 629-9700
Fax:  (303) 629-8702
Email:    winocur@ridleylaw.com
Email:    labranche@ridleylaw.com
*Lawyers for William Sears*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following:

Jeremy S. Sibert
Assistant United States Attorney
U.S. Attorney's Office
1225 Seventeenth Street Suite 700
Denver, Colorado  80202
Telephone: (303) 454-0100
Fax:  (303) 454-0402
Email: Jeremy.Sibert@usdoj.gov

s/ Jennifer J. Feldman
Paralegal
Ridley, McGreevy & Winocur, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Telephone: (303) 629-9700
Email:  feldman@ridleylaw.com

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Kenneth (Former AUSA) Harmon (andrea.hough@usdoj.gov,
caseview.ecf@usdoj.gov, kenneth.harmon@usdoj.gov, mascianicas@sec.gov,
usaco.ecfcriminal@usdoj.gov), Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov, hagop.ayvazian@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Matthew Kyle Belcher (cecilia_hernandez@fd.org,
co.ecf@fd.org, matthew_belcher@fd.org), Philip L. Dubois (dubois@dubois.com,
pldubois3@gmail.com), Andres Rene Guevara (andres@guevaracoloradolaw.com), Marci Gilligan
LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Jeremy S. Sibert
(brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Alaurice Marie Tafoya-Modi (alauricetafoya@yahoo.com),
Fredric Michael Winocur (cratty@ridleylaw.com, winocur@ridleylaw.com), Judge William J.
Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), ad hoc (mix_chambers@cod.uscourts.gov)
--No Notice Sent:

Message-Id:6373822@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Memorandum
```
Content−Type: text/html

### U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 2/14/2018 at 11:43 AM MST and filed on 2/14/2018

**Case Name:**    USA v. Sears et al

**Case Number:**    <u>1:16−cr−00301−WJM</u>

**Filer:**

**Document Number:** 119(No document attached)

**Docket Text:**

 **MEMORANDUM regarding [117] MOTION to Withdraw as Attorney *for William J. Sears and for Appointment of New Counsel from the Criminal Justice Act Panel* by Fredric Winocur & Marci LaBranche filed by William J. Sears. Motion(s) referred to Magistrate Judge Kristen L. Mix. by Judge William J. Martinez on 2/14/2018. Text Only Entry (wjmsec, )**

**1:16−cr−00301−WJM−1 Notice has been electronically mailed to:**

Philip L. Dubois    dubois@dubois.com, pldubois3@gmail.com

Kenneth (Former AUSA) Harmon (Terminated)    USACO.ECFCriminal@usdoj.gov, Andrea.Hough@usdoj.gov, CaseView.ECF@usdoj.gov, CaseView.ecf@usdoj.gov, kenneth.harmon@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert     Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Eileen.OConnor–Barnes@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
hagop.ayvazian@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, cecilia_hernandez@fd.org, co.ecf@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Kenneth (Former AUSA) Harmon (andrea.hough@usdoj.gov,
caseview.ecf@usdoj.gov, kenneth.harmon@usdoj.gov, mascianicas@sec.gov,
usaco.ecfcriminal@usdoj.gov), Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, eileen.oconnor-barnes@usdoj.gov, hagop.ayvazian@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Matthew Kyle Belcher (cecilia_hernandez@fd.org,
co.ecf@fd.org, matthew_belcher@fd.org), Philip L. Dubois (dubois@dubois.com,
pldubois3@gmail.com), Andres Rene Guevara (andres@guevaracoloradolaw.com), Marci Gilligan
LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Jeremy S. Sibert
(brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Alaurice Marie Tafoya-Modi (alauricetafoya@yahoo.com),
Fredric Michael Winocur (cratty@ridleylaw.com, winocur@ridleylaw.com), Judge William J.
Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov)
--No Notice Sent:

Message-Id:6373993@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion to Withdraw
as Attorney
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 2/14/2018 at 1:01 PM MST and filed on 2/14/2018

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16-cr-00301-WJM |
| **Filer:** | |
| **Document Number:** | 120(No document attached) |

**Docket Text:**
 ORDER granting [117] Motion to Withdraw as Attorney. Fredric Michael Winocur and Marci Gilligan LaBranche withdrawn from case as to William J. Sears (1). On review of Defendant Sears' financial affidavit [#118], the Court finds that he is entitled and qualified for the appointment of counsel under Fed.R.Crim.P. 44(a) and 18 U.S.C. section 3006A(b). Accordingly, IT IS HEREBY ORDERED that counsel shall be appointed to represent Defendant William J. Sears. By Magistrate Judge Kristen L. Mix on February 14, 2018. Text Only Entry (klm)

**1:16-cr-00301-WJM-1 Notice has been electronically mailed to:**

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Kenneth (Former AUSA) Harmon (Terminated)     USACO.ECFCriminal@usdoj.gov,
Andrea.Hough@usdoj.gov, CaseView.ECF@usdoj.gov, CaseView.ecf@usdoj.gov,
kenneth.harmon@usdoj.gov, mascianicaS@sec.gov

Fredric Michael Winocur     winocur@ridleylaw.com, cratty@ridleylaw.com

Alaurice Marie Tafoya–Modi (Terminated)     alauricetafoya@yahoo.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert     Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Eileen.OConnor–Barnes@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
hagop.ayvazian@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov,
michelle.lockman@usdoj.gov, usaco.ecfcivil@usdoj.gov

Matthew Kyle Belcher (Terminated)     Matthew_Belcher@fd.org, cecilia_hernandez@fd.org, co.ecf@fd.org

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1.  WILLIAM J. SEARS,**

Defendant.

---

## ENTRY OF APPEARANCE

---

Peter R. Bornstein, pursuant to appointment through the Criminal Justice Act,

hereby enters his appearance on behalf of the Defendant William J. Sears.

Respectfully submitted this 6th day of March, 2018.

THE LAW OFFICES OF PETER R. BORNSTEIN

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
Facsimile: 720-287-5674
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March, 2018, I electronically filed the foregoing **ENTRY OF APPEARANCE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ *Jeannette Wolf*
**THE LAW OFFICES OF PETER R. BORNSTEIN**

2

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, hagop.ayvazian@usdoj.gov, jason.haddock@usdoj.gov,
jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Peter R.
Bornstein (jwolf@prblegal.com, pbornstein@prblegal.com), Philip L. Dubois
(dubois@dubois.com, pldubois3@gmail.com), Andres Rene Guevara
(andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Jeremy S. Sibert (brittany.herrera@usdoj.gov,
caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Judge
William J. Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (gillian.fleck@usdoj.gov,
jason.brackett@usdoj.gov, royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6401487@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 3/6/2018 at 2:29 PM MST and filed on 3/6/2018

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | <u>1:16–cr–00301–WJM</u> |
| **Filer:** | |
| **Document Number:** | 122(No document attached) |

**Docket Text:**
 **ORDER as to William J. Sears (1) and Scott M. Dittman (2): This matter is before the Court on the Parties' First Supplemental Joint Status Report [106]. The Parties are DIRECTED to file an updated Joint Status Report on or before <u>March 23, 2018</u>, which should include, without limitation, the items the Court required counsel to address in its [79] Minute Entry of March 31, 2017. SO ORDERED by Judge William J. Martinez on 3/6/2018. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert     Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, hagop.ayvazian@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Philip L. Dubois     dubois@dubois.com, pldubois3@gmail.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert     Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, hagop.ayvazian@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. **WILLIAM J. SEARS, and**
2. **SCOTT M. DITTMAN,**

Defendants.

---

## JOINT STATUS REPORT

---

The United States of America, by Jeremy Sibert; William Sears, by Peter Bornstein; and Scott Dittman, by Philip Dubois and Andres Guevara, submit this joint status report.

1.       By its order of March 6, 2018 (Doc. 122), this Court required the parties to file an updated joint status report addressing the items listed in the Court's minute entry of March 31, 2017 (Doc. 79). Those items are: (1) whether a further status conference is appropriate or necessary; (2) whether the parties continue to believe a pre-sentencing evidentiary hearing is required; and (3) whether there is any reason the Court cannot proceed to re-setting the sentencing hearing(s) and the evidentiary hearing on contested sentencing facts, should the parties continue to believe that such a hearing is necessary.

2.       The defendants pled guilty pursuant to agreements with the government

that required the defendants to cooperate with the government.  (Docs. 56, 67-68).  The principal focus of the defendants' ongoing assistance and cooperation pertains to the pending prosecution of Guy Jean-Pierre, who is charged in *United States v. Jean-Pierre*, Case No. 17-cr-0008-WJM (D. Colo.).  Mr. Jean-Pierre's trial has been continued to May 21, 2018.

3.      The parties have conferred, and the defendants, through counsel, have determined that their position(s) concerning whether factual sentencing issues should be litigated will be shaped and informed by sentencing decisions, positions, and recommendations that will be made by the parties arising out of the defendants' assistance to the government in the prosecution of Guy Jean-Pierre and potential other matters.   As a result of Mr. Jean-Pierre's pending trial, defendants are still under the obligation to cooperate pursuant to their plea agreements.  Since defendants may cooperate, sentencing decisions, positions, and recommendations arising from that cooperation are not yet ripe.  The parties are therefore not in a position authoritatively and reliably to state to the Court at this time which sentencing facts are currently in dispute that would need to be resolved by the Court prior to a sentencing hearing.  The parties ask leave to submit additional joint status reports as the prosecution of Jean-Pierre progresses and the defendants' cooperation unfolds.  The government has informed defense counsel their concerns with the defendants' lack of cooperation up to this point.

4.      **Whether a further status conference is appropriate or necessary:  t**he parties do not believe that a status hearing is necessary.  Periodic status reports will ensure that the case remains under control.

2

5.  **Whether the parties continue to believe a pre-sentencing evidentiary hearing is required:** the parties address this question in paragraph 3 above. The short answer is that the parties cannot yet make a reasoned and well-grounded decision on whether to ask for a pre-sentencing evidentiary hearing.

6.  **Whether there is any reason the Court cannot proceed to re-setting the sentencing hearing(s) and the evidentiary hearing on contested sentencing facts, should the parties continue to believe that such a hearing is necessary:**

Because

a.  the Jean-Pierre trial will not occur at least until May 21, 2018,

b.  any sentencing that may result from a conviction of Mr. Jean-Pierre will not happen for some time after that,

c.  cooperation obligations are ongoing,

d.  the defense needs more time to investigate some of the contested sentencing facts, including the lack of cooperation by defendants at this time, and

e.  counsel for Mr. Sears is new to a complex case the discovery in which amounts to thousands of pages, to include Mr. Sears lack of credibility in his cooperation as of this notice,

f.  New counsel for Mr. Sears, Peter Bornstein, needs time (60 days) to evaluate the filing of a motion to withdraw his plea. Obviously, the filing of such a motion will impact the re-setting of sentencing hearings.

The parties ask that the sentencing hearings continue to be deferred and that the case continue until a time after Mr. Jean-Pierre's trial.

Respectfully submitted this 21st day of March, 2018.

*s/ Jeremy Sibert*
Jeremy Sibert
Assistant United States Attorney
U.S. Attorney's Office
1225 Seventeenth Street Suite 700
Denver, Colorado  80202
Telephone: (303) 454-0100
Fax:  (303) 454-0402Email:
   jeremysibert@usdoj.gov

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Boulevard
Suite 500
Greenwood Village, CO 80111
720-354-4440
Fax: 720-287-5674
Email: pbornstein@prblegal.com
*Lawyer for William Sears*

*s/ Philip L. Dubois*
Philip L. Dubois
411 S. Cascade Ave. F12
Colorado Springs, CO 80903-3809
Telephone: (719) 635-4848
Email:   dubois@dubois.com

*s/ Andres Guevara*
Andres Rene Guevara
Andres R. Guevara, Law Office of
2806 N. Speer Boulevard
Denver, CO 80211
720-379-8262
Fax: 720-699-9170
Email: andres@guevaracoloradolaw.com

*Lawyers for Scott Dittman*

4

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*s/ Jeremy Sibert*

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Peter R.
Bornstein (jwolf@prblegal.com, pbornstein@prblegal.com), Andres Rene Guevara
(andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Jeremy S. Sibert (brittany.herrera@usdoj.gov,
caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Judge
William J. Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (gillian.fleck@usdoj.gov,
jason.brackett@usdoj.gov, royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6888664@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Hearing
Content−Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 2/8/2019 at 11:19 AM MST and filed on 2/8/2019

**Case Name:**       USA v. Sears et al
**Case Number:**     1:16–cr–00301–WJM
**Filer:**
**Document Number:**  128(No document attached)

**Docket Text:**
**ORDER as to William J. Sears (1) and Scott M. Dittman (2) granting the Government's Motion for Sentencing Date [127]. The Government's Motion is GRANTED for good cause shown. Defendant Sears' Sentencing Hearing is hereby SET for July 11, 2019 at 1:30 p.m. in Courtroom A801. Defendant Dittman's Sentencing Hearing is hereby SET for July 11, 2019 at 9:30 a.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards (as revised effective December 1, 2018) with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 2/8/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jason.haddock@usdoj.gov,
jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Peter R. Bornstein      pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche      labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jason.haddock@usdoj.gov,
jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, michelle.lockman@usdoj.gov,
usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.    WILLIAM J. SEARS,

       Defendant.

_____

**UNITED STATES' MOTION FOR PRELIMINARY ORDER OF FORFEITURE FOR DIRECT ASSETS, SUBSTITUTE ASSETS, AND A PERSONAL FORFEITURE MONEY JUDGMENT AGAINST DEFENDANT WILLIAM J. SEARS**

_____

COMES NOW the United States of America, by and through United States Attorney Jason R. Dunn and Assistant United States Attorney Tonya S. Andrews, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, and moves this Court to enter a Preliminary Order of Forfeiture in this case.

In support, the United States sets forth the following:

**I.    Procedural Background**

1.    On November 14, 2016, defendant William J. Sears was charged by Information in Counts One and Two with conspiracy to defraud the United States and one of its agencies, by committing violations of 15 U.S.C. §§ 78j(b) and 78ff(a), 15 U.S.C. § 77e(a) and 78ff(a), 18 U.S.C. § 1341, and 18 U.S.C. § 1343, all in violation of 18 U.S.C.

§ 371; and with willfully making a false declaration under the penalty of perjury, in violation of 26 U.S.C. § 7206(1). (Doc. 43).

2.      The Information also sought forfeiture against defendant Sears, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of numerous assets, including a money judgment, that constituted or derived from gross proceeds traceable to the commission of the offense charged in Count One of the Information or property traceable to such property. (Doc. 43).

3.      On November 14, 2016, the United States and defendant Sears entered into a Plea Agreement in this case, in which he plead guilty to Counts One and Two of the Information, with conspiracy to defraud the United States and one of its agencies in violation of 18 U.S.C. § 371; and with filing a false income tax return, in violation of Title 26, United States Code, Section 7206(1). (Doc. 56). In the Plea Agreement, defendant Sears agreed to forfeit to the United States any and all interest he may have in all of the following property derived from the sale of Fusion Pharm common stock, and constituting direct and indirect proceeds of Count One:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee[1]; and

---

[1] Pursuant to the plea agreement, the Government agreed to apply $2,472,945 of the Moors and Cabot funds, to Mr. Sears' restitution.

> 4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.[2]

4.      The defendant further agreed to forfeit, as substitute assets:

> a.  $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

> b.  Any monetary value he realizes in the future from his interest in FusionPharm, Inc. ("FusionPharm").[3]

5.      The defendant also agreed to the entry of a preliminary order of forfeiture for a personal money judgment described above.  Specifically, the defendant agreed that $12,204,172.00 constituted proceeds from the defendant and his co-defendant's scheme.[4]

6.      As set forth in the Affidavit of Special Agent Jared Erwin, Internal Revenue Service, defendant Sears obtained and retained $10,810,916.90 of the $12,204,172.00 in FusionPharm stock sales proceeds, personally or through accounts he controlled.  *See* Affidavit of Special Agent Jared Erwin, Internal Revenue Service (hereinafter "Erwin Aff."), Attachment A, p. 8, ¶¶31, 33.

---

[2] Defendant William Sears also agreed to the forfeiture of numerous other direct assets.  However, those assets were under the direction and control of co-defendant Scott Dittman and are being directly forfeited from defendant Dittman.

[3] The government is presently unaware of any funds realized by the defendant from the dissolution of FusionPharm.

[4] The parties agreed that the defendant and his co-defendant Scott Dittman would be joint and severally liable for the forfeiture money judgment.  (Doc. 67, p. 2-3).  However, in June 5, 2017, in *United States v. Honeycutt*, the Supreme Court determined that there was no legal authority for joint and several forfeiture money judgments.  Rather, the Court held that a defendant could only be found liable for the proceeds he obtained, directly or indirectly, from the criminal conduct.  Accordingly, the United States analyzed the financial accounts in this case to determine the amount of funds obtained by defendant William Sears and co-defendant Scott Dittman, respectively.

7.     The United States has identified $8,896,867.41 in direct and substitute assets that are subject to forfeiture from defendant William Sears.  *See* Erwin Aff. ¶34.

8.     Therefore, the United States seeks an order of forfeiture against defendant William Sears of the following:

> 1).     The following directly traceable assets:
>
>> a.     $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;
>>
>> b.     $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;
>>
>> c.     $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and
>>
>> d.     $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monace Street, Denver, Colorado.
>
> 2).     The following substitute assets:
>
>> a.     $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and
>>
>> b.     any monetary value realized in the future from his interest in FusionPharm.
>
> 3).     A personal money judgment in the amount of $1,914,049.49.

## II.     Argument

Pursuant to Rule 32.2(b)(1)(A) of the Federal Rules of Criminal Procedure, the Court must determine what property is subject to forfeiture after a plea of guilty.  When a personal money judgment is sought, "the court must determine the amount of money the

4

defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). Once the property is determined to be subject to forfeiture, the Court "must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment." Fed. R. Crim. P. 32.2(b)(2)(A). It is mandatory that the Preliminary Order of Forfeiture is entered "sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant." Fed. R. Crim. P. 32.2(b)(2)(B).

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Court shall order criminal forfeiture of all property constituting or derived from proceeds traceable to specified unlawful activity such as those in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 15 U.S.C. § 77e(a) and 78ff(a), 18 U.S.C. § 1341, and 18 U.S.C. § 1343. In this case, the defendants William Sears and Scott Dittman obtained $12,204,172.00 from the criminal conduct charged in Count One, conspiracy to defraud the United States and one of its agencies, by committing violations of 15 U.S.C. §§ 78j(b) and 78ff(a), 15 U.S.C. § 77e(a) and 78ff(a), 18 U.S.C. § 1341, and 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 371. Of these $12,204,172.00 in proceeds realized by the conspiracy, defendant William Sears retained $10,810,916.90 in FusionPharm stock proceeds. *See* Erwin Aff ¶33.

### 1). __Direct Assets__

In this case, the United States has shown, and the defendant has agreed, that $8,749,143.04 of the proceeds from the criminal offense were traceable to the following directly forfeitable assets:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monace Street, Denver, Colorado.

### 2.) **Substitute Assets**

When proceeds or directly forfeitable property are unavailable, the court "shall order" the forfeiture of substitute assets up to the value of the unavailable assets. 21 U.S.C. § 853(p)(2). Pursuant to 21 U.S.C. § 853(p), an asset is unavailable when "as a result of any act or omission of the defendant" the asset: "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third person; (C) has been placed beyond the jurisdiction of the Court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1)(A)-(E). These factors are determined by the court. *United States v. Alamoudi*, 452 F.3d 310, 315 (4th Cir. 2006) (Section 853(p) "requires the court to allow the Government to seize substitute property when the defendant has placed the assets initially sought - and to which the Government is legally entitled - beyond the court's reach."). Further, Section 853(p) is interpreted "liberally" so as to prevent "efforts by a defendant to circumvent the

economic impact of an anticipated criminal forfeiture sentence." *Id.* at 316 (citation omitted).

In this case, the United States has identified two assets belonging to defendant William Sears that may be forfeited as a substitute asset: (1) $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and (2) any monetary value he realizes in the future from his interest in FusionPharm, Inc. ("FusionPharm").[5]

### 3). __Money Judgment__

The United States also seeks a money judgment for the proceeds obtained by defendant William Sears that it was unable to recover through directly traceable assets or identified substitute assets. In determining the amount of a money judgment, the Court must determine the amount of proceeds obtained by the defendant that are no longer available for forfeiture for the reasons set forth in 21 U.S.C. § 853(p). As noted above, these are proceeds that "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third person; (C) has been placed beyond the jurisdiction of the Court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1)(A)-(E).

Here, defendant William Sears obtained $10,810,916.90 of the $12,204,172.00 in proceeds of the offense in Count One for which defendant Sears has pleaded guilty. *See* Erwin Aff. ¶33. As set forth above, the United States has identified and is seeking

---

[5] The government is presently unaware of any funds realized by the defendant from the dissolution of FusionPharm.

forfeiture of $8,896,867.41 in directly traceable assets ($8,749,143.04) and substitute assets ($147,724.38). Accordingly, the United States seeks an order of forfeiture in the form of a personal money judgment in the amount of $1,914,049.49 in proceeds which were obtained and retained by William Sears but were since dissipated or transferred to third parties and are unable to be located by the United States.

**Conclusion**

Accordingly, the United States requests that the Court grant its Motion for Preliminary Order of Forfeiture for Direct Assets, Substitute Assets, and a Personal Money Judgment against Defendant William J. Sears.

WHEREFORE, the United States moves this Court to enter the Preliminary Order of Forfeiture for Direct Assets, Substitute Assets, and a Personal Money Judgment, tendered herewith, for the reasons set forth above.

DATED this 12th day of February 2019.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:   s/ Tonya Andrews
Tonya S. Andrews
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: tonya.andrews@usdoj.gov
*Attorney for the United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of February 2019, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notice to all counsel of record.

s/ *Jody Gladura*
FSA Paralegal
Office of the U.S. Attorney

**AFFIDAVIT IN SUPPORT OF MOTION FOR**

**PRELIMINARY ORDER OF FORFEITURE**

I, Jared Erwin, Special Agent with the Internal Revenue Service, being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge, and belief.

**Entities**

1.      FusionPharm, Inc. ("FusionPharm") is a Nevada corporation headquartered in Commerce City, Colorado. Scott Dittman is the President and CEO of FusionPharm.

2.      Microcap Management LLC ("Microcap") was formed in 2009 by William Sears. Sears controlled Microcap's bank accounts and brokerage accounts. Sears sold FusionPharm stock through his Microcap brokerage accounts from April 2011, through December 2012.

3.      Bayside Realty Holdings LLC ("Bayside") was formed on October 28, 2011 by Sandra Sears, William Sears' mother. According to a former employee of FusionPharm, Defendant Sears controlled Bayside and would tell his mother what actions he wanted her to take on behalf of Bayside. Sandra Sears substantively confirmed the employee's statements during a May 16, 2014 interview with the FBI at her home in North Carolina. Sandra Sears said that Defendant Sears requested her to open bank accounts in the name of Bayside because she was the only person he could trust with his money. Despite Sandra Sears' superficial management of Bayside, Defendant Sears ultimately managed all deposits and withdrawals from the

accounts. According to Sandra Sears, Defendant Sears would contact her when he wanted her to wire money out of the accounts in her name. Even though Sandra Sears had access to the accounts to wire money, Defendant Sears was a signor on all of Bayside's accounts at the bank and was the signor of most, if not all, of the checks drafted on the account.

4. Meadpoint Venture Partners, LLC ("Meadpoint") was formed on October 24, 2011, by Defendant Sears. Meadpoint operated out of the same office space and shared employees with FusionPharm. As of November 11, 2011, Meadpoint was FusionPharm's exclusive distributor for PharmPods in North America. According to the agreement, Meadpoint would purchase the PharmPods at a 15% discount to the retail sales price.

5. Defendant Sears controlled Meadpoint's bank account and brokerage accounts. As discussed in detail below, Meadpoint was also a purported lender to FusionPharm in 2011.

6. Dittman was directly involved with Meadpoint. According to an email sent from Defendant Sears to Dittman on November 14, 2011 containing an attachment titled "Meadpoint Shareholder Agreement.docx," Defendants Dittman and Sears were each 50% owners of all the issued shares and outstanding stock of the Corporation. It also stated that both Defendants Dittman and Sears will have equal say in the management of Meadpoint. The document was dated October 31, 2011 and was not signed.

### Dittman and Sears Realize Millions in Profits

7.      Given that Defendant Dittman was required to disclose his stock transactions, Defendant Sears sold millions of shares for their mutual benefit through the affiliated entities.  He did this by selling shares of FusionPharm's common stock and selling portions of the Bayside and Meadpoint promissory notes, as set forth below.

8.      From April 2011 through July 2012, Microcap sold 678,727 shares of FusionPharm stock through its Oppenheimer account, resulting in proceeds of $1,505,732.  These proceeds were deposited into Wells Fargo Bank account #5993910560 ("account #0560).  Wells Fargo Bank account #0560 was held in the name of Microcap Management, LLC with Defendant William Sears as the only signor.

9.      From August 2012 through December 2012, Microcap sold 56,273 shares of FusionPharm stock through its Scottsdale account, resulting in proceeds of $84,386.  These proceeds were deposited into Wells Fargo Bank account #0560.

10.      In February 2013, Bayside sold a promissory note to five investors for $250,000.00.    These funds were deposited into Wells Fargo Bank account #3905862037 ("account #2037").  Wells Fargo Bank account #2037 was held in the name of Bayside Realty Holdings, LLC, with Defendant William Sears and Sandra L. Sears as signors.

3

11.     From February 2013 through April 2013, Bayside sold 140,000 shares of FusionPharm stock through a Scottsdale account, resulting in proceeds of $75,129. These funds were deposited into Wells Fargo Bank account #2037.

12.     From May 2013 through May 2014, Meadpoint sold 3,190,314 shares of FusionPharm stock through a Scottsdale Securities account, resulting in proceeds of $10,188,925. These proceeds were deposited into Wells Fargo Bank account #6020559917 ("account #9917"). On November 15, 2011, Defendant William Sears opened Meadpoint Wells Fargo Bank account #9917 held in the name of Meadpoint Venture Partners. Defendant Sears was the sole signer of this account until October 21, 2013, when Sandra L. Sears was added.

13.     In September 2013, Meadpoint sold 1,000,000 shares of FusionPharm stock to an individual investor for $100,000.00. These proceeds were deposited into Wells Fargo Bank account #9917.

14.     In total, as outlined above, Defendant Sears' controlled entities and accounts received $12,204,172 in FusionPharm stock proceeds.

**Proceeds and funds seized from Sears' controlled accounts and assets**

15.     On May 16, 2014, the United States seized funds from the following accounts, controlled by Defendant William Sears or his mother, Sandra Sears:

- $8,462,621.24 from Moors and Cabot Trust Account # 4597-6546, held in the name of Sandra Lee Sears, Trust, which had previously received $9,360,000.00 in FusionPharm stock sales proceeds;

4

- $9,455.56 from Wells Fargo Account # 7784731577, which had previously received $9,630,202.83 in FusionPharm stock sales proceeds; and

- $27,066.23 from Meadpoint Wells Fargo Account # 9917, which had previously received $10,178,828.90 in FusionPharm stock sales proceeds.

16.    In addition, Defendant William Sears transferred $147,724.38 from Wells Fargo Account #1577, which had received $9,630,202.83 in FusionPharm stock sale proceeds, to pay off the mortgage on real property 13442 Jackson Drive, Thornton, Colorado, 80241. On or about November 30, 2015, William Sears sold real property located at 13442 Jackson Drive. Through a consent agreement, William Sears remitted $147,724.38 to the United States as directly traceable proceeds to the sale of FusionPharm stock sale proceeds.

17.    Further, through a consent agreement, William Sears remitted an additional $250,000.00 to the United States as a substitute asset for the fraudulently obtained FusionPharm stock sale proceeds.

18.    In total, the United States has recovered $8,896,867.41 of the FusionPharm stock proceeds obtained and retained by William Sears.

### Transfer of FusionPharm stock proceeds to Scott Dittman, Laura Dittman, and Scott Dittman controlled accounts

19.    From February 2013 through March 2014, $333,468.89 in FusionPharm stock sales proceeds was transferred from Wells Fargo Bank account #9917 to Wells Fargo Bank account #5181260307 ("account #0307"). Wells Fargo

Bank account #0307 was held in the name of FusionPharm, with Defendant Scott Dittman as a signer on the account. Defendant Dittman represented himself as a Manager of FusionPharm.

20. Between April 2011 to October 2011, $11,000 in FusionPharm stock sales proceeds was transferred from Wells Fargo Bank account #0560 to Laura Dittman. Laura Dittman is Defendant Scott Dittman's wife. On June 23, 2011, Defendant Dittman sent Defendant Sears an email asking Defendant Sears to "wire $3K from this weeks take to Laura's account?" Laura Dittman was a member of the board of directors of FusionPharm, but did not have any substantive role in the decision making with respect the manipulation of FusionPharm stock. Furthermore, Laura Dittman was never an employee or agent of Microcap Management, LLC. Accordingly, Laura Dittman never engaged in any substantive work on behalf of Microcap Management, LLC or Meadpoint.

21. On March 7, 2014, $20,000 in FusionPharm stock sales proceeds was transferred from Wells Fargo Bank account #9917 to Wells Fargo Bank account number #7964230663 ("account #0663"), through a check made payable to Defendant Scott M. Dittman, which was signed by Sandra Sears. The Wells Fargo Bank account #0663 is held in the name of Defendant Scott Dittman.

22. On March 5, 2014, Laura Dittman, Defendant Scott Dittman's wife, initiated the purchase of real property located at 194 Basket Road, Oley, Pennsylvania 19547 for $750,000.00.

23. On March 14, 2014, $70,000 in FusionPharm stock sales proceeds were withdrawn in cash from Wells Fargo Bank account #9917. Sandra Sears signed the withdrawal ticket. On the same day, the funds were deposited into the Wells Fargo Bank account #0663. On March 14, 2014, a check for $75,000 was issued from Wells Fargo Bank account #0663 to the order of ReMax of Reading. This check was a portion of the payment on the 194 Basket Road property.

24. In a May 14, 2014, letter, Sandra Lee Sears directed her brokers at Moors & Cabot to transfer $688,000.00 from her trust account to VIST Bank "for a business transaction to be later named as an asset of the trust. Should you have any queries regarding please contact myself or my son William to whom you already have written authority to speak to on my behalf." The letter also included a hand-written note stating, "Broker spoke with client funds are being used for house purchase." The funds represented a pay-off of the outstanding amount due for the purchase of the Basket Road property. On May 15, 2014, $688,000 was transferred to a bank account held by Paragon Abstract from Sandra Sears Moors and Cabot account # 6546, which had previously received $9,360,000 in FusionPharm stock sales proceeds.

25. From April 2011 through December 2012, $426,022.28 in FusionPharm stock sale proceeds were deposited into Wells Fargo Bank account #9475650090 ("account #0090") from several different accounts. Wells Fargo Bank account #0090 is held in the name of FusionPharm Inc. At the time of opening, William Sears and Sandra Sears were the signors. On October 7, 2011, William Sears and Sandra Sears were removed as signors and Scott Dittman was added as the sole signor.

26.     Prior to October 7, 2011, Wells Fargo Bank account #0090 received $214,397.00 in FusionPharm stock sale proceeds.[1]

27.     After October 7, 2011, Wells Fargo Bank account #0090 received $211,625.28 in FusionPharm stock sale proceeds.

28.     In total, as outlined above, William Sears transferred $1,393,255.10 of FusionPharm stock sale proceeds to accounts and assets controlled by Defendant Scott Dittman.

### Funds Seized from accounts under Scott Dittman's control

29.     On May 16, 2014, the United States seized funds from the following accounts, controlled by Defendant Scott Dittman:

- $20,820.37 seized from Wells Fargo Bank account #0307.  Account #0307 had previously received $333,468.89 in proceeds from the sale of FusionPharm stock;

- $212,273.92 was seized from Wells Fargo Bank account #8141061286. Account #1286 was opened on March 19, 2014, with the sole signer being Defendant Scott Dittman. Account #1286 was held in the name of FusionPharm, Inc.  Account #1286 had previously received $297,918.69 in proceeds from the sale of FusionPharm stock.

---

[1] Because these proceeds were sourced from other accounts controlled by William Sears, they are accounted for Defendant William Sears in numbered paragraphs 8 through 13 based on their initial deposit and not subsequent transfer. However, all transfers of these funds once Defendant Scott Dittman is the sole signor of Wells Fargo Bank account #0090 constitute a transfer from Defendant William Sears' control and benefit to Defendant Scott Dittman's control and benefit.

30.     In total, the United States has recovered $233,094.29 of the FusionPharm stock proceeds obtained and retained by Defendant Scott Dittman, not including 194 Basket Road, Pennsylvania.

## Conclusion

31.     As stated above in numbered paragraph 14, Defendants William Sears and Scott Dittman obtained $12,204,172.00 in FusionPharm stock sales proceeds.

32.     Defendant William Sears then transferred $1,393,255.10 of these proceeds to accounts and assets controlled by Defendant Scott Dittman.  See numbered paragraphs 19 through 27.

33.     Accordingly, Defendant William Sears retained $10,810,916.90 in FusionPharm stock sale proceeds.

34.     As outlined in numbered paragraphs 15 through 18, the United States has recovered $8,896,867.41 of the proceeds obtained and retained by Defendant William Sears.

35.     However, despite due diligence, the United States has been unable to locate the remaining $1,914,049.49 in FusionPharm stock sale proceeds obtained and retained by Defendant William Sears as they were dissipated and transferred to third parties by Defendant William Sears.

36.     Likewise, to date, the United States has recovered $233,094.29 in proceeds obtained and retained by Defendant Scott Dittman.  See numbered paragraphs 29 and 30.

37.    However, despite due diligence, the United States has been unable to
recover the remaining $1,160,160.81 in FusionPharm stock sale proceeds obtained
and retained by Scott Defendant Dittman as they were dissipated and transferred to
third parties by Scott Dittman except for the additional directly traceable asset
described below.

38.    The United States has identified a non-liquid asset, Basket Road, which
was purchased with stock sale proceeds and is valued at approximately $725,000.00.

39.    Besides the direct assets identified above, the United States has been
unable to locate any additional funds traceable to the sale of stock proceeds despite
due diligence because Defendants William Sears and Scott Dittman has dissipated,
transferred, or placed these funds beyond the jurisdiction of the court.

I declare under penalty of perjury that the foregoing is true and correct to the
best of my information, knowledge, and belief.

Jared Erwin, Special Agent
IRS – Criminal Investigation

STATE OF COLORADO                )
                                 ) ss
COUNTY OF Denver                 )

The foregoing was acknowledged before me this 12th day of February, 2019 by
Special Agent Jared Erwin, Internal Revenue Service, CI.

CATHERINE OLGUIN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20014008786
MY COMMISSION EXPIRES MARCH 30, 2021

Notary Public - Colorado

My Commission Expires: 3/30/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     WILLIAM J. SEARS,

      Defendant.

_____

## PRELIMINARY ORDER OF FORFEITURE

_____

THIS MATTER comes before the Court on the United States' Motion for Preliminary Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. The Court having read said Motion and being fully advised in the premises finds:

On November 14, 2016, defendant William J. Sears was charged by Information in Count One with conspiracy to defraud the United States and one of its agencies, violation of 18 U.S.C. § 371; and with willfully making a false declaration under the penalty of perjury, in violation of 26 U.S.C. § 7206(1). (Doc. 43). The Information also sought forfeiture against defendant Sears, pursuant to 18 USC § 981(a)(1)(C) and 28 U.S.C. § 2461 (c), of numerous assets, including a money judgment, that constituted or derived from gross proceeds traceable to the commission of the offense charged in Count One of the Information or property traceable to such property. (Doc. 43).

On November 14, 2016, the United States and defendant William Sears entered

1

into a Plea Agreement, which provides a factual basis and cause to issue a forfeiture

order and issue a personal money judgment under 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c) and Rule 32.2 of the Federal Rules of Criminal Procedure. (Doc. 56).

Defendant William Sears obtained $10,810,916.90 of the 12,204,172.00 in

FusionPharm, Inc. stock sales proceeds, personally, or through accounts he controlled.

The requisite nexus exists between the conspiracy to defraud offense to which

defendant William Sears pleaded guilty, and the following directly traceable assets:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.

Defendant William Sears has an interest in the following substitute assets, which

are subject to forfeiture:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc.

Prior to the disposition of the assets, the United States, or its designated sub-

custodian, is required to seize the forfeited property and provide notice to any third

2

parties pursuant to 21 U.S.C. § 853(n).

THEREFORE, IT IS ORDERED, DECREED AND ADJUDGED:

THAT defendant William Sears's interest in:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado

is forfeited to the United States in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c);

THAT defendant William Sears' interest in:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc

is forfeited to the United States in accordance with 21 U.S.C. § 853(p) as substitute assets.

THAT the United States is directed to seize the property subject to forfeiture, and further to make its return as provided by law;

3

THAT the United States shall publish notice of this Preliminary Order of Forfeiture in accordance with Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, via a government website for at least thirty consecutive days, and to make its return to this Court that such action has been completed;

THAT upon adjudication of all third-party interests, if any, the Court will enter a Final Order of Forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and Rule 32.2(c)(2) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

THAT a Personal Money Judgment against defendant William J. Sears in the amount of $1,914,049.49 in United States currency shall be entered in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

THAT pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, upon entry of this Preliminary Order of Forfeiture, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, pursuant to Rule 45 of the Federal Rules of Civil Procedure.

THAT Pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), this Preliminary Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.

THAT the Court shall retain jurisdiction to enforce this Order and adjudicate the

interests of all third-parties in ancillary proceedings. Fed. R. Crim. P. 32.2(c)(1).

THAT this Preliminary Order of Forfeiture may be amended pursuant to Rule 32.2(e)(1) of the Federal Rules of Criminal Procedure.


SO ORDERED this _____ day of _____, 2019


BY THE COURT:


_____
HONORABLE WILLIAM J. MARTÍNEZ
United States District Court Judge

5

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Peter R. Bornstein (jwolf@prblegal.com, pbornstein@prblegal.com),
Tonya Shotwell Andrews (caseview.ecf@usdoj.gov, charisha.cruz@usdoj.gov,
elizabeth.young2@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Jeremy S. Sibert
(brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Andres Rene Guevara (andres@guevaracoloradolaw.com), Marci
Gilligan LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Judge William J.
Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (gillian.fleck@usdoj.gov,
jason.brackett@usdoj.gov, royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6894141@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 2/12/2019 at 3:09 PM MST and filed on 2/12/2019

**Case Name:**      USA v. Sears et al

**Case Number:**    1:16–cr–00301–WJM

**Filer:**

**Document Number:**  131(No document attached)

**Docket Text:**
**ORDER as to William J. Sears (1) and Scott M. Dittman (2): This matter is before the Court
*sua sponte*. The Parties are DIRECTED to file an updated joint status report, no later than
March 5, 2019, which address all issues, if any, that need to be resolved prior to the
sentencing hearings set for July 11, 2019, including without limitation any remaining
disputes regarding amount of loss or restitution for either Defendant. SO ORDERED by
Judge William J. Martinez on 2/12/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov,
usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Peter R. Bornstein      pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche      labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov,
usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-301-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1.    WILLIAM J. SEARS,

Defendant.
_____

**PRELIMINARY ORDER OF FORFEITURE**
_____

THIS MATTER comes before the Court on the United States' Motion for

Preliminary Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal

Procedure.  The Court having read said Motion and being fully advised in the premises

finds:

On November 14, 2016, Defendant William J. Sears was charged by Information

in Count One with conspiracy to defraud the United States and one of its agencies,

violation of 18 U.S.C. § 371; and with willfully making a false declaration under the

penalty of perjury, in violation of 26 U.S.C. § 7206(1).  (Doc. 43).  The Information also

sought forfeiture against Defendant Sears, pursuant to 18 USC § 981(a)(1)(C) and 28

U.S.C. § 2461 (c), of numerous assets, including a money judgment, that constituted or

derived from gross proceeds traceable to the commission of the offense charged in

Count One of the Information or property traceable to such property. (Doc.  43).

On November 14, 2016, the United States and Defendant William Sears entered

into a Plea Agreement, which provides a factual basis and cause to issue a forfeiture order and issue a personal money judgment under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and Rule 32.2 of the Federal Rules of Criminal Procedure.  (Doc. 56).

Defendant William Sears obtained $10,810,916.90 of the 12,204,172.00 in FusionPharm, Inc. stock sales proceeds, personally, or through accounts he controlled.

The requisite nexus exists between the conspiracy to defraud offense to which Defendant William Sears pleaded guilty, and the following directly traceable assets:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Trustee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.

Defendant William Sears has an interest in the following substitute assets, which are subject to forfeiture:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc.

Prior to the disposition of the assets, the United States, or its designated sub-custodian, is required to seize the forfeited property and provide notice to any third

parties pursuant to 21 U.S.C. § 853(n).

THEREFORE, IT IS ORDERED, DECREED AND ADJUDGED:

THAT Defendant William Sears's interest in:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Trustee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado

is forfeited to the United States in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c);

THAT Defendant William Sears' interest in:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc

is forfeited to the United States in accordance with 21 U.S.C. § 853(p) as substitute assets.

THAT the United States is directed to seize the property subject to forfeiture, and further to make its return as provided by law;

3

THAT the United States shall publish notice of this Preliminary Order of Forfeiture in accordance with Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, via a government website for at least thirty consecutive days, and to make its return to this Court that such action has been completed;

THAT upon adjudication of all third-party interests, if any, the Court will enter a Final Order of Forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and Rule 32.2(c)(2) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

THAT a Personal Money Judgment against Defendant William J. Sears in the amount of $1,914,049.49 in United States currency shall be entered in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

THAT pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, upon entry of this Preliminary Order of Forfeiture, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, pursuant to Rule 45 of the Federal Rules of Civil Procedure.

THAT Pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), this Preliminary Order of Forfeiture shall become final as to the Defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.

THAT the Court shall retain jurisdiction to enforce this Order and adjudicate the

4

interests of all third-parties in ancillary proceedings.  Fed. R. Crim. P. 32.2(c)(1).

THAT this Preliminary Order of Forfeiture may be amended pursuant to Rule 32.2(e)(1) of the Federal Rules of Criminal Procedure.

Dated this 13th day of February, 2019.

BY THE COURT:

William J. Martinez
United States District Judge

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Peter R. Bornstein (jwolf@prblegal.com, pbornstein@prblegal.com),
Tonya Shotwell Andrews (caseview.ecf@usdoj.gov, charisha.cruz@usdoj.gov,
elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov,
jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Jeremy S.
Sibert (brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Andres Rene Guevara (andres@guevaracoloradolaw.com), Marci
Gilligan LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Judge William J.
Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov)
--No Notice Sent:

Message-Id:6928824@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for
Extension of Time to File
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 3/6/2019 at 12:20 PM MST and filed on 3/6/2019

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 135(No document attached) |

**Docket Text:**
**ORDER as to William Sears (1) and Scott M. Dittman (2) granting Defendant Dittman's Unopposed Motion to Request Fourteen Days to File a Joint Status Report [134]. The Motion is GRANTED for good cause shown. The deadline for the Parties to file an updated joint status report pursuant to this Court's Order at ECF No. 131, is extended up to and including March 19, 2019. SO ORDERED by Judge William J. Martinez on 3/6/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16−cr−00301−WJM−1 Notice has been mailed by the filer to:**

**1:16−cr−00301−WJM−2 Notice has been electronically mailed to:**

Peter R. Bornstein    pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara    andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16−cr−00301−WJM−2 Notice has been mailed by the filer to:**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

    1. WILLIAM SEARS,
    2. SCOTT DITTMAN,

      Defendants

---

**MOTION TO CONTINUE JOINT STATUS REPORT**

---

      Comes now the United States of America, through Jason R. Dunn, United States

Attorney, and Jeremy Sibert, Assistant United States Attorney, respectfully requests that

the date for the Joint States Report be moved from March 19, 2019 to April 19, 2019.

      The parties are requesting additional time for several reasons but not due to the

lack of working through the issues that may be pending for the sentencings in the above

matters.   The purpose for the additional time is to try and resolve any differences in

order to present the clearest understandings between all parties for this Court.   Due to

various scheduling conflicts involving other cases, clients and hearings, the parties need

additional time and are requesting until April 19th to file the joint status report.   In

addition, Mr. Dittman is out of state which takes a little more time to communicate and

confirm various positions and options that are presented and need confirmation.

Therefore, the parties are seeking the additional time to file the joint status report ordered by this Court in Doc# 135.

Mr. Andres Guevara, Mr. Scott Dittman's attorney, does not object to this motion and continuance. Mr. Guevara and the government spoke on the phone this afternoon and decided that these continuance was the best approach to trying to resolve any matters before presenting the report to the Court.

The government was unable to reach Mr. Peter R. Bornstein, Mr. William Sears' attorney, regarding this continuance. However, it is the government's position, that additional time to work with Mr. Bornstein regarding this joint status report would be beneficial for all parties, including this Court.

Dated this 19th day of December, 2018.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:   s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov
Attorney for the United States

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December, 2018, I electronically filed the foregoing **MOTION TO CONTINUE JOINT STATUS CONFERENCE REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Andres Guevara**
**Peter Bornstein**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Peter R. Bornstein (jwolf@prblegal.com,
pbornstein@prblegal.com), Andres Rene Guevara (andres@guevaracoloradolaw.com), Marci
Gilligan LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Jeremy S. Sibert
(brittany.herrera@usdoj.gov, caseview.ecf@usdoj.gov, diana.brown@usdoj.gov,
jeremy.sibert@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez
(deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (bradshaw.perry@usdoj.gov,
gillian.fleck@usdoj.gov, jason.brackett@usdoj.gov, joseph.braaten@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6954361@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion to Continue
```
Content–Type: text/html

## U.S. District Court – District of Colorado

### District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 3/21/2019 at 4:15 PM MDT and filed on 3/21/2019

**Case Name:**        USA v. Sears et al

**Case Number:**      1:16–cr–00301–WJM

**Filer:**

**Document Number:** 137(No document attached)

**Docket Text:**
 **ORDER as to William Sears (1) and Scott M. Dittman (2) granting the Government's Motion to Continue Joint Status Report [136]. The Motion is GRANTED for good cause shown. The deadline for the Parties to file an updated joint status report pursuant to this Court's Order at ECF No. 131, is extended up to and including** <u>April 19, 2019</u>**. SO ORDERED by Judge William J. Martinez on 3/21/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein      pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche      labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov, diana.brown@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov, Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16−cr−00301−WJM−1 Notice has been mailed by the filer to:**

**1:16−cr−00301−WJM−2 Notice has been electronically mailed to:**

Peter R. Bornstein    pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara    andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov, diana.brown@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov, Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16−cr−00301−WJM−2 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

     Plaintiff,

v.

**1. WILLIAM J. SEARS,**

     Defendant.

---

### MOTION TO WITHDRAW PLEA OF GUILTY

---

Defendant, William J. Sears, by his counsel of record, Peter R. Bornstein, moves this Court pursuant to Fed. R. Crim. P. 11(d)(2) to withdraw, before sentencing, his previously entered plea of guilty. As grounds in support of his motion, Mr. Sears states to the Court as follows:

### PROCEDURAL POSTURE OF CASE

1.     On September 15, 2016, the government filed an Information as to William J. Sears and Scott M. Dittman charging in Count 1 a violation of conspiracy to defraud the United States, securities fraud, willful violations of the Securities Act of 1933, mail fraud, and wire fraud. In Count 2 of the Information, the United States charged Mr. Sears with a violation of a false return of the United States Income Tax Return in violation of Title 26 U.S. Code § 7206(1). (DOC. 1)

2.      That same day, not guilty pleas were entered by both Mr. Sears and Mr. Dittman in an initial appearance before the Court.

3.      Previous counsel for Mr. Sears filed a Notice of Disposition on September 16, 2016, (DOC. 5) and a change of plea hearing was set for November 14, 2016.

4.      On November 14, 2016, defendant William J. Sears pled guilty to Counts 1 and 2 of the Information in accordance with a plea agreement which was filed with the Court.

5.      Since that entry of plea, sentencing for Mr. Sears has been delayed due to various factors, including his testimony in Case No. 17-cr-008-WJM, *United States v. Guy Jean-Pierre*.   The delay in sentencing was for the convenience of and at the instance of the government.

## APPLICABLE LAW

6.      Rule 11(d)(2) of the Federal Rules of Criminal Procedure govern the withdrawal of pleas of guilty.  The rule reads as follows:

> (d)   Withdrawing a guilty or nolo contendre plea.   A defendant may withdraw a plea of guilty or nolo contender: (1) before the court accepts the plea, for any reason or no reason; or (2) after the court accepts the plea, but before it imposes sentence if: (A) the court rejects a plea agreement under 11(c)(5); or (B) the defendant can show a fair and just reason for requesting the withdrawal.

7.      A motion to withdraw a plea of guilty prior to sentencing is directed to the sound discretion of the trial court which discretion is reviewed for an abuse of discretion. *United States v. Yazzie*, 407 F.3d 1139, 1142 (10th Cir. 2005).

8.      When a defendant moves to withdraw a guilty plea – after its acceptance by the District Court, but prior to sentencing – the court must assess whether there is a "fair and just reason for withdraw."  *United States v. Byrum*, 567 F.3d 1255, 1264 (10th

Cir. 2009). In determining whether there is a fair and just reason for withdrawal, the Court should consider the following seven factors:

1. Whether the defendant has asserted his innocence;

2. Whether withdrawal would prejudice the government;

3. Whether the defendant delayed in filing his motion, and if so, the reason for the delay;

4. Whether withdrawal would substantial inconvenience the court;

5. Whether close assistance of counsel was available to the defendant;

6. Whether the plea was knowing and voluntary; and

7. Whether the withdrawal would waste judicial resources.

*Id.*

9.    "Although a defendant does not have an absolute right to withdraw a guilty plea, [citation omitted], the court should view a motion to withdraw with favor, granting the defendant 'a great deal of latitude.'"  *United States v. Sandoval,* 390 F.3d 1294, 1297 (10th Cir. 2004).

10.    Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, the government has a continuing due process obligation to disclose evidence that is material either to guilt or to punishment.  *Id.* at 87.  *Kyles v. Whitley* held that the obligation to disclose includes evidence "known only to police investigators and not to the prosecutor."  514 U.S. 419 (1995).  Moreover, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf …, including the police."  *Id. at* 437-38.

11.  *Giglio v. United States*, 405 U.S. 150, 153-55 (1972) extended the Brady doctrine to impeachment evidence.

12.  To establish a Brady violation the defendant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the accused; and *3) that the evidence was material.  *United States v. McElhiney,* 275 F.3d 928, 932 (10th Cir. 2001).

13.  In the context of the defendant's plea bargaining decision as to whether to enter a guilty plea or persist in a not guilty plea, the government's obligation to disclose Brady materials is pertinent to the accused's decision.  *United States v. Ohiri,* 133 Fed. Appx. 555, 562, 2005 U.S. App. LEXIS 10677 (10th Cir. 2005) citing *United States v. Persico,* 164 F.3d 796, 814-05 (2d Cir 1999); in the same context the Seventh Circuit has noted that "it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors … have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters a guilty plea." citing *McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003).

14.  Whether a plea is truly voluntary and knowing requires the prosecution to disclose *Brady* material to the defendant before he enters a plea bargain.  *United States v. Nelson,* 979 F.Supp.2d 123-135-36 (D.D.C. 2113)("Because the prosecution suppressed exculpatory evidence before Nelson pled guilty, Nelson's due process rights were violated to his prejudice and his guilty plea was not voluntary and knowing.")

## ARGUMENT

15.    Since the entry of the guilty plea, Mr. Sears has learned that exculpatory evidence was withheld by the previous prosecutor who developed this case, former AUSA Kenneth Harmon.

16.    He has learned that the FBI case agent in this case lied about her credentials when she obtained two search warrants that were key and instrumental to the evidence accumulated by the Government to prosecute the Defendant.

17.    The onset of this case began with a search pursuant to a search warrant issued out of the United States District Court for the District of Colorado in May of 2014. The affidavit for the search warrant was written by FBI Agent Kate E. Funk, previously known as Kate Egan.

18.    Agent Funk claimed in the affidavit to be a certified public accountant and made financial opinions throughout the affidavit in her effort to assert probable cause. Agent Funk is not and was not a certified public accountant.

19.    If one holds herself out to be a certified public accountant falsely, that is a misdemeanor in Colorado, and if that person does it on multiple occasions, it is a felony. C.R.S. §§ 12-2-129 and 12-2-115(3)(a).

20.    The search warrant, at its beginning and at its end, asserts that the business known as Fusion Pharm, Inc. was a Ponzi scheme.  In other words, that it was not based on actual sales and revenue, but rather based on paying old investors with new investor money.  Next, the affidavit alleges that the stock of Fusion Pharm was subject to a fraudulent scheme known as "pump and dump."  However, the body of the affidavit fails to establish the truth of the assertions that Fusion Pharm was either a

5

Ponzi scheme or that its stock was being manipulated through pump and dump. The entire theory or predicate for the issuance of the warrant was false.

21.    Mr. Sears has noted numerous misstatement of fact in the search warrant affidavit which could have been the subject of a motion to suppress as well as a violation of the doctrine of *Franks v. Delaware,* 438 U.S. 154 (1978); *United States v. McKissick,* 204 F.3d 1282, 1297 (10th Cir. 2000).

22.    On November 28, 2014, a second warrant was issued out of the United States District Court for the District of Colorado. The object of this warrant was seizure of email accounts belonging to Mr. Sears and Mr. Dittman. Once again, Kate Funk claimed to be a certified public accountant, and this warrant was based, in pertinent part, on the computers and records seized in the earlier search warrant. It was the fruit of a poisonous tree.

23.    The warrant issued in May for the documents at Fusion Pharm was, not only based on a totally erroneous theory of the operation of the business and the sale of the stock, but was a general warrant. As a general warrant, the government came in and seized virtually all of the financial records of the company, as well as its computers. Essentially, the search warrant itself put the company out of business.

24.    Mr. Sears also asserts his innocence because the essential contention by the Government that Mr. Sears was a control person of Fusion Pharm, Inc. and that one or more companies that he operated was an affiliate of Fusion Pharm, Inc. is not factually correct. And, he asserts his innocence of the charge of securities fraud, mail fraud, wire fraud, or any other fraud involved in the securities and financing surrounding Fusion Pharm, Inc.

25.     In this case, the prosecutor, Kenneth Harmon, did not reveal exculpatory evidence regarding his relationship with the attorney hired by Fusion Pharm, Inc. to assist it in its securities filings.  Frederick M. Lehrer is the lawyer hired by Fusion Pharm after the services of Guy Jean-Pierre were terminated.

26.     Mr. Lehr rendered far more legal opinions in support of Fusion Pharm's activities than those issued by Mr. Jean-Pierre.  It would be anticipated that Mr. Lehrer would be a favorable witness for the defense.  However, it turns out that Mr. Harmon and Mr. Lehrer worked together in a task force in Miami prior to Mr. Harmon accepting an Assistant United States Attorney position in Colorado.  The two of them are not only colleagues, but friends.

27.     Effort has been made by the prosecution to minimize and hide Lehrer's role in this case.  Lehrer turned against his clients, and, in fact, testified falsely in proceedings before the Securities and Exchange Commission, with respect to his knowledge and activity with Fusion Pharm.  Exculpatory evidence in this regard was withheld from Mr. Sears.

28.     Mr. Sears has been debriefed and prepared for trial testimony by AUSA Jeremy Siebert, who replaced Mr. Harmon.  During those meetings it became clear to Mr. Sears that the basis upon which the government claims Mr. Sears violated the securities laws and committed mail fraud or wire fraud are factually wrong.

29.     At the root of this issue is whether or not Mr. Sears was really a control person for Fusion Pharm, and whether Mr. Sears' companies, Meadpoint or Vertifresh where affiliates of Fusion Pharm.

30.     AUSA Siebert and Mr. Sears had several disagreements during Mr. Sears'
testimony at the trial of Guy Jean-Pierre; and it became apparent that there is conflict,
and perhaps animosity, as demonstrated when Mr. Siebert asked repeatedly that Mr.
Sears be declared a hostile adverse witness during the trial of Guy Jean-Pierre.

31.     Mr. Siebert attempted to elicit testimony from Mr. Sears that these were
true facts, to which Mr. Sears balked.

32.     The seven factors which the Court should consider in determining whether
to grant a motion to withdraw the plea begin with whether the defendant has asserted
his innocence.  Mr. Sears asserts his innocence.  The second factor is whether the
withdrawal would prejudice the government.  The government was able to get all of its
witnesses to the trial of Guy Jean-Pierre, and there is no reason why they have
prejudice by virtue of lost evidence or lost witnesses.  Any other prejudice is unknown to
Mr. Sears and it is therefore submitted that there is no real prejudice to the government.

33.     The third factor is whether the defendant delayed in filing his motion, and if
so, the reason for the delay.  Mr. Sears has delayed filing his motion for two reasons.
First, he didn't learn from prior counsel of the exculpatory evidence withheld from him or
from the search warrants issued.  He learned of this after his plea.  Second, new
counsel was appointed for Mr. Sears pursuant to the Criminal Justice Act, and it has
taken new counsel a significant period of time to learn and understand the case so as to
be able to make a determination as to whether a motion to withdraw the plea was in the
best interest of Mr. Sears and was supportable in front of the Court.

34.     The fourth factor is whether the withdrawal would substantially inconvenience the Court.  It is submitted that this factor is generally not a big factor in the decision making.

35.     The fifth factor is whether close assistance of counsel was available to the defendant.  Although he had previous counsel, it was part of the reason why previous counsel withdrew was in order for new counsel to consider the issues with fresh eyes. Certainly, the plea was knowing and voluntary in some regards, but the withholding of exculpatory and impeachment information brings that issue into sharp relief and calls it into question.  *See United States v. Nelson, supra.*

36.     Finally, whether the court considers the withdrawal would waste judicial resources.  It is asserted that that is not a significant factor in the matrix of decision making in this case.

37.     With all of the issues raised in this motion for consideration by the Court, the determination of whether there is a fair and just reason for withdrawal is significantly in favor of such withdrawal.

**CONCLUSION**

38.     Wherefore, Mr. Sears requests that this Court grant his motion to withdraw his guilty plea, and set this case for a trial on the merits.

Respectfully submitted this 4th day of April, 2019.

THE LAW OFFICES OF PETER R. BORNSTEIN

*s/ Peter R. Bornstein*

Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April, 2019, I electronically filed the foregoing **MOTION TO WITHDRAW PLEA OF GUILTY** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ *Jeannette Wolf*

THE LAW OFFICES OF PETER R. BORNSTEIN

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. WILLIAM SEARS,
2. SCOTT DITTMAN,

      Defendants

---

**GOVERNMENT'S MOTION FOR ALTERNATIVE VICTIM NOTIFICATION UNDER 18 U.S.C. § 3771(d)(2)**

---

      The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully moves this Court, pursuant to Title 18, United States Code, Section 3771(d)(2), for authorization to employ the victim notification procedures described below, in lieu of those prescribed by section 3771(a), (b) and (c), on the grounds that the number of crime victims in this case makes it impracticable to accord all of the crime victims the rights described in subsection 3771(a).

      The Crimes Victims' Rights Act ("the Act"), codified at 18 U.S.C. § 3771, provides certain rights to victims in federal criminal proceedings. Among these rights is the right to "reasonable, accurate, and timely notice" of public court proceedings. 18 U.S.C. § 3771(a). The Act requires "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation and prosecution of

crime make their best efforts to see that crime victims are notified of, and accorded, the rights

described in subsection [3771](a)," 18 U.S.C. § 3771(c)(1), and it instructs the Court to "ensure

that the crime victim is afforded" those rights. 18 U.S.C. § 3771(b). The Act defines a crime

victim as "a person directly and proximately harmed as a result of the commission of a Federal

offense . . ." 18 U.S.C. § 3771(e). Importantly, the Act recognizes that for crimes involving

multiple victims, the Court has discretion to adopt procedures to accord victim rights without

unduly interfering with the criminal proceedings. Thus, 18 U.S.C. §3771(d)(2) provides:

> In a case where the court finds that the number of crime victims makes it
> impracticable to accord all of the crime victims the rights described in subsection
> (a), the court shall fashion a reasonable procedure to give effect to this chapter
> that does not unduly complicate or prolong the proceedings.

The Act places no limitations on the alternative procedures which a Court may fashion other than

that the procedures be reasonable to effectuate the Act and that they not unduly complicate or

prolong the proceedings. *Id.*

In the above cited case and United States v. Guy Jean-Pierre, Case No. 17-cr-00008-

WJM, many individuals were victims of security fraud committed by William Sears, Scott

Dittman, and Guy Jean-Pierre. Due to the length of the security conspiracy fraud,

approximately 2011 through 2014, over 13000 individuals became victims as a result of

investing into Fusion-Pharm Inc. by purchasing stock. Due to the share volume of trades,

timing of the trades, and the selling of shares, it is very difficult to track each potential victim

and the victim's contact information.

This number of victims make compliance with the notification requirements outlined in

2

section 3771(a), (b) and (c) impracticable. Neither the government nor the Court has the resources to accord all of the victims in this case the notice required by subsection 3771(a). Therefore, due to the large number of victims in this case, the Government intends to use the Justice Department's website for large case to direct victims to a case-specific website where all required notices will be posted. The Government will issue a press release informing individuals who believe they may be victims to access the Justice Department website for more information. In addition, the Government would like to post its press release with OTC Markets in an effort to notify as many victims as possible about the upcoming sentencing in the previously mentioned cases. Victim notification at the corrections stage will be provided through the Bureau of Prisons' website.

## CONCLUSION

Based on the foregoing, the government requests the Court grant the motion for alternative victim notification procedures. Counsel for the defendants in all the cases were not contacted due to the nature of the motion.

Dated this 8th day of April 2019.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By: s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600

Denver, Colorado   80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov
Attorney for the United States

4

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of April 2019, I electronically filed the foregoing **GOVERNMENT'S MOTION FOR ALTERNATIVE VICTIM NOTIFICATION UNDER 18 U.S.C. § 3771(d)(2)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Andres Guevara**
**Peter Bornstein**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado   80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

5

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov,
usaco.ecffluatty@usdoj.gov), Peter R. Bornstein (jwolf@prblegal.com,
pbornstein@prblegal.com), Jeremy S. Sibert (brittany.herrera@usdoj.gov,
caseview.ecf@usdoj.gov, diana.brown@usdoj.gov, jeremy.sibert@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Andres Rene Guevara (andres@guevaracoloradolaw.com), Marci
Gilligan LaBranche (feldman@ridleylaw.com, labranche@ridleylaw.com), Judge William J.
Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (bradshaw.perry@usdoj.gov,
gillian.fleck@usdoj.gov, jason.brackett@usdoj.gov, joseph.braaten@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:6981413@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 4/9/2019 at 8:43 AM MDT and filed on 4/9/2019

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 141(No document attached) |

**Docket Text:**
 **ORDER as to William J. Sears (1): This matter is before the Court on Defendant's Motion to Withdraw Plea of Guilty [139]. The Government is DIRECTED to file a Response to Defendant's Motion on or before April 19, 2019. No Reply will be accepted without prior leave or order of Court. SO ORDERED by Judge William J. Martinez on 4/9/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, brittany.herrera@usdoj.gov, diana.brown@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Peter R. Bornstein (jwolf@prblegal.com, pbornstein@prblegal.com),
Tonya Shotwell Andrews (caseview.ecf@usdoj.gov, charisha.cruz@usdoj.gov,
elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov,
jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov,
tonya.andrews@usdoj.gov, usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Jeremy S.
Sibert (caseview.ecf@usdoj.gov, diana.brown@usdoj.gov, jeremy.sibert@usdoj.gov,
monica.houston@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andres Rene Guevara
(andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com)
--No Notice Sent:

Message-Id:6985071@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Victim
Rights
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 4/10/2019 at 3:43 PM MDT and filed on 4/10/2019

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 142(No document attached) |

**Docket Text:**
 **ORDER as to William Sears (1) and Scott Dittman (2) granting the Government's Motion for Alternative Victim Notification Under 18 U.S.C. § 3771(d)(2) [140]. The Government's Motion is GRANTED for good cause shown. Pursuant to 18 U.S.C. § 3771(d)(2), the Government is authorized to employ its requested alternative victim notification procedures. SO ORDERED by Judge William J. Martinez on 4/10/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein      pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche      labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, diana.brown@usdoj.gov, monica.houston@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov, Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

**1:16–cr–00301–WJM–2 Notice has been electronically mailed to:**

Peter R. Bornstein    pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara    andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, diana.brown@usdoj.gov, monica.houston@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov, Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–2 Notice has been mailed by the filer to:**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  16-cr-00301-WJM

UNITED STATES OF AMERICA,

　　　　Plaintiff,

v.

　　1.  WILLIAM SEARS,
　　2.  SCOTT DITTMAN,

　　　　Defendants

---

## JOINT STATUS REPORT

---

　　　　Comes now the United States of America, through Jason R. Dunn, United States

Attorney, and Jeremy Sibert, Assistant United States Attorney, respectfully submits this

joint status report as ordered by the Court.

　　　　As for defendant Sears, defendant Sears has filed a motion to withdraw from his

plea agreement.   The government will file a response to that motion on April 19th, 2019.

　　　　Regarding defendant Dittman sentencing, there are two issues that are pending.

The first issue deals with the forfeiture of defendant Dittman's residence located at 194

Basket Road, Oley, Pennsylvania.  Pursuant to defendant Dittman's plea agreement,

Doc. #34, page 2, defendant Dittman agreed to forfeit the real property located at 194

Basket Road, Oley, Pennsylvania or in lieu of the forfeiture, pay the government

$688,000.00 no later than six months after the sentencing.  Currently, there is a

preliminary order to allow the government to seize the residence based on the

conditions set out in the plea agreement. If defendant Dittman does not pay the government $688,000.00 within six months of the sentencing date, the government will move for the final order for seizure of said property.

The second issue pending regarding defendant Dittman's sentencing is his right to offer evidence concerning advice he received from counsel, his resulting *mens rea*, good faith, state of mind, awareness, motivations and intentions with respect to other acts and conduct described below and to provide evidence putting such acts and conduct in context. (Defendant Dittman does not dispute that the government's evidence would otherwise establish the underlying facts set forth in the "Facts" section of the plea agreement and that there is an independent basis, to include defendant Dittman's acknowledgment that he was complicit as a con-conspirator and legally accountable for the acts of the conspiracy under various theories of co-conspirator liability, and that he is guilty.) Defendant Dittman reserved this right in his plea agreement, Doc. #34, page 12, footnote 2.

It is the government's understanding that defendant Dittman wishes to offer evidence regarding his reserved right. If defendant Dittman wants to present evidence regarding his reserved rights, the government would request that whatever evidence defendant Dittman wishes to present is made known to the government ahead of any hearing this Court may grant so that the government will be able to have the ability to present evidence in order to rebut the defendant's argument before this Court.

2

Mr. Andres Guevara, defendant Scott Dittman's attorney, was consulted with prior to the filing of this Joint Status Report. Mr. Peter R. Bornstein, defendant William Sears' attorney, was not consulted prior to the filing of this report due to defendant Sears' pending motion to withdraw from his guilty plea.

Dated this 19th day of April 2019.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:     s/Jeremy Sibert
        JEREMY SIBERT
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0100
        FAX: (303) 454-0403
        E-mail: Jeremy.Sibert@usdoj.gov
        Attorney for the United States

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April 2019, I electronically filed the foregoing **Joint Status Report** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Andres Guevara**
**Peter Bornstein**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1.  WILLIAM SEARS,

Defendant

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S WITHDRAW MOTION**

---

The United States of America, by and through its counsel, Jeremy Sibert, hereby

respectfully submits this response regarding defendant Sears' motion to withdraw his plea of

guilty.

Procedural History of the Case

The government agrees paragraphs 1 through 4 of the defendant's procedure history of

the case, but disagrees with paragraph 5.   In addition to paragraphs 1 through 4, the government

would like to stress some important colloquy this Court addressed at the change of plea with

defendant Sears.

At the change of plea this Court found defendant Sears to be competent to proceed with the

hearing based on Sears' answers to the Court's questions.   *See* Doc. #84, page 6, lines 2-4.

Defendant Sears carefully read the plea agreement with his lawyer, that his lawyer answered any

his questions, and defendant Sears voluntarily signed the plea agreement. *Id*. at page 12, lines 18-

25, and page 13, lines 1-3.   Defendant Sears admitted that the facts in the plea agreement are accurate and that he knowingly and voluntarily entered into the security fraud conspiracy for Count 1. *Id*. at pages 14, lines 1-2, 21-23.   As for Count 2, defendant Sears admitted to willfully making a false statement on his tax return with the intent to violate a known legal duty. *Id*. at page 15, lines 9-17.   Defendant Sears understood that he would be incriminating himself, and giving up the right to a jury trial if the Court accepted the plea. *Id*. at 17, lines 1-5.   Defendant Sears, nor his family, was threatened by anyone in order to force him to plead guilty in this case, that he was satisfied with the representation of his counsel, and that he understood everything the Court had reviewed regarding to him pleading guilty. *Id*. at 23, lines 10-17.   Finally, defendant Sears plead guilty to Counts 1 and 2 and this Court found that defendant Sears was competent to enter into a plea of guilty, that he was represented throughout the course of the case by competent counsel with whom Sears had no objection or complaint, that Sears knowingly and voluntarily signed the plea agreement, and that Sears knowingly and voluntarily entered a guilty plea to Counts 1 and 2 of the Information without mistake or coercion. *Id*. at page 24, lines 18, 22, and page 25, lines 3-24.

<u>Argument</u>

The defendant's primary argument in support of his request for plea withdrawal is that had he became aware of certain "exculpatory evidence." *See* Doc. 139 page 5.   The defendant offers little if any explanation as to how this information would have been favorable to him, stating merely that he asserts his innocence of the charges. *Id*. at 6.   The defendant claims that the FBI agent leading the investigation "lied about her credentials" as being a certified public accountant

2

and accuses the agent of committing a crime.   In addition to alleging that the FBI agent's truthful declarations were exculpatory evidence, defendant Sears alleges that Mr. Harmon's prior relationship with Mr. Lehrer is also exculpatory in nature.   The defendant fails to take a position on whether the information about the FBI agent and Mr. Harmon was truly exculpatory or merely impeachment based.   There really is no question, however, as to what category this evidence falls into as it can only be classified, at most, as impeachment evidence.[1]   More importantly to the argument here, however, the defendant fails to meaningfully address the Supreme Court's decision in *United States v. Ruiz*, 536 U.S. 622 (2002), and its impact on this case.

In *Ruiz*, the Court considered "whether the Fifth and Sixth Amendments require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses.'" *Id.* at 625 (quoting App. to Pet. For Cert. 46a).   The Court concluded that "the Constitution ***does not*** require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Id.* at 633 (emphasis supplied).   In reaching this holding, without dissent, the Court plainly stated that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." *Id.* at 630 (emphasis in original).   The Court went on to state that:

> It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant.   The degree of help that impeachment information can provide will

---

1  *See e.g. Ellsworth v. Warden*, 333 F.3d 1, 8 (1st Cir. 2003) (en banc) ("[t]he theory, simple enough, is that evidence about lies not directly relevant to the episode at hand could carry courts into an endless parade of distracting, time-consuming inquiries.").

depend upon the defendant's own independent knowledge of the prosecution's potential case – a matter that the Constitution does not require prosecutors to disclose.

*Id*. at 630.

In the end, "*Ruiz* teaches that *Brady* does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts." *United States v. Mathur*, 624 F.3d 498, 507 (1st Cir. 2010); *United States v. Johnson*, 369 Fed.Appx. 905, 906, 2010 WL 925877 *2 (10th Cir. 2010) (unpublished opinion). Indeed, as the circuit court stated in *United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010), "[w]hen a defendant pleads guilty, [*Brady*] concerns are almost completely eliminated because his guilt is admitted." *Id*. at 285; *see also United States v. Coates*, 483 Fed.Appx. 488, 499 n. 9, 2012 WL 1995018 *8 n. 9 (10th Cir. 2012) (unpublished opinion) (to the extent the defendant views impeachment evidence as favorable, his guilty plea casts significant doubt on the legal viability of a *Brady* claim); *Cf. United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009) (guilty plea waives the right to claim a *Brady* violation).

The defendant cannot sustain an argument that his guilty plea should be questioned because the government failed to produce evidence that it was not constitutionally obligated to disclose, even if such evidence were in the possession of the government at the time of the plea, which it was not. As stated in *Ruiz*, "the need for this information is more closely related to the *fairness* of a trial than to the *voluntariness* of the plea." *Id*. at 633 (emphasis in original). In addition, the allegations made by defendant Sears in his motion are not true.

First, the FBI agent has an active CPA certificate out of Kansas and correctly lists her

4

employment with FBI. *See*

http://oitsapps.ks.gov/boa/IndividualLicenseeInformation.aspx?ID=104618153&lastName=Funk

Once an accountant has passed the CPA exam, an accountant is required to pass the AICPAs

Professional Ethics course.   If the candidate passes the ethics course and is issued a Kansas CPA

certificate, a person may use the CPA as a credential only.   (In other words, CPA may appear

after a person's name if they are working in an industry that is not related to the practice of

public accountancy.) *See* www.ksboa.org/statutes/1_321.pdf., *also see* Colorado Department of

Regulatory Agencies, Rules and Regulations of the State Board of Accountancy, 3 CCR 705-1,

specifically page 29. Agent Funk is a federal agent for the FBI and her duties include

investigating violations of federal law, which is not the practice of public accounting.   The

defendant's arguments are without merit and simply wrong regarding Agent's Funk's use of

"CPA" after her name.   Defendant Sears' allegations against Agent Funk are false and this

Court should impose sanctions it deems appropriate on defendant Sears for making such false

allegations.

        Second, defendant's argument regarding Mr. Harmon's and Mr. Lehrer's prior

relationship regarding their past employment is merely an unsupportive allegation by the

defendant.   Both Mr. Harmon and Mr. Lehrer are active lawyers that retain ethical duties to

represent their clients with professional conduct.   Defendant Sears fails to show how this

evidence is favorable and put this whole case against him in a different light as to undermine his

guilty plea.   *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995).   The government further argues

that this evidence is not even material under *Brady* since the results would be the same.   *See*

*Cone v. Bell*, 556 U.S. 449, 469-70 (2009). Finally, Sears hired and knew the actions of Mr.

Lehrer, hence, there is not a *Brady* violation because the defense already possessed the evidence.

*See United States v. Erickson*, 561 F.3d 1150, 1165 (10th Cir. 2009). More importantly, Mr.

Harmon is no longer employed by the United States Attorney's Office and has no control over

this case. Hence, defendant Sears' argument regarding any relationship between Mr. Harmon

and Mr. Lehrer is moot and irrelevant.

    Defendant's argument regarding the search warrants fails since it is well established that

a voluntary and unconditional guilty plea waives all non-jurisdictional defenses.2 *See United

States v. Hawthorne*, 316 F.3d 1140, 1145 (10th Cir. 2003). The Supreme Court clearly stated "a

guilty plea represents a break in the chain of events which has preceded it in the criminal

process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty

of the offense with which he is charged, he may not thereafter raise independent claims relating

to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He

may only attack the voluntary and intelligent character of the guilty plea by showing that the

advice that he received was not [competent]." *Tollett v. Henderson* 411 U.S. 258, 267 (1973).

Thus, if this Court finds that Sears' plea was voluntary and intelligent, Sears waived his right to

appeal the search warrants in this case.

    The government maintains that this Court can deny the defendant relief strictly on the

Supreme Court's decision in *Ruiz*. Nevertheless, out of an abundance of caution, the

---

2 On a side note, defendant Sears takes offense that the warrant asserted Fusion Pharm to be a "Ponzi scheme."
That language was from the whistle blower that contacted the investigating agencies, and was not the language
"created" by law enforcement.

government will address those factors to be considered under a plea withdrawal request pursuant to rule 11(d)(2)(B).

The standard for permitting withdrawal of the plea before sentencing is a "fair and just reason." *See* Rule 11(d)(B), Fed. R. Crim. P., *United States v. Hyde*, 520 U.S. 670 (1997), and *United States v. West*, 392 F.3d 450 (D.C. Cir. 2004). This standard does not create an automatic right to withdraw a plea. *United States v. Green*, 521 F.3d 929 (8th Cir. 2008). To permit the defendant to withdraw his guilty plea simply on a lark "debases the judicial proceeding at which a defendant pleads and the court accepts his plea." *United States v. Hyde*, at 1634. A plea of guilty is itself a conviction, and like a verdict of a jury it is conclusive. It is an 'admission that he committed the crime charged against him.'" *United States v. Broce*, 488 U.S. 563, 570 (1989) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity."). The burden of a defendant who attempts to withdraw his guilty plea after a conviction is the same "heavy burden" that a defendant has who challenges his conviction after a jury verdict. *United States v. Maher*, 108 F.3d 1513, 1530 (2d Cir. 1997). "Ordinarily, a defendant is stuck with the representations that he himself makes in open court at the time of the plea." *United States v. Padilla-Galarza*, 351 F.3d 594, 598 (1st Cir. 2003). A plea is considered valid if it represents a voluntary and intelligent choice among the alternatives open to the defendant. *United States v. Gigley*, 213 F.3d 50, 516 (10th Cir. 2000). Any attempt to "reopen the proceedings after a guilty plea is usually confined to whether the plea was 'counseled and voluntary.'" *United States v. De Vaughan*, 694 F.3d 1141, 1152 (10th Cir. 2012) (quoting

*Broce*, 488 U.S. at 569).

In deciding whether a defendant has met the burden, the Tenth Circuit examines a number of non-exclusive factors often referred to as the "Gordon factors":

(1) Whether the defendant asserted his innocence,

(2) Whether the plea was knowing and voluntary,

(3) Whether defendant was assisted by counsel,

(4) Whether the defendant delayed filing his motion and, if so, why,

(5) Whether withdrawal would prejudice the government,

(6) Whether withdrawal would substantially inconvenience the court, and

(7) Whether withdrawal would waste judicial resources.

*See United States v. Gordon*, 4 F.3d 1567, 1572 (10th Cir. 1993). In addition, the Tenth Circuit in resent cases has included an eighth factor as whether the government would be likely to convict the defendant at trial. *See United States v. Sanchez-Leon*, 764 F.3d 1248, 1258 (10th Cir. 2014). If the defendant fails to carry his burden on asserted innocence, validity of the plea, and ineffective assistance of counsel, this Court does not need to address the remaining factors. *United* States *v. Byrum*, 567 F.3d 1255, 1265 (10th Cir. 2009). Whether to permit a withdrawal by the defendant is "always and ultimately lies within the sound discretion of the district court to determine on a case by case basis when the standard is and isn't met." *United States v. Soto*, 660 F.3d 1264, 1267 (10th Cir. 2011).

1. <u>Assertion of Innocence</u>

Regarding the first factor, "[a] defendant's subjective belief in his own innocence does not mandate allowing him to withdraw his plea of guilty." *United States v. Hamilton*, 510 F.3d 1209, 1214 (10th Cir. 2007). The defendant is required to "make a factual argument that supports a legally cognizable defense." *Id*. The possibility that the defendant merely said what the government and the court needed to hear rather than the truth during the plea colloquy does not overcome his admission of guilty. *United States v. Coates,* 483 F.Appx 744, 493 (10th Cir. 2000).

The defendant's request for a plea withdrawal is in no way premised on an assertion of innocence—factual or legal—but rather on a claim that the government failed to turn over evidence that it was not constitutionally obligated to reveal. Indeed, the defendant must make some attempt at a factual argument that supports a legally cognizable defense, *Hamilton*, supra, and not merely a bald assertion that he is legally innocent. The defendant's conclusory claim falls remarkably short of satisfying the burden of asserting either his factual or legal innocence. *United States v. Hasson*, 287 Fed.Appx. 712, 717, 2008 WL 2894087 *5 (10th Cir. 2008) (unpublished opinion); *see also United States v. Brown*, 250 F.3d 811, 818 (3d Cir. 2001) (in assessing a defendant's claim of legal innocence a court must first examine whether the defendant has asserted his factual innocence); *United States v. Salgado-Ocampo*, 159 F.3d 322, 326 (7th Cir. 1998) (an assertion of legal innocence must be buttressed by facts in the record which support a claimed defense); *United States v. Fiorello*, No. 08-0600 (FLW), 2010 WL 2516472 *3 (D.N.J. June 14, 2010) (unpublished opinion) ("The absence of any assertion of factual innocence by Defendant is fatal to his motion to withdraw."). Consequently, this Court must find that the defendant fails to satisfy this first factor.

9

2. <u>Assistance of Counsel</u>

Regarding the second factor, assistance of counsel, a defendant challenging a guilty plea based on ineffective assistance of counsel must show that the counsel's performance was deficient and that the this deficiency prejudiced [his] defense. *See United States v. Hamilton,* 510 F.3d at 1216.  First, defendant Sears argues that the second factor is whether the withdrawal would be prejudice the government.  *See* Doc. #139, page 8.  This is not the second factor based on Tenth Circuit case law and is just wrong.  The burden to establish that counsel's performance was constitutionally deficient requires Sears to overcome the strong presumption that his prior counsel's conduct falls within a wide range of reasonable professional assistance. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984).  Sears must show that but for his prior lawyers actions he would not have plead guilty and would have insisted on going to trial.  *See United States v. Hamilton*, 510 F.3d at 1216.  Nowhere in defendant's motion does Sears clearly allege ineffective assistance of counsel, let alone overcome the strong presumption that his prior counsel's conduct falls within the range of providing reasonable professional assistance. Therefore this Court must find that the defendant fails to satisfy the second factor.

 2.  <u>Knowing and Voluntary Plea</u>

The defendant asserts that the third factor is whether the defendant delayed in filing his motion, and if so, the reason for delay. *See* Doc. #139, page 8.  This is not the third factor based on Tenth Circuit case law and is just wrong.  The third factor is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to defendant Sears. *See United States v. Carr*, 80 F.3d 413, 416 (10th Cir. 1996).

The defendant's entire argument on this point is that the government violated its obligations under *Brady* and thus his plea was involuntary. However, as set out above, the United States cannot run afoul of *Brady* when the Constitution does not require the disclosure of impeachment evidence prior to entering a plea agreement with a criminal defendant. *Ruiz*, 536 U.S. at 633.

Additionally, the plea transcript fully supports that the defendant's decision to enter a guilty plea was knowingly, voluntarily, and intelligently made. The defendant unquestionably understood the consequences of entering his guilty plea and there were certainly no threats or promises made to induce him into pleading guilty. *Brady v. United States*, 397 U.S. 742, 755 (1970). This Court advised and questioned Sears about his understanding of and intention to accept the plea agreement's terms and consequences of pleading guilty. If Sears felt that he was being coerced into pleading guilty, he should have raised it with this Court during the Court's colloquy. *See United States v. Jones*, 168 F.3d 1217, 1120 (10th Cir. 1999). The fact that Sears is not satisfied with his plea agreement is not a Rule 11 factor that the Court needs to consider in accepting a guilty plea. *Id.* Here again, the defendant fails to satisfy the third factor.

<u>Remaining Factors</u>

Because the defendant has failed in his burden of establishing a fair and just reason for requesting a withdrawal of his guilty plea the Court need not address the remaining factors which speak only to the potential impact upon the government and the court. *Hamilton*, 510 F.3d at 1217; *United States v. Hickok*, 907 F.2d 983, 986 (10th Cir. 1990). However, again, out of an abundance of caution, the government will briefly address those factors which burden the government and the court.

4. Delay in Filing

The defendant filed his motion over 27 months after he entered his guilty plea. The delay in filing in this case is significant and weighs heavily against the defendant's position. *United States v. Graham*, 466 F.3d 1234, 1238 (10th Cir. 2006) (two month delay characterized as lengthy). Nothing in defendant Sears' motion is new and his claims should have been submitted immediately after the entry of his plea.

5, 6, and 7. Inconvenience to the Court and Waste of Judicial Resources / Prejudice to the Government

Understandably a plea withdrawal results in some inconvenience to the court and wastes judicial resources. *Hamilton*, 510 F.3d 1217 n. 4. That reality is exacerbated in this case as the trial will assuredly be set many months from now and over two years since the defendant entered his guilty plea and near eight years since the security fraud conspiracy began. This Court has "expended significant resources" scheduling several hearings in this case, along with its related case, *United States v. Guy Jean-Pierre*, 17-cr-00008-WJM, to include a lengthy trial. *Graham*, 466 F.3d at 1238. An expected delay of over two years from the time the defendant entered his guilty plea significantly burdens this Court and prejudices the government's ability to effectively prosecute this matter. The government relied on the defendant's solemn declaration that he was guilty of the offense for which he was charged. Investigators have moved on to other pressing matters and witnesses are finally relieved from being subpoenaed to appear before this Court. And while these factors may not be deemed substantial there is certainly prejudice to the government's case when the defendant's attempt to withdraw his guilty plea could result in a trial

after a significant period of time has passed since the original offenses occurred. *See e.g. United States v. Tulu*, 535 F.Supp.2d 492, 505 (D.N.J. 2008); *Holloway v. United States*, No. RDB-11-0804, 2012 WL 4718060 *3 (D.Md. 2012) (prejudice to government stems from the elapse of over three years since commission of the crime, and over two and one half years since petitioner's admission of guilt); *United States v. Dyess*, 293 F.Supp.2d 675, 689 (S.D.W.Va. 2003) (prejudice extreme where government would be required to mount a criminal trial five years after the indictment was handed down). In short, these factors weigh heavily against the defendant.

8. Likelihood of Conviction

This Court is well aware of the evidence arrayed against the defendant having presided over one trial related to this case. As this Court is aware, the discovery in this case was very large, consisting of many emails and documents produced by the defendant, which will show his involvement in the security's fraud. In addition, the defendant assisted in an over cover operation against Mr. Jean-Pierre, where he described his criminal role regarding Fusion-Pharm. In addition, there would be multiple witnesses that would testify about how Sears concealed his role as an undisclosed owner of Fusion-Pharm and several other related/relevant companies. Finally, the government would offer undercover video of Sears and co-defendant Dittman that clearly portrays Sears as an owner of Fusion-Pharm and other related/relevant entities. Simply put, the defendant's guilt with respect to the counts to which he entered a guilty plea is not in question, and the defendant presents nothing to suggest that he is in fact innocent of the charge.


CONCLUSION

13

The defendant has fallen short of establishing a fair and just reason for the withdrawal of his guilty plea. Consequently, the defendant's motion must be denied. However, it should be noted that if this Court grants the defendant's motion for withdraw from his plea agreement, the funds/restitution that is owed to the IRS will not be paid from the funds that were set out in the plea agreement, which is approximately 2 million dollars. *See* Doc #84, page 7, lines 20-25.

Dated this 19th day of April 2019.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:    s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April 2019, I electronically filed the foregoing **Government's Response to Defendant's Motion to Withdraw from Plea Agreement** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Andres Guevara**
**Peter Bornstein**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado   80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

      Plaintiff,

v.

**1. WILLIAM J. SEARS,**

      Defendant.

---

### REPLY RE: MOTION TO WITHDRAW PLEA OF GUILTY

---

Defendant, William J. Sears, by his counsel of record, Peter R. Bornstein, hereby submits his reply memorandum in support of his Motion to Withdraw Plea of Guilty.

The government first argues that the Supreme Court has held that impeachment evidence relating to witnesses need not be disclosed before entry of a plea of guilty. *United States v. Ruiz,* 536 U.S 622 (2002). It then argues that the case agent's misrepresentation of her credentials, her use of the CPA designation in the multiple warrants, and the fallout from the prior Assistant U.S. Attorney hiding his relationship with FusionPharm's former lawyer are merely impeachment and thus not grounds to withdraw a plea. Post *Ruiz* cases, including one from the Tenth Circuit, have held that the Supreme Court would distinguish Brady violations from impeachment, finding that Brady violations have due process implications which cast doubt on whether a plea is truly knowing, intelligent, and voluntary. *United States v. Ohiri,* 133 Fed. Appx. 555, 562 (10th Cir. 2005) citing *United States v. Persico* 164 F.3d 796, 814-15 (2nd Cir. 1999);

*United States v. Nelson,* 979 F.Supp.2d 123, 135-36 (D.D.C. 2113).   Government misconduct or government misrepresentations are part and parcel of Brady violations. *United States v. Fisher*, 711 F.3d 460, 467-68 (4th Cir. 2013)(impermissible conduct was "an officer's deliberate lie that led to the warrant that led to the discovery of the evidence against him").

The government misconduct here goes to the heart of fundamental fairness and is exculpatory, not mere impeachment.   Mr. Sears asserts that this evidence is exculpatory.   For example, counsel has attempted to find in the discovery statements made to either the FBI or to the Assistant United States Attorney in charge of the case by Fred Lehrer, FusionPharm, Inc.'s counsel after Mr. Jean-Pierre.   Lehrer rendered more opinion letters than either Guy Jean-Pierre or another corporate lawyer.   Neither an FBI 302 form nor an interview form from the U.S. Attorney's Office can be located in the discovery.

Before the plea was entered, Mr. Sears tried to explain to AUSA Harmon that Attorney Lehrer advised that disclosure of Sears' background and relationships was not required.   He further advised Sears could lawfully sell his shares.   He also told Harmon that Leher's testimony before the SEC was not truthful.[1]   Harmon advised Sears to leave it alone.   After the plea was entered, Mr. Sears learned Harmon and Lehrer worked together in Miami on a large case.   Harmon in his capacity with the Department of Justice was Lehrer's supervisor.   It is contended that the reason for non-disclosure was to protect Mr. Lehrer from suffering the same prosecutorial fate as that of earlier

---

[1] Former counsel for Mr. Dittman, Philip Dubois, sent a 51 page package of materials on April 27, 2017 to Mr. Harmon and three other Assistant U.S. Attorneys detailing Lehrer's knowledge, role, and perfidy. This should have caused the release of exculpatory information about Mr. Lehrer.  Instead, the government brushed this off.

counsel for the company, Mr. Jean-Pierre and a third counsel, Mr. DiTomasso. In other words, this was government corruption and a willful failure to disclose.

Likewise, the government argues that Special Agent Funk of the FBI had a right to use the CPA designation when submitting affidavits to the federal court for the multiple search warrants sought and issued by the government. The government is wrong in its assertion. Counsel has consulted with Mr. Steven Anderson, a lawyer and CPA in Colorado, who is prepared to testify that Ms. Funk violated the accountancy laws in Colorado and Kansas when she claimed a CPA designation. Counsel has the records from Kansas which clearly show that Ms. Funk never completed the Kansas requirements for use of the CPA designation. See Exhibit A, attached. Ms. Funk was not merely using that designation in "industry". She was publicly holding herself out to the Court as having a CPA license and credentials which she has never had.[2] This is not merely impeachment, but is exculpatory evidence that could have and should have been used to attack the search warrant issued in this case. Furthermore, as stated in the motion to withdraw the plea, other factual misstatements in the search warrant affidavits should cause concern for their validity and, therefore, the validity of most of the evidence which the government seeks to use against Mr. Sears.

A second important argument made by the government in its response is a claim that Mr. Sears does not claim factual or legal innocence. This assertion is untrue. Mr. Sears seeks to withdraw his plea because he believes in his innocence and has facts to back up that belief.

---

[2] It now appears that after learning of the current motion to withdraw plea, Agent Funk has contacted the Kansas Board of Accountancy in an attempt to update her record there. Her records used to be under her former name, Kate Egan and her former employment with Sprint.

3

A review of the factual paragraphs in the plea agreement demonstrates the primary contentions underlying this prosecution. The government contends that Mr. Sears was a *de facto* officer of FusionPharm, that Sears' companies Vertifresh, Microcap, Bayside, and Meadpoint were affiliated entities, that Sears's felony conviction should have been disclosed by FusionPharm, that Scott Dittman was his co-conspirator, and that there was an agreement to violate the law. These contentions are the *sine qua non* of the prosecution; and Mr. Sears contends the government has got its facts wrong.

The first contention is whether Fusion Pharm was required to disclose Mr. Sears to the investing public and whether that non-disclosure was a violation of securities laws. Mr. Sears held a good faith belief that disclosure was not required based, in part, on advice given to him by Mr. Lehrer as well as by Mr. Jean-Pierre. Second, the contention by the government in the plea agreement that Mr. Sears was a "de facto" officer and director of FusionPharm or that Sears, Meadpoint Venture Partners, Micro Cap, and Vertifresh, LLC were, in fact, affiliates of FusionPharm. Mr. Sears disputes this factually in his contention of factual and legal innocence. He disputes that FusionPharm intentionally or knowingly misstated its revenues when it uploaded financial reports to the OTC website; and that its revenues can be substantiated. He disputes making false disclosures or having false press releases. And he contends that much of the government case consists of taking lawful conduct and spinning it to appear as unlawful conduct. The use of stock sales to capitalize Meadpoint or FusionPharm is a prime example.

Footnote 9 on pages 17 and 18 of the plea agreement is significant. In that footnote, Mr. Sears has indicated that the government is wrong in claiming that he was

an affiliate of FusionPharm even though his name appeared on various documents as having a formal position in the company. Likewise, the plea agreement is replete with footnotes demonstrating the contentions that now form the basis of Mr. Sears' claim of innocence, both factually and legally. Unlike the cases cited by the government in which defendants who sought to withdraw their plea had their motion denied and the court's exercise of discretion affirmed on appeal, this case has facts that are significantly distinct and differentiated from all of the cases cited by the government in its response. For example, in *United States v. Hamilton*, 510 F.3d 1209 (10th Cir. 2007), the court said that the defendant must present a credible claim of innocence based on facts and not just a subjective belief in his own innocence.

In this case, Mr. Sears is making a credible claim of innocence based on factual contentions concerning whether or not his relationship with Mr. Dittman represented a fraud on the investing public, or whether he truly entered into a conspiracy to violate the law. Mr. Sears has presented fair and just reasons why this Court should exercise its discretion, while at the same time, viewing the motion to withdraw with favor, and grant the motion to withdraw the plea.

Respectfully submitted this 9th day of May, 2019.

THE LAW OFFICES OF PETER R. BORNSTEIN

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

Case 1:16-cr-00301-WJM Document 237-1 Filed 05/14/20 USDC Colorado Page 6 of 8
Case 1:16-cr-00301-WJM Document 145 Filed 05/09/19 Page 6 of 6

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this 9th day of May, 2019, I electronically filed the foregoing **REPLY RE: MOTION TO WITHDRAW PLEA OF GUILTY** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


                        s/ *Jeannette Wolf*
                        THE LAW OFFICES OF PETER R. BORNSTEIN

12/24/17 11:16:00

**CPAVerify Individual Report Results**

NAME: **KATE EGAN**
STATE OF LICENSE: KS
LAST UPDATED: **2017-12-24**

| | |
|---|---|
| **Address:** | **Mail** |
| | CHICAGO, IL, |
| License/Permit/Certificate Number: | 8757 |
| Registration Number: | |
| License/Permit/Certificate Status: | ACTIVE CERTIFICATE |
| License/Certificate Status Details: | The certificate is in good standing. |
| License Type: | CPA. |
| License Type Details: | CPA Certificate. In Kansas, a certificate is not a license so therefore, a certificate holder who does not also have an active permit may not hold out, perform or offer to perform services as a CPA. The person may use the title CPA in connection with their employment in industry. |
| Basis for License: | |
| Issue Date: | 1999-08-04 |
| Expiration Date: | |
| Enforcement, Non-Compliance or Disciplinary Actions: | None Reported To This Site By The Board |
| Other Information: | IN KANSAS, A CERTIFICATE IS NOT A LICENSE. ONLY THOSE WHO HAVE PERMITS (ALSO KNOWN AS LICENSES) ARE ALLOWED TO HOLD OUT AND PROVIDE AND PROVIDE OR OFFER TO PROVIDE SERVICES TO THE PUBLIC AS A CPA. IF THE PERMIT STATUS DOES NOT REFLECT "ACTIVE", THAT INDIVIDUAL IS NOT LICENSED TO PRACTICE. |

CPAVERIFY INCLUDES ALL CERTIFICATE HOLDERS AND PERMIT HOLDERS. If an individual has a permit, their permit record and their certificate record will show. Only a certificate record will show for non-licensed certificate holders.

If Permit Number shows N/A that means this person had a permit to practice at one point, but let it lapse. When the permit lapses in that case, so does the permit number. If permit shows Lapsed it means that this person once had a permit (license) to practice, but has since let them lapse. This individual is not licensed to practice as a CPA in Kansas.

Contact the Board for official verification of information.

State Board Contact Information:

KANSAS BOARD OF ACCOUNTANCY
LANDON STATE OFFICE BUILDING
900 SW JACKSON, SUITE 556
TOPEKA, KS 66612-1239

Phone: 785-296-2162
Fax: 785-291-3501
Email: INFO@KSBOA.KS.GOV
Licensee Lookup: http://www.da.ks.gov/boa/searchforindividual.aspx

Details of Enforcement, Non-Compliance or Disciplinary Actions:

1. If "Contact State Board For Details" is displayed then the State Board has reported some type of enforcement, non-compliance or disciplinary action to this site and the State Board should be contacted for full details about the action reported.
2. If "None Reported To This Site By The Board" is displayed then the State Board provides enforcement, non-compliance and disciplinary action data to this site and none was indicated for this record.
3. If "State Does Not Provide This Type of Data At This Site" is displayed then CPAverify is not currently receiving enforcement, non-compliance or disciplinary action data for licensees in this state. Some states are limited to sharing this type of data with third party websites due to privacy laws or policies, but most State Boards offer this information on their official State Board websites.
4. Contact the State Board for official verification of all enforcement, non-compliance and disciplinary activity.

The results shown here include all data made available by participating states. Additional data about the individual or firm may exist and is not shown here for other states that are not yet participating in the CPAverify website. Please refer to the Participating States tab for more information about which states are currently sharing their licensing data for use with this website and for clarification about which states these results do not include. If

1

EXHIBIT A

Case 1:16-cr-00301-WJM Document 145-1 Filed 05/09/19 Page 2 of 6

12/24/17 11:18:00

the Board of interest is not participating, you may refer to the **"Contact Boards"** tab where a link to every Boards' website and therefore individual license lookup tool is available.

Kansas Board of Accountancy -- KSBOA.org -- 785-296-2162     http://oitsapps.ks.gov/boa/IndividualLicenseInformation.aspx?ID=9211...



>> Home     >> Search for Firms

## Individual Information   [ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Egan | **Certificate Status:** | Active |
| **Address:** | 22 N Morgan Unit 210<br>Chicago, IL 60607-0000 | **Permit Status:** | |
| **Firm/Employer:** | Sprint | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |

Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

Kansas Board of Accountancy – KSBOA.org – 785-296-2162                    http://www.ksboa.org/faq.htm





**Home**
**Board of Directors**
**Board Meeting Dates, Agendas & Minutes**
**Complaint Form**
**CPA Exam Pass List**
**CPE requirements**
**Disciplinary Actions**
**FAQ's**
**Fees**
**Firm Search**
**Forms**
**Helpful Links**
**Individual Search**
**Laws & Regulations**
**Peer Review**
**Proposed Regulation Amendments**
**Site Map**
**Site Tools Download Center**
**Contact Us**

Frequently Asked Questions

These are some of the most frequently asked questions we receive. If you have any additional questions, or need any additional information, please contact the Board office at 785-296-2162, by Fax at 785-291-3501, or via our web e-mail submission form.

    CPA EXAM QUESTIONS
    CERTIFICATION QUESTIONS
    PERMIT TO PRACTICE (LICENSING) QUESTIONS
    FIRM QUESTIONS
    PEER REVIEW QUESTIONS
    CPE QUESTIONS
    GENERAL QUESTIONS

**CPA EXAM QUESTIONS**

Back To Top

**1. What are the requirements to sit for the CPA Exam?**

a. Successful completion of course work consisting of at least 150 semester hours, with a concentration in accounting, at a college or university approved by the board, and the applicant is the holder of a baccalaureate or higher academic degree. The Board does not have a list of approved colleges and universities. Please contact the Board office if you have questions.

b. Within the 150-hour education requirement, a candidate must complete 42 semester hours in business and general education courses, including the following:

A macroeconomics course, a microeconomics course, and one upper division economics course
At least two courses in the legal aspects of business or business law;
College algebra of higher-level course;
Statistics and Probability theory course;
Computer systems and applications course;
Finance course;
Management and Administration course;
Marketing course; and
Production, Operations Research or applications of quantitative
techniques to business problem course.
At least 11 hours in written and oral communications; (this includes courses such as English Composition, Speech, Business Communications, it does not include Foreign Language, Poetry, Literature, Theatre, etc.)
At least 30 semester credit hours in accounting theory and practice including:
Financial Accounting and reporting for business organizations course, which may include one of the following:
Intermediate Accounting course
Advanced accounting course; or
Accounting theory course.
Managerial Accounting beyond an introductory course;
Auditing course concentrating on auditing standards generally accepted in the United States as issued by the AICPA auditing standards board or the PCAOB, or both;
U.S. Income tax course; and
Accounting Information Systems beyond an introductory computer course.

Kansas Board of Accountancy -- KSBOA.org — 785-296-2162                                    http://www.ksboa.org/faq.htm

c. Residency "Must be a resident of Kansas, or have a place of business as a public accountant in, or be permanently employed by a public accounting firm in Kansas.

**2. Is it true that the Board may waive some of the required courses?**
Not to exceed a total of six hours, up to three hours of course requirements in each of the three categories listed above may be waived by the board, but only if the applicant has met the 150 hour education requirement and can provide satisfactory verification that he or she has otherwise met the course requirement.  Note that a waiver is an exception, not the rule, so any request for a waiver will be considered on a very narrow basis and must be for good cause. Please see the Board's position paper on waivers under the "CPA Exam Info" tab @ www.ksboa.org

**3. Where do I get an application to sit for the CPA Exam?**
Online at https://cpacentral.nasba.org/

**4. Can I sit for the exam any time I want, and as often as I want?**
The exam is offered in "windows". A "window" is the equivalent of a quarter. The exam will be offered no less than two months out of each examination window.  A candidate may not sit for a particular section more than once in a testing window. However, a candidate will be able to sit for a particular section 4 times in a year.

**5. Can I sit for the exam before meeting the education requirements?**
Beginning July 1, 2016, Kansas CPA exam applicants may sit for the exam up to 60 days before meeting the education requirements. The applicant will be required to submit final transcripts and any documents verifying completion of the education requirements to the Board or the examination service within 120 days after the applicant has taken the first section of the examination. Failure to provide the required documentation within the 120 days may result in the applicant's scores being voided, subject to notice and an opportunity for a hearing before the Board. Please contact the Board office if you have any questions.

**6. What are the exam application deadlines?**
With the computerized exam, there is no application deadline date. Applications will be taken and processed when submitted. However, once a candidate has been issued a "Notice to Schedule", the candidate will have six months from the issuance of the "Notice to Schedule" in which to sit for the approved exam sections.

**7. Do I have to sit for all four parts of the exam at one time?**
No. Candidates will be able to apply for one section of the examination at a time. Once the candidate is issued a "Notice to Schedule", the candidate will have six months from the date the "Notice to Schedule" is issued to sit for the approved sections. However, once a candidate has passed a section, the candidate will have 18 months from the date that part is passed to pass the remaining sections before losing credit for the passed part.

**8. Where is the CPA Examination held?**
In Kansas, there are four Prometric (Sylvan) sites: Topeka, Wichita, Overland Park, Pittsburg and Hays.
It is up to the candidate to schedule his/her dates and times to sit for the exam. However, when a person has been sent a "Notice to Schedule", the candidate may schedule to sit for the exam at any Prometric site in that provides testing for the CPA exam. Go to www.prometric.com for site information.

**9. When are the results of the exam released, and who will notify me?**
Grades are released as they are received by the AICPA and may be accessed by the candidate online. Once a candidate has passed all 4 parts of the exam, the Board will notify the candidate of the successful completion of the exam in writing. This process will take longer because all of the grades have to be released by the AICPA for the testing window and the successful candidate files then sent to the Board by NASBA.  Once this occurs, the Board will notify the candidate of their successful completion of the exam.  We appreciate your patience.  A candidate may access their scores online by clicking on the following link:
https://ncd.nasba.org/gwprdv2/servlet/hgwcs01

**10. I am from a foreign country, or I attended a college in a foreign country.  What requirements must I meet to sit for the CPA Exam in Kansas?**
An individual with a foreign degree must have their foreign degree evaluated to substantiate that the foreign degree is equivalent to a baccalaureate degree from a U.S. institution and must satisfy the 150-semester credit hour requirement. Contact the Board office for a listing of acceptable foreign evaluators.



**11. I passed the exam— can I call myself a CPA?**
Once you have passed the CPA exam, you are required to pass the AICPA™s Professional Ethics



course. Once a candidate has successfully completed the ethics course and has been issued a Kansas CPA certificate, a person may use the CPA as a credential only. (In other words, CPA may appear after a person™s name if they are working in an industry that is not related to the practice of public accountancy.) **CAUTION: Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, ALL fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, a person must also hold a valid Kansas permit to practice.** The CPA Certificate allows a person to use the designation as a credential, not hold out or sign reports for the public as a CPA. If a person wants to reflect this information on a resume, then we strongly suggest that the CPA designation is explained by saying, "not licensed to practice in Kansas". For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf The definition is broken out into two categories: attest and non-attest.

**12. What if I sat for the exam before the education requirement changed in May of 1997--do I now have to meet the 150-hour education requirement to sit for the exam in the future?**
If you sat for the CPA Exam in Kansas as a Kansas candidate prior to July of 1997, you do not have to meet the 150 hour education requirement to sit for the exam as a Kansas candidate in the future.


**CERTIFICATION QUESTIONS**

Back To Top

**NOTE: KANSAS IS A TWO-TIERED STATE, WHICH MEANS A PERSON MUST APPLY FIRST FOR A CPA CERTIFICATE AND THEN A PERMIT (LICENSE) TO PRACTICE AFTER MEETING AN EXPERIENCE REQUIREMENT. ONLY AFTER OBTAINING A PERMIT TO PRACTICE, MAY A PERSON HOLD OUT, PERFORM OR OFFER TO PEFORM SERVICES AS A CPA FOR THE PUBLIC. SEE PERMIT QUESTIONS FOR INFORMATION ON OBTAINING A PERMIT.**



**1. How do I obtain a CPA certificate by exam, or by transfer of grades, in Kansas?**
A Kansas exam candidate need only complete the Application for Certificate by Passing Examination in Kansas, and pay a $25.00 application fee, after the candidate has successfully completed the CPA exam as a Kansas candidate and the AICPA ethics exam. A person transferring their grades to Kansas is required to meet Kansas' specific education requirements at the time of transfer and be a resident of Kansas.

**2. How do I obtain a CPA certificate by reciprocity in Kansas?**
A person whose original certificate is from another state may be issued a certificate by reciprocity if the applicant passed the exam with grades that would have been passing grades that time in this state and the applicant meets all current requirements in this state for issuance of a certificate at the time application is made, and at the time of the issuance of the applicant's certificate in the other state met all such requirements applicable in this state, or the applicant had four years of experience after passing the exam upon which the applicant's certificate was based and within the 10 years immediately preceding the application.


**PERMIT (LICENSE) TO PRACTICE QUESTIONS**

Back To Top

**A PERSON WHOSE PRINCIPAL PLACE OF BUSINESS IS IN KANSAS AND WHO HOLDS OUT OR PERFORMS OR OFFERS TO PERFORM SERVICES AS A CPA MUST HAVE A VALID KANSAS PERMIT TO PRACTICE.**

**1. What is the experience requirement for a permit to practice?**
One year of accounting experience obtained through employment in government, industry, academia or public practice, providing any type of service or advice involving the use of attest or nonattest skills, all of which was verified by a CPA holding an active license to practice.

**2. Does the person verifying my experience have to be a supervisor?**
The experience no longer has to be under the direct supervision of a licensed CPA; however, a licensed CPA must verify that a person has the experience necessary to obtain a permit to

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 16-cr-301-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    **WILLIAM J. SEARS**,

     Defendant.

---

## ORDER DENYING MOTION TO WITHDRAW GUILTY PLEA

---

Defendant William J. Sears ("Sears") pleaded guilty in November 2016 to one count of conspiracy to defraud the United States (18 U.S.C. § 371) and one count of filing a false income tax return (26 U.S.C. § 7206(1)). (ECF Nos. 41, 48, 84.) His sentencing has been postponed pending his opportunity to testify in the Government's case against Guy Jean-Pierre, a co-conspirator who, for procedural reasons not relevant here, was charged in a separate criminal action. (*See* Criminal Case No. 17-cr-008-WJM.) Jean-Pierre went to trial before the undersigned in January 2019, and Sears testified at the trial, as expected. The Court then set Sears's sentencing hearing for July 11, 2019.

On May 4, 2019, Sears filed a Motion to Withdraw Plea of Guilty (ECF No. 139), which is currently before the Court. The Government filed a response opposing the relief sought in the motion (ECF No. 144) and Sears filed a reply (ECF No. 149). Having reviewed these materials, and having reviewed the plea agreement (ECF Nos.

41–42) and the transcript of the change-of-plea hearing (ECF No. 84), the Court finds

that Sears has not met the standard for withdrawing a guilty plea. His motion will be

denied.

## I.  BACKGROUND

This prosecution came to the Court essentially as a pre-arranged plea deal.  On

September 15, 2016, Sears and his co-defendant in this case (Scott Dittman) were both

charged by information with conspiracy to defraud the United States, and Sears alone

was charged with filing a false income tax return.  (ECF No. 1.)  That same day, both

defendants waived the indictment (ECF Nos. 16, 17) and then filed notices of

disposition the following day (ECF Nos. 3, 5).

The essence of the Government's conspiracy charge was that Sears and Dittman

had worked together to build a business called FusionPharm, but took numerous steps

to, among other things, conceal Sears's relationship to the company (given Sears's prior

conviction for federal securities fraud), and create free-trading FusionPharm shares

without truthfully satisfying federal regulatory requirements for such shares.  This, the

Government charged, was a willful evasion of federal securities laws and therefore a

conspiracy to defraud the United States.

Sears's plea agreement details the conspiracy over the course of approximately

twenty-five pages.  (ECF No. 41 at 12–25 & ECF No. 42 at 1–12.)  These facts were

mostly stipulated.  Some were augmented by footnotes describing additional facts

Sears or Dittman, or both, would introduce (if there were a trial, apparently), mostly

regarding alleged advice of counsel.  (*See, e.g.*, ECF No. 41 at 15 n.5, 17 n.8, 22 n.15,

24 n.18; ECF No. 42 at 6 n.25.)  A few facts were disputed, mostly in the sense that

2

Sears or Dittman believed the Government was stating its case too strongly, but none of these facts was dispositive to the Government's case. (*See, e.g.*, ECF No. 41 at 20 n.13, 22 n.16; ECF No. 42 at 7 nn.26–27, 9 n.31.)  As for the tax charge against Sears, it is detailed in two pages of unequivocally stipulated facts.  (ECF No. 42 at 13–14.)

Sears's change-of-plea hearing took place on November 14, 2016.  (ECF No. 48.)  Sears was placed under oath.  (ECF No. 84 at 2–3.)  The Court then confirmed that Sears understood his oath and that false answers could subject him to a perjury prosecution.  (*Id.* at 4.)  After some inquiries of counsel, the Court turned back to Sears and had the following exchange:

> Q. . . . Have you read Court Exhibits 1 and 2?[1]
>
> A. Yes, I have, Your Honor.
>
> Q. Have you read them carefully?
>
> A. Yes, I have, Your Honor.
>
> Q. Have you discussed these documents with your lawyer?
>
> A. In detail, sir, yes.
>
> Q. All right. Has your lawyer answered your questions regarding Exhibits 1 and 2?
>
> A. Yes, he has.
>
> Q. When you signed Exhibits 1 and 2, did you do so voluntarily?
>
> A. Yes, I did, sir.

(ECF No. 84 at 12–13.)  The Court then explained that the facts described in the plea agreement are the facts the Government believes it could prove at trial, and continued

---

[1] Court Exhibit 1 was the plea agreement and its attachments (ECF Nos. 41–43) and Court Exhibit 2 was Sears's Statement in Advance of Pleading Guilty (ECF No. 44).  (*See* ECF No. 84 at 3–4.)

3

its exchange with Sears as follows:

> Q. . . . So do you agree that the facts that you've reviewed
> at pages 12 through 37 of the plea agreement are true?
>
> A. Yes, I do, Your Honor.
>
> Q. Is there any inaccuracy in those facts you'd like to correct
> at this time?
>
> A. No, Your Honor.

(*Id.* at 13–14.)  The Court then asked Sears to "summarize . . . what it is that you did

with respect to the counts you are pleading guilty to."  (*Id.* at 14.)  Sears responded by

describing one of the events that, according to the Government, amounted to an

evasion of federal securities laws:

> Your Honor, I was involved in the creation of a convertible
> promissory note that was backdated.  In conjunction with
> that convertible promissory note, I failed to properly disclose
> my affiliation status which enabled me to have access to free
> trading securities.  I then liquidated those free trading
> securities into the public markets for a profit and failed to
> report that profit on my personal income tax, sir.

(*Id.*)  The Court then turned to the elements of the two crimes to which Sears would

plead guilty:

> Q. All right.  And did you do so in conspiracy with at least
> one other person to engage in those acts?
>
> A. Indeed, sir.
>
> Q. All right.  And you knowingly and voluntarily participated
> in that conspiracy?
>
> A. Yes, sir.
>
> Q. And you were aware of the objective of that conspiracy?
>
> A. Yes, sir.
>
> Q. And what was the objective?

Case 1:16-cv-00301-WJM Document 237-1 Filed 05/14/20 USDC Colorado Page 5 of 15
Case 1:16-cv-00301-WJM Document 155-1 Filed 05/22/19 Page 5 of 15

314

A.  To obtain free trading securities and be able to sell them into the market, sir.

Q.  All right.  Both you and your coconspirator [Dittman] acted in a manner for your shared mutual benefit within the scope of the conspiracy charged?

A.  Yes, sir.

Q.  With respect to Count 2 and the statements that you made on your—the false statements, as you've just characterized them, on your tax returns, you knew them to be false at the time you made them on the return; is that correct?

A.  Yes, sir.

Q.  And you did so—you made that false statement willfully and with the intent to violate a known legal duty?

A.  Yes, sir.

(*Id.* at 14–15.)  The Court accordingly accepted Sears's guilty plea.  (*Id.* at 26.)

## II.  LEGAL STANDARD

"A defendant may withdraw a plea of guilty * * * after the court accepts the plea, but before it imposes sentence if * * * the defendant can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  The defendant "has the burden of establishing that there is a fair and just reason for allowing withdrawal of his guilty plea."  *United States v. Gordon*, 4 F.3d 1567, 1572 (10th Cir. 1993).  The relevant factors for the Court to consider are: "(1) whether the defendant has asserted his innocence, (2) prejudice to the government, (3) delay in filing defendant's motion, (4) inconvenience to the court, (5) defendant's assistance of counsel, (6) whether the plea is knowing and voluntary, and (7) waste of judicial resources."  *Id.*  But the first, fifth, and sixth factors are the most important—if a defendant does not persuade the Court that those factors cut in his or her favor, the Court need not examine the

remaining factors. *United States v. Byrum*, 567 F.3d 1255, 1265 (10th Cir. 2009).

## III. ANALYSIS

In light of Sears's arguments, the Court finds it most effective to first examine assertion of innocence (factor 1), followed by voluntariness (factor 6), and finally assistance of counsel (factor 5).

## A. Assertion of Innocence

Sears pleaded guilty to two crimes: conspiracy to defraud the Government, and making a knowingly false statement on a tax return. Sears nowhere asserts his innocence on the tax charge. As for conspiracy to defraud the government, his entire assertion of innocence is as follows:

> Mr. Sears also asserts his innocence because the essential contention by the Government that Mr. Sears was a control person of Fusion Pharm, Inc. and that one or more companies that he operated was an affiliate of Fusion Pharm, Inc. is not factually correct. And, he asserts his innocence of the charge of securities fraud, mail fraud, wire fraud, or any other fraud involved in the securities and financing surrounding Fusion Pharm, Inc.

> * * *

> At the root of this issue is whether or not Mr. Sears was really a control person for Fusion Pharm, and whether Mr. Sears' [other] companies, Meadpoint or Vertifresh[,] where [*sic*] affiliates of Fusion Pharm.

(ECF No. 139 ¶¶ 24, 29.)

This argument addresses two specific ways the Government accused Sears of conspiring to defraud by evasion of the securities laws: (i) concealing Sears's role in FusionPharm, and (ii) concealing the fact that other companies Sears controlled (Meadpoint and Vertifresh), through which he carried out some FusionPharm stock transactions, were not actually independent of FusionPharm or acting for their own

interests. But that does not address all of the theories under which the Government could have proven Sears guilty. Most notably, it does not address the specific theory Sears himself described at his change-of-plea hearing, namely, the intentional backdating of a promissory note. (*See* Part I, above.) This backdating made it appear that the holding period for restricted shares had been satisfied, which, in part, prompted a stock transfer agent to issue free-trading shares that otherwise should not have issued. (*See* ECF No. 41 at 25 & ECF No. 42 at 1 (describing this transaction in more detail).)

Moreover, Sears cannot simply assert that the Government is "factually incorrect" (ECF No. 139 ¶ 24) and rest his case. "[T]he assertion of a defendant's subjective belief in his own innocence does not mandate allowing him to withdraw his plea of guilty." *United States v. Hickok*, 907 F.2d 983, 985 n.2 (10th Cir. 1990) (internal quotation marks omitted; certain alterations incorporated). The defendant "must affirmatively advance an objectively reasonable argument that he is innocent." *United States v. Hamilton*, 510 F.3d 1209, 1214 (10th Cir. 2007) (internal quotation marks omitted). Sears's motion nowhere presents such an argument.

For the first time in his reply brief, Sears elaborates, but only slightly. He asserts that he "held a good faith belief that disclosure [of his role in FusionPharm] was not required based, in part, on advice given to him by [attorneys]." (ECF No. 149 at 4.) The Court could deem this argument forfeited as untimely. *See, e.g.*, *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011). But it is not enough, regardless. Sears nowhere attempts to demonstrate that advice of counsel was a viable defense for him, legally or factually. And Sears, again, addresses only one theory by which the

Government could have proven him guilty under the conspiracy charge.[2]

Finally, Sears nowhere explains why he admitted the illegality of all of this conduct, under oath, at his change-of-plea hearing. The Court finds the Supreme Court's guidance in the habeas context instructive here: "Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Similarly, bare assertions of innocence with no support, and no explanation of why the defendant has gone back on his or her sworn testimony, are not entitled to consideration when the defendant moves to withdraw a guilty plea.

For all these reasons, the assertion-of-innocence factor does not weigh in Sears's favor.

## B. Voluntariness of Plea

"When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). However, the defendant *may* raise potential constitutional deprivations to the extent they affect "the voluntary and intelligent character of the guilty plea." *Id.* Here, Sears raises what he characterizes as violations of the Government's constitutional duty following *Brady v.*

---

[2] Sears's reply brief goes on to deny that he was a de facto officer and director of FusionPharm, that FusionPharm intentionally or knowingly misstated its revenues, or that FusionPharm issued false press releases. (ECF No. 149 at 4.) He also denies that FusionPharm stock transactions via his other company, Meadpoint, were unlawful. (*Id.*) But these more granular denials are still no more than bare denials. Sears nowhere attempts to provide an objectively reasonable argument in support of any denial. *See Hamilton*, 510 F.3d at 1214.

*Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995), to disclose exculpatory evidence to the defense, including evidence known to others acting on the Government's behalf, such as law enforcement officers. (ECF No. 139 ¶¶ 10–14.)[3]

1.     Agent Funk's CPA Status

The first alleged *Brady* violation relates to the Government's case agent, FBI Special Agent Kate Funk. Sears argues that

> Agent Funk claimed in [a search warrant] affidavit [leading to a search warrant executed during the investigation of this case] to be a certified public accountant and [she] made financial opinions throughout the affidavit in her effort to assert probable cause. Agent Funk is not and was not a certified public accountant.

(*Id.* ¶ 18.) This is the extent of the argument in Sears's motion. He makes the assertion and then moves on. Given that Sears provides no reason for the Court to accept his rather bold accusation as true, or even potentially true, the Court could disregard it as an inadequately developed argument. *See, e.g.*, *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013); *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008). In the interest of clarifying the record, however, the Court will address it.

The Government's response brief notes that Agent Funk's CPA status is publicly displayed on the Kansas Board of Accountancy's website,[4] which reports that she first received her "Certificate" in August 1999, that her "Certificate Status" is "Active," and that she has never had any disciplinary action brought against her. (ECF No. 144 at 4–5.) The Government further argues that an individual with a Kansas CPA certificate

---

[3] Sears directs these accusations at former AUSA Kenneth Harmon only, who departed the U.S. Attorney's Office in the middle of the prosecution. (*Id.* ¶ 15.) Sears does not accuse AUSA Jeremy Seibert, who substituted for Mr. Harmon as lead prosecutor.

[4] *See* http://oitsapps.ks.gov/boa/IndividualLicenseeInformation.aspx?ID=105540667&lastName=Funk (last visited May 21, 2019).

may use "CPA" as a credential after his or her name if the individual is working in an

industry that is not related to the practice of public accountancy. (*Id.* (citing Kan. Stat.

Ann. § 1-321).) In reply, Sears says (for the first time) that he has "consulted with [a

particular] lawyer and CPA in Colorado, who is prepared to testify that Ms. Funk violated

the accountancy laws in Colorado and Kansas when she claimed a CPA designation."

(ECF No. 149 at 3.) Sears then attaches a print-out from the "frequently asked

questions" portion of the Kansas Board of Accountancy's website, which explains that

an individual with a Kansas CPA certificate

> may use the CPA as a credential only. (In other words, CPA
> may appear after a person[']s name if they are working in an
> industry that is not related to the practice of public
> accountancy.) **CAUTION: Financial Planning, litigation
> support, broker/dealer services, investment advisory,
> consulting, management advisory and business
> valuation services, ALL fall under the definition of non-
> attest practice, and in order to use the CPA designation
> in connection with these services, a person must also
> hold a valid Kansas permit to practice.** The CPA
> Certificate allows a person to use the designation as a
> credential, not hold out or sign reports for the public as a
> CPA.

(ECF No. 149-1 at 6 (boldface in original).) Sears highlights the words "litigation

support." (*See id.*)

Before evaluating the significance of Sears's discovery about Agent Funk, the

Court notes that Agent Funk *is* a certified public accountant—the only questions are the

contexts in, and purposes for which, she may represent herself as such, under Kansas

law. It was therefore rather reckless of Sears's counsel to state, without qualification,

"Agent Funk is not and was not a certified public accountant." (ECF No. 139 ¶ 18.)

Leaving that aside, the question is whether the Government's failure to disclose

the precise nature of Agent Funk's CPA status is a *Brady* violation. Sears believes that

this information should have been used to challenge the search warrant obtained via Agent Funk's affidavit. (*Id.* ¶¶ 16–19; ECF No. 149 at 3.) The Court will mostly address the question of whether the search warrant could have been challenged in Part III.C, below, when the Court turns to the assistance-of-counsel factor. For present purposes, it suffices to point out that information suggesting that the magistrate judge should not have given as much credit to Agent Funk's representations in the search warrant seems to suggest, instead of a *Brady* violation, a potential violation of *Franks v. Delaware*, 438 U.S. 154 (1978), which holds that a law enforcement officer violates a suspect's constitutional rights if he or she knowingly offers material misstatements to secure a warrant, and *United States v. Merton*, 274 F. Supp. 2d 1156 (D. Colo. 2003), which extends *Franks* to material omissions.

Regardless, there is no *Brady* violation under the circumstances of this case because the allegedly withheld information is not *exculpatory*. How and when Agent Funk may call herself a CPA under Kansas law has nothing to do with whether Sears committed the crimes with which he was accused. The evidence is, at best, impeachment evidence, and "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002). As a matter of law, then, Sears's lack of knowledge about Agent Funk's status as a CPA "certificate" holder only, and not as a fully licensed-to-practice CPA, did not render his guilty plea involuntary.[5]

_____

[5] There is also an interesting question of whether Agent Funk's representation of her CPA qualifications in a sealed search warrant affidavit submitted to a federal magistrate judge can ever be deemed "hold[ing oneself] out or sign[ing] reports for the public as a CPA," and therefore requiring additional qualifications under Kansas law. (ECF No. 149-1 at 6.) But in

2. <u>AUSA Harmon's Relationship to Mr. Lehrer</u>

The second alleged *Brady* violation requires slightly more background. Part of Sears's and Dittman's scheme to obtain free-trading shares was to obtain "Rule 144 opinion letters" from attorneys who would attest that the requirements in the SEC's Rule 144 had been met to remove a restrictive legend from a stock certificate. Sears and Dittman obtained many of these letters from Jean-Pierre.[6] But Sears and Dittman later turned to Fred Lehrer, who also provided opinion letters. Sears alleges a *Brady* violation flowing from the failure to disclose the relationship between former AUSA Harmon (*see* n.3, above) and Mr. Lehrer:

> In this case, the [former] prosecutor, Kenneth Harmon, did not reveal exculpatory evidence regarding his relationship with the attorney hired by Fusion Pharm, Inc. to assist it in its securities filings. Frederick M. Lehrer is the lawyer hired by Fusion Pharm after the services of Guy Jean-Pierre were terminated.
>
> Mr. Lehr[er] rendered far more legal opinions in support of Fusion Pharm's activities than those issued by Mr. Jean-Pierre. It would be anticipated that Mr. Lehrer would be a favorable witness for the defense. However, it turns out that Mr. Harmon and Mr. Lehrer worked together in a task force in Miami prior to Mr. Harmon accepting an Assistant United States Attorney position in Colorado. The two of them are not only colleagues, but friends.
>
> Effort has been made by the prosecution to minimize and hide Lehrer's role in this case. Lehrer turned against his clients, and, in fact, testified falsely in proceedings before the Securities and Exchange Commission, with respect to his knowledge and activity with Fusion Pharm. Exculpatory evidence in this regard was withheld from Mr. Sears.

---

light of the disposition above, the Court need not reach this question.

[6] The jury in the January 2019 trial was persuaded that Jean-Pierre's attestations in these letters were knowingly false, and therefore convicted him on counts of conspiracy, mail fraud, wire fraud, and aiding and abetting Sears's and Dittman's fraud.

(ECF No. 139 ¶¶ 25–27.)  This argument is very difficult to connect to a *Brady* violation—or any other constitutional violation—but the Court can say at least the following.

First, Sears's reply brief makes clear that, among all the factual assertions above, the *only* thing about Mr. Lehrer that Sears did not know at the time of his decision to accept a plea deal was Mr. Lehrer's relationship with Mr. Harmon.  (ECF No. 149 at 2.)  Sears knew beforehand that Mr. Lehrer was not being prosecuted, that Mr. Harmon had no intent to prosecute Mr. Lehrer, and that Mr. Lehrer had offered testimony in an SEC proceeding that Sears considered false.  So the *Brady* evidence, if there is any, must be the relationship between Mr. Lehrer and Mr. Harmon.

Second, Sears nowhere explains how this relationship is exculpatory.  As best the Court can tell—and Sears himself does not make this connection—it would have been *impeachment* evidence had Mr. Lehrer testified in a trial and, for example, disavowed Sears's (apparent) claim that he received good-faith advice from Mr. Lehrer about the legality of the FusionPharm stock transactions.  Knowledge that Mr. Lehrer and Mr. Harmon are friends, and that Mr. Lehrer was not being prosecuted,[7] might give the jury reason to suspect that Mr. Harmon was allowing Mr. Lehrer to say whatever he

---

[7] The fact that Mr. Lehrer was not being prosecuted—for whatever reason—likely could not have been considered by the jury for anything more than its impeachment value.  The Court routinely gives Tenth Circuit Criminal Pattern Jury Instruction No. 1.19, which reads in relevant part as follows:

> It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged.  The fact that another person also may be guilty is no defense to a criminal charge.

> The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime charged.

needed to say to protect himself, as a courtesy to a friend.  But again, the Government

need not disclose potential impeachment evidence before the defendant decides to

plead guilty.  *Ruiz*, 536 U.S. at 633.  Therefore, Sears's plea was not involuntary on this

account, and so this factor does not favor allowing him to withdraw his plea.

## C.     Assistance of Counsel

Sears's current counsel was not his counsel at the time of the plea deal.

Although Sears does not directly accuse his former counsel of ineffective assistance, he

argues that Fourth Amendment grounds existed to challenge the three search warrants

that issued during the investigation of this case, and therefore grounds existed to

suppress the evidence gathered through those warrants.  (ECF No. 139 ¶¶ 17–23; ECF

No. 149 at 3.)  Because Sears cannot now assert those Fourth Amendment arguments

directly, *Tollett*, 411 U.S. at 267, the Court presumes that Sears means to say that his

former counsel was ineffective in advising him to take a plea deal rather than to bring

motions to suppress.

"When a defendant's challenge to a guilty plea is based on ineffective assistance

of counsel, we apply the two-part test established in *Strickland v. Washington*, 466 U.S.

668, 687 (1984)."  *Hamilton*, 510 F.3d at 1216.  That two-part test is as follows:

1.   *Objective Unreasonableness*: his "counsel's representation fell below an

objective standard of reasonableness"; and

2.   *Prejudice*: "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine

confidence in the outcome."

*Strickland*, 466 U.S. at 688, 694 (1984).  There is a "strong presumption" that an

attorney "render[s] adequate assistance and [makes] all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90.

Moreover, to demonstrate prejudice in the context of a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "Going to trial" can include attempts to *avoid* trial through moving to suppress evidence. *Premo v. Moore*, 562 U.S. 115, 118 (2011). But the standard for prejudice remains high: "A defendant who accepts a plea bargain on counsel's advice does not necessarily suffer prejudice when his counsel fails to seek suppression of evidence, even if it would be reversible error for the court to admit that evidence." *Id.* at 129.

Sears does not cite, much less attempt to apply, these standards. In the interest of justice, however, the Court observes the following.

Sears says that the first warrant issued in this case could have been challenged on the basis that Agent Funk is not a CPA. (ECF No. 139 ¶¶ 16–19, 22.) As already explained above (Part III.B.1), Agent Funk *is* a CPA, but she is restricted under Kansas law in the ways she may hold herself out as a CPA. So, had Sears moved to suppress on this basis, the argument would have been that full disclosure of Agent Funk's CPA status was a material fact that should not have been withheld from the magistrate judge. *See Franks*, *supra*; *Merton*, *supra*. But Sears offers no reason to believe that it was material. Even if it was, this Court would be required to reevaluate the warrant affidavit as if Agent Funk's full CPA status was disclosed and decide if probable cause still existed. *See Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996). Sears offers no

reason to believe that analysis would cut in his favor. Thus, at a minimum, he fails even to imply that the result of the proceeding would have been different had his former counsel moved to suppress on these grounds.

Sears next argues that the first warrant could also have been challenged because it described FusionPharm as a Ponzi scheme, and also as a "pump and dump" scheme to artificially inflate FusionPharm's stock price and then to sell at those artificially inflated prices, yet "the body of the affidavit fails to establish the truth of the[se] assertions." (ECF No. 139 ¶ 20.) This is a pure lack-of-probable-cause argument—that the magistrate judge simply made the wrong decision. In terms of challenges to search warrants, this argument is probably the most difficult to win. *See United States v. Nolan*, 199 F.3d 1180, 1182 (10th Cir. 1999) ("Because of the strong preference for searches conducted pursuant to a warrant, the Supreme Court has instructed us to pay great deference to a magistrate judge's determination of probable cause." (internal quotation marks omitted)). Yet again, Sears offers no reason to believe this argument had a serious chance of succeeding, and so cannot show that the result of the proceeding would have been different if his counsel had brought this motion.

Sears continues that he "has noted numerous misstatement[s] of fact in the search warrant affidavit which could have been the subject of a motion to suppress as well as a violation of the doctrine of *Franks*." (ECF No. 139 ¶ 21.) But, having claimed as much, Sears immediately moves on to a new argument. This unsupported accusation does not show that the result of the proceeding would have been different if

his counsel had challenged the warrant on these grounds.[8]

As for the second warrant that issued in this case, Sears argues that it was infirm because Agent Funk again represented herself as a CPA, allegedly beyond what Kansas law permits her to do; and because the warrant was based on evidence gathered during execution of the purportedly unlawful first warrant, and so was the fruit of the poisonous tree. (*Id.* ¶ 22.) The Court's previous analysis disposes of this claim.

Finally, as for the third warrant, Sears declares that it was "based on a totally erroneous theory of the operation of the business and the sale of stock, [and] was [also] a general warrant." (*Id.* ¶ 23.) But, as usual, Sears does not elaborate. And specifically concerning the general warrant argument, "[a] motion challenging a warrant as a 'general warrant' is difficult to win. As to whether warrant language is insufficiently particular, the relevant case law puts a heavy thumb on the Government's side of the scale." *United States v. Holt*, 2019 WL 193646, at *13 (D. Colo. Jan. 14, 2019) (citing cases). Sears's bare contention that the third warrant was a general warrant, without more, is not enough to show a reasonable probability that such a motion would have succeeded.

For all these reasons, Sears has not established that he received poor advice from his former lawyer to take the plea deal. The advice-of-counsel factor therefore does not tip in his favor.[9]

---

[8] Sears also nowhere says that the misstatements, whatever they were, flowed from some error that Agent Funk committed because she had "only" a CPA certificate.

[9] To the extent Sears sees a lack of proper advice from counsel as bearing on the voluntariness factor, and not just the advice-of-counsel factor, *see Hamilton*, 510 F.3d at 1215 (acknowledging that ineffective assistance of counsel can render a plea involuntary), the foregoing analysis equally demonstrates that the assistance Sears received from his former counsel was not so deficient (if it was deficient at all) as to be constitutionally ineffective, and so

\* \* \*

In sum, Sears has not carried his burden to demonstrate that any of the three crucial factors favors him, so the Court need not examine the remaining factors. *Byrum*, 567 F.3d at 1265. Sears has not established "a fair and just reason for requesting the withdrawal" of his guilty plea. Fed. R. Crim. P. 11(d)(2)(B). The Court therefore will not permit him to withdraw the plea.

## IV. CONCLUSION

For the reasons set forth above, Sears's Motion to Withdraw Plea of Guilty (ECF No. 139) is DENIED.

Dated this 22nd day of May, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge

---

his plea cannot be considered involuntary on that account.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No.  16-cr-00301-WJM-02

UNITED STATES OF AMERICA,

     Plaintiff,

v.

2.     SCOTT M. DITTMAN,

     Defendant.
_____

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO CONTINUE THE SENTENCING
_____

     The United States of America, by and through United States Attorney Jason R. Dunn and Assistant United States Attorney Jeremy Sibert, hereby responds to Defendant's Motion to Continue the Sentencing Hearing, document 154, as follows:

     1.  The Court is aware of the sentencing hearing dates scheduled in this case and the related case to allow for co-defendant William Sears and Guy Jean-Pierre (17-cr-00008-WJM) to be sentenced close together in order to allow for any victims to attend the hearings.  This Honorable Court granted the government's request for a July 11, 2019 sentencing date for Sears and Dittman for good cause shown.  *See* Doc. 127 and 128.  Based on this Court's order, the sentencing dates were set for July 10th for Guy Jean-Pierre and July 11th for Scott Dittman and William Sears.

     2.  In ruling upon a defendant's motion for a continuance that will permit

1

representation by a defendant's counsel, the Court must balance the defendant's "constitutional right to retain counsel of . . . choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice." *United States v. Mendoza-Salgado,* 964 F.2d 993, 1015 (10th Cir. 1992) (quotation omitted).

3. In making this determination, the Court considers whether "1) the continuance would inconvenience witnesses, the court, counsel, or the parties; 2) other continuances have been granted; 3) legitimate reasons warrant a delay; 4) the defendant's actions contributed to the delay; 5) other competent counsel is prepared to try the case; 6) rejecting the request would materially prejudice or substantially harm the defendant's case; 7) the case is complex; and 8) any other case-specific factors necessitate or weigh against further delay." *United States v. Flanders,* 491 F.3d 1197, 1216 (10th Cir. 2007) (quoting *Mendoza-Salgado,* 964 F.2d at 1015).

4. Defendant's counsel is requesting more time to review additional discovery that essentially relates to defendant Jean-Pierre's case. Specifically undercover recording between defendant Sears and Jean-Pierre, evidence regarding Jean-Pierre's actions, and discovery pertaining to the proffers made by Sears regarding the investigation into Jean-Pierre are the discovery materials that defendant Dittman is seeking in order to better prepare for his sentencing. However, none of the discovery that is listed in defendant's motion for additional time will assist defendant Dittman at his sentencing. Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government has the obligation to produce evidence favorable to the accused at sentencing. *See* United States v.

2

Guerrero, 894 F.2d 261 (7th Cir. 1990)   Further, defendant's request must be timely and

must show some type of need for access to the discovery.  *See United States v.*

*Valencia-Lucena*, 988 F.2d 228 (1st Cir. 1993) and *United States v. Williams*, 624 F.3d

889 (8th Cir. 2010).  Here the defendant is making request for additional time to review

discovery but does not explain how this discovery regarding a co-defendant and Jean-

Pierre's case will assist him at sentencing.  Everything listed by defendant Dittman has

nothing to do with his case, thus, the materials won't be useful in assisting him at his

sentencing.

5.   Courts have generally found no error in denying a defendant's request to

continue a sentencing hearing, including when a defendant fails to show that granting

more time would likely change the resulting sentence.  *See United States v. Lopez-*

*Lopez*, 295 F.3d 165 (1st Cir. 2002)(upholding failure to continue sentencing hearing

despite late receipt of PSR); and *United States v. Garcia*, 78 F.3d 1457 (10th Cir.

1996)(upholding denial of continuance to allow defendant to subpoena witnesses).

6.   This is a 2016 case, where the defendant has stated to this court his guilt.  The

plea agreement in this case, allows for a sentencing range of 3 to 5 years.   As this

Court might remember, defendant Dittman refused to testify in Jean-Pierre's trial who he

conspired with in committing security fraud.   The defendant has once again placed the

Court in the untenable position of protecting "the public's confidence in the integrity of

the judicial process and the orderly administration of justice," *Mendoza-Saldado,* 964,

F.2d at 1015.  The right to a speedy trial is not exclusive to the defendant.  The public

also has a right to a speedy disposition of the case.  18 U.S.C. § 3161(h)(8)(A).  Denial

of the continuance will not result in a miscarriage of justice. 18 U.S.C. § 316(h)(8)(B)(i). There is no legitimate purpose for a continuance and the interests of justice are not served by additional delay. The defendant's strategic maneuvering should not trump the public's interest in a speedy resolution of this case.

For these reasons, the government opposes the defendant's request for a continuance. If this Honorable Court disagrees, the government is requesting that the other sentencing dates be continued for reasons stated in Document 127.

DATED this 18th day of June, 2019.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By: s/Jeremy Sibert
Jeremy Sibert
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Jeremy.Sibert@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this 18th day of June, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all counsel of record in this case.

s/ Jeremy Sibert
Jeremy Sibert
Assistant United States Attorney

4

Case 1:16-cv-00301-WJM Document 155 Filed 06/18/19 Page 5 of 8

1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Jeremy.Sibert@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

### SEARS' OBJECTION TO PRESENTENCE INVESTIGATION REPORT

---

Defendant, William J. Sears, by his counsel of record, Peter R. Bornstein, hereby submits his objections to the Presentence Investigation Report as provided in Rule 32(f) of the Federal Rules of Criminal Procedure.

**Objection to ¶ 16.** Defendant objects to the language that shares in Baby Bee Bright would go to both Sears and Dittman. Dittman received most of the stock in Baby Bee Bright, and not Sears. Defendant also objects to the language that Family Member A was appointed to act as a director in part to avoid disclosure of Sears' involvement and his prior conviction for securities fraud. Pursuant to advice from counsel, Family Member A was to only be a placeholder and resigned within four months of the transaction. Family Member A was not appointed to avoid disclosure of Sears' involvement.

**Objection to ¶ 17.** In footnote number 3, Defendant objects to the character-ization of the advice from Counsel B regarding selling product to legal marijuana

cultivators.  Counsel B suggested to Sears and Dittman to have a private company work directly with the marijuana growers rather than FusionPharm.

**Objection to ¶ 18.**  Defendant objects to the language that control of Baby Bee Bright went to both Sears and Dittman inasmuch as Dittman controlled 86.6% of the outstanding stock.

**Objection to ¶ 19.**  Once the transaction of turning Baby Bee Bright's stock to FusionPharm's name was completed, Sears removed himself as the "Administrative Officer" as the company was now that of Scott Dittman.

**Objection to ¶ 20.**  Defendant objects to the designation of the individual denominated "A" as a co-conspirator; and denies the implication that his email to "A" regarding a business plan and financial projections was based on conspiratorial activity. It was based on the fact that Sears has no training on financial projections, nor does he have the ability to write a business plan and he did not want to be involved in this part of the creation of a new business.

**Objection to ¶ 21.**  Defendant objects to the implication that Dittman and Sears operated FusionPharm as business partners, and that Sears was primarily responsible for FusionPharm's capital formation and investor relations.  Defendant admits that there was communication and consultation that fell far short of a partnership.

**Objection to ¶ 22.**  Defendant objects to the description that he or any of the entities through which he conducted business was an affiliate of or a related party to FusionPharm.  Additionally, any reports that were uploaded to the OTC Link internet platform by Defendant were done purely as a ministerial act and not a substantive act.

Finally, Defendant's activities with respect to this paragraph received approval by the company securities counsel and secretary.

**Objection to ¶ 23.**  Defendant denies having a formal role in FusionPharm and that his company and FusionPharm worked together.  Furthermore, any documents giving Defendant formal title in the company were unofficial documents that appeared only at the beginning for a very limited time until corporate counsel advised Dittman to ensure that Sears had no formal role in the company.

**Objection to ¶ 24.**  Defendant objects to being categorized as acting as a Chief Financial Officer because he does not have the knowledge or experience to do so.  In addition, he only signed checks for Dittman when Dittman's bank closed his account because the bank thought Dittman was deceased.  Once this mistake was rectified, all check writing ceased.  Defendant's receipt of a salary was a mistake made by a new employee who should have treated him through an IRS Form 1099 and not on the payroll.  Finally, Defendant's use of FusionPharm's email address was terminated on advice of securities counsel which was followed by the Defendant immediately.

**Objection to ¶ 26.**  Defendant objects to being labeled as a *de facto* affiliate, and denies that sales of preferred shares in Microcap were in violation of securities laws.

**Objection to ¶ 27.**  Defendant objects to the implication that the transactions involving Family Members B and C were merely proxies for his stock ownership, and asserts that there were legitimate reasons for these transactions.

**Objection to ¶ 28.** Defendant objects to the characterization of these transactions because securities counsel oversaw most of the documentation regarding

3

these stock transactions and approved of them. Moreover, most investors were told that these (free) shares were Dittman's from a previous deal.

**Objection to ¶ 29.** Defendant objects because he received advice from securities counsel that these transactions were approved. Defendant submitted the documents required as the control person for Microcap.

**Objection to ¶ 30.** Defendant objects to the characterization that Dittman's inquiries to Sears about money made in the market was due to a conspiracy, but rather because Sears owed money to Dittman for the manufacturing of pods.

**Objection to ¶ 31.** Defendant objects to the contention that Bayside was an entity used by the Defendant to secure FusionPharm stock, and contends that Sears' mother owned Bayside and that the three lawyers providing securities advice to FusionPharm knew of this fact.

**Objection to ¶ 33.** Defendant objects to the comment that Dittman was identified as a VertiFresh director. VertiFresh was a limited liability company without any directors and was owned by Sears solely.

**Objection to ¶ 34.** Defendant objects to the statement that Dittman owned 50% of Meadpoint.

**Objection to ¶ 35.** Defendant objects that Dittman sold stock through any of the companies identified as Microcap, Bayside, VertiFresh, and Meadpoint.

**Objection to ¶ 36.** Defendant objects because he was acting on advice of counsel to create two notes. Family Member A was a legitimate owner of Bayside at that time, and the dates on the notes were affixed as to when the loan money was first

taken by the company. Thus, the backdating of notes to May 2, 2011 was not a fraudulent act.

**Objection to ¶ 37.** Defendant objects to this paragraph as being nonsensical and wrong.

**Objection to ¶ 38.** Defendant objects to the characterization of the notes as non-convertible, as they were always convertible.

**Objection to ¶ 40.** Defendant objects to the statement that the notes were at some time non-convertible. Defendant also objects that this was part of a fraudulent scheme and that three securities lawyers oversaw the transactions and he was led to believe that it was legal.

**Objection to ¶ 42.** Defendant objects to being labeled as an affiliate because he was advised by securities lawyers that he was not an affiliate. Accordingly, no volume restrictions were violated.

**Objection to ¶ 43.** Defendant objects to this paragraph because he was advised by counsel that all representations made were in compliance with securities laws.

**Objection to ¶ 45.** Defendant objects to this paragraph because he contends that he did not mislead the transfer agent and, once again, he was advised by securities lawyers that he was in compliance with securities law.

**Objection to ¶ 46.** Defendant objects to being labeled as an employee when he was never employed directly with FusionPharm.

**Objection to ¶ 47.** Defendant objects to the language that the conversion of the Meadpoint note into shares of FusionPharm common stock was something other than what it purported to be.

**Objection to ¶ 49.** Defendant objects because he had no stock to sell for the month of January which was the month when FusionPharm stock sold for the highest price ever. Defendant did not get any stock until the middle of February of 2014.

**Objection to ¶ 50.** Defendant objects to the idea that funds were treated as owned collectively with Dittman. Dittman's funds were his and Sears' funds were his.

**Objection to ¶¶ 52 - 65.** Defendant objects to all factual statements implicating him in creating, preparing or commenting, on revenue recognition or its reporting from the sale of FusionPharmPods. He is not competent in finances.

**Objection to ¶¶ 71 - 78.** Defendant denies that his failure to file or pay taxes in these years was done willfully, and asserts that he was in the process of catching up on his taxes when the government conducted its search warrants and raiding of the business.

**Objection to ¶¶ 85 – 114 concerning Guy M. Jean-Pierre.** Defendant objects to the inclusion of the presentence investigation report information on Guy Jean-Pierre as Defendant was not provided with this information through discovery and does not know whether it is substantially correct or not. Jean-Pierre was not convicted of conspiring with the Defendant.

**Objection to ¶¶ 108 - 111.** Defendant objects because his statements were scripted by the FBI and IRS agents who were directing the undercover operation.

**Objection to ¶ 130.** Defendant objects to the use of inaccurate or false allegations to compute the offense level as contained in the previous objections.

**Objection to ¶ 133.** Defendant objects to this paragraph giving him a 4-level increase because he acted as an organizer or leader of a criminal activity that involved

five or more participants because he denies being an organizer or leader of any criminal activity.

**Objection to ¶ 137.** Defendant objects to this paragraph giving him a 2-level increase for failure to report income from criminal activity because he denies this income was from criminal activity.

**Objection to ¶ 138.** Defendant objects to this paragraph because the failure to file income tax returns is not sophisticated means.

**Objection to ¶ 160.** Defendant objects to this paragraph because he remained in Queens until the age of 16 and not until the age of 7.

**Objection to ¶ 161.** Defendant objects to this paragraph because he remained in Queens until the age of 16 and not until the age of 7.

**Objection to ¶ 173.** Defendant objects to this paragraph because the Defendant has Diabetes and controls it with diet and, therefore, his health is not "good".

Respectfully submitted this 18th day of June, 2019.

THE LAW OFFICES OF PETER R. BORNSTEIN

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

7

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June, 2019, I electronically filed the foregoing **SEARS' OBJECTION TO PRESENTENCE INVESTIGATION REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


 *s/ Jeannette Wolf*_____
THE LAW OFFICES OF PETER R. BORNSTEIN

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Peter R. Bornstein
(jwolf@prblegal.com, pbornstein@prblegal.com), Jeremy S. Sibert (caseview.ecf@usdoj.gov,
diana.brown@usdoj.gov, jeremy.sibert@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andres Rene
Guevara (andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov)
--No Notice Sent:

Message-Id:7107971@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for
Clarification
Content-Type: text/html
```

## U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 6/28/2019 at 3:59 PM MDT and filed on 6/28/2019

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 170(No document attached) |

**Docket Text:**
 ORDER as to William J. Sears (1): This matter is before the Court *sua sponte*. Due to a conflict with a criminal jury trial the week of July 8, 2019, the Sentencing Hearing set for July 11, 2019 at 1:30 p.m. is hereby VACATED and RESET to October 31, 2019 at 1:15 p.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards with regard to the deadlines for filing sentencing–related motions. It is FURTHER ORDERED that the Government's Motion for Clarification [168] is DENIED as MOOT, given this Court's Orders in *United States of America v. Dittman*, Case No. 16–cr–301–WJM–2 (ECF No. 169) and *United States of America v. Jean–Pierre*, Case No. 17–cr–008–WJM (ECF No. 232), which set the sentencing hearings for these two defendants at or near the same time as Defendant Sears' sentencing hearing. SO ORDERED by Judge William J. Martinez on 6/28/2019. Text Only Entry (wjmsec, )

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche      labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, diana.brown@usdoj.gov

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16−cr−00301−WJM−1 Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Peter R. Bornstein
(jwolf@prblegal.com, pbornstein@prblegal.com), Jeremy S. Sibert (caseview.ecf@usdoj.gov,
diana.brown@usdoj.gov, jeremy.sibert@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andres Rene
Guevara (andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (bradshaw.perry@usdoj.gov,
gillian.fleck@usdoj.gov, jason.brackett@usdoj.gov, joseph.braaten@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:7109419@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
```
Content−Type: text/html

### U.S. District Court − District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 7/1/2019 at 1:19 PM MDT and filed on 7/1/2019

**Case Name:**   USA v. Sears et al

**Case Number:**   1:16−cr−00301−WJM

**Filer:**

**Document Number:**  171(No document attached)

**Docket Text:**
 **ORDER as to William J. Sears (1): This matter is before the Court upon the entry of the Court's Order resetting Defendant Sears' Sentencing Hearing for October 31, 2019 (ECF No. 170). The deadline for the Government to file its Response to Defendant Sears' Objection to Presentence Investigation Report (ECF No. [160]) is extended up to and including August 7, 2019. No reply will be permitted. SO ORDERED by Judge William J. Martinez on 7/1/2019. Text Only Entry (wjmsec, )**

**1:16−cr−00301−WJM−1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Marci Gilligan LaBranche     labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert     Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, diana.brown@usdoj.gov

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

## MOTION FOR RECONSIDERATION

---

Defendant, William J. Sears, by his counsel of record, Peter R. Bornstein, moves this Court for an order reconsidering the Court's Order denying Sears's motion to withdraw his guilty plea. Mr. Sears attaches to this motion three exhibits as well as his affidavit with three more exhibits attached. As grounds in support of his motion for reconsideration, Mr. Sears states to the Court as follows:

1. On May 4, 2019, Mr. Sears filed a Motion to Withdraw his Plea of Guilty (ECF No. 139). A response was filed by the government and a reply was filed by Mr. Sears.

2. On May 22, 2019, this Court entered an Order Denying Motion to Withdraw Guilty Plea (ECF No. 150).

3. The Federal Rules of Criminal Procedure do not formally recognize a means for obtaining reconsideration of a prior ruling, but the courts possess inherent

power to revisit their own rulings as circumstances require. *United States v. Coughlin*, 821 F. Supp. 2d 8, 17, (D. D.C. July 6, 2011). *United States v. Hawkins*, 2012 U.S. Dist. LEXIS 48851, *14-15 (D. Colo. 2012).

4.     The Tenth Circuit Court of Appeals has held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law, or to prevent manifest injustice. *United States v. Huff*, 782 F.3d 1221, 1224 (10th Cir. 2015).

5.     The Court is imposing too high a bar of stringent requirements on the defendant in ruling on his motion to withdraw plea. As Judge Hartz said in his dissent in *United States v. Marceleno*, 819 F.3d 1267, 1276 (10th Cir. 2016): "In my view, the district court was required to grant defendant's motion to withdraw his plea. To begin with, the motion preceded sentencing; and under our precedent, motions to withdraw guilty pleas before sentencing are to be freely allowed, viewed with favor, treated with liberality, and given a great deal of latitude. *United States v. Carr*, 80 F.3d 413, 419 (10th Cir. 1996)." Instead of liberality and latitude, this Court's denial of the motion to withdraw plea was based on imposing a burden on the defendant to not just raise arguments in favor of innocence, but to convince the Court of his innocence.

6.     In this case, the Court has misapprehended Mr. Sears' position and the facts that support his position.

7.     The Court weighed heavily the factor of the knowing and voluntary nature of the plea. The Court quoted some significant sections from the plea colloquy. Of the multi-pages of alleged activities recited in the plea agreement, the only one that Mr.

2

Sears acknowledged, in the colloquy, was his involvement in the creation of a convertible promissory note that was backdated.

8.      Sears's change of plea hearing took place on November 14, 2016. Several months thereafter, Sears wrote to his then attorneys, Frederic Winocur and Marci Gilligan LaBranche, an email saying that he wanted to correct the record.  What he wanted to say was:

> I failed to properly disclose my affiliation status due to incorrect advice from council [sic] which enabled me to have access to free trading securities.  I then liquidated those free trading securities into the public markets for a profit and failed to report that profit on my personal income tax, sir.

Attached to this motion as Exhibit A is a copy of the email sent by the defendant to his previous counsel concerning this aspect of the plea colloquy.

9.      When asked further by the Court about the objective of the conspiracy, Mr. Sears said that it was to obtain free trading securities and be able to sell them into the market.  Once again, this is only a very small part of the scheme as alleged by the government in this case.  Sears never agreed he was guilty of the entire crime as presented by the government in the plea agreement.

10.      When Mr. Sears says that he is innocent of these charges, he is making two arguments.  First, he is arguing that he did not have the *mens rea* to agree to violate the law and to engage in an overt act furthering the objective of the conspiracy. This is because he has claimed throughout, as noted by the footnotes in the plea agreement, that he was acting with advice of counsel and because of that advice he lacked the *mens rea* to violate the conspiracy statute.  The Court misapprehended this argument.

3

11.     The second argument for his innocence is that the backdating of the convertible notes was not an illegal act under the securities laws, nor was it evidence of a fraud, be it mail fraud or wire fraud.  Sears' affidavit, ¶ 7, and exhibit 2 attached thereto.

12.     The colloquy with Mr. Sears during the change of plea hearing reveals that he admitted only to a very narrow slice of the facts the government alleged against him. As stated in the original motion to withdraw he denies that he was the officer or a *de facto* officer of Fusion Pharm, Inc., and that the companies through which he acted were affiliates of Fusion Pharm.  Sears, here, contends that the government's facts to establish these key elements of their prosecution alleged in the plea agreement are less than convincing.  Hence, he contends he is innocent.

13.     Defendant's assertion of innocence is more than simply a subjective statement on his part.  He has articulated his arguments and reasons.  The Court's rejection of his statement of innocence is an equivalent of making the defendant prove his innocence or render the plea involuntary.  The Court, here, misapprehended the facts presented by Sears.  Sears' affidavit, ¶ 12.

14.     The Court further fails to understand the significance of the Kate Funk argument.  The basis of this argument is that Agent Funk perpetrated a fraud upon the Court when she submitted her false credentials to the magistrate on the search warrants, and further compounded this fraud on the Court by relying on the word of a confidential informant whose information was both bad and false.

15.     Attached to this motion as Exhibit B is the Affidavit of Steven R. Anderson, CPA, JD.  Anderson has represented accountants before multiple government

4

agencies. He states Kate Funk does not have a permit to practice as a CPA in Kansas, and she "is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado." She wanted the federal court to rely on her statements in her affidavit as if they were provided by a CPA and so that it would accept her opinions on the appropriateness of revenue recognition and other opinions based on GAAP and GAAS standards. Exhibit B, ¶ 16. Anderson says Funk was not qualified to render the opinions she submitted in her affidavit to the court.

16.     In his affidavit, he makes it clear that Agent Funk is practicing accountancy in the state of Colorado and not in the state of Kansas, and that she has no right to do so. She is in violation of Colorado law which makes it a misdemeanor to use the CPA designation as she did. In fact, using that CPA designation multiple times would elevate her misconduct to that of felonious conduct. Exhibit B, ¶ 17.

17.     The issue is the integrity of the prosecution itself. When the prosecution is based on a fraud on the court, it reflects poorly on our entire system of justice and criminal jurisprudence. The requirement that government seek justice and not just convictions is applicable to what happened in this case during the investigation and the decision to prosecute by the Assistant United States Attorney in charge of the case at the time. There is in this case a need to prevent manifest injustice.

18.     Attached to this motion as <u>Exhibit C</u> is a summary of the share transactions which were approved by Mr. Lehrer as counsel for Fusion Pharm. This chart shows that over 5,000,000 shares were traded based on his opinions that to do so was legal and proper. His role and that of his colleague, Mr. Harmon, is more than

5

mere impeachment evidence of a witness who the government has made efforts to minimize, if not hide.

19.     In his attached affidavit, <u>Exhibit D</u>, Mr. Sears states facts that demonstrate that the steps taken by the prosecution to hamper or frustrate Mr. Sears' attempt to obtain advice from Brenda Hamilton, a securities lawyer and former wife of Fred Lehrer. After the plea, she advised him that a key prosecution piece of evidence, the backdating of the convertible notes, was not necessarily a violation of the securities laws.  Sears' affidavit, ¶ 7.

20.     His affidavit also explains why the prosecution effort to shelter Fred Lehrer was hiding exculpatory evidence and not mere impeachment evidence.  He explains why Lehrer's testimony, even hostile testimony, would be helpful if he is allowed to withdraw his guilty plea.  Sears' affidavit, ¶¶ 10 and 11.

21.     If there was a trial in this case, Mr. Sears could subpoena Mr. Lehrer to testify as a hostile witness demanding that he admit that he counseled Fusion Pharm and Mr. Sears that the sale of stock through the convertible promissory notes was not illegal or in violation of securities laws.  This issue with Mr. Harmon and Mr. Lehrer is more than simply hiding impeachment evidence.  Once again, it goes to the integrity of this prosecution and the system of justice it symbolizes.

22.     Undersigned counsel certifies that he has conferred with Assistant United States Attorney Jeremy Sibert regarding this motion who has stated that he opposes the relief requested in this motion.

23. For these reasons, and in addition to those originally presented to the Court in the motion to withdraw plea, Mr. Sears requests that this Court reconsider its denial of his motion and grant the motion to withdraw the plea.

Respectfully submitted this 1st day of August, 2019.

THE LAW OFFICES OF PETER R. BORNSTEIN

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of August, 2019, I electronically filed the foregoing **MOTION FOR RECONSIDERATION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Jeannette Wolf*
THE LAW OFFICES OF PETER R. BORNSTEIN

7

## Peter Bornstein

**From:** Bill S <bill@bmails.biz>
**Sent:** Thursday, May 23, 2019 2:15 AM
**To:** Peter Bornstein
**Subject:** Fwd: Plea Testimony

**Importance:** High

This is me asking Winocur to revise my plea testimony. As the judge pointed out.......

Begin forwarded message:

**From:** William Sears <wjsears66@icloud.com>
**Subject: Fwd: Plea Testimony**
**Date:** March 15, 2018 at 10:30:43 AM MDT
**To:** pbornstein@prblegal.com

Begin forwarded message:

**From:** William Sears <wjsears66@icloud.com>
**Subject: Plea Testimony**
**Date:** May 21, 2017 at 12:23:38 PM MDT
**To:** Fred Winocur <winocur@ridleylaw.com>, Marci Gilligan LaBranche <labranche@ridleylaw.com>

Fred/Marci,
I want to clarify on thing on this.
I failed to properly disclose my affiliation status
which enabled me to have access to free trading securities.
I then liquidated those free trading securities into the
public markets for a profit and failed to report that
profit on my personal income tax, sir.

Here is what I want it to be. If we need to go to court so beit. As It is now is factually incorrect and I want it right. **Do what you have to do to get right for the record.** Please see below.

I failed to properly disclose my affiliation status due to incorrect advice from council which enabled me to have access to free trading securities. I then liquidated those free trading securities into the public markets for a profit and failed to report that profit on my personal income tax, sir.
Ill be in all this week on those tapes also.

Billy



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

     Plaintiff,

v.

**1. WILLIAM J. SEARS,**

     Defendant.

---

### AFFIDAVIT OF STEVEN R. ANDERSON, CPA, JD

---

Steven R. Anderson, being of lawful age and upon his oath, deposes and states:

1.    I am an attorney licensed to practice law in the State of Colorado since 1987, and co-founder and managing partner of Anderson & Jahde, PC, 5800 South Nevada Street, Littleton, Colorado 80120.

2.    I also hold an inactive certified public accountant license in Colorado, having received my certification and license to practice public accounting in the State of Colorado in 1984.

3.    My practice focuses on Federal & State, civil and criminal tax controversies and trials; and, on representing accountants, tax return preparers and CPAs in all professional facets, to include CPA malpractice defense, representing CPAs before the Colorado State Board of Accountancy (and other state licensing boards), representing CPAs before the American Institute of Certified Public Accountants, and representing accountants before the IRS' Office of Professional Responsibility. I have represented and


EXHIBIT
B

consulted between 150 and 200 CPAs in cases before the Colorado State Board of Accountancy.

4.      I do not have an exact number on how many, but a portion of the Board of Accountancy cases I have worked on involved CPAs who had relocated from other states to Colorado and were defending complaints before Colorado's Board of Accountancy (the "Board") because they did not understand Colorado's rules pertaining to holding out as a CPA in Colorado. I frequently work with Colorado's statutes governing CPAs and with the Rules of the Board. I have reviewed the CPA rules and statutes in Kansas.

5.      I was asked to review the propriety of Special Agent Kate Funk's use of a CPA designation on search warrant applications related to cases involving William Sears, Scott Dittman, and Fusion Pharm, LLC, which were filed in the United States District Court for the District of Colorado.

6.      Colorado's rules deem this a holding out as a CPA in Colorado that requires qualifications Ms. Funk does not have. She is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado.

7.      Ms. Funk passed the CPA exam in Kansas, but never completed the Kansas requirement of having one year of qualified work experience to earn a Kansas "permit" to practice as a CPA. Kansas and Colorado have different legal structures for becoming a CPA authorized to practice as a CPA.  In Kansas you obtain a CPA "certificate" (which Ms. Funk has) by meeting educational requirements and passing the CPA exam.  Then, you must have the year of qualified work experience after which you may obtain a Kansas "permit" to practice as a CPA. Ms. Funk does not have a "permit" to practice as a CPA in Kansas.

2

8.      Colorado combines education, passing the CPA exam and one year of qualified work experience before you can obtain a CPA "certificate." Colorado does not issue "permits" for individual CPAs See, *C.R.S. §§ 12-2-108 and 12-2-109, and Rule 4.1 Colorado Board of Accountancy*. This difference between the states is key. Colorado does not allow someone from another state without one year of qualified work experience to hold themselves out as a Certified Public Accountant or use "CPA." *C.R.S. § 12-2-115(3)*.

9.      Within the last year, I represented *a* Kansas CPA before the Board who was fully licensed in Kansas, with a Kansas permit, who used "CPA" on a business card handed to one client. The Board held this individual in violation of Colorado's statutes for improperly holding herself out as a CPA in Colorado. She did not first get reciprocity from Colorado. Ms. Funk's holding out was more egregious because she has no Kansas permit.

10.     On the Affidavit for Search Warrant, Special Agent for the Federal Bureau of Investigation, Kate E. Funk, wrote, "[p]rior to my employment with the FBI, I received an accounting degree from the University of Kansas in 1995. I became a certified public accountant in 1996 through the State of Kansas." Again, Ms. Funk has a Kansas certificate, not a permit to practice as a CPA. Clearly, Ms. Funk wanted the Court and others to rely on her statements in her affidavit as if they were provided by a CPA who had met Colorado's requirements to be a CPA. She is not recognized as a CPA in Colorado. I also checked the Kansas Board of Accountancy website and found an FAQ that addresses whether Ms. Funk could provide litigation support services (which is what

3

she did by submitting the affidavit) without having a permit in Kansas. She cannot. Here

is the Q&A from the Kansas Board of Accountancy website:

**6. I don't provide any attest services. Am I required to hold a permit to practice to provide non-attest services as a CPA?**
Yes. Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, all fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, requires a person to hold a valid Kansas permit to practice. For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf The definition is broken out into two categories: atttest and non-attest.

Ms. Funk violated the laws of Colorado by claiming she is a Certified Public Accountant,

intending for the Court and others to rely on her statements with the full level of trust,

training and competence those statements would have had they been made by a CPA.

Even under Kansas law she could not provide the litigation support services she provided

here in Colorado.

11.  She made the same statement in an affidavit to support an application for

search warrant to search email accounts for William Sears, Scott Dittman, and others.

12.  According to the records of the University of Kansas, Kate Egan graduated

in 1996, not 1995.

13.  According to the records of the State Board of Accountancy for the State of

Kansas dated December 24, 2017, Kate Egan was issued a CPA certificate on August 4,

1999, not in 1996 as she claimed in Affidavits filed.

14.  I am informed, and therefore do believe, that Kate Egan is the same person

as Kate Funk. I also have been informed and do believe that Kate Funk has moved to

and does reside in Denver, Colorado and not in Chicago, Illinois, and has done so for

many years.

4

15.     Once one becomes a resident of the State of Colorado, and desires to hold themselves out as a CPA in Colorado, they must obtain reciprocity and a license from the Board to hold themselves out as a CPA in Colorado. Ms. Funk could not have accomplished this because she had no Kansas permit. According to the Board's website: "To apply for a license in Colorado one must satisfy the following:

*       Holds an active license from a substantially equivalent jurisdiction and/or possesses the requirements necessary for issuance of a license in Colorado.

*       Attests to having completed all CPE required by the other state as of the application receipt date"

Kate Funk formerly known as Kate Egan could not obtain reciprocity because her Kansas certificate is not the equivalent to being a CPA in the State of Colorado.

16.     Kate Funk has no professional CPA credential in Colorado. Therefore, she is not qualified as a CPA to offer opinion testimony on the appropriateness of revenue recognition or other applications of Generally Accepted Accounting Principles (GAAP) and Generally Accepting Auditing Standards (GAAS). I have reviewed an Affidavit drafted containing opinions by Kate Funk regarding revenue recognition and disclosure requirements for FusionPharm, and it is my opinion as a licensed lawyer and licensed inactive CPA in the State of Colorado, that Kate Funk was not qualified to render said opinions in her Affidavit as a CPA and violated Colorado's laws by doing so.

17.     Colorado Revised Statute § 12-2-129 makes it a Class 2 Misdemeanor to use the CPA designation in Colorado when one is not authorized to do so; and a class 6

felony for any subsequent offense. Kate Funk appears to have violated this criminal statute.

FURTHER AFFIANT SAYETH NAUGHT.

_____                    6 -18 -19
Steven R. Anderson                                  Date


STATE OF COLORADO          )
                           ) ss.
COUNTY OF *Arapahoe*       )

       Subscribed and sworn to before me by Steven R. Anderson this 18th day of June, 2019.

       Witness my official hand and seal.

                                        *Marcie Morton*
                                        Notary Public

MARCIE J MORTON
NOTARY PUBLIC
STATE OF COLORADO
Notary ID 20034026692          My commission expires: 8-26-2019
My Commission Expires 08/26/2019

6

| Date | Name | No. of Shares | Source Document |
|------|------|--------------|-----------------|
| 01/06/13 | Meadpoint Venture Partners | 800,000 | SPA |
| 08/28/13 | Myron Thaden | 500,000 | SPA |
| 08/28/13 | Sharryn Thaden | 500,000 | SPA |
| 08/28/13 | Richard Scholz | 500,000 | SPA |
| 09/10/13 | Black Arch Opportunity Fund LP | 28,562 | Note & SPA |
| 09/10/13 | Starcity Capital LLC | 313,703 | Note & SPA |
| 09/12/13 | Starcity Capital LLC | 313,703 | Note & SPA |
| 09/12/13 | Black Arch Opportunity Fund LP | 28,562 | Note & SPA |
| 01/16/14 | Alexandra Mauriello | 61,437 | Note & SPA |
| 01/16/14 | Vera Group, LLC | 29,625 | Note & SPA |
| 01/16/14 | SGI Group LLC | 29,625 | Note & SPA |
| 01/23/14 | Vera Group, LLC | 29,625 | Note & SPA |
| 01/23/14 | SGI Group LLC | 29,625 | Note & SPA |
| 01/23/14 | Alexandra Mauriello | 61,437 | Note & SPA |
| 02/14/14 | Meadpoint Venture Partners | 600,000 | SPA |
| 03/04/14 | Craig Dudley | 20,000 | Company's filings with OCMG |
| 03/06/14 | Meadpoint Venture Partners | 370,000 | SPA |
| 03/26/14 | Meadpoint Venture Partners | 600,000 | SPA |
| 04/16/14 | Meadpoint Venture Partners | 900,000 | SPA |

TOTAL SHARES 5,715,904



EXHIBIT
C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

### AFFIDAVIT OF WILLIAM J. SEARS

---

William J. Sears, being of lawful age and upon his oath, deposes and states:

1.    I am the named defendant in this criminal case.  I make this affidavit based on my personal knowledge.

2.    I make this affidavit in support of my Motion to Withdraw Guilty Plea and my Motion for Reconsideration of the Court order denying my motion to withdraw guilty plea.

3.    I entered my guilty plea believing that FBI Special Agent Kate Funk was not only the case agent, but also an expert witness by virtue of her claimed CPA credentials.  I thought her opinions about financial matters such as revenue recognition, convertible promissory notes, and bank records were going to be the main evidence against me in any trial.

4.    I learned after the plea was entered that she was not a certified public accountant or a recognized financial analyst and that her opinions might not be usable in a trial, or would not carry much weight.  Moreover, many of her opinions were based on



EXHIBIT
D

hearsay statements from confidential sources whose information was admittedly wrong such as FusionPharm was a Ponzi scheme or a pump and dump scheme; or the information was wrong and subject to being discredited.

5.     Throughout the pre-plea negotiations the government only disclosed selected cherry-picked information to share with my attorneys.

6.     Before the plea hearing, AUSA Harmon threatened me with loss of my cooperation agreement if I spoke with a securities lawyer named Brenda Hamilton. Brenda Hamilton is the ex-wife of Fred Lehrer and a forensic securities expert. She was giving me legal advice and facts about Mr. Lehrer's false statements to the SEC about me, FusionPharm, and Mr. Jean-Pierre. An email string showing this threat is attached as Exhibit 1 to my affidavit.

7.     I have an email from Brenda Hamilton advising me that backdating a convertible promissory note is irrelevant and that it is the date the note is funded and the securities are paid for that count. See email is attached as Exhibit 2.

8.     In the courtroom and off the record, Mr. Harmon told me and my attorney that he was displeased with Mr. Dittman's statements and he was not going to put up with anything other than what he wanted me to say. He threatened me with his power to harm my mother by taking away her home and her assets; and threatened me with his power over the IRS aspect of the case. He "coached" me to add what he wanted me to say to the Court.

9.     Immediately after the plea hearing, I was further interrogated by Mr. Harmon, Agent Funk, and AUSA Tonya Andrews. In this meeting he told me not to worry about both Fred Lehrer's and Tod Di Tommaso's (Fusionpharms former securities

2

attorney) perjury and and I was again threatened not to speak to attorney Brenda Hamilton without Agent Funk's permission.

10.    Lehrer knew that either I and/or my mother controlled Meadpoint. It was his recommendation that my mother take over control. He also knew from the very first meeting in 2013 that I had a criminal conviction and, Despite Lehrer's intimate knowledge of my daily actions and routines as we spoke almost daily, he approved not disclosing those facts in the OTC Markets Annual Report for Fusion Pharm in 2014. See email from Craig Dudley to Fred Lehrer attached as Exhibit 3.

11.    Lehrer rendered multiple Disclosure Opinions that state:

> (i) constitutes "adequate current public information" (the "Information") concerning the Securities and the Issuer and "is available" within the meaning of Rule 144(c)(2) under the Securities Act, (ii) includes all of the information that a broker-dealer would be required to obtain from the Issuer to publish a quotation for the Securities under Rule 15c2-11 under the Securities Exchange Act of 1934, as amended, (iii) complies as to form with the OTC Markets Group's OTC Pink Disclosure Guidelines, which are located on the Internet at www.otcmarkets.com , and (iv) has been posted through the OTC Disclosure and News Service.

12.    I have learned much since November of 2016 to convince me without a doubt that I was misled then forced into entering the plea by the misbelief that Kate Funk was legally licensed, qualified, and competent to lead and put together a case that would stand scrutiny in court. Only to find that Kate Funk defrauded the FBI by saying she had a credential she did not possess to get hired. She also defrauded the court by using her fraudulent credentials in her opening paragraph of her affidavit to influence the court. Then she defrauded the American tax payer by taking money she did not deserve. Kate had no securities experience, she never worked as a CPA nor Trained under one to receive the right to practice as one and receive a permit. Fact is Kate Funk committed a felony by submitting that affidavit to the court if not numerous depending on how many times she used her fraudulent title. Clearly this is **FRAUD ON THE COURT!**

I was also misled and forced into a plea by receiving ineffective assistance from securities council about the back dating / memorializing of the convertible notes, and by the

3

government's protection of Mr. Ken Harmons longtime friend and ex subordinate Mr. Fred Lehrer. Lehrer filed the affidavit in 2011 that's started all of Jean Pierre's woes. This was 2 years prior to me hiring Lehrer. When questioned by the SEC in 2014 Lehrer lied and denied knowing him prior to the raid. Lehrer perjured himself multiple times in his testimony. Lehrer should have stopped everything when he recognized Jean Pierre and advised me that he call the SEC to explain before things got out of hand. Mr. Harmons protection of his former subordinate and longtime friend Fred Lehrer from being subpoenaed to testify in a trial seems to be a clear breakdown of justice and wreaks of corruption. I have a very real and disturbing basis for asserting that I am innocent of the charges that I pled to and beg and pray that the court to grant me the ability to withdraw my plea and take a stand to fight the obvious corruption, abuse and injustice I have been subjected to.

FURTHER AFFIANT SAYETH NAUGHT.

_____       7-29-19
William J. Sears                 Date

STATE OF COLORADO      )
                       ) ss.
COUNTY OF Adams        )

     Subscribed and sworn to before me by William J. Sears this 29 day of July, 2019.

     Witness my official hand and seal.

LINDSEY JEAN RICHTER
Notary Public
State of Colorado
Notary ID # 20174050581
My Commission Expires 12-11-2021

_____
Notary Public

My commission expires: 12/11/2021

4

363

# Peter Bornstein

| | |
|---|---|
| **From:** | William Sears <wjsears66@icloud.com> |
| **Sent:** | Tuesday, July 16, 2019 2:13 AM |
| **To:** | Peter Bornstein |
| **Subject:** | Fwd: Sears Plea |

Begin forwarded message:

**From:** Fredric Winocur <winocur@ridleylaw.com>
**Subject: Re: Sears Plea**
**Date:** November 8, 2016 at 4:44:26 PM MST
**To:** William Sears <wjsears66@icloud.com>

Billy -- Nothing has been said about this since our meeting. I am simply reminding you of the caution you were given at that time. I recall her name being brought up in the context of you telling them that she has information that would impeach Lehrer's testimony -- thus making her a potential witness. I recall that you offered that you in fact knew that Kate Funk was scheduled to interview her -- thus making her a potential witness. I recall Ken being displeased with the fact that you knew that, and he explained all the reasons why your conversations outside the government's presence might be viewed as a breach of your cooperation agreement, as well as problematic for your future value to Harmon as a witness.

On Nov 8, 2016, at 4:35 PM, William Sears <wjsears66@icloud.com> wrote:

No I don't remember that being the law. I remember you saying a lot afterwords. Etc etc. rebutting her being a witness. Brenda does not consider herself a witness at all! Just hung up with her and she finds it rediculads to say the least. She's not an adversarial witness. She told funk she was my lawyer in fact! Something stinks here Freddy. Not sure what it is yet but I'm going to find out!!!

Your advise in duly noted.

MRegards
Billy Sears
(303) 518-3895

On Nov 8, 2016, at 4:25 PM, Fredric Winocur <winocur@ridleylaw.com> wrote:

Ken specifically stated at our meeting that if he finds out you are having conversations with other witnesses you are at risk of losing your cooperation credit. The specific example he pointed to was your knowledge that Kate was about to interview Brenda (thus making her a potential witness).

Fredric M. Winocur
RIDLEY, MCGREEVY & WINOCUR, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Tel. 303.629.9700
Fax 303.629.9702
winocur@ridleylaw.com
www.ridleylaw.com



EXHIBIT
1

The information contained in this message along with any attachments hereto may be attorney-client privileged work product or otherwise confidential. If you receive this communication in error please notify the sender and delete it immediately. Any unintended or unauthorized examination, use, distribution or copying of this message is prohibited. Thank you.

On Nov 8, 2016, at 4:21 PM, William Sears <wjsears66@icloud.com> wrote:

Umm so you know Brenda is not a witness. As per her! I was never told not to see speak or otherwise. Kate's approval??? When was that?  Sorry bud. Brenda is my lawyer!!

Regards
Billy Sears
(303) 518-3895


On Nov 8, 2016, at 4:04 PM, Fredric Winocur <winocur@ridleylaw.com> wrote:

Also per Ken's instructions, remember you must have no contact with Brenda Hamilton or any other witness without Kate's express approval.

Fredric M. Winocur
RIDLEY, MCGREEVY & WINOCUR, P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Tel. 303.629.9700
Fax 303.629.9702
winocur@ridleylaw.com
www.ridleylaw.com

The information contained in this message along with any attachments hereto may be attorney-client privileged work product or otherwise confidential. If you receive this communication in error please notify the sender and delete it immediately. Any unintended or unauthorized examination, use, distribution or copying of this message is prohibited. Thank you.

On Nov 8, 2016, at 11:26 AM, William Sears <wjsears66@icloud.com> wrote:

Well that's good! Thanks for that

Regards
Billy Sears
(303) 518-3895


On Nov 8, 2016, at 11:10 AM, Fredric Winocur <winocur@ridleylaw.com> wrote:

I just hung up from Ian -- nothing has changed on his end.  His recommendation to the Commission continues to be no further proceedings in light of the sentencing range and funds forfeited.

FMW

Begin forwarded message:

**From:** Fredric Winocur <winocur@ridleylaw.com>
**Date:** November 8, 2016 at 10:49:35 AM MST
**To:** "Karpel, Ian S." <Karpell@SEC.GOV>
**Cc:** Marci Gilligan LaBranche <labranche@ridleylaw.com>, "Greer, Kim" <GreerK@SEC.GOV>
**Subject: Re: Sears Plea**

I'll try you now.

On Nov 8, 2016, at 10:48 AM, Karpel, Ian S. <Karpell@SEC.GOV> wrote:

What's Dittman's status?  My number is 303-844-1017

**From:** Fredric Winocur [mailto:winocur@ridleylaw.com]
**Sent:** Tuesday, November 08, 2016 10:45 AM

2

## Peter Bornstein

**From:** William Sears <wjsears66@icloud.com>
**Sent:** Tuesday, July 16, 2019 2:36 AM
**To:** Peter Bornstein
**Subject:** Fwd:

Begin forwarded message:

**From:** William Sears <wjsears66@icloud.com>
**Date:** June 26, 2017 at 6:20:35 PM MDT
**To:** Todd Feinstein <todd@feinsteinlawfirm.com>

Todd
See below so if I had a convertable note and funded it in tranches can take down the tranches as their individual
date comes up?
Sent from ProtonMail Mobile
---------- Forwarded message ----------
From: Fufbi2<fufbi2@protonmail.com>
Date: On Mon, Jun 26, 2017 at 6:02 PM
Subject: Fwd: (No Subject)
To: Screwby <screwby@protonmail.com>
CC:

Begin forwarded message:

> **From:** bhamilton@securitieslawyer101.com

> **Date:** April 5, 2017 at 1:14:12 PM MDT

> **To:** 'William Sears' <wjsears66@icloud.com>

> **The date of the note is irrelevant. It is the date the securities are paid for. With a note
> this is the date the note is funded. Backdating a note would not impact the holding
> period.**

> **https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html**



1

**Holding Period**. Before you may sell any restricted securities in the marketplace, you must hold them for a certain period of time. If the company that issued the securities is a "reporting company" in that it is subject to the reporting requirements of the Securities Exchange Act of 1934, then you must hold the securities for at least six months. If the issuer of the securities is not subject to the reporting requirements, then you must hold the securities for at least one year. The relevant holding period begins when the securities were bought and <u>fully paid for.</u> The holding period only applies to restricted securities. Because securities acquired in the public market are not restricted, there is no holding period for an affiliate who purchases securities of the issuer in the marketplace. But the resale of an affiliate's shares as control securities is subject to the other conditions of the rule.

Brenda Hamilton, Esq.

Hamilton & Associates Law Group
101 Plaza Real S, Suite 202 N
Boca Raton, Florida 33432
Telephone 561-416-8956
Facsimile 561-416-2855
www.SecuritiesLawyer101.com

Sent with ProtonMail Secure Email.

Regards
Billy Sears

Fusion Pharm - Relativity

https://ext.ediscovery.faegrebd.com/Relativity/Case/Document/Review.aspx?AppID=104...

Case 1:16-cv-00301-WJM Document 237-1 Filed 05/14/20 USDC Colorado Page 9 Page 368 of 699
Case 1:16-cv-00301-WJM Document 173-41 Filed 08/01/19 Page 9 of 10

Return to document list

☒ FBDED00436528

⊕ Viewer ⃝ Native ⃝  [Extracted Text  ▾]    [100%]

☒ ↑ [378] of 771 [⏮] [ᐸ] [ᐳ] [⏭]

[FBD Default Imaging Settings-B&W  ▾] [Image]

**From:** Craig Dudley
**To:** Scott Dittman[sdittman@fusionpharminc.com]
**Subject:** Related Party Disclosure
**Attachments:** image001.png

**Sent:** Mon 4/14/2014 3:00:41 P

Hey -
For the related party footnote, I think we need to disclose Meadpoint, Bayside & 10mm. Something simple like:

**Our unsecured lenders, Bayside Realty Holdings, LLC and Meadpoint Venture Partners, are both controlled by ii laws of the Company's CEO. The note receivable due at yearend is from 10mm, an entity controlled by the Company's CEO.**

I'm not exactly sure of the familial tie ins, so please help clarify.

The note

**Craig Dudley**
**FusionPharm, Inc./PharmPods**
303 809 5467
pharmpods.com



EXHIBIT
3

368

Fusion Pharm - Relativity                                          https://ext.ediscovery.faegrebd.com/Relativity/Case/Document/Review.aspx?AppID=104...

Case 1:16-cr-00301-WJM Document 237-1 Filed 05/14/20 USDC Colorado Page 10 of 91
Case 1:16-cr-00301-WJM Document 173-4 Filed 08/01/19 Page 369 of 699

**Return to document list**

FBDED00512869

Viewer ○ Image ○ Native ⊙ Extracted Text          100%

**From:**    CRAIG DUDLEY

**To:**      Lehrer, Fred[flehrer@securitiesattorney1.com]

**CC:**      Scott Dittman[sdittman@fusionpharminc.com]

**Subject:** "Related Party" Disclosure                    **Sent:** Tue 4/15/2014 11:18:02 PM

Fred - from our discussion and on the basis that the Meadpoint and Bayside stuff is all winding down, Scott's elected to not include the "extended" family blurb.

Judgement call - I'm ok with this.

Cool by you?

Thanks. Craig.

Craig Dudley
(303) 809 5467

ed not to include the
rty" disclosure (relates to
ilege: Attorney-Client
ct regarding preliminary
- re proposed equty issue

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

  Plaintiff,

v.

1. WILLIAM SEARS,

  Defendant

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**

---

  The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully submits this response regarding defendant Sears' objections to the PSR.

  1. Defendant Sears objects to paragraph 16 regarding the language that Baby Bee Bright (BBB) shares would go to both Sears and Dittman. Emails between defendant Sears and Fredrick Dalhman in November, 2010 show Sears instructing Dalhman to transfer a certain number of BBB preferred shares to Salt Investments, LLC (Dittman), Microcap Management, LLC (Sears), and to Mr. Dalhman himself. See Attachment One, Two, and Three. In March of 2011, Defendant Sears sent an email to Mr. Dalhman with an attached letter for Mr. and Mrs. Dalhman to sign and deliver to the transfer agent. The letter requested that 185,000 Series A Preferred shares of BBB be transferred to Microcap Management and the remaining 15,000 shares left in the name of the Dalhmans. See Attachment Four. In addition, the transaction journal for PacificStockTransfer (PST) on January 25, 2011, shows 1.3 million preferred shares

of BBB were issued to Salt Investments (Dittman) and 200,000 shares remained with Mr.

Dahlman. See Attachment Five. Defendant Sears was contact person on the credit card payment

Authorization sheet for that transfer of shares. On March 16, 2011, PST's transaction journal

shows 185,000 preferred shares of BBB were issued to Microcap Management, LLC (Sears) and

15,000 shares remained with Mr. Dahlman. See Attachment Six. In addition, under oath,

Defendant Sears testified that Microcap was his corporation. See Attachment Seven, page 172

Line 20. The evidence shows that 185,000 preferred A shares of BBB were transferred to Sears'

corporation Microcap and 1.3 million preferred A shares of BBB to Dittman. In addition, on

page 14 of Sears' Plea Agreement, Sears agreed that Sears and Dittman would receive 99% of

BBB convertible preferred shares. See Attachment 8. The common shares that were

fraudulently sold by Microcap came from the 185,000 preferred A shares that Sears received

from BBB.

Defendant Sears next objects to the language that Family Member A was appointed to act

as a director in part to avoid disclosure of Sears' involvement and his prior conviction for

securities fraud. On February 18, 2016, in Sears' debrief with the government, Sears stated his

mother was listed as the Corporate Secretary of FusionPharm (FUSIONPHARM) and she was

only on the paperwork as a name only. Sears' mother never acted as an officer or director for

FUSIONPHARM and eventually Jean-Pierre took over as Corporate Secretary. Sears stated that

originally it was going to be himself and his mother listed as the officers because Sears did not

believe FUSIONPHARM would be around for a long time. Sears did not want to be listed as an

officer or director because he would have to disclose his prior criminal history. See Attachment

9, page 10. See Also Attachment 10, page 4, paragraph 24, 25, 28 (Another debrief with Sears

where he states that Jean-Pierre listed Sears' mother as secretary because Jean-Pierre knew Sears

could not be on the paperwork.)  Furthermore, Sears in his plea agreement agreed that family member A was appointed to act as director in order to avoid disclosure of Sears' involvement and his prior conviction for securities fraud.  See Attachment 8, page 14-15.

2.  Defendant Sears objects to paragraph 17 and the government does not contest that objection.

3.  Defendant Sears objects to paragraph 18 regarding to the language that control of BBB went to both Sears and Dittman inasmuch as Dittman controlled 86.6% of the outstanding stock.   As stated above and shown through PST transaction journal, Sears received at least 185,000 preferred shares of the 1.5 million.  Sears' ownership percentage of shares equals 12.33 percent.  In the industry of securities, the SEC, and other regulatory organizations, 10% is considered a controlling ownership.  Further, as stated in Sears' plea agreement, Dittman and he owned 99.9% of BBB convertible shares.  Finally, the undercover video of Sears and the agents shows Sears speaking about how much time he has placed into FUSIONPHARM.  When the agents ask who is really the person running the show for FUSIONPHARM and Sears stated that he was the "hand up Mona Lisa's skirt" after denying a 50-50 ownership with Dittman.  See Attachment 11, Undercover Video.

4.  Sears objects to paragraph 19 and states that once BBB's name was changed to FUSIONPHARM, Sears removed himself as the "Administrative Officer" since the company was now Dittman's.  As of this date, there is no evidence with FINRA that Sears was ever removed as the "Administrative Officer."  All the paperwork that FINRA has regarding FUSIONPHARM still list Sears as the Administrative Officer.  Sears and Dittman held themselves out as business partners that moved their operations into a publicly traded company.

See Attachment 8, page 16. In addition, Sears identified himself as FUSIONPHARM's Vice President, Director of Financial Operations, and Investor Relations Director. *Id*. at 17.

5. Sears objects to paragraph 20 designating individual "A" as a co-conspirator and denies that his email to "A" regarding a business plan and financial projections was based on conspiratorial activity. In *United States v. Martinez–Martinez*, 156 F.3d 936, 939, n. 5 (9th Cir.1998) the Court stated that Section 2X1.1(b)(2) does not refer to the acts of each individual defendant. ("In evaluating whether all the acts necessary for completion of the offense have occurred or are about to have occurred, the court must look at the actions of all the conspirators collectively, rather than at those of a particular defendant individually.") Individual "A" was a co-conspirator within the entire scheme to include his discussions and work regarding non-convertible notes and convertible notes, back dating notes, falsifying deposits into FUSIONPHARM from Sears' shell entities, and participating in meetings with Sears and Jean-Pierre regarding funding FUSIONPHARM by selling unrestricted shares of FUSIONPHARM, among other activities. The fact that Sears did not want to be part of writing a business plan is irrelevant to the overall fraudulent scheme and purposes of sentencing in this case. However, the evidence in the investigation proves otherwise. On March 10, 2011, Sears sends an email to Bodden asking him to communicate with him regarding the FUSIONPHARM business plan. See Attachment 30.

6. Next, Sears objects to paragraph 21 that implicates that he and Dittman were business partners in FUSIONPHARM. First, in Sears plea agreement he admitted that held themselves out as business partners. See Attachment 8, page 16, paragraph 9. Second, in Sears debrief with the government, Sears stated that he and Dittman were "partners" that he viewed as two guys building a business. Further, Sears admitted that "We screwed up royally. It was two guys

trying to start a business." See Attachment 9, page 11 and 27.  Sears stated several times on the

undercover video "we" and Scott when referring to the buisness.  See Attachment 11.  In

addition, Dittman on April 21, 2011 in a group email stated that he had just partnered with his

brother-in-law William Sears, and that they had just acquired FUSIONPHARM.  See Attachment

31.

      7.   Defendant Sears objects to paragraph 22 description that he or any of the entities

through which he conducted business was an affiliate or related party to FUSIONPHARM.

Rule 144(a) (1) defines an "affiliate" to mean "a person that directly, or indirectly through one or

more intermediaries, controls, or is controlled by, or is under common control with the issuer."

Rule 405 of the Securities Act defines "control" to mean "the possession, direct or indirect, of

the power to direct or cause the direction of the management and policies of a person, whether

through ownership of voting securities, by contract, or otherwise."   Sears stated in his debriefs

with the government that he was an affiliate of FUSIONPHARM, and that his affiliate status was

not disclosed to investors.  Further, Sears stated that Jean-Pierre knew of his affiliation status

with FUSIONPHARM.  See Attachment 12, page 1 and 5 and Attachment 9, page 25.  Further,

Sears admitted to controlling Bayside.  See Attachment 12, page 5.   In Sears' plea agreement,

Sears admitted that Meadpoint, FUSIONPHARM, and Vertifresh were entities operated by him.

See Attachment 8, page 31.  In direct examination in defendant Jean-Pierre's trial, Sears

admitted to owing Microcap and Meadpoint.  See Attachment 7 and 14.  Scott Dittman admitted

in an undercover video that Sears was always Meadpoint.  See Attachment 15.  Under oath at

Sears' change of plea, Sears stated to this Honorable Court the he failed to properly disclose his

affiliation status with FUSIONPHARM to enable him to have access to free trading

FUSIONPHARM shares.  See Attachment 13, page 14.

Based on Sears' own statements and evidence, Sears was the owner/controller of Microcap, Meadpoint, Bayside, and Vertifresh, in addition to controlling FUSIONPHARM as an affiliate. Essentially, the entities were shell companies that held FUSIONPHARM stock for Sears and Dittman that eventually became unrestricted and sold. Investors did not know about William Sears and his affiliation with all these entities.

Sears argues that any reports that were uploaded to the OTC Link internet platform by him, were done purely as a ministerial act. This Honorable Court heard and permitted several emails, with attachments, in the Jean-Pierre trial into evidence that showed Sears, Dittman, and Jean-Pierre reviewing, commenting on, making changes, and uploading onto the OTC Markets portal for the public's view. For example, on August 20, 2013, Sears sends Scott Dittman an email regarding the quarterly report for June 30, 2013 where Sears clearly reviewed the report for mistakes since he informs Dittman that he missed updating all the dates from last year. Reviewing reports in that much detail is more than a ministerial act. See Attachment 32.

8. Defendant Sears denies that he had a role in FUSIONPHARM and that his company worked together with FUSIONPHARM in his objection to paragraph 23. First, the government is unsure of which one of Sears' company his is objecting as having conducted business with FUSIONPHARM. The government argues that Sears' entities (Bayside, Meadpoint, Microcap, and Vertifresh) were nothing more than shell companies used by Dittman and Sears to hold FUSIONPHARM stock through fraudulent agreements. Second, Sears played a major role with FUSIONPHARM based on all the statements he made in his debriefs and the undercover video. In his change of plea, Sears admitted to being an undisclosed affiliate of FUSIONPHARM. Further the facts in his plea agreement clearly lay out his various roles and titles regarding FUSIONPHARM. See Attachments 8, 9, 10, 11, 12, and 13.

9.  Defendant Sears objects to paragraph 24 as being categorized as acting as a Chief Financial Officer.  The government does not contest the exact wording of "Chief Financial Officer" but Sears did admit in his plea agreement to being Director of Financial Operations.  See Attachment 8, page 17.  Sears in his debrief admitted to the title of Investment Relations Director for FUSIONPHARM.  See Attachment 9, page 11.  Sears did open FUSIONPHARM bank account on March 24, 2011.  Sears and his mother were the only two individuals that had access to FUSIONPHARM bank account up to October 7, 2011.  See Attachment 16 (Changes to Authorized Signers on Business Deposit Accounts).  From April 2011 through October 3, 2011, Sears signed approximately 153 checks for FUSIONPHARM.  On October 5, 2011, FINRA contacted FUSIONPHARM regarding Microcap and William Sears affiliation with FUSIONPHARM.  After that date, Dittman took over the signing of the majority of FUSIONPHARM checks.  See Attachment 19.  In addition, in the undercover video, Sears presents a lot of knowledge regarding international hedge funds, the costs associated to labor, and FUSIONPHARM's capital situation from the start of the company to the date of the video.  See Attachment 11.  Sears' knowledge about such subjects puts doubt into his claims regarding his lack of knowledge with finance.

Sears claims that a receipt of a salary was a mistake mated by a new employee who should have treated him through an IRS Form 1099 and not on the payroll.  However in tax year 2011, a W-2 was filed by FUSIONPHARM for William Sears that reported $8,750 in wages.  In tax year 2012 and 2013 there was no wage W-2 or income 1099 filed by FUSIONPHARM for William Sears.  An email from Scott Dittman shows that he instructed an employee at paychex to process "our" payroll, which included Dittman's and Sears' normal salary amounts.  See Attachment 17.  However, the officer manager for FUSIONPHARM stated in a letter that Sears

was a 1099 employee with a gross pay of $5,000 per month since January 2011. In that same

letter, Sears was supposed to be a W-2 employee with the same monthly salary as of March 1,

2012. This letter was written on January 2012, and had attached checks for three months to

Sears for $5,000 signed by Dittman. See Attachment 22.

Sears admitted to doing work for FUSIONPHARM and using a FUSIONPHARM email

address. Further, he stated that co-defendant Jean-Pierre advised him not to use a

FUSIONPHARM email account because he could be construed as an affiliate. When Jean-Pierre

informed him of this information he was upset at Jean-Pierre because he believed that Jean-

Pierre gave him the tools to avoid the perception that he was an affiliate of FUSIONPHARM.

See Attachment 9, page 25.

10. In Sears' objection to paragraph 26, he objects to being labeled as de facto affiliate

and that sales of preferred shares in Microcap were in violation of securities law. As this

Honorable Court heard in the trial of Jean-Pierre, Sears did not have the legal knowledge to

understand if he qualified as an affiliate. However, the government's security expert testified

that Sears had a controlling role in FUSIONPHARM, thus making him an affiliate. In addition,

under oath at his change of plea, Sears admitted to being an undisclosed affiliate, along with

admitting being an affiliate in his debriefs to the government. See Attachment 13, page 14 and

Attachment 12 page 1. Because Sears was an affiliate to FUSIONPHARM, he had to disclose

his true status to the transfer agent when selling shares of FUSIONPHARM. The law restricts

the amount of shares an affiliate of an issuer can sell, otherwise known as a volume limitation for

affiliates. As part of the scheme, Sears never disclosed to the transfer agents or brokers that he

was an affiliate to FUSIONPHARM and Jean-Pierre falsely mislead the transfer agents and

brokers by stating Microcap was in no way an affiliate to FUSIONPHARM. As a result, Sears

was able to obtain free trading shares of FUSIONPHARM and sell more than the volume

limitation for an affiliate, which is against the securities laws.  See Attachment 18 (Rule 144

Affiliate Volume Calculations, displays that during the entire time of the conspiracy, Sears as an

undisclosed affiliate, was always over the allowed percentage.  In 2011, when Sears was selling

FUSIONPHARM through microcap he was at one time 2000% over the limit.)

11.  Sears objects to paragraph 27 that implicates the transactions of issuing

FUSIONPHARM shares to his wife and brother-in-law "RD" were merely proxies for his stock

ownership.   Both, Sears' wife and "RD" were called to the stand in the trial of Jean-Pierre and

had little or no knowledge to ever owning or understanding the stock transactions that were in

their names.  Further, witness Bodden testified that "RD" was known as the "beard" because he

was essentially a placeholder for Sears' FUSIONPHARM stock.  Sears admitted that he was

controlling the stock that was in "RD's" name and that "RD" did not know anything about the

paperwork required for stock transactions.  Sears stated he drew down his FUSIONPHARM

shares from "RD's" account in order to avoid being a control person by holding over 10% of

FUSIONPHARM shares in his name.  See Attachment 9, pages 9-10.

12.  Regarding Sears' objection to paragraph 28, the government is unclear about what

Sears means by the "characterization of these transactions" and what "free" shares he is referring

to regarding Dittman.   The objection is just not clear to the government.  The government will

file a motion to clarify or provide more details to the objection.

13.  As to Sears' objection to paragraph 29, the government does not contest that the

transactions regarding FUSIONPHARM shares held by Microcap were approved by the transfer

agent and the restricted legends were removed.   The crux of the securities fraud scheme was that

Sears never disclosed his true affiliation with FUSIONPHARM to the transfer agents and

brokers.  Jean-Pierre being an expert in securities law, assisted Sears and Dittman with concealing Sears' true affiliation with FUSIONPHARM.  Several of attachments already discussed in this response address these points.

14.  Defendant Sears objects to paragraph 30 denying that the money was made in the market at part of the conspiracy and argues that he owed Dittman for the manufacturing of pods.  However, the email recovered in the FBI search warrants shows Scott Dittman asking if $3k can be transferred into his wife's account from "this weeks take."  Sears responds back "Done???you want the full five?"  See Attachment 20.  The "full five" is consistent with what Dittman would make a month based on testifying that his salary was $60,000.   See Attachment 21.  Furthermore, Sears should be paying FusionPharm for the manufacturing of PharmPods, not Scott Dittman's wife.

15.  Defendant Sears objects to paragraph 31 and indicates that his mother owned Bayside.  The government has addressed this issue in previous paragraphs.  Also, Sears' mother took the stand at Jean-Pierre's trial and could not speak or remember anything about "her alleged company" Bayside.

16.  Defendant Sears objects to paragraph 33 stating that Dittman was identified as a director of Vertifresh.  Sears claims that Vertifresh was a LLC without any directors and was owned by him.  However, the email the Sears sent to "PG" on October 5, 2012 had attached to it the business plan for Vertifresh.  In the business plan, Scott Dittman is listed as "Director."  See Attachment 23.

17.  Defendant Sears objects to paragraph 34 that Dittman owned 50 percent of Meadpoint.  However, in Sears' email on November 14, 2011 with the Meadpoint Shareholder Agreement attached, the agreement states on the first page that Dittman and Sears own 50% each

of the issued shares and outstanding stock for Meadpoint.  See Attachment 24.  It should also be noted that Sears is asking the CEO of FUSIONPHARM to forward the agreement.

18.  The government does not contest defendant Sears' objection to paragraph 35.

19.  Regarding Defendant's objections to Paragraph 36, as already stated in this response, Sears' mother was not the legitimate owner of Bayside.  Further, the documents filed with OTC show that there was never a convertible feature on any note until the annual report of 2012.  As co-defendant Jean-Pierre stated in the undercover video, the convertible feature of a note must be negotiated and agreed upon at the time the note is created, not at a later date.  In addition, Bodden testified that the notes were created in 2012/2013 and back dated to 2011 timeframe.

20. Defendant Sears objects to paragraph 37 as being nonsensical and wrong.  The source of 97% of funds for the Bayside convertible note came from the sale of FUSIONPHARM stock through Microcap.  See Attachment 25 (Table indicating the source of funds for the Bayside and Meadpoint convertible notes based on documentation provided by transfer agent.)

21.  Defendant Sears objects to paragraphs 38 and 40 stating that the notes were non-convertible at some time.  In an email from Bodden to Sears on June 6, 2012, Bodden attaches Promissory Note and Credit Line Agreement for Bayside.  In that agreement there is no convertible option.  See Attachment 26.  On that same date, Bodden sends another email to Sears with the Meadpoint Promissory Note and Credit Line Agreement attached.   Again, in that agreement there is no convertible option.  See Attachment 27.  On June 20, 2012, Bodden sends "NM" the signed notes for Bayside and Meadpoint.  At this time, FUSIONPHARM via Sears, is trying to sell these notes to "NM."   There is no convertible feature an either of the notes.  See Attachment 28 (email from Bodden with the attached notes).  Finally, defendant objects to the

fraudulent scheme, but he has plead guilty to Conspiracy to Defraud the United States and Filing False Income Tax Return in a two-count information.

22. Regarding Defendant Sears' objection to paragraph 42 regarding his affiliation status with FUSIONPHARM, the government has addressed this objection in previous paragraphs and attachments. Sears informed this Court that he was an undisclosed affiliate.

23. Defendant Sears objects to paragraphs 43 and 45 arguing that counsel advised him that all representations were in compliance with securities laws regarding the Bayside and Meadpoint convertible notes. First, Sears signed approximately 109 of the 110 checks issues by Bayside. Further as stated in previous paragraphs, Sears was the controller of Bayside and Meadpoint and had a controlling interest in FUSIONPHARM making him an affiliate. Sears, Dittman, and Jean-Pierre all conspired to hide Sears affiliation status with FUSIONPHARM in order to obtain free trading shares of FUSIONPHARM.

24. Defendant Sears objects to paragraph 46 as being labeled an employee. As stated, in 2011, FUSIONPHARM filed a W-2 for William Sears that reported $8,750 in wages. In addition, checks were signed by Dittman paying Sears $5000 as part of payroll for FUSIONPHARM. In addition, the officer manager for FUSIONPHARM stated in a letter that Sears was a 1099 employee with a gross pay of $5,000 per month since January 2011. In that same letter, Sears was supposed to be a W-2 employee with the same monthly salary as of March 1, 2012. See Attachment 22.

25. Defendant Sears' objection to paragraph 47 is unclear to the government. The government will file a motion to clarify or provide more details to the objection.

26. Defendant Sears objects to paragraph 49 stating that he had no stock to sell for the month of January, which was the month that FUSIONPHARM stock sold for the highest price

and claims he did not get any stock until the middle of February 2014. Sears held 800,000 shares as of FUSIONPHARM stock on January 16, 2014, that he began selling on 2/7/2014. This is shown in the transfer agent's transaction journal. As of January 9, 2014 there were 800,000 that were mailed to Sears' broker and received on January 27, 2014. See Attachment

27. Defendant objects to paragraph 50 regarding that the funds were treated as owned collectively with Dittman. Dittman used funds from Sears' sale of FUSIONPHARM stock to purchase his home in May, 2014. Attachment 34 shows the wiring of the funds.

28. As to defendant Sears' objections regarding paragraphs 52-65, Cliff Bodden emailed Sears asking him how to book several deposits. Bodden clearly does not know if the deposits are supposed to be booked as revenue, debt, or/and loans into quickbooks, so he is asking Sears. If Sears did not understand the finances regarding FUSIONPHARM, Bodden would not have asked him how to book certain deposits. See Attachment 29.

29. Defendant Sears objects to paragraphs 71-78 denying his failure to pay taxes. Sears plead guilty to a tax charge and told this Honorable Court that during his change of plea while under oath. Second, his plea agreement discusses his tax violations on pages 38-39. See Attachment 8. Sears agreed to this plea agreement and told this Honorable Court that the facts in the agreement were true.

30. Defendant Sears objects to paragraphs 84-114 regarding information about Jean-Pierre since he was not provided that information in discovery. As shown in this response, Sears debriefed with the government, which included discussions about Jean-Pierre. Further, Sears worked with Jean-Pierre in this conspiracy. Jean-Pierre was found guilty to have conspired with Sears. Finally, it was Sears who reached out to the FBI to assist in an undercover operation to lure Jean-Pierre. The entire undercover operation showed Sears close relationship that he had

with Jean-Pierre and discussed various events that occurred in the FUSIONPHARM case/conspiracy.

31.  Regarding Defendant Sears' objects to paragraphs 108-111, the government would argue that the FBI oversaw the undercover operation and Sears' involvement.  However, as this Court heard in Jean-Pierre's trial, much of the conversations that Sears had with Jean-Pierre was unscripted.  Law enforcement concentrated on topics of discussion, not direct word for word written scripts.  In fact in the hotel video of the undercover, Sears had no written script and was speaking freely.

32.  Defendant Sears objects to paragraph 130.  The government argues that the information used by the USPO to compute the offense level were correct and summarized a very complex and long term fraudulent conspiracy.

33.  In response to defendant Sears' objection to paragraph 133 as being an organizer or leader of criminal activity, the government agrees with the USPO.  Sears was no doubt a leader or organizer of the criminal activity in which he plead guilty.  Sears was an undisclosed owner/controller of FUSIONPHARM and several other entities.  Sears organized a fraudulent scheme to hold FUSIONPHARM shares in his entities in which he sold in order to fund FUSIONPHARM.  Sears is now denying any criminal activity, much like him denying his affiliation status with FUSIONPHARM.

34.  Defendant Sears objects to receiving a two level increase for failure to report income from criminal activity in paragraph 137.  Again, defendant Sears is denying criminal activity even though he plead guilty to a tax charge and agreed to the facts of a plea agreement that details his failure to report this income.

35. Defendant Sears objects to paragraph 138 because his failure to report tax returns was not conducted in sophisticated means. "The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010); *see also United States v. Jenkins–Watts*, 574 F.3d 950, 962 (8th Cir.2009)

In *United States v. McKye*, 638 Fed. Appx. 680 (10th Cir. 2015), cert. denied, 2016 WL 2840457 (U.S. 2016), the Tenth Circuit upheld the District Court applying two-level sentencing enhancement for use of sophisticated means to defendant's sentence for securities fraud, where defendant ran his scheme undetected for five years, used multiple entities to coordinate the fraud, and used newspaper and television ads to attract more investors, and induced individuals to invest in his scheme by deceiving them into believing their investments were collateralized by real property. The crime and means of committing the crime in *McKye* are similar to the means used in this case. Like in *McKye*, Sears, along with co-conspirators Jean-Pierre and Dittman, used multiple entities to coordinate the securities fraud, assisted in drafting fraudulent press releases, and disclosed fraudulent information, specifically pertaining to their revenue, to OTC Markets, the forum for the public to receive information about microcap companies. They also used a licensed lawyer, not banned to write opinion letters, review fraudulent documents without his knowledge and pay him to place his letterhead and signature on the opinion letters. In addition, this securities fraud went undetected for approximately four years and the undercover operation displayed that defendant Jean-Pierre was willing to continue engaging in securities fraud. Many other circuits have upheld the two-level sentencing enhancement when securities

fraud was committed and various layers of fraud was involved. *See United States v. Regensberg*, 381 Fed.Appx. 60 (2nd Cir. 2010), 210 WL 2501042; *United States v. Bollin*, 73 Fed.Appx. 316, (9th Cir. 2003), 2003 WL 21995421; *United States v. Brennan*, 562 Fed.Appx. 914 (11th Cir. 2014), 2014 WL 1394654; and *United States v. Altomare*, 673 Fed.Appx. 956 (11th Cir. 2016), 2016 WL 7404668.

36.  Defendant Sears objects to paragraphs 160, 161, and 173.   The government does not contest to these objections.

Dated this 2nd day of August 2019.

<div style="margin-left:40%">

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:     s/Jeremy Sibert
        JEREMY SIBERT
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado  80202
        Telephone: (303) 454-0100
        FAX: (303) 454-0403
        E-mail: Jeremy.Sibert@usdoj.gov
        Attorney for the United States

</div>

### CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2019, I electronically filed the foregoing **Government's Response to Defendant's Objections to PSR** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Peter Bornstein**

<div style="margin-left:40%">

s/Jeremy Sibert

</div>

JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

**PACIFIC STOCK TRANSFER COMPANY**
**PW027 - FUSION PHARM INC.**

Transaction Journal

All Transactions For All Stock Classes from 01/01/11 through 01/23/15

| Transact Date | Trans # | Holder ID Name | | Certificate No. | Shares | DispDt | Holder ID Name | Certificate No. | Number of Shares | How Aqr | Active 01/23/2015 | Disp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | DISPOSED | | | | | ACQUIRED | | | | | |

**NEW ISSUES**

| Transact Date | Trans # | Holder ID Name | | Certificate No. | Shares | DispDt | Holder ID Name | Certificate No. | Number of Shares | How Aqr | Active 01/23/2015 | Disp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/11/11 | 12937 | NewIssue | | | | | 129078 KELLY BLUME | CS2 11139 | 15,000 | * New | 15,000 | |
| 11/11/11 | 12937 | NewIssue | | | | | 129060 GINO RODRIGUEZ | CS2 11140 | 25,000 | * New | 25,000 | |
| 01/06/12 | 12943 | NewIssue | | | | | 129080 ANNE CADDEN | CS2 11145 | 2,500 | * New | 2,500 | |
| 01/06/12 | 12943 | NewIssue | | | | | 129081 DAVID P ROY | CS2 11146 | 25,000 | * New | | T |
| 01/06/12 | 12943 | NewIssue | | | | | 129074 PAUL VAN STEKELENBURG | CS2 11147 | 5,869 | * New | 5,869 | |
| 01/06/12 | 12943 | NewIssue | | | | | 129082 STUART LEUDAN | CS2 11148 | 12,000 | * New | | T |
| 04/24/12 | 12954 | NewIssue | @ $1.00/per share** | | | | 129077 FRANKLIN R FALCONER | CS2 11163 | 2,500 | * New | 2,500 | |
| 04/24/12 | 12954 | NewIssue | @ $1.00/per share** | | | | 129089 STEVE FALCONER | CS2 11164 | 10,000 | * New | 10,000 | |
| 07/31/12 | 12962 | NewIssue | @ $1.00/per share** | | | | 129092 MARC GOLDENBERG | CS2 11173 | 28,000 | * New | | T |
| 01/18/13 | 12986 | NewIssue | @ $0.00/per share** | | | | 129068 BAYSIDE REALTY HOLDINGS | CS2 11208 | 140,000 | New | | T |
| 03/14/13 | 12992 | NewIssue | | | | | 129104 SGI GROUP LLC | CS2 11214 | 12,500 | New | | T |
| 03/14/13 | 12992 | NewIssue | | | | | 129105 STARCITY CAPITAL LLC | CS2 11215 | 137,500 | New | | T |
| 03/14/13 | 12992 | NewIssue | | | | | 129106 VERA GROUP LLC | CS2 11216 | 12,500 | New | | T |
| 03/14/13 | 12992 | NewIssue | | | | | 129107 ALEXANDRA MAURIELLO | CS2 11217 | 25,000 | New | | T |
| 03/14/13 | 12992 | NewIssue | | | | | 129108 BLACK ARCH OPPORTUNITY FUND LP | CS2 11218 | 12,500 | New | | T |
| 04/12/13 | 12998 | NewIssue | @ $0.00/per share** | | | | 129110 MEADPOINT VENTURES PARTNERS | CS2 11223 | 475,000 | New | | T |
| 08/15/13 | 13002 | NewIssue | @ $0.01/per share** | | | | 129110 MEADPOINT VENTURES PARTNERS | CS2 11227 | 500,000 | New | | T |
| 09/03/13 | 13003 | NewIssue | @ $0.01/per share** | | | | 129061 MYRON THADEN | CS2 11228 | 500,000 | New | | T |
| 09/03/13 | 13003 | NewIssue | @ $0.01/per share** | | | | 129113 SHARRYN THADEN | CS2 11229 | 500,000 | New | | T |
| 09/03/13 | 13003 | NewIssue | @ $0.01/per share** | | | | 129114 RICHARD SCHOLZ | CS2 11230 | 500,000 | New | | T |
| 09/05/13 | 13005 | NewIssue | | | | | 99696 E*TRADE CLEARING LLC | BE2 1 | | New | | V |
| 09/05/13 | 13005 | NewIssue | | | | | 99696 E*TRADE CLEARING LLC | BE2 2 | 276 | * New | | T |
| 09/19/13 | 13008 | NewIssue | | | | | 129115 STAR CITY CAPITAL | CS2 11235 | 313,703 | New | | T |
| 09/19/13 | 13008 | NewIssue | | | | | 129108 BLACK ARCH OPPORTUNITY FUND LP | CS2 11236 | 28,562 | New | | T |
| 01/09/14 | 13015 | NewIssue | @ $0.01/per share** | | | | 129110 MEADPOINT VENTURES PARTNERS | CS2 11245 | 800,000 | New | | T |

Confidential Treatment Requested by PST
Fusion Pharm (D-03997) - PST-002197

Attachment 33
Page 1 of 2

**PACIFIC STOCK TRANSFER COMPANY**
**PW027 - FUSION PHARM INC.**
Transaction Journal
All Transactions For All Stock Classes from 01/01/11 through 01/23/15

1/23/15
3:23 pm
Page 28 of 114

| Transact Date | Trans # | Holder ID Name | Certificate No. | Shares | DispDt | Holder ID Name | Certificate No. | Number of Shares | How Aqr | Active 01/23/2015 Disp |
|---|---|---|---|---|---|---|---|---|---|---|

**TRANSFERS**

| Transact Date | Trans # | Holder ID Name | Certificate No. | Shares | DispDt | Holder ID Name | Certificate No. | Number of Shares | How Aqr | Active 01/23/2015 Disp |
|---|---|---|---|---|---|---|---|---|---|---|
| **Rcd From:** RIDGE CLEARING & OUTSORCING | | | 09/24/13 10:00 AM Routine | **Total:** | 281 | **Control ID:** STTK000000044304 **Mailed:** 09/24/13 16:00 **Total:** | | 281 | | 281 |
| 10/01/13 | 13010 | 129115 STAR CITY CAPITAL | CS2 11235 | 313,703 | 10/01/13 | 51534 CEDE & CO | CS2 11239 | 313,703 | Tra | 313,703 |
| **Rcd From:** DTC | | | 10/01/13 10:00 AM Routine | **Total:** | 313,703 | **Control ID:** STTK000000044585 **Mailed:** 10/01/13 | **Total:** | 313,703 | | 313,703 |
| 10/03/13 | 13011 | 129114 RICHARD SCHOLZ | CS2 11230 | 500,000 | 10/03/13 | 51534 CEDE & CO | CS2 11240 | 500,000 | Tra | 500,000 |
| **Rcd From:** DTC | | | 10/03/13 10:00 AM Routine | **Total:** | 500,000 | **Control ID:** STTK000000044679 **Mailed:** 10/03/13 16:00 **Total:** | | 500,000 | | 500,000 |
| 10/10/13 | 13012 | 88454 UNION VALOREN AG | CS2 7303 | 1 * | 10/10/13 | 51690 JEAN-MICHEL DUBUIS | CS2 11241 | 1 * | Tra | 1 |
| 10/10/13 | 13012 | 51690 JEAN-MICHEL DUBUIS | CS2 7304 | 1 * | 10/10/13 | 88454 UNION VALOREN AG | CS2 11242 | 1 * | Tra | 1 |
| **Rcd From:** CITI | | | 10/10/13 10:00 AM Routine | **Total:** | 2 | **Control ID:** STTK000000044873 **Mailed:** 10/10/13 16:00 **Total:** | | 2 | | 2 |
| 10/11/13 | 13013 | 129108 BLACK ARCH OPPORTUNITY FUND LP | CS2 11236 | 28,562 | 10/11/13 | 51534 CEDE & CO | CS2 11243 | 28,562 | Tra | 28,562 |
| **Rcd From:** DTC | | | 10/11/13 10:00 AM Routine | **Total:** | 28,562 | **Control ID:** STTK000000044920 **Mailed:** 10/11/13 16:00 **Total:** | | 28,562 | | 28,562 |
| 12/17/13 | 13014 | 51798 GUNDYCO | CS1 (CS1-6525) | 1 * | 12/17/13 | 129117 NBCN INC ITF ESTATE OF DAVID PARKER | CS2 11244 | 2 * | Tra | 2 |
| **Rcd From:** NBCN | | | 12/12/13 10:00 AM Routine | **Total:** | 1 | **Control ID:** STTK000000046942 **Mailed:** 12/17/13 16:00 **Total:** | | 2 | | 2 |
| 01/14/14 | 13016 | 129110 MEADPOINT VENTURES PARTNERS | CS2 11245 | 800,000 | 01/14/14 | 129110 MEADPOINT VENTURES PARTNERS | CS2 11246 | 400,000 | Tra | T |
| 01/14/14 | 13016 | | | | | 129110 MEADPOINT VENTURES PARTNERS | CS2 11247 | 400,000 | Tra | T |
| **Rcd From:** SCOTTSDALE CAPITAL ADVISOR | | | 01/13/14 10:00 AM Routine | **Total:** | 800,000 | **Control ID:** STTK000000047811 **Mailed:** 01/14/14 16:00 **Total:** | | 800,000 | | 0 |
| 01/15/14 | 13017 | 129098 JON B KRULJAC | CS2 11190 | 10,000 | 01/15/14 | 51534 CEDE & CO | CS2 11248 | 10,000 | Tra | 10,000 |
| **Rcd From:** DTC | | | 01/15/14 10:00 AM Routine | **Total:** | 10,000 | **Control ID:** STTK000000047885 **Mailed:** 01/15/14 16:00 **Total:** | | 10,000 | | 10,000 |
| 01/28/14 | 13018 | 129110 MEADPOINT VENTURES PARTNERS | CS2 11246 | 400,000 | 01/28/14 | 129101 ALPCO | CS2 11249 | 125,000 | Tra | T |
| 01/28/14 | 13018 | 129110 MEADPOINT VENTURES PARTNERS | CS2 11247 | 400,000 | 01/28/14 | 129101 ALPCO | CS2 11250 | 125,000 | Tra | T |
| 01/28/14 | 13018 | | | | | 129101 ALPCO | CS2 11251 | 125,000 | Tra | T |
| 01/28/14 | 13018 | | | | | 129101 ALPCO | CS2 11252 | 125,000 | Tra | T |
| 01/28/14 | 13018 | | | | | 129101 ALPCO | CS2 11253 | 125,000 | Tra | T |
| 01/28/14 | 13018 | | | | | 129101 ALPCO | CS2 11254 | 125,000 | Tra | T |
| 01/28/14 | 13018 | | | | | 129101 ALPCO | CS2 11255 | 50,000 | Tra | T |
| **Rcd From:** ALPINE SECURITIES | | | 01/27/14 10:00 AM Routine | **Total:** | 800,000 | **Control ID:** STTK000000048220 **Mailed:** 01/28/14 16:00 **Total:** | | 800,000 | | 0 |

Confidential Treatment Requested by PST
Fusion Pharm (D-03997) - PST-002223

Attachment 33
Page 2 of 2

**To:**      william@williamjsears.com[william@williamjsears.com]
**From:**    Scott Dittman
**Sent:**     Tue 8/20/2013 7:30:28 PM
**Importance:**      **Normal**
**Subject:**   financials
Quarterly Report - 06 30 2013.docx

Please read carefully, make sure I updated all the dates from last year (you missed quite a few :-)  Let me know if you have the OTC form that needs to be filled out and attached to this:



**GOVERNMENT EXHIBIT**
372nnn
17-cr-00008-WJM

**SEC-SMD-0042653**
SEC-DOJ-EPROD-000783161

Attachment 32
Page 1 of 1

| | |
|---|---|
| **From:** | Hosley, Richard "Rick" <richard.hosley@hoganlovells.com> |
| **Sent:** | Tuesday, October 20, 2015 3:49 PM |
| **To:** | Funk, Kate E. (DN) (FBI) |
| **Subject:** | FW: Fusion Pharm |

---------- Forwarded message ----------
From: **Scott Dittman** <sdittman@fusionpharminc.com>
Date: Thu, Apr 21, 2011 at 8:11 AM
Subject: Fusion Pharm
To: sdittman@fusionpharminc.com

Greetings,

For those of you who don't know, I have spent the past 16 months exploring and working in the medical cannabis industry here in Colorado. I currently own an infused products/edibles company and also a dispensary/center license (not currently active) in Denver and recently sold my interest in a Lakewood dispensary.

Recently, I have partnered with my brother-in-law William Sears, and we have acquired and moved our operations into a publicly traded company: Fusion Pharm, Inc. Fusion Pharm is not directly involved in the production or sale of medical cannabis in any way. What FusionPharm does do, is provide products, services and support to companies involved in the medical cannabis industry. Among other things, FusionPharm produces self contained cultivation rooms built out of standard shipping containers (GroPods) , provides non-cannabis products to dispensaries, and provides consulting, sales and accounting services to medical cannabis companies.

To use an 1800's 'gold rush' analogy, our mission is not to be the gold miners of this medical cannabis gold rush, but to be the guys who sell them picks and shovels…to be Levi Strauss.

Below is our 'coming out' press release explaining our recent expansion into the Arizona marketplace. Feel free to contact me if you have any interest/questions.

ABBOTT_00000050

Best regards

**Scott Dittman, CEO**

FusionPharm, Inc. (OTC:FSPM)

O. **720-458-0686** * F. **720-458-0687**

**sdittman@fusionpharminc.com**

**fusionpharminc.com**



CONFIDENTIALITY NOTICE: This e-mail transmission (and/or the documents accompanying it), may contain confidential information belonging to the sender or receiver. The information is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify sender by telephone.

### FusionPharm in Negotiation With Two Major Arizona Dispensary Groups

DENVER, April 21, 2011 /PRNewswire/ -- FusionPharm, Inc. (PINKSHEETS: FSPM), a national, publicly-traded medical cannabis industry support company, announced that they are negotiating agreements to provide cultivation, extraction/infusion and ancillary services with two major Arizona dispensary groups met at the Green Relief Expo in Phoenix.    FusionPharm, Inc. is also negotiating leases on commercial space to offer their GroPods ™ shipping container growing systems to the emerging Arizona market and Arizona patients and caregivers.

ABOUT FUSIONPHARM, INC.

FusionPharm, Inc. (www.fusionpharminc.com) provides products and support services for the emerging medical cannabis industry in Colorado, Arizona and nationwide while allowing individual investors the opportunity to participate in the medical cannabis industry explosion.  FusionPharm, Inc. offers industry expertise in cultivation, extraction, infusion  and business service.  Visit www.fusionpharminc.com today.

NOTES ABOUT FORWARD-LOOKING STATEMENTS

Except for any historical information contained herein, the matters discussed in this press release contain forward-looking statements that involve risks and uncertainties, including those described in the Company's Securities and Exchange Commission reports and filings. Certain statements contained in this release that are

ABBOTT_00000051

**From:**      William Sears <william@williamjsears.com>
**Sent:**      Thursday, March 10, 2011 7:15 AM
**To:**        sdittman@fusionpharminc.com
**Cc:**        cbodden@gsccventure.com
**Subject:**   Fusion Pharm

Gentlemen,
Please start communicating with regard to putting a business plane/power point/offering documents together. Cliffe as usual we need this last week! We want it in the format you used for Green street. We will require them in both pdf and word docs for future revisions. Fee for the whole enchilada is 2-k with 500 as retainer and balance with acceptance of finished product.

Scott number is (303) 419-6352  Cliff's number is (407) 451-1675

Regards,

William Sears
(303) 518-3174

Confidentiality Notice:  This email, including attachments, may include non-public, proprietary, confidential or legally privileged information.  If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited.  If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately.  You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person.
Thank you

Attachment 30
Page 1 of 1

| **From:** | Cliff Bodden </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F8197232BFF34637B2668315946116D0-CBODDEN> |
|---|---|
| **Sent:** | Sunday, August 5, 2012 10:05 AM |
| **To:** | wsears@vertifresh.com |
| **Subject:** | FW: Deposits |
| **Attach:** | image001.jpg |

Updated for your review

**From:** Cliff Bodden
**Sent:** Saturday, August 04, 2012 5:35 PM
**To:** wjsears@vertifresh.com
**Subject:** Deposits

I need to know how to book these deposits:

| Date | Payer | Amount |
|---|---|---|
| 04/30/2012 | Cash Deposit | 15,000.00 |
| 05/03/2012 | Bayside | 16,767.00 |
| 06/07/2012 | Bayside | 5,750.00 |
| 06/14/2012 | Bank Originated Credit | 15,500.00 |
| 06/29/2012 | Cash Deposit | 1,000.00 |

Thanks,



**Cliff Bodden**
2731 Silver Star Road
Orlando, Florida 32808
(407) 522-7201 Phone
(407) 506-1314 Direct Dial
(407) 641-8496 Fax
(407) 520-6025 Mobile

Please consider the environment before printing this e-mail.

DISCLAIMER: Sender is not a Securities Dealer or Broker or Investment Adviser. Sender is an investor and consultant. This e-mail and the attached related documents are never to be considered an offer or solicitation for any purpose in any form or content. Such offer or solicitation may only be made by means of delivery of a confidential private offering memorandum or other appropriate document which contains a description of the material terms (including, without limitation, risk factors, conflicts of interest, fees and charges) relating to a particular investment product or fund. If you reply to this email, please note that we are a public investor and do not want any material non-public information. We do not agree to keep confidential any information you provide and do not agree to any restrictions on our investment activity, except pursuant to a written confidentiality agreement executed by Green Street Capital Partners, LLC. Upon receipt of this e-mail you, as the recipient, hereby acknowledge this disclaimer.

The preceding email message may be confidential or contain proprietary or privileged information.  It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Financial or consulting advice contained in the preceding message is solely for the benefit of the Green Street Capital Partners' clients(s) represented by the firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

To the extent the preceding message contains advice relating to securities matters. The information provided has been prepared from sources believed to be reliable but is not guaranteed, does not represent all available data necessary for making investment decisions and is for informational purposes only.

Attachment 29
Page 1 of 1

| | |
|---|---|
| **From:** | Cliff Bodden </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F8197232BFF34637B2668315946116D0-CBODDEN> |
| **Sent:** | Wednesday, June 20, 2012 6:46 PM |
| **To:** | nmalino@capitolineadvisors.com |
| **Bcc:** | wsears@fusionpharminc.com; mbarbarosh@stentonleighgroup.com |
| **Subject:** | FusionPharm Inc - Due Diligence Request |
| **Attach:** | Capitoline Due Diligence Checklist [FusionPharm Inc].pdf; Exhibit A - FusiopnPharm Inc ByLaws.pdf; Exhibit B - FusionPharm Inc Certificate of Good Standing.pdf; Exhibit C - FusionPharm Inc Amended and Restated Articles of Incorporation 03072011.pdf; Exhibit D - FusionPharm Inc 504 Offering Documents - June 2012.pdf; Exhibit E - FusionPharm Inc Preferred Stock Certificate of Designation.pdf; Exhibit F - Shareholders Consent 11152010 - Election of New Directors.pdf; Exhibit G - Minutes of Directors Meeting 11152010 - Officer Appointments.pdf; Exhibit H - Form D 06202012.pdf; Exhibit I - Financial Statements 2010 2011 and 1Q 2012.pdf; Exhibit J - FusionPharm Inc. Shareholders' List 03312012.pdf; Exhibit K - FusionPharm Inc - Note Agreements Requests and Deposit Receipts.pdf; Exhibit L - Accountant's Verification.pdf; image003.jpg |

Nick

Please find attached the company's response to you due diligence request and exhibits.  Please acknowledge receipt to me and Scott Dittman (sdittman@fusionpharminc.com) in due course.  Let me know if you require any additional information and I will run it down.

Once you have completed your review we can discuss next steps.

Best regards,

Cliff



**Cliff Bodden**
2731 Silver Star Road
Orlando, Florida 32808
(407) 522-7201 Phone
(407) 506-1314 Direct Dial
(407) 295-0421 Fax
(407) 520-6025 Mobile

BlackBerry Messenger PIN: 20EFC818

Please consider the environment before printing this e-mail.

DISCLAIMER: Sender is not a Securities Dealer or Broker or Investment Adviser. Sender is an investor and consultant. This e-mail and the attached related documents are never to be considered an offer or solicitation for any purpose in any form or content. Such offer or solicitation may only be made by means of delivery of a confidential private offering memorandum or other appropriate document which contains a description of the material terms (including, without limitation, risk factors, conflicts of interest, fees and charges) relating to a particular investment product or fund. If you reply to this email, please note that we are a public investor and do not want any material non-public information. We do not agree to keep confidential any information you provide and do not agree to any restrictions on our investment activity, except pursuant to a written confidentiality agreement executed by Green Street Capital Partners, LLC. Upon receipt of this e-mail you, as the recipient, hereby acknowledge this disclaimer.

The preceding email message may be confidential or contain proprietary or privileged information.  It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Financial or consulting advice contained in the preceding message is solely for the benefit of the Green Street Capital Partners' clients(s) represented by the firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

**PROMISSORY NOTE**
**AND**
**CREDIT LINE AGREEMENT**

**THIS PROMISSORY NOTE AND CREDIT LINE AGREEMENT** (this "Agreement") is entered into by and between Bayside Realty Holdings, LLC (hereinafter referred to as the "Lender") and FusionPharm, Inc. (hereinafter referred to as the "Borrower") for the purpose of the Borrower's borrowing up to Two Hundred and Seventy Five Thousand ($275,000) dollars from the Lender as follows:

**RECITALS**

**FOR VALUE RECEIVED**, the Borrower promises to pay to the order of the Lender, the principal sum of Two Hundred and Seventy Five Thousand dollars ($275,000), or so much thereof as may be disbursed to, or for the benefit of the Borrower by the Lender in the Lender's sole and absolute discretion. It is the intent of the Borrower and the Lender to create a line of credit between the Borrower and the Lender whereby Borrower may borrow up to Two Hundred and Seventy Five Thousand dollars ($275,000) from the Lender; provided, however, that the Lender has no obligation to lend the Borrower any amounts hereunder and the decision to lend such money lies in the sole and complete discretion of the Lender.

**ARTICLE 1.    DRAWDOWN ON LINE OF CREDIT**

The Borrower may request drawdown of the line of credit once every thirty (30) day period (each a "Drawdown Request"). The Lender may pay the amount requested in such Drawdown Request, in the sole and complete discretion, in one or more installments beginning within three (3) days of receipt of such Drawdown Request.

**ARTICLE 2.    INTEREST RATE AND PRINCIPAL**

The unpaid principal of this line of credit shall bear simple interest at a rate of ten percent (10%) per annum. Interest shall be calculated beginning on April 1, 2012 and based on the principal balance as may adjusted from time to time to reflect additional advances made hereunder. Interest on the unpaid principal balance shall accrue monthly but shall not be due and payable until such time as when the principal balance of this Promissory Note becomes due and payable. The principal balance of this Promissory Note shall become due and payable on March 31, 2013 (the "Maturity Date"). There shall be no penalty for early repayment of all or any part of the principal.

**ARTICLE 3.    DEFAULT**

In the event the principal and any interest due hereunder is not received by the Lender on the Maturity Date ("Default") a late charge in the amount of twelve percent (12%) simple interest shall be due and payable on the first subsequent day of the month, represented as a full month without regard to partial accrual of interest after the expiration of the loan period ("Penalty").

**ARTICLE 4.    OTHER CONSIDERATIONS**

Upon the occurrence of an Acceleration Event, the Lender may, in its discretion, declare the entire unpaid principal and interest due and payable as provided herein. The occurrence of any one or more of the following events shall constitute an "Acceleration Event," and the Borrower's indebtedness shall be repaid as set forth below:

(a) The receipt of funding for business development initiatives currently contemplated by Borrower, for which the payment of the Borrower's indebtedness is part of the stated use of proceeds from such funding; or

1

(b) The receipt by Borrower of offering proceeds, financing or a similar arrangement in the amount of $2,000,000.

## ARTICLE 5.   MISCELLANEOUS

5.1   Notices. Any notice required or permitted hereunder must be in writing and either personally served, sent by facsimile or email transmission, or sent by overnight courier. Notices will be deemed effectively delivered at the time of transmission if by facsimile or email, and if by overnight courier the business day after such notice is deposited with the courier service for delivery.

5.2   Amendment Provision. The term "Note" and all reference thereto, as used throughout this instrument, means this Agreement as originally executed, or if later amended or supplemented, then as so amended or supplemented.

5.3   Assignability. This Agreement will be binding upon the Borrower and its successors and permitted assigns, and will inure to the benefit of the Lender and its successors and permitted assigns, and may be assigned by the Lender.

5.4   Governing Law. This Agreement will be governed by, and construed and enforced in accordance, with the laws of the State of Colorado, without regard to the conflict of laws principles thereof. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Colorado or in the federal courts located in Denver County, in the State of Colorado. Both parties and the individuals signing this Agreement agree to submit to the jurisdiction of such courts.

5.5   Delivery of Process by the Lender to the Borrower. In the event of any action or proceeding by Lender against Borrower, and only by the Lender against Borrower, service of copies of summons and/or complaint and/or any other process which may be served in any such action or proceeding may be made by the Lender via U.S. Mail, overnight delivery service such as FedEx or UPS, email, fax, or process server, or by mailing or otherwise delivering a copy of such process to the Borrower at its last known address.

5.6   Attorney Fees. In the event any attorney is employed by either party to this Agreement with regard to any legal or equitable action, arbitration or other proceeding brought by such party for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the prevailing party in such proceeding will be entitled to recover from the other party reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which the prevailing party may be entitled.

5.7   Effective Date. This Agreement will become effective only upon occurrence of the two following events: the receipt of a Drawdown Request by the Lender from the Borrower and delivery of loan proceeds by the Lender to the Borrower.

Agreed this May 2, 2011

FUSIONPHARM, INC.

By: _____
       Scott Dittman
       Chief Executive Officer

BAYSIDE REALTY HOLDINGS, LLC

By: _____
       Sandra L. Sears
       Manager

2



| 5/06/11 | TRANSFER FROM DDA # 000005993910560 | $4,400.00 |
| 05/11/11 | TRANSFER FROM DDA # 000005993910560 | $24,762.00 |
| 05/18/11 | TRANSFER FROM DDA # 000005993910560 | $27,285.00 |
| 05/25/11 | TRANSFER FROM DDA # 000005993910560 | $30,000.00 |

<div align="center">

**PROMISSORY NOTE**
**AND**
**CREDIT LINE AGREEMENT**

</div>

**THIS PROMISSORY NOTE AND CREDIT LINE AGREEMENT** (this "Agreement") is entered into by and between MeadPoint Venture Partners, LLC (hereinafter referred to as the "Lender") and FusionPharm, Inc. (hereinafter referred to as the "Borrower") for the purpose of the Borrower's borrowing up to Two Hundred Thousand ($200,000) dollars from the Lender as follows:

<div align="center">

**RECITALS**

</div>

**FOR VALUE RECEIVED**, the Borrower promises to pay to the order of the Lender, the principal sum of Two Hundred Thousand dollars ($200,000), or so much thereof as may be disbursed to, or for the benefit of the Borrower by the Lender in the Lender's sole and absolute discretion. It is the intent of the Borrower and the Lender to create a line of credit between the Borrower and the Lender whereby Borrower may borrow up to Two Hundred Thousand dollars ($200,000) from the Lender; provided, however, that the Lender has no obligation to lend the Borrower any amounts hereunder and the decision to lend such money lies in the sole and complete discretion of the Lender.

**ARTICLE 1.**     **DRAWDOWN ON LINE OF CREDIT**

The Borrower may request drawdown of the line of credit once every thirty (30) day period (each a "Drawdown Request"). The Lender may pay the amount requested in such Drawdown Request, in the sole and complete discretion, in one or more installments beginning within three (3) days of receipt of such Drawdown Request.

**ARTICLE 2.**     **INTEREST RATE AND PRINCIPAL**

The unpaid principal of this line of credit shall bear simple interest at a rate of ten percent (10%) per annum. Interest shall be calculated beginning on April 1, 2012 and based on the principal balance as may adjusted from time to time to reflect additional advances made hereunder. Interest on the unpaid principal balance shall accrue monthly but shall not be due and payable until such time as when the principal balance of this Promissory Note becomes due and payable. The principal balance of this Promissory Note shall become due and payable on March 31, 2013 (the "Maturity Date"). There shall be no penalty for early repayment of all or any part of the principal.

**ARTICLE 3.**     **DEFAULT**

In the event the principal and any interest due hereunder is not received by the Lender on the Maturity Date ("Default") a late charge in the amount of twelve percent (12%) simple interest shall be due and payable on the first subsequent day of the month, represented as a full month without regard to partial accrual of interest after the expiration of the loan period ("Penalty").

**ARTICLE 4.**     **OTHER CONSIDERATIONS**

Upon the occurrence of an Acceleration Event, the Lender may, in its discretion, declare the entire unpaid principal and interest due and payable as provided herein. The occurrence of any one or more of the following events shall constitute an "Acceleration Event," and the Borrower's indebtedness shall be repaid as set forth below:

    (a) The receipt of funding for business development initiatives currently contemplated by Borrower, for which the payment of the Borrower's indebtedness is part of the stated use of proceeds from such funding; or

    (b) The receipt by Borrower of offering proceeds, financing or a similar arrangement in the amount of $2,000,000.

<div align="center">1</div>

## ARTICLE 5.    MISCELLANEOUS

5.1    Notices. Any notice required or permitted hereunder must be in writing and either personally served, sent by facsimile or email transmission, or sent by overnight courier.  Notices will be deemed effectively delivered at the time of transmission if by facsimile or email, and if by overnight courier the business day after such notice is deposited with the courier service for delivery.

5.2    Amendment Provision. The term "Note" and all reference thereto, as used throughout this instrument, means this Agreement as originally executed, or if later amended or supplemented, then as so amended or supplemented.

5.3    Assignability. This Agreement will be binding upon the Borrower and its successors and permitted assigns, and will inure to the benefit of the Lender and its successors and permitted assigns, and may be assigned by the Lender.

5.4    Governing Law. This Agreement will be governed by, and construed and enforced in accordance, with the laws of the State of Colorado, without regard to the conflict of laws principles thereof.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Colorado or in the federal courts located in Denver County, in the State of Colorado.  Both parties and the individuals signing this Agreement agree to submit to the jurisdiction of such courts.

5.5    Delivery of Process by the Lender to the Borrower.  In the event of any action or proceeding by Lender against Borrower, and only by the Lender against Borrower, service of copies of summons and/or complaint and/or any other process which may be served in any such action or proceeding may be made by the Lender via U.S. Mail, overnight delivery service such as FedEx or UPS, email, fax, or process server, or by mailing or otherwise delivering a copy of such process to the Borrower at its last known address.

5.6    Attorney Fees. In the event any attorney is employed by either party to this Agreement with regard to any legal or equitable action, arbitration or other proceeding brought by such party for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the prevailing party in such proceeding will be entitled to recover from the other party reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which the prevailing party may be entitled.

5.7    Effective Date. This Agreement will become effective only upon occurrence of the two following events: the receipt of a Drawdown Request by the Lender from the Borrower and delivery of loan proceeds by the Lender to the Borrower.

Agreed this June 15, 2011

FUSIONPHARM, INC.

By: _____
Scott Dittman
Chief Executive Officer

MEADPOINT VENTURE PARTNERS, LLC

By: _____
William J. Sears
Manager

2

Source of Funds for Bayside Note

| DATE | AMOUNT | ACTUAL SOURCE OF MONEY |
|---|---|---|
| 5/5/2011 | $5,800 | Microcap[1] |
| 5/6/2011 | $4,400 | Microcap |
| 5/11/2011 | $24,762 | Microcap |
| 5/18/2011 | $27,285 | Microcap |
| 5/25/2011 | $30,000 | Microcap |
| 5/25/2011 | $300 | Microcap |
| 6/9/2011 | $36,700 | Microcap |
| 9/19/2011 | $14,000 | Microcap |
| 10/21/2011 | $10,000 | Microcap |
| 11/16/2011 | $15,000[2] | Microcap |
| 12/28/2011 | $9,000 | Bayside |
| TOTAL | $177,247 | |

[1] In 2011, 97% of the $1,252,294 in incoming deposits into the Microcap account came from the sale of FusionPharm stock. Based on the supporting documentation provided to the transfer agent in support of the Bayside and Meadpoint loans, it is clear that the funds provided to FusionPharm were generated from the sale of FusionPharm stock.

[2] This $15,000 deposit was provided as supporting documentation for both the Meadpoint and Bayside loans.

Attachment 25
Page 1 of 2

Source of Funds for Meadpoint Note

| DATE | AMOUNT | SOURCE OF MONEY |
|------|--------|-----------------|
| 6/15/2011 | $50,000 | Microcap |
| 07/25/2011 | $15,000[3] | Microcap |
| 11/16/2011 | $15,000 | Microcap |
| 12/8/2011 | $8,000 | Microcap |
| **TOTAL** | $88,000 | |

**To:**       sdittman@fusionpharminc.com[sdittman@fusionpharminc.com]
**From:**    William Sears
**Sent:**    Mon 11/14/2011 4:17:10 PM
**Importance:**        Normal
**Subject:**  Meadpoint Shareholder Agreement
Meadpoint Shareholder Agreement.docx

Scott,

Send to Stu and explain the nature of said agreement.

SEC_TRAN_00001479

Attachment 24
Page 1 of 3

### Meadpoint Shareholder Agreement

AGREEMENT made and entered into as of the 31st day of October, 2011, by and among William Sears, residing at 13442 Jackson Drive Thornton, Colorado 80241 (hereinafter "Sears"), and Scott Dittman, residing at 2233 Ponderosa Road Franktown, Colorado 80116 (hereinafter "Ditman"), and Meadpoint Venture Partners LLC a Nevada Limited Liability Corporation ("the Corporation").

W I T N E S S E T H:

WHEREAS, all of the issued shares and outstanding stock of the Corporation are owned in the following percentages:
Dittman 50%
Sears 50%

WHEREAS, the Shareholders hereto deem it to be in the best interest of the Corporation to act together concerning the management of the Corporation as well as to make provision for the contingency of the death or disability of any Shareholder and to set forth the manner and method by which a Shareholder may sell his stock during his lifetime.

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS;

FIRST: **MANAGEMENT AND OPERATION OF THE CORPORATION**

A. 1. **Directors and Officers**. For the duration and term of this Agreement, the Shareholders will elect and continue in office as Directors of the Corporation the following:


The Officers of the Corporation shall be:
Sears – Managing Member

B. **Voting**. All decisions within the ordinary course of business shall be made by the unanimous consent of both Shareholders, who shall have equal say in the management of the ordinary course of business of the Corporation. In addition, for the purposes of selling, terminating, liquidating, entering loans or changing the basic purposes of the Corporation, the quorum and voting requirements shall be 100 percent of all shareholders.

C. **Checks.** All cash, checks and instruments for the payment of monies are to be deposited in the Corporation's bank account. All checks drawn upon such account are to be signed by the President with notice of all such proposed checks to the non-management shareholder, who shall be employed as a consultant to the Corporation.

D. **Salaries.** Neither Shareholder shall receive any compensation for their services to the Corporation unless agreed upon by both shareholders; provided that both the President and Consultant shall receive equal compensation for their services.  In the event a non-shareholder

SEC_TRAN_00001480

employee, officer or consultant is hired by the Corporation, such non-shareholder employee, officer or consultant shall receive a compensation determined by both shareholders jointly.

E. **Shareholder Services.** Both parties shall provide such services to the operation of the Corporation and Corporate business as shall be deemed proper and necessary, including keeping each other informed of all letters, accounts, writings and other information which shall come to their attention concerning the business of the Corporation.

Both parties shall keep or cause to be kept full records of each transaction of the Corporation and shall maintain such records at the principal office of the Corporation at [specify address], or at the principal office of the Corporation's accountant.

F. **Indemnity.** In the event any Shareholder is held personally liable for any liability of the Corporation, then the other Shareholder shall indemnify him against fifty percent (50%) of any such personal liability.

G. **Corporation Assets.** The sole assets of the Corporation consist of 1,300,000 (One Million Three Hundred Thousand) shares of the preferred stock of Fusion Pharm, Inc. Shares are currently registered in the name of Scott Dittman,

H. **Death Of A Shareholder.** In the event of the death of a Shareholder, the legal representative of his Estate shall be required to sell all of decedent's shares of stock of the Corporation and he shall be deemed to have offered all of said shares to the Corporation and surviving Shareholder.
1. **Acceptance.** The Corporation shall be deemed to have accepted the offer to purchase as many shares as it may legally purchase. In the event the Corporation is unable to legally purchase all of such shares, the surviving Shareholder shall purchase those shares which the Corporation cannot legally purchase.
2. **Closing.** Closing shall be held at the office of the attorney for the Corporation, [specify attorney], on a date and time to be mutually agreed upon but no later than ten (10) days after either the determination of the purchase price or appointment of a legal representative for the decedent's estate, whichever is later. The article of this Agreement entitled Manner Of Payment, sets forth the documents and papers to be executed and/or delivered at closing.
3. **Purchase Price.** The purchase price of a deceased Shareholder's stock shall be determined by the Shareholders in writing every six (6) months. If no such written determination has been agreed upon within six (6) months from date of death, then the price shall be fixed at the gross commission income received by the Corporation during the preceding full fiscal year.
4. The Corporation may obtain life insurance policies on the lives of each of the Shareholders. In the event such life insurance policies are so obtained, then the Corporation shall collect the proceeds thereof, hold same as trustee and turn same immediately over to the legal representative of the deceased Shareholder as payment on account for decedent's share of stock. In the event said insurance proceeds exceed the amount of the purchase price as hereinabove provided, then the legal representative of the decedent shall retain the amount of said proceeds as payment in full for decedent's stock. In the event the purchase price of decedent's stock as hereinabove provided exceeds the

SEC_TRAN_00001481

| | |
|---|---|
| **From:** | William Sears <wsears@vertifresh.onmicrosoft.com> |
| **Sent:** | Friday, October 5, 2012 4:17 PM |
| **To:** | Giron, Patrick R. - OED <Patrick.Giron@denvergov.org> |
| **Subject:** | RE: CORRECTION - JumpStart Biz Plan Awards Additional items |
| **Attach:** | VertiFresh Business Plan 2012 -2015.pdf |

Patrick,
Please find attached the business plan required for review. Once again I am honored to be considered for this award.

Regards,

**William Sears**
O. 303-398-7081 * M. 303-518-3174
4360 Vine Street
Denver, Colorado 80216
wsears@vertifresh.com
www.vertifresh.com


CONFIDENTIALITY NOTICE: This e-mail transmission (and/or the documents accompanying it), may contain confidential information belonging to the sender or receiver. The information is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify sender by telephone.

**From:** Giron, Patrick R. - OED [mailto:Patrick.Giron@denvergov.org]
**Sent:** Thursday, October 04, 2012 5:18 PM
**To:** Giron, Patrick R. - OED
**Subject:** CORRECTION - JumpStart Biz Plan Awards Additional items
**Importance:** High

Please note that the email address I provided for you to send the business plan to is not working.  Send your final business plan directly to me at patrick.giron@denvergov.org by close of business tomorrow (10/5/12) per the original instructions.

**ADDITIONALLY, PLEASE BE SURE YOUR BUSINESS PLAN CONTAINS A STATEMENT DESCRIBING THE SPECIFIC USE OF FUNDS FROM THIS COMPETITION AND INCLUDE A TIMELINE/BURN RATE.**

Thank you very much and I look forward to receiving your business plan.

Sincerely,

**Patrick Giron**
Economic Development Supervisor
Office of Economic Development | City and County of Denver
Phone: 720.913.1649 Fax: 720.913.1802
www.milehigh.com

INV_00004653

patrick.giron@denvergov.org

This e-mail transmission from the City and County of Denver, and any documents, files, or previous e-mail messages attached to it, are intended solely for the individual(s) to whom it is addressed and may contain information that is confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any unauthorized review, forwarding, printing, copying, distribution, or use of this transmission or the information it contains is strictly prohibited. A misdirected transmission does not constitute waiver of any applicable privilege. If you received this transmission in error, please immediately notify the sender and delete the original transmission and its attachments. Thank you.

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.2221 / Virus Database: 2441/5312 - Release Date: 10/05/12

INV_00004654

Attachment 23
Page 2 of 3

# MANAGEMENT AND PERSONNEL

### William Sears
President

William began his career in 1984 with Coca-Cola Bottling in New York City, where he became a distribution manager before leaving in 1989 to join Coca-Cola Enterprises in Palm Beach, Florida. In 1992, he became an entrepreneur, forming a consulting firm in Boca Raton, Florida that specialized in early stage ventures. In 1995, William co-founded Growth Planning Limited, a Cayman Islands-based investment advisory firm and launched AstraFund, Ltd., a small-cap focused private investment fund. In 2000, he moved to Surfers Paradise in Queensland, Australia where he was a partner in a real estate development firm. William returned to the U.S. in 2004 and served as an advisor with several developmental stage public and private companies in the environmental services, information technology and resource reclamation industries. William has over 20 years of entrepreneurial experience and has been invested in the development of hydroponic cultivation systems for 3 years prior to founding VertiFresh in March 2012.

### Kelly Blume
Farming Manager

Kelly joined Vertifresh at inception and currently oversees our day-to-day farming operations. She completed her undergraduate work at Washington State University and is currently pursuing her Master of Agriculture degree at Colorado State University. Ms. Blume is writing her thesis on hydroponic vertical farming as a solution to many of the current issues we face in agriculture today.

### Scott Dittman
Director

Scott is the President and Chief Executive Officer of FusionPharm, Inc., the developer of the patent pending PharmPods hydroponic cultivation system. Prior to joining FusionPharm, he served as Chief Executive Officer of Equity Custom Homes, Inc., a Denver, Colorado based home builder. Scott was formerly an Enterprise Consultant with Arthur Andersen and Company in San Francisco and Sydney Australia. He received a Business and Finance degree from the University of Colorado, Boulder and went on to acquire his CPA qualification in 1991. Scott has been active in numerous charities and organizations in Denver and currently serves as a member of the Board of Directors of the Denver Buff Club, supporting athletics at the University of Colorado.

## PERSONNEL PLAN

The personnel plan includes operations managers, who will oversee the construction and operations of each PharmPlex facility, and technical staff experienced in hydroponic farming. Wages for the agricultural laborers who will tend the produce are included in the Sales Forecast table as part of cost of sales.

| Personnel Plan | | | |
|---|---|---|---|
| | 2013 | 2014 | 2015 |
| Senior Management | 2 | 2 | 3 |
| Growing and Harvesting | 6 | 9 | 14 |
| Sales | 1 | 2 | 3 |
| Operations | 6 | 10 | 18 |
| Total People | 15 | 23 | 38 |
| Total Payroll | $551,942 | $1,033,388 | $1,574,025 |

*Includes Cost of Goods Sold: Labor

16

Attachment 23
Page 3 of 3

198

Direct - Dittman

1   Q.   And, in fact, VertiFresh, as we discussed, was

2   90 percent of your revenue in 2012.

3   A.   That much is true.

4   Q.   Can I have Government Exhibit 19 shown.

5           MR. SIBERT:   And this has been stipulated to, Your

6   Honor.  I don't think it has been put into evidence, so I

7   would like to move into evidence Government Exhibit 19, 40,

8   390.  That's section 8, Your Honor.

9           THE COURT:   Section 8?

10          MR. SIBERT:   Yes, sir.  Sorry.

11          THE COURT:   All right.  Given the stipulation of

12  the parties, Government Exhibits 19, 40, and 390 are

13  admitted into evidence and may be published to the jury.

14      (Government's Exhibit 19, 40, and 390 received)

15          MR. SIBERT:   Your Honor, may I have a moment?

16          THE COURT:   You may.

17          MR. SIBERT:   Actually, I'm okay.  I'm sorry.

18  BY MR. SIBERT:

19  Q.   Can I have -- let me get the hard copy.  I'm sorry.

20  Can I have the witness shown page 13 -- I'm sorry,

21  actually, before we do that, go ahead and just blow that up

22  for me.  Not the top.

23          And what is this document, Government Exhibit 19?

24  A.   It's the annual information and disclosure statement

25  for FusionPharm dated December 31st, 2011.

Direct - Dittman

1  Q.   So the annual -- the annual report being submitted to

2  OTC Markets for 2011?

3  A.   Yes.

4  Q.   Can I have page 13?  Can you blow this up, please?

5       What is your annual salary, sir?

6  A.   $60,000.

7  Q.   Can I have Exhibit 40 shown, please.  Can I have page

8  2 of Exhibit 40.

9       Okay, sir, you stated that Mrs. Blume worked for

10 you; is that correct?

11 A.   She did.

12 Q.   And this is a letter to -- Mrs. Blume is writing on

13 behalf of FusionPharm; is that right?

14 A.   It appears so.

15 Q.   And this is January 30th, 2012?

16 A.   Yes.

17 Q.   Okay.  And how much is Mr. Sears being paid since

18 January 2011 by FusionPharm?

19 A.   According to Ms. Blume, 5,000 per month, but I don't

20 think that's accurate.

21 Q.   Okay.  Well, how much is 5,000 times 12?

22 A.   Excuse me?

23 Q.   How much is 5,000 times 12?

24 A.   60,000.

25 Q.   So that would be the same salary, if this is right, as

| | |
|---|---|
| **From:** | William Sears <wsears@fusionpharminc.com> |
| **Sent:** | Thursday, June 23, 2011 10:23 AM |
| **To:** | 'Scott Dittman' <sdittman@fusionpharminc.com> |
| **Subject:** | RE: wire |

Done……….you want the full five?

**William Sears**
FusionPharm, Inc.
O. 720-458-0686 ⬩ F. 720-458-0687
wsears@fusionpharminc.com
fusionpharminc.com



CONFIDENTIALITY NOTICE: This e-mail transmission (and/or the documents accompanying it), may contain confidential information belonging to the sender or receiver. The information is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify sender by telephone.

**From:** Scott Dittman [mailto:sdittman@fusionpharminc.com]
**Sent:** Thursday, June 23, 2011 10:13 AM
**To:** 'Bill Sears'
**Subject:** wire

Billy,

Can we wire $3k from this weeks take to Laura's account?

Instructions below:

Compass Bank
568 E Castle Pines Pkwy
Castle Rock, CO 80108-4606

Account info:

Laura Dittman
Routing #:  107005319
Account # 2510043602

**Scott Dittman, CEO**
FusionPharm, Inc. (OTC:FSPM)
O. 720-458-0686 * F. 720-458-0687
sdittman@fusionpharminc.com

Attachment 20
Page 1 of 2

**fusionpharminc.com**



**CONFIDENTIALITY NOTICE:** This e-mail transmission (and/or the documents accompanying it), may contain confidential information belonging to the sender or receiver. The information is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify sender by telephone.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.901 / Virus Database: 271.1.1/3721 - Release Date: 06/23/11 00:34:00

Attachment 20
Page 2 of 2

### Checks Signed on Fusion Pharm Wells Fargo Acct #0090
### from March 23, 2011 to February 15, 2013



10/5/2011: FINRA contacts Scott Dittman

| Signer | Apr 2011 | May 2011 | June 2011 | July 2011 | Aug 2011 | Sept 2011 | Oct 2011 | Nov 2011 | Dec 2011 | Jan 2012 | Feb 2012 | Mar 2012 | Apr 2012 | May 2012 | June 2012 to Feb 2013 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scott Dittman | 3 | - | - | - | - | - | 36 | 30 | 19 | 27 | 10 | 21 | 19 | 15 | 74 | 254 |
| William Sears | 4 | 35 | 24 | 32 | 35 | 22 | 1 | - | - | - | 1 | - | - | 1 | - | 155 |
| Sandra Sears | - | - | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 1 |
| Total Checks- FSPM Acct #0090 | 7 | 35 | 25 | 32 | 35 | 22 | 37 | 30 | 19 | 27 | 11 | 21 | 19 | 16 | 74 | 410 |

On March 23, 2011, Wells Fargo Account 9475650090 was opened under the name Fusion Pharm, Inc.  Initial signers were William J. Sears and Sandra L. Sears.
On October 11, 2011, initial signers were deleted and Scott Dittman was added as the sole signer on the account.
On February 15, 2013, the account was closed.



GOVERNMENT
EXHIBIT
314
17-cr-00008-WJM

Attachment 19
Page 1 of 1

## Rule 144 Affiliate Volume Calculations

| Date | Three Month Volume Limit | Selected Accounts Shares Sold | Percent of Volume Limit |
|------|--------------------------|-------------------------------|-------------------------|
| 6/30/2011 | 9,600 | 262,794 | 2737% |
| 9/30/2011 | 17,081 | 130,274 | 763% |
| 12/31/2011 | 21,218 | 104,600 | 493% |
| 3/31/2012 | 21,568 | 75,282 | 349% |
| 6/30/2012 | 23,462 | 109,758 | 468% |
| 9/30/2012 | 28,337 | 19,461 | 69% |
| 12/31/2012 | 28,617 | 41,699 | 146% |
| 3/31/2013 | 30,017 | 681,508 | 2270% |
| 6/30/2013 | 52,017 | 169,643 | 326% |
| 9/30/2013 | 56,757 | 2,034,859 | 3585% |
| 12/31/2013 | 56,757 | 343,625 | 605% |
| 3/31/2014 | 80,192 | 1,241,581 | 1548% |

Prepared by FINRA CPAG
Source: OTC Filings; Exhibits 47, 76, 84, 432, 433, 434, 438

Selected Accounts: Meadpoint (ALPS-7669);  Microcap (OPCO-9990); Microcap (ALPS-7090); Bayside (ALPS-4611); and William Sears (ETRS-1511)

GOVERNMENT
EXHIBIT
301
17-cr-00008-WJM

Attachment 18
Page 1 of 1

Blank

| | |
|---|---|
| **From:** | Scott Dittman <sdittman@fusionpharminc.com> |
| **Sent:** | Thursday, September 29, 2011 9:24 AM |
| **To:** | 'Rutherford, Connie J' <crutherford@paychex.com> |
| **Subject:** | RE: Payroll - Paychex |

Connie,

Sorry, traveling this week and just returned last night.

Yes indeed, we would still like for you to process our payroll.  Do I need to sign/do anything for you?  Pls advise.

Please mail all checks to the following address:

1610 Wynkoop St #110

Denver, CO 80202

Best regards.

**Scott Dittman**
**FusionPharm, Inc.**
**O. 720-458-0686** ® **F. 720-458-0687**
**sdittman@fusionpharminc.com**
**fusionpharminc.com**



**CONFIDENTIALITY NOTICE**: This e-mail transmission (and/or the documents accompanying it), may contain confidential information belonging to the sender or receiver. The information is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please immediately notify sender by telephone.

**From:** Rutherford, Connie J [mailto:crutherford@paychex.com]
**Sent:** Wednesday, September 28, 2011 12:38 PM
**To:** sdittman@fusionpharminc.com
**Subject:** Payroll - Paychex

Hi Scott,

I left you a voice message so if we have already talked you can disregard this email.

I was checking to see if we are processing payroll for the Sept 30th check date for you and William for the normal salary amounts.

Please let me know and also let me know if we have any other changes. I know Shane is no longer with the company so you will be the payroll contact moving forward?

Attachment 17
Page 1 of 2

Blank

Also do the checks get delivered to the same address we have been sending them to, or has that changed?

Thank you.

*Connie Rutherford*

New Client Specialist
Paychex, Inc.
602-266-3660 ext. 23771
Fax: 602-279-0334
Email: crutherford@paychex.com

·  The Arizona Department of Economic Security (DES) has retroactively established a Special Assessment tax. AZ DES will send employers first and second quarter 2011 bills in September. Payments are due October 31, 2011. You will be responsible for making this payment even if you are a Paychex Taxpay client.

The third quarter assessment will be included on your third quarter Paychex prepared return. If you are a Taxpay client, we will remit this tax to the agency on your behalf.

The information contained in this message may be privileged, confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Attachment 17
Page 2 of 2

# Addendum To Certificate Of Authority

For Changes To Authorized Signers On Business Deposit Accounts


**WELLS FARGO**

Host Status:
Host Update Successful

| Bank Name: | | Store Name: |
|---|---|---|
| Wells Fargo Bank , N.A. | | LoDo |

| Banker Name: | | Officer/Portfolio Number: | Date: |
|---|---|---|---|
| GRANT TAYLOR | | K2530 | 10/07/2011 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 303/260-6260 | 03743 | 0076132 | C7337-011 |

Use this Addendum when Authorized Signers are being added or deleted to a Certificate of Authority currently on file for a business customer and a new, signed Certificate of Authority has not been obtained.

## Business/Account Information

| Business Name: | COID: | Product: | Account Number: |
|---|---|---|---|
| FUSION PHARM, INC | 163 | DDA | 9475650090 |

## Authorized Signers

| Authorized Signer Name(s): | Relationship Status: | | | | | |
|---|---|---|---|---|---|---|
| SCOTT DITTMAN | ☒ | Existing/Remaining | ☐ | New | ☐ | Delete |
| SANDRA L SEARS | ☐ | Existing/Remaining | ☐ | New | ☒ | Delete |
| WILLIAM J SEARS | ☐ | Existing/Remaining | ☐ | New | ☒ | Delete |

## Addendum to Certificate of Authority

| Original Certificate of Authority Dated: | Addendum to Certificate of Authority Dated: |
|---|---|
| | 10/07/2011 |

Each person signing in the "Certified/Agreed To" section below:

- directs the Bank that the additional Authorized Signers shall have all of the authority granted to the persons identified as Authorized Signers on the Certificate of Authority, including without limitation the authority to instruct the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services;
- directs the Bank to discontinue acting on the instructions of any person who has been deleted as an Authorized Signer;
- acknowledges that these modifications become effective only after this Addendum has been received by the Bank and the Bank has had a reasonable opportunity to act on it; and
- certifies that the account owner has taken all action under its organizational documents, if any, including passage of resolutions by its board of directors, trustees, or other governing body, required to make these modifications and to authorize the undersigned to execute and deliver this Addendum


2W02-000451763962-01

BBG5351 (8 07 SVP)
© 2007 Wells Fargo Bank, N.A. All rights reserved.

Page 1 of 2
Wells Fargo Confidential

SEC-WF-P-0000007

Attachment 16
Page 1 of 2

**Certified/Agreed To**

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| SCOTT DITTMAN | WORKER |

Owner/Key Individual 1 Signature



☒ Submit manually
☐ Signature not required

Date
10/07/2011

SEC-WF-P-0000008

Attachment 16
Page 2 of 2

221
Direct - Sears

1    A.   Yes, sir.

2    Q.   Do you know who signed that letter of opinion?

3    A.   Not off the top of my head without looking at it.

4    Q.   And who are you sending it to?

5    A.   Sending it to Ms. Joanna DiBella and I am carbon

6    copying Scott Dittman.

7    Q.   Could I have Government Exhibit 77.

8         Do you recognize Government Exhibit 77?

9    A.   Hold on one second, sir.  Yes, I do.

10   Q.   Okay.  Can you describe to me what Government Exhibit

11   77 is.

12   A.   This is an e-mail from myself using the Vertifresh

13   e-mail.  It was sent Thursday, April 11th, 2013.  It's to

14   Joanna at Pacific Stock Transfer, carbon copy to Scott

15   Dittman at FusionPharm.  The subject is "Meadpoint Venture

16   Partners FSPM."  Attachment, "J DiBella doc."

17   Q.   What are you telling Ms. DiBella in this e-mail?

18   A.   I'm asking her to find all the documentation that we

19   spoke about the week prior.

20   Q.   Okay.  And why are you sending all this documentation

21   to Ms. DiBella?

22   A.   This looks like a note and a note to convert.

23   Q.   Do you know what note it is?

24   A.   It would be the Meadpoint Venture Partners note, sir.

25   Q.   And essentially Meadpoint, that's your company; is

222

Direct - Sears

1    that correct?

2    A.    Yes, sir.

3    Q.    And essentially did your company loan FusionPharm

4    money?

5    A.    Originally the notes came from myself or one of my

6    companies, and when it was time to go ahead back in 2011, I

7    believe it was, to start to rectify the books of the

8    company, that was the trip that Mr. Jean-Pierre came out

9    on, I believe it was September or October --

10              MR. SIBERT:  Your Honor, I'm going --

11              THE WITNESS:  I can't just --

12              THE COURT:  Hold on.  Hold on.

13              THE WITNESS:  -- give you bits and pieces.  You

14    got to --

15              THE COURT:  Hold on.

16              THE WITNESS:  Sorry.

17              MR. SIBERT:  I'm going to ask that the witness is

18    not being responsive to the question.

19              THE COURT:  All right.  We've gone through this

20    before, Mr. Sears.

21              THE WITNESS:  Yes, sir.

22              THE COURT:  Please answer the question that's

23    posed and -- why don't we do this:  Why don't we take our

24    afternoon break.  Mr. Sibert, you can think about how you

25    might want to rephrase that question.

1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO
 2
       Criminal Action No. 16-cr-0301-WJM-1
 3
       UNITED STATES OF AMERICA,
 4
       Plaintiff,
 5
       vs.
 6
       WILLIAM J. SEARS,
 7
       Defendant.
 8
       -----------------------------------------------------------
 9
                            REPORTER'S TRANSCRIPT
10                             (Change of Plea)

11     -----------------------------------------------------------

12          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13     Judge, United States District Court for the District of

14     Colorado, commencing at 10:04 a.m., on the 14th day of

15     November, 2016, in Courtroom A801, United States

16     Courthouse, Denver, Colorado.

17
                                APPEARANCES
18
            KENNETH M. HARMON and TONYA S. ANDREWS, Assistant U.S.
19     Attorneys, 1801 California Street, Suite 1600, Denver,
       Colorado 80202, appearing for the plaintiff.
20
            FREDERIC M. WINOCUR, Ridley McGreevy & Winocur, P.C.,
21     303 16th Street, Suite 200, Denver, Colorado 80202,
       appearing for the defendant.
22

23                  MARY J. GEORGE, FCRR, CRR, RMR
                  901 19th Street, Denver, Colorado 80294
24           Proceedings Reported by Mechanical Stenography
                   Transcription Produced via Computer
25
```

```
 1                       P R O C E E D I N G S

 2          (Call to order of the court at 10:04 a.m.)

 3              THE COURT:  We're on the record in criminal case

 4      No. 16 cr 301, defendant 1, United States of America versus

 5      William Sears.  I'll take appearances of counsel.

 6              MR. HARMON:  Good morning, Your Honor.  Kenneth

 7      Harmon on behalf of the United States.  Seated to my left

 8      is Assistant United States Attorney Tonya Andrews, who's

 9      cocounsel -- one of the cocounsels on the case.  To my

10      right are the Government's case agents, Special Agent Kate

11      Funk with the FBI and Special Agent Michael Godson with the

12      Internal Revenue Service's Criminal Services Investigation.

13              THE COURT:  Good morning to all four of you.

14              MR. WINOCUR:  Good morning, Your Honor.  Frederic

15      Winocur, registration No. 22112.  Appearing with me is

16      William Sears.  We are ready to proceed to hearing this

17      morning.

18              THE COURT:  All right.  Good morning to the two of

19      you.

20              THE DEFENDANT:  Good morning.

21              THE COURT:  All right.  Mr. Winocur, will you and

22      your client please approach the lectern.

23              Ms. Hansen, please administer the oath to the

24      defendant.

25              COURTROOM DEPUTY:  Please raise your right hand,
```

1    sir.

2         (Defendant sworn in)

3              THE COURT:  The record reflects that Mr. Sears was

4    charged by an information dated the 15th of September of

5    this year.  He was arraigned the same day, at which time he

6    entered a plea of not guilty to Counts 1 and 2 of the

7    information, and he denied the criminal forfeiture

8    allegations in that information.  The following day the

9    defendant filed with this Court a notice of disposition and

10   he requested that this matter be set for a change of plea

11   hearing.

12             According to the plea agreement reached between

13   the parties, the defendant wishes to enter a guilty plea to

14   Counts 1 and 2 of the information, charging a violation of

15   18 United States Code Section 371, and 26 United States

16   Code Section 7206(1).  In addition, the defendant agrees to

17   admit the forfeiture allegation in the information and

18   confess forfeiture of all items the Government has in its

19   possession and as to which the defendant can make any

20   claim.

21             I have before me Court Exhibit 1, which is a plea

22   agreement of the parties.  Voluminous plea agreement.  Has

23   appended to it Exhibits A and B.  Exhibit A is the

24   information and Exhibit B -- Mr. Harmon how do we

25   succinctly summarize Exhibit B for the record?

1          MR. HARMON:   That was a letter agreement between

2     the parties that set forth the operative terms for this

3     plea agreement, that was superseded by this plea agreement.

4          THE COURT:   Okay.   The agreement, itself -- the

5     plea agreement, itself, Exhibit 1, on page 47, has been

6     dated and signed by the defendant, the attorney for the

7     defendant, and the Assistant United States Attorneys.   And

8     I note that it -- at the top of that page -- let's see --

9     all right, so not the top of the page, the bottom of the

10    page, Exhibit -- footnote, rather, 40 makes reference to

11    the plea agreements superseding the letter agreement, which

12    is appended as Exhibit B.

13         All right.   Also before me is Court Exhibit 2,

14    which is the Statement by Defendant in Advance of Plea of

15    Guilty.   Exhibit No. 2 has been dated and signed by the

16    defendant as well as the defendant's attorney.

17         All right.   Mr. Sears, do you understand that you

18    are under oath and that if you answer any of my questions

19    falsely, your answers may later be used against you in a

20    separate prosecution for perjury?

21         THE DEFENDANT:   I do, sir.

22         THE COURT:   Do you understand that you have the

23    right to remain silent and not to answer any of my

24    questions?

25         THE DEFENDANT:   I do, Your Honor.

```
 1              THE COURT:  Do you give up your right to remain
 2     silent in order to answer the questions I need to ask you
 3     at this hearing?
 4              THE DEFENDANT:  I understand that.
 5              THE COURT:  The question is, do you give up your
 6     right to remain silent in order to answer the questions I
 7     need to ask you at this hearing?
 8              THE DEFENDANT:  Yes, I do.  Sorry.
 9              THE COURT:  All right.  What is your true,
10     correct, and full name?
11              THE DEFENDANT:  William Joseph Sears.
12              THE COURT:  How old are you?
13              THE DEFENDANT:  50 years old.
14              THE COURT:  What level of schooling have you
15     completed?
16              THE DEFENDANT:  High school.
17              THE COURT:  Can you read and write in the English
18     language?
19              THE DEFENDANT:  Yes, sir.
20              THE COURT:  Are you now under the influence of any
21     medication, drug, or alcohol?
22              THE DEFENDANT:  I am not.
23              THE COURT:  Is there anything about the way you
24     feel right now that prevents you from understanding what is
25     happening at this hearing?
```

1           THE DEFENDANT:  No.

2           THE COURT:  All right.  Based on the statement of

3      the defendant and my observations, I find that he is

4      competent to proceed with this hearing.

5           Now, Mr. Sears, have you read and discussed the

6      charge to which you will be pleading guilty with your

7      attorney?

8           THE DEFENDANT:  Yes, I have, Your Honor.

9           THE COURT:  Do you understand the charge to which

10     you will be pleading guilty?

11          THE DEFENDANT:  Yes, I do, Your Honor.

12          THE COURT:  All right.  Mr. Winocur, will you

13     please outline for the record the important terms of the

14     parties' plea agreement.

15          MR. WINOCUR:  Mr. Sears will be pleading guilty to

16     Count 1, which is 18 U.S.C. 371, conspiracy to defraud

17     United States, in particular the Securities and Exchange

18     Commission.  He will also be entering a plea to Count 2, 26

19     U.S.C. 7206(1), which is filing a false tax return.

20          Does the Court wish for me to outline the

21     sentencing -- terms of the sentencing agreement?

22          THE COURT:  Well, just what are the -- from your

23     perspective.  And I'll ask the Government if the Government

24     has anything to add to what you believe are the important

25     terms of the plea agreement.  First of all, is there a

1    waiver in this agreement?

2            MR. WINOCUR:  There is, Your Honor, that's

3    correct.  There also is an appellate waiver and collateral

4    attack --

5            THE COURT:  Okay.  So we'll talk about that later

6    because I take those waivers very seriously and I inquire

7    of those later in the hearing, so we separate that out and

8    I make sure that the defendant understands fully what he is

9    doing with respect to an appellate and collateral challenge

10    waiver.

11            Beyond that, are there any other terms of the

12    agreement that you would like to point out for the record?

13            MR. WINOCUR:  Your Honor, we would agree with the

14    terms as set out, as the Court noted in this fairly

15    voluminous plea agreement.  I wouldn't want to leave out

16    anything in my summary.

17            THE COURT:  Well, most of the volume is the

18    stipulated facts.  I'm not talking about the facts, I'm

19    talking about the terms of the agreement.

20            MR. WINOCUR:  Your Honor, that's correct.  Mr.

21    Sears is also agreeing to forfeit all funds that are

22    presently seized as part and parcel of this plea agreement.

23    In addition, whatever restitution is owed to the IRS will

24    also be paid from those funds as set out in the plea

25    agreement.  Mr. Sears understands that he is cooperating

8

1      rather extensively and will continue to cooperate

2      extensively with the United States Government.

3            And pending his -- the Government's view of his

4      cooperation, the sentencing range in this case will either

5      be between 60 months and 96 months, between five years and

6      eight years.  The Government's position at sentencing will

7      rest entirely on how Mr. Sears continues to perform between

8      now and that time.  I think those are the main parts of the

9      plea agreement, Your Honor.

10            THE COURT:  And when you mean "perform," you mean

11      both how he continues to cooperate with the Government and

12      also comply with the pretrial --

13            MR. WINOCUR:  Of course.

14            THE COURT:  -- bond requirements set upon him by

15      the magistrate judge?

16            MR. WINOCUR:  That is correct, Your Honor.  Those

17      are the conditions.

18            THE COURT:  Does the Government have anything to

19      add to the record as to the important terms of the plea

20      agreement?

21            MR. HARMON:  Just in terms of supplementation,

22      Your Honor, the plea agreement makes clear that the parties

23      take the position that the guidelines, but for the

24      statutory caps, would have exceeded eight years; however,

25      because it's a two-count information, the effective

1    guideline range is 96 months.  The Government makes clear

2    in the plea agreement that that cap is in consideration

3    for -- in consideration for -- partially, at least, for Mr.

4    Sears' cooperation to date.  And so the Government will

5    then assess, going forward, what its position is as to

6    whether there should be a 5K1 motion to reduce the

7    effective guidelines below the 96 months.  It will depend

8    upon the Government's discretion and assessment and we will

9    state our position at the time of sentencing.

10           However, the defendant is free to make an argument

11   for whatever sentence is lawful as long as it's not

12   inconsistent with the facts, up to but not below the

13   five -- five-year floor.

14           So the defendant is agreeing basically not to seek

15   a sentence below five years.  So that's the effective range

16   here.

17           THE COURT:  Okay.

18           MR. HARMON:  The Government may or may not make a

19   motion, I think all parties have the hope that the

20   cooperation will continue, and it will be substantial and

21   we will be back here.  In any event, whether a motion is

22   made or not, the Court will be presented with a guideline

23   sentence -- an effective guideline sentence of 96 months

24   and the floor of 60 months.  And where the Court goes in

25   that range will be determined in part by whether the

1    Government makes a 5K1 motion and its assessment of this

2    substantial assistance, or the assistance, and whatever

3    arguments the defendant wants to make to convince the Court

4    that there should be a variant sentence below the 96

5    months.

6                THE COURT:  Below the downward departure should

7    the Government choose to seek one.

8                MR. HARMON:  Well, even below the 96 months.  If

9    the Government does not seek to do a 5K1.1, there's still a

10   96-month sentence.  This defendant is free to make whatever

11   arguments he wants as long as they're not inconsistent with

12   the facts that there should be a variant sentence below the

13   96 months, but he is foreclosed under this plea agreement

14   for asking for anything below 60 months.

15               So he goes into this plea agreement and he goes to

16   sentencing with the understanding that he is agreeing to a

17   sentence of at least 60 months imprisonment.

18               THE COURT:  Okay.  I understand.  So the statutory

19   maximum right now for Count 1 is five years and Count 2 is

20   three years, so the statutory maximum as the information is

21   now written is the eight years, or 96 months, were I to

22   impose sentence consecutive.

23               MR. HARMON:  That's correct.

24               THE COURT:  All right.

25               MR. HARMON:  And that's what the guidelines teach

1      in the case of a guideline range that otherwise would have

2      been above those statutory maxes, that's what the guideline

3      range defaults to.  The only other thing I'll add, Your

4      Honor, is that there are some occupational restrictions on

5      supervised release that the parties have agreed to.

6      They're set forth in the plea agreement.

7              THE COURT:  All right.  Are those in effect

8      pretrial, or --

9              MR. HARMON:  No, no --

10             THE COURT:  -- or presentencing?

11             MR. HARMON:  They will be addressed by the

12     probation office in the presentence, but they are -- they

13     are restrictions on what the defendant can do once he goes

14     on supervised release.  Of course subject to the Court's

15     endorsement.

16             Basically this is a securities fraud case --

17             THE COURT:  No, I understand that.  I'm asking are

18     there any professional restrictions now in place prior to

19     sentencing --

20             MR. HARMON:  No.

21             THE COURT:  -- that he has agreed to do?

22             MR. HARMON:  No.  Well, he's -- I believe he's

23     agreeing -- not part of the plea agreement, he's agreeing

24     now in this limited time not to be involved in the

25     securities industry.  There's a parallel civil -- there's a

1    parallel SEC action that will ultimately foreclose him from

2    being in the securities industry.

3            THE COURT:  Okay.

4            MR. WINOCUR:  That's true, Your Honor.  Setting

5    aside that Mr. Sears is on unsupervised pretrial release at

6    the moment, the only condition is he surrender his

7    passport.  He's on an unsecured PR bond.  He did execute

8    an -- there has been an execution of -- a parallel

9    settlement with the SEC that would preclude Mr. Sears from

10   operating in that industry as a fiduciary or involved in

11   any capacity with a publicly traded company as an officer

12   or director.

13           THE COURT:  All right.

14           MR. HARMON:  That's all I have.

15           THE COURT:  Okay.  Thank you, counsel.  All right,

16   Mr. Sears, back to you.  Have you read Court Exhibits 1 and

17   2?

18           THE DEFENDANT:  Yes, I have, Your Honor.

19           THE COURT:  Have you read them carefully?

20           THE DEFENDANT:  Yes, I have, Your Honor.

21           THE COURT:  Have you discussed these documents

22   with your lawyer?

23           THE DEFENDANT:  In detail, sir, yes.

24           THE COURT:  All right.  Has your lawyer answered

25   your questions regarding Exhibits 1 and 2?

1          THE DEFENDANT:  Yes, he has.

2          THE COURT:  When you signed Exhibits 1 and 2, did

3     you do so voluntarily?

4          THE DEFENDANT:  Yes, I did, sir.

5          THE COURT:  Now, the plea agreement at pages 12

6     through 37 contain a significant number of stipulated

7     facts.  You just told me that you -- when you reviewed

8     Exhibit 1, that you reviewed those facts carefully, and so

9     I'm not going to ask you to go through those now because it

10    will take a long time, it's 25 some pages, so I'm relying

11    on your representation to me that you've already reviewed

12    these carefully.

13          So I'm going to proceed to ask you -- or, first,

14    let me state that the way these plea agreements are

15    structured, the facts that you've reviewed at pages 12

16    through 37 are the facts that the Government believes it

17    could prove at trial.  And so when you enter into this plea

18    agreement, you are admitting these facts and I will treat

19    them as true for purposes of considering your plea and for

20    purposes of sentencing.

21          So do you agree that the facts that you've

22    reviewed at pages 12 through 37 of the plea agreement are

23    true?

24          THE DEFENDANT:  Yes, I do, Your Honor.

25          THE COURT:  Is there any inaccuracy in those facts

1        you'd like to correct at this time?

2                THE DEFENDANT:  No, Your Honor.

3                THE COURT:  All right.  And admittedly it will

4        probably be an abbreviated form, can you summarize for me

5        what it is that you did with respect to the counts you're

6        pleading guilty to.  And I'm -- just so you know, I ask

7        defendants to do that so that I know that they understand

8        what it is that they're pleading guilty to.

9                THE DEFENDANT:  Your Honor, I was involved in the

10       creation of a convertible promissory note that was

11       backdated.  In conjunction with that convertible promissory

12       note, I failed to properly disclose my affiliation status

13       which enabled me to have access to free trading securities.

14       I then liquidated those free trading securities into the

15       public markets for a profit and failed to report that

16       profit on my personal income tax, sir.

17               THE COURT:  All right.  And did you do so in

18       conspiracy with at least one other person to engage in

19       those acts?

20               THE DEFENDANT:  Indeed, sir.

21               THE COURT:  All right.  And you knowingly and

22       voluntarily participated in that conspiracy?

23               THE DEFENDANT:  Yes, sir.

24               THE COURT:  And you were aware of the objective of

25       that conspiracy?

```
 1              THE DEFENDANT:  Yes, sir.
 2              THE COURT:  And what was the objective?
 3              THE DEFENDANT:  To obtain free trading securities
 4      and be able to sell them into the market, sir.
 5              THE COURT:  All right.  Both you and your
 6      coconspirator acted in a manner for your shared mutual
 7      benefit within the scope of the conspiracy charged?
 8              THE DEFENDANT:  Yes, sir.
 9              THE COURT:  With respect to Count 2 and the
10      statements that you made on your -- the false statements,
11      as you've just characterized them, on your tax returns, you
12      knew them to be false at the time you made them on the
13      return; is that correct?
14              THE DEFENDANT:  Yes, sir.
15              THE COURT:  And you did so -- you made that false
16      statement willfully and with the intent to violate a known
17      legal duty?
18              THE DEFENDANT:  Yes, sir.
19              THE COURT:  All right.  All right, counsel, for
20      the factual basis, may the Court rely on the stipulated
21      facts in the plea agreement?
22              MR. HARMON:  From the Government's perspective,
23      yes, Your Honor.
24              MR. WINOCUR:  Yes, Your Honor.
25              THE COURT:  All right.  Thank you, counsel.
```

1           All right, Mr. Sears, I'm advising you that you

2    have the following constitutional rights you will be giving

3    up if you plead guilty.  You have the right to plead not

4    guilty to any offense charged against you.  You have the

5    right to a speedy and public trial.  You have the right to

6    a trial by a jury of 12 persons whose verdict must be

7    unanimous; and at trial you would be presumed innocent and

8    the Government would have to prove your guilt beyond a

9    reasonable doubt.

10           You have the right to the assistance of legal

11   counsel for your defense throughout these proceedings even

12   if you do not enter a plea of guilty.  You have the right

13   with your lawyer to confront and cross-examine all

14   witnesses at trial and to challenge all evidence presented

15   against you.

16           At trial, you have the right to testify yourself

17   on your own behalf, but you also have the privilege against

18   self-incrimination.  That means you have the right not to

19   testify or incriminate yourself in any way.  By pleading

20   guilty, you're giving up that right and you are

21   incriminating yourself.  If you went to trial and were

22   convicted, you'd have the right to appeal both your

23   conviction and your sentence.  Do you understand these

24   rights?

25           THE DEFENDANT:  I do, Your Honor.

1          THE COURT:  Do you understand that if your plea is
2     accepted, you will be incriminating yourself, you will be
3     giving up your right to a jury trial and most of the other
4     rights I've just described?
5          THE DEFENDANT:  I do, Your Honor.
6          THE COURT:  Do you give up those rights?
7          THE DEFENDANT:  I do, Your Honor.
8          THE COURT:  All right.  Mr. Winocur, will you
9     please state for the record the scope of your client's
10    limited waiver of his appellate and collateral challenge
11    rights.  And basically since this is your first change of
12    plea in front of me, what I'm getting at and what I want to
13    get on the record are the exceptions to the appellate and
14    collateral challenge waivers.
15         MR. WINOCUR:  Thank you, Your Honor.  Mr. Sears
16    understands that this agreement contains a waiver of his
17    right to appeal or collaterally attack the sentence.  The
18    only exceptions with respect to appealing the sentence
19    would be if the Court imposed a sentence that exceeded the
20    96-month statutory maximum.
21         He's also agreed to waive his right to
22    collaterally challenge the prosecution, conviction, and
23    sentence, and the manner in which it was determined.  Any
24    collateral attack.  And the exceptions there would be
25    unless there's an explicitly retroactive change in the

1     applicable guidelines or sentencing statute; or if there's

2     a claim that he was denied effective assistance of counsel;

3     and, thirdly, if there's a claim of prosecutorial

4     misconduct.

5             Short of those exceptions, he is waiving his right

6     to collaterally challenge this conviction.

7             THE COURT:  All right.  Mr. Sears, do you

8     understand and do you agree to the limitations contained in

9     your plea agreement on your right to appeal the sentence I

10    will impose in this case or the manner in which I will

11    determine it?

12            THE DEFENDANT:  I do, Your Honor.

13            THE COURT:  Do you understand and do you agree to

14    the limitation that is contained in your plea agreement on

15    your right to appeal or challenge this prosecution or your

16    conviction?

17            THE DEFENDANT:  I do, Your Honor.

18            THE COURT:  All right.  All right, Mr. Harmon,

19    will you please inform the defendant of the charges to

20    which he will be pleading guilty, please state the elements

21    of the charges, the maximum sentence, and maximum fine.

22            MR. HARMON:  Thank you, Your Honor.

23            Mr. Sears, in Count 1, you are charged with

24    conspiring with Scott Dittman and other people, both known

25    and unknown, to do two things:  To defraud the United

1    States and one of its agencies, the Securities and Exchange

2    Commission, and to commit specific offenses against the

3    United States, including securities fraud, a statutory

4    provision of the Securities Act of 1933, mail fraud and

5    wire fraud in violation of Title 18 United States Code

6    Section 371.

7              In order to be found guilty of that offense, if

8    you were to proceed to trial, the Government would have to

9    establish the following by evidence beyond a reasonable

10   doubt:  First, that you agreed with at least one other

11   person to violate the law; second, one of the

12   co-conspirators alleged in this conspiracy engaged in at

13   least one of the overt acts -- at least one overt act

14   furthering the conspiracy's objective; third, that you knew

15   the essential objective of the conspiracy; fourth, the

16   defendant knowingly -- you knowingly and voluntarily

17   participated; and, fifth, that there was interdependence

18   among the members of the conspiracy, that is, the members

19   in some way or manner intended to act together for their

20   shared mutual benefit within the scope of the charged

21   conspiracy.

22             With respect to the second count, Mr. Sears, you

23   are charged -- you are charged with filing a -- willfully

24   making and subscribing to -- eventually filing a U.S.

25   income tax return on 1040 EZ for the year 2011 which you

1     verified through a written declaration under penalty of

2     perjury, and you are alleged to have known that -- and

3     believed that not every part of that filing was true in

4     material respect -- true and correct, in particular your

5     representation that your total adjusted gross income for

6     the year was $7500.

7              It alleges that you then and there well knew that

8     your adjusted income was significantly higher.  You're

9     alleged to have done this willfully.  And this is alleged

10    to be in violation of Title 26 United States Code Section

11    7206(1).

12             In order to be found guilty of that charge, were

13    the Government to proceed to trial with you, we would need

14    to prove beyond a reasonable doubt the evidence that would

15    show that you signed or subscribed to the income tax return

16    in question, that contained a written declaration made

17    under the penalties of perjury; the second element, that

18    the return contained a false statement as alleged in the

19    charging document and information; third, that you knew the

20    statement was false; fourth, that you acted willfully, that

21    is, with the intent -- the voluntary intent to violate a

22    known legal duty; and, fifth, that the statement was

23    material.

24             THE COURT:  All right.  Did you state the maximum

25    sentence --

```
 1              MR. HARMON:  Oh, I'm sorry, Your Honor, I forgot
 2     that --
 3              THE COURT:  The maximum sentence, max --
 4              MR. HARMON:  Sure.
 5              THE COURT:  -- and maximum fine.
 6              MR. HARMON:  With respect to Count 1, sir, the
 7     maximum sentence is a term of not more than five years
 8     imprisonment, not more than a $250,000 fine, could be both,
 9     followed by three years of not more than three years of
10     supervised release, a $100 special assessment fee, and
11     restitution.
12              With respect to Count 2, the maximum term of
13     imprisonment is three years, a fine of not more than
14     $250,000, and you could be assessed both, the cost of
15     prosecution as well.  There would be a maximum supervised
16     release term of not more than three years and a special
17     assessment fee of $100.
18              THE COURT:  Thank you, Mr. Harmon.
19              Mr. Sears, do you understand the consequences of
20     your plea including the maximum sentence that could be
21     imposed upon you in this case?
22              THE DEFENDANT:  I do, Your Honor.
23              THE COURT:  All right.  Do you understand that I
24     can impose a sentence that is more severe or less severe
25     than that recommended or set forth in your plea agreement?
```

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  Do you understand that even if you're

3    disappointed with the sentence that I do impose, that will

4    not be a basis for you to withdraw your guilty plea?

5          THE DEFENDANT:  I do, Your Honor.

6          THE COURT:  Do you understand that when you're

7    released from prison, some of the conditions of your

8    release to which you may be subject include that you may

9    not commit any new federal, state or local crime and you

10   may not possess any illegal substances?

11         THE DEFENDANT:  I do, Your Honor.

12         THE COURT:  Do you understand that if you violate

13   any conditions of supervised release, you may be returned

14   to prison for all or part of the remaining term of

15   supervised release?

16         THE DEFENDANT:  I do, Your Honor.

17         THE COURT:  Are you presently on parole,

18   probation, or supervised release as the result of a

19   conviction of any other crime?

20         THE DEFENDANT:  No, sir, I am not.

21         THE COURT:  Do you understand you're pleading

22   guilty today to a felony offense?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Do you understand that conviction of a

25   felony offense may deprive you of certain civil rights,

1        including the right to possess a firearm, the right to

2        vote, the right to hold public office, and the right to

3        serve on a jury?

4                    THE DEFENDANT:  I do, Your Honor.

5                    THE COURT:  Do you understand that in the federal

6        system, parole has been abolished and although you may earn

7        good time, depending on your behavior if you are sent to

8        prison, you will not be released on parole?

9                    THE DEFENDANT:  I do understand that.

10                   THE COURT:  Has anyone threatened you or your

11       family in order to force you to plead guilty in this case?

12                   THE DEFENDANT:  No, Your Honor.

13                   THE COURT:  Are you satisfied with the

14       representation your attorney's provided to you?

15                   THE DEFENDANT:  I am, Your Honor.

16                   THE COURT:  Have you understood everything that I

17       have told you or asked of you today?

18                   THE DEFENDANT:  I have, sir.

19                   THE COURT:  Having in mind all that we have

20       discussed regarding your plea of guilty, the rights you

21       will be giving up, and the maximum sentence you may

22       receive, do you still wish to plead guilty?

23                   THE DEFENDANT:  I do, Your Honor.

24                   THE COURT:  Very well.  Other than arraigning the

25       defendant on Counts 1 and 2 of the information, do counsel

24

1    agree the Court has complied with the requirements of

2    Rule 11?

3           MR. HARMON:  Yes, Your Honor.

4           MR. WINOCUR:  Yes, Your Honor.

5           THE COURT:  Thank you, counsel.  All right.  Mr.

6    Harmon, will you please arraign the defendant on Counts 1

7    and 2 of the information as well as the criminal forfeiture

8    allegation of the information.

9           MR. HARMON:  Mr. Sears, do you waive formal

10   reading to this information?

11          THE DEFENDANT:  Excuse me?

12          MR. HARMON:  Do you waive formal reading to the

13   information, for me to read it word-for-word?

14          THE DEFENDANT:  Yes.

15          MR. HARMON:  With respect to Count 1, the

16   conspiracy counts, which I have summarized previously, how

17   do you now plead, sir?

18          THE DEFENDANT:  Guilty.

19          MR. HARMOM:  With respect to Count 2, the count

20   charging you with filing a false income tax return, how do

21   you now plead, sir?

22          THE DEFENDANT:  Guilty.

23          MR. HARMON:  With respect to the notice of

24   forfeiture allegation -- the forfeiture allegations set

25   forth in the information, do you admit those allegations

1      and agree to the forfeiture of those assets?

2                THE DEFENDANT:  I do, sir.

3                THE COURT:  Thank you, counsel.  The Court makes

4      the following findings of fact and conclusions of law.  In

5      the matter of the United States of America versus William

6      J. Sears, case No. 16 cr 301, defendant No. 1, the

7      defendant's fully competent of entering an informed plea.

8      He's aware of the nature of the charge and the consequences

9      of that plea.

10               The defendant has thoroughly discussed his plea

11     agreement with his attorney.  The defendant has been

12     represented throughout the course of this case by competent

13     counsel with whom he has no objection or complaint.  The

14     defendant has read and he understands each term of his plea

15     agreement, including his limited waiver of his appellate

16     and collateral challenge rights.

17               The defendant has knowingly and voluntarily signed

18     Court Exhibits 1 and 2.  The defendant has knowingly and

19     voluntarily entered a plea of guilty to Counts 1 and 2 of

20     the information and he has admitted the forfeiture

21     allegation in that information, with a full understanding

22     of the factual basis and essential elements of the charges.

23               The defendant's guilty plea is not the result of

24     mistake or coercion.  The defendant's guilty plea is not

25     the result of any representations or promises made to him

1     by anyone except as to those matters disclosed in open

2     court or included in his plea agreement.

3          The defendant understands each of his legal rights

4     in this case.  The defendant understands that the Court is

5     not bound by any sentence recommended in his plea agreement

6     and if the Court does not follow any such recommendation,

7     the defendant may not withdraw his guilty plea.

8          The defendant understands the maximum sentence of

9     imprisonment and maximum fine and terms of supervised

10    release that the Court may impose under the terms of his

11    plea agreement.  And, finally, the plea is supported by an

12    independent factual basis containing each of the essential

13    elements of the offenses.

14         It is therefore ordered that Court Exhibits 1 and

15    2 are accepted and admitted.  The plea as made in open

16    court today is accepted, and the defendant is adjudged

17    guilty of violating 18 United States Code Section 371 and

18    26 United States Code Section 7206(1), and he has admitted

19    the forfeiture allegation in the information.

20         Sentencing hearing is hereby set for Tuesday,

21    April 25th, 2017, at 10:30 a.m.

22         Earlier at ECF No. 37, I ordered counsel to be

23    prepared to discuss the application of Section 3143.  Mr.

24    Harmon.

25         MR. HARMON:  Thank you, Your Honor.  We believe

1      that the defendant should be allowed to continue at liberty

2      under the terms of his pretrial release, which is personal

3      recognizance.  We believe that the terms that -- that there

4      is clear and convincing evidence to show that the defendant

5      is not a flight risk or a danger to others.  In particular,

6      this defendant has known since about May of 2014 when a

7      warranted search was executed on the business premises of

8      FusionPharm, he's known basically of this investigation, he

9      has been negotiating a resolution of this case in earnest

10     since -- since basically earlier this year, January of this

11     year, so he has known.

12             Had he wanted to structure his affairs to flee or

13     avoid prosecution, he would have very well been able to do

14     it by now.

15             He is continuing to cooperate in ongoing

16     investigation which gives him an additional incentive to

17     comply with the terms of this plea agreement.  His crime is

18     not of a violent nature and we don't see any evidence from

19     our investigation of him having any violent propensities or

20     any indication that he is in a position to harm or inclined

21     to harm anybody.

22             THE COURT:  All right.  Thank you for that.  Mr.

23     Winocur, do you wish to be heard on this?

24             MR. WINOCUR:  Does the Court -- the Court prefer

25     some additional supplemental argument?  I will certainly be

1    happy to give it --

2          THE COURT:  You don't have to, I'm just giving you

3    the opportunity if you wish to be heard on this.

4          MR. WINOCUR:  The only thing I'll add by way of

5    brief summary, Your Honor, I agree with Mr. Harmon's

6    comments.  The Court may note the date of the execution of

7    the actual plea agreement was back in September on the date

8    of advisement.  I think when that statutory scheme

9    technically imposing a presumption of detention between the

10   time of plea and sentencing in certain cases, I think that

11   contemplates that in many cases the defendant appears for

12   advisement and they think the future is rosy, and when that

13   changed, perhaps there's more of a risk, that's more

14   tenuous.

15         Here again, this was a pre-indictment disposition

16   that has been worked on over two years with Mr. Harmon's

17   office, the SEC, the IRS.  Mr. Sears executed the plea

18   prior to the advisement.  He has been complying with the

19   Government, and the Court will hear more about this, I

20   don't want to belabor the point now.

21         The undercover operation in this case was

22   extensive, to say the least.  This was a situation where

23   Mr. Sears actually got on the plane and flew to Florida and

24   was wired and was instrumental in the apprehension and

25   take-down of an individual that was previously an

1    international fugitive, so he was working with all layers

2    of Government to make that happen.

3          He continues to cooperate in this matter.  There

4    hopefully will be soon a grand jury where he will be

5    testifying in that matter.

6          The bottomline is, Your Honor, the Court sees at

7    the time of sentencing there is a significant range in this

8    case.  It is only to Mr. Sears' benefit that he continues

9    to stay out of trouble and continue to cooperate because he

10   knows by doing that, they will work down towards the bottom

11   of the range.

12         I think for those reasons in particular, he

13   certainly is not a flight risk and a danger to the

14   community.  I'll say one other thing just by way of a

15   supplement.  There continues to be -- even though he's not

16   on pretrial supervision that we felt was necessary at the

17   time of the advisement, I don't think that's necessary now.

18   There continues to be ongoing close communication between

19   Mr. Sears and the Government.  They are -- there's frequent

20   interaction.  I think they are actually monitoring -- it's

21   not a wiretap, but monitoring the pen registry, certain

22   phone calls that goes in and out, market travel.

23         Mr. Sears was in as recently as two weeks ago

24   disclosing information that he had come into possession in

25   the community, which may even result in a further

1    investigation.  That's still out there.  And so in order

2    for Mr. Sears to really get the benefit of his bargain, he

3    really does need to stay out in the community.  Certainly

4    it is not contemplated that he would be taken into custody

5    at this time.

6              If the Court wants to hear any further argument, I

7    can --

8              THE COURT:  Has there been any discussion as to

9    any restrictions?  It's not in the agreement, but at least

10   an informal agreement as to your client and the

11   codefendant, there being a restriction on their

12   communication or being in physical contact, anything along

13   those lines?

14             MR. WINOCUR:  There has not been that restriction.

15   They are brothers-in-law.  They have been in communication

16   throughout the course of this case.

17             THE COURT:  Right.

18             MR. WINOCUR:  Mr. Sears wanted to proceed by way

19   of this disposition this morning, again with the

20   understanding that we could push sentencing off until --

21             THE COURT:  Right.  But your -- the codefendant is

22   now the -- the temporal alignment of these two defendants

23   is now getting further and further apart because we are

24   having a series of problems with counsel for Mr. Dittman,

25   and so his case has fallen further and further behind.

1          I'm just -- I'll ask Mr. Harmon, is there any

2     consideration from the Government about consideration

3     between the defendant --

4          MR. HARMON:  Well, the short answer is yes and we

5     have discussions with Mr. Sears about how he should not be

6     talking to prospective witnesses or targets except on

7     the -- with the understanding and direction of counsel --

8     of Government counsel and the agents, at least as it goes

9     to -- at least as it goes with respect to targets.

10          Mr. Sears is Mr. Dittman's brother-in-law.  It is

11     our understanding, and it was a matter discussed at the

12     initial appearance that any business that they had has now

13     been wound down, so there should be really no reason that

14     they should be discussing business matters, and really no

15     reason that they should be discussing this case as well,

16     and this is probably an appropriate time to admonish the

17     defendant of that.

18          I will say one other thing, Your Honor, that

19     the -- although the two cases got out of alignment, one of

20     the reasons we appended the letter, so that the Court could

21     understand this was a package resolution, and the letter

22     agreement -- although the plea agreement does not state

23     that explicitly, the letter agreement makes it clear that

24     the deal with respect to Mr. Sears wasn't going to be

25     offered without a deal being accepted with respect to Mr.

1    Dittman and vice versa, so that -- by the time we got to

2    this plea agreement, Mr. Dittman's case was already

3    resolved, it was in the same stage, it -- we have the same

4    executed agreement, it's an exhibit to this Court under Mr.

5    Dittman's case, you can take a look at it.  It's under

6    restriction but it was submitted and handed up at the time

7    of the motion that was -- that was made for Mr. Taylor,

8    counsel to negotiate this withdrawal.  Government had some

9    significant input, or significant concern about the timing

10   of that, and that's why we handed up the plea agreement.

11          But both of these defendants should be in the

12   posture that they are going to be pleading guilty,

13   according to the terms of their respective plea agreements,

14   and both cases are going to be resolved.

15          We have had a discussion with Mr. Sears -- Mr.

16   Sears and his counsel about the possibility that Mr.

17   Dittman for some reason doesn't abide by his plea

18   agreement, in which case Mr. Sears, under the terms of this

19   plea agreement, would be obligated to testify if there were

20   additional charges, or even on the contemplated

21   information -- on the information against Mr. Dittman.

22          So that is a concern.  Mr. Dittman --

23          THE COURT:  That's exactly my concern.  Here's the

24   problem I see.  Mr. Dittman has executed a plea agreement

25   under the advice of counsel he no longer has, and new

1    counsel is going to be coming into this case who might

2    advise him differently and in which case then you may have

3    one defendant, let's say, hypothetically, under -- with

4    advice of new counsel he no longer wants to proceed with

5    this change of plea and he goes to trial, and we have Mr.

6    Sears here free on bond and free to chat away with his

7    brother-in-law who's going to go to trial.  You see the --

8             MR. HARMON:  Absolutely, and we have discussed

9    it, Your Honor.  We have discussed it and the only thing I

10   have indicated, and the only ability right now I have to

11   police that is the following:  That if we find that they

12   are trying to get their information together and get their

13   accounts of facts consistent, and if we find that that's

14   continuing onward, it -- it affects the calculus of our

15   decision as to whether to use Mr. Sears in any capacity, it

16   affects our ability -- our evaluation of his cooperation.

17   That's the only leverage we have right now.

18            So I think it's probably -- the Court is probably

19   on to something that there should probably be a condition

20   added to his release that he not communicate with other --

21   with the other defendant or with other people who may be

22   witnesses in this case.

23            Now, obviously there's a familial relationship so

24   there could be a carve-out with respect to that.

25            THE COURT:  But not as to the codefendant.

34

1            MR. HARMON:  Well, I can't -- I don't know if I
2    can prevent them from not talking about football at
3    Thanksgiving.  I guess that's the type of thing I'm talking
4    about.
5            THE COURT:  Oh, that's the carve-out.  Okay.  The
6    carve-out about any discussion of this case, the facts, the
7    witnesses --
8            MR. HARMON:  Right.
9            THE COURT:  -- evidence, anything like that.
10           MR. HARMON:  Right.
11           THE COURT:  I think that's appropriate.  Do you
12    have any objection to the Court including that as a
13    precondition to remaining free on bond, Mr. Winocur?
14           MR. WINOCUR:  Let me make the following thought
15    and comment, just thinking out loud.  There was a time, it
16    may have been the intent of the letter agreement, that one
17    defendant was more inclined to proceed than another.  And
18    it was because of the cooperating efforts between the
19    brothers-in-law that we had two executed plea agreements.
20    It might be to the Government's benefit that the two
21    codefendants continue to stay in cooperation because it may
22    facilitate --
23           THE COURT:  But in a supervised cooperation,
24    right?  Cooperation when everyone is together in the same
25    room with counsel, not -- not in a situation, I don't

1     think --

2              MR. WINOCUR:  I think that's --

3              THE COURT:  -- where there's no control by the

4     Government as to what's being exchanged or not being

5     exchanged with the codefendant, who now we don't know with

6     the -- he's now on to his third lawyer, and we don't know

7     if he's going to pull out from his change of plea or not.

8              And if he does, if he's going to trial, I could

9     see some direct conflict between the interests of your

10    client and the interests of the defendant who wants --

11    who's going to go to trial and assert his innocence, and

12    fight the evidence the Government is going to be putting on

13    against him.

14             MR. HARMON:  Judge, may we consult just for a

15    second?  I think Mr. Winocur wanted to just talk to me.

16             THE COURT:  Sure.

17             MR. HARMON:  This will be about a minute long.

18    That's all.

19             THE COURT:  Go ahead.

20             One second, counsel.  We're having issues with my

21    monitor.

22             MR. WINOCUR:  Your Honor, having conferred with

23    Mr. Harmon, we would agree -- Mr. Sears and I would agree

24    to stipulate that going forward, given the tenuous

25    situation of Mr. Dittman Mr. Sears will have no further

1     conversations with Mr. Dittman whatsoever about the facts

2     of this case past, present or future.  They will still have

3     contact with each other, of course, the family, and seeing

4     each other over the holidays, but they will not be

5     conversing about this case.  And if they did, it would be

6     viewed as a violation of Mr. Sears' cooperation agreement.

7              THE COURT:  Okay.  Other than in situations where

8     both parties and all counsel are present with everyone's

9     notice.  Is the Government agreeable to that?

10             MR. HARMON:  Yes, Your Honor.  The only thing I

11    think needs to be -- I think it's been discussed, it just

12    needs to be added on, is that the defendant also not

13    communicate with other people known to be prospective

14    witnesses in the case.

15             THE COURT:  All right.  Any issue with that, Mr.

16    Winocur?  Because I think I'm going to need that before I

17    grant this motion.

18             MR. WINOCUR:  Your Honor, we agree with the last

19    comment with, again, the caveat being unless it's with the

20    approval or permission or supervision of the Government.

21             THE COURT:  Okay.  And let me bring up one last

22    thing.  Is there any request by either side for a

23    restriction of the plea agreements in this case?  Filing

24    restriction.  Meaning that these agreements will be

25    available or viewable only by the parties and the

1     Government -- I mean the parties and the Court, rather.

2           MR. HARMON:   I -- Your Honor, I talked to Mr.

3     Winocur and out of an abundance of caution because of the

4     possibility of any proactive other things that -- other

5     proactive things that may come up that we don't know about,

6     we probably should file this document under restriction.

7           The only reason I hesitate is that we have

8     obligations under the Crimes Victims' Rights Act to make

9     things like this available to prospective victims and there

10    are numerous ones here, so we're just going to have to find

11    a way to make that agreement available to the victims when

12    they want to consult --

13          THE COURT:   What about this, what if I ordered

14    that the plea agreements by the defendant -- because at

15    least right now the defendant No. 2 still has an operative

16    plea agreement, we'll see what happens when new counsel

17    comes in, but -- and then both sides are given leave to

18    file a redacted publicly viewable plea agreement that the

19    victims can review.

20          MR. HARMON:   We'll undertake to make the

21    redactions, propose them to Mr. Winocur, and then make a

22    motion to file that document.

23          THE COURT:   Okay.  So, Deb, let's make sure we've

24    got all this in the minutes.  So I'll grant you -- how much

25    time do you need to do that?

1          MR. HARMON:  Oh, I -- I'll ask for a week.

2          THE COURT:  I'll give you two weeks.

3          MR. HARMON:  Okay.

4          THE COURT:  I want to make sure that you've

5     thought this all through because there's a number of moving

6     parts here.  And the parties are given two weeks -- so I'm

7     ordering that the two plea agreements that are currently

8     filed with the Court be restricted to viewable by the

9     parties and the Court only.  The parties are given 14 days

10    to file a motion for leave to file a redacted publicly

11    viewable version of the plea agreements.  All right.

12          Now, Mr. Sears, I'm going to grant the motion that

13    you remain free on bond.  And let me make a couple of

14    findings for the record and then I'm going to tell you

15    exactly what I see as the obligations incumbent upon you

16    going forward here.  So I have reviewed the pretrial

17    services and release status report from the probation

18    office and I find by clear and convincing evidence that the

19    Government -- that the defendant's, rather, the defendant's

20    condition of release reasonably assure that he will not

21    flee nor will he pose a danger to the safety of the

22    community.

23          I therefore will permit the defendant to remain

24    free on bond subject to the same conditions of release as

25    set forth in the order setting conditions of release

```
 1      entered by the magistrate judge with the following
 2      additional conditions, Mr. Sears:  That you do not discuss
 3      the facts of this case, the evidence, witnesses, or any of
 4      the issues raised by this prosecution either with your
 5      codefendant, your brother-in-law, Mr. Dittman, or any other
 6      potential witness in this case.  Is that understood?
 7                THE DEFENDANT:  It is, Your Honor.
 8                THE COURT:  All right.  And if there's any
 9      evidence that you have violated that order from me, that
10      will put you in immediate -- at least an immediate
11      likelihood of coming before me for ordering of a revocation
12      of that order and that you be placed in custody pending
13      your sentencing.  Do you understand that?
14                THE DEFENDANT:  I do, Your Honor.
15                THE COURT:  All right.  All right.  Is there
16      anything further from the Government at this time?
17                MR. HARMON:  No.  Thank you, Your Honor.
18                THE COURT:  Anything further from the defendant?
19                MR. WINOCUR:  No, Your Honor.  Thank you.
20                THE COURT:  All right.  Thank you.  That will be
21      all.
22           (Proceedings concluded at 10:51 a.m.)
23                     *     *     *     *     *
24
25
```

1                       REPORTER'S CERTIFICATE

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled

5     matter.

6          Dated at Denver, Colorado, this 7th day of March,

7     2017.

8

9

10

11       _                                              _

12                    MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25

318C-DN-2098327 Serial 78
-1 of 9-

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry _____ 11/07/2017

William Sears, date of birth (DOB) May 13, 1966, was interviewed at
the United States Attorney's Office (USAO) in Denver, Colorado.  In
attendance were Assistant United States Attorney (AUSA) Kenneth Harmon,
Assistant United States Attorney(AUSA) Jeremy Sibert, Federal Bureau of
Investigation(FBI) Special Agent Kate Funk, United States Postal Inspector
Services(USPIS) Robert Barnett,and defense attorney Fredric
Winocur.  After being advised of the identity of the interviewers and the
nature of the interview, Sears provided the following information:


Sears stated that Guy Jean-Pierre knew that Sears was an affiliate of
FusionPharm and that his affiliate status was not disclosed to
investors.  Jean-Pierre wrote opinion letters stating that Sears was not
an affiliate of FusionPharm.  Sears stated that there was an email
exchange involving Jean-Pierre where Jean-Pierre requested to be paid
approximately $2,000 per month along with FusionPharm stock.  This email
was part of the emails related to Scott Dittman.  Jean-Pierre was
constantly asking Sears for equity in FusionPharm because he wanted to be
a part of the company.  Sears said that he had not spoken with Brenda
Hamilton since his last disclosed contact with her.  He also had not
spoken with Dittman recently.  Sears said that he had not been contacted
by anyone else about the FusionPharm or Jean-Pierre cases.


Sears reviewed the recording of a skype conversation created
approximately October 1, 2015, between Sears and Jean-Pierre.  On the same
day prior to the recording, Sears sent Jean-Pierre documentation from the
transfer agent related to the transaction discussed in the video via e-
mail.  Sears said that he produced this documentation to the Securities
and Exchange Commission (SEC) as part of his subpoena return.  Sears
believed that the documents provided both to the SEC and Jean-Pierre via
email included an attorney opinion letter.  Sears believed that the
attorney opinion letter referenced Fred Dahlman's lost stock certificate
and did not include the signature of Leslie Dinwoodie.  He recalled
speaking to Leslie Eldridge at Pacific Stock Transfer about this opinion

| | | |
|---|---|---|
| Investigation on | 10/16/2017 at | Denver, Colorado, United States (In Person) |
| File # | 318C-DN-2098327 | Date drafted  10/18/2017 |
| by | Kate E. Funk | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

INV_00008226

FD-302a (Rev. 05-08-10)                    318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of  (U) Interview of William Sears                    , On  10/16/2017 , Page  2 of 9

letter.  Sears said that every time there was a conversion for the same
shares, the same opinion letter that was on file would be used.  He said
this might explain the Dinwoodie opinion letter being used by Oppenheimer
for multiple deposits of the FusionPharm shares in his Microcap brokerage
account.  Sears said that Jean-Pierre wrote an opinion letter for
Microcap's deposit of FusionPharm shares that were transferred from the
original 185,000 preferred shares from Dahlman.  Sears believed all the
opinion letters that he received from Jean-Pierre either had Dinwoodie or
Tod DiTommaso's signature.  Sears reviewed a packet from Pacific
Stock  Transfer Company (PSTC) relating to certificate 1015 with bates
numbers PST_00001515 through PST_00001526. Sears believed that the packet
should have an attorney opinion letter because the transfer required a
letter.


    Sears said that he paid Jean-Pierre occasionally after May 16, 2014, to
keep him "on the hook" to include returning Sears' phone calls and
providing Sears with any information requested even though Jean-Pierre had
been fired.  Sears kept Jean-Pierre "on the hook" through their
discussions about the company Vast.  Sears said the payments were not for
any other deals that Sears and Jean-Pierre were working together.  Sears
deposited checks directly into Jean-Pierre's bank account in the name
"Jean-Pierre and Jean-Pierre" at Chase.  Sears wrote the checks from one
of Sears company accounts to include Bayside, Microcap, and
Meadpoint.  Sears estimated that each check was a few hundred
dollars.  Sears said that he did not pay Jean-Pierre after meeting at the
USAO in February, 2016.  Sears reviewed a number of checks from entities
he controlled to Jean-Pierre with bates numbers GJP_00007591,
GJP_00007529, GJP_00007537, and GJP_00007541.  Sears said that he paid
Jean-Pierre via a check from S&W Solutions on approximately July 3, 2014,
for $500.  Sears believed this had something to do with a deal for
PharmPods and real estate that did not happen.  Sears paid Jean-Pierre
from an account in the name Sandra L Sears on October 1, 2015 for $600 and
from an account in the name Meadpoint on August 21, 2014 for $1,000.  He
also paid him from a VF Management account on August 25, 2014 for $1,000.


    Sears would not have done anything that Jean-Pierre said was
illegal.  Jean-Pierre never advised Sears not to do any business with
Dittman due to Sears' affiliate status.

INV_00008227

FD-302a (Rev. 05-08-10)

318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of (U) Interview of William Sears _____ , On 10/16/2017 , Page 3 of 9

Sears said that Jean-Pierre had another client, believed to be female, in Texas or Florida that Jean-Pierre would visit in the United States. Sears reviewed an email dated September 16, 2014 from Jean-Pierre to Sears with bates number SWFBI_00000624. He believed this communication was linked to some sort of cannabis related company. Jean-Pierre was aware of the Federal search warrant on FusionPharm but was still trying to do deals with Sears and would occasionally present deals to Sears.

When Sears was doing corporate communications for penny stock companies, he would send the company's press releases via e-mail to a proprietary database including brokers. The recipients of the email paid a subscription fee to Sears.

Charles Cleland represented Sears in the friendly lawsuit executed to transfer JAGR shares to Sears. Sears was introduced to Cleland through broker David Adams. Sears did not know that Jean-Pierre was involved in the friendly lawsuit. Dale Williams was the other party to the friendly lawsuit. At the time of the lawsuit, Sears had used Jean-Pierre to write Attorney opinion letters to clear stock. He did not recall why he did not use Jean-Pierre to assist him with the friendly lawsuit. Sears brokered the deal for Green Street to acquire JAGR. He introduced Billy King to Cliffe Bodden.

Sears reviewed the March 16, 2009, Consulting Agreement between Microcap Management and Baby Bee Bright with bates number SEC-DOJ-EPROD-000802791. Sears and Dahlman both signed the Consulting Agreement. The document was a standard consulting agreement used previously on other Microcap deals where Jean-Pierre was the attorney. Jean-Pierre provided Sears with standard templates for Sears' consulting agreements. Sometimes, Jean-Pierre would adjust and finalize these agreements for Sears. Neither Sears nor Dahlman created this document. Jean-Pierre talked to Dahlman on several occasions during the transition of Baby Bee Bright(BBYB) to FusionPharm to include one phone conversation between Sears, Dahlman and Jean-Pierre. Sears was not aware of Dahlman having his own attorney. Jean-Pierre liked to speak with people on the other end of deals to confirm they were real people. Per the agreement, Sears would be paid $140,000 in unrestricted stock, which was what he typically received in other deals, and $70,000 per month in unrestricted stock. Sears received his stock from Doug Sailors and Jamie

INV_00008228

FD-302a (Rev. 05-08-10)                    318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of   (U) Interview of William Sears           , On   10/16/2017   , Page   4 of 9


O'Bryan or through their company, FUM Management.  Sailors worked for
Dahlman.  Jean-Pierre prepared the Attorney opinion letters related to
Sears' BBYB stock, but Sears could not recall whose signature appeared on
the letter.  Sears paid Jean-Pierre for the opinion letters.  Sears
received 14 million of free trading BBYB stock pursuant to his
consulting agreement and the debt settlement agreement.  He deposited
these shares into his Oppenheimer brokerage account with his broker, Scott
Eisler.  BBYB stock was very thinly traded.  Issuers often hired Sears
when their stock was thinly traded to help increase the volume through his
public relations work.  Sears' fees were structured to have a large
upfront payment because of the low volume.  Sears would sometimes
outsource the public relations work to stock promoters that were paid in
stock.  He used the company, OTC Picks, to help with BBYB.  Sears was able
to sell 10 million of his BBYB shares using opinion letters he received
from Jean-Pierre.  Sears was not sure if Jean-Pierre actually signed these
letters or just provided them to Sears.


    Sears communicated with Jean-Pierre via telephone, email and
Skype.  Their communication via Skype was mostly via a Skype call but they
also used the instant message feature.  Sears used the names trader5280,
billysears66, and wjsears66.  Jean-Pierre used several names to include
elcommandante1, marcelodominguez, guyjeanpierre, donmarcusi and eldiablo.


    Sears reviewed the skype messages on September 1, 2010.  Sears
recognized them as messages between Sears and Jean-Pierre.  Sears said
that messages 32021 and 32024 were discussing Dahlman's resignation.  They
are referencing the BBYB shell company.  Sears only took an interest in
two shell companies: JAGR and BBYB.  The Shareholder Termination agreement
was for Andrew Cafferkey.  Sears reviewed a copy of a Termination
Agreement for Cafferkey with bates number FD_00000171 and stated that Jean-
Pierre would have drafted the agreement because Sears did not have any
templates for this type of document.  It was part of the due diligence for
BBYB shell.  Sears met with Cafferkey in person to discuss the options
Cafferkey had on the BBYB stock.  Sears reviewed a document granting Sears
Power of Attorney for BBYB with bates number PST_00004101 with Dahlman's
resignation and said that Jean-Pierre would have prepared the letter.


    Sears reviewed bates range FD_00000172 through FD_00000177 relating to
a Debt Settlement Agreement between Microcap and BBYB.  The information in
this agreement was shared with Jean-Pierre.  This document was necessary


INV_00008229

FD-302a (Rev. 05-08-10)

318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of (U) Interview of William Sears ,On 10/16/2017 , Page 5 of 9

to take over the shell company. The number of shares reflected post
reverse split of the common stock which came out to $1 per share (350,000
shares and $350,000). Sears said that there was a second agreement for
approximately $550,000. The second agreement was created after Sears
became aware of outstanding BBYB bills that Dahlman had not disclosed to
Sears to include money owed to the transfer agent, the accountant, OTC
markets and to attorneys. Sears said he paid less than $200,000 in bills
that Dahlman had not disclosed to him. Sears reviewed bates number
FD_00000050. Robert Taylor had an option or warrant for BBYB
stock. Sears could not recall the background for the text "I have to give
you two hundred of mine to make the numbers work." Sears said that he was
going to be involved in another company.


    Jean-Pierre prepared the BBYB Shareholder Written Consent Appointing
Dittman and Sandra Sears as Officers of FusionPharm with bates number
PST_00004102 for Sears and Sears sent to Dahlman. Originally there was
only one person on the paperwork, but Jean-Pierre told Sears that they
needed two people, so Sears told Jean-Pierre to put his Mother's name,
Sandra Sears, on the paperwork. Sears said that Bayside was in his
Mother's name, but Sears controlled Bayside. Sandra Sears spoke with Jean-
Pierre in 2009 in order to get an opinion letter from him. Sears
transferred some of his Microcap shares to Bayside but retained control of
the shares. Sears would have told Jean-Pierre that he was going to be
involved in FusionPharm and that FusionPharm was going to be operating in
the marijuana industry.


    Sears reviewed bates number FD_00000136. These financials were
prepared by Michael Kocinski with Dittman. Sears forwarded them to
Dahlman. Sears did not create this document. Jean-Pierre would have
received this document. The Other Assets on the financials included
BBYB's inventory of fetal monitors. The Accounts Payable of $98,579.86
was not for money owed to Sears.


    The emails back and forth between Sears and Dahlman regarding the
preferred share distribution were negotiations between Sears and
Dahlman. Jean-Pierre was blind copied on these emails. Sears and Jean-
Pierre decided on the number of BBYB shares that went to Microcap. Sears
did not want to go over 10% of the outstanding stock because that would
restrict the stock which would subject Sears to volume limits (trickle
rule). Jean-Pierre advised Sears on this rule. Jean-Pierre was aware

INV_00008230

Attachment 12
Page 5 of 9

FD-302a (Rev. 05-08-10)                      318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  10/16/2017 , Page  6 of 9

that the preferred stock could be converted to common stock at a ratio of
one hundred shares of common stock for each share of preferred
stock.  Dittman and Robert Dittman decided where they wanted their
stock.  Jean-Pierre was aware that if Dahlman transferred the 350,000
shares to Microcap immediately after the split, it would take Sears over
10% of the outstanding common stock.  Jean-Pierre worked closely with the
transfer agent throughout the process of transferring the preferred
shares.  Jean-Pierre knew there was going to be a 200-1 reverse split of
the common shares.  He also knew that Sears was going to be getting
185,000 preferred shares of FusionPharm.  Sears could have control of
these shares while they were in his possession.  Sears was owed 350,000
shares of common stock from the 185,000 preferred shares that he
received.  Sears planned to draw down these shares over time keeping him
under the 10% rule.  Sears reviewed an email dated February 15, 2011 with
bates number PST_00007071 stating the Jean-Pierre was handling the
reverse.  He said that at the time the letter went out for Dahlman to send
to the transfer agent, Jean-Pierre and Sears both knew that the stock was
going to do a 200-1 reverse split.  Sears reviewed bates number
PST_00007111, an email from Joanna DiBella advising Sears and Dahlman to
wait 90 days before transferring the preferred shares to Microcap.  Sears
recalled receiving the email and followed the advice of DiBella.  He would
have confirmed this 90 day period with Jean-Pierre.


    Sears reviewed an email dated February 16, 2011, where a PSTC
representative said that Sears was taking over Baby Bee Bright with bates
number PST_00007098.  Sears said that Belmont was owned by Joe Meuse, the
same owner as Pacific Stock Transfer Company.  They were concerned about
the viability of the company going forward.  Sears did not recall talking
about taking over BBYB.  Sears was cleaning up BBYB.  Sears did not come
up with the name FusionPharm.  Sears reviewed an email where Jean-Pierre
was requesting incorporation dates of Baby Bee Bright with bates number
FD_00000143.  Sears forwarded this email to Dahlman from his
iPhone.  Sears discovered that Jean-Pierre worked with Sequoia, a previous
business name for BBBYB, from Billy King.  This came up when dealing with
a Green Street capital issue.  Sears reviewed an email date March 14, 2011
from Sears to Bodden attaching a draft letter to the Florida Bar
Association with bates number SWIRS_00011887 and SWIRS_00011888.  Sears
sent this email to Bodden.  The attachment to the email came from Jean-
Pierre and was drafted by Jean-Pierre.  Jean-Pierre told Sears that it was
a recommendation that he needed Bodden to sign, but they did not discuss
the contents of the letter.  Sears knew that it was in connection to a bar
complaint filed in Florida on Jean-Pierre.  Sears reviewed Dittman's
letter to the Florida Bar with bates number GJP_00001956 through

INV_00008231

318C-DN-2098327 Serial 78

FD-302a (Rev. 05-08-10)

318C-DN-2098327

Continuation of FD-302 of  (U) Interview of William Sears                          , On  10/16/2017 , Page  7 of 9

GJP_00002843.  Sears did not recall ever seeing this letter before the
interview.  Sears said that it was Jean-Pierre's idea to have DiTommaso
signing the opinion letters.  Sears did not know why he no longer used
Dinwoodie.


    Sears did not recall ever discussing with anyone that the preferred
shares should also be split along with the common.


    *ADMINISTRATIVE NOTE: We concluded our interview at 5:10 pm on Monday,
October 16, 2017, and reconvened on Tuesday, October 17, 2017.*


    Sears reviewed the Skype messages between Sears and Jean-Pierre in
September, 2010.  Sears was going to give Jean-Pierre JAGR shares as
payment for work that Jean-Pierre did for Sears because Sears did not have
any cash.  Sears needed the name for the stock certificates.  Sears did
not end up providing the discussed shares.


    Sears said that he was entitled to $350,000 worth of FusionPharm stock
as a result of the Debt Settlement Agreement.  He said that the actual
number of shares may have fluctuated based on the stock price.  Sears said
that there were one or two later versions of the Debt Settlement Agreement
that was sent to brokers.  Dahlman signed three different versions of the
Debt Settlement Agreement.  The remainder of the 185,000 shares, after the
Debt Settlement Agreement was paid, was to be transferred to Robert
Dittman.  Sears shared the terms of every version of the Debt Settlement
Agreement with Jean-Pierre.  Sears reviewed the Debt Settlement Agreement
between Microcap and LaDeDaa for 700,000 shares with bates number SEC_DOJ-
EPROD-000802785 through SEC_DOJ-EPROD_000802788.  Sears said that this
document was created by Jean-Pierre and Sears and was a newer version of
the Debt Settlement Agreement although it was backdated to 2010.  The
newer version was necessary because the preferred shares had been
transferred to LaDeeDa, a limited liability corporation in Sears' wife's
name.  The preferred shares were eventually going to be held by Robert
Dittman when he took over LaDeeDa.  Robert Dittman did not want the
preferred shares in his name.  Around this time, Robert Dittman had some
substance abuse and drinking problems.  He was also having some health
issues including seizures.  The new version was created so that the debt
owed to Sears would follow the stock.  Jean-Pierre added language to the
revised agreement to allow Sears to draw down on the debt in tranches in

INV_00008232

FD-302a (Rev. 05-08-10)                      318C-DN-2098327 Serial 78

318C-DN-2098327

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  10/16/2017 , Page  8 of 9

order to keep him under 10% of the outstanding common stock.  The new
document was created for the transfer agent and brokers.  Sears main
contact at Pacific Stock Transfer Company for this transaction was Joanna
DiBella and Mikki McGee.  Sears had discussed why he received free-trading
stock with Jean-Pierre.  Sears and Jean-Pierre discussed the problem with
the original Debt Settlement Agreement because Sears did not want all the
stock in his name because it would have made him an affiliate.  When Sears
reviewed the preferred stock certificate for 185,000 shares assigned to
Microcap, he discussed with Jean-Pierre the fact that the stock
certificate was stamped control stock.  Jean-Pierre suggested transferring
the stock to LaDeeDa since it was going to eventually be taken over by
Robert Dittman.  Jean-Pierre modified the original Debt Settlement
Agreement and then e-mailed the new version to Sears.  Jean-Pierre knew
that LaDeeDa was Sears' wife's old skincare company.  Jean-Pierre added
language into the second agreement reflecting that the debt followed the
stock.  The date on the second agreement was not updated to reflect the
actual date the agreement was modified because Jean-Pierre said that
letter needed to reflect the original agreement.  The number of shares
changed from 350,000 to 700,000 because of the change in the stock
price.  Sears said that the market conditions went from $1 per share to
$0.50 per share.  Sears signed this second agreement.  He did not know who
signed the name Sandra Sears.  He said that it did not look like his
wife's signature.


   Sears reviewed bates number RS_00000411 through RS_00000423 including a
third version of the debt settlement agreement now for 875,000
shares.  The goal of this third agreement was for Sears to get more stock
and capital.  It was not related to the $350,000 of debt owed to him from
Dahlman.  Jean-Pierre created this third version in 2012 after speaking
with Sears.  It was Jean-Pierre's idea to increase the number of
shares.  Jean-Pierre changed the number of shares from 700,000 to
875,000.  This version still had Dahlman's signature and did not include
the language to draw down the stock in tranches.  Sears thought that was
likely because Jean-Pierre modified the first version, rather than the
second version, to create the third version.  Sears drafted the letter to
Tina Marini at Moors & Cabot.  Sears said that the Debt Settlement
Agreement should have included Robert Dittman's signature and not
Dahlman's.  Sears said that Jean-Pierre drafted a debt settlement
agreement with Robert Dittman's name.  Dahlman and Robert Dittman did not
owe Sears any money.  Jean-Pierre was aware that the revised agreement was
not based on any existing debt.  Sears controlled the shares in Robert

INV_00008233

318C-DN-2098327 Serial 78

FD-302a (Rev. 05-08-10)

318C-DN-2098327

Continuation of FD-302 of  (U) Interview of William Sears                     , On  10/16/2017 , Page  9 of 9

Dittman's name for a period of time.  Sears could ask Robert Dittman at
any point in time for shares and Robert Dittman would give him the shares
with no questions asked.

INV_00008234



## Memorandum of Interview

| | |
|---|---|
| CASE NUMBER: | 2042900-MF |
| PERSON INTERVIEWED: | William Sears |
| PLACE OF INTERVIEW: | US Attorney's Office<br>1801 California<br>Denver, CO |
| DATE OF INTERVIEW: | June 26 and 27, 2017 |
| TIME OF INTERVIEW: | 9:30 AM |
| INTERVIEWED BY: | FBI SA Kate Funk, IRS-CID SA Jared Erwin, Postal Inspector Rob Barnett |
| ALSO PRESENT: | AUSA Ken Harmon, Attorney Fred Winocur, and FBI Intern Elizabeth Smedley |

1. At the above time, date, and location, William (Billy) Sears was interviewed concerning his involvement with Guy Jean-Pierre and FusionPharm. Also present during the interview was AUSA Ken Harmon and Sears' attorney, Fred Winocur.

2. At the beginning of the session, Sears reviewed his plea agreement, with emphasis on paragraphs 5, 10 (note 8), 12, 18, 22 (note 17), and 28 (note 20). After review, Sears stated that Guy Jean-Pierre knew everything going on with the running of FusionPharm, Microcap, Meadpoint, Bayside, Vertifresh and other entities Sears was a part of. Sears stated he felt he was too close to the company and that made him an affiliate.

3. Sears first heard of Jean-Pierre in Richmond, TX, possibly around 2009 or 2010. Sears recalls being in the office of Billy King, who Sears knew as a lawyer that would acquire shell companies for the purpose of forming new companies. Sears recalls hearing Jean-Pierre's name associated with Monogram Energy but does not know how Jean-Pierre was involved. Sears was being used by King and another lawyer, David Adams, to promote and market deals of the companies the lawyers were working on. Sears was paid with shares of stock in the companies he was promoting.

4. Sears was under the impression that Jean-Pierre did attorney opinion letters for Billy King and David Adams. Jean-Pierre was Adams' go-to attorney. A deal involving Billie King's Monogram Energy was the first deal with Jean-Pierre that Sears was involved with. The Polaris Diversified Media deal through Adams was the first deal done with Jean-Pierre where Sears was a part of the company.

5. Sears said Jean-Pierre wrote attorney opinion letters for him dealing with stock shares being changed from Restricted to Unrestricted. Although he knew the name Jean-Pierre through dealings with King and Adams, Sears first talked with Jean-Pierre around the 2009-2010 timeframe. Sears said he first met Jean-Pierre face-to-face when Jean-Pierre flew into Denver for his son's graduation from the Air Force Academy and they ate at a local diner.

6. Sears left Green Street Capital in approximately 2008 and met Jean-Pierre after that point. Sears recalls doing public relations work for JAGR Mining through Microcap. Jean-Pierre was doing attorney opinion letters for JAGR. JAGR merged with Green Street Capital.

7. Jean-Pierre did most of the opinion letters in which Microcap was involved and worked with Joe Muse who did a lot of small company deals. Sears paid Jean-Pierre $500 per opinion letter and never paid him in shares of the companies. The letters were used to clear stock through transfer agents. Sears always had less than 10% holdings in stock at any one time in the company.

8. In 2005, Sears became involved with a product called Ultra Grip. Sears researched this product and formed a private company, Rosual, with Robert Dittman and the founder of Ultra Grip, Henry Sarmiento. Rosual did well and had hospitals and hotels as clients. Shareholders in the company included Dittman, Sarmiento, and Sears' wife. Sears did not have any personal ownership stake in the company because he was under federal investigation at the time. Jean-Pierre did not have any affiliation with this company. However, Cliff Bodden came from Ohio to Florida to help with the administration of Rosual. Bodden and Sears had a business relationship stretching back to 1991.

9. Sarmiento claimed ownership of Rosual and, as a result, sold it to International Solubles to continue distributing Ultra Grip. Bodden and Sears continued to work for the company and the company continued to do well until around 2008. At one point, Sears uncovered Bodden trading undocumented stocks and claiming 17% monthly returns. Bodden told Sears he was just putting in what "George" told him to but did not have any reports to back up the return percentage. Sears asked Bodden to leave the company.

10. During the recession in 2008, International Solubles lost customers and shut down. It was changed into the company Poker Book. Bodden and Richard Buffington then turned Poker Book into Silver Star and eventually into Green Street Capital. Shareholders that held Rosual stock were rolled over into Green Street.

11. Sears did Investor Relations and Public Relations work for JAGR through Microcap and helped Bodden with the merger into Green Street. Sears did not have any shares of Green Street/JAGR but received 7.7 million shares through a friendly lawsuit. Sears reviewed a copy of the lawsuit during the interview. Sears said these shares were owed to him from prior work he had done. These shares were eventually broken down into various entities controlled by Sears. Charles Cleland represented Sears during this lawsuit while Jean-Pierre represented Green Street. Sears had no knowledge of Jean-Pierre involvement in the JAGR to Green Street conversion.

12. Sears was shown a list of Green Street/JAGR beneficial owners from September 2010 showing Robert Dittman holding approximately 7% shares in the company. According to Sears, Robert Dittman was not involved with this company and that the shares had been rolled over from Rosual.

13. Sears was told that there were Skype messages from January 2012 where Jean-Pierre asked Sears for a Robert Dittman non-affiliate letter. In the Skype message, Jean-Pierre tells Sears he hadn't received "the non-affiliation form for Rob Dittman for Green Street Capital corporation." Sears told Jean-Pierre he had it and would get it to Jean-Pierre.

Robert Dittman was holding shares of FusionPharm for Sears. Jean-Pierre knew this and did not have a problem with it.

14. Sears was not aware that Robert Dittman had 6.1 million shares of JAGR stock in 2011. Sears and Dittman were broke and if Sears had known those shares existed he would have sold them. The shares were rolled forward from Rosual.

15. 185,000 preferred shares of FusionPharm stock in Robert Dittman's name were actually shares belonging to Sears. Sears had somewhere between 300,000 to 700,000 common shares of Baby Bee Bright (BBYB) that were the result of the debt settlement agreement for Sears' prior services to the company. The shares were held in Robert Dittman's name to be given to Sears later.

16. From 2009-2010 Sears used Jean-Pierre as his sole attorney for writing opinion letters. Jean-Pierre also did work for Dahlman with Baby Bee Bright. Sears said he put Dahlman and Jean-Pierre in contact with each other.

17. Sears was shown an April 2011 letter to the Florida Bar on behalf of Jean-Pierre. Sears said he had no memory of seeing this letter and was not sure he knew at the time that Jean-Pierre was banned by the OTC from writing opinion letters. Sears was shown a March 2011 email string where Jean-Pierre sent drafts of the letter to Sears to forward to Bodden because Jean-Pierre did not have a good email address for Bodden. Sears did not open or review the letter prior to forwarding it to Bodden. Sears said he knew there was a Florida Bar complaint but was not aware of the OTC ban.

18. Sears knew that Jean-Pierre was writing opinion letters but that Leslie Dinwoodie from Complete Legal Solutions in Texas and DiTommaso were signing them. Jean Pierre originally told Sears that Dinwoodie and DiTommaso were his partners he worked with for opinion letters. Jean-Pierre also told Sears that since he was an officer of FusionPharm, he needed a third party to write the letters.

19. Sears knew that Jean-Pierre was ghost writing opinion letters and DiTommaso was signing them. Sears said he was indifferent in knowing that Jean-Pierre was doing this because the letters Sears needed for stock were getting signed. Sears did not have a conversation with Jean-Pierre about anything outlined in the Bodden affidavit.

20. Sears was shown a Dinwoodie opinion letter from June 17, 2010 concerning Baby Be Bright and Microcap stock. Jean-Pierre provided this letter to Sears and also additional letters after this one. Sears never spoke with or met Dinwoodie. Sears said Dinwoodie signed Jean-Pierre drafted letters for other companies such as Polaris and Diversified Media. Jean –Pierre would have known that the letters were used by stock transfer agents and brokerage firms to issue, deposit, sell, etc. stock associated with the companies listed in the letters. Sears knew this letter would be used to clear stock through compliance requirements at the transfer agents and others.

21. Jean-Pierre knew it was industry standard to give opinion letters to transfer agents and other compliance entities. Jean-Pierre knew the Dinwoodie letter would have been used to remove the restricted label from the 185,000 shares of preferred stock. Sears said Jean-Pierre drafted all letters to include opinion letters, safe harbor letters and others in due diligence packages for companies.

22. Jean-Pierre knew Dinwoodie's letter was used by Oppenheimer for depositing stock shares. Oppenheimer would have relied on this letter to be true and Sears would have sent it to them. Jean-Pierre knew the same Dinwoodie letter was used on multiple occasions to clear stock. The letter was sent by Oppenheimer to DTC Scottsdale.

23. Sears spoke with Jean-Pierre on a daily basis concerning the transition from Baby Bee Bright to FusionPharm. Jean-Pierre helped negotiate stock prices and was on phone calls with Sears and the stock transfer agents. It was Sears' idea to use Baby bee Bright as a shell corporation.

24. Jean-Pierre drafted paperwork with Sandra Sears as an officer of FusionPharm, knowing she would have no involvement with the company. Jean-Pierre told Sears a second officer was needed which caused Sears to propose using Sandra as an officer. Jean-Pierre listed Sandra as the secretary on the paperwork and never questioned the practice. Jean-Pierre knew Sears could not be listed on the company paperwork.

25. Sears and Jean-Pierre had a discussion about and knew that Sandra Sears was simply a placeholder as an officer in the company and would have no affiliation with the running of the company. It was known by both Sears and Jean-Pierre that Sandra was to be a placeholder until a new officer was found.

26. Jean-Pierre worked with Maria Sampson who was working with FINRA for the name change from Baby Bee Bright to FusionPharm. Jean-Pierre knew that preferred stock in the company would be going to different places once the company was set up.

27. At the end of 2011, Jean-Pierre recommended to Sears to put FusionPharm shares into one convertible note that would consolidate short term loans Sears gave to the company. Bayside was a holding company that only held FusionPharm stock and Sandra Sears set up the bank accounts for Bayside.

28. Sears ran the brokerage accounts and had Sandra Sears sign the paperwork as needed for those accounts. Sears said he occasionally signed for Sandra. Jean-Pierre knew Sears signed for Sandra on occasion because Sears told him.

29. In the beginning of FusionPharm, Jean-Pierre would have seen Sears's role as a "transition guy" to get the company going. However, Jean-Pierre knew Sears was pitching the company and working for the company with Dittman. Jean-Pierre told Sears this was not a problem as long as Sears didn't take a commission on the sale of stock. Jean-Pierre and Sears had discussions about affiliate status. Jean-Pierre told Sears he would be considered an affiliate if he was an officer, controlled management decisions, or took commissions. Sears was using a FusionPharm email address and Jean-Pierre advised Sears not to use it in order to avoid Sears' appearing to be involved with FusionPharm. Jean-Pierre knew how much Sears was involved with the company and did not raise any concerns as far as Sears being an affiliate.

30. Jean-Pierre was the corporate secretary of FusionPharm at the same time he was writing opinion letters.

31. Sears was shown a series of checks made out to Jean-Pierre: #1064, #1141, #1172. Sears said he wrote each of the three checks to Jean-Pierre and deposited them into Jean-Pierre's JP Morgan Chase account. This was Jean-Pierre's payment for services. If

Jean-Pierre was late getting paid, he would have talked with Dittman about it first and then called Sears if he still could not get paid by Dittman.

32. Sears was shown a series of Bayside checks: #5014, #5047, #5057, #5063. Sears stated he signed these checks to pay Jean-Pierre for opinion letters and legal services from the Bayside account. Jean-Pierre never asked why the checks were coming from Bayside. Checks #5014 and #5047 were for Jean-Pierre's legal services to FusionPharm. Check #5057 could have been a letter of opinion for Adams, but may not have been for FusionPharm. Check #5063 was most likely to pay for work done on creating a note or for Jean-Pierre's retainer fee. Sears indicated he paid Jean-Pierre numerous times on behalf of FusionPharm after discussions with Dittman and Jean-Pierre. However, Sears said the Bayside checks for $2500 would have been for Jean-Pierre's FusionPharm retainer. Sears paid Jean-Pierre out of whatever account had money.

33. Sears was shown Bayside checks #5069 and #5082. Sears stated #5069 was for Jean-Pierre doing normal FusionPharm work, but that #5082 was likely for a 144 letter on a "gypsy swap" deal for Todd Abbott. As the company legal counsel, Jean-Pierre gave the OK for this transaction to occur but then told Sears they should not do it because it was a "gypsy swap."

34. Sears was shown Wells Fargo checks #2002 and #6000. Sears said he signed both of these checks. Sears did not recall what #2002 was for, but said #6000 was most likely one of the $2500 retainer checks for FusionPharm work.

35. Sears was shown an email dated 5/31/2011 from Sears to Jean-Pierre with a copy to Dittman. The email concerned trademark issues with registering the pods produced by FusionPharm. Jean-Pierre never questioned why Sears was making management type decisions and doing affiliate type work with issues such as trademarking. Sears said he may have contracted with Don Hemmer to look into trademarks, but doesn't recall FusionPharm ever getting anything trademarked.

36. Sears was shown an email dated 7/17/2011 from Sears to Jean-Pierre with a copy to Dittman. The subject of the email was 504/506 asking Jean-Pierre to review paperwork created by Bodden. Sears said he did not create the paperwork and that Jean-Pierre never questioned Sears' management type role in creating the documents. Sears said Jean-Pierre recommended 506 because of the accredited investor requirements. Sears recalls the conversation dealing with the 506 recommendation being only between him and Jean-Pierre.

37. Sears was shown an email dated 8/8/2011 from Sears to Jean-Pierre dealing with 15c-211a documents. Sears was not sure why the documents were needed. However, a Form D was needed in order to disclose large blocks of stock for a 504 company. Sears does not know for sure if the Form D was completed, but was assured Jean-Pierre filed the Form D because that was his job.

38. Sears was shown an email dated 12/17/2012 from Sears to Bodden and Jean-Pierre dealing with Kodiak Capital. Sears met with Kodiak by himself in California as Kodiak was pitching to feed money to FusionPharm as part of a Reg A filing. Sears sent the term sheets to Bodden and Jean-Pierre for an opinion. Sears recalled having a conversation with Jean-Pierre about Kodiak getting newly issued FusionPharm stock as well as the term sheets and corporate financing opportunity. Jean-Pierre ended up talking about Kodiak

with Dittman who "went down the road with them" for a period of time. However, a deal was never done. Kodiak was supposed to be a "block" buyer.

39. Jean-Pierre would sometimes pass financing leads to Sears but would never mention where they were coming from. Jean Pierre would keep the sources of the financing leads to himself. Jean-Pierre would say the investors wanted a 40%-50% discount on the stock, which Sears would refuse.

40. Jean-Pierre would call Sears with people wanting to buy free-trading stock or wanting to "uplist" the company onto higher exchanges. Sears said he would pass Jean-Pierre and the information onto Dittman, but it never went anywhere.

BREAK – approximately 1:50PM to 2:25 PM

41. Sears said he had always intended that funds given by him to FusionPharm were to be loans. Notes were drafted to reflect that.

42. Jean-Pierre's role in disclosure statements included reviewing what Bodden drafted as Bodden was more eloquent with his writing. Bodden would draft the documents and send them to Jean-Pierre for review. Notes to the financial statements were drafted by Dittman or Kocinski while the 2011 annual report was drafted by Bodden.

43. Sears was shown a FusionPharm disclosure statement dated June 30, 2011. Sears indicated Bodden drafted the product and it was reviewed by Jean-Pierre before being sent to Dittman for signature. Sears would then upload the documents to the OTC website from a computer in Colorado. Jean-Pierre would then complete the current information letter after the disclosure statement was uploaded and get DiTommaso's signature. Sears would receive the information letter from Jean-Pierre and would then upload it to the OTC website from a computer in Colorado.

44. Sears was shown FusionPharm's 2011 annual report. On the officers and directors page, Jean-Pierre is listed as the corporate secretary with other positions being held by Dittman and Andy Duke. Sears did not have any conversation with Jean-Pierre about Sears not being included as an officer of the company. Sears said he did not want to be listed as an officer because he would not be able to sell his stock if he was. According to Sears, there was never any discussion about removing Jean-Pierre from the list of officers.

45. Sandra Sears was listed as FusionPharm's corporate secretary at one point, but Jean-Pierre never raised any issue about it even though Sandra had no official duties and responsibilities outside of signing a few documents. Sandra would sign stock certificates sent to transfer agents for stock transfers.

46. Jean-Pierre never asked or raised an issue about Sandra resigning in June 2011 as secretary but continuing to be listed on documents as the secretary. Sears found out about Sandra's resignation as part of a due diligence during the Malino deal when he saw a letter from June 2011 to Dittman concerning the resignation.

47. In the legal section of the 2011 annual report, there was no discussion between Sears and Jean-Pierre about listing Sears' criminal history. It was not listed on the filing, even

though Jean-Pierre knew about Sears' criminal history. Additionally, Sears never had a discussion with Jean-Pierre about Jean-Pierre's Florida bar or SEC troubles. Sears was not sure why Jean-Pierre dropped off the reports but said it would have been Dittman making those decisions. Bodden and Dittman would have drafted the reports.

48. In the 2011 annual report section dealing with disclosure of family relationships, Sears is not listed. Sears recalls numerous discussions with Jean-Pierre concerning whether or not Sears should be listed as a family member. Jean-Pierre told Sears he did not have to be disclosed. Dittman and Jean-Pierre had an initial discussion about disclosing Sears as family before Sears and Jean-Pierre talked about it. Sears said he thought he should be disclosed, but Jean-Pierre said that since he was not a blood relative and only a brother-in-law he did not need to be disclosed. Sears thought Jean-Pierre said it was section or rule 404 that he used to make the non-disclosure opinion.

49. In the section of the 2011 annual report dealing with related parties, Sears had discussions with Jean-Pierre concerning Sears needing to be disclosed. Again, Jean-Pierre stated since Sears was not a blood relative and was only an in-law, he did not need to be disclosed as a related party.

50. There was no discussion between Sears and Jean-Pierre about Bayside being a related party or a beneficial owner even though Bayside owned 9.74% of FusionPharm stock at the end of 2011. Sandra took all direction concerning Bayside shares from Sears. Jean-Pierre knew the Bayside shares held by Sandra were Sears' shares. Jean-Pierre knew Bayside loaned money to FusionPharm that was from the sale of stock via Microcap. Jean-Pierre knew this was Sears' stock. The issue of Bayside holding more that 5% shares was never discussed as an issue with Jean-Pierre.

51. Shares due to Sears from his debt settlement agreement with Baby Bee Bright were transferred to Robert Dittman from Dahlman. Jean-Pierre put the debt settlement agreement together in 2010. If Sears had taken possession of the 185,000 preferred shares of stock then he would have possibly had to be disclosed on the company documents as an affiliate. Jean-Pierre had no issues with putting Sears' shares into Robert Dittman's name in order to keep Sears under a 10% shareholder in FusionPharm. Jean-Pierre knew that the stock in Robert Dittman's name was for the funds owed to him from Baby Bee Bright and told Sears there was no problem putting it in Robert Dittman's name. Jean-Pierre knew the shares transferred into Robert Dittman's name were to avoid Sears being an affiliate and to allow him to draw down those shares over time. Jean-Pierre was also aware that Robert Dittman held FusionPharm shares controlled by Scott Dittman.

52. Sears received stock certificates for Microcap with a "Control" stamp on it and said he had an "Oh Shit" moment. Sears called Jean-Pierre to ask what to do about the control stamp and Jean-Pierre asked why the certificates were in Sears' name. Sears explained he was waiting for Robert Dittman to create a holding company so the stock could be placed into it. Jean-Pierre told Sears to transfer the shares to Robert Dittman's name. Sears said he just wanted the stock out of Dahlman's name as soon as possible.

53. Sears was shown a skype message dated 5/18/2011 from Jean-Pierre to Sears stating "Sounds Good! I should still be here. We can go over everything else regarding FusionPlarm's [sic] disclosure statement." Sears did not recall the message.

54. Sears was shown an email dated 10/17/2011 from Sears to Jean-Pierre with the subject of trustee agreement. Sears said the template in the email was from Redchip lawyers from Australia which was obtained as a possible way to put various entities under one umbrella trust account. Sears said Jean-Pierre made no attempt to customize this template but asked for details on how to do the business deals concerning the trust accounts. The text of the email refers to Sears future interests in FusionPharm and Scott Dittman's potential interest in Meadpoint.

55. Sears indicated the trustee agreement email dated 10/17/2011 was around the time he fronted money for a deal in Mile High Green Cross. Sears thinks Jean-Pierre knew about the Mile High Green Cross deal because Jean-Pierre wanted to know everything about all deals. Jean-Pierre was aware Sears bought pods because Sears told him. Jean-Pierre told Sears it was OK to lease the pods for less money that was needed to pay for the pods. However, even though he may have known about the Mile High Green Cross deal, Jean-Pierre may not have known about the personal loans Sears provided to Dittman from the monthly payments made by Mile High Green Cross.

56. Sears was shown the Meadpoint Shareholder Agreement. Sears said Jean-Pierre knew about this agreement. Meadpoint was formed to keep the marijuana part of the business out of FusionPharm since it was a public company. The agreement would have passed from Jean-Pierre, to Sears, to Dittman, and to Stuart Leudan. The agreement was never executed because of the marijuana aspect and Jean-Pierre never followed up with it.

57. Sears recalls Jean-Pierre traveling to Denver in the latter part of 2011, maybe around September 2011. Sears recalls having lunch with Jean-Pierre and Andy Duke, but does not recall discussing FINRA issues with Jean-Pierre.

58. Sears was shown the Vertifresh agreement. Sears said he retrieved an old licensing agreement from Bodden, made some changes, and sent to Leudan and Jean-Pierre for review. Jean-Pierre and Bodden worked on the Vertifresh deal and Jean-Pierre knew about the $750,000 licensing fee for Vertifresh. Sears could not recall which lawyer represented which specific company but that both lawyers were involved with both companies. Both Jean-Pierre and Leudan provided input and comments on the first draft of the Vertifresh agreement. Jean-Pierre knew that revenue was being booked based on an agreement that was not finalized.

59. Sears was shown the Vertifresh-VF Management Shareholder Agreement (Colorado). According to Sears, Leudan drafted the agreement but it was never finalized. This company (known as VF Management, Inc.) was to be the mother company of Vertifresh with Scott Dittman as the CEO. Sears said Jean-Pierre may have seen the agreement or maybe heard about it, but did not have involvement with it. The attorney for this company was Stu Leudan. For reference, Sears said there was also a Vertifresh-VF Management company in Delaware.

60. In preparation for the end of quarter, emails would be sent around among "everyone" to put together financials. Sears said he would skim over these emails and attachments but would not review them in depth. Emails would at least be sent among Bodden, Sears, Dittman, and Jean-Pierre. Jean-Pierre would review the drafts of the financials sent to him by Dittman or Sears. Jean-Pierre would then start drafting attorney opinion letters (AOLs) based on the financials. According to Sears, Jean-Pierre would get documentation from Bodden or Dittman concerning the transfer agents and then check with the transfer

agents to make sure the numbers were right. Sears cannot recall what specific documents, if any, Jean-Pierre received to backup AOLs. Sears would pass on requests for documents from Jean-Pierre to Dittman and others. Sears is not sure what the other people provided back to Jean-Pierre. Sears does not recall Jean-Pierre ever asking him for support documents for the OTC filings.

61. Sears talked to Tod DiTommaso one time on the phone and never actually met him in person. Jean-Pierre wrote the AOLs that were signed by DiTommaso. Sears had the impression that Jean-Pierre and DiTommaso were lawyers in the same firm.

62. Sears knew that Dittman traveled to California one time to meet DiTommaso in person at the Los Angeles Airport. Dittman told Sears that the meeting lasted for 15 minutes and that DiTommaso seemed like a dumpy guy. Dittman routinely complained to Sears that DiTommaso would not return his calls. Sears does not know if Dittman ever talked to DiTommaso outside of the 15 minute meeting at Los Angeles Airport and does not know if DiTommaso contacted Dittman prior to signing the AOLs. Sears does not know if DiTommaso met with anyone from FusionPharm Management outside Scott Dittman for 15 minutes at the Los Angeles Airport.

63. Sears waived any possible attorney client privilege and provided information from Brenda Hamilton containing a copy of a DiTomaso Opinion letter. Additionally, Sears provided information about www.promotionstocksecrets.com and other printed material he had obtained from an internet search.

64. Sears was never subpoenaed by the SEC for any records. Jean-Pierre never told Sears that Dinwoodie was his niece.

65. Sears had less than 10% of FusionPharm holdings in Microcap.

The first day of the interview (6/26/2017) ended at approximately 5:05 PM.

The second day of the interview (6/27/2017) began at approximately 10:41 AM.

66. Documents shown to Sears at the beginning of the interview included: 10/5/2011 email from Todd Kramer (FINRA), 10/5/2011 memo from Kramer concerning a phone call to FusionPharm, 10/5/2011 Skype message between Sears and Jean-Pierre stating that Kramer was part of "a new division of FINRA only enacted post Madoff", 10/6/2011 memo from Todd Kramer concerning an interview with Scott Dittman, various emails from within FusionPharm concerning the FINRA investigation, and a letter from Jean-Pierre to FINRA dated 11/30/2011. Other documents included Baby Bee Bright Corporate Consent Form (March 2011), Baby Bee Bright Corporate registration (11/15/2010), Baby Bee Bright Consent of Stockholder Agreement (11/15/2010), email string between Sears and Jean-Pierre about Microcap transfers to Scholz (Oct 2011), and 11/25/2011 email from Kramer to Jean-Pierre.

67. Sears said he sometimes signed Sandra Sears name to documents associated with the company and sometimes the documents were sent to Sandra for her signature. On the

Baby Bee Bright Corporate Consent form, Sears identified the signature as coming from Sandra and not him. Jean-Pierre prepared the Baby Bee Bright Stockholder Agreement and spoke with Sandra on the phone to confirm she was a real person.

68. According to Sears, Jean-Pierre created and forwarded the Baby Bee Bright documents to Dittman and Sears in March 2011. The documents eventually ended up with Todd Kramer later that year. Don Harmer, from Carson, NV, runs a corporate services/registered agent business and also assisted getting documents to Jean-Pierre when organizing the company.

69. Sears remembers hearing about the 10/5/2011 FINRA call from Duke or Dittman and it having something to do with an internet crime division or something similar. Sears searched FINRA and Todd Kramer on the internet to find out what the "post Madoff" division was all about. Sears talked to Jean-Pierre about FINRA inquiring about FusionPharm. Sears said he probably Skyped Jean-Pierre first which led to a phone call. Sears talked to Jean-Pierre about why FINRA would be looking into FusionPharm. Sears recalls asking Jean-Pierre if the FINRA call was about issues with Robert Taylor. Sears talked to Dittman about his conversations with Jean-Pierre about what FINRA might be inquiring about.

70. Sears does not remember Dittman talking to Kramer on the phone on 10/6/2011, but he would have been in the building on Wynkoop. Sears did not prep Dittman for the call with Kramer. After the call, Dittman told Sears that FINRA was asking about him. Dittman told Sears about the call and Sears told Jean-Pierre. Jean-Pierre would have been told that FINRA was asking about Sears.

71. Jean-Pierre was aware of Sears selling FusionPharm stock through Microcap around the time of the FINRA call because Jean-Pierre was writing the AOLs. Jean-Pierre was the only lawyer Sears used to write any type of paper for FusionPharm and Microcap. According to Sears, Jean-Pierre knew everything because Sears told him everything through documents, emails, and phone conversations. Jean-Pierre knew Sears owned a block of FusionPharm stock that was held in the name of Microcap and that Sears was selling the this stock.

72. In October 2011, Jean-Pierre visited Denver. Sears recalls a meeting that occurred at the Rialto Café on the 16th Street Mall with Sears, Jean-Pierre, Scott Dittman, and Andy Duke in attendance. Sears said Duke left early in the meeting. Sears recalls discussions about raising capital, notes, and SB1 vs Form 10. Sears said they could have talked about the FINRA investigation but does not specifically recall it happening.

73. Sears was shown an email string (with attachments) between Sears and Jean-Pierre concerning the Scholz Microcap transfer. As part of the Assignment of Ownership Interest, Scholz would get the database, software, and online publications but did not get the stock in the brokerage accounts, even though the signed agreement states the brokerage accounts were included. Sears identified the signature on the document as being from him. The FINRA inquiry led Jean-Pierre to write the agreement this way. Sears said he did discuss the transfer with Scholz prior to the FINRA agreement but Kramer's inquiry pushed it to the top of the to-do list. Jean-Pierre wrote the agreement, sent it to Sears who then sent it to Scholz for both to sign. Jean-Pierre was aware that Sears was keeping the stock despite what the agreement said. Sears remembers Scholz

telling him that FusionPharm stock got "blue slipped" but that may have been up to a year later.

74. Jean-Pierre knew, during the time of the FINRA inquiry, that Sears was trading Microcap shares. Jean-Pierre also knew this was going on both before and after the FINRA inquiry.

75. Sears was shown an 11/27/2011 email from Dittman to Jean-Pierre concerning Kramer saying they would talk tomorrow. Sears did not recall being on the phone conversation with Dittman and Jean-Pierre but that Jean-Pierre was the lawyer for both he and Dittman.

76. Dittman told Kramer that Sears was divested from Microcap, but he does not know why Dittman would say that. Sears did not collaborate with Dittman on that statement.

77. During the FINRA investigation, Dittman began with an attitude of cooperation with the investigators. However, Jean-Pierre changed the direction and refused to cooperate. Sears said Jean-Pierre put up road blocks to the investigation and it was not at Sears' direction.

78. Sears was shown an email dated 2/28/2012 from Robert Dittman to Leslie at Pacific Stock Transfer Company regarding a transfer of shares from Robert Dittman to Scholz. Sears said he would have assisted Robert Dittman with the language sent to the transfer agent. As a result, Scholz would receive FusionPharm shares from the transfer agent in the name of Microcap at a Florida address. This gave the appearance that Scholz was receiving FusionPharm shares. However, Sears stated that any FusionPharm stock certificate issued to Microcap meant that he was the beneficial owner. Jean-Pierre knew the FusionPharm stock was owned by Sears while in the Microcap name.

79. Another email from May 2012 outlining a Bayside transfer to Scholz was shown to Sears. Sears was not sure of Jean-Pierre's involvement with this transfer. Sears always controlled the Microcap brokerage accounts and Jean-Pierre was aware of this.

BREAK - approximately 1:05 PM to approximately 1:40 PM.

80. Sears gave short term loans to FusionPharm that were derived from previous sales of FusionPharm stock via Microcap. Both Sears and Jean-Pierre knew the loans were from the sale of FusionPharm stock held by Microcap and had conversations on how to convert the loans. The FusionPharm stock that was sold originated from the Dahlman block of shares. According to Sears, Jean-Pierre knew the stock sold was held by Microcap and was owned by Sears, that the preferred shares were given to a third party and released in tranches to Sears, and the proceeds from the sale were placed back into FusionPharm. Jean-Pierre also knew the shares were transferred to the LaDeeDa company before going to Robert Dittman.

81. The debt consisting of Sears' loans to FusionPharm were not initially documented by promissory notes. However, Jean-Pierre knew that if FusionPharm was to be up-listed then the financials would be audited and the loans would have to be documented. Sears recalls this topic being brought up by Jean-Pierre and discussed at the meeting at the Rialto Café when Jean-Pierre was in Denver. The two entity split idea came up after the meeting and was proposed by Bodden.

82. Sears was shown an email dated 9/15/2011 concerning templates for note conversions. Sears recalls Jean-Pierre sending sample notes to him through email, but is not sure if it was this specific email. Sears was interested in the convertible feature of the notes. Sears had no explanation for the amount of time between the proposed templates in September 2011 and the notes being drafted and signed in June 2012.

83. During the dinner meeting at the Rialto Café, Jean-Pierre, Sears, and Dittman discussed up-listing FusionPharm, the associated financial audit, and how to document the loans. During a discussion of the stock strike price, Jean-Pierre proposed listing it at "par" but both Sears and Dittman said no. Jean-Pierre knew money had been previously given to the company and a promissory note was a way to document that. The notes were to be for a finite obligation and not an open line of credit. Sears said Jean-Pierre never prepared a promissory note that Sears signed for the loans.

84. Sears knew Nick Malino as a person who would purchase company debt, specifically notes convertible into stock. Sears was introduced to Malino by Bodden. Bodden put together a FusionPharm due diligence package for Malino to look at. During a conference call between Malino, Bodden and Sears, Malino asked a lot of questions concerning FusionPharm's OTC filings. After the one conference call and exchanging a few emails, Sears and Bodden met with Malino in New York to talk about the sale. Malino wanted the debt to be a convertible note but Sears and Bodden did not. The sale never went through. Jean-Pierre was aware that Sears and Bodden were attempting to sell the debt and knew it was split into two notes. From conversations with Bodden, Sears knew that Bodden was communicating with Jean-Pierre on drafting the notes. Sears said he had not been looking for anyone to purchase the debt prior to discussions with Malino. Sears said he talked to Jean-Pierre at some point about the note sale but did not recall a specific conversation.

85. Sears was shown a certificate of designation. Sears said that prior to the Malino deal, he did not know what a certificate of designation was until Bodden told him. Sears was not aware if one had been received from Dahlman so he asked the transfer agent, who said they did not have one. Sears then told Bodden and Jean-Pierre that the transfer agent did not have one and Jean–Pierre said one will need to be created. Bodden and Jean-Pierre then started the process of creating one with a 9.9% limit on the conversion of preferred stock.

BREAK - approximately 3:25 PM to approximately 3:45 PM.

86. Sears indicated the documents for the Malino deal were put together by Bodden and Jean-Pierre. Sears said he did not review the documents in detail at the time and is shocked reviewing them in detail during this interview. Sears was not aware all this documentation existed to the extent that was shown to him.

87. Sears was not able to recall why a Current Information Letter was not submitted in November 2012 for the reporting period ending September 30, 2012.

88. Sears was shown an email dated November 26, 2012 from Bodden to Sears concerning convertible notes. Sears indicated this was an attempt to bring the notes to market and get money for the company. Sears was could not recall the specific conversations leading up to Bodden sending the email with the notes.

Attachment 10
Page 12 of 14

89. Sears was shown documents for #12986 concerning 140,000 free trading shares. Sears said he signed these documents for Sandra Sears as Bayside. Jean-Pierre provided documents related to the backdated note that went to the transfer agent. Jean-Pierre knew the documents were going to the transfer agent.

90. Sears was shown an email dated 12/13/2012 from Jean-Pierre to DiTommaso. Sears identified the attachments on the email and said he traded emails with the transfer agent. Jean-Pierre was OK with the documents being sent to the transfer agent. Jean-Pierre told Sears that the 144 period started when the first money goes in.

91. In an email dated 12/26/2012 from Sears to Joanna DiBella, Sears used the term "righteous" in referencing the notes. The term was provided to him by Jean-Pierre.

92. Sears said he composed and sent emails to the transfer agents using Sandra Sears' emails. Sears said emails would have been sent from Sandra Sears' email address to the transfer agent with documents for by the transfer agent.

93. Sears did an initial conversion on the Bayside note due to Coleson's interest in the note. Sears knew that Coleson's interest in the note would garner interest from the market for stock. Jean-Pierre and DiTommaso did all the attorney letters for the Coleson deal as well as all other deals.

94. Sears forwarded emails from DiBella to Jean-Pierre regarding the initial conversion of the Bayside note. Sears would then have phone calls with Jean-Pierre who would provide lengthy explanations on why the transfer agent was incorrect. However, Jean-Pierre eventually modified the letter with DiTommaso to satisfy the transfer agent.

95. Sears looked at Jean-Pierre as the lawyer and Bodden as the bookkeeper. Bodden put together drawdown requests and worked with Jean-Pierre to draft documents. Sears relied on Jean-Pierre and Bodden for proper documents to give to the transfer agents.

96. Jean-Pierre never pointed out that the notes were prepared in two different ways. Sears would have stopped if he had been advised by Jean-Pierre that the documents were wrong. According to Sears, Jean-Pierre never pushed back or raised any issue with the notes or the changing of documents to meet transfer agent needs.

97. Coleson drove the paperwork changes concerning the purchase of the Bayside notes. Coleson would send them to Sears who would then send to Jean-Pierre to make the changes.

98. Sears said he drafted the email dated 1/17/2013 from Sandra Sears to DiBella with the subject of "Convertable [sic] Note" using Sandra Sears' email address. .

99. Sears was shown a series of documents that were sent through FedEx to and from the transfer agent. Sears noted that the transfer agent would have relied on an attorney letter drafted by Jean-Pierre and signed by DiTommaso as truthful in issuing the stock certificates. Sears said he sent and received the documents by FedEx.

100.     Sears was shown the FedEx receipt showing a record of him sending a packet to the transfer agent in Nevada on 7/25/2012 and another FedEx record showing him receiving a mailing from the transfer agent on 8/01/2012. Sears said he mailed a packet

of information to Pacific Stock Transfer Company by FedEx from Colorado to Las Vegas, NV for the conversion of 40,000 shares from Todd Abbott to Microcap. Sears indicated the packet contained, among many other things, an attorney letter drafted by Jean-Pierre and signed by DiTommaso used by the transfer agent to convert the certificate. Sears said he received the new certificate through FedEx at the Vine Street address in Denver, CO from the transfer agent in Nevada.

101.    Sears was shown a FedEx mailing record showing a packet addressed to him being mailed from the transfer agent on 1/18/2013 to Thornton, CO. Sears said he received the certificate for 140,000 shares in the name of Bayside Realty Holdings at his Jackson Drive address in Thornton, CO. Sears said he knows he received the certificate because he would have remembered if it had not arrived. Sears said this certificate would not have been issued had an attorney letter not been presented at some point to the transfer agent. According to Sears, Jean-Pierre would have drafted the letter and DiTommaso would have signed the letter.

102.    Sears was shown a FedEx mailing record showing a packet addressed to him being mailed from the transfer agent on 8/15/2013 to Brighton, CO. Sears said he received a certificate for 500,000 shares in the name of Meadpoint Ventures Partners at his UPS store box in Brighton, CO. Sears said he knows he received the certificate because he would have remembered if he hadn't. Sears said this certificate would also not have been issued had an attorney letter not been presented at some point to the transfer agent. According to Sears, Jean-Pierre would have drafted the letter and DiTommaso would have signed the letter.

103.    The interview concluded at approximately 5:00 PM.

Rob Barnett

U.S. Postal Inspector

FD-302 (Rev. 5-8-10)

- 1 of 28 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____ 07/11/2016 _____

William Joseph Sears, date of birth May 13, 1966, was interviewed at the Denver United States Attorney's Office located at 1225 17th Street, Suite 700, Denver, Colorado 80202. In attendance were Assistant United States Attorney (AUSA) Kenneth Harmon, Special Assistant United States Attorney (SAUSA) Scott Mascianica (via telephone), Federal Bureau of Investigation (FBI) Special Agent Kate E. Funk, Internal Revenue Service (IRS) Special Agent Michael Godson, United States Postal Inspector Service (USPIS) Kenneth Haithcoat, Securities and Exchange Commission (SEC) Attorney Kimberly Greer and SEC Attorney Lincoln "James" Lyman. Also in attendance were Sears' attorneys Fredric Winocur and Marci Gilligan (via telephone). The proffer letters were reviewed and signed by Harmon, Winocur and Sears. After being advised of the identity of the interviewers and the nature of the interview, Sears provided the following information:

Sears was born in Rockaway Beach, New York and grew up in Queens and Long Island. In 1984, he graduated from General Douglas McArthur High School in New York. He attended Nassau Community College for one year. From 1984 through 1992, he held several jobs to include personal trainer, iron worker, salesman, and driver. Sears also worked for Coca-Cola. He does not have any professional licenses. He studied for the Series 7 in 1991 but did not take the test.

His main employment in adulthood has been as a "financial intermediary" or "stock jock". He has been involved in securities since 1992. When he was 22 years old, he met Marilyn Redman, an older woman who worked at a brokerage firm named Dunhill Securities. Redman held several securities licenses. She taught him the securities business and introduced him to people in Boca Raton, Florida. Sears became involved in Regulation S Securities, which are offers and sales of securities that occur outside of the United States and discounted stocks. The stock would have to spend a minimum of 41 days overseas. Investors would put money into an offshore fund which was used to purchase the discounted stock with the assistance of Sears. He was able to "jockey" blocks of stock.

| Investigation on | 02/18/2016 | at | Denver, Colorado, United States (In Person) |

| File # | 318B-DN-3938165 | | Date drafted | 02/29/2016 |

by  Kate E. Funk, GODSON MICHAEL ANTHONY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

GJP_00006226

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  2 of 28


He met and became friends with Cliffe Bodden in approximately 1991 or
1992 in Atlanta, Georgia. Bodden was a stock broker from the Cayman Islands
that worked for an "OSJ" and satellite office of Bear Stearns as well as
Camelot Securities. Sears also worked for Camelot Securities making cold
calls. Sears moved to the Cayman Islands in 1993 or 1994 through 1999. He
set up a hedge fund related to Regulation S securities. He did sales and
marketing and sent out a free newsletter called "Projections". He worked
with Peter Jeffries from Canada and Ari Leo Fromm. Sears also worked for
the business Peachtree with Bodden and Mitch Borcherding.   Bodden was good
at putting together business plans and contracts and was an intermediary in
Cayman. Bodden and Fromm were doing things with the business that he did
not like and Sears left the business in 1997 and began working under his
own name. In 1999, Sears received a call from someone from Australia
telling him that Bodden and Fromm had absconded with $2.5 million of a
friend's money. Sears said that he will go "up to the line", "dance around
the line" and "cross the line" but he would not steal from somebody. Sears
worked with the companies Astro Fund and Growth Planning Limited.


From 1992 through 1999, Sears had good contacts in Australia and did
several other deals related to 144 stock including with symbols ONST, HIVC
or HIVV. Sears moved to Australia in the late 1990s and came back to the
U.S. (and Cayman) in 2004 or 2005. While in Australia, he helped his friend
sell and market a high-rise building, he was an extra in movies and did
some modeling. When he returned to the United States, the industry had
changed: 144 stocks had a one year holding period and were different than
Regulation S securities.


When Sears returned to the United States, Bodden told Sears that he
had the Atlantis, the vessel that found the Titanic, in Lake Pontchartrain,
Louisiana. They wanted to use the vessel for high-end dive operations.
Vencap Holdings, a shell company, was going to be used to run these
operations. Atlantis needed too much work and the deal fell through because
they needed $2.5 million to refurbish the vessel. Vencap was also the
entity that Bodden used in the investment fraud case where he was charged
federally. Sears also worked on an Australian securities deal with the
company Omni-Net related to kiosk advertising. Bodden was not involved with
this deal.

GJP_00006227

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 3 of 28

 

Sears met Richard Scholz in 2000 in New York. Scholz was working the floor of an Investment Relations company. Scholz was living in Florida at the time, but was from New York. They met at 100 Wall on the 26th floor. Sears was at the meeting on a separate Omni deal. Scholz was a stock promoter. Sears and Scholz did not work together until FusionPharm in 2011. They did not work any other deals together.  Sears sold Microcap Management to Scholz in 2012.


Sears had been involved with bribing brokers. The last time he bribed a broker was in 2004 or 2005 when he was charged in a New York federal case.


Scott Dittman and Robert Dittman are Sears' brother-in-laws. Sears met his wife, Sandra Dittman Sears, in February of 2004. From 2004 through 2007, Sears started the company International Solubles with Robert Dittman and owner Henry Sarmiento. Sears put the company in his wife, Sandra Dittman Sears', name because he was the subject of the New York Federal securities fraud case. Their product was Ultra Grip, a non-slip product that started through Rosual, a private Florida Limited Liability Company (LLC). Rosual and International Solubles had a licensing agreement. It was a clear substance that was applied to floors to make the floor non-slippery. They sold the product to hotels and hospitals in Rhode Island and Florida. International Solubles also had a janitorial company. They had shareholders but did not have a ticker symbol. In November of 2009, the company lost business and was unsustainable. The shareholder list for International Solubles was transferred to Silver Star. Silver Star's business was the Green Street Report which did advertising and marketing for publicly traded "green" businesses. Sears said that the same shareholders were "churned and burned" from one entity to another. The following people were involved with International Solubles: Jack Owens, Bodden, Sears, Richard Buffington, Fred Nelson, Ben Last Name Unknown (LNU), and Robert Dittman. Nelson did Investor Relations/Public Relations (IR/PR) work. Sears was not involved with the company Green Street Capital or Green Street Ventures and did not know why it was started. Owens had owned the shell company, Poker Book. Sears left Silver Star in 2008.


In 2007, Sears met Alan Siegel, owner of Microcap Management. Siegel had an algorithm related to his business which was to pitch microcap companies to registered representatives.  In 2008 or 2009, Sears started

GJP_00006228

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  4 of 28

promoting stocks under the company name Microcap Management. David Heredia,
Also Known As (AKA) David Scott, was supposed to get the Microcap
Management website running. Sears and Heredia worked together at Microcap
for about six or seven months. Heredia was involved with narcotics and had
OxyContin sent to the Microcap office at the end of 2009. Sears discovered
that Heredia was bribing brokers and Sears kicked Heredia out of the
Microcap office. Microcap's IR/PR work terminated around the end of 2009.


Sears met Buffington in 2007 or 2008. He worked to raise money for
Buffington's publicly traded company Silver Star. Silver Star was looking
to put together the Green Street Report. Sears described Buffington as an
alcoholic who was regimented.  Buffington served in the military and had
been a broker in the past. In 2014, Buffington contacted Sears to purchase
Vertifresh. Sears flew to Florida and met with Buffington.


Before 2010, Sears had been doing IR/PR for Jaguar Mining through his
company Microcap Management in order to raise investor awareness. Sears'
contract with Jaguar for this work was similar to the agreement that he
entered into with Baby Bee Bright for IR/PR work. The boiler plate IR/PR
consulting agreement that Sears used for multiple IR/PR clients was
provided by Guy Jean-Pierre. Sears was sending e-mails to 2,000 brokers
that he had set up in Constant Contact. He inherited his list of contacts
from Heredia. Sears would disseminate press releases to his contacts. He
did not draft the press releases.  He did not follow up with brokers
because it was a gray area and he did not want any problems. Sears'
consulting agreement with Jaguar reflected payment of $770,000 in stock. He
said that stock was totally different than getting paid in cash. He charged
three to four times for payment in stock instead of cash because of the
inherent risk associated with stock prices. Sears could not recall who he
received his Jaguar shares from but said that it could have been from
King's family. He was paid in free-trading, unaffiliated and unencumbered
stock for his work doing IR/PR as documented in his contracts. The stock
came from a third party, usually a large shareholder. He did not care who
provided the free-trading stock and did not pay any third-parties for the
stock. He deposited the stock into his brokerage accounts at "RM Stark" or
Oppenheimer. He worked with broker Scott Eisler, who Sears had met years
earlier in Boca Raton, Florida. Eisler is a legitimate broker with a large
book of business. Jean-Pierre completed the Attorney Opinion Letters, to
include those for Sears' Jaguar stock, stating that the third party
shareholders were not affiliates. Sears also had a brokerage account out of
Salt Lake City.

GJP_00006229

Attachment 9
Page 4 of 28

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 5 of 28

       In 2010, Bodden was looking for a shell to acquire for Green Street
and Sears helped him by brokering a deal with Billy King and Jaguar. Sears
was the "intermediary" in the deal. Bodden never paid King for the shell.
Jaguar had been a shell before it became Jaguar Mining. Dale Williams of
Jaguar had walked away from the company by moving to Mexico. Sears required
that he get paid as a condition of the acquisition of the shell since he
had not yet received his stock for the IR/PR work. He filed a "friendly
lawsuit" with his attorney Charles Kleeland in Florida court to get his
free-trading Jaguar stock. Sears did not have any role with Green Street.
He did not want to do any IR/PR work for Green Street (formerly Jaguar)
because he was did not want to be involved in Bodden and Buffington's
business. He sold all of his Jaguar stock within several months of
receiving the stock. Scholz worked for a few weeks with Buffington and
Bodden. Bodden had numerous emails addresses to include a Meadpoint,
Hotmail, Star City and Green Street email account.


       Sears said that the shell companies evolved over several years with
different names. The names, in order, were Rosual, International Solubles,
PokerBook, SilverStar, and then Green Street. Green Street became publicly
traded through the acquisition of the Jaguar Mining shell company. The
founder shares came from Sears, Robert Dittman and Henry Sarmiento that
started Rosual. Sears received his shares through his wife's name, who was
still Sandra Dittman at the time.


       Sears met Jean-Pierre through King in 2009. Jean-Pierre was the
attorney for the Monogram Energy Deal and was King's Securities Attorney.
King was also an attorney. Jean-Pierre was born in Haiti but moved to the
United States. He went to Rutgers University and practiced law in Deerfield
Beach with several other lawyers. Jean-Pierre helped King get stock.
Jean-Pierre was involved with the following companies: Jaguar Mining,
FusionPharm, Baby Bee Bright, and Cotton Western. Sears paid Jean-Pierre to
write Attorney Opinion Letters. He also had him look at disclaimers, to
include safe harbor disclaimers, on Microcap Management's website.


       Sears formed Bayside Realty Holdings in North Carolina in 1997 which
is now defunct. He then formed Bayside Realty Holdings in Nevada. It was
created as a holding company to protect Sears' assets. Sears could not
recall using his Mother's name, Sandra Sears, for any business transactions

GJP_00006230

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  6 of 28

other than Baby Bee Bright and FusionPharm although the entity Bayside may
have been used in several other deals. Although his Mother's name was on
some of the Bayside paperwork, Sears was making all the decisions.


Sears met Doug Sailors over the telephone in 2009, likely through
Billy King, when Sears was hired to do stock promotion work for Baby Bee
Bright. Sailors was a major shareholder of Baby Bee Bright and owned the
company FUM Management. Sailors put his Baby Bee Bright stock in his wife's
name, Jamie O'Bryan. Sailors was also a "stock jock" that was involved in
putting deals together. Sears met Frederick Dahlman through Billy King.
Dahlman, Baby Bee Bright's Chief Executive Officer (CEO) hired Sears to do
the IR/PR work for Baby Bee Bright. Sears and Dahlman agreed to Sears'
standard consulting agreement which included a fee of $70,000 worth of free
trading stock per month. Sears always received the first month worth of
fees in free-trading stock. Sears received his shares from FUM Management.
Sears said that the cash equivalent for this agreement was about $10,000 to
$20,000. The $70,000 figure was used in the agreement because of the
inherent risks associated with penny stocks. Sears modified the name in his
template IR/PR agreement for each client. Baby Bee Bright had a
communication device for unborn babies. Sears received a due diligence
package regarding Baby Bee Bright. They originally marketed it as a
learning device but had some issues with the Federal Trade Commission
(FTC). Dahlman had about $140,000 worth of inventory.


When Sears started working for Baby Bee Bright, the company had no
money and was dead. Baby Bee Bright wanted to get the news out that the FTC
investigation was clear. Sears was shown a copy of the consulting agreement
between Baby Bee Bright and Microcap Management. He said that he may have
received two months worth of free trading stock up front. He did IR/PR work
for Baby Bee Bright from April through October or November of 2009. His
work involved sending out press release emails to brokers and directing
investors and brokers to Dahlman. Because of Sears' criminal history
including securities fraud, he did not want to talk directly with brokers
and registered representatives. Baby Bee Bright owed him a lot of money.
During the first half of 2010, Sears explained to Dahlman that Baby Bee
Bright was not worth anything. Sears continued to work under his contract
because it was not cancelled, thus, the associated fees were still
accumulating. Sears planned to use the accumulated fees to allow him to
take over the Baby Bee Bright shell company in lieu of payment. In 2010,
Sears was thinking of starting a business that bought and sold shell
companies. He would clean up the shell by paying the bills, consolidating

GJP_00006231

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  7 of 28

the debt and reversing the stock. Baby Bee Bright was the first shell that
he acquired. Sears met with Dahlman in August of 2010 in Tennessee to
discuss the acquisition of Baby Bee Bright to be used for FusionPharm.
Dittman was out of the home building business at this time and in the
marijuana industry.


Sears hired Jean-Pierre to do the Attorney Opinion Letter's (AOL) for
Sears' Baby Bee Bright stock. The letters were actually signed by someone
other than Jean-Pierre. Sears never thought about why he would receive an
AOL from Jean-Pierre with a different attorneys name on it. Sears always
paid Jean-Pierre for the AOLs. Jean-Pierre also did other attorney work for
Baby Bee Bright on behalf of Sears.


While Sears was promoting Baby Bee Bright, he was also doing IR/PR
work for other companies likely including Cotton and Western Mining,
Diverse Media Group/DMVT, Polaris International Holding, and Actionview
International. These deals originated from broker David Adams. He used the
same type of consulting agreements with these companies. Sears said that if
he received stock from a company, than he did IR/PR work for the company.
He also put together company profiles for his Microcap Management website.


Sears was shown a copy of the 2010 Annual Report for Green Street
Capital which showed Robert Dittman as a beneficial owner of the stock.
Sears was not aware that Robert Dittman ever owned shares of Green Street.
He said Robert Dittman's stock may have originated from International
Solubles or the company Rosual. Robert Dittman was not holding shares that
Sears' controlled. He indicated that Robert Dittman may not even know that
he owned those shares. He noticed the name Rhett Wertzbaugher was also in
the list of beneficial owners. Sears said that Wertzbaugher was part of the
2004/2005 New York federal case against Sears. He said that any newly
issued shares for Green Street Capital would be to new "victims".


Sears wanted to start a business where he purchased shell companies
and then used Pacific Stock Transfer Company (PSTC) as the transfer agent.
This business did not materialize. FusionPharm was the first and only
business deal that Dittman and Sears did together.

GJP_00006232

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears , On 02/18/2016 , Page 8 of 28

Sears became an Administrative Officer of Baby Bee Bright and/or
FusionPharm in order to take over the shell company and clean it up.
Jean-Pierre was instrumental to Sears because Sears had not taken over a
shell company before. Jean-Pierre worked with Maria Samson and Joanna
Dibella at PSTC and put together all the paperwork required to transfer
Baby Bee Bright to FusionPharm. Jean-Pierre kept Sears and Dittman in the
loop regarding everything he was doing to transition the companies.
Jean-Pierre was hired to do legal work for FusionPharm because he had
knowledge of Baby Bee Bright and was inexpensive. Jean-Pierre created
corporate documents, reviewed financial statements, created business plans
with Bodden, and wrote AOLs.

As part of the transition from Baby Bee Bright to FusionPharm,
Dahlman transferred a control stock certificate to Dittman. Sears could not
recall the number of shares. Before the transition, Dahlman owned 1.5
million preferred shares of Baby Bee Bright. Sears had a verbal agreement
with Dahlman regarding the distribution of Dahlman's shares. Dahlman was
supposed to transfer all of his shares to Dittman with the exception of the
15,000 preferred shares that Dahlman would retain as payment for the shell
and the shares for Sears' IR/PR work. Dahlman transferred 1.3 million
preferred shares to Dittman, giving him shareholder control, and held onto
200,000 preferred shares. Sears was owed approximately 500,000 to 700,000
common stock shares as part of his consulting agreement. Sears wanted to
get his shares in tranches so that he did not own more than 10% of the
outstanding shares.  If he owned 10% or more of the outstanding shares, he
would be deemed a control person of FusionPharm. Dahlman ended up retaining
200,000 preferred shares for a period of time as a way to attempt to get
Sears to pay him $50,000 to release the stock. Sears was shown an email
dated March 1, 2011, from him to Dahlman regarding the share
distribution.  Sears said that Dittman wanted Dahlman to transfer 185,000
preferred shares from his 200,000 preferred shares to Robert Dittman.
Dahlman had some issues with putting the stock in Robert Dittman's name.
Sears wanted control of the 185,000 preferred shares so he had Dahlman
transfer the shares to Microcap Management. Sears did not want to keep the
shares in his name because it made him an affiliate. He discussed the fact
that he was over the threshold with Jean-Pierre. Jean-Pierre was telling
Sears what he wanted to hear in order to get his stock as free-trading.
Sears also spoke with Joanna DiBella at PSTC on a daily basis. Jean-Pierre
also worked with DiBella and Maria Sampson at PSTC on working to clean up
Baby Bee Bright. Jean-Pierre helped to facilitate the process with the
transfer agent. DiBella was aware that Sears wanted free-trading stock.
Sears came up with the idea to transfer the majority of the shares to La
Dee Da, a business name set up by his wife, which Robert Dittman was

GJP_00006233

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  9 of 28

supposed to take over. Robert Dittman did not want the stock in his name
and was supposed to set up an entity to hold the FusionPharm stock. Dittman
wanted Robert Dittman to have the shares in case Dittman sold a portion of
FusionPharm in the future. Dittman wanted to have voting rights. The shares
in Robert Dittman's name would allow Dittman to still have an ownership
interest in FusionPharm. Robert Dittman had no involvement with FusionPharm
at the time. At some point, Sears then transferred the shares from La Dee
Da directly to Robert Dittman. He was using Robert Dittman to hold the
stock. Jean-Pierre knew that a portion of the 185,000 preferred shares
included compensation for Sears' work for Baby Bee Bright.


        Sears reviewed the email dated June 20, 2011. Sears did not
specifically recall the email but believed the "we" in the email likely
referred to Sears and Dittman. Sears stated that at the time of this email,
Sears and Dittman were in other ancillary business including marijuana
infused products and another business run by Kelly Blume. Sears said that
Robert Dittman did not know anything about the paperwork required for stock
transactions and that Sears drafted any paperwork and directed the
transfers related to the FusionPharm stock in Robert Dittman's name.
Dittman did not direct Robert Dittman's stock transactions. Todd Abbott,
Paul VanStekelenburg, and Kuntal Vora received FusionPharm free-trading
shares from Sears. They were older investors from prior businesses that
were Scott Dittman's friends. There may have been one or two other
investors that also transferred their restricted stock for unrestricted
stock. VanStekelenburg may have also bought FusionPharm stock. The stock
that went to Roger Pawson, Stephanie Pawson, OTC Markets and For Your
Information was related to a private placement for free trading stock. The
funds were going to be used to start Vertifresh. They never paid for the
stock and should not have received the stock. Buck Adams received 5,000
shares for consulting work and technology provided to Vertifresh.
Vertifresh was run by Sears and Robert Dittman. Steve Falconer, Frank's
father, purchased 144 restricted stock. Jean-Pierre was involved in every
step of the FusionPharm stock transactions related to the 185,000 preferred
shares. At some point after the transfer of shares occurred for Abbott and
Vora, Jean-Pierre said that it could be considered a "gypsy swap". Sears
told Jean-Pierre that he was controlling the stock that was in Robert
Dittman's name. Jean-Pierre also knew that the shares due to Sears from his
debt settlement agreement with Baby Bee Bright were being held by Robert
Dittman. Jean-Pierre was working out of Florida. Bodden, Dittman and Robert
Dittman might be able to corroborate that Jean-Pierre was aware that Sears
was controlling the preferred shared in Robert Dittman's name. Robert
Dittman's incentive to keep the preferred shares in his name was that if he
got his act together, he may have been able to use the shares in the

GJP_00006234

Attachment 9
Page 9 of 28

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  10 of 28

future. Robert Dittman did not receive any compensation for holding the
shares from 2011 through 2014.


The 185,000 preferred shares consisted of shares owed to Sears from
his debt settlement agreement and Robert Dittman's stock. Sears drew down
his shares from Robert Dittman's in order to avoid being a control person.
If he owned more than 10% of the outstanding shares, he would have problems
depositing the shares in his brokerage account.


Sears' Mother, Sandra Sears, was listed as the Corporate Secretary of
FusionPharm although she never had any role with FusionPharm. They needed
two signatures and Sears was already the Administrative Officer on
documents submitted to the OTC, so they had his Mother sign although she
was there in name only. Sandra Sears was listed on the stock certificates
because she was Corporate Secretary. She was never an officer or director
of FusionPharm. Sandra Sears resigned from her position with FusionPharm
when Sears' Grandmother became ill. Jean-Pierre took over as Corporate
Secretary. Originally, it was going to just be Sears and his Mother listed
as the officers of the shell company. In the beginning, Sears did not think
FusionPharm would be around for a long time. He did not want to be a listed
officer or director because he would have to disclose his prior criminal
history.


Jean-Pierre introduced Sears to attorney Tod DiTommaso in 2011 after
telling Sears that he was working with DiTommaso. DiTommaso was working
from California. DiTommaso told Sears to run everything through
Jean-Pierre, but Sears never asked why. He only talked to DiTommaso on the
phone once. Dittman also spoke to DiTommaso. Sears was not sure why
DiTommaso was involved, but thought that DiTommaso and Jean-Pierre were
partners. Jean-Pierre wrote every AOL signed by DiTommaso. Sears was
friendly with Jean-Pierre and attorney Fred Lehrer. Sears met Frederick
Lehrer in August of 2013. Jean Pierre had an issue with Lehrer's ex-wife,
Linda Hamilton, relating to the company Big Apple, an Investor Relations
firm. Sears learned of Jean-Pierre's OTC ban around the same time in early
2013 that he learned about the SEC default judgment from a text message he
received from Scholz. He maintained contact with Jean-Pierre after finding
out about his legal trouble but Sears' never hired him to do work after
that date.

GJP_00006235

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  11 of 28

 

Sears initial role with FusionPharm was to get everything set up with the Over-the-Counter (OTC) market. He worked with Baby Bee Bright's accountant, Mike Kocinski, and with Jean-Pierre. The financial statements from Baby Bee Bright had not been audited. In order to file a Form 10 or S-1 with the SEC, they would need two years of audited financial statements. In early 2011, FusionPharm was going to be a cannabis support and consulting business. Shane Bohlender had accounting software that they thought could be used for cannabis business. The PharmPod idea started in summer of 2011. Bill Farley from Commerce City had the initial idea but had his containers outdoors. In 2011 and 2012, FusionPharm began procuring PharmPods. Sears had administrative responsibilities at FusionPharm to include uploading reports to the OTC website after they had been reviewed by the accountants and the attorneys.  Sears did not take part in preparing the content included in the documents posted to the OTC website. This was handled by Dittman, Kocinski, Bodden, and then Craig Dudley in 2014. Sears, Dittman and Bodden all worked on the content of press releases.  Sears posted the press releases on the news websites, PR Newswire and Globe Newswire. Sears was responsible for FusionPharm stock to include being present for pitches to investors and being the main contact for the transfer agent from 2011 through sometime in 2013. Sears said that he should not have been assigned the title of Investment Relations Director in any of the FusionPharm documents. Sears and Dittman were "partners" that he viewed as two guys building a business.  There were numerous times that the company could have gone out of business due to lack of funding.


Scholz was involved from the beginning of FusionPharm in 2011. Sears visited Scholz's office in Florida. Through Scholz's company Prestige Media, Scholz, and his approximately six employees, were making phone calls to registered representatives at Oppenheimer, Merrill Lynch and Prudential to market FusionPharm and generate interest in FusionPharm's stock. Scholz sent investors copies of FusionPharm press releases and directed them to the OTC website. Scholz tried to have brokers and dealers contact Sears with any questions. Sears spoke to one or two of these brokers and dealers. Sears requested that Scholz instead send him a list of the brokers and dealers wanting more information. Sears and Scholz had an agreement where Sears paid Scholz 25% or 30% of the proceeds from Sears' sale of FusionPharm stock. Sears transferred Microcap Management to Scholz for $1 to shield Sears from Scholz's failure to disclose the commission he was being paid by Sears. Scholz set up a new Employer Identification Number for Microcap Management. Sears did not know if Scholz ever paid bribes to the brokers.

GJP_00006236

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  12 of 28

 

Sears reviewed an email dated July 2, 2012. Sears did not recall the email. He said he had to pay Jimmy Harris $900 for damage to his house as a result of a Pharmpod install in Arizona.


Jean-Pierre was aware of everything that Sears was doing at FusionPharm. Jean-Pierre told him not to be an officer, director or on FusionPharm's payroll. He told Sears not to get paid a commission for bringing in investors and not to make management decisions.


Dittman wanted to speak with Baby Bee Bright's attorney and accountant. He first met Jean-Pierre in October or November of 2011 via a telephone call. This was around the same time that Dittman spoke with Kocinski. Jean-Pierre wanted to be paid quarterly or receive stock options for his duties as Corporate Secretary. Sears paid Jean-Pierre by deposit into a Jean-Pierre and Jean-Pierre Citibank bank account. The checks came from Microcap or Sears' personal bank account. Jean-Pierre was never paid in stock.


Sears was loaning money to FusionPharm in 2011 to clean up the shell and start up FusionPharm although they had not discussed the terms of the loan or documented the loan agreement. They were all handshake deals between Dittman and Sears that were not documented. They operated the business loose and fast. Dittman was always trying to raise money. The funds came from Sears' sale of FusionPharm stock in his Microcap brokerage account. Jean-Pierre advised that the loan be documented in a financial instrument. At the end of 2011 or early 2012, Jean-Pierre traveled to Denver and they discussed the terms of the convertible note. Jean-Pierre was aware of the fact that Sears was lending proceeds of FusionPharm stock sales back to FusionPharm and did not have an issue with it. Bodden suggested that the loans made by Sears to FusionPharm be split into two notes, one from Meadpoint and one from Bayside, so Sears could keep one note and sell the other note. Bodden had contacts that would buy the debt including Nick Malino at Capitoline. Malino was only interested in purchasing a convertible note and wanted his attorneys to do the paperwork to purchase the convertible note. Malino wanted to purchase the note in drawdowns of 50,000 shares. In March of 2012, Sears and Bodden flew to Florida and met with Jean-Pierre to discuss the notes. Sears was only interested in selling Malino a non-convertible note. Around the time of the discussions with Malino, the note agreements between FusionPharm and

GJP_00006237

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  13 of 28

Meadpoint and Bayside were documented as non-convertible notes. The
convertible notes sent to Malino did not accurately reflect the terms of
the loan because the convertible feature was concealed. There were multiple
unsigned versions of the notes, both convertible and non-convertible, all
documented after the loan was funded. The conversion rate was $0.01 per
share. Conversion rates were always at a discount. Sears did not know if
any other investors received FusionPharm stock at $0.01 per share. After
the Florida meeting in March of 2012, Jean-Pierre and Bodden drafted the
notes and they were executed at the same time. The note amounts were
determined after Bodden went through the FusionPharm bank statements to
identify all of the deposits from Sears. There were several companies
interested in purchasing FusionPharm's convertible debt. Sears did not want
to enter into any of these agreements because he was afraid it would tank
FusionPharm's stock. He also wanted to be in a position to take back
FusionPharm's stock in the event that FusionPharm failed.

Sears reviewed an email dated November 26, 2012 from Bodden.  Sears
believed that this was related to the later version of the notes. Sears
believed that Bodden may have recreated the convertible loan paperwork in
order to clean up FusionPharm's paperwork. Sears could not recall the
amount of the loans. The earlier version of the notes was drafted sometime
around the summer of 2012. Sears had the notes changed to include the
convertible option in order to sell the Bayside note to Wayne Coleson.
Sears set the price to $0.40 per share for Coleson.

Sears had his concerns about drafting the notes and backdating them
to 2011, but Jean-Pierre was willing to put them together. Jean-Pierre said
that the "144 tack back date" would start from when the first money was
loaned from Sears to FusionPharm. When the convertible notes were sent to
DiBella at PSTC, Sears did not tell her that the notes were backdated.
Dittman and Bodden were aware that the notes were backdated. Lehrer was not
aware that the notes were backdated.  Sears believed that Jean-Pierre was
not aware that he was giving bad legal advice. Sears also believed that
Lehrer was manipulative.

Sears' Mother did not have any role with Meadpoint. His Mother did
not have a job. Sears' Mother signed most of the documents that required
her signature, but Sears also signed her name to documents. Sears never
signed a stock certificate.

GJP_00006238

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  14 of 28

        Sears said that FusionPharm only sold two Pharmpods in 2012. One was
sold to Jimmy Harris and the other one was to Boone Smith.   Sears was not
certain of Smith's first name.


        Scholz told Sears about Jean-Pierre's case being charged by the SEC
in 2013. It was around the time that Sears was selling portions of the
Meadpoint note to Myron Thaden and Scholz and while he was focused on the
Bayside note. Sears had to find someone else to do the Attorney Opinion
Letters. Jean-Pierre was living in the Dominican Republic at the time.
Dittman and Sears were shocked to find out about Jean-Pierre's legal
trouble. Sears did not think that Jean-Pierre did any legal work for
FusionPharm after they found out about his legal issues. Sears said that he
did not know why Jean-Pierre was not listed in FusionPharm's 2012 Annual
Report as the Corporate Secretary. He said the financial statements changed
over time depending on who was creating the report.


        Sears was transitioning out of his role at FusionPharm around the
time that Paul and Dustin Budden invested in FusionPharm restricted stock.
 At Dittman's request, Sears sent the Buddens their stock purchase
agreements.


        Sears, Lehrer, Scholz and James Painter were going to do a turn-key
grown business together with plans for Lehrer to be the Chief Executive
Officer. Lehrer and Painter were discussing doing a registration or
acquiring a shell for the company. This was progressing until law
enforcement executed the search warrant on FusionPharm's warehouse in May
of 2014.


        Sears said that if he asked Jean-Pierre to do the same work that he
did for FusionPharm today, that he would do it. Sears said that Jean-Pierre
was still in the securities legal business and had called Sears on February
17, 2016, looking for work. Jean-Pierre and Sears also communicated via
e-mail. Jean-Pierre used an e-mail with Florida Advisors within the e-mail
address. They used Skype to communicate over the phone. Sears said that he

GJP_00006239

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____, On 02/18/2016 , Page 15 of 28

continued to communicate with Jean-Pierre in the event that the Department
of Justice was interested in having Jean-Pierre travel back to the United
States.


Buffington is currently raising money for the company Vast through an
S-1 offering that cleared in November of 2015. This is the final iteration
of Green Street. Buffington is taking money from "old ladies".   Sometime
around February 4, 2016, Sears mentioned Vast to Jean-Pierre on a phone
call saying that he will need documents and convertible notes drafted for
the S-1 filing. Jean-Pierre was interested in doing the work and indicated
that he would travel to Florida to start doing the work. Buffington is
aware that Sears is being investigated for his activity related to
FusionPharm.


Sears assisted the FBI with his previous case when he was charged
with Securities Fraud in 2004 or 2005. He worked with FBI Special Agent
Richard Jacobs and the prosecutors. He was proactive in cooperating and
made consensual recordings of targets. He helped the Department of Justice
apprehend a subject in Canada. He received a 5K-1 letter for his
cooperation. He was on probation for three years. He was supervised in
Colorado and his last probation officer was Elizabeth Oppenheimer. One of
his probation officers visited his office. He wanted to provide similar
assistance in this investigation with regard to Jean-Pierre.


Sears worked with Tim Scarpino, a broker at Scottsdale. Scarpino was
an administrative person, substitute trader, and took stock orders from
Sears. Sears met Joe Meuse from PSTC through Billy King. Sears was going to
start a transfer agent with King names Patriot. King is currently deceased.
Mark Habegger was Sears' wife's cousin.


In 2009, Sears received a letter in the mail from the state of Nevada
relating to child support. Through this letter, Sears learned that he had a
child, Nick Terry, who is now 16 years old. Sears was not aware that his
previous attorney had been served with the paperwork related to Nick Terry.
Nick Terry lived in Illinois with his mother, Pamela Terry. Sears met Nick
Terry for the first time in December of 2013. Sears had an ex-wife who
lived in Australia.

GJP_00006240

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of   (U) Interview of William Sears _____, On  02/18/2016 , Page  16 of 28


Robert Dittman has substance abuse issues including alcohol and cocaine. He also suffers from seizures.


Bodden was very good at putting together paperwork. Bodden pitched FusionPharm to three different investors.


*Administrative Note: The proffer on February 18, 2016 ended at approximately 4:45 pm. The proffer reconvened on February 22, 2016 with the following parties: AUSA Harmon, SA Funk, SA Godson, United States Postal Inspection Service Investigative Analyst George Allen, Inspector Haithcoat, SEC Attorneys Greer and Lyman, Sears and his attorneys Winocur and Gilligan.*


Sears and Dittman attended a marijuana conference at the Expo Center located at 26th and Walnut. Around the time of this conference, they met with attorney Robert Corry because Dittman had concerns with selling PharmPods direct to the marijuana industry. The FusionPharm public documents started to reference High Intensity Lighting which correlated to the marijuana industry. Corry recommended setting up a third party to sell the PharmPods. Corry used the word "disconnect" to refer to the use of a third party to sell the PharmPods. Sears set up Meadpoint to fill this role and incorporated it in Nevada. Sears was the only employee of Meadpoint. Corry was aware that Sears was running Meadpoint but may not have been aware that Sears was also doing work for FusionPharm. Sears and Dittman's conversation with Corry was focused on marijuana and did not focus on SEC requirements. The agreement was that Sears was supposed to receive a 15% discount off the order price but it did not always work out that way. Sears said he might have discussed the concept of setting up and running Meadpoint with Bodden and Jean-Pierre. Sears could not recall which PharmPods he actually marked up in order to make any money on the sale. The intent was for Sears to pay for the PharmPods upfront for FusionPharm to sell. Jean-Pierre and Sears discussed Meadpoint and whether or not Meadpoint or Sears were affiliates to FusionPharm. Jean-Pierre told Sears not to be on FusionPharm's payroll, not to participate in board members' meetings and not to take a commission for bringing in investors. Corry represented FusionPharm at times but never represented Meadpoint.


GJP_00006241

Attachment 9
Page 16 of 28

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears                    , On  02/18/2016 , Page 17 of 28

FusionPharm only sold PharmPods to Mile High Green Cross (MHGC) in
2011. The deal was brokered by Dittman although Frank Falconer established
the initial contact with MHGC. The original plan was for MHGC to rent the
warehouse space and the PharmPods at FusionPharm's warehouse at 4360 Vine
Street in Denver, but MHGC was unable to transfer their marijuana license
to Vine Street. Sears purchased these PharmPods and then leased them to
MHGC in order to get a higher return on this investment. He made a
commission on the sale and then leased at a 14.99% interest rate resulting
in Sears either breaking even or making a little bit of money. MHGC did not
have the money to pay for the PharmPods upfront, so it was always the plan
to finance the PharmPods. Originally MHGC was going to lease directly from
FusionPharm. The deal was essentially complete but then Dittman switched
the lease to Meadpoint because Sears wanted to help FusionPharm by
providing the financing and because of the advice provided by Corry. Sears
used proceeds from the sale of FusionPharm stock to pay FusionPharm for the
MHGC PharmPods. MHGC wrote their initial check to FusionPharm because of a
mistake made by Falconer. Sears could not recall who drafted the lease
agreement between Meadpoint and MHGC but said that it could have been
Dittman and an attorney. Sears then said that he did not really make any
money on the MHGC PharmPods because they were prototypes and expensive.
They were using window air conditioners in the PharmPods. Sears said that
he guessed that Dittman discussed the accounting rules with Jean-Pierre
regarding the structure of the MHGC deal. Sears did not take part in
accounting discussions regarding the MHGC deal because he was the sales
guy.


Sears picked up the lease payment from MHGC every month. They usually
paid in cash. Sears said that he loaned Dittman money that came from MHGC
monthly payments and Fusionpharm stock sales to help keep FusionPharm
going.  Sears never documented the loans. Per Lehrer and Jean-Pierre, it
was not a problem for Sears to loan Dittman money. Lehrer was going to
prepare paperwork for the loans that Sears made to Dittman, including the
loan for Dittman to purchase his home, prior to the Federal search warrant
executed in May, 2014.


Sears lost money on two PharmPod sales related to FusionPharm
promotions. Sears and FusionPharm employees helped to build the PharmPods
and put them on a flatbed trailer to promote them at an event. Mark
Anderson, an independent contractor for FusionPharm, and his crew were

GJP_00006242

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  18 of 28

responsible for building the PharmPods and were always involved in the
construction of PharmPods. Falconer and First Name Unknown (FNU) Cook were
hired to help Sears. Dittman paid Anderson for his contract work.


Sears and Dittman were involved in negotiating the purchase of the
storage containers that were used to construct the PharmPods, to include
the vendor Complete Containers. Sears purchased containers in order to
avoid losing a negotiated container.


Sears purchased the PharmPods in advance for all the PharmPods sales
up until 2013. Sears and Dittman did not document any of these purchases
between FusionPharm and Meadpoint. Sears said that he was horrendous with
paperwork. Starting sometime in 2013, FusionPharm's business had grown and
Sears no longer had to pay for the PharmPods in advance of the sale. Sears
did not make any money from his business dealings with FusionPharm. He got
paid through what he believed to be legitimate FusionPharm stock sales.


In 2012, FusionPharm almost abandoned marijuana and moved into
lettuce. In the spring of 2012, FusionPharm was experimenting with growing
lettuce in one test PharmPod. They did a lot of testing to include testing
lights in different containers. Buck Adams had a growing medium that did
not work very well. The Vertifresh deal was similar to the Meadpoint deal.
Sears was now running Vertifresh. Sears took over the FusionPharm test
PharmPod. Sears role was to grow the lettuce and then market and sell that
lettuce. He delivered lettuce to local Denver restaurant Mad Greens. Sears
said that the terms of the Vertifresh licensing agreement included four
PharmPods and the exclusive rights to the Denver area. He believed he paid
about $200,000 for the Vertifresh licensing agreement: $32,000 for each
PharmPod and then approximately $90,000 to $100,000 for the exclusivity to
the Denver territory. Dittman had completed the analysis to come up with
the price and felt it was a fair price. Sears did not see any paperwork
regarding the justification for the price. Vertifresh was necessary because
it was an area that Sears was interested in pursuing and he had the
proceeds from the FusionPharm stock sales for research and development.
Steve Reinhardt, who used to work for eBay motors, was going to the same
deal with Dittman but the deal fell through because Reinhardt could not get
a tax break to build out a "pharmplex". Sears was not sure if Sears and
Dittman discussed the specific terms of the Vertifresh deal or documented
the agreement. The agreement was drawn up sometime after the fact when they
figured out what it was worth but it was never signed. Sears wrote an

GJP_00006243

Attachment 9
Page 18 of 28

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  19 of 28

initial draft that Leudan said was too draconian so Leudan may have
rewritten it. Leudan, Sears, Dittman, Bodden and Jean-Pierre would have all
been copied on emails with the draft Vertifresh Licensing Agreements.
Jean-Pierre needed to know the terms of the agreement in order to opine for
the financials and draft information for the financial statements. Sears
said that he paid the total amount due for the Vertifresh licensing
agreement but could not recall the agreed upon price or when he had
completed payments. He said that there was still lettuce growing in the
Vertifresh PharmPods in 2013. He made the payments to FusionPharm when he
sold FusionPharm stock just as he did for the deals between Meadpoint and
FusionPharm. He also used FusionPharm stock proceeds to pay for Vertifresh
equipment and staffing.  All the PharmPods located at the FusionPharm
warehouse belonged to Vertifresh. FSPM was using these PharmPods to do
testing.  FusionPharm did not sell any lettuce after the Vertifresh
licensing agreement was effective.


Dittman was an advisor to Vertifresh and was not an officer or
director. Vertifresh was Sears' company.  Sears and Dittman had an
atypical business relationship where they talked about everything all the
time. Sears said that Vertifresh did not have a Board of Directors. Sears
came up with the Vertifresh name, logo and website content. He worked with
Nelson, an Information Technology professional from Florida, who helped
Sears build the Vertifresh website. The name was derived from vertical
farming and fresh produce. Vertifresh was the name that Dittman liked the
most of the three to four names proposed.  Vertifresh's management company
was VF Management, which was initially owned by Sears. VF Management was a
cultivation and employment company that was incorporated by Stuart Leudan
in Delaware. Dittman may have been listed as a controller of VF Management
in a later use of VF Management. Vertifresh was also incorporated in
Delaware. Leudan was possibly paid by FusionPharm and from one of Sears'
accounts by check. Sears reincorporated Vertifresh in Colorado as a Limited
Liability Corporation.


Chris Haddad and Kelly Blume worked on the Vertifresh lettuce
operations. Each company paid the employees that worked for FusionPharm,
Vertifresh or Meadpoint separately. Sears estimated that Haddad was paid
about $2,500 in cash for the work that he did for Vertifresh. Haddad also
had a Vertifresh credit card and was at Home Depot regularly. Blume had
been working for FusionPharm since 2011 and was likely paid by check. She
did Quickbooks for Dittman and was growing lettuce for Vertifresh. Her time
for Vertifresh was tracked via a time clock. Sears just sold the last

GJP_00006244

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  20 of 28

Vertifresh PharmPod to an individual in Seattle for $25,000. The Seattle
buyer did not have to pay a licensing fee.


Falconer brokered a deal between Mad Greens and Vertifresh.
Vertifresh did not make money on the deal with Mad Greens because
Vertifresh was still in a testing phase and needed to scale. Vertifresh
received exposure by being in 11 Mad Greens stores. Sears was not sure if
Falconer knew about the licensing agreement between FusionPharm and
Vertifresh. Vertifresh tried to work a deal with the Mayor's Office to
provide lettuce to prisons. They also had a deal with the restaurant Lola
in the Highlands neighborhood in Denver. Vertifresh gave away more lettuce
than was sold in the beginning. Sears did the business plan presentation
for Denver Jumpstart.  Sears lost money through the Vertifresh business.
He did not even get close to their goal of 50 PharmPods. The Vertifresh
business was put on hold when FusionPharm decided to focus again on the
marijuana industry. At some point later, Robert Dittman took over
Vertifresh. In 2013, Bodden expressed interested in pursuing Vertifresh. In
mid-2014, Richard Buffington gave Sears a check for $100,000 to purchase
Vertifresh to include the website, consulting services from Sears and one
PharmPod. Buffington wanted the Vertifresh name because it was more
established. Sears did not cash the check and the deal did not happen
although Buffington is in the process of a new offering that includes the
name Vertifarm. Sears said that Vertifarm was just another one of
Buffington's Ponzi schemes. Sears had not had any contact with Buffington
for the last 18 months with the exception of receiving a few voicemails
from Buffington where it sounded like Buffington was drunk.


Dittman and Bodden would have completed the 2012 annual report that
reflected 100 percent of FusionPharm's revenue came from Sears' companies,
Meadpoint and Vertifresh. Sears was copied on the e-mails regarding this
report. Mike Kocinski and Jean-Pierre were also involved. Jean-Pierre and
Lehrer told Sears that if Sears had a customer, it was not a problem for
Sears to purchase PharmPods from FusionPharm. Jean-Pierre also advised that
if Sears sold stock that originated from a convertible note, he could use
those funds to purchase a tangible asset from FusionPharm. Lehrer often
said that with regard to the SEC, it's all about the "optics".  Sears and
Jean-Pierre spoke primarily by themselves and by telephone via Sears'
Verizon cellular telephone and Jean-Pierre's Skype account. Jean-Pierre
often called Sears twice a day. Sears said that he changed his telephone

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears                , On  02/18/2016 , Page 21 of 28

number in 2012, but stayed with Verizon. Dittman had trouble understanding
Jean-Pierre on the phone and preferred to speak via Skype. Jean-Pierre used
audio and video on Skype. They rarely exchanged text messages.


At the end of 2012, FusionPharm business was grim and they almost
went out of business. They were almost shut down three separate times.
Sears was working with Tim Scarpino, Debra Friednash and Craig Summers at
Scottsdale Capital Advisors. Summers was a trader at Scottsdale and
Friednash worked in the back office. Friednash knew of New York investors
that purchased debt from companies. Friednash set up an introductory phone
call with Sears, Wayne Coleson, Sam Levin and maybe Levin's son. They
discussed marijuana, lettuce, and the debt for at least 90 minutes. The
investors were only interested in purchasing debt that was convertible to
free-trading stock where the holding period had been met. Sears sent
Coleson an email with the Bayside convertible note. Coleson and his group
of investors purchased the remainder of the Bayside note for approximately
$240,000 after Sears converted a portion of the note. Sears raised the
strike price to $0.40 per share from the $0.01 share. There were no terms
for when they could sell their stock from the note, although Sears
requested that they not sell the stock all at once because it would crush
the market.


In 2013, marijuana became hot again because of the legalization of
recreational marijuana in Denver. FusionPharm transitioned out of lettuce
and went back to the marijuana industry. In early 2013, Sears used a
portion of the note proceeds to purchase seven or nine PharmPods from
FusionPharm. Sears paid approximately $30,000 per Pharmpod through
Meadpoint before the Pharmpods were constructed. Sears believed that the
approximately $277,000 booked in Quickbooks for this transaction was likely
accurate. He did not recall any documentation being generated to support
the purchase. The PharmPods were not constructed from the standard PharmPod
shipping containers. Sears paid upfront and over a period of time for the
PharmPods because he planned to lease them to Don Novak of Groundswell. He
transferred the PharmPods from Meadpoint to VF Management's name without
any related compensation. Sears and Novak began discussing the leasing of
the PharmPods at the end of 2012. It was a joint venture/operating
agreement where Novak would provide the licensing and distribution and
Sears and Dittman would provide the equipment and expertise to bring the
cannabis to market. FusionPharm, Mark Anderson and Sears worked on
constructing the PharmPods purchased by Sears. Haddad and VF Management
were growing cannabis in the seven or nine PharmPods for Groundswell using

GJP_00006246

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page 22 of 28

Groundswell's off-premise license. Groundswell was supposed to pay VF
Management based on the amount of cannabis harvested. Dittman became owner
of VF Management. Haddad was a 1099 contractor for VF Management. VF
Management had the agreement with Groundswell.  The lease agreement with
Novak was reviewed by attorneys at Vincente Sederberg. Haddad failed at
growing cannabis and only had one good harvest.


      The seven or nine VF Management PharmPods were eventually sold to
Groundswell through the entity 10MM Holdings, an entity controlled by
Sears, Dittman and John Scott. 10MM Holdings was the entity that purchased
FusionPharm's warehouse space located at 4360 Vine. Dittman, Sears and
Scott originally wanted Novak to rent 4360 Vine and the seven or nine
PharmPods for $20,000 per month, but that was too expensive for Novak.
Instead, he purchased the PharmPods. When Sears was asked about the
complexity of this transaction, Sears then said, "We fucked up royally, it
was not premeditated, the circumstances dictated the setting up of
entities. It's the way it worked out."


      Sears sold a portion of the Meadpoint note to Scholz, Myron Thaden
and Thaden's wife. Scholz wanted to buy a portion of the note because he
knew about the Thaden's note purchase. Scholz was going to purchase 500,000
shares of the note for $50,000. Scholz never came up with the money to pay
for the note, but the stock was already in his name. Sears let him pay it
off over time. Sears could not recall the terms that he negotiated with
Scholz. Sears provided false records to the transfer agent showing that
Scholz paid him $50,000 before transferring the stock. Scholz paid Sears as
he sold the stock. Sears believed that he may have modified the terms of
the note purchase from a $50,000 payment to a split based on the stock
proceeds. The stock proceeds split may have been 75% of the proceeds going
to Sears and 25% going to Scholz. Sears believed that Scholz was actively
promoting FusionPharm stock at this time.  Sears was not aware that it was
an issue to promote stock and sell stock at the same time, although he was
aware that there were rules related to promoting and selling. Tyler Floor
was Scholz's contact at Alpine Securities.


      Scholz set up the meeting in Orlando to introduce Sears and Lehrer.
Scholz had given Lehrer due diligence on Sears and FusionPharm. Lehrer was
interested in representing FusionPharm and working as General Counsel.
Lehrer wanted Sears to discuss this with Dittman. Lehrer wanted to be paid
two million shares of FusionPharm stock in additional to monetary

GJP_00006247

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                    , On  02/18/2016 , Page  23 of 28

compensation. Sears told Lehrer that he needed to lower his fees. Dittman
and Lehrer came to an arrangement but Sears could not recall the details.
Once Lehrer started working for FusionPharm, he did all the legal work that
was previously done by Jean-Pierre.


    Sears discussed the Bayside note with Lehrer. Lehrer told Sears that
Jean-Pierre had been involved in a lawsuit with Lehrer's ex-wife and Lehrer
did not think Jean-Pierre was a good person. Sears and Lehrer discussed
doing an S-1 registration for FusionPharm. Lehrer began drafting the
document and had a copy on his computer. When discussing the necessary
disclosures for the S-1, Sears told Lehrer about Bayside and Meadpoint and
the related notes. Lehrer knew that Sears' Mother was on the Bayside
paperwork, but because the note was already sold when Lehrer starting doing
work for Sears and FusionPharm, it was not an issue they discussed in
detail. Lehrer advised Sears to transfer the Meadpoint entity to his
Mother. They did not discuss Vertifresh because the transaction was
complete. Lehrer wrote the AOLs saying that Sears was not an affiliate of
FusionPharm. Lehrer did not have a problem with Sears providing money to
FusionPharm as long as Sears was purchasing a real product. Lehrer had some
concerns about disclosing the Bayside and Meadpoint notes in the S-1. Sears
flew down to Altamont Springs, Florida and met with Lehrer at a conference
room in Lehrer's apartment building.


    Sears explained the Sears/Dittman relationship to Lehrer as "two guys
building a bunch of businesses". Lehrer knew that Dittman and Sears were
brother-in-laws and knew about Sears' criminal history.   Sears said that
he was friends with Lehrer. Lehrer advised that it is not what they are,
but rather how they look with the object being not to get noticed by the
SEC. Lehrer used to work for the SEC. After a conversation with Lehrer,
Sears was nervous because he knew that he had broken the law regarding his
activities with FusionPharm and the entities controlled by Sears. In
approximately October of 2013, Sears requested that Lehrer send him an
email documenting what he could and could not do regarding FusionPharm.
Sears' attorney, Winocur, provided a copy of the email sent by Lehrer for
the interviewers to review. The email copy was retained by Winocur. After
providing Sears with specific instructions regarding what Sears could and
could not do for FusionPharm, Lehrer continued to copy Sears on emails
regarding FusionPharm financial statements. Lehrer was aware that Sears was
performing activities that were listed as prohibited activities in Lehrer's
email. Sears was still involved with FusionPharm investors including the
purchase of restricted stock in 2014 by Thaden and the Buddens. Lehrer knew

GJP_00006248

Attachment 9
Page 23 of 28

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of (U) Interview of William Sears _____ , On 02/18/2016 , Page 24 of 28

Thaden personally. Sears gave tours of the 5850 warehouse to multiple
people including investors. When Sears needed an AOL to provide to his
broker at Scottsdale for his Meadpoint stock, Lehrer was provided all the
paperwork necessary to write the letter. Lehrer asked Sears why Sears was
signing off a director of Meadpoint when he had transferred Meadpoint to
his Mother. Sears told Lehrer that he signed off as director because he
still had a brokerage account and that response was sufficient for Lehrer
to write the AOL. On one occasion, Lehrer asked Sears to cut and paste
Lehrer's signature from one AOL to a new AOL. Lehrer had been having issues
with his scanner. Sears was able to highlight Lehrer's signature and cut
and paste it into the new AOL. Lehrer was able to highlight text in
documents and then copy and paste the text into other documents. According
to Gilligan, this AOL may have been related to a January 2014 transaction.
In the AOL, Lehrer opined that Sears was not an affiliate or control person
of FusionPharm.

Lehrer and Sears discussed the necessary disclosures related to
FusionPharm.   Lehrer, Dudley and Dittman had a call to discuss the
disclosure of Sears in the 2013 annual report. Sears talked with Lehrer by
telephone prior to this call. Dittman was upset that Lehrer had a prior
call with Sears before the call with Dittman. Dudley had been reviewing
some of FusionPharm's records and was getting things in order to include
the Vertifresh agreement. Sears was not participating in the Vertifresh
restatement conversation.

Sears and Lehrer also discussed setting up another company with a
separate S-1 filing. They were in the very early stages of this company and
had not yet come up with a name. The people involved included James
Painter, Lehrer, Scholz and Sears. Dittman was not involved in this
business. They discussed the concept of affiliates. Sears did not want to
make a long term commitment to company and was only going to do consulting
work related to locating real estate. Sears was not going to be on the S-1
paperwork. Lehrer agreed with the approach of having Sears involved with
the new company but not be listed on the company paperwork. The business
was going to be a real estate PharmPod business with Lehrer being the Chief
Executive Officer. Lehrer did not like the idea of using a shell company.
They were getting ready to file paperwork and locate shareholders. Scholz
introduced Sears to Painter. Painter knew Lehrer's Father.

Sears paid Lehrer by check for all legal services. He also loaned

GJP_00006249

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of   (U) Interview of William Sears _____ , On   02/18/2016 , Page   25 of 28

Lehrer money to include a loan for $2,500 in cash. Buffington and Bodden
both coordinated purchases of FusionPharm stock for their investors through
Sears. Sears was never paid for the stock.

Peter Miller from Organigram contacted Sears in August of 2013. He
came to Denver, Colorado in October of 2013. Miller wanted to build his own
building for PharmPods so Sears put Miller in touch with Dittman. Meadpoint
became profitable toward the end of 2013 when FusionPharm was starting to
get business. MHGC won the "cannabis cup" and they were talking to other
customers. The free MHGC advertising was worth at least $100,000.

Up until when Meadpoint was set up at the end of 2011, Sears was
doing work for FusionPharm.  In the beginning, Sears used a FusionPharm
email address. Jean-Pierre told Sears not to use the FusionPharm email
account because he could be construed as an affiliate of FusionPharm. Sears
then began using his william@williamjsears.com account. Sears was upset
with Jean-Pierre for not telling him early on that he should not be using a
FusionPharm email account. Sears said that in hindsight, he thought that
Jean-Pierre gave him the tools to avoid the perception that he was an
affiliate of FusionPharm. Jean-Pierre was FusionPharm's attorney and Sears'
personal attorney.

Sears did not think he would have asked Jean-Pierre to backdate a
document. He could not recall an email where he asked Jean-Pierre to
backdate the contract for Scholz to purchase Microcap from Sears. The
transfer of Microcap from Sears to Scholz took place around the time that
Scholz started promoting FusionPharm stock. Scholz did not disclose on his
website that he was being paid by a third party to promote FusionPharm
stock. Sears was concerned about this so he suggested that Scholz purchase
Microcap to include the website and the broker list. The purchase price was
$1 which was never paid. Sears maintained control of the Microcap brokerage
accounts at Oppenheimer. At some point, Oppenheimer stopped dealing with
penny stocks. Sears was aware of the Financial Industry Regulatory
Authority (FINRA) investigation and knew that Microcap was a part of the
investigation but he did not know the details. He believed that Jean-Pierre
handled the FINRA investigation.

Sears communicated with Jean-Pierre over the telephone. When
FusionPharm provided the due diligence to Capitoline via email, Jean-Pierre

GJP_00006250

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears                , On  02/18/2016 , Page  26 of 28

was aware that the paperwork provided regarding the Meadpoint and Bayside
notes showed the notes were not convertible into stock. Jean-Pierre opined
on the notes, through DiTommaso, at a later date with the notes now
including a convertible option.


     Corry represented Dittman in various different matters. Sears and
Dittman also met with attorney Warren Edson.


     Sears spoke with Andrew Rolle once and exchanged a couple of emails
regarding setting up offshore trust, brokerage and bank accounts. Sears was
looking to set up offshore accounts to limit his tax liability and to keep
his accounts anonymous. Scholz and Sears were still vetting Rolle, but
Sears did not trust Rolle. Sears did not think he set up any offshore
accounts for himself. He set up offshore accounts for others back in 2002
or 2003 while he was in Australia.


     When the search warrant was executed at FusionPharm in May, 2014,
Sears was working out at the gym. He found out about the search warrant
from SA Funk on that morning at his home. He was phasing out of FusionPharm
at that time with his responsibilities begin transitioned to John Scott.
Sears and Lehrer spoke three or four times after the Federal Search
Warrant. Lehrer said that he had no idea what was going on and would refer
Sears to another attorney. Lehrer advised Sears to say nothing to the
Federal investigators. Two nights after the Federal Search Warrant, Lehrer
contacted Sears and asked him if Sears provided Meadpoint funds directly to
FusionPharm. Lehrer sounded like he was drunk. Sears also spoke with
Jean-Pierre after the Federal Search Warrant. Jean-Pierre advised not to
give anything to law enforcement without a court order. Jean-Pierre gave
Sears some advice on what to tell the Federal Government but Sears could
not recall the specific details. Sears heard that Lehrer had a drinking
problem. Ted Mahoney, Kermit Silva and Scholz also knew about Lehrer's
alcohol abuse. Lehrer is well known in Orlando and it's a small community.


     FusionPharm's attorney hired a forensic accountant to review
FusionPharm's revenue figures. Sears said that there were not any books or
records in existence that were not already produced to the Department of
Justice.

GJP_00006251

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  27 of 28


    Nelson contacted Sears regarding helping to raise money for Green
Street Equities. Nelson did website work for Green Street Equities. Green
Street Equities is made up of the following companies: Vast, Vertifarm,
Affordable Bio and Bee Homes. Buffington is currently trying to raise $25
million for these portfolio companies and had a couple hundred thousand
dollars in the pipeline. Buffington has raised some money for Green Street
Equities. Nelson was listed as the VP of Marketing for Green Street
Equities. Vast is the newest company and has legitimate technology and a
patent for storing 26 terabytes of data on a thumb drive. The other
companies have never had any products and are one big Ponzi scheme. Sears
did not want to be involved in Green Street Equities because of the current
Federal investigation. Bodden told Sears about Green Street Equities.
Bodden and Buffington used to work together before Bodden went to prison.
Borcherding and Bodden lived together in Cayman. Borcherding is the "front
man" for Bodden.  Buffington is renting a $900,000 home in Florida. Sears
said that Nelson has put himself in a bad spot. Sears no longer has a good
relationship with Buffington. Buffington's contract with Vast to assist
with raising money is getting ready to expire.


    Sears spoke to Jean-Pierre a little over a week ago. Jean-Pierre was
interested in finding work through Sears. Jean-Pierre is still acting as an
attorney and recently traveled to Haiti to meet with a client. Jean-Pierre
asked about the status of the FusionPharm investigation. Sears told him
that it was turning into a tax investigation. Sears told Jean-Pierre that
Vast was looking to register with the SEC.  Jean-Pierre was interested in
doing the securities work for Vast and wanted to be paid in cash and stock.
Sears and Jean-Pierre discussed setting up a meeting. Jean-Pierre wanted to
meet in the Dominican Republic but Sears told him that they needed to meet
in the United States. They discussed setting up some offshore accounts.
Sears did not mention Vast's deal with Buffington and did not think that
Jean-Pierre knew Buffington. Jean-Pierre is also known as Marcelo
Dominguez. Sears did not know if Jean-Pierre had another attorney in the
United States that he was using to sign AOLs. Sears spoke with Jean-Pierre
every few days.


    Sears said, "We screwed up royally. It was two guys trying to start a
business. A lot of stuff was on the fly." They discussed disclosing Sears
as a part of FusionPharm in the early stages of FusionPharm. They decided

GJP_00006252

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  (U) Interview of William Sears _____ , On  02/18/2016 , Page  28 of 28

to keep Sears name out of FusionPharm but wanted to do it legally.    Sears
said that he knew he what he was doing regarding FusionPharm and is
culpable for his activity.

GJP_00006253

172
Direct - Sears

1    Q.    Okay.   And where are those shares transferred to at

2    one time?

3    A.    The shares were transferred to Microcap Management as

4    free trading, and Microcap did the same to Prestige for

5    services.

6    Q.    All right.   Can we have Exhibit 141.

7          Sir, could you please take a look at Exhibit 141.

8    A.    Yes, sir.   I have it.

9    Q.    All right.   Can we have the middle -- thank you.

10         Okay.   Sir, if you could look on your screen here,

11   I just circled an e-mail.   Would you tell the jury what

12   that e-mail is about.

13   A.    It is an e-mail from *guy@lawfirmofjeanpierre.com*.   It

14   was dated October 19th, 2011.   It was to myself at

15   *william@williamjsears.com*.   And the subject matter is:

16   "Proposed Agreement referencing purchase of MicroCap."

17   Q.    So it's -- what type of agreement is this?

18   A.    An agreement to purchase a corporation.

19   Q.    Whose corporation?

20   A.    My corporation, MicroCap Management.

21   Q.    Okay.   So you're selling your corporation?

22   A.    Yes, the interest in the company.

23   Q.    And who's doing the paperwork to help you sell that

24   corporation?

25   A.    Guy Jean-Pierre.

## PW027 - BABY BEE BRIGHT CORPORATION
**Certificate Transaction Journal**
**Transaction Number 12834 Stock Class PR**
**Control ID: STTK000000013068      Transfer**

03/16/2011  4:03 pm

Page 1 of 1

**Transaction Date 03/16/11**

| Registration | Certif. No | | Canceled | Issued | |
|---|---|---|---|---|---|
| FREDERICK A DAHLMAN JR AND BELLE C DAHLMAN JT TEN | PR | 1012 | 200,000 | | Restricted |
| 1115 SAFETY HARBOR COVE OLD HICKORY, TN 37138-1998 | PR | 1014 | | 15,000 | Restricted |
| MICROCAP MANAGEMENT LLC 2004-A WEST 120TH AVENUE WESTMINSTER, CO 80234 | PR | 1015 | | 185,000 | Restricted |
| | | | 200,000 | 200,000 | |

Confidential Treatment Requested by PST
Fusion Pharm (D-03397) - PST-002617

SEC-DOJ-EPROD-000801033

Attachment 6
Page 1 of 2

Fredrick A. Dahlman, Jr
Belle C. Dahlman
1115 Safety Harbor Cove
Old Hickory. TN 37138-1998

*Issuer - Baby Bee Bright*
*Presenter - Fred Dahlman*
*12901*

*$190 - 2cert*
*1 ship(?)*

March 7, 2011

Joanna DiBella
Pacific Stock Transfer Co.
4045 South Spencer Street
Suite 403
Las Vegas, NV 89119

Reference: BBYB 200,000 Series 'A' Preferred Shares

Dear Joanna:

Please transfer One Hundred Eighty Five Thousand (185,000) Series 'A' Preferred shares of BBYB from certificate number 1012 to the following:

Microcap Management
13762 Colorado Blvd
#124-203
Thornton, CO 80602

The remaining Fifteen Thousand (15,000) shares are to be left in the names of Frederick A. Dahlman, Jr. and Belle C. Dahlman JT TEN and are to be sent to our address on file. Our resignations were effective as of November 15, 2010 so the above mentioned shares should be transferred free of any restrictions.

Mr. Sears will be sending you a onetime use credit card authorization form to pay for the above transfer and delivery. Mr. Sears's direct line is (303) 518-3174.

Thank you for handling this matter. My Commission Expires *9/21/13*

Sincerely,

*Frederick A. Dahlman Jr*                    *Marilyn W. Bitz*
                                                            NOTARY   WILSON COUNTY
                                                            STATE OF TENNESSEE NOTARY PUBLIC

Frederick A. Dahlman, Jr.

*Belle C. Dahlman*                          *Marilyn W. Bitz*
                                                            NOTARY
Belle C. Dahlman
                                                            STATE OF TENNESSEE NOTARY PUBLIC
                                          My Commission Expires *9/21/13*
                                                            WILSON COUNTY

Confidential Treatment Requested by PST
Fusion Pharm (D-03397) - PST-002627

## PW027 - BABY BEE BRIGHT CORPORATION
**Certificate Transaction Journal**
**Transaction Number 10701 Stock Class PR**
**Control ID: STTK000000011356      Transfer**

01/25/2011  4:03 pm

Page 1 of 1

**Transaction Date 01/25/11**

| Registration | Certif. No | | Canceled | Issued | |
|---|---|---|---|---|---|
| FREDERICK A DAHLMAN JR AND BELLE C DAHLMAN JT TEN | PR | 1007 | 1,500,000 | | Restricted |
| 1115 SAFETY HARBOR COVE OLD HICKORY, TN 37138-1998 | PR | 1012 | | 200,000 | Restricted |
| SALT INVESTMENTS LLC 2233 PONDEROSA RD FRANKTOWN, CO 80116 | PR | 1013 | | 1,300,000 | Restricted |
| | | | 1,500,000 | 1,500,000 | |

Confidential Treatment Requested by PST
Fusion Pharm (D-03397) - PST-002466

SEC-DOJ-EPROD-000800882

Attachment 5
Page 1 of 3

Frederick A. Dahlman, Jr.
Belle C. Dahlman
1115 Safety Harbor Cove
Old Hickory, TN 37138-1998

December 30, 2010

Joanna DiBella
Pacific Stock Transfer Co.
4045 South Spencer Street
Suite 403
Las Vegas, NV 89119

Reference: BBYB 1,500,000 Series 'A' Preferred Shares (certificate number: 1007)

Dear Joanna:

In reference to your conversations with William Sears in which you discussed the new rulings and the waiting period for transfer stock prior to a reversal, Mr. Sears wanted us to change the November 27th letter of authorization as follows:

Please let this letter act as a letter of authorization for you to transfer a portion of the above reference shares to the following company:

1,300,000 (One Million Three hundred Thousand) shares to:

Salt Investments, LLC.
2233 Ponderosa Road
Franktown, CO 80116

The remaining 200,000 (Two Hundred Thousand) shares are to be left in our names:

Frederick A. Dahlman, Jr. and Belle C. Dahlman JT TEN
1115 Safety Harbor Cove
Old Hickory, TN 37138-1998

This transfer of 1,300,000 (One Million, Three Hundred Thousand) shares to Salt Investments, LLC. is to be effective immediately and recorded on the books and records of your firm. Stock certificates are to be sent to the shareholders at the appropriate above address. William Sears will cover all expenses of this transaction.

Enclosed is a copy of the original paperwork for the preferred shares, Affidavit of Loss, and the Irrevocable Stock Power.

Sincerely,

Frederick A. Dahlman, Jr.

Belle C. Dahlman

Confidential Treatment Requested by PST
Fusion Pharm (D-03397) - PST-002468

SEC-DOJ-EPROD-000800884

Attachment 5
Page 2 of 3

. . . .

 **PacificStockTransfer**

*Proudly Serving Clients Since 1983*

4045 S Spencer St, Suite 403, Las Vegas, NV 89119
Phone: 702.361.3033   Fax: 702.433.1979

### Credit Card Payment Authorization

Company: _____

Contact Name: _William  Sears_

Email Address: _william @ williamJsears.com_

Phone Number: _(303) 519-8408_

Name on Card: _Sandra  Sears_

Billing Address: _13762  Colorado  Blvd  # 124-203_

_Thornton  Co  80602_

☑ VISA   ☐ MC   ☐ AMEX

Account Number: _4259·0740-0012_

Exp: _12 / 12_   CVV: _880_

Amount: $ _____

I hereby authorize Pacific Stock Transfer Company for a one-time charge to my credit card in the above amount for services rendered.

Signed: _____

Date: _1-7-10_

If you have any questions, please do not hesitate to contact our account representative, Lisa Upham. She may be reached via telephone at 540.675.6274 or via email at lupham@belmontfs.com.

Confidential Treatment Requested by PST
Fusion Pharm (D-03397) - PST-002475

SEC-DOJ-EPROD-000800891

Attachment 5
Page 3 of 3

Outlook.com Print Message                                      Page 1 of 1

Print                                                              Close

# (No Subject)

From:  **William Sears** (william@williamjsears.com)
Sent:  Tue 3/01/11 5:01 PM
To:    'Fred Dahlman' (dahlman@msn.com); Frederick Dahlman (fred@dahlman.net)
       1 attachment
       Fredrick A.docx (14.2 KB)

Fred,

As per our conversation please see attached and forward to MS DiBella.


**Regards,**


**William Sears**


"The fact is that the average man's love of liberty is nine-tenths imaginary, exactly like his love of sense, justice and truth. He
is not actually happy when free; he is uncomfortable, a bit alarmed, and intolerably lonely. Liberty is not a thing for the great
masses of men. It is the exclusive possession of a small and disreputable minority, like knowledge, courage and honor. It
takes a special sort of man to understand and enjoy liberty-- and he is usually an outlaw in democratic societies." -- H.L.
Mencken, Baltimore Evening Sun, Feb. 12, A. D. 1923


**CONFIDENTIAL COMMUNICATION:** This communication is for informational purposes only and may contain information that is privileged,
confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified
that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED.
Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into
which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by William Sears
or his affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately
contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.



GOVERNMENT
EXHIBIT
37
17-cr-00008-WJM

6/14/2015
FD_00000156

Attachment 4
Page 1 of 2

Fredrick A. Dahlman, Jr
Belle C. Dahlman
1115 Safety Harbor Cove
Old Hickory. TN 37138-1998

March 2, 2011

Joanna DiBella
Pacific Stock Transfer Co.
4045 South Spencer Street
Suite 403
Las Vegas, NV 89119

Reference: BBYB 200,000 Series 'A' Preferred Shares

Dear Joanna:

Please transfer One Hundred Eighty Five Thousand (185,000) Series A Preferred shares of BBYB from certificate number XXXXX to the following:

Microcap Management
13762 Colorado Blvd
#124-203
Thornton, CO 80602

The remaining Fifteen Thousand (15,000) shares are to be left in the names of Frederick A. Dahlman, Jr and Belle C. Dahlman JT TEN and to be sent to our address on file. Our resignations were effective as of November 15th 2010 so the above mentioned shares should be transferred free of any restrictions.

Mr. Sears will be sending you a onetime use credit card authorization form to pay for the above transfers and delivery. Mr. Sears's direct line is (303) 518-3174

Frederick A. Dahlman, Jr.

Belle C. Dahlman

FD_00000157

Attachment 4
Page 2 of 2

Outlook.com Print Message

Print                                                                          Close

---

# (No Subject)

---

From:   **William Sears** (william@williamjsears.com)
Sent:   Mon 11/22/10 4:47 PM
To:     'Fred Dahlman' (dahlman@msn.com)
        1 attachment
        FD- PW- Preferred Transfer 11-21-2010.docx (47.5 KB)

Fred,

Try this one on.

**Regards,**

**William Sears**

"The fact is that the average man's love of liberty is nine-tenths imaginary, exactly like his love of sense, justice and truth. He is not actually happy when free; he is uncomfortable, a bit alarmed, and intolerably lonely. Liberty is not a thing for the great masses of men. It is the exclusive possession of a small and disreputable minority, like knowledge, courage and honor. It takes a special sort of man to understand and enjoy liberty-- and he is usually an outlaw in democratic societies." -- H.L. Mencken, Baltimore Evening Sun, Feb. 12, A. D. 1923

CONFIDENTIAL COMMUNICATION: This communication is for informational purposes only and may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by William Sears or his affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.



GOVERNMENT
EXHIBIT
36
17-cr-00008-WJM

**Attachment 3**
**Page 1 of 2**

6/15/2015

FD_00000082

# Frederick A. Dahlman



November 21, 2010

Pacific Stock Transfer Co.
4045 South Spencer Street
Suite 403
Las Vegas, NV 89119

Reference: BBYB 1,500,000 Series A Preferred Shares


Dear Pac West,
        Please let this letter act as a letter of authorization for you to transfer the above referenced shares to the following:

1.  1,365,000 (One Million Three Hundred Sixty Five Thousand) shares to:

<div align="center">

Salt Investments LLC
2233 Ponderosa Road
Franktown, Co 80116

</div>

2.  100,000  (One Hundred Thousand) shares to:

<div align="center">

Microcap Management
13762 Colorado Blvd
#124-203
Thornton, Co 80602

</div>

3. 50,000  (Fifty Thousand) shares to:

<div align="center">

Robert L Dittman
13442 Jackson Drive
Thornton, Co 80241

</div>

The remaining 10,000 (Ten Thousand) shares are to be left in my name. These transfers are to be effective immediately and recorded on the books and records of your firm. No certificates are required. The above share holders will in contact with you when they do decide to convert said shares.

<div align="center">

## Attachment 3
## Page 2 of 2

</div>

Outlook.com Print Message

Page 1 of 2

Print

Close

# (No Subject)

From: **William Sears** (william@williamjsears.com)
Sent: Fri 11/19/10 5:14 PM
To: 'Fred Dahlman' (dahlman@msn.com)

Fred,

As per our conversation please transfer the following amounts of preferred shares to complete the transaction.

10,000 to yourself or nominee

100,000 to Microcap Management LLC

25,000 to Robert L Dittman

the balance (1,365,000shs) of the stock should go to Salt Investments LLC.

In addition please forward copy's of the original certs or documentation that was used to create said shares.

**Regards,**

**William Sears**

"The fact is that the average man's love of liberty is nine-tenths imaginary, exactly like his love of sense, justice and truth. He is not actually happy when free; he is uncomfortable, a bit alarmed, and intolerably lonely. Liberty is not a thing for the great masses of men. It is the exclusive possession of a small and disreputable minority, like knowledge, courage and honor. It takes a special sort of man to understand and enjoy liberty-- and he is usually an outlaw in democratic societies." -- H.L. Mencken, Baltimore Evening Sun, Feb. 12, A. D. 1923



GOVERNMENT
EXHIBIT
35
17-cr-00008-WJM

6/15/2015

FD_00000078

**CONFIDENTIAL COMMUNICATION:** This communication is for informational purposes only and may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by William Sears or his affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.

6/15/2015

FD_00000079

Outlook.com Print Message

Page 1 of 2

Print

Close

# Preferred Shares

From: **William Sears** (william@williamjsears.com)
Sent: Mon 11/08/10 9:02 AM
To: Dahlman, Fredrick (dahlman@msn.com)

Fred,

As per our conversation please transfer the following amounts of preferred shares to complete the transaction.

10,000 to yourself or nominee

50,000 to Microcap Management LLC

the balance (1,440,000shs) of the stock should go to Salt Investments LLC.

In addition please forward copy's of the original certs or documentation that was used to create said shares.

**Regards,**

**William Sears**



"The fact is that the average man's love of liberty is nine-tenths imaginary, exactly like his love of sense, justice and truth. He is not actually happy when free; he is uncomfortable, a bit alarmed, and intolerably lonely. Liberty is not a thing for the great masses of men. It is the exclusive possession of a small and disreputable minority, like knowledge, courage and honor. It takes a special sort of man to understand and enjoy liberty– and he is usually an outlaw in democratic societies." – H.L. Mencken, Baltimore Evening Sun. Feb. 12, A. D. 1923

**CONFIDENTIAL COMMUNICATION:** This communication is for informational purposes only and may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED.

6/15/2015

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  WILLIAM SEARS,

      Defendant

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**

---

      The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully submits this response regarding defendant Sears' objections to the PSR.

      1.  Defendant Sears objects to paragraph 16 regarding the language that Baby Bee Bright (BBB) shares would go to both Sears and Dittman.   Emails between defendant Sears and Fredrick Dalhman in November, 2010 show Sears instructing Dalhman to transfer a certain number of BBB preferred shares to Salt Investments, LLC (Dittman), Microcap Management, LLC (Sears), and to Mr. Dalhman himself.  See Attachment One, Two, and Three.  In March of 2011, Defendant Sears sent an email to Mr. Dalhman with an attached letter for Mr. and Mrs. Dalhman to sign and deliver to the transfer agent.   The letter requested that 185,000 Series A Preferred shares of BBB be transferred to Microcap Management and the remaining 15,000 shares left in the name of the Dalhmans.  See Attachment Four.  In addition, the transaction journal for PacificStockTransfer (PST) on January 25, 2011, shows 1.3 million preferred shares

1

of BBB were issued to Salt Investments (Dittman) and 200,000 shares remained with Mr.

Dahlman.  See Attachment Five.  Defendant Sears was contact person on the credit card payment

Authorization sheet for that transfer of shares.   On March 16, 2011, PST's transaction journal

shows 185,000 preferred shares of BBB were issued to Microcap Management, LLC (Sears) and

15,000 shares remained with Mr. Dahlman.  See Attachment Six.  In addition, under oath,

Defendant Sears testified that Microcap was his corporation.  See Attachment Seven, page 172

Line 20.  The evidence shows that 185,000 preferred A shares of BBB were transferred to Sears'

corporation Microcap and 1.3 million preferred A shares of BBB to Dittman.   In addition, on

page 14 of Sears' Plea Agreement, Sears agreed that Sears and Dittman would receive 99% of

BBB convertible preferred shares.  See Attachment 8.  The common shares that were

fraudulently sold by Microcap came from the 185,000 preferred A shares that Sears received

from BBB.

Defendant Sears next objects to the language that Family Member A was appointed to act

as a director in part to avoid disclosure of Sears' involvement and his prior conviction for

securities fraud.  On February 18, 2016, in Sears' debrief with the government, Sears stated his

mother was listed as the Corporate Secretary of FusionPharm (FUSIONPHARM) and she was

only on the paperwork as a name only.  Sears' mother never acted as an officer or director for

FUSIONPHARM and eventually Jean-Pierre took over as Corporate Secretary.  Sears stated that

originally it was going to be himself and his mother listed as the officers because Sears did not

believe FUSIONPHARM would be around for a long time.  Sears did not want to be listed as an

officer or director because he would have to disclose his prior criminal history.  See Attachment

9, page 10.  See Also Attachment 10, page 4, paragraph 24, 25, 28 (Another debrief with Sears

where he states that Jean-Pierre listed Sears' mother as secretary because Jean-Pierre knew Sears

could not be on the paperwork.)  Furthermore, Sears in his plea agreement agreed that family member A was appointed to act as director in order to avoid disclosure of Sears' involvement and his prior conviction for securities fraud.  See Attachment 8, page 14-15.

2.  Defendant Sears objects to paragraph 17 and the government does not contest that objection.

3.  Defendant Sears objects to paragraph 18 regarding to the language that control of BBB went to both Sears and Dittman inasmuch as Dittman controlled 86.6% of the outstanding stock.   As stated above and shown through PST transaction journal, Sears received at least 185,000 preferred shares of the 1.5 million.  Sears' ownership percentage of shares equals 12.33 percent.  In the industry of securities, the SEC, and other regulatory organizations, 10% is considered a controlling ownership.  Further, as stated in Sears' plea agreement, Dittman and he owned 99.9% of BBB convertible shares.  Finally, the undercover video of Sears and the agents shows Sears speaking about how much time he has placed into FUSIONPHARM.  When the agents ask who is really the person running the show for FUSIONPHARM and Sears stated that he was the "hand up Mona Lisa's skirt" after denying a 50-50 ownership with Dittman.  See Attachment 11, Undercover Video.

4.  Sears objects to paragraph 19 and states that once BBB's name was changed to FUSIONPHARM, Sears removed himself as the "Administrative Officer" since the company was now Dittman's.  As of this date, there is no evidence with FINRA that Sears was ever removed as the "Administrative Officer."  All the paperwork that FINRA has regarding FUSIONPHARM still list Sears as the Administrative Officer.  Sears and Dittman held themselves out as business partners that moved their operations into a publicly traded company.

See Attachment 8, page 16.  In addition, Sears identified himself as FUSIONPHARM's Vice President, Director of Financial Operations, and Investor Relations Director.  *Id*. at 17.

5.  Sears objects to paragraph 20 designating individual "A" as a co-conspirator and denies that his email to "A" regarding a business plan and financial projections was based on conspiratorial activity.  In *United States v. Martinez–Martinez*, 156 F.3d 936, 939, n. 5 (9th Cir.1998) the Court stated that Section 2X1.1(b)(2) does not refer to the acts of each individual defendant.  ("In evaluating whether all the acts necessary for completion of the offense have occurred or are about to have occurred, the court must look at the actions of all the conspirators collectively, rather than at those of a particular defendant individually.")  Individual "A" was a co-conspirator within the entire scheme to include his discussions and work regarding non-convertible notes and convertible notes, back dating notes, falsifying deposits into FUSIONPHARM from Sears' shell entities, and participating in meetings with Sears and Jean-Pierre regarding funding FUSIONPHARM by selling unrestricted shares of FUSIONPHARM, among other activities.  The fact that Sears did not want to be part of writing a business plan is irrelevant to the overall fraudulent scheme and purposes of sentencing in this case.  However, the evidence in the investigation proves otherwise.  On March 10, 2011, Sears sends an email to Bodden asking him to communicate with him regarding the FUSIONPHARM business plan. See Attachment 30.

6.  Next, Sears objects to paragraph 21 that implicates that he and Dittman were business partners in FUSIONPHARM.  First, in Sears plea agreement he admitted that held themselves out as business partners.  See Attachment 8, page 16, paragraph 9.   Second, in Sears debrief with the government, Sears stated that he and Dittman were "partners" that he viewed as two guys building a business.  Further, Sears admitted that "We screwed up royally.  It was two guys

trying to start a business." See Attachment 9, page 11 and 27. Sears stated several times on the undercover video "we" and Scott when referring to the buisness. See Attachment 11. In addition, Dittman on April 21, 2011 in a group email stated that he had just partnered with his brother-in-law William Sears, and that they had just acquired FUSIONPHARM. See Attachment 31.

7.   Defendant Sears objects to paragraph 22 description that he or any of the entities through which he conducted business was an affiliate or related party to FUSIONPHARM. Rule 144(a) (1) defines an "affiliate" to mean "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the issuer." Rule 405 of the Securities Act defines "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." Sears stated in his debriefs with the government that he was an affiliate of FUSIONPHARM, and that his affiliate status was not disclosed to investors. Further, Sears stated that Jean-Pierre knew of his affiliation status with FUSIONPHARM. See Attachment 12, page 1 and 5 and Attachment 9, page 25. Further, Sears admitted to controlling Bayside. See Attachment 12, page 5. In Sears' plea agreement, Sears admitted that Meadpoint, FUSIONPHARM, and Vertifresh were entities operated by him. See Attachment 8, page 31. In direct examination in defendant Jean-Pierre's trial, Sears admitted to owing Microcap and Meadpoint. See Attachment 7 and 14. Scott Dittman admitted in an undercover video that Sears was always Meadpoint. See Attachment 15. Under oath at Sears' change of plea, Sears stated to this Honorable Court the he failed to properly disclose his affiliation status with FUSIONPHARM to enable him to have access to free trading FUSIONPHARM shares. See Attachment 13, page 14.

Based on Sears' own statements and evidence, Sears was the owner/controller of Microcap, Meadpoint, Bayside, and Vertifresh, in addition to controlling FUSIONPHARM as an affiliate.  Essentially, the entities were shell companies that held FUSIONPHARM stock for Sears and Dittman that eventually became unrestricted and sold.   Investors did not know about William Sears and his affiliation with all these entities.

Sears argues that any reports that were uploaded to the OTC Link internet platform by him, were done purely as a ministerial act.   This Honorable Court heard and permitted several emails, with attachments, in the Jean-Pierre trial into evidence that showed Sears, Dittman, and Jean-Pierre reviewing, commenting on, making changes, and uploading onto the OTC Markets portal for the public's view.  For example, on August 20, 2013, Sears sends Scott Dittman an email regarding the quarterly report for June 30, 2013 where Sears clearly reviewed the report for mistakes since he informs Dittman that he missed updating all the dates from last year. Reviewing reports in that much detail is more than a ministerial act.  See Attachment 32.

8.  Defendant Sears denies that he had a role in FUSIONPHARM and that his company worked together with FUSIONPHARM in his objection to paragraph 23.   First, the government is unsure of which one of Sears' company his is objecting as having conducted business with FUSIONPHARM.  The government argues that Sears' entities (Bayside, Meadpoint, Microcap, and Vertifresh) were nothing more than shell companies used by Dittman and Sears to hold FUSIONPHARM stock through fraudulent agreements.  Second, Sears played a major role with FUSIONPHARM based on all the statements he made in his debriefs and the undercover video. In his change of plea, Sears admitted to being an undisclosed affiliate of FUSIONPHARM. Further the facts in his plea agreement clearly lay out his various roles and titles regarding FUSIONPHARM.  See Attachments 8, 9, 10, 11, 12, and 13.

9.  Defendant Sears objects to paragraph 24 as being categorized as acting as a Chief Financial Officer.  The government does not contest the exact wording of "Chief Financial Officer" but Sears did admit in his plea agreement to being Director of Financial Operations.  See Attachment 8, page 17.  Sears in his debrief admitted to the title of Investment Relations Director for FUSIONPHARM.  See Attachment 9, page 11.   Sears did open FUSIONPHARM bank account on March 24, 2011.   Sears and his mother were the only two individuals that had access to FUSIONPHARM bank account up to October 7, 2011.  See Attachment 16 (Changes to Authorized Signers on Business Deposit Accounts).   From April 2011 through October 3, 2011, Sears signed approximately 153 checks for FUSIONPHARM.  On October 5, 2011, FINRA contacted FUSIONPHARM regarding Microcap and William Sears affiliation with FUSIONPHARM.  After that date, Dittman took over the signing of the majority of FUSIONPHARM checks.  See Attachment 19.  In addition, in the undercover video, Sears presents a lot of knowledge regarding international hedge funds, the costs associated to labor, and FUSIONPHARM's capital situation from the start of the company to the date of the video.  See Attachment 11.  Sears' knowledge about such subjects puts doubt into his claims regarding his lack of knowledge with finance.

Sears claims that a receipt of a salary was a mistake mated by a new employee who should have treated him through an IRS Form 1099 and not on the payroll.  However in tax year 2011, a W-2 was filed by FUSIONPHARM for William Sears that reported $8,750 in wages.  In tax year 2012 and 2013 there was no wage W-2 or income 1099 filed by FUSIONPHARM for William Sears.  An email from Scott Dittman shows that he instructed an employee at paychex to process "our" payroll, which included Dittman's and Sears' normal salary amounts.  See Attachment 17.  However, the officer manager for FUSIONPHARM stated in a letter that Sears

was a 1099 employee with a gross pay of $5,000 per month since January 2011. In that same letter, Sears was supposed to be a W-2 employee with the same monthly salary as of March 1, 2012. This letter was written on January 2012, and had attached checks for three months to Sears for $5,000 signed by Dittman. See Attachment 22.

Sears admitted to doing work for FUSIONPHARM and using a FUSIONPHARM email address. Further, he stated that co-defendant Jean-Pierre advised him not to use a FUSIONPHARM email account because he could be construed as an affiliate. When Jean-Pierre informed him of this information he was upset at Jean-Pierre because he believed that Jean-Pierre gave him the tools to avoid the perception that he was an affiliate of FUSIONPHARM. See Attachment 9, page 25.

10. In Sears' objection to paragraph 26, he objects to being labeled as de facto affiliate and that sales of preferred shares in Microcap were in violation of securities law. As this Honorable Court heard in the trial of Jean-Pierre, Sears did not have the legal knowledge to understand if he qualified as an affiliate. However, the government's security expert testified that Sears had a controlling role in FUSIONPHARM, thus making him an affiliate. In addition, under oath at his change of plea, Sears admitted to being an undisclosed affiliate, along with admitting being an affiliate in his debriefs to the government. See Attachment 13, page 14 and Attachment 12 page 1. Because Sears was an affiliate to FUSIONPHARM, he had to disclose his true status to the transfer agent when selling shares of FUSIONPHARM. The law restricts the amount of shares an affiliate of an issuer can sell, otherwise known as a volume limitation for affiliates. As part of the scheme, Sears never disclosed to the transfer agents or brokers that he was an affiliate to FUSIONPHARM and Jean-Pierre falsely mislead the transfer agents and brokers by stating Microcap was in no way an affiliate to FUSIONPHARM. As a result, Sears

was able to obtain free trading shares of FUSIONPHARM and sell more than the volume limitation for an affiliate, which is against the securities laws.  See Attachment 18 (Rule 144 Affiliate Volume Calculations, displays that during the entire time of the conspiracy, Sears as an undisclosed affiliate, was always over the allowed percentage.  In 2011, when Sears was selling FUSIONPHARM through microcap he was at one time 2000% over the limit.)

11.  Sears objects to paragraph 27 that implicates the transactions of issuing FUSIONPHARM shares to his wife and brother-in-law "RD" were merely proxies for his stock ownership.   Both, Sears' wife and "RD" were called to the stand in the trial of Jean-Pierre and had little or no knowledge to ever owning or understanding the stock transactions that were in their names.  Further, witness Bodden testified that "RD" was known as the "beard" because he was essentially a placeholder for Sears' FUSIONPHARM stock.  Sears admitted that he was controlling the stock that was in "RD's" name and that "RD" did not know anything about the paperwork required for stock transactions.  Sears stated he drew down his FUSIONPHARM shares from "RD's" account in order to avoid being a control person by holding over 10% of FUSIONPHARM shares in his name.  See Attachment 9, pages 9-10.

12.  Regarding Sears' objection to paragraph 28, the government is unclear about what Sears means by the "characterization of these transactions" and what "free" shares he is referring to regarding Dittman.   The objection is just not clear to the government.  The government will file a motion to clarify or provide more details to the objection.

13.  As to Sears' objection to paragraph 29, the government does not contest that the transactions regarding FUSIONPHARM shares held by Microcap were approved by the transfer agent and the restricted legends were removed.   The crux of the securities fraud scheme was that Sears never disclosed his true affiliation with FUSIONPHARM to the transfer agents and

brokers.  Jean-Pierre being an expert in securities law, assisted Sears and Dittman with concealing Sears' true affiliation with FUSIONPHARM.  Several of attachments already discussed in this response address these points.

14.  Defendant Sears objects to paragraph 30 denying that the money was made in the market at part of the conspiracy and argues that he owed Dittman for the manufacturing of pods. However, the email recovered in the FBI search warrants shows Scott Dittman asking if $3k can be transferred into his wife's account from "this weeks take."  Sears responds back "Done???you want the full five?"  See Attachment 20.  The "full five" is consistent with what Dittman would make a month based on testifying that his salary was $60,000.   See Attachment 21. Furthermore, Sears should be paying FusionPharm for the manufacturing of PharmPods, not Scott Dittman's wife.

15.  Defendant Sears objects to paragraph 31 and indicates that his mother owned Bayside.  The government has addressed this issue in previous paragraphs.  Also, Sears' mother took the stand at Jean-Pierre's trial and could not speak or remember anything about "her alleged company" Bayside.

16.  Defendant Sears objects to paragraph 33 stating that Dittman was identified as a director of Vertifresh.  Sears claims that Vertifresh was a LLC without any directors and was owned by him.  However, the email the Sears sent to "PG" on October 5, 2012 had attached to it the business plan for Vertifresh.  In the business plan, Scott Dittman is listed as "Director."  See Attachment 23.

17.  Defendant Sears objects to paragraph 34 that Dittman owned 50 percent of Meadpoint.  However, in Sears' email on November 14, 2011 with the Meadpoint Shareholder Agreement attached, the agreement states on the first page that Dittman and Sears own 50% each

of the issued shares and outstanding stock for Meadpoint.  See Attachment 24.  It should also be noted that Sears is asking the CEO of FUSIONPHARM to forward the agreement.

18.  The government does not contest defendant Sears' objection to paragraph 35.

19.  Regarding Defendant's objections to Paragraph 36, as already stated in this response, Sears' mother was not the legitimate owner of Bayside.  Further, the documents filed with OTC show that there was never a convertible feature on any note until the annual report of 2012.  As co-defendant Jean-Pierre stated in the undercover video, the convertible feature of a note must be negotiated and agreed upon at the time the note is created, not at a later date.  In addition, Bodden testified that the notes were created in 2012/2013 and back dated to 2011 timeframe.

20. Defendant Sears objects to paragraph 37 as being nonsensical and wrong.  The source of 97% of funds for the Bayside convertible note came from the sale of FUSIONPHARM stock through Microcap.  See Attachment 25 (Table indicating the source of funds for the Bayside and Meadpoint convertible notes based on documentation provided by transfer agent.)

21.  Defendant Sears objects to paragraphs 38 and 40 stating that the notes were non-convertible at some time.  In an email from Bodden to Sears on June 6, 2012, Bodden attaches Promissory Note and Credit Line Agreement for Bayside.  In that agreement there is no convertible option.  See Attachment 26.  On that same date, Bodden sends another email to Sears with the Meadpoint Promissory Note and Credit Line Agreement attached.   Again, in that agreement there is no convertible option.  See Attachment 27.  On June 20, 2012, Bodden sends "NM" the signed notes for Bayside and Meadpoint.  At this time, FUSIONPHARM via Sears, is trying to sell these notes to "NM."   There is no convertible feature an either of the notes.  See Attachment 28 (email from Bodden with the attached notes).  Finally, defendant objects to the

fraudulent scheme, but he has plead guilty to Conspiracy to Defraud the United States and Filing False Income Tax Return in a two-count information.

22.  Regarding Defendant Sears' objection to paragraph 42 regarding his affiliation status with FUSIONPHARM, the government has addressed this objection in previous paragraphs and attachments.  Sears informed this Court that he was an undisclosed affiliate.

23.  Defendant Sears objects to paragraphs 43 and 45 arguing that counsel advised him that all representations were in compliance with securities laws regarding the Bayside and Meadpoint convertible notes.  First, Sears signed approximately 109 of the 110 checks issues by Bayside.  Further as stated in previous paragraphs, Sears was the controller of Bayside and Meadpoint and had a controlling interest in FUSIONPHARM making him an affiliate.  Sears, Dittman, and Jean-Pierre all conspired to hide Sears affiliation status with FUSIONPHARM in order to obtain free trading shares of FUSIONPHARM.

24.  Defendant Sears objects to paragraph 46 as being labeled an employee.  As stated, in 2011, FUSIONPHARM filed a W-2 for William Sears that reported $8,750 in wages.   In addition, checks were signed by Dittman paying Sears $5000 as part of payroll for FUSIONPHARM.  In addition, the officer manager for FUSIONPHARM stated in a letter that Sears was a 1099 employee with a gross pay of $5,000 per month since January 2011.  In that same letter, Sears was supposed to be a W-2 employee with the same monthly salary as of March 1, 2012.  See Attachment 22.

25.  Defendant Sears' objection to paragraph 47 is unclear to the government.  The government will file a motion to clarify or provide more details to the objection.

26.  Defendant Sears objects to paragraph 49 stating that he had no stock to sell for the month of January, which was the month that FUSIONPHARM stock sold for the highest price

and claims he did not get any stock until the middle of February 2014.  Sears held 800,000 shares as of FUSIONPHARM stock on January 16, 2014, that he began selling on 2/7/2014.  This is shown in the transfer agent's transaction journal.  As of January 9, 2014 there were 800,000 that were mailed to Sears' broker and received on January 27, 2014.  See Attachment

27.  Defendant objects to paragraph 50 regarding that the funds were treated as owned collectively with Dittman.  Dittman used funds from Sears' sale of FUSIONPHARM stock to purchase his home in May, 2014.  Attachment 34 shows the wiring of the funds.

28.  As to defendant Sears' objections regarding paragraphs 52-65, Cliff Bodden emailed Sears asking him how to book several deposits.  Bodden clearly does not know if the deposits are supposed to be booked as revenue, debt, or/and loans into quickbooks, so he is asking Sears.  If Sears did not understand the finances regarding FUSIONPHARM, Bodden would not have asked him how to book certain deposits.  See Attachment 29.

29.  Defendant Sears objects to paragraphs 71-78 denying his failure to pay taxes.  Sears plead guilty to a tax charge and told this Honorable Court that during his change of plea while under oath.  Second, his plea agreement discusses his tax violations on pages 38-39.  See Attachment 8.  Sears agreed to this plea agreement and told this Honorable Court that the facts in the agreement were true.

30.  Defendant Sears objects to paragraphs 84-114 regarding information about Jean-Pierre since he was not provided that information in discovery.  As shown in this response, Sears debriefed with the government, which included discussions about Jean-Pierre.  Further, Sears worked with Jean-Pierre in this conspiracy.  Jean-Pierre was found guilty to have conspired with Sears.   Finally, it was Sears who reached out to the FBI to assist in an undercover operation to lure Jean-Pierre.  The entire undercover operation showed Sears close relationship that he had

13

with Jean-Pierre and discussed various events that occurred in the FUSIONPHARM case/conspiracy.

31.  Regarding Defendant Sears' objects to paragraphs 108-111, the government would argue that the FBI oversaw the undercover operation and Sears' involvement.  However, as this Court heard in Jean-Pierre's trial, much of the conversations that Sears had with Jean-Pierre was unscripted.  Law enforcement concentrated on topics of discussion, not direct word for word written scripts.  In fact in the hotel video of the undercover, Sears had no written script and was speaking freely.

32.  Defendant Sears objects to paragraph 130.  The government argues that the information used by the USPO to compute the offense level were correct and summarized a very complex and long term fraudulent conspiracy.

33.  In response to defendant Sears' objection to paragraph 133 as being an organizer or leader of criminal activity, the government agrees with the USPO.  Sears was no doubt a leader or organizer of the criminal activity in which he plead guilty.  Sears was an undisclosed owner/controller of FUSIONPHARM and several other entities.  Sears organized a fraudulent scheme to hold FUSIONPHARM shares in his entities in which he sold in order to fund FUSIONPHARM.  Sears is now denying any criminal activity, much like him denying his affiliation status with FUSIONPHARM.

34.  Defendant Sears objects to receiving a two level increase for failure to report income from criminal activity in paragraph 137.  Again, defendant Sears is denying criminal activity even though he plead guilty to a tax charge and agreed to the facts of a plea agreement that details his failure to report this income.

35.  Defendant Sears objects to paragraph 138 because his failure to report tax returns was not conducted in sophisticated means.  "The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010); *see also United States v. Jenkins–Watts*, 574 F.3d 950, 962 (8th Cir.2009)

In *United States v. McKye*, 638 Fed. Appx. 680 (10th Cir. 2015), cert. denied, 2016 WL 2840457 (U.S. 2016), the Tenth Circuit upheld the District Court applying two-level sentencing enhancement for use of sophisticated means to defendant's sentence for securities fraud, where defendant ran his scheme undetected for five years, used multiple entities to coordinate the fraud, and used newspaper and television ads to attract more investors, and induced individuals to invest in his scheme by deceiving them into believing their investments were collateralized by real property.  The crime and means of committing the crime in *McKye* are similar to the means used in this case.  Like in *McKye*, Sears, along with co-conspirators Jean-Pierre and Dittman, used multiple entities to coordinate the securities fraud, assisted in drafting fraudulent press releases, and disclosed fraudulent information, specifically pertaining to their revenue, to OTC Markets, the forum for the public to receive information about microcap companies.  They also used a licensed lawyer, not banned to write opinion letters, review fraudulent documents without his knowledge and pay him to place his letterhead and signature on the opinion letters.  In addition, this securities fraud went undetected for approximately four years and the undercover operation displayed that defendant Jean-Pierre was willing to continue engaging in securities fraud.  Many other circuits have upheld the two-level sentencing enhancement when securities

fraud was committed and various layers of fraud was involved. *See United States v. Regensberg*, 381 Fed.Appx. 60 (2nd Cir. 2010), 210 WL 2501042; *United States v. Bollin*, 73 Fed.Appx. 316, (9th Cir. 2003), 2003 WL 21995421; *United States v. Brennan*, 562 Fed.Appx. 914 (11th Cir. 2014), 2014 WL 1394654; and *United States v. Altomare*, 673 Fed.Appx. 956 (11th Cir. 2016), 2016 WL 7404668.

 36.  Defendant Sears objects to paragraphs 160, 161, and 173.   The government does not contest to these objections.

Dated this 2nd day of August 2019.

<div style="margin-left:40%">

Respectfully submitted,

JASON R. DUNN
United States Attorney

</div>

By: s/Jeremy Sibert
   JEREMY SIBERT
   Assistant United States Attorney
   United States Attorney's Office
   1801 California Street, Suite 1600
   Denver, Colorado  80202
   Telephone: (303) 454-0100
   FAX: (303) 454-0403
   E-mail: Jeremy.Sibert@usdoj.gov
   Attorney for the United States

## CERTIFICATE OF SERVICE

 I hereby certify that on this 2nd day of August 2019, I electronically filed the foregoing **Government's Response to Defendant's Objections to PSR** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

 **Peter Bornstein**

<div style="margin-left:40%">

s/Jeremy Sibert

</div>

JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. WILLIAM SEARS,

Defendant

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO RECONSIDER**

---

The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully submits this reply as directed by this Court regarding defendant's motion to reconsider his withdraw from his guilty plea.

The defendant asks the court to reconsider its ruling based on what he argues to be the court's "misapprehension" of the defendant's "position and facts that support his position." See ECF No. 175, ¶ 6. In support of this erroneous suggestion, the defendant focuses not on Rule 11 but only on the court's change of plea practice of asking a defendant directly what it was that he did wrong. The defendant suggests the court limit its view of the existence of a factual basis to only the defendant's direct answer to this question which comprised only two sentences. *Id* at ¶ 7.

370

The defendant then attempts to bolster his argument that his brief response to the court's direct questions is not some "johnny come lately" suggestion by noting a two-sentence email sent to his attorney six months later.  *Id* at ¶ 8.

These two suggestions show the defendant's misguided view of the application of Rule 11 at a change of plea hearing.  *United States v. Pence* provides the requirements for a Court to accept a guilty plea under Rule 11.  Quoting from *United States v. Pence*, 399 Fed.Appx. 361, (10th Cir. 2010), 2010 WL 4069474, ""Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed.R.Crim.P. 11(b)(3). The court may consider "anything that appears in the record" when making its determination. *United States v. Keiswetter,* 860 F.2d 992, 996 (10th Cir.1988) (internal quotations and emphasis omitted). " 'An inquiry might be made of the defendant, of the attorneys for the government and the defense, of the presentence report when one is available, or by whatever means is appropriate in a specific case.' " *Id.* (quoting Notes of Advisory Committee on Rules, 1974 Amendment to Rule 11). Thus, Rule 11 does not require the district judge to question the defendant as to the factual basis for a guilty plea; rather, the rule simply imposes an obligation on the judge to "determine *that there is* a factual basis for the plea." Fed.R.Crim.P. 11(b)(3) (emphasis added). Questioning the defendant is merely one method, albeit a laudable and effective one, of ascertaining that such a factual basis exists. *See* Notes of Advisory Committee on Rules, 1974 Amendment to Rule 11 ("An inquiry might be made ... *by whatever means is appropriate* in a specific case.") (emphasis added). Nevertheless, whatever the chosen method, it is " 'incumbent upon the judge to produce a record on the basis of which we can determine that his discretion was not abused.' " *Keiswetter,* 860 F.2d at 996 (quoting *United States v. Dayton,* 604 F.2d 931, 938 (5th Cir.1979))."

United States v. Adams, 448 F.3d 492, 500 (2nd Cir. 2006) is in agreement with the Tenth

Circuit regarding the requirements under Rule 11. In *Adams*, the Court ruled that the district

court must "determine there is a factual basis for the plea." Rule 11(b)(3). Two aspects of this

section are important in considering the defendants motion to reconsider. First, the

determination if sufficient facts exist to support a plea must be made *at the time of the plea is*

accepted, not in an after the fact hearing supported by emails from a defendant to his lawyer

months after the plea and months before his motion to withdraw filing. *United States v. Adams*,

448 F.3d 492, 500 (2nd Cir. 2006). Second, the court's determination that a factual basis exists to

support the plea need not come directly from the defendant's mouth, as the defendant seems to

suggest, here. "We need not rely solely on defendant's allocution, however to support the plea,

rather any facts on the record at the time of the plea proceeding may be used. Such facts must

already exist on the record or be put on the record at the time of giving of the plea after an

inquiry of the defendant, the government or any other available sources of information." *Id.* at

499. The Court may rely on "any facts on the record at the time of the plea proceeding," *Adams,*

448 F.3d at 499, including the defendant's own admissions and statements made by defense

counsel. *See United States v. Smith,* 160 F.3d 117, 121 (2d Cir.1998).

This Honorable Court found at the time of the plea a sufficient factual basis existed for

the pleas. As this Court correctly noted in EDF No. 150, this Court reviewed the plea agreement

facts with defendant Sears, asked Sears to provide him a summary his criminal misconduct, and

then went over each of the essential elements for the two charged offenses with defendant Sears.

In addition to reviewing the facts with defendant Sears, this Court asked defendant Sears' lawyer

if the Court could rely on the stipulated facts in the plea agreement for a factual basis. *See* ECF

No. 84 at 15. Defendant Sears' lawyer, along with the government, agreed that this Court could

3

rely on the stipulated facts in the plea agreement. *Id.* After going over the facts of the plea agreement, his rights to a jury trial, the elements of the offenses, and maximum statutory sentences with defendant Sears, defendant Sears still agreed to enter a guilty plea on both counts. *Id.* at 23-25. In addition, defendant Sears' lawyer, along with the government, agreed that this Court complied with the requirements under Rule 11. *Id.* at 24. Finally, after hearing from defendant Sears, reviewing and accepting the plea agreement, questioning defendant Sears' lawyer, and hearing defendant Sears plead guilty, this Court found that the defendant knowingly and voluntarily entered a plea of guilty to Counts 1 and 2 of the information and he has admitted the forfeiture allegation in that information, with a full understanding of the factual basis and essential elements of the charges. *Id.* at 25. This Court made a record that clearly shows that the Court's discretion under Rule 11 was not abused.

The fact the defendant later sent an email to his attorney months later arguably calling into question what he admitted to this court under oath is insignificant. Further, the defendant now suggests his brief response to the court's direct questions is the only source which can be used for the determination the court must make under Rule 11(b)(3) that there exists a factual basis for the plea. As noted in the Tenth Circuit, this is not the case. As noted in the court's ruling ECF 84, the court inquired of the defendant if the statement of facts covering 25 pages of the plea agreement were true. The defendant agreed they were true. This factual basis described in the plea agreement was sufficient. A recitation of facts need come from the defendant's own mouth.

Rule 11 requires the court to make direct inquiry of the defendant as to the voluntariness and knowing nature of his understanding of his rights and what he is forfeiting. Here, the court did. Totally separate and apart from the defendant's understanding, the court must make an

independent determination from the facts before it from all sources at the time of the plea whether a factual basis exists for the charge to which the defendant is pleading. In reviewing what transpired more than three years ago at the change of plea hearing, this Court painstakingly reviewed the record and concluded the two aspects of a validly conducted change of plea hearing occurred then. This Court did not, as the defendant characterizes it, "misapprehend" what he is arguing now. Rather in its ruling, this Court focused on the legal standard for a change of plea and the facts before it, given the change of heart of the defendant after being put through the ringer during his testimony at the Jean-Pierre trial.

As for defendant Sears's remaining agreements in his Motion for Reconsideration, this Honorable Court correctly ruled that matters such as Agent Funk's CPA status is not Brady material or facts/information that render defendant Sears' guilty plea involuntary. *See* ECF No. 150. At best, the information regarding Agent Funk and Mr. Lehrer might have been impeachment evidence if defendant Sears had elected his right to a trial as opposed to pleading guilty. *Id*.

Based on the above argument, this Honorable Court probably concluded that there was no basis for defendant Sears from withdrawing from his change of plea. In his Motion for Reconsideration, defendant Sears fails again to provide any legal basis to withdraw from his guilty plea and this Court should deny defendant Sears' request again.

Dated: August 23rd, 2019

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:    s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney

United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2019, I electronically filed the foregoing
**Government's Response**
with the Clerk of the Court using the CM/ECF system which will send notification of such filing
to the following e-mail address:

**Peter Bornstein**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 16-cr-301-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    **WILLIAM J. SEARS**,

    Defendant.

---

## ORDER DENYING MOTION TO RECONSIDER

---

Defendant William J. Sears ("Sears") pleaded guilty in November 2016 to one count of conspiracy to defraud the United States (18 U.S.C. § 371) and one count of filing a false income tax return (26 U.S.C. § 7206(1)).  (ECF Nos. 41, 48, 84.)  His sentencing has been postponed pending his opportunity to testify in the Government's case against Guy Jean-Pierre, a co-conspirator who, for procedural reasons not relevant here, was charged in a separate criminal action.  (*See* Criminal Case No. 17-cr-008-WJM.)  Jean-Pierre went to trial before the undersigned in January 2019, and Sears testified at the trial, as expected.  The Court then set Sears's sentencing hearing for July 11, 2019, which has since been continued to October 31, 2019.

On May 4, 2019, Sears filed a Motion to Withdraw Plea of Guilty.  (ECF No. 139.)  The Court denied that motion on May 22, 2019.  (ECF No. 150.)  On August 1, 2019, Sears filed a Motion for Reconsideration (ECF No. 173), which is currently before the Court.  The Court's analysis below presumes familiarity with its May 22, 2019 order.

In a criminal case,

> [a] motion to reconsider may be granted when the court has
> misapprehended the facts, a party's position, or the law.
> Specific grounds include: (1) an intervening change in the
> controlling law, (2) new evidence previously unavailable, and
> (3) the need to correct clear error or prevent manifest
> injustice.  A motion to reconsider should not be used to
> revisit issues already addressed or advance arguments that
> could have been raised earlier.

*United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014) (internal quotation marks
and citations omitted).

Sears first argues that the Court has misapprehended the law, "imposing a
burden on [him] to not just raise arguments in favor of innocence, but to convince the
Court of his innocence."  (ECF No. 173 ¶ 5.)  The Court imposed no such burden.
Sears's motion seemed to presume that he could simply claim innocence and that
would be enough.  The Court thus found that Sears had not justified his motion
because, among other reasons, he had offered only "bare assertions of innocence with
no support, and no explanation of why [he had] gone back on [his] sworn testimony [at
the change-of-plea hearing]."  (ECF No. 150 at 8.)

Sears next attacks the Court's reliance on his change-of-plea testimony:

> Of the multi-pages of alleged activities recited in the plea
> agreement, the only one that Mr. Sears acknowledged, in
> the colloquy, was his involvement in the creation of a
> convertible promissory note that was backdated.
>
> * * *
>
> . . . Sears never agreed he was guilty of the entire crime as
> presented by the government in the plea agreement.
>
> * * *
>
> [B]ackdating of the convertible notes was not an illegal act
> . . . .

2

> The colloquy with Mr. Sears during the change of plea
> hearing reveals that he admitted only to a very narrow slice
> of the facts the government alleged against him.

(ECF No. 173 ¶¶ 7, 9, 11–12.)  To the contrary, Sears acknowledged that he had read

all of the facts alleged in the plea agreement and that there was no inaccuracy.  (*See*

ECF No. 150 at 3–4.)  In addition, there is no requirement that the Court obtain the

defendant's verbal description of his or her incriminating actions, and therefore no

requirement that the Court's colloquy or the defendant's resulting narrative embrace

every criminal act alleged by the Government.[1]

Sears's third argument for reconsideration is that the Court misapprehended his

assertion of innocence:

> [H]e is arguing that he did not have the *mens rea* to agree to
> violate the law and to engage in an overt act furthering the
> objective of the conspiracy.  This is because he has claimed
> throughout, as noted by the footnotes in the plea agreement,
> that he was acting with advice of counsel and because of
> that advice he lacked the *mens rea* to violate the conspiracy
> statute.

(ECF No. 173 ¶ 10.)  Sears never made this argument in his original motion so the

Court could not have misapprehended it.  But the argument is self-defeating in any

event.  The plea agreement indeed contains many footnotes explaining Sears's position

about the advice of counsel he received and evidence in that regard that he would

introduce at a trial.  (*See* ECF No. 41 at 15 n.5, 17 n.8, 22 n.15, 24 n.18; ECF No. 42 at

1 n.20, 6 n.25.)  And yet Sears still signed the plea agreement and pleaded guilty.

Perhaps he regrets that now, but he cannot claim that he was not well-informed at the

---

[1] If Sears means to say that he admitted only one criminal violation because that is the only violation he subjectively believed the Government could have proved, he has never before expressed that subjective belief.  To testify in a change-of-plea hearing with his fingers crossed, so to speak, is a violation of the oath to testify truthfully.

relevant time.

Sears's fourth argument is that the Court misapprehended the significance of his discovery that Agent Funk is not authorized under Kansas law to hold herself out as a CPA, and that her representation of herself as such in search warrant affidavits calls into question "the integrity of the prosecution." (ECF No. 173 ¶¶ 14–17.) But this is no more than a more emphatic re-urging of a prior argument that the Court rejected. Also, as the Court previously explained, Agent Funk is a CPA and the only question is the context in which she can hold herself out as such under the laws of her regulating jurisdiction, Kansas. (ECF No. 150 at 10.) As the Court further explained, even if Agent Funk should not have represented to the magistrate judge in a warrant affidavit that she is a CPA, the question in any motion to suppress that warrant would be whether it would have mattered to the magistrate judge—whether the "CPA" designation was materially misleading *and* whether its removal from the warrant affidavit would have destroyed probable cause. (*Id.* at 11, 15.) Moreover, the Court noted that Sears had not identified any alleged accounting errors that Agent Funk had committed. (*Id.* at 17 n.8.) Sears's Motion for Reconsideration still does not identify any such errors.

Finally, Sears re-urges his argument that it should have been disclosed to him, before he pleaded guilty, that former AUSA Harmon was friends with Mr. Lehrer, who had provided similar opinion letters as Mr. Jean-Pierre, but who was not charged. (ECF No. 173 ¶¶ 18–21.) Sears raises nothing in this respect that he did not or could not have previously raised. His assertion that he could subpoena Mr. Lehrer for trial (*id.* ¶ 21) was as true before he pleaded guilty as now. (*See* ECF No. 150 at 13 ("[T]he *only* thing about Mr. Lehrer that Sears did not know at the time of his decision to accept a

plea deal was Mr. Lehrer's relationship with Mr. Harmon.  Sears knew beforehand that

Mr. Lehrer was not being prosecuted, that Mr. Harmon had no intent to prosecute

Mr. Lehrer, and that Mr. Lehrer had offered testimony in an SEC proceeding that Sears

considered false." (emphasis in original; citation omitted)).

  For the reasons set forth above, Sears's Motion for Reconsideration (ECF No.

173) is DENIED.

  Dated this 30th day of September, 2019.

<div align="right">

BY THE COURT:

_____

William J. Martinez
United States District Judge

</div>

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Jeremy S. Sibert (caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov,
michaela.keiter@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andres Rene Guevara
(andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Peter R. Bornstein (jwolf@prblegal.com,
pbornstein@prblegal.com), Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Robert M. Brown
(caseview.ecf@usdoj.gov, glenda.galloway@usdoj.gov, robert.brown5@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (bradshaw.perry@usdoj.gov,
gillian.fleck@usdoj.gov, jason.brackett@usdoj.gov, joseph.braaten@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:7243978@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order
```
Content−Type: text/html

### U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 10/1/2019 at 11:19 AM MDT and filed on 10/1/2019

**Case Name:**   USA v. Sears et al

**Case Number:**   <u>1:16–cr–00301–WJM</u>

**Filer:**

**Document Number:**   183(No document attached)

**Docket Text:**
**ORDER as to William J. Sears (1): This matter comes before the Court *sua sponte*. The undersigned will be out of the office the week of October 28, 2019, and as a result the Sentencing Hearing currently set for October 31, 2019 at 1:15 p.m. is hereby VACATED and RESET to January 23, 2020 at 1:30 p.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 10/1/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Robert M. Brown     Robert.Brown5@usdoj.gov, CaseView.ECF@usdoj.gov,

USACO.ECFCriminal@usdoj.gov, glenda.galloway@usdoj.gov

Marci Gilligan LaBranche    labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara    andres@guevaracoloradolaw.com

Jeremy S. Sibert    Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, michaela.keiter@usdoj.gov

Tonya Shotwell Andrews    Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

## UNOPPOSED MOTION TO RESET SENTENCING HEARING

---

Defendant, William J. Sears, by his counsel of record, Peter R. Bornstein, moves this Court for an order resetting the sentencing hearing currently set for January 23, 2020. As grounds in support of his motion, Defendant Sears states to the Court as follows:

1.      On October 1, 2019, this Court, *sua sponte*, reset the sentencing hearing for Defendant Sears from October 31, 2019 to January 23, 2020. [Doc. #183].

2.      Counsel for Mr. Sears will be out of the country the week of January 19th through the 25th on a trip planned many months ago.

3.      Counsel requests that the Court reset the sentencing hearing for Mr. Sears on another date.

4.     Counsel has conferred with AUSA Jeremy Siebert who does not object to resetting the sentencing.  Mr. Siebert notes that he will be out of the country starting February 12th through March 1st.

espectfully submitted this 2nd day of October, 2019.

**THE LAW OFFICES OF PETER R. BORNSTEIN**

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2019, I electronically filed the foregoing **UNOPPOSED MOTION TO RESET SENTENCING HEARING** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Jeannette Wolf*
**THE LAW OFFICES OF PETER R. BORNSTEIN**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Jeremy S. Sibert (caseview.ecf@usdoj.gov, jeremy.sibert@usdoj.gov,
michaela.keiter@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andres Rene Guevara
(andres@guevaracoloradolaw.com), Marci Gilligan LaBranche (feldman@ridleylaw.com,
labranche@ridleylaw.com), Peter R. Bornstein (jwolf@prblegal.com,
pbornstein@prblegal.com), Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Robert M. Brown
(caseview.ecf@usdoj.gov, glenda.galloway@usdoj.gov, robert.brown5@usdoj.gov,
usaco.ecfcriminal@usdoj.gov), Judge William J. Martinez (deborah_hansen@cod.uscourts.gov,
jamie_h_hubbard@cod.uscourts.gov, jenna_grambort@cod.uscourts.gov,
martinez_chambers@cod.uscourts.gov, theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM-Criminal Division (gillian.fleck@usdoj.gov,
jason.brackett@usdoj.gov, justin.kellogg@usdoj.gov, katrina.crouse@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:7256937@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion for Order
Content-Type: text/html
```

### U.S. District Court – District of Colorado

### District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 10/9/2019 at 1:20 PM MDT and filed on 10/9/2019

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 185(No document attached) |

**Docket Text:**
 **ORDER as to William J. Sears (1) granting the Defendant's Unopposed Motion to Reset Sentencing Hearing [184]. The Defendant's Motion is GRANTED for good cause shown. The Sentencing Hearing set for January 23, 2020 at 1:30 p.m. is hereby VACATED and RESET to January 30, 2020 at 1:30 p.m. in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards with regard to the deadlines for filing sentencing–related motions. SO ORDERED by Judge William J. Martinez on 10/9/2019. Text Only Entry (wjmsec, )**

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Robert M. Brown     Robert.Brown5@usdoj.gov, CaseView.ECF@usdoj.gov,

USACO.ECFCriminal@usdoj.gov, glenda.galloway@usdoj.gov

Marci Gilligan LaBranche      labranche@ridleylaw.com, feldman@ridleylaw.com

Andres Rene Guevara      andres@guevaracoloradolaw.com

Jeremy S. Sibert      Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov,
USACO.ECFCriminal@usdoj.gov, michaela.keiter@usdoj.gov

Tonya Shotwell Andrews      Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov,
Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov,
jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov,
krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Date:                January 30, 2020
Courtroom Deputy:    Anna Frank
Court Reporter:      Mary George
Probation Officer:   Gary Kruck

---

Criminal Action No. **16-cr-301-WJM**          Counsel:

UNITED STATES OF AMERICA,                       Jeremy Sibert

      Plaintiff,

v.

1. WILLIAM J. SEARS,                            Peter Bornstein

      Defendant.

---

## COURTROOM MINUTES

---

**Sentencing Hearing**

**1:33 p.m.      Court in session.**

Appearances of counsel. Also seated at Government's counsel table are Agent Kate Funk, FBI and Agent Jared Erwin, IRS.

Defendant is present on bond.

Defendant sworn.

Court's remarks regarding defendant's offense level, criminal history level, and sentencing guidelines range.

Discussion held regarding loss amount and restitution, as stated on the record.

Discussion held regarding the Court's Preliminary Order of Forfeiture [ECF 132] that ordered a personal money judgment in the amount of $1,160,160.81 as well as certain assets and property, as itemized in that Order. The parties will have the opportunity to submit a Proposed Final Order of Forfeiture.

**ORDERED:** Sears' Objections to Presentence Investigation Report [ECF 160] are overruled as forfeited, overruled, and sustained, as stated on the record.

**ORDERED:** The Government's oral motion for an additional one-level reduction in the offense level for acceptance of responsibility is granted.

Argument given on sentencing.

**3:02 p.m.** **Court in recess.**
**3:16 p.m.** **Court in session.**

Continued argument given on sentencing.

The Court states its consideration of the history and characteristics of the defendant under 18 U.S.C. § 3553(a).

Victim impact statement to the Court.

Court's findings and conclusions.

**ORDERED:** The Government's request to add an additional special condition of supervised release, as stated on the record, is granted.

**ORDERED:** The Plea Agreement between the parties is ACCEPTED.

**ORDERED:** Defendant shall be imprisoned for 60 months as to Count 1 and 36 months as to Count 2 of the Information, to be served consecutively for a total custodial sentence of 96 months. Upon release from imprisonment, the defendant shall be placed on supervised release for a period of 3 years as to Count 1 and 1 year as to Count 2, to be served concurrently.

The Court recommends that the director of the Bureau of Prisons give the defendant full credit for time served in pretrial detention.

The Court recommends that the director of the Bureau of Prisons place the defendant in a facility that is appropriate to his security designation and is located within the District of Colorado.

**ORDERED:** The defendant shall be subject to the standard, mandatory, and special conditions of supervised release, as stated on the record. Defendant shall pay a special assessment of $200, due and payable immediately. Payment of any fine is waived.

**ORDERED:** Restitution shall be paid to the Internal Revenue Service in the amount of $2,433,818.00, as stated on the record.

The Court finds that any additional restitution provisions shall not be ordered, as stated on the record. The Government intends to use the remission process to make victims whole.

**ORDERED:**   The parties shall file a Proposed Final Order of Forfeiture by **Tuesday, February 4, 2020.**

**ORDERED:**   Defendant is remanded to the custody of the United States Marshals.

The defendant is formally advised of his limited right to appeal the sentence imposed by the Court. Any notice of appeal must be filed with the Clerk of the Court within 14 days after entry of judgment.

**4:21 p.m.      Court in recess.**

Total time in court: 2:34

Hearing concluded.

*#'16-CR-00301 WJM*

UNITED STATES OF AMERICA

v

WILLIAM J SEARS

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2020 JAN 30 PM 1: 17

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

### MOTION FOR DISMISSAL OF CHARGES WITH PREJUDICE
### FOR LACK OF JURISDICTION

**HERE COMES TO**

The defendant, William J. Sears comes before the court on his own behalf after he realized that any and all of the legal counsel and legal advice he has trusted since before this case started has provided less than adequate representation for him. As such this has made it necessary for him to present this motion pro se in order so that justice might finally be served in this case filed against him. No agency of the United States should be allowed to operate outside the laws and regulations that grant them their power. Just as no government employee should be allowed to violate the laws they have been hired to enforce under the guise of enforcement. This is unless the government expects the citizens in the country to resort to the behavior that exists in a lawless society. The rules of law must apply equally to everyone including those who work within the government. There are only minor exceptions and this cannot be negotiable as it seems to be the situation in this case. When the federal prosecutors entered into a plea agreement which was based on an investigation that violated federal regulations whereby rendering the investigation the product of perjury. Thus the failure by the prosecution to disclose this fact makes the plea agreement made in this case the product of government misconduct. Ultimately rendering it invalid and making the charges in this case invalid which then requires this case be dismissed with prejudice.

### BACKGROUND

On May 16, 2014 the federal government exercised a search warrant on the FusionPharm warehouse. On that same day Kate Funk of the FBI exercised a search warrant to Mr. Sears bank account, brokerage account and family trusts. Then approximately 6 months later on November 28, 2014, a warrant was exercised on the email and web hosting companies for FusionPharm and Mr. Sears' personal email accounts. Please note just like Fred Lehrer's FBI 302 the warrant for Mr. Sears bank records, brokerage accounts and family trust have never been seen by the defendants!

Then on September 16, 2016 nearly 3 years after this investigation started, the prosecution filed charges against the defendant by information.

## I. ELEMENTS TO WITHDRAW PLEA

The Defendant essentially will argue his plea is constitutionally infirm for two distinct reasons: (1) The prosecution's Funk's underlying pre-plea misconduct rendered his plea involuntary under Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); and (2) the government failed to meet its evidentiary disclosure obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In Brady it was argued that:

> "[A] guilty plea is a grave and solemn act to be accepted only with care and discernment[.]" Brady v. United States, 397 U.S. at 748, 90 S.Ct. 1463.

> When a defendant pleads guilty, he forgoes not only a fair trial, but also other accompanying constitutional guarantees. 628, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002).

> Thus, a guilty plea "not only must be voluntary but must be a knowing, intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. at 748, 90 S.Ct. 1463.

It is axiomatic that, "to be constitutionally valid, a plea of guilty must be knowingly and voluntarily made." United States v. Brown, 117 F.3d 471, 473 (11th Cir.1997). And " a guilty plea is not knowingly and voluntarily made when the defendant has been misinformed" as to a crucial aspect of his case.

While AUSA attempts to equate the discovery by the defendant with regards to the United States v. Ruiz, 536 U.S. At 630 122 S.Ct. 2450 where it states, "Nevertheless the Constitution "permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." And" Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted." Brady v. United States, 397 U.S. at 756, 90 S.Ct. 1463. Ruiz, 536 U.S. at 630, 122 S.Ct. 2450

However, this is not where the defendant is seeking to withdraw his plea "merely because he discovers[ed] long after the plea had been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action." Brady v. United States, 397 U.S. at 757, 90 S.Ct. 1463.

Rather, Defendant's misapprehension stems from an affirmative government misrepresentation that strikes at the integrity of the prosecution as a whole. Only when the defendant's misapprehension of the strength of the government's case results from some particularly pernicious form of impermissible conduct that due process concerns are implicated, should a plea be vacated. To have a plea vacated, in addition to showing impermissible government conduct, Defendant must show that the misconduct induced him to plead guilty. Brady v. United States, 397 U.S. at 755, 90 S.Ct. 1463. In other words, Defendant must show a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial.

## II. SECURITIES FRAUD FINANCIAL INVESTIGATION

The SEC press releases regarding the halted trading of FusionPharm stock states, "The Commission temporarily suspended trading in the securities of FusionPharm due to a lack of current and accurate information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition. This order was entered pursuant to Section 12(k) of the Exchange Act." See Exhibit A and B

The defendant now asserts and will show that the DOJ and FBI were aware or should have been aware of the fact that Special Agent Funk provided false information regarding her qualifications. For instance the year she graduated, the fact her degree was in business not accounting and the year she received her Kansas State certificate. Instead she was using the title Certified Public Accountant to misrepresent her professional licensing status required under federal regulations required for the forensic financial investigations that are required in securities fraud cases.

## III. QUALIFICATIONS TO PERFORM A SECURITIES FRAUD FINANCIAL INVESTIGATION

This investigation requires that the regulations of the Commission apply as this was a referral and a parallel investigation. It fully relied on the financial investigation by Special Agent Kate Funk who failed to meet the requirements of practice to transact business with the Commission. As such the Commission failed to insure the qualifications of the person they provided confidential financial information to regarding

Mr. Sears including his personal, business and trading accounts which is in violation of the Commissions own regulatory requirements. The defendant calls the courts attention to the following;

17 CFR § 201.102 - Appearance and practice before the Commission

(f) Practice defined. For the purposes of these Rules of Practice, practicing before the Commission shall include, but shall not be limited to:

(1)     Transacting any business with the Commission; and

(2)     The preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert.

17 CFR § 210.2-01 Qualifications of accountants.

(a) The Commission will not recognize any person as a certified public accountant who is not duly registered and in good standing as such under the laws of the place of his residence or principal office. The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.

Under the definitions section this shows that the definitions of this section apply to licensing requirements under the following;

17 CFR § 201.101 - Definitions.

(4) Enforcement proceeding means an action, initiated by an order instituting proceedings, held for the purpose of determining whether or not a person is about to violate, has violated, has caused a violation of, or has aided or abetted a violation of any statute or rule administered by the Commission, or whether to impose a sanction as defined in Section 551(10) of the Administrative Procedure Act, 5 U.S.C. 551(10);

Under the Administrative Procedure Act 5 U.S. Code § 551. Definitions as it relates to this investigation and licensing it applies by definition to

For the purpose of this subchapter—
(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;
(B) the courts of the United States;
(C) the governments of the territories or possessions of the United States;
(D) the government of the District of Columbia;

And it applies to any agency that holds the power over a person's freedom which is shown in the Administrative Procedure Act 5 U.S. Code § 551(10)

(10) "sanction" includes the whole or a part of an agency—
(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;
(B) withholding of relief;
(C) imposition of penalty or fine;
(D) destruction, taking, seizure, or withholding of property;
(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;
(F) requirement, revocation, or suspension of a license; or
(G) taking other compulsory or restrictive action;

Under the code of federal regulations contained in 17 CFR Part 210 which is used to define an accountant's report

§ 210.1-02(a)(1) Accountant's report. The term accountant's report is "used in regard to financial statements, means a document in which an independent public or certified public accountant indicates the scope of the audit (or examination) which he has made and sets forth his opinion regarding the financial statements taken as a whole, or an assertion to the effect that an overall opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor shall be stated."

## V. IMPERMISSIBLE GOVERNMENT CONDUCTING UNQUALIFIED INVESTIGATOR

The defendant has discovered impermissible misconduct on the part of Special Agent Kate Funk, who is the sole source of evidence relied on by the courts in rendering its probable cause determinations in this case. This investigation was the basis for the asset forfeiture that Funk claimed FusionPharm to be a Ponzi scheme, which was proven not

to be the case in Funk's own investigation. The government never disclosed the fact that Special Agent Funk provided perjured testimony when she attested to the information contained in her sworn affidavits.

In Special Agent Kate Funk's sworn affidavit in support of search warrant dated May 15, 2014, whereby in Paragraph 1 on Page 1, Special Agent Funk stated under oath,

"I became a Certified Public Accountant in 1996 through the state of Kansas."
See Exhibit C

She then repeats this claim again in the second sworn affidavit in support of search warrant dated November 28, 2014, in Paragraph 1 on Page 1, Special Agent Funk whereby again, she states under oath,

"I became a Certified Public Accountant in 1996 through the state of Kansas."
See Exhibit D

It is important to note that nowhere in the either of these two documents does Special Agent Funk use the initials CPA behind or after her last name, as was claimed by AUSA Sibert in his response to the defendant's motion to withdraw his plea previously

filed on April 19, 2019.

After reviewing the Kansas Board of Accountancy website, it was discovered that Kansas does not comply with the requirements of the Uniform Accountancy Act (UAA), as it requires a two-tiered regulatory standard for the licensing of Certified Public Accountants, which was basically abolished under the UAA. Prior to the passage of the UAA, most states had the two tiered (Exhibit) regulatory requirements for the licensing of Certified Public Accountants. This required being issued a certificate and a license in order to meet the regulatory licensing requirements. However, after it was discovered that many holding only a certificate but did not complete the requirements to be legally licensed were falsely claiming to be Certified Public Accountants. All the while providing services to individuals, businesses, academia and government and falsely claiming to be licensed when they were not. It was these violations that led to the passage of the UAA in order to be established. See Exhibit

A Kansas issued certificate is not a license, as it is issued prior to meeting the regulatory standards for licensing. Because it is not a license and the reason, the Kansas issued certificate is not valid without also obtaining a valid permit (license). This is plainly stated on the Kansas Board of Accountancy [3] website. See Exhibit

A search of the Kansas Board of Accountancy website found no listing for Kate Funk being issued license as a Certified Public Accountant in Kansas. A wild card

attempt was made using the first name Kate and there was a single name that was returned, Kate Egan. While the information did not match what Funk stated in her sworn affidavit, a public record check verified Egan was in fact Special Agent Funk's maiden name. It was then learned that Egan aka Funk did not hold the permit required under Kansas law to claim to be a Certified Public Accountant, as she only held the certificate but not the required license (or permit) required by regulation to use the professional credentials of Certified Public Accountant. The Kansas issued certificate is not a standalone license as it is under the standards for the UAA. Exhibit E

The NASBA website Verify PA, is an excellent source of information which explains the Kansas issued certificate is not a license under the regulatory requirements established for the licensing of Certified Public Accountants. It also addresses the legal limitations imposed on those who hold only a Kansas issued certificate, a review of the information regarding Kate Egan is included here. Exhibit F

On April 19, 2019, the same day the defendant's counsel filed the motion to withdraw his plea for various reasons that were not addressed properly and the reason why it is necessary for Mr. Sears to represent himself here now. It was noticed the same day of that filing Special Agent Funk changed her name on her Kansas issued certificate. While Funk had not changed her name legally after she was married in 2009, it seems a bit odd that she would choose that specific day to make that change. However her name has nothing to do with the legal reason why she is not a Certified Public Accountant, although it does confirm the fact that Special Agent Funk and Kate Egan were the same person who holds the Kansas issued certificate #8757. Exhibit G

(1) AICPA (https://www.aicpa.org)
(2) NASBA (https://www.nasba.org)
(3) Kansas Board of Accountancy (http://www.ksboa.org/applyCertificate.htm)

## VI. OTHER INACCURATE INFORMATION

It was also discovered that Special Agent Funk provided inaccurate information regarding several items contained in Paragraph 1 on Page 1 of her sworn affidavits. This includes the year she was issued a certificate which according to the Kansas Board of Accountancy website[4] Egan was not issued a certificate in 1996 instead Egan was issued a certificate in August 1999. According to the Kansas University Alumni Association website [5] it indicates Egan did not graduate from Kansas University in 1995 but instead it indicates Egan graduated from Kansas University in 1996. The Alumni Association also shows Kansas University did not offer a bachelor's degree in Accounting, therefor Egan cannot have a degree in Accounting as she states. It does however show that she earned a degree in Business. While accounting does include business, that does not mean business is accounting, so the difference can be substantial. This also means that she is not eligible for any exempts for licensing that occurred in

Kansas in 1996, as there are no 'grandfathered' exceptions applicable in 1999. However, this does however indicate a very disturbing pattern of deceptive pattern of behavior on the part of Special Agent Funk and calls into question the hiring practices of the FBI and the DOJ which is responsible for supervising the hiring of the FBI. See Exhibits H and I

The defendant wishes to call attention to the Kansas Laws of Accountancy requires Certified Public Accountants must possess both the Kansas issued certificate and permit to practice prior to holding out to be a Certified Public Accountant or to practice as such before the courts, this fact is clearly addressed under the laws governing the licensing of Certified Public Accountants in Kansas. (KS Stat § 1-316(a) (2012)) See Exhibit J

Special Agent Funk has violated the statues and regulations governing the licensing and practice of Certified Public Accountancy in Colorado and every State in the United States, including Kansas by claiming to be a Certified Public Accountant, which she is not because she does not hold the required permit which is a license in Kansas. See Exhibit K

As the Kansas issued certificate is provided prior to the license (permit) is issued, this means the Kansas issued certificate holds absolutely no meaning outside of Kansas nor does it provide the holder the ability to use the professional designation in legal proceedings. Doing such provides the false status of being a financial expert which comes with the commitment required to be a licensed and practicing Certified Public Accountant. This case was handed to the FBI by the SEC. Now let us keep in mind the SEC's requirements to be recognized as a Certified Public Accountant.

**The Securities and Exchange Commission Federal Regulations under: 17 CFR § 210.2-01 - Qualifications of accountants**

*(a) The Commission will not recognize any person as a certified public accountant who is not duly registered and in good standing as such under the laws of the place of his residence or principal office. The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.*

*(b) The Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement. In determining whether an accountant is independent, the Commission will consider all relevant circumstances, including all relationships between the accountant and the audit client, and not just those relating to reports filed.*

(4)  Kansas Board of Accountancy (http://www.ksboa.org/applyCertificate.htm)
(5)  Kansas University Alumni Association

https://securelb.imodules.com/s/1312/alumni/index.aspx?sid=1312&gid=2&pgid=8&cid=46

A person is a "statutory" resident of Colorado if the person maintains a permanent place of abode in Colorado and spends, in aggregate, more than six months in Colorado. For a more complete discussion of domicile and statutory residency. See Department Regulation 39-22-103(8)(A).

As such the laws of Colorado require residents who are licensed by a regulatory agency in another state must apply for licensing in Colorado after becoming a resident. As such Special Agent Funk was required to apply for licensing as a Certified Public Accountant in 2011 after she became a resident. This is regulated by the Colorado Code of Regulations governing the licensing and practice of Certified Public Accountants under 3 CCR 705-1 – 1.5 Requirements for Certification – (E.) Reciprocity Requirements states, "An applicant who holds a certificate or license issued by another state based upon passage of the examination but who does not hold a certificate or license to practice is not eligible for reciprocity through that certificate or license." As such this means Special Agent Funk does not meet the requirements to obtain a license by reciprocity in Colorado and as such she cannot legally hold out as being a Certified Public Accountant in proceedings conducted in the State of Colorado and there is nothing that excludes a federal agent who resides in Colorado from meeting these legal requirements for licensing and practice within the state.

## VII. FORENSIC ACCOUNTING EXPLANATION

The defendant wishes to introduce the definition and explanation regarding forensic accounting as was found on the Investopedia website which is operated with permission by the SEC, the explanation of meaning of forensic accounting investigation [6] is explained it detail below:

What is Forensic Accounting?
Forensic accounting utilizes accounting, auditing and investigative skills to conduct an examination into the finances of an individual or business. Forensic accounting provides an accounting analysis suitable to be used in legal proceedings. Forensic accountants are trained to look beyond the numbers and deal with the business reality of a situation. Forensic accounting is frequently used in fraud and embezzlement cases to explain the nature of a financial crime in court.

---

[6] Investopedia

(https://www.investopedia.com/terms/f/forensicaccounting.asp)
Understanding Forensic Accounting

Forensic accountants analyze, interpret and summarize complex financial and business matters. They may be employed by insurance companies, banks, police forces, government agencies or public accounting firms. Forensic accountants compile financial evidence, develop computer applications to manage the information collected and communicate their findings in the form of reports or presentations.

Forensic Accounting for Criminal Investigation

Forensic accounting is also used to discover whether a crime occurred and assess the likelihood of criminal intent. Such crimes may include employee theft, securities fraud, falsification of financial statement information, identify theft or insurance fraud. Forensic accounting is often brought to bear in complex and high-profile financial crimes. The reason we understand the nature of Bernie Madoff's Ponzi scheme today is because forensic accountants dissected the scheme and made it understandable for the court case.

Defining Financial Forensics

Financial forensics is a field that combines criminal investigation skills with financial auditing skills to identify criminal financial activity coming from within or outside of an organization. Financial forensics may be used in prevention, detection, and recovery activities to investigate terrorism and other criminal activity, provide oversight to private-sector and government organizations, and assess organizations' vulnerability to fraudulent activities. In the world of investments, financial forensics experts look for companies to short or try to win whistleblower awards.

This fact that this was a forensic financial investigation was even admitted to by Special Agent Funk in her sworn affidavits on Page 5 in Paragraph 12, whereby Funk says:

"*Your affiant thereafter reviewed and has been reviewing the SEC Produced Records on an ongoing basis. Additionally, your affiant was made privy to SEC analyses of the Bank Records, Brokerage Records and Transfer Agent Records*

*(collectively "SEC Analyses") and has reviewed the same on an ongoing basis.*"

According to the FBI's own website under the position of Forensic Accountant [8] it states the following:

"FOLLOW THE MONEY TRAILS OF CRIMINAL ACTIVITY AND NATIONAL SECURITY MATTERS"

Because in the Affidavit in Support of Search Warrant prepared by Special Agent Kate Funk she referenced auditing standards accepted by the SEC and the United States of American with her references to violations of GAAP. This means she created a report and as such this requires she must be a Certified Public Accountant, as she not only claimed a violation of GAAP but she then attempted to track financial transactions between accounts in order to determine actual company earnings. This requires the services of a Certified Public Accountant in order to legally attest to those sworn opinions before the court. Under the laws in Kansas,

*"It is unlawful for any person, except the holder of a Kansas permit to practice, to issue a report with regard to any attest or compilation service under standards adopted by the board. A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board."* Keeping in mind she's not in Kansas Anymore. (KS Stat § 1-316(e) (2012)) Exhibit Highlighted Pages

Additionally, under KS Stat § 1-321. Definitions – it defines "Report" as follows:

*"When used with reference to any attest or compilation service, means an opinion, report or other form of language that states or implies assurance as to the reliability of the attested information or compiled financial statements and that also includes or is accompanied by any statement or implication that the person or firm issuing it has special knowledge or competence in accounting or auditing. Such a statement or implication of special knowledge or competence may arise from use, by the issuer of the report, of names or titles indicating that the person or firm is an accountant or auditor or from the language of the report itself. The term report includes any form of language which disclaims an opinion when such form of language is conventionally understood to imply any positive assurance as to the reliability of the attested information or compiled financial statements referred to or special competence on the part of the person or firm issuing such language; and it includes any other form of language that is*

*conventionally understood to imply such assurance or such special knowledge or competence."*

8) FBI Forensic Accountant
https://www.fbijobs.gov/career-paths/forensic-accountant

## VIII.  RELIVANCE TO THIS CASE

As the affidavits in support of search warrants prepared by Special Agent Funk were provided to the court through the use of telephonic equipment the requirements under the federal rules of criminal procedure apply.  Under section 4.1(b)(2)(A) requires the affiant must attest to information contained in the written affidavit. Which has occurred in this case, as such the requirements under the rules of public accountancy that requires only a certified public accountant can attest to information contained in a financial report.  As such this means the information attested to before the judge magistrates in this case was perjury as Special Agent Funk knowingly provided false testimony under oath.

In law, an attestation is a declaration by a witness that a legal document was properly signed in the presence of the witness. Essentially, it confirms that a document is valid. In finance, an attestation service is a Certified Public Accountants declaration that the numbers are accurate and reliable. As the service is completed by an independent party, it validates or invalidates in this case the financial information prepared by internal accountants.

Title 41 Search and Seizure d.  Obtaining a warrant (2) The applicant must orally state facts sufficient to satisfy the probable cause requirement for the issuance of the search warrant. (See subdivision (c)(1).) This information may come from either the applicant federal law enforcement officer or the attorney for the government or a witness willing to make an oral statement. The oral testimony must be recorded at this time so that the transcribed affidavit will provide an adequate basis for determining the sufficiency of the evidence if that issue should later arise. See Kipperman. Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Avalere. 825 (1971).

Testimony provided in the form of opinion must be grounded in an accepted body of learning or experience in that particular field, and the witness must explain how the conclusion is so grounded.  See, e.g., American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after Daubert, 157 F.R.D. 571, 579 (1994) ("[W]hither the testimony concerns economic principles, accounting standards, property valuation or other non-scientific subjects, it should be

evaluated by reference to the 'knowledge and experience' of that particular field.").

As Special Agent Funk attested before the courts in three sworn affidavits (keeping in mind Mr. Sears nor his lawyers have ever seen the warrant for the bank accounts and brokerage accounts of his family's trust.) which she testified under oath were truthful. That means she represented herself as a Certified Public Accountant. This means she was an expert capable of performing the services of the financial investigation of the publicly traded company and the transactions regarding money involved with that company. This she confirmed with the implied insurances of her knowledge, training and experience a total of 47 times in these affidavits. As the courts relied on this information as evidence to support probable cause of her claims, the fact that this was perjury means it was material to this case and required disclosure to the defendant prior to entering into the plea agreement.

## IX. SHOWING PATTERN OF MISCONDUCT

This is not the only incidence of misconduct by Special Agent Funk that could be construed as unlawful, as on October 13, 2009, Special Agent Funk aka Kate Egan married then United States Assistant Lead Prosecutor for the United States Department of Justice, AUSA T Markus Funk. As such when Special Agent Kate Funk, decided to accept a position of employment with the FBI while her husband the esteemed Mr. Funk was still employed by the DOJ (while still using her maiden name). As such by Special Agent Funk accepting the position with the FBI, she violated federal regulations and code in doing such. Exhibit

After which Special Agent Kate Funk accepted employment within the FBI, in violation of the following federal regulations:

(a) 5 U.S. Code (USC), § 3110, Employment of Relatives; Restrictions
(b) 5 Code of Federal Regulations (CFR) § 310, Employment of Relatives
(c) 5 CFR § 2635, Standards of Ethical Conduct for Employees of the Executive Branch; Subparts D, E, G,
(d) 5 USC § 2302, Prohibited Personnel Practices
(e) Executive Order 11222, Prescribing Standards of Ethical Conduct for Government Officers and Employees, May 8, 1965
(f) 5 CFR § 735, Employee Responsibilities and Conduct

This situation extends beyond just a minor violation of federal regulation by an employee holding a position of trust within the government. This matter involves numerous violations of federal regulation by two executive level employees within the

402

Department of Justice who swore to uphold and defend the Constitution of the United States and are responsible for national security. As such this makes the fact that they were willing to violate the laws in order for one of them to obtain a position enforcing the law, suspect. Clearly this relates to the credibility of this government agent and the integrity of this investigation and the fact that Special Agent Kate Funk was the sole source of evidence provided to the court makes this discovery material in this case.

## X.  GOVERNMENT AWARE OF MISCONDUCT

Special Agent Kate Funk was required to obtain and pass a mandatory 10 year background investigation[7] in order to obtain the top secret security clearance required of all FBI Special Agents. This information was readily available to the Department of Justice, FBI and SEC, all of which were actively involved in the investigation and prosecution of this case, as such this information regarding the violations of federal regulation that were involved in the hiring of Special Agent Kate Funk.  Exhibit

The fact Special Agent Funk had no law enforcement experience prior to working for the FBI and she had never been involved in a white collar securities fraud investigation prior her assignment as the lead investigator in this case, as such there is nothing to support the fact that Special Agent Funk is an expert in these proceedings.  As is shown in the court decision in the 5th circuit where the decision of that court was, *"The government used an FDIC investigator as an expert in the area of mortgage fraud. Though the agent had some training in fraud investigation, he had no specialized training in the area of mortgage fraud and had never previously testified as an expert in this field."* United States v. Cooks, 589 F.3d 173 (5th Cir. 2009) AUSA Jeremy Siebert also attests to the fact that Special Agent Funk is not an expert in his response to Mr. Sears' motion to withdraw his plea.

As this entire case rested on the misrepresentations provided by Special Agent Funk as to the inadmissible hearsay statements provided by the confidential witness which she knew was not only unreliable but were false to form the legal basis for her investigation and the fact that she based the opinions she provided to the courts as evidence in this case, makes this information exculpatory in nature and as such it should have been disclosed to the defense.  The facts upon which a witness relies for her opinion is discoverable and must be disclosed to the other party.  See Dickinson-Tidewater, Inc. v. Supervisor of Assessments, 273 Md. 245 (Md. 1974).  The trier of fact should be disregarded if it is found to be unreasonable or not adequately supported by the facts upon which the opinion is based. Clark v. State ex rel. Wyoming Workers' Safety & Compensation Div. (In re Clark), 934 P.2d 1269 (Wyo. 1997).

As the court relied on evidence in the form of inadmissible hearsay and the opinions held by Special Agent Funk which were derived from such this qualifies as

expert testimony in this case and as Special Agent Funk is not an expert this violates the federal rules of evidence 701 and 702-705. As Special Agent Funk was allowed to testify before the court supplying opinions that were not based on first hand observation into the matters claimed by Special Agent Funk, the court must take into consideration any Sixth Amendment Confrontation Clause concerns whenever the prosecution intends to call an expert to offer his or her opinion. *"Though an expert may generally rely on inadmissible evidence in reaching a conclusion, including hearsay, that rule assumes that an expert will carefully analyze the basis of his opinion..."* Howard v. Walker, 406 F.3d 114 (2d Cir. 2005)

## XI. WHISTLEBLOWER PROVEN UNRELIABLE

So, the fact that Special Agent Funk's entire investigation was based on the securities fraud investigation which was based on the false statements provided by the confidential witness, where he claims that FusionPharm was a Ponzi scheme, as is shown in Special Agent Funk's affidavit, in paragraph 8 pages 2 and 3, Funk states:

*"The genesis of the SEC's investigation involved a complaint filed by Cooperating Witness 1 (hereinafter referred to as "CW-1"), a former FusionPharm employee. In the complaint, CW-1 suspected that FusionPharm was operating as a "Ponzi" investment fraud. Although FusionPharm publicly claimed via press releases and quarterly and annual disclosures to develop, produce and sell refurbished shipping containers called "Pharm Pods" to cannabis and organic produce grow operations, CW-1 stated that the company had not made any legitimate product sales during his time with the company."*

Then in Special Agent Funk's own investigation, it was proven this information was false, in footnote 8 on page 28, whereby Funk states:

*"As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company. CW-1 has revised that statement to match the sales highlighted in ¶58. "*

To further support this claim the following is provided from Special Agent Funks affidavit whereby in paragraph 58 on page 28, Funk states:

*"CW-1 identified, at most, two possible sales between January – October 2013: (a) FusionPharm sold two Pharm Pods to a customer in California"; and*

*"(b) FusionPharm sold five Pharm Pods to Local Products, a Denver company."* and

*"CW-1 said there might have been an additional, single Pharm Pod sale to Mile High Green Cross in 2013, but he could not be sure.*

And again where the confidential witness is allowed to provided information and claims that are material to the investigation without there being any way that information which he has provided can be verified given the discrepancies he has provided here or possibly could it be Special Agent Funk simply altering evidence herself to fit within the answers she is looking to discover in order to fit within her investigation. However, it might be a good thing if Special Agent Funk learns to perform basic math as 2+5+1=8 not 7 as she states the confidential witness has said, in paragraph 59 on page 28, Funk states:

*"(b) as noted above, CW-1 could recall, at most, 7 Pharm Pod sales total in 2013."*

## XIII. PROBLEMS WITH WARRANTS

The problems with this investigation are reflected in the Search and Seizure Warrants as well. In the Search and Seizure Warrants executed in this case both affidavits contain the following charges on its face instead the violations being alleged are contained in Attachment B, however the violations are not the same as those alleged in the affidavits. The charges not on the face but on the Attachment B and government exceeded the scope of the warrant as Attachment B. Exhibit L – May 15, 2014 and Exhibit M – November 28, 2014

The affidavit in support of search warrant dated May 15, 2014 and the affidavit dated November 28, 2014 do not allege a chargeable violation of law has been committed. Both of these documents cite the following violations were committed:

In the Affidavit dated May 15, 2014, violations cited on Page 2 in Paragraph 4 which states:

*"William Sears ("Sears"), Dittman's brother-in-law, and a founder and control person of FusionPharm, for various suspected federal criminal offenses, including wire fraud, in violation of 18 U.S.C. §1343, and securities fraud, in violation of 15 U.S.C. §§78(b) and 78ff(a), and 17 C.F.R. §240.10b-5."*

In the Affidavit dated November 28, 2014, violations cited on Page 1 in Paragraph 4 which states:

*"William Sears ("Sears"), Dittman's brother-in-law, and a founder and control person of FusionPharm, for various suspected federal criminal offenses, including wire fraud, in violation of 18 U.S.C. §1343, and securities fraud, in violation of 15 U.S.C. §§78(b) and 78ff(a), and 17 C.F.R. §240.10b-5."*

The following is a breakdown of the violations cited in the Affidavit in Support of Search Warrant, dated May 15, 2014;

15 U.S.C. §§78(b) is a regulatory statement, it contains no essential elements required to support a violation of law having been committed under this section.

15 U.S.C. §§78ff(a) is a penalty assessment which discusses the penalties for violations of the various sections under 15 U.S.C. §§78, however it does not actually address the actual violation and the legal elements required to show a violation under this section instead it requires a valid violation be included one of the numerous violations contained in Section §78 for there to be a penalty assessed under this section.

18 U.S.C. §1343 as there was no legally chargeable fraud violation cited there is nothing to establish a fraud violation has been committed and without which there is nothing to invoke the protections of the mail fraud statutes and it is well established the protections of the mail fraud statutes do not extend to government regulatory interests. See F.J. Vollmer & Co., 1 F.3d 1511, 1521 (7th Cir. 1993) ("It is well established that the government's regulatory interests are not protected by the mail fraud statute.)

17 C.F.R. §240.10b-5 is not addressed in the search warrant as such there is no reason to address this here. The Code of Federal Regulation must be named separately on the Search and Seizure Warrant to be considered a part of the items that are being Searched and Seized it is not a standalone charge where it can be included automatically and there was nothing discussed in the affidavit that showed that the company was a Ponzi scheme as was claimed by the CW#1

The Search and Seizure Warrant executed on the FusionPharm warehouse on May 16, 2014 contained the violations in Attachment B however those were not the same violations cited in the supporting affidavit. Attachment B to the Search and Seizure Warrant dated May 16, 2014, states the following:

*"Title 18, United States Code, Section 1343 (wire fraud) and Title 15 United States Codes, Section 78j(b) and 78ff(a)"*

While the prosecution is likely to claim this was merely a clerical error, this was shown not to be the case, as the search warrant dated November 28, 2014 contains the same errors as the Attachment B which states the following

> *"Title 18, United States Code, Section 1343 (wire fraud) and Title 15 United States Codes, Section 78j(b) and 78ff(a), excluding, however, any items constituting privileged attorney-client communications"*

The affidavits were not attached to the Search and Seizure Warrants despite being referenced. This normally invalidates the Search and Seizure Warrants and the evidence discovered as the result of these type of warrants is illegally obtained.

It is well established under the Colorado Constitution, the facts supporting probable cause must be reduced to a writing, and probable cause must be established within the four corners of the warrant or its supporting affidavit. See the Colorado Constitution Article II, § 7; United States Constitution IV Amendment and People v. Padilla, 182 Colo. 101, 105, 511 P.2d 480, 482 (1973).

> *"In this Circuit, both attachment and incorporation are required for an affidavit to remedy a warrant's lack of particularity." See United States v. Leary, 846 F.2d 592 (10th Cir. 1988) at 603 and United States v. Williamson, 1 F.3d 1134, 1136 n.1 (10th Cir. 1993).*

The Fourth Amendment requires a search warrant to *"describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings."* United States v. Carey, 172 F.3d 1268, 1272 (10th Cir. 1999).

A warrant runs afoul of the Fourth Amendment when it is broader in scope than justified by the *"probable cause established by the affidavit upon which the warrant issued."* United States v. Christine, 687 F.2d 749, 753 (3rd Cir.1982)

Because the Search and Seizure Warrant authorized the seizure of a very broad array of items in the FusionPharm offices, for which there was no probable cause and whereby making the search warrant overly broad and as such violated the Fourth Amendment. The Fourth Amendment prohibits general warrants authorizing *"a general, exploratory rummaging in a person's belongings."* Coolidge v. New Hampshire, 403 U.S. at 467. Evidence seized pursuant to a general warrant must be suppressed. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979).

A search warrant that provides law enforcement agents free reign to rummage through a defendant's papers at will renders the warrant overly broad and vague. United States v.

Beckett, 321 F.3d 26, 33 (1st Cir. 2003).

The Search and Seizure Warrant and supporting documentation presented to Magistrate Judge Craig B. Shaffer on May 15, 2014 was attested to telephonically by Special Agent Funk which requires a recording of that and the Search and Seizure Warrant and all supporting documentation be filed with clerk of the court in accordance with the Federal Rules of Criminal Procedure Rule 41 and Rule 4.1.

As this document was not filed in an emergency situation which is shown by the time and date of the Magistrate Judges signature being on May 15, 2014 and the time which it was executed on the following day on May 16, 2014, as such this was not an anticipatory warrant, as such there was no reason why this search warrant was never properly filed. See Exhibit A and Exhibit B

After reviewing this Search and Seizure Warrant it was discovered it was not properly filed as it does not contain the appropriate seal nor the stamp of the clerk across the top. See Exhibit C – copy of Search and Seizure Warrant signed by Robert Dittman.

Nor was this document ever sealed as was claimed by AUSA Harmon on numerous occasions. There is no court order on the dockets sealing the Search and Seizure Warrant which was in fact exercised on the FusionPharm warehouses. Due to the invalid Search and Seizure Warrant which was exercised on the May 16, 2014 raid on FusionPharm which included Special Agent Funk, IRS-CID Agent Loecker and AUSA Harmon and others from the prosecutors office who all have many years' experience dealing with Search and Seizure Warrants. They all knew that this warrant was not valid because it was never properly filed. See Exhibit D – Showing the proper filing and sealing stamps required on a Search and Seizure Warrant as is shown from co-defendant Jean-Pierre's case. There was a **third Warrant served** on the bank, trust and trading accounts of Mr. Sears and his family on May 16, 2014 By Special agent Funk. Much like Fred Lehrer's 302 interview, no one but no one has ever seen it. Mr Sears has called the clerk of the court and confirmed that the Warrant is not in their possession and could not furnish a certified copy. How can the integrity of the warrant be guaranteed if it was not registered with the court as per Federal Rules of Criminal Procedure which state:

*(f) Executing and Returning the Warrant.*

*(1) Warrant to Search for and Seize a Person or Property.*

(A) *Noting the Time. The officer executing the warrant must enter on it the exact date and time it was executed.*

(B) *Inventory. An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person. In a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied. The officer may retain a copy of the electronically stored information that was seized or copied.*

(C) *Receipt. The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property. For a warrant to use remote access to search electronic storage media and seize or copy electronically stored information, the officer must make reasonable efforts to serve a copy of the warrant and receipt on the person whose property was searched or who possessed the information that was seized or copied. Service may be accomplished by any means, including electronic means, reasonably calculated to reach that person.*

**(D) *Return. The officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.***

## XIV. DISCLOSURE REQUIREMENTS
## & FAILURE TO DISCLOSE

Based on the previous responses supplied by the federal prosecutor in this case, which has ignored the fact that the Supreme Court ruled, *"the prosecution has an affirmative duty to learn of and disclose, any favorable evidence known to "others acting on the government's behalf in the case, including the police."* Kyles v. Whitley, 514 U.S. 419, 437 (1995). Thus, the prosecution was required not only to disclose what was already known to prosecutors, but also to learn of any such information that was known to law enforcement, including matters related to witness credibility even that of law enforcement.

Additionally, the Supreme Court decision in Giglio v. United States, 405 U.S. 150 (1972), were the disclosure rule was extended to include not only evidence directly related to the crime involved, but also to information that would affect the credibility of a prosecution witness in the case. The fact, Special Agent Funk was the sole source of the evidence discovered in this investigation and she was the sole source of opinions relied on by the court as evidence including that which was relied on by the courts in rendering it's probable cause determination, this means her credibility relates directly to the evidence.

Additionally, in that case the Supreme Court honed in on the ultimate goal of the Confrontation Clause — that the reliability of evidence introduced against a criminal defendant be assessed through the particular mechanism of cross-examination. In Crawford, it was decided "[The [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Its commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." The applicability of the Confrontation Clause, according to Crawford, is limited to witnesses providing testimonial statements. While Justice Scalia did not provide an absolute definition of "testimonial," but articulated that testimonial statements are "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

Furthermore, the Supreme Court provided useful examples of testimonial statements: statements taken by police officers in the course of interrogations and prior testimony given at a court proceeding. The Court held that where a testimonial hearsay statement is offered against a criminal defendant, it is not admissible unless either (1) the prosecution makes the witness who made the statement available, or (2) if the witness is unavailable, the defendant had a prior opportunity to cross-examine him or her.

In United States v. Bagley, 473 U.S. 667 (1985), the Supreme Court defines "material" evidence as information that, had it been disclosed to the defense, would have a "reasonable probability of providing a different result in the trial or sentencing" in the case. The national law enforcement model policy defines in the disclosure requirements under Brady, as exculpatory evidence is "material" if there is a reasonable probability that disclosing it will change the outcome of a criminal proceeding. Further, it notes, that a "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial or sentencing of a criminal case. So, the requirements of Brady relate not only to the finding of the case but to the sentencing phase as well.

As the term "exculpatory" is generally understood to refer to virtually any kind of

information that would cast doubt on the guilt of the defendant. As such exculpatory information is that which would bear directly upon the issue of the defendant's guilt or innocence and, therefore must be disclosed to the defense. Like the discussion of material evidence however, material that is exculpatory can also be germane to sentencing. The model policy states that "Brady violations are, by definition, violations of an individual's 14th Amendment right to due process of law. Exculpatory evidence is evidence that is favorable to the accused; is material to the guilt, innocence, or punishment of the accused; and that may impact the credibility of a government witness, including a police officer. Impeachment material is included in the Brady disclosure requirements." With the help of a Florida Forensic Securities Lawyer and specialist who was a whistle-blower to the Securities & Exchange Commission in the case entitled Securities and Exchange Commission v. Guy M. Jean-Pierre, a/k/a Marcelo Dominguez de Guerra, Civil Action No. 12-cv-8886, I uncovered many disturbing things that can only be deemed as Corruption on the part of Mr. Lehrer. The case can be found at the links below:

www.sec.gov/litigation/litreleases/2015/lr23217.htm

https://www.sec.gov/litigation/complaints/2012/comp-pr2012-257.pdf

In that case Jean-Pierre forged more than 100 legal opinions that were used to remove the restrictive legend from millions of shares of penny stock companies. Through discovery in a related case, The specialists firm obtained the forged opinions. The referral to the Florida Bar of that matter resulted in the Florida Supreme court disbarring Mr. Jean-Pierre. (Please note Jean Pierre was never criminally charged. What?) In connection with that case Jean Pierre provided a letter from Scott Dittman, in his capacity as the Chief Executive Officer of Fusion Pharm Inc. ("FSPM") in defense of the allegations. At that time, Jean Pierre was a corporate officer of FSPM. The Specialist involvement in that matter resulted in a civil suit and bar complaint against the securities specialist by Jean-Pierre and his client, Marc Jablon. The securities specialist spent more than two years and thousands of unpaid hours because they were retaliated against for stating that the conduct of Jean-Pierre and his associates was illegal. During that period, the specialist was represented by **Frederick M. Lehrer**. Lehrer assisted them in drafting the documents in all aspects referring the matter to the Florida Bar, SEC and FBI vs Mr. Jeanne Pierre. As a result of the retaliation the securities specialist endured, they became a witness for the Securities & Exchange Commission (the "SEC") in the penalty phase of that proceeding against Marc Jablon. They have not had meaningful communications with Lehrer since 2013.

The Forensic securities specialist then became aware of what they believed to be egregious misconduct by the Colorado Office of the SEC. In approximately 2014, the Colorado SEC commenced an investigation of FSPM. The SEC's news release about FSPM is below:

https://www.sec.gov/litigation/admin/2016/33-10210.pdf

In connection with FSPM, Sears and Dittman were indicted by the US Attorney's Office in Colorado. This, taken from the SEC's press release was then and remained forever

untrue, neither myself or Mr. Dittman were ever in this case.

When The specialist met William Sears and Scott Dittman and learned of Lehrer's involvement in FSPM, they were shocked to learn of Lehrer's conflicts of interest in connection with FSPM. The specialist then contacted Sears and Mr. Dittman to make them aware of Mr. Lehrer's familiarity with Mr. Jeanne Pierre and his conflicts of interest with Mr. Jeanne Pierre in this case. They also made Sears and Mr. Dittman aware of Mr. Lehrers conflicts of interest with AUSA Harmon, who was in charge of the investigation/prosecution. Per the specialist, Mr. Lehrer and Mr. Harmon were 2 of 4 attorneys who constituted the special task force for securities fraud in South Florida in the 1990s (referred to above). In fact, Mr. Harmon and Mr. Lehrer worked side by side for 4 years and remained close friends to this day. This conflict of interest was never disclosed in this case by Mr. Harmon, who should have recused himself from the case as soon as Mr. Lehrers involvement was known. Unfortunately, he did not.

Despite the conflict of interest and without disclosing his conflict, Lehrer commenced representing FSPM, Dittman and Sears within a few months after representing the specialist in the Guy Jeanne Pierre matter. Lehrer continued to represent FSPM until the middle of 2014, approximately two months after the SEC investigation commenced. Pursuant to a Formal Order of Investigation dated January 29, 2015, Lehrer was asked to submit to a deposition concerning FSPM, Dittman and Sears. Prior to his testimony, Lehrer requested that Dittman and Sears waived the attorney client privilege, which they did without any knowledge of Mr. Lehrer's prior involvement with Guy Jeanne Pierre or Kenneth Harmon.

Lehrer provided sworn testimony on January 29, 2015 and May 29, 2015. In that testimony, Lehrer lied repeatedly. Among other things, Lehrer falsely stated that he learned about Jean Pierres OTC Markets ban, a ban he himself brought about, from 'Google searches' after the SEC investigation of FusionPharm began. He was largely responsible for the OTC Markets ban as a result of his representation of specialist in connection with referrals to the SEC, FBI and Florida Bar!

Secondly, Lehrer lied in stating that he had no knowledge of Sears relationship with Dittman or Sears family involvement in FusionPharm. Even more troubling is that Lehrer' conduct makes the waiver of the privilege given by Dittman and Sears ineffective because they were not provided with disclosure of Lehrers egregious conflict of interest and role in reporting a corporate officer of FSPM. ***Because of this non-disclosure, Sears and Dittman could not have made an informed decision of whether to waive the attorney client privilege allowing Lehrer to testify against them.***

Despite this, Denver SEC enforcement attorneys, Ian Karpel and Kim Greer allowed Lehrer to testify as to matters that were subject to the attorney client privilege. Dittman and Sears would never have waived the attorney client privilege if they knew that (i) Lehrer had participated in reporting Jean-Pierre, a corporate officer of FSPM to the FBI and SEC, and (ii) Kenneth Harmon had worked with Lehrer for years and was his supervisor. Greer and Karpel were aware of these conflicts and took no steps to ensure the integrity of Lehrers testimony to the SEC.

Karpel and Greers questioning of Lehrer during his testimony reflects they were aware of the specialists relationship with Lehrer – that he worked with the specialists law firm. The NY SEC action also references the bar complaints the specialist filed. Despite this, Karpel and Greer never contacted the specialist for information about Guy Jean-Pierre, Lehrer or their investigation. Greer and Carpels knowledge of many of the conflicts is demonstrated by Lehrers own SEC testimony.

Further, the DOJ who would interview countless witnesses in the FusionPharm case and would ultimately bring charges against both Jeanne Pierre and Tod DiTomasso (another lawyer who worked with Jeanne Pierre and advised FusionPharm), **NEVER INTERVIEWED LEHRER!!**...

Ken Harmons friend and previous co-worker. The SEC only interviewed one witness in this case, twice interviewing Fred Lehrer. **The SEC never interviewed another witness, attorney or otherwise.**

Upon the specialists review of this matter, they found that Lehrer had provided multiple baseless legal opinions for Sears in regarding the trading of his FSPM stock. The only thing more shocking was they learned that Lehrer had even instructed Sears (in writing) to sign his name to legal opinions to remove the legend from restricted securities. This was due to his printer not working, as he explained in his email to Sears. Sears trusting Lehrer, as who better to protect him then an EX SEC enforcement attorney? He did as instruct. If FSPM is a fraud as the SEC states then Lehrer was the gatekeeper allowing Sears to cut and paste legal opinions on his law firm. Fact is Fred Lehrer cut and pasted Guy Jean Pierres legal opinions as they are almost exactly the same. Kim Greer of the SEC commented on this in Lehrers interview. According to the SEC's press release based on Agent Funks Investigation, FSPM was a pump and dump (not that she would know what that really means) that resulted in investor losses of more than $12 million because of baseless legal opinions. The vast majority (more than $10million of the $12 million at issue with the SEC) of the sales of FSPM stock were only possible because of **Lehrer's opinions**. In the most recent filing to Scott Dittm,ans lawyers Mr Jeremy Siebert say:"Still no investigation or even mention of Lehrer from the DOJ while all other attorneys in the case were prosecuted? Additionally, "Pump and dump" is when multiple (1-2 a week) press releases are made through a given period to stimulate volume in the stock price. Once volume and a target price are met shareholders will sell into the new volume. FSPM did 10 press releases in 4 years. This was in no way a pump and dump. During the investigation, no press release was ever questioned or at issue. FusionPharms stock price followed the same exact trajectory as all the other marijuana index companies when amendment 64 passed in 2014. If anything, FusionPharm was critiqued by many investors for not putting out any PR/News. Exhibit 19

In 2017 the specialist, provided Mr. Karpel and Ms. Greer with evidence demonstrating that Lehrer lied multiple times under oath in connection with their investigation. they advised them that the specialist had declarations and other evidence of Lehrer that contradict his SEC testimony. Along with emails from Sears that directly refuted much of his SEC testimony. One example was an email communication whereas Lehrer

advised Scott Dittman and Craig Dudley (FusionPharms CFO) that disclosing William Sears was not necessary. Craig Dudley confirms this in his FBI 302 interview. The specialist also advised them that Lehrer had told William Sears to sign his name to a legal opinion. After receipt of this information, Ms. Greer and Mr. Karpel did not investigate. *EXHIBIT 20 EXHIBIT 21. Exhibit 22*
Instead Greer contacted Jeff Thomas an attorney of Scott Dittman
*"Kim called to let me know that they received a call from XXXXXXXXXXXX, who detailed some of her knowledge about Fred Lehrer. I pressed Kim as to what this meant in terms of their case, and she made it clear that it didn't mean anything. Because their case is technically still open, she just believed that she had an obligation to inform me of the call."*

Greer violated SEC policy by disclosing confidential SEC information to a private attorney. Her motive is clear and she did this to silence the specialist as a whistle-blower against Lehrer. Greer indicated that their refusal to investigate Lehrer was because of Mr. Harmon.

Further, when Harmon learned the specialist had provided exonerating information about Lehrer to Sears and Dittman and to the FBI as a whistle- blower, Harmon retaliated against Sears and the specialist. Instead of encouraging whistle-blowers to come forward when they learn of information relevant to investigations, Harmon, Karpel and Greer retaliated against the specialist and Sears and sought to discourage them from providing information and him from speaking to the specialist. While the SECs revolving door ignored Lehrer, the SEC charged another attorney, Todd D Tommaso for his legal opinions. The action against him can be found at this link: www.sec.gov/litigation/admin/2016/33-10215.pdf

Sears had put together a chart whereas it could be shown as Mr. D Tomasso also committed perjury in his interview with the SEC.
Exhibit 24
The Conviction of Mr. Jeanne Pierre in the Fusionpharm case can be found at this link:
www.justice.gov/usao-co/pr/denver-jury-convicts-attorney-securities-fraud-0

The specialist even went to the extent to send a letter to Matt Kirsch at the Denver DOJ' office. At that time Matt Kirsch, the First Assistant United States Attorney was the second in command below US Attorney Bob Troyer. This too was ignored and swept under the rug. Despite that Lehrer opinions were baseless and merely cut and pasted from previous Tod D Tomasso opinions and caused greater investor losses and his conduct was more egregious, the Denver SEC/DOJ would never charge Lehrer. For the reasons above, Karpel and Greer of the SEC should be investigated by the Inspector General. Along with Kate Funk of the FBI and & former AUSA Ken Harmon of the Denver US Attorney office.

## XV.  MISCONDUCT BY FEDERAL PROSECUTOR

Furthermore, as AUSA  Jeremy Sibert failed to adequately investigate these credible claims alleged by Mr. Sears, amounts to misconduct, as it is well established the duty of prosecutors is "to seek justice within the bounds of the law, not merely to convict." ABA Criminal Justice Standards for the Prosecution Function, Standard 3-1.2(b) (4th ed.2015); see also Berger v. United States, 295 U.S. 78, 88(1935) (a prosecutor's interest is not to "win a case, but that justice shall be done"); United States v. Kojayan,8 F.3d 1315, 1323 (9th Cir. 1993) ("Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. ... The prosecutor's job isn't just to win, but to win fairly, staying well within the rules."). And should view these obligations as applying in both civil and criminal enforcement actions. See Freeport-McMoRan Oil & Gas Co. v. FERC, 962 F. 2 d 45, 47 (D.C. Cir. 1992) (duty to do justice applies "with equal force to the government's civil lawyers").

## XII. CASE SUMMARY

As such, Special Agent Funks use of the term Certified Public Accountant was not just being used to show she held a Kansas issued certificate but instead was done to mislead the magistrate judges into believing she was qualified to perform the services required in this investigation as the evidence discovered as the result of her unqualified forensic accounting opinions were the basis of fact relied on by the court in this investigation and by the courts in rendering their probable cause determinations and as such violates federal regulations tainting this entire investigation and rendering these search warrants as being illegal.

Without the investigation, search warrants and everything else discovered subsequent to this investigation renders the prosecution with no winnable case and the reasons why the prosecutors kept coming after the company and Mr. Sears.  The last thing that the government thought they would find, is exactly what they found. A legitimate business.  Instead of the Ponzi scheme or illegal marijuana grow they were assured they would discover.

The defendant humbly requests consideration in this matter that relates to the fact that the governmental abuse of power and corruption undermines the courts at its very

foundation.

However should this court choose not to grant this motion the defendant humbly requests a stay in proceedings so a proper evidentiary hearing may be conducted

The defendant wishes to thank the court for its assistance, fairness and patience as this is a pro se filing of which I have never had the experience to encounter till this day. As shown above he has not received effective counsel in this matter as he was advised to accept a pre-charging plea agreement without his attorney ever reviewing in detail any of the evidence provided in this document. All of the above claims were discovered after the fact by non-legal professionals and myself.

Thank you again your Honor and I do pray you will honor my request here by granting this motion.

Respectfully submitted this 29th day of January 2020.


William J. Sears - Defendant

1-30-2020

13670 Via Varra #114
Broomfield Co 80020

**EXHIBIT A**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

May 16, 2014

IN THE MATTER OF
Fusion Pharm, Inc.

File No. 500-1

ORDER OF SUSPENSION OF
TRADING

It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of FusionPharm, Inc. ("FusionPharm") because of questions regarding the accuracy of assertions by FusionPharm and by others, in filings and disclosures made by FusionPharm on OTC Link (previously "Pink Sheets") operated by OTC Markets Group. Inc. and press releases to investors concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition.

The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

THEREFORE, IT IS ORDERED, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the above-listed company is suspended from the period 9:30 a.m. EDT, on May 16, 2014, through 11:59 p.m. EDT, on May 30, 2014.

By the Commission.

Jill M. Peterson
Assistant Secretary

**EXHIBIT B**

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following records and other items, however maintained, related to (a) the formation, ownership, control and/or operations of FusionPharm, Inc., MeadPoint Venture Partners, LLC, VertiFresh, LLC, Bayside Realty Holdings, LLC, and Microcap Management, LLC (hereinafter, collectively, the "Enumerated Entities"); and (b) the scheme and activities which are described and are the subject of the affidavit in support of this warrant (which affidavit is incorporated by reference herein), which records and items are further described below, and which constitute evidence and/or instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud) and Title 15 United States Codes, Section 78j(b) and 78ff(a):

*(As used herein, the terms "records" and "information" include all of the items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory, calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).)*

A. Accounting records and supporting workpapers (in any iteration, including drafts) concerning any and all of the Enumerated Entities, including general journals, general ledgers, accounts receivable and payable ledgers, sales journals, purchase journals, accounts reconciliations, and all data entered in Quickbooks or any other computer digital accounting system.

B. All financial statements and supporting workpapers (in any iteration, including drafts) concerning any and all of the Enumerated Entities.

C. All records concerning sales or any other revenue generating activities of any and all of the Enumerated Entities, including, by way of example, purchase and sales contracts or agreements, memoranda of understanding, term sheets, licensing or distributor agreements and contracts, invoices and purchase orders.

1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 72177 / May 16, 2014

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of FusionPharm, Inc. ("FusionPharm") of Denver, Colorado, at 9:30 a.m. EDT on May 16, 2014, and terminating at 11:59 p.m. EDT on May 30, 2014.

The Commission temporarily suspended trading in the securities of FusionPharm due to a lack of current and accurate information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition. This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to FusionPharm's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker-dealer or other person has any information which may relate to this matter, they should contact Jay Scoggins at (303) 844-1105, Kimberly S. Greer at (303) 844-1042, or Ian S. Karpel at (303) 844-1017, of the Division of Enforcement.

# EXHIBIT C

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.     I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2.     At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.     I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

a.  Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.     The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"),  is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

**EXHIBIT D**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2.      At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.      I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

   a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.      The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

President and CEO of FusionPharm, Inc. ("FusionPharm") and William Sears ("Sears"), Dittman's brother-in-law, and a founder and control person of FusionPharm, for various suspected federal criminal offenses, including wire fraud, in violation of 18 U.S.C. §1343, and securities fraud, in violation of 15 U.S.C. §§78(b) and 78ff(a), and 17 C.F.R. §240.10b-5.

5.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, written reports, information from witnesses, and information and analyses obtained from other law enforcement agencies, including the United States Securities and Exchange Commission (" SEC").  This affidavit is intended to show that there is probable cause for the requested search warrants and does not purport to set forth all of my knowledge of, or investigation into, this matter.

6.      Based on the evidence developed, described and detailed herein, your affiant submits that there is probable cause to believe that: (a) Dittman and Sears have committed the criminal offenses as listed in paragraph 4 above, and (b) evidence of these crimes is located at the Subject Premises.

## ORIGINS OF SEC'S INVESTIGATION

7.      The matter which is currently the subject of a criminal investigation arose from a referral on or about December 9, 2013, by the SEC's Regional Office in Denver, Colorado.  The referral involved allegations the SEC had been investigating relating to a possible offering fraud and pump-and-dump scheme being orchestrated by Dittman and Sears through FusionPharm, a publicly traded small cap company.

8.      The genesis of the SEC's investigation involved a complaint filed by Cooperating Witness 1 (hereinafter referred to as "CW-1"), a former FusionPharm

2

- You have all the legal rights of a CPA including signing tax returns and audit reports
- You are allowed to own a CPA firm
- You can use the title in any public or official setting
- Requires a significant fee to renew each year

# CPA Certificate vs CPA License

Remember that each state board of accountancy has different rules and regulations to become a CPA. Most have common requirements, but all of them are different in some way, shape, or form.

That being said, most states back in the day had a two-tiered certification process. This meant that once you fulfilled the requirements to sit for the uniform CPA exam and you passed it, you were issued a certificate. This simply meant that you completed the first step to becoming a CPA, but you weren't all the way there yet.

Often candidates still had to complete a lengthy work experience program, additional education requirements, or an ethics exam in order to fulfill the licensure requirements of the state, but they were able to call themselves a CPA in the meantime because they had a certificate. Thus, on resumes and job applications, they could indicate that they had passed the exam and were on their way to becoming licensed.

Keep in mind that this certificate is not a license to practice. Candidates who only have a certificate are not allowed to practice publicly because they are not licensed. Only after you complete the rest of the requirements are you able to obtain your license and truly become a practicing CPA with all of the designations rights intact.

Most states have gotten rid of this two-tiered system and now don't issue you a certificate upon completing the exam. Instead, they

**Top 5 CPA Prep Courses**

**#1**

have switched to using this terminology to define different levels of licenses.

# Different Levels of CPA Licensure:

# Non-reporting and Inactive

This title is a little misleading because it implies that you can be licensed but not be fully licensed. That isn't really true. You are either licensed or you are not. There is no in between. Some states do offer non-reporting or inactive licenses though.

What a lot of states that have gotten rid of the two-tier system have started doing is allowing non-practicing CPAs to switch their full-blown license into a certificate. This way they don't have to pay a huge renewal fee and maintain 40 hours of continuing education each year, but they can still call themselves a CPA for informal purposes.

A good example of this is a college accounting professor. He or she may want to maintain their credential as it gives them more authority in their field, but there is no reason why they should be licensed. They will never perform audit or tax functions that practicing CPAs must perform, so there is no need for them to be licensed.

Most states that allow this type of "downgraded" license also allow certificate holders to renew their license at any time just by filing the proper paperwork and paying the licensure fees. This is also a plus for the accounting professor. If he or she ever wanted to get licensed again, he or she could simply sign up and pay the fee. There is no extra testing or qualifications required.

#2

#3

#4

#5

# CPA Certification vs CPA License for International Candidates

A lot of international candidates think that they can simply obtain a certificate and use it as a license. This is not the case. Just become you are practicing outside of the US doesn't mean that you don't have to be completely licensed.

In order to call yourself a CPA and perform the functions of a certified public accountant, you must be a licensed CPA (whether that be active or inactive).

If you are having a difficult time meeting the requirements to become a CPA because you are an international candidate, check out this post. I walk you through the international process.

# Become a Licensed CPA

The best thing that you can do for your career is to become a full-blown licensed CPA. You will have all of the opportunities and respect afforded to you by people within and outside your profession.

I would highly recommend pursuing this rather than just getting your certificate.

The first place to start pursuing this career goal is to ace the CPA exam. If you haven't already started studying for it, you will need to pick out a CPA review course that fits your learning style and will work for you. Here's a list of the top review course publishers out there. Take a look at my reviews and see which one will work the best for you.

Compare Courses!

**SAVE BIG!**

**Get Up to $1,000 Off Your Review Course!**

Get a FREE Crush the CPA Exam Study Guide

Your first name

Your email addres

Where you at in ▼


SUBSCRIBE TODAY!

# See the Top CPA Review Courses

### Kenneth W. Boyd

Website

**in**

**G**

**V**

**a**

Kenneth W. Boyd is a former Certified Public Accountant (CPA) and the author of several of the popular "For Dummies" books published by John Wiley & Sons including 'CPA Exam for Dummies' and 'Cost Accounting for Dummies'.

Ken has gained a wealth of business experience through his previous employment as a CPA, Auditor, Tax Preparer and College Professor. Today, Ken continues to use those finely tuned skills to educate students as a professional writer and teacher.

## Related Posts

← →

What Are the Requirements to Take the CP...

CPA Exam Score Release Dates | 2020 Test...

Best CPA Ex Plan for a Bu

**Get a FREE Crush the CPA Exam Study Guide**

Your first name

Your email address

Where you at in your CPA journey?  ▼

SUBSCRIBE TODAY!

# CPA EXAM

Exam Costs

Exam Schedule & Dates

Application Process

Exam Sections

Pass Rates

Score Release Dates

International Candidates

Glossary

CPA Videos

CPA Exam Books

# TOP CPA REVIEW COURSES

Best CPA Courses

Wiley CPAexcel

Roger CPA

Yaeger CPA

Gleim CPA

431

Fast Forward Academy
Surgent CPA
Becker CPA
CPAexcel vs Becker
Roger vs CPAexcel
Wiley CPA vs Gleim
Yaeger vs Roger

# Categories

CPA Careers
CPA Exam
CPA Exam Study Tips

Copyright© 2020 - All Rights Reserved | Accounting Institute for Success

Home    Articles    Videos    Academic Scholarships

Ask your question here          **Search**      **Show Related Q&As**

Education and Career FAQs / Business FAQs / Accounting FAQs / What is CPE Accounting?

# What Is CPE Accounting?

CPE accounting is continued professional education for accountants. Accounting is a highly specialized field. Since tax laws and regulations can change rapidly, accountants participate in continuing education programs to keep abreast of developments in laws and accounting practices. They need to be aware of the CPE requirements of the jurisdictions in which they work. Schools offering Accounting degrees can also be found in these popular choices.

## CPE Requirements

According to the American Institute of Certified Public Accountants, each state has specific continuing education requirements accountants must follow in order to maintain their licenses. The CPA Journal states that accountants should be concerned about licensing requirements if they maintain such credentials in more than one jurisdiction.

**View Schools**

## Important Facts About CPE Accounting

| Work Environment | Office or classroom setting |
|---|---|
| Key Skills | Accounting, Math, Reading Comprehension, Communication |
| Training | There are no mandatory subjects or lessons for CPE, so accountants are free to choose the program that best fits their needs. Acceptable programs include courses offered by the accountant's own firm, accounting-focused conferences or conventions, and any university courses that offer CEUs (Continuing Education Units). |
| Common Courses | Accounting and Finance for Business Operations, Fair Value Accounting, IFRS in the USA: An Implementation Guide |
| Median Salary (2018) | $70,500 *(Accountants and Auditors)* |
| Job Outlook (2016-2026) | 10% *(Accountants and Auditors)* |

*Source: U.S. Bureau of Labor Statistics (BLS)*

## Comparing CPE Requirements

Almost every jurisdiction requires an average of 40 hours of CPE per year for Certified Public Accountants (CPA). Other variations are for each 2-year period or 120 hours each 3-year period. Many jurisdictions do not allow carryover of surplus CPE credits from one period to the next.

In some jurisdictions, required CPE hours depend on either specific duties or job classifications. For example, New York reduces the amount of required hours of CPE credits if an accountant takes continuing education courses in a specialized area. Kentucky reduces the number of required hours if an accountant works less than 3,000 hours every two years.

Each state has different CPE accounting requirements. A CPA must take the required numbers of CPE credits for the jurisdiction where her or she works, and must be aware of the requirements of other jurisdictions if he or she wishes to maintain a license in that jurisdiction.

To continue researching, browse degree options below for course curriculum, prerequisites and financial aid information. Or, learn more about the subject by reading the related articles below:

### 1. Degree Options:

Accounting

Accounting & Management

Bookkeeping

View All Degree Options

### 2. More Articles

What Schools Offer Accounting Degrees in Phoenix, Arizona?

What Schools Have Accounting Degrees in Philadelphia, PA?

Where in Vermont Can I Take Courses in Accounting?

---

**Choose your subject:**

Business Management

Bookkeeping and Accounting

Select a Very Specific Subject

**Choose your degree level:**

Select a Degree Level

**Choose your location:**

Online schools only

Campus near me

Or

zip

State

**SEARCH**

No preference

**1. Southern New Hampshire University**
- MBA - Accounting
- BS in Accounting
- AS in Business Administration

**What is your highest level of education completed?**

Select One...

**2. Purdue University Global**
- Master of Science in Accounting
- Bachelor of Science in Accounting
- Associate of Applied Science in Accounting

**Which subject are you interested in?**

Select One...

**3. Florida Tech**
- Master's in Business Administration/Accounting & Finance
- Master's in Business Administration/Finance
- Master's in Business Administration/Management

**What is your highest level of education completed?**

Select One...

**4. Grand Canyon University**
- DBA in Management
- MBA in Accounting
- BS in Accounting

**What is your highest level of education?**

Select One...

BUSINESS

# Agency clarifies uses of CPA designation

BY JERRY SIEBENMARK

JANUARY 21, 2010 12:00 AM

The state agency that regulates certified public accountants and CPA firms noticed a trend it wanted to stop.

Some Kansas CPAs have been using their professional designation in advertising, letters or other public documents in a way that would require them to have a separate practice license.

"We see that more now because information is more available to us," said Susan Somers, executive director of the Kansas Board of Accountancy. "We've got the Internet."

The trend prompted the board to post a notice on its Internet home page — www.ksboa.org — clarifying the use of CPA.

## Subscribe and Save

Act now to get a full year of unlimited digital access – just $49.99!

**VIEW OFFER**

The designation can be used after the CPA's name and in connection with his or her employer as long as the company is not providing services that fall under a separate definition of practice.

So a CPA who is a controller of a company that does not provide CPA services — or any financial or consulting services — can use the designation if it includes the name of the company for whom they work and their job title.

Where things get fuzzy, Somers said, is advertising, phone book listings, letterheads and signatures as a CPA on documents that are available to the public.

In those instances, she said, the CPA can't use the designation unless they also have a practice license.

The board's clarification of the use of CPA has been well received, Somers said.

"I've had a lot of thank yous from people," she said.

**FROM OUR ADVERTISING PARTNERS**


Shep Smith's First Public Remarks Since Leaving Fox News


The Main Reason Behind Sarah Palin's Divorce is Pretty Clear Now


This May Have Been Trump's Biggest Flaw


Anna Kendrick Refuses To Do Nude Scenes & We Now Understand Why


No Wonder Aldi's Meat Is So Cheap


Controversial Movies That Were Box Office Hits


There Were Athletes Who Skipped Visiting Obama's White House Too


Celebs Who Died Tragically in 2018

COMMENTS

VIDEOS

So you think you have the flu? Here's what you should do

See the impressive gumball machine collection at Nifty Nut House

**VIEW MORE VIDEO →**

**TRENDING STORIES**

Riverfront Legacy group moves forward with a plan that tears down Century II
DECEMBER 16, 2019 10:01 PM

Wichita is mourning the death of a popular bartender, 'one of the all-time good guys'
DECEMBER 17, 2019 12:54 PM

Impact on Spirit AeroSystems unclear as Boeing plans to halt production of 737 Max
DECEMBER 16, 2019 6:07 PM

State may have to help with Spirit salaries if 737 Max stays grounded, governor says
DECEMBER 17, 2019 7:32 PM

Pie and home cooking are on the menu in the Spaghetti Works District as of Tuesday
DECEMBER 16, 2019 2:36 PM

# EXHIBIT E



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: ksboa@ks.gov

| Apply for Certificate | Apply for Permit | Change of Address | Contact Us |
|---|---|---|---|
| CPA Exam Info. | CE | FAQ's | Firm Registration |
| Forms | Laws & Regs | Online Firm Renewal | Newsletter |
| Online Permit Renewal | Peer Review | Search -- Firm | Search -- Individual |

**Sidebar:**
Home
Board of Directors
Board Meeting Dates, Agendas & Minutes
Complaint Form
CPA Exam Pass List
CE requirements
Disciplinary Actions
FAQ's
Fees
Firm Search
Forms
Helpful Links
Individual Search
Laws & Regulations
Peer Review
Proposed Regulation Amendments
Site Map
Site Tools Download Center
Contact Us

## Apply for a Certificate

PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU THAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.

NOTE: KANSAS IS A TWO-TIERED STATE. YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE. THE CERTIFICATE DOES NOT ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.

Below are the forms required to be submitted to obtain a Kansas CPA Certificate:

### CPA Certificate by passing the exam in Kansas--Fee: $50.00

- http://www.ksboa.org/pdf/app_exam.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf

### CPA Certificate by reciprocity, or for transfer of grades—Fee: $250.00

- http://www.ksboa.org/pdf/app_recip.pdf
- http://www.ksboa.org/pdf/app_transfer.pdf
- http://www.ksboa.org/pdf/auth_exch.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--this is the order information)



Page Last Updated: 04/30/2018 21:44:52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

**EXHIBIT F**

12/24/17 11:16:00

**CPAVerify Individual Report Results**

---

NAME: **KATE EGAN**
STATE OF LICENSE: **KS**
LAST UPDATED: **2017-12-24**

**Mail**

**Address:**                                          CHICAGO, IL,
**License/Permit/Certificate Number:**                8757
**Registration Number:**
**License/Permit/Certificate Status:**                ACTIVE CERTIFICATE
**License/Certificate Status Details:**               The certificate is in good standing.
**License Type:**                                     CPA.

**License Type Details:**                             CPA Certificate. In Kansas, a certificate is not a license so therefore, a certificate holder who does not also have an active permit may not hold out, perform or offer to perform services as a CPA. The person may use the title CPA in connection with their employment in industry.

**Basis for License:**
**Issue Date:**                                       1999-08-04
**Expiration Date:**
**Enforcement, Non-Compliance or Disciplinary Actions:**    None Reported To This Site By The Board
**Other Information:**                                 IN KANSAS, A CERTIFICATE IS NOT A LICENSE. ONLY THOSE WHO HAVE PERMITS (ALSO KNOWN AS LICENSES) ARE ALLOWED TO HOLD OUT AND PROVIDE OR OFFER TO PROVIDE SERVICES TO THE PUBLIC AS A CPA. IF THE PERMIT STATUS DOES NOT REFLECT "ACTIVE", THAT INDIVIDUAL IS NOT LICENSED TO PRACTICE.

CPAVERIFY INCLUDES ALL CERTIFICATE HOLDERS AND PERMIT HOLDERS. If an individual has a permit, their permit record and their certificate record will show. Only a certificate record will show for non-licensed certificate holders.

If Permit Number shows N/A that means this person had a permit to practice at one point, but let it lapse. When the permit lapses in that case, so does the permit number. If permit shows Lapsed it means that this person once had a permit (license) to practice, but has since let them lapse. This individual is not licensed to practice as a CPA in Kansas.

Contact the Board for official verification of information.

**State Board Contact Information:**                  KANSAS BOARD OF ACCOUNTANCY
                                                      LANDON STATE OFFICE BUILDING
                                                      900 SW JACKSON, SUITE 556
                                                      TOPEKA, KS 66612-1239

                                                      Phone: 785-296-2162
                                                      Fax: 785-291-3501
                                                      Email: INFO@KSBOA.KS.GOV
                                                      Licensee Lookup: http://www.da.ks.gov/boa/searchforindividual.aspx

---

Details of Enforcement, Non-Compliance or Disciplinary Actions:

1. If "Contact State Board For Details" is displayed then the State Board has reported some type of enforcement, non-compliance or disciplinary action to this site and the State Board should be contacted for full details about the action reported.
2. If "None Reported To This Site By The Board" is displayed then the State Board provides enforcement, non-compliance and disciplinary action data to this site and none was indicated for this record.
3. If "State Does Not Provide This Type of Data At This Site" is displayed then CPAverify is not currently receiving enforcement, non-compliance or disciplinary action data for licensees in this state. Some states are limited to sharing this type of data with third party websites due to privacy laws or policies, but most State Boards offer this information on their official State Board websites.
4. Contact the State Board for official verification of all enforcement, non-compliance and disciplinary activity.

**The results shown here include all data made available by participating states.** Additional data about the individual or firm may exist and is not shown here for other states that are not yet participating in the CPAverify website. Please refer to the Participating States tab for more information about which states are currently sharing their licensing data for use with this website and for clarification about which states these results do not include. If

438

1

the Board of interest is not participating, you may refer to the <u>"Contact Boards"</u> tab where a link to every Boards' website and therefore individual license lookup tool is available.

439

# EXHIBIT G



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home    >> Search for Firms

**Individual Information**    [ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Egan | **Certificate Status:** | Active |
| **Address:** | 22 N Morgan Unit 210 Chicago, IL 60607-0000 | **Permit Status:** | |
| **Firm/Employer:** | Sprint | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |



Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

# EXHIBIT H



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home    >> Search for Firms

## Individual Information    [ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Funk | **Certificate Status:** | Active |
| **Address:** | 8000 E. 36th Ave. Denver, CO 80238-0000 | **Permit Status:** | |
| **Firm/Employer:** | Federal Bureau of Investigation | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |



Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

*Exhibit J*

Join or Give      News      Events & Programs      Networks      About      Resources      Info for:      Adams Alumni C

KU

Search...

Home » Resources » Manage My Profile » First-time Registration

## Resources

Community Home
My Profile
Online Directory
Career Center
Kansas Alumni magazine
Shop for KU Merchandise
KU Websites
Just for Fun
Kansas Alumni Magazine

**Step 2:**

Find your name in the list below and click the radio button beside it, then click "Next."

If your record is marked as "Already Registered," please click here to log in. Tools are available to recover your password if you don't remember it.

In the KU Degree column, the first letter indicates the school that granted your degree, followed by the year of the degree. Below is a key to determining school codes.

## Manage My Profile

Login/Logout
First-time Registration
Change Password
Class Notes
Email Subscriptions
Contact Support

| | |
|---|---|
| A | School of Architecture, Design & Planning |
| B | School of Business |
| C | College of Liberal Arts & Sciences |
| D | School of Education |
| E | School of Engineering |
| F | School of Fine Arts |
| G | Master's Degree |
| H | School of Health Professions |
| J | School of Journalism |
| L | School of Law |
| M | School of Medicine |
| N | School of Nursing |
| P | School of Pharmacy |
| PharmD | School of Pharmacy |
| S | School of Social Welfare |
| U | School of Music |
| AUD | Doctor of Audiology |
| DE | Doctor of Engineering |
| DMA | Doctor of Musical Arts |
| DNP | Doctor of Nursing Practice |
| DPT | Doctor of Physical Therapy |
| EdD | Doctor of Education |
| OTD | Doctor of Occupational Therapy |
| PhD | Doctor of Philosophy |
| SJD | Doctor of Juridical Science |

*If you don't see your name on the list, please use your browser's Back button to try searing again using alternate values, such as your legal name or a previous name. If you still do not see your name or have other questions about the account lookup*

Join or Give      News      Events & Programs      Networks      About      Resources      Info for:      Adams Alumni C

| First Name: | Last Name: | Birth or Former Last Name: | KU Degrees : |
|---|---|---|---|
| ○ Aidan | Egan | | |
| ○ Ann | Egan | | g'89 |
| ○ Anne | Cory | Egan | d'78 g'82 |
| ○ Brenda | Egan | | PharmD'10 |
| ○ Brian | Egan | | F05 |
| ○ Cassidy | Egan | | c'10 |
| ○ Catherine | Fennelly | Egan | c'13 |
| ○ Chet | Egan | | c'06 g'15 |
| ○ Drew | Egan | | b'16 g'17 |
| ○ Elaine | Wilson | Egan | '72 |
| ○ F. | Egan | | PhD'11 |
| ○ Georgine | Egan | Neuner | g'87 |
| ○ Gregory | Egan | | C95 |
| ○ James | Egan | | b'82 |
| ○ James | Egan | | G85 |
| ○ Jaxon | Egan | | |
| ○ Jeanne | Binder | Egan | g'92 |
| ○ Jennifer | Egan | | g'97 |
| ○ Jennifer | Egan | Clapper | s'13 |
| Already registered John | Egan | | j'86 |
| ○ John | Egan | | C99 |
| ○ Kate | Egan | | B96 |
| ○ Katie | Egan | | |
| ○ Kristian | Eganhouse | Hamilton | l'96 |
| ○ Lawrence | Egan | | C86 |
| ○ Lisa | Egan | Hardy | c'12 |
| ○ Lori | Egan | Wehr | d'83 |
| ○ Margaret | Egan | | g'77 |
| ○ Mary | Egan | Hardman | c'42 g'44 |
| ○ Mary | Egan | | '20 |
| ○ Michael | Egan | | |
| ○ Michael | Egan | | g'93 |
| ○ Misti | Jones | Egan | '84 |
| ○ Mitchell | Egan | | c'15 |
| ○ Patricia | Egan | | g'86 PhD'94 |
| Already registered Philip | Egan | | G72 G74 G81 |
| ○ Rebecca | Egan | Foster | f87 |
| ○ Robert | Egan | | e'86 |
| ○ Spencer | Egan | | |
| ○ Susan | Egan | | |
| Already registered Thomas | Egan | | j'77 |

**Contact Us**          **Current Issue**          **Shop**          **Featured Partner**

**KU Alumni Association**
Adams Alumni Center
1266 Oread Ave., Lawrence, KS 66045
Email: kualumni@kualumni.org
Phone: 800-584-2957

Join or Give    News    Events & Programs    Networks    About    Resources    Info for:    Adams Alumni C











**Nationwi**



*The* **Alumni Insurance Program**



**INTRU**



Adams Alumni Center    Join/Renew    Advertise    Jobs    Site Map A-Z    Privacy & Terms

© 2019 KU Alumni Association. All Right

**EXHIBIT J**



CPA Courses    Reviews ↓    (104) Discounts
Blog    Other Exams ↓

# CPA Certificate vs CPA License: What's the Difference?

📅 **Updated:** Dec. 30, 2019 · ✍ Kenneth W. Boyd · 🏷 Best CPA Review Courses · 📁 Advertiser Disclosure

Contents ▤

▤ CPA Exam, Careers



Search …



There always tends to be a lot of confusion between a **CPA certificate vs license**. They both mean completely different things. Furthermore, they give you different amounts of legal authority and responsibility although they seem like the same thing.

Kenneth W. Boyd is a former Certified Public Accountant (CPA) and the author of several popular accounting books including 'CPA Exam for Dummies' and 'Cost Accounting for Dummies'.

A CPA certificate, in most cases, is simply an acknowledgment. It means that you passed the CPA examination and fulfilled the minimum requirements to take it. A CPA license, on the other hand, is issued when you complete all the requirements from a board of accountancy to become a CPA. Consequently, you are granted

permission by the state to practice public accounting.

Let's take a look at some of the differences between these two designations and why you would want one over the other.

# CPA Certificate vs CPA License

# What's the Different between a CPA Certificate vs CPA License?

Let's look at a few key differences between a license and certificate.

## What's a CPA Certificate?

- No work experience requirements
- No continuing education requirements
- Cannot sign tax returns, audit reports, or use the title CPA on any official or legal report
- Cannot be an owner or partner of a public accounting firm
- Some states allow you to use the designation CPA after your name on unofficial documents, like resumes, while others expressly forbid using the acronym altogether
- Requires a small fee to renew each year

## What's a CPA License?

- Most states require at least 1-2 years of relevant accounting experience under a CPA
- Most states require at least 40 hours of continuing education each year

Learn More

CPA Exam
CMA Exam
CFA Exam
EA Exam
CIA Exam
PMP Exam
Six Sigma Exam
Bar Exam
LSAT Exam

Popular Posts

**EXHIBIT K**

**1-316.  Unlawful acts; penalty.**  (a) It is unlawful for any person to practice certified public accountancy unless the person holds a Kansas certificate and a valid permit to practice issued by the board pursuant to K.S.A. 1-310 and amendments thereto, or is entitled to practice pursuant to K.S.A. 1-322 and amendments thereto.

(b) It is unlawful for any firm to practice certified public accountancy as a certified public accounting firm or CPA firm unless the firm is registered with the board pursuant to K.S.A. 1-308 and amendments thereto, or meets the requirements to be exempt from such registration.

(c) It is unlawful for any person, except the holder of a valid certificate or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, to use or assume the title "certified public accountant" or to use the abbreviation "CPA" or any other title, designation, words, letters, abbreviation, sign, card or device likely to be confused with "certified public accountant." The use of the term "public accountant" without the word "certified" shall not be interpreted as implying that one is a certified public accountant.

(d) Except as provided by this subsection, no person holding a permit or practice privilege or a firm holding a registration under this act or meeting the requirements to be exempt from such registration shall use a professional or firm name or designation that is misleading as to:  (1) The legal form of the firm; (2) the persons who are partners, officers, members, managers or shareholders of the firm; or (3) any other matter.  The names of one or more former partners, members or shareholders may be included in the name of a firm or its successor unless the firm becomes a sole proprietorship because of the death or withdrawal of all other partners, officers, members or shareholders.  The use of a fictitious name by a firm is permissible if the fictitious name is registered with the board and is not otherwise misleading.  The name of a firm may not include the name of an individual who is neither a present nor a past partner, member or shareholder of the firm or its predecessor.  The name of the firm may not include the name of an individual who is not a certified public accountant.

(e) It is unlawful for any person, except the holder of a Kansas permit to practice or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, or a valid Kansas firm registration, to issue a report with regard to any attest or compilation service under standards adopted by the board.  A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board.  The practice of public accountancy by persons not required to hold a permit to practice, including public accountants, is not prohibited or regulated by the provisions of this act, except for the provisions of this section, K.S.A. 1-308, 1-318 and 1-319, and amendments thereto and K.S.A. 1-319, and amendments thereto.  The title "enrolled agent" may only be used by individuals so designated by the federal internal revenue service.

(f) Any person who violates any provision of this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $5,000, or to imprisonment for not more than one year, or by both such fine and imprisonment.

**From:** Professional Ethics - Submissions <ProfessionalEthicsSubmissions@aicpa.org>
**Date:** Friday, November 8, 2019 at 9:46 AM
**To:** Bill S <bill@bmails.biz>, Professional Ethics - Submissions <ProfessionalEthicsSubmissions@aicpa.org>
**Cc:** Peter Bornstein <pbornstein@prblegal.com>, Jeannette Wolf <jwolf@prblegal.com>
**Subject:** RE: Attention Unlicensed Individual Practicing

Hello William,

This individual is neither an AICPA member nor a member of the Kansas State Society of CPAs so we don't have jurisdiction to perform any investigation. You may want to contact the State Board of Accountancy to see if they have any provisions.

Thank you.
Aradhana

## Aradhana Aggarwal, CPA
Manager - Professional Ethics
Professional Ethics Hotline: 888.777.7077 or ethics@aicpa.org
AICPA Member Service: 888.777.7077 or service@aicpa.org
CIMA: cimaglobal.com/Contact-us/

This message, including any attachments, may contain confidential information intended for a specific individual and purpose and is protected by law. If you are not the intended recipient, please delete it. Any disclosure, copying or distribution of this message is strictly prohibited.

The position expressed above represents the opinion of the staff of the AICPA Professional Ethics Division as to the application of the *Code of Professional Conduct* to the facts presented in your e-mail. The opinions reflected in this response do not reflect an official position of the Professional Ethics Executive Committee or of the AICPA.

Views expressed by AICPA employees are expressed for purposes of deliberation, providing member services and other purposes exclusive of practicing public accounting. Views expressed by AICPA staff do not necessarily represent the official views of the AICPA unless otherwise noted. Official AICPA positions are determined through certain specific committee procedures, due process and deliberation.



Department of
**Regulatory Agencies**
Division of Professions and Occupations

Program Branch
Colorado Accountancy Board

William Sears
wjsears@gmail.com

November 8, 2019

Re: Kate Elizabeth Funk

Dear Mr. Sears,

The Colorado Accountancy Board is a state agency that licenses CPAs and CPA Firms, and when appropriate, takes disciplinary action against licensed CPAs. The jurisdiction of the Accountancy Board is confined to issues of customer care and issues of a CPA's ability to practice within State Guidelines. The Board lacks jurisdiction over fee disputes and any aspect of general business practice including matters relating to the personal manner of a CPA Firm's staff.

However the Board wants you to know that its lack of authority to act upon these matters should in no way be construed as an endorsement of rude conduct by a licensed CPAs or of excessive fees for services.

Sincerely,

FOR THE COLORADO ACCOUNTANCY BOARD

Amanda Sarrazin
Program Support Specialist

cc: file



**From:** Professional Ethics - Submissions <ProfessionalEthicsSubmissions@aicpa.org>
**Date:** Friday, November 8, 2019 at 9:46 AM
**To:** Bill S <bill@bmails.biz>, Professional Ethics - Submissions
<ProfessionalEthicsSubmissions@aicpa.org>
**Cc:** Peter Bornstein <pbornstein@prblegal.com>, Jeannette Wolf <jwolf@prblegal.com>
**Subject:** RE: Attention Unlicensed Individual Practicing

Hello William,

This individual is neither an AICPA member nor a member of the Kansas State Society of CPAs so we
don't have jurisdiction to perform any investigation.  You may want to contact the State Board of
Accountancy to see if they have any provisions.

Thank you.
Aradhana

## Aradhana Aggarwal, CPA
Manager - Professional Ethics
Professional Ethics Hotline: 888.777.7077 or ethics@aicpa.org
AICPA Member Service: 888.777.7077 or service@aicpa.org
CIMA: cimaglobal.com/Contact-us/

This message, including any attachments, may contain confidential information intended for a specific individual and purpose and is
protected by law. If you are not the intended recipient, please delete it. Any disclosure, copying or distribution of this message is
strictly prohibited.

The position expressed above represents the opinion of the staff of the AICPA Professional Ethics Division as to the application of the
*Code of Professional Conduct* to the facts presented in your e-mail. The opinions reflected in this response do not reflect an official
position of the Professional Ethics Executive Committee or of the AICPA.

Views expressed by AICPA employees are expressed for purposes of deliberation, providing member services and other purposes
exclusive of practicing public accounting. Views expressed by AICPA staff do not necessarily represent the official views of the
AICPA unless otherwise noted. Official AICPA positions are determined through certain specific committee procedures, due process
and deliberation.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1. WILLIAM J. SEARS,

     Defendant.

---

## AFFIDAVIT OF STEVEN R. ANDERSON, CPA, JD

---

Steven R. Anderson, being of lawful age and upon his oath, deposes and states:

1.     I am an attorney licensed to practice law in the State of Colorado since 1987, and co-founder and managing partner of Anderson & Jahde, PC, 5800 South Nevada Street, Littleton, Colorado 80120.

2.     I also hold an inactive certified public accountant license in Colorado, having received my certification and license to practice public accounting in the State of Colorado in 1984.

3.     My practice focuses on Federal & State, civil and criminal tax controversies and trials; and, on representing accountants, tax return preparers and CPAs in all professional facets, to include CPA malpractice defense, representing CPAs before the Colorado State Board of Accountancy (and other state licensing boards), representing CPAs before the American Institute of Certified Public Accountants, and representing accountants before the IRS' Office of Professional Responsibility. I have represented and



EXHIBIT
B

consulted between 150 and 200 CPAs in cases before the Colorado State Board of Accountancy.

4. I do not have an exact number on how many, but a portion of the Board of Accountancy cases I have worked on involved CPAs who had relocated from other states to Colorado and were defending complaints before Colorado's Board of Accountancy (the "Board") because they did not understand Colorado's rules pertaining to holding out as a CPA in Colorado. I frequently work with Colorado's statutes governing CPAs and with the Rules of the Board. I have reviewed the CPA rules and statutes in Kansas.

5. I was asked to review the propriety of Special Agent Kate Funk's use of a CPA designation on search warrant applications related to cases involving William Sears, Scott Dittman, and Fusion Pharm, LLC, which were filed in the United States District Court for the District of Colorado.

6. Colorado's rules deem this a holding out as a CPA in Colorado that requires qualifications Ms. Funk does not have. She is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado.

7. Ms. Funk passed the CPA exam in Kansas, but never completed the Kansas requirement of having one year of qualified work experience to earn a Kansas "permit" to practice as a CPA. Kansas and Colorado have different legal structures for becoming a CPA authorized to practice as a CPA. In Kansas you obtain a CPA "certificate" (which Ms. Funk has) by meeting educational requirements and passing the CPA exam. Then, you must have the year of qualified work experience after which you may obtain a Kansas "permit" to practice as a CPA. Ms. Funk does not have a "permit" to practice as a CPA in Kansas.

2

8.     Colorado combines education, passing the CPA exam and one year of qualified work experience before you can obtain a CPA "certificate." Colorado does not issue "permits" for individual CPAs See, *C.R.S. §§ 12-2-108 and 12-2-109, and Rule 4.1 Colorado Board of Accountancy*.  This difference between the states is key.  Colorado does not allow someone from another state without one year of qualified work experience to hold themselves out as a Certified Public Accountant or use "CPA." *C.R.S. § 12-2-115(3)*.

9.     Within the last year, I represented a Kansas CPA before the Board who was fully licensed in Kansas, with a Kansas permit, who used "CPA" on a business card handed to one client.  The Board held this individual in violation of Colorado's statutes for improperly holding herself out as a CPA in Colorado. She did not first get reciprocity from Colorado.  Ms. Funk's holding out was more egregious because she has no Kansas permit.

10.    On the Affidavit for Search Warrant, Special Agent for the Federal Bureau of Investigation, Kate E. Funk, wrote, "[p]rior to my employment with the FBI, I received an accounting degree from the University of Kansas in 1995.  I became a certified public accountant in 1996 through the State of Kansas." Again, Ms. Funk has a Kansas certificate, not a permit to practice as a CPA. Clearly, Ms. Funk wanted the Court and others to rely on her statements in her affidavit as if they were provided by a CPA who had met Colorado's requirements to be a CPA. She is not recognized as a CPA in Colorado.  I also checked the Kansas Board of Accountancy website and found an FAQ that addresses whether Ms. Funk could provide litigation support services (which is what

3

she did by submitting the affidavit) without having a permit in Kansas. She cannot. Here

is the Q&A from the Kansas Board of Accountancy website:

**6. I don't provide any attest services. Am I required to hold a permit to practice to provide non-attest services as a CPA?**
Yes. Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, all fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, requires a person to hold a valid Kansas permit to practice. For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf The definition is broken out into two categories: atttest and non-attest.

Ms. Funk violated the laws of Colorado by claiming she is a Certified Public Accountant,

intending for the Court and others to rely on her statements with the full level of trust,

training and competence those statements would have had they been made by a CPA.

Even under Kansas law she could not provide the litigation support services she provided

here in Colorado.

11. She made the same statement in an affidavit to support an application for

search warrant to search email accounts for William Sears, Scott Dittman, and others.

12. According to the records of the University of Kansas, Kate Egan graduated

in 1996, not 1995.

13. According to the records of the State Board of Accountancy for the State of

Kansas dated December 24, 2017, Kate Egan was issued a CPA certificate on August 4,

1999, not in 1996 as she claimed in Affidavits filed.

14. I am informed, and therefore do believe, that Kate Egan is the same person

as Kate Funk. I also have been informed and do believe that Kate Funk has moved to

and does reside in Denver, Colorado and not in Chicago, Illinois, and has done so for

many years.

4

15.     Once one becomes a resident of the State of Colorado, and desires to hold themselves out as a CPA in Colorado, they must obtain reciprocity and a license from the Board to hold themselves out as a CPA in Colorado. Ms. Funk could not have accomplished this because she had no Kansas permit. According to the Board's website: "To apply for a license in Colorado one must satisfy the following:

*       Holds an active license from a substantially equivalent jurisdiction and/or possesses the requirements necessary for issuance of a license in Colorado.

*       Attests to having completed all CPE required by the other state as of the application receipt date"

Kate Funk formerly known as Kate Egan could not obtain reciprocity because her Kansas certificate is not the equivalent to being a CPA in the State of Colorado.

16.     Kate Funk has no professional CPA credential in Colorado. Therefore, she is not qualified as a CPA to offer opinion testimony on the appropriateness of revenue recognition or other applications of Generally Accepted Accounting Principles (GAAP) and Generally Accepting Auditing Standards (GAAS). I have reviewed an Affidavit drafted containing opinions by Kate Funk regarding revenue recognition and disclosure requirements for FusionPharm, and it is my opinion as a licensed lawyer and licensed inactive CPA in the State of Colorado, that Kate Funk was not qualified to render said opinions in her Affidavit as a CPA and violated Colorado's laws by doing so.

17.     Colorado Revised Statute § 12-2-129 makes it a Class 2 Misdemeanor to use the CPA designation in Colorado when one is not authorized to do so; and a class 6

5

felony for any subsequent offense. Kate Funk appears to have violated this criminal statute.

FURTHER AFFIANT SAYETH NAUGHT.

Steven R. Anderson

6-18-19

Date

STATE OF COLORADO )
) ss.
COUNTY OF Arapahoe. )

Subscribed and sworn to before me by Steven R. Anderson this 18th day of June, 2019.

Witness my official hand and seal.

Notary Public

My commission expires: 8-26-2019

MARCIE J MORTON
NOTARY PUBLIC
STATE OF COLORADO
Notary ID 20034028692
My Commission Expires 08/26/2019

6

460

**EXHIBIT L**

and IRS-CID has acquired additional bank records as additional accounts and transactions have been uncovered. Your affiant has been reviewing these records as part of an ongoing effort to follow the flow of money from the scheme detailed herein.

13.     In addition to my review of the records set forth in ¶ 12, your affiant interviewed two former FusionPharm employees.   On February 17, 2014, CW-1 voluntarily sat for a joint proffer session with your affiant, and representatives from the SEC, IRS-CID, and United States Attorney's Office ("USAO") at the USAO offices in Denver, CO.   CW-1 sat for a second voluntary joint proffer session on February 28, 2014 with your affiant and representatives from the SEC, IRS-CID, and USAO at the USAO offices.   On March 12, 2014, your affiant and IRS-CID Special Agent Ronald Loecker had a follow up meeting with CW-1, at which time CW-1 voluntarily provided your affiant and IRS-CID Special Agent Loecker with e-mail and phone text message communications between CW-1, and Dittman and Sears.   Your affiant reviewed these e-mail and phone text message communications after receipt from CW-1.

14.     As part of your affiant's discussions with CW-1, CW-1 identified a former FusionPharm employee, Cooperating Witness 2 (hereinafter referred to as "CW-2"), who was familiar with various aspects of FusionPharm's business operations from the company's inception, including the accounting and bookkeeping aspects of the business.   On March 5, 2014, your affiant and IRS-CID Special Agent Loecker interviewed CW-2.

15.     As part of his assistance, on or about March 28, 2014, CW-1 introduced Dittman to an FBI undercover agent (hereinafter referred to as "UC-1").   CW-1 introduced UC-1 as a prospective FusionPharm investor.  From March 28, 2014 to May

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK being duly sworn, depose and state the following:

1. I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2. At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3. I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

   a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4. The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

463

38.   In 2011, FusionPharm purportedly focused on two aspects of the organic produce and agriculture market: (1) growing and selling produce (almost always lettuce); and (2) selling PharmPods in the organic produce industry. According to FusionPharm's 2011 Annual Report, FusionPharm claimed to have made $256,895 in revenues during the 2011 fiscal year. Notably, your affiant's review of FusionPharm's 2011 Annual Report reveals $0 in Accounts Receivable, suggesting that any revenue generated by FusionPharm during the 2011 fiscal year (January 1, 2011 through December 31, 2011) should be supported by incoming deposits in FusionPharm's bank accounts.

39.   In the same report, FusionPharm represented to investors that it derived its revenue from organic food sales. FusionPharm touted its relationship with Circle Fresh Farms as its main partner and revenue driver in 2011. Based on your affiant's review of the SEC Produced Records, SEC Analyses, statements by CW-2 and your affiant's independent investigation, FusionPharm did not generate any significant revenue from: (a) Circle Fresh Farms directly; or (b) agriculture-related business. Moreover, it did not generate anywhere close to $256,895 in revenues during the 2011 fiscal year.

40.   FusionPharm reported its "successful harvest and sale of its initial crop through its collaboration agreement with Circle Fresh Farms." Your affiant's review of the SEC's Analyses and the Bank Records reveals only one check from Circle Fresh Farms at any time between 2011 and 2013 across the bank accounts of FusionPharm and the Sears Controlled Entities – for $30.60 in 2012. Accordingly, Circle Fresh Farms did not generate any revenue for FusionPharm in 2011.

20

464

41. Moreover, CW-2 estimated that FusionPharm only made $3,000 - $5,000 in organic produce sales from 2011 through 2013. Your affiant's review of the Bank Records along with the SEC Analyses of the same corroborates the statements made by CW-2. Your affiant found, and the SEC Analyses confirmed, that there was less than $4,000 worth of organic produce sales across the bank accounts of FusionPharm and the Sears Controlled Entities – and those sales were all in 2012 and 2013. Once again, these sales could not be a basis for claimed 2011 revenue.

42. Furthermore, your affiant's review of the Bank Records and the SEC's Analyses regarding the same provide no evidence of any FusionPharm sales of PharmPods to third parties in 2011. Of the almost $600,000 of incoming funds into FusionPharm's bank account in 2011, nearly 100% of the funds can be traced to: (a) the Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. I have reviewed the SEC Analyses of the Bank Records, wherein the SEC was able to trace the majority of cash deposits and cashier's checks directly back to a corresponding withdrawal from one of the accounts for the Sears Controlled Entities for the same dollar amount on the same day. Your affiant's review of the Bank Records confirms these findings.

43. To ensure that payments from third party customers were not made to one of the Sears Controlled Entities, your affiant reviewed the SEC Analyses concerning the incoming wires and deposits into the Sears Controlled Entities' accounts for 2011. Your affiant found no evidence of any FusionPharm PharmPods sales to third parties in 2011 based upon the following: (a) Sears did not open VertiFresh's bank account until 2012; (b) The Meadpoint account only had a single $100 deposit into the account during 2011

21

from another Sears Controlled Entity; and (c) Bayside's account was almost wholly funded from incoming wires and deposits from Microcap.

44. Microcap, meanwhile, received over $1.2 million in incoming wires and deposits in 2011. Of that amount, approximately 99% came from wire transfers. Based on my review of the Bank Records and Brokerage Records, these wire transfers originated from Microcap's brokerage account. The Brokerage Records confirm that nearly all of the money coming into Microcap's brokerage account in 2011 came from sales of FusionPharm common stock. The remaining 1% that came into Microcap's bank account is 2011 was comprised almost entirely of a single deposit from Bayside.

45. As a result, there is no evidence that the money coming into FusionPharm's accounts or the accounts in the name of the Sears Controlled Entities was the result of legitimate sales of produce or PharmPods. Rather, the source of the money appears to the sale of FusionPharm stock, which was then funneled between and among the Sears Controlled Entities.

## MISREPRESENTING SALES REVENUE IN 2012

46. In its 2012 Annual Report, FusionPharm represented that its net revenues for the year ended December 31, 2012 were $808,398 an increase of 250+% compared to 2011. When asked if these figures seemed accurate, CW-2 said this revenue figure was "impossible" as the most revenue that could have come into FusionPharm from PharmPod sales in 2012 was $160,000. CW-2 was aware of only one deal in 2012 to a customer in Arizona for eight PharmPods. CW-2 helped load the PharmPods for delivery. CW-1 said these figures were "bullshit" and "crazy." Based on your affiant's

22

466

review of the Bank Records and SEC Analyses regarding the same, FusionPharm did make anywhere close to $825,594 – or even $160,000 – in revenue in 2012.

47.     In comparison to 2011, the 2012 Annual Report did disclose significant accounts receivable – over $500,000. Accordingly, your affiant and the SEC analyzed the Bank Records to determine if there was evidence to support approximately $300,000 in incoming revenues in 2012.

48.     Based on your affiant's review of the Bank Records and the SEC's Analyses regarding the same, FusionPharm had approximately $400,000 in incoming wires and deposits into its accounts in 2012. As in 2011, nearly 100% of the funds can be traced to: (a) Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. As with 2011, the SEC was able to trace most of the cash deposits back to corresponding cash withdrawals at other Sears Controlled Entities. Your affiant reviewed the Bank Records and the SEC's Analysis on this point and corroborated this conclusion.

49.     The SEC and your affiant also reviewed the Bank Records for the Sears Controlled Entities in 2012. The Meadpoint and VertiFresh accounts in 2012 had a very similar pattern – significant deposits and wires coming in to the accounts from other Sears Controlled Entities with little-to-no evidence of any incoming deposits or wires coming into the account from unaffiliated third parties. Consistent with 2011, the majority of the funds coming in to the VertiFresh and Meadpoint accounts were from Bayside and Microcap. More importantly, your affiant's review of the Bank Records reveals evidence of only one possible third-party sale of a PharmPod, with

23

51.     Based on my review, investigation and analysis above, the money coming into FusionPharm's and the Sear Controlled Entities' bank accounts was ultimately the result of Microcap, selling FusionPharm stock on the open market, and re-circulating portions of those proceeds to the other Sears Controlled Entities.

## RESTATEMENT TO 2012 SALES REVENUE STILL INCLUDES MISREPRESENTATIONS

52.     On April 15, 2014, FusionPharm issued its 2013 Annual Report, which included a restatement of 2012 annual revenue, reversing $500,000 of 2012 revenue. The newly stated revenue with the reversal was $308,398. The restatement clarified that $750,000 of initial claimed revenue was purportedly attributable to an "exclusive licensing arrangement with [VertiFresh] for the use of PharmPods growing technologies for agricultural products."

53.     The restatement claimed that VertiFresh paid $250,000 in 2012 in connection with the purported licensing agreement mentioned above, but that the remaining $500,000 was reflected as revenue in error under GAAP. With the restatement, FusionPharm claimed that it only made an additional $58,398 ($308,398 - $250,000) outside of the licensing revenue from VertiFresh – a figure far more consistent with actual 2012 PharmPod sales based on your affiant's review of the Bank Records, statements made by CW-2 and CW-1 and the SEC's Analyses.

54.     However, based on my review of the SEC Produced Records, the SEC Analyses and your affiant's experience and background in accounting, the reported revenue remains inaccurate for at least three reasons:

25

a. First, as detailed herein ¶¶68-72, nowhere in the Restatement does FusionPharm disclose that VertiFresh is an affiliate owned, operated and controlled by Sears, a FusionPharm control person.

b. Second, even if the revised $250,000 figure could be a legitimate third party transaction, and even if the revenue could be properly recognized under GAAP, FusionPharm misrepresented the basis for possibly recognizing this amount as revenue. In Note 4 to FusionPharm's 2013 Annual Report, FusionPharm claims that "The restatement was based on reevaluating the arrangement with VertiFresh which required $250,000 be paid during 2012 for the licensing of the Colorado territory (on a nonrefundable basis), and the remaining $500,000 to be due in equal installments of $250,000 during 2013 and 2014 for the rights to two additional territories. The initial $250,000 was paid during 2012 and was reflected as earned revenue. Yet, according to the SEC analyses of the Bank Records, and my review of the same, VertiFresh only contributed approximately $128,000 in deposits and wires to FusionPharm in 2012.

c. Third, CW-2 said that FusionPharm did not sell any licenses or receive any licensing income while she worked at FusionPharm, which includes 2012.

## MISREPRESENTING 2013 SALES REVENUE AND BUSINESS DEALS

55.) In its 2013 Annual Report, FusionPharm claimed that it made $594,397 in revenue in 2013. Based on your affiant's review of FusionPharm's 2013 Annual Report, FusionPharm did not have any accounts receivable at the end of 2013. In an email

26

469

conversation with UC-1 on April 30, 2014, Dittman confirmed the 2013 revenue was all from the sale of PharmPods. In a subsequent meeting on May 1, 2014, Dittman stated that FusionPharm delivered 34 PharmPods in 2013.

56.) CW-1 said that it was "impossible" that the company could have earned these revenues in 2013. Although CW-1 only worked at FusionPharm until October 2013, your affiant's comparison of FusionPharm's September 2013 quarterly financial disclosure comparison, which claimed a cumulative revenue figures of $549,725 through the company's third quarter, with the year-end revenue claimed in FusionPharm's 2013 Annual Report, $594,397, reveals that FusionPharm only claimed to make $44,672 in revenue in the last quarter of 2013. Accordingly, the bulk of the revenue purportedly came during the time that CW-1 worked at FusionPharm.

57.) Furthermore, there were only three PharmPods at the warehouse when CW-1 arrived in January 2013: (a) two were used to grow lettuce; and (b) one was not functioning. Additionally, according to CW-1, there were not any deals in place to sell any PharmPods in 2013 when he started. Throughout 2013, CW-1 was responsible for: (a) preparing PharmPods for sales to customers; and (b) constructing the PharmPods kept at the warehouse where FusionPharm would grow cannabis. This meant that any FusionPharm PharmPod 2013 sales required CW-1 to be involved in the refurbishing and retrofitting of the shipping containers prior to delivery. CW-1 did not believe it was possible for FusionPharm to have sold anywhere close to 34 PharmPods while he was employed without his knowledge.

58.) According to CW-1, there were two possible revenue sources in 2013: (a) sales of PharmPods; and (b) sales of marijuana. CW-1 said that the most revenue that

27

could be derived from PharmPod sales in 2013 was $200,000-$250,000 – and CW-1 stated that those figures were a high estimates. CW-1 identified, at most, two possible sales between January – October 2013: (a) FusionPharm sold two PharmPods to a customer in California; and (b) FusionPharm sold five PharmPods to Local Products, a Denver company.[8]

    a. CW-1 said there might have been an additional, single PharmPod sale to Mile High Green Cross in 2013, but he could not be sure. Dittman told CW-1 that FusionPharm "gave away" a PharmPod to Mile High Green Cross so CW-1 was not sure that this could be classified as a "sale." Based on your affiant's review of the Bank Records, Mile High Green Cross did provide funds to Meadpoint – but this was in 2012. There is no evidence that Mile High Green Cross made any payments to FusionPharm or the Sears Controlled Entities in 2013.

59. Based on the statements from CW-1, FusionPharm did not sell more than 7 PharmPods between January – October 2013. Yet FusionPharm continued to make representations to the contrary to the public. For example, on February 6, 2013 the company issued a press release claiming it "completed the sale of 8 PharmPod High Intensity containers under its licensing agreement with Meadpoint Venture Partners." CW-1 said there were multiple problems with this: (a) since Dittman and Sears operated the Sears Controlled Entities and FusionPharm as one entity, this release was basically claiming a sale to itself; and (b) as noted above, CW-1 could recall, at most, 7 PharmPod sales *total* in 2013.

---

[8] As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company. CW-1 has revised that statement to match the sales highlighted in ¶58.

28

60.    Additionally, Sears's company, Meadpoint directly participated in the misrepresentations.  For example, on July 29, 2013, Meadpoint issued a press release that appears on the FusionPharm web page announcing that it "reached the $200,000 mark for sales in the past 30 days, including its first ever sale into the California medical cannabis marketplace."  The press release also claimed that Meadpoint was "optimistic that we will reach our annual sales goal of 100 PharmPods by the end of the year."  CW-1 said that delivering 100 PharmPods to customers in 2013 was "ridiculous" and not even close to actual figures.  Moreover, CW-1 said that the $200,000 figure may have been an annual amount, but certainly not in the last 30 days.  Furthermore, based on affiant's review of the Bank Records, there is no evidence of $200,000 coming in to FusionPharm's or Meadpoint's bank accounts between June 2013 and July 2013 from companies that are not affiliated with Sears or Dittman.

61.    For the second possible revenue stream, FusionPharm grew cannabis and sold it to Groundswell, a licensed marijuana retailer on record with the Medical Marijuana Enforcement Division in Colorado, in the latter part of 2013.

62.    Based on your affiant's review of the Bank Records, SEC's Analyses of the same, and CW-1's statements, there is little evidence that Groundswell made up the remainder of the claimed 2013 revenue.  In fact, there is only one check or incoming wire from Groundswell in 2013: a $50,000 check to FusionPharm on August 15, 2013.

63.    While your affiant observed some significant transactions in the fourth quarter of 2013, Dittman told UC-1 a portion of the December orders were not recognized as revenue because they were not yet delivered.  FusionPharm's 2013

29

472

Annual Report confirms this statement. Importantly, as noted above in ¶56, FusionPharm made, at most, $44,672 in revenue in the last quarter of 2013.

64. For the first three quarters of 2013 when CW-1 worked at FusionPharm, based on your affiant's review of the Bank Records and SEC's Analyses regarding the same, as well as statements from CW-1, there is no evidence that FusionPharm made $549,725 or sold 34 PharmPods.

## ADDRESSING CONCERNS OF CASH PAYMENTS

65. Dittman told UC-1 on May 1, 2014 that one of FusionPharm's vendors made cash payments between 2011 and 2013. In an effort to ensure that cash payments were not dismissed as a potential legitimate revenue source, the SEC conducted an analysis of FusionPharm's bank accounts and the accounts in the name of the Sears Controlled Entities to determine if a conservative analysis of the cash transactions could provide sufficient revenue to match the numbers claimed by FusionPharm in its financial disclosures.

66. Even after including all cash deposits that could not be directly traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account, based on a review of the Bank Records and SEC Analyses regarding the same, your affiant was unable to get anywhere near the revenues that FusionPharm included in the Financial Statements for 2011, 2012 or 2013.

  a. 2011: Your affiant found less than $25,000 worth of incoming deposits and wires that could be considered from unaffiliated third parties.

  b. 2012: Your affiant uncovered approximately $200,000 in incoming wires and deposits. Of that amount, approximately $128,000 came from

30

473

VertiFresh (discussed above in ¶¶ 52-54), approximately $35,000 in cash and approximately $47,000 from Bayside, MeadPoint and a missing check with the notation "container deposit."

c. 2013: Your affiant uncovered approximately $425,000 in incoming wires and deposits in 2013. More than 50% of this amount was cash deposits, with many of these traceable back to Meadpoint. The majority of the remaining checks were from Sears Controlled Entities.

67.    Accordingly, even if it were to be assumed that every cash deposit which could not be traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account was the byproduct of a legitimate, arms-length transaction, the maximum possible revenue under my conservative approach was still more than $100,000 short every year of the revenue claimed by FusionPharm.

## OTHER MISREPRESENTATIONS TO INVESTORS

68.    As noted in ¶¶19-20 above, Sears handled numerous responsibilities at FusionPharm that are often reserved for a company officer. Yet, based on statements from CW-1 and CW-2, Sears refused to put his name on any FusionPharm documents or accounts. Rather, Sears attempted to get FusionPharm employees (including CW-1 and CW-2) to open up bank accounts and businesses in their names.

69.    Based on affiant's review of the FINRA Records, Dittman authored FusionPharm's press releases and reviewed its financial statements. Yet, based on affiant's review of the same, Dittman never made any disclosures about Sears's involvement with FusionPharm or the connection between Sears, the Sears Controlled Entities and FusionPharm.

31

474

Case 1:16-cv-00301-WJM-Document 33-1 Filed 05/14/20 Page 86 of 96
Case 1:16-cv-00301-WJM Document 28-5 Filed 01/30/20 Colorado Page 646 of 699

EXHIBIT
A

Page 93

1  letters or whether they were denoted for a retainer for
2  FusionPharm, I don't recall. But I -- but the import of
3  the statements -- of the statement was that, you know,
4  you're hired, and in my mind it was FusionPharm.
5      Q   Okay.
6          MR. KARPEL:  Kim, let's go off the record for a
7  moment.
8          (Short recess from 10:22 a.m. to 10:28 a.m.)
9          MS. GREER:  Let's go back on the record,
10 please, at 10:28, a.m.
11         BY MS. GREER:
12     Q   Mr. Lehrer, during the break, did we have any
13 substantive conversations about the case?
14     A   No.
15     Q   Going back to the meeting that was held in
16 Orlando between yourself, Mr. Sears, and Mr. Scholz, how
17 long was the meeting?
18     A   Maybe an hour.
19     Q   And was there any legal advice sought during
20 the meeting?
21     A   No. It was very general about the company,
22 what my experience is.
23     Q   And what did -- what did -- what did Mr. Sears
24 say about FusionPharm?
25     A   I really don't recollect.  I mean, it was just

Page 94

1  very general stuff about what the business is.
2      Q   What did he tell you their business was?
3      A   Selling these pharmpods for cultivation.
4      Q   Did Mr. Scholz tell you anything about
5  FusionPharm?
6      A   I don't really recall him saying anything about
7  FusionPharm. He was really there as an introduction to
8  Mr. Sears.
9          MR. KARPEL:  What else do you recall about the
10 meeting? Can you just sort of describe what was said
11 generally?
12         THE WITNESS:  I can't really recall. I mean,
13 it was just very general about what the company did,
14 what its prospects were. That was about it.
15         MR. KARPEL:  Did he talk about the future? Did
16 he talk about what -- you know, what FusionPharm's plans
17 were for expansion or growth, those kinds of things?
18         THE WITNESS:  Well, I think they talked about
19 the opportunity -- he talked about the opportunity in
20 other states where marijuana was medically approved
21 and/or would be recreationally permitted. Again, very
22 general kind of information.
23         MR. KARPEL:  Did he speak about Mr. Dittman at
24 all, the CEO?
25         THE WITNESS:  I believe so, just that he was a

Page 95

1  very competent CEO.
2          MR. KARPEL:  Any more that you recall?
3          THE WITNESS:  No.
4          MR. KARPEL:  Anything about the facilities or
5  what customers? Anything --
6          THE WITNESS:  No.
7          MR. KARPEL:  -- along those lines?
8          THE WITNESS:  Nothing about that.  Generally
9  about what these pharmpods were.
10         MR. KARPEL:  That's what you remember? So
11 talking through this, it's not jogging your memory as to
12 any other parts of the conversation?
13         THE WITNESS:  No.
14         MR. KARPEL:  Okay.
15         BY MS. GREER:
16     Q   Did Mr. Sears indicate that he, through his
17 company, was a shareholder of FusionPharm?
18     A   I don't recall.
19         MR. KARPEL:  And was it at this meeting you
20 talked about a registration statement?
21         THE WITNESS:  Yes.
22         MR. KARPEL:  Can you tell us about that?
23         THE WITNESS:  Yeah.  The information was that
24 the company wanted to do an S-1 registration statement.
25         MR. KARPEL:  It was Mr. Sears who was telling

Page 96

1  you that?
2          THE WITNESS:  Yes.
3          BY MS. GREER:
4      Q   Did you have an understanding as to why
5  FusionPharm wanted to do an S-1?
6      A   Well, yes.  They wanted to become an
7  SEC-reporting company.
8      Q   Do you know an individual by the name of Guy
9  Jean-Pierre?
10     A   Yes.
11     Q   And how do you know Mr. Jean-Pierre?
12     A   I knew him in connection with my ex-wife's
13 practice.
14     Q   Was he a member of your ex-wife's firm?
15     A   No, absolutely not.
16     Q   Can you explain what you mean when you say you
17 knew him in connection with your ex-wife's practice?
18     A   Well, I believe I only met him once, but prior
19 to that, there was -- I believe it had something to do
20 with my ex-wife contesting something about his opinion
21 letters.
22     Q   Do you recall when that happened?
23     A   I think it was around 2007 or 2008.
24     Q   And you said you met him once?
25     A   Yeah.  I can't even recall why I met him, but,

Page 97

1  you know, I found out -- I was with my son, and I found
2  out his office was right there, and I walked in and
3  introduced myself. And I just don't recall what it was,
4  an introduction or I was inquiring about something in
5  particular that my ex-wife had told me to inquire about.
6  This was quite a while ago. I don't recall. And it was
7  an extremely brief, no more than one minute, situation.
8      Q  Did you ever speak with Mr. Jean-Pierre about
9  FusionPharm?
10     A  No, absolutely not.
11     Q  Did you ever become aware at any point that Mr.
12  Jean-Pierre was involved with FusionPharm?
13     A  I don't recall.
14     Q  You don't ever knowing that, or you
15  don't recall either way?
16     A  I really don't recall either way. I mean, it's
17  conceivable, but it's certainly not at the forefront of
18  my mind that he was involved in any way.
19     MR. SALLAH: Is that something you would have
20  remembered, having this prior incident with him, met
21  him, had this, you know, brief incident if his name
22  would have come up in the context of FusionPharm? You
23  would have --
24     THE WITNESS: Yeah, I would have, because at
25  some point I had learned that he had been banned from

Page 98

1  issuing opinion letters.
2      BY MS. GREER:
3      Q  When did you learn that?
4      A  I don't recall. It was probably, you know,
5  just through a computer search, not necessarily in
6  reference to him in particular, you know, but banned
7  opinion writers.
8      Q  Is there a reason that you were doing that
9  search?
10     A  I really don't recall.
11     MR. KARPEL: Did -- did you do that search
12  during the time period that you still represented
13  FusionPharm?
14     THE WITNESS: No.
15     MR. KARPEL: After?
16     THE WITNESS: No, this is way before.
17     MR. KARPEL: Before?
18     THE WITNESS: Yes.
19     MR. KARPEL: Okay. So you know before --
20     THE WITNESS: I believe so.
21     MR. KARPEL: You knew before you began
22  representing FusionPharm that Guy Jean-Pierre had been
23  banned?
24     THE WITNESS: Yes.
25     MR. KARPEL: And ...

Page 99

1      BY MS. GREER:
2      Q  Do you know an individual by the name of Tod
3  DiTommaso?
4      A  Tod DiTommaso? What -- I'm not sure. I think
5  he may have been involved as an officer or one of these
6  shareholders. I'm not sure. I don't recall his name in
7  particular other than perhaps in connection with his
8  opinion letters.
9      Q  I'm sorry. I don't understand that. So you
10  recognize his name or you don't recognize his name?
11     A  I'm thinking perhaps that one of these slices
12  of debt that was sold, that that particular person was
13  representing one of the entities that was trying to free
14  up shares.
15     Q  Okay.
16     A  But I don't -- other than that, I never met the
17  guy, never -- you know, I don't even know --
18     Q  Okay. So I'll represent to you -- we'll get to
19  those -- your attorney opinion letters.
20     A  Yeah.
21     Q  Right. None of those relate -- none of the
22  entities who purchased Bayside debt related to Tod
23  DiTommaso at all. So --
24     A  You're telling me this?
25     Q  I'm telling you this.

Page 100

1      A  Okay. All right.
2      Q  So knowing that, I mean, does --
3      A  No, I --
4      Q  -- do you know his name?
5      A  I don't know his name.
6      Q  And I'll represent to you he's an attorney
7  practicing in California. Does that refresh your
8  recollection or ring any bells?
9      A  Oh, I'm sorry. You mean the gentleman that had
10  issued opinion letters for me?
11     Q  So you do know --
12     A  No, I do.
13     Q  Okay.
14     A  Yeah, because I remember -- I apologize. I
15  didn't get the name right in my mind. I had reviewed an
16  opinion letter that he issued. It was provided to me.
17     Q  Who provided that to you?
18     A  Bill Sears.
19     Q  And when did Mr. Sears provide Mr. DiTommaso's
20  opinion letter to you?
21     A  I don't recall exactly, but it was early on in
22  the engagement.
23     Q  Was it before you drafted and issued your first
24  FusionPharm --
25     A  I believe so --



IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 502011CA007165XXXXMB-AE

BIG APPLE CONSULTING USA, INC.,
a Delaware corporation; BIG APPLE
EQUITIES, LLC., a New York Limited
Liability Corporation, MANAGEMENT
SOLUTIONS INTERNATIONAL, INC.,
a Florida corporation, and MARC JABLON,
an individual,

       Plaintiffs,

vs.

BRENDA LEE HAMILTON, an individual;
HAMILTON & ASSOCIATES LAW GROUP,
P.A., and HAMILTON & LEHRER, P.A.

       Defendants.
_____/

## <u>Declaration</u>

My name is Frederick M. Lehrer. I am a Florida licensed attorney. On or about July 15, 2011, I was assisting Hamilton & Associates Law Group, P.A. in various matters and accepted a telephone call from Leslie Jean Pierre ("L Pierre"), who identified herself as an attorney licensed to practice law in Texas and the niece of Guy Jean-Pierre ("GJP"). L. Pierre informed me that she wished to discuss matters pertaining to a June 15, 2011 letter to the Texas Bar in matter number S00411125140 (hereafter referred to as the "Texas Bar Matter"), a copy of which letter is attached hereto as Exhibit A. L. Pierre told me the following:

1. In or about March or April of 2010, her uncle, Guy Jean-Pierre ("GJP"), asked her for a copy of my driver's license and signature, which he said was required to form a corporation, Complete Legal Solutions, Inc. ("CLS'). GJP also asked L Pierre to assist him with his law firm because he had more legal work than he could do. This work included drafting legal opinions in securities-related matters.

2. L. Pierre advised GJP that she knew nothing about such legal opinions, the SEC, or the OTC Markets. GJP responded, "Don't worry about it". At the conclusion of this conversation, L. Pierre made it clear to GJP that she did not have any experience in securities or corporate law.

3. In compliance with GJP's request, L. Pierre provided GJP with a copy of her driver's license and signature for the purpose of forming CLS. In hindsight, after realizing that her signature has been forged on legal opinions, L. Pierre realized that this was an ill-

advised action on her part. However, at the time she trusted her uncle completely, and never imagined he would violate this trust.

4. L. Pierre had had no further contact with GJP until approximately one year later, when she received notification of the Texas Bar Matter, relating to Brenda Hamilton's concerns about legal opinions that purport to have been authored and signed by L. Pierre under the CLS letterhead. L. Pierre identified those letters as forgeries and L. Pierre did not author or sign them, or authorize GJP or anyone else to sign her name to these letters.

5. L. Pierre called GJP to discuss these circumstances. GHP told L. Pierre said that Ms. Hamilton filed the Texas Bar Matter against him in retaliation against him, which made no sense to L. Pierre. Ms. Hamilton provided L. Pierre with the legal opinions in question and there is no doubt they are forgeries of her signature.

6. L. Pierre confronted GJP about the forged letters, and advised him that she never authorized him to sign her name to the legal opinion letters. In response, GJP told L. Pierre that he thought that she had understood "how things would work." L. Pierre interpreted this remark to be an admission that he her uncle had forged her name to these letters, but explained that he believed she had somehow been complicit in his plan to do so.

7. L. Pierre immediately responded to GJP that he never gave her any idea of "how things would work," and specifically never told her that he would be signing her name to opinion letters. L. Pierre also told him that she never would have agreed to allow him or anyone else to use her signature or name in such a manner.

8. Based on this conversation with GJP, L. Pierre has come to the conclusion that GJP forged her signature to, or used a copy of her signature on the legal opinions that are the subject of the Texas Bar Matter. .

9. Before learning of the Texas Bar Matter, L. Pierre was unaware that OTC Markets had banned GJP from providing any opinion letters to OTC Markets. In hindsight, she has concluded that GJP used her to form CLS because the OTC Markets would not accept any opinion letters authored by his firm, or any new firm he might create, since he had been banned. Instead, he used CLS and L. Pierre's name -- without her knowledge or permission -- to continue sending opinion letters to OTC Markets and evade the ban, by not using his own name.

10. L. Pierre has never had any contact with Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on her behalf. L. Pierre has never provided a copy of her driver's license or signature to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone on his or her behalf. L. Pierre has never provided a legal opinion, or legal opinion bearing her signature, to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf. L. Pierre has never authorized Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf to provide her driver's license or any legal opinion bearing her signature to anyone, including the OTC Markets.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed on August 2, 2011

EXHIBIT

**C**

## DECLARATION OF FREDERICK M. LEHRER

The undersigned, Frederick M. Lehrer, hereby declares that:

1. I am an attorney licensed to practice law in the state of Florida.

2. I am a former attorney with the Division of Enforcement of the US Securities and Exchange Commission and a Special Assistant US Attorney with the United States Attorney's Office for the Southern District of Florida.

3. I have a son, Brandon Lehrer, with my ex-wife, Brenda Hamilton.

4. Since he was born, Brandon has suffered various illnesses, which last for weeks and sometimes more than a month. During May of 2010, Brenda and I were told that our son, Brandon's immune system was not functioning properly, which was particularly traumatic for Brenda because her sister's first son died of a rare immune disorder when he was 3 years of age and her sister's second son recently was diagnosed with Stage 4 nasopharyngeal cancer.

5. Because we were advised by our physician at Miami Children's Hospital that Brandon could literally die from a cold, whenever Brandon was ill, Brenda missed work to care for our son, instead of arranging for a babysitter or other childcare.

6. Shortly after learning of our son's illness, in July of 2010, Brenda learned her mother (now deceased) was diagnosed with cancer of an unknown primary region, a terminal form of cancer with a 100% mortality rate. Brenda also assisted in the care of her mother regarding her illness.

7. Because it was impossible for Brenda to maintain a normal work schedule for almost a year, until her mother's death in late April 2011, as summarized above in 4-6, I provided her with assistance in her work with multiple client matters during such time including her representation of Cloud Centric, Inc. ("Cloud Centric") and David Lovatt ("Lovatt"). At times I provided representation to Cloud Centric and Lovatt including the appropriate steps Cloud Centric should take to correct its prior illegal public disclosures, which are available on the OTCMarkets.com website, which Guy Jean Pierre ("Jean Pierre") and Kimberly Graus ("Graus") opined upon.

8. I substantially assisted in drafting the Cloud Centric remedial disclosures (the "Remedial Disclosures") posted on the OTC Markets website pertaining to Big Apple Consulting and its related corporate egos and control persons (collectively "Big Apple"), including Marc Jablon ("Jablon") which are the subject of the Florida Bar grievance (the "Grievance") filed by Jablon against Brenda.

9. When assisting with the drafting of the Remedial Disclosures, I confirmed ALL of the factual disclosures concerning Big Apple by reviewing executed contracts, publicly available information, filings on www.sunbiz.org & OTC Markets website and Cloud Centric's corporate documents and did not rely upon any factual representations made by Lovatt, Brenda or any other person. I also conducted a legal analysis of the securities law issues related to the matters involving Big Apple and assisted with the drafting of the legal analysis contained within the

Remedial Disclosures.

10.   It is my opinion that the Remedial Disclosures are factually and  legally accurate and are disclosures required by the securities laws.

11.  In December of 2010, I assisted David Lovatt in drafting the bar grievance against Carl N. Duncan for the theft of shares held in escrow by Duncan after Duncan provided me with what I believe are false accountings of Cloud Centric's common shares he purportedly held in Escrow. I also assisted substantially with drafting the grievances filed against Jean Pierre and Graus as well as the UPL grievance concerning Connectyx Technologies, Inc. during the time when Brenda's mother was in the final stages of her cancer.

12.  It is my firm belief that there are no confidential communications of any type (including between Jablon and Brenda), which were disclosed in the Remedial Disclosures because I independently verified the information concerning Big Apple contained within the Remedial Disclosures from publicly available documents from the internet, transfer agent documents,  or contracts and corporate documents provided by Lovatt.

13. I have never spoken with Marc Jablon or anyone at Big Apple about any portion of the information contained within the Remedial Disclosures.

14.  It is my opinion that Brenda's only objective and role in drafting the Remedial Disclosure was to protect the interests of her clients, Cloud Centric and Lovatt and provide truthful disclosure of the public to protect her clients' interests and prevent them from being the subject of an SEC enforcement action based upon improper and illegal disclosures drafted by Big Apple and opined upon by Graus and Jean Pierre, neither understood or undertaken by Cloud Centric and Lovatt.

15. It is a travesty of just that  Brenda has spent more than a year and dedicated literally hundreds of hours defending herself against fabricated allegations made by Jablon during a period of her life when she had devastating personal matters requiring her attention.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed this  16th[h]  day of October 2011

EXHIBIT

D

Private Email <william@williamjsears.com>
To: William Sears
FW: Introduction

September 8, 2015 8:08 AM

---

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:04 AM
**To:** William Sears
**Subject:** Re: Introduction

OK
Thanks

On Wed, Aug 28, 2013 at 1:02 PM, William Sears <william@williamjsears.com> wrote:
No he has not been secretary since the beginning of 2012 when this came to light

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:02 AM
**To:** William Sears
**Subject:** Re: Introduction

Bill

I have reviewed some of the otcmarkets' flings for Fusion Pharm, Inc.

Can you please inform me whether the link below is the same person appointed to Secretary and whether he still is the Secretary?

http://www.sec.gov/litigation/litreleases/2012/lr22562.htm

Thank you

On Wed, Aug 28, 2013 at 10:58 AM, William Sears <william@williamjsears.com> wrote:
Fred,
We will be in town next week. I would love to have lunch to discuss. We are looking to do a form 10 and S1. I assume you have reasonable auditors you work with along with a BD that will do the 2-11 for the BB? The symbol is FSPM. I look forward to meeting next week and have a great holiday.

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted within this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 8:40 AM
**To:** William Sears
**Subject:** Introduction

Bill:

I understand that Rich Scholz has provided you with an introduction to my services. In further explanation, I have some of the lowest rates in the business for registration statements, opinion letters, periodic reports, securities disclosure matters and other securities related matters.

I charge $350 for opinion letters. Because Rich referred you I would lower that amount for you to $250 (most opinion letters are from $500 to $1,250). My hourly rate is $300/hour. I accept low retainers of $2,500. On registration statements, I charge $10,000 to $15,000 plus a block of stock from 200,000 shares to 400,000 shares. All registration statement quotes are open to negotiation. I have a deep regulatory background with 15 years at the SEC and 3 1/2 years as a Special Assistant United States Attorney. My legal practice since 2000 has been predominately in the area of corporate finance. My ultimate goal in any engagement is to provide full and accurate disclosure to the public and the SEC to protect the shareholders and to provide liability protection to the issuer and its officers and directors. Kindly review my website below or my linked in page for further information pertaining to my background and services.

I look forward to discussing these matters with you further and working with you in the future.

Thank you.

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com

EXHIBIT

E

## Page 315

1  Dudley came to you or called you --
2      A   Correct.
3      Q   – and said I've seen Sears in the office
4  every day for the past two months.
5      A   Correct.
6      Q   And at a later point in time, Mr. Dittman
7  told you Sears has nothing to do with FusionPharm and
8  I'd never let him have anything to do with FusionPharm?
9      A   Correct.
10     Q   Do I have the timeline right so far?
11     A   And then Mr. Dudley informed me
12  that pursuant to discussions with Mr. Dittman, that
13  there would not be any disclosure because -- regarding
14  Mr. Sears or Meadpoint being an affiliate because based
15  upon Mr. Dittman's representations, he was not.
16     Q   Did Mr. Dudley express to you any indication
17  that he might not agree with Mr. Dittman's
18  characterization of Mr. Sears' involvement with
19  FusionPharm?
20     A   Only from the standpoint that he saw him
21  there every day.  I really apologize I had too much
22  coffee this morning.
23     Q   Do you need to take a break?
24     A   Yes.
25         MR. LYMAN:  Let's go off the record.

## Page 316

1      (A break was had from 11:04 to 11:10 a.m.)
2         MR. LYMAN:  All right.  Let's go back on the
3  record.
4         BY MR. LYMAN:
5      Q   Mr. Lehrer, while we were on the break, did
6  we have any substantive conversations about the case?
7      A   No.
8      Q   Okay.  In your previous day's testimony we
9  had asked you whether you had an understanding that
10  Meadpoint was one of Bill Sears' companies and you had
11  refused to answer that question on privilege grounds.
12  In light of the agreement we now have with Mr. Sears'
13  counsel, will you now answer whether you were aware
14  that Meadpoint was one of Bill Sears' companies during
15  the time you were issuing Rule 144 letters?
16     A   Yes.
17     Q   And how did you come to be aware of that
18  information?
19     A   In a meeting with Mr. Sears, he told me that
20  he was in control of Meadpoint, but that he was
21  transferring it to a third party unrelated to him or in
22  any family context, including his mother.
23     Q   So when you first had the conversation about
24  Sears' ownership in Meadpoint, he mentioned
25  specifically that he wasn't going to transfer Meadpoint

## Page 317

1  to his mother?
2      A   Very specifically.
3      Q   And was that on your prompting, did you ask
4  him whether he was going to transfer it to his mother
5  or did he just volunteer that particular family member?
6      A   I did ask him.
7      Q   And why his mother?  Why did that come up?
8      A   I don't remember why it came up, you know,
9  were having a conversation back and forth.  And, you
10  know, through questioning or otherwise about whether it
11  was going to be transferred to a family member.  He
12  said, no, it's not going to be transferred to a family
13  member.  And I may have asked him, you know, is it
14  going to be transferred to your wife, to your mother,
15  you know, you're saying it's not going to be
16  transferred to a family member.  Does that include "X"
17  and "Y"?  I don't remember specifically if I asked
18  that, but certainly in the conversation it was
19  communicated to me that it would not be transferred to
20  his mother specifically.
21     Q   Did you ever have an understanding of whether
22  any of the other entities for which you wrote Rule 144
23  opinion letters or which were involved in any of the
24  opinion letters were owned by Mr. Sears' mother?
25     A   Yes.

## Page 318

1      Q   Okay.  And which entities were those?
2      A   When I had that conversation with Mr. Sears
3  in or about April, 2014, when he said he transferred it
4  to his mother.
5      Q   But prior to that, when you had the
6  conversation with Mr. Sears, which I believe you
7  thought was in October, 2013, about him transferring
8  Meadpoint, at that point in time were you aware of any
9  other entities that were owned by, managed by or
10  included as an officer, Mr. Sears' mother?
11     A   No.
12     Q   Okay.  And other than Meadpoint, did you ever
13  become aware of any other entities that were owned by
14  or directed by or had as an officer Mr. Sears' mother?
15     A   No.  Again, apart from that conversation in
16  April, 2014, with Mr. Sears.
17     Q   Okay.  So what about Bayside Realty Holdings,
18  did you ever come to understand that Mr. Sears's mother
19  was involved with that company?
20     A   No.
21     Q   Okay.  But you knew that there was a Sandra
22  Sears who was involved with Bayside?
23     A   My understanding, it was the Sandra Sears
24  that was Bill Sears' wife.
25     Q   Okay.  And what did you understand the person

17 (Pages 315 to 318)

Page 279

1    A   Correct.

2    Q   2013. So the date of the e-mail is October

3    10, 2013. Thank you for that. And at your prior day

4    of testimony we had asked you if you had an engagement

5    letter with Mr. Sears and you said that you did, but we

6    didn't yet have it. So is this document that begins on

7    page Bates number FLWS00291 the engagement letter

8    between you and Mr. Sears?

9    A   Yes, however, I do recall that Mr. Sears

10   signed that document and if in fact, we did not produce

11   that, we produced a copy with the signature of Mr.

12   Sears

13            (SEC Exhibit No. 122 was marked for

14            identification.)

15   BY MR. LYMAN:

16   Q   Let's mark this 122. Exhibit 122, Bates

17   number FLWS00298. And if you take a look at the third

18   page of this document, unfortunately, this doesn't

19   include every page of the agreement, but the third page

20   of this document appears to be the signature page of

21   Mr. Sears.

22   A   That's correct.

23   Q   Okay. And as this was produced it's missing

24   every other page. Any reason to think that this

25   agreement, this signed agreement, is any different from

Page 280

1    the agreement that's attached to Exhibit 121?

2    A   No.

3    Q   The letter is dated October 10, 2013 and it

4    states in the first paragraph, I'm happy that we could

5    agree on mutually acceptable fee agreement. Do you

6    recall what date you reached a mutually acceptable fee

7    agreement with Mr. Sears?

8    A   Presumably, I really don't know. Presumably,

9    it would have been within a couple weeks prior to

10   October 10, 2013.

11   Q   Okay. Did you recall when you first

12   started -- and we looked at some documents in your

13   previous day's testimony, but when you first started

14   performing work at Mr. Sears's request relating to

15   opinion letters touching on FusionPharm stock --

16   A   I apologize, I didn't catch your question.

17   Q   So this is dated October 10, 2013, and I'm

18   wondering if -- you said that you came to a fee

19   agreement maybe a couple weeks before this.

20   A   Right.

21   Q   But your first letter relating to FusionPharm

22   stock was in August of 2013 and my question is: Did

23   you have a fee agreement with him at that point in

24   time?

25   A   No

Page 281

1    Q   And what was the sort of payment arrangement

2    that you had for those first initial opinion letters?

3    A   Well, the payment arrangement was $250 an

4    opinion.

5    Q   And was that ever sort of memorialized in an

6    engagement letter similar to this?

7    A   No. The first meeting with Mr. Sears wa[...]

8    and I think I already testified to this that it was[...]

9    about preparing a registration statement. As a re[...]

10   of the first testimony refreshed my recollection th[...]

11   you know, there were matters prior to that meeting

12   involving those August 28, 2013, opinions. I don't

13   specifically recall the conversations, but it's

14   apparent to me that I did have conversations with him,

15   you know, as a result of my looking at transmittal

16   information regarding those opinion letters.

17   Q   Okay. If we take a look at Exhibit 121, on

18   this second page, it says engagement and scope of legal

19   work. The client hereby retains FML, which is you, to

20   research various issues pertaining to certain

21   disclosure issues and other related matters under the

22   federal securities laws. And then the next sentence

23   says that the scope of the representation shall be

24   limited to that set forth in this agreement. Would

25   writing attorney opinion letters fall under the scope

Page 282

1    of what's described here as your engagement with Mr.

2    Sears?

3    A   Indirectly.

4    Q   And how is that?

5    A   Can I consult with my counsel? I don't know

6    whether I'm getting into any attorney-client privilege.

7    Q   You can consult with your counsel.

8    THE WITNESS: What was the question again?

9    MR. LYMAN: Could you repeat the last

10   question, please

11            (The reporter read back the record.)

12   THE WITNESS: As I said, indirectly.

13   BY MR. LYMAN:

14   Q   And how is that?

15   A   There was an issue involving Meadpoint -- and

16   Mr. Sears affiliation with FusionPharm. He informed me

17   that he was in control of Meadpoint; but that Meadpoint

18   was going to be transferred to an unrelated third

19   party; not a family relationship, not his mother.

20   Q   Who did he say Meadpoint was going to be

21   transferred to?

22   A   He did not. He said it was going to be

23   transferred to an unrelated third party.

24   Q   And -- go ahead?

25   A   There was also discussions about Mr. Sears's

EXHIBIT

F

## Page 283

1   affiliation with FusionPharm and my questioning him in
2   a very detailed fashion, whether he had any kind of
3   control or affiliate relationship with FusionPharm,
4   whether he engaged in any management decisions, whether
5   he had any participation in any shape, form or manner
6   in management decisions. To which he responded,
7   absolutely not. I have nothing to do with management.
8   Those are the issues that were discussed.
9       Q   And did he tell you that he had never had
10  anything to do with management issues at FusionPharm?
11      A   Yes.
12      Q   Did he mention whether his mother, Sandra
13  Sears, had anything to do with FusionPharm?
14      A   Not at that meeting, no.
15      Q   At a subsequent meeting?
16      A   In a telephone conversation.
17      Q   And what did he say to you about that topic?
18      A   I believe that was either in March or April
19  2014; he had informed me that Meadpoint was transferred
20  to his mother. I was shocked to learn that. And I
21  said you informed me that Meadpoint was being
22  transferred to an unrelated third party; not a
23  relative. And that was the substance of that
24  conversation.
25      Q   Why were you shocked to hear that Meadpoint

## Page 284

1   was being transferred to his mother?
2       A   It wasn't -- the statement wasn't that
3   Meadpoint was being transferred to his mother. He said
4   it had been transferred.
5       Q   And why was that shocking?
6       A   It was shocking because during the meeting
7   with him in October, 2013; he said that he was
8   transferring to an unrelated third party, not a
9   relative, including his mother.
10      Q   Did he respond to your expression that that
11  seemed inconsistent with what he had told you in
12  October?
13      A   He may very well have. I can't recall.
14      Q   So when you spoke with him in October, 2013
15  about Meadpoint, he expressed to you or left you with
16  the understanding that Meadpoint was his company at
17  that point?
18      A   Correct.
19      Q   And did he leave you with the impression in
20  March or April of 2014 that Meadpoint was now his
21  mother's company and no longer his company?
22      A   Correct.
23      Q   Did he give you any indication of whether he
24  had any dealings on behalf of Meadpoint after he
25  transferred it to his mother?

## Page 285

1       A   Well, he didn't give me any indication as
2   such, but again, he was acting as a facilitator for
3   these opinions.
4       Q   Do you have an understanding of when he
5   transferred -- when he told you he transferred
6   Meadpoint to his mother?
7       A   As I said, it was in March or April of 2014.
8       Q   Well, I understand that that's when he told
9   you, but do you have a sense of when the transfer
10  actually occurred?
11      A   No, I don't. And if he did, I don't recall,
12  you know, if he gave me a specific date or an
13  approximate time period.
14          MS. GREER:  Going back to the engagement
15  letter that we were just looking at that's part of
16  Exhibit 121, I just want to clarify. This is an
17  engagement letter between yourself and Mr. Sears; is
18  that correct?
19          THE WITNESS:  Yes.
20          MS. GREER:  Does it in any way reflect an
21  engagement between yourself and FusionPharm?
22          THE WITNESS:  No.
23          MS. GREER:  So the reference in this
24  engagement letter to the scope being -- pertaining to
25  certain disclosure issues and other related matters

## Page 286

1   under the federal securities laws, that was solely as
2   it related to your engagement with Mr. Sears?
3           THE WITNESS:  Correct. However, obviously,
4   indirectly, as I testified previously, it would have
5   something to do with my opinion letters.
6           BY MR. LYMAN:
7       Q   What disclosure issues just generally was Mr.
8   Sears interested in you assisting him with, if not
9   related to FusionPharm?
10      A   Having to do with Meadpoint.
11      Q   So Meadpoint disclosures under the federal
12  securities laws?
13      A   As referenced in the FusionPharm obligations.
14      Q   Could you explain that a little bit more?  I
15  didn't follow you.
16      A   Sure. I'm sorry. That was very ambiguous.
17  Okay. The subject of our discussions was Meadpoint.
18  He informed me that he controlled Meadpoint, but he was
19  transferring it to an unrelated party, not his mother,
20  not a family relationship. Coupled with that, what I
21  had raised with him was -- were discussions about
22  whether he had any participation in management of the
23  company.
24      Q   Of FusionPharm or Meadpoint?
25      A   I'm sorry. Of FusionPharm. That although

EXHIBIT
G

Page 317

---

**Page 315**

1    Dudley came to you or —
2      A    Correct.
3      Q    — and said I've seen Sears in the office,
4    every day for the past two months.
5      A    Correct.
6      Q    And at a later point in time, Mr. Dittman
7    told you Sears has nothing to do with FusionPharm and
8    I'd never let him have anything to do with FusionPharm?
9      A    Correct.
10     Q    Do I have the timeline right so far?
11     A    Correct. And then Mr. Dudley informed me
12   that pursuant to discussions with Mr. Dittman, that
13   there would not be any disclosure because -- regarding
14   Mr. Sears or Meadpoint being an affiliate because based
15   upon Mr. Dittman's representations, he was not.
16     Q    Did Mr. Dudley express to you any indication
17   that he might not agree with Mr. Dittman's
18   characterization of Mr. Sears' involvement with
19   FusionPharm?
20     A    Only from the standpoint that he saw him
21   there every day. I really apologize I had too much
22   coffee this morning.
23     Q    Do you need to take a break?
24     A    Yes.
25       MR. LYMAN:  Let's go off the record.

---

**Page 316**

1        (A break was had from 11:04 to 11:10 a.m.)
2        MR. LYMAN:  All right. Let's go back on the
3    record.
4    BY MR. LYMAN:
5      Q    Mr. Lehrer, while we were on the break, did
6    we have any substantive conversations about the case?
7      A    No.
8      Q    Okay. In your previous day's testimony we
9    had asked you whether you had an understanding that
10   Meadpoint was one of Bill Sears' companies and you had
11   refused to answer that question on privilege grounds.
12   In light of the agreement we now have with Mr. Sears'
13   counsel, will you now answer whether you were aware
14   that Meadpoint was one of Bill Sears' companies during
15   the time you were issuing Rule 144 letters?
16     A    Yes
17     Q    And how did you come to be aware of that
18   information?
19     A    In a meeting with Mr. Sears, he told me that
20   he was in control of Meadpoint, but that he was
21   transferring it to a third party unrelated to him or in
22   any family context, including his mother.
23     Q    So when you first had the conversation about
24   Sears' ownership in Meadpoint, he mentioned
25   specifically that he wasn't going to transfer Meadpoint

---

**Page 317**

1    to his mother?
2      A    Very specifically.
3      Q    And was that on your prompting, did you ask
4    him whether he was going to transfer it to his mother
5    or did he just volunteer that particular family member?
6      A    I did ask him.
7      Q    And why his mother? Why did that come up?
8      A    I don't remember why it came up, you know, we
9    were having a conversation back and forth. And, you
10   know, through questioning or otherwise about whether it
11   was going to be transferred to a family member. He
12   said, no, it's not going to be transferred to a family
13   member. And, may have asked him, you know, is it
14   going to be transferred to your wife, you know, your mother,
15   you know, you're saying it's not going to be
16   transferred to a family member. Does that include "X"
17   and "Y", I don't remember, specifically if I asked
18   that, but certainly in the conversation it was
19   communicated to me that it would not be transferred to
20   his mother specifically.
21     Q    Did you ever have an understanding of whether
22   any of the other entities for which you wrote Rule 144
23   opinion letters or which were involved in any of the
24   opinion letters were owned by Mr. Sears' mother?
25     A    Yes.

---

**Page 318**

1      Q    Okay. And which entities were those?
2      A    When I had that conversation with Mr. Sears
3    in or about April, 2014, when he said he transferred it
4    to his mother.
5      Q    But prior to that, when you had the
6    conversation with Mr. Sears, which I believe you
7    thought was in October, 2013, about him transferring
8    Meadpoint, at that point in time were you aware of any
9    other entities that were owned by, managed by or
10   included as an officer, Mr. Sears' mother?
11     A    No.
12     Q    Okay. And other than Meadpoint, did you ever
13   become aware of any other entities that were owned by
14   or directed by or had as an officer Mr. Sears' mother?
15     A    No. Again, apart from that conversation in
16   April, 2014, with Mr. Sears.
17     Q    Okay. So what about Bayside Realty Holdings,
18   did you ever come to understand that Mr. Sears's mother
19   was involved with that company?
20     A    No.
21     Q    Okay. But you knew that there was a Sandra
22   Sears who was involved with Bayside?
23     A    My understanding, it was the Sandra Sears
24   that was Bill Sears' wife.
25     Q    Okay. And what did you understand the person

**Private Email**

To:                    wjsears66@icloud.com
Subject:               FW: Meeting tomorrow



EXHIBIT

H

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Tuesday, October 22, 2013 6:30 AM
**To:** William Sears
**Subject:** Re: Meeting tomorrow

No worries
We will discuss at length during our meeting

On Tue, Oct 22, 2013 at 8:28 AM, William Sears <william@williamjsears.com> wrote:
~~No I do not own Meadpoint any more~~ I do understand however we need to implement practices to ensure not having a conflict regardless

Regards,
Bill Sears

On Oct 22, 2013, at 6:15 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

This will require more drilling down on this subject. That the company is out of state and you own the company only represents a small part of the relevant factors that we need to analyze. The crucial aspects of this will depend on your participation in Fusion Pharm. No worries - we will cover the subject adequately during our meeting.

On Tue, Oct 22, 2013 at 8:06 AM, William Sears <william@williamjsears.com> wrote:
FYI no conflict with Meadpoint as a ~~family member out of state~~ owns the company and it's asserts now
Nevada registration should reflect the change any day now

Regards,
Bill Sears

On Oct 22, 2013, at 6:04 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

I mean Wed...correct?

Do I need to change the conference room reservation for Thursday???

On Tue, Oct 22, 2013 at 8:02 AM, William Sears
<william@williamjsears.com> wrote:
Fred

Meeting for Thursday. I only land at four pm

Regards,
Bill Sears


On Oct 22, 2013, at 6:00 AM, "Lehrer, Fred"
<flehrer@securitiesattorney1.com> wrote:

Plan for tomorrow:

~~Discuss Meadpoint agreement, historical background of your~~
~~relationship with Fusion Pharm, nature of related party~~
~~transaction and appropriate disclosure, plan going forward to~~
~~ensure that you have no participation with management.~~

Review draft registration statement with emphasis on:
(a) Business section, plan of operations, marketing,
distribution, patent information, product information and any
other matters pertaining to the business and operations.
(b) Information and documents needed


Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com;
www.secdefenselaw.com

<fps1@10-22-13.docx>


--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com


--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

# MEADPOINT VENTURE PARTNERS

EXHIBIT

I

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Default | File Date: | 10/24/2011 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0580232011-5 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2015 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20111669192 | Business License Exp: | 10/31/2015 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | INCORP SERVICES, INC. | Address 1: | 3773 HOWARD HUGHES PKWY STE 500S |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89169-6014 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## Officers

☑ Include Inactive Officers

### Manager - SANDRA L SEARS

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Historical | Email: | |

### Manager - SANDRA L SEARS

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Active | Email: | |

## ─ | Actions\Amendments

| | |
|---|---|
| **Action Type:** | Articles of Organization |
| **Document Number:** | 20110759943-21 |
| **File Date:** | 10/24/2011 |

| | |
|---|---|
| **# of Pages:** | 2 |
| **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Initial List |
| **Document Number:** | 20110846367-98 |
| **File Date:** | 11/30/2011 |

| | |
|---|---|
| **# of Pages:** | 1 |
| **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |
| **Document Number:** | 20130084907-14 |
| **File Date:** | 2/7/2013 |

| | |
|---|---|
| **# of Pages:** | 1 |
| **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |
| **Document Number:** | 20130708196-47 |
| **File Date:** | 10/30/2013 |

| | |
|---|---|
| **# of Pages:** | 1 |
| **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |
| **Document Number:** | 20140824744-66 |
| **File Date:** | 12/26/2014 |

| | |
|---|---|
| **# of Pages:** | 1 |
| **Effective Date:** | |

(No notes for this action)

1 something like that. But by saying --
2 　　　MS. GREER: Yeah. I'm just trying to figure
3 out if we have a date or an approximate date.
4 　　　THE WITNESS: I understand that, but by --
5 　　　MR. SALLAH: By doing that, we are -- you
6 know -- because you said at some point you Googled it.
7 　　　THE WITNESS: Correct.
8 　　　MR. SALLAH: Right. And that is not privileged
9 because you're not waiving --
10 　　　THE WITNESS: Right.
11 　　　MR. SALLAH: -- any work product. You're
12 waiving all work product --
13 　　　THE WITNESS: But the characterization of your
14 question is such that it almost implies that you're
15 going to learn the actual communication.
16 　　　MR. SALLAH: Yeah, and the date of the actual
17 communication.
18 　　　MS. GREER: But I --
19 　　　THE WITNESS: The date is not privileged.
20 　　　MS. GREER: But I'm allowed to ask the date.
21 　　　THE WITNESS: I understand that, but you're
22 asking when did I learn about this or something.
23 　　　MR. SALLAH: If you're saying -- I guess -- I
24 guess -- I guess he would be -- it presupposes that a
25 communication took place between the two where one

1 conveyed to the other that they had some kind of a
2 criminal background or one asked the other one if they
3 had some kind of criminal background. And by asking
4 that, it -- it invades that communication. That's my --
5 that's my --
6 　　　MS. GREER: Okay.
7 　　　MR. SALLAH: Do you see what I'm saying?
8 　　　MR. LYMAN: Yeah, but we're not asking about
9 the communication or the context or what else was in the
10 meeting. All we're asking is --
11 　　　MR. SALLAH: Well, I don't know.
12 　　　MR. LYMAN: We know that you have told us that
13 you are aware that Mr. Sears had a criminal conviction
14 for a securities-related matter. And our question is,
15 when did you become aware of that, and there's nothing
16 privileged in that --
17 　　　MR. SALLAH: I think he said --
18 　　　MR. LYMAN: -- information.
19 　　　MR. SALLAH: -- he Googled it. He Googled it
20 and became aware he had a conviction.
21 　　　THE WITNESS: No.
22 　　　MR. SALLAH: He clicked on it, and there was no
23 information.
24 　　　THE WITNESS: That's not what I'm saying.
25 　　　MR. SALLAH: You guys asked if he was aware it

1 was for securities fraud. He didn't say that.
2 　　　THE WITNESS: This is what I'm saying. I'm
3 saying that --
4 　　　MR. SALLAH: See, that's why these privilege
5 issues get -- because it creates is
6 　　　THE WITNESS: If I can sta
7 circle back here. I already provide
8 this Google search. Now, you're a
9 learned, you know, that he had a criminal conviction for
10 securities fraud. I can't answer that question because
11 that's a -- you know --
12 　　　MR. SALLAH: If he says no, it implies that no
13 such communication took place. If he says he can't
14 answer because it's privileged, then it presupposes a
15 communication --
16 　　　THE WITNESS: Exactly.
17 　　　MR. SALLAH: -- took place.
18 　　　MS. GREER: Wait. I think you've already -- I
19 think you've already testified that at some point you
20 knew that.
21 　　　MR. SALLAH: No, not that, that he had a
22 conviction. He found on the Internet and then clicked
23 on it, and he couldn't -- it was like some nonsense.
24 Fred, you testify. I don't want to mischaracterize.
25 　　　THE WITNESS: Okay.

1 　　　MR. SALLAH: What did you find when you Googled
2 it?
3 　　　THE WITNESS: I did the Google search, as I
4 testified before. It went to -- the link, you know -- I
5 mean the facing page said William Sears. Then I went to
6 the link, and it didn't correspond anything about
7 William Sears.
8 　　　Anything else that I may have had about what
9 you're talking about, you know, may have been privileged
10 communications. I'm not going to, you know, tell you
11 what the -- you know, what the substance of that
12 conversation was or --
13 Q　Certainly.
14 A　-- or --
15 Q　I mean, do you know now at this point -- and
16 I'm not asking you how you learned it -- that Mr. Sears
17 had a prior conviction --
18 A　Yes.
19 Q　-- for securities fraud?
20 　　　MR. SALLAH: Now it could invade on our
21 privilege.
22 A　Yes. No. I learned from a newspaper article,
23 you know, after the search warrant.
24 　　　BY MS. GREER:
25 Q　I believe you said this morning, however, you

EXHIBIT

L

1 FusionPharm?

2 A Well, I don't specifically remember, so I don't
3 generally remember.

4 Q And do you recall Mr. Scholz telling you
5 anything about Mr. Sears' connection to any other
6 company?

7 A No.

8 (SEC Exhibit 88 was marked for

9 identification.)

10 BY MS. GREER:

11 Q Mr. Lehrer, I'm handing you what's been marked
12 as Exhibit 88. It's a document with the Bates number
13 FLPA 373 through 374. Do you recognize Exhibit 88?

14 And if you need time to read through it, feel
15 free to take as much time as you need.

16 A Yes, I recognize this.

17 Q And what is Exhibit 88?

18 A It's a communication by e-mail from me to
19 Richard Scholz.

20 Q And are you --

21 A And then --

22 Q Sorry. Go ahead.

23 A And then an e-mail from me to William Sears.

24 Q And the bottom e-mail in the chain that begins
25 on the first page of Exhibit 88 and continues on to the

1 second page of Exhibit 88, was that an e-mail you sent
2 to Mr. Sears first reaching out to him about your legal
3 services?

4 A Yes.

5 Q In your August 28, 2013, e-mail to Mr. Sears,
6 at the -- it starts at the bottom, the first page of
7 Exhibit 88. In the second paragraph, you say: I charge
8 $350 for attorney letters -- sorry -- for opinion
9 letters.

10 A Right.

11 Q Do you see that?

12 A Right.

13 Q And was that, at this time in August of 2013,
14 your normal price for doing opinion letters?

15 A Yes, but there were some that were 250.

16 Q And for those that were 250, how did they --
17 how did they differ from those that were 350?

18 A Negotiation. Negotiation.

19 Q Was there some difference in negotiation or
20 difference in clients between those clients who you
21 charged 250 versus who you charged 350?

22 A Yeah. I mean, there may have been a couple of
23 clients that I got, you know, several opinions that I
24 charged a deal. It would be 250.

25 Q So based more on volume, you would give people

1 a discount?

2 A Well, yeah. No, it was not per se volume. It
3 was negotiation.

4 Q The next sentence of your e-mail to Mr. Sears
5 says: Because Rich referred you, I would lower that
6 amount for you to $250.

7 Do you see that?

8 A Yes.

9 Q And so why were you -- why were you offering to
10 lower Mr. Sears' amount to 250?

11 A It was just a selling point.

12 Q What do you mean by "it was just a selling
13 point"?

14 A Yeah. Well, I had not been retained as of yet
15 and went ahead and, you know, said I'll lower it to 250.

16 Q Prior to sending this e-mail to Mr. Sears about
17 your services, did you do any research about Mr. Sears?

18 A At what point?

19 Q Prior to sending this e-mail --

20 A No.

21 Q -- to Mr. Sears.

22 A No.

23 Q After sending this e-mail to Mr. Sears, did you
24 do any research about Mr. Sears and his background?

25 A On one occasion, yes.

1 Q And when was that?

2 A I honestly do not recall.

3 Q Was it shortly after this time period or --

4 A I don't recall.

5 Q -- 2014?

6 A I don't recall.

7 Q Okay. And what further research did you do
8 about Mr. Sears?

9 A I Googled his name.

10 Q And upon Googling his name, what results did
11 you get?

12 A I had a -- there was a link to some kind of
13 it was a criminal indictment or a conviction or
14 something like that. And when I pressed on the link, it
15 went to information or a document that had nothing to do
16 with William Sears, but it did list it in the link.

17 Q Did you do any further investigation then to
18 try to find what that reference was to a criminal
19 conviction?

20 A No.

21 (Discussion off the record.)

22 A Other than attorney-client privilege.

23 BY MS. GREER:

24 Q Did you become aware at any point that Mr.
25 Sears has a prior conviction for securities fraud?

Page 73

1  MR. SALLAH: Again, to the extent you learned
2  it through a privileged communication with Mr. Sears,
3  that would be privileged. At least that's our position
4  at this point.
5  A  That's correct.
6  MR. KARPEL: Are you willing to tell us the
7  timing of that privileged communication?
8  MR. SALLAH: Yeah. I think we have to tell you
9  the timing of the privileged communication.
10  If you remember. Do you remember when the
11  conversation was, the client that --
12  THE WITNESS: Yeah. I believe in the
13  production there -- well, I'm not sure if there's some
14  communication about -- I don't know the date, but it was
15  the day that I met Mr. Sears in my conference room.
16  MR. KARPEL: So it was before issuing any
17  FusionPharm attorney opinion letters?
18  THE WITNESS: I'm pretty sure it was after.
19  MR. SALLAH: It was the day he met him. He --
20  they had the conversation personally, he remembers.
21  THE WITNESS: No, no, it wasn't the day I met
22  him.
23  MR. SALLAH: No. That's what I'm saying. It
24  was the day you met him.
25  THE WITNESS: Correct.

Page 74

1  MS. GREER: In person.
2  MR. SALLAH: -- a personal conversation --
3  THE WITNESS: Correct.
4  MR. SALLAH: -- he remembers. He just
5  doesn't remember what day. It was after.
6  THE WITNESS: I may be able to determine that
7  by looking at documents. I don't know.
8  MR. SALLAH: Your notepad for DayTimer or
9  something like that?
10  THE WITNESS: No.
11  MR. SALLAH: But you're confident it was after
12  the opinion?
13  THE WITNESS: It was after at least the August
14  opinions. I don't know when it was.
15  BY MS. GREER:
16  Q  Can you be any more specific? Was it 2014?
17  Was it --
18  A  Again --
19  Q  -- the end of 2013?
20  A  -- I do not remember. I would be happy to
21  research the matter to make a determination.
22  MR. KARPEL: Okay. We would appreciate that.
23  But just generally, did -- were -- do you recall, were
24  there any opinion letters relating to FusionPharm that
25  you issued after that conversation that we've been

Page 75

1  talking about?
2  THE WITNESS: Yes.
3  BY MS. GREER:
4  Q  Looking back again at Exhibit 88, the next
5  e-mail up in the chain, sort of in the middle of the
6  first page from yourself. It appears to be back again
7  to Mr. Sears. You say: Bill, did you say you were
8  paying for the opinion letters?
9  Do you see that?
10  A  Yes.
11  Q  And what opinion letters were you referring to
12  there?
13  A  The opinion letters that are in your
14  possession.
15  Q  Okay. And so --
16  A  I mean, there was no -- I didn't note what
17  opinion letters they were but just generally speaking.
18  Q  So at least as of this point, August 28, 2013,
19  you understood that the work that you were discussing
20  with Mr. Sears was to issue attorney opinion letters?
21  A  Yes.
22  Q  And did you understand at this point what
23  company those attorney opinion letters would relate to?
24  A  Yeah, FusionPharm.
25  Q  Okay. And how did you come to learn that those

Page 76

1  attorney opinion letters related to FusionPharm
2  shareholders?
3  A  Through the documents that I was provided.
4  Q  Okay. Prior to that, I mean, did Mr. Scholz
5  say to you -- and, actually, one of the first attorney
6  opinion letters we'll look at when we get to it --
7  A  Yeah.
8  Q  -- is from Mr. Scholz himself.
9  A  Yeah.
10  Q  So did Mr. Scholz say to you, hey, I'm a
11  shareholder of FusionPharm. You know, I have an
12  attorney opinion letter, and there are others that --
13  other FusionPharm shareholders that will need attorney
14  opinion letters?
15  A  No. No. He may very well have talked about an
16  opinion for him individually, but I don't recall a
17  statement to the effect that there will be a bunch of
18  others or any others.
19  Q  And what was your understanding at this point
20  when you -- on August 28, 2013, when you sent the e-mail
21  to Mr. Sears? I mean, what was your understanding as to
22  why Mr. Sears was going to be involved at all in the
23  FusionPharm shareholder attorney opinion letters?
24  A  What was my understanding of the involvement?
25  Q  Why was -- why was Mr. Sears involved, yes.

Page 229

```
 1    Q   There -- so you're saying there may have been
 2  communications with Mr. Dittman that you relied upon in
 3  determining for this opinion letter, February 14, 2014,
 4  Meadpoint's nonaffiliate status?
 5    A   No.  What I'm saying is that I don't have any
 6  specific recollection of having a privileged
 7  communication in the form of a telephone conversation
 8  with Mr. Dittman, but in general it's conceivable that I
 9  did, not necessarily with respect to this particular
10  opinion letter as reflected in Exhibit 115 but perhaps
11  some other --
12         MR. SALLAH:  Just --
13    A   -- opinion letters.
14         MR. SALLAH:  Just show you.
15    A   There was one on March 17, 2014, in written
16  form with Mr. Dittman.
17         BY MS. GREER:
18    Q   That you're asserting privilege over?
19    A   Correct.  And March 24, 2014.
20    Q   And that you're also asserting privilege over?
21    A   Correct.  And --
22         MR. SALLAH:  There's a lot.
23         THE WITNESS:  I'm sorry?
24         MR. SALLAH:  There's a lot.
25         THE WITNESS:  Okay.
```

Page 230

```
 1         MR. SALLAH:  Relative to -- not relative to --
 2         THE WITNESS:  Yeah.  I'm saying generally,
 3  yeah.
 4         MR. SALLAH:  But some of these are just general
 5  questions.
 6         (Discussion off the record.)
 7    A   Another one on April 15, 2014.
 8         BY MS. GREER:
 9    Q   Okay.  And are --
10    A   Another one -- I'm sorry.  Go ahead.
11    Q   Go ahead.
12    A   Another one on the same date.
13    Q   And are those attorney-client privileged
14  communications you had with Mr. Dittman communications
15  that you relied upon in determining that Meadpoint was
16  not an affiliate?
17    A   Let me go back, if I could, please.
18         Yes, but not ...
19         (Discussion off the record.)
20    A   Let me just go back and review this, please.
21         (Discussion off the record.)
22    A   There was a communication on March 24, 2014,
23  with Mr. Dittman having to do with Meadpoint, which is,
24  you know -- had no reference to any particular opinion
25  letter.  There was an April 15, 2014, communication.
```

Page 231

```
 1  That one had to do with the OTC Markets opinion.  There
 2  was another one on April 15, 2014, having to do with the
 3  OTC Markets opinion; April 15th, the same OTC Markets
 4  opinion.
 5         MR. SALLAH:  But they generally ce
 6  the Meadpoint and relationships with ce
 7  Meadpoint?
 8         THE WITNESS:  Well, no, not all of them.
 9         MR. SALLAH:  Not all of them.
10         THE WITNESS:  No.  The March 24th one does, the
11  first April 15, 2014, one does not; the next April 15th
12  one does not; and the next April 15th one does have to
13  do with Meadpoint.
14         BY MS. GREER:
15    Q   And these are all -- these communications are
16  all e-mails over which you're asserting FusionPharm's
17  privilege?
18    A   Yes.
19    Q   Mr. Lehrer, earlier this morning during your
20  testimony, you testified at some point you became aware
21  of Mr. Sears' prior securities fraud conviction,
22  correct?
23    A   Yes.
24    Q   And I think you were struggling to recall
25  exactly when that happened.  Seeing a number of these
```

Page 232

```
 1  opinion letters -- you had the three in the August 2013
 2  timeframe, and then, you know, we've seen a few in early
 3  January and February of 2014.  Having those sort of data
 4  points for time, does that refresh your recollection as
 5  to when you learned that?
 6    A   I'm not sure when I learned that.  It was a
 7  privileged communication.  But it may have been in a
 8  meeting that I had with him in my conference room
 9  downstairs where I live.
10    Q   And do you recall when that meeting took place?
11    A   I believe in preparation for this testimony I
12  had determined an approximate date, but --
13    Q   What's --
14    A   -- I don't recall what it is.  I would
15  certainly --
16    Q   What's that approximate date?
17    A   I don't recall, but can we provide....
18         (Discussion off the record.)
19         MR. SALLAH:  Yeah.  What I'm concerned about
20  is -- what I'm concerned about is, in essence, reverse
21  engineering -- and I know it's not your intention.  I
22  don't think it's your intention -- to try to kind of
23  circumvent the privilege.  Because, again, you're
24  allowed to learn about when privileged communications
25  are, the general -- you know, was it legal advice or
```

EXHIBIT

M

Page 233

1 something like that. But by saying --
2     MS. GREER: Yeah. I'm just trying to figure
3 out if we have a date or an approximate date.
4     THE WITNESS: I understand that, but by --
5     MR. SALLAH: By doing that, we are -- you
6 know -- because you said at some point you Googled it.
7     THE WITNESS: Correct.
8     MR. SALLAH: Right. And that is not privileged
9 because you're not waiving --
10     THE WITNESS: Right.
11     MR. SALLAH: -- any work product. You're
12 waiving all work product --
13     THE WITNESS: But the characterization of your
14 question is such that it almost implies that you're
15 going to learn the actual communication.
16     MR. SALLAH: Yeah, and the date of the actual
17 communication.
18     MS. GREER: But I --
19     THE WITNESS: The date is not privileged.
20     MS. GREER: But I'm allowed to ask the date.
21     THE WITNESS: I understand that, but you're
22 asking when did I learn about this or something.
23     MR. SALLAH: If you're saying -- I guess -- I
24 guess -- I guess he would be -- it presupposes that a
25 communication took place between the two where one

Page 234

1 conveyed to the other that they had some kind of a
2 criminal background or one asked the other one if they
3 had some kind of criminal background. And by asking
4 that, it -- it invades that communication. That's my --
5 that's my --
6     MS. GREER: Okay.
7     MR. SALLAH: Do you see what I'm saying?
8     MR. LYMAN: Yeah, but we're not asking about
9 the communication or the context or what else was in the
10 meeting. All we're asking is --
11     MR. SALLAH: Well, I don't know.
12     MR. LYMAN: We know that you have told us that
13 you are aware that Mr. Sears had a criminal conviction
14 for a securities-related matter. And our question is,
15 when did you become aware of that, and there's nothing
16 privileged in that --
17     MR. SALLAH: I think he said --
18     MR. LYMAN: -- information.
19     MR. SALLAH: -- he Googled it. He Googled it
20 and became aware he had a conviction.
21     THE WITNESS: No.
22     MR. SALLAH: He clicked on it, and there was no
23 information.
24     THE WITNESS: That's not what I'm saying.
25     MR. SALLAH: You guys asked if he was aware it

Page 235

1 was for securities fraud. He didn't say that.
2     THE WITNESS: This is what I'm saying. I'm
3 saying that --
4     MR. SALLAH: See, that's why these privilege
5 issues get -- because it creates issues like this.
6     THE WITNESS: If I can state -- you know,
7 circle back here. I already provided testimony about
8 this Google search. Now, you're asking about whether I
9 learned, you know, that he had a criminal conviction for
10 securities fraud. I can't answer that question because
11 that's a -- you know --
12     MR. SALLAH: If he says no, it implies that no
13 such communication took place. If he says he can't
14 answer because it's privileged, then it presupposes a
15 communication --
16     THE WITNESS: Exactly.
17     MR. SALLAH: -- took place.
18     MS. GREER: Wait. I think you've already, -- I
19 think you've already testified that at some point you
20 knew that.
21     MR. SALLAH: No, not that, that he had a
22 conviction. He found on the Internet and then clicked
23 on it, and he couldn't -- it was like nonsense.
24 Fred, you testify. I don't want to mischaracterize.
25     THE WITNESS: Okay.

Page 236

1     MR. SALLAH: What did you find when you Googled
2 it?
3     THE WITNESS: I did the Google search, as I
4 testified before. It went to -- the link, you know --
5 mean the facing page said William Sears. Then I went to
6 the link, and it didn't correspond anything about
7 William Sears?
8     Anything else that I may have had about what
9 you're talking about, you know, may have been privileged
10 communications. I'm not going to, you know, tell you
11 what the -- you know, what the substance of that
12 conversation was or --
13     Q  Certainly.
14     A  -- or --
15     Q  I mean, do you know now at this point -- and
16 I'm not asking you how you learned it -- that Mr. Sears
17 had a prior conviction --
18     A  Yes.
19     Q  -- for securities fraud?
20     MR. SALLAH: Now it could invade on our
21 privilege.
22     A  Yes. No. I learned from a newspaper article,
23 you know, after the search warrant.
24     BY MS. GREER:
25     Q  I believe you said this morning, however, you

From: **William Sears** william@williamjsears.com.
Subject: FW:
Date: Today at 8:10 AM
To: William Sears wjsears66@icloud.com



**From:** William Sears
**Sent:** Thursday, October 10, 2013 11:04 AM
**To:** Lehrer, Fred
**Subject:** Re:

Hmmmm  One says no one says yes  I think we stay clear till ten years

Regards,
Bill Sears

On Oct 10, 2013, at 10:58 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

http://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm  

http://www.corporatecrimereporter.com/news/200/secexemptsbadactors09192013/

**Item 404 -- Transactions with Related Persons, Promoters and Certain Control Persons**

1. **Transactions with related persons.** Describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transac
   any related person had or will have a direct or indirect material interest. Disclose the following information regarding the transaction:

   1. The name of the related person and the basis on which the person is a related person.
   2. The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership
   3. The approximate dollar value of the amount involved in the transaction.
   4. The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the am
   5. In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstand
      date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which di
   6. Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the

2.

   **Instructions to Item 404(a):**

   1. For the purposes of paragraph (a) of this Item, the term related person means:

      1. Any person who was in any of the following categories at any time during the specified period for which disclosure under paragraph (a) o

         1. Any director or executive officer of the registrant;
         2. Any nominee for director, when the information called for by paragraph (a) of this Item is being presented in a proxy or information
         3. Any immediate family member of a director or executive officer of the registrant, or of any nominee for director when the informat
            election of that nominee for director, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-
            director, and any person (other than a tenant or employee) sharing the household of such director, executive officer or nominee for

      2.

      3. Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest

         1. A security holder covered by Item 403(a); or
         2. Any immediate family member of any such security holder, which means any child, stepchild, parent, stepparent, spouse, sibling, m

            any person (other than a tenant or employee) sharing the household of such security holder.

2. For purposes of paragraph (a) of this Item, a transaction includes, but is not limited to, any financial transaction, arrangement or relationship (in relationships

3. The amount involved in the transaction shall be computed by determining the dollar value of the amount involved in the transaction in question,

    1. In the case of any lease or other transaction providing for periodic payments or installments, the aggregate amount of all periodic payment payments due during or at the conclusion of the lease or other transaction providing for periodic payments or installments; and

    2. In the case of indebtedness, the largest aggregate amount of all indebtedness outstanding at any time since the beginning of the registrant's

4.

5. In the case of a transaction involving indebtedness:

    1. The following items of indebtedness may be excluded from the calculation of the amount of indebtedness and need not be disclosed: Amo business travel and expense payments and for other transactions in the ordinary course of business;

    2. Disclosure need not be provided of any indebtedness transaction for the related persons specified in Instruction 1.b. to paragraph (a) of thi

    3. If the lender is a bank, savings and loan association, or broker-dealer extending credit under Federal Reserve Regulation T (12 CFR part 2 2. of Industry Guide 3, Statistical Disclosure by Bank Holding Companies (17 CFR 229.802(c))), disclosure under paragraph (a) of this It

        1. Were made in the ordinary course of business;

        2. Were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loa

        3. Did not involve more than the normal risk of collectibility or present other unfavorable features.

6.

    1. Disclosure of an employment relationship or transaction involving an executive officer and any related compensation solely resulting fron

        1. The compensation arising from the relationship or transaction is reported pursuant to Item 402; or

        2. The executive officer is not an immediate family member (as specified in Instruction 1 to paragraph (a) of this Item) and such comp executive officer was a named executive officer as that term is defined in Item 402(a)(3), and such compensation had been approved board of directors (or group of independent directors performing a similar function) of the registrant.

    2. Disclosure of compensation to a director need not be provided pursuant to paragraph (a) of this Item if the compensation is reported pursu

7. A person who has a position or relationship with a firm, corporation, or other entity that engages in a transaction with the registrant shall not be

    1. The interest arises only:

        1. From such person's position as a director of another corporation or organization that is a party to the transaction; or

        2. From the direct or indirect ownership by such person and all other persons specified in Instruction 1 to paragraph (a) of this Item, in to the transaction; or

        3. From both such position and ownership; or

    2. The interest arises only from such person's position as a limited partner in a partnership in which the person and all other persons specifie general partner of and does not hold another position in the partnership.

8. Disclosure need not be provided pursuant to paragraph (a) of this Item if:

    1. The transaction is one where the rates or charges involved in the transaction are determined by competitive bids, or the transaction involv with law or governmental authority;

    2. The transaction involves services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar services

    3. The interest of the related person arises solely from the ownership of a class of equity securities of the registrant and all holders of that cla

3.

4. **Review, approval or ratification of transactions with related persons.**

    1. Describe the registrant's policies and procedures for the review, approval, or ratification of any transaction required to be reported under paragra particular circumstances, examples of such features may include, in given cases, among other things:

        1. The types of transactions that are covered by such policies and procedures;

        2. The standards to be applied pursuant to such policies and procedures;

        3. The persons or groups of persons on the board of directors or otherwise who are responsible for applying such policies and procedures; an

        4. A statement of whether such policies and procedures are in writing and, if not, how such policies and procedures are evidenced.

    2. Identify any transaction required to be reported under paragraph (a) of this Item since the beginning of the registrant's last fiscal year where such

not followed

5

**Instruction to Item 404 (b):**

Disclosure need not be provided pursuant to this paragraph regarding any transaction that occurred at a time before the related person became one of the related person became one of the enumerated persons in Instruction 1.a.i., ii., or iii. to Item 404(a)

6. **Promoters and certain control persons.**

1. Registrants that are filing a registration statement on Form S-1 under the Securities Act (Rule 239.11 of this chapter) or on Form 10 under the E: shall:

    1. State the names of the promoter(s), the nature and amount of anything of value (including money, property, contracts, options or rights of amount of any assets, services or other consideration therefore received or to be received by the registrant; and

    2. As to any assets acquired or to be acquired by the registrant from a promoter, state the amount at which the assets were acquired or are to making the determination and their relationship, if any, with the registrant or any promoter. If the assets were acquired by the promoter wi

2. Registrants shall provide the disclosure required by paragraphs (c)(1)(i) and (c)(1)(ii) of this Item as to any person who acquired control of a reg act together for the purpose of acquiring, holding, voting or disposing of equity securities of a registrant, that acquired control of a registrant that Securities Act and Rule 12b-2 under the Exchange Act.

7. Smaller reporting companies. A registrant that qualifies as a "smaller reporting company," as defined by Rule 229.10(f)(1), must provide the following

1. The information required by paragraph (a) of this Item for the period specified there for a transaction in which the amount involved exceeds the last two completed fiscal years;

2. The information required by paragraph (c) of this Item; and

3. A list of all parents of the smaller reporting company showing the basis of control and as to each parent, the percentage of voting securities own

**Instruction to Item 404(d)**

1. Include information for any material underwriting discounts and commissions upon the sale of securities by the smaller reporting compan; controlling person or member of a firm that was or is to be a principal underwriter.

2. For smaller reporting companies information shall be given for the period specified in paragraph (a) of this Item and, in addition, for the f

8.

**Instructions to Item 404:**

1. If the information called for by this Item is being presented in a registration statement filed pursuant to the Securities Act or the Exchange Act, i the registrant's last fiscal year, unless the information is being incorporated by reference into a registration statement on Form S-4, in which case

2. A foreign private issuer will be deemed to comply with this Item if it provides the information required by Item 7.B. of Form 20-F with more de jurisdiction or a market in which its securities are listed or traded.

WE SHOULD AVOID ANY SITUATION THAT IS INTERPRETED AS YOU EXERCISING ANY MANAGEMENT CONTROL WHATSOEVER
**Item 401 – Directors, Executive Officers, Promoters and Control Persons**

1. *Identification of directors.* List the names and ages of all directors of the registrant and all persons nominated or chosen to become directors; indicate a period(s) during which he has served as such; describe briefly any arrangement or understanding between him and any other person(s) (naming such p

*Instructions to Paragraph (a) of Item 401:*

1 Do not include arrangements or understandings with directors or officers of the registrant acting solely in their capacities as such.

2 No nominee or person chosen to become a director who has not consented to act as such shall be named in response to this Item In this regard, ·

3. If the information called for by this paragraph (a) is being presented in a proxy or information statement, no information need be given respectin

4. With regard to proxy statements in connection with action to be taken concerning the election of directors, if fewer nominees are named than the cannot be voted for a greater number of persons than the number of nominees named.

5. With regard to proxy statements in connection with action to be taken concerning the election of directors, if the solicitation is made by persons

other instances, information shall be given as to directors and persons nominated for election or chosen by management to become directors.

2.

3. *Identification of executive officers.* List the names and ages of all executive officers of the registrant and all persons chosen to become executive office and the period during which he has served as such and describe briefly any arrangement or understanding between him and any other person(s) (namin

*Instructions to Paragraph (b) of Item 401*

1. Do not include arrangements or understandings with directors or officers of the registrant acting solely in their capacities as such.
2. No person chosen to become an executive officer who has not consented to act as such shall be named in response to this Item.
3. The information regarding executive officers called for by this Item need not be furnished in proxy or information statements prepared in accord General Instruction G of <u>Form 10-K</u> under the Exchange Act (Rule 249.310 of this chapter); Provided, that such information is furnished in a se Form 10-K.

4.

5. *Identification of certain significant employees.* Where the registrant employs persons such as production managers, sales managers, or research scienti the registrant, such persons shall be identified and their background disclosed to the same extent as in the case of executive officers. Such disclosure n section 13(a) by <u>section 12(g)(2)(G)</u> of such Act immediately prior to the filing of the registration statement, report, or statement to which this Item is

6. *Family relationships.* State the nature of any family relationship between any director, executive officer, or person nominated or chosen by the registra

*Instruction to Paragraph 401 (d):* The term "family relationship" means any relationship by blood, marriage, or adoption, not more remote than first co

7. *Business experience--*

1. *Background.*Background. Briefly describe the business experience during the past five years of each director, executive officer, person nominate 401, including: each person's principal occupations and employment during the past five years; the name and principal business of any corporati or organization is a parent, subsidiary or other affiliate of the registrant. In addition, for each director or person nominated or chosen to become the person should serve as a director for the registrant at the time that the disclosure is made, in light of the registrant's business and structure. If particular areas of expertise or other relevant qualifications. When an executive officer or person named in response to paragraph (c) of this Item 401 shall be included as to the nature of the responsibility undertaken by the individual in prior positions to provide adequate disclosure of his or her competence, which may include, depending upon the circumstances, such specific information as the size of the operation supervised.

2. *Directorships.*Indicate any other directorships held, including any other directorships held during the past five years, held by each director or per section 12 of the Exchange Act or subject to the requirements of section 15(d) of such Act or any company registered as an investment company

8.

*Instruction to Paragraph (e) of Item 401.*

For the purposes of paragraph (e)(2), where the other directorships of each director or person nominated or chosen to become a director include directo <u>Item 22(a)</u> of Schedule 14A under the Exchange Act, the registrant may, rather than listing each such investment company, identify the fund complex a

9. *Involvement in certain legal proceedings.* Describe any of the following events that occurred during the past ten years and that are material to an evalua registrant:

1. A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer was partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at o
2. Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and oth
3. Such person was the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent juris

1. Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverag associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person engaging in or continuing any conduct or practice in connection with such activity;
2. Engaging in any type of business practice; or
3. Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of Fede

4. Such person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority described in paragraph (f)(3)(i) of this section, or to be associated with persons engaged in any such activity;

5. Such person was found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities suspended, or vacated;

6. Such person was found by a court of competent jurisdiction in a civil action or by the Commodity Futures Trading Commission to have violated Commission has not been subsequently reversed, suspended or vacated;

7. Such person was the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently

   1. Any Federal or State securities or commodities law or regulation; or
   2. Any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent inju or removal or prohibition order; or
   3. Any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

8. Such person was the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory orga defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization

10.

*Instructions to Paragraph (f) of Item 401:*

1. For purposes of computing the ten-year period referred to in this paragraph, the date of a reportable event shall be deemed the date on which the judgments, or decrees have lapsed. With respect to bankruptcy petitions, the computation date shall be the date of filing for uncontested petition

2. If any event specified in this paragraph (f) has occurred and information in regard thereto is omitted on the grounds that it is not material, the rep before definitive materials are filed in preliminary filing is not required, pursuant to Rule 14a-6 or 14c-5 under the Exchange Act), as supplemen which the omission relates, a description of the event and a statement of the reasons for the omission of information in regard thereto.

3. The registrant is permitted to explain any mitigating circumstances associated with events reported pursuant to this paragraph.

4. If the information called for by this paragraph (f) is being presented in a proxy or information statement, no information need be given respectin

5. This paragraph (f)(7) shall not apply to any settlement of a civil proceeding among private litigants.

11.

12. *Promoters and control persons.*

   1. Registrants, which have not been subject to the reporting requirements of section 13(a) or 15(d) of the Exchange Act for the twelve months imm which had a promoter at any time during the past five fiscal years, shall describe with respect to any promoter, any of the events enumerated in p or investment decision.

   2. Registrants, which have not been subject to the reporting requirements of section 13(a) or 15(d) of the Exchange Act for the twelve months imm describe with respect to any control person, any of the events enumerated in paragraphs (f)(1) through (f)(6) of this section that occurred during

13

*Instructions to Paragraph (g) of Item 401:*

1 Instructions 1. through 3. to paragraph (f) shall apply to this paragraph (g).

2. Paragraph (g) shall not apply to any subsidiary of a registrant which has been reporting pursuant to section 13(a) or 15(d) of the Exchange Act f

14.

## Regulatory History

47 FR 11401, Mar. 16, 1982, as amended at 47 FR 55665, Dec. 13, 1982; 48 FR 19874, May 3, 1983; 49 FR 32763, Aug. 16, 1984; 52 FR 48982, Dec. 29, 1 18788, 18817, Apr. 16, 2003; 68 FR 36636, 36663, June 18, 2003, 68 FR 66992, Nov. 28, 2003; 70 FR 1506, 1594, Jan. 7, 2005; 71 FR 53158, 53241, Sept.

Return to top

**Previous · Contents · Next**

1.

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_ENotice@cod.uscourts.gov
Bcc:
--Case Participants: Tonya Shotwell Andrews (caseview.ecf@usdoj.gov,
charisha.cruz@usdoj.gov, elizabeth.young2@usdoj.gov, jasmine.zachariah@usdoj.gov,
jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov,
laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, tonya.andrews@usdoj.gov,
usaco.ecfcivil@usdoj.gov, usaco.ecffluatty@usdoj.gov), Peter R. Bornstein
(jwolf@prblegal.com, pbornstein@prblegal.com), Robert M. Brown (caseview.ecf@usdoj.gov,
michaela.keiter@usdoj.gov, robert.brown5@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Andres
Rene Guevara (andres@guevaracoloradolaw.com), Marci Gilligan LaBranche
(labranche@sslhlaw.com, rodriguez@sslhlaw.com), Jeremy S. Sibert (caseview.ecf@usdoj.gov,
jeremy.sibert@usdoj.gov, michaela.keiter@usdoj.gov, usaco.ecfcriminal@usdoj.gov), Judge
William J. Martinez (deborah_hansen@cod.uscourts.gov, jamie_h_hubbard@cod.uscourts.gov,
jenna_grambort@cod.uscourts.gov, martinez_chambers@cod.uscourts.gov,
theresa_sauer@cod.uscourts.gov)
--Non Case Participants: Michael Evan Sander
(docketalarm-ecf-admin-0@inbound.docketalarm.com), Probation-General
(cod_efiling@cod.uscourts.gov), USM Warrants Division (jonathan.walker@usdoj.gov,
usms.cod-warrants@usdoj.gov), USM-Criminal Division (gillian.fleck@usdoj.gov,
jason.brackett@usdoj.gov, justin.kellogg@usdoj.gov, katrina.crouse@usdoj.gov,
royce.namoca@usdoj.gov, usms.cod-criminal@usdoj.gov)
--No Notice Sent:

Message-Id:7425116@cod.uscourts.gov
Subject:Activity in Case 1:16-cr-00301-WJM USA v. Sears et al Order on Motion to Dismiss
```
Content–Type: text/html

## U.S. District Court – District of Colorado

### District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 2/3/2020 at 11:55 AM MST and filed on 2/3/2020

| | |
|---|---|
| **Case Name:** | USA v. Sears et al |
| **Case Number:** | 1:16–cr–00301–WJM |
| **Filer:** | |
| **Document Number:** | 207(No document attached) |

**Docket Text:**
 ORDER as to William J. Sears (1) striking Defendant's Motion for Dismissal of Charges with Prejudice for Lack of Jurisdiction [206] As the Defendant, Mr. Sears has the right to have counsel appointed to represent him or he has the right to represent himself, but he does not have the right to hybrid representation. *United States v. Hill*, 526 F.2d 1019, 1025 (10th Cir. 1975). Because Defendant continues to be represented by counsel, he cannot be represented and still continue to file motions on his own behalf. Accordingly, ECF No. 206 is STRICKEN. SO ORDERED by Judge William J. Martinez on 2/3/2020. Text Only Entry (wjmsec, )

**1:16–cr–00301–WJM–1 Notice has been electronically mailed to:**

Peter R. Bornstein     pbornstein@prblegal.com, jwolf@prblegal.com

Robert M. Brown     Robert.Brown5@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, michaela.keiter@usdoj.gov

Marci Gilligan LaBranche     labranche@sslhlaw.com, rodriguez@sslhlaw.com

Andres Rene Guevara     andres@guevaracoloradolaw.com

Jeremy S. Sibert     Jeremy.Sibert@usdoj.gov, CaseView.ECF@usdoj.gov, USACO.ECFCriminal@usdoj.gov, michaela.keiter@usdoj.gov

Tonya Shotwell Andrews     Tonya.Andrews@usdoj.gov, CaseView.ECF@usdoj.gov, Elizabeth.Young2@usdoj.gov, USACO.ECFFLUATTY@USDOJ.GOV, charisha.cruz@usdoj.gov, jasmine.zachariah@usdoj.gov, jason.haddock@usdoj.gov, jody.gladura@usdoj.gov, krystel.garcia@usdoj.gov, laura.hurd@usdoj.gov, sheri.gidan@usdoj.gov, usaco.ecfcivil@usdoj.gov

**1:16–cr–00301–WJM–1 Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.     WILLIAM J. SEARS,

        Defendant.

_____

**UNITED STATES' MOTION TO AMEND THE PRELIMINARY ORDER OF
FORFEITURE AGAINST DEFENDANT WILLIAM J. SEARS**
_____

COMES NOW the United States of America, by and through United States Attorney Jason R. Dunn and Assistant United States Attorney Tonya S. Andrews, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and Rule 32.2 of the Federal Rules of Criminal Procedure, and moves this Court to enter an Amended Preliminary Order of Forfeiture.

**I.    Procedural Background**

1.    In the two-count Information in this case, the United States sought forfeiture of numerous direct assets, substitute assets, and a personal money judgment against Defendant William J. Sears, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). (Doc. 1).

2.    On November 14, 2016, Defendant Sears entered into a plea agreement with the United States. (Doc. 56).

1

3.      The Plea Agreement provided, *inter alia*, that Defendant Sears agreed to plead guilty to Counts One and Two of the Information, charging violations of 18 U.S.C. § 371 and 26 U.S.C § 7206(1), and further agreed to the forfeiture of the subject property and the issuance of a money judgment.

4.      Pursuant to the Plea Agreement, the Court entered a Preliminary Order of Forfeiture on February 13, 2019 (Doc. 132), forfeiting to the United States any and all of Defendant William J. Sears's right, title, and interest in the following property:

1)    Direct assets:

a.    $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

b.    $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

c.    $8,462,621.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

d.    $250,000.00 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.

2)    Substitute assets:

a.    $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b.    Any monetary value Defendant Sears realizes in the future from his interest in FusionPharm, Inc.[1]

5.      In addition, the Court entered a Personal Money Judgment against Defendant Sears in the amount of $1,914,049.49.

---

[1] The United States is presently unaware of any funds realized by Defendant Sears from the dissolution of FusionPharm, Inc.

6.      On January 30, 2020, the Court entered restitution payable to the Internal Revenue Service in relation to Count Two in the amount of $2,433,818.00.

7.      Per the plea agreement, the parties agreed that funds seized and sought to be forfeited from the Moors and Cabot Trust would be applied to Defendant William J. Sears's restitution to the Internal Revenue Service.

8.      The seized funds are currently held in the custody of the United States Marshals Service.  Restitution payments are made payable to the Clerk of the Court.

9.      In light of the above, the United States seeks an amended Preliminary Order of Forfeiture, reducing the amount to be forfeiture from the Moors and Cabot Trust account by the amount order to be applied to restitution, of the following assets:

    1)    Direct assets:

        a.    $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

        b.    $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

        c.    $6,028,803.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

        d.    $250,000.00 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.

    2)    Substitute assets:

        c.    $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

        d.      Any monetary value Defendant Sears realizes in the future from his interest in FusionPharm, Inc.[2]

3)      a Personal Money Judgment against Defendant Sears in the amount of $1,914,049.49.

10.    The United States further seeks an order, directing the United States Marshals Service remit $2,433,818.00 seized from the Moors and Cabot Trust account to the Clerk of the Court to be applied to the restitution ordered in this case.

11.    Moreover, pursuant to Fed. R. Crim. P. 32.2(b)(4), the Preliminary Order of Forfeiture became final at sentencing as to defendant William J. Sears. However, the order remains preliminary as to third parties.  Pursuant Fed. R. Crim. P. 32.2(b)(6), the United States must perfect notice to third parties.

12.    The United States will move for a Final Order of Forfeiture after noticing to third parties is complete, approximately ninety days from the date of filing of this motion. The United States will notify the Court if additional noticing is necessary.

WHEREFORE, the United States moves this Court to enter the Amended Preliminary Order of Forfeiture herewith, for the reasons set forth above.

DATED this 4th day of February, 2020.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:    s/ Tonya Andrews
        Tonya S. Andrews
        Assistant U.S. Attorney
        U.S. Attorney's Office
        1801 California Street, Ste. 1600
        Denver, Colorado 80202

---

[2] The United States is presently unaware of any funds realized by Defendant Sears from the dissolution of FusionPharm, Inc.

Telephone: (303) 454-0100
E-mail: tonya.andrews@usdoj.gov
*Attorney for the United States*

## CERTIFICATE OF SERVICE

     I hereby certify that on this 4th day of February, 2020, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notice to all counsel of record.

*s/* _____
FSA Paralegal
Office of the U.S. Attorney

509

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-00301-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.     WILLIAM J. SEARS,

      Defendant.

_____

**AMENDED PRELIMINARY ORDER OF FORFEITURE**
_____

THIS MATTER comes before the Court on the United States' Motion for Amended Preliminary Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. The Court having read said Motion and being fully advised in the premises finds:

On November 14, 2016, defendant William J. Sears was charged by Information in Count One with conspiracy to defraud the United States and one of its agencies, violation of 18 U.S.C. § 371; and with willfully making a false declaration under the penalty of perjury, in violation of 26 U.S.C. § 7206(1). (Doc. 43). The Information also sought forfeiture against defendant Sears, pursuant to 18 USC § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of numerous assets, including a money judgment, that constituted or derived from gross proceeds traceable to the commission of the offense charged in Count One of the Information or property traceable to such property. (Doc. 43).

On November 14, 2016, the United States and defendant William Sears entered

1

into a Plea Agreement, which provides a factual basis and cause to issue a forfeiture

order and issue a personal money judgment under 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c) and Rule 32.2 of the Federal Rules of Criminal Procedure. (Doc. 56).

Defendant William Sears obtained $10,810,916.90 of the 12,204,172.00 in

FusionPharm, Inc. stock sales proceeds, personally, or through accounts he controlled.

The requisite nexus exists between the conspiracy to defraud offense to which

defendant William Sears pleaded guilty, and the following directly traceable assets:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $6,028,803.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.

Defendant William Sears has an interest in the following substitute assets, which

are subject to forfeiture:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc.

Prior to the disposition of the assets, the United States, or its designated sub-

custodian, is required to seize the forfeited property and provide notice to any third

parties pursuant to 21 U.S.C. § 853(n).

On January 30, 2020, the Court ordered defendant William J. Sears to pay restitution in the amount of $2,433,818.00 to the Internal Revenue Service.

The parties have agreed that funds seized from the Moors and Cabot Trust account shall be applied to the restitution ordered against defendant William J. Sears.

THEREFORE, IT IS ORDERED, DECREED AND ADJUDGED:

THAT defendant William Sears's interest in:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $6,028,803.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado

is forfeited to the United States in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c);

THAT defendant William Sears' interest in:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc

is forfeited to the United States in accordance with 21 U.S.C. § 853(p) as substitute

assets.

THAT the United States is directed to seize the property subject to forfeiture, and further to make its return as provided by law;

THAT the United States Marshals Service shall remit $2,433,818.00 seized from the Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee to the Clerk of the Court to be applied to the restitution ordered in this case.

THAT the United States shall publish notice of this Amended Preliminary Order of Forfeiture in accordance with Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, via a government website for at least thirty consecutive days, and to make its return to this Court that such action has been completed;

THAT upon adjudication of all third-party interests, if any, the Court will enter a Final Order of Forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and Rule 32.2(c)(2) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

THAT a Personal Money Judgment against defendant William J. Sears in the amount of $1,914,049.49 in United States currency shall be entered in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

THAT pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, upon entry of this Amended Preliminary Order of Forfeiture, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate or dispose of

4

forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, pursuant to Rule 45 of the Federal Rules of Civil Procedure.

THAT pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), this Amended Preliminary Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.

THAT the Court shall retain jurisdiction to enforce this Order and adjudicate the interests of all third-parties in ancillary proceedings. Fed. R. Crim. P. 32.2(c)(1).

THAT this Amended Preliminary Order of Forfeiture may be amended pursuant to Rule 32.2(e)(1) of the Federal Rules of Criminal Procedure.

SO ORDERED this _____ day of _____, 2019

BY THE COURT:

_____
HONORABLE WILLIAM J. MARTÍNEZ
United States District Court Judge

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 16-cr-301-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. **WILLIAM J. SEARS**,

Defendant.

_____

**AMENDED PRELIMINARY ORDER OF FORFEITURE**
_____

THIS MATTER comes before the Court on the United States' Motion for
Amended Preliminary Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of
Criminal Procedure. The Court having read said Motion and being fully advised in the
premises finds:

On November 14, 2016, Defendant William J. Sears was charged by Information
in Count One with conspiracy to defraud the United States and one of its agencies,
violation of 18 U.S.C. § 371; and with willfully making a false declaration under the
penalty of perjury, in violation of 26 U.S.C. § 7206(1). (Doc. 43). The Information also
sought forfeiture against defendant Sears, pursuant to 18 USC § 981(a)(1)(C) and 28
U.S.C. § 2461(c), of numerous assets, including a money judgment, that constituted or
derived from gross proceeds traceable to the commission of the offense charged in
Count One of the Information or property traceable to such property. (Doc. 43).

On November 14, 2016, the United States and Defendant William Sears entered

1

into a Plea Agreement, which provides a factual basis and cause to issue a forfeiture

order and issue a personal money judgment under 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c) and Rule 32.2 of the Federal Rules of Criminal Procedure. (Doc. 56).

Defendant William Sears obtained $10,810,916.90 of the 12,204,172.00 in

FusionPharm, Inc. stock sales proceeds, personally, or through accounts he controlled.

The requisite nexus exists between the conspiracy to defraud offense to which

Defendant William Sears pleaded guilty, and the following directly traceable assets:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $6,028,803.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado.

Defendant William Sears has an interest in the following substitute assets, which

are subject to forfeiture:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc.

Prior to the disposition of the assets, the United States, or its designated sub-

custodian, is required to seize the forfeited property and provide notice to any third

parties pursuant to 21 U.S.C. § 853(n).

On January 30, 2020, the Court ordered Defendant William J. Sears to pay

restitution in the amount of $2,433,818.00 to the Internal Revenue Service.

The parties have agreed that funds seized from the Moors and Cabot Trust

account shall be applied to the restitution ordered against Defendant William J. Sears.

THEREFORE, IT IS ORDERED, DECREED AND ADJUDGED:

THAT Defendant William Sears's interest in:

1) $27,066.23 in United States currency seized from Wells Fargo Bank Account No. 6020559917, held in the name of Meadpoint Venture Partners;

2) $9,455.56 in United States currency seized from Wells Fargo Bank Account No. 7784731577, held in the name of Sandra L. Sears;

3) $6,028,803.25 in United States currency seized from Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; and

4) $250,000 in United States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado

is forfeited to the United States in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

§ 2461(c);

THAT Defendant William Sears' interest in:

a. $147,724.38 realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; and

b. Any monetary value he realizes in the future from his interest in FusionPharm, Inc

is forfeited to the United States in accordance with 21 U.S.C. § 853(p) as substitute

assets.

THAT the United States is directed to seize the property subject to forfeiture, and further to make its return as provided by law;

THAT the United States Marshals Service shall remit $2,433,818.00 seized from the Moors and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee to the Clerk of the Court to be applied to the restitution ordered in this case.

THAT the United States shall publish notice of this Amended Preliminary Order of Forfeiture in accordance with Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, via a government website for at least thirty consecutive days, and to make its return to this Court that such action has been completed;

THAT upon adjudication of all third-party interests, if any, the Court will enter a Final Order of Forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and Rule 32.2(c)(2) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

THAT a Personal Money Judgment against Defendant William J. Sears in the amount of $1,914,049.49 in United States currency shall be entered in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

THAT pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, upon entry of this Amended Preliminary Order of Forfeiture, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate or dispose of

4

forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, pursuant to Rule 45 of the Federal Rules of Civil Procedure.

THAT pursuant to Federal Rule of Criminal Procedure 32.2(b)(4), this Amended Preliminary Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment.

THAT the Court shall retain jurisdiction to enforce this Order and adjudicate the interests of all third-parties in ancillary proceedings. Fed. R. Crim. P. 32.2(c)(1).

THAT this Amended Preliminary Order of Forfeiture may be amended pursuant to Rule 32.2(e)(1) of the Federal Rules of Criminal Procedure.

Dated this 10th day of February, 2020.

BY THE COURT:

William J. Martinez
United States District Judge

AO 245B (Rev. 02/18)    Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

District of Colorado

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| | ) | |
| WILLIAM J SEARS | ) | Case Number:    1:16-cr-00301-WJM-1 |
| | ) | USM Number:    56353-054 |
| | ) | |
| | ) | Peter R. Bornstein |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)    1-2 of the Information

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Defraud the U.S. and Commit Offenses | 7/18/2014 | 1 |
| 26 U.S.C. § 7206(1) | Filing False Income Tax Return | 4/15/2012 | 2 |

    The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____    ☐ is    ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

January 30, 2020
Date of Imposition of Judgment

Signature of Judge

William J. Martinez, United States District Judge
Name and Title of Judge

February 10, 2020
Date

AO 245B (Rev. 02/18) Judgment in Criminal Case

|  | Judgment — Page 2 of 7 |

DEFENDANT: WILLIAM J SEARS
CASE NUMBER: 1:16-cr-00301-WJM-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **sixty (60) months as to Count 1 and thirty-xix (36) months as to Count 2, for a total term of ninety-six (96) months incarceration.**

☒ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends the defendant be given full credit for time served in presentence confinement. The Court further recommends the defendant be designated to a facility in the District of Colorado appropriate to his security designation.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 02/18) Judgment in Criminal Case

| | | Judgment — Page | 3 | of | 7 |
|---|---|---|---|---|---|

DEFENDANT: WILLIAM J SEARS
CASE NUMBER: 1:16-cr-00301-WJM-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **three (3) years as to Count 1, one (1) year as to Count 2, concurrent.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Case 1:16-cr-00301-WJM Document 237-1 Filed 05/14/20 USDC Colorado Page 4 of 7
Case 1:16-cr-00301-WJM Document 233 Filed 02/16/20 Page 4 of 7

AO 245B (Rev. 02/18) Judgment in Criminal Case

| | Judgment — Page | 4 | of | 7 |

DEFENDANT: WILLIAM J SEARS
CASE NUMBER: 1:16-cr-00301-WJM-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B (Rev. 02/18) Judgment in Criminal Case

Judgment — Page ___5___ of ___7___

DEFENDANT: WILLIAM J SEARS
CASE NUMBER: 1:16-cr-00301-WJM-1

# SPECIAL CONDITIONS OF SUPERVISION

1. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.
2. You must provide the probation officer access to any requested financial information and authorize the release of any financial information until all financial obligations imposed by the court are paid in full.
3. As directed by the probation officer, you must apply any monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation in this case.
4. If the judgment imposes a financial penalty/restitution, you must pay the financial penalty/restitution in accordance with the Schedule of Payments sheet of this judgment. You must also notify the court of any changes in economic circumstances that might affect your ability to pay the financial penalty/restitution.
5. If you have an outstanding financial obligation, the probation office may share any financial or employment documentation relevant to you with the Asset Recovery Division of the United States Attorney's Office to assist in the collection of the obligation.
6. You must comply with all legal obligations associated with the Colorado Department of Revenue and the Internal Revenue Service regarding federal and state income taxes. This includes resolution of any tax arrearages as well as continued compliance with federal and state laws regarding the filing of taxes.
7. You must document all income and compensation generated or received from any source and must provide that information to the probation officer as requested.
8. You must not cause or induce anyone to conduct any financial transaction on your behalf or maintain funds on your behalf.
9. You must not engage in an occupation, business, profession, or volunteer activity that would require or enable you to solicit for funds without the prior approval of the probation officer.
10. You must not be employed by any family member or known associate without permission of the probation officer.
11. All employment for the defendant shall be approved in advance by the supervising probation officer and you must not engage in any business activity unless approved by the probation officer. All approved business activity must operate under a formal, registered entity, and you must provide the probation officer with the business entities and their registered agents. You must maintain business records for any approved business activity and provide all documentation and records as requested by the probation officer.
12. You must not engage in employment in which you would solicit funds for investment or employment that would permit you to have custody and/or control over investor funds, and you must not be the signatory on any accounts possessing investor funds
13. You must maintain separate personal and business finances and must not co-mingle personal and business funds or income in any financial accounts, including but not limited to bank accounts and lines of credit.
14. You must participate in and successfully complete a program of testing and/or treatment for substance abuse, as approved by the probation officer, until such time as you are released from the program by the probation officer. You must abstain from the use of alcohol or other intoxicants during the course of treatment and must pay the cost of treatment as directed by the probation officer.
15. You must participate in and successfully complete a program of mental health treatment, as approved by the probation officer, until such time as you are released from the program by the probation officer. You must pay the cost of treatment as directed by the probation officer.
16. You must remain medication compliant and must take all medications that are prescribed by your treating psychiatrist. You must cooperate with random blood tests as requested by your treating psychiatrist and/or supervising probation officer to ensure that a therapeutic level of your prescribed medications is maintained.
17. The defendant is prohibited from making any public postings with respect to or showing any depiction or image of Agent Funk or her family.

AO 245B (Rev. 02/18) Judgment in Criminal Case

| | Judgment — Page 6 of 7 |
|---|---|

**DEFENDANT:** WILLIAM J SEARS
**CASE NUMBER:** 1:16-cr-00301-WJM-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | **Assessment** | **JVTA Assessment\*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ | $ 2,433,818.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Internal Revenue Service-RACS<br>Attn: Mail Stop 6261, Restitution<br>333 West Pershing Avenue<br>Kansas City, Missouri 64108 | $2,433,818.00 | $2,433,818.00 | |
| **TOTALS** | $ **2,433,818.00** | $ **2,433,818.00** | |

☒ Restitution amount ordered pursuant to plea agreement $ 2,433,818.00

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☒ the interest requirement is waived for the    ☐ fine   ☒ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 02/18) Judgment in Criminal Case

Judgment — Page ___7___ of ___7___

DEFENDANT: WILLIAM J SEARS
CASE NUMBER: 1:16-cr-00301-WJM-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of $ _____ due immediately, balance due

   ☐ not later than _____ , or
   ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ F below); or

C ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
   _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
   _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
   term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
   imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

   The special assessment and restitution/fine obligation are due immediately. Any unpaid monetary obligations upon release from
   incarceration shall be paid in monthly installment payments during the term of supervised release. The monthly installment
   payment will be calculated as at least 10 percent of the defendant's gross monthly income.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

   Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
   and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:
   The defendant shall forfeit to the United States, $27,066.23 in United States currency seized from Wells Fargo Bank Account No.
   6020559917, held in the name of Meadpoint Venture Partners; $9,455.56 in United States currency seized from Wells Fargo
   Bank Account No. 7784731577, held in the name of Sandra L. Sears; $6,028,803.25 in United States currency seized from Moors
   and Cabot Trust Account No. 4597-6546, held in the name of Sandra Lee Sears, Tr. Sandra Lee Sears Ttee; $250,000.00 in United
   States currency held in lieu of earnest money held on deposit for the purchase of 4200 Monaco Street, Denver, Colorado; $147,724.38
   realized from the sale of 13442 Jackson Drive, Thornton, Colorado, 80241; any monetary value Defendant Sears realizes in the future
   from his interest in FusionPharm, Inc. and a Personal Money Judgment against Defendant Sears in the amount of $1,914,049.49, and
   all property listed in the Amended Preliminary Order of Forfeiture (Document 209).

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine
interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No.  16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

## NOTICE OF APPEAL

---

NOTICE is hereby given that William J. Sears, Defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the final judgment entered against him in this action on January 30, 2020.

Respectfully submitted this 11th day of February, 2020.

THE LAW OFFICES OF PETER R. BORNSTEIN

*s/ Peter R. Bornstein*
Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
Telephone: 720-354-4440
Facsimile: 720-287-5674
E-mail: pbornstein@prblegal.com
*Attorney for Defendant William J. Sears*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2020, I electronically filed the foregoing **NOTICE OF APPEAL** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

And, I hereby certify that on this 12th day of February, 2020, I sent a copy of the foregoing **NOTICE OF APPEAL** via First Class Mail to the Defendant/Appellant at the following address:

William J. Sears
FCI Englewood
Federal Correctional Institution
9595 West Quincy Avenue
Littleton, CO 80123

*s/ Jeannette Wolf*
THE LAW OFFICES OF PETER R. BORNSTEIN

528