FiLing # 1

2255

FoR

William Joseph Sears

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 72177 / May 16, 2014

The Securities and Exchange Commission ("Comm iss ion") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange , Act"), of trading in the securities of FusionPharm, Inc. (" FusionPharm " ) of Denver, Colorado, at 9:30 a.m. EDT on May 16, 2014, and terminating at 11:59 p.m. EDT on May 30, 2014.

The Commission temporarily suspended trading in the securities of FusionPharm due to a lack of current and accurate information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning , among other things: (1) the company' s assets; (2) the company's revenues; (3) the company' s financial statements; (4) the company's business transactions; and (5) the company ' s current financial condition. This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further , brokers and dealers should be alert to the fact that , pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to FusionPharm's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action .

If any broker-dealer or other person has any information which may relate to this matter , they should contact Jay Scoggins at (303) 844-11 05, Kimberly S. Greer at (303) 844-1042, or Ian S. Karpel at (303) 844-1011; of the Division of Enforcement.

search warrants.  In addition, I have a legal opinion from an attorney who is also a CPA.  In his affidavit, he makes it clear that SA Funk's conduct is felonious.  SEE EXHIBIT 2, 2-B.

Federal prosecutors claimed in their response to my motion to withdraw my plea that SA Funk was not used in this case - which is not true.  The fact is, unlike blue collar crimes, that rely on physical evidence, securities fraud relies on evidence developed through a forensic financial examination of corporate financial statements and records, which is required to determine if a crime even occurred. The forensic investigation requires the services of a forensic accountant who is a well-educated, highly skilled, expert.. The fact the court relied on the misrepresentations provided by SA Funk as being a CPA is proven by the fact the court relied on the inadmissable hearsay evidence provided by an unproven confidential informant (CI) used by SA Funk to establish the tier of the fact to establish her claims being made in rendering its probable cause determination.  If SA Funk was not an expert the court could not have relied on her statements to develop evidence to support the probable cause, as such, this proves the court relied on the misrepresentation provided by SA Funk as that of an expert. This renders the probable cause determination to be invalid under the IV amendment to the US Constitution.

This fact was obviously never disclosed to the court as it would then have to return my funds that were illegally seized under the invalid warrants.  This also shows that the information was also never properly disclosed prior to entering into any agreement for you to provide cooperation in the return of Jean-Pierre to the United States in order to obtain evidence to support the crimes being alleged against me.  Thus violating my 5th Amendment rights against self incrimination.  To do so would have required that the AUSA disclose that I was no longer a target of the investigation - which never happened - which means that they failed to disclose that the original warrants were invalid to me or the courts.  The fact that any agreement I entered into had to be approved by the Attorney General of his Assistant or the head of the economic crimes section of the US Attorney's Office shows a serious conflict of interest in this case as AUSA Kirsch and SA Funk's husband had a business relationship that was current at the time of this investigation that required AUSA Kirsch to have disclosed this prior to being a part of this case.  Kirsch is a part of the ethics committee within the Colorado Bar Association so he was aware of the fact that he had the legal and ethical duty to disclose errors that occurred in this case prior to approving the cooperation agreement that wasa part of the pre-indictment plea agreement.  However, the fact that the misrepresentations by SA Funk regarding her status as an expert should have

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI").  I have been so employed for approximately four years.  I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes.  I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud.  Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995.  I became a Certified Public Accountant in 1996 through the state of Kansas.

2.      At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.      I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

        a.  Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.      The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"),  is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

38.     In 2011, FusionPharm purportedly focused on two aspects of the organic produce and agriculture market: (1) growing and selling produce (almost always lettuce); and (2) selling PharmPods in the organic produce industry.  According to FusionPharm's 2011 Annual Report, FusionPharm claimed to have made $256,895 in revenues during the 2011 fiscal year.  Notably, your affiant's review of FusionPharm's 2011 Annual Report reveals $0 in Accounts Receivable, suggesting that any revenue generated by FusionPharm during the 2011 fiscal year (January 1, 2011 through December 31, 2011) should be supported by incoming deposits in FusionPharm's bank accounts.

39.     In the same report, FusionPharm represented to investors that it derived its revenue from organic food sales.  FusionPharm touted its relationship with Circle Fresh Farms as its main partner and revenue driver in 2011.  Based on your affiant's review of the SEC Produced Records, SEC Analyses, statements by CW-2 and your affiant's independent investigation, FusionPharm did not generate any significant revenue from: (a) Circle Fresh Farms directly; or (b) agriculture-related business.  Moreover, it did not generate anywhere close to $256,895 in revenues during the 2011 fiscal year.

40.     FusionPharm reported its "successful harvest and sale of its initial crop through its collaboration agreement with Circle Fresh Farms."  Your affiant's review of the SEC's Analyses and the Bank Records reveals only one check from Circle Fresh Farms at any time between 2011 and 2013 across the bank accounts of FusionPharm and the Sears Controlled Entities —for $30.60 in 2012  Accordingly, Circle Fresh Farms did not generate any revenue for FusionPharm in 2011.

20

41.   Moreover, CW-2 estimated that FusionPharm only made $3,000 - $5,000 in organic produce sales from 2011 through 2013.  Your affiant's review of the Bank Records along with the SEC Analyses of the same corroborates the statements made by CW-2.  Your affiant found, and the SEC Analyses confirmed, that there was less than $4,000 worth of organic produce sales across the bank accounts of FusionPharm and the Sears Controlled Entities – and those sales were all in 2012 and 2013.  Once again, these sales could not be a basis for claimed 2011 revenue.

42   Furthermore, your affiant's review of the Bank Records and the SEC's Analyses regarding the same provide no evidence of any FusionPharm sales of PharmPods to third parties in 2011.  Of the almost $600,000 of incoming funds into FusionPharm's bank account in 2011, nearly 100% of the funds can be traced to: (a) the Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. I have reviewed the SEC Analyses of the Bank Records, wherein the SEC was able to trace the majority of cash deposits and cashier's checks directly back to a corresponding withdrawal from one of the accounts for the Sears Controlled Entities for the same dollar amount on the same day.  Your affiant's review of the Bank Records confirms these findings.

43.   To ensure that payments from third party customers were not made to one of the Sears Controlled Entities, your affiant reviewed the SEC Analyses concerning the incoming wires and deposits into the Sears Controlled Entities' accounts for 2011.  Your affiant found no evidence of any FusionPharm PharmPods sales to third parties in 2011 based upon the following: (a) Sears did not open VertiFresh's bank account until 2012; (b) The Meadpoint account only had a single $100 deposit into the account during 2011

from another Sears Controlled Entity; and (c) Bayside's account was almost wholly funded from incoming wires and deposits from Microcap.

44. Microcap, meanwhile, received over $1.2 million in incoming wires and deposits in 2011. Of that amount, approximately 99% came from wire transfers. Based on my review of the Bank Records and Brokerage Records, these wire transfers originated from Microcap's brokerage account. The Brokerage Records confirm that nearly all of the money coming into Microcap's brokerage account in 2011 came from sales of FusionPharm common stock. The remaining 1% that came into Microcap's bank account is 2011 was comprised almost entirely of a single deposit from Bayside.

45. As a result, there is no evidence that the money coming into FusionPharm's accounts or the accounts in the name of the Sears Controlled Entities was the result of legitimate sales of produce or PharmPods. Rather, the source of the money appears to the sale of FusionPharm stock which was then funneled between and among the Sears Controlled Entities.

## MISREPRESENTING SALES REVENUE IN 2012

46. In its 2012 Annual Report, FusionPharm represented that its net revenues for the year ended December 31, 2012 were $808,398 an increase of 250+% compared to 2011. When asked if these figures seemed accurate, CW-2 said this revenue figure was "impossible" as the most revenue that could have come into FusionPharm from PharmPod sales in 2012 was $160,000. CW-2 was aware of only one deal in 2012 to a customer in Arizona for eight PharmPods. CW-2 helped load the PharmPods for delivery. CW-1 said these figures were "bullshit" and "crazy." Based on your affiant's

review of the Bank Records and SEC Analyses regarding the same, FusionPharm did make anywhere close to $825,594 — or even $160,000 — in revenue in 2012.

47.     In comparison to 2011, the 2012 Annual Report did disclose significant accounts receivable – over $500,000. Accordingly, your affiant and the SEC analyzed the Bank Records to determine if there was evidence to support approximately $300,000 in incoming revenues in 2012.

48.     Based on your affiant's review of the Bank Records and the SEC's Analyses regarding the same, FusionPharm had approximately $400,000 in incoming wires and deposits into its accounts in 2012. As in 2011, nearly 100% of the funds can be traced to: (a) Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. As with 2011, the SEC was able to trace most of the cash deposits back to corresponding cash withdrawals at other Sears Controlled Entities. Your affiant reviewed the Bank Records and the SEC's Analysis on this point and corroborated this conclusion.

49.     The SEC and your affiant also reviewed the Bank Records for the Sears Controlled Entities in 2012. The Meadpoint and VertiFresh accounts in 2012 had a very similar pattern — significant deposits and wires coming in to the accounts from other Sears Controlled Entities with little-to-no evidence of any incoming deposits or wires coming into the account from unaffiliated third parties. Consistent with 2011, the majority of the funds coming in to the VertiFresh and Meadpoint accounts were from Bayside and Microcap. More importantly, your affiant's review of the Bank Records reveals evidence of only one possible third-party sale of a PharmPod, with

51.   Based on my review, investigation and analysis above, the money coming into FusionPharm's and the Sear Controlled Entities' bank accounts was ultimately the result of Microcap selling FusionPharm stock on-the-open-market, and re-circulating portions of those proceeds to the other Sears Controlled Entities.

## RESTATEMENT TO 2012 SALES REVENUE STILL INCLUDES MISREPRESENTATIONS

*All of this*

52.   On April 15, 2014, FusionPharm issued its 2013 Annual Report, which included a restatement of 2012 annual revenue, reversing $500,000 of 2012 revenue. The newly stated revenue with the reversal was $308,398.  The restatement clarified that $750,000 of initial claimed revenue was purportedly attributable to an "exclusive licensing arrangement with [VertiFresh] for the use of PharmPods growing technologies for agricultural products."

53.   The restatement claimed that VertiFresh paid $250,000 in 2012 in connection with the purported licensing agreement mentioned above, but that the remaining $500,000 was reflected as revenue in error under GAAP.  With the restatement, FusionPharm claimed that it only made an additional $58,398 ($308,398 - $250,000) outside of the licensing revenue from VertiFresh — a figure far more consistent with actual 2012 PharmPod sales based on your affiant's review of the Bank Records, statements made by CW-2 and CW-1 and the SEC's Analyses.

54.   However, based on my review of the SEC Produced Records, the SEC Analyses and your affiant's experience and background in accounting, the reported revenue remains inaccurate for at least three reasons:

a.  First, as detailed herein ¶¶68-72, nowhere in the Restatement does FusionPharm disclose that VertiFresh is an affiliate owned, operated and controlled by Sears, a FusionPharm control person.

b.  Second, even if the revised $250,000 figure could be a legitimate third party transaction, and even if the revenue could be properly recognized under GAAP, FusionPharm misrepresented the basis for possibly recognizing this amount as revenue.  In Note 4 to FusionPharm's 2013 Annual Report, FusionPharm claims that "The restatement was based on reevaluating the arrangement with VertiFresh which required $250,000 be paid during 2012 for the licensing of the Colorado territory (on a nonrefundable basis), and the remaining $500,000 to be due in equal installments of $250,000 during 2013 and 2014 for the rights to two additional territories. The initial $250,000 was paid during 2012 and was reflected as earned revenue.  Yet, according to the SEC analyses of the Bank Records, and my review of the same, VertiFresh only contributed approximately $128,000 in deposits and wires to FusionPharm in 2012.

c.  Third, CW-2 said that FusionPharm did not sell any licenses or receive any licensing income while she worked at FusionPharm, which includes 2012.

## MISREPRESENTING 2013 SALES REVENUE AND BUSINESS DEALS

55.    In its 2013 Annual Report, FusionPharm claimed that it made $594,397 in revenue in 2013.  Based on your affiant's review of FusionPharm's 2013 Annual Report, FusionPharm did not have any accounts receivable at the end of 2013.  In an email

conversation with UC-1 on April 30, 2014. Dittman confirmed the 2013 revenue was all from the sale of PharmPods. In a subsequent meeting on May 1, 2014, Dittman stated that FusionPharm delivered 34 PharmPods in 2013.

56. CW-1 said that it was "impossible" that the company could have earned these revenues in 2013. Although CW-1 only worked at FusionPharm until October 2013, your affiant's comparison of FusionPharm's September 2013 quarterly financial disclosure comparison, which claimed a cumulative revenue figures of $549,725 through the company's third quarter, with the year-end revenue claimed in FusionPharm's 2013 Annual Report, $594,397, reveals that FusionPharm only claimed to make $44,672 in revenue in the last quarter of 2013. Accordingly, the bulk of the revenue purportedly came during the time that CW-1 worked at FusionPharm.

57. Furthermore, there were only three PharmPods at the warehouse when CW-1 arrived in January 2013: (a) two were used to grow lettuce; and (b) one was not functioning. Additionally, according to CW-1, there were not any deals in place to sell any PharmPods in 2013 when he started. Throughout 2013, CW-1 was responsible for: (a) preparing PharmPods for sales to customers; and (b) constructing the PharmPods kept at the warehouse where FusionPharm would grow cannabis. This meant that any FusionPharm PharmPod 2013 sales required CW-1 to be involved in the refurbishing and retrofitting of the shipping containers prior to delivery. CW-1 did not believe it was possible for FusionPharm to have sold anywhere close to 34 PharmPods while he was employed without his knowledge.

58. According to CW-1, there were two possible revenue sources in 2013: (a) sales of PharmPods; and (b) sales of marijuana. CW-1 said that the most revenue that

could be derived from PharmPod sales in 2013 was $200,000-$250,000 — and CW-1 stated that those figures were a high estimate. CW-1 identified, at most, two possible sales between January — October 2013: (a) FusionPharm sold two PharmPods to a customer in California; and (b) FusionPharm sold five PharmPods to Local Products, a Denver company.[8]

    a. CW-1 said there might have been an additional, single PharmPod sale to Mile High Green Cross in 2013, but he could not be sure. Dittman told CW-1 that FusionPharm "gave away" a PharmPod to Mile High Green Cross so CW-1 was not sure that this could be classified as a "sale." Based on your affiant's review of the Bank Records, Mile High Green Cross did provide funds to Meadpoint — but this was in 2012. There is no evidence that Mile High Green Cross made any payments to FusionPharm or the Sears Controlled Entities in 2013.

59. Based on the statements from CW-1, FusionPharm did not sell more than 7 PharmPods between January — October 2013. Yet FusionPharm continued to make representations to the contrary to the public. For example, on February 6, 2013 the company issued a press release claiming it "completed the sale of 8 PharmPod High Intensity containers under its licensing agreement with Meadpoint Venture Partners." CW-1 said there were multiple problems with this: (a) since Dittman and Sears operated the Sears Controlled Entities and FusionPharm as one entity, this release was basically claiming a sale to itself; and (b) as noted above, CW-1 could recall, at most, 7 PharmPod sales *total* in 2013.

---

[8] As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company. CW-1 has revised that statement to match the sales highlighted in ¶58.

60. Additionally, Sears's company, Meadpoint directly participated in the misrepresentations. For example, on July 29, 2013, Meadpoint issued a press release that appears on the FusionPharm web page announcing that it "reached the $200,000 mark for sales in the past 30 days, including its first ever sale into the California medical cannabis marketplace." The press release also claimed that Meadpoint was "optimistic that we will reach our annual sales goal of 100 PharmPods by the end of the year." CW-1 said that delivering 100 PharmPods to customers in 2013 was "ridiculous" and not even close to actual figures. Moreover, CW-1 said that the $200,000 figure may have been an annual amount, but certainly not in the last 30 days. Furthermore, based on affiant's review of the Bank Records, there is no evidence of $200,000 coming in to FusionPharm's or Meadpoint's bank accounts between June 2013 and July 2013 from companies that are not affiliated with Sears or Dittman.

*Wrong!*

61. For the second possible revenue stream, FusionPharm grew cannabis and sold it to Groundswell, a licensed marijuana retailer on record with the Medical Marijuana Enforcement Division in Colorado, in the latter part of 2013.

62. Based on your affiant's review of the Bank Records, SEC's Analyses of the same, and CW-1's statements, there is little evidence that Groundswell made up the remainder of the claimed 2013 revenue. In fact, there is only one check or incoming wire from Groundswell in 2013: a $50,000 check to FusionPharm on August 15, 2013.

63. While your affiant observed some significant transactions in the fourth quarter of 2013, Dittman told UC-1 a portion of the December orders were not recognized as revenue because they were not yet delivered. FusionPharm's 2013

Annual Report confirms this statement. Importantly, as noted above in ¶56, FusionPharm made, at most, $44,672 in revenue in the last quarter of 2013.

64. For the first three quarters of 2013 when CW-1 worked at FusionPharm, based on your affiant's review of the Bank Records and SEC's Analyses regarding the same, as well as statements from CW-1, there is no evidence that FusionPharm made $549,725 or sold 34 PharmPods.

## ADDRESSING CONCERNS OF CASH PAYMENTS

65. Dittman told UC-1 on May 1, 2014 that one of FusionPharm's vendors made cash payments between 2011 and 2013. In an effort to ensure that cash payments were not dismissed as a potential legitimate revenue source, the SEC conducted an analysis of FusionPharm's bank accounts and the accounts in the name of the Sears Controlled Entities to determine if a conservative analysis of the cash transactions could provide sufficient revenue to match the numbers claimed by FusionPharm in its financial disclosures.

66. Even after including all cash deposits that could not be directly traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account, based on a review of the Bank Records and SEC Analyses regarding the same, your affiant was unable to get anywhere near the revenues that FusionPharm included in the Financial Statements for 2011, 2012 or 2013.

    a. 2011: Your affiant found less than $25,000 worth of incoming deposits and wires that could be considered from unaffiliated third parties.

    b. 2012: Your affiant uncovered approximately $200,000 in incoming wires and deposits. Of that amount, approximately $128,000 came from

VertiFresh (discussed above in ¶¶ 52-54), approximately $35,000 in cash and approximately $47,000 from Bayside, MeadPoint and a missing check with the notation "container deposit."

c. 2013: Your affiant uncovered approximately $425,000 in incoming wires and deposits in 2013. More than 50% of this amount was cash deposits, with many of these traceable back to Meadpoint. The majority of the remaining checks were from Sears Controlled Entities.

67.     Accordingly, even if it were to be assumed that every cash deposit which could not be traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account was the byproduct of a legitimate, arms-length transaction, the maximum possible revenue under my conservative approach was still more than $100,000 short every year of the revenue claimed by FusionPharm.

## OTHER MISREPRESENTATIONS TO INVESTORS

68.     As noted in ¶¶19-20 above, Sears handled numerous responsibilities at FusionPharm that are often reserved for a company officer.  Yet, based on statements from CW-1 and CW-2, Sears refused to put his name on any FusionPharm documents or accounts.  Rather, Sears attempted to get FusionPharm employees (including CW-1 and CW-2) to open up bank accounts and businesses in their names.

69.     Based on affiant's review of the FINRA Records, Dittman authored FusionPharm's press releases and reviewed its financial statements.  Yet, based on affiant's review of the same, Dittman never made any disclosures about Sears's involvement with FusionPharm or the connection between Sears, the Sears Controlled Entities and FusionPharm.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

## AFFIDAVIT OF STEVEN R. ANDERSON, CPA, JD

Steven R. Anderson, being of lawful age and upon his oath, deposes and states:

1.    I am an attorney licensed to practice law in the State of Colorado since 1987, and co-founder and managing partner of Anderson & Jahde, PC, 5800 South Nevada Street, Littleton, Colorado 80120.

2.    I also hold an inactive certified public accountant license in Colorado, having received my certification and license to practice public accounting in the State of Colorado in 1984.

3.    My practice focuses on Federal & State, civil and criminal tax controversies and trials; and, on representing accountants, tax return preparers and CPAs in all professional facets, to include CPA malpractice defense, representing CPAs before the Colorado State Board of Accountancy (and other state licensing boards), representing CPAs before the American Institute of Certified Public Accountants, and representing accountants before the IRS' Office of Professional Responsibility. I have represented and



EXHIBIT
2-B

consulted between 150 and 200 CPAs in cases before the Colorado State Board of Accountancy.

4.    I do not have an exact number on how many, but a portion of the Board of Accountancy cases I have worked on involved CPAs who had relocated from other states to Colorado and were defending complaints before Colorado's Board of Accountancy (the "Board") because they did not understand Colorado's rules pertaining to holding out as a CPA in Colorado.  I frequently work with Colorado's statutes governing CPAs and with the Rules of the Board. I have reviewed the CPA rules and statutes in Kansas.

5.    I was asked to review the propriety of Special Agent Kate Funk's use of a CPA designation on search warrant applications related to cases involving William Sears, Scott Dittman, and Fusion Pharm, LLC, which were filed in the United States District Court for the District of Colorado.

6.    Colorado's rules deem this a holding out as a CPA in Colorado that requires qualifications Ms. Funk does not have. She is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado.

7.    Ms. Funk passed the CPA exam in Kansas, but never completed the Kansas requirement of having one year of qualified work experience to earn a Kansas "permit" to practice as a CPA. Kansas and Colorado have different legal structures for becoming a CPA authorized to practice as a CPA.  In Kansas you obtain a CPA "certificate" (which Ms. Funk has) by meeting educational requirements and passing the CPA exam.  Then, you must have the year of qualified work experience after which you may obtain a Kansas "permit" to practice as a CPA. Ms. Funk does not have a "permit" to practice as a CPA in Kansas.

2

8.    Colorado combines education, passing the CPA exam and one year of qualified work experience before you can obtain a CPA "certificate." Colorado does not issue "permits" for individual CPAs See, *C.R.S. §§ 12-2-108 and 12-2-109, and Rule 4.1 Colorado Board of Accountancy*. This difference between the states is key. Colorado does not allow someone from another state without one year of qualified work experience to hold themselves out as a Certified Public Accountant or use "CPA." *C.R.S. § 12-2-115(3)*.

9.    Within the last year, I represented a Kansas CPA before the Board who was fully licensed in Kansas, with a Kansas permit, who used "CPA" on a business card handed to one client. The Board held this individual in violation of Colorado's statutes for improperly holding herself out as a CPA in Colorado. She did not first get reciprocity from Colorado. Ms. Funk's holding out was more egregious because she has no Kansas permit.

10.    On the Affidavit for Search Warrant, Special Agent for the Federal Bureau of Investigation, Kate E. Funk, wrote, "[p]rior to my employment with the FBI, I received an accounting degree from the University of Kansas in 1995. I became a certified public accountant in 1996 through the State of Kansas." Again, Ms. Funk has a Kansas certificate, not a permit to practice as a CPA. Clearly, Ms. Funk wanted the Court and others to rely on her statements in her affidavit as if they were provided by a CPA who had met Colorado's requirements to be a CPA. She is not recognized as a CPA in Colorado. I also checked the Kansas Board of Accountancy website and found an FAQ that addresses whether Ms. Funk could provide litigation support services (which is what

3

she did by submitting the affidavit) without having a permit in Kansas. She cannot. Here is the Q&A from the Kansas Board of Accountancy website:

**6. I don't provide any attest services.  Am I required to hold a permit to practice to provide non-attest services as a CPA?**
Yes.  Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, all fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, requires a person to hold a valid Kansas permit to practice.  For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf  The definition is broken out into two categories:  atttest and non-attest.

Ms. Funk violated the laws of Colorado by claiming she is a Certified Public Accountant, intending for the Court and others to rely on her statements with the full level of trust, training and competence those statements would have had they been made by a CPA. Even under Kansas law she could not provide the litigation support services she provided here in Colorado.

11.     She made the same statement in an affidavit to support an application for search warrant to search email accounts for William Sears, Scott Dittman, and others.

12.     According to the records of the University of Kansas, Kate Egan graduated in 1996, not 1995.

13.     According to the records of the State Board of Accountancy for the State of Kansas dated December 24, 2017, Kate Egan was issued a CPA certificate on August 4, 1999, not in 1996 as she claimed in Affidavits filed.

14.     I am informed, and therefore do believe, that Kate Egan is the same person as Kate Funk.  I also have been informed and do believe that Kate Funk has moved to and does reside in Denver, Colorado and not in Chicago, Illinois, and has done so for many years.

4

15.    Once one becomes a resident of the State of Colorado, and desires to hold themselves out as a CPA in Colorado, they must obtain reciprocity and a license from the Board to hold themselves out as a CPA in Colorado. Ms. Funk could not have accomplished this because she had no Kansas permit. According to the Board's website: "To apply for a license in Colorado one must satisfy the following:

- Holds an active license from a substantially equivalent jurisdiction and/or possesses the requirements necessary for issuance of a license in Colorado.

- Attests to having completed all CPE required by the other state as of the application receipt date"

Kate Funk formerly known as Kate Egan could not obtain reciprocity because her Kansas certificate is not the equivalent to being a CPA in the State of Colorado.

16.    Kate Funk has no professional CPA credential in Colorado. Therefore, she is not qualified as a CPA to offer opinion testimony on the appropriateness of revenue recognition or other applications of Generally Accepted Accounting Principles (GAAP) and Generally Accepting Auditing Standards (GAAS). I have reviewed an Affidavit drafted containing opinions by Kate Funk regarding revenue recognition and disclosure requirements for FusionPharm, and it is my opinion as a licensed lawyer and licensed inactive CPA in the State of Colorado, that Kate Funk was not qualified to render said opinions in her Affidavit as a CPA and violated Colorado's laws by doing so.

17.    Colorado Revised Statute § 12-2-129 makes it a Class 2 Misdemeanor to use the CPA designation in Colorado when one is not authorized to do so; and a class 6

felony for any subsequent offense. Kate Funk appears to have violated this criminal statute.

FURTHER AFFIANT SAYETH NAUGHT.

Steven R. Anderson

6-18-19

Date

STATE OF COLORADO       )
                        ) ss.
COUNTY OF *Arapahoe*    )

Subscribed and sworn to before me by Steven R. Anderson this *18th* day of June, 2019.

Witness my official hand and seal.

Notary Public

My commission expires: 8-26-2019

MARCIE J MORTON
NOTARY PUBLIC
STATE OF COLORADO
Notary ID 20034028692
My Commission Expires 08/26/2019

6

been easily discovered in the review of this case by AUSA Kirsch who has over 20 years experience, as such this calls into question the reason why this was not disclosed to the court and the defense prior to his approval of the cooperation agreement that required me to assist in returning Jean-Pierre to the United States and any other cooperation required in this case, as it appears from his failure to disclose his business relationship with the law offices of Perkins Cole, including T. Markus Funk, the husband of SA Funk affected his professional judgement required in the performance of his duties and as such calls into question his failure to properly disclose this relationship resulted int he additional discovery of evidence used to charge me in violation of my 5th Amendment rights. This supports the fact that there was misconduct on the part of the federal prosecutors used to coerce me into a plea which the prosecution knew was based on a violation of the 4th and 5th Amendments to the US Constitution which amounts to misconduct on the part of the federal prosecutors and the fact that none of this was disclosed to the court or me prior to entering the plea agreement renders the agreement to be invalid and the fact that it was the product of intentional fraudulent misrepresentation by federal prosecutors renders them liable for the losses suffered due to their misconduct. This shows there was on-going and continuing misconduct that affected the unbiased functioning of the court based on the charges being brought without regard to the harm that was caused by being unjustly accused of criminal offenses, proving there is a serious problem that exists within the criminal justice system. The fact that they lacked the evidence required to enter into an agreement that required my cooperation which was used to illegally obtain evidence required to support the crimes being alleged without which they had no evidence to support shows a complete disregard of the intentional harm caused to me by their failure to perform the duties renders them liable for their intentional and deliberate acts that resulted in my unjust conviction and others who have been unjustly convicted as a result of the deliberate and ongoing fraud on the court perpetrated by SA Funk and others involved in the investigation and prosecution of this case.

QUALIFICATIONS TO PERFORM A
SECURITIES FRAUD FINANCIAL INVESTIGATION

This investigation requires that the regulations of the Commission apply as this was a referral and a parallel investigation.  It fully relied on the financial investigation by SA Funk who failed to meet the requirements of practice to transact business with the Commission.  As such, the Commission failed to insure the qualifications of the person they provided confidential information to regarding Mr. Sears including his personal, business, and trading accounts which is in violation of the Commission's own regulatory requirements.  Please note the following:

17 CFR §201.102 - Appearance and practice before the Commission
(f)  Practice defined.  For the purpose of these rules of practice, practicing before the Commission shall include but shall not be limited to:
(1) Transacting any business with the Commission; and
(2) The preparation of any statement, opinion or other paper by any attorney, accountant, engineer, or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert.

17 CFR § 210.2 - 01  Qualifications of accountants.
(a)  The Commission will not recognize any person as a CPA who is not duly registered and in good standing as such under the laws of the place of his residence or principal office.  The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.

Under the definitions section this shows that the definitions of this section apply to licensing requirements under the following:
17 CFR § 201.101 - Definitions.
(4)  Enforcement proceeding means an action, initiated by an order instituting proceedings, held for the purpose of

determining whether or not a person is about to
violate, has violated, has caused a violation of, or
has aided or abetted a violation of any statute or
rule administered by the Commission, or whether to
impose a sanction as defined in Section 551(10) of the
Administrative Procedures Act, 5 U.S.C. 551(10):

Under the Administrative Procedures Act 5 U.S. Code § 551.  Definitions as
it relates to this investigation and licensing it applies by definition to:

For the purpose of this subchapter -

(1) "agency" means each authority of the Government of the
United States, whether or not it is within or subject to
review by another agency, but does not include -

(A)  the Congress;

(B)  the courts of the United States;

(C)  the governments of the territories or possessions
of the United States;

(D)  the government of the District of Columbia.

And it applies to any agency that holds the power over a person's freedom
which is shown in the Administrative Procedure's Act 5 U.S. Code § 551(10):

(10)  "sanction" includes the whole or a part of an agency -

(A)  prohibition, requirement, limitation, or other
condition affecting the freedom of a person;

(B)  withholding relief;

(C)  imposition of a penalty or fine;

(D)  destruction, taking, seizure, or withholding of
property;

(E)  assessment of damages, reimbursement, restitution,
compensation, costs, charges, or fees;

(F)  requirement, revocation, or suspension of a
license; or

(G)  taking other compulsory or restrictive action.

Under the Code of Federal Regulations contained in 17 CFR Part 210 which is
used to define an accountant's report

§ 210.1 - 02(a)(1) - Accountant's Report.  The term accountant's
report is "used in regard to financial statements,
means a document in whcih an independent public or
CPA indicates the scope of the audit (or examination)
which he has made and sets forth his opinion of the
financial statements taken as a whole, or an assertion

to the effect that an overall opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor shall be stated."

IMPERMISSIBLE GOVERNMENT CONDUCTING
UNQUALIFIED INVESTIGATOR

I have discovered impermissible misconduct on the part of SA Funk, who is the sole source of evidence relied upon by the courts in rendering its probable cause determinations in this case. This investigation was the basis for the asset forfeiture that SA Funk claimed FusinoPharm to be a Ponzi scheme, which was proven not to be the case in SA Funk's own investigation. The government never disclosed the fact that SA Funk provided perjured testimony when she attested to the information contained in her sworn affidavits.

In SA Funk's sworn affidavit in support of search warrant dated May 15, 2014, whereby in paragraph 1 on page 1, SA Funk stated under oath, "I became a certified public accountant in 1996 through the State of Kansas." EXHIBIT $3$

She then repeats this claim again in the second sworn affidavit in support of search warrant dated November 28, 2014, in paragraph 1 on page 1, SA Funk whereby again, she states under oath, "I became a Certified Public Accountant in 1996 through the State of Kansas." EXHIBIT $3$

**It is important to note that nowhere in the either of these two documents does SA Funk use the initials "CPA" behind or after her last name, as was claimed by AUSA Sibert in his response to the defendant's motion to withdraw his plea previously filed on April 19, 2019.**

After reviewing the Kansas Board of Accountancy website, it was discovered that Kansas does not comply with the requirements of the Uniform Accountancy Act (UAA), as it requires a two-tiered regulatory standard for the licensing of CPA's, which was abolished under the UAA. Prior to the passage of the UAA, most states had the two-tiered regulatory requirements for the licensing of CPA's. This required being issued a certificate and a license in order to meet the requirements. However, after it was discovered that many holding only a certificate but did not complete the requirements to be legally licensed were falsely claiming to be CPA's. All the while providing services to individuals, businesses, academia and government and falsely claiming to be licensed when they were not. It was these violations that led to the passage of the UAA in order to be established.

A Kansas issued certificate is not a license, as it is issued prior to meeting the regulatory standards for licensing. Because it is not a license and the reason, the Kansas issued certificate is not valid without also

3

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.     I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2.     At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.     I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

> a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.     The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

obtaining a valid permit (license).  This is plainly stated on the Kansas Board of Accountantcy website.  SEE EXHIBIT  4

A search of the Kansas Board of Accountantcy website found no listing for Kate Funk being issued a license as a CPA in Kansas.  A wild card attempt was made using the first name Kate and there was only one named returned, Kate Egan.  While the information did not match what SA Funk stated in her sworn affidavit, a public record check verified that Egan was in fact SA Funk's maiden name.  It was then learned that Egan (a.k.a. Funk) did not hold the permit required under Kansas law to claim to be a CPA, as she only held the certificate but not the required license (or permit) required by regulation to use the professional credentials of CPA.  The Kansas issued certificate is not a standalone license as it is under the standards for the UAA.  EXHIBIT  5

The NASBA website Verify PA, is an excellent source of information which explains the Kansas issued certificate is not a license under the regulatory requirements established for the licensing of CPA's.  It also addresses the legal limitations imposed on those who hold only a Kansas issued certificate, a review of the information regarding Kate Egan is included here.  SEE EXHIBIT  6

On April 19, 2019, the same day that defendant's counsel filed the motion to withdraw his plea for various reasons that were not addressed properly and the reason why it is necessary for Mr. Sears to represent himself here now.  It was noticed the same day of that filing that SA Funk changed her name on her Kansas issued certificate.  While Funk had not changed her name legally after she was married in 2009, it seems a bit odd that she would choose that specific day to make that change.  However, her name has nothing to do with the legal reason why she is not a CPA, although it does confirm the fact that SA Funk and Kate Egan are the same person who holds the Kansas issued certificate number 8757.  SEE EXHIBIT  7

    (1)  AICPA  (https://www.aicpa.org)

    (2)  NASBA  (https://www.nasba.org)

    (3)  Kansas Board of Accountants  (http://www.ksboa.org/applyCertificate)

## MORE FRAUDULENT CLAIMS

It was also discovered that SA Funk provided inaccurate information regarding several items contained in ¶1 on p. 1 of her sworn affidavits.  This includes the year she was issued a certificate.  According to the Kansas Board of Accountancy website Egan was not issued a certificate in 1996 as she claimed.  Instead, it was issued in August 1999.  According to the Kansas



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: ksboa@ks.gov



| | | | |
|---|---|---|---|
| Apply for Certificate | Apply for Permit | Change of Address | Contact Us |
| CPA Exam Info. | CF | FAQ's | Firm Registration |
| Forms | Laws & Regs | Online Firm Renewal | Newsletter |
| Online Permit Renewal | Peer Review | Search -- Firm | Search -- Individual |

**Sidebar navigation:**

Home
Board of Directors
Board Meeting Dates,
Agendas & Minutes
Complaint Form
CPA Exam Pass List
CE requirements
Disciplinary Actions
FAQ's
Fees
Firm Search
Forms
Helpful Links
Individual Search
Laws & Regulations
Peer Review
Proposed Regulation
Amendments
Site Map
Site Tools Download
Center
Contact Us

## Apply for a Certificate

**PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU THAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.**

**NOTE:  KANSAS IS A TWO-TIERED STATE.  YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE.  THE CERTIFICATE DOES NOT ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.**

Below are the forms required to be submitted to obtain a Kansas CPA Certificate:

**CPA Certificate by passing the exam in Kansas--Fee: $50.00**

- http://www.ksboa.org/pdf/app_exam.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf

**CPA Certificate by reciprocity, or for transfer of grades—Fee: $250.00**

- http://www.ksboa.org/pdf/app_recip.pdf
- http://www.ksboa.org/pdf/app_transfer.pdf
- http://www.ksboa.org/pdf/auth_exch.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--this is the order information)



Page Last Updated: 04/30/2018 21:44:52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

Kansas Board of Accountancy -- KSBOA.org -- 785-296-2162

http://oitsapps.ks.gov/boa/IndividualLicenseeInformation.aspx?ID=9211...



>> Home    >> Search for Firms

## Individual Information    [ Back to Search Results  |  Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Egan | **Certificate Status:** | Active |
| **Address:** | 22 N Morgan Unit 210<br>Chicago, IL 60607-0000 | **Permit Status:** | |
| **Firm/Employer:** | Sprint | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |



Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

1 of 1

1/6/2018, 10:40 AM

Understanding Forensic Accounting

Forensic accountants analyze, interpret and summarize complex financial and business matters. They may be employed by insurance companies, banks, police forces, government agencies, or public accounting firms. Forensic accountants compile financial evidence, develop computer applications to manage the information collected and communicate their findings in the form of reports or presentations.

Forensic Accounting for Criminal Investigation

Forensic accounting is also used to discover whether a crime occurred and assess the liklihood of criminal intent. Such crimes may include employee theft or insurance fraud, securities fraud, falsification of financial statement information, or identity theft. Forensic accounting is often brought to bear in complex and high-profile financial crimes. The reason we understand the nature of Bernie Madoff's ponzi scheme today is because forensic accountants dissected the scheme and made it understandable for the court and public.

Defining Financial Forensics

Financial forensics is a field that combines criminal investigation skills with financial auditing skills to identify criminal financial activity coming from within or outside of an organization. Financial forensics may be used in prevention, detection, and recovery activities to investigate terrorism and other criminal activity, provide oversight to private-sector and government organizations, and assess organizations' vulnerability to fraudulent activities. In the world of investments, financial forensics experts look for companies to short or try to win whistleblower awards.

**The fact that this was a forensic financial investigation was admitted to by SA Funk in her sworn affidavits on page 5, paragraph 12, she states,** "Your affiant thereafter reviewed and has been reviewing the SEC produced records on an ongoing basis. Additionally, your affiant was made privy to SEC analysis of the bank records and transfer agent records and has reviewed the same on an ongoing basis."

According to the FBI's own website under the position of "Forensic Accountant" it states the following:

★ "FOLLOW THE MONEY TRAILS OF CRIMINAL ACTIVITY
AND NATIONAL SECURITY MATTERS"

Because in the affidavit in support of search warrant prepared by SA Funk she referenced auditing standards accepted by the SEC and the United States of America with her references to violations of GAAP. This means she created a report and as such this requires she must be a CPA, as she not only claimed a violation of GAAP but she then attempted to track financial transactions between accounts in order to determine actual company earnings. This requires the services of a CPA in order to legally attest to those sworn opinions before the court. Under the laws in Kansas,

"It is unlawful for any person, except the holder of a Kansas permit to practice, to issue a report with regard to any attest or compilation service under standards adopted by the Board. A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the Board." (KS Stat § 1-316(e) (2012)) Keeping in mind she's not in Kansas anymore. SEE EXHIBIT ___9___

Additionally, under KS Stat § 1 - 321. Definitions: It defines "report":

"When used with reference to any attest or compilation service, means an opinion, report or other form of language that states or implies assurance as to the reliability of the attested information or compiled financial statements and that also includes or is accompanied by any statement or implication that the person or firm issuing it has special knowledge or competence in accounting or auditing. Such a statement or implication of special knowledge or competence may arise from use, by the issuer of the report, of names or titles indicating that the person or firm is an accountant or auditor or from the language of the report itself."

## RELEVANCE TO THIS CASE

As the affidavits in support of search warrants prepared by SA Funk were provided to the court through the use of telephonic equipment the requirements under the federal rules of criminal procedure apply (Rules). Under section 4.1(b)(2)(A) requires the affiant to attest to information contained in the written affidavit. Which has occurred in this case, as such the requirements under the rules of public accountantcy state that only a CPA can attest to information contained in a financial report. As such, this means the information attested to before the Judge Magistrates in this case was perjury as SA Funk knowingly provided false testimony under oath.

In law, an attestation is a declaration by a witness that a legal document was properly signed in the presence of the witness. Essentially, it confirms that a document is valid. In finance, an attestation service

is a CPA's declaration that the numbers are accurate and reliable. As the service is completed by an independent party, it validates or invalidates in this case the financial information prepared by internal accountants.

Title 41 Search and Seizure - Obtaining a Warrant

(2) The applicant must orally state facts sufficient to satisfy the probable cause for the issuance of the search warrant. This information may come from either the applicant federal law enforcement officer or the attorney for the government or a witness willing to make an oral statement. The oral testimony must be recorded at this time so that the transcribed affidavit will provide an adequate basis for determining the sufficiency of the evidence if that issue should later arise.

Testimony provided in the form of opinion must be grounded in an accepted body of learning or experience in that particular field, and the witness must explain how the conclusion is so grounded. See, e.g. American College of Trial Lawyers, Standards and Procedures for Determining Admissability of Expert Testimony. ("[W]hether the testimony concerns economic principles accounting standards, property valuation or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field.")

As SA Funk attested before the courts in three sworn affidavits (keeping in mind Mr. Sears nor his lawyers have ever seen the warrant for the bank accountants and brokerage accounts of his family's trust.) which she testified under oath were truthful. That means she represented herself as a CPA. This means she represented herself as an expert capable of performing the services of the financial investigation of the publicly traded company and the transactions regarding money involved with that company. This she confirmed with the implied insurances of her knowledge, training, and experience a total of 47 times in these affidavits. As the courts relied on this information as evidence to support probable cause of her claims, the fact that this was perjury means it was material to this case and required disclosure to the Defendant prior to entering the plea agreement.

## SHOWING PATTERN OF MISCONDUCT

This is not the only incident of misconduct by SA Funk that could be construed as unlawful, as on October 13, 2009, SA Funk aka Kate Egan married then United States Assistant Lead Prosecutor T. Markus Funk. As such, when SA Funk decided to accept a position of employment with the FBI while her husband was still employed by the DOJ. As such by SA Funk accepting the position with the FBI, she violated federal regulations and code in doing

such.

After which SA Funk accepted employment within the FBI, in violation of the following federal laws and regulations:

(a) 5 US Code § 3110, Employment of relatives;

(b) 5 Code of Federal Regulations (CFR) § 310, Employment of Relatives;

(c) 5 CFR § 2635, Standards of Ethical Conduct for employees of the Executive branch; Subparts D, E, and G;

(d) 5 USC § 2302, Prohibited Personnel Practices

(e) Executive Order 11222, Prescribing Standards of Ethical Conduct for Government Officers and Employees, May 8, 1965;

(f) 5 CFR § 735, Employee Responsibilities and Conduct.

This situation extends beyond just a minor violation of federal regs by an employee holding a position of trust within the government. This matter involves numerous violations of federal regulations by two executive level employees within the DOJ who swore to uphold and defend the Constitution and are responsible for national security. As such this makes the fact that they were willing to violate the laws in order to gain employment enforcing the law, suspect. Clearly this relates to the credibility of this government agent and the integrity of this investigation and the fact that SA Funk was the sole source of evidence provided to the court makes this discovery material in this case.

## GOVERNMENT AWARE OF MISCONDUCT

SA Funk was required to obtain and pass a mandatory 10 year background investigation in order to obtain the top secret security clearance required of all FBI agents. This information was readily available to the DOJ, the FBI, and SEC, all of which were actively involved in the investigation and prosecution of this case, as such this information regarding the violations of federal laws and regulations that were involved in the hiring of SA Funk.

The fact that SA Funk had no law enforcement experience prior to working for the FBI and she had never been involved in a white collar securities fraud investigation prior to her assignment as the lead investigator in this case, as such there is nothing to support the fact that SA Funk is an expert in these proceedings. As is shown in the court decision in the 5th circuit where the decision of that court was, "The government used an FDIC investigator as an expert in the area of mortgage fraud. Though the agent had some training in fraud investigation, he had no specialized training in the area of mortgage fraud and had never previously testified as an expert in this field." AUSA Siebert also attests to the fact that **SA Funk is not an expert**

in his response to Mr. Sears' motion to withdraw his plea.

As this entire investigation started with the misrepresentations provided by SA Funk as to the inadmissible hearsay statements provided by the confidential witness which she was not only unreliable but were FALSE to form the legal basis for her investigation and the fact that she based the opinions she provided to the courts as evidence in this case, makes this information exculpatory in nature and as such it should have been disclosed to the defense. The facts upon which a witness relies for her opinion is discoverable and must be disclosed to the other party. The trier of fact should be disregarded if it is found to be unreasonable or not supported by the facts upon which the opinion is based.

As SA Funk is not an expert this violates the federal rules of evidence 701 and 702 - 705. As SA Funk was allowed to testify before the court supplying opinions that were not based on first hand observation into the matters claimed by SA Funk, the court must take into consideration any sicth amendment confrontation clause concerns whenever the prosecution intends to call an expert to offer his or her opinion. "Though an expert may generally rely on inadmissible evidence in reaching a conclusion, including hearsay, that rule assumes that an expert will carefully analyze the basis of his opinion."

## PROBLEMS WITH WARRANTS

The search and seizure warrant and supporting documentation presented to Magistrate Shaffer on May 15, 2014 was attested to telephonically by SA Funk which requires a recording of that and the Search and Seizure warrant and all supporting documentation be filed with clerk of the court in accordance with  the Federal Rules 41 and 4.1.

As this document was not filed in an emergency situation which is shown by the time and date of the Judge's signature being on May 15, 2014 and the time whcih it was executed on the following day on May 16, 2014, as such this was not an anticipatory warrant, as such there was no reason why it was not filed properly.

After reviewing the copy furnished by the prosecution only after the plea was signed, it was discovered that the warrant was not properly filed as it does not contain the appropriate seal nor the stamp of the clerk on the top.

Nor was this document ever sealed as was claimed by the AUSA Harmon on numerous occasions.  There is no court order on the docket sealing the search and seizure warrant which was in fact exercised on the FusionPharm

warehouses.  Due to the invalid warrant  and subsequent raid on FusionPharm
which included SA Funk, IRS-CID Agent Loecker, and AUSA Harmon and others
from the prosecutors office who all have many years of experience dealing
with warrants.  They all knew that this warrant was not valid because
it was never properly filed. (SEE EXHIBIT __*ZZ-12*__ showing the proper
filing and sealing stamps from co-defendant Jean-Pierre's case.)  There
was a third warrant served on the bank, trust, and trading accounts of Mr.
Sears and his family on May 16, 2014 by SA Funk.  However, to date we have
not been provided a copy.  How can the integrity of the warrant be guaranteed
if it was not registered with the court as per the Federal Rules of Criminal
Procedure that state:

   (f)      Executing and returning the warrant.

   (1)      Warrant to search for and seize a person or property.

(A) Noting the Time.  The officer executing the warrant must enter on it
the exact date and time it was executed.

(B)  Inventory.  An officer present during the execution of the warrant
must prepare and verify an inventory of any property seized.  The officer
must do so in the presence of another officer and the person from whom or
from whose premises, the property was taken.

(C) Receipt.  The officer executing the warrant must give a copy of the
warrant and a receipt for the property taken to the person from whom, or
from whose premises, the property was taken or leave a copy of the warrant
and receipt at the place where the officer took the property.  For a
warrant to use remote access to search electronic storage media and
seize or copy electronically stored information, the officer must make
reasonable efforts to serve a copy of the warrant and receipt on the
person whose property was searched or who possessed that information
that was seized or copied.  Service may be accomplished by any means
including electronic means, reasonably calculated to reach that person.

✳ (D) Return.  The officer executing the warrant must promptly return it -
together with a copy of the inventory - to the Magistrate designated on
the warrant.  The officer may do so by reliable electronic means.
The Judge must, on request, give a copy of the inventory to the person
from whom the property was taken and to the applicant for the warrant.

AO 91 (Rev 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| **GUY M. JEAN-PIERRE** | ) | Case No.   16-mj-01103-KMT |
| a/k/a Marcelo Dominguez de Guerra | ) | |
| | ) | |
| *Defendant* | | |

## CRIMINAL COMPLAINT

I am the undersigned complainant in this case, and state that the following is true to the best of my knowledge and belief.

On or about the date of _____ in the county of ___Denver___ in the ___State and___ District of ___Colorado___, the defendant violated ___18___ U. S. C. § ___1956(a)(3) and 2.___ an offense described as follows:

See Attachment A.

This criminal complaint is based on these facts:

See Affidavit, Attachment B, attached hereto and hereby incorporated by reference.

☑ Continued on the attached sheet.

s/ Michael A. Godson

*Complainant's signature*

SA Michael A. Godson, IRS-CID

*Printed name and title*

Sworn to before me and : ☐ signed in my presence; ☑ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___*Jun 13, 2016*___

*Judge's signature*

City and state: ___Denver, Colorado___

Kathleen M. Tafoya, U.S. Magistrate Judge

*Printed name and title*

# ATTACHMENT A

From on or about April 22, 2016 and continuing through on or about April 29, 2016, in the District of Colorado, the defendant, Guy M. Jean Pierre, a/k/a Marcelo Dominguez de Guerra, with the intent to conceal and disguise the location, source, ownership and control, of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a person at the direction of a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be proceeds of specified unlawful activity, to wit: securities fraud, in violation of Title 15 United States Code, Sections 78j(b) and 78ff(a), and 17 C.F.R. Section 240.10b-5, and wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

## ATTACHMENT B

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Michael Anthony Godson, being duly sworn, hereby depose and state the following:

1.        I am a Special Agent of the Internal Revenue Service Criminal Investigation (IRS-CID), in Denver, Colorado, and have been so employed for the past seven years. My duties and responsibilities include the investigation of possible criminal violations of the Internal Revenue laws under Title 26, United States Code, and related offenses, including but not limited to, violations of Title 31, Bank Secrecy Act or Currency Crimes, and Title 18, Money Laundering based upon Specified Unlawful Acts (SUA's), as defined under Title 18, U.S.C., Sections 1956 and 1961 and Forfeiture. My education includes a Bachelor's of Science degree in Business Administration-Accounting from Colorado State University, a Masters in Accountancy from the University of Colorado at Denver, and six months of training at the Federal Law Enforcement Training Center

2.        Since in or about May 2014, together with Special Agents of the Federal Bureau of Investigation (FBI) and Postal Inspectors of the United States Postal Inspection Service (USPIS), I and other IRS-CID Special Agents have been involved in a federal criminal investigation in the District of Colorado of activities and conduct arising from and relating to the operations of FusionPharm, Inc ("FusionPharm"), an erstwhile publicly traded, microcap or "penny stock" company, headquartered in Commerce City, Colorado, and, in particular the conduct of two individuals (Targets 1 and 2) who constituted principals of the business and were de facto partners, concerning federal criminal securities, mail fraud, wire fraud, money laundering and tax offenses. As set forth below, during the course of the investigation, one of

1

*12*

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Premises located at:<br>5850 East 58th Ave., Unit F<br>5750 East 58th Avenue, Unit J<br>Commerce City, Colorado<br>more fully described in Attachment A,<br>attached hereto. | )<br>)<br>)<br>)      Case No.<br>)<br>)<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ___State and___ District of ___Colorado___ *(identify the person or describe the property to be searched and give its location)*:

## SEE "ATTACHMENT A" attached hereto and incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

## SEE "ATTACHMENT B" attached hereto and incorporated by reference

I find that the affidavit(s), or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before ___May 29, 2014___ *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Craig B. Shaffer___.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30).*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   ___*4:39 pm, May 15, 2014*___

City and state:   ___Denver, CO___

___Craig B. Shaffer___
*Judge's signature*

___United States Magistrate Judge___
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

FAILURE TO DISCLOSE AND
WITHHOLDING EXCULPATORY EVIDENCE

Based on the previous responses supplied by the federal
prosecutor in this case, which has ignored the fact that the Supreme Court ruled,
"the prosecution has an affirmative duty to learn of and disclose, any favorable
evidence known to others acting on behalf of the government in the case, including
the police." Thus the prosecution was required not only to disclose what was already
known to prosecutors, but also to learn of any such information that was known to law
enforcement, including matters related to witness credibility even that of law enforce-
ment.

The prosecution withheld three different FBI 302 interview transcripts.
Only in October of 2020 did I receive a copy of them from an annonymous source. It
had a note saying, "only 5 years late". Much like the SEC interview transcripts
that were withheld until after I signed the plea. They are littered with lies! The
prosecution knew if I saw any of it there was no way I'd sign anything. This is a
clear violation of my 6th Amendment rights. I can provide affidvits or testify in
court as to the requests by five different lawyers of the Lehrer 302's. Only to
never get a response.

Additionally, the Supreme Court decision where the disclosure rule was
extended to include not only evidence directly related to the crime involved, but
also to information that would affect the credibility of a prosecution witness in
the case. The fact, SA Funk was the sole source of opinions relied on by the court
as evidence including that which was relied on by the courts in rendering its'
probable cause determination, means her credibility related directly to the evidence.

As the term "exculpatory" is generally understood to refer to virtually
any kind of information that would cast doubt on the defendant. Exculpatory evidence
is evidence that is favorable to the accused; is material to the guilt, innocence,
or punishment of the accused; and that may impact the credibility of a government
witness, including a police officer. Impeachment material is included in the Brady
disclosure requirements. With the help of a Floriday Forensic Securities Lawyer and
specialist who was a whistle-blower to the SEC in the case SEC v. Guy M. Jean-Pierre,
Civil action 12-cv-8886, I uncovered many disturbing things that can only be deemed
as corruption on the part of Mr. Lehrer.

In that case, Mr. Jean-Pierre forged more than 100 legal opinions that were
used to remove the restrictive legend from millions of shares of penny stock company's.
Through discovery in a related case, the specialists firm obtained the forged opinions.
The referral to the Florida bar of that matter resulted in the Florida Supreme Court
disbarring Mr. Jean-Pierre. In connection with that case Jean-Pierre provided a letter

from Scott Dittman, in his capacity as the CEO of Fusion Pharm Inc. (FSPM) in defence of the allegations. At that time, Jean-Pierre was a corporate officer of FSPM. The specialist's involvement in that matter resulted in a civil suit and bar complaint against the securities specialist by Jean-Pierre and his client, Marc Jablon. The securities specialist spent more than two years and thousands of unpaid hours because they were retained for stating that the conduct of Jean-Pierre and his associates was illegal. During that period, the specialist was represented by **Frederick M. Lehrer.** Lehrer assisted them in drafting the documents in all aspects referring the matter to the Florida Bar, SEC, and FBI v. Mr. Jean-Pierre. As a result of the retaliation the specialist endured, they became a witness for the SEC in the penalty phase of that proceeding against Mr. Jablon. They have not had meaningful communications with Lehrer since 2013.

The forensic securities specialist then became aware of what he believed to be egregious misconduct by the Colorado Office of the SEC. In 2014, the CO SEC commenced an investigation of FSPM. In connection with FSPM, Sears and Dittman were indicted by the US Attorney's Office for the District of CO. This taken from the SEC's press release was then and remained forever untrue. When the specialist met Mr. Sears and Mr. Dittman and learned of Lehrer's involvement in FSPM, he was shocked to learn of Lehrer's conflict of interest with Mr. Jean-Pierre in this case. He also made Sears and Dittman aware of Mr. Jean-Pierre's conflicts with the AUSA Harmon, who was in charge of the investigation and prosecution. Per the specialist, Mr. Lehrer and Mr. Harmon were 2 of 4 attorneys who constituted the special task force for securities fraud in South Florida in the 1990's. In fact, Mr. Harmon and Mr. Lehrer worked side-by-side for 4 years and remained close friends. The conflict of interest was never disclosed in this case by Mr. Harmon, who should have recused himself as soon as Mr. Lehrer's involvement was known. Unfortunately, he did not. Despite the conflict, Lehrer commensed representing FSPM, Dittman and Sears within a few months after representing the specialist in the Jean-Pierre matter. Lehrer continued to represent FSPM until the middle of 2014, approximately two months after the SEC investigation commenced. Pursuant to a formal order of investigation dated January 29, 2015, Lehrer was asked to submit to a deposition concerning FSPM, Dittman and Sears. Prior to his testimony, Lehrer requested that Dittman and Sears waive the attorney client priviledge, which they did without any knowledge of Mr. Lehrer's prior involvement with Jean-Pierre or Mr. Harmon.

Lehrer provided sworn testimony on January 29, 2015 and May 29, 2015. In that testimony, Lehrer lied repeatedly. Among other things Lehrer falsely

stated that "he learned about Jean_pierre's OTC Markets ban, a ban he brought about from Google searches after the SEC investigation of FusionPharm began". He was largely responsible for the OTC markets ban as a result of his representation of teh Specialist in connection with referrals to the SEC, FBI, and Florida Bar!

Secondly, Lehrer lied in stating that he had no knowledge of Sears' relationship with Dittman or Sears' relationship with his family and Fusion Pharm. even more troubling is that Lehrer's conduct makes the waiver of priviledge given by Dittman and Sears ineffective because they were not provided with disclosure of Lehrer's behavior and conflict of interest role in reporting a corporate officer of FSPM. <u>Because of this non-disclosure, Sears and Dittman could not have made an informed decision of whether to waive the attorney client priviledge allowing Lehrer to testify against them.</u> Despite this, Denver SEC enforcement attorneys, Ian Karpel and Kim Greer allowed Lehrer to testify as to matters that were subject to the attorney client priviledge. Dittman and Sears never would have allowed the waiver of attorney client priviledge if they knew (1) Lehrer had participated in reporting Jean-Pierre, a corporate officer of FSPM to the FBI and SEC, and (2) Harmon had worked with Lehrer for years and was his supervisor. Greer and Karpel were aware of these conflicts and took no steps to ensure the integrity of Lehrer's testimony to the SEC. (3) If the prosecution had not withheld Lehrer's 302 when multiple requests for it were made. Greer and Carpels' knowledge of many of the conflicts is demonstrated by Lehrer's own SEC testimony.

Upon the Specialist's review of this matter, they found that Lehrer had provided multiple baseless legal opinions for Sears in regards to the trading of FSPM stock. The only things more shocking was they learned that Lehrer had even instructed Sears (in writing) to sign his name to legal opinions to remove the legend from restricted securities. This was due to his printer not working, as he explained to Sears in his email to Sears. Sears, trusting Lehrer, as who better to protect him than an ex-SEC enforcement attorney? He did as instructed. If FSPM is a fraud as the SEC states, then Lehrer was the gatekeeper allowing Sears to cut and paste legal opinions on his law firm. The fact is Fred Lehrer cut and pasted Jean-Pierre's legal opinions as they are almost exactly the same. Kim Greer of the SEC commented on this in Lehrer's interview. According to the SEC's press release based on SA Funk's investigation, FSPM was a "pump-and-dump" (not that she would know what that really means) that resulted in investor losses of more than $12 million because of baseless legal opinions. The vast majority (more than $10 million of the $12 million at issue with the SEC) of the sales of FSPM stock were only possible

because of **Lehrer's opinions.** Still, no investigation or even mention of Lehrer from the DOJ while all other attorneys in the case were prosecuted? During the investigation, no press release was ever questioned or at issue. FusionPharm's stock price followed the same exact trajectory as all the other marijuana index company's when amendment 64 passed in 2014. In 2017, the Specialist provided Mr. Karpel and Ms. Greer with evidence demonstrating that Lehrer lied multiple times under oath in their investigation. They advised them that the Specialist had declarations and other evidence of Lehrer that contradicted his SEC testimony. Along with emails from Sears that directly refuted much of his SEC testimony. One example was an email communication whereas Lehrer advised Dittman and Craig Dudley (FusionPharm CFO) that disclosing Sears was not necessary. Dudley confirms this in his FBI 302. The Specialist also advised them that Lehrer had told Sears to sign his name to a legal opinion. After receipt of this information, Greer and Karpel did not investigate. SEE EXHIBITS _13-14.A_ Instead, Greer contacted Jeff Thomas an attorney of Scott Dittman.

> "Kim called to let me know that they received a call from XXXXXXXXXXX, who detailed some of her knowledge about Fred Lehrer. I pressed Kim as to what this meant in terms of their case, and she made it clear that it didn't mean anything. Because their case is technically still open, she just believed that she had an obligation to inform me of the call".

Greer violated SEC policy by disclosing confidential SEC information to a private attorney. Her motive is clear and she did this to silence the Specialist as a whistle-blower against Lehrer. Greer indicated that their refusal to investigate Lehrer was because of Mr. Harmon.

Further, when Harmon learned the Specialist had provided exonerating evidence about Lehrer to Sears and Dittman and to the FBI as a whistle-blower, HARMON retaliated against Sears and the Specialist. Instead of encouraging whistle-blowers to come forward when they learn of information relevant to investigations, Harmon, Karpel, and Greer retaliated aginst the Specialist and Sears and sought to discourage them from providing information and Sears from speaking to the Specialist. While the SEC's revolving door ignored Lehrer, the SEC charged another attorney, Todd D. Tommaso for his legal opinions. The action against him can be found at: www.sec.gov/litigation/admin/2016/33-10215. Sears had put together a chart whereas it could be shown that Tomasso also committed perjury in his interview with the SEC. SEE EXHIBIT _15_

Despite the Lehrer opinions that were baseless and merely cut and pasted from previous Tomasso opinions and caused greater investor losses and his conduct was more egregious, the Denver SEC/DOJ would never charge Lehrer. For the reasons above, Karpel and Greer of the SEC should be investigated

From: Jeffrey Thomas <jthomas@thomaslawllc.com>
Subject: RE: follow up
Date: January 26, 2017 at 12:10:08 PM EST
To: 'Scott Dittman' <sdittman69@icloud.com>

Scott,

Kim called to let me know that they received a call from ▓▓▓▓▓▓▓▓▓▓, who detailed some of her knowledge about Fred Lehrer.  I pressed Kim as to what this meant in terms of their case, and she made it clear that it didn't mean anything.  Because their case is technically still open, she just believed that she had an obligation to inform me of the call.

Thanks.

Jeffrey R. Thomas
Thomas Law LLC
50 S. Steele Street, Suite 250
Denver, Colorado 80209

# FREDRICK LEHRER'S PERJURY TO THE SEC

1. *Lehrer's Knowledge of Jean-Pierre's Opinion Letter Ban.*  In his sworn testimony before the SEC, Lehrer stated that he learned that Jean-Pierre had been banned from issuing opinion letters "through a computer search, not necessarily in reference to him in particular, you know, but banned opinion writers." (Exhibit A at 96:8-98:24.)  In stark contrast to that statement, Lehrer described, in an August 7, 2011 declaration signed under penalty of perjury, Guy Jean-Pierre's forgeries. (Exhibit B.)  In his October 16, 2011 declaration, Lehrer states that he "assisted substantially with drafting the [bar] grievances filed against Jean Pierre ..." (Exhibit C at ¶11.)  In email communication on August 28, 2013, a mere 4 minutes after Sears first introduces him to FusionPharm/FSPM, Lehrer refers to an SEC.gov link and asks Sears whether Jean-Pierre is still the Secretary.  (Exhibit D.)  The SEC link was to the Jean-Pierre case in which Lehrer was an investigator.

2. *Lehrer's Knowledge of Bill and Sandra Sears' Ownership of Mead point and Advice Regarding Disclosing Mead point as a Related Party.*  In his SEC testimony, Lehrer admitted that he knew that Bill Sears controlled Meadpoint during the time Lehrer was issuing Rule 144 opinions. (Exhibit E at 316: 8-16).  While Lehrer stated in his testimony that he did not know that Bill Sears had transferred control of Meadpoint to his mother, Sandra Sears, until April 2014 (Exhibit F at 282:15 - 284:9; Exhibit G at 316:19 - 317:20), that claim is belied by, among other things, an October 22, 2013 email in which Bill Sears told Lehrer "FYI no conflict with Meadpoint as a family member out of state owns the company." (Exhibit H) (emphasis added).  Bill Sears also stated in that email that the ownership change would be reflected on the Nevada Secretary of State's website.  Consistent with that statement, the Nevada Secretary of State's website identifies Sandra Sears as Meadpoint's only officer. (Exhibit I).

3. Despite Lehrer's knowledge throughout his representation of FusionPharm that Bill Sears or his mother controlled Meadpoint, Lehrer advised FusionPharm that it did not need to disclose Meadpoint as a related party.  *** An April 15, 2014 email from Craig Dudley to Lehrer, in which Dudley specifically sought advice on that issue, is attached as Exhibit J. ***

4. *Lehrer's Knowledge of Bills Sears' Criminal History.*  Lehrer stated in his SEC testimony that he learned from a newspaper article after DOJ's raid of FusionPharm's office that Bill Sears had a prior criminal conviction for securities fraud. (Exhibit K at 236: 15-23.)  Lehrer's other testimony on that subject, however, made clear that he knew about Bill Sears' conviction long before that. (Exhibit L at 71:23-74:21; Exhibit M at 231:19-236:14).  An October 10, 2013 email exchange, in fact, shows Lehrer and Bill Sears discussing that very issue. (Exhibit L.)

5. *Lehrer's Use of Medications.*  On information and belief, Mr. Lehrer has a long history of taking various medications – including medications to treat seizures, anxiety, bipolar disorder, and psychosis – that are known to impair memory and judgment.  He has also been hospitalized for mental-health reasons.  The medications include clonazepam, lorazipam, quetiapine, Prozac, Pemazepam, BuSpar, buspirone, Remeron, Effexor, and Klonopin. This long history casts doubt on Lehrer's statement that he was not taking any medications at the time of his testimony.

# **FREDRICK LEHRER'S PERJURY TO THE SEC**

*Klonopin.  This long history casts doubt on Lehrer's statement that he was not taking any medications at the time of his testimony.*

# XXXXXXXXXXXXXXXXXXXXXXXXXXX.

**Attorneys** Counselors **Consultants**

www.xxxxxx.com

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**April 24, 2017**

Matthew Kirsch
United States Attorney
Department of Justice
1801 California Street
Suite 1600
Denver Colorado 80202

**Re: Kenneth Harmon**

Dear Mr. Kirsch

My name is xxxxxxxxxxxxxxx. I am a securities attorney admitted to and in good standing with the xxxxxxxState Bar. I routinely handle matters before the Securities and Exchange Commission (the "SEC") and have had a long history of satisfactory dealings with the SEC and Federal Bureau of Investigation. I bring these matters to your attention and respectfully request that you investigate the handling of the case Fusion Pharm, Inc, ("FSPM") Guy M. Jean-Pierre ("Jean-Pierre`), Scott Dittman ("Dittman"), William Sears ("Sears"), Tod Ditommaso ("Ditommaso") and Frederick M. Lehrer ("Lehrer"), by Assistant United States Attorney, Kenneth Harmon.

I was a whistleblower to the SEC and Department of Justice in connection with a matter captioned Securities & Exchange Commission v Big Apple Consulting USA et al (Civil Action No. 09-cv-1963 (M.D. Fla.) (JA). In connection with that matter, among other things I was approached by Marc Jablon ("Jablon") and Mark Kaley ("Kaley") who controlled a stock promotion firm known as Big Apple Consulting to engage in criminal activity as lawyer for an issuer and its principal. Jablon, Kaley, and Big Apple Consulting are referred to herein as "Big Apple". I refused to engage in the crimes proposed. This advice included that opinions rendered by Jean-Pierre were baseless and unlawful. The client became a whistleblower to the SEC and provided the SEC and FBI with information about Big Apple. In the course of my review of the Big Apple matter, I found hundreds of penny stock companies/tickers manipulated by Big Apple. In connection therewith, Jean-Pierre and other complicit attorneys provided baseless opinions as to the legality of the transactions.

It also is clear that because of the mishandling of the Big Apple and FSPM investigations by Kenneth Harmon, I will never have retribution.

After the baseless civil suit and Florida Bar complaint filed against me by Big Apple were dismissed, I was asked to be a government witness during the penalty phase of the case against Big Apple to discuss the retaliation I endured. During the Big Apple matter, I was represented by another lawyer and Lehrer who assisted me in reporting issuers, attorneys including Jean-Pierre and other Big Apple associates to regulators. I have not had meaningful communications with Lehrer for almost five years because of among other things, his long history of erratic and unethical behavior and abuse of prescription drug medication.

My referrals resulted in the discovery and reporting of Jean-Pierre's forgery of more than 100 baseless legal opinions. It also resulted in an SEC judgment against him in the Southern District of New York (Civil Action No. 12-CV-8886). The referrals also led to enforcement actions by FINRA against two brokerage firms who accepted the forged opinions, one of which was expelled from the industry, SEC actions against issuers and other attorneys.

1

where Lehrer represented her.

**The Tradability Opinions**

The SEC pleadings discuss the significance of the Tradability Opinions of FSPM:

> "First, utilizing backdated convertible notes and preferred FSPM stock, FSPM issued common stock to three entities controlled by Sears. Second, Sears, through these entities, illegally sold the FSPM stock into the market. Third, Sears transferred some of the proceeds from the illegal stock sales back to FSPM, where the money was fraudulently recognized and reported as revenue. Fourth, FSPM issued press releases and financial reports claiming the false revenues, and failed to disclose Sears' identity, role, and background in FSPM's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website." in FSPM's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website... *In order to ensure that his entities could sell their FSPM shares without a restrictive legend, Sears needed attorney opinion letters opining that Microcap, Bayside and Meadpoint were not affiliates of FSPM, and consequently opining that the transactions were exempt from the registration requirements of Section 5 of the Securities Act [15 U.S.C. § 77(e)]."*

Between approximately August 2013 and April 2014, Lehrer provided at least 19 attorney opinion letters as to the tradability of FSPM shares (Opinions available upon request). Lehrer's opinions covered almost all of the shares sold in the FSPM scheme. Without Lehrer's opinions, investors would not have been able to purchase FSPM shares and would not have been harmed. According to pleadings filed by the SEC, FSPM caused approximately $12 million of investor losses from approximately 5,575,000 shares unlawfully sold using baseless legal opinions. The chart below demonstrates the significance of Lehrer's opinions:

| Date | Name | No. of Shares |
|---|---|---|
| 8/28/2013 | Myron Thaden | |
| 8/28/2013 | Sharryn Thaden | 500,000 |
| 8/28/2013 | Richard Scholz | 500,000 |
| 9/10/2013 | Black Arch Opportunity Fund LP | 500,000 |
| 9/10/2013 | Starcity Capital LLC | 28,562 |
| 9/12/2013 | Starcity Capital LLC | 313,703 |
| 9/12/2013 | Black Arch Opportunity Fund LP | 313,703 |
| 1/6/2014 0 | Meadpoint Venture Partners | 28,562 |
| 1/16/2014 | Alexandra Mauriello | 800,000 |
| 1/16/2014 | Vera Group, LLC | 61,437 |
| 1/16/2014 | SGI Group LLC | 29,625 |
| 1/23/2014 | Vera Group, LLC | 29,625 |
| 1/23/2014 | SGI Group LLC | 29,625 |
| 1/23/2014 | Alexandra Mauriello | 29,625 |
| 2/14/2014 | Meadpoint Venture Partners from $88,000 Note | 61,437 |
| 3/4/2014 0 | Craig Dudley | 600,000 |
| 3/6/2014 0 | Meadpoint Venture Partners from $88,000 Note | 20,000 |
| 3/26/2014 | Meadpoint Venture Partners from $88,000 Note | 370,000 |
| 4/16/2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 |
| | | 900,000 |
| | **Total Shares Opined Upon By Lehrer** | 5,715,904 |

**Lehrer's Testimony**

Lehrer's representation of Complainant spanned years and involved thousands of pages of materials. In his sworn SEC testimony, Lehrer lied about how he learned that Jean-Pierre had been banned from issuing opinion letters and stated it was "through a computer search, not necessarily in reference to him in particular, you know, but banned opinion writers." (Exhibit A at 96:8-98:24.) In stark contrast to that statement, Lehrer described, in an August 7, 2011 declaration signed under penalty of perjury, Guy Jean-Pierre's forgeries. (Exhibit B.) In his October 16, 2011 declaration, Lehrer states that he "assisted substantially with drafting the [bar] grievances filed against Jean-Pierre ..." (Exhibit C at ¶11.) In email communication on August 28, 2013, a mere 4 minutes after Sears first introduces him to FSPM/FSPM, Lehrer refers to an SEC.gov link and asks Sears whether Jean-Pierre is still the Secretary. (Exhibit D.) The SEC link was to the Jean-Pierre case which Lehrer assisted the Complainant in investigating and reporting to the FBI, SEC and Florida Bar. Even then Lehrer did not come clean and advise Sears of his conflict of interest and he did not obtain a conflict waiver from Complainant, FSPM or Sears.

Lehrer's representation of FSPM, Sears and Dittman interfered with the whistleblower referrals to regulators that Complainant made with Lehrer's assistance. Complainant lost all credibility in those proceedings because of Lehrer's double dealings.

In his SEC testimony, Lehrer admitted that he knew that Sears controlled Meadpoint during the time Lehrer was issuing tradability opinions. (Exhibit E at 316: 8-16). Lehrer lied in his testimony and stated that he did not know that Sears had transferred control of Meadpoint to his mother, Sandra Sears, until April 2014 (Exhibit F at 282:15 - 284:9; Exhibit G at 316:19 - 317:20), that claim is belied by, among other things, an October 22, 2013 email in which Sears told Lehrer "FYI no conflict with Meadpoint *as a family member out of state owns the company.*" (Exhibit H) (emphasis added). Sears also stated in that email that the ownership change would be reflected on the Nevada Secretary of State's website. Consistent with that statement, the Nevada Secretary of State's website identifies Sandra Sears as Meadpoint's only officer. (Exhibit I).

Lehrer stated in his SEC testimony that he learned from a newspaper article after DOJ's raid of FSPM's office that Sears had a prior criminal conviction for securities fraud. (Exhibit K at 236: 15-23.) Lehrer's other testimony on that subject, however, made clear that he knew about Sears' conviction long before that. (Exhibit L at 71:23-74:21; Exhibit M at 231:19-236:14). An October 10, 2013 email exchange, in fact, shows Lehrer and Sears discussing that very issue. (Exhibit N.)

Lehrer even instructed Sears to sign his name on legal opinions used to create the shares that the SEC says were unlawfully sold. (See Exhibit 0)

> "OK My scanner is not working If the latest draft covers it, can you sign my name similar to how I signed the other opinion letters?"

FSPM did not disclose in its OTC Markets Annual Report that Sears and/or his mother controlled Meadpoint and that Sears had a criminal conviction. Despite that Lehrer had knowledge that Sears and or his mother controlled Meadpoint and Sears had a criminal conviction, Lehrer rendered a Disclosure Opinion (Exhibit J) that states that FSPM's disclosure:

> (i) constitutes "adequate current public information" (the "Information") concerning the Securities and the Issuer and "is available" within the meaning of Rule 144(c)(2) under the Securities Act, (ii) includes all of the information that a broker-dealer would be required to obtain from the Issuer to publish a quotation for the Securities under Rule 15c2-11 under the Securities Exchange Act of 1934, as amended, (iii) complies as to form with the OTC Markets Group's OTC Pink Disclosure

4

that matter. These are "Tradability Opinions" to remove legends from shares so that they can be sold to investors and the "Disclosure Opinions" which relate to the adequacy of the information a public company provides to investors. Disclosure Opinions are posted on the OTC Markets and viewable by the public at large to inform investors that a company's disclosures comply with federal securities laws.

In defense of the bar grievance against Jean-Pierre, he provided a statement from Dittman, the president of FSPM (Available upon request). Complainant and Lehrer's referral of Jean-Pierre to the Florida Bar resulted in his disbarment as well as other investigations. (Supporting Documents Available upon request).

From November 2010 until June 2013, Jean-Pierre was a corporate officer and legal counsel for FSPM and Dittman is its Chief Executive Officer and sole director. Sears is Dittman's brother-in-law, and a consultant for and shareholder of FSPM.

During his representation of Complainant, Lehrer as Complainant's attorney, assisted her in reviewing the opinions and disclosures of Jean-Pierre's clients that were listed on the OTC Markets website at www.otcmarkets.com. This was done to evaluate the Disclosure Opinions rendered by Jean-Pierre.

In late 2012, Complainant and Lehrer had a falling out and have not had meaningful communication since such time. During and after his representation of Complainant, Lehrer, repeatedly disclosed confidential attorney-client privileged information about Complainant, including the bar grievance against her which was dismissed with a finding of no probable cause.

Shortly after his falling out with Complainant, Lehrer became counsel to Dittman, Sears and FSPM. Lehrer was engaged to draft FSPM's Tradability Opinions and Disclosure Opinions. At no time did Lehrer obtain a conflict waiver from Complainant as to his representation of FSPM, Sears or Dittman despite that he provided legal advice to Complainant concerning FSPM and Jean-Pierre's other clients.

From the inception of his representation of Sears, Dittman and FSPM, Lehrer was dishonest. For example, on August 28, 2013, Lehrer sent an email to Sears, with a link to the SEC enforcement action against Jean-Pierre, asking if Jean-Pierre was still involved with FSPM. At no time did Lehrer discuss his role as Complainant's attorney or advise Sears that he had assisted Complainant in reporting Jean-Pierre to the Florida Bar, SEC or FBI in connection with his baseless legal opinions and forgeries. Further, Lehrer did not obtain a conflict waiver from Sears. Lehrer rendered at least 19 Tradability Opinions for FSPM's shares and rendered a Disclosure Opinion (Available upon request).

In May of 2014, the SEC suspended trading of FSPM's shares. Dittman, Sears and Jean-Pierre were indicted. Sears and Dittman's indictments stem from the public disclosures and stock sales opined upon by Lehrer.

Lehrer was asked to testify at the SEC about FSPM. In connection with his proposed testimony, Lehrer requested that Sears waive the attorney client privilege and they agreed believing that Lehrer would testify truthfully about the advice he had provided to them. At no time did Lehrer disclose to Sears and Dittman that he had represented Complainant in the referral of Jean-Pierre to the Florida Bar, SEC and FBI. Further, Lehrer did not disclose to Sears and Dittman that the Assistant U.S. Attorney in their case was his former supervisor for 4 years and personal friend, Kenneth Harmon.

Lehrer failed to provide Sears with information necessary for him to have provided "informed consent" as to the waiver of the attorney-client privilege. Further, Lehrer failed to obtain a waiver of his conflict of interest from Complainant, FSPM and Sears.

Lehrer also failed to obtain a waiver of the attorney client privilege from Complainant despite that Jean-Pierre (FSPM's corporate officer), Dittman and FSPM had been an adversarial party to her in a matter

2

Guidelines, which are located on the Internet at www.otcmarkets.com, and (iv) has been posted through the OTC Disclosure and News Service.

To fully explain Lehrer's conflict, a timeline of the overlapping referrals of Complainant and the indictment and SEC charges against Sears, Dittman and FSPM is below:

- On March 29, 2013, the SEC received penalties against Marc Jablon in the case in which Lehrer represented Complainant. Jean Pierre was general counsel to Jablon and provided baseless legal opinions many of which were forged.
- In August 2013, begins representing Sears, Dittman and FSPM where Jean-Pierre was a corporate officer and general counsel.
- In approximately September of 2013, the SEC and FBI in Denver begin investigating FSPM.
- On January 13, 2014, Jean-Pierre is disbarred by the Florida Supreme Court based upon Complaint's referral – Lehrer was Complainant's attorney.
- In May of 2014, the Denver SEC suspended trading of FSPM.
- On January 29, 2015, Lehrer provided testimony in the Denver SEC case.
- On March 9, 2015, the New York SEC obtained a civil judgment and life time penny stock bar against Jean-Pierre in connection with his forged opinions that Lehrer assisted Complainant in reporting.
- On May 29, 2015, Lehrer provided testimony a second time in the Denver SEC case.
- On August 16, 2016, FINRA filed a case against Delaney Capital, the broker-dealer who accepted Jean-Pierre's forged opinions based upon Complainant's referral that Lehrer had assisted Complainant in investigating and reporting.
- In September of 2016, Sears and Dittman were indicted for securities fraud by the U.S. Attorney's Office in Denver.
- On December 15, 2016, FINRA entered into a settlement with Gary Hume and ACAP financial who accepted the forged opinions of Jean-Pierre that Lehrer had assisted Complainant in investigating and reporting.

Lehrer should be sanctioned for his myriad of conflicts and dishonest behavior particularly the lies in his SEC testimony. His testimony "evade[d] the proper functioning of the legal system[, which] has been found to constitute clearly dishonest conduct that adversely reflects on a lawyer's fitness to practice law" Fla. Bar v. Cohen, 908 So.2d 405, 411 (Fla.2005). His flagrant abuse of the law demonstrates a serious character flaw and merits a severe sanction such as disbarment. The harm to the public is demonstrated by the harm he caused Plaintiff's ongoing whistleblower referrals, the approximately $10 million of investor losses caused by Lehrer's baseless FSPM tradability opinions and the indictment of Sears and Dittman who relied upon Lehrer's advice.

I respectfully request that you take appropriate action against Lehrer.

Thank You,

. For the Firm

# Tod A Ditommaso Background

DiTommaso was licensed to practice law in California on December 14, 1987
http://members.calbar.ca.gov/fal/Member/Detail/130564

DiTommaso had his license suspended on April 13, 1997 for 2 years stayed, placed on probation with an actual nine-month suspension for multiple
DUI arrests. Didn't meet the criteria to get reinstated until June 27, 2000
http://archive.calbar.ca.gov/calbar/2cbj/97jul/art04.htm

While the SEC Civil case against Guy M Jean-Pierre for forged opinion letters was going on, the SEC and FBI in Denver began investigating Fusion
Pharm Inc (FSPM) at least as early as August of 2013.

On May 16, 2014, the SEC suspended trading in FSPM.
https://www.sec.gov/litigation/suspensions/2014/34-72177.pdf

On September 16, 2016, the SEC filed an Administrative Proceeding against the main FSPM insiders.
https://www.sec.gov/litigation/admin/2016/33-10210.pdf

In that document we get an explanation about what the government claims was going on. According to the government, William Sears was an
undisclosed control person of FSPM with Scott Dittman allegedly acting as a puppet CEO.

On September 16, 2016, the SEC also brought an Administrative Proceeding against one of the FSPM attorneys, Tod A Ditommaso.
https://www.sec.gov/litigation/admin/2016/33-10215.pdf

According to the SEC document, Tod A Ditommaso assisted in the share selling scheme and provided at least 10 legal opinion letters between July 2012 and August 2013. The SEC further alleges that the letters provided by Tod A DiTommaso were drafted by Guy M Jean-Pierre then emailed from Jean-Pierre to DiTommaso who put the letters on his letterhead, signed them, and sent them back to Jean-Pierre to be put into use. Jean-Pierre paid DiTommaso approximately $175 per legal opinion. According to the SEC, Tod A DiTommaso's sole contact for FSPM was Guy M Jean-Pierre.

On March 21, 2017, the SEC's motion for Summary Disposition was granted.
https://www.sec.gov/alj/aljorders/2017/ap-4698.pdf

In that document we are told DiTommaso was introduced to Guy Jean-Pierre in 2012 and was unaware of any penny stock ban against Jean-Pierre until the SEC contacted DiTommaso as part of their investigation into FSPM in 2014. The following chart shows that information to most likely be false as DiTommaso had previously taken over as legal counsel for 3 other Jean-Pierre Issuers (AGCZ, NWGC, and EHSI) in 2010 immediately after Jean-Pierre was added to the prohibited attorney list, a full 2 years before DiTommaso got involved in FSPM. The chart shows that the first 5 public Issuers to hire DiTommaso (AGCZ, NWGC, EHSI, FSPM, and IJJP) had all previously hired Guy Jean-Pierre for legal services. At least 4 of the 8 Issuers that hired DiTommaso had links to Roy Meadows (AGCZ, NWGC, IJJP, and RSCF) 2 of the 8 Issuers had links to William Sears (FSPM and PIHN)

| Issuer | Free Trading Stock | Litigation – DiTomasso Scam Alert | Opinions |
|---|---|---|---|
| Polaris International Holdings (PIHN) | William Sears; James Douglas Pulver; Takeshi Someya; Tomohiro Wakabayashi | The SEC and DOJ charged William Sears for FSPM; Sears had previously pleaded guilty to federal charges involving securities fraud and bribery in 2007 following a 2004 Indictment; Diane Dalmy was charged by the SEC in 2013 then charged again in 2015, she was suspended from practicing in 2016; Jackson L Morris was charged by the SEC in 2001 | DiTommaso wrote Attorney Letters |
| Andes Gold Corp (AGCZ)  Sub of NWGC Below | Roy Meadows; Donna Rayburn; Jean-François Amyot; Dan Ryan; Dennis Ruggeri; Tillerman Securities; Karisa Augustus | SEC Litigation against Amyot; SEC litigation against Ryan; In April 2016 an independent consultant declared AGCZ a fraud from 2011 - 2015 (lying about its business operations); OTC ban SEC, DOJ Guy Jean-Pierre  **Public Filings and Marketing Materials reflect the same address and telephone for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud** | DiTommaso wrote Attorney letters from May of 2010 – 2015  Jean Pierre wrote opinions for sub NWGC |
| New World Gold Corporation (NWGC) | Roy Meadows; Donna Rayburn; Dennis Ruggeri; Keithley Lake; Karisa Augustus | In April 2016 an independent consultant declared NWGC a fraud from 2011 - 2015 (lying about its business operations); OTC ban SEC and DOJ Jean-Pierre  **Public Filings and Marketing Materials reflect the same address for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud. Also a former address used by Frederick M. Lehrer.** | DiTommaso wrote Attorney Letters from May of 2010  Guy Jean-Pierre (from 2008 - 2010) |
| Zoloto Resources Ltd (ZRSCF) | Karisa Augustus (T&S Inestments Limited); NWGC | ZRSCF was well linked to AGCZ and NWGC and had common participants  **ZRSCF DID IR ACTIVITY/PUMP AROUND NWGC - AGCZ JOINT VENTURE**  **PINK – NO INFORMATION STOP SIGN**  Company address, phone and management appear to be fabricated.  **Public Filings and Marketing Materials reflect the same address for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud** | DiTommaso wrote opinion letters- Jean Pierre Clients  Note SEC Revoked Ticker used same address SFAZ |

| | | DiTomasso rendered opinions | |
|---|---|---|---|
| EQ Labs, Inc (EQLB) | The outstanding share count grew a ton between 2015 - 2017, but EQLB never discloses who received the shares or held the debt | | In 2015 DiTommaso showed up authoring the Attorney letters for the ticker. He did the most recent letter in June 2016 |
| Emerging Healthcare Solutions Inc (EHSI) | Joe Schmoe (obviously a fake name); Jack Uselton; Darrel Uselton; Jonathan Gilchrist; Maurice Stone; John Austin, Andrew Farmer | SEC Suspension on June 7, 2011; Jack and Darrell Uselton were named in SEC litigation in 2001 then again in 2009 – they criminally Indicted in 2007; Eddie Austin was named in an SEC Complaint in 2012; Jonathan Gilchrist was charged by the SEC in 2013; Andrew Farmer was named in an SEC Complaint in 2013; Samuel E Whitley was named in an SEC Complaint in 2014; OTC ban, SEC & DOJ Guy M. Jean Pierre | DiTommaso wrote Attorney Letter in May of 2010- Guy Jean-Pierre (from 2009 - 2010); |
| Fusion Pharm Inc | William Sears, Scott Dittman | SEC Trading Suspension, SEC Action and DOJ against Sears, Dittman and Jean-Pierre | Guy Jean-Pierre 2009 opinion-Corporate officer  DiTommaso Attorney Letters, July 2011 - August 2014  Frederick Lehrer wrote 1 OTC Market Opinion and 19 tradability legal opinions. |
| Artfest International | Big Apple Consulting, Roy Meadows, Marc Jablon, Edward Bronson Joseph Blumenthal | SEC Trading Suspension Dilution Scam | Jean Pierre then DiTommaso rendered tradability opinions |
| IJJP | Big Apple Consulting, Roy Meadows, Marc Jablon, Edward Bronson Joseph Blumenthal | Dilution Scam/ Stop Sign | Jean Pierre then DiTommaso rendered opinions |

| Date | Name | No. of Shares | Conversion price | Source Document SEC Complaint | Stock price previous close | Value of Stock date of letter | SEC claims - $$ stock sold |
|---|---|---|---|---|---|---|---|
| April 2011 – July 2012 we aren't told who wrote the opinion letters during this period | Microcap Management LLC - preferred stock conversions | 695,000 | | | | | |
| | | | | | | approximately $1,450,000 | Approximately $591,000 was made by Sears prior to DiTommaso |
| **The following were written by DiTommaso** | | | | | | | |
| June 7, 2012 | Microcap Management LLC - preferred stock conversion | 190,000 | | | | $461,700.00 | |
| July 5, 2012 | Microcap Management LLC - preferred stock conversion | 190,000 | | | $2.43/share | $397,100.00 | |
| | | 380,000 of 695,000 | | | $2.09/share | | |
| | | | | | | $858,800 of the $1,450,000 | |
| **Prior to July 2012 DiTommaso wrote the following opinion letters (not part of the SEC/DOJ Investigation)** | | | | | | | |
| March 13, 2012 | Oxford Capital Fund (Joshua Yudell) - preferred stock conversion | 115,000 | | | | | |
| May 2, 2012 | Stephanie Padilla - preferred stock conversion | 175,000 | | | $2.34/share | $269,100.00 | |
| May 2, 2012 | For Your Information Inc (Roger Pawson) - preferred stock conversion | 100,000 | | | $2.20/share | $385,000.00 | |
| May 2, 2012 | Roger Pawson - preferred stock conversion | 100,000 | | | $2.20/share | $220,000.00 | |
| May 2, 2012 | OTC Market Services (signed for by Mark Wakil) - preferred stock conversion | 100,000 | | | $2.20/share | $220,000.00 | |
| May 10, 2012 | William Adams - preferred stock conversion | 5,000 | | | $2.20/share | $220,000.00 | |
| June 5, 2012 | Myron Thaden - preferred stock conversion - purchased in May 2011 for $25,000 | 100,000 | | | $2.25/share | $11,250.00 | |
| | | | | | $2.42/share | $242,000.00 | |
| All the preferred stock was previously owned by Frederick A Dahlman Jr the former CEO of Hay Bee | | 695,000 | | | | | |
| | | | | | | $1,567,350.00 | |
| **Between July 2012 - August 2013 DiTommaso wrote 10 opinion letters that were part of the SEC/ DOJ Investigation** | | | | | | | |
| July 23, 2012 | Microcap Management LLC (transferred from Todd Abbott) | 40,000 | | | | | |
| January 4, 2013 | Bayside Realty Holding LLC from $275,000 Note | 140,000 | $.01/share | SEC Complaint | $2.03/share | $81,200.00 | |
| March 13, 2013 | $1,172 of Debt purchased from Bayside by SGI Group LLC (Shmez Sova) for $5,000 | 12,500 | $.81/share | SEC Complaint | $.81/share | $113,400.00 | |
| March 13, 2013 | $12,885 of Debt purchased from Bayside by Starcity Capital (Schraga Levin) for $55,000 | 137,500 | $.40/share | SEC Complaint | $.74/share | $9,250.00 | |
| March 13, 2013 | $1,172 of Debt purchased from Bayside by Blackarch Opportunity (Scott Levin) for $50,000 | 12,500 | $.40/share | SEC Complaint | $.74/share | $101,750.00 | |
| March 13, 2013 | $2,343 of Debt purchased from Bayside by Alexandra Mauriello for $10,200 | 25,500 | $.40/share | SEC Complaint | $.74/share | $9,250.00 | |
| March 13, 2013 | $1,172 of Debt purchased from Bayside by Vera Group LLC ( ) for $5,000 | 12,500 | $.40/share | SEC Complaint | $.74/share | $18,870.00 | |
| March 31, 2013 | Meadpoint Venture Partners from $88,000 Note | 475,000 | $.01/share | SEC Complaint | $.74/share | $9,250.00 | |
| August 13, 2013 | Meadpoint Venture Partners from $88,000 Note | 500,000 | $.10/share | SEC Complaint | $.59/share | $280,250.00 | |
| August 26, 2013 | $15,000 of Meadpoint debt sold to Scholz/Thaden/Thaden for $150,000 | 1,500,000 | $.10/share | SEC Complaint | $.36/share | $180,000.00 | |
| | | | | | $.40/share | $600,000.00 | |
| Meadpoint had 975,000 of its 4,245,000 shares made free trading by DiTommaso | | | | | | | |
| | | | | | | $1,403,220.00 | $1,200,000 was made by investors from the 10 DiTommaso opinions in this section |
| | | | | | | | Approximately $1,594,000 - $1,744,000 was made by Sears via opinion letters provided by DiTommaso depending on if we credit DiTommaso from the $150,000 for the $15,000 in debt sold to Thaden and Scholz |
| **Other Letters written by DiTommaso not included in the SEC/ DOJ Investigation** | | | | | | | |
| March 13, 2013 | David P Roy (stock issued January 6, 2012) | 25,000 | | | $.80/share | $20,000.00 | |
| **Starting August 2013 Frederick Lehrer wrote all the Opinion Letters** | | | | | | | |
| August 28, 2013 | Myron Thaden ($5,000 in debt from $88,000 Meadpoint Note acquired for $50,000) | 500,000 | $.10/share | SPA | $.49/share | $245,000.00 | |
| August 28, 2013 | Sharyn Thaden ($5,000 in debt from $88,000 Meadpoint Note acquired for $50,000) | 500,000 | $.10/share | SPA | $.49/share | $245,000.00 | |
| August 28, 2013 | Richard Scholz ($5,000 in debt from $88,000 Meadpoint Note acquired for $50,000) | 500,000 | $.10/share | SPA | $.49/share | $245,000.00 | |
| September 10, 2013 | Black Arch Opportunity Fund LP - Scott Levin ($15,625 from $275,000 Bayside Note) | 28,562 | $.50/share | Note B & SPA | $.50/share | $14,281.00 | |
| September 10, 2013 | Starcity Capital LLC - Schraga Levin ($116,875 from $275,000 Bayside Note) | 313,703 | $.40/share | Note & SPA | $.50/share | $156,851.50 | |
| September 12, 2013 | Black Arch Opportunity Fund LP - Scott Levin ($15,625 from $275,000 Bayside Note) | 28,562 | $.40/share | Note B & SPA | $.51/share | $159,988.53 | |
| January 6, 2014 | Meadpoint Venture Partners from $88,000 Note (date on letter was 1/6/2013) | 800,000 | $.01/share | SPA | $.51/share | $14,566.62 | |
| January 16, 2014 | Alexandra Mauriello ($24,875 from $275,000 Bayside Note) | 61,437 | $.40/share | Note & SPA | $.43/share | $344,000.00 | |
| January 16, 2014 | Vera Group, LLC ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | SPA | $1.98/share | $121,645.26 | |
| January 23, 2014 | SGI Group LLC - Shmez Sova ($11,849.99 from $275.00 Bayside Note) | 29,625 | $.40/share | Note & SPA | $1.98/share | $58,657.50 | |
| January 23, 2014 | Vera Group, LLC ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | SPA | $1.98/share | $58,657.50 | |
| January 23, 2014 | SGI Group LLC - Shmez Sova ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | Note & SPA | $3.17/share | $93,911.25 | |
| January 23, 2014 | Alexandra Mauriello ($24,875 from $275,000 Bayside Note) | 61,437 | $.40/share | SPA | $3.17/share | $93,911.25 | |
| February 14, 2014 | Starcity Capital LLC - Schraga Levin ($116,875 from $275,000 Bayside Note) | 600,000 | $.01/share | SPA | $1.94/share | $194,755.29 | |
| March 4, 2014 | Craig Dudley (stock issued 5/9/11) | 20,000 | | Company's Filings with OCMG | | $3,132,000.00 | |
| March 6, 2014 | Meadpoint Venture Partners from $88,000 Note | 370,000 | $.01/share | SPA | $6.30/share | $126,000.00 | |
| March 26, 2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 | $.01/share | SPA | $8.70/share | $3,219,000.00 | |
| April 16, 2014 | Meadpoint Venture Partners from $88,000 Note | 900,000 | $.01/share | SPA | $5.25/share | $3,150,000.00 | |
| | | | | | $3.31/share | $2,979,000.00 | |
| | TOTAL SHARES | 5,715,904 | | | | $14,652,225.70 | |
| Meadpoint had 3,270,000 of its 4,245,000 shares made free trading by Lehrer | | | | | | | |

Between May 2013 and April 2014 the SEC says Meadpoint converted debt into 4,245,000 shares and sold $15,000 worth of debt that was converted into 1,500,000 shares  Meadpoint sold 3,200,000 of those shares for $9,900,000 in proceeds

Based on these numbers we know that Sears was unable to sell 1,045,000 shares before the stock was suspended.  The last 1,045,000 shares off our chart carried a value of $3,740,250 reducing the Lehrer value down from $14,652,225.70 to $10,911,975.70  The SEC credits DiTommaso with the 1,500,000 shares sold by Scholz and Thaden in August 2013 so if we deduct that $735,000 from Lehrer the new total becomes $10,176,975.70

All total the SEC claims that Sears made $12,200,000 from his stock/ debt sales.  Approximately $2,185,000 - $2,335,000 was made prior to Lehrer. So that means approximately $9,665,000 - $9,815,00 was made with Lehrer as the attorney

by the Inspector General.  Along with SA Funk of the FBI and former AUSA Harmon of the Denver US Attorney's Office.

## MISCONDUCT BY FEDERAL PROSECUTOR

Furthermore, as AUSA Siebert failed to adequately investigate these credible claims alleged by Mr. Sears, this also amounts to misconduct, as it is well established that the duty of prosecutors is to "seek justice within the bounds of law, not merely to convict".  A prosecutors job is not to win a case, but that justice shall be done.  Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers.  They must win fairly and stay within the rules.  They should view these obligations as applying in both civil and criminal enforcement actions.

## CASE SUMMARY

As such, SA Funk's use of the term Certified Public Accountant was not just being used to show she held a Kansas issued certificate but instead was done to mislead the magistrate Judge into believing she was qualified to perform the services required in this investigation as the evidence discovered as the result of her unqualified forensic accounting opinions were the basis of fact relied on by the court in this investigation and by the courts in rendering their probable cause determinations and as such vilates federal regulations tainting this entire investigation and rendering these search warrants as being illegal.

Without the investigation, search warrants and everything else discovered subsequent to this investigation renders the prosecution with no winnable case and the reasons why the prosecutors kept coming after the company and Mr. Sears.  The last thing that the government thought they would find, is exactly what they found, A legitimate business.  Instead of the Ponzi scheme or illegal marijuana grow they were assured they would discover. Exh. B, F 16

So then they resorted to letting Fred Lehrer, Mr. Harmon's longtime friend and the man who was supposed to keep me safe tell them what they needed to hear so they could get a conspiracy case.  All the while knowing that Lehrer was lying to federal investigators.  Then they used the lies to railroad Sears so this huge mess would never be known.

This type of government abuse of power and corruption undermines the courts at their very core.

I wish to thank the court for its' assistance and patience as this is a Pro Se petition of which I have never done.  I am in no way a lawyer and request that the court appoint one to me so that I may better argue these



# SIDEMAN
# BANCROFT

303 16ᵗʰ Street, Suite 200
Denver, Colorado 80202-5657
Telephone: (415) 392-1960
Facsimile (415) 392-0827

**William L. Taylor**
Admitted only in Colorado & the District of Columbia
wtaylor@sideman.com
(415) 733-9395

June 20, 2014

**VIA HAND DELIVERY**

AUSA Kenneth Harmon
United States Attorney's Office
District of Colorado
1225 Seventeenth Street, Suite 700
Denver, CO 80202

      Re:    *Scott Dittman - Fusion Pharm, Inc.*

Dear Ken:

During our recent meeting together, you suggested that I take a hard look at the sales revenues for Fusion Pharm, Inc. As promised earlier this week, with this letter I am transmitting to you a compilation of documents yielded by our preliminary efforts to review transactions for sales of pods manufactured by Fusion Pharm since 2011.

By my count, the attached records and materials document a total of sixty seven (67) pods sold. Fifty nine (59) pods appear to have been delivered to buyers, and eight (8) have yet to be delivered.

Attached hereto you will find a series of tabs, each of which corresponds to a customer of the company during that period, and under which you will find records or other evidence documenting such sales transactions. The records attached are not complete -- the government has seized most of the company's records, so it has been difficult to assemble complete records sets for each sale. What you will find, however, depending on availability of records for various transactions, are copies of proposals, contracts, excerpts of bank records, copies of checks, shipping, customs, and inspection documents, and photographs of pods. In most cases, signed copies of documents were not available because the government seized the signed copies, so we have had to make do with copies attached to email messages. Most of these records came from Scott Dittman's email records, banking records available online, or from Fusion Pharm customers who were interviewed by my investigator, and who sent us photos of pods or records upon my investigator's request.

Kenneth Harmon
June 20, 2014
Page 2

I apologize that it has taken us a couple of weeks to put together this (admittedly incomplete) set of documents evidencing these sales transactions, but you have the company's records, and I needed to hire an investigator to conduct interviews of customers. Even though the records are not complete, I am fairly well satisfied that the company sold north of five dozen pods, and got paid for them, either directly by the purchaser, or by Mead Point, the company publicly disclosed as the contract sales agency for Fusion Pharm.

I confess that in light of what we have been able to document readily even without the benefit of the company's full business records (with more substantiation available from public sources), I am puzzled as to why the government would believe that these sales had not taken place. I would like to discuss the matter further with you when you have time.

Very truly yours,

William L. Taylor

Enclosures

cc:   Ian Karpel, Assistant Director
      United States Securities and Exchange Commission



1 letters or whether they were denoted for a retainer for
2 FusionPharm, I don't recall. But I -- but the import of
3 the statements -- of the statement was that, you know,
4 you're hired, and in my mind it was FusionPharm.
5    Q   Okay.
6        MR. KARPEL: Kim, let's go off the record for a
7 moment.
8        (Short recess from 10:22 a.m. to 10:28 a.m.)
9        MS. GREER: Let's go back on the record,
10 please, at 10:28, a.m.
11       BY MS. GREER:
12    Q   Mr. Lehrer, during the break, did we have any
13 substantive conversations about the case?
14    A   No.
15    Q   Going back to the meeting that was held in
16 Orlando between yourself, Mr. Sears, and Mr Scholz, how
17 long was the meeting?
18    A   Maybe an hour.
19    Q   And was there any legal advice sought during
20 the meeting?
21    A   No. It was very general about the company,
22 what my experience is.
23    Q   And what did -- what did -- what did Mr. Sears
24 say about FusionPharm?
25    A   I really don't recollect. I mean, it was just

1 very general stuff about what the business is.
2    Q   What did he tell you their business was?
3    A   Selling these pharmpods for cultivation.
4    Q   Did Mr. Scholz tell you anything about
5 FusionPharm?
6    A   I don't really recall him saying anything about
7 FusionPharm. He was really there as an introduction to
8 Mr. Sears.
9        MR. KARPEL: What else do you recall about the
10 meeting? Can you just sort of describe what was said
11 generally?
12       THE WITNESS: I can't really recall. I mean,
13 it was just very general about what the company did,
14 what its prospects were. That was about it.
15       MR. KARPEL: Did he talk about the future? Did
16 he talk about what -- you know, what FusionPharm's plans
17 were for expansion or growth, those kinds of things?
18       THE WITNESS: Well, I think they talked about
19 the opportunity -- he talked about the opportunity in
20 other states where marijuana was medically approved
21 and/or would be recreationally permitted. Again, very
22 general kind of information.
23       MR. KARPEL: Did he speak about Mr. Dittman at
24 all, the CEO?
25       THE WITNESS: I believe so, just that he was a

1 very competent CEO.
2        MR. KARPEL: Any more that you recall?
3        THE WITNESS: No.
4        MR. KARPEL: Anything about the facilities or
5 what customers? Anything --
6        THE WITNESS: No.
7        MR. KARPEL: -- along those lines?
8        THE WITNESS: Nothing about that. Generally
9 about what these pharmpods were.
10       MR. KARPEL: That's what you remember? So
11 talking about this, it's not jogging your memory as to
12 any other parts of the conversation?
13       THE WITNESS: No.
14       MR. KARPEL: Okay.
15       BY MS. GREER:
16    Q   Did Mr. Sears indicate that he, through his
17 company, was a shareholder of FusionPharm?
18    A   I don't recall.
19       MR. KARPEL: And was it at this meeting you
20 talked about a registration statement?
21       THE WITNESS: Yes.
22       MR. KARPEL: Can you tell us about that?
23       THE WITNESS: Yeah. The information was that
24 the company wanted to do an S-1 registration statement.
25       MR. KARPEL: It was Mr. Sears who was telling

1 you that?
2        THE WITNESS: Yes.
3        BY MS. GREER:
4    Q   Did you have an understanding as to why
5 FusionPharm wanted to do an S-1?
6    A   Well, yes. They wanted to become an
7 SEC-reporting company.
8    Q   Do you know an individual by the name of Guy
9 Jean-Pierre?
10    A   Yes.
11    Q   And how do you know Mr. Jean-Pierre?
12    A   I knew him in connection with my ex-wife's
13 practice.
14    Q   Was he a member of your ex-wife's firm?
15    A   No, absolutely not.
16    Q   Can you explain what you mean when you say you
17 knew him in connection with your ex-wife's practice?
18    A   Well, I believe I only met him once; but prior
19 to that, there was -- I believe it had something to do
20 with my ex-wife contesting something about his opinion
21 letters.
22    Q   Do you recall when that happened?
23    A   I think it was around 2007 or 2008.
24    Q   And you said you met him once?
25    A   Yeah. I can't even recall why I met him, but,

Page 97

1  you know, I found out -- I was with my son, and I found
2  out his office was right there, and I walked in and
3  introduced myself.  And I just don't recall what it was,
4  an introduction or I was inquiring about something in
5  particular that my ex-wife had told me to inquire about.
6  This was quite a while ago.  I don't recall.  And it was
7  an extremely brief, no more than one minute, situation.
8      Q  Did you ever speak with Mr. Jean-Pierre about
9  FusionPharm?
10     A  No, absolutely not.
11     Q  Did you ever become aware at any point that Mr.
12 Jean-Pierre was involved with FusionPharm?
13     A  I don't recall.
14     Q  You don't recall ever knowing that, or you
15 don't recall either way?
16     A  I really don't recall either way.  I mean, it's
17 conceivable, but it's certainly not at the forefront of
18 my mind that he was involved in any way.
19     MR. SALLAH:  Is that something you would have
20 remembered, having this prior incident with him, met
21 him, had this, you know, brief incident if his name
22 would have come up in the context of FusionPharm?  You
23 would have --
24     THE WITNESS:  Yeah, I would have, because at
25 some point I had learned that he had been banned from

Page 98

1  issuing opinion letters.
2      BY MS. GREER:
3      Q  When did you learn that?
4      A  I don't recall.  It was probably, you know,
5  just through a computer search, not necessarily in
6  reference to him in particular, you know, but banned
7  opinion writers.
8      Q  Is there a reason that you were doing that
9  search?
10     A  I really don't recall.
11     MR. KARPEL:  Did -- did you do that search
12 during the time period that you still represented
13 FusionPharm?
14     THE WITNESS:  No.
15     MR. KARPEL:  After?
16     THE WITNESS:  No, this is way before.
17     MR. KARPEL:  Before?
18     THE WITNESS:  Yes.
19     MR. KARPEL:  Okay.  So you know before --
20     THE WITNESS:  I believe so.
21     MR. KARPEL:  You knew before you began
22 representing FusionPharm that Guy Jean-Pierre had been
23 banned?
24     THE WITNESS:  Yes.
25     MR. KARPEL:  And ...

Page 99

1      BY MS. GREER:
2      Q  Do you know an individual by the name of Tod
3  DiTommaso?
4      A  Tod DiTommaso?  What -- I'm not sure.  I think
5  he may have been involved as an officer or one of these
6  shareholders.  I'm not sure.  I don't recall his name in
7  particular other than perhaps in connection with his
8  opinion letters.
9      Q  I'm sorry.  I don't understand that.  So you
10 recognize his name or you don't recognize his name?
11     A  I'm thinking perhaps that one of these slices
12 of debt that was sold, that that particular person was
13 representing one of the entities that was trying to free
14 up shares.
15     Q  Okay.
16     A  But I don't -- other than that, I never met the
17 guy, never -- you know, I don't even know --
18     Q  Okay.  So I'll represent to you -- we'll get to
19 those -- your attorney opinion letters.
20     A  Yeah.
21     Q  Right.  None of those relate -- none of the
22 entities who purchased Bayside debt related to Tod
23 DiTommaso at all.  So --
24     A  You're telling me this?
25     Q  I'm telling you this.

Page 100

1      A  Okay.  All right.
2      Q  So knowing that, I mean, does --
3      A  No, I --
4      Q  -- do you know his name?
5      A  I don't know his name.
6      Q  And I'll represent to you he's an attorney
7  practicing in California.  Does that refresh your
8  recollection or ring any bells?
9      A  Oh, I'm sorry.  You mean the gentleman that had
10 issued opinion letters before me?
11     Q  So you do know --
12     A  No, I do.
13     Q  Okay.
14     A  Yeah, because I remember -- I apologize.  I
15 didn't get the name right in my mind.  I had reviewed an
16 opinion letter that he issued.  It was provided to me.
17     Q  Who provided that to you?
18     A  Bill Sears.
19     Q  And when did Mr. Sears provide Mr. DiTommaso's
20 opinion letter to you?
21     A  I don't recall exactly, but it was early on in
22 the engagement.
23     Q  Was it before you drafted and issued your first
24 FusionPharm --
25     A  I believe so --



EXHIBIT

B

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT**
**IN AND FOR PALM BEACH COUNTY, FLORIDA**
**CASE NO. 502011CA007165XXXXMB-AE**

BIG APPLE CONSULTING USA, INC.,
a Delaware corporation; BIG APPLE
EQUITIES, LLC., a New York Limited
Liability Corporation, MANAGEMENT
SOLUTIONS INTERNATIONAL, INC.,
a Florida corporation, and MARC JABLON,
an individual,

       Plaintiffs,

vs.

BRENDA LEE HAMILTON, an individual;
HAMILTON & ASSOCIATES LAW GROUP,
P.A., and HAMILTON & LEHRER, P.A.

       Defendants.

_____/

## Declaration

My name is Frederick M. Lehrer.  I am a Florida licensed attorney.  On or about July 15, 2011, I was assisting Hamilton & Associates Law Group, P.A. in various matters and accepted a telephone call from Leslie Jean Pierre ("L Pierre"), who identified herself as an attorney licensed to practice law in Texas and the niece of Guy Jean-Pierre ("GJP").  L. Pierre informed me that she wished to discuss matters pertaining to a June 15, 2011 letter to the Texas Bar in matter number S00411125140 (hereafter referred to as the "Texas Bar Matter"), a copy of which letter is attached hereto as Exhibit A.  L. Pierre told me the following:

1. In or about March or April of 2010, her uncle, Guy Jean-Pierre ("GJP"), asked her for a copy of my driver's license and signature, which he said was required to form a corporation, Complete Legal Solutions, Inc. ("CLS').  GJP also asked L Pierre to assist him with his law firm because he had more legal work than he could do.  This work included drafting legal opinions in securities-related matters.

2. L. Pierre advised GJP that she knew nothing about such legal opinions, the SEC, or the OTC Markets.  GJP responded, "Don't worry about it".  At the conclusion of this conversation, L. Pierre made it clear to GJP that she did not have any experience in securities or corporate law.

3. In compliance with GJP's request, L. Pierre provided GJP with a copy of her driver's license and signature for the purpose of forming CLS.  In hindsight, after realizing that her signature has been forged on legal opinions, L. Pierre realized that this was an ill-

advised action on her part. However, at the time she trusted her uncle completely, and never imagined he would violate this trust.

4. L. Pierre had had no further contact with GJP until approximately one year later, when she received notification of the Texas Bar Matter, relating to Brenda Hamilton's concerns about legal opinions that purport to have been authored and signed by L. Pierre under the CLS letterhead. L. Pierre identified those letters as forgeries and L. Pierre did not author or sign them, or authorize GJP or anyone else to sign her name to these letters.

5. L. Pierre called GJP to discuss these circumstances. GHP told L. Pierre said that Ms. Hamilton filed the Texas Bar Matter against him in retaliation against him, which made no sense to L. Pierre. Ms. Hamilton provided L. Pierre   with the legal opinions in question and there is no doubt they are forgeries of her signature.

6. L. Pierre confronted GJP about the forged letters, and advised him that she never authorized him to sign her name to the legal opinion letters. In response, GJP told L. Pierre that he thought that she had understood "how things would work." L. Pierre interpreted this remark to be an admission that he her uncle had forged her name to these letters, but explained that he believed she had somehow been complicit in his plan to do so.

7. L. Pierre immediately responded to GJP that he never gave her any idea of "how things would work," and specifically never told her that he would be signing her name to opinion letters. L. Pierre also told him that she never would have agreed to allow him or anyone else to use her signature or name in such a manner.

8. Based on this conversation with GJP, L. Pierre has come to the conclusion that GJP forged her signature to, or used a copy of her signature on the legal opinions that are the subject of the Texas Bar Matter. .

9. Before learning of the Texas Bar Matter, L. Pierre was unaware that OTC Markets had banned GJP from providing any opinion letters to OTC Markets. In hindsight, she has concluded that GJP used her to form CLS because the OTC Markets would not accept any opinion letters authored by his firm, or any new firm he might create, since he had been banned. Instead, he used CLS and L. Pierre's name -- without her knowledge or permission -- to continue sending opinion letters to OTC Markets and evade the ban, by not using his own name.

10. L. Pierre has never had any contact with Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on her behalf. L. Pierre has never provided a copy of her driver's license or signature to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone on his or her behalf. L. Pierre has never provided a legal opinion, or legal opinion bearing her signature, to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf. L. Pierre has never authorized Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf to provide her driver's license or any legal opinion bearing her signature to anyone, including the OTC Markets.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed on August 7 2011



DECLARATION OF FREDERICK M. LEHRER

The undersigned, Frederick M. Lehrer, hereby declares that:

1. I am an attorney licensed to practice law in the state of Florida.

2. I am a former attorney with the Division of Enforcement of the US Securities and Exchange Commission and a Special Assistant US Attorney with the United States Attorney's Office for the Southern District of Florida.

3. I have a son, Brandon Lehrer, with my ex-wife, Brenda Hamilton.

4. Since he was born, Brandon has suffered various illnesses, which last for weeks and sometimes more than a month. During May of 2010, Brenda and I were told that our son, Brandon's immune system was not functioning properly, which was particularly traumatic for Brenda because her sister's first son died of a rare immune disorder when he was 3 years of age and her sister's second son recently was diagnosed with Stage 4 nasopharyngeal cancer.

5. Because we were advised by our physician at Miami Children's Hospital that Brandon could literally die from a cold, whenever Brandon was ill, Brenda missed work to care for our son, instead of arranging for a babysitter or other childcare.

6. Shortly after learning of our son's illness, in July of 2010, Brenda learned her mother (now deceased) was diagnosed with cancer of an unknown primary region, a terminal form of cancer with a 100% mortality rate. Brenda also assisted in the care of her mother regarding her illness.

7. Because it was impossible for Brenda to maintain a normal work schedule for almost a year, until her mother's death in late April 2011, as summarized above in 4-6, I provided her with assistance in her work with multiple client matters during such time including her representation of Cloud Centric, Inc. ("Cloud Centric") and David Lovatt ("Lovatt"). At times I provided representation to Cloud Centric and Lovatt including the appropriate steps Cloud Centric should take to correct its prior illegal public disclosures, which are available on the OTCMarkets.com website, which Guy Jean Pierre ("Jean Pierre") and Kimberly Graus ("Graus") opined upon.

8. I substantially assisted in drafting the Cloud Centric remedial disclosures (the "Remedial Disclosures") posted on the OTC Markets website pertaining to Big Apple Consulting and its related corporate egos and control persons (collectively "Big Apple"), including Marc Jablon ("Jablon") which are the subject of the Florida Bar grievance (the "Grievance") filed by Jablon against Brenda.

9. When assisting with the drafting of the Remedial Disclosures, I confirmed ALL of the factual disclosures concerning Big Apple by reviewing executed contracts, publicly available information, filings on www.sunbiz.org & OTC Markets website and Cloud Centric's corporate documents and did not rely upon any factual representations made by Lovatt, Brenda or any other person. I also conducted a legal analysis of the securities law issues related to the matters involving Big Apple and assisted with the drafting of the legal analysis contained within the

Remedial Disclosures.

10.    It is my opinion that the Remedial Disclosures are factually and  legally accurate and are disclosures required by the securities laws.

11.  In December of 2010, I assisted David Lovatt in drafting the bar grievance against Carl N. Duncan for the theft of shares held in escrow by Duncan after Duncan provided me with what I believe are false accountings of Cloud Centric's common shares he purportedly held in Escrow. I also assisted substantially with drafting the grievances filed against Jean Pierre and Graus as well as the UPL grievance concerning Connectyx Technologies, Inc. during the time when Brenda's mother was in the final stages of her cancer.

12.  It is my firm belief that there are no confidential communications of any type (including between Jablon and Brenda), which were disclosed in the Remedial Disclosures because I independently verified the information concerning Big Apple contained within the Remedial Disclosures from publicly available documents from the internet, transfer agent documents,  or contracts and corporate documents provided by Lovatt.

13. I have never spoken with Marc Jablon or anyone at Big Apple about any portion of the information contained within the Remedial Disclosures.

14.  It is my opinion that Brenda's only objective and role in drafting the Remedial Disclosure was to protect the interests of her clients, Cloud Centric and Lovatt and provide truthful disclosure of the public to protect her clients' interests and prevent them from being the subject of an SEC enforcement action based upon improper and illegal disclosures drafted by Big Apple and opined upon by Graus and Jean Pierre, neither understood or undertaken by Cloud Centric and Lovatt.

15. It is a travesty of just that  Brenda has spent more than a year and dedicated literally hundreds of hours defending herself against fabricated allegations made by Jablon during a period of her life when she had devastating personal matters requiring her attention.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed this  16th[h]  day of October 2011



Private Email <william@williamjsears.com>
To   William Sears
FW. Introduction

September 8 2015  8 08 AM



**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:04 AM
**To:** William Sears
**Subject:** Re: Introduction

OK
Thanks


On Wed, Aug 28, 2013 at 1:02 PM, William Sears <william@williamjsears.com> wrote:
No he has not been secretary since the beginning of 2012 when this came to light

Regards,

William Sears
(303) 518-3895


Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information.  If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited.  If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately.  You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:02 AM
**To:** William Sears
**Subject:** Re: Introduction

Bill

I have reviewed some of the otcmarkets' flings for Fusion Pharm, Inc.

Can you please inform me whether the link below is the same person appointed to Secretary and whether he still is the Secretary?

http://www.sec.gov/litigation/litreleases/2012/lr22562.htm

Thank you


On Wed, Aug 28, 2013 at 10:58 AM, William Sears <william@williamjsears.com> wrote:
Fred,
We will be in town next week. I would love to have lunch to discuss. We are looking to do a form 10 and S1. I assume you have reasonable auditors you work with along with a BD that will do the 2-11 for the BB? The symbol is FSPM. I look forward to meeting next week and have a great holiday.

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 8:40 AM
**To:** William Sears
**Subject:** Introduction

Bill:

I understand that Rich Scholz has provided you with an introduction to my services. In further explanation, I have some of the lowest rates in the business for registration statements, opinion letters, periodic reports, securities disclosure matters and other securities related matters.

I charge $350 for opinion letters. Because Rich referred you I would lower that amount for you to $250 (most opinion letters are from $500 to $1,250). My hourly rate is $300/hour. I accept low retainers of $2,500. On registration statements, I charge $10,000 to $15,000 plus a block of stock from 200,000 shares to 400,000 shares. All registration statement quotes are open to negotiation. I have a deep regulatory background with 15 years at the SEC and 3 1/2 years as a Special Assistant United States Attorney. My legal practice since 2000 has been predominately in the area of corporate finance. My ultimate goal in any engagement is to provide full and accurate disclosure to the public and the SEC to protect the shareholders and to provide liability protection to the issuer and its officers and directors. Kindly review my website below or my linked in page for further information pertaining to my background and services.

I look forward to discussing these matters with you further and working with you in the future.

Thank you.

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com

EXHIBIT

E

## Page 315

1 Dudley came to you or called you --

2    A  Correct

3    Q  -- and said I've seen Sears in the office

4 every day for the past two months.

5    A  Correct

6    Q  And at a later point in time, Mr. Dittman

7 told you Sears has nothing to do with FusionPharm and

8 I'd never let him have anything to do with FusionPharm?

9    A  Correct.

10    Q  Do I have the timeline right so far?

11    A  Correct  And then Mr. Dudley informed me

12 that pursuant to discussions with Mr Dittman, that

13 there would not be any disclosure because -- regarding

14 Mr Sears or Meadpoint being an affiliate because based

15 upon Mr Dittman's representations, he was not

16    Q  Did Mr. Dudley express to you any indication

17 that he might not agree with Mr. Dittman's

18 characterization of Mr. Sears' involvement with

19 FusionPharm?

20    A  Only from the standpoint that he saw him

21 there every day  I really apologize I had too much

22 coffee this morning.

23    Q  Do you need to take a break?

24    A  Yes

25      MR LYMAN  Let's go off the record

## Page 316

1     (A break was had from 11 04 to 11.10 a m )

2      MR LYMAN  All right  Let's go back on the

3 record

4 BY MR LYMAN

5    Q  Mr. Lehrer, while we were on the break, did

6 we have any substantive conversations about the case?

7    A  No

8    Q  Okay.  In your previous day's testimony we

9 had asked you whether you had an understanding that

10 Meadpoint was one of Bill Sears' companies and you had

11 refused to answer that question on privilege grounds.

12 In light of the agreement we now have with Mr. Sears'

13 counsel, will you now answer whether you were aware

14 that Meadpoint was one of Bill Sears' companies during

15 the time you were issuing Rule 144 letters?

16    A  Yes

17    Q  And how did you come to be aware of that

18 information?

19    A  In a meeting with Mr Sears, he told me that

20 he was in control of Meadpoint, but that he was

21 transferring it to a third party unrelated to him or in

22 any family context, including his mother

23    Q  So when you first had the conversation about

24 Sears' ownership in Meadpoint, he mentioned

25 specifically that he wasn't going to transfer Meadpoint

## Page 317

1 to his mother?

2    A  Very specifically,

3    Q  And was that on your prompting, did you ask

4 him whether he was going to transfer it to his mother

5 or did he just volunteer that particular family member?

6    A  I did ask him.

7    Q  And why his mother?  Why did that come up?

8    A  I don't remember why it came up, you know, we

9 were having a conversation back and forth  And, you

10 know, through questioning or otherwise about whether it

11 was going to be transferred to a family member  He

12 said, no, it's not going to be transferred to a family

13 member  And I may have asked him, you know, is it

14 going to be transferred to your wife, to your mother,

15 you know, you're saying it's not going to be

16 transferred to a family member  Does that include "X"

17 and "Y"?  I don't remember specifically if I asked

18 that, but certainly in the conversation it was

19 communicated to me that it would not be transferred to

20 his mother specifically

21    Q  Did you ever have an understanding of whether

22 any of the other entities for which you wrote Rule 144

23 opinion letters or which were involved in any of the

24 opinion letters were owned by Mr. Sears' mother?

25    A  Yes

## Page 318

1    Q  Okay.  And which entities were those?

2    A  When I had that conversation with Mr Sears

3 in or about April, 2014, when he said he transferred it

4 to his mother

5    Q  But prior to that, when you had the

6 conversation with Mr Sears, which I believe you

7 thought was in October, 2013, about him transferring

8 Meadpoint, at that point in time were you aware of any

9 other entities that were owned by, managed by or

10 included as an officer, Mr. Sears' mother?

11    A  No

12    Q  Okay.  And other than Meadpoint, did you ever

13 become aware of any other entities that were owned by

14 or directed by or had as an officer Mr Sears' mother?

15    A  No  Again, apart from that conversation in

16 April, 2014, with Mr Sears

17    Q  Okay.  So what about Bayside Realty Holdings,

18 did you ever come to understand that Mr. Sears's mother

19 was involved with that company?

20    A  No

21    Q  Okay.  But you knew that there was a Sandra

22 Sears who was involved with Bayside?

23    A  My understanding, it was the Sandra Sears

24 that was Bill Sears' wife

25    Q  Okay.  And what did you understand the person

Page 279

1    A   Correct

2    Q   2013. So the date of the e-mail is October

3   10, 2013. Thank you for that. And at your prior day

4   of testimony we had asked you if you had an engagement

5   letter with Mr. Sears and you said that you did, but we

6   didn't yet have it. So is this document that begins on

7   page Bates number FLWS00291 the engagement letter

8   between you and Mr. Sears?

9    A   Yes, however, I do recall that Mr Sears

10   signed that document and if in fact, we did not produce

11   that, we produced a copy with the signature of Mr

12   Sears.

13       (SEC Exhibit No. 122 was marked for

14       identification.)

15   BY MR LYMAN

16    Q   Let's mark this 122. Exhibit 122, Bates

17   number FLWS00298. And if you take a look at the third

18   page of this document, unfortunately, this doesn't

19   include every page of the agreement, but the third page

20   of this document appears to be the signature page of

21   Mr. Sears.

22    A   That's correct

23    Q   Okay. And as this was produced it's missing

24   every other page. Any reason to think that this

25   agreement, this signed agreement, is any different from

Page 280

1   the agreement that's attached to Exhibit 121?

2    A   No

3    Q   The letter is dated October 10, 2013 and it

4   states in the first paragraph, I'm happy that we could

5   agree on mutually acceptable fee agreement. Do you

6   recall what date you reached a mutually acceptable fee

7   agreement with Mr. Sears?

8    A   Presumably, I really don't know  Presumably,

9   it would have been within a couple weeks prior to

10   October 10, 2013.

11    Q   Okay. Did you recall when you first

12   started -- and we looked at some documents in your

13   previous day's testimony, but when you first started

14   performing work at Mr. Sears's request relating to

15   opinion letters touching on FusionPharm stock --

16    A   I apologize  I didn't catch your question

17    Q   So this is dated October 10, 2013, and I'm

18   wondering if -- you said that you came to a fee

19   agreement maybe a couple weeks before this.

20    A   Right

21    Q   But your first letter relating to FusionPharm

22   stock was in August of 2013 and my question is:  Did

23   you have a fee agreement with him at that point in

24   time?

25    A   No

Page 281

1    Q   And what was the sort of payment arrangement

2   that you had for those first initial opinion letters?

3    A   Well, the payment arrangement was $250 an

4   opinion

5    Q   And was that ever sort of memorialized in an

6   engagement letter similar to this?

7    A   No  The first meeting with Mr  Sears wa

8   and I think I already testified to this that it was

9   about preparing a registration statement  As a re

10   of the first testimony refreshed my recollection th

11   you know, there were matters prior to that meeting

12   involving those August 28, 2013, opinions.  I don't

13   specifically recall the conversations, but it's

14   apparent to me that I did have conversations with him,

15   you know, as a result of my looking at transmittal

16   information regarding those opinion letters.

17    Q   Okay.  If we take a look at Exhibit 121, on

18   this second page, it says engagement and scope of legal

19   work.  The client hereby retains FML, which is you, to

20   research various issues pertaining to certain

21   disclosure issues and other related matters under the

22   federal securities laws.  And then the next sentence

23   says that the scope of the representation shall be

24   limited to that set forth in this agreement.  Would

25   writing attorney opinion letters fall under the scope

Page 282

1   of what's described here as your engagement with Mr.

2   Sears?

3    A   Indirectly

4    Q   And how is that?

5    A   Can I consult with my counsel?  I don't know

6   whether I'm getting into any attorney-client privilege

7    Q   You can consult with your counsel.

8       THE WITNESS  What was the question again?

9       MR LYMAN  Could you repeat the last

10   question, please

11       (The reporter read back the record )

12       THE WITNESS  As I said, indirectly

13   BY MR  LYMAN

14    Q   And how is that?

15    A   There was an issue involving Meadpoint -- and

16   Mr  Sears affiliation with FusionPharm  He informed me

17   that he was in control of Meadpoint, but that Meadpoint

18   was going to be transferred to an unrelated third

19   party  not a family relationship, not his mother

20    Q   Who did he say Meadpoint was going to be

21   transferred to?

22    A   He did not  He said it was going to be

23   transferred to an unrelated third party.

24    Q   And -- go ahead?

25    A   There was also discussions about Mr  Sears's

EXHIBIT

F

Page 283

1  affiliation with FusionPharm and my questioning him in
2  a very detailed fashion, whether he had any kind of
3  control or affiliate relationship with FusionPharm,
4  whether he engaged in any management decisions, whether
5  he had any participation in any shape, form or manner
6  in management decisions  To which he responded,
7  absolutely not  I have nothing to do with management
8  Those are the issues that were discussed
9      Q  And did he tell you that he had never had
10  anything to do with management issues at FusionPharm?
11     A  Yes
12     Q  Did he mention whether his mother, Sandra
13  Sears, had anything to do with FusionPharm?
14     A  Not at that meeting, no.
15     Q  At a subsequent meeting?
16     A  In a telephone conversation
17     Q  And what did he say to you about that topic?
18     A  I believe that was either in March or April,
19  2014, he had informed me that Meadpoint was transferred
20  to his mother  I was shocked to learn that  And I
21  said you informed me that Meadpoint was being
22  transferred to an unrelated third party, not a
23  relative  And that was the substance of that
24  conversation
25     Q  Why were you shocked to hear that Meadpoint

Page 284

1  was being transferred to his mother?
2      A  It wasn't -- the statement wasn't that
3  Meadpoint was being transferred to his mother  He said
4  it had been transferred
5      Q  And why was that shocking?
6      A  It was shocking because during the meeting
7  with him in October, 2013, he said that he was
8  transferring to an unrelated third party, not a
9  relative, including his mother
10     Q  Did he respond to your expression that that
11  seemed inconsistent with what he had told you in
12  October?
13     A  He may very well have  I can't recall
14     Q  So when you spoke with him in October, 2013
15  about Meadpoint, he expressed to you or left you with
16  the understanding that Meadpoint was his company at
17  that point?
18     A  Correct
19     Q  And did he leave you with the impression in
20  March or April of 2014 that Meadpoint was now his
21  mother's company and no longer his company?
22     A  Correct
23     Q  Did he give you any indication of whether he
24  had any dealings on behalf of Meadpoint after he
25  transferred it to his mother?

Page 285

1      A  Well, he didn't give me any indication as
2  such, but again, he was acting as a facilitator for
3  these opinions.
4      Q  Do you have an understanding of when he
5  transferred -- when he told you he transferred
6  Meadpoint to his mother?
7      A  As I said, it was in March or April of 2014.
8      Q  Well, I understand that that's when he told
9  you, but do you have a sense of when the transfer
10  actually occurred?
11     A  No, I don't.  And if he did, I don't recall,
12  you know, if he gave me a specific date or an
13  approximate time period.
14         MS. GREER:  Going back to the engagement
15  letter that we were just looking at that's part of
16  Exhibit 121, I just want to clarify.  This is an
17  engagement letter between yourself and Mr. Sears; is
18  that correct?
19         THE WITNESS:  Yes.
20         MS. GREER:  Does it in any way reflect an
21  engagement between yourself and FusionPharm?
22         THE WITNESS:  No.
23         MS. GREER:  So the reference in this
24  engagement letter to the scope being -- pertaining to
25  certain disclosure issues and other related matters

Page 286

1  under the federal securities laws, that was solely as
2  it related to your engagement with Mr. Sears?
3         THE WITNESS  Correct  However, obviously,
4  indirectly, as I testified previously, it would have
5  something to do with my opinion letters
6  BY MR. LYMAN
7      Q  What disclosure issues just generally was Mr.
8  Sears interested in you assisting him with, if not
9  related to FusionPharm?
10     A  Having to do with Meadpoint
11     Q  So Meadpoint disclosures under the federal
12  securities laws?
13     A  As referenced in the FusionPharm obligations
14     Q  Could you explain that a little bit more?  I
15  didn't follow you.
16     A  Sure  I'm sorry  That was very ambiguous
17  Okay  The subject of our discussions was Meadpoint
18  He informed me that he controlled Meadpoint, but he was
19  transferring it to an unrelated party, not his mother,
20  not a family relationship  Coupled with that, what I
21  had raised with him was -- were discussions about
22  whether he had any participation in management of the
23  company
24     Q  Of FusionPharm or Meadpoint?
25     A  I'm sorry  Of FusionPharm  That although

EXHIBIT
G

Page 317

1  Dudley came to you or [...]
2      A  Correct
3      Q  – and said I've seen Sears in the office
4  every day for the past two months.
5      A  Correct
6      Q  And at a later point in time, Mr. Dittman
7  told you Sears has nothing to do with FusionPharm and
8  I'd never let him have anything to do with FusionPharm?
9      A  Correct
10     Q  Do I have the timeline right so far?
11     A  Correct  And then Mr Dudley informed me
12 that pursuant to discussions with Mr Dittman, that
13 there would not be any disclosure because – regarding
14 Mr Sears or Meadpoint being an affiliate because based
15 upon Mr Dittman's representations, he was not
16     Q  Did Mr. Dudley express to you any indication
17 that he might not agree with Mr. Dittman's
18 characterization of Mr. Sears' involvement with
19 FusionPharm?
20     A  Only from the standpoint that he saw him
21 there every day  I really apologize I had too much
22 coffee this morning
23     Q  Do you need to take a break?
24     A  Yes
25         MR LYMAN  Let's go off the record

---

Page 316

1      (A break was had from 11 04 to 11 10 a m.)
2         MR LYMAN  All right  Let's go back on the
3  record
4         BY MR LYMAN
5      Q  Mr. Lehrer, while we were on the break, did
6  we have any substantive conversations about the case?
7      A  No
8      Q  Okay.  In your previous day's testimony we
9  had asked you whether you had an understanding that
10 Meadpoint was one of Bill Sears' companies and you had
11 refused to answer that question on privilege grounds.
12 In light of the agreement we now have with Mr. Sears'
13 counsel, will you now answer whether you were aware
14 that Meadpoint was one of Bill Sears' companies during
15 the time you were issuing Rule 144 letters?
16     A  Yes
17     Q  And how did you come to be aware of that
18 information?
19     A  In a meeting with Mr Sears, he told me that
20 he was in control of Meadpoint, but that he was
21 transferring it to a third party unrelated to him or in
22 any family context, including his mother
23     Q  So when you first had the conversation about
24 Sears' ownership in Meadpoint, he mentioned
25 specifically that he wasn't going to transfer Meadpoint

---

Page 317

1  to his mother?
2      A  Very specifically
3      Q  And was that on your prompting, did you ask
4  him whether he was going to transfer it to his mother
5  or did he just volunteer that particular family member?
6      A  I did ask him
7      Q  And why his mother?  Why did that come up?
8      A  I don't remember why it came up, you know, we
9  were having a conversation back and forth  And, you
10 know, through questioning or otherwise about whether it
11 was going to be transferred to a family member  He
12 said, no, it's not going to be transferred to a family
13 member  And I may have asked him, you know, is it
14 going to be transferred to your wife, to your mother,
15 you know, you're saying it's not going to be
16 transferred to a family member  Does that include "X"
17 and "Y"?  I don't remember specifically if I asked
18 that, but certainly in the conversation it was
19 communicated to me that it would not be transferred to
20 his mother specifically
21     Q  Did you ever have an understanding of whether
22 any of the other entities for which you wrote Rule 144
23 opinion letters or which were involved in any of the
24 opinion letters were owned by Mr. Sears' mother?
25     A  Yes

---

Page 318

1      Q  Okay.  And which entities were those?
2      A  When I had that conversation with Mr Sears
3  in or about April, 2014, when he said he transferred it
4  to his mother
5      Q  But prior to that, when you had the
6  conversation with Mr. Sears, which I believe you
7  thought was in October, 2013, about him transferring
8  Meadpoint, at that point in time were you aware of any
9  other entities that were owned by, managed by or
10 included as an officer, Mr. Sears' mother?
11     A  No
12     Q  Okay.  And other than Meadpoint, did you ever
13 become aware of any other entities that were owned by
14 or directed or had as an officer Mr. Sears' mother?
15     A  No  Again, apart from that conversation in
16 April, 2014, with Mr Sears
17     Q  Okay.  So what about Bayside Realty Holdings,
18 did you ever come to understand that Mr. Sears's mother
19 was involved with that company?
20     A  No
21     Q  Okay.  But you knew that there was a Sandra
22 Sears who was involved with Bayside?
23     A  My understanding, it was the Sandra Sears
24 that was Bill Sears' wife
25     Q  Okay.  And what did you understand the person

Meeting for Thursday. I only land at four pm

Regards,
Bill Sears

On Oct 22, 2013, at 6:00 AM, "Lehrer, Fred"
<flehrer@securitiesattorney1.com> wrote:

Plan for tomorrow:

Discuss Meadpoint agreement; historical background of your
relationship with Fusion Pharm; nature of related party
transaction and appropriate disclosure, plan going forward to
ensure that you have no participation with management.

Review draft registration statement with emphasis on:
(a) Business section, plan of operations, marketing,
distribution, patent information, product information and any
other matters pertaining to the business and operations.
(b) Information and documents needed



--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:     flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com;
www.secdefenselaw.com

<fps1@10-22-13.docx>

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:     flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

**Private Email**

To:                          wjsears66@icloud.com
Subject:                 FW: Meeting tomorrow

EXHIBIT H

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Tuesday, October 22, 2013 6:30 AM
**To:** William Sears
**Subject:** Re: Meeting tomorrow

No worries
We will discuss at length during our meeting

On Tue, Oct 22, 2013 at 8:28 AM, William Sears <william@williamjsears.com> wrote:
No I do not own Meadpoint any more  I do understand however we need to implement practices to ensure not having a conflict regardless

Regards,
Bill Sears

On Oct 22, 2013, at 6:15 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

This will require more drilling down on this subject.  That the company is out of state and you own the company only represents a small part of the relevant factors that we need to analyze.  The crucial aspects of this will depend on your participation in Fusion Pharm.  No worries - we will cover the subject adequately during our meeting.

On Tue, Oct 22, 2013 at 8:06 AM, William Sears <william@williamjsears.com> wrote:
FYI no conflict with Meadpoint as a family member out of state owns the company and it's asserts now
Nevada registration should reflect the change any day now

Regards,
Bill Sears

On Oct 22, 2013, at 6:04 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

I mean Wed...correct?

Do I need to change the conference room reservation for Thursday???

On Tue, Oct 22, 2013 at 8:02 AM, William Sears
<william@williamjsears.com> wrote:
Fred

Entity Details - Secretary of State, Nevada

https://nvsos.gov/SOSEntitySearch/PrintCorp.aspx?lx8nvq=%2bH...

# MEADPOINT VENTURE PARTNERS

EXHIBIT
I

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Default | File Date: | 10/24/2011 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0580232011-5 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2015 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20111669192 | Business License Exp: | 10/31/2015 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | INCORP SERVICES, INC. | Address 1: | 3773 HOWARD HUGHES PKWY STE 500S |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89169-6014 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |
| **No stock records found for this company** | | | |

## − Officers

☑ Include Inactive Officers

**Manager - SANDRA L SEARS**

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Historical | Email: | |

**Manager - SANDRA L SEARS**

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Active | Email: | |

1 of 2

9/21/16 8:04 AM

Entity Details - Secretary of State, Nevada                    https://nvsos.gov/SOSEntitySearch/PrintCorp.aspx?lx8nvq7%2bII...

## − Actions\Amendments

| Action Type: | Articles of Organization | | |
|---|---|---|---|
| Document Number: | 20110759943-21 | | |
| | | # of Pages: | 2 |
| File Date: | 10/24/2011 | | |
| | | Effective Date: | |
| (No notes for this action) | | | |

| Action Type: | Initial List | | |
|---|---|---|---|
| Document Number: | 20110846367-98 | | |
| | | # of Pages: | 1 |
| File Date: | 11/30/2011 | | |
| | | Effective Date: | |
| (No notes for this action) | | | |

| Action Type: | Annual List | | |
|---|---|---|---|
| Document Number: | 20130084907-14 | | |
| | | # of Pages: | 1 |
| File Date: | 2/7/2013 | | |
| | | Effective Date: | |
| (No notes for this action) | | | |

| Action Type: | Annual List | | |
|---|---|---|---|
| Document Number: | 20130708196-47 | | |
| | | # of Pages: | 1 |
| File Date: | 10/30/2013 | | |
| | | Effective Date: | |
| (No notes for this action) | | | |

| Action Type: | Annual List | | |
|---|---|---|---|
| Document Number: | 20140824744-66 | | |
| | | # of Pages: | 1 |
| File Date: | 12/26/2014 | | |
| | | Effective Date: | |
| (No notes for this action) | | | |

9/21/16 8:04 AM

Fusion Pharm - Relativity

https://ext.ediscovery.faegrebd.com/Relativity/Case/Document/Review.aspx?AppID=104...

**Return to document list**

FBDED00436528

Viewer   Native   Extracted Text

100%

FBD Default Imaging Settings-B&W

Image

378   of 771

**From:**      Craig Dudley
**To:**        Scott Dittman[sdittman@fusionpharminc.com]
**Subject:**   Related Party Disclosure
**Attachments:** image001.png

**Sent:**  Mon 4/14/2014 3:00:41 P

Hey -
For the related party footnote, I think we need to disclose Meadpoint, Bayside & 10mm.  Something simple like:

**Our unsecured lenders, Bayside Realty Holdings, LLC and Meadpoint Venture Partners, are both controlled by in laws of the Company's CEO. The note receivable due at yearend is from 10mm, an entity controlled by the Company's CEO.**

I'm not exactly sure of the familial tie ins, so please help clarify.

The note

**Craig Dudley**
**FusionPharm, Inc./PharmPods**
303 909 5467
pharmpods.com

1 of 1

10/28/16 8:01 AM

Fusion Pharm - Relativity

https://ext.ediscovery.faegrebd.com/Relativity/Case/Document/Review.aspx?AppID=104...

**Return to document list**

FBDED00512869

Viewer    Native    Image    Extracted Text

100%

**From:**    CRAIG DUDLEY
**To:**    Lehrer, Fred[flehrer@securitiesattorney1.com]
**CC:**    Scott Dittman[sdittman@fusionpharminc.com]
**Subject:** "Related Party" Disclosure

**Sent:** Tue 4/15/2014 11:18:02 PM

Fred - from our discussion and on the basis that the Meadpoint and Bayside stuff is all winding down, Scott's elected to not include the "extended" family blurb.

Judgement call - I'm ok with this.

Cool by you?

Thanks. Craig.

Craig Dudley
(303) 809 5467

ed not to include the
rty" disclosure (relates to
ilege. Attorney-Client
ct regarding preliminary
- re proposed equity issue

10/28/16 8:13 AM

1 of 1

## QUOTE TAKEN FROM CRAIG DUDLEYS 302.

Sears is engaged with and works very closely with FusionPharm because Meadpoint is the sales arm. Meadpoint was out "humping for sales" at trade shows and such. Sears has been an advisor and helped Dittman along the way. With regards to the relationship between Sears and FusionPharm, Dudley advised that is was a "muddy situation." It is close but not over the line. Dudley brought up the disclosure of this relationship with their securities counsel, Fred Last Name Unknown (LNU). Dudley raised this when he was finishing the 2013 financials. While it is a muddy situation, the decision was made that it did not rise to the level of disclosure.

Page 233

1    something like that. But by saying --
2         MS. GREER: Yeah. I'm just trying to figure
3    out if we have a date or an approximate date.
4         THE WITNESS: I understand that, but by --
5         MR. SALLAH: By doing that, we are -- you
6    know -- because you said at some point you Googled it.
7         THE WITNESS: Correct.
8         MR. SALLAH: Right. And that is not privileged
9    because you're not waiving --
10        THE WITNESS: Right.
11        MR. SALLAH: -- any work product. You're
12   waiving all work product --
13        THE WITNESS: But the characterization of your
14   question is such that it almost implies that you're
15   going to learn the actual communication.
16        MR. SALLAH: Yeah, and the date of the actual
17   communication.
18        MS. GREER: But I --
19        THE WITNESS: The date is not privileged.
20        MS. GREER: But I'm allowed to ask the date.
21        THE WITNESS: I understand that, but you're
22   asking when did I learn about this or something.
23        MR. SALLAH: If you're saying -- I guess -- I
24   guess -- I guess he would be -- it presupposes that a
25   communication took place between the two where one

Page 234

1    conveyed to the other that they had some kind of a
2    criminal background or one asked the other one if they
3    had some kind of criminal background. And by asking
4    that, it -- it invades that communication. That's my --
5    that's my --
6         MS. GREER: Okay.
7         MR. SALLAH: Do you see what I'm saying?
8         MR. LYMAN: Yeah, but we're not asking about
9    the communication or the context or what else was in the
10   meeting. All we're asking is --
11        MR. SALLAH: Well, I don't know.
12        MR. LYMAN: We know that you have told us that
13   you are aware that Mr. Sears had a criminal conviction
14   for a securities-related matter. And our question is,
15   when did you become aware of that, and there's nothing
16   privileged in that --
17        MR. SALLAH: I think he said --
18        MR. LYMAN: -- information.
19        MR. SALLAH: -- he Googled it. He Googled it
20   and became aware he had a conviction.
21        THE WITNESS: No.
22        MR. SALLAH: He clicked on it, and there was no
23   information.
24        THE WITNESS: That's not what I'm saying.
25        MR. SALLAH: You guys asked if he was aware it

Page 235

1    was for securities fraud. He didn't say that.
2         THE WITNESS: This is what I'm saying. I'm
3    saying that --
4         MR. SALLAH: See, that's wh
5    issues get -- because it creates is
6         THE WITNESS: If I can sta
7    circle back here. I already provide
8    this Google search. Now, you're a
9    learned, you know, that he had a criminal conviction for
10   securities fraud. I can't answer that question because
11   that's a -- you know --
12        MR. SALLAH: If he says no, it implies that no
13   such communication took place. If he says he can't
14   answer because it's privileged, then it presupposes a
15   communication --
16        THE WITNESS: Exactly.
17        MR. SALLAH: -- took place.
18        MS. GREER: Wait. I think you've already -- I
19   think you've already testified that at some point you
20   knew that.
21        MR. SALLAH: No, not that, that he had a
22   conviction. He found on the Internet and then clicked
23   on it, and he couldn't -- it was like some nonsense.
24   Fred, you testify. I don't want to mischaracterize.
25        THE WITNESS: Okay.

Page 236

1         MR. SALLAH: What did you find when you Googled
2    it?
3         THE WITNESS: I did the Google search, as I
4    testified before. It went to -- the link, you know -- I
5    mean the facing page said William Sears. Then I went to
6    the link, and it didn't correspond anything about
7    William Sears.
8         Anything else that I may have had about what
9    you're talking about, you know, may have been privileged
10   communications. I'm not going to, you know, tell you
11   what the -- you know, what the substance of that
12   conversation was or --
13   Q    Certainly.
14   A    -- or --
15   Q    I mean, do you know now at this point -- and
16   I'm not asking you how you learned it -- that Mr. Sears
17   had a prior conviction --
18   A    Yes.
19   Q    -- for securities fraud?
20        MR. SALLAH: Now it could invade on our
21   privilege.
22   A    Yes. No. I learned from a newspaper article,
23   you know, after the search warrant.
24   BY MS. GREER:
25   Q    I believe you said this morning, however, you

EXHIBIT K

EXHIBIT

L

1 FusionPharm?

2   A   Well, I don't specifically remember, so I don't
3 generally remember.

4   Q   And do you recall Mr. Scholz telling you
5 anything about Mr. Sears' connection to any other
6 company?

7   A   No.

8           (SEC Exhibit 88 was marked for
9           identification.)

10   BY MS. GREER:

11   Q   Mr. Lehrer, I'm handing you what's been marked
12 as Exhibit 88. It's a document with the Bates number
13 FLPA 373 through 374. Do you recognize Exhibit 88?

14       And if you need time to read through it, feel
15 free to take as much time as you need.

16   A   Yes, I recognize this.

17   Q   And what is Exhibit 88?

18   A   It's a communication by e-mail from me to
19 Richard Scholz.

20   Q   And are you --

21   A   And then --

22   Q   Sorry. Go ahead.

23   A   And then an e-mail from me to William Sears.

24   Q   And the bottom e-mail in the chain that begins
25 on the first page of Exhibit 88 and continues on to the

1 second page of Exhibit 88, was that an e-mail you sent
2 to Mr. Sears first reaching out to him about your legal
3 services?

4   A   Yes.

5   Q   In your August 28, 2013, e-mail to Mr. Sears,
6 at the -- it starts at the bottom, the first page of
7 Exhibit 88. In the second paragraph, you say: I charge
8 $350 for attorney letters -- sorry -- for opinion
9 letters.

10   A   Right.

11   Q   Do you see that?

12   A   Right.

13   Q   And was that, at this time in August of 2013,
14 your normal price for doing opinion letters?

15   A   Yes, but there were some that were 250.

16   Q   And for those that were 250, how did they --
17 how did they differ from those that were 350?

18   A   Negotiation. Negotiation.

19   Q   Was there some difference in negotiation or
20 difference in clients between those clients who you
21 charged 250 versus those who you charged 350?

22   A   Yeah. I mean, there may have been a couple of
23 clients that I got, you know, several opinions that I
24 charged a deal. It would be 250.

25   Q   So based more on volume, you would give people

1 a discount?

2   A   Well, yeah. No, it was not per se volume. It
3 was negotiation.

4   Q   The next sentence of your e-mail to Mr. Sears
5 says: Because Rich referred you, I would lower that
6 amount for you to $250.

7       Do you see that?

8   A   Yes.

9   Q   And so why were you -- why were you offering to
10 lower Mr. Sears' amount to 250?

11   A   It was just a selling point.

12   Q   What do you mean by "it was just a selling
13 point"?

14   A   Yeah. Well, I had not been retained as of yet
15 and went ahead and, you know, said I'll lower it to 250.

16   Q   Prior to sending this e-mail to Mr. Sears about
17 your services, did you do any research about Mr. Sears?

18   A   At what point?

19   Q   Prior to sending this e-mail --

20   A   No.

21   Q   -- to Mr. Sears.

22   A   No.

23   Q   After sending this e-mail to Mr. Sears, did you
24 do any research about Mr. Sears and his background?

25   A   On one occasion, yes.

1   Q   And when was that?

2   A   I honestly do not recall.

3   Q   Was it shortly after this time period or --

4   A   I don't recall.

5   Q   -- 2014?

6   A   I don't recall.

7   Q   Okay. And what further research did you do
8 about Mr. Sears?

9   A   I Googled his name.

10   Q   And upon Googling his name, what results did
11 you get?

12   A   I had a -- there was a link to some kind of --
13 it was a criminal indictment or a conviction or
14 something like that. And when I pressed on the link, it
15 went to information or a document that had nothing to do
16 with William Sears, but it did list it in the link.

17   Q   Did you do any further investigation then to
18 try to find what that reference was to a criminal
19 conviction?

20   A   No.

21       (Discussion off the record.)

22   A   Other than attorney-client privilege.

23   BY MS. GREER:

24   Q   Did you become aware at any point that Mr.
25 Sears has a prior conviction for securities fraud?

Page 73

1      MR. SALLAH: Again, to the extent you learned
2  it through a privileged communication with Mr. Sears,
3  that would be privileged. At least that's our position
4  at this point.
5      A  That's correct.
6      MR. KARPEL: Are you willing to tell us the
7  timing of that privileged communication?
8      MR. SALLAH: Yeah. I think we have to tell you
9  the timing of the privileged communication.
10      If you remember. Do you remember when the
11  conversation was, the client that --
12      THE WITNESS: Yeah. I believe in the
13  production there -- well, I'm not sure if there's some
14  communication about -- I don't know the date, but it was
15  the day that I met Mr. Sears in my conference room.
16      MR. KARPEL: So it was before issuing any
17  FusionPharm attorney opinion letters?
18      THE WITNESS: I'm pretty sure it was after.
19      MR. SALLAH: It was the day he met him. He --
20  they had the conversation personally, he remembers.
21      THE WITNESS: No, no, it wasn't the day I met
22  him.
23      MR. SALLAH: No. That's what I'm saying. It
24  was the day you met him.
25      THE WITNESS: Correct.

Page 74

1      MS. GREER: In person.
2      MR. SALLAH: -- a personal conversation --
3      THE WITNESS: Correct.
4      MR. SALLAH: -- he remembers. He just
5  doesn't remember what day. It was after.
6      THE WITNESS: I may be able to determine that
7  by looking at documents. I don't know.
8      MR. SALLAH: Your notepad for DayTimer or
9  something like that?
10      THE WITNESS: No.
11      MR. SALLAH: But you're confident it was after
12  the opinion?
13      THE WITNESS: It was after at least the August
14  opinions. I don't know when it was.
15      BY MS. GREER:
16      Q  Can you be any more specific? Was it 2014?
17  Was it --
18      A  Again --
19      Q  -- the end of 2013?
20      A  -- I do not remember. I would be happy to
21  research the matter to make a determination.
22      MR. KARPEL: Okay. We would appreciate that.
23  But just generally, did -- were -- do you recall, were
24  there any opinion letters relating to FusionPharm that
25  you issued after that conversation that we've been

Page 75

1  talking about?
2      THE WITNESS: Yes.
3      BY MS. GREER:
4      Q  Looking back again at Exhibit 88, the next
5  e-mail up in the chain, sort of in the middle of the
6  first page from yourself. It appears to be back again
7  to Mr. Sears. You say: Bill, did you say you were
8  paying for the opinion letters?
9      Do you see that?
10      A  Yes.
11      Q  And what opinion letters were you referring to
12  there?
13      A  The opinion letters that are in your
14  possession.
15      Q  Okay. And so --
16      A  I mean, there was no -- I didn't note what
17  opinion letters they were but just generally speaking.
18      Q  So at least as of this point, August 28, 2013,
19  you understood that the work that you were discussing
20  with Mr. Sears was to issue attorney opinion letters?
21      A  Yes.
22      Q  And did you understand at this point what
23  company those attorney opinion letters would relate to?
24      A  Yeah, FusionPharm.
25      Q  Okay. And how did you come to learn that those

Page 76

1  attorney opinion letters related to FusionPharm
2  shareholders?
3      A  Through the documents that I was provided.
4      Q  Okay. Prior to that, I mean, did Mr. Scholz
5  say to you -- and, actually, one of the first attorney
6  opinion letters we'll look at when we get to it --
7      A  Yeah.
8      Q  -- is from Mr. Scholz himself.
9      A  Yeah.
10      Q  So did Mr. Scholz say to you, hey, I'm a
11  shareholder of FusionPharm. You know, I have an
12  attorney opinion letter, and there are others that --
13  other FusionPharm shareholders that will need attorney
14  opinion letters?
15      A  No. No. He may very well have talked about an
16  opinion for him individually, but I don't recall a
17  statement to the effect that there will be a bunch of
18  others or any others.
19      Q  And what was your understanding at this point
20  when you -- on August 28, 2013, when you sent the e-mail
21  to Mr. Sears? I mean, what was your understanding as to
22  why Mr. Sears was going to be involved at all in the
23  FusionPharm shareholder attorney opinion letters?
24      A  What was my understanding of the involvement?
25      Q  Why was -- why was Mr. Sears involved, yes.

1    Q   There -- so you're saying there may have been
2  communications with Mr. Dittman that you relied upon in
3  determining for this opinion letter, February 14, 2014,
4  Meadpoint's nonaffiliate status?
5    A   No.  What I'm saying is that I don't have any
6  specific recollection of having a privileged
7  communication in the form of a telephone conversation
8  with Mr. Dittman, but in general it's conceivable that I
9  did, not necessarily with respect to this particular
10  opinion letter as reflected in Exhibit 115 but perhaps
11  some other --
12    MR. SALLAH:  Just --
13    A   -- opinion letters.
14    MR. SALLAH:  Just show you.
15    A   There was one on March 17, 2014, in written
16  form with Mr. Dittman.
17    BY MS. GREER:
18    Q   That you're asserting privilege over?
19    A   Correct.  And March 24, 2014.
20    Q   And that you're also asserting privilege over?
21    A   Correct.  And --
22    MR. SALLAH:  There's a lot.
23    THE WITNESS:  I'm sorry?
24    MR. SALLAH:  There's a lot.
25    THE WITNESS:  Okay.

1    MR. SALLAH:  Relative to -- not relative to --
2    THE WITNESS:  Yeah.  I'm saying generally,
3  yeah.
4    MR. SALLAH:  But some of these are just general
5  questions.
6    (Discussion off the record.)
7    A   Another one on April 15, 2014.
8    BY MS. GREER:
9    Q   Okay.  And are --
10    A   Another one -- I'm sorry.  Go ahead.
11    Q   Go ahead.
12    A   Another one on the same date.
13    Q   And are those attorney-client privileged
14  communications you had with Mr. Dittman communications
15  that you relied upon in determining that Meadpoint was
16  not an affiliate?
17    A   Let me go back, if I could, please.
18    Yes, but not ...
19    (Discussion off the record.)
20    A   Let me just go back and review this, please.
21    (Discussion off the record.)
22    A   There was a communication on March 24, 2014,
23  with Mr. Dittman having to do with Meadpoint, which is,
24  you know -- had no reference to any particular opinion
25  letter.  There was an April 15, 2014, communication.

1  That one had to do with the OTC Markets opinion.  There
2  was another one on April 15, 2014, having to do with the
3  OTC Markets opinion; April 15th, the same OTC Markets
4  opinion.
5    MR. SALLAH:  But they generally
6  the Meadpoint and relationships with ce
7  Meadpoint?
8    THE WITNESS:  Well, no, not all of them.
9    MR. SALLAH:  Not all of them.
10    THE WITNESS:  No.  The March 24th one does, the
11  first April 15, 2014, one does not; the next April 15th
12  one does not; and the next April 15th one does have to
13  do with Meadpoint.
14    BY MS. GREER:
15    Q   And these are all -- these communications are
16  all e-mails over which you're asserting FusionPharm's
17  privilege?
18    A   Yes.
19    Q   Mr. Lehrer, earlier this morning during your
20  testimony, you testified at some point you became aware
21  of Mr. Sears' prior securities fraud conviction,
22  correct?
23    A   Yes.
24    Q   And I think you were struggling to recall
25  exactly when that happened.  Seeing a number of these

**EXHIBIT M**

1  opinion letters -- you had the three in the August 2013
2  timeframe and then, you know, we've seen a few in early
3  January and February of 2014.  Having those sort of data
4  points for time, does that refresh your recollection as
5  to when you learned that?
6    A   I'm not sure when I learned that.  It was a
7  privileged communication.  But it may have been in a
8  meeting that I had with him in my conference room
9  downstairs where I live.
10    Q   And do you recall when that meeting took place?
11    A   I believe in preparation for this testimony I
12  had determined an approximate date, but --
13    Q   What's --
14    A   -- I don't recall what it is.  I would
15  certainly --
16    Q   What's that approximate date?
17    A   I don't recall, but can we provide ...
18    (Discussion off the record.)
19    MR. SALLAH:  Yeah.  What I'm concerned about
20  is -- what I'm concerned about is, in essence, reverse
21  engineering -- and I know it's not your intention.  I
22  don't think it's your intention -- to try to kind of
23  circumvent the privilege.  Because, again, you're
24  allowed to learn about when privileged communications
25  are, the general -- you know, was it legal advice or

1 something like that. But by saying --

2        MS. GREER: Yeah. I'm just trying to figure

3 out if we have a date or an approximate date.

4        THE WITNESS: I understand that, but by --

5        MR. SALLAH: By doing that, we are -- you

6 know -- because you said at some point you Googled it.

7        THE WITNESS: Correct.

8        MR. SALLAH: Right. And that is not privileged

9 because you're not waiving --

10        THE WITNESS: Right.

11        MR. SALLAH: -- any work product. You're

12 waiving all work product --

13        THE WITNESS: But the characterization of your

14 question is such that it almost implies that you're

15 going to learn the actual communication.

16        MR. SALLAH: Yeah, and the date of the actual

17 communication.

18        MS. GREER: But I --

19        THE WITNESS: The date is not privileged.

20        MS. GREER: But I'm allowed to ask the date.

21        THE WITNESS: I understand that, but you're

22 asking when did I learn about this or something.

23        MR. SALLAH: If you're saying -- I guess -- I

24 guess -- I guess he would be -- it presupposes that a

25 communication took place between the two where one

1 conveyed to the other that they had some kind of a

2 criminal background or one asked the other one if they

3 had some kind of criminal background. And by asking

4 that, it -- it invades that communication. That's my --

5 that's my --

6        MS. GREER: Okay.

7        MR. SALLAH: Do you see what I'm saying?

8        MR. LYMAN: Yeah, but we're not asking about

9 the communication or the context or what else was in the

10 meeting. All we're asking is --

11        MR. SALLAH: Well, I don't know.

12        MR. LYMAN: We know that you have told us that

13 you are aware that Mr. Sears had a criminal conviction

14 for a securities-related matter. And our question is,

15 when did you become aware of that, and there's nothing

16 privileged in that --

17        MR. SALLAH: I think he said --

18        MR. LYMAN: -- information.

19        MR. SALLAH: -- he Googled it. He Googled it

20 and became aware he had a conviction.

21        THE WITNESS: No.

22        MR. SALLAH: He clicked on it, and there was no

23 information.

24        THE WITNESS: That's not what I'm saying.

25        MR. SALLAH: You guys asked if he was aware it

1 was for securities fraud. He didn't say that.

2        THE WITNESS: This is what I'm saying. I'm

3 saying that --

4        MR. SALLAH: See, that's why these privilege

5 issues get -- because it creates issues like this.

6        THE WITNESS: If I can state -- you know,

7 circle back here. I already provided testimony about

8 this Google search. Now, you're asking about whether I

9 learned, you know, that he had a criminal conviction for

10 securities fraud. I can't answer that question because

11 that's a -- you know --

12        MR. SALLAH: If he says no, it implies that no

13 such communication took place. If he says he can't

14 answer because it's privileged, then it presupposes a

15 communication --

16        THE WITNESS: Exactly.

17        MR. SALLAH: -- took place.

18        MS. GREER: Wait. I think you've already -- I

19 think you've already testified that at some point you

20 knew that.

21        MR. SALLAH: No, not that, that he had a

22 conviction. He found on the Internet and then clicked

23 on it, and he couldn't -- it was like some nonsense.

24 Fred, you testify. I don't want to mischaracterize.

25        THE WITNESS: Okay.

1        MR. SALLAH: What did you find when you Googled

2 it?

3        THE WITNESS: I did the Google search, as I

4 testified before. It went to -- the link, you know -- I

5 mean the facing page said William Sears. Then I went to

6 the link, and it didn't correspond anything about

7 William Sears.

8        Anything else that I may have had about what

9 you're talking about, you know, may have been privileged

10 communications. I'm not going to, you know, tell you

11 what the -- you know, what the substance of that

12 conversation was or --

13    Q   Certainly.

14    A   -- or --

15    Q   I mean, do you know now at this point -- and

16 I'm not asking you how you learned it -- that Mr. Sears

17 had a prior conviction --

18    A   Yes.

19    Q   -- for securities fraud?

20        MR. SALLAH: Now it could invade on our

21 privilege.

22    A   Yes. No. I learned from a newspaper article,

23 you know, after the search warrant.

24        BY MS. GREER:

25    Q   I believe you said this morning, however, you

From: **William Sears** william@williamjsears.com.
Subject: FW:
Date: Today at 8:10 AM
To: William Sears wjsears66@icloud.com



From: William Sears
Sent: Thursday, October 10, 2013 11:04 AM
To: Lehrer, Fred
Subject: Re:

Hmmmm  One says no one says yes  I think we stay clear till ten years

Regards,
Bill Sears


On Oct 10, 2013, at 10:58 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

http://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm 

http://www.corporatecrimereporter.com/news/200/secexemptsbadactors09192013/


**Item 404 – Transactions with Related Persons, Promoters and Certain Control Persons**

1. **Transactions with related persons.** Describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transac
any related person had or will have a direct or indirect material interest. Disclose the following information regarding the transaction:

   1. The name of the related person and the basis on which the person is a related person.
   2. The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership
   3. The approximate dollar value of the amount involved in the transaction.
   4. The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amo
   5. In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstand
      date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which di
   6. Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the
2.
   **Instructions to Item 404(a):**

   1. For the purposes of paragraph (a) of this Item, the term related person means:
      1. Any person who was in any of the following categories at any time during the specified period for which disclosure under paragraph (a) o
         1. Any director or executive officer of the registrant.
         2. Any nominee for director, when the information called for by paragraph (a) of this Item is being presented in a proxy or information
         3. Any immediate family member of a director or executive officer of the registrant, or of any nominee for director when the informati
            election of that nominee for director, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-
            director, and any person (other than a tenant or employee) sharing the household of such director, executive officer or nominee for
      2.
   3. Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest (
      1. A security holder covered by Item 403(a); or
      2. Any immediate family member of any such security holder, which means any child, stepchild, parent, stepparent, spouse, sibling, m
         any person (other than a tenant or employee) sharing the household of such security holder.

Many requests by five different attorneys have been made for these interview copies. They were all ignored as if they did not exist. After reading through them, I now know why the government purposely withheld these, (they are filled with lies). I just saw and read them for the first time in October of 2020 from an anonymous source to whom mailed them to me while being held in FCI. Florence Federal institute.

Sincerly,

William Sears

William Sears

1/05/2021





## Apply for a Certificate

PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU HAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.

NOTE: KANSAS IS A TWO-TIERED STATE. YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE. THE CERTIFICATE DOES NOT ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.

Below are the forms required to be submitted to obtain a Kansas CPA Cert ificate :

**CPA Certificate by passing the exam in Kansas--Fee: $50.00**

- http://www .ksboa .org/ pdf/ app_exam .pdf
- htt p:/ / www .ksboa.org/pdf/oath.pdf
- http://www .ksboa .org/ pdf/ et hics.pdf

**CPA Certificate by reciprocity, or for transfer of grades-Fee: $250.00**

- http://www .ksboa .org/ pdf/ app_recip .pdf
- htt p:/ / www .ksboa .org/ pdf/ app_t ransfer .pdf
- htt p:/ / www .ksboa .org/ pdf/ aut h_exch .pdf
- htt p:/ / www .ksboa.org/pdf/oath.pdf
- http:// www .ksboa .org/ pdf/ et hics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--t his is the order info rmat ion)



Page Last Updated : 04/ 30/ 2018 21: 44 : 52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer I Accessibility I Privacy

12/24/17 11:16:00

**CPAVerify Individual Report Results**

---

NAME: **KATE EGAN**
STATE OF LICENSE: **KS**
LAST UPDATED: **2017-12-24**

| | |
|---|---|
| **Address:** | **Mail** |
| **License/Permit/Certificate Number:** | CHICAGO, IL, |
| **Registration Number:** | 8757 |
| **License/Permit/Certificate Status:** | ACTIVE CERTIFICATE |
| **License/Certificate Status Details:** | The certificate is in good standing. |
| **License Type:** | CPA. |
| | CPA Certificate. In Kansas, a certificate is not a license so therefore, a certificate |
| **License Type Details:** | holder who does not also have an active permit may not hold out, perform or offer to perform services as a CPA. The person may use the title CPA in connection with their employment in industry. |
| **Basis for License:** | |
| **Issue Date:** | 1999-08-04 |
| **Expiration Date:** | |
| **Enforcement, Non-Compliance or Disciplinary Actions:** | None Reported To This Site By The Board |
| **Other Information:** | IN KANSAS, A CERTIFICATE IS NOT A LICENSE. ONLY THOSE WHO HAVE PERMITS (ALSO KNOWN AS LICENSES) ARE ALLOWED TO HOLD OUT AND PROVIDE OR OFFER TO PROVIDE SERVICES TO THE PUBLIC AS A CPA. IF THE PERMIT STATUS DOES NOT REFLECT "ACTIVE", THAT INDIVIDUAL IS NOT LICENSED TO PRACTICE. |

CPAVERIFY INCLUDES ALL CERTIFICATE HOLDERS AND PERMIT HOLDERS. If an individual has a permit, their permit record and their certificate record will show. Only a certificate record will show for non-licensed certificate holders.

If Permit Number shows N/A that means this person had a permit to practice at one point, but let it lapse. When the permit lapses in that case, so does the permit number. If permit shows Lapsed it means that this person once had a permit (license) to practice, but has since let them lapse. This individual is not licensed to practice as a CPA in Kansas.

Contact the Board for official verification of information.

**State Board Contact Information:**

KANSAS BOARD OF ACCOUNTANCY
LANDON STATE OFFICE BUILDING
900 SW JACKSON, SUITE 556
TOPEKA, KS 66612-1239

Phone: 785-296-2162
Fax: 785-291-3501
Email: INFO@KSBOA.KS.GOV
Licensee Lookup: http://www.da.ks.gov/boa/searchforindividual.aspx

---

Details of Enforcement, Non-Compliance or Disciplinary Actions:

1. If "Contact State Board For Details" is displayed then the State Board has reported some type of enforcement, non-compliance or disciplinary action to this site and the State Board should be contacted for full details about the action reported.
2. If "None Reported To This Site By The Board" is displayed then the State Board provides enforcement, non-compliance and disciplinary action data to this site and none was indicated for this record.
3. If "State Does Not Provide This Type of Data At This Site" is displayed then CPAverify is not currently receiving enforcement, non-compliance or disciplinary action data for licensees in this state. Some states are limited to sharing this type of data with third party websites due to privacy laws or policies, but most State Boards offer this information on their official State Board websites.
4. Contact the State Board for official verification of all enforcement, non-compliance and disciplinary activity.

**The results shown here include all data made available by participating states.** Additional data about the individual or firm may exist and is not shown here for other states that are not yet participating in the CPAverify website. Please refer to the **Participating States tab** for more information about which states are currently sharing their licensing data for use with this website and for clarification about which states these results do not include. If

1

12/26/2019                                   Kansas Board of Accountancy -- KSBOA.org -- 785-296-2162



>> Home     >> Search for Firms

## Individual Information   [ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Funk | **Certificate Status:** | Active |
| **Address:** | 8000 E. 36th Ave. Denver, CO 80238-0000 | **Permit Status:** | |
| **Firm/Employer:** | Federal Bureau of Investigation | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |

Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

University Alumni Association website it indicates Egan did not graduate from Kansas University in 1995 but instead indicates Egan graduated in 1996.  The Alumni Association also shows KU did not offer a bachelor's degree in accounting therefor Egan cannot have a degree in Accounting as she states. It does, however, show that she earned a degree in "Business".  This means that she is not eligible for any exempts for licensing that occured in Kansas in 1996, as there are no "grandfathered" exceptions applicable in 1999.  However, this does indicate a deceptive pattern of behavior on the part of SA Funk and calls into question the hiring practices of the FBI and the DOJ which is responsible for supervising the hiring in the FBI.  SEE EXHIBITS _____8_____

I wish to call attention to the Kansas Laws of Accountancy that require CPA's to possess both the Kansas issued certificate and permit to practice prior to holding out to be a CPA or to practice as such before the courts, this fact is clearly addressed under the laws governing the licensing of CPA's in Kansas.  (KS Stat § 1-316(a)(2012))  SEE EXHIBIT ___9___

SA Funk has violated the statutes and regulations governing the licensing and practice of CPA's in Colorado and every State in the United States, including Kansas by claiming to be a CPA, which she is not because she does not hold the required permit which is a license in Kansas.  SEE EXHIBIT __10__

As the Kansas issued certificate is provided prior to the license, this means the Kansas issued certificate holds no meaning outside of Kansas nor does it provide the holder the ability to use the professional designation in legal proceedings.  Doing such provides the false status of being a financial expert which comes with the commitment required to be a licensed and practicing CPA.  This case was handed to the FBI by the SEC.  Now, **let us keep in mind the SEC's requirements to be recognized as a CPA.**
The Securities and Exchange Commission Federal Regulations under: 17 CFR §210.2 - 01 - Qualifications of Accountants:

(a)  The Commission will not recognize any person as a CPA who is not duly registered and in good standing as such under the laws of the place of his residence or principal office.  The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.

(b)  The Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgement on all issues encompassed within the accountant's engagement.  In determining



**8**

| Join or Give | News | Events & Programs | Networks | About | Resources | Info for: | Adams Alumni C |

Search…

Home » Resources » Manage My Profile » First-time Registration

### Resources

Community Home
My Profile
Online Directory
Career Center
Kansas Alumni magazine
Shop for KU Merchandise
KU Websites
Just for Fun
Kansas Alumni Magazine

**Step 2:**

Find your name in the list below and click the radio button beside it, then click "Next."

If your record is marked as "Already Registered," please click here to log in. Tools are available to recover your password if you don't remember it.

In the KU Degree column  the first letter indicates the school that granted your degree. followed by the year of the degree. Below is a key to determining school codes.

### Manage My Profile

Login/Logout
First-time Registration
Change Password
Class Notes
Email Subscriptions
Contact Support

*✱ NO ACCOUNTING !*

| | |
|---|---|
| A | School of Architecture, Design & Planning |
| B | School of Business |
| C | College of Liberal Arts & Sciences |
| D | School of Education |
| E | School of Engineering |
| F | School of Fine Arts |
| G | Master's Degree |
| H | School of Health Professions |
| J | School of Journalism |
| L | School of Law |
| M | School of Medicine |
| N | School of Nursing |
| P | School of Pharmacy |
| PharmD | School of Pharmacy |
| S | School of Social Welfare |
| U | School of Music |
| AUD | Doctor of Audiology |
| DE | Doctor of Engineering |
| DMA | Doctor of Musical Arts |
| DNP | Doctor of Nursing Practice |
| DPT | Doctor of Physical Therapy |
| EdD | Doctor of Education |
| OTD | Doctor of Occupational Therapy |
| PhD | Doctor of Philosophy |
| SJD | Doctor of Juridical Science |

*If you don't see your name on the list, please use your browser's Back button to try searing again using alternate values, such as your legal name or a previous name. If you still do not see your name or have other questions about the account lookup*

| | First Name: | Last Name: | Birth or Former Last Name. | KU Degrees : |
|---|---|---|---|---|
| | Aidan | Egan | | |
| | Ann | Egan | | g'89 |
| | Anne | Cory | Egan | d'78 g'82 |
| | Brenda | Egan | | PharmD'10 |
| | Brian | Egan | | F05 |
| | Cassidy | Egan | | c'10 |
| | Catherine | Fennelly | Egan | c'13 |
| | Chet | Egan | | c'06 g'15 |
| | Drew | Egan | | b'16 g'17 |
| | Elaine | Wilson | Egan | '72 |
| | F. | Egan | | PhD'11 |
| | Georgine | Egan | Neuner | g'87 |
| | Gregory | Egan | | C95 |
| | James | Egan | | b'82 |
| | James | Egan | | G85 |
| | Jaxon | Egan | | |
| | Jeanne | Binder | Egan | g'92 |
| | Jennifer | Egan | | g'97 |
| | Jennifer | Egan | Clapper | s'13 |
| Already registered | John | Egan | | j'86 |
| | John | Egan | | C99 |
| | Kate | Egan | | B96 |
| | Katie | Egan | | |
| | Kristian | Eganhouse | Hamilton | f'96 |
| | Lawrence | Egan | | C86 |
| | Lisa | Egan | Hardy | c'12 |
| | Lori | Egan | Wehr | d'83 |
| | Margaret | Egan | | g'77 |
| | Mary | Egan | Hardman | c'42 g'44 |
| | Mary | Egan | | '20 |
| | Michael | Egan | | |
| | Michael | Egan | | g'93 |
| | Misti | Jones | Egan | '84 |
| | Mitchell | Egan | | c'15 |
| | Patricia | Egan | | g'86 PhD'94 |
| Already registered | Philip | Egan | | G72 G74 G81 |
| | Rebecca | Egan | Foster | f'87 |
| | Robert | Egan | | e'86 |
| | Spencer | Egan | | |
| | Susan | Egan | | |
| Already registered | Thomas | Egan | | j'77 |

## Contact Us

**Current Issue**

**Shop**

**Featured Partner**

**KU Alumni Association**
Adams Alumni Center
1266 Oread Ave , Lawrence, KS 66045
Email  kualumni@kualumni.org
Phone: 800-584-2957

**1-316.   Unlawful acts; penalty.**   (a) It is unlawful for any person to practice certified public accountancy unless the person holds a Kansas certificate and a valid permit to practice issued by the board pursuant to K.S.A. 1-310 and amendments thereto, or is entitled to practice pursuant to K.S.A. 1-322 and amendments thereto.

(b) It is unlawful for any firm to practice certified public accountancy as a certified public accounting firm or CPA firm unless the firm is registered with the board pursuant to K.S.A. 1-308 and amendments thereto, or meets the requirements to be exempt from such registration.

(c) It is unlawful for any person, except the holder of a valid certificate or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, to use or assume the title "certified public accountant" or to use the abbreviation "CPA" or any other title, designation, words, letters, abbreviation, sign, card or device likely to be confused with "certified public accountant."   The use of the term "public accountant" without the word "certified" shall not be interpreted as implying that one is a certified public accountant.

(d) Except as provided by this subsection, no person holding a permit or practice privilege or a firm holding a registration under this act or meeting the requirements to be exempt from such registration shall use a professional or firm name or designation that is misleading as to:   (1) The legal form of the firm; (2) the persons who are partners, officers, members, managers or shareholders of the firm; or (3) any other matter.   The names of one or more former partners, members or shareholders may be included in the name of a firm or its successor unless the firm becomes a sole proprietorship because of the death or withdrawal of all other partners, officers, members or shareholders.   The use of a fictitious name by a firm is permissible if the fictitious name is registered with the board and is not otherwise misleading.   The name of a firm may not include the name of an individual who is neither a present nor a past partner, member or shareholder of the firm or its predecessor.   The name of the firm may not include the name of an individual who is not a certified public accountant.

(e) It is unlawful for any person, except the holder of a Kansas permit to practice or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, or a valid Kansas firm registration, to issue a report with regard to any attest or compilation service under standards adopted by the board.   A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board. The practice of public accountancy by persons not required to hold a permit to practice, including public accountants, is not prohibited or regulated by the provisions of this act, except for the provisions of this section, K.S.A. 1-308, 1-318 and 1-319, and amendments thereto and K.S.A. 1-319, and amendments thereto.   The title "enrolled agent" may only be used by individuals so designated by the federal internal revenue service.

(f) Any person who violates any provision of this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $5,000, or to imprisonment for not more than one year, or by both such fine and imprisonment.

**From:** AccountancyBoard, DORA
**Sent:** Friday, February 9, 2018 11:41 AM
**To:** ~~tessaosook@hotmail.com~~
**Subject:** Fwd: Licensure Requirements in Colorado

Ms. ~~Best~~,

Anyone who has been residing in Colorado for 4 years and completing CPA work would be violating the Colorado Board of Accountancy Rules by not having a Colorado CPA License? That would be considered as "Holding Out". Mobility only covers you when have another license in another state and you temporarily completing work in Colorado but do not reside in Colorado. I hope this clarifies your inquiry. Thank you

**Kind Regards,**

**Colorado Department of Regulatory Agencies**
**Division of Professions and Occupations**
Board of Accountancy
1560 Broadway, Suite 1350
Denver, CO 80202
P 303.894.7800 | F 303.869.7764
Email dora_accountancyboard@state.co.us
www.dora.colorado.gov/professions/accounting





CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

---------- Forwarded message ----------
From: ~~Tessa Best tessaosook@hotmail.com~~
Date: Wed, Jan 31, 2018 at 8:53 AM
Subject: Licensure Requirements in Colorado
To: "DORA_Customercare@state.co.us" <DORA_Customercare@state.co.us>

Hello....

Thank you for your time and I was unable to find the answer to this question on your website, so I decided to write to see if you might be able to provide me an answer to my question regarding Certified Public Accountancy licensing in Colorado.  In Kansas it has a two-tiered system where you are issued a certificate first then you apply for a permit to practice which requires continuing education, verifiable work experience and payment of the fee....If someone does not have a permit in Kansas to practice certified public accountancy would this be acceptable to hold themselves out to be a certified public accountant in Colorado...The person is a resident of Colorado and has been for 4 years, so I am not sure how that would work here.


Thank you for your time it is greatly appreciated...




Sent from <u>Mail</u> for Windows 10


--

**DORA Customer Care**

**COLORADO**
Department of
Regulatory Agencies

Consumer protection is our mission

P 303.894.7855  |  <u>dora_customercare@state.co.us</u>
<u>1560 Broadway, Suite 110, Denver, CO 80202</u>

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

whether an accountant is independent, the Commission will consider all relevant circumstances, including all relationships between the accountant and the audit client, and not just those relating to the reports filed.

https://searchlb.imodules.com/s/1312/alumni/index.aspx?sid=1312&gid

A person is a "statutory" resident of Colorado if the person maintains a permanent place of abode in Colorado and speands, in aggregate, more than six months in Colorado.  For a more complete discussion of domicile and statutory residency see Department Regulation 39-22-103(8)(A).

As such the laws of Colorado require residents who are licensed by a regulatory agency in another State to apply for licensing in CO after becoming a resident.  As such, SA Funk was required to apply for licensing as a CPA in 2011 after she became a resident.  This is regulated by CO Code of Regulations governing the licensing and practice of CPA's un 3 CCR 705-1 - 1.5 Requirements for Certification - E. Reciprocity.  The regulation states, "an applicant who holds a certificate or license issued by another state based upon passage of the examination but who does not hold a certificate or license to practice is not eligible for reciprocity through that certificate or license."  As such, this means SA Funk does not meet the requirements to obtain a license by reciprocity  in CO and as such she cannot legally hold out as being a CPA  in proceedings conducted in the State and there is nothing that excludes a federal agent who resides in CO from meeting these legal requirements for licensing and practice withint he State.

## FORENSIC ACCOUNTING EXPLANATION

Now I wish to introduce the definition and explanation regarding forensic accounting as was found on the Investopedia website which is operated with permission by the SEC.  The explanation of meaning of forensic accounting investigation is explained in detail below:

What is forensic accounting?

Forensic accounting utilizes accounting, auditing, and investigative skills to conduct an examination into the finances of an individual or business.  Forensic accounting provides an accounting analysis suitable to be used in legal proceedings. Forensic accountants are trained to look beyond the numbers and deal with the business reality of the situation. Forensic accounting is frequently used in fraud and embezzlement cases to explain the nature of a financial crime in court.

Understanding Forensic Accounting

Forensic accountants analyze, interpret and summarize complex financial and business matters. They may be employed by insurance companies, banks, police forces, government agencies, or public accounting firms. Forensic accountants compile financial evidence, develop computer applications to manage the information collected and communicate their findings in the form of reports or presentations.

Forensic Accounting for Criminal Investigation

Forensic accounting is also used to discover whether a crime occurred and assess the liklihood of criminal intent. Such crimes may include employee theft or insurance fraud, securities fraud, falsification of financial statement information, or identity theft. Forensic accounting is often brought to bear in complex and high-profile financial crimes. The reason we understand the nature of Bernie Madoff's ponzi scheme today is because forensic accountants dissected the scheme and made it understandable for the court and public.

Defining Financial Forensics

Financial forensics is a field that combines criminal investigation skills with financial auditing skills to identify criminal financial activity coming from within or outside of an organization. Financial forensics may be used in prevention, detection, and recovery activities to investigate terrorism and other criminal activity, provide oversight to private-sector and government organizations, and assess organizations' vulnerability to fraudulent activities. In the world of investments, financial forensics experts look for companies to short or try to win whistleblower awards.

**The fact that this was a forensic financial investigation was admitted to by SA Funk in her sworn affidavits on page 5, paragraph 12, she states,**

"Your affiant thereafter reviewed and has been reviewing the SEC produced records on an ongoing basis. Additionally, your affiant was made privy to SEC analysis of the bank records and transfer agent records and has reviewed the same on an ongoing basis."

According to the FBI's own website under the position of "Forensic Accountant" it states the following:

⋆ "FOLLOW THE MONEY TRAILS OF CRIMINAL ACTIVITY
AND NATIONAL SECURITY MATTERS"

Because in the affidavit in support of search warrant prepared by SA Funk she referenced auditing standards accepted by the SEC and the United States of America with her references to violations of GAAP. This means she created a report and as such this requires she must be a CPA, as she not only claimed a violation of GAAP but she then attempted to track financial transactions between accounts in order to determine actual company earnings. This requires the services of a CPA in order to legally attest to those sworn opinions before the court. Under the laws in Kansas,

"It is unlawful for any person, except the holder of a Kansas permit to practice, to issue a report with regard to any attest or compilation service under standards adopted by the Board. A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the Board." (KS Stat § 1-316(e) (2012)) Keeping in mind she's not in Kansas anymore. SEE EXHIBIT ___9___

Additionally, under KS Stat § 1 - 321. Definitions: It defines "report":

"When used with reference to any attest or compilation service, means an opinion, report or other form of language that states or implies assurance as to the reliability of the attested information or compiled financial statements and that also includes or is accompanied by any statement or implication that the person or firm issuing it has special knowledge or competence in accounting or auditing. Such a statement or implication of special knowledge or competence may arise from use, by the issuer of the report, of names or titles indicating that the person or firm is an accountant or auditor or from the language of the report itself."

## RELEVANCE TO THIS CASE

As the affidavits in support of search warrants prepared by SA Funk were provided to the court through the use of telephonic equipment the requirements under the federal rules of criminal procedure apply (Rules). Under section 4.1(b)(2)(A) requires the affiant to attest to information contained in the written affidavit. Which has occurred in this case, as such the requirements under the rules of public accountantcy state that only a CPA can attest to information contained in a financial report. As such, this means the information attested to before the Judge Magistrates in this case was perjury as SA Funk knowingly provided false testimony under oath.

In law, an attestation is a declaration by a witness that a legal document was properly signed in the presence of the witness. Essentially, it confirms that a document is valid. In finance, an attestation service

is a CPA's declaration that the numbers are accurate and reliable.  As the service is completed by an independent party, it validates or invalidates in this case the financial information prepared by internal accountants.

Title 41 Search and Seizure - Obtaining a Warrant

(2)  The applicant must orally state facts sufficient to satisfy the probable cause for the issuance of the search warrant.  This information may come from either the applicant federal law enforcement officer or the attorney for the government or a witness willing to make an oral statement.  The oral testimony must be recorded at this time so that the transcribed affidavit will provide an adequate basis for determining the sufficiency of the evidence if that issue should later arise.

Testimony provided in the form of opinion must be grounded in an accepted body of learning or experience in that particular field, and the witness must explain how the conclusion is so grounded.  See, e.g. American College of Trial Lawyers, Standards and Procedures for Determining Admissability of Expert Testimony.  ("[W]hether the testimony concerns economic principles accounting standards, property valuation or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field.")

As SA Funk attested before the courts in three sworn affidavits (keeping in mind Mr. Sears nor his lawyers have ever seen the warrant for the bank accountants and brokerage accounts of his family's trust.) which she testified under oath were truthful.  That means she represented herself as a CPA.  This means she represented herself as an expert capable of performing the services of the financial investigation of the publicly traded company and the transactions regarding money involved with that company.  This she confirmed with the implied insurances of her knowledge, training, and experience a total of 47 times in these affidavits.  As the courts relied on this information as evidence to support probable cause of her claims, the fact that this was perjury means it was material to this case and required disclosure to the Defendant prior to entering the plea agreement.

## SHOWING PATTERN OF MISCONDUCT

This is not the only incident of misconduct by SA Funk that could be construed as unlawful, as on October 13, 2009, SA Funk aka Kate Egan married then United States Assistant Lead Prosecutor T. Markus Funk.  As such, when SA Funk deceided to accept a position of employment with the FBI while her husband was still employed by the DOJ.  As such by SA Funk accepting the position with the FBI, she violated federal regulations and code in doing

such.

After which SA Funk accepted employment within the FBI, in violation of the following federal laws and regulations:

(a)   5 US Code § 3110, Employment of relatives;

(b)   5 Code of Federal Regulations (CFR) § 310, Employment of Relatives;

(c)   5 CFR § 2635, Standards of Ethical Conduct for employees of the Executive branch; Subparts D, E, and G;

(d)   5 USC § 2302, Prohibited Personnel Practices

(e)   Executive Order 11222, Prescribing Standards of Ethical Conduct for Government Officers and Employees, May 8, 1965;

(f)   5 CFR § 735, Employee Responsibilities and Conduct.

This situation extends beyond just a minor violation of federal regs by an employee holding a position of trust within the government. This matter involves numerous violations of federal regulations by two executive level employees within the DOJ who swore to uphold and defend the Constitution and are responsible for national security. As such this makes the fact that they were willing to violate the laws in order to gain employment enforcing the law, suspect. Clearly this relates to the credibility of this government agent and the integrity of this investigation and the fact that SA Funk was the sole source of evidence provided to the court makes this discovery material in this case.

## GOVERNMENT AWARE OF MISCONDUCT

SA Funk was required to obtain and pass a mandatory 10 year background investigation in order to obtain the top secret security clearance required of all FBI agents. This information was readily available to the DOJ, the FBI, and SEC, all of which were actively involved in the investigation and prosecution of this case, as such this information regarding the violations of federal laws and regulations that were involved in the hiring of SA Funk.

The fact that SA Funk had no law enforcement experience prior to working for the FBI and she had never been involved in a white collar securities fraud investigation prior to her assignment as the lead investigator in this case, as such there is nothing to support the fact that SA Funk is an expert in these proceedings. As is shown in the court decision in the 5th circuit where the decision of that court was, "The government used an FDIC investigator as an expert in the area of mortgage fraud. Though the agent had some training in fraud investigation, he had no specialized training in the area of mortgage fraud and had never previously testified as an expert in this field." AUSA Siebert also attests to the fact that **SA Funk is not an expert**

in his response to Mr. Sears' motion to withdraw his plea.

As this entire investigation started with the misrepresentations provided by SA Funk as to the inadmissable hearsay statements provided by the confidential witness which she was not only unreliable but were FALSE to form the legal basis for her investigation and the fact that she based the opinions she provided to the courts as evidence in this case, makes this information exculpatory in nature and as such it should have been disclosed to the defense. The facts upon which a witness relies for her opinion is discoverable and must be disclosed to the other party. The trier of fact should be disregarded if it is found to be unreasonable or not supported by the facts upon which the opinion is based.

As SA Funk is not an expert this violates the federal rules of evidence 701 and 702 - 705. As SA Funk was allowed to testify before the court supplying opinions that were not based on first hand observation into the matters claimed by SA Funk, the court must take into consideration any sicth amendment confrontation clause concerns whenever the prosecution intends to call an expert to offer his or her opinion. "Though an expert may generally rely on inadmissable evidence in reaching a conclusion, including hearsay, that rule assumes that an expert will carefully analyze the basis of his opinion."

## PROBLEMS WITH WARRANTS

The search and seizure warrant and supporting documentation presented to Magistrate Shaffer on May 15, 2014 was attested to telephonically by SA Funk which requires a recording of that and the Search and Seizure warrant and all supporting documentation be filed with clerk of the court in accordance with  the Federal Rules 41 and 4.1.

As this document was not filed in an emergency situation which is shown by the time and date of the Judge's signature being on May 15, 2014 and the time whcih it was executed on the following day on May 16, 2014, as such this was not an anticipatory warrant, as such there was no reason why it was not filed properly.

After reviewing the copy furnished by the prosecution only after the plea was signed, it was discovered that the warrant was not properly filed as it does not contain the appropriate seal nor the stamp of the clerk on the top.

Nor was this document ever sealed as was claimed by the AUSA Harmon on numerous occasions.  There is no court order on the docket sealing the search and seizure warrant which was in fact exercised on the FusionPharm

warehouses.  Due to the invalid warrant  and subsequent raid on FusionPharm
which included SA Funk, IRS-CID Agent Loecker, and AUSA Harmon and others
from the prosecutors office who all have many years of experience dealing
with warrants.  They all knew that this warrant was not valid because
it was never properly filed. (SEE EXHIBIT _12 -12_ showing the proper
filing and sealing stamps from co-defendant Jean-Pierre's case.)  There
was a third warrant served on the bank, trust, and trading accounts of Mr.
Sears and his family on May 16, 2014 by SA Funk.  However, to date we have
not been provided a copy.  How can the integrity of the warrant be guaranteed
if it was not registered with the court as per the Federal Rules of Criminal
Procedure that state:

    (f)       Executing and returning the warrant.

    (1)       Warrant to search for and seize a person or property.

(A)  Noting the Time.  The officer executing the warrant must enter on it
the exact date and time it was executed.

(B)   Inventory.  An officer present during the execution of the warrant
must prepare and verify an inventory of any property seized.  The officer
must do so in the presence of another officer and the person from whom or
from whose premises, the property was taken.

(C)  Receipt.  The officer executing the warrant must give a copy of the
warrant and a receipt for the property taken to the person from whom, or
from whose premises, the property was taken or leave a copy of the warrant
and receipt at the place where the officer took the property.  For a
warrant to use remote access to search electronic storage media and
seize or copy electronically stored information, the officer must make
reasonable efforts to serve a copy of the warrant and receipt on the
person whose property was searched or who possessed that information
that was seized or copied.  Service may be accomplished by any means
including electronic means, reasonably calculated to reach that person.

(D) Return.  The officer executing the warrant must promptly return it -
together with a copy of the inventory - to the Magistrate designated on
the warrant.  The officer may do so by reliable electronic means.
The Judge must, on request, give a copy of the inventory to the person
from whom the property was taken and to the applicant for the warrant.

AO 91 (Rev 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| GUY M. JEAN-PIERRE | ) | Case No.  16-mj-01103-KMT |
| a/k/a Marcelo Dominguez de Guerra | ) | |
| Defendant | ) | |

## CRIMINAL COMPLAINT

I am the undersigned complainant in this case, and state that the following is true to the best of my knowledge and belief.

On or about the date of _____ in the county of ___Denver___ in the ___State and___ District of ___Colorado___, the defendant violated ___18___ U. S. C. § ___1956(a)(3) and 2.___ an offense described as follows:

See Attachment A.

This criminal complaint is based on these facts:

　　See Affidavit, Attachment B, attached hereto and hereby incorporated by reference.

☑ Continued on the attached sheet.

s/ Michael A. Godson
*Complainant's signature*

SA Michael A. Godson, IRS-CID
*Printed name and title*

Sworn to before me and : ☐ signed in my presence; ☑ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___Jun 13, 2016___

*Judge's signature*

City and state: ___Denver, Colorado___   Kathleen M. Tafoya, U.S. Magistrate Judge
*Printed name and title*

Case 1:16-cr-00301-WJM   Document 246-1   Filed 01/15/21   USDC Colorado   Page 104 of 175

Case 1:16-mj-01103-KMT *SEALED*   Document 1-1   Filed 06/13/16   USDC Colorado   Page 1
Case 1:17-mj-08125-UA   Document 1-1   Filed 02/10/17   Page 6 of 20
of 20

## ATTACHMENT A

From on or about April 22, 2016 and continuing through on or about April 29, 2016, in the District of Colorado, the defendant, Guy M. Jean Pierre, a/k/a Marcelo Dominguez de Guerra, with the intent to conceal and disguise the location, source, ownership and control, of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a person at the direction of a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be proceeds of specified unlawful activity, to wit: securities fraud, in violation of Title 15 United States Code, Sections 78j(b) and 78ff(a), and 17 C.F.R. Section 240.10b-5, and wire fraud, in violation of Title 18, United States Code, Section 1343,

In violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

Case 1:16-cr-00301-WJM Document 246-1 Filed 01/15/21 USDC Colorado Page 105 of 175

Case 1:16-mj-01103-KMT *SEALED* Document 1-1 Filed 06/13/16 USDC Colorado Page 2
Case 1:17-mj-00129-GPG *SEALED* Document 1-1 Filed 01/20/17 Page 7 of 20
of 20

**ATTACHMENT B**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Michael Anthony Godson, being duly sworn, hereby depose and state the following:

1.     I am a Special Agent of the Internal Revenue Service Criminal Investigation
(IRS-CID), in Denver, Colorado, and have been so employed for the past seven years. My duties
and responsibilities include the investigation of possible criminal violations of the Internal
Revenue laws under Title 26, United States Code, and related offenses, including but not limited
to, violations of Title 31, Bank Secrecy Act or Currency Crimes, and Title 18, Money
Laundering based upon Specified Unlawful Acts (SUA's), as defined under Title 18, U.S.C.,
Sections 1956 and 1961 and Forfeiture. My education includes a Bachelor's of Science degree in
Business Administration-Accounting from Colorado State University, a Masters in Accountancy
from the University of Colorado at Denver, and six months of training at the Federal Law
Enforcement Training Center

2.     Since in or about May 2014, together with Special Agents of the Federal Bureau
of Investigation (FBI) and Postal Inspectors of the United States Postal Inspection Service
(USPIS), I and other IRS-CID Special Agents have been involved in a federal criminal
investigation in the District of Colorado of activities and conduct arising from and relating to the
operations of FusionPharm, Inc ("FusionPharm"), an erstwhile publicly traded, microcap or
"penny stock" company, headquartered in Commerce City, Colorado, and, in particular the
conduct of two individuals (Targets 1 and 2) who constituted principals of the business and were
de facto partners, concerning federal criminal securities, mail fraud, wire fraud, money
laundering and tax offenses. As set forth below, during the course of the investigation, one of

1

*12*

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Premises located at:<br>5850 East 58th Ave., Unit F<br>5750 East 58th Avenue, Unit J<br>Commerce City, Colorado<br>more fully described in Attachment A,<br>attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. |

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

       An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ___ State and ___ District of ___ Colorado ___ *(identify the person or describe the property to be searched and give its location)*:

### SEE "ATTACHMENT A" attached hereto and incorporated by reference

       I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

### SEE "ATTACHMENT B" attached hereto and incorporated by reference

       I find that the affidavit(s), or any recorded testimony, establishes probable cause to search and seize the person or property.

       **YOU ARE COMMANDED** to execute this warrant on or before ___ May 29, 2014 ___ *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.    ☐ at any time in the day or night because good cause has been established.

       Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

       The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___ Craig B. Shaffer ___ .
<em>(United States Magistrate Judge)</em>

       ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
       ☐ for ___ days *(not to exceed 30).*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   **_4:39 pm, May 15, 2014_**     _____
<em>Judge's signature</em>

City and state:    ___ Denver, CO ___       Craig B. Shaffer
United States Magistrate Judge<br><em>Printed name and title</em>

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
|  |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## FAILURE TO DISCLOSE AND
## WITHHOLDING EXCULPATORY EVIDENCE

Based on the previous responses supplied by the federal prosecutor in this case, which has ignored the fact that the Supreme Court ruled, "the prosecution has an affirmative duty to learn of and disclose, any favorable evidence known to others acting on behalf of the government in the case, including the police." Thus the prosecution was required not only to disclose what was already known to prosecutors, but also to learn of any such information that was known to law enforcement, including matters related to witness credibility even that of law enforcement.

The prosecution withheld three different FBI 302 interview transcripts. Only in October of 2020 did I receive a copy of them from an annonymous source. It had a note saying, "only 5 years late". Much like the SEC interview transcripts that were withheld until after I signed the plea. They are littered with lies! The prosecution knew if I saw any of it there was no way I'd sign anything. This is a clear violation of my 6th Amendment rights. I can provide affidavits or testify in court as to the requests by five different lawyers of the Lehrer 302's. Only to never get a response.

Additionally, the Supreme Court decision where the disclosure rule was extended to include not only evidence directly related to the crime involved, but also to information that would affect the credibility of a prosecution witness in the case. The fact, SA Funk was the sole source of opinions relied on by the court as evidence including that which was relied on by the courts in rendering its' probable cause determination, means her credibility related directly to the evidence.

As the term "exculpatory" is generally understood to refer to virtually any kind of information that would cast doubt on the defendant. Exculpatory evidence is evidence that is favorable to the accused; is material to the guilt, innocence, or punishment of the accused; and that may impact the credibility of a government witness, including a police officer. Impeachment material is included in the Brady disclosure requirements. With the help of a Floriday Forensic Securities Lawyer and specialist who was a whistle-blower to the SEC in the case SEC v. Guy M. Jean-Pierre, Civil action 12-cv-8886, I uncovered many disturbing things that can only be deemed as corruption on the part of Mr. Lehrer.

In that case, Mr. Jean-Pierre forged more than 100 legal opinions that were used to remove the restrictive legend from millions of shares of penny stock company's. Through discovery in a related case, the specialists firm obtained the forged opinions. The referral to the Florida bar of that matter resulted in the Florida Supreme Court disbarring Mr. Jean-Pierre. In connection with that case Jean-Pierre provided a letter

from Scott Dittman, in his capacity as the CEO of Fusion Pharm Inc. (FSPM) in defence of the allegations. At that time, Jean-Pierre was a corporate officer of FSPM. The specialist's involvement in that matter resulted in a civil suit and bar complaint against the securities specialist by Jean-Pierre and his client, Marc Jablon. The securities specialist spent more than two years and thousands of unpaid hours because they were retained for stating that the conduct of Jean-Pierre and his associates was illegal. During that period, the specialist was represented by **Frederick M. Lehrer**. Lehrer assisted them in drafting the documents in all aspects referring the matter to the Florida Bar, SEC, and FBI v. Mr. Jean-Pierre. As a result of the retaliation the specialist endured, they became a witness for the SEC in the penalty phase of that proceeding against Mr. Jablon. They have not had meaningful communications with Lehrer since 2013.

The forensic securities specialist then became aware of what he believed to be egregious misconduct by the Colorado Office of the SEC. In 2014, the CO SEC commenced an investigation of FSPM. In connection with FSPM, Sears and Dittman were indicted by the US Attorney's Office for the District of CO. This taken from the SEC's press release was then and remained forever untrue. When the specialist met Mr. Sears and Mr. Dittman and learned of Lehrer's involvement in FSPM, he was shocked to learn of Lehrer's conflict of interest with Mr. Jean-Pierre in this case. He also made Sears and Dittman aware of Mr. Jean-Pierre's conflicts with the AUSA Harmon, who was in charge of the investigation and prosecution. Per the specialist, Mr. Lehrer and Mr. Harmon were 2 of 4 attorneys who constituted the special task force for securities fraud in South Florida in the 1990's. In fact, Mr. Harmon and Mr. Lehrer worked side-by-side for 4 years and remained close friends. The conflict of interest was never disclosed in this case by Mr. Harmon, who should have recused himself as soon as Mr. Lehrer's involvement was known. Unfortunately, he did not. Despite the conflict, Lehrer commensed representing FSPM, Dittman and Sears within a few months after representing the specialist in the Jean-Pierre matter. Lehrer continued to represent FSPM until the middle of 2014, approximately two months after the SEC investigation commenced. Pursuant to a formal order of investigation dated January 29, 2015, Lehrer was asked to submit to a deposition concerning FSPM, Dittman and Sears. Prior to his testimony, Lehrer requested that Dittman and Sears waive the attorney client priviledge, which they did without any knowledge of Mr. Lehrer's prior involvement with Jean-Pierre or Mr. Harmon.

Lehrer provided sworn testimony on January 29, 2015 and May 29, 2015. In that testimony, Lehrer lied repeatedly. Among other things Lehrer falsely

stated that "he learned about Jean_pierre's OTC Markets ban, a ban he brought about from Google searches after the SEC investigation of FusionPharm began". He was largely responsible for the OTC markets ban as a result of his representation of teh Specialist in connection with referrals to the SEC, FBI, and Florida Bar!

Secondly, Lehrer lied in stating that he had no knowledge of Sears' relationship with Dittman or Sears' relationship with his family and Fusion Pharm. even more troubling is that Lehrer's conduct makes the waiver of priviledge given by Dittman and Sears ineffective because they were not provided with disclosure of Lehrer's behavior and conflict of interest role in reporting a corporate officer of FSPM. Because of this non-disclosure, Sears and Dittman could not have made an informed decision of whether to waive the attorney client priviledge allowing Lehrer to testify against them. Despite this, Denver SEC enforcement attorneys, Ian Karpel and Kim Greer allowed Lehrer to testify as to matters that were subject to the attorney client priviledge. Dittman and Sears never would have allowed the waiver of attorney client priviledge if they knew (1) Lehrer had participated in reporting Jean-Pierre, a corporate officer of FSPM to the FBI and SEC, and (2) Harmon had worked with Lehrer for years and was his supervisor. Greer and Karpel were aware of these conflicts and took no steps to ensure the integrity of Lehrer's testimony to the SEC. (3) If the prosecution had not withheld Lehrer's 302 when multiple requests for it were made. Greer and Carpels' knowledge of many of the conflicts is demonstrated by Lehrer's own SEC testimony.

Upon the Specialist's review of this matter, they found that Lehrer had provided multiple baseless legal opinions for Sears in regards to the trading of FSPM stock. The only things more shocking was they learned that Lehrer had even instructed Sears (in writing) to sign his name to legal opinions to remove the legend from restricted securities. This was due to his printer not working, as he explained to Sears in his email to Sears. Sears, trusting Lehrer, as who better to protect him than an ex-SEC enforcement attorney? He did as instructed. If FSPM is a fraud as the SEC states, then Lehrer was the gatekeeper allowing Sears to cut and paste legal opinions on his law firm. The fact is Fred Lehrer cut and pasted Jean-Pierre's legal opinions as they are almost exactly the same. Kim Greer of the SEC commented on this in Lehrer's interview. According to the SEC's press release based on SA Funk's investigation, FSPM was a "pump-and-dump" (not that she would know what that really means) that resulted in investor losses of more than $12 million because of baseless legal opinions. The vast majority (more than $10 million of the $12 million at issue with the SEC) of the sales of FSPM stock were only possible

because of **Lehrer's opinions.** Still, no investigation or even mention of
Lehrer from the DOJ while all other attorneys in the case were prosecuted?
During the investigation, no press release was ever questioned or at issue.
FusionPharm's stock price followed the same exact trajectory as all the other
marijuana index company's when amendment 64 passed in 2014. In 2017, the
Specialist provided Mr. Karpel and Ms. Greer with evidence demonstrating
that Lehrer lied multiple times under oath in their investigation. They
advised them that the Specialist had declarations and other evidence of Lehrer
that contradicted his SEC testimony. Along with emails from Sears that directly
refuted much of his SEC testimony. One example was an email communication
whereas Lehrer advised Dittman and Craig Dudley (FusionPharm CFO) that disclosing
Sears was not necessary. Dudley confirms this in his FBI 302. The Specialist
also advised them that Lehrer had told Sears to sign his name to a legal
opinion. After receipt of this information, Greer and Karpel did not investigate.
SEE EXHIBITS ___13 -/4,A-N__ Instead, Greer contacted Jeff Thomas an attorney
of Scott Dittman.

> "Kim called to let me know that they received a call from XXXXXXXXXXX,
> who detailed some of her knowledge about Fred Lehrer. I pressed Kim
> as to what this meant in terms of their case, and she made it clear that
> it didn't mean anything. Because their case is technically still open,
> she just believed that she had an obligation to inform me of the call".

Greer violated SEC policy by disclosing confidential SEC information to
a private attorney. Her motive is clear and she did this to silence the
Specialist as a whistle-blower against Lehrer. Greer indicated that their
refusal to investigate Lehrer was because of Mr. Harmon.

Further, when Harmon learned the Specialist had provided exonerating
evidence about Lehrer to Sears and Dittman and to the FBI as a whistle-blower,
HARMON retaliated against Sears and the Specialist. Instead of encouraging
whistle-blowers to come forward when they learn of information relevant to
investigations, Harmon, Karpel, and Greer retaliated aginst the Specialist
and Sears and sought to discourage them from providing information and Sears
from speaking to the Specialist. While the SEC's revolving door ignored Lehrer,
the SEC charged another attorney, Todd D. Tommaso for his legal opinions. The
action against him can be found at: www.sec.gov/litigation/admin/2016/33-10215.
Sears had put together a chart whereas it could be shown that Tomasso also
committed perjury in his interview with the SEC. SEE EXHIBIT __15__

Despite the Lehrer opinions that were baseless and merely cut and pasted
from previous Tomasso opinions and caused greater investor losses and his
conduct was more egregious, the Denver SEC/DOJ would never charge Lehrer.
For the reasons above, Karpel and Greer of the SEC should be investigated

From: Jeffrey Thomas <jthomas@thomaslawllc.com>
Subject: RE: follow up
Date: January 26, 2017 at 12:10:08 PM EST
To: 'Scott Dittman' <sdittman69@icloud.com>

Scott,

Kim called to let me know that they received a call from ▮▮▮▮▮▮▮▮▮, who detailed some of her knowledge about Fred Lehrer.  I pressed Kim as to what this meant in terms of their case, and she made it clear that it didn't mean anything.  Because their case is technically still open, she just believed that she had an obligation to inform me of the call.

Thanks.

Jeffrey R. Thomas
Thomas Law LLC
50 S. Steele Street, Suite 250
Denver, Colorado 80209

# FREDRICK LEHRER'S PERJURY TO THE SEC

1. *Lehrer's Knowledge of Jean-Pierre's Opinion Letter Ban.  In his sworn testimony before the SEC, Lehrer stated that he learned that Jean-Pierre had been banned from issuing opinion letters "through a computer search, not necessarily in reference to him in particular, you know, but banned opinion writers."  (Exhibit A at 96:8-98:24.)  In stark contrast to that statement, Lehrer described, in an August 7, 2011 declaration signed under penalty of perjury, Guy Jean-Pierre's forgeries.  (Exhibit B.)  In his October 16, 2011 declaration, Lehrer states that he "assisted substantially with drafting the [bar] grievances filed against Jean Pierre ..." (Exhibit C at ¶11.)  In email communication on August 28, 2013, a mere 4 minutes after Sears first introduces him to FusionPharm/FSPM, Lehrer refers to an SEC.gov link and asks Sears whether Jean-Pierre is still the Secretary.  (Exhibit D.)  The SEC link was to the Jean-Pierre case in which Lehrer was an investigator.*

2. *Lehrer's Knowledge of Bill and Sandra Sears' Ownership of Mead point and Advice Regarding Disclosing Mead point as a Related Party.  In his SEC testimony, Lehrer admitted that he knew that Bill Sears controlled Meadpoint during the time Lehrer was issuing Rule 144 opinions.  (Exhibit E at 316: 8-16).  While Lehrer stated in his testimony that he did not know that Bill Sears had transferred control of Meadpoint to his mother, Sandra Sears, until April 2014 (Exhibit F at 282:15 - 284:9; Exhibit G at 316:19 - 317:20), that claim is belied by, among other things, an October 22, 2013 email in which Bill Sears told Lehrer "FYI no conflict with Meadpoint as a family member out of state owns the company."  (Exhibit H) (emphasis added).  Bill Sears also stated in that email that the ownership change would be reflected on the Nevada Secretary of State's website.  Consistent with that statement, the Nevada Secretary of State's website identifies Sandra Sears as Meadpoint's only officer. (Exhibit I).*

3. *Despite Lehrer's knowledge throughout his representation of FusionPharm that Bill Sears or his mother controlled Meadpoint, Lehrer advised FusionPharm that it did not need to disclose Meadpoint as a related party.  *** An April 15, 2014 email from Craig Dudley to Lehrer, in which Dudley specifically sought advice on that issue, is attached as Exhibit J.  ****

4. *Lehrer's Knowledge of Bills Sears' Criminal History.  Lehrer stated in his SEC testimony that he learned from a newspaper article after DOJ's raid of FusionPharm's office that Bill Sears had a prior criminal conviction for securities fraud.  (Exhibit K at 236: 15-23.)  Lehrer's other testimony on that subject, however, made clear that he knew about Bill Sears' conviction long before that.  (Exhibit L at 71:23-74:21; Exhibit M at 231:19-236:14).  An October 10, 2013 email exchange, in fact, shows Lehrer and Bill Sears discussing that very issue.  (Exhibit L.)*

5. *Lehrer's Use of Medications.  On information and belief, Mr. Lehrer has a long history of taking various medications – including medications to treat seizures, anxiety, bipolar disorder, and psychosis – that are known to impair memory and judgment.  He has also been hospitalized for mental-health reasons.  The medications include clonazepam, lorazipam, quetiapine, Prozac, Pemazepam, BuSpar, buspirone, Remeron, Effexor, and Klonopin. This long history casts doubt on Lehrer's statement that he was not taking any medications at the time of his testimony.*

## <u>FREDRICK LEHRER'S PERJURY TO THE SEC</u>

*Klonopin.  This long history casts doubt on Lehrer's statement that he was not taking any medications at the time of his testimony.*

# XXXXXXXXXXXXXXXXXXXXXXXXXX.

**Attorneys** Counselors **Consultants**

www.xxxxxxx.com

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**April 24, 2017**

Matthew Kirsch
United States Attorney
Department of Justice
1801 California Street
Suite 1600
Denver Colorado 80202

**Re: Kenneth Harmon**

Dear Mr. Kirsch

My name is xxxxxxxxxxxxxx. I am a securities attorney admitted to and in good standing with the xxxxxxxState Bar. I routinely handle matters before the Securities and Exchange Commission (the "SEC") and have had a long history of satisfactory dealings with the SEC and Federal Bureau of Investigation. I bring these matters to your attention and respectfully request that you investigate the handling of the case Fusion Pharm, Inc, ("FSPM") Guy M. Jean-Pierre ("Jean-Pierre`), Scott Dittman ("Dittman"), William Sears ("Sears"), Tod Ditommaso ("Ditommaso") and Frederick M. Lehrer ("Lehrer"), by Assistant United States Attorney, Kenneth Harmon.

I was a whistleblower to the SEC and Department of Justice in connection with a matter captioned Securities & Exchange Commission v Big Apple Consulting USA et al (Civil Action No. 09-cv-1963 (M.D. Fla.) (JA). In connection with that matter, among other things I was approached by Marc Jablon ("Jablon") and Mark Kaley ("Kaley") who controlled a stock promotion firm known as Big Apple Consulting to engage in criminal activity as lawyer for an issuer and its principal. Jablon, Kaley, and Big Apple Consulting are referred to herein as "Big Apple". I refused to engage in the crimes proposed. This advice included that opinions rendered by Jean-Pierre were baseless and unlawful. The client became a whistleblower to the SEC and provided the SEC and FBI with information about Big Apple. In the course of my review of the Big Apple matter, I found hundreds of penny stock companies/tickers manipulated by Big Apple. In connection therewith, Jean-Pierre and other complicit attorneys provided baseless opinions as to the legality of the transactions.

It also is clear that because of the mishandling of the Big Apple and FSPM investigations by Kenneth Harmon, I will never have retribution.

After the baseless civil suit and Florida Bar complaint filed against me by Big Apple were dismissed, I was asked to be a government witness during the penalty phase of the case against Big Apple to discuss the retaliation I endured. During the Big Apple matter, I was represented by another lawyer and Lehrer who assisted me in reporting issuers, attorneys including Jean-Pierre and other Big Apple associates to regulators. I have not had meaningful communications with Lehrer for almost five years because of among other things, his long history of erratic and unethical behavior and abuse of prescription drug medication.

My referrals resulted in the discovery and reporting of Jean-Pierre's forgery of more than 100 baseless legal opinions. It also resulted in an SEC judgment against him in the Southern District of New York (Civil Action No. 12-CV-8886). The referrals also led to enforcement actions by FINRA against two brokerage firms who accepted the forged opinions, one of which was expelled from the industry, SEC actions against issuers and other attorneys.

1

where Lehrer represented her.

**The Tradability Opinions**

The SEC pleadings discuss the significance of the Tradability Opinions of FSPM:

> "First, utilizing backdated convertible notes and preferred FSPM stock, FSPM issued common stock to three entities controlled by Sears. Second, Sears, through these entities, illegally sold the FSPM stock into the market. Third, Sears transferred some of the proceeds from the illegal stock sales back to FSPM, where the money was fraudulently recognized and reported as revenue. Fourth, FSPM issued press releases and financial reports claiming the false revenues, and failed to disclose Sears' identity, role, and background in FSPM's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website." in FSPM's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website... ***In order to ensure that his entities could sell their FSPM shares without a restrictive legend, Sears needed attorney opinion letters opining that Microcap, Bayside and Meadpoint were not affiliates of FSPM, and consequently opining that the transactions were exempt from the registration requirements of Section 5 of the Securities Act [15 U.S.C. § 77(e)]."***

Between approximately August 2013 and April 2014, Lehrer provided at least 19 attorney opinion letters as to the tradability of FSPM shares (Opinions available upon request). Lehrer's opinions covered almost all of the shares sold in the FSPM scheme. Without Lehrer's opinions, investors would not have been able to purchase FSPM shares and would not have been harmed. According to pleadings filed by the SEC, FSPM caused approximately $12 million of investor losses from approximately 5,575,000 shares unlawfully sold using baseless legal opinions. The chart below demonstrates the significance of Lehrer's opinions:

| Date | Name | No. of Shares |
|------|------|---------------|
| 8/28/2013 | Myron Thaden | 500,000 |
| 8/28/2013 | Sharryn Thaden | 500,000 |
| 8/28/2013 | Richard Scholz | 500,000 |
| 9/10/2013 | Black Arch Opportunity Fund LP | 28.562 |
| 9/10/2013 | Starcity Capital LLC | 313,703 |
| 9/12/2013 | Starcity Capital LLC | 313,703 |
| 9/12/2013 | Black Arch Opportunity Fund LP | 28,562 |
| 1/6/2014 0 | Meadpoint Venture Partners | 800,000 |
| 1/16/2014 | Alexandra Mauriello | 61.437 |
| 1/16/2014 | Vera Group. LLC | 29,625 |
| 1/16/2014 | SGI Group LLC | 29,625 |
| 1/23/2014 | Vera Group, LLC | 29,625 |
| 1/23/2014 | SGI Group LLC | 29,625 |
| 1/23/2014 | Alexandra Mauriello | 61.437 |
| 2/14/2014 0 | Meadpoint Venture Partners from $88,000 Note | 600,000 |
| 3/4/2014 0 | Craig Dudley | 20,000 |
| 3/6/2014 0 | Meadpoint Venture Partners from $88,000 Note | 370,000 |
| 3/26/2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 |
| 4/16/2014 | Meadpoint Venture Partners from $88,000 Note | 900,000 |
| | **Total Shares Opined Upon By Lehrer** | 5,715,904 |

**Lehrer's Testimony**

3

Lehrer's representation of Complainant spanned years and involved thousands of pages of materials. In his sworn SEC testimony, Lehrer lied about how he learned that Jean-Pierre had been banned from issuing opinion letters and stated it was "through a computer search, not necessarily in reference to him in particular, you know, but banned opinion writers." (Exhibit A at 96:8-98:24.) In stark contrast to that statement, Lehrer described, in an August 7, 2011 declaration signed under penalty of perjury, Guy Jean-Pierre's forgeries. (Exhibit B.) In his October 16, 2011 declaration, Lehrer states that he "assisted substantially with drafting the [bar] grievances filed against Jean-Pierre ..." (Exhibit C at ¶11.) In email communication on August 28, 2013, a mere 4 minutes after Sears first introduces him to FSPM/FSPM, Lehrer refers to an SEC.gov link and asks Sears whether Jean-Pierre is still the Secretary. (Exhibit D.) The SEC link was to the Jean-Pierre case which Lehrer assisted the Complainant in investigating and reporting to the FBI, SEC and Florida Bar. Even then Lehrer did not come clean and advise Sears of his conflict of interest and he did not obtain a conflict waiver from Complainant, FSPM or Sears.

Lehrer's representation of FSPM, Sears and Dittman interfered with the whistleblower referrals to regulators that Complainant made with Lehrer's assistance. Complainant lost all credibility in those proceedings because of Lehrer's double dealings.

In his SEC testimony, Lehrer admitted that he knew that Sears controlled Meadpoint during the time Lehrer was issuing tradability opinions. (Exhibit E at 316: 8-16). Lehrer lied in his testimony and stated that he did not know that Sears had transferred control of Meadpoint to his mother, Sandra Sears, until April 2014 (Exhibit F at 282:15 - 284:9; Exhibit G at 316:19 - 317:20), that claim is belied by, among other things, an October 22, 2013 email in which Sears told Lehrer "FYI no conflict with Meadpoint *as a family member out of state owns the company.*" (Exhibit H) (emphasis added). Sears also stated in that email that the ownership change would be reflected on the Nevada Secretary of State's website. Consistent with that statement, the Nevada Secretary of State's website identifies Sandra Sears as Meadpoint's only officer. (Exhibit I).

Lehrer stated in his SEC testimony that he learned from a newspaper article after DOJ's raid of FSPM's office that Sears had a prior criminal conviction for securities fraud. (Exhibit K at 236: 15-23.) Lehrer's other testimony on that subject, however, made clear that he knew about Sears' conviction long before that. (Exhibit L at 71:23-74:21; Exhibit M at 231:19-236:14). An October 10, 2013 email exchange, in fact, shows Lehrer and Sears discussing that very issue. (Exhibit N.)

Lehrer even instructed Sears to sign his name on legal opinions used to create the shares that the SEC says were unlawfully sold. (See Exhibit O)

> "OK My scanner is not working If the latest draft covers it, can you sign my name similar to how I signed the other opinion letters?"

FSPM did not disclose in its OTC Markets Annual Report that Sears and/or his mother controlled Meadpoint and that Sears had a criminal conviction. Despite that Lehrer had knowledge that Sears and/or his mother controlled Meadpoint and Sears had a criminal conviction, Lehrer rendered a Disclosure Opinion (Exhibit J) that states that FSPM's disclosure:

> (i) constitutes "adequate current public information" (the "Information") concerning the Securities and the Issuer and "is available" within the meaning of Rule 144(c)(2) under the Securities Act, (ii) includes all of the information that a broker-dealer would be required to obtain from the Issuer to publish a quotation for the Securities under Rule 15c2-11 under the Securities Exchange Act of 1934, as amended, (iii) complies as to form with the OTC Markets Group's OTC Pink Disclosure

that matter. These are "Tradability Opinions" to remove legends from shares so that they can be sold to investors and the "Disclosure Opinions" which relate to the adequacy of the information a public company provides to investors. Disclosure Opinions are posted on the OTC Markets and viewable by the public at large to inform investors that a company's disclosures comply with federal securities laws.

In defense of the bar grievance against Jean-Pierre, he provided a statement from Dittman, the president of FSPM (Available upon request). Complainant and Lehrer's referral of Jean-Pierre to the Florida Bar resulted in his disbarment as well as other investigations. (Supporting Documents Available upon request).

From November 2010 until June 2013, Jean-Pierre was a corporate officer and legal counsel for FSPM and Dittman is its Chief Executive Officer and sole director. Sears is Dittman's brother-in-law, and a consultant for and shareholder of FSPM.

During his representation of Complainant, Lehrer as Complainant's attorney, assisted her in reviewing the opinions and disclosures of Jean-Pierre's clients that were listed on the OTC Markets website at www.otcmarkets.com . This was done to evaluate the Disclosure Opinions rendered by Jean-Pierre.

In late 2012, Complainant and Lehrer had a falling out and have not had meaningful communication since such time. During and after his representation of Complainant, Lehrer, repeatedly disclosed confidential attorney-client privileged information about Complainant, including the bar grievance against her which was dismissed with a finding of no probable cause.

Shortly after his falling out with Complainant, Lehrer became counsel to Dittman, Sears and FSPM. Lehrer was engaged to draft FSPM's Tradability Opinions and Disclosure Opinions. At no time did Lehrer obtain a conflict waiver from Complainant as to his representation of FSPM, Sears or Dittman despite that he provided legal advice to Complainant concerning FSPM and Jean-Pierre's other clients.

From the inception of his representation of Sears, Dittman and FSPM, Lehrer was dishonest. For example, on August 28, 2013, Lehrer sent an email to Sears, with a link to the SEC enforcement action against Jean-Pierre, asking if Jean-Pierre was still involved with FSPM. At no time did Lehrer discuss his role as Complainant's attorney or advise Sears that he had assisted Complainant in reporting Jean-Pierre to the Florida Bar, SEC or FBI in connection with his baseless legal opinions and forgeries. Further, Lehrer did not obtain a conflict waiver from Sears. Lehrer rendered at least 19 Tradability Opinions for FSPM's shares and rendered a Disclosure Opinion (Available upon request).

In May of 2014, the SEC suspended trading of FSPM's shares. Dittman, Sears and Jean-Pierre were indicted. Sears and Dittman's indictments stem from the public disclosures and stock sales opined upon by Lehrer.

Lehrer was asked to testify at the SEC about FSPM. In connection with his proposed testimony, Lehrer requested that Sears waive the attorney client privilege and they agreed believing that Lehrer would testify truthfully about the advice he had provided to them. At no time did Lehrer disclose to Sears and Dittman that he had represented Complainant in the referral of Jean-Pierre to the Florida Bar, SEC and FBI. Further, Lehrer did not disclose to Sears and Dittman that the Assistant U.S. Attorney in their case was his former supervisor for 4 years and personal friend, Kenneth Harmon.

Lehrer failed to provide Sears with information necessary for him to have provided "informed consent" as to the waiver of the attorney-client privilege. Further, Lehrer failed to obtain a waiver of his conflict of interest from Complainant, FSPM and Sears.

Lehrer also failed to obtain a waiver of the attorney client privilege from Complainant despite that Jean-Pierre (FSPM's corporate officer). Dittman and FSPM had been an adversarial party to her in a matter

Guidelines, which are located on the Internet at www.otcmarkets.com, and (iv) has been posted through the OTC Disclosure and News Service.

To fully explain Lehrer's conflict, a timeline of the overlapping referrals of Complainant and the indictment and SEC charges against Sears, Dittman and FSPM is below:

- On March 29, 2013, the SEC received penalties against Marc Jablon in the case in which Lehrer represented Complainant. Jean Pierre was general counsel to Jablon and provided baseless legal opinions many of which were forged.
- In August 2013, begins representing Sears, Dittman and FSPM where Jean-Pierre was a corporate officer and general counsel.
- In approximately September of 2013, the SEC and FBI in Denver begin investigating FSPM.
- On January 13, 2014, Jean-Pierre is disbarred by the Florida Supreme Court based upon Complaint's referral – Lehrer was Complainant's attorney.
- In May of 2014, the Denver SEC suspended trading of FSPM.
- On January 29, 2015, Lehrer provided testimony in the Denver SEC case.
- On March 9, 2015, the New York SEC obtained a civil judgment and life time penny stock bar against Jean-Pierre in connection with his forged opinions that Lehrer assisted Complainant in reporting.
- On May 29, 2015, Lehrer provided testimony a second time in the Denver SEC case.
- On August 16, 2016, FINRA filed a case against Delaney Capital, the broker-dealer who accepted Jean-Pierre's forged opinions based upon Complainant's referral that Lehrer had assisted Complainant in investigating and reporting.
- In September of 2016, Sears and Dittman were indicted for securities fraud by the U.S. Attorney's Office in Denver.
- On December 15, 2016, FINRA entered into a settlement with Gary Hume and ACAP financial who accepted the forged opinions of Jean-Pierre that Lehrer had assisted Complainant in investigating and reporting.

Lehrer should be sanctioned for his myriad of conflicts and dishonest behavior particularly the lies in his SEC testimony. His testimony "evade[d] the proper functioning of the legal system[,which] has been found to constitute clearly dishonest conduct that adversely reflects on a lawyer's fitness to practice law" Fla. Bar v. Cohen, 908 So.2d 405, 411 (Fla.2005). His flagrant abuse of the law demonstrates a serious character flaw and merits a severe sanction such as disbarment. The harm to the public is demonstrated by the harm he caused Plaintiff's ongoing whistleblower referrals, the approximately $10 million of investor losses caused by Lehrer's baseless FSPM tradability opinions and the indictment of Sears and Dittman who relied upon Lehrer's advice.

I respectfully request that you take appropriate action against Lehrer.

Thank You,

. For the Firm

# Tod A Ditommaso Background

DiTommaso was licensed to practice law in California on December 14, 1987
http://members.calbar.ca.gov/fal/Member/Detail/130564

DiTommaso had his license suspended on April 13, 1997 for 2 years stayed, placed on probation with an actual nine-month suspension for multiple DUI arrests. Didn't meet the criteria to get reinstated until June 27, 2000
http://archive.calbar.ca.gov/calbar/2cbj/97jul/art04.htm

While the SEC Civil case against Guy M Jean-Pierre for forged opinion letters was going on, the SEC and FBI in Denver began investigating Fusion Pharm Inc (FSPM) at least as early as August of 2013.

On May 16, 2014, the SEC suspended trading in FSPM.
https://www.sec.gov/litigation/suspensions/2014/34-72177.pdf

On September 16, 2016, the SEC filed an Administrative Proceeding against the main FSPM insiders.
https://www.sec.gov/litigation/admin/2016/33-10210.pdf

In that document we get an explanation about what the government claims was going on. According to the government, William Sears was an undisclosed control person of FSPM with Scott Dittman allegedly acting as a puppet CEO.

On September 16, 2016, the SEC also brought an Administrative Proceeding against one of the FSPM attorneys, Tod A Ditommaso.
https://www.sec.gov/litigation/admin/2016/33-10215.pdf

According to the SEC document, Tod A Ditommaso assisted in the share selling scheme and provided at least 10 legal opinion letters between July 2012 and August 2013. The SEC further alleges that the letters provided by Tod A DiTommaso were drafted by Guy M Jean-Pierre then emailed from Jean-Pierre to DiTommaso who put the letters on his letterhead, signed them, and sent them back to Jean-Pierre to be put into use. Jean-Pierre paid DiTommaso approximately $175 per legal opinion. According to the SEC, Tod A DiTommaso's sole contact for FSPM was Guy M Jean-Pierre.

On March 21, 2017, the SEC's motion for Summary Disposition was granted.
https://www.sec.gov/all/allorders/2017/ap-4698.pdf

In that document we are told DiTommaso was introduced to Guy Jean-Pierre in 2012 and was unaware of any penny stock ban against Jean-Pierre until the SEC contacted DiTommaso as part of their investigation into FSPM in 2014. The following chart shows that information to most likely be false as DiTommaso had previously taken over as legal counsel for 3 other Jean-Pierre Issuers (AGCZ, NWGC, and EHSI) in 2010 immediately after Jean-Pierre was added to the prohibited attorney list, a full 2 years before DiTommaso got involved in FSPM. The chart shows that the first 5 public Issuers to hire DiTommaso (AGCZ, NWGC, EHSI, FSPM, and IJJP) had all previously hired Guy Jean-Pierre for legal services. At least 4 of the 8 Issuers that hired DiTommaso had links to Roy Meadows (AGCZ, NWGC, IJJP, and RSCF) 2 of the 8 Issuers that hired DiTommaso had links to William Sears (FSPM and PIHN)

| Issuer | Free Trading Stock | Litigation – DiTomasso Scam Alert | Opinions |
|--------|-------------------|-----------------------------------|----------|
| **Polaris International Holdings (PIHN)** | William Sears; James Douglas Pulver; Takeshi Someya; Tomohiro Wakabayashi | The SEC and DOJ charged William Sears for FSPM; Sears had previously pleaded guilty to federal charges involving securities fraud and bribery in 2007 following a 2004 Indictment; Diane Dalmy was charged by the SEC in 2013 then charged again in 2015, she was suspended from practicing in 2016; Jackson L Morris was charged by the SEC in 2001 | DiTommaso wrote Attorney Letters |
| **Andes Gold Corp (AGCZ)**<br><br>Sub of NWGC Below | Roy Meadows; Donna Rayburn; Jean-François Amyot; Dan Ryan; Dennis Ruggeri; Tillerman Securities; Karisa Augustus | SEC Litigation against Amyot; SEC litigation against Ryan; In April 2016 an independent consultant declared AGCZ a fraud from 2011 - 2015 (lying about its business operations); OTC ban SEC, DOJ Guy Jean-Pierre **Public Filings and Marketing Materials reflect the same address and telephone for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud** | DiTommaso wrote Attorney letters from May of 2010 – 2015<br><br>Jean Pierre wrote opinions for sub NWGC |
| **New World Gold Corporation (NWGC)** | Roy Meadows; Donna Rayburn; Dennis Ruggeri; Keithley Lake; Karisa Augustus | In April 2016 an independent consultant declared NWGC a fraud from 2011 - 2015 (lying about its business operations); OTC ban SEC and DOJ Jean-Pierre<br><br>**Public Filings and Marketing Materials reflect the same address for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud. Also a former address used by Frederick M. Lehrer** | DiTommaso wrote Attorney Letters from May of 2010<br><br>Guy Jean-Pierre (from 2008 - 2010) |
| **Zoloto Resources Ltd (ZRSCF)** | Karisa Augustus (T&S Inestments Limited); NWGC | ZRSCF was well linked to AGCZ and NWGC and had common participants<br>**ZRSCG DID IR ACTIVITY/PUMP AROUND NWGC - AGCZ JOINT VENTURE**<br>**PINK – NO INFORMATION STOP SIGN**<br>**Company address, phone and management appear to be fabricated.**<br>**Public Filings and Marketing Materials reflect the same address for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud** | DiTommaso wrote opinion letters-Jean Pierre Clients<br><br>Note SEC Revoked Ticker used same address SFAZ |

| | | DiTommaso rendered opinions | |
|---|---|---|---|
| EQ Labs, Inc (EQLB) | The outstanding share count grew a ton between 2015 - 2017, but EQLB never discloses who received the shares or held the debt | | In 2015 DiTommaso showed up authoring the Attorney letters for the ticker.  He did the most recent letter in June 2016 |
| Emerging Healthcare Solutions Inc (EHSI) | Joe Schmoe (obviously a fake name); Jack Uselton; Darrel Uselton; Jonathan Gilchrist; Maurice Stone; John Austin, Andrew Farmer | SEC Suspension on June 7, 2011; Jack and Darrell Uselton were named in SEC litigation in 2001 then again in 2009 – they criminally Indicted in 2007; Eddie Austin was named in an SEC Complaint in 2012; Jonathan Gilchrist was charged by the SEC in 2013; Andrew Farmer was named in an SEC Complaint in 2013; Samuel E Whitley was named in an SEC Complaint in 2014; OTC ban, SEC & DOJ Guy M. Jean Pierre | DiTommaso wrote Attorney Letter in May of 2010- Guy Jean-Pierre (from 2009 - 2010); |
| Fusion Pharm Inc | William Sears, Scott Dittman | SEC Trading Suspension, SEC Action and DOJ against Sears, Dittman and Jean-Pierre | Guy Jean-Pierre 2009 opinion- Corporate officer

DiTommaso Attorney Letters, July 2011 - August 2014

Frederick Lehrer wrote 1 OTC Market Opinion and 19 tradability legal opinions. |
| Artfest International | Big Apple Consulting, Roy Meadows, Marc Jablon, Edward Bronson Joseph Blumenthal | SEC Trading Suspension Dilution Scam | Jean Pierre then DiTommaso rendered tradability opinions |
| IJJP | Big Apple Consulting, Roy Meadows, Marc Jablon, Edward Bronson Joseph Blumenthal | Dilution Scam/ Stop Sign | Jean Pierre then DiTommaso rendered opinions |

| Date | Name | No. of Shares | Conversion price | Source Document SEC Complaint | Stock price previous close | Value of Stock date of letter | SEC claims - $$ stock sold |
|---|---|---|---|---|---|---|---|
| April 2011 – July 2012 we aren't told who wrote the opinion letters during this period | Microcap Management LLC – preferred stock conversions | 695,000 | | | | | |
| | | | | | | approximately $1,450,000 | Approximately $591,000 was made by Sears prior to DiTommaso |
| The following were written by DiTommaso | | | | | | | |
| June 7, 2012 | Microcap Management LLC – preferred stock conversion | 190,000 | | | $2.43/share | $461,700.00 | |
| July 5, 2012 | Microcap Management LLC – preferred stock conversion | 190,000 | | | $2.09/share | $397,100.00 | |
| | | 380,000 of 695,000 | | | | $858,800 of the $1,450,000 | |
| Prior to July 2012 DiTommaso wrote the following opinion letters (not part of the SEC/DOJ Investigation) | | | | | | | |
| March 13, 2012 | Oxford Capital Fund (Joshua Yudell) – preferred stock conversion | 115,000 | | | $2.34/share | $269,100.00 | |
| May 2, 2012 | Stephanie Padilla – preferred stock conversion | 175,000 | | | $2.20/share | $385,000.00 | |
| May 2, 2012 | For Your Information Inc (Roger Pawson) – preferred stock conversion | 100,000 | | | $2.20/share | $220,000.00 | |
| May 2, 2012 | Roger Pawson – preferred stock conversion | 100,000 | | | $2.20/share | $220,000.00 | |
| May 2, 2012 | OTC Market Services (signed for by Mark Maki) – preferred stock conversion | 100,000 | | | $2.20/share | $220,000.00 | |
| May 10, 2012 | William Adams – preferred stock conversion | 5,000 | | | $2.20/share | $220,000.00 | |
| June 5, 2012 | Myron Thaden – preferred stock conversion – purchased in May 2011 for $25,000 | 100,000 | | | $2.25/share | $11,250.00 | |
| | | | | | $2.42/share | $242,000.00 | |
| | All the preferred stock was previously owned by Frederick A Dahlman Jr the former CEO of Baby Bee | 695,000 | | | | | |
| | | | | | | $1,567,350.00 | |
| Between July 2012 – August 2013 DiTommaso wrote 10 opinion letters that were part of the SEC/DOJ Investigation | | | | | | | |
| July 23, 2012 | Microcap Management LLC (transferred from Todd Abbott) | 40,000 | | SEC Complaint | | | |
| January 4, 2013 | Bayside Realty Holding LLC from $275,000 Note | 140,000 | $.01/share | SEC Complaint | $2.03/share | $81,200.00 | |
| March 13, 2013 | $1,172 of Debt purchased from Bayside by SGI Group LLC (Shmez Sova) for $5,000 | 12,500 | $.40/share | SEC Complaint | $.81/share | $113,400.00 | |
| March 13, 2013 | $12,885 of Debt purchased from Bayside by Starcity Capital (Schrega Levin) for $55,000 | 137,500 | $.40/share | SEC Complaint | $.74/share | $9,250.00 | |
| March 13, 2013 | $1,172 of Debt purchased from Bayside by BlackArch Opportunity (Scott Levin) for $5,000 | 12,500 | $.40/share | SEC Complaint | $.74/share | $101,750.00 | |
| March 13, 2013 | $2,343 of Debt purchased from Bayside by Alexandra Maurlello for $10,200 | 25,500 | $.40/share | SEC Complaint | $.74/share | $9,250.00 | |
| March 13, 2013 | $1,172 of Debt purchased from Bayside by Vera Group LLC ( ) for $5,000 | 12,500 | $.40/share | SEC Complaint | $.74/share | $18,870.00 | |
| March 31, 2013 | Meadpoint Venture Partners from $88,000 Note | 475,000 | $.01/share | SEC Complaint | $.74/share | $9,250.00 | |
| August 13, 2013 | Meadpoint Venture Partners from $88,000 Note | 500,000 | $.01/share | SEC Complaint | $.59/share | $280,250.00 | |
| August 26, 2013 | $15,000 of Meadpoint debt sold to Scholz/Thaden/Thaden for $150,000 | 1,500,000 | $.10/share | SEC Complaint | $.36/share | $180,000.00 | |
| | | | | | $.40/share | $600,000.00 | |
| | Meadpoint had 975,000 of its 4,245,000 shares made free trading by DiTommaso | | | | | | $1,200,000.00 was made by investors from the 10 DiTommaso opinions in this section |
| | | | | | | $1,403,220.00 | Approximately $1,594,000 - $1,744,000 was made by Sears via opinion letters provided by DiTommaso depending on if we credit DiTommaso for the $150,000 for the $15,000 in debt sold to Thaden and Scholz |
| Other Letters written by DiTommaso not included in the SEC/ DOJ Investigation | | | | | | | |
| March 13, 2013 | David P Roy (stock issued January 6, 2012) | 25,000 | | | $80/share | $20,000.00 | |
| Starting August 2013 Frederick Lehrer wrote all the Opinion Letters | | | | | | | |
| August 28, 2013 | Myron Thaden ($5,000 in debt from $88,000 Meadpoint Note acquired for $50,000) | 500,000 | $.10/share | SPA | $.49/share | $245,000.00 | |
| August 28, 2013 | Sharryn Thaden ($5,000 in debt from $88,000 Meadpoint Note acquired for $50,000) | 500,000 | $.10/share | SPA | $.49/share | $245,000.00 | |
| August 28, 2013 | Richard Scholz ($5,000 in debt from $88,000 Meadpoint Note acquired for $50,000) | 500,000 | $.10/share | SPA | $.49/share | $245,000.00 | |
| September 10, 2013 | Black Arch Opportunity Fund LP – Scott Levin ($15,425 from $275,000 Bayside Note) | 28,562 | $.40/share | Note & SPA | $.50/share | $14,281.00 | |
| September 12, 2013 | Starcity Capital LLC – Schraga Levin ($116,875 from $275,000 Bayside Note) | 313,703 | $.40/share | Note & SPA | $.50/share | $156,851.50 | |
| September 12, 2013 | Starcity Capital LLC – Schraga Levin ($116,875 from $275,000 Bayside Note) | 313,703 | $.40/share | Note & SPA | $.51/share | $159,988.53 | |
| September 12, 2013 | Black Arch Opportunity Fund LP – Scott Levin ($15,425 from $275,000 Bayside Note) | 28,562 | $.40/share | Note & SPA | $.51/share | $14,566.62 | |
| January 6, 2014 | Meadpoint Venture Partners from $88,000 Note (date on letter was 1/6/2013) | 800,000 | $.01/share | SPA | $.43/share | $344,000.00 | |
| January 16, 2014 | Alexandra Maurlello ($24,875 from $275,000 Bayside Note) | 61,437 | $.40/share | Note & SPA | $1.98/share | $121,645.26 | |
| January 16, 2014 | Vera Group, LLC ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | Note & SPA | $1.98/share | $58,657.50 | |
| January 16, 2014 | SGI Group LLC - Shmez Sova ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | Note & SPA | $1.98/share | $58,657.50 | |
| January 23, 2014 | Vera Group, LLC ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | Note & SPA | $3.17/share | $93,911.25 | |
| January 23, 2014 | SGI Group LLC - Shmez Sova ($11,849.99 from $275,000 Bayside Note) | 29,625 | $.40/share | Note & SPA | $3.17/share | $93,911.25 | |
| January 23, 2014 | Alexandra Maurlello ($24,875 from $275,000 Bayside Note) | 61,437 | $.40/share | Note & SPA | $3.17/share | $194,755.29 | |
| February 14, 2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 | $.01/share | SPA | $3.17/share | $3,132,000.00 | |
| March 4, 2014 | Craig Dudley (stock issued from 5/9/11) | 20,000 | | Company's Filings with OCMG | $5.22/share | | |
| March 26, 2014 | Meadpoint Venture Partners from $88,000 Note | 370,000 | $.01/share | SPA | $6.30/share | $126,000.00 | |
| March 26, 2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 | $.01/share | SPA | $8.70/share | $3,219,000.00 | |
| April 16, 2014 | Meadpoint Venture Partners from $88,000 Note | 900,000 | $.01/share | SPA | $5.25/share | $3,150,000.00 | |
| | | | | | $3.31/share | $2,979,000.00 | |
| | | TOTAL SHARES 5,715,904 | | | | $14,652,225.70 | |
| | Meadpoint had 3,270,000 of its 4,245,000 shares made free trading by Lehrer | | | | | | |

Between May 2013 and April 2014 the SEC says Meadpoint converted debt into 4,245,000 shares and sold $15,000 worth of debt that was converted into 1,500,000 shares. Meadpoint sold 3,200,000 of those shares for $9,900,000 in proceeds. Based on these numbers we know that Sears was unable to sell 1,045,000 shares before the stock was suspended. The last 1,045,000 shares of our chart carried a value of $3,740,250 reducing the Lehrer value down from $14,652,225.70 to $10,911,975.70. The SEC credits DiTommaso with the 1,500,000 shares sold by Scholz and Thaden in August 2013 so if we deduct that $735,000 from Lehrer the new total becomes $10,176,975.70

All total the SEC claims that Sears made $12,200,000 from his stock/ debt sales. Approximately $2,185,000 - $2,335,000 was made prior to Lehrer. So that means approximately $9,665,000 - $9,815,000 was made with Lehrer as the attorney

by the Inspector General.  Along with SA Funk of the FBI and former AUSA
Harmon of the Denver US Attorney's Office.

## MISCONDUCT BY FEDERAL PROSECUTOR

Furthermore, as AUSA Siebert failed to adequately investigate these
credible claims alleged by Mr. Sears, this also amounts to misconduct, as it is
well established that the duty of prosecutors is to "seek justice within the
bounds of law, not merely to convict".  A prosecutors job is not to win a case,
but that justice shall be done.  Prosecutors are subject to constraints and
responsibilities that don't apply to other lawyers.  They must win fairly
and stay within the rules.  They should view these obligations as applying in
both civil and criminal enforcement actions.

## CASE SUMMARY

As such, SA Funk's use of the term Certified Public Accountant was not just
being used to show she held a Kansas issued certificate but instead was done
to mislead the magistrate Judge into believing she was qualified to perform
the services required in this investigation as the evidence discovered as the
result of her unqualified forensic accounting opinions were the basis of fact
relied on by the courtin this investigation and by the courts in rendering
their probable cause determinations and as such vilates federal regulations
tainting this entire investigation and rendering these search warrants as
being illegal.

Without the investigation, search warrants and everything else discovered
subsequent to this investigation renders the prosecution with no winnable
case and the reasons why the prosecutors kept coming after the company and
Mr. Sears.  The last thing that the government thought they would find, is
exactly what they found, A legitimate business.  Instead of the Ponzi scheme
or illegal marijuana grow they were assured they would discover. Exhibit 16

So then they resorted to letting Fred Lehrer, Mr. Harmon's longtime
friend and the man who was supposed to keep me safe tell them what they needed
to hear so they could get a conspiracy case.  All the while knowing that
Lehrer was lying to federal investigators.  Then they used the lies to railroad
Sears so this huge mess would never be known.

This type of government abuse of power and corruption undermines the
courts at their very core.

I wish to thank the court for its' assistance and patience as this is a
Pro Se petition of which I have never done.  I am in no way a lawyer and
request that the court appoint one to me so that I may better argue these



**SIDEMAN ~
BANCROFT**

303 16th Street, Suite 200
Denver, Colorado 80202 5657
Telephone: (415) 392-1960
Facsimile: (415) 392-0827

**William L. Taylor**
Admitted only in Colorado & the District of Columbia
wtaylor@sideman.com
(415) 733-3395

June 20, 2014

**VIA HAND DELIVERY**

AUSA Kenneth Harmon
United States Attorney's Office
District of Colorado
1225 Seventeenth Street, Suite 700
Denver, CO 80202

Re:    *Scott Dittman   Fusion Pharm, Inc.*

Dear Ken:

During our recent meeting together, you suggested that I take a hard look at the sales revenues for Fusion Pharm, Inc. As promised earlier this week, with this letter I am transmitting to you a compilation of documents yielded by our preliminary efforts to review transactions for sales of pods manufactured by Fusion Pharm since 2011.

By my count, the attached records and materials document a total of sixty seven (67) pods sold. Fifty nine (59) pods appear to have been delivered to buyers, and eight (8) have yet to be delivered.

Attached hereto you will find a series of tabs, each of which corresponds to a customer of the company during that period, and under which you will find records or other evidence documenting such sales transactions. The records attached are not complete - - the government has seized most of the company's records, so it has been difficult to assemble complete records sets for each sale. What you will find, however, depending on availability of records for various transactions, are copies of proposals, contracts, excerpts of bank records, copies of checks, shipping, customs, and inspection documents, and photographs of pods. In most cases, signed copies of documents were not available because the government seized the signed copies, so we have had to make do with copies attached to email messages. Most of these records came from Scott Dittman's email records, banking records available online, or from Fusion Pharm customers who were interviewed by my investigator, and who sent us photos of pods or records upon my investigator's request.

Kenneth Harmon
June 20, 2014
Page 2

I apologize that it has taken as a couple of weeks to put together this (admittedly incomplete) set of documents evidencing these sales transactions, but you have the company's records, and I needed to hire an investigator to conduct interviews of customers. Even though the records are not complete, I am fairly well satisfied that the company sold north of five dozen pods, and got paid for them, either directly by the purchaser, or by Mead Point, the company publicly disclosed as the contract sales agency for Fusion Pharm.

I confess that in light of what we have been able to document readily even without the benefit of the company's full business records (with more substantiation available from public sources), I am puzzled as to why the government would believe that these sales had not taken place. I would like to discuss the matter further with you when you have time.

Very truly yours,

William L. Taylor

Enclosures

cc:     Ian Karpel, Assistant Director
        United States Securities and Exchange Commission

Page 93

1  letters or whether they were denoted for a retainer for
2  FusionPharm, I don't recall. But I -- but the import of
3  the statements -- of the statement was that, you know,
4  you're hired, and in my mind it was FusionPharm.
5      Q   Okay.
6      MR. KARPEL:  Kim, let's go off the record for a
7  moment.
8      (Short recess from 10:22 a.m. to 10:28 a.m.)
9      MS. GREER:  Let's go back on the record,
10  please, at 10:28, a.m.
11     BY MS. GREER:
12     Q   Mr. Lehrer, during the break, did we have any
13  substantive conversations about the case?
14     A   No.
15     Q   Going back to the meeting that was held in
16  Orlando between yourself, Mr. Sears, and Mr. Scholz, how
17  long was the meeting?
18     A   Maybe an hour.
19     Q   And was there any legal advice sought during
20  the meeting?
21     A   No. It was very general about the company,
22  what my experience is.
23     Q   And what did -- what did -- what did Mr. Sears
24  say about FusionPharm?
25     A   I really don't recollect. I mean, it was just

Page 94

1  very general stuff about what the business is.
2      Q   What did he tell you their business was?
3      A   Selling these pharmpods for cultivation.
4      Q   Did Mr. Scholz tell you anything about
5  FusionPharm?
6      A   I don't really recall him saying anything about
7  FusionPharm. He was really there as an introduction to
8  Mr. Sears.
9      MR. KARPEL:  What else do you recall about the
10  meeting? Can you just sort of describe what was said
11  generally?
12     THE WITNESS:  I can't really recall. I mean,
13  it was just very general about what the company did,
14  what its prospects were. That was about it.
15     MR. KARPEL:  Did he talk about the future? Did
16  he talk about what -- you know, what FusionPharm's plans
17  were for expansion or growth, those kinds of things?
18     THE WITNESS:  Well, I think they talked about
19  the opportunity -- he talked about the opportunity in
20  other states where marijuana was medically approved
21  and/or would be recreationally permitted. Again, very
22  general kind of information.
23     MR. KARPEL:  Did he speak about Mr. Dittman at
24  all, the CEO?
25     THE WITNESS:  I believe so, just that he was a

Page 95

1  very competent CEO.
2      MR. KARPEL:  Any more that you recall?
3      THE WITNESS:  No.
4      MR. KARPEL:  Anything about the facilities or
5  what customers? Anything --
6      THE WITNESS:  No.
7      MR. KARPEL:  -- along those lines?
8      THE WITNESS:  Nothing about that. Generally
9  about what these pharmpods were.
10     MR. KARPEL:  That's what you remember? So
11  talking through this, it's not jogging your memory as to
12  any other parts of the conversation?
13     THE WITNESS:  No.
14     MR. KARPEL:  Okay.
15     BY MS. GREER:
16     Q   Did Mr. Sears indicate that he, through his
17  company, was a shareholder of FusionPharm?
18     A   I don't recall.
19     MR. KARPEL:  And was it at this meeting you
20  talked about a registration statement?
21     THE WITNESS:  Yes.
22     MR. KARPEL:  Can you tell us about that?
23     THE WITNESS:  Yeah. The information was that
24  the company wanted to do an S-1 registration statement.
25     MR. KARPEL:  It was Mr. Sears who was telling

Page 96

1  you that?
2      THE WITNESS:  Yes.
3      BY MS. GREER:
4      Q   Did you have an understanding as to why
5  FusionPharm wanted to do an S-1?
6      A   Well, yes. They wanted to become an
7  SEC-reporting company.
8      Q   Do you know an individual by the name of Guy
9  Jean-Pierre?
10     A   Yes.
11     Q   And how do you know Mr. Jean-Pierre?
12     A   I knew him in connection with my ex-wife's
13  practice.
14     Q   Was he a member of your ex-wife's firm?
15     A   No, absolutely not.
16     Q   Can you explain what you mean when you say you
17  knew him in connection with your ex-wife's practice?
18     A   Well, I believe I only met him once, but prior
19  to that, there was -- I believe it had something to do
20  with my ex-wife contesting something about his opinion
21  letters.
22     Q   Do you recall when that happened?
23     A   I think it was around 2007 or 2008.
24     Q   And you said you met him once?
25     A   Yeah. I can't even recall why I met him, but,

1   you know, I found out -- I was with my son, and I found
2   out his office was right there, and I walked in and
3   introduced myself. And I just don't recall what it was,
4   an introduction or I was inquiring about something in
5   particular that my ex-wife had told me to inquire about.
6   This was quite a while ago. I don't recall. And it was
7   an extremely brief, no more than one minute, situation.
8       Q   Did you ever speak with Mr. Jean-Pierre about
9   FusionPharm?
10      A   No, absolutely not.
11      Q   Did you ever become aware at any point that Mr.
12  Jean-Pierre was involved with FusionPharm?
13      A   I don't recall.
14      Q   You don't recall ever knowing that, or you
15  don't recall either way?
16      A   I really don't recall either way. I mean, it's
17  conceivable, but it's certainly not at the forefront of
18  my mind that he was involved in any way.
19          MR. SALLAH:  Is that something you would have
20  remembered, having this prior incident with him, met
21  him, had this, you know, brief incident if his name
22  would have come up in the context of FusionPharm? You
23  would have --
24          THE WITNESS:  Yeah, I would have, because at
25  some point I had learned that he had been banned from

1   issuing opinion letters.
2           BY MS. GREER:
3       Q   When did you learn that?
4       A   I don't recall. It was probably, you know,
5   just through a computer search, not necessarily in
6   reference to him in particular, you know, but banned
7   opinion writers.
8       Q   Is there a reason that you were doing that
9   search?
10      A   I really don't recall.
11          MR. KARPEL:  Did -- did you do that search
12  during the time period that you still represented
13  FusionPharm?
14          THE WITNESS:  No.
15          MR. KARPEL:  After?
16          THE WITNESS:  No, this is way before.
17          MR. KARPEL:  Before?
18          THE WITNESS:  Yes.
19          MR. KARPEL:  Okay. So you know before --
20          THE WITNESS:  I believe so.
21          MR. KARPEL:  You knew before you began
22  representing FusionPharm that Guy Jean-Pierre had been
23  banned?
24          THE WITNESS:  Yes.
25          MR. KARPEL:  And ...

1           BY MS. GREER:
2       Q   Do you know an individual by the name of Tod
3   DiTommaso?
4       A   Tod DiTommaso?  What -- I'm not sure. I think
5   he may have been involved as an officer or one of these
6   shareholders. I'm not sure. I don't recall his name in
7   particular other than perhaps in connection with his
8   opinion letters.
9       Q   I'm sorry. I don't understand that. So you
10  recognize his name or you don't recognize his name?
11      A   I'm thinking perhaps that one of these slices
12  of debt that was sold, that that particular person was
13  representing one of the entities that was trying to free
14  up shares.
15      Q   Okay.
16      A   But I don't -- other than that, I never met the
17  guy, never -- you know, I don't even know --
18      Q   Okay. So I'll represent to you -- we'll get to
19  those -- your attorney opinion letters.
20      A   Yeah.
21      Q   Right. None of those relate -- none of the
22  entities who purchased Bayside debt related to Tod
23  DiTommaso at all. So --
24      A   You're telling me this?
25      Q   I'm telling you this.

1       A   Okay. All right.
2       Q   So knowing that, I mean, does --
3       A   No, I --
4       Q   -- do you know his name?
5       A   I don't know his name.
6       Q   And I'll represent to you he's an attorney
7   practicing in California. Does that refresh your
8   recollection or ring any bells?
9       A   Oh, I'm sorry. You mean the gentleman that had
10  issued opinion letters before me?
11      Q   So you do know --
12      A   No, I do.
13      Q   Okay.
14      A   Yeah, because I remember -- I apologize. I
15  didn't get the name right in my mind. I had reviewed an
16  opinion letter that he issued. It was provided to me.
17      Q   Who provided that to you?
18      A   Bill Sears.
19      Q   And when did Mr. Sears provide Mr. DiTommaso's
20  opinion letter to you?
21      A   I don't recall exactly, but it was early on in
22  the engagement.
23      Q   Was it before you drafted and issued your first
24  FusionPharm --
25      A   I believe so --



EXHIBIT

B

## IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
## IN AND FOR PALM BEACH COUNTY, FLORIDA
## CASE NO. 502011CA007165XXXXMB-AE

BIG APPLE CONSULTING USA, INC.,
a Delaware corporation; BIG APPLE
EQUITIES, LLC., a New York Limited
Liability Corporation, MANAGEMENT
SOLUTIONS INTERNATIONAL, INC.,
a Florida corporation, and MARC JABLON,
an individual,

      Plaintiffs,

vs.

BRENDA LEE HAMILTON, an individual;
HAMILTON & ASSOCIATES LAW GROUP,
P.A., and HAMILTON & LEHRER, P.A.

      Defendants.

_____/

### Declaration

My name is Frederick M. Lehrer.   I am a Florida licensed attorney.  On or about July 15, 2011, I was assisting Hamilton & Associates Law Group, P.A. in various matters and accepted a telephone call from Leslie Jean Pierre ("L Pierre"), who identified herself as an attorney licensed to practice law in Texas and the niece of Guy Jean-Pierre ("GJP").  L. Pierre informed me that she wished to discuss matters pertaining to a June 15, 2011 letter to the Texas Bar in matter number S00411125140 (hereafter referred to as the "Texas Bar Matter"), a copy of which letter is attached hereto as Exhibit A.  L. Pierre told me the following:

1. In or about March or April of 2010, her uncle, Guy Jean-Pierre ("GJP"), asked her for a copy of my driver's license and signature, which he said was required to form a corporation, Complete Legal Solutions, Inc. ("CLS').  GJP also asked L Pierre to assist him with his law firm because he had more legal work than he could do.  This work included drafting legal opinions in securities-related matters.

2. L. Pierre advised GJP that she knew nothing about such legal opinions, the SEC, or the OTC Markets.  GJP responded, "Don't worry about it".  At the conclusion of this conversation, L. Pierre made it clear to GJP that she did not have any experience in securities or corporate law.

3. In compliance with GJP's request, L. Pierre provided GJP with a copy of her driver's license and signature for the purpose of forming CLS.  In hindsight, after realizing that her signature has been forged on legal opinions, L. Pierre realized that this was an ill-

advised action on her part. However, at the time she trusted her uncle completely, and never imagined he would violate this trust.

4.  L. Pierre had had no further contact with GJP until approximately one year later, when she received notification of the Texas Bar Matter, relating to Brenda Hamilton's concerns about legal opinions that purport to have been authored and signed by L. Pierre under the CLS letterhead. L. Pierre identified those letters as forgeries and L. Pierre did not author or sign them, or authorize GJP or anyone else to sign her name to these letters.

5.  L. Pierre called GJP to discuss these circumstances. GHP told L. Pierre said that Ms. Hamilton filed the Texas Bar Matter against him in retaliation against him, which made no sense to L. Pierre. Ms. Hamilton provided L. Pierre   with the legal opinions in question and there is no doubt they are forgeries of her signature.

6.  L. Pierre confronted GJP about the forged letters, and advised him that she never authorized him to sign her name to the legal opinion letters. In response, GJP told L. Pierre that he thought that she had understood "how things would work." L. Pierre interpreted this remark to be an admission that he her uncle had forged her name to these letters, but explained that he believed she had somehow been complicit in his plan to do so.

7.  L. Pierre immediately responded to GJP that he never gave her any idea of "how things would work," and specifically never told her that he would be signing her name to opinion letters. L. Pierre also told him that she never would have agreed to allow him or anyone else to use her signature or name in such a manner.

8.  Based on this conversation with GJP, L. Pierre has come to the conclusion that GJP forged her signature to, or used a copy of her signature on the legal opinions that are the subject of the Texas Bar Matter. .

9.  Before learning of the Texas Bar Matter, L. Pierre was unaware that OTC Markets had banned GJP from providing any opinion letters to OTC Markets. In hindsight, she has concluded that GJP used her to form CLS because the OTC Markets would not accept any opinion letters authored by his firm, or any new firm he might create, since he had been banned. Instead, he used CLS and L. Pierre's name -- without her knowledge or permission -- to continue sending opinion letters to OTC Markets and evade the ban, by not using his own name.

10. L. Pierre has never had any contact with Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on her behalf. L. Pierre has never provided a copy of her driver's license or signature to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone on his or her behalf. L. Pierre has never provided a legal opinion, or legal opinion bearing her signature, to Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf. L. Pierre has never authorized Marc Jablon, Mark Kaley, Big Apple Consulting or anyone acting on their behalf to provide her driver's license or any legal opinion bearing her signature to anyone, including the OTC Markets.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed on August 7 2011



## DECLARATION OF FREDERICK M. LEHRER

The undersigned, Frederick M. Lehrer, hereby declares that:

1. I am an attorney licensed to practice law in the state of Florida.

2. I am a former attorney with the Division of Enforcement of the US Securities and Exchange Commission and a Special Assistant US Attorney with the United States Attorney's Office for the Southern District of Florida.

3. I have a son, Brandon Lehrer, with my ex-wife, Brenda Hamilton.

4. Since he was born, Brandon has suffered various illnesses, which last for weeks and sometimes more than a month. During May of 2010, Brenda and I were told that our son, Brandon's immune system was not functioning properly, which was particularly traumatic for Brenda because her sister's first son died of a rare immune disorder when he was 3 years of age and her sister's second son recently was diagnosed with Stage 4 nasopharyngeal cancer.

5. Because we were advised by our physician at Miami Children's Hospital that Brandon could literally die from a cold, whenever Brandon was ill, Brenda missed work to care for our son, instead of arranging for a babysitter or other childcare.

6. Shortly after learning of our son's illness, in July of 2010, Brenda learned her mother (now deceased) was diagnosed with cancer of an unknown primary region, a terminal form of cancer with a 100% mortality rate. Brenda also assisted in the care of her mother regarding her illness.

7. Because it was impossible for Brenda to maintain a normal work schedule for almost a year, until her mother's death in late April 2011, as summarized above in 4-6, I provided her with assistance in her work with multiple client matters during such time including her representation of Cloud Centric, Inc. ("Cloud Centric") and David Lovatt ("Lovatt"). At times I provided representation to Cloud Centric and Lovatt including the appropriate steps Cloud Centric should take to correct its prior illegal public disclosures, which are available on the OTCMarkets.com website, which Guy Jean Pierre ("Jean Pierre") and Kimberly Graus ("Graus") opined upon.

8. I substantially assisted in drafting the Cloud Centric remedial disclosures (the "Remedial Disclosures") posted on the OTC Markets website pertaining to Big Apple Consulting and its related corporate egos and control persons (collectively "Big Apple"), including Marc Jablon ("Jablon") which are the subject of the Florida Bar grievance (the "Grievance") filed by Jablon against Brenda.

9. When assisting with the drafting of the Remedial Disclosures, I confirmed ALL of the factual disclosures concerning Big Apple by reviewing executed contracts, publicly available information, filings on www.sunbiz.org & OTC Markets website and Cloud Centric's corporate documents and did not rely upon any factual representations made by Lovatt, Brenda or any other person. I also conducted a legal analysis of the securities law issues related to the matters involving Big Apple and assisted with the drafting of the legal analysis contained within the

Remedial Disclosures.

10.   It is my opinion that the Remedial Disclosures are factually and  legally accurate and are disclosures required by the securities laws.

11.   In December of 2010, I assisted David Lovatt in drafting the bar grievance against Carl N. Duncan for the theft of shares held in escrow by Duncan after Duncan provided me with what I believe are false accountings of Cloud Centric's common shares he purportedly held in Escrow. I also assisted substantially with drafting the grievances filed against Jean Pierre and Graus as well as the UPL grievance concerning Connectyx Technologies, Inc. during the time when Brenda's mother was in the final stages of her cancer.

12.   It is my firm belief that there are no confidential communications of any type (including between Jablon and Brenda), which were disclosed in the Remedial Disclosures because I independently verified the information concerning Big Apple contained within the Remedial Disclosures from publicly available documents from the internet, transfer agent documents,  or contracts and corporate documents provided by Lovatt.

13. I have never spoken with Marc Jablon or anyone at Big Apple about any portion of the information contained within the Remedial Disclosures.

14.   It is my opinion that Brenda's only objective and role in drafting the Remedial Disclosure was to protect the interests of her clients, Cloud Centric and Lovatt and provide truthful disclosure of the public to protect her clients' interests and prevent them from being the subject of an SEC enforcement action based upon improper and illegal disclosures drafted by Big Apple and opined upon by Graus and Jean Pierre, neither understood or undertaken by Cloud Centric and Lovatt.

15. It is a travesty of just that  Brenda has spent more than a year and dedicated literally hundreds of hours defending herself against fabricated allegations made by Jablon during a period of her life when she had devastating personal matters requiring her attention.

I declare under the penalty of perjury that the foregoing is true and correct.

Frederick M. Lehrer

Executed this  16th day of October 2011



Private Email <william@williamjsears.com>
To William Sears
FW. Introduction

September 8 2015 8 08 AM



**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:04 AM
**To:** William Sears
**Subject:** Re: Introduction

OK
Thanks

On Wed, Aug 28, 2013 at 1:02 PM, William Sears <william@williamjsears.com> wrote:
No he has not been secretary since the beginning of 2012 when this came to light

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 11:02 AM
**To:** William Sears
**Subject:** Re: Introduction

Bill

I have reviewed some of the otcmarkets' flings for Fusion Pharm, Inc.

Can you please inform me whether the link below is the same person appointed to Secretary and whether he still is the Secretary?

http://www.sec.gov/litigation/litreleases/2012/lr22562.htm

Thank you

On Wed, Aug 28, 2013 at 10:58 AM, William Sears <william@williamjsears.com> wrote:
Fred,
We will be in town next week. I would love to have lunch to discuss. We are looking to do a form 10 and S1. I assume you have reasonable auditors you work with along with a BD that will do the 2-11 for the BB? The symbol is FSPM. I look forward to meeting next week and have a great holiday.

Regards,

William Sears
(303) 518-3895

Confidentiality Notice: This email, including attachments, may include non-public, proprietary, confidential or legally privileged information. If you are not an intended recipient or an authorized agent of an intended recipient, you are hereby notified that any dissemination, distribution or copying of the information contained in or transmitted with this e-mail is unauthorized and strictly prohibited. If you have received this email in error, please notify the sender by replying to this message and permanently delete this e-mail, its attachments, and any copies of it immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you

**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Wednesday, August 28, 2013 8:40 AM
**To:** William Sears
**Subject:** Introduction

Bill:

I understand that Rich Scholz has provided you with an introduction to my services. In further explanation, I have some of the lowest rates in the business for registration statements, opinion letters, periodic reports, securities disclosure matters and other securities related matters.

I charge $350 for opinion letters. Because Rich referred you I would lower that amount for you to $250 (most opinion letters are from $500 to $1,250). My hourly rate is $300/hour. I accept low retainers of $2,500. On registration statements, I charge $10,000 to $15,000 plus a block of stock from 200,000 shares to 400,000 shares. All registration statement quotes are open to negotiation. I have a deep regulatory background with 15 years at the SEC and 3 1/2 years as a Special Assistant United States Attorney. My legal practice since 2000 has been predominately in the area of corporate finance. My ultimate goal in any engagement is to provide full and accurate disclosure to the public and the SEC to protect the shareholders and to provide liability protection to the issuer and its officers and directors. Kindly review my website below or my linked in page for further information pertaining to my background and services.

I look forward to discussing these matters with you further and working with you in the future.

Thank you.

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:     flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com


--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:     flehrer@securitiesattorney1.com

EXHIBIT

E

Page 315

1    Dudley came to you or called you --
2        A   Correct.
3        Q   -- and said I've seen Sears in the office
4    every day for the past two months.
5        A   Correct.
6        Q   And at a later point in time, Mr. Dittman
7    told you Sears has nothing to do with FusionPharm and
8    I'd never let him have anything to do with FusionPharm?
9        A   Correct.
10       Q   Do I have the timeline right so far?
11       A   Correct.  And then Mr. Dudley informed me
12   that pursuant to discussions with Mr. Dittman, that
13   there would not be any disclosure because -- regarding
14   Mr. Sears or Meadpoint being an affiliate because based
15   upon Mr. Dittman's representations, he was not
16       Q   Did Mr. Dudley express to you any indication
17   that he might not agree with Mr. Dittman's
18   characterization of Mr. Sears' involvement with
19   FusionPharm?
20       A   Only from the standpoint that he saw him
21   there every day.  I really apologize I had too much
22   coffee this morning.
23       Q   Do you need to take a break?
24       A   Yes.
25           MR. LYMAN:  Let's go off the record

Page 316

1           (A break was had from 11:04 to 11:10 a.m.)
2           MR. LYMAN:  All right.  Let's go back on the
3    record
4           BY MR. LYMAN:
5        Q   Mr. Lehrer, while we were on the break, did
6    we have any substantive conversations about the case?
7        A   No.
8        Q   Okay.  In your previous day's testimony you
9    had asked you whether you had an understanding that
10   Meadpoint was one of Bill Sears' companies and you had
11   refused to answer that question on privilege grounds.
12   In light of the agreement we now have with Mr. Sears'
13   counsel, will you now answer whether you were aware
14   that Meadpoint was one of Bill Sears' companies during
15   the time you were issuing Rule 144 letters?
16       A   Yes.
17       Q   And how did you come to be aware of that
18   information?
19       A   In a meeting with Mr. Sears, he told me that
20   he was in control of Meadpoint, but that he was
21   transferring it to a third party unrelated to him or in
22   any family context, including his mother.
23       Q   So when you first had the conversation about
24   Sears' ownership in Meadpoint, he mentioned
25   specifically that he wasn't going to transfer Meadpoint

Page 318

1    to his mother?
2        A   Very specifically.
3        Q   And was that on your prompting, did you ask
4    him whether he was going to transfer it to his mother
5    or did he just volunteer that particular family member?
6        A   I did ask him.
7        Q   And why his mother?  Why did that come up?
8        A   I don't remember why it came up, you know, we
9    were having a conversation back and forth.  And, you
10   know, through questioning or otherwise about whether it
11   was going to be transferred to a family member.  He
12   said, no, it's not going to be transferred to a family
13   member.  And I may have asked him, you know, is it
14   going to be transferred to your wife, to your mother,
15   you know, you're saying it's not going to be
16   transferred to a family member.  Does that include "X"
17   and "Y"?  I don't remember specifically if I asked
18   that, but certainly in the conversation it was
19   communicated to me that it would not be transferred to
20   his mother specifically.
21       Q   Did you ever have an understanding of whether
22   any of the other entities for which you wrote Rule 144
23   opinion letters or which were involved in any of the
24   opinion letters were owned by Mr. Sears' mother?
25       A   Yes

Page 318

1        Q   Okay.  And which entities were those?
2        A   When I had that conversation with Mr. Sears
3    in or about April, 2014, when he said he transferred it
4    to his mother
5        Q   But prior to that, when you had the
6    conversation with Mr. Sears, which I believe you
7    thought was in October, 2013, about him transferring
8    Meadpoint, at that point in time were you aware of any
9    other entities that were owned by, managed by or
10   included as an officer, Mr. Sears' mother?
11       A   No
12       Q   Okay.  And other than Meadpoint, did you ever
13   become aware of any other entities that were owned by
14   or directed by or had as an officer Mr. Sears' mother?
15       A   No.  Again, apart from that conversation in
16   April, 2014, with Mr. Sears
17       Q   Okay.  So what about Bayside Realty Holdings,
18   did you ever come to understand that Mr. Sears's mother
19   was involved with that company?
20       A   No
21       Q   Okay.  But you knew that there was a Sandra
22   Sears who was involved with Bayside?
23       A   My understanding, it was the Sandra Sears
24   that was Bill Sears' wife
25       Q   Okay.  And what did you understand the person

Page 279

1 A Correct
2 Q 2013. So the date of the e-mail is October
3 10, 2013. Thank you for that. And at your prior day
4 of testimony we had asked you if you had an engagement
5 letter with Mr. Sears and you said that you did, but we
6 didn't yet have it. So is this document that begins on
7 page Bates number FLWS00291 the engagement letter
8 between you and Mr. Sears?
9 A Yes, however, I do recall that Mr Sears
10 signed that document and if in fact, we did not produce
11 that, we produced a copy with the signature of Mr
12 Sears
13 (SEC Exhibit No 122 was marked for
14 identification )
15 BY MR LYMAN
16 Q Let's mark this 122. Exhibit 122, Bates
17 number FLWS00298. And if you take a look at the third
18 page of this document, unfortunately, this doesn't
19 include every page of the agreement, but the third page
20 of this document appears to be the signature page of
21 Mr. Sears.
22 A That's correct
23 Q Okay. And as this was produced it's missing
24 every other page. Any reason to think that this
25 agreement, this signed agreement, is any different from

Page 280

1 the agreement that's attached to Exhibit 121?
2 A No
3 Q The letter is dated October 10, 2013 and it
4 states in the first paragraph, I'm happy that we could
5 agree on a mutually acceptable fee agreement. Do you
6 recall what date you reached a mutually acceptable fee
7 agreement with Mr. Sears?
8 A Presumably, I really don't know Presumably,
9 it would have been within a couple weeks prior to
10 October 10, 2013.
11 Q Okay. Did you recall when you first
12 started -- and we looked at some documents in your
13 previous day's testimony, but when you first started
14 performing work at Mr. Sears's request relating to
15 opinion letters touching on FusionPharm stock --
16 A I apologize I didn't catch your question
17 Q So this is dated October 10, 2013, and I'm
18 wondering if -- you said that you came to a fee
19 agreement maybe a couple weeks before this.
20 A Right
21 Q But your first letter relating to FusionPharm
22 stock was in August of 2013 and my question is: Did
23 you have a fee agreement with him at that point in
24 time?
25 A No

Page 281

1 Q And what was the sort of payment arrangement
2 that you had for those first initial opinion letters?
3 A Well, the payment arrangement was $250 an
4 opinion
5 Q And was that ever sort of memorialized in an
6 engagement letter similar to this?
7 A No The first meeting with Mr Sears wa
8 and I think I already testified to this that it was
9 about preparing a registration statement As a re
10 of the first testimony refreshed my recollection th
11 you know, there were matters prior to that meeting
12 involving those August 28, 2013, opinions. I don't
13 specifically recall the conversations, but it's
14 apparent to me that I did have conversations with him,
15 you know, as a result of my looking at transmittal
16 information regarding those opinion letters.
17 Q Okay. If we take a look at Exhibit 121, on
18 this second page, it says engagement and scope of legal
19 work. The client hereby retains FML, which is you, to
20 research various issues pertaining to certain
21 disclosure issues and other related matters under the
22 federal securities laws. And then the next sentence
23 says that the scope of the representation shall be
24 limited to that set forth in this agreement. Would
25 writing attorney opinion letters fall under the scope

Page 282

1 of what's described here as your engagement with Mr.
2 Sears?
3 A Indirectly
4 Q And how is that?
5 A Can I consult with my counsel? I don't know
6 whether I'm getting into any attorney-client privilege
7 Q You can consult with your counsel.
8 THE WITNESS What was the question again?
9 MR LYMAN. Could you repeat the last
10 question, please
11 (The reporter read back the record )
12 THE WITNESS As I said, indirectly
13 BY MR LYMAN
14 Q And how is that?
15 A There was an issue involving Meadpoint -- and
16 Mr. Sears affiliation with FusionPharm He informed me
17 that he was in control of Meadpoint, but that Meadpoint
18 was going to be transferred to an unrelated third
19 party, not a family relationship not his mother
20 Q Who did he say Meadpoint was going to be
21 transferred to?
22 A He did not He said it was going to be
23 transferred to an unrelated third party
24 Q And -- go ahead?
25 A There was also discussions about Mr. Sears s

Page 283

1 affiliation with FusionPharm and my questioning him in
2 a very detailed fashion, whether he had any kind of
3 control or affiliate relationship with FusionPharm,
4 whether he engaged in any management decisions, whether
5 he had any participation in any shape, form or manner
6 in management decisions. To which he responded,
7 absolutely not, I have nothing to do with management.
8 Those are the issues that were discussed.
9     Q   And did he tell you that he had never had
10 anything to do with management issues at FusionPharm?
11     A   Yes.
12     Q   Did he mention whether his mother, Sandra
13 Sears, had anything to do with FusionPharm?
14     A   Not at that meeting, no.
15     Q   At a subsequent meeting?
16     A   In a telephone conversation.
17     Q   And what did he say to you about that topic?
18     A   I believe that was either in March or April,
19 2014, he had informed me that Meadpoint was transferred
20 to his mother. I was shocked to learn that. And I
21 said you informed me that Meadpoint was being
22 transferred to an unrelated third party, not a
23 relative. And that was the substance of that
24 conversation.
25     Q   Why were you shocked to hear that Meadpoint

Page 284

1 was being transferred to his mother?
2     A   It wasn't -- the statement wasn't that
3 Meadpoint was being transferred to his mother. He said
4 it had been transferred.
5     Q   And why was that shocking?
6     A   It was shocking because during the meeting
7 with him in October, 2013, he said that he was
8 transferring to an unrelated third party, not a
9 relative, including his mother.
10     Q   Did he respond to your expression that that
11 seemed inconsistent with what he had told you in
12 October?
13     A   He may very well have. I can't recall.
14     Q   So when you spoke with him in October, 2013
15 about Meadpoint, he expressed to you or left you with
16 the understanding that Meadpoint was his company at
17 that point?
18     A   Correct.
19     Q   And did he leave you with the impression in
20 March or April of 2014 that Meadpoint was now his
21 mother's company and no longer his company?
22     A   Correct.
23     Q   Did he give you any indication of whether he
24 had any dealings on behalf of Meadpoint after he
25 transferred it to his mother?

Page 285

1     A   Well, he didn't give me any indication as
2 such, but again, he was acting as a facilitator for
3 these opinions.
4     Q   Do you have an understanding of when he
5 transferred -- when he told you he transferred
6 Meadpoint to his mother?
7     A   As I said, it was in March or April of 2014.
8     Q   Well, I understand that that's when he told
9 you, but do you have a sense of when the transfer
10 actually occurred?
11     A   No, I don't. And if he did, I don't recall,
12 you know, if he gave me a specific date or an
13 approximate time period.
14     MS. GREER:  Going back to the engagement
15 letter that we were just looking at that's part of
16 Exhibit 121, I just want to clarify. This is an
17 engagement letter between yourself and Mr. Sears; is
18 that correct?
19     THE WITNESS:  Yes.
20     MS. GREER:  Does it in any way reflect an
21 engagement between yourself and FusionPharm?
22     THE WITNESS:  No.
23     MS. GREER:  So the reference in this
24 engagement letter to the scope being -- pertaining to
25 certain disclosure issues and other related matters

Page 286

1 under the federal securities laws, that was solely as
2 it related to your engagement with Mr. Sears?
3     THE WITNESS:  Correct. However, obviously,
4 indirectly, as I testified previously, it would have
5 something to do with my opinion letters.
6     BY MR. LYMAN:
7     Q   What disclosure issues just generally was Mr.
8 Sears interested in you assisting him with, if not
9 related to FusionPharm?
10     A   Having to do with Meadpoint.
11     Q   So Meadpoint disclosures under the federal
12 securities laws?
13     A   As referenced in the FusionPharm obligations.
14     Q   Could you explain that a little bit more? I
15 didn't follow you.
16     A   Sure. I'm sorry. That was very ambiguous.
17 Okay. The subject of our discussions was Meadpoint.
18 He informed me that he controlled Meadpoint, but he was
19 transferring it to an unrelated party, not his mother,
20 not a family relationship. Coupled with that, what I
21 had raised with him was -- were discussions about
22 whether he had any participation in management of the
23 company.
24     Q   Of FusionPharm or Meadpoint?
25     A   I'm sorry. Of FusionPharm. That although

EXHIBIT
G

Page 317

1   Dudley came to you or c[...]
2       A   Correct
3       Q   — and said I've seen Sears in the office
4   every day for the past two months.
5       A   Correct
6       Q   And at a later point in time, Mr. Dittman
7   told you Sears has nothing to do with FusionPharm and
8   I'd never let him have anything to do with FusionPharm?
9       A   Correct
10      Q   Do I have the timeline right so far?
11      A   Correct   And then Mr. Dudley informed me
12  that pursuant to discussions with Mr Dittman, that
13  there would not be any disclosure because — regarding
14  Mr Sears or Meadpoint being an affiliate because based
15  upon Mr Dittman's representations, he was not
16      Q   Did Mr. Dudley express to you any indication
17  that he might not agree with Mr. Dittman's
18  characterization of Mr. Sears' involvement with
19  FusionPharm?
20      A   Only from the standpoint that he saw him
21  there every day  I really apologize I had too much
22  coffee this morning
23      Q   Do you need to take a break?
24      A   Yes
25          MR LYMAN. Let's go off the record

Page 316

1       (A break was had from 11:04 to 11:10 a m )
2           MR LYMAN  All right  Let's go back on the
3   record
4   BY MR LYMAN:
5       Q   Mr. Lehrer, while we were on the break, did
6   we have any substantive conversations about the case?
7       A   No
8       Q   Okay.  In your previous day's testimony we
9   had asked you whether you had an understanding that
10  Meadpoint was one of Bill Sears' companies and you had
11  refused to answer that question on privilege grounds.
12  In light of the agreement we now have with Mr. Sears'
13  counsel, will you now answer whether you were aware
14  that Meadpoint was one of Bill Sears' companies during
15  the time you were issuing Rule 144 letters?
16      A   Yes
17      Q   And how did you come to be aware of that
18  information?
19      A   In a meeting with Mr. Sears, he told me that
20  he was in control of Meadpoint, but that he was
21  transferring it to a third party unrelated to him or in
22  any family context, including his mother
23      Q   So when you first had the conversation about
24  Sears' ownership in Meadpoint, he mentioned
25  specifically that he wasn't going to transfer Meadpoint

Page 317

2   to his mother?
2       A   Very specifically.
3       Q   And was that on your prompting, did you ask
4   him whether he was going to transfer it to his mother
5   or did he just volunteer that particular family member?
6       A  I did ask him
7       Q   And why his mother?  Why did that come up?
8       A   I don't remember why it came up, you know, we
9   were having a conversation back and forth  And, you
10  know, through questioning or otherwise about whether it
11  was going to be transferred to a family member.  He
12  said, no, it's not going to be transferred to a family
13  member   And I may have asked him, you know, is it
14  going to be transferred to your wife, to your mother,
15  you know, you're saying it's not going to be
16  transferred to a family member.  Does that include "X"
17  and "Y"?  I don't remember specifically if I asked
18  that, but certainly in the conversation it was
19  communicated to me that it would not be transferred to
20  his mother specifically
21      Q   Did you ever have an understanding of whether
22  any of the other entities for which you wrote Rule 144
23  opinion letters or which were involved in any of the
24  opinion letters were owned by Mr. Sears' mother?
25      A   Yes

Page 318

1       Q   Okay.  And which entities were those?
2       A   When I had that conversation with Mr Sears
3   in or about April, 2014, when he said he transferred it
4   to his mother
5       Q   But prior to that, when you had the
6   conversation with Mr. Sears, which I believe you
7   thought was in October, 2013, about him transferring
8   Meadpoint, at that point in time were you aware of any
9   other entities that were owned by, managed by or
10  included as an officer, Mr. Sears' mother?
11      A   No
12      Q   Okay.  And other than Meadpoint, did you ever
13  become aware of any other entities that were owned by
14  or directed by or had as an officer Mr. Sears' mother?
15      A   No  Again, apart from that conversation in
16  April, 2014, with Mr Sears
17      Q   Okay.  So what about Bayside Realty Holdings,
18  did you ever come to understand that Mr. Sears's mother
19  was involved with that company?
20      A   No
21      Q   Okay.  But you knew that there was a Sandra
22  Sears who was involved with Bayside?
23      A   My understanding, it was the Sandra Sears
24  that was Bill Sears' wife
25      Q   Okay.  And what did you understand the person

17  (Pages 315 to 318)

Meeting for Thursday. I only land at four pm

Regards,
Bill Sears

On Oct 22, 2013, at 6:00 AM, "Lehrer, Fred"
<flehrer@securitiesattorney1.com> wrote:

Plan for tomorrow:

~~Discuss Meadpoint agreement, historical background of your relationship with Fusion Pharm, nature of related party transaction and appropriate disclosure, plan going forward to ensure that you have no participation with management.~~



Review draft registration statement with emphasis on:
(a) Business section, plan of operations, marketing, distribution, patent information, product information and any other matters pertaining to the business and operations.
(b) Information and documents needed

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com;
www.secdefenselaw.com

<fps1@10-22-13.docx>

--
Frederick M. Lehrer, Esq.
Attorney and Counselor at Law
285 Uptown Blvd, 402
Altamonte Springs, Florida 32701
Office: (321) 972-8060
Cell: (561) 706-7646
Email:    flehrer@securitiesattorney1.com
Websites: www.securitiesattorney1.com; www.secdefenselaw.com

**Private Email**



EXHIBIT
H

**To:**                    wjsears66@icloud.com
**Subject:**           FW: Meeting tomorrow


**From:** Lehrer, Fred [mailto:flehrer@securitiesattorney1.com]
**Sent:** Tuesday, October 22, 2013 6:30 AM
**To:** William Sears
**Subject:** Re: Meeting tomorrow

No worries
We will discuss at length during our meeting


On Tue, Oct 22, 2013 at 8:28 AM, William Sears <william@williamjsears.com> wrote:
~~No I do not own Meadpoint any more~~  I do understand however we need to implement practices to ensure not having a conflict regardless

Regards,
Bill Sears


On Oct 22, 2013, at 6:15 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

> This will require more drilling down on this subject.  That the company is out of state and you own the company only represents a small part of the relevant factors that we need to analyze.  The crucial aspects of this will depend on your participation in Fusion Pharm.  No worries - we will cover the subject adequately during our meeting.
>
>
> On Tue, Oct 22, 2013 at 8:06 AM, William Sears <william@williamjsears.com> wrote:
> FYI no conflict with Meadpoint as a ~~family member and of state~~ owns the company and it's asserts now
> Nevada registration should reflect the change any day now
>
> Regards,
> Bill Sears
>
>
> On Oct 22, 2013, at 6:04 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:
>
>> I mean Wed...correct?
>>
>> Do I need to change the conference room reservation for Thursday???
>>
>> On Tue, Oct 22, 2013 at 8:02 AM, William Sears <william@williamjsears.com> wrote:
>> Fred

Entity Details - Secretary of State, Nevada                    https://nvsos.gov/SOSEntitySearch/PrintCorp.aspx?lx8nvq=%2bH...

# MEADPOINT VENTURE PARTNERS

EXHIBIT
I

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Default | File Date: | 10/24/2011 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0580232011-5 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2015 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20111669192 | Business License Exp: | 10/31/2015 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | INCORP SERVICES, INC. | Address 1: | 3773 HOWARD HUGHES PKWY STE 500S |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89169-6014 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## − Officers

☑ Include Inactive Officers

### Manager - SANDRA L SEARS

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Historical | Email: | |

### Manager - SANDRA L SEARS

| | | | |
|---|---|---|---|
| Address 1: | 13762 COLORADO BLVD #124-203 | Address 2: | |
| City: | THORNTON | State: | CO |
| Zip Code: | 80602 | Country: | USA |
| Status: | Active | Email: | |

Entity Details - Secretary of State, Nevada        https://nvsos.gov/SOSEntitySearch/PrintCorp.aspx?lx8nvq=%2bH...

## ▭ Actions\Amendments

| | |
|---|---|
| **Action Type:** | Articles of Organization |

| | | | |
|---|---|---|---|
| **Document Number:** | 20110759943-21 | **# of Pages:** | 2 |
| **File Date:** | 10/24/2011 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Initial List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20110846367-98 | **# of Pages:** | 1 |
| **File Date:** | 11/30/2011 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20130084907-14 | **# of Pages:** | 1 |
| **File Date:** | 2/7/2013 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20130708196-47 | **# of Pages:** | 1 |
| **File Date:** | 10/30/2013 | **Effective Date:** | |

(No notes for this action)

| | |
|---|---|
| **Action Type:** | Annual List |

| | | | |
|---|---|---|---|
| **Document Number:** | 20140824744-66 | **# of Pages:** | 1 |
| **File Date:** | 12/26/2014 | **Effective Date:** | |

(No notes for this action)

Fusion Pharm - Relativity

https://ext.ediscovery.faegrebd.com/Relativity/Case/Document/Review.aspx?AppID=104...

**Return to document list**

FBDED00436528

Viewer | Native | Extracted Text

_FBD Default Imaging Settings-B&W_   Image

**From:** Craig Dudley
**To:** Scott Dittman[sdittman@fusionpharminc.com]
**Subject:** Related Party Disclosure
**Attachments:** image001.png

**Sent:** Mon 4/14/2014 3 00:41 P

Hey –

For the related party footnote, I think we need to disclose Meadpoint, Bayside & 10mm.  Something simple like:

**Our unsecured lenders, Bayside Realty Holdings, LLC and Meadpoint Venture Partners, are both controlled by ii laws of the Company's CEO.  The note receivable due at yearend is from 10mm, an entity controlled by the Company's CEO.**

I'm not exactly sure of the familial tie ins, so please help clarify.

The note

**Craig Dudley**
**FusionPharm, Inc./PharmPods**
303 809 5467
**pharmpods.com**

10/28/16 8:01 AM

1 of 1

Fusion Pharm - Relativity

https://ext.ediscovery.faegrebd.com/Relativity/Case/Document/Review.aspx?AppID=104...

Return to document list

FBDED00512869

Viewer | Native | Image | Extracted Text

100%

97   of 116

**From:**   CRAIG DUDLEY

**To:**   Lehrer, Fred[flehrer@securitiesattorney1.com]

**CC:**   Scott Dittman[sdittman@fusionpharminc.com]

**Subject:** "Related Party" Disclosure

**Sent:**   Tue 4/15/2014 11:18:02 PM

Fred - from our discussion and on the basis that the Meadpoint and Bayside stuff is all winding down, Scott's elected to not include the "extended" family blurb.

Judgement call - I'm ok with this.

Cool by you?

Thanks.  Craig.

Craig Dudley
(303) 809-5467

ed not to include the
arty" disclosure (relates to
ilege: Attorney-Client
ict regarding preliminary
- re proposed equty issue

1 of 1

10/28//16:8:13 AM

## QUOTE TAKEN FROM CRAIG DUDLEYS 302.

Sears is engaged with and works very closely with
FusionPharm because Meadpoint is the sales arm. Meadpoint was
out "humping for sales" at trade shows and such. Sears has been
an advisor and helped Dittman along the way. With regards to the
relationship between Sears and FusionPharm, Dudley advised that
is was a "muddy situation." It is close but not
over the line. Dudley brought up the disclosure of this relationship
with their securities counsel, Fred Last Name Unknown (LNU).
Dudley raised this when he was finishing the 2013 financials.
While it is a muddy situation, the decision
was made that it did not rise to the level of disclosure.

Page 233

1 something like that. But by saying --
2     MS. GREER: Yeah. I'm just trying to figure
3 out if we have a date or an approximate date.
4     THE WITNESS: I understand that, but by --
5     MR. SALLAH: By doing that, we are -- you
6 know -- because you said at some point you Googled it.
7     THE WITNESS: Correct.
8     MR. SALLAH: Right. And that is not privileged
9 because you're not waiving --
10     THE WITNESS: Right.
11     MR. SALLAH: -- any work product. You're
12 waiving all work product --
13     THE WITNESS: But the characterization of your
14 question is such that it almost implies that you're
15 going to learn the actual communication.
16     MR. SALLAH: Yeah, and the date of the actual
17 communication.
18     MS. GREER: But I --
19     THE WITNESS: The date is not privileged.
20     MS. GREER: But I'm allowed to ask the date.
21     THE WITNESS: I understand that, but you're
22 asking when did I learn about this or something.
23     MR. SALLAH: If you're saying -- I guess -- I
24 guess -- I guess he would be -- it presupposes that a
25 communication took place between the two where one

Page 234

1 conveyed to the other that they had some kind of a
2 criminal background or one asked the other one if they
3 had some kind of criminal background. And by asking
4 that, it -- it invades that communication. That's my --
5 that's my --
6     MS. GREER: Okay.
7     MR. SALLAH: Do you see what I'm saying?
8     MR. LYMAN: Yeah, but we're not asking about
9 the communication or the context or what else was in the
10 meeting. All we're asking is --
11     MR. SALLAH: Well, I don't know.
12     MR. LYMAN: We know that you have told us that
13 you are aware that Mr. Sears had a criminal conviction
14 for a securities-related matter. And our question is,
15 when did you become aware of that, and there's nothing
16 privileged in that --
17     MR. SALLAH: I think he said --
18     MR. LYMAN: -- information.
19     MR. SALLAH: -- he Googled it. He Googled it
20 and became aware he had a conviction.
21     THE WITNESS: No.
22     MR. SALLAH: He clicked on it, and there was no
23 information.
24     THE WITNESS: That's not what I'm saying.
25     MR. SALLAH: You guys asked if he was aware it

Page 235

1 was for securities fraud. He didn't say that.
2     THE WITNESS: This is what I'm saying. I'm
3 saying that --
4     MR. SALLAH: See, that's w~~h~~ ~~these privileg~~
5 issues get -- because it creates is~~ ~~
6     THE WITNESS: If I can sta~~ ~~
7 circle back here. I already provide~~ ~~
8 this Google search. Now, you're a~~ ~~
9 learned, you know, that he had a criminal conviction for
10 securities fraud. I can't answer that question because
11 that's a -- you know --
12     MR. SALLAH: If he says no, it implies that no
13 such communication took place. If he says he can't
14 answer because it's privileged, then it presupposes a
15 communication --
16     THE WITNESS: Exactly.
17     MR. SALLAH: -- took place.
18     MS. GREER: Wait. I think you've already -- I
19 think you've already testified that at some point you
20 knew that.
21     MR. SALLAH: No, not that, that he had a
22 conviction. He found on the Internet and then clicked
23 on it, and he couldn't -- it was like some nonsense.
24 Fred, you testify. I don't want to mischaracterize.
25     THE WITNESS: Okay.

Page 236

1     MR. SALLAH: What did you find when you Googled
2 it?
3     THE WITNESS: I did the Google search, as I
4 testified before. It went to -- the link, you know -- I
5 mean the facing page said William Sears. Then I went to
6 the link, and it didn't correspond anything about
7 William Sears.
8     Anything else that I may have had about what
9 you're talking about, you know, may have been privileged
10 communications. I'm not going to, you know, tell you
11 what the -- you know, what the substance of that
12 conversation was or --
13     Q Certainly.
14     A -- or --
15     Q I mean, do you know now at this point -- and
16 I'm not asking you how you learned it -- that Mr. Sears
17 had a prior conviction --
18     A Yes.
19     Q -- for securities fraud?
20     MR. SALLAH: Now it could invade on our
21 privilege.
22     A Yes. No. I learned from a newspaper article,
23 you know, after the search warrant.
24     BY MS. GREER:
25     Q I believe you said this morning, however, you

EXHIBIT K

Page 69

1 FusionPharm?

2    A  Well, I don't specifically remember, so I don't

3 generally remember.

4    Q  And do you recall Mr. Scholz telling you

5 anything about Mr. Sears' connection to any other

6 company?

7    A  No.

8             (SEC Exhibit 88 was marked for

9             identification.)

10 BY MS. GREER:

11   Q  Mr. Lehrer, I'm handing you what's been marked

12 as Exhibit 88. It's a document with the Bates number

13 FLPA 373 through 374. Do you recognize Exhibit 88?

14      And if you need time to read through it, feel

15 free to take as much time as you need.

16   A  Yes, I recognize this.

17   Q  And what is Exhibit 88?

18   A  It's a communication by e-mail from me to

19 Richard Scholz.

20   Q  And are you --

21   Q  And then --

22   Q  Sorry. Go ahead.

23   A  And then an e-mail from me to William Sears.

24   Q  And the bottom e-mail in the chain that begins

25 on the first page of Exhibit 88 and continues on to the

Page 70

1 second page of Exhibit 88, was that an e-mail you sent

2 to Mr. Sears first reaching out to him about your legal

3 services?

4    A  Yes.

5    Q  In your August 28, 2013, e-mail to Mr. Sears,

6 at the -- it starts at the bottom, the first page of

7 Exhibit 88. In the second paragraph, you say:  I charge

8 $350 for attorney letters -- sorry -- for opinion

9 letters.

10   A  Right.

11   Q  Do you see that?

12   A  Right.

13   Q  And was that, at this time in August of 2013,

14 your normal price for doing opinion letters?

15   A  Yes, but there were some that were 250.

16   Q  And for those that were 250, how did they --

17 how did they differ from those that were 350?

18   A  Negotiation. Negotiation.

19   Q  Was there some difference in negotiation or

20 difference in clients between those clients who you

21 charged 250 versus those who you charged 350?

22   A  Yeah. I mean, there may have been a couple of

23 clients that I got, you know, several opinions that I

24 charged a deal. It would be 250.

25   Q  So based more on volume, you would give people

Page 71

1 a discount?

2    A  Well, yeah. No, it was not per se volume. It

3 was negotiation.

4    Q  The next sentence of your e-mail to Mr. Sears

5 says:  Because Rich referred you, I would lower that

6 amount for you to $250.

7       Do you see that?

8    A  Yes.

9    Q  And so why were you -- why were you offering to

10 lower Mr. Sears' amount to 250?

11   A  It was just a selling point.

12   Q  What do you mean by "it was just a selling

13 point"?

14   A  Yeah. Well, I had not been retained as of yet

15 and went ahead and, you know, said I'll lower it to 250.

16   Q  Prior to sending this e-mail to Mr. Sears about

17 your services, did you do any research about Mr. Sears?

18   A  At what point?

19   Q  Prior to sending this e-mail --

20   A  No.

21   Q  -- to Mr. Sears.

22   A  No.

23   Q  After sending this e-mail to Mr. Sears, did you

24 do any research about Mr. Sears and his background?

25   A  On one occasion, yes.

Page 72

1    Q  And when was that?

2    A  I honestly do not recall.

3    Q  Was it shortly after this time period or --

4    A  I don't recall.

5    Q  -- 2014?

6    A  I don't recall.

7    Q  Okay. And what further research did you do

8 about Mr. Sears?

9    A  I Googled his name.

10   Q  And upon Googling his name, what results did

11 you get?

12   A  I had a -- there was a link to some kind of --

13 it was a criminal indictment or a conviction or

14 something like that. And when I pressed on the link, it

15 went to information or a document that had nothing to do

16 with William Sears, but it did list it in the link.

17   Q  Did you do any further investigation then to

18 try to find what that reference was to a criminal

19 conviction?

20   A  No.

21      (Discussion off the record.)

22   A  Other than attorney-client privilege.

23 BY MS. GREER:

24   Q  Did you become aware at any point that Mr.

25 Sears has a prior conviction for securities fraud?

EXHIBIT L

Page 73

1    MR. SALLAH: Again, to the extent you learned
2  it through a privileged communication with Mr. Sears,
3  that would be privileged. At least that's our position
4  at this point.
5    A   That's correct.
6    MR. KARPEL: Are you willing to tell us the
7  timing of that privileged communication?
8    MR. SALLAH: Yeah. I think we have to tell you
9  the timing of the privileged communication.
10    If you remember. Do you remember when the
11  conversation was, the client that --
12    THE WITNESS: Yeah. I believe in the
13  production there -- well, I'm not sure if there's some
14  communication about -- I don't know the date, but it was
15  the day that I met Mr. Sears in my conference room.
16    MR. KARPEL: So it was before issuing any
17  FusionPharm attorney opinion letters?
18    THE WITNESS: I'm pretty sure it was after.
19    MR. SALLAH: It was the day he met him. He --
20  they had the conversation personally, he remembers.
21    THE WITNESS: No, no, it wasn't the day I met
22  him.
23    MR. SALLAH: No. That's what I'm saying. It
24  was the day you met him.
25    THE WITNESS: Correct.

Page 74

1    MS. GREER: In person.
2    MR. SALLAH: -- a personal conversation --
3    THE WITNESS: Correct.
4    MR. SALLAH: -- he remembers. He just
5  doesn't remember what day. It was after.
6    THE WITNESS: I may be able to determine that
7  by looking at documents. I don't know.
8    MR. SALLAH: Your notepad for DayTimer or
9  something like that?
10    THE WITNESS: No.
11    MR. SALLAH: But you're confident it was after
12  the opinion?
13    THE WITNESS: It was after at least the August
14  opinions. I don't know when it was.
15    BY MS. GREER:
16    Q   Can you be any more specific? Was it 2014?
17  Was it --
18    A   Again --
19    Q   -- the end of 2013?
20    A   -- I do not remember. I would be happy to
21  research the matter to make a determination.
22    MR. KARPEL: Okay. We would appreciate that.
23  But just generally, did -- were -- do you recall, were
24  there any opinion letters relating to FusionPharm that
25  you issued after that conversation that we've been

Page 75

1  talking about?
2    THE WITNESS: Yes.
3    BY MS. GREER:
4    Q   Looking back again at Exhibit 88, the next
5  e-mail up in the chain, sort of in the middle of the
6  first page from yourself. It appears to be back again
7  to Mr. Sears. You say: Bill, did you say you were
8  paying for the opinion letters?
9    Do you see that?
10    A   Yes.
11    Q   And what opinion letters were you referring to
12  there?
13    A   The opinion letters that are in your
14  possession.
15    Q   Okay. And so --
16    A   I mean, there was no -- I didn't note what
17  opinion letters they were but just generally speaking.
18    Q   So at least as of this point, August 28, 2013,
19  you understood that the work that you were discussing
20  with Mr. Sears was to issue attorney opinion letters?
21    A   Yes.
22    Q   And did you understand at this point what
23  company those attorney opinion letters would relate to?
24    A   Yeah, FusionPharm.
25    Q   Okay. And how did you come to learn that those

Page 76

1  attorney opinion letters related to FusionPharm
2  shareholders?
3    A   Through the documents that I was provided.
4    Q   Okay. Prior to that, I mean, did Mr. Scholz
5  say to you -- and, actually, one of the first attorney
6  opinion letters we'll look at when we get to it --
7    A   Yeah.
8    Q   -- is from Mr. Scholz himself.
9    A   Yeah.
10    Q   So did Mr. Scholz say to you, hey, I'm a
11  shareholder of FusionPharm. You know, I have an
12  attorney opinion letter, and there are others that --
13  other FusionPharm shareholders that will need attorney
14  opinion letters?
15    A   No. No. He may very well have talked about an
16  opinion for him individually, but I don't recall a
17  statement to the effect that there will be a bunch of
18  others or any others.
19    Q   And what was your understanding at this point
20  when you -- on August 28, 2013, when you sent the e-mail
21  to Mr. Sears? I mean, what was your understanding as to
22  why Mr. Sears was going to be involved at all in the
23  FusionPharm shareholder attorney opinion letters?
24    A   What was my understanding of the involvement?
25    Q   Why was -- why was Mr. Sears involved, yes.

Page 229

1   Q   There -- so you're saying there may have been
2   communications with Mr. Dittman that you relied upon in
3   determining for this opinion letter, February 14, 2014,
4   Meadpoint's nonaffiliate status?
5   A   No.   What I'm saying is that I don't have any
6   specific recollection of having a privileged
7   communication in the form of a telephone conversation
8   with Mr. Dittman, but in general it's conceivable that I
9   did, not necessarily with respect to this particular
10  opinion letter as reflected in Exhibit 115 but perhaps
11  some other --
12      MR. SALLAH:   Just --
13  A   -- opinion letters.
14      MR. SALLAH:   Just show you.
15  A   There was one on March 17, 2014, in written
16  form with Mr. Dittman.
17      BY MS. GREER:
18  Q   That you're asserting privilege over?
19  A   Correct.   And March 24, 2014.
20  Q   And that you're also asserting privilege over?
21  A   Correct.   And --
22      MR. SALLAH:   There's a lot.
23      THE WITNESS:   I'm sorry?
24      MR. SALLAH:   There's a lot.
25      THE WITNESS:   Okay.

Page 230

1       MR. SALLAH:   Relative to -- not relative to --
2       THE WITNESS:   Yeah.   I'm saying generally,
3   yeah.
4       MR. SALLAH:   But some of these are just general
5   questions.
6       (Discussion off the record.)
7   A   Another one on April 15, 2014.
8       BY MS. GREER:
9   Q   Okay.   And are --
10  A   Another one -- I'm sorry.   Go ahead.
11  Q   Go ahead.
12  A   Another one on the same date.
13  Q   And are those attorney-client privileged
14  communications you had with Mr. Dittman communications
15  that you relied upon in determining that Meadpoint was
16  not an affiliate?
17  A   Let me go back, if I could, please.
18      Yes, but not ...
19      (Discussion off the record.)
20  A   Let me just go back and review this, please.
21      (Discussion off the record.)
22  A   There was a communication on March 24, 2014,
23  with Mr. Dittman having to do with Meadpoint, which is,
24  you know -- had no reference to any particular opinion
25  letter.   There was an April 15, 2014, communication.

Page 231

1   That one had to do with the OTC Markets opinion.   There
2   was another one on April 15, 2014, having to do with the
3   OTC Markets opinion; April 15th, the same OTC Markets
4   opinion.
5       MR. SALLAH:   But they generally
6   the Meadpoint and relationships with ce
7   Meadpoint?
8       THE WITNESS:   Well, no, not all of them.
9       MR. SALLAH:   Not all of them.
10      THE WITNESS:   No.   The March 24th one does, the
11  first April 15, 2014, one does not; the next April 15th
12  one does not; and the next April 15th one does have to
13  do with Meadpoint.
14      BY MS. GREER:
15  Q   And these are all -- these communications are
16  all e-mails over which you're asserting FusionPharm's
17  privilege?
18  A   Yes.
19  Q   Mr. Lehrer, earlier this morning during your
20  testimony, you testified at some point you became aware
21  of Mr. Sears' prior securities fraud conviction,
22  correct?
23  A   Yes.
24  Q   And I think you were struggling to recall
25  exactly when that happened.   Seeing a number of these

Page 232

1   opinion letters -- you had the three in the August 2013
2   timeframe, and then, you know, we've seen a few in early
3   January and February of 2014.   Having those sort of data
4   points for time, does that refresh your recollection as
5   to when you learned that?
6   A   I'm not sure when I learned that.   It was a
7   privileged communication.   But it may have been in a
8   meeting that I had with him in my conference room
9   downstairs where I live.
10  Q   And do you recall when that meeting took place?
11  A   I believe in preparation for this testimony I
12  had determined an approximate date, but --
13  Q   What's --
14  A   -- I don't recall what it is.   I would
15  certainly --
16  Q   What's that approximate date?
17  A   I don't recall, but can we provide ...
18      (Discussion off the record.)
19      MR. SALLAH:   Yeah.   What I'm concerned about
20  is -- what I'm concerned about is, in essence, reverse
21  engineering -- and I know it's not your intention.   I
22  don't think it's your intention -- to try to kind of
23  circumvent the privilege.   Because, again, you're
24  allowed to learn about when privileged communications
25  are, the general -- you know, was it legal advice or

Page 233

1 something like that. But by saying --
2        MS. GREER: Yeah. I'm just trying to figure
3 out if we have a date or an approximate date.
4        THE WITNESS: I understand that, but by --
5        MR. SALLAH: By doing that, we are -- you
6 know -- because you said at some point you Googled it.
7        THE WITNESS: Correct.
8        MR. SALLAH: Right. And that is not privileged
9 because you're not waiving --
10        THE WITNESS: Right.
11        MR. SALLAH: -- any work product. You're
12 waiving all work product.
13        THE WITNESS: But the characterization of your
14 question is such that it almost implies that you're
15 going to learn the actual communication.
16        MR. SALLAH: Yeah, and the date of the actual
17 communication.
18        MS. GREER: But I --
19        THE WITNESS: The date is not privileged.
20        MS. GREER: But I'm not allowed to ask the date.
21        THE WITNESS: I understand that, but you're
22 asking when did I learn about this or something.
23        MR. SALLAH: If you're saying -- I guess -- I
24 guess -- I guess he would be -- it presupposes that a
25 communication took place between the two where one

Page 234

1 conveyed to the other that they had some kind of a
2 criminal background or one asked the other one if they
3 had some kind of criminal background. And by asking
4 that, it -- it invades that communication. That's my --
5 that's my --
6        MS. GREER: Okay.
7        MR. SALLAH: Do you see what I'm saying?
8        MR. LYMAN: Yeah, but we're not asking about
9 the communication or the context or what else was in the
10 meeting. All we're asking is --
11        MR. SALLAH: Well, I don't know.
12        MR. LYMAN: We know that you have told us that
13 you are aware that Mr. Sears had a criminal conviction
14 for a securities-related matter. And our question is,
15 when did you become aware of that, and there's nothing
16 privileged in that --
17        MR. SALLAH: I think he said --
18        MR. LYMAN: -- information.
19        MR. SALLAH: -- he Googled it. He Googled it
20 and became aware he had a conviction.
21        THE WITNESS: No.
22        MR. SALLAH: He clicked on it, and there was no
23 information.
24        THE WITNESS: That's not what I'm saying.
25        MR. SALLAH: You guys asked if he was aware it

Page 235

1 was for securities fraud. He didn't say that.
2        THE WITNESS: This is what I'm saying. I'm
3 saying that --
4        MR. SALLAH: See, that's why these privilege
5 issues get -- because it creates issues like this.
6        THE WITNESS: If I can state -- you know,
7 circle back here. I already provided testimony about
8 this Google search. Now, you're asking about whether I
9 learned, you know, that he had a criminal conviction for
10 securities fraud. I can't answer that question because
11 that's a -- you know --
12        MR. SALLAH: If he says no, it implies that no
13 such communication took place. If he says he can't
14 answer because it's privileged, then it presupposes a
15 communication --
16        THE WITNESS: Exactly.
17        MR. SALLAH: -- took place.
18        MS. GREER: Wait. I think you've already -- I
19 think you've already testified that at some point you
20 knew that.
21        MR. SALLAH: No, not that, that he had a
22 conviction. He found on the Internet and then clicked
23 on it, and he couldn't -- it was like some nonsense.
24 Fred, you testify. I don't want to mischaracterize.
25        THE WITNESS: Okay.

Page 236

1        MR. SALLAH: What did you find when you Googled
2 it?
3        THE WITNESS: I did the Google search, as I
4 testified before. It went to -- the link, you know -- I
5 mean the facing page said William Sears. Then I went to
6 the link, and it didn't correspond anything about
7 William Sears.
8        Anything else that I may have had about what
9 you're talking about, you know, may have been privileged
10 communications. I'm not going to, you know, tell you
11 what the -- you know, what the substance of that
12 conversation was or --
13   Q   Certainly.
14   A   -- or --
15   Q   I mean, do you know now at this point -- and
16 I'm not asking you how you learned it -- that Mr. Sears
17 had a prior conviction --
18   A   Yes.
19   Q   -- for securities fraud?
20        MR. SALLAH: Now it could invade on our
21 privilege.
22   A   Yes. No. I learned from a newspaper article,
23 you know, after the search warrant.
24        BY MS. GREER:
25   Q   I believe you said this morning, however, you

From: **William Sears** william@williamjsears.com.
Subject: FW:
Date: Today at 8:10 AM
To: William Sears wjsears66@icloud.com



**From:** William Sears
**Sent:** Thursday, October 10, 2013 11:04 AM
**To:** Lehrer, Fred
**Subject:** Re:

Hmmmm  One says no one says yes  I think we stay clear till ten years

Regards,
Bill Sears

On Oct 10, 2013, at 10:58 AM, "Lehrer, Fred" <flehrer@securitiesattorney1.com> wrote:

http://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm 

http://www.corporatecrimereporter.com/news/200/secexemptsbadactors09192013/

**Item 404 – Transactions with Related Persons, Promoters and Certain Control Persons**

1. **Transactions with related persons.** Describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transac
   any related person had or will have a direct or indirect material interest. Disclose the following information regarding the transaction:

   1. The name of the related person and the basis on which the person is a related person.
   2. The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership
   3. The approximate dollar value of the amount involved in the transaction.
   4. The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the am
   5. In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstand
      date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which di
   6. Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the

2.
   **Instructions to Item 404(a):**

   1. For the purposes of paragraph (a) of this Item, the term related person means:

      1. Any person who was in any of the following categories at any time during the specified period for which disclosure under paragraph (a) o

         1. Any director or executive officer of the registrant;
         2. Any nominee for director, when the information called for by paragraph (a) of this Item is being presented in a proxy or informatio
         3. Any immediate family member of a director or executive officer of the registrant, or of any nominee for director when the informati
            election of that nominee for director, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-
            director, and any person (other than a tenant or employee) sharing the household of such director, executive officer or nominee for c

      2.
      3. Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest

         1. A security holder covered by Item 403(a); or
         2. Any immediate family member of any such security holder, which means any child, stepchild, parent, stepparent, spouse, sibling, m

            any person (other than a tenant or employee) sharing the household of such security holder.

318B-DN-3938165 Serial 241

-1 of 9-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry   03/02/2016

Frederick Lehrer, attorney, business telephone number (321)972-8060, was interviewed at the Denver Securities and Exchange (SEC) office located at 1961 Stout Street, Denver, Colorado, 80294. Lehrer's attorney, Bill Jung, was also in attendance. After being advised of the identity of the interviewing Federal Bureau of Investigation Special Agent, Kate E. Funk, Internal Revenue Service Special Agent, Michael Godson, Assistant United States Attorney Kenneth Harmon and SEC Enforcement Attorney, James Lyman and the nature of the interview, Lehrer provided the following information:

Jung said that Lehrer was no longer asserting privilege related to legal advice that Lehrer provided to William Sears based on the crime fraud exception.

Lehrer's work for FusionPharm, Sears and Dittman consisted of writing Rule 144 Attorney Opinion Letters (AOL), Current Information Letters for the Over-the-Counter (OTC) market and writing FusionPharm's registration statement. The Rule 144 AOLs were written for FusionPharm investors who acquired stock from FusionPharm or through the sale of two convertible notes between FusionPharm and Bayside Realty Holdings and Meadpoint Venture Partners. The Rule 144 AOL was paid for by either Sears or the individual investor. Sears paid for both Myron Thaden's and Richard Scholz's AOLs. Craig Dudley paid for his own AOL. Scholz was in the business of promoting issuer's stock to brokers and introduced Lehrer to Sears. Lehrer said that he was originally hired by FusionPharm to do the Current Information Letters but the relationship morphed into occasional advice. The registration statement was delayed and Lehrer regularly had to go through Sears to get FusionPharm information. Sears was also coordinating matters related to the S1 and the 504 and 506. Lehrer wrote the Current Information Letter in April, 2014, for the 2013 annual report.

In putting together the 2013 Annual Report Current Information Letter,

| | | |
|---|---|---|
| Investigation on | 01/27/2016 | at Denver, Colorado, United States (In Person) |

File # 318B-DN-3938165

Date drafted  02/03/2016

by Kate E. Funk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318B-DN-3938165 Serial 241

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer _____ , On  01/27/2016 , Page  2 of 9

Lehrer relied on representations made to him by FusionPharm management and
in reviewing the financial statements.  It took him a couple of hours to
prepare the letter.  There were two issues brought to his attention in
putting together FusionPharm's 2013 Annual Report: 1) a proposed related
party disclosure of Sears and 2) FusionPharm was restating their revenue
from a prior period.

   Lehrer discussed a proposed related party disclosure on the phone with
Dudley and Dittman.  Craig Dudley, who was working on preparing
FusionPharm's 2013 annual report, said that Sears was at FusionPharm's
office every day for two months.  Dudley's main concern was on disclosing
the family/related party transactions in the financial statements but
Dudley may also have been concerned with Sears' affiliate status with
regard to FusionPharm.  Lehrer believed that Dudley may also have been
concerned that Sears was part of FusionPharm management.  Dudley drafted a
related party disclosure that he suggested be included in the 2013 annual
report.  Dittman reiterated to Lehrer that Sears was not part of
FusionPharm management and never had been part of FusionPharm management.
After that call, Dittman and Lehrer spoke on the phone separately.  Dittman
indicated to Lehrer that Dudley's observations could be a big problem.
Dittman did not say why it was an issue to disclose Sears' role with
FusionPharm but Sears' affiliate status was implied in the conversation.
Lehrer left the decision whether or not to include the related party
disclosure in the Annual Report up to Dittman.  During this conversation
with Dittman and Dudley, Lehrer was focused on whether or not Sears was an
affiliate of FusionPharm which would impact the Meadpoint AOLs and the
Current Information Letter.  Sears was not part of these conversations.
Lehrer reviewed an email dated April 15, 2014, with subject ""Related
Party" Disclosure".  He said that he never discussed the fact that
Meadpoint and Bayside were winding down as a reason not to disclose Sears.
He said that he did not discuss Sears' role at length with Dittman.  Lehrer
was not aware of Sears owning any FusionPharm shares other than the shares
acquired through the Meadpoint Convertible Note.  If Sears owned more than
10 percent of the outstanding shares, then he would have been considered an
affiliate.

   After the related party disclosures conversation in approximately April,
2014, Dittman never denied that Sears was doing work for FusionPharm or at
the office every day.  If Lehrer had know that Sears was working for
FusionPharm, he would have asked more questions to include: 1) who was
handling finances; 2) who was preparing Financial Statements; 3) who was

FD-302a (Rev. 05-08-10)                    318B-DN-3938165 Serial 241

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer                    , On  01/27/2016 , Page  3 of 9

the Chief Financial Officer; 4) who was negotiating contracts for
FusionPharm; and 4) who was making management decisions for FusionPharm.
Lehrer did not discuss with Dittman what responsibilities would be reserved
for management or a control person related to the 144 affiliate rules or
required SEC affiliate disclosures.


    Lehrer did not ask any questions regarding the numbers included in
FusionPharm's Balance Sheet, Income Statement or Statement of Cash Flow.
Lehrer may have asked FusionPharm questions about the information contained
in their Notes to the Financial Statements after reviewing for
inconsistencies. Lehrer did not know the rules for Generally Accepted
Accounting Principles (GAAP) and relied on FusionPharm management to
provide accurate information. Lehrer reviewed the information in the 2013
Notes related to stock ownership and debt but did not review any of
FusionPharm's prior financial statements.


    Meadpoint was a PharmPod sales distributor and a FusionPharm creditor.
Lehrer was not aware of anyone else working for Meadpoint other than Sears
and later learned it was owned by Sears' Mother. He was not aware of
Dittman having any role with Meadpoint. He did not know why Meadpoint was
necessary as a distributor. Lehrer was not aware of Meadpoint or Sears
having any other FusionPharm stock (common or preferred) other than the
common stock acquired by Meadpoint through the convertible note. Sears
told Lehrer that he was concerned that through his control of Meadpoint, it
might give the impression that Sears was part of FusionPharm's management.
During this same conversation, Lehrer learned of Sears' felony conviction.
Dittman was not part of this conversation. After some time, Sears
transferred Meadpoint to an extended family member. Later, Dittman told
Lehrer in an email that Sears transferred Meadpoint to his Mother. At the
time of the discussions around disclosing Sears as a related party, Sears
was coordinating all aspects of Meadpoint with Lehrer. Lehrer researched
if there were any concerns regarding Sears' criminal history. They had no
further discussions regarding Sears' criminal history after October, 2013.
Lehrer and Dittman never discussed disclosing Sears to the investing public
based on his involvement with the Meadpoint Distribution Agreement or
FusionPharm revenue related to Meadpoint.


    Lehrer was not aware of Bayside's business as anything other than a
creditor to FusionPharm. He did not know who worked for Bayside. Lehrer
saw the name Sandra Sears on some of the paperwork for Bayside. Sears told

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer                    , On  01/27/2016 , Page  4 of 9

him the Sandra Sears listed on the Bayside paperwork was his wife.  Sears
provided the information to Lehrer with regard to Bayside's AOLs.  Lehrer
was not aware of Bayside having any other FusionPharm stock other than the
stock acquired through the convertible note.  He did not know if Bayside
was selling FusionPharm stock.  He assumed the purchasers of the Bayside
convertible note would sell their stock after obtaining the AOLs.  Lehrer
never considered Bayside to be an affiliate of FusionPharm based on the
representations made to him by FusionPharm and by Dittman's Officer Letter.


Lehrer did not know what type of work was done by the entity
Vertifresh.  He said that it may have been in the Financial Statement
Notes.  He did not know who worked at or owned Vertifresh.  Dudley provided
Lehrer with a proposed revenue restatement for a prior reporting period
related to Vertifresh.  Lehrer contacted Crystal Last Name Unknown (LNU) at
the OTC Market about how to adjust the prior year's report.  Lehrer left
the decision regarding the proposed restatement up to FusionPharm
management.  He made only cosmetic changes to the proposed restatement and
did not provide any advice regarding the statement.  He said that he did
not opine on GAAP matters.  He felt that the restatement write-up was
provided to him just as information.  He did not gather any additional
information regarding the restatement.  He assumed that Vertifresh was a
third-party entity that was not controlled by Sears and/or Dittman.  He was
not aware of Sears or Dittman working for Vertifresh.  Lehrer never
discussed Vertifresh with Sears.


Lehrer said that if he had known that Sears or Dittman were involved in
operating Vertifresh, that it would have been clearly material.  If he knew
that Dittman was a Director of Vertifresh, the transaction may have been a
related party, affiliate, internal or fictitious transaction.  If Dittman
were making management decisions on behalf of Vertifresh, Lehrer would have
been more compelled that the transaction was an issue.  Lehrer did not know
that Dittman participated in a presentation of Vertifresh's business plan.
If he knew that Sears was part of Vertifresh, he would want to know about
the nature of the transaction to include consideration paid and what was
bought and sold.  Lehrer said that Dittman and Sears relationship to
Vertifresh would be information he would have wanted to review prior to
creating the Current Information Letter for FusionPharm.  Lehrer did not
know where the funds came from to fund the $250,000 that was still
recognized for the Vertifresh licensing agreement after the restatement.
If he had been aware that the money came from FusionPharm stock sales, he
said that would have been most problematic as it constituted an

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of __Interview of Frederick Lehrer_____ , On 01/27/2016 , Page 5 of 9

unregistered distribution or offering by the issuer. If he was aware that
a portion of the money paid for the agreement came from Bayside or Microcap
rather than Vertifresh, he would not have written the AOLs or Current
Information Letter. He was not aware of Vertifresh owning any FusionPharm
stock and had not heard of the company Microcap Management. Lehrer said
that if the convertible notes issued to Meadpoint and Bayside were funded
with FusionPharm stock proceeds, that would be also be deemed an
unregistered offering by an issuer in violation of SEC Section 5. Lehrer
said that if an issuer is using an entity to raise money through stock,
regardless if the entity was an affiliate, that would be considered
collusion with an issuer and would be a violation of Section 5. Sears
seemed to be knowledgeable of securities although Lehrer did not know if
Sears was ever working in the securities business.


Lehrer was not aware that Scholz did not pay upfront for the purchase of
a portion of the Meadpoint convertible note but instead paid Sears as he
sold FusionPharm stock while also promoting FusionPharm. He said that if
money from Scholz stock sales were distributed back to Meadpoint that
"would make the transaction a complete farce". If the proceeds from
Scholz' stock sales were distributed back to FusionPharm through Meadpoint,
than it would constitute an unregistered offering and would raise questions
about the affiliate status of Meadpoint and Scholz with regard to
FusionPharm. Lehrer was not aware that Scholz was doing any promotion work
for FusionPharm or Sears. If Lehrer knew that Scholz was promoting
FusionPharm stock, he would not have been able to issue an AOL for Scholz'
purchase of the Meadpoint convertible note because it would it would be
deemed to be an unregistered offering and would have to be disclosed under
"17B" regardless of who was paying Scholz to promote FusionPharm stock. If
Lehrer had known that the convertible notes had been backdated, it would be
a "classic red flag" and he would not have written the AOLs. If the
convertible feature had been added after the loan was purportedly entered
into, the holding period would begin when the convertible feature was
added. If the convertible feature was added in December 2012, Lehrer would
be comfortable writing an AOL using the December 2012 date to calculate the
holding period. If the loan was funded with FusionPharm stock proceeds, it
would be an unregistered offering by FusionPharm and he would not have
written any related AOLs.


Lehrer said that knowing the beneficial owners of FusionPharm was
important in putting together the Current Information Letter. He did not
know the name Robert Dittman. If Sears transferred his FusionPharm shares

FD-302a (Rev. 05-08-10)

318B-DN-3938165 Serial 241

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer _____ , On  01/27/2016 , Page  6 of 9

to Robert Dittman or Vertifresh, it could also constitute an unregistered
distribution. Lehrer said that beneficial owners distributing their shares
to other individuals and entities is often seen in penny stocks and is a
clear red flag.


In order to file an S-1 Registration Statement with the SEC, a company
must complete an audit with a Public Company Accounting Oversight Board
(PCAOB) auditor which was expensive. Lehrer was constantly trying to
gather the information required to file the S-1/Form 10 from FusionPharm.
Lehrer never discussed with FusionPharm whether they were ready for an
audit. Dittman mentioned listing on the Canadian exchange instead of going
through the SEC. In hindsight, Lehrer believed that the audit may have
been an issue for FusionPharm but he did not know if it was because of the
associated expense or the concern of what would be uncovered during an
audit.


Dittman and Sears role with FusionPharm remained the same throughout his
engagement although Lehrer was not aware of their daily responsibilities.
Lehrer did not have any discussion with Sears or Dittman about Sears'
Mother being a related party. Lehrer was aware that Dittman did not live
in Colorado. He thought Dittman lived in either New Jersey or Arizona and
traveled often. Lehrer only spoke with Sears, Dittman and Dudley; he never
spoke to anyone else that worked for FusionPharm.


Dittman and Lehrer never discussed not including Sears in the financial
statements. Lehrer did not review any of FusionPharm's prior financial
statements. Lehrer did not know that Sears was selling his FusionPharm
stock. Lehrer never discussed insider trading with Sears. He added that
if Sears was aware of the proposed Vertifresh restatement, it would be
insider trading for Sears to sell FusionPharm stock before the restatement
was public.


Lehrer reviewed an email dated October 22, 2013, with the subject
"Meeting tomorrow". Lehrer said that he was referring to Sears and
FusionPharm in the text "plan going forward to ensure that you have no
participation with management". Sears told Lehrer that he was not part of
FusionPharm management. Lehrer said that there was another email exchange
between Lehrer and Sears only in approximately October, 2013, that was not

INV_00001646

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of Interview of Frederick Lehrer , On 01/27/2016 , Page 7 of 9

produced to the Securities and Exchange Commission and was listed in the
privilege log. The email included an exchange about what constituted
responsibilities reserved for FusionPharm management. The email was
exchanged after Sears indicated concerns about giving the impression he was
part of FusionPharm management. Around this time, Sears told Lehrer he was
going to transfer Meadpoint to an unrelated third party. Lehrer never
discussed with Sears or Dittman if Sandra Sears would have been considered
a related party.

    Lehrer reviewed an email dated March 3, 2014, with subject "several
questions". Lehrer said that he discussed setting up an
"investors@fusionpharminc.com" email account with Sears by telephone and
email. Lehrer believed that Dittman was also part of some of these
conversations. After reviewing the email, Lehrer said that it appeared
that Sears was working for FusionPharm, rather than just performing in a
liaison/coordinator role. Lehrer often corresponded with Sears about
FusionPharm because Dittman was difficult to get in touch with and Sears
worked as a coordinator for FusionPharm.

    Lehrer reviewed an email dated March 17, 2014, with subject "several
questions". They discussed these topics, to include Dittman selling his
FusionPharm stock, once prior to the email when Dittman called Lehrer with
the questions. Lehrer was at another client's office and spent
approximately 10 to 15 minutes discussing these questions with Dittman on
the telephone. He asked Dittman to put his questions in an email. Lehrer
said that they did not have any follow up conversations or emails regarding
the listed questions after this email. Lehrer said that he did not
specifically recall any conversations with Dittman about Dittman purchasing
a home but said it was possible that it was discussed. Lehrer never had a
conversation with Dittman about him purchasing a home using FusionPharm
stock proceeds. Lehrer said that if Sears' Mother purchased Dittman's
stock using proceeds from FusionPharm stock sales than it would also be an
issue.

    Lehrer reviewed an email dated November 25, 2013, with subject "Re:
meadpoint proposed buy-back structure". Lehrer never received the
agreement and did not think it ever happened although it may have been
discussed. He was not sure why they were closing Meadpoint and did not
receive any clarity on the revenue stream.

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer                    , On  01/27/2016 , Page  8 of 9

Lehrer was not sure why he had a copy of the promissory note between
Meadpoint Ventures and John Scott for $40,000 dated June 10, 2013.  He
agreed to review his records and follow up with investigators after the
interview.  On January 28, 2014, Jung provided the attached email stating
that:

*"On 1/13/14 Sears asked Fred for a debt satisfaction agreement pertaining
to the above agreements.  That day Fred sent Sears a sample settlement
agreement and mutual release not specifically tailored to Scott or
Meadpoint.  Fred reports his research shows nothing further - no follow up
by Sears or anything else."*

Lehrer recalled that Sears and/or Dittman were looking to purchase land
in Denver for PharmPods.  He provided a draft of a Memorandum of
Understanding for the purchase of the land but did not provide any legal
advice.  He did not know the details of the purchase and it did not have
any related securities.

Lehrer was not sure why Sears was involved as a liaison/coordinator for
FusionPharm.  He said that his was purely how the relationship evolved
because Dittman was not available.  Sears did have an interest in his
AOLs.  Lehrer said that he never provided FusionPharm with any accounting
advice or revenue recognition advice.

Lehrer drank approximately two drinks a month and did not have any
issues with drinking.  His divorce settlement did not have any discovery.
If Dittman said that he abused alcohol, it was a complete fabrication.

Lehrer learned of the Federal Search Warrant executed on May 16, 2014,
likely through Dittman, or possibly through Sears or Scholz.  Dittman
contacted Lehrer about getting his bank accounts unfrozen.  Lehrer did not
know which accounts or how many accounts had been frozen and did not know
the amount of money that was frozen.  Dittman told Lehrer that it was
crucial to get access to the funds.  Lehrer never received the bank account
numbers from Dittman.  On May 16, 2014, Lehrer sent a number of his emails
with FusionPharm to an attorney at RHEIM because he was "freaked out".

INV_00001648

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of __Interview of Frederick Lehrer__ , On __01/27/2016__ , Page __9 of 9__

 

    Lehrer provided copies of his Sprint cellular telephone records with calls with Sears and Dittman flagged. His office telephone records were only available for one year so he was not able to provide any records before May, 2014. He estimated that he spoke with Sears for about two hours and Dittman for about 36 minutes on his cellular telephone. He said that an estimate of 20-30 hours of discussion between Lehrer, Dittman, and/or Sears was "absurd". Lehrer had a few conversations with Dittman on his office telephone. He spoke with Sears significantly more than Dittman. He was not sure what he discussed with Sears on May 16, 2014.

facts in court if permitted to do so.  Once again, all of this evidence was discovered by myself after being fraudulently induced to sign a plea agreement.  My previous attorneys should have at least caught some of these egregious acts by the prosecution!

I humbly ask for an order to set aside my conviction and that an evidentiary hearing be ordered after I am appointed cousel so that all of these facts and evidence can be presented in a court of law.

318B-DN-3938165 Serial 241

-1 of 9-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    03/02/2016

        Frederick Lehrer, attorney, business telephone number (321)972-8060,
was interviewed at the Denver Securities and Exchange (SEC) office located
at 1961 Stout Street, Denver, Colorado, 80294. Lehrer's attorney, Bill
Jung, was also in attendance. After being advised of the identity of the
interviewing Federal Bureau of Investigation Special Agent, Kate E. Funk,
Internal Revenue Service Special Agent, Michael Godson, Assistant United
States Attorney Kenneth Harmon and SEC Enforcement Attorney, James Lyman
and the nature of the interview, Lehrer provided the following information:


        Jung said that Lehrer was no longer asserting privilege related to legal
advice that Lehrer provided to William Sears based on the crime fraud
exception.


        Lehrer's work for FusionPharm, Sears and Dittman consisted of writing
Rule 144 Attorney Opinion Letters (AOL), Current Information Letters for
the Over-the-Counter (OTC) market and writing FusionPharm's registration
statement. The Rule 144 AOLs were written for FusionPharm investors who
acquired stock from FusionPharm or through the sale of two convertible
notes between FusionPharm and Bayside Realty Holdings and Meadpoint Venture
Partners. The Rule 144 AOL was paid for by either Sears or the individual
investor. Sears paid for both Myron Thaden's and Richard Scholz's AOLs.
Craig Dudley paid for his own AOL. Scholz was in the business of promoting
issuer's stock to brokers and introduced Lehrer to Sears. Lehrer said that
he was originally hired by FusionPharm to do the Current Information
Letters but the relationship morphed into occasional advice. The
registration statement was delayed and Lehrer regularly had to go through
Sears to get FusionPharm information. Sears was also coordinating matters
related to the S1 and the 504 and 506. Lehrer wrote the Current
Information Letter in April, 2014, for the 2013 annual report.


        In putting together the 2013 Annual Report Current Information Letter,

| | | | |
|---|---|---|---|
| Investigation on | 01/27/2016 | at | Denver, Colorado, United States (In Person) |

File #  318B-DN-3938165                                   Date drafted  02/03/2016

by  Kate E. Funk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of <u>Interview of Frederick Lehrer</u> , On <u>01/27/2016</u> , Page <u>2 of 9</u>

Lehrer relied on representations made to him by FusionPharm management and in reviewing the financial statements. It took him a couple of hours to prepare the letter. There were two issues brought to his attention in putting together FusionPharm's 2013 Annual Report: 1) a proposed related party disclosure of Sears and 2) FusionPharm was restating their revenue from a prior period.

Lehrer discussed a proposed related party disclosure on the phone with Dudley and Dittman. Craig Dudley, who was working on preparing FusionPharm's 2013 annual report, said that Sears was at FusionPharm's office every day for two months. Dudley's main concern was on disclosing the family/related party transactions in the financial statements but Dudley may also have been concerned with Sears' affiliate status with regard to FusionPharm. Lehrer believed that Dudley may also have been concerned that Sears was part of FusionPharm management. Dudley drafted a related party disclosure that he suggested be included in the 2013 annual report. Dittman reiterated to Lehrer that Sears was not part of FusionPharm management and never had been part of FusionPharm management. After that call, Dittman and Lehrer spoke on the phone separately. Dittman indicated to Lehrer that Dudley's observations could be a big problem. Dittman did not say why it was an issue to disclose Sears' role with FusionPharm but Sears' affiliate status was implied in the conversation. Lehrer left the decision whether or not to include the related party disclosure in the Annual Report up to Dittman. During this conversation with Dittman and Dudley, Lehrer was focused on whether or not Sears was an affiliate of FusionPharm which would impact the Meadpoint AOLs and the Current Information Letter. Sears was not part of these conversations. Lehrer reviewed an email dated April 15, 2014, with subject ""Related Party" Disclosure". He said that he never discussed the fact that Meadpoint and Bayside were winding down as a reason not to disclose Sears. He said that he did not discuss Sears' role at length with Dittman. Lehrer was not aware of Sears owning any FusionPharm shares other than the shares acquired through the Meadpoint Convertible Note. If Sears owned more than 10 percent of the outstanding shares, then he would have been considered an affiliate.

After the related party disclosures conversation in approximately April, 2014, Dittman never denied that Sears was doing work for FusionPharm or at the office every day. If Lehrer had know that Sears was working for FusionPharm, he would have asked more questions to include: 1) who was handling finances; 2) who was preparing Financial Statements; 3) who was

FD-302a (Rev. 05-08-10)

318B-DN-3938165 Serial 241

318B-DN-3938165

Continuation of FD-302 of __Interview of Frederick Lehrer_____ , On __01/27/2016__ , Page __3 of 9__

the Chief Financial Officer; 4) who was negotiating contracts for
FusionPharm; and 4) who was making management decisions for FusionPharm.
Lehrer did not discuss with Dittman what responsibilities would be reserved
for management or a control person related to the 144 affiliate rules or
required SEC affiliate disclosures.


Lehrer did not ask any questions regarding the numbers included in
FusionPharm's Balance Sheet, Income Statement or Statement of Cash Flow.
Lehrer may have asked FusionPharm questions about the information contained
in their Notes to the Financial Statements after reviewing for
inconsistencies. Lehrer did not know the rules for Generally Accepted
Accounting Principles (GAAP) and relied on FusionPharm management to
provide accurate information. Lehrer reviewed the information in the 2013
Notes related to stock ownership and debt but did not review any of
FusionPharm's prior financial statements.


Meadpoint was a PharmPod sales distributor and a FusionPharm creditor.
Lehrer was not aware of anyone else working for Meadpoint other than Sears
and later learned it was owned by Sears' Mother. He was not aware of
Dittman having any role with Meadpoint. He did not know why Meadpoint was
necessary as a distributor. Lehrer was not aware of Meadpoint or Sears
having any other FusionPharm stock (common or preferred) other than the
common stock acquired by Meadpoint through the convertible note. Sears
told Lehrer that he was concerned that through his control of Meadpoint, it
might give the impression that Sears was part of FusionPharm's management.
During this same conversation, Lehrer learned of Sears' felony conviction.
Dittman was not part of this conversation. After some time, Sears
transferred Meadpoint to an extended family member. Later, Dittman told
Lehrer in an email that Sears transferred Meadpoint to his Mother. At the
time of the discussions around disclosing Sears as a related party, Sears
was coordinating all aspects of Meadpoint with Lehrer. Lehrer researched
if there were any concerns regarding Sears' criminal history. They had no
further discussions regarding Sears' criminal history after October, 2013.
Lehrer and Dittman never discussed disclosing Sears to the investing public
based on his involvement with the Meadpoint Distribution Agreement or
FusionPharm revenue related to Meadpoint.


Lehrer was not aware of Bayside's business as anything other than a
creditor to FusionPharm. He did not know who worked for Bayside. Lehrer
saw the name Sandra Sears on some of the paperwork for Bayside. Sears told

INV_00001643

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer  , On  01/27/2016  , Page  4 of 9

him the Sandra Sears listed on the Bayside paperwork was his wife.  Sears
provided the information to Lehrer with regard to Bayside's AOLs.  Lehrer
was not aware of Bayside having any other FusionPharm stock other than the
stock acquired through the convertible note.  He did not know if Bayside
was selling FusionPharm stock.  He assumed the purchasers of the Bayside
convertible note would sell their stock after obtaining the AOLs.  Lehrer
never considered Bayside to be an affiliate of FusionPharm based on the
representations made to him by FusionPharm and by Dittman's Officer Letter.


    Lehrer did not know what type of work was done by the entity
Vertifresh.  He said that it may have been in the Financial Statement
Notes.  He did not know who worked at or owned Vertifresh.  Dudley provided
Lehrer with a proposed revenue restatement for a prior reporting period
related to Vertifresh.  Lehrer contacted Crystal Last Name Unknown (LNU) at
the OTC Market about how to adjust the prior year's report.  Lehrer left
the decision regarding the proposed restatement up to FusionPharm
management.  He made only cosmetic changes to the proposed restatement and
did not provide any advice regarding the statement.  He said that he did
not opine on GAAP matters.  He felt that the restatement write-up was
provided to him just as information.  He did not gather any additional
information regarding the restatement.  He assumed that Vertifresh was a
third-party entity that was not controlled by Sears and/or Dittman.  He was
not aware of Sears or Dittman working for Vertifresh.  Lehrer never
discussed Vertifresh with Sears.


    Lehrer said that if he had known that Sears or Dittman were involved in
operating Vertifresh, that it would have been clearly material.  If he knew
that Dittman was a Director of Vertifresh, the transaction may have been a
related party, affiliate, internal or fictitious transaction.  If Dittman
were making management decisions on behalf of Vertifresh, Lehrer would have
been more compelled that the transaction was an issue.  Lehrer did not know
that Dittman participated in a presentation of Vertifresh's business plan.
If he knew that Sears was part of Vertifresh, he would want to know about
the nature of the transaction to include consideration paid and what was
bought and sold.  Lehrer said that Dittman and Sears relationship to
Vertifresh would be information he would have wanted to review prior to
creating the Current Information Letter for FusionPharm.  Lehrer did not
know where the funds came from to fund the $250,000 that was still
recognized for the Vertifresh licensing agreement after the restatement.
If he had been aware that the money came from FusionPharm stock sales, he
said that would have been most problematic as it constituted an

INV_00001644

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer                    , On  01/27/2016 , Page  5 of 9

unregistered distribution or offering by the issuer. If he was aware that
a portion of the money paid for the agreement came from Bayside or Microcap
rather than Vertifresh, he would not have written the AOLs or Current
Information Letter. He was not aware of Vertifresh owning any FusionPharm
stock and had not heard of the company Microcap Management. Lehrer said
that if the convertible notes issued to Meadpoint and Bayside were funded
with FusionPharm stock proceeds, that would be also be deemed an
unregistered offering by an issuer in violation of SEC Section 5. Lehrer
said that if an issuer is using an entity to raise money through stock,
regardless if the entity was an affiliate, that would be considered
collusion with an issuer and would be a violation of Section 5. Sears
seemed to be knowledgeable of securities although Lehrer did not know if
Sears was ever working in the securities business.

Lehrer was not aware that Scholz did not pay upfront for the purchase of
a portion of the Meadpoint convertible note but instead paid Sears as he
sold FusionPharm stock while also promoting FusionPharm. He said that if
money from Scholz stock sales were distributed back to Meadpoint that
"would make the transaction a complete farce". If the proceeds from
Scholz' stock sales were distributed back to FusionPharm through Meadpoint,
than it would constitute an unregistered offering and would raise questions
about the affiliate status of Meadpoint and Scholz with regard to
FusionPharm. Lehrer was not aware that Scholz was doing any promotion work
for FusionPharm or Sears. If Lehrer knew that Scholz was promoting
FusionPharm stock, he would not have been able to issue an AOL for Scholz'
purchase of the Meadpoint convertible note because it would it would be
deemed to be an unregistered offering and would have to be disclosed under
"17B" regardless of who was paying Scholz to promote FusionPharm stock. If
Lehrer had known that the convertible notes had been backdated, it would be
a "classic red flag" and he would not have written the AOLs. If the
convertible feature had been added after the loan was purportedly entered
into, the holding period would begin when the convertible feature was
added. If the convertible feature was added in December 2012, Lehrer would
be comfortable writing an AOL using the December 2012 date to calculate the
holding period. If the loan was funded with FusionPharm stock proceeds, it
would be an unregistered offering by FusionPharm and he would not have
written any related AOLs.

Lehrer said that knowing the beneficial owners of FusionPharm was
important in putting together the Current Information Letter. He did not
know the name Robert Dittman. If Sears transferred his FusionPharm shares

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer                    , On  01/27/2016 , Page  6 of 9

to Robert Dittman or Vertifresh, it could also constitute an unregistered
distribution. Lehrer said that beneficial owners distributing their shares
to other individuals and entities is often seen in penny stocks and is a
clear red flag.


    In order to file an S-1 Registration Statement with the SEC, a company
must complete an audit with a Public Company Accounting Oversight Board
(PCAOB) auditor which was expensive. Lehrer was constantly trying to
gather the information required to file the S-1/Form 10 from FusionPharm.
Lehrer never discussed with FusionPharm whether they were ready for an
audit. Dittman mentioned listing on the Canadian exchange instead of going
through the SEC. In hindsight, Lehrer believed that the audit may have
been an issue for FusionPharm but he did not know if it was because of the
associated expense or the concern of what would be uncovered during an
audit.


    Dittman and Sears role with FusionPharm remained the same throughout his
engagement although Lehrer was not aware of their daily responsibilities.
Lehrer did not have any discussion with Sears or Dittman about Sears'
Mother being a related party. Lehrer was aware that Dittman did not live
in Colorado. He thought Dittman lived in either New Jersey or Arizona and
traveled often. Lehrer only spoke with Sears, Dittman and Dudley; he never
spoke to anyone else that worked for FusionPharm.


    Dittman and Lehrer never discussed not including Sears in the financial
statements. Lehrer did not review any of FusionPharm's prior financial
statements. Lehrer did not know that Sears was selling his FusionPharm
stock. Lehrer never discussed insider trading with Sears. He added that
if Sears was aware of the proposed Vertifresh restatement, it would be
insider trading for Sears to sell FusionPharm stock before the restatement
was public.


    Lehrer reviewed an email dated October 22, 2013, with the subject
"Meeting tomorrow". Lehrer said that he was referring to Sears and
FusionPharm in the text "plan going forward to ensure that you have no
participation with management". Sears told Lehrer that he was not part of
FusionPharm management. Lehrer said that there was another email exchange
between Lehrer and Sears only in approximately October, 2013, that was not

INV_00001646
INV_00001646

Here Comes To:

William J. Sears comes before the court on his own behalf after he realized all the legal counsel and legal advise he has trusted since before this case started has provided less than adequate representation for him. As such, it is necessary for me to present this motion Pro Se in order that justice might finally be served in this case.

No agency of the United States should be allowed to operate outside the laws and regulations that grant them power. Just as no government employee should be allowed to violate the laws they have been hired to enforce under the guise of enforcement. This is, unless the government expects the citizens of this great nation to resort to the behavior that exists in a lawless society. "The rules of law must apply equally to everyone including those who work in government." As I will show, in my case the above statement did not and still does not apply.

When the prosecutors entered into a plea agreement which was based on an investigation that violates federal regulations whereby rendering the investigation the product of perjury. Thus the failure by the prosecution to disclose and withhold makes any agreement in this case the product of misconduct and fraud. Ultimately rendering it invalid and making the charges in this case invalid which then requires this case to be dismissed or at the very least set aside.

I will show the plea agreement is constitutionally infirm because of the prosecutions' underlying pre-plea misconduct. It is axiomatic that for a plea to be constitutionally valid "a plea of guilty must be knowingly and voluntarily made". And a guilty plea is NOT VALID if it was made not knowingly and voluntarily made when the defendant was misinformed! Crucial evidence was purposely withheld from me in order to force a plea. Ultimately covering up a bungled investigation that started with fraud on the court and then prosecutorial misconduct soon after ensued.

All of the wrongdoings I am about to detail have been discovered after the signing of my plea agreement. In addition, all of it was discovered by myself. My attorney's at that time were perfectly happy with taking the word of the prosecution and the FBI Special Agent in Charge. When I confronted them with what I had discovered at that time, they promptly withdrew as counsel. Besides counsels' bad advice, the government's misconduct where it withheld "stunning" evidence favorable to me. With all the things I will set forth below, I would never have pleaded guilty and I would have rejected the proffered plea agreement.

While the prosecution has said, "Mr. Sears has buyers remorse" the below will show that I was lied to repeatedly and falsely induced to sign the agreement. Once again, if the AUSA or the FBI SAC were held to the same standard as I am, they would both be in prison. This is how it all started with an FBI agent that was unqualified to say the least and how the prosecution lied, withheld and committed fraud on the court and myself to save face.

### THIS STARTED AS A SECURITIES FRAUD INVESTIGATION

The SEC press release regarding the halted trading of FusionPharm stock states "the commission temporarily suspended trading in the securities of FusionPharm due to a lack of current information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning among other things (1) company assets, (2) company revenues, (3) financial statements, (4) business transactions, (5) and the company's current financial condition. SEE EXHIBIT __1__.

I will show that the DOJ and FBI were aware or should have been aware of the fact that SA Funk provided false information regarding her qualifications. For instance, the year she graduated, the fact her degree was in business not accounting, and the year she received her Kansas State certificate. Instead, she was using the title Certified Public Accountant to misrepresent her professional licensing status required under federal regulations required for the forensic financial investigations that are required in securities fraud cases.

The question has been raised "how was she acting as a certified public accountant in this case?" I have had a Colorado licensed and practicing CPA highlight the sections of her affidavit where there is no doubt she was acting in this capacity when she submitted her affidavit in order to secure three different

# Fred Lehrers Withheld FBI Interviews

Many requests by Five different attorneys have been made for these interview copies. They were all ignored as if they did not exist. After reading through them, I now know why the government purposely withheld these, (they are filled with lies). I just saw and read them for the First time in October of 2020 from an anonymous source to whom mailed them to me while being held in F CI. Florence Federal institute.

Sincerly,

William Sears

William Sears

1/05/2021

FD-302a (Rev. 05-08-10)

318B-DN-3938165 Serial 241

318B-DN-3938165

Continuation of FD-302 of  Interview of Frederick Lehrer _____ , On  01/27/2016 , Page  7 of 9

produced to the Securities and Exchange Commission and was listed in the
privilege log.  The email included an exchange about what constituted
responsibilities reserved for FusionPharm management.  The email was
exchanged after Sears indicated concerns about giving the impression he was
part of FusionPharm management.  Around this time, Sears told Lehrer he was
going to transfer Meadpoint to an unrelated third party.  Lehrer never
discussed with Sears or Dittman if Sandra Sears would have been considered
a related party.


    Lehrer reviewed an email dated March 3, 2014, with subject "several
questions".  Lehrer said that he discussed setting up an
"investors@fusionpharminc.com" email account with Sears by telephone and
email.  Lehrer believed that Dittman was also part of some of these
conversations.  After reviewing the email, Lehrer said that it appeared
that Sears was working for FusionPharm, rather than just performing in a
liaison/coordinator role.  Lehrer often corresponded with Sears about
FusionPharm because Dittman was difficult to get in touch with and Sears
worked as a coordinator for FusionPharm.


    Lehrer reviewed an email dated March 17, 2014, with subject "several
questions".  They discussed these topics, to include Dittman selling his
FusionPharm stock, once prior to the email when Dittman called Lehrer with
the questions.  Lehrer was at another client's office and spent
approximately 10 to 15 minutes discussing these questions with Dittman on
the telephone.  He asked Dittman to put his questions in an email.  Lehrer
said that they did not have any follow up conversations or emails regarding
the listed questions after this email.  Lehrer said that he did not
specifically recall any conversations with Dittman about Dittman purchasing
a home but said it was possible that it was discussed.  Lehrer never had a
conversation with Dittman about him purchasing a home using FusionPharm
stock proceeds.  Lehrer said that if Sears' Mother purchased Dittman's
stock using proceeds from FusionPharm stock sales than it would also be an
issue.


    Lehrer reviewed an email dated November 25, 2013, with subject "Re:
meadpoint proposed buy-back structure".  Lehrer never received the
agreement and did not think it ever happened although it may have been
discussed.  He was not sure why they were closing Meadpoint and did not
receive any clarity on the revenue stream.

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of _Interview of Frederick Lehrer_ _____ , On _01/27/2016_ , Page _8 of 9_

Lehrer was not sure why he had a copy of the promissory note between Meadpoint Ventures and John Scott for $40,000 dated June 10, 2013. He agreed to review his records and follow up with investigators after the interview. On January 28, 2014, Jung provided the attached email stating that:

*"On 1/13/14 Sears asked Fred for a debt satisfaction agreement pertaining to the above agreements. That day Fred sent Sears a sample settlement agreement and mutual release not specifically tailored to Scott or Meadpont. Fred reports his research shows nothing further - no follow up by Sears or anything else."*

Lehrer recalled that Sears and/or Dittman were looking to purchase land in Denver for PharmPods. He provided a draft of a Memorandum of Understanding for the purchase of the land but did not provide any legal advice. He did not know the details of the purchase and it did not have any related securities.

Lehrer was not sure why Sears was involved as a liaison/coordinator for FusionPharm. He said that his was purely how the relationship evolved because Dittman was not available. Sears did have an interest in his AOLs. Lehrer said that he never provided FusionPharm with any accounting advice or revenue recognition advice.

Lehrer drank approximately two drinks a month and did not have any issues with drinking. His divorce settlement did not have any discovery. If Dittman said that he abused alcohol, it was a complete fabrication.

Lehrer learned of the Federal Search Warrant executed on May 16, 2014, likely through Dittman, or possibly through Sears or Scholz. Dittman contacted Lehrer about getting his bank accounts unfrozen. Lehrer did not know which accounts or how many accounts had been frozen and did not know the amount of money that was frozen. Dittman told Lehrer that it was crucial to get access to the funds. Lehrer never received the bank account numbers from Dittman. On May 16, 2014, Lehrer sent a number of his emails with FusionPharm to an attorney at RHEIM because he was "freaked out".

INV_00001648

318B-DN-3938165 Serial 241

FD-302a (Rev. 05-08-10)

318B-DN-3938165

Continuation of FD-302 of __Interview of Frederick Lehrer_____ , On __01/27/2016__ , Page __9 of 9__

 

 

 

Lehrer provided copies of his Sprint cellular telephone records with calls with Sears and Dittman flagged. His office telephone records were only available for one year so he was not able to provide any records before May, 2014. He estimated that he spoke with Sears for about two hours and Dittman for about 36 minutes on his cellular telephone. He said that an estimate of 20-30 hours of discussion between Lehrer, Dittman, and/or Sears was "absurd". Lehrer had a few conversations with Dittman on his office telephone. He spoke with Sears significantly more than Dittman. He was not sure what he discussed with Sears on May 16, 2014.

facts in court if permitted to do so.  Once again, all of this evidence was discovered by myself after being fraudulently induced to sign a plea agreement.  My previous attorneys should have at least caught some of these egregious acts by the prosecution!

I humbly ask for an order to set aside my conviction and that an evidentiary hearing be ordered after I am appointed cousel so that all of these facts and evidence can be presented in a court of law.