# Motion to be Appointed Legal Council

---

I, William Joseph Sears, am requesting the court to appoint me legal council so I may be Properly represented with regard to the Most recent Filings that I have submitted to the court. I am in no way an attorney and I have no experience in such complicated legal matters. I have been incarcerated since January 2020, and I have no resources or assets to afford legal representation of any kind. I pray the courts will grant this motion so the truth may Finally be told.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
JAN 15 2021
JEFFREY P. COLWELL
CLERK

Respectfully,

William Joseph Sears

William J Sears

1/05/2021

Here Comes To:

William J. Sears comes before the court on his own behalf after he realized all the legal counsel and legal advise he has trusted since before this case started has provided less than adequate representation for him. As such, it is necessary for me to present this motion Pro Se in order that justice might finally be served in this case.

No agency of the United States should be allowed to operate outside the laws and regulations that grant them power. Just as no government employee should be allowed to violate the laws they have been hired to enforce under the guise of enforcement. This is, unless the government expects the citizens of this great nation to resort to the behavior that exists in a lawless society. "The rules of law must apply equally to everyone including those who work in government." As I will show, in my case the above statement did not and still does not apply.

When the prosecutors entered into a plea agreement which was based on an investigation that violates federal regulations whereby rendering the investigation the product of perjury. Thus the failure by the prosecution to disclose and withhold makes any agreement in this case the product of misconduct and fraud. Ultimately rendering it invalid and making the charges in this case invalid which then requires this case to be dismissed or at the very least set aside.

I will show the plea agreement is constitutionally infirm because of the prosecutions' underlying pre-plea misconduct. It is axiomatic that for a plea to be constitutionally valid "a plea of guilty must be knowingly and voluntarily made". And a guilty plea is NOT VALID if it was made not knowingly and voluntarily made when the defendant was misinformed! Crucial evidence was purposely withheld from me in order to force a plea. Ultimately covering up a bungled investigation that started with fraud on the court and then prosecutorial misconduct soon after ensued.

All of the wrongdoings I am about to detail have been discovered after the signing of my plea agreement. In addition, all of it was discovered by myself. My attorney's at that time were perfectly happy with taking the word of the prosecution and the FBI Special Agent in Charge. When I confronted them with what I had discovered at that time, they promptly withdrew as counsel. Besides counsels' bad advice, the government's misconduct where it withheld "stunning" evidence favorable to me. With all the things I will set forth below, I would never have pleaded guilty and I would have rejected the proffered plea agreement.

While the prosecution has said, "Mr. Sears has buyers remorse" the below will show that I was lied to repeatedly and falsely induced to sign the agreement. Once again, if the AUSA or the FBI SAC were held to the same standard as I am, they would both be in prison. This is how it all started with an FBI agent that was unqualified to say the least and how the prosecution lied, withheld and committed fraud on the court and myself to save face.

THIS STARTED AS A SECURITIES FRAUD INVESTIGATION

The SEC press release regarding the halted trading of FusionPharm stock states "the commission temporarily suspended trading in the securities of FusionPharm due to a lack of current information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning among other things (1) company assets, (2) company revenues, (3) financial statements, (4) business transactions, (5) and the company's current financial condition. SEE EXHIBIT 1.

I will show that the DOJ and FBI were aware or should have been aware of the fact that SA Funk provided false information regarding her qualifications. For instance, the year she graduated, the fact her degree was in business not accounting, and the year she received her Kansas State certificate. Instead, she was using the title Certified Public Accountant to misrepresent her professional licensing status required under federal regulations required for the forensic financial investigations that are required in securities fraud cases.

The question has been raised "how was she acting as a certified public accountant in this case?" I have had a Colorado licensed and practicing CPA highlight the sections of her affidavit where there is no doubt she was acting in this capacity when she submitted her affidavit in order to secure three different

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 72177 / May 16, 2014

The Securities and Exchange Commission ("Comm iss ion") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange , Act"), of trading in the securities of FusionPharm, Inc. (" FusionPharm " ) of Denver, Colorado, at 9:30 a.m. EDT on May 16, 2014, and terminating at 11:59 p.m. EDT on May 30, 2014.

The Commission temporarily suspended trading in the securities of FusionPharm due to a lack of current and accurate information about the company because of questions that have been raised about the accuracy and adequacy of publicly disseminated information concerning , among other things: (1) the company' s assets; (2) the company's revenues; (3) the company' s financial statements; (4) the company's business transactions; and (5) the company ' s current financial condition. This order was entered pursuant to Section 12(k) of the Exchange Act.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further , brokers and dealers should be alert to the fact that , pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to FusionPharm's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action .

If any broker-dealer or other person has any information which may relate to this matter , they should contact Jay Scoggins at (303) 844-11 05, Kimberly S. Greer at (303) 844-1042, or Ian S. Karpel at (303) 844-1011; of the Division of Enforcement.

search warrants. In addition, I have a legal opinion from an attorney who is also a CPA. In his affidavit, he makes it clear that SA Funk's conduct is felonious. SEE EXHIBIT 2, 2-B

Federal prosecutors claimed in their response to my motion to withdraw my plea that SA Funk was not used in this case - which is not true. The fact is, unlike blue collar crimes, that rely on physical evidence, securities fraud relies on evidence developed through a fornesic financial examination of corporate financial statements and records, which is required to determine if a crime even occurred. The forensic investigation requires the services of a forensic accountant who is a well-educated, highly skilled, expert. The fact the court relied on the misrepresentations provided by SA Funk as being a CPA is proven by the fact the court relied on the inadmissable hearsay evidence provided by an unproven confidential informant (CI) used by SA Funk to establish the tier of the fact to establish her claims being made in rendering its probable cause determination. If SA Funk was not an expert the court could not have relied on her statements to develop evidence to support the probable cause, as such, this proves the court relied on the misrepresentation provided by SA Funk as that of an expert. This renders the probable cause determination to be invalid under the IV amendment to the US Constitution.

This fact was obviously never disclosed to the court as it would then have to return my funds that were illegally seized under the invalid warrants. This also shows that the information was also never properly disclosed prior to entering into any agreement for you to provide cooperation in the return of Jean-Pierre to the United States in order to obtain evidence to support the crimes being alleged against me. Thus violating my 5th Amendment rights against self incrimination. To do so would have required that the AUSA disclose that I was no longer a target of the investigation - which never happened - which means that they failed to disclose that the original warrants were invalid to me or the courts. The fact that any agreement I entered into had to be approved by the Attorney General of his Assistant or the head of the economic crimes section of the US Attorney's Office shows a serious conflict of interest in this case as AUSA Kirsch and SA Funk's husband had a business relationship that was current at the time of this investigation that required AUSA Kirsch to have disclosed this prior to being a part of this case. Kirsch is a part of the ethics committee within the Colorado Bar Association so he was aware of the fact that he had the legal and ethical duty to disclose errors that occurred in this case prior to approving the cooperation agreement that wasa part of the pre-indictment plea agreement. However, the fact that the misrepresentations by SA Funk regarding her status as an expert should have

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, KATE E. FUNK, being duly sworn, depose and state the following:

1. I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2. At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3. I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

   a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4. The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

38. In 2011, FusionPharm purportedly focused on two aspects of the organic produce and agriculture market: (1) growing and selling produce (almost always lettuce); and (2) selling PharmPods in the organic produce industry. According to FusionPharm's 2011 Annual Report, FusionPharm claimed to have made $256,895 in revenues during the 2011 fiscal year. Notably, your affiant's review of FusionPharm's 2011 Annual Report reveals $0 in Accounts Receivable, suggesting that any revenue generated by FusionPharm during the 2011 fiscal year (January 1, 2011 through December 31, 2011) should be supported by incoming deposits in FusionPharm's bank accounts.

39. In the same report, FusionPharm represented to investors that it derived its revenue from organic food sales. FusionPharm touted its relationship with Circle Fresh Farms as its main partner and revenue driver in 2011. Based on your affiant's review of the SEC Produced Records, SEC Analyses, statements by CW-2 and your affiant's independent investigation, FusionPharm did not generate any significant revenue from: (a) Circle Fresh Farms directly; or (b) agriculture-related business. Moreover, it did not generate anywhere close to $256,895 in revenues during the 2011 fiscal year.

40. FusionPharm reported its "successful harvest and sale of its initial crop through its collaboration agreement with Circle Fresh Farms." Your affiant's review of the SEC's Analyses and the Bank Records reveals only one check from Circle Fresh Farms at any time between 2011 and 2013 across the bank accounts of FusionPharm and the Sears Controlled Entities—for $30.60 in 2012 Accordingly, Circle Fresh Farms did not generate any revenue for FusionPharm in 2011.

41. Moreover, CW-2 estimated that FusionPharm only made $3,000 - $5,000 in organic produce sales from 2011 through 2013. Your affiant's review of the Bank Records along with the SEC Analyses of the same corroborates the statements made by CW-2. Your affiant found, and the SEC Analyses confirmed, that there was less than $4,000 worth of organic produce sales across the bank accounts of FusionPharm and the Sears Controlled Entities – and those sales were all in 2012 and 2013. Once again, these sales could not be a basis for claimed 2011 revenue.

42 Furthermore, your affiant's review of the Bank Records and the SEC's Analyses regarding the same provide no evidence of any FusionPharm sales of PharmPods to third parties in 2011. Of the almost $600,000 of incoming funds into FusionPharm's bank account in 2011, nearly 100% of the funds can be traced to: (a) the Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. I have reviewed the SEC Analyses of the Bank Records, wherein the SEC was able to trace the majority of cash deposits and cashier's checks directly back to a corresponding withdrawal from one of the accounts for the Sears Controlled Entities for the same dollar amount on the same day. Your affiant's review of the Bank Records confirms these findings.

43. To ensure that payments from third party customers were not made to one of the Sears Controlled Entities, your affiant reviewed the SEC Analyses concerning the incoming wires and deposits into the Sears Controlled Entities' accounts for 2011. Your affiant found no evidence of any FusionPharm PharmPods sales to third parties in 2011 based upon the following: (a) Sears did not open VertiFresh's bank account until 2012; (b) The Meadpoint account only had a single $100 deposit into the account during 2011

from another Sears Controlled Entity; and (c) Bayside's account was almost wholly funded from incoming wires and deposits from Microcap.

44. Microcap, meanwhile, received over $1.2 million in incoming wires and deposits in 2011. Of that amount, approximately 99% came from wire transfers. Based on my review of the Bank Records and Brokerage Records, these wire transfers originated from Microcap's brokerage account. The Brokerage Records confirm that nearly all of the money coming into Microcap's brokerage account in 2011 came from sales of FusionPharm common stock. The remaining 1% that came into Microcap's bank account is 2011 was comprised almost entirely of a single deposit from Bayside.

45. As a result, there is no evidence that the money coming into FusionPharm's accounts or the accounts in the name of the Sears Controlled Entities was the result of legitimate sales of produce or PharmPods. Rather, the source of the money appears to the sale of FusionPharm stock, which was then funneled between and among the Sears Controlled Entities.

**MISREPRESENTING SALES REVENUE IN 2012**

46. In its 2012 Annual Report, FusionPharm represented that its net revenues for the year ended December 31, 2012 were $808,398 an increase of 250+% compared to 2011. When asked if these figures seemed accurate, CW-2 said this revenue figure was "impossible" as the most revenue that could have come into FusionPharm from PharmPod sales in 2012 was $160,000. CW-2 was aware of only one deal in 2012 to a customer in Arizona for eight PharmPods. CW-2 helped load the PharmPods for delivery. CW-1 said these figures were "bullshit" and "crazy." Based on your affiant's

review of the Bank Records and SEC Analyses regarding the same, FusionPharm did make anywhere close to $825,594—or even $160,000—in revenue in 2012.

47. In comparison to 2011, the 2012 Annual Report did disclose significant accounts receivable – over $500,000. Accordingly, your affiant and the SEC analyzed the Bank Records to determine if there was evidence to support approximately $300,000 in incoming revenues in 2012.

48. Based on your affiant's review of the Bank Records and the SEC's Analyses regarding the same, FusionPharm had approximately $400,000 in incoming wires and deposits into its accounts in 2012. As in 2011, nearly 100% of the funds can be traced to: (a) Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. As with 2011, the SEC was able to trace most of the cash deposits back to corresponding cash withdrawals at other Sears Controlled Entities. Your affiant reviewed the Bank Records and the SEC's Analysis on this point and corroborated this conclusion.

49. The SEC and your affiant also reviewed the Bank Records for the Sears Controlled Entities in 2012. The Meadpoint and VertiFresh accounts in 2012 had a very similar pattern – significant deposits and wires coming in to the accounts from other Sears Controlled Entities with little-to-no evidence of any incoming deposits or wires coming into the account from unaffiliated third parties. Consistent with 2011, the majority of the funds coming in to the VertiFresh and Meadpoint accounts were from Bayside and Microcap. More importantly, your affiant's review of the Bank Records reveals evidence of only one possible third-party sale of a PharmPod, with

51. Based on my review, investigation and analysis above, the money coming into FusionPharm's and the Sear Controlled Entities' bank accounts was ultimately the result of Microcap selling FusionPharm stock on the open market, and re-circulating portions of those proceeds to the other Sears Controlled Entities.

**RESTATEMENT TO 2012 SALES REVENUE STILL INCLUDES MISREPRESENTATIONS**

52. On April 15, 2014, FusionPharm issued its 2013 Annual Report, which included a restatement of 2012 annual revenue, reversing $500,000 of 2012 revenue. The newly stated revenue with the reversal was $308,398. The restatement clarified that $750,000 of initial claimed revenue was purportedly attributable to an "exclusive licensing arrangement with [VertiFresh] for the use of PharmPods growing technologies for agricultural products."

53. The restatement claimed that VertiFresh paid $250,000 in 2012 in connection with the purported licensing agreement mentioned above, but that the remaining $500,000 was reflected as revenue in error under GAAP. With the restatement, FusionPharm claimed that it only made an additional $58,398 ($308,398 - $250,000) outside of the licensing revenue from VertiFresh – a figure far more consistent with actual 2012 PharmPod sales based on your affiant's review of the Bank Records, statements made by CW-2 and CW-1 and the SEC's Analyses.

54. However, based on my review of the SEC Produced Records, the SEC Analyses and your affiant's experience and background in accounting, the reported revenue remains inaccurate for at least three reasons:

a. First, as detailed herein ¶¶68-72, nowhere in the Restatement does FusionPharm disclose that VertiFresh is an affiliate owned, operated and controlled by Sears, a FusionPharm control person.

b. Second, even if the revised $250,000 figure could be a legitimate third party transaction, and even if the revenue could be properly recognized under GAAP, FusionPharm misrepresented the basis for possibly recognizing this amount as revenue. In Note 4 to FusionPharm's 2013 Annual Report, FusionPharm claims that "The restatement was based on reevaluating the arrangement with VertiFresh which required $250,000 be paid during 2012 for the licensing of the Colorado territory (on a nonrefundable basis), and the remaining $500,000 to be due in equal installments of $250,000 during 2013 and 2014 for the rights to two additional territories. The initial $250,000 was paid during 2012 and was reflected as earned revenue. Yet, according to the SEC analyses of the Bank Records, and my review of the same, VertiFresh only contributed approximately $128,000 in deposits and wires to FusionPharm in 2012.

c. Third, CW-2 said that FusionPharm did not sell any licenses or receive any licensing income while she worked at FusionPharm, which includes 2012.

## MISREPRESENTING 2013 SALES REVENUE AND BUSINESS DEALS

55. In its 2013 Annual Report, FusionPharm claimed that it made $594,397 in revenue in 2013. Based on your affiant's review of FusionPharm's 2013 Annual Report, FusionPharm did not have any accounts receivable at the end of 2013. In an email

conversation with UC-1 on April 30, 2014, Dittman confirmed the 2013 revenue was all from the sale of PharmPods. In a subsequent meeting on May 1, 2014, Dittman stated that FusionPharm delivered 34 PharmPods in 2013.

56.    CW-1 said that it was "impossible" that the company could have earned these revenues in 2013. Although CW-1 only worked at FusionPharm until October 2013, your affiant's comparison of FusionPharm's September 2013 quarterly financial disclosure comparison, which claimed a cumulative revenue figures of $549,725 through the company's third quarter, with the year-end revenue claimed in FusionPharm's 2013 Annual Report, $594,397, reveals that FusionPharm only claimed to make $44,672 in revenue in the last quarter of 2013. Accordingly, the bulk of the revenue purportedly came during the time that CW-1 worked at FusionPharm.

57.    Furthermore, there were only three PharmPods at the warehouse when CW-1 arrived in January 2013: (a) two were used to grow lettuce; and (b) one was not functioning. Additionally, according to CW-1, there were not any deals in place to sell any PharmPods in 2013 when he started. Throughout 2013, CW-1 was responsible for: (a) preparing PharmPods for sales to customers; and (b) constructing the PharmPods kept at the warehouse where FusionPharm would grow cannabis. This meant that any FusionPharm PharmPod 2013 sales required CW-1 to be involved in the refurbishing and retrofitting of the shipping containers prior to delivery. CW-1 did not believe it was possible for FusionPharm to have sold anywhere close to 34 PharmPods while he was employed without his knowledge.

58.    According to CW-1, there were two possible revenue sources in 2013: (a) sales of PharmPods; and (b) sales of marijuana. CW-1 said that the most revenue that

could be derived from PharmPod sales in 2013 was $200,000-$250,000 – and CW-1 stated that those figures were a high estimates. CW-1 identified, at most, two possible sales between January – October 2013: (a) FusionPharm sold two PharmPods to a customer in California; and (b) FusionPharm sold five PharmPods to Local Products, a Denver company.[8]

    a. CW-1 said there might have been an additional, single PharmPod sale to Mile High Green Cross in 2013, but he could not be sure. Dittman told CW-1 that FusionPharm "gave away" a PharmPod to Mile High Green Cross so CW-1 was not sure that this could be classified as a "sale." Based on your affiant's review of the Bank Records, Mile High Green Cross did provide funds to Meadpoint – but this was in 2012. There is no evidence that Mile High Green Cross made any payments to FusionPharm or the Sears Controlled Entities in 2013.

59.    Based on the statements from CW-1, FusionPharm did not sell more than 7 PharmPods between January – October 2013. Yet FusionPharm continued to make representations to the contrary to the public. For example, on February 6, 2013 the company issued a press release claiming it "completed the sale of 8 PharmPod High Intensity containers under its licensing agreement with Meadpoint Venture Partners." CW-1 said there were multiple problems with this: (a) since Dittman and Sears operated the Sears Controlled Entities and FusionPharm as one entity, this release was basically claiming a sale to itself; and (b) as noted above, CW-1 could recall, at most, 7 PharmPod sales *total* in 2013.

---

[8] As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company. CW-1 has revised that statement to match the sales highlighted in ¶58.

60. Additionally, Sears's company, Meadpoint directly participated in the misrepresentations. For example, on July 29, 2013, Meadpoint issued a press release that appears on the FusionPharm web page announcing that it "reached the $200,000 mark for sales in the past 30 days, including its first ever sale into the California medical cannabis marketplace." The press release also claimed that Meadpoint was "optimistic that we will reach our annual sales goal of 100 PharmPods by the end of the year." CW-1 said that delivering 100 PharmPods to customers in 2013 was "ridiculous" and not even close to actual figures. Moreover, CW-1 said that the $200,000 figure may have been an annual amount, but certainly not in the last 30 days. Furthermore, based on affiant's review of the Bank Records, there is no evidence of $200,000 coming in to FusionPharm's or Meadpoint's bank accounts between June 2013 and July 2013 from companies that are not affiliated with Sears or Dittman.

61. For the second possible revenue stream, FusionPharm grew cannabis and sold it to Goundswell, a licensed marijuana retailer on record with the Medical Marijuana Enforcement Division in Colorado, in the latter part of 2013.

62. Based on your affiant's review of the Bank Records, SEC's Analyses of the same, and CW-1's statements, there is little evidence that Goundswell made up the remainder of the claimed 2013 revenue. In fact, there is only one check or incoming wire from Goundswell in 2013: a $50,000 check to FusionPharm on August 15, 2013.

63. While your affiant observed some significant transactions in the fourth quarter of 2013, Dittman told UC-1 a portion of the December orders were not recognized as revenue because they were not yet delivered. FusionPharm's 2013

Annual Report confirms this statement. Importantly, as noted above in ¶56, FusionPharm made, at most, $44,672 in revenue in the last quarter of 2013.

64. For the first three quarters of 2013 when CW-1 worked at FusionPharm, based on your affiant's review of the Bank Records and SEC's Analyses regarding the same, as well as statements from CW-1, there is no evidence that FusionPharm made $549,725 or sold 34 PharmPods.

**ADDRESSING CONCERNS OF CASH PAYMENTS**

65. Dittman told UC-1 on May 1, 2014 that one of FusionPharm's vendors made cash payments between 2011 and 2013. In an effort to ensure that cash payments were not dismissed as a potential legitimate revenue source, the SEC conducted an analysis of FusionPharm's bank accounts and the accounts in the name of the Sears Controlled Entities to determine if a conservative analysis of the cash transactions could provide sufficient revenue to match the numbers claimed by FusionPharm in its financial disclosures.

66. Even after including all cash deposits that could not be directly traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account, based on a review of the Bank Records and SEC Analyses regarding the same, your affiant was unable to get anywhere near the revenues that FusionPharm included in the Financial Statements for 2011, 2012 or 2013.

a. 2011: Your affiant found less than $25,000 worth of incoming deposits and wires that could be considered from unaffiliated third parties.

b. 2012: Your affiant uncovered approximately $200,000 in incoming wires and deposits. Of that amount, approximately $128,000 came from

VertiFresh (discussed above in ¶¶ 52-54), approximately $35,000 in cash and approximately $47,000 from Bayside, MeadPoint and a missing check with the notation "container deposit."

c. 2013: Your affiant uncovered approximately $425,000 in incoming wires and deposits in 2013. More than 50% of this amount was cash deposits, with many of these traceable back to Meadpoint. The majority of the remaining checks were from Sears Controlled Entities.

67. Accordingly, even if it were to be assumed that every cash deposit which could not be traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account was the byproduct of a legitimate, arms-length transaction, the maximum possible revenue under my conservative approach was still more than $100,000 short every year of the revenue claimed by FusionPharm.

**OTHER MISREPRESENTATIONS TO INVESTORS**

68. As noted in ¶¶19-20 above, Sears handled numerous responsibilities at FusionPharm that are often reserved for a company officer. Yet, based on statements from CW-1 and CW-2, Sears refused to put his name on any FusionPharm documents or accounts. Rather, Sears attempted to get FusionPharm employees (including CW-1 and CW-2) to open up bank accounts and businesses in their names.

69. Based on affiant's review of the FINRA Records, Dittman authored FusionPharm's press releases and reviewed its financial statements. Yet, based on affiant's review of the same, Dittman never made any disclosures about Sears's involvement with FusionPharm or the connection between Sears, the Sears Controlled Entities and FusionPharm.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

**AFFIDAVIT OF STEVEN R. ANDERSON, CPA, JD**

---

Steven R. Anderson, being of lawful age and upon his oath, deposes and states:

1. I am an attorney licensed to practice law in the State of Colorado since 1987, and co-founder and managing partner of Anderson & Jahde, PC, 5800 South Nevada Street, Littleton, Colorado 80120.

2. I also hold an inactive certified public accountant license in Colorado, having received my certification and license to practice public accounting in the State of Colorado in 1984.

3. My practice focuses on Federal & State, civil and criminal tax controversies and trials; and, on representing accountants, tax return preparers and CPAs in all professional facets, to include CPA malpractice defense, representing CPAs before the Colorado State Board of Accountancy (and other state licensing boards), representing CPAs before the American Institute of Certified Public Accountants, and representing accountants before the IRS' Office of Professional Responsibility. I have represented and



consulted between 150 and 200 CPAs in cases before the Colorado State Board of Accountancy.

4. I do not have an exact number on how many, but a portion of the Board of Accountancy cases I have worked on involved CPAs who had relocated from other states to Colorado and were defending complaints before Colorado's Board of Accountancy (the "Board") because they did not understand Colorado's rules pertaining to holding out as a CPA in Colorado. I frequently work with Colorado's statutes governing CPAs and with the Rules of the Board. I have reviewed the CPA rules and statutes in Kansas.

5. I was asked to review the propriety of Special Agent Kate Funk's use of a CPA designation on search warrant applications related to cases involving William Sears, Scott Dittman, and Fusion Pharm, LLC, which were filed in the United States District Court for the District of Colorado.

6. Colorado's rules deem this a holding out as a CPA in Colorado that requires qualifications Ms. Funk does not have. She is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado.

7. Ms. Funk passed the CPA exam in Kansas, but never completed the Kansas requirement of having one year of qualified work experience to earn a Kansas "permit" to practice as a CPA. Kansas and Colorado have different legal structures for becoming a CPA authorized to practice as a CPA. In Kansas you obtain a CPA "certificate" (which Ms. Funk has) by meeting educational requirements and passing the CPA exam. Then, you must have the year of qualified work experience after which you may obtain a Kansas "permit" to practice as a CPA. Ms. Funk does not have a "permit" to practice as a CPA in Kansas.

8. Colorado combines education, passing the CPA exam and one year of qualified work experience before you can obtain a CPA "certificate." Colorado does not issue "permits" for individual CPAs See, *C.R.S. §§ 12-2-108 and 12-2-109, and Rule 4.1 Colorado Board of Accountancy*. This difference between the states is key. Colorado does not allow someone from another state without one year of qualified work experience to hold themselves out as a Certified Public Accountant or use "CPA." *C.R.S. § 12-2-115(3).*

9. Within the last year, I represented *a* Kansas CPA before the Board who was fully licensed in Kansas, with a Kansas permit, who used "CPA" on a business card handed to one client. The Board held this individual in violation of Colorado's statutes for improperly holding herself out as a CPA in Colorado. She did not first get reciprocity from Colorado. Ms. Funk's holding out was more egregious because she has no Kansas permit.

10. On the Affidavit for Search Warrant, Special Agent for the Federal Bureau of Investigation, Kate E. Funk, wrote, "[p]rior to my employment with the FBI, I received an accounting degree from the University of Kansas in 1995. I became a certified public accountant in 1996 through the State of Kansas." Again, Ms. Funk has a Kansas certificate, not a permit to practice as a CPA. Clearly, Ms. Funk wanted the Court and others to rely on her statements in her affidavit as if they were provided by a CPA who had met Colorado's requirements to be a CPA. She is not recognized as a CPA in Colorado. I also checked the Kansas Board of Accountancy website and found an FAQ that addresses whether Ms. Funk could provide litigation support services (which is what

she did by submitting the affidavit) without having a permit in Kansas. She cannot. Here is the Q&A from the Kansas Board of Accountancy website:

**6. I don't provide any attest services. Am I required to hold a permit to practice to provide non-attest services as a CPA?**
Yes. Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, all fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, requires a person to hold a valid Kansas permit to practice. For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf The definition is broken out into two categories: atttest and non-attest.

Ms. Funk violated the laws of Colorado by claiming she is a Certified Public Accountant, intending for the Court and others to rely on her statements with the full level of trust, training and competence those statements would have had they been made by a CPA. Even under Kansas law she could not provide the litigation support services she provided here in Colorado.

11. She made the same statement in an affidavit to support an application for search warrant to search email accounts for William Sears, Scott Dittman, and others.

12. According to the records of the University of Kansas, Kate Egan graduated in 1996, not 1995.

13. According to the records of the State Board of Accountancy for the State of Kansas dated December 24, 2017, Kate Egan was issued a CPA certificate on August 4, 1999, not in 1996 as she claimed in Affidavits filed.

14. I am informed, and therefore do believe, that Kate Egan is the same person as Kate Funk. I also have been informed and do believe that Kate Funk has moved to and does reside in Denver, Colorado and not in Chicago, Illinois, and has done so for many years.

Case 1:16-cr-00301-WJM Document 173-2 Filed 08/01/19 USDC Colorado Page 5 of 6

15. Once one becomes a resident of the State of Colorado, and desires to hold themselves out as a CPA in Colorado, they must obtain reciprocity and a license from the Board to hold themselves out as a CPA in Colorado. Ms. Funk could not have accomplished this because she had no Kansas permit. According to the Board's website: "To apply for a license in Colorado one must satisfy the following:

- Holds an active license from a substantially equivalent jurisdiction and/or possesses the requirements necessary for issuance of a license in Colorado.
- Attests to having completed all CPE required by the other state as of the application receipt date"

Kate Funk formerly known as Kate Egan could not obtain reciprocity because her Kansas certificate is not the equivalent to being a CPA in the State of Colorado.

16. Kate Funk has no professional CPA credential in Colorado. Therefore, she is not qualified as a CPA to offer opinion testimony on the appropriateness of revenue recognition or other applications of Generally Accepted Accounting Principles (GAAP) and Generally Accepting Auditing Standards (GAAS). I have reviewed an Affidavit drafted containing opinions by Kate Funk regarding revenue recognition and disclosure requirements for FusionPharm, and it is my opinion as a licensed lawyer and licensed inactive CPA in the State of Colorado, that Kate Funk was not qualified to render said opinions in her Affidavit as a CPA and violated Colorado's laws by doing so.

17. Colorado Revised Statute § 12-2-129 makes it a Class 2 Misdemeanor to use the CPA designation in Colorado when one is not authorized to do so; and a class 6

Case 1:16-cr-00301-WJM Document 173-2 Filed 08/01/19 USDC Colorado Page 6 of 6

felony for any subsequent offense. Kate Funk appears to have violated this criminal statute.

FURTHER AFFIANT SAYETH NAUGHT.

[signature]
Steven R. Anderson

6-18-19
Date

STATE OF COLORADO )
) ss.
COUNTY OF Arapahoe )

Subscribed and sworn to before me by Steven R. Anderson this 18th day of June, 2019.

Witness my official hand and seal.

MARCIE J MORTON
NOTARY PUBLIC
STATE OF COLORADO
Notary ID 20034028692
My Commission Expires 08/26/2019

Marcie J Morton
Notary Public

My commission expires: 8-26-2019

been easily discovered in the review of this case by AUSA Kirsch who has over 20 years experience, as such this calls into question the reason why this was not disclosed to the court and the defense prior to his approval of the cooperation agreementthat required me to assist in returning Jean-Pierre to the United States and any other cooperation required in this case, as it appears from his failure to disclose his business relationship with the law offices of Perkins Cole, including T. Markus Funk, the husband of SA Funk affected his professional judgement required in the performance of his duties and as such calls into question his failure to properly disclose this relationship resulted int he additional discovery of evidence used to charge me in violation of my 5th Amendment rights. This supports the fact that there was misconduct on the part of the federal prosecutors used to coerce me into a plea which the prosecution knew was based on a violation of the 4th and 5th Amendments to the US Constitution which amounts to misconduct on the part of the federal prosecutors and the fact that none of this was disclosed to the court or me prior to entering the plea agreement renders the agreement to be invalid and the fact that it was the product of intentional fraudulent misrepresentation by federal prosecutors renders them liable for the losses suffered due to their misconduct. This shows there was on-going and continuing misconduct that affected the unbiased functioning of the court based on the charges being brought without regard to the harm that was caused by being unjustly accused of criminal offenses, proving there is a serious problem that exists within the criminal justice system. The fact that they lacked the evidence required to enter into an agreement that required my cooperation which was used to illegally obtain evidence required to support the crimes being alleged without which they had no evidence to support shows a complete disregard of the intentional harm caused to me by their failure to perform the duties renders them liable for their intentional and deliberate acts that resulted in my unjust conviction and others who have been unjustly convicted as a result of the deliberate and ongoing fraud on the court perpetrated by SA Funk and others involved in the investigation and prosecution of this case.

QUALIFICATIONS TO PERFORM A
SECURITIES FRAUD FINANCIAL INVESTIGATION

This investigation requires that the regulations of the Commission apply as this was a referral and a parallel investigation. It fully relied on the financial investigation by SA Funk who failed to meet the requirements of practice to transact business with the Commission. As such, the Commission failed to insure the qualifications of the person they provided confidential information to regarding Mr. Sears including his personal, business, and trading accounts which is in violation of the Commission's own regulatory requirements. Please note the following:

17 CFR §201.102 - Appearance and practice before the Commission

(f) Practice defined. For the purpose of these rules of practice, practicing before the Commission shall include but shall not be limited to:

(1) Transacting any business with the Commission; and

(2) The preparation of any statement, opinion or other paper by any attorney, accountant, engineer, or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert.

17 CFR § 210.2 - 01 Qualifications of accountants.

(a) The Commission will not recognize any person as a CPA who is not duly registered and in good standing as such under the laws of the place of his residence or principal office. The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.

Under the definitions section this shows that the definitions of this section apply to licensing requirements under the following:

17 CFR § 201.101 - Definitions.

(4) Enforcement proceeding means an action, initiated by an order instituting proceedings, held for the purpose of

determining whether or not a person is about to
violate, has violated, has caused a violation of, or
has aided or abetted a violation of any statute or
rule administered by the Commission, or whether to
impose a sanction as defined in Section 551(10) of the
Administrative Procedures Act, 5 U.S.C. 551(10):

Under the Administrative Procedures Act 5 U.S. Code § 551. Definitions as
it relates to this investigation and licensing it applies by definition to:

For the purpose of this subchapter -

(1) "agency" means each authority of the Government of the
United States, whether or not it is within or subject to
review by another agency, but does not include -

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions
of the United States;

(D) the government of the District of Columbia.

And it applies to any agency that holds the power over a person's freedom
which is shown in the Administrative Procedure's Act 5 U.S. Code § 551(10):

(10) "sanction" includes the whole or a part of an agency -

(A) prohibition, requirement, limitation, or other
condition affecting the freedom of a person;

(B) withholding relief;

(C) imposition of a penalty or fine;

(D) destruction, taking, seizure, or withholding of
property;

(E) assessment of damages, reimbursement, restitution,
compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a
license; or

(G) taking other compulsory or restrictive action.

Under the Code of Federal Regulations contained in 17 CFR Part 210 which is
used to define an accountant's report

§ 210.1 - 02(a)(1) - Accountant's Report. The term accountant's
report is "used in regard to financial statements,
means a document in whcih an independent public or
CPA indicates the scope of the audit (or examination)
which he has made and sets forth his opinion of the
financial statements taken as a whole, or an assertion

to the effect that an overall opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor shall be stated."

IMPERMISSIBLE GOVERNMENT CONDUCTING
UNQUALIFIED INVESTIGATOR

I have discovered impermissible misconduct on the part of SA Funk, who is the sole source of evidence relied upon by the courts in rendering its probable cause determinations in this case. This investigation was the basis for the asset forfeiture that SA Funk claimed FusinoPharm to be a Ponzi scheme, which was proven not to be the case in SA Funk's own investigation. The government never disclosed the fact that SA Funk provided perjured testimony when she attested to the information contained in her sworn affidavits.

In SA Funk's sworn affidavit in support of search warrant dated May 15, 2014, whereby in paragraph 1 on page 1, SA Funk stated under oath, "I became a certified public accountant in 1996 through the State of Kansas." EXHIBIT 3

She then repeats this claim again in the second sworn affidavit in support of search warrant dated November 28, 2014, in paragraph 1 on page 1, SA Funk whereby again, she states under oath, "I became a Certified Public Accountant in 1996 through the State of Kansas." EXHIBIT 3

**It is important to note that nowhere in the either of these two documents does SA Funk use the initials "CPA" behind or after her last name, as was claimed by AUSA Sibert in his response to the defendant's motion to withdraw his plea previously filed on April 19, 2019.**

After reviewing the Kansas Board of Accountancy website, it was discovered that Kansas does not comply with the requirements of the Uniform Accountancy Act (UAA), as it requires a two-tiered regulatory standard for the licensing of CPA's, which was abolished under the UAA. Prior to the passage of the UAA, most states had the two-tiered regulatory requirements for the licensing of CPA's. This required being issued a certificate and a license in order to meet the requirements. However, after it was discovered that many holding only a certificate but did not complete the requirements to be legally licensed were falsely claiming to be CPA's. All the while providing services to individuals, businesses, academia and government and falsely claiming to be licensed when they were not. It was these violations that led to the passage of the UAA in order to be established.

A Kansas issued certificate is not a license, as it is issued prior to meeting the regulatory standards for licensing. Because it is not a license and the reason, the Kansas issued certificate is not valid without also

3

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, KATE E. FUNK, being duly sworn, depose and state the following:

1. I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2. At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3. I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4. The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

obtaining a valid permit (license). This is plainly stated on the Kansas Board of Accountantcy website. SEE EXHIBIT 4

A search of the Kansas Board of Accountantcy website found no listing for Kate Funk being issued a license as a CPA in Kansas. A wild card attempt was made using the first name Kate and there was only one named returned, Kate Egan. While the information did not match what SA Funk stated in her sworn affidavit, a public record check verified that Egan was in fact SA Funk's maiden name. It was then learned that Egan (a.k.a. Funk) did not hold the permit required under Kansas law to claim to be a CPA, as she only held the certificate but not the required license (or permit) required by regulation to use the professional credentials of CPA. The Kansas issued certificate is not a standalone license as it is under the standards for the UAA. EXHIBIT 5

The NASBA website Verify PA, is an excellent source of information which explains the Kansas issued certificate is not a license under the regulatory requirements established for the licensing of CPA's. It also addresses the legal limitations imposed on those who hold only a Kansas issued certificate, a review of the information regarding Kate Egan is included here. SEE EXHIBIT 6

On April 19, 2019, the same day that defendant's counsel filed the motion to withdraw his plea for various reasons that were not addressed properly and the reason why it is necessary for Mr. Sears to represent himself here now. It was noticed the same day of that filing that SA Funk changed her name on her Kansas issued certificate. While Funk had not changed her name legally after she was married in 2009, it seems a bit odd that she would choose that specific day to make that change. However, her name has nothing to do with the legal reason why she is not a CPA, although it does confirm the fact that SA Funk and Kate Egan are the same person who holds the Kansas issued certificate number 8757. SEE EXHIBIT 7

(1) AICPA (https://www.aicpa.org)

(2) NASBA (https://www.nasba.org)

(3) Kansas Board of Accountants (http://www.ksboa.org/applyCertificate)

MORE FRAUDULENT CLAIMS

It was also discovered that SA Funk provided inaccurate information regarding several items contained in ¶1 on p. 1 of her sworn affidavits. This includes the year she was issued a certificate. According to the Kansas Board of Accountancy website Egan was not issued a certificate in 1996 as she claimed. Instead, it was issued in August 1999. According to the Kansas



KANSAS BOARD OF ACCOUNTANCY
Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: ksboa@ks.gov

Apply for Certificate | Apply for Permit | Change of Address | Contact Us
CPA Exam Info. | CE | FAQ's | Firm Registration
Forms | Laws & Regs | Online Firm Renewal | Newsletter
Online Permit Renewal | Peer Review | Search -- Firm | Search -- Individual

Home
Board of Directors
Board Meeting Dates, Agendas & Minutes
Complaint Form
CPA Exam Pass List
CE requirements
Disciplinary Actions
FAQ's
Fees
Firm Search
Forms
Helpful Links
Individual Search
Laws & Regulations
Peer Review
Proposed Regulation Amendments
Site Map
Site Tools Download Center
Contact Us

## Apply for a Certificate

**PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU THAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.**

**NOTE: KANSAS IS A TWO-TIERED STATE. YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE. THE CERTIFICATE DOES NOT ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.**

Below are the forms required to be submitted to obtain a Kansas CPA Certificate:

**CPA Certificate by passing the exam in Kansas--Fee: $50.00**

- http://www.ksboa.org/pdf/app_exam.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf

**CPA Certificate by reciprocity, or for transfer of grades—Fee: $250.00**

- http://www.ksboa.org/pdf/app_recip.pdf
- http://www.ksboa.org/pdf/app_transfer.pdf
- http://www.ksboa.org/pdf/auth_exch.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--this is the order information)

Page Last Updated: 04/30/2018 21:44:52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

Kansas Board of Accountancy -- KSBOA.org -- 785-296-2162 http://oitsapps.ks.gov/boa/IndividualLicenseeInformation.aspx?ID=9211...

KANSAS BOARD OF ACCOUNTANCY
Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home >> Search for Firms

## Individual Information

[ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Egan | **Certificate Status:** | **Active** |
| **Address:** | 22 N Morgan Unit 210<br>Chicago, IL 60607-0000 | **Permit Status:** | |
| **Firm/Employer:** | Sprint | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |

Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

1 of 1 1/6/2018, 10:40 AM



KANSAS BOARD OF ACCOUNTANCY
Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: ksboa@ks.gov

Apply for Certificate
Apply for Permit
Change of Address
Contact Us
CPA Exam Info.
CE
FAQ's
Firm Registration
Forms
Laws & Regs
Online Firm Renewal
Newsletter
Online Permit Renewal
Peer Review
Search -- Firm
Search -- Individual

Home
Board of Directors
Board Meeting Dates, Agendas & Minutes
Complaint Form
CPA Exam Pass List
CE requirements
Disciplinary Actions
FAQ's
Fees
Firm Search
Forms
Helpful Links
Individual Search
Laws & Regulations
Peer Review
Proposed Regulation Amendments
Site Map
Site Tools Download Center
Contact Us

## Apply for a Certificate

**PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU HAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.**

**NOTE: KANSAS IS A TWO-TIERED STATE. YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE. THE CERTIFICATE DOES NOT ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.**

Below are the forms required to be submitted to obtain a Kansas CPA Cert ificate :

**CPA Certificate by passing the exam in Kansas--Fee: $50.00**

- http://www .ksboa .org/ pdf/ app_exam .pdf
- htt p:/ / www .ksboa.org/pdf/oath.pdf
- http://www .ksboa .org/ pdf/ et hics.pdf

**CPA Certificate by reciprocity, or for transfer of grades-Fee: $250.00**

- http://www .ksboa .org/ pdf/ app_recip .pdf
- htt p:/ /www .ksboa .org/ pdf/ app_t ransfer .pdf
- htt p:/ /www .ksboa.org/ pdf/ aut h_exch .pdf
- htt p:/ / www .ksboa.org/pdf/oath.pdf
- http:/ / www .ksboa .org/ pdf/ et hics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--t his is the order info rmat ion)

Page Last Updated : 04/ 30/ 2018 21: 44 : 52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

12/24/17 11:16:00

**CPAVerify Individual Report Results**

---

NAME: **KATE EGAN**
STATE OF LICENSE: **KS**
LAST UPDATED: **2017-12-24**

| | |
|---|---|
| **Address:** | **Mail**<br>CHICAGO, IL, |
| **License/Permit/Certificate Number:** | 8757 |
| **Registration Number:** | |
| **License/Permit/Certificate Status:** | ACTIVE CERTIFICATE |
| **License/Certificate Status Details:** | The certificate is in good standing. |
| **License Type:** | CPA. |
| **License Type Details:** | CPA Certificate. In Kansas, a certificate is not a license so therefore, a certificate holder who does not also have an active permit may not hold out, perform or offer to perform services as a CPA. The person may use the title CPA in connection with their employment in industry. |
| **Basis for License:** | |
| **Issue Date:** | 1999-08-04 |
| **Expiration Date:** | |
| **Enforcement, Non-Compliance or Disciplinary Actions:** | None Reported To This Site By The Board |
| **Other Information:** | IN KANSAS, A CERTIFICATE IS NOT A LICENSE. ONLY THOSE WHO HAVE PERMITS (ALSO KNOWN AS LICENSES) ARE ALLOWED TO HOLD OUT AND PROVIDE OR OFFER TO PROVIDE SERVICES TO THE PUBLIC AS A CPA. IF THE PERMIT STATUS DOES NOT REFLECT "ACTIVE", THAT INDIVIDUAL IS NOT LICENSED TO PRACTICE.<br><br>CPAVERIFY INCLUDES ALL CERTIFICATE HOLDERS AND PERMIT HOLDERS. If an individual has a permit, their permit record and their certificate record will show. Only a certificate record will show for non-licensed certificate holders.<br><br>If Permit Number shows N/A that means this person had a permit to practice at one point, but let it lapse. When the permit lapses in that case, so does the permit number. If permit shows Lapsed it means that this person once had a permit (license) to practice, but has since let them lapse. This individual is not licensed to practice as a CPA in Kansas. |

Contact the Board for official verification of information.

| | |
|---|---|
| **State Board Contact Information:** | KANSAS BOARD OF ACCOUNTANCY<br>LANDON STATE OFFICE BUILDING<br>900 SW JACKSON, SUITE 556<br>TOPEKA, KS 66612-1239<br><br>Phone: 785-296-2162<br>Fax: 785-291-3501<br>Email: INFO@KSBOA.KS.GOV<br>Licensee Lookup: http://www.da.ks.gov/boa/searchforindividual.aspx |

---

Details of Enforcement, Non-Compliance or Disciplinary Actions:

1. If "Contact State Board For Details" is displayed then the State Board has reported some type of enforcement, non-compliance or disciplinary action to this site and the State Board should be contacted for full details about the action reported.
2. If "None Reported To This Site By The Board" is displayed then the State Board provides enforcement, non-compliance and disciplinary action data to this site and none was indicated for this record.
3. If "State Does Not Provide This Type of Data At This Site" is displayed then CPAverify is not currently receiving enforcement, non-compliance or disciplinary action data for licensees in this state. Some states are limited to sharing this type of data with third party websites due to privacy laws or policies, but most State Boards offer this information on their official State Board websites.
4. Contact the State Board for official verification of all enforcement, non-compliance and disciplinary activity.

**The results shown here include all data made available by participating states. Additional data about the individual or firm may exist and is not shown here for other states that are not yet participating in the CPAverify website. Please refer to the Participating States tab for more information about which states are currently sharing their licensing data for use with this website and for clarification about which states these results do not include. If**

KANSAS BOARD OF ACCOUNTANCY
Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home >> Search for Firms

**Individual Information** [ Back to Search Results | Search Again ]

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Funk | **Certificate Status:** | Active |
| **Address:** | 8000 E. 36th Ave.<br>Denver, CO 80238-0000 | **Permit Status:** | |
| **Firm/Employer:** | Federal Bureau of Investigation | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |

Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

University Alumni Association website it indicates Egan did not graduate from Kansas University in 1995 but instead indicates Egan graduated in 1996. The Alumni Association also shows KU did not offer a bachelor's degree in accounting therefor Egan cannot have a degree in Accounting as she states. It does, however, show that she earned a degree in "Business". This means that she is not eligible for any exempts for licensing that occured in Kansas in 1996, as there are no "grandfathered" exceptions applicable in 1999. However, this does indicate a deceptive pattern of behavior on the part of SA Funk and calls into question the hiring practices of the FBI and the DOJ which is responsible for supervising the hiring in the FBI. SEE EXHIBITS 8

I wish to call attention to the Kansas Laws of Accountancy that require CPA's to possess both the Kansas issued certificate and permit to practice prior to holding out to be a CPA or to practice as such before the courts, this fact is clearly addressed under the laws governing the licensing of CPA's in Kansas. (KS Stat § 1-316(a)(2012)) SEE EXHIBIT 9

SA Funk has violated the statutes and regulations governing the licensing and practice of CPA's in Colorado and every State in the United States, including Kansas by claiming to be a CPA, which she is not because she does not hold the required permit which is a license in Kansas. SEE EXHIBIT 10

As the Kansas issued certificate is provided prior to the license, this means the Kansas issued certificate holds no meaning outside of Kansas nor does it provide the holder the ability to use the professional designation in legal proceedings. Doing such provides the false status of being a financial expert which comes with the commitment required to be a licensed and practicing CPA. This case was handed to the FBI by the SEC. Now, **let us keep in mind the SEC's requirements to be recognized as a CPA.**

The Securities and Exchange Commission Federal Regulations under: 17 CFR §210.2 - 01 - Qualifications of Accountants:

(a) The Commission will not recognize any person as a CPA who is not duly registered and in good standing as such under the laws of the place of his residence or principal office. The Commission will not recognize any person as a public accountant who is not in good standing and entitled to practice as such under the laws of the place of his residence or principal office.

(b) The Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgement on all issues encompassed within the accountant's engagement. In determining

8

Join or Give News Events & Programs Networks About Resources Info for: Adams Alumni C

Search...

Home » Resources » Manage My Profile » First-time Registration

## Resources

Community Home
My Profile
Online Directory
Career Center
Kansas Alumni magazine
Shop for KU Merchandise
KU Websites
Just for Fun
Kansas Alumni Magazine

## Manage My Profile

Login/Logout
First-time Registration
Change Password
Class Notes
Email Subscriptions
Contact Support

**Step 2:**

Find your name in the list below and click the radio button beside it, then click "Next."

If your record is marked as "Already Registered," please click here to log in. Tools are available to recover your password if you don't remember it.

In the KU Degree column, the first letter indicates the school that granted your degree, followed by the year of the degree. Below is a key to determining school codes.

* NO ACCOUNTING!

| | |
|---|---|
| A | School of Architecture, Design & Planning |
| B | School of Business |
| C | College of Liberal Arts & Sciences |
| D | School of Education |
| E | School of Engineering |
| F | School of Fine Arts |
| G | Master's Degree |
| H | School of Health Professions |
| J | School of Journalism |
| L | School of Law |
| M | School of Medicine |
| N | School of Nursing |
| P | School of Pharmacy |
| PharmD | School of Pharmacy |
| S | School of Social Welfare |
| U | School of Music |
| AUD | Doctor of Audiology |
| DE | Doctor of Engineering |
| DMA | Doctor of Musical Arts |
| DNP | Doctor of Nursing Practice |
| DPT | Doctor of Physical Therapy |
| EdD | Doctor of Education |
| OTD | Doctor of Occupational Therapy |
| PhD | Doctor of Philosophy |
| SJD | Doctor of Juridical Science |

*If you don't see your name on the list, please use your browser's Back button to try searing again using alternate values, such as your legal name or a previous name. If you still do not see your name or have other questions about the account lookup*

8

Join or Give | News | Events & Programs | Networks | About | Resources | Info for: | Adams Alumni C

| | First Name: | Last Name: | Birth or Former Last Name: | KU Degrees : |
|---|---|---|---|---|
| | Aidan | Egan | | |
| | Ann | Egan | | g'89 |
| | Anne | Cory | Egan | d'78 g'82 |
| | Brenda | Egan | | PharmD'10 |
| | Brian | Egan | | F05 |
| | Cassidy | Egan | | c'10 |
| | Catherine | Fennelly | Egan | c'13 |
| | Chet | Egan | | c'06 g'15 |
| | Drew | Egan | | b'16 g'17 |
| | Elaine | Wilson | Egan | '72 |
| | F. | Egan | | PhD'11 |
| | Georgine | Egan | Neuner | g'87 |
| | Gregory | Egan | | C95 |
| | James | Egan | | b'82 |
| | James | Egan | | G85 |
| | Jaxon | Egan | | |
| | Jeanne | Binder | Egan | g'92 |
| | Jennifer | Egan | | g'97 |
| | Jennifer | Egan | Clapper | s'13 |
| Already registered | John | Egan | | j'86 |
| | John | Egan | | C99 |
| X | Kate | Egan | | B96 * |
| | Katie | Egan | | |
| | Kristian | Eganhouse | Hamilton | l'96 |
| | Lawrence | Egan | | C86 |
| | Lisa | Egan | Hardy | c'12 |
| | Lori | Egan | Wehr | d'83 |
| | Margaret | Egan | | g'77 |
| | Mary | Egan | Hardman | c'42 g'44 |
| | Mary | Egan | | '20 |
| | Michael | Egan | | |
| | Michael | Egan | | g'93 |
| | Misti | Jones | Egan | '84 |
| | Mitchell | Egan | | c'15 |
| | Patricia | Egan | | g'86 PhD'94 |
| Already registered | Philip | Egan | | G72 G74 G81 |
| | Rebecca | Egan | Foster | f'87 |
| | Robert | Egan | | e'86 |
| | Spencer | Egan | | |
| | Susan | Egan | | |
| Already registered | Thomas | Egan | | j'77 |

Contact Us | Current Issue | Shop | Featured Partner

**KU Alumni Association**
Adams Alumni Center
1266 Oread Ave , Lawrence, KS 66045
Email. kualumni@kualumni org
Phone: 800-584-2957

**1-316. Unlawful acts; penalty.** (a) It is unlawful for any person to practice certified public accountancy unless the person holds a Kansas certificate and a valid permit to practice issued by the board pursuant to K.S.A. 1-310 and amendments thereto, or is entitled to practice pursuant to K.S.A. 1-322 and amendments thereto.

(b) It is unlawful for any firm to practice certified public accountancy as a certified public accounting firm or CPA firm unless the firm is registered with the board pursuant to K.S.A. 1-308 and amendments thereto, or meets the requirements to be exempt from such registration.

(c) It is unlawful for any person, except the holder of a valid certificate or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, to use or assume the title "certified public accountant" or to use the abbreviation "CPA" or any other title, designation, words, letters, abbreviation, sign, card or device likely to be confused with "certified public accountant." The use of the term "public accountant" without the word "certified" shall not be interpreted as implying that one is a certified public accountant.

(d) Except as provided by this subsection, no person holding a permit or practice privilege or a firm holding a registration under this act or meeting the requirements to be exempt from such registration shall use a professional or firm name or designation that is misleading as to: (1) The legal form of the firm; (2) the persons who are partners, officers, members, managers or shareholders of the firm; or (3) any other matter. The names of one or more former partners, members or shareholders may be included in the name of a firm or its successor unless the firm becomes a sole proprietorship because of the death or withdrawal of all other partners, officers, members or shareholders. The use of a fictitious name by a firm is permissible if the fictitious name is registered with the board and is not otherwise misleading. The name of a firm may not include the name of an individual who is neither a present nor a past partner, member or shareholder of the firm or its predecessor. The name of the firm may not include the name of an individual who is not a certified public accountant.

(e) It is unlawful for any person, except the holder of a Kansas permit to practice or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, or a valid Kansas firm registration, to issue a report with regard to any attest or compilation service under standards adopted by the board. A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board. The practice of public accountancy by persons not required to hold a permit to practice, including public accountants, is not prohibited or regulated by the provisions of this act, except for the provisions of this section, K.S.A. 1-308, 1-318 and 1-319, and amendments thereto and K.S.A. 1-319, and amendments thereto. The title "enrolled agent" may only be used by individuals so designated by the federal internal revenue service.

(f) Any person who violates any provision of this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $5,000, or to imprisonment for not more than one year, or by both such fine and imprisonment.

**From:** AccountancyBoard, DORA
**Sent:** Friday, February 9, 2018 11:41 AM
**To:** [redacted]
**Subject:** Fwd: Licensure Requirements in Colorado

Ms. [redacted],

Anyone who has been residing in Colorado for 4 years and completing CPA work would be violating the Colorado Board of Accountancy Rules by not having a Colorado CPA License. That would be considered as "Holding Out". Mobility only covers you when have another license in another state and you temporarily completing work in Colorado but do not reside in Colorado. I hope this clarifies your inquiry. Thank you

**Kind Regards,**

**Colorado Department of Regulatory Agencies**
**Division of Professions and Occupations**
Board of Accountancy
1560 Broadway, Suite 1350
Denver, CO 80202
P 303.894.7800 | F 303.869.7764
Email dora_accountancyboard@state.co.us
www.dora.colorado.gov/professions/accounting

COLORADO
Department of
Regulatory Agencies

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

---------- Forwarded message ----------
From: [redacted]>
Date: Wed, Jan 31, 2018 at 8:53 AM
Subject: Licensure Requirements in Colorado
To: "DORA_Customercare@state.co.us" <DORA_Customercare@state.co.us>

Hello....

10

Thank you for your time and I was unable to find the answer to this question on your website, so I decided to write to see if you might be able to provide me an answer to my question regarding Certified Public Accountancy licensing in Colorado. In Kansas it has a two-tiered system where you are issued a certificate first then you apply for a permit to practice which requires continuing education, verifiable work experience and payment of the fee....If someone does not have a permit in Kansas to practice certified public accountancy would this be acceptable to hold themselves out to be a certified public accountant in Colorado...The person is a resident of Colorado and has been for 4 years, so I am not sure how that would work here.

Thank you for your time it is greatly appreciated...

[illegible]

Sent from Mail for Windows 10

..

DORA Customer Care

DORA
CO
COLORADO
Department of
Regulatory Agencies

P 303.894.7855 | dora_customercare@state.co.us
1560 Broadway, Suite 110, Denver, CO 80202

[illegible]

whether an accountant is independent, the Commission will consider all relevant circumstances, including all relationships between the accountant and the audit client, and not just those relating to the reports filed.

https://searchlb.imodules.com/s/1312/alumni/index.aspx?sid=1312&gid

A person is a "statutory" resident of Colorado if the person maintains a permanent place of abode in Colorado and speands, in aggregate, more than six months in Colorado. For a more complete discussion of domicile and statutory residency see Department Regulation 39-22-103(8)(A).

As such the laws of Colorado require residents who are licensed by a regulatory agency in another State to apply for licensing in CO after becoming a resident. As such, SA Funk was required to apply for licensing as a CPA in 2011 after she became a resident. This is regulated by CO Code of Regulations governing the licensing and practice of CPA's un 3 CCR 705-1 - 1.5 Requirements for Certification - E. Reciprocity. The regulation states, "an applicant who holds a certificate or license issued by another state based upon passage of the examination but who does not hold a certificate or license to practice is not eligible for reciprocity through that certificate or license." As such, this means SA Funk does not meet the requirements to obtain a license by reciprocity in CO and as such she cannot legally hold out as being a CPA in proceedings conducted in the State and there is nothing that excludes a federal agent who resides in CO from meeting these legal requirements for licensing and practice withint he State.

FORENSIC ACCOUNTING EXPLANATION

Now I wish to introduce the definition and explanation regarding forensic accounting as was found on the Investopedia website which is operated with permission by the SEC. The explanation of meaning of forensic accounting investigation is explained in detail below:

What is forensic accounting?

Forensic accounting utilizes accounting, auditing, and investigative skills to conduct an examination into the finances of an individual or business. Forensic accounting provides an accounting analysis suitable to be used in legal proceedings. Forensic accountants are trained to look beyond the numbers and deal with the business reality of the situation. Forensic accounting is frequently used in fraud and embezzlement cases to explain the nature of a financial crime in court.