# Exhibit SECR-1

This is a copy of the press release the SEC Put out. This demonstrates it HAS an SEC Investigation then referred to the FBI/DOJ.

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

May 16, 2014

IN THE MATTER OF
Fusion Pharm, Inc.

File No. 500-1

ORDER OF SUSPENSION OF
TRADING

It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of FusionPharm, Inc. ("FusionPharm") because of questions regarding the accuracy of assertions by FusionPharm and by others, in filings and disclosures made by FusionPharm on OTC Link (previously "Pink Sheets") operated by OTC Markets Group. Inc. and press releases to investors concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition.

The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

THEREFORE, IT IS ORDERED, pursuant to Section 12(k) of the Securities Exchange Act of 1934, that trading in the above-listed company is suspended from the period 9:30 a.m. EDT, on May 16, 2014, through 11 :59 p.m. EDT, on May 30, 2014.

By the Commission.

Jill M. Peterson
Assistant Secretary

# Exhibit PAF 1

This points out Agent Funks purgery & Fraudelent Claims of her credentials in one of her affadavit pages.

She commits the same purgery & Fraudelent claims in other documents. (Her application to the FBI amongst them)

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, KATE E. FUNK, being duly sworn, depose and state the following:

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

2.      At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

3.      I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

4.      The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

NOTE: *(handwritten)* If She said "I Got my certificate in 1999 on Her JOB Application, The FBI would have Picked up on her Lie. They Go Back 10 years...

# Exhibit·KU

This is From the Kansas University Alumni Association. Kate "EGAN" FunK as EGAN being her maiden Name is highlighted along with her degree Type.

She Lied: her degree is clearly NOT in accounting as she swore under oath in her affadavits. (The Fake ones we got anyway) Kansas does Not offer an accounting degree.

KU Alumni Association - First-time Registration – Lookup Results                    https://securelb.imodules.com/s/1312/alumni/index.aspx?sid=1312&gi...

Search...

Home » Resources » Manage My Profile » First-time Registration

## Resources

Community Home
My Profile
Online Directory
Career Center
Kansas Alumni magazine
Shop for KU Merchandise
KU Websites
Just for Fun
Kansas Alumni Magazine

**Step 2:**

Find your name in the list below and click the radio button beside it, then click "Next."

If your record is marked as "Already Registered," please click here to log in. Tools are available to recover your password if you don't remember it.

In the KU Degree column, the first letter indicates the school that granted your degree, followed by the year of the degree. Below is a key to determining school codes.

*No Accounting Degree Offered*

## Manage My Profile

Login/Logout
First-time Registration
Change Password
Class Notes
Email Subscriptions
Contact Support

| | |
|---|---|
| A | School of Architecture, Design & Planning |
| B | School of Business |
| C | College of Liberal Arts & Sciences |
| D | School of Education |
| E | School of Engineering |
| F | School of Fine Arts |
| G | Master's Degree |
| H | School of Health Professions |
| J | School of Journalism |
| L | School of Law |
| M | School of Medicine |
| N | School of Nursing |
| P | School of Pharmacy |
| PharmD | School of Pharmacy |
| S | School of Social Welfare |
| U | School of Music |
| AUD | Doctor of Audiology |
| DE | Doctor of Engineering |
| DMA | Doctor of Musical Arts |
| DNP | Doctor of Nursing Practice |
| DPT | Doctor of Physical Therapy |
| EdD | Doctor of Education |
| OTD | Doctor of Occupational Therapy |
| PhD | Doctor of Philosophy |
| SJD | Doctor of Juridical Science |

*If you don't see your name on the list, please use your browser's Back button to try searing again using alternate values, such as your legal name or a previous name. If you still do not see your name or have other questions about the account lookup*

12/15/2019, 4:07 PM

| | Join or Give | News | Events & Programs | Networks | About | Resources | Info for: | Adams Alumni C |

| | First Name: | Last Name: | Birth or Former Last Name: | KU Degrees : |
|---|---|---|---|---|
| ○ | Aidan | Egan | | |
| ○ | Ann | Egan | | g'89 |
| ○ | Anne | Cory | Egan | d'78 g'82 |
| ○ | Brenda | Egan | | PharmD'10 |
| ○ | Brian | Egan | | F05 |
| ○ | Cassidy | Egan | | c'10 |
| ○ | Catherine | Fennelly | Egan | c'13 |
| ○ | Chet | Egan | | c'06 g'15 |
| ○ | Drew | Egan | | b'16 g'17 |
| ○ | Elaine | Wilson | Egan | '72 |
| ○ | F. | Egan | | PhD'11 |
| ○ | Georgine | Egan | Neuner | g'87 |
| ○ | Gregory | Egan | | C95 |
| ○ | James | Egan | | b'82 |
| ○ | James | Egan | | G85 |
| ○ | Jaxon | Egan | | |
| ○ | Jeanne | Binder | Egan | g'92 |
| ○ | Jennifer | Egan | | g'97 |
| ○ | Jennifer | Egan | Clapper | s'13 |
| Already registered | John | Egan | | j'86 |
| ○ | John | Egan | | C99 |
| ○ | Kate | Egan | | B96 |
| ○ | Katie | Egan | | |
| ○ | Kristian | Eganhouse | Hamilton | f'96 |
| ○ | Lawrence | Egan | | C86 |
| ○ | Lisa | Egan | Hardy | c'12 |
| ○ | Lori | Egan | Wehr | d'83 |
| ○ | Margaret | Egan | | g'77 |
| ○ | Mary | Egan | Hardman | c'42 g'44 |
| ○ | Mary | Egan | | '20 |
| ○ | Michael | Egan | | |
| ○ | Michael | Egan | | g'93 |
| ○ | Misti | Jones | Egan | '84 |
| ○ | Mitchell | Egan | | c'15 |
| ○ | Patricia | Egan | | g'86 PhD'94 |
| Already registered | Philip | Egan | | G72 G74 G81 |
| ○ | Rebecca | Egan | Foster | f'87 |
| ○ | Robert | Egan | | e'86 |
| ○ | Spencer | Egan | | |
| ○ | Susan | Egan | | |
| Already registered | Thomas | Egan | | j'77 |

*handwritten annotation:* S he gets NOT ACCOUNTING DEGREE (As. she swore under OATh) Also graduated IN 96 NOT 95 as she swore

Next ››

**Contact Us**      Current Issue      Shop      Featured Partner

**KU Alumni Association**
Adams Alumni Center
1266 Oread Ave., Lawrence, KS 66045
Email: kualumni@kualumni.org
Phone: 800-584-2957

2 of 3                                                   12/15/2019, 4:07 PM

# Exhibit - WD-NC

This is an Example of what happens to anyone but the wife of T Markus Funk.

Sounds all too familiar.

United States Department of Justice                 Offices of the United States Attorneys

THE UNITED STATES ATTORNEY'S OFFICE

WESTERN DISTRICT *of* NORTH CAROLINA

Search

 SEARCH

**HOME**   **ABOUT**   **U.S. ATTORNEY**   **NEWS**   **DIVISIONS**   **PROGRAMS**   **VICTIM WITNESS**

**CAREERS**   *This is what happens to regular people*

U.S. Attorneys » Western District of North Carolina » News

Department of Justice

U.S. Attorney's Office

Western District of North Carolina

FOR IMMEDIATE RELEASE                                    Tuesday, December 12, 2017

# Atlanta Woman Is Handed Down Six-Month Sentence For Lying To Federal Judge

CHARLOTTE, N.C. – Tonya Leshun Hall, 43, of Atlanta, Georgia, was sentenced to six months in prison yesterday for lying in federal court, following her guilty plea to a criminal contempt charge, announced R. Andrew Murray, U.S. Attorney for the Western District of North Carolina.  Chief U.S. District Judge Frank D. Whitney presided over the case.

According to court documents, Hall testified in August 2016 during a pair of hearings in a civil lawsuit between plaintiff Antonio Stukes and defendant Debra Antney filed in U.S. District Court.  Stukes was shot in a shoot-out along Independence Boulevard in February 2011 by members of a security detail working for rapper Waka Flocka Flame, whose given name is Juaquin Malphurs.  In connection with the civil suit, Stukes sought to enforce a judgment for compensatory and punitive damages obtained against Antney, who is Waka Flocka's mother, and various business entities allegedly under Antney's control.

Court documents show that Hall testified on Antney's behalf during the hearings on August 25 and August 30, 2016.  During those hearings, Hall opined that, based on her review of Antney's finances, Antney had "no money" to satisfy the judgment entered against her in the civil suit.  In support of her opinion, Hall represented she had graduated from Emory University with a degree in accounting and was licensed as a certified public accountant in Georgia.

In yesterday's hearing in federal court, Hall admitted that her claims about her credentials were not true.  Hall did not graduate from Emory and was never licensed as a CPA.  During the sentencing hearing, Judge Whitney explained that Hall's lies "misled" the court in its assessment of Antney's ability to satisfy the judgment in the civil suit.  In announcing Hall's sentence, Judge Whitney highlighted the "need to promote respect for the law" and the importance of truthfulness in the justice system."

Hall pleaded guilty to one count of criminal contempt. She will be ordered to report to the Federal Bureau

# Exhibit-FBI

This confirms the 10 year backround check & why she Never mentions her Bogus certificate in 1999. Had she been Truthful the FBI would Know she was a Fraud!

It is the policy of the Federal Bureau of Investigation (FBI) to share with Law Enforcement personnel pertinent information regarding terrorism. In the past, the primary mechanism for such information sharing was the Joint Terrorism Task Force (JTTF). In response to the terrorist attack on America on September 11, 2001, the FBI established the State and Local Law Enforcement Executives and Elected Officials Security Clearance Initiative. This program was initiated to brief officials with an established "need-to-know" on classified information that would or could affect their area of jurisdiction.

Most information needed by state or local law enforcement can be shared at an unclassified level. In those instances where it is necessary to share classified information, it can usually be accomplished at the Secret level. This brochure describes when security clearances are necessary and the notable differences between clearance levels. It also describes the process involved in applying and being considered for a clearance.

State and local officials who require access to classified material must apply for a security clearance through their local FBI Field Office. The candidate should obtain from their local FBI Field Office a Standard Form 86 (SF 86), Questionnaire for National Security Positions, and two FD-258 (FBI applicant fingerprint cards). One of two levels of security clearance, Secret or Top Secret, may be appropriate.

The background investigation and records checks for Secret and Top Secret security clearance are mandated by Presidential Executive Order (EO). The EO requires these procedures in order for a security clearance to be granted; the FBI does not have the ability to waive them.

## SECRET CLEARANCES

A Secret security clearance may be granted to those persons that have a "need-to-know" national security information, classified at the Confidential or Secret level. It is generally the most appropriate security clearance for state and local law enforcement officials that do not routinely work on an FBI Task Force or in an FBI facility. A Secret security clearance takes the least amount of time to process and allows for escorted access to FBI facilities.

The procedure is as follows:

FBI performs record checks with various Federal agencies and local law enforcement, as well as, a review of credit history.

Candidate completes forms SF-86 and FD-258. Once favorably adjudicated for a Secret security clearance, the candidate will be required to sign a Non-Disclosure Agreement.

## TOP SECRET CLEARANCES

A Top Secret clearance may be granted to those persons who have a "need-to-know" national security information, classified up to the Top Secret level, and who need unescorted access to FBI facilities, when necessary. This type of clearance will most often be appropriate for law enforcement officers assigned to FBI Task Forces housed in FBI facilities.

In addition to all the requirements at the Secret level, a background investigation, covering a 10-year time period, is required.

Once favorably adjudicated for a Top Secret security clearance, the candidate will be required to sign a Non-Disclosure Agreement.

## QUESTIONS AND ANSWERS (Q&A):

Q: Who should apply for a security clearance?

A: State or local officials whose duties require that they have access to classified information, and who are willing to undergo a mandatory background investigation.

Q: What is the purpose of a background investigation?

A: The scope of the investigation varies with the level of the clearance being sought. It is designed to allow the government to assess whether a candidate is sufficiently trustworthy to be granted access to classified information. Applicants must meet certain criteria, relating to their honesty, character, integrity, reliability, judgement, mental health, and association with undesirable persons or foreign nationals.

Q: If an individual occupies an executive position with a law enforcement agency, must he or she still undergo a background investigation in order to access classified information?

A: An Executive Order (EO), issued by the President, requires background investigations for all persons entrusted with access to classified information. The provisions of the EO are mandatory, cannot be waived, and apply equally to all federal, state, and local law enforcement officers. This is true of both Secret and Top Secret security clearances

Q: How long does it normally take to obtain a Secret security clearance?

A: It is the goal of the FBI to complete the processing for Secret security clearances within 45 to 60 days, once a completed application is submitted. The processing time for each individual case will vary depending upon its complexity.

Q: How long does it normally take to obtain a Top Secret security clearance?

A: It is the goal of the FBI to complete the processing for Top Secret security clearances within 6 to 9 months, once a completed application is submitted. The processing time for each individual case will vary depending upon its complexity.

Q: What kind of inquiries will the FBI make into my background?

A: Credit and criminal history checks will be conducted on all applicants. For a Top Secret security clearance, the background investigation includes additional record checks which can verify citizenship for the applicant and family members, verification of birth, education, employment history, and military history. Additionally, interviews will be conducted of persons who know the candidate, and of any spouse divorced within the past ten years. Additional interviews will be conducted, as needed, to resolve any inconsistencies. Residences will be confirmed, neighbors interviewed, and public records queried for information about bankruptcies, divorces, and criminal or civil litigation. The background investigation may be expanded if an applicant has resided abroad, or has a history of mental disorders, or drug or alcohol abuse. A personal interview will be conducted of the candidate.

Q: If I have a poor credit history, or other issues in my background, will this prevent me from getting a security clearance?

A: A poor credit history, or other issues, will not necessarily disqualify a candidate from receiving a clearance, but resolution of the issues will likely take additional time. If the issues are significant, they may prevent a clearance from being approved.

# Exhibit AF1 & AF2

## Falsified Affadavit Pages

You will notice "2" different pages that are supposed to be the first page of the affadavit in support for Search Warrent for the same premisis for the same day. Seems agent Funk lost track of which fake document she sent to whom.

There are more examples to prove the claim of the Affadavit being Falsified like this one. However the point is made here.

Its no wonder the Prosecution claimed they were sealed & never registered them. One Lie leads to another.

*Not resigned, not seeded. illegal!*

*EXHIBIT AF-1*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

⚹ I, KATEE FUNK, being duly sworn, depose and state the following:

⚹ 1. I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years. I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas. At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

⚹ 2. I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

> a. Business of FusionPharm, 5850 East 58th Avenue, Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

⚹ 3. The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

Exhibit AF-2

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, KATE E. FUNK, being duly sworn, depose and state the following:

(1) I am a Special Agent employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for approximately four years . I am currently assigned in Denver, Colorado, to investigate economic or white collar crimes. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money-laundering and mortgage fraud. Prior to my employment with the FBI, I received an Accounting degree from the University of Kansas in 1995. I became a Certified Public Accountant in 1996 through the state of Kansas.

(2) At all times during the investigation described in this affidavit, I have been acting in my official capacity as a Special Agent with the FBI and have conducted interviews, collected and reviewed documents, and obtained information from the sources outlined in the following paragraphs as they relate to the issue of probable cause.

(3) I make this affidavit in support of applications for the issuance of a search warrant for the following premises described more fully herein and in Attachment A (incorporated herein by reference):

> a. Business of FusionPharm, 5850 East 58th Avenue , Unit F, and 5750 East 58th Avenue Unit J, Commerce City, Colorado, 80022 (hereinafter, the "Subject Premises").

(4) The FBI, with the assistance of the Internal Revenue Service's Criminal Investigation Division ("IRS-CID"), is investigating an offering fraud and "pump and dump" microcap stock scheme believed to be perpetrated by Scott Dittman ("Dittman"),

1

# Exhibit - NRW - 1 & 2

This is proof The Affadavits and warrents are Illegal. They ran so afoul The Prosecution Never registered Them With the courts as Required by Federal Laws of Procedure. Instead They Withheld these Fraudelent & Purgered Evidence. Only To use The supposid content To cause duress & coerse a plea.

AO 442 (Rev. 01/09) Arrest Warrant

*Sealed Registered* &P   *Guy Jean-Pierre*

*Example*

# UNITED STATES DISTRICT COURT

### for the

### District of Colorado

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 16-mj-01103-KMT |
| GUY M. JEAN-PIERRE | ) |
| a/k/a Marcelo Dominguez de Guerra | ) |
| | ) |
| *Defendant* | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    GUY M. JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment     ❏ Superseding Indictment     ❏ Information     ❏ Superseding Information     ☑ Complaint
❏ Probation Violation Petition     ❏ Supervised Release Violation Petition     ❏ Violation Notice     ❏ Order of the Court

This offense is briefly described as follows:
    18 USC § 1956(a)(3) - Conducting a financial transaction in property represented to be the proceeds of specified unlawful
    activity.

Date:   **Jun 13, 2016 3:04 pm**

*Issuing officer's signature*

City and state:     **Denver, CO**

                                                                        Kathleen M. Tafoya, U.S. Magistrate Judge
                                                                        *Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ |
| at *(city and state)* _____ |
| |
| Date: _____ |
| _____ |
| *Arresting officer's signature* |
| |
| _____ |
| *Printed name and title* |

AO 106 (Rev. 04/10) Application for a Search Warrant *NOT SEALED — NOT Registered : Not Legal*

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado.

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. |
| Premises located at: | ) |
| 5850 East 58th Ave., Unit F | ) |
| 5750 East 58th Avenue, Unit J | ) |
| Commerce City, Colorado | ) |
| more fully described in Attachment A, | ) |
| attached hereto. | ) |

## APPLICATION FOR A SEARCH WARRANT

I, Kate E. Funk, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE "ATTACHMENT A", which is attached to and incorporated in this Application and Affidavit

located in the ___State and___ District of ___Colorado___, there is now concealed *(identify the person or describe the property to be seized):*

SEE "ATTACHMENT B", which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 15 U.S.C. §§ 78j(b), 78ff(a) | Securities Fraud |

The application is based on these facts:

**X** Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Kate E. Funk*
_____
*Applicant's signature*

*Kate E. Funk, Special Agent, Federal Bureau of Investigation*
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
                           ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **4:38 pm, May 15, 2014**

_____
Craig B. Shaffer    *Judge's signature*

City and state: ___Denver, CO___

United States Magistrate Judge
_____
*Printed name and title*

# Exhibit-NCPA-1-12

These all clearly show KATE EGAN
FuNK is NoT and Never WAS a cpa.
She Lied To the courTs To InFluence
a Judge. She Purgers herself as she
has been for some 12 years Now.

Why is This woman NoT being Prosecuted?

✳ ImporTANT To keep in mind is she hAS NoThing
"O" To even Try To say she is in Colorado!

**From:** Professional Ethics - Submissions <ProfessionalEthicsSubmissions@aicpa.org>
**Date:** Friday, November 8, 2019 at 9:46 AM
**To:** Bill S <bill@bmails.biz>, Professional Ethics - Submissions
<ProfessionalEthicsSubmissions@aicpa.org>
**Cc:** Peter Bornstein <pbornstein@prblegal.com>, Jeannette Wolf <jwolf@prblegal.com>
**Subject:** RE: Attention Unlicensed Individual Practicing

Hello William,

This individual is neither an AICPA member nor a member of the Kansas State Society of CPAs so we
don't have jurisdiction to perform any investigation. You may want to contact the State Board of
Accountancy to see if they have any provisions.

Thank you.
Aradhana

## Aradhana Aggarwal, CPA
Manager - Professional Ethics
Professional Ethics Hotline: 888.777.7077 or ethics@aicpa.org
AICPA Member Service: 888.777.7077 or service@aicpa.org
CIMA: cimaglobal.com/Contact-us/

This message, including any attachments, may contain confidential information intended for a specific individual and purpose and is
protected by law. If you are not the intended recipient, please delete it. Any disclosure, copying or distribution of this message is
strictly prohibited.

The position expressed above represents the opinion of the staff of the AICPA Professional Ethics Division as to the application of the
*Code of Professional Conduct* to the facts presented in your e-mail. The opinions reflected in this response do not reflect an official
position of the Professional Ethics Executive Committee or of the AICPA.

Views expressed by AICPA employees are expressed for purposes of deliberation, providing member services and other purposes
exclusive of practicing public accounting. Views expressed by AICPA staff do not necessarily represent the official views of the
AICPA unless otherwise noted. Official AICPA positions are determined through certain specific committee procedures, due process
and deliberation.

**From:** AccountancyBoard, DORA
**Sent:** Friday, February 9, 2018 11:41 AM
**To:** tessa-noel@hotmail.com
**Subject:** Fwd: Licensure Requirements in Colorado

Ms. Noel, 

Anyone who has been residing in Colorado for 4 years and completing CPA work would be violating the Colorado Board of Accountancy Rules by not having a Colorado CPA License. That would be considered as "Holding Out". Mobility only covers you when have another license in another state and you temporarily completing work in Colorado but do not reside in Colorado. I hope this clarifies your inquiry. Thank you

**Kind Regards,**

**Colorado Department of Regulatory Agencies**
**Division of Professions and Occupations**
Board of Accountancy
1560 Broadway, Suite 1350
Denver, CO 80202
P 303.894.7800 I F 303.869.7764
Email dora_accountancyboard@state.co.us
www.dora.colorado.gov/professions/accounting



CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not an intended recipient you are not authorized to disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail and any attachments from your system.

--------- Forwarded message ---------
From: **Tessa Noel** <tessa-noel@hotmail.com>
Date: Wed, Jan 31, 2018 at 8:53 AM
Subject: Licensure Requirements in Colorado
To: "DORA_Customercare@state.co.us" <DORA_Customercare@state.co.us>

Hello

12/24/17, 11:16:00

**CPAVerify Individual Report Results**

*Please—Note—AGENT FUNK*
*Living in Colorado For 17 years—Not!!*

NAME: KATE EGAN
STATE OF LICENSE: KS
LAST UPDATED: 2017-12-24

Mail

Address:                                           CHICAGO, IL!
License/Permit/Certificate Number:                 8757
Registration Number:
License/Permit/Certificate Status:                 ACTIVE CERTIFICATE
License/Certificate Status Details:                The certificate is in good standing.
License Type:                                      CPA.
                                                   CPA Certificate. In Kansas, a certificate is not a license so therefore, a certificate
License Type Details:                              holder who does not also have an active permit may not hold out, perform or
                                                   offer to perform services as a CPA. The person may use the title CPA in
                                                   connection with their employment in industry.

Basis for License:
Issue Date:                                        1999-08-04
Expiration Date:
Enforcement, Non-Compliance or Disciplinary Actions:   None Reported To This Site By The Board
Other Information:                                 IN KANSAS, A CERTIFICATE IS NOT A LICENSE. ONLY THOSE WHO HAVE
                                                   PERMITS (ALSO KNOWN AS LICENSES) ARE ALLOWED TO HOLD OUT
                                                   AND PROVIDE OR OFFER TO PROVIDE SERVICES TO THE PUBLIC AS A
                                                   CPA. IF THE PERMIT STATUS DOES NOT REFLECT "ACTIVE", THAT
                                                   INDIVIDUAL IS NOT LICENSED TO PRACTICE.

                                                   CPAVERIFY INCLUDES ALL CERTIFICATE HOLDERS AND PERMIT
                                                   HOLDERS. If an individual has a permit, their permit record and their certificate
                                                   record will show. Only a certificate record will show for non-licensed certificate
                                                   holders.

                                                   If Permit Number shows N/A that means this person had a permit to practice at
                                                   one point, but let it lapse. When the permit lapses in that case, so does the
                                                   permit number. If permit shows Lapsed it means that this person once had a
                                                   permit (license) to practice, but has since let them lapse. This individual is not
                                                   licensed to practice as a CPA in Kansas.

Contact the Board for official verification of information.

State Board Contact Information:                   KANSAS BOARD OF ACCOUNTANCY
                                                   LANDON STATE OFFICE BUILDING
                                                   900 SW JACKSON, SUITE 556
                                                   TOPEKA, KS 66612-1239

                                                   Phone: 785-296-2162
                                                   Fax: 785-291-3501
                                                   Email: INFO@KSBOA.KS.GOV
                                                   Licensee Lookup: http://www.da.ks.gov/boa/searchforindividual.aspx

Details of Enforcement, Non-Compliance or Disciplinary Actions:

1. If "Contact State Board For Details" is displayed then the State Board has reported some type of enforcement, non-compliance or disciplinary action to this site and the State Board should be contacted for full details about the action reported.
2. If "None Reported To This Site By The Board" is displayed then the State Board provides enforcement, non-compliance and disciplinary action data to this site and none was indicated for this record.
3. If "State Does Not Provide This Type of Data At This Site" is displayed then CPAverify is not currently receiving enforcement, non-compliance or disciplinary action data for licensees in this state. Some states are limited to sharing this type of data with third party websites due to privacy laws or policies, but most State Boards offer this information on their official State Board websites.
4. Contact the State Board for official verification of all enforcement, non-compliance and disciplinary activity.

The results shown here include all data made available by participating states. Additional data about the individual or firm may exist and is not shown here for other states that are not yet participating in the CPAverify website. Please refer to the Participating States tab for more information about which states are currently sharing their licensing data for use with this website and for clarification about which states these results do not include. If

Kansas Board of Accountancy -- KSBOA.org – 785-296-2162          http://oitsapps.ks.gov/boa/IndividualLicenseeInformation.aspx?ID=9211...



## KANSAS BOARD OF ACCOUNTANCY
Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home    >> Search for Firms

**Individual Information**   [ Back to Search Results  |  Search Again ]

*Please Note Agent Funk living in Colorado 8 years)*

| | | | |
|---|---|---|---|
| **Name:** | Kate Elizabeth Egan | **Certificate Status:** | Active |
| **Address:** | 22 N Morgan Unit 210 Chicago, IL 60607-0000 | **Permit Status:** | |
| **Firm/Employer:** | Sprint | **Discipline and/or Board Action:** | NO |
| **Certificate Issue Date:** | 08/04/1999 | | |
| **Certificate Number:** | 8757 | | |
| **Permit Number:** | | | |
| **Permit Issue/Renew Date:** | / / | | |
| **Permit Expiration Date:** | / / | | |

Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy


1/6/2018, 10:40 AM

 12/26/2019

Kansas Board of Accountancy -- KSBOA.org -- 785-296-2162



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: info@ksboa.ks.gov

>> Home   >> Search for Firms

## Individual Information   [ Back to Search Results  |  Search Again ]

*Only Changed When Confirmed*

| | | |
|---|---|---|
| **Name:** | Kate Elizabeth Funk | **Certificate Status:** Active |
| **Address:** | 8000 E. 36th Ave. Denver, CO 80238-0000 | **Permit Status:** |
| **Firm/Employer:** | Federal Bureau of Investigation | **Discipline and/or Board Action:** NO |
| **Certificate Issue Date:** | 08/04/1999 | |
| **Certificate Number:** | 8757 | |
| **Permit Number:** | | |
| **Permit Issue/Renew Date:** | / / | |
| **Permit Expiration Date:** | / / | |

Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

 **ACCOUNTING** INSTITUTE *for* SUCCESS

CPA Courses    Reviews ↓    (104) Discounts

Blog    Other Exams ↓

# CPA Certificate vs CPA License: What's the Difference?

📅**Updated:** Dec. 30, 2019    ✍Kenneth W. Boyd    🏷Best CPA Review Courses    📰Advertiser Disclosure

Contents ☰

☰ CPA Exam, Careers



There always tends to be a lot of confusion between a **CPA certificate vs license.** They both mean completely different things. Furthermore, they give you different amounts of legal authority and responsibility although they seem like the same thing.

A CPA certificate, in most cases, is simply an acknowledgment. It means that you passed the CPA examination and fulfilled the minimum requirements to take it. A CPA license, on the other hand, is issued when you complete all the requirements from a board of accountancy to become a CPA. Consequently, you are granted

Search ...



Kenneth W. Boyd is a former Certified Public Accountant (CPA) and the author of several popular accounting books including 'CPA Exam for Dummies' and 'Cost Accounting for Dummies'.

    12/31/2019, 1:26 AM

permission by the state to practice public accounting.

Let's take a look at some of the differences between these two designations and why you would want one over the other.

Learn More

# CPA Certificate vs CPA License

# What's the Different between a CPA Certificate vs CPA License?

Let's look at a few key differences between a license and certificate.

## What's a CPA Certificate?

- No work experience requirements
- No continuing education requirements
- Cannot sign tax returns, audit reports, or use the title CPA on any official or legal report
- Cannot be an owner or partner of a public accounting firm
- Some states allow you to use the designation CPA after your name on unofficial documents, like resumes, while others expressly forbid using the acronym altogether
- Requires a small fee to renew each year

## What's a CPA License?

- Most states require at least 1-2 years of relevant accounting experience under a CPA
- Most states require at least 40 hours of continuing education each year

CPA Exam
CMA Exam
CFA Exam
EA Exam
CIA Exam
PMP Exam
Six Sigma Exam
Bar Exam
LSAT Exam

## Popular Posts

- You have all the legal rights of a CPA including signing tax returns and audit reports
- You are allowed to own a CPA firm
- You can use the title in any public or official setting
- Requires a significant fee to renew each year

# CPA Certificate vs CPA License

Remember that each state board of accountancy has different rules and regulations to become a CPA. Most have common requirements, but all of them are different in some way, shape, or form.

That being said, most states back in the day had a two-tiered certification process. This meant that once you fulfilled the requirements to sit for the uniform CPA exam and you passed it, you were issued a certificate. This simply meant that you completed the first step to becoming a CPA, but you weren't all the way there yet.

Often candidates still had to complete a lengthy work experience program, additional education requirements, or an ethics exam in order to fulfill the licensure requirements of the state, but they were able to call themselves a CPA in the meantime because they had a certificate. Thus, on resumes and job applications, they could indicate that they had passed the exam and were on their way to becoming licensed.

Keep in mind that this certificate is not a license to practice. Candidates who only have a certificate are not allowed to practice publicly because they are not licensed. Only after you complete the rest of the requirements are you able to obtain your license and truly become a practicing CPA with all of the designations rights intact.

Most states have gotten rid of this two-tiered system and now don't issue you a certificate upon completing the exam. Instead, they

**Top 5 CPA Prep Courses**

**#1**

have switched to using this terminology to define different levels of licenses.

# Different Levels of CPA Licensure: Non-reporting and Inactive

**#2**

This title is a little misleading because it implies that you can be licensed but not be fully licensed. That isn't really true. You are either licensed or you are not. There is no in between. Some states do offer non-reporting or inactive licenses though.

**#3**

What a lot of states that have gotten rid of the two-tier system have started doing is allowing non-practicing CPAs to switch their full-blown license into a certificate. This way they don't have to pay a huge renewal fee and maintain 40 hours of continuing education each year, but they can still call themselves a CPA for informal purposes.

**#4**

A good example of this is a college accounting professor. He or she may want to maintain their credential as it gives them more authority in their field, but there is no reason why they should be licensed. They will never perform audit or tax functions that practicing CPAs must perform, so there is no need for them to be licensed.

**#5**

Most states that allow this type of "downgraded" license also allow certificate holders to renew their license at any time just by filing the proper paperwork and paying the licensure fees. This is also a plus for the accounting professor. If he or she ever wanted to get licensed again, he or she could simply sign up and pay the fee. There is no extra testing or qualifications required.

*one has done zero hours*

Home     Articles     Videos     Academic Scholarships

Ask your question here                    Search          Show Related Q&As

Education and Career FAQs / Business FAQs / Accounting FAQs / What is CPE Accounting?

# What Is CPE Accounting?

CPE accounting is continued professional education for accountants. Accounting is a highly specialized field. Since tax laws and regulations can change rapidly, accountants participate in continuing education programs to keep abreast of developments in laws and accounting practices. They need to be aware of the CPE requirements of the jurisdictions in which they work. Schools offering Accounting degrees can also be found in these popular choices.

## CPE Requirements



According to the American Institute of Certified Public Accountants, each state has specific continuing education requirements accountants must follow in order to maintain their licenses. The CPA Journal states that accountants should be concerned about licensing requirements if they maintain such credentials in more than one jurisdiction.

## Important Facts About CPE Accounting

| | |
|---|---|
| Work Environment | Office or classroom setting |
| Key Skills | Accounting, Math, Reading Comprehension, Communication |
| Training | There are no mandatory subjects or lessons for CPE, so accountants are free to choose the program that best fits their needs. Acceptable programs include courses offered by the accountant's own firm, accounting-focused conferences or conventions, and any university courses that offer CEUs (Continuing Education Units). |
| Common Courses | Accounting and Finance for Business Operations, Fair Value Accounting, IFRS in the USA: An Implementation Guide |
| Median Salary (2018) | $70,500 (Accountants and Auditors) |
| Job Outlook (2016-2026) | 10% (Accountants and Auditors) |

*Source: U.S. Bureau of Labor Statistics (BLS)*

## Comparing CPE Requirements

Almost every jurisdiction requires an average of 40 hours of CPE per year for Certified Public Accountants (CPA). Other variations are 80 hours required each 2-year period or 120 hours each 3-year period. Many jurisdictions do not allow carryover of surplus CPE credits from one period to the next.

In some jurisdictions, required CPE hours depend on either specific duties or job classifications. For example, New York reduces the amount of required hours of CPE credits if an accountant takes continuing education courses in a specialized area. Kentucky reduces the number of required hours if an accountant works less than 3,000 hours every two years.

Each state has different CPE accounting requirements. A CPA must take the required numbers of CPE credits for the jurisdiction where her or she works, and must be aware of the requirements of other jurisdictions if he or she wishes to maintain a license in that jurisdiction.

To continue researching, browse degree options below for course curriculum, prerequisites and financial aid information. Or, learn more about the subject by reading the related articles below:

### 1. Degree Options:

Accounting

Accounting & Management

Bookkeeping

View All Degree Options

### 2. More Articles

What Schools Offer Accounting Degrees in Phoenix, Arizona?

What Schools Have Accounting Degrees in Philadelphia, PA?

Where in Vermont Can I Take Courses in Accounting?

---

Choose your subject:

Business Management

Bookkeeping and Accounting

Select a Very Specific Subject

Choose your degree level:

Select a Degree Level

Choose your location:

Online schools only

Campus near me

Or

zip

State

SEARCH

No preference

**1. Southern New Hampshire University**
- MBA - Accounting
- BS in Accounting
- AS in Business Administration

What is your highest level of education completed?

Select One...

**2. Purdue University Global**
- Master of Science in Accounting
- Bachelor of Science in Accounting
- Associate of Applied Science in Accounting

Which subject are you interested in?

Select One...

**3. Florida Tech**
- Master's in Business Administration/Accounting & Finance
- Master's in Business Administration/Finance
- Master's in Business Administration/Management

What is your highest level of education completed?

Select One...

**4. Grand Canyon University**
- DBA in Management
- MBA in Accounting
- BS in Accounting

What is your highest level of education?

Select One...

View Schools

By JAMES CHEN   Updated Apr 25, 2019

## What is Forensic Accounting?            https://www.investopedia.com/terms/f/forensicaccounting.asp

Forensic accounting utilizes accounting, auditing and investigative skills to conduct an examination into the finances of an individual or business. Forensic accounting provides an accounting analysis suitable to be used in legal proceedings. Forensic accountants are trained to look beyond the numbers and deal with the business reality of a situation. Forensic accounting is frequently used in fraud and embezzlement cases to explain the nature of a financial crime in court.

Understanding Forensic Accounting
Forensic accountants analyze, interpret and summarize complex financial and business matters. They may be employed by insurance companies, banks, police forces, government agencies or public accounting firms. Forensic accountants compile financial evidence, develop computer applications to manage the information collected and communicate their findings in the form of reports or presentations.

Along with testifying in court, a forensic accountant may be asked to prepare visual aids to support trial evidence. For business investigations, forensic accounting entails the use of tracing funds, asset identification, asset recovery and due diligence reviews. Forensic accountants may seek out additional training in alternative dispute resolution (ADR) due to their high level of involvement in legal issues and familiarity with the judicial system.

## Forensic Accountants Follow the Money  https://www.fbi.gov/news/stories/financial-fraud

In complex financial fraud investigations, FBI agents have an invaluable resource—the Bureau's core of forensic accountants. These highly trained professionals are located in all 56 field offices and are experts at following the money.

The relationship between agents and forensic accountants "is a vital partnership," said Special Agent Kevin Legleiter, who relied on Forensic Accountant Janetta Maxwell in the Willard Leonard Jones investigation and has partnered with her for two decades in other financial fraud investigations.

The Bureau's forensic accounting program was established in 2009 to advance the FBI's financial investigative capabilities. There are more than 500 forensic accountants in the program, and nearly half are certified public accountants. Many have additional training such as being certified fraud examiners.

Besides the ability to analyze complex financial records and documents, forensic accountants can testify to their findings in court and assist investigators in many other ways. "As a forensic accountant, I have the ability to issue subpoenas and conduct interviews," Maxwell said.

1/5/2019                    Kansas Board of Accountancy -- KSBOA.org -- 785-296-2162



# KANSAS BOARD OF ACCOUNTANCY

Landon State Office Building
900 SW Jackson Street
Suite 556
Topeka, Kansas 66612
Main: 785-296-2162
Fax: 785-291-3501
email: ksboa@ks.gov

| Apply for Certificate | Apply for Permit | Change of Address | Contact Us |
| CPA Exam Info. | CE | FAQ's | Firm Registration |
| Forms | Laws & Regs | Online Firm Renewal | Newsletter |
| Online Permit Renewal | Peer Review | Search -- Firm | Search -- Individual |

Home
Board of Directors
Board Meeting Dates,
Agendas & Minutes
Complaint Form
CPA Exam Pass List
CE requirements
Disciplinary Actions
FAQ's
Fees
Firm Search
Forms
Helpful Links
Individual Search
Laws & Regulations
Peer Review
Proposed Regulation
Amendments
Site Map
Site Tools Download
Center
Contact Us

Apply for a Certificate

**PURSUANT TO 5 U.S.C. 552a, THE KANSAS BOARD OF ACCOUNTANCY ADVISES YOU THAT SOCIAL SECURITY NUMBERS PROVIDED TO THE BOARD PURSUANT TO K.S.A. 74-148 AND 74-139 MAY BE PROVIDED TO THE KANSAS DEPARTMENT OF REVENUE, UPON REQUEST, OR MAY BE USED FOR CHILD SUPPORT ENFORCEMENT PURPOSES.**

**NOTE: KANSAS IS A TWO-TIERED STATE. YOU MUST OBTAIN A CPA CERTIFICATE BEFORE YOU CAN APPLY FOR A PERMIT TO PRACTICE. THE CERTIFICATE DOES NOT ALLOW YOU TO PRACTICE OR HOLD OUT AS A CPA.**

Below are the forms required to be submitted to obtain a Kansas CPA Certificate:

**CPA Certificate by passing the exam in Kansas--Fee: $50.00**

- http://www.ksboa.org/pdf/app_exam.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf

**CPA Certificate by reciprocity, or for transfer of grades—Fee: $250.00**

- http://www.ksboa.org/pdf/app_recip.pdf
- http://www.ksboa.org/pdf/app_transfer.pdf
- http://www.ksboa.org/pdf/auth_exch.pdf
- http://www.ksboa.org/pdf/oath.pdf
- http://www.ksboa.org/pdf/ethics.pdf (If you have never taken the AICPA ethics exam, or an ethics exam approved by the Kansas Board, or if another State Board of Accountancy cannot verify that you have taken an acceptable ethics exam, you will be required to--this is the order information)



Page Last Updated: 04/30/2018 21:44:52
Copyright © 2005 Kansas State Board of Accountancy
Disclaimer | Accessibility | Privacy

**1-316. Unlawful acts; penalty.** (a) It is unlawful for any person to practice certified public accountancy unless the person holds a Kansas certificate and a valid permit to practice issued by the board pursuant to K.S.A. 1-310 and amendments thereto, or is entitled to practice pursuant to K.S.A. 1-322 and amendments thereto.

(b) It is unlawful for any firm to practice certified public accountancy as a certified public accounting firm or CPA firm unless the firm is registered with the board pursuant to K.S.A. 1-308 and amendments thereto, or meets the requirements to be exempt from such registration.

(c) It is unlawful for any person, except the holder of a valid certificate or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, to use or assume the title "certified public accountant" or to use the abbreviation "CPA" or any other title, designation, words, letters, abbreviation, sign, card or device likely to be confused with "certified public accountant." The use of the term "public accountant" without the word "certified" shall not be interpreted as implying that one is a certified public accountant.

(d) Except as provided by this subsection, no person holding a permit or practice privilege or a firm holding a registration under this act or meeting the requirements to be exempt from such registration shall use a professional or firm name or designation that is misleading as to: (1) The legal form of the firm; (2) the persons who are partners, officers, members, managers or shareholders of the firm; or (3) any other matter. The names of one or more former partners, members or shareholders may be included in the name of a firm or its successor unless the firm becomes a sole proprietorship because of the death or withdrawal of all other partners, officers, members or shareholders. The use of a fictitious name is permissible if the fictitious name is registered with the board and is not otherwise misleading. The name of a firm may not include the name of an individual who is neither a present nor a past partner, member or shareholder of the firm or its predecessor. The name of the firm may not include the name of an individual who is not a certified public accountant.

(e) It is unlawful for any person, except the holder of a Kansas permit to practice or practice privilege pursuant to K.S.A. 1-322, and amendments thereto, or a valid Kansas firm registration, to issue a report with regard to any attest or compilation service under standards adopted by the board. A reference in a report to auditing standards generally accepted in the United States of America is deemed to be a reference to standards adopted by the board. The practice of public accountancy by persons not required to hold a permit to practice, including public accountants, is not prohibited or regulated by the provisions of this act, except for the provisions of this section, K.S.A. 1-308, 1-318 and 1-319, and amendments thereto and K.S.A. 1-319, and amendments thereto. The title "enrolled agent" may only be used by individuals so designated by the federal internal revenue service.

(f) Any person who violates any provision of this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $5,000, or to imprisonment for not more than one year, or by both such fine and imprisonment.



course. Once a candidate has successfully completed the ethics course and has been issued a Kansas CPA certificate, a person may use the CPA as a credential only. (In other words, CPA may appear after a person™s name if they are working in an industry that is not related to the practice of public accountancy.) **CAUTION: Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, ALL fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, a person must also hold a valid Kansas permit to practice.** The CPA Certificate allows a person to use the designation as a credential, not hold out or sign reports for the public as a CPA. If a person wants to reflect this information on a resume, then we strongly suggest that the CPA designation is explained by saying, "not licensed to practice in Kansas". For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf The definition is broken out into two categories:  attest and non-attest.

**12. What if I sat for the exam before the education requirement changed in May of 1997--do I now have to meet the 150-hour education requirement to sit for the exam in the future?**
If you sat for the CPA Exam in Kansas as a Kansas candidate prior to July of 1997, you do not have to meet the 150 hour education requirement to sit for the exam as a Kansas candidate in the future.

**CERTIFICATION QUESTIONS**

Back To Top

**NOTE: KANSAS IS A TWO-TIERED STATE, WHICH MEANS A PERSON MUST APPLY FIRST FOR A CPA CERTIFICATE AND THEN A PERMIT (LICENSE) TO PRACTICE AFTER MEETING AN EXPERIENCE REQUIREMENT. ONLY AFTER OBTAINING A PERMIT TO PRACTICE, MAY A PERSON HOLD OUT, PERFORM OR OFFER TO PEFORM SERVICES AS A CPA FOR THE PUBLIC. SEE PERMIT QUESTIONS FOR INFORMATION ON OBTAINING A PERMIT.**

**1. How do I obtain a CPA certificate by exam, or by transfer of grades, in Kansas?**
A Kansas exam candidate need only complete the Application for Certificate by Passing Examination in Kansas, and pay a $25.00 application fee, after the candidate has successfully completed the CPA exam as a Kansas candidate and the AICPA ethics exam.  A person transferring their grades to Kansas is required to meet Kansas' specific education requirements at the time of transfer and be a resident of Kansas.

**2. How do I obtain a CPA certificate by reciprocity in Kansas?**
A person whose original certificate is from another state may be issued a certificate by reciprocity if the applicant passed the exam with grades that would have been passing grades that time in this state and the applicant meets all current requirements in this state for issuance of a certificate at the time application is made, and at the time of issuance of the applicant's certificate in the other state met all such requirements applicable in this state, or the applicant had four years of experience after passing the exam upon which the applicant's certificate was based and within the 10 years immediately preceding the application.

**PERMIT (LICENSE) TO PRACTICE QUESTIONS**

Back To Top

**A PERSON WHOSE PRINCIPAL PLACE OF BUSINESS IS IN KANSAS AND WHO HOLDS OUT OR PERFORMS OR OFFERS TO PERFORM SERVICES AS A CPA MUST HAVE A VALID KANSAS PERMIT TO PRACTICE.**

**1. What is the experience requirement for a permit to practice?**
One year of accounting experience obtained through employment in government, industry, academia or public practice, providing any type of service or advice involving the use of attest or nonattest skills, all of which was verified by a CPA holding an active license to practice.

**2. Does the person verifying my experience have to be a supervisor?**
The experience no longer has to be under the direct supervision of a licensed CPA; however, a licensed CPA must verify that a person has the experience necessary to obtain a permit to

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00301-WJM

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**1. WILLIAM J. SEARS,**

Defendant.

---

### AFFIDAVIT OF STEVEN R. ANDERSON, CPA, JD

---

Steven R. Anderson, being of lawful age and upon his oath, deposes and states:

1.      I am an attorney licensed to practice law in the State of Colorado since 1987, and co-founder and managing partner of Anderson & Jahde, PC, 5800 South Nevada Street, Littleton, Colorado 80120.

2.      I also hold an inactive certified public accountant license in Colorado, having received my certification and license to practice public accounting in the State of Colorado in 1984.

3.      My practice focuses on Federal & State, civil and criminal tax controversies and trials; and, on representing accountants, tax return preparers and CPAs in all professional facets, to include CPA malpractice defense, representing CPAs before the Colorado State Board of Accountancy (and other state licensing boards), representing CPAs before the American Institute of Certified Public Accountants, and representing accountants before the IRS' Office of Professional Responsibility. I have represented and



consulted between 150 and 200 CPAs in cases before the Colorado State Board of Accountancy.

4.      I do not have an exact number on how many, but a portion of the Board of Accountancy cases I have worked on involved CPAs who had relocated from other states to Colorado and were defending complaints before Colorado's Board of Accountancy (the "Board") because they did not understand Colorado's rules pertaining to holding out as a CPA in Colorado.  I frequently work with Colorado's statutes governing CPAs and with the Rules of the Board. I have reviewed the CPA rules and statutes in Kansas.

5.      I was asked to review the propriety of Special Agent Kate Funk's use of a CPA designation on search warrant applications related to cases involving William Sears, Scott Dittman, and Fusion Pharm, LLC, which were filed in the United States District Court for the District of Colorado.

6.      Colorado's rules deem this a holding out as a CPA in Colorado that requires qualifications Ms. Funk does not have. She is not a CPA in Colorado and may not hold herself out to be a CPA in Colorado.

7.      Ms. Funk passed the CPA exam in Kansas, but never completed the Kansas requirement of having one year of qualified work experience to earn a Kansas "permit" to practice as a CPA. Kansas and Colorado have different legal structures for becoming a CPA authorized to practice as a CPA.  In Kansas you obtain a CPA "certificate" (which Ms. Funk has) by meeting educational requirements and passing the CPA exam.  Then, you must have the year of qualified work experience after which you may obtain a Kansas "permit" to practice as a CPA. Ms. Funk does not have a "permit" to practice as a CPA in Kansas.

2

8.    Colorado combines education, passing the CPA exam and one year of qualified work experience before you can obtain a CPA "certificate." Colorado does not issue "permits" for individual CPAs See, *C.R.S. §§ 12-2-108 and 12-2-109, and Rule 4.1 Colorado Board of Accountancy.* This difference between the states is key. Colorado does not allow someone from another state without one year of qualified work experience to hold themselves out as a Certified Public Accountant or use "CPA." *C.R.S. § 12-2-115(3).*

9.    Within the last year, I represented a Kansas CPA before the Board who was fully licensed in Kansas, with a Kansas permit, who used "CPA" on a business card handed to one client. The Board held this individual in violation of Colorado's statutes for improperly holding herself out as a CPA in Colorado. She did not first get reciprocity from Colorado. Ms. Funk's holding out was more egregious because she has no Kansas permit.

10.    On the Affidavit for Search Warrant, Special Agent for the Federal Bureau of Investigation, Kate E. Funk, wrote, "[p]rior to my employment with the FBI, I received an accounting degree from the University of Kansas in 1995. I became a certified public accountant in 1996 through the State of Kansas." Again, Ms. Funk has a Kansas certificate, not a permit to practice as a CPA. Clearly, Ms. Funk wanted the Court and others to rely on her statements in her affidavit as if they were provided by a CPA who had met Colorado's requirements to be a CPA. She is not recognized as a CPA in Colorado. I also checked the Kansas Board of Accountancy website and found an FAQ that addresses whether Ms. Funk could provide litigation support services (which is what

3

she did by submitting the affidavit) without having a permit in Kansas. [She cannot.] Here

is the Q&A from the Kansas Board of Accountancy website:

**6. I don't provide any attest services.  Am I required to hold a permit to practice to provide non-attest services as a CPA?**
Yes.  Financial Planning, litigation support, broker/dealer services, investment advisory, consulting, management advisory and business valuation services, all fall under the definition of non-attest practice, and in order to use the CPA designation in connection with these services, requires a person to hold a valid Kansas permit to practice.  For the definition of practice of certified public accountancy, please go to www.ksboa.org/statutes/1_321.pdf  The definition is broken out into two categories:  atttest and non-attest.

Ms. Funk violated the laws of Colorado by claiming she is a Certified Public Accountant, intending for the Court and others to rely on her statements with the full level of trust, training and competence those statements would have had they been made by a CPA.  Even under Kansas law she could not provide the litigation support services she provided here in Colorado.

11.     She made the same statement in an affidavit to support an application for

search warrant to search email accounts for William Sears, Scott Dittman, and others.

12.     According to the records of the University of Kansas, Kate Egan graduated in 1996, not 1995.

13.     According to the records of the State Board of Accountancy for the State of

Kansas dated December 24, 2017, Kate Egan was issued a CPA certificate on August 4, 1999, not in 1996 as she claimed in Affidavits filed. 

14.     I am informed, and therefore do believe, that Kate Egan is the same person

as Kate Funk.  I also have been informed and do believe that Kate Funk has moved to

and does reside in Denver, Colorado and not in Chicago, Illinois, and has done so for

many years.

15. Once one becomes a resident of the State of Colorado, and desires to hold themselves out as a CPA in Colorado, they must obtain reciprocity and a license from the Board to hold themselves out as a CPA in Colorado. Ms. Funk could not have accomplished this because she had no Kansas permit. According to the Board's website: "To apply for a license in Colorado one must satisfy the following:

- Holds an active license from a substantially equivalent jurisdiction and/or possesses the requirements necessary for issuance of a license in Colorado.

- Attests to having completed all CPE required by the other state as of the application receipt date"

Kate Funk formerly known as Kate Egan could not obtain reciprocity because her Kansas certificate is not the equivalent to being a CPA in the State of Colorado.

16. Kate Funk has no professional CPA credential in Colorado. Therefore, she is not qualified as a CPA to offer opinion testimony on the appropriateness of revenue recognition or other applications of Generally Accepted Accounting Principles (GAAP); and Generally Accepting Auditing Standards (GAAS). I have reviewed an Affidavit drafted containing opinions by Kate Funk regarding revenue recognition and disclosure requirements for FusionPharm; and it is my opinion as a licensed lawyer and licensed inactive CPA in the State of Colorado, that Kate Funk was not qualified to render said opinions in her Affidavit as a CPA and violated Colorado's laws by doing so.

17. Colorado Revised Statute § 12-2-129 makes it a Class 2 Misdemeanor to use the CPA designation in Colorado when one is not authorized to do so; and a class 6

5

(felony for any subsequent offense.  Kate Funk appears to have violated this criminal statute.

FURTHER AFFIANT SAYETH NAUGHT.

_____          6-18-19
Steven R. Anderson                              Date


STATE OF COLORADO          )
                                                )ss.
COUNTY OF Arapahoe          )

        Subscribed and sworn to before me by Steven R. Anderson this 18th day of June, 2019.

        Witness my official hand and seal.

                                        Marcie J Morton
                                        Notary Public

        MARCIE J MORTON
        NOTARY PUBLIC
        STATE OF COLORADO          My commission expires: 8-26-2019
        Notary ID 20034028692
        My Commission Expires 08/26/2019

6

# Exhibit - KFAFBS

Kate Funks affadavit. Highlighted where she was acting as a Certified Public Accountant as she fraudelently claims to be

Along with notes to her assumptions where as there is no doubt she was and is clearly unqualified & Incompetent.

✳ Please note this is a unofficial copy of her affadavit. The real one was never registered with the court as required. As show in Exhibit AF-1 & AF-2 the document was changed after the fact. Never to reveal the True Affadavit. To think she got to change it & still got it all wrong?

The "four Corners Rule" comes to mind here as the entire document is falsified & perjured.

✳ You will also notice the reference number to the Section in the Auditors Comments may not correspond. The auditors comments were made on the version given to Scott Dittmans Lawyers. The version provided here is the version sent to my Lawyers. There for the same warrent. Mysteriously my version is longer.

How is this not Fraud & Malicious Prosecution. ?

account statements, checks, deposits, incoming wire information) provided by various banks of accounts owned, operated or controlled by FusionPharm, Dittman and Sears ("Bank Records"); (b) brokerage records (account statements, transaction history and wire transfers) provided by Oppenheimer & Co., Inc. of an account controlled by Sears ("Brokerage Records"); (c) records provided by FusionPharm's transfer agent regarding stock issuances, transfers and transactions ("Transfer Agent Records"); (d) investigative records provided by the Financial Industry Regulatory Authority ("FINRA") of its 2011 investigation of FusionPharm ("FINRA Records"); (e) records obtained from the Blue Sheet System (a system used to collect data resulting from "Blue Sheet Requests," which are electronic requires for detailed information on trades in publicly traded securities sent to clearing firms, broker dealers and market makers)("Blue Sheet Data") and (f) records of wire transfers in various bank accounts owned, operated or controlled by FusionPharm, Dittman and Sears, as provided by the Federal Reserve Bank ("FedWire Records") (collectively "SEC Produced Records").

## THE CRIMINAL INVESTIGATION

11. [Following receipt of the referral] the FBI opened a criminal investigation and shortly thereafter enlisted IRS-CID to assist in financial and other aspects of the criminal investigation.

12. [Your affiant thereafter reviewed and has been reviewing] the SEC Produced Records on an ongoing basis. [Additionally, your affiant was] made privy to [SEC analyses] of the [Bank Records,] Brokerage Records and [Transfer Agent Records] (collectively "SEC Analyses") and has reviewed the same on an ongoing basis. Furthermore, beyond the Bank Records included in the SEC Produced Records, the FBI

4



and IRS-CID has acquired additional bank records as additional accounts and transactions have been uncovered. Your affiant has been reviewing these records as part of an ongoing effort to follow the flow of money from the scheme detailed herein.

13.     In addition to my review of the records set forth in ¶. 12, your affiant interviewed two former FusionPharm employees.   On February 17, 2014, CW-1 voluntarily sat for a joint proffer session with your affiant, and representatives from the SEC, IRS-CID, and United States Attorney's Office ("USAO") at the USAO offices in Denver, CO.   CW-1 sat for a second voluntary joint proffer session on February 28, 2014 with your affiant and representatives from the SEC, IRS-CID, and USAO at the USAO offices.   On March 12, 2014, your affiant and IRS-CID Special Agent Ronald Loecker had a follow up meeting with CW-1, at which time CW-1 voluntarily provided your affiant and IRS-CID Special Agent Loecker with e-mail and phone text message communications between CW-1, and Dittman and Sears.   Your affiant reviewed these e-mail and phone text message communications after receipt from CW-1.

14.     As part of your affiant's discussions with CW-1, CW-1 identified a former FusionPharm employee, Cooperating Witness 2 (hereinafter referred to as "CW-2"), who was familiar with various aspects of FusionPharm's business operations from the company's inception, including the accounting and bookkeeping aspects of the business.   On March 5, 2014, your affiant and IRS-CID Special Agent Loecker interviewed CW-2.

15.     As part of his assistance, on or about March 28, 2014, CW-1 introduced Dittman to an FBI undercover agent (hereinafter referred to as "UC-1").   CW-1 introduced UC-1 as a prospective FusionPharm investor.   From March 28, 2014 to May

5

resulted in his conviction in 2007, by way of guilty plea, to one count of conspiracy to commit securities fraud and commercial bribery and one count of securities fraud, in a federal criminal prosecution brought in the Southern District of New York (Case No. 04-cr-556-swk).

20.     According to CW-1 and CW-2, and based on your affiant's review of the SEC Produced Records, Sears worked at FusionPharm for large portions of the 2011-2014 time period, often handling day-to-day responsibilities reserved for the chief financial officer of a company.  From the time of FusionPharm's inception, Sears: (a) was the person responsible for negotiating the purchase of Baby Bee Bright (a predecessor company discussed below); (b) handled and managed incoming investor checks and paperwork; (c) often corresponded with FusionPharm's transfer agent in connection with FusionPharm transactions; (d) provided credit cards and company funds to FusionPharm employees when they needed to make business purchases; (e) wrote payroll checks for FusionPharm employees, including many checks that came from bank accounts in the name of the entities controlled by Sears; and (f) made pitches to a number of investors on FusionPharm's behalf.  Furthermore, as detailed below, Sears held millions of shares of FusionPharm's common stock through entities he controlled.

21.   Based on your affiant's review of FusionPharm's annual and quarterly disclosures, FusionPharm is the latest incarnation in a far-ranging corporate history of the company.  From February 1998 through December 2003, the company was known as Argent Capital Corp.  From December 2003 through May 2006, the company was known as Sequoia Interests Corp.  Sequoia Interests Corp. purportedly manufactured a

product called Diamond Flo, an alkaline detergent used to break down oil in sand.  On May 6, 2006, the company became known as Baby Bee Bright Corp ("Baby Bee Bright") after completing a reverse merger.[3]  Baby Bee Bright, which was traded on the over-the-counter ("OTC") market via OTC Link operated by OTC Markets Group Inc. ("OTC Link")[4] under the symbol BBYB, was purportedly the developer, manufacturer and marketer of a prenatal communicator and related products servicing the expectant mother/prenatal market.  Based on your affiant's review of the FINRA Records, Dittman was appointed President and Director of Baby Bee Bright on November 15, 2010. Additionally, Sandra L. Sears, Sears's mother (hereinafter "Mrs. Sears"), was appointed Treasurer & Secretary and Director on the same date.

22.    Based on your affiant's review of the Transfer Agent Records, on January 25, 2011, Baby Bee Bright's CEO, Frederick Dahlman, Jr., transferred 1,300,000 preferred shares of Baby Bee Bright's stock to Salt Investments, LLC, a single person LLC owned, operated and controlled by Dittman.  Dahlman retained the other 200,000 preferred shares of Baby Bee Bright.  Less than two months later, on March 16, 2011, Dahlman transferred 185,000 of his remaining 200,000 preferred shares to Microcap Management, LLC ("Microcap"), an LLC owned, operated and controlled by Sears. Based on your affiant's review of the FINRA Records, Dittman told FINRA on October 6,

---

[3] In a reverse merger transaction, an existing public "shell company," which is a public reporting company with few or no operations, acquires a private operating company—usually one that is seeking access to funding in the U.S. capital markets. Typically, the shareholders of the private operating company exchange their shares for a large majority of the shares of the public company. Although the public shell company survives the merger, the private operating company's shareholders gain a controlling interest in the voting power and outstanding shares of stock of the public shell company. The SEC's Office of Investor Education and Advocacy has issued an investor bulletin in the past warning about the risks of investing in companies that have been involved in recent reverse mergers.  (See http://www.sec.gov/investor/alerts/reversemergers.pdf)

[4] In the OTC Market, trading is not done via an exchange but rather directly between two parties.  OTC trading in stocks is generally carried out using inter-dealer quotation services such as OTC Link and the OTC Bulletin Board (operated by FINRA).

38.     In 2011, FusionPharm purportedly focused on two aspects of the organic produce and agriculture market: (1) growing and selling produce (almost always lettuce); and (2) selling PharmPods in the organic produce industry.  According to FusionPharm's 2011 Annual Report, FusionPharm claimed to have made $256,895 in revenues during the 2011 fiscal year.  Notably, your affiant's review of FusionPharm's 2011 Annual Report reveals $0 in Accounts Receivable, suggesting that any revenue generated by FusionPharm during the 2011 fiscal year (January 1, 2011  through December 31, 2011) should be supported by incoming deposits in FusionPharm's  bank accounts.

39.     In the same report, FusionPharm represented to investors that it derived its revenue from organic food sales.  FusionPharm  touted  its relationship  with Circle Fresh Farms as its main partner and revenue driver in 2011.  Based on your affiant's review of the SEC Produced Records, SEC Analyses, statements by CW-2 and your affiant's  independent  investigation,  FusionPharm  did  not  generate  any  significant  revenue from: (a) Circle Fresh Farms directly; or (b) agriculture-related business.  Moreover, it did not generate anywhere close to $256,895 in revenues during the 2011  fiscal year.

40.     FusionPharm reported its "successful harvest and sale of its initial crop through its collaboration agreement with Circle Fresh Farms."  Your affiant's review of the SEC's Analyses and the Bank Records reveals only one check from Circle Fresh Farms at any time between 2011 and 2013 across the bank accounts of FusionPharm and the Sears Controlled Entities – for $30.60 in 2012.  Accordingly, Circle Fresh Farms did not generate any revenue for FusionPharm in 2011.

41.     Moreover, CW-2 estimated that FusionPharm only made $3,000 - $5,000 in organic produce sales from 2011 through 2013. Your affiant's review of the Bank Records, along with the SEC Analyses of the same corroborates the statements made by CW-2. Your affiant found, and the SEC Analyses confirmed, that there was less than $4,000 worth of organic produce sales across the bank accounts of FusionPharm and the Sears Controlled Entities – and those sales were all in 2012 and 2013. Once again, these sales could not be a basis for claimed 2011 revenue.

42.     Furthermore, your affiant's review of the Bank Records and the SEC's Analyses regarding the same provide no evidence of any FusionPharm sales of PharmPods to third parties in 2011. Of the almost $600,000 of incoming funds into FusionPharm's bank account in 2011, nearly 100% of the funds can be traced to: (a) the Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits. I have reviewed the SEC Analyses of the Bank Records, wherein the SEC was able to trace the majority of cash deposits and cashier's checks directly back to a corresponding withdrawal from one of the accounts for the Sears Controlled Entities for the same dollar amount on the same day. Your affiant's review of the Bank Records confirms these findings.

43.     To ensure that payments from third party customers were not made to one of the Sears Controlled Entities, your affiant reviewed the SEC Analyses concerning the incoming wires and deposits into the Sears Controlled Entities' accounts for 2011. Your affiant found no evidence of any FusionPharm PharmPods sales to third parties in 2011 based upon the following: (a) Sears did not open VertiFresh's bank account until 2012; (b) The Meadpoint account only had a single $100 deposit into the account during 2011

from another Sears Controlled Entity; and (c) Bayside's account was almost wholly funded from incoming wires and deposits from Microcap.

44.     Microcap, meanwhile, received over $1.2 million in incoming wires and deposits in 2011. Of that amount, approximately 99% came from wire transfers. Based on my review of the Bank Records and Brokerage Records, these wire transfers originated from Microcap's brokerage account. The Brokerage Records confirm that nearly all of the money coming into Microcap's brokerage account in 2011 came from sales of FusionPharm common stock. The remaining 1% that came into Microcap's bank account is 2011 was comprised almost entirely of a single deposit from Bayside.

45.     As a result, there is no evidence that the money coming into FusionPharm's accounts or the accounts in the name of the Sears Controlled Entities was the result of legitimate sales of produce or PharmPods.   Rather, the source of the money appears to the sale of FusionPharm stock, which was then funneled between and among the Sears Controlled Entities.

## MISREPRESENTING SALES REVENUE IN 2012

46.     In its 2012 Annual Report, FusionPharm represented that its net revenues for the year ended December 31, 2012 were $808,398 an increase of 250+% compared to 2011. When asked if these figures seemed accurate, CW-2 said this revenue figure was "impossible" as the most revenue that could have come into FusionPharm from PharmPod sales in 2012 was $160,000. CW-2 was aware of only one deal in 2012 to a customer in Arizona for eight PharmPods. CW-2 helped load the PharmPods for delivery. CW-1 said these figures were "bullshit" and "crazy." Based on your affiant's

review of the Bank Records and SEC Analyses regarding the same, FusionPharm did make anywhere close to $825,594 – or even $160,000 – in revenue in 2012.

47.    In comparison to 2011, the 2012 Annual Report did disclose significant accounts receivable – over $500,000. Accordingly, your affiant and the SEC analyzed the Bank Records to determine if there was evidence to support approximately $300,000 in incoming revenues in 2012.

48.    Based on your affiant's review of the Bank Records and the SEC's Analyses regarding the same, FusionPharm had approximately $400,000 in incoming wires and deposits into its accounts in 2012. As in 2011, nearly 100% of the funds can be traced to: (a) Sears Controlled Entities; (b) cash or cashier's checks deposits; or (c) investor deposits.   As with 2011, the SEC was able to trace most of the cash deposits back to corresponding cash withdrawals at other Sears Controlled Entities. Your affiant reviewed the Bank Records and the SEC's Analysis on this point and corroborated this conclusion.

49. The SEC and your affiant also reviewed the Bank Records for the Sears Controlled Entities in 2012. The Meadpoint and VertiFresh accounts in 2012 had a very similar pattern – significant deposits and wires coming in to the accounts from other Sears Controlled Entities with little-to-no evidence of any incoming deposits or wires coming into the account from unaffiliated third parties. Consistent with 2011, the majority of the funds coming in to the VertiFresh and Meadpoint accounts were from Bayside and Microcap. More importantly, your affiant's review of the Bank Records reveals evidence of only one possible third-party sale of a PharmPod, with

approximately $70,000 worth of incoming deposits and wires potentially related to this transaction.

50. In turn, your affiant and the SEC analyzed the Bayside and Microcap accounts in 2012. Based on your affiant's review of the Bank Records and the SEC Analyses regarding the same:

a. Bayside received more than $500,000 in deposits and incoming wires in 2012. Of that amount, more than 80% of the incoming funds came from Microcap Management or William Sear's personal accounts. The remaining deposits were from Sears Controlled Entities, cash or investors. Importantly, there was not any evidence of third-party purchases of PharmPods.

b. Microcap had more than $550,000 in deposits and incoming wires in 2012. Of that amount, your affiant and the SEC traced more than 85% of those funds back to Microcap's brokerage accounts. Based on your affiant's review of the Brokerage Records and Blue Sheet Data, Microcap made all of its money in its brokerage accounts between January 2012 and August 2012 selling FusionPharm stock. Based on your affiant's analysis of the Blue Sheet Data, as well as the SEC's Analyses of the same, it appears that Microcap continued this practice throughout the remainder of 2012 in a different brokerage account. The remaining 15% of incoming deposits and wires in Microcap's account came from FusionPharm investors and cash. Once again, there was not any evidence of a third-party sale of PharmPods.

51.     Based on my review, investigation and analysis above, the money coming into FusionPharm's and the Sear Controlled Entities' bank accounts was ultimately the result of Microcap selling FusionPharm stock on the open market, and re-circulating portions of those proceeds to the other Sears Controlled Entities.

### RESTATEMENT TO 2012 SALES (REVENUE STILL INCLUDES MISREPRESENTATIONS)

52.     On April 15, 2014, FusionPharm issued its 2013 Annual Report, which included a restatement of 2012 annual revenue, reversing $500,000 of 2012 revenue. The newly stated revenue with the reversal was $308,398. The restatement clarified that $750,000 of initial claimed revenue was purportedly attributable to an "exclusive licensing arrangement with [VertiFresh] for the use of PharmPods growing technologies for agricultural products."

53.     The restatement claimed that VertiFresh paid $250,000 in 2012 in connection with the purported licensing agreement mentioned above, but that the remaining $500,000 was reflected as revenue in error under GAAP.   With the restatement, FusionPharm claimed that it only made an additional $58,398 ($308,398 - $250,000) outside of the licensing revenue from VertiFresh – a figure far more consistent with actual 2012 PharmPod sales based on your affiant's review of the Bank Records, statements made by CW-2 and CW-1 and the SEC's Analyses.

54.     However, based on my review of the SEC Produced Records, the SEC Analyses and your affiant's experience and background in accounting, the reported revenue remains inaccurate for at least three reasons:



a. First, as detailed herein ¶¶68-72, nowhere in the Restatement does FusionPharm disclose that VertiFresh is an affiliate owned, operated and controlled by Sears, a FusionPharm control person.

b. Second, even if the revised $250,000 figure could be a legitimate third party transaction, and even if the revenue could be properly recognized under GAAP, FusionPharm misrepresented the basis for possibly recognizing this amount as revenue. In Note 4 to FusionPharm's 2013 Annual Report, FusionPharm claims that "The restatement was based on reevaluating the arrangement with VertiFresh which required $250,000 be paid during 2012 for the licensing of the Colorado territory (on a nonrefundable basis), and the remaining $500,000 to be due in equal installments of $250,000 during 2013 and 2014 for the rights to two additional territories. The initial $250,000 was paid during 2012 and was reflected as earned revenue. Yet, according to the SEC analyses of the Bank Records, and my review of the same, VertiFresh only contributed approximately $128,000 in deposits and wires to FusionPharm in 2012.

c. Third, CW-2 said that FusionPharm did not sell any licenses or receive any licensing income while she worked at FusionPharm, which includes 2012.

## MISREPRESENTING 2013 SALES REVENUE AND BUSINESS DEALS

55.     In its 2013 Annual Report, FusionPharm claimed that it made $594,397 in revenue in 2013. Based on your affiant's review of FusionPharm's 2013 Annual Report, FusionPharm did not have any accounts receivable at the end of 2013. In an email

conversation with UC-1 on April 30, 2014, Dittman confirmed the 2013 revenue was all from the sale of PharmPods. In a subsequent meeting on May 1, 2014, Dittman stated that FusionPharm delivered 34 PharmPods in 2013.

56.    CW-1 said that it was "impossible" that the company could have earned these revenues in 2013.   Although CW-1 only worked at FusionPharm until October 2013, your affiant's comparison of FusionPharm's September 2013 quarterly financial disclosure comparison, which claimed a cumulative revenue figures of $549,725 through the company's third quarter, with the year-end revenue claimed in FusionPharm's 2013 Annual Report, $594,397, reveals that FusionPharm only claimed to make $44,672 in revenue in the last quarter of 2013. Accordingly, the bulk of the revenue purportedly came during the time that CW-1 worked at FusionPharm.

57.    Furthermore, there were only three PharmPods at the warehouse when CW-1 arrived in January 2013: (a) two were used to grow lettuce; and (b) one was not functioning. Additionally, according to CW-1, there were not any deals in place to sell any PharmPods in 2013 when he started. Throughout 2013, CW-1 was responsible for: (a) preparing PharmPods for sales to customers; and (b) constructing the PharmPods kept at the warehouse where FusionPharm would grow cannabis. This meant that any FusionPharm PharmPod 2013 sales required CW-1 to be involved in the refurbishing and retrofitting of the shipping containers prior to delivery. CW-1 did not believe it was possible for FusionPharm to have sold anywhere close to 34 PharmPods while he was employed without his knowledge.

58.    According to CW-1, there were two possible revenue sources in 2013: (a) sales of PharmPods; and (b) sales of marijuana. CW-1 said that the most revenue that

could be derived from PharmPod sales in 2013 was $200,000-$250,000 – and CW-1 stated that those figures were a high estimates. CW-1 identified, at most, two possible sales between January – October 2013: (a) FusionPharm sold two PharmPods to a customer in California; and (b) FusionPharm sold five PharmPods to Local Products, a Denver company.[8]

a. CW-1 said there might have been an additional, single PharmPod sale to Mile High Green Cross in 2013, but he could not be sure.  Dittman told CW-1 that FusionPharm "gave away" a PharmPod to Mile High Green Cross so CW-1 was not sure that this could be classified as a "sale."  Based on your affiant's review of the Bank Records, Mile High Green Cross did provide funds to Meadpoint – but this was in 2012. There is no evidence that Mile High Green Cross made any payments to FusionPharm or the Sears Controlled Entities in 2013.

59.       Based on the statements from CW-1, FusionPharm did not sell more than 7 PharmPods between January – October 2013. Yet FusionPharm continued to make representations to the contrary to the public.   For example, on February 6, 2013 the company issued a press release claiming it "completed the sale of 8 PharmPod High Intensity containers under its licensing agreement with Meadpoint Venture Partners." CW-1 said there were multiple problems with this: (a) since Dittman and Sears operated the Sears Controlled Entities and FusionPharm as one entity, this release was basically claiming a sale to itself; and (b) as noted above, CW-1 could recall, at most, 7 PharmPod sales *total* in 2013.

---

[8] As noted in ¶8, CW-1 originally complained that FusionPharm had not made any sales during his time with the company.  CW-1 has revised that statement to match the sales highlighted in ¶58.

60. Additionally, Sears's company, Meadpoint directly participated in the misrepresentations. For example, on July 29, 2013, Meadpoint issued a press release that appears on the FusionPharm web page announcing that it "reached the $200,000 mark for sales in the past 30 days, including its first ever sale into the California medical cannabis marketplace." The press release also claimed that Meadpoint was "optimistic that we will reach our annual sales goal of 100 PharmPods by the end of the year." CW-1 said that delivering 100 PharmPods to customers in 2013 was "ridiculous" and not even close to actual figures. Moreover, CW-1 said that the $200,000 figure may have been an annual amount, but certainly not in the last 30 days. Furthermore, based on affiant's review of the Bank Records, there is no evidence of $200,000 coming in to FusionPharm's or Meadpoint's bank accounts between June 2013 and July 2013 from companies that are not affiliated with Sears or Dittman.

61. For the second possible revenue stream, FusionPharm grew cannabis, and sold it to Groundswell, a licensed marijuana retailer on record with the Medical Marijuana Enforcement Division in Colorado, in the latter part of 2013.

62. Based on your affiant's review of the Bank Records, SEC's Analyses of the same, and CW-1's statements, there is little evidence that Groundswell made up the remainder of the claimed 2013 revenue. In fact, there is only one check or incoming wire from Groundswell in 2013: a $50,000 check to FusionPharm on August 15, 2013.

63. While your affiant observed some significant transactions in the fourth quarter of 2013, Dittman told UC-1 a portion of the December orders were not recognized as revenue because they were not yet delivered. FusionPharm's 2013

29

Annual Report confirms this statement.    Importantly, as noted above in ¶56, FusionPharm made, at most, $44,672 in revenue in the last quarter of 2013.

64.    For the first three quarters of 2013 when CW-1 worked at FusionPharm, based on your affiant's review of the Bank Records and SEC's Analyses regarding the same, as well as statements from CW-1, there is no evidence that FusionPharm made $549,725 or sold 34 PharmPods.

## ADDRESSING CONCERNS OF CASH PAYMENTS

*There were NONE !!!*

65.    Dittman told UC-1 on May 1, 2014 that one of FusionPharm's vendors made cash payments between 2011 and 2013.    In an effort to ensure that cash payments were not dismissed as a potential legitimate revenue source, the SEC conducted an analysis of FusionPharm's bank accounts and the accounts in the name of the Sears Controlled Entities to determine if a conservative analysis of the cash transactions could provide sufficient revenue to match the numbers claimed by FusionPharm in its financial disclosures.

66.    Even after including all cash deposits that could not be  directly traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account, based on a review of the Bank Records and SEC Analyses regarding the same, your affiant was unable to get anywhere near the revenues that FusionPharm included in the Financial Statements for 2011, 2012 or 2013.

   a.  2011: Your affiant found less than $25,000 worth of incoming deposits and wires that could be considered from unaffiliated third parties.

   b.  2012: Your affiant uncovered approximately $200,000 in incoming wires and deposits.    Of that amount, approximately $128,000 came from

VertiFresh (discussed above in ¶¶ 52-54), approximately $35,000 in cash and approximately $47,000 from Bayside, MeadPoint and a missing check with the notation "container deposit."

c. 2013: Your affiant uncovered approximately $425,000 in incoming wires and deposits in 2013. More than 50% of this amount was cash deposits, with many of these traceable back to Meadpoint. The majority of the remaining checks were from Sears Controlled Entities.

67. Accordingly, even if it were to be assumed that every cash deposit which could not be traced back to a corresponding withdrawal from an affiliated Sears Controlled Entity account was the byproduct of a legitimate, arms-length transaction, the maximum possible revenue under my conservative approach was still more than $100,000 short every year of the revenue claimed by FusionPharm.

## OTHER MISREPRESENTATIONS TO INVESTORS

68. As noted in ¶¶19-20 above, Sears handled numerous responsibilities at FusionPharm that are often reserved for a company officer. Yet, based on statements from CW-1 and CW-2, Sears refused to put his name on any FusionPharm documents or accounts. Rather, Sears attempted to get FusionPharm employees (including CW-1 and CW-2) to open up bank accounts and businesses in their names.

69. Based on affiant's review of the FINRA Records, Dittman authored FusionPharm's press releases and reviewed its financial statements. Yet, based on affiant's review of the same, Dittman never made any disclosures about Sears's involvement with FusionPharm or the connection between Sears, the Sears Controlled Entities and FusionPharm.

70.   By way of example, based on affiant's review of FusionPharm's Financial Disclosures dating back to 2012, FusionPharm has repeatedly emphasized that the vast majority of its PharmPod sales are through Meadpoint and VertiFresh.  FusionPharm claimed in its 2012 Annual Report that 100% of its 2012 revenue came from Meadpoint and VertiFresh.  Yet, there is no disclosure anywhere in the financial disclosures dating back to 2012 that Sears controlled and operated these entities while handling the responsibilities detailed in ¶¶19-20, above.  Additionally, according to CW-1, he never heard Sears or Dittman disclose to investors that Meadpoint and VertiFresh were being run by themselves.

71.   Moreover, based on affiant's review of multiple FusionPharm Financial Disclosures throughout 2012, FusionPharm repeatedly represented a lack of inside or related parties that had "any material interest, direct or indirect, in any transaction with [FusionPharm] or in any presently proposed transaction that has or will materially affect" the company, including (1) any executive officer; (2) any person who beneficially owns, directly or indirectly, shares carrying more than 5% of the voting rights attached to our outstanding shares of common stock; and (3) any member of the immediate family (including spouse, parents, children, siblings and in-laws) of any of the foregoing persons."   According to CW-1 and CW-2, and based on your affiant's review of, FusionPharm's 2012 Financial Disclosures and the SEC Produced Records:

    a. Sears is not listed as an officer;

    b. Through the Sears Controlled Entities, Sears indirectly owned more than 5% of FusionPharm's common stock shares in 2012.  Based on affiant's review of the Transfer Agent Records, the Sears Controlled Entities

32

#23 : False statement. Chris Haddad & Kelly Blume were Independent Contractors for Both MeadPoint & VertiFresh. No withholding Tax ever paid as they were 1099.

Agent Funk not understanding the labor Pool Expertise being shared as Part of MeadPoints Distribution agreement

#27 : False Statement. A reverse split DOES NOT increase over all holdings 10 Fold. Only the cost of the Individual share.

If in Footnote #9 on Page 8 a preferred shareholder to convert significant shares to common, any attempt to liquidate would bring the stock price down to conversion price or lower. At very least the price prior to reverse or conversion.

"This is a silly Statement and shows the Agent has NO CONCEPT of the Public markets.

#42 : False Statement. The units were built on site for MeadPoint For Rental To MileHigh green cross. The certificate of Occupancy Took Longer then Expected. Thus Prompting Mile High Green Cross to secure their own Building & Purchased them instead of Leasing them

The 2012 multiple year lease Proved To be with MeadPoint NOT FusionPharm as the Agent Claims.

B - "Can Not be a basis for Revenue Recognition"
The above is another False Statement"

C - Was not a Related Party Transaction as proved.
All the units went To 3rd Parties
Another False Statement

#48: False Statement. "Fusion can not recognize revenue to MeadPoint without there being a 3rd party customer ahead of time." This is a absurd & rediculous statement! Since when are distribution companies illegal in the United States? In addition as documentation proves, MeadPoint always had customers identified prior as MeadPoint did Not have the means to simply purchase Inventory and Sell off the Floor.

Just another Example of Agent Funk having No concept of accounting.

#49: False Statement. CWI is wrong & could not opine on events that transpired 2 years prior to his employment. The 85% calculation is IMPOSSIBLE to adhere as she has done. MeadPoint did NOT always receive a comission/discount, as is displayed in other Transactions of the same. MeadPoint did NOT recieve a comission on the Mile High Green Cross Transaction. MeadPoint did NOT Source that customer. There are more & better documented Examples of these Type of Transactions that show this Comission Vs No Comission issue.

#53: The 5% is only applicable to Nasdaq & Higher Exchange listed Companies. FusionPharm was quoted on the OTC Pink Sheets. The threshhold is 10% NOT 5%. More Evidence Agent Funk has NO CONCEPT of the Public Markets.

#58: False Statement. NOT ONE single cash deposit was Made! NOT 1! These were ALL Inter-bank Transfers From One Wells Fargo Customer To Another.

"Agent Funk does NOT EVEN have the Knowledge of a First year bank Teller." Any first year bank Teller KNOWS this.

#74: False Statement. FusionPharm NEVER recieved any money Not 1 cent From the Growth of Marijuana. Not 1.

#76: False Statement. All Sales went to 3rd Parties There are None.

#77: False Statement. More of the same

#78: More Proof Agent Funk has no Grasp of Accounting.

#79: False Statement. Revenue is Fine To be booked once unit is shipped/delivered

#80: More of the same. Units sold to Meadpoint and Immediately rented To GroundSwell From June of 2013 To February 2014 when Groundswell Exercised the purchase option in the Lease Purchase Agreement.
  Agent Funk has no concept of a lease Purchase Agreement

#84: False Statement. FusionPharm Never Took or recieved money From direct cannabus Participation "Never"

#85: False Statement. It did NOT As advised by counsel & as 302 interviews prove that advice. There was a Seperate Entity For a reason as advised The Agreement had Nothing to do with FusionPharm.

#87: False Statement. The agents revenue calculation is Wrong, in addition a settlement was reached in 2015 For additional money owed.
  False Statement. it did NOT end until February of 2014 when CG bought the units as the settlement agreement Clearly shows!

#88: False Statement

#89: False Statement

#90: False Statement. No comission of John Scott.
Scott Dittman Sourced that Transaction Not Sears.

#91: False Statement. No comission on that
Transaction either.

#94: True Statement. Sears & Dittman were .50/50
Partners in VF Management.
"Not Fusion Pharm as Agent Funk Falsely States"

These were but a few examples. I think the
Point is made here If an evidentiary were granted
we will prove all of the above plus many more.

Please Note #74 #84 & #55. These all
speak to the fact of the governments money laundering
scheme theory. Couple that with all her false claims
of No 3rd party sales, Put those together & you have
The Ponzi scheme theory.

You cant make this up. If it was not happening
to me, I would not believe it possible.

#96 * Yes, Dittman disclosed Sears relationship
To the company and his backround to all potential
Investors How is this wrong? The under cover video
Proves this fact. The agent just spent more then
3/4 of the document saying Dittman hid Sears.

#97  What Would CWI Know or opine about how many units Fusion Pharm would or Could Sell? The figure in question was based on 2 large orders that were in the pipeline

1. Agripharm in Canada To whom Bought 46, only To start receiving them until March/April of 2014 due To construction delays in Canada.

2. The Greenway who signed a LOI to produce 108 units For They were going thru Final stages of licensing Procurement in Massachusetts

#100.  Complete False Statement

#104. How could a 8 month employment as a 1099 Independent Construction Contractor opine on a Percentage of a publically Traded companys share holdings as 50/50! The statement is absurd.

Once again. The affadavit starts as Perjured & False and continues as the same. These were but a Few as I dont want to overload This Filing.

# Exhibit - SB-1

Letter dated 6-20-14 From Scott Dittmans lawyer William Taylor to Ken Harmon. This confirms the Prosecutions initial theory of a money laundering Ponzi scheme. This was a result From a meeting in May of 2014 Whereas the government Flat out stated "We Know They Never sold a can"

Strangly Enough I had Just sent 13 units to Canada 5 months Before. US Customs comes to mind as a verification Source?

Once again who to second guess the Wife of Markus Funk!



303 16ᵗʰ Street, Suite 200
Denver, Colorado 80202-5657
Telephone: (415) 392-1960
Facsimile: (415) 392-0827

**William L. Taylor**
*Admitted only to Colorado & the District of Columbia*
wtaylor@sideman.com
(415) 733-3999

<u>June 20, 2014</u>

**VIA HAND DELIVERY**

AUSA Kenneth Harmon
United States Attorney's Office
District of Colorado
1225 Seventeenth Street, Suite 700
Denver, CO  80202

    Re: *Scott Dittman / Fusion Pharm, Inc.*

Dear Ken:

During our recent meeting together, you suggested that I take a hard look at the sales revenues for Fusion Pharm, Inc.  As promised earlier this week, with this letter I am transmitting to you a compilation of documents yielded by our preliminary efforts to review transactions for sales of pods manufactured by Fusion Pharm since 2011.

By my count, the attached records and materials document a total of sixty seven (67) pods sold.  Fifty nine (59) pods appear to have been delivered to buyers, and eight (8) have yet to be delivered.

Attached hereto you will find a series of tabs, each of which corresponds to a customer of the company during that period, and under which you will find records or other evidence documenting such sales transactions.  The records attached are not complete - - the government has seized most of the company's records, so it has been difficult to assemble complete records sets for each sale.  What you will find, however, depending on availability of records for various transactions, are copies of proposals, contracts, excerpts of bank records, copies of checks, shipping, customs, and inspection documents, and photographs of pods   In most cases, signed copies of documents were not available because the government seized the signed copies, so we have had to make do with copies attached to email messages.  Most of these records came from Scott Dittman's email records, banking records available online, or from Fusion Pharm customers who were interviewed by my investigator, and who sent us photos of pods or records upon my investigator's request.

Kenneth Harmon
June 20, 2014
Page 2


I apologize that it has taken us a couple of weeks to put together this (admittedly incomplete) set of documents evidencing these sales transactions, but you have the company's records, and I needed to hire an investigator to conduct interviews of customers.  Even though the records are not complete, I am fairly well satisfied that the company sold north of five dozen pods, and got paid for them, either directly by the purchaser, or by Mead Point, the company publicly disclosed as the contract sales agency for Fusion Pharm.

I confess that in light of what we have been able to document readily even without the benefit of the company's full business records (with more substantiation available from public sources), I am puzzled as to why the government would believe that these sales had not taken place.  I would like to discuss the matter further with you when you have time.

                                    Very truly yours,

                                    William L. Taylor


Enclosures


cc:      Ian Karpel, Assistant Director
         United States Securities and Exchange Commission

# Exhibit PD-1 thru 5

These are comments made by Investors in a online public forum. You will notice the are saying the opposite of what Agent Funk attests to. Fusion Pharm did 10 Press Releases in 4 years. In a pump & Dump 4 to 8 Press Releases are done in a month or 2.

falsified quarterly and annual financial disclosures and press releases ("the pump") in order to increase and/or sustain the price of the common stock of FusionPharm, thereby allowing them to make millions of dollars when dumping their company's stock in the secondary OTC market ("the dump"); and

b.      Evidence and instrumentalities of these crimes, as described in Attachment B, are likely to be located at the Subject Premises.

*s/Kate E. Funk*
Kate E. Funk, Special Agent
Federal Bureau of Investigation

Reviewed by Scott T. Mascianica, Special Assistant U.S. Attorney, and submitted by Kenneth M. Harmon, Assistant U.S. Attorney.

Sworn telephonically and signed electronically on this 15th day of May, 2014 at Denver, CO.

UNITED STATES MAGISTRATE JUDGE

12/28/2019

Fusion Pharm, Inc. (FSPM): the lack of PR is the reason why

Support: 888-992-3836 | NewsWire | Home | Login / Register



Join iHub today - FREE!



| Boards | Hot! | | Tools | Crypto | Streamer | Level 2 |

**Get Quote**

**Search iHub**

Take on the markets w/ confidence. Start trading at E*TRADE

**$0 COMMISSIONS**
**E✦TRADE**

E✦TRADE Open an account.

Home > Boards > US OTC > Cannabis > Fusion Pharm, Inc. (FSPM)

**the lack of PR is the reason why**

**Public Reply** | **Private Reply** | **Keep** | **Last Read**          Post New Msg          Replies (1) | Next 10 | **Previous** | **Next**

**talisman49**

| Followed By | 1 |
| Posts | 114 |
| Boards Moderated | 0 |
| Alias Born | 04/10/13 |

talisman49

Monday, 04/21/14
02:41:59 PM

**Re:** strategicinvest post# 5942

**Post #** 5943   of 9502
Go

the lack of PR is the reason why you know FSPM isn't bs.

if the company was trying to pump and dump its **shares** on investors, it would be coming out with daily/weekly non-substantial, bs PRs. FSPM doesn't do that. it only reports real news.

patience is the key here. i'm long. this company will be $10+

**Fusion Pharm, Inc. ( (FSPM)**
**0.0001 ▼ -0.0099 (-99.00%)**



Volume: 1,464

**Get more from your money. Open an account & invest @ E*TRADE**

| | Bid | Ask | Day's Range |
| --- | --- | --- | --- |
| | - | - | 0.0001 - 0.0002 |



Join iHub today - **FREE!**



Support: 888-992-3836 | NewsWire | Home | **Login / Register**

| **Boards** | **Hot!** | **Tools** | **Crypto** | **Streamer** | **Level 2** |
|---|---|---|---|---|---|

E✦TRADE Open an account   | Get Quote |

E✦TRADE Open an account   | Search iHub |

Get more from your money. Open an account & invest @ E✦TRADE

E✦TRADE Open an account.

$0 COMMISSIONS
E✦TRADE

Home > Boards > US OTC > Cannabis > Fusion Pharm, Inc. (FSPM)

**FUSION MANAGEMENT: Put out a pr already. Us**

**Public Reply** | Private Reply | **Keep** | **Last Read**        Post New Msg        Next 10 | **Previous** | **Next**

**sunnyrn**        Monday, 04/21/14
                   04:05:14 PM
**sunnyrn**
| | |
|---|---|
| Followed By | 0 |
| Posts | 79 |
| Boards Moderated | 0 |
| Alias Born | 03/18/14 |

**Re:** None
**Post #** 5945    of
9502  Go

FUSION MANAGEMENT: Put out a pr already. Us
shareholders have no idea what you are doing. New
shareholders wont discover your company.
So aggrevating!!!!!!!!!!!!!!!!!!!!

12/28/2019



Join iHub today - FREE!



Fusion Pharm, Inc. (FSPM): Which stock are you referring to? FSPM rarely

Support: 888-992-3836 | NewsWire | Home | **Login / Register**

| Boards | Hot! | Tools | Crypto | Streamer | Level 2 |
|---|---|---|---|---|---|

E✦TRADE Open an account | Get Quote | E✦TRADE Open an account | Search iHub

**Get more from your money. Open an account & invest @ E*TRADE**

$0 COMMISSIONS
E✦TRADE

$0 COMMISSIONS
E✦TRADE

Home > Boards > US OTC > Cannabis > Fusion Pharm, Inc. (FSPM)

**Which stock are you referring to? FSPM rarely**

**Public Reply** | Private Reply | Keep | Last Read     Post New Msg     Replies (1) | Next 10 | **Previous** | **Next**

**WinnerAlright**

| | |
|---|---|
| Followed By | 16 |
| Posts | 444 |
| Boards Moderated | 0 |
| Alias Born | 04/07/14 |

**WinnerAlright**     Tuesday, 04/22/14 08:59:17 PM

**Re:** Jarnism post# 6046

**Post #** 6048 of 9502  Go

Which stock are you referring to? FSPM rarely even puts out PR's for significant news, let alone "fluff" PR's.

FEATURED VIDEOS                    Powered by [primis]



**Yield Growth, CEO Penny Green**
CSE:BOSS OTC:BOSQF



Join iHub today - FREE!

**Click Here**

Support: 888-992-3836 | NewsWire | Home | **Login / Register**

| Boards | Hot! | Tools | Crypto | Streamer | Level 2 |

E*TRADE Open an account.

Get Quote

E*TRADE Open an account.

Search iHub

Seamlessly connect w/ the markets on the E*TRADE Mobile app

E*TRADE Open an account.

$0 COMMISSIONS
E*TRADE

Home > Boards > US OTC > Cannabis > Fusion Pharm, Inc. (FSPM)
FSPM as far as PRzz go are very

**Public Reply** | Private Reply | **Keep** | **Last Read**

Post New Msg        Next 10 | **Previous** | **Next**

FEATURED VIDEOS                    Powered by [primis]

Yield Growth, CEO Penny Green
CSE:BOSS OTC:BOSQF

**stockseekerok**
Followed By      762
Posts            88,596
Boards Moderated   2
Alias Born     03/13/04

**stockseekerok**          Tuesday, 04/22/14
                           09:38:36 PM
**Re:** WinnerAlright post#
6048
**Post #** 6050      of
9502  Go

FSPM as far as PRzz go are very lacking in Fluff,
Most do not really even detail enough to grasp what
the Company has done or is doing, I suspect some
Teaching on PR writing would serve FSPM very
well.

The PRz are very short and to the Point, I personally
would like to see more details about what the
company is doing and progress reports . I mean
Geez they didnt even PR the Tacoma Show of the
5th and 6th. I think that was a big missed
opportunity for would be investors near the Tacoma
area to go and check them out, But hell no one
really knew about it LoL

# Exhibit - BLH - 1

This is a letter sent to the second in command at the DOJ. It details Fred Lehrers Purgery and Todd D Tomasso's Purgery. Still No Investigation - Just the malicious prosecution and use of Testimony the government knew to be Purgered against me.

Please note at This time No one had Ever seen Fred Lehrers Purjured 302s that were Withheld Till October of 2020.

\* To Date Fred Lehrer has never been charged!
One has to wonder Why?

# XXXXXXXXXXXXXXXXXXXXXXXXX.

Attorneys Counselors Consultants

www.xxxxxx.com

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

April 24, 2017

Matthew Kirsch
United States Attorney
Department of Justice
1801 California Street
Suite 1600
Denver Colorado 80202

**Re: Kenneth Harmon**

Dear Mr. Kirsch

My name is xxxxxxxxxxxxxx. I am a securities attorney admitted to and in good standing with the xxxxxxxState Bar. I routinely handle matters before the Securities and Exchange Commission (the "SEC") and have had a long history of satisfactory dealings with the SEC and Federal Bureau of Investigation. I bring these matters to your attention and respectfully request that you investigate the handling of the case Fusion Pharm, Inc, ("FSPM") Guy M. Jean-Pierre ("Jean-Pierre'), Scott Dittman ("Dittman"), William Sears ("Sears"), Tod Ditommaso ("Ditommaso") and Frederick M. Lehrer ("Lehrer"), by Assistant United States Attorney, Kenneth Harmon.

I was a whistleblower to the SEC and Department of Justice in connection with a matter captioned Securities & Exchange Commission v Big Apple Consulting USA et al (Civil Action No. 09-cv-1963 (M.D. Fla.) (JA). In connection with that matter, among other things I was approached by Marc Jablon ("Jablon") and Mark Kaley ("Kaley") who controlled a stock promotion firm known as Big Apple Consulting to engage in criminal activity as lawyer for an issuer and its principal. Jablon, Kaley, and Big Apple Consulting are referred to herein as "Big Apple". I refused to engage in the crimes proposed. This advice included that opinions rendered by Jean-Pierre were baseless and unlawful. The client became a whistleblower to the SEC and provided the SEC and FBI with information about Big Apple. In the course of my review of the Big Apple matter, I found hundreds of penny stock companies/tickers manipulated by Big Apple. In connection therewith, Jean-Pierre and other complicit attorneys provided baseless opinions as to the legality of the transactions.

It also is clear that because of the mishandling of the Big Apple and FSPM investigations by Kenneth Harmon, I will never have retribution.

After the baseless civil suit and Florida Bar complaint filed against me by Big Apple were dismissed, I was asked to be a government witness during the penalty phase of the case against Big Apple to discuss the retaliation I endured. During the Big Apple matter, I was represented by another lawyer and Lehrer who assisted me in reporting issuers, attorneys including Jean-Pierre and other Big Apple associates to regulators. I have not had meaningful communications with Lehrer for almost five years because of among other things, his long history of erratic and unethical behavior and abuse of prescription drug medication.

My referrals resulted in the discovery and reporting of Jean-Pierre's forgery of more than 100 baseless legal opinions. It also resulted in an SEC judgment against him in the Southern District of New York (Civil Action No. 12-CV-8886). The referrals also led to enforcement actions by FINRA against two brokerage firms who accepted the forged opinions, one of which was expelled from the industry, SEC actions against issuers and other attorneys.

that matter. These are "Tradability Opinions" to remove legends from shares so that they can be sold to investors and the "Disclosure Opinions" which relate to the adequacy of the information a public company provides to investors. Disclosure Opinions are posted on the OTC Markets and viewable by the public at large to inform investors that a company's disclosures comply with federal securities laws.

In defense of the bar grievance against Jean-Pierre, he provided a statement from Dittman, the president of FSPM (Available upon request). Complainant and Lehrer's referral of Jean-Pierre to the Florida Bar resulted in his disbarment as well as other investigations. (Supporting Documents Available upon request).

From November 2010 until June 2013, Jean-Pierre was a corporate officer and legal counsel for FSPM and Dittman is its Chief Executive Officer and sole director. Sears is Dittman's brother-in-law, and a consultant for and shareholder of FSPM.

During his representation of Complainant, Lehrer as Complainant's attorney, assisted her in reviewing the opinions and disclosures of Jean-Pierre's clients that were listed on the OTC Markets website at www.otcmarkets.com. This was done to evaluate the Disclosure Opinions rendered by Jean-Pierre.

In late 2012, Complainant and Lehrer had a falling out and have not had meaningful communication since such time. During and after his representation of Complainant, Lehrer, repeatedly disclosed confidential attorney-client privileged information about Complainant, including the bar grievance against her which was dismissed with a finding of no probable cause.

Shortly after his falling out with Complainant, Lehrer became counsel to Dittman, Sears and FSPM. Lehrer was engaged to draft FSPM's Tradability Opinions and Disclosure Opinions. At no time did Lehrer obtain a conflict waiver from Complainant as to his representation of FSPM, Sears or Dittman despite that he provided legal advice to Complainant concerning FSPM and Jean-Pierre's other clients.

From the inception of his representation of Sears, Dittman and FSPM, Lehrer was dishonest. For example, on August 28, 2013, Lehrer sent an email to Sears, with a link to the SEC enforcement action against Jean-Pierre, asking if Jean-Pierre was still involved with FSPM. At no time did Lehrer discuss his role as Complainant's attorney or advise Sears that he had assisted Complainant in reporting Jean-Pierre to the Florida Bar, SEC or FBI in connection with his baseless legal opinions and forgeries. Further, Lehrer did not obtain a conflict waiver from Sears. Lehrer rendered at least 19 Tradability Opinions for FSPM's shares and rendered a Disclosure Opinion (Available upon request).

In May of 2014, the SEC suspended trading of FSPM's shares. Dittman, Sears and Jean-Pierre were indicted. Sears and Dittman's indictments stem from the public disclosures and stock sales opined upon by Lehrer.

Lehrer was asked to testify at the SEC about FSPM. In connection with his proposed testimony, Lehrer requested that Sears waive the attorney client privilege and they agreed believing that Lehrer would testify truthfully about the advice he had provided to them. At no time did Lehrer disclose to Sears and Dittman that he had represented Complainant in the referral of Jean-Pierre to the Florida Bar, SEC and FBI. Further, Lehrer did not disclose to Sears and Dittman that the Assistant U.S. Attorney in their case was his former supervisor for 4 years and personal friend, Kenneth Harmon.

Lehrer failed to provide Sears with information necessary for him to have provided "informed consent" as to the waiver of the attorney-client privilege. Further, Lehrer failed to obtain a waiver of his conflict of interest from Complainant, FSPM and Sears.

Lehrer also failed to obtain a waiver of the attorney client privilege from Complainant despite that Jean-Pierre (FSPM's corporate officer). Dittman and FSPM had been an adversarial party to her in a matter

2

where Lehrer represented her.

**The Tradability Opinions**

The SEC pleadings discuss the significance of the Tradability Opinions of FSPM:

> "First, utilizing backdated convertible notes and preferred FSPM stock, FSPM issued common stock to three entities controlled by Scars. Second, Scars, through these entities, illegally sold the FSPM stock into the market. Third, Scars transferred some of the proceeds from the illegal stock sales back to FSPM, where the money was fraudulently recognized and reported as revenue. Fourth, FSPM issued press releases and financial reports claiming the false revenues, and failed to disclose Scars' identity, role, and background in FSPM's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website." in FSPM's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website... ***In order to ensure that his entities could sell their FSPM shares without a restrictive legend, Scars needed attorney opinion letters opining that Microcap, Bayside and Meadpoint were not affiliates of FSPM, and consequently opining that the transactions were exempt from the registration requirements of Section 5 of the Securities Act [15 U.S.C. § 77(e)] ."***

Between approximately August 2013 and April 2014, Lehrer provided at least 19 attorney opinion letters as to the tradability of FSPM shares (Opinions available upon request). Lehrer's opinions covered almost all of the shares sold in the FSPM scheme. Without Lehrer's opinions, investors would not have been able to purchase FSPM shares and would not have been harmed. According to pleadings filed by the SEC, FSPM caused approximately $12 million of investor losses from approximately 5,575,000 shares unlawfully sold using baseless legal opinions. The chart below demonstrates the significance of Lehrer's opinions:

| Date | Name | No. of Shares |
|------|------|---------------|
| 8/28/2013 | Myron Thaden | 500,000 |
| 8/28/2013 | Sharryn Thaden | 500,000 |
| 8/28/2013 | Richard Scholz | 500,000 |
| 9/10/2013 | Black Arch Opportunity Fund LP | 28,562 |
| 9/10/2013 | Starcity Capital LLC | 313,703 |
| 9/12/2013 | Starcity Capital LLC | 313,703 |
| 9/12/2013 | Black Arch Opportunity Fund LP | 28,562 |
| 1/6/2014 0 | Meadpoint Venture Partners | 800,000 |
| 1/16/2014 | Alexandra Mauriello | 61,437 |
| 1/16/2014 | Vera Group, LLC | 29,625 |
| 1/16/2014 | SGI Group LLC | 29,625 |
| 1/23/2014 | Vera Group, LLC | 29,625 |
| 1/23/2014 | SGI Group LLC | 29,625 |
| 1/23/2014 | Alexandra Mauriello | 61,437 |
| 2/14/2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 |
| 3/4/2014 0 | Craig Dudley | 20,000 |
| 3/6/2014 0 | Meadpoint Venture Partners from $88,000 Note | 370,000 |
| 3/26/2014 | Meadpoint Venture Partners from $88,000 Note | 600,000 |
| 4/16/2014 | Meadpoint Venture Partners from $88,000 Note | 900,000 |
| | **Total Shares Opined Upon By Lehrer** | 5,715,904 |

**Lehrer's Testimony**

Lehrer's representation of Complainant spanned years and involved thousands of pages of materials. In his sworn SEC testimony, Lehrer lied about how he learned that Jean-Pierre had been banned from issuing opinion letters and stated it was "through a computer search, not necessarily in reference to him in particular, you know, but banned opinion writers." (Exhibit A at 96:8-98:24.) In stark contrast to that statement, Lehrer described, in an August 7, 2011 declaration signed under penalty of perjury, Guy Jean-Pierre's forgeries. (Exhibit B.) In his October 16, 2011 declaration, Lehrer states that he "assisted substantially with drafting the [bar] grievances filed against Jean-Pierre ..." (Exhibit C at ¶11.) In email communication on August 28, 2013, a mere 4 minutes after Sears first introduces him to FSPM/FSPM, Lehrer refers to an SEC.gov link and asks Sears whether Jean-Pierre is still the Secretary. (Exhibit D.) The SEC link was to the Jean-Pierre case which Lehrer assisted the Complainant in investigating and reporting to the FBI, SEC and Florida Bar. Even then Lehrer did not come clean and advise Sears of his conflict of interest and he did not obtain a conflict waiver from Complainant, FSPM or Sears.

Lehrer's representation of FSPM, Sears and Dittman interfered with the whistleblower referrals to regulators that Complainant made with Lehrer's assistance. Complainant lost all credibility in those proceedings because of Lehrer's double dealings.

In his SEC testimony, Lehrer admitted that he knew that Sears controlled Meadpoint during the time Lehrer was issuing tradability opinions. (Exhibit E at 316: 8-16). Lehrer lied in his testimony and stated that he did not know that Sears had transferred control of Meadpoint to his mother, Sandra Sears, until April 2014 (Exhibit F at 282:15 - 284:9; Exhibit G at 316:19 - 317:20), that claim is belied by, among other things, an October 22, 2013 email in which Sears told Lehrer "FYI no conflict with Meadpoint *as a family member out of state owns the company.*" (Exhibit H) (emphasis added). Sears also stated in that email that the ownership change would be reflected on the Nevada Secretary of State's website. Consistent with that statement, the Nevada Secretary of State's website identifies Sandra Sears as Meadpoint's only officer. (Exhibit I).

Lehrer stated in his SEC testimony that he learned from a newspaper article after DOJ's raid of FSPM's office that Sears had a prior criminal conviction for securities fraud. (Exhibit K at 236: 15-23.) Lehrer's other testimony on that subject, however, made clear that he knew about Sears' conviction long before that. (Exhibit L at 71:23-74:21; Exhibit M at 231:19-236:14). An October 10, 2013 email exchange, in fact, shows Lehrer and Sears discussing that very issue. (Exhibit N.)

Lehrer even instructed Sears to sign his name on legal opinions used to create the shares that the SEC says were unlawfully sold. (See Exhibit O)

> "OK My scanner is not working If the latest draft covers it, can you sign my name similar to how I signed the other opinion letters?"

FSPM did not disclose in its OTC Markets Annual Report that Sears and/or his mother controlled Meadpoint and that Sears had a criminal conviction. Despite that Lehrer had knowledge that Sears and or his mother controlled Meadpoint and Sears had a criminal conviction, Lehrer rendered a Disclosure Opinion (Exhibit J) that states that FSPM's disclosure:

> (i) constitutes "adequate current public information" (the "Information") concerning the Securities and the Issuer and "is available" within the meaning of Rule 144(c)(2) under the Securities Act, (ii) includes all of the information that a broker-dealer would be required to obtain from the Issuer to publish a quotation for the Securities under Rule 15c2-11 under the Securities Exchange Act of 1934, as amended, (iii) complies as to form with the OTC Markets Group's OTC Pink Disclosure

4

Guidelines, which are located on the Internet at www.otcmarkets.com, and (iv) has been posted through the OTC Disclosure and News Service.

To fully explain Lehrer's conflict, a timeline of the overlapping referrals of Complainant and the indictment and SEC charges against Sears, Dittman and FSPM is below:

- On March 29, 2013, the SEC received penalties against Marc Jablon in the case in which Lehrer represented Complainant. Jean Pierre was general counsel to Jablon and provided baseless legal opinions many of which were forged.
- In August 2013, begins representing Sears, Dittman and FSPM where Jean-Pierre was a corporate officer and general counsel.
- In approximately September of 2013, the SEC and FBI in Denver begin investigating FSPM.
- On January 13, 2014, Jean-Pierre is disbarred by the Florida Supreme Court based upon Complaint's referral – Lehrer was Complainant's attorney.
- In May of 2014, the Denver SEC suspended trading of FSPM.
- On January 29, 2015, Lehrer provided testimony in the Denver SEC case.
- On March 9, 2015, the New York SEC obtained a civil judgment and life time penny stock bar against Jean-Pierre in connection with his forged opinions that Lehrer assisted Complainant in reporting.
- On May 29, 2015, Lehrer provided testimony a second time in the Denver SEC case.
- On August 16, 2016, FINRA filed a case against Delaney Capital, the broker-dealer who accepted Jean-Pierre's forged opinions based upon Complainant's referral that Lehrer had assisted Complainant in investigating and reporting.
- In September of 2016, Sears and Dittman were indicted for securities fraud by the U.S. Attorney's Office in Denver.
- On December 15, 2016, FINRA entered into a settlement with Gary Hume and ACAP financial who accepted the forged opinions of Jean-Pierre that Lehrer had assisted Complainant in investigating and reporting.

Lehrer should be sanctioned for his myriad of conflicts and dishonest behavior particularly the lies in his SEC testimony. His testimony "evade[d] the proper functioning of the legal system[,which] has been found to constitute clearly dishonest conduct that adversely reflects on a lawyer's fitness to practice law" Fla. Bar v. Cohen, 908 So.2d 405, 411 (Fla.2005). His flagrant abuse of the law demonstrates a serious character flaw and merits a severe sanction such as disbarment. The harm to the public is demonstrated by the harm he caused Plaintiff's ongoing whistleblower referrals, the approximately $10 million of investor losses caused by Lehrer's baseless FSPM tradability opinions and the indictment of Sears and Dittman who relied upon Lehrer's advice.

I respectfully request that you take appropriate action against Lehrer.

Thank You,

. For the Firm

# Tod A Ditommaso Background

DiTommaso was licensed to practice law in California on December 14, 1987
http://members.calbar.ca.gov/fal/Member/Detail/130564

DiTommaso had his license suspended on April 13, 1997 for 2 years stayed, placed on probation with an actual nine-month suspension for multiple DUI arrests. Didn't meet the criteria to get reinstated until June 27, 2000
http://archive.calbar.ca.gov/calbar/2cbj/97tul/art04.htm

While the SEC Civil case against Guy M. Jean-Pierre for forged opinion letters was going on, the SEC and FBI in Denver began investigating Fusion Pharm Inc (FSPM) at least as early as August of 2013.

On May 16, 2014, the SEC suspended trading in FSPM.
https://www.sec.gov/litigation/suspensions/2014/34-72177.pdf

On September 16, 2016, the SEC filed an Administrative Proceeding against the main FSPM insiders.
https://www.sec.gov/litigation/admin/2016/33-10210.pdf

In that document we get an explanation about what the government claims was going on. According to the government, William Sears was an undisclosed control person of FSPM with Scott Dittman allegedly acting as a puppet CEO.

On September 16, 2016, the SEC also brought an Administrative Proceeding against one of the FSPM attorneys, Tod A Ditommaso.
https://www.sec.gov/litigation/admin/2016/33-10215.pdf

According to the SEC document, Tod A Ditommaso assisted in the share selling scheme and provided at least 10 legal opinion letters between July 2012 and August 2013. The SEC further alleges that the letters provided by Tod A DiTommaso were drafted by Guy M Jean-Pierre then emailed from Jean-Pierre to DiTommaso who put the letters on his letterhead, signed them, and sent them back to Jean-Pierre to be put into use. Jean-Pierre paid DiTommaso approximately $175 per legal opinion. According to the SEC, Tod A DiTommaso's sole contact for FSPM was Guy M Jean-Pierre.

On March 21, 2017, the SEC's motion for Summary Disposition was granted. https://www.sec.gov/all/allorders/2017/ap-4698.pdf

In that document we are told DiTommaso was introduced to Guy Jean-Pierre in 2012 and was unaware of any penny stock ban against Jean-Pierre until the SEC contacted DiTommaso as part of their investigation into FSPM in 2014. The following chart shows that information to most likely be false as DiTommaso had previously taken over as legal counsel for 3 other Jean-Pierre Issuers (AGCZ, NWGC, and EHSI) in 2010 immediately after Jean-Pierre was added to the prohibited attorney list, a full 2 years before DiTommaso got involved in FSPM. The chart shows that the first 5 public Issuers to hire DiTommaso (AGCZ, NWGC, EHSI, FSPM, and IJJP) had all previously hired Guy Jean-Pierre for legal services. At least 4 of the 8 Issuers that hired DiTommaso had links to Roy Meadows (AGCZ, NWGC, IJJP, and RSCF) 2 of the 8 Issuers that hired DiTommaso had links to William Sears (FSPM and PIHN)

| Issuer | Free Trading Stock | Litigation – DiTomasso Scam Alert | Opinions |
|---|---|---|---|
| Polaris International Holdings (PIHN) | William Sears; James Douglas Pulver; Takeshi Someya; Tomohiro Wakabayashi | The SEC and DOJ charged William Sears for FSPM; Sears had previously pleaded guilty to federal charges involving securities fraud and bribery in 2007 following a 2004 Indictment; Diane Dalmy was charged by the SEC in 2013 then charged again in 2015, she was suspended from practicing in 2016; Jackson L Morris was charged by the SEC in 2001 | DiTomasso wrote Attorney Letters |
| Andes Gold Corp (AGCZ) | Roy Meadows; Donna Rayburn; Jean-François Amyot; Dan Ryan; Dennis Ruggeri; Tillerman Securities; Karisa Augustus | SEC Litigation against Amyot; SEC litigation against Ryan; In April 2016 an independent consultant declared AGCZ a fraud from 2011 - 2015 (lying about its business operations); OTC ban SEC, DOJ Guy Jean-Pierre | DiTommaso wrote Attorney letters from May of 2010 – 2015 |
| Sub of NWGC Below | | Public Filings and Marketing Materials reflect the same address and telephone for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud | Jean-Pierre wrote opinions for sub NWGC |
| New World Gold Corporation (NWGC) | Roy Meadows; Donna Rayburn; Dennis Ruggeri; Keithley Lake; Karisa Augustus | In April 2016 an independent consultant declared NWGC a fraud from 2011 - 2015 (lying about its business operations); OTC ban SEC and DOJ Jean-Pierre | Guy Jean-Pierre (from 2008 - 2010) . |
| | | Public Filings and Marketing Materials reflect the same address for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud. Also a former address used by Frederick M. Lehrer | DiTommaso wrote Attorney Letters from May of 2010 |
| Zoloto Resources Ltd (ZRSCF) | Karisa Augustus (T&S Inestments Limited); NWGC | ZRSCF was well linked to AGCZ and NWGC and had common participants | DiTommaso wrote opinion letters- Jean Pierre Clients |
| | | AGCZ JOINT VENTURE PINK – NO INFORMATION STOP SIGN ZRSCF DID IR ACTIVITY/PUMP AROUND NWGC - Company address, phone and management appear to be fabricated. | |
| | | Public Filings and Marketing Materials reflect the same address for ZRSCG, NWGC and AGCZ. DiTomasso rendered opinions throughout the fraud | Note SEC Revoked Ticker used same address SFAZ |

| | | DiTommaso rendered opinions | |
|---|---|---|---|
| EQ Labs, Inc (EQLB) | The outstanding share count grew a ton between 2015 - 2017, but EQLB never discloses who received the shares or held the debt | | In 2015 DiTommaso showed up authoring the Attorney letters for the ticker. He did the most recent letter in June 2016 |
| Emerging Healthcare Solutions Inc (EHSI) | Joe Schmoe (obviously a fake name); Jack Uselton; Darrel Uselton; Jonathan Gilchrist; Maurice Stone; John Austin; Andrew Farmer | SEC Suspension on June 7, 2011; Jack and Darrel Uselton were named in SEC litigation in 2001 then again in 2009 – they criminally indicted in 2007; Eddie Austin was named in an SEC Complaint in 2012; Jonathan Gilchrist was charged by the SEC in 2013; Andrew Farmer was named in an SEC Complaint in 2013; Samuel E Whitley was named in an SEC Complaint in 2014; OTC ban, SEC & DOJ Guy M. Jean Pierre | DiTommaso wrote Attorney Letter in May of 2010- Guy Jean-Pierre (from 2009 - 2010); |
| Fusion Pharm Inc | William Sears, Scott Dittman | SEC Trading Suspension, SEC Action and DOJ against Sears, Dittman and Jean-Pierre | Guy Jean-Pierre 2009 opinion- Corporate officer<br><br>DiTommaso Attorney Letters, July 2011 - August 2014<br><br>Frederick Lehrer wrote 1 OTC Market Opinion and 19 tradability legal opinions. |
| Artfest International | Big Apple Consulting, Roy Meadows, Marc Jablon, Edward Bronson Joseph Blumenthal | SEC Trading Suspension Dilution Scam | Jean Pierre then DiTommaso rendered tradability opinions |
| IJJP | Big Apple Consulting, Roy Meadows, Marc Jablon, Edward Bronson Joseph Blumenthal | Dilution Scam/ Stop Sign | Jean Pierre then DiTommaso rendered opinions |

# Exhibit - JT-1

This is Proof the SEC Knew of Fred Lehrers Purjured Testimony. Instead of Investigating They use iT Just Like the DOJ did against me.

Justice was Never an option fore me. Only a conviction

From: Jeffrey Thomas <jthomas@thomaslawllc.com>
Subject: RE: follow up
Date: January 26, 2017 at 12:10:08 PM EST
To: 'Scott Dittman' <sdittman69@icloud.com>

Scott,

Kim called to let me know that they received a call from Brenda Hamilton, who detailed some of her knowledge about Fred Lehrer. I pressed Kim as to what this meant in terms of their case, and she made it clear that it didn't mean anything. Because their case is technically still open, she just believed that she had an obligation to inform me of the call.

Thanks.

Jeffrey R. Thomas
Thomas Law LLC
50 S. Steele Street, Suite 250
Denver, Colorado 80209

*Kim Greer   SEC*

# Exhibit CD1

This is Taken From Craig Dudley's 302 Interview. Mr Dudley is a CPA (a realone) That WAS Mr Dittmans CFO at that Time. Mr Dudley has worked for many Publicly Traded fortune 500 Companies prior to FusionPharm.

This is proof Fred Lehrer advised that My daily actions did Not rise to a disclosure Level.

Fred Lehrer lies about this very conservation in his Testimony.

## QUOTE TAKEN FROM CRAIG DUDLEYS 302.

Sears is engaged with and works very closely with
FusionPharm because Meadpoint is the sales arm. Meadpoint was
out "humping for sales" at trade shows and such. Sears has been
an advisor and helped Dittman along the way. With regards to the
relationship between Sears and FusionPharm, Dudley advised that
is was a "muddy situation." It is close but not
over the line. Dudley brought up the disclosure of this relationship
with their securities counsel, Fred Last Name Unknown (LNU).
Dudley raised this when he was finishing the 2013 financials.
While it is a muddy situation, the decision
was made that it did not rise to the level of disclosure.

# Exhibit FL-302s

These are material and exculpatory! These were withheld for 5 years & 7 months after they occured.

There are far too many False Statements & perjuries to list in this Filing. The Fact that they were hidden & withheld for all this time speaks volumes.

If required to do so email traffic can be produced to support this claim!

# Exhibit - KFDRS

In this instance in June of 2015, my wife was employed by Frontier Airlines. She was with Frontier for some 16 years at that time. As a Flight Attendent she structured her schedule for that month whereas she would be off the first three weeks or 23 days to be exact. On or about June 20th (My Wifes First Day Back To Work), She was seated in take off position as the plane was on the runway & cleared for take off.

Then comes a call across the planes communication system Homeland Security called the Plane back to the gate. So take off is aborted and they taxi back to the gate. Once secured at the gate homeland Security informes the Captain that Sandra Sears is to be escorted off the plane. So as my wife & the Captain leave the Plane midway down the Jet Way is Kate Funk. She did this to serve a subpeona. She immediately starts peppering Sandy with questions. Ultimately the Captain Interviens and takes my wife back on board. He called Agent Funks conduct "Disgraceful."

Agent Funk got that subpeona 20 days prior. My Wife was home all that time. She could have easily Served her there. This was to cause, stress, duress, fear and emotional & physical Exhaustion. She would have had to research Employment Supervisors & access Schedules Then To purposely wait till the plane was on the runway only to pull it back. How is this NOT Abuse.

My Wife never recovered from that. She left Frontier that October. She said she could not cope with the thought of that happening again PTSD she still has To this day.

Witness's can be called to verify this abusive Event.